**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                         )

| | |
|---|---|
| In the Matter of the | ) |
| Federal Bureau of Prisons' Execution | ) |
| Protocol Cases, | ) |
| | ) |
| LEAD CASE: _Roane et al. v. Barr_ | )    Case No.  19-mc-0145 (TSC) |
| | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| _Lee v. Barr_, 19-cv-2559 | ) |
| | ) |

_____ )

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION BARRING THE IMPLEMENTATION
OF THE NEWLY ANNOUNCED FEDERAL LETHAL INJECTION PROTOCOL**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS ......................................................................................................4

    I.      Lee's Conviction and Sentencing, and Post-Conviction Motions .........................4

    II.     Exhaustion of Administrative Remedies ...............................................................5

    III.    The FDPA and 28 C.F.R. § 26.3.........................................................................5

    IV.   The BOP Protocols Prior to the 2019 Protocol.....................................................6

    V.     2011 Announcements Relating to 2008 Protocol and Subsequent Status
          Reports ..............................................................................................................7

    VI.   The Administrative Record .................................................................................7

    VII.  Announcement of Lee's Execution Date and 2019 Addendum ............................9

    VIII. Details of 2019 Protocol and Concerns That Are Implicated..............................10

    IX.   Alternatives Regarding the Eighth Amendment Issues ......................................13

    X.     Procedural Background in the Lee Action and Related Cases .............................14

ARGUMENT ......................................................................................................................15

    I.      Relevant Factors on a Motion for Preliminary Injunction ..................................15

    II.     All of the Factors Weigh Heavily in Favor of a Preliminary Injunction .............15

          A.     Lee Has a Strong Likelihood of Success on the Merits...........................15

          B.     Lee Will Suffer Irreparable Injury If the Implementation of the
                2019 Protocol Is Not Enjoined ...............................................................26

          C.     The Defendants Will Not Suffer "Substantial Harm" If the Court
                Were to Enjoin the Implementation of the 2019 Protocol.......................28

          D.     The Public Interest Would Be Served by An Order Enjoining the
                Implementation of the 2019 Protocol ......................................................29

    III.    The Court Should Enjoin the Implementation of the 2019 Protocol Until
          Lee's Claims Are Decided or, in the Alternative, Until Lee Completes
          Discovery..........................................................................................................30

CONCLUSION ...................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Academy of Pediatrics v. Food & Drug Admin.*,
   379 F. Supp. 3d 461 (D. Md. 2019) ...................................................................................19

*Am. Bus Ass'n v. Slater*,
   231 F.3d 1 (D.C. Cir. 2000) ..............................................................................................18

*Am. Hosp. Ass'n v. Azar*,
   Civil Action No. 18-2841 (RMC), 2019 WL 4451984 (D.D.C. Sept. 17, 2019) ...................16

*\*Baze v. Rees*,
   553 U.S. 35 (2008) ............................................................................................................25

*\*Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*,
   153 F.3d 155 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) ..................................................16

*\*Brown v. Beck*,
   No. 5:06CT3018 H, 2006 WL 3914717 (E.D. N.C. Apr. 7, 2006).........................................28

*Camp v. Pitts*,
   411 U.S. 138 (1973) ............................................................................................................8

*\*Catholic Health Initiatives v. Sebelius*,
   617 F.3d 490 (D.C. Cir. 2014) .........................................................................................16

*Clifford v. Pena*,
   77 F.3d 1414 (D.C. Cir. 1996) ............................................................................................8

*\*Clinton v. City of N.Y.*,
   524 U.S. 417 (1998) ..........................................................................................................17

*Cooey v. Strickland*,
   No. 2:4-CV-1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011).........................................26

*\*Cooey v. Taft*,
   430 F. Supp. 2d 702 (S.D. Ohio 2006)..........................................................................28, 30

*\*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018) ...................................................................................27

*Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.*,
   102 F. Supp. 3d 334 (D.D.C. 2015) ...................................................................................15

*Elrod v. Burns,*
　　427 U.S. 347 (1976) ........................................................................................27

*Ernst & Ernst v. Hochfelder,*
　　425 U.S. 185 (1976) ........................................................................................17

*Farmer v. Brennan,*
　　511 U.S. 825 (1994) ........................................................................................25

*FBME Bank Ltd. v. Lew,*
　　125 F. Supp. 3d 109 (D.D.C. 2015) ...............................................................27

*Furman v. Georgia,*
　　408 U.S. 238 (1972) ........................................................................................25

*Glossip v. Gross,*
　　135 S. Ct. 2726 (2015) ..............................................................................25, 26

*Gregg v. Georgia,*
　　428 U.S. 153 (1976) ........................................................................................25

*Harbison v. Bell,*
　　556 U.S. 180 (2009) ........................................................................................26

*Harris v. Johnson,*
　　323 F. Supp. 2d 797 (S.D. Tex. 2004)..............................................28, 29, 30

*Kisor v. Wilkie,*
　　139 S. Ct. 2400 (2019) ....................................................................................20

*Lewis v. Casey,*
　　518 U.S. 343 (1996) ........................................................................................26

*Lyng v. Payne,*
　　476 U.S. 926 (1986) ........................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
　　463 U.S. 29 (1983) ..........................................................................................20

*N.C. Growers' Ass'n Inc. v. UFW,*
　　702 F.3d 755 (4th Cir. 2012) ..........................................................................19

*N.J. Dep't of Envtl. Prot. v. EPA,*
　　626 F.2d 1038 (D.C. Cir. 1980) ......................................................................18

*Nat'l Mining Ass'n v. Jackson,*
　　768 F. Supp. 2d 34 (D.D.C. 2011) ..................................................................19

iv

*Nooner v. Norris*,
No. 5:06CV00110 SWW, 2006 WL 8445125 (E.D. Ark. June 26, 2006) ...................... 28, 30

*In re Ohio Execution Protocol Litig.*,
No. 2:11-CV-1016, 2018 WL 6529145 (S.D. Ohio Dec. 12, 2018) ..................................... 26

*Portland Cement Ass'n v. EPA*,
665 F.3d 177 (D.C. Cir. 2011) ............................................................................................... 20

*Schad v. Brewer*,
No. CV–13–2001–PHX–ROS, 2013 WL 5551668 (D. Ariz. Oct. 7, 2013) ......................... 27

*Sea Containers Ltd. v. Stena AB*,
890 F.2d 1205 (D.C. Cir. 1989) ............................................................................................ 15

*Stellar IT Solutions, Inc. v. U.S.C.I.S.*,
Civ. A. No. 18-2015 (RC), 2018 WL 6047413 (D.D.C. Nov. 19, 2018) .............................. 27

*U.S. v. Wade*,
388 U.S. 218 (1967) .............................................................................................................. 26

*Wagner v. Taylor*,
836 F.2d 566 (D.C. Cir. 1987) .............................................................................................. 15

*Weyerhaeuser Co. v. Costle*,
590 F.2d 1011 (D.C. Cir. 1978) ............................................................................................ 18

*Wolff v. McDonnell*,
418 U.S. 539 (1974) .............................................................................................................. 26

**Statutes and Regulations**

28 C.F.R. § 26.2(a) ................................................................................................................. 10

28 C.F.R. § 26.3 ............................................................................................................... *passim*

5 U.S.C. § 551(4) ................................................................................................................... 18

5 U.S.C. § 551(5) ................................................................................................................... 18

5 U.S.C. § 553(b) & (c) ......................................................................................................... 18

5 U.S.C. § 706(2) ............................................................................................................ *passim*

18 U.S.C. § 3591 ...................................................................................................................... 5

18 U.S.C. § 3594 ...................................................................................................................... 5

18 U.S.C. § 3596 ............................................................................................................. *passim*

28 U.S.C. § 2241 ........................................................................................................................4

28 U.S.C. § 2255 ........................................................................................................................4

**Rules**

Fed. R. Civ. P. 30(b)(6) ..........................................................................................................14

Fed. R. Civ. P. 60(b) ................................................................................................................4

Fed. R. Civ. P. 65(a) .................................................................................................................1

Local Civil Rule 7(n) ..............................................................................................................7

**Other Authorities**

Steven Sark & Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Actions,* 36 ADMIN. L. REV. 333 (1984) ..........................8

Plaintiff Daniel Lewis Lee ("Lee") respectfully submits these points and authorities, along with the Declaration of Pieter Van Tol, dated September 27, 2019 (the "Van Tol Decl."), in support of Lee's motion for an order, pursuant to Fed. R. Civ. P. 65(a), preliminarily enjoining the Defendants from implementing the new federal lethal injection protocol announced in July 2019 (the "2019 Protocol") pending the determination of Lee's claims in this action or, at a minimum, until after Lee has completed discovery relating to the 2019 Protocol (which is necessary so Lee can gather additional evidence to prove his well-pled claims at trial).[1]

## PRELIMINARY STATEMENT

Eight years after announcing they were considering protocol revisions and sixteen years after the last federal execution, the Department of Justice (the "DOJ") and the Federal Bureau of Prisons (the "BOP") now seek to execute Lee under the 2019 Protocol, which violates both the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et seq.*, and the U.S. Constitution.  Lee's execution date of December 9, 2019 is the earliest of the five the DOJ has scheduled.

The Court should enjoin the Defendants from implementing the 2019 Protocol because all of the relevant factors weigh heavily in favor of a preliminary injunction.  *First*, there is a strong likelihood that Lee will succeed on the merits of his claims that the 2019 Protocol violates several sections of the APA.  Lee was sentenced to death under the Federal Death Penalty Act ("FDPA") and, in promulgating the 2019 Protocol, the DOJ and BOP disregarded the express mandates in the FDPA, which does not authorize the BOP to carry out any steps related to executions, including creating an execution procedure, setting dates, or performing the execution.  Because the DOJ and BOP exceeded their constitutional and statutory authority, the APA dictates that the Court set aside the 2019 Protocol.  The 2019 Protocol is also deficient

---

[1] The 2019 Protocol consists of the two documents that are described below.  *See infra*, 9.

under the APA because the DOJ and BOP wholly ignored the notice-and-comment requirements that are integral to the rule-making process.   Rather than adhering to the APA's mandatory provisions for notice and information regarding proposed agency rules and the opportunity for public comment, the DOJ and BOP kept the development of the 2019 Protocol entirely secret. Indeed, they did not make any information about the protocol public until the release of a two-page addendum on July 25, 2019 announcing the intended use of a single-drug procedure, the same day they set Lee's and four other federal execution dates.   The DOJ and BOP did not even publicly release the main protocol.   While Lee (and the similarly situated plaintiffs) recently obtained the main protocol and other information from the Defendants, this limited — and inadequate — evidence demonstrates that the DOJ and BOP further violated the APA by finalizing the 2019 Protocol in an arbitrary and capricious manner.

In addition, the 2019 Protocol suffers from several constitutional infirmities on its face, and it is likely that Lee will uncover additional evidence on these claims (and/or other issues) through discovery.   For example, the Due Process Clause of the Fifth Amendment required the DOJ and BOP to provide Lee with notice and the opportunity to be heard before determining that they intend to execute him pursuant to the 2019 Protocol.   There was no such notice or opportunity prior to the DOJ's press release in July 2019 announcing the 2019 Protocol.   Lee, therefore, did not have the opportunity to raise questions, concerns or issues about the 2019 Protocol or otherwise participate, through counsel, in the development of the new protocol as part of the rule-making process.   As a result, Lee was (and still is) prevented from specifying all of the ways that the new procedures violate the Eighth Amendment and from consulting with medical and other experts concerning those violations.   However, even with the sparse information that Lee has, it is evident that the 2019 Protocol violates the Eighth Amendment

2

because it lacks any (or adequate) safeguards and spelled-out procedures relating to the source, form and quality of the pentobarbital or the IV administration of the lethal substance.  Without those protections, there is a substantial risk that executions under the 2019 Protocol will result in the unnecessary infliction of pain.  Finally, the 2019 Protocol violates the First, Fifth and Sixth Amendments because it does not provide for access to counsel during executions, which is critical because the lack of such access impedes the ability to discover constitutional violations and address them.

*Second*, the balancing of the relative harm to the parties strongly favors the issuance of an injunction.  Where, as in this case, a plaintiff has made an initial showing that the execution has a substantial risk of resulting in the infliction of unnecessary pain, the courts have held that there is irreparable injury.  Other courts have found irreparable injury in cases under the APA because, in the absence of an injunction, the plaintiff would suffer imminent harm (such as the cessation of business or loss of immigration status) that could not be remediated.  The same is true here. There would be no recourse if Lee were to endure unnecessary pain in an execution.  By contrast, a delay in Lee's execution date caused by an injunction prohibiting the implementation of the 2019 Protocol would not constitute "substantial harm" to the Defendants, which is one of the factors that the Court considers under this Circuit's standard for preliminary injunctions.

*Third*, it would be in the public interest for the Court to enjoin the implementation of the 2019 Protocol.  The public has an interest in ensuring that the APA requirements are followed and an interest in the constitutional exercise of federal laws.  On the other hand, any public interest in executions would not be jeopardized by an injunction and the attendant delay in Lee's execution date.  Lee was sentenced more than 17 years ago, the Government has not executed a federal prisoner since 2003, and the Government itself suspended executions in 2011.  Any delay

caused by an injunction would pale in comparison, and it would provide Lee with an opportunity to take discovery and litigate his claims (just as the plaintiffs without execution dates are doing).

Under the circumstances, the Court has ample reason to enjoin the implementation of the 2019 Protocol while Lee's claims are being adjudicated.  At a minimum, the Court should bar the Defendants from seeking to implement the 2019 Protocol until Lee has had an opportunity, through discovery in this action, to obtain necessary information supporting his claims.

## STATEMENT OF FACTS

### I.  Lee's Conviction and Sentencing, and Post-Conviction Motions

Lee's conviction is described in the Complaint filed on August 23, 2019 and those facts will not be repeated in full here.  (*See* Compl., ¶¶ 26-28.)[2]  In addition, we respectfully refer the Court to the Complaint for the details on the procedural history of Lee's case from May 2002 through early this year.  (*See* Compl., ¶¶ 29-34.)

Currently, Lee has an appeal pending in the Eighth Circuit from a February 2019 decision denying Lee's motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 or, in the alternative, for relief from judgment under Fed. R. Civ. P. 60(b), raising the Government's violation of *Brady v. Maryland* regarding an important guilt-phase witness.  (*See id.*, ¶¶ 33-34.) Lee also has pending in the Southern District of Indiana a petition recently filed pursuant to 28 U.S.C. § 2241 challenging false evidence relied on to obtain his sentence of death.  *Lee v. Warden, USP-Terre Haute, et al.*, Case No. 2:19-cv-468 (S.D. Ind.), Dkt. #1.

---

[2]     The Complaint was filed in *Lee v. Barr et al.*, Case No. 19-02559 (TSC) (the "*Lee* Action"), Dkt. #1.  The *Lee* Action was later consolidated with similar cases under the caption *Roane et al. v. Barr*, Case No. 19-mc-0145 (TSC).  We will refer to the latter below as the "Consolidated Action."

## II.    Exhaustion of Administrative Remedies

As alleged in the Complaint, Lee has diligently followed the BOP's grievance procedure with respect to the claims that are at issue in this action arising out of the newly released 2019 Protocol.  (*See id.*, ¶¶ 45-48.)  Since the filing of the Complaint, Lee's BP-9 was denied by the Warden of USP Terre Haute, and Lee timely filed a BP-10 several weeks ago with the North Central Regional Office.  Lee will continue to follow the BOP grievance procedure, but he notes that his administrative remedies may not be exhausted until after the scheduled execution date of December 9, 2019.  (*See id.*, ¶ 48.)

## III.    The FDPA and 28 C.F.R. § 26.3

The FDPA was passed in 1994.  (*Id.*, ¶ 54.)  Lee was sentenced under Section 3594 of the FDPA, 18 U.S.C. § 3594, which provides for death sentences for offenses described in Section 3591, 18 U.S.C. § 3591.  (Compl., ¶ 28.)  Section 3596 governs the implementation of death sentences under the FDPA and it states as follows:

> When the [death] sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.  If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a).

As discussed below, the DOJ and BOP have relied upon 28 C.F.R. § 26.3 (which predates the FDPA) as the authority for implementing the 2019 Protocol.  *See infra*, 9-10.  The regulation provides that death sentences shall be carried out (i) at the time and place designated by the Director of the BOP; (ii) at a federal penal or correctional institution; and (iii) by injection of a

lethal substance or substances under the direction of the U.S. Marshal.  *See* 28 C.F.R. § 26.3(a).

Thus, by invoking 28 C.F.R. § 26.3(a) in connection with the 2019 Protocol, the DOJ and BOP

are attempting to establish a protocol that governs <u>all</u> executions under federal law.

Section 3596 of the FDPA, however, does not authorize the DOJ or BOP to create such a

protocol for executions under the FDPA.  Instead, the statute sets forth its own requirements.  As

alleged in the Complaint, the DOJ and BOP have recognized in the past that Section 3596 of the

FDPA does not grant them the power to implement executions that they are now seeking to

exercise.  Beginning in 1995, the year after the passage of the FDPA, the DOJ and BOP

supported a series of bills in Congress that would have amended the FDPA to allow the BOP to

carry out FDPA-authorized executions under its own procedures.  (*See* Compl., ¶¶ 54-59.)

Those measures failed.  (*See id.*, ¶ 59.)  Because 28 C.F.R. § 26.3(a) existed at the time that the

FDPA was passed, the efforts to amend Section 3596 also reflect a recognition that the regulation

does not comport with the statute.  Accordingly, the DOJ and BOP lack the authority under the

FDPA to implement the 2019 Protocol and their current reliance on 28 C.F.R. § 26.3(a) is

unavailing, as they clearly recognized by supporting the failed amendments to the FDPA.

## IV.    **The BOP Protocols Prior to the 2019 Protocol**

In one of the consolidated cases pending before the Court, *Roane et al. v. Holder et al.*,

Case No. 05-2337 (TSC) (the "*Roane* Action"), the defendants produced a redacted version of a

protocol from 2004 entitled "BOP Execution Protocol" (the "2004 Protocol").  The defendants in

the *Roane* Action also produced an "Addendum to BOP Execution Protocol" (the "2008

Addendum").  (*See id.*, ¶ 35 and Exs. A and B thereto.)   As in the Complaint, Lee will refer to

the 2004 Protocol and the 2008 Addendum collectively as the "2008 Protocol."  The 2008

Addendum called for the use of three drugs: (1) sodium pentothal; (2) pancuronium bromide; and

(3) potassium chloride.  (*See* Compl., ¶ 36 and Ex. B thereto.)

## V. 2011 Announcements Relating to 2008 Protocol and Subsequent Status Reports

No federal executions were conducted under the 2008 Protocol.  In March 2011, the DOJ publicly acknowledged the "lack of availability" of sodium thiopental and reported that the federal government did not have reserves of the drug.  (*See* March 4, 2011 Letter from Office of Attorney General to National Association of Attorneys General, https://files.deathpenaltyinfo.org/legacy/documents/2011.03.04.holder.letter.pdf.)  Two months later, the BOP informed the Court that it lacked the drugs necessary to implement the 2008 Protocol and was considering revisions.  (*See* Joint Motion, dated May 24, 2011 (Dkt. #286), in *Roane* Action.)  Later in 2011, the BOP began submitting status reports to this Court stating that it was still considering changes to the 2008 Protocol.  (*See, e.g.*, Status Report, dated September 1, 2011 (Dkt. #289), in *Roane* Action.)  Until recently, the BOP continued to file similar status reports regarding its continuing review of the 2008 Protocol.  (*See, e.g.*, Status Report, dated May 1, 2019 (Dkt. #383), in *Roane* Action.)

## VI. The Administrative Record

On August 30, 2019, more than a month <u>after</u> the announcement of the 2019 Protocol, counsel from the DOJ provided counsel in the consolidated cases with what was described as the "Administrative Record" relating to the 2019 Protocol.[3]

The Administrative Record is sparse and it includes only a handful of documents (most of which are formal memoranda) discussing the process for the adoption of the 2019 Protocol.  A large portion of the 1067 pages making up the Administrative Record (over 88%) is from public

---

[3]   For the reasons discussed below, Lee does not believe that the documents sent on August 30, 2019 constitute the complete administrative record and he reserves the right to seek additional documentation.  Lee has cited portions of the Administrative Record below (with "AR" references), but, in accordance with Local Civil Rule 7(n), he will not provide the documents from the Administrative Record until an agreed-upon appendix is submitted within 14 days after the last filing on the preliminary injunction motion.

sources; for example, it includes over 300 pages of case law and law review articles.  There are no notes or communications (such as e-mails or any correspondence) reflecting the internal processes by which the DOJ and BOP reached their conclusions and developed the 2019 Protocol.  For example, the BOP states in the Administrative Record that it consulted with a number of agencies, included the U.S. Marshal Service, U.S. Food and Drug Administration ("FDA") and U.S. Drug Enforcement Agency.  (*See* AR 858-59, AR 872.)  Such communications are not included in the Administrative Record, even though they likely shed light on why certain decisions were made.  In addition, there are several references in the Administrative Record to licenses, trainings and discussions with Terre Haute USP (*see, e.g.*, AR 859, AR 872), none of which are discussed in any detail.  Thus, it is evident that the Administrative Record is an attempt to "paper the file" rather than a true record of the rule-making process.[4]

In similar situations, where the administrative record submitted by the agency is deficient and incomplete, the courts have considered evidence from outside the administrative record. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 141-43 (1973) (holding that courts may "obtain from the agency, either through affidavits or testimony ... additional explanation of the [contemporaneous] reasons for the agency decision"); *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (approving the consideration of evidence outside of administrative record to illuminate reasons for agency actions that are "obscured but implicit in the administrative record") (internal quotation omitted).  *See generally* Steven Sark & Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Actions,* 36 ADMIN. L. REV. 333 (1984).

---

[4]   The Administrative Record also does not contain any evidence of participation by the general public in the development of the 2019 Protocol or an opportunity for the public to comment on it.

Here, discovery will help Lee determine the various shortcomings of the Administrative Record and develop other relevant evidence regarding the rule-making process.

Finally, the Administrative Record reveals that there are two components to the 2019 Protocol.  The first is a 2019 document entitled "BOP Execution Protocol" (the "2019 Main Protocol"), which, upon information and belief, supersedes the 2008 Protocol.  (*See* AR 1016-67.)  The second component is the "Addendum to BOP Execution Protocol," which was publicly announced on July 25, 2009 (the "2019 Addendum").  (*See* Compl., ¶ 41 and Ex. C thereto.)[5] As noted above, this memorandum refers to the 2019 Main Protocol and the 2019 Addendum collectively as the "2019 Protocol."

**VII.**   <u>**Announcement of Lee's Execution Date and 2019 Addendum**</u>

The DOJ issued a press release on July 25, 2019 stating that Lee is currently scheduled to be executed at the USP Terre Haute on December 9, 2019.  On that same day, the DOJ also announced that, at the direction of Attorney General Barr, the BOP had adopted the 2019 Protocol.  As described below, the 2019 Protocol replaces the three-drug procedure previously used under the 2008 Protocol with a single drug — pentobarbital.  (*See* Compl., ¶¶ 41, 52-53.)

By letter dated July 25, 2019 (the "July 25, 2019 Letter") and handed to him by the Warden at USP Terre Haute, the BOP advised Lee of his December 9, 2019 execution date.  (*See id.*, ¶ 42 and Ex. D thereto.)  In the July 25, 2019 Letter, the BOP states that Lee's execution will be carried out pursuant to 28 C.F.R. §26.3(a)(1) and that the letter constitutes "official notification" of the execution date and method.  (*See* Compl., ¶ 43.)  The July 25, 2019 Letter contained several mistakes (which Lee's counsel pointed out), requiring the BOP to re-issue a

---

[5]   For the Court's convenience, the version of the 2019 Addendum that was made public in July 2019 is annexed as Exhibit 1 to the Van Tol Declaration.

corrected letter on July 31, 2019 (the "July 31, 2019 Letter").  (*See id.*).[6]  As with the July 25, 2019 Letter and the July 31, 2019 Letter, the sole authority cited in the 2019 Addendum for the new protocol is 28 C.F.R. § 26.3.  (*See Van Tol Decl., Ex. 2 (2019 Addendum), ¶ A.)*[7]

## VIII.  Details of 2019 Protocol and Concerns That Are Implicated

The most significant provisions of the 2019 Protocol — other than what has been discussed above — and Lee's comments on provisions are below.  These and other deficiencies in the 2019 Protocol raise both constitutional and statutory issues, as discussed below.  *See infra*, 15-27.

| Source | Provision(s) | Comments |
|---|---|---|
| 2019 Addendum, Van Tol Decl., Ex. 1, ¶ A | Substance or substances used in lethal injection "to be determined by the Director [of the BOP]" | Vague and unlimited discretion of the BOP Director; contrary to Section 3596 of FDPA, which refers to manner prescribed by State law |
| *Id.* | Substance(s) "to be administered by qualified personnel selected by Warden" | Contrary to Section 3596 of FDPA, which states that the U.S. Marshal shall supervise implementation; reference to "qualified" is vague and there is no clarity as to how the Warden (or others) are to identify and select qualified personnel |

---

[6]   As discussed above, 28 C.F.R. § 26.3 does not apply to executions under the FDPA. Even if it did apply, however, the BOP has failed to follow the other regulations relating to the one it has invoked here.  Section 26.2 states that, when a criminal defendant is sentenced to death, the Government "<u>shall</u> promptly file with the sentencing court a proposed Judgment and Order" setting forth various details regarding the execution.  28 C.F.R. § 26.2(a) (emphasis added).  Lee was sentenced to death in May 2002, but, upon information and belief, the Government did not file a proposed "Judgment and Order" regarding Lee's execution with the sentencing court, as mandated by 28 C.F.R. § 26.2(a).  The July 25, 2019 Letter and the July 31, 2019 Letter do not cure this deficiency because (a) they were not timely; and (b) they were not filed with the sentencing court.  (*See* Compl., ¶ 43.)

[7]   The 2019 Main Protocol similarly provides that "[t]he execution will be carried out in a manner consistent with Title 28, Code of Federal Regulations, Part 26."  (*See* AR 1032.)  It does not anywhere refer to Section 3596 of the FDPA.

| Source | Provision(s) | Comments |
|---|---|---|
| *Id.* | Death sentence procedures in 2019 Addendum may be modified at the discretion of the BOP Director or his/her designee "as may be required by … circumstances" | Vague and unlimited discretion that could eliminate any notice and result in no protocol at all; contrary to Section 3596 of FDPA, which refers to manner prescribed by State law |
| *Id.*, ¶ B | Documentation establishing qualifications of personnel performing death sentence-related functions shielded from disclosure | Prevents outside determination of whether such personnel are qualified, even though such documentation is required to be maintained (*see id.*, ¶ D) |
| *Id.*, ¶ C | Identifies lethal substance as "Pentobarbital Sodium" | No reference to form or source of substance or measures to ensure quality control, etc. |
| *Id.*, ¶ D | Director of the BOP, in conjunction with the U.S. Marshal, shall select personnel to serve as executioners | Contrary to Section 3596 of FDPA, which only refers to the U.S. Marshal supervising implementation, and contrary to Paragraph A stating that the Warden shall select such personnel; no indication that relevant officials know how to identify and select qualified personnel |
| *Id.*, ¶ E | Director of the BOP or designee shall appoint senior level BOP employee "to supervise the activities of personnel preparing and administering lethal substances" | Contrary to Section 3596 of FDPA, which states that the U.S. Marshal shall supervise implementation, and contrary to Paragraph A stating that the Warden shall select such personnel |
| *See id.*, ¶ G & H | Description of IV administration of substances | Vague and does not provide sufficient detail to assess fully whether or how manner of execution will inflict pain in violation of Eighth Amendment |
| *See id.*, ¶ H | Establishes dose of pentobarbital | Does not allow variations to account for individual medical history or condition |

11

| Source | Provision(s) | Comments |
|---|---|---|
| 2019 Main Protocol, Intro., § I, AR 1019 | "These procedures should be observed and followed as written unless deviation or adjustment is required, as determined by the Director of the BOP or the Warden." | Vague and unlimited discretion of the BOP Director or the Warden; contrary to Section 3596 of FDPA, which states that the U.S. Marshal shall supervise implementation, and essentially results in no protocol at all |
| *Id.*, Chap. 1, §§ III(F)(1)(a) and IV(E), AR 1025, 1027 | States that the Warden, with the assistance of the Director and Regional Director of the BOP and U.S. Marshal, will select the executioners | Contrary to Section 3596 of FDPA, which only refers to the U.S. Marshal supervising implementation, and contrary to Paragraphs D and E of the 2019 Addendum, which only refer to the BOP Director making the selection |
| *See id.*, Chap. 1, §§ III-VI, AR 1023-29 | Numerous references to the role of the Warden | Contrary to Section 3596 of FDPA, which only refers to the U.S. Marshal supervising implementation |
| *See id.*, Chap. 1, § VII, AR 1031 | Multiple references to the role of the BOP Regional Director | Contrary to Section 3596 of FDPA, which only refers to the U.S. Marshal supervising implementation |
| *See, e.g., id.*, Chap. 2, §§ II and IV, AR 1032-33 and AR 1035-37 | Reference to role of Regional Director and Warden | Contrary to Section 3596 of FDPA, which only refers to the U.S. Marshal supervising implementation[8] |

The above chart refers to the issues raised by the provisions that are set forth in the 2019 Protocol.  It is equally important what the 2019 Protocol does not say.

As noted in the Complaint, the 2019 Protocol provides no details (or insufficient details) on (a) the form or source of pentobarbital that the DOJ and BOP intend to use in executions, including whether it must be FDA-approved or can be a compounded or imported version and what testing will be done on the substance prior to the execution, which are vital details given the

---

[8]     For this particular row, the cited provisions are examples only and Lee has not listed all similar instances in the document.  In general, Lee reserves the right to point out other deficiencies in the 2019 Protocol.

well-documented problems associated with the use of compounded and imported drugs in executions (*see* Compl., ¶¶ 74-79); and (b) the IV administration of the substance, including the procedures to be followed during the execution and the qualifications, training and experience of the team members, which is similarly critical information because the IV administration of lethal substances raises its own set of constitutional issues (*see id.*, ¶¶ 80-89).

In order to address these concerns, Lee listed in the Complaint the numerous factors that must be addressed to ensure compliance with constitutional requirements.  (*See id.*, ¶ 90.)  The 2019 Protocol does not provide any (or sufficient) detail on those factors.

## IX.   Alternatives Regarding the Eighth Amendment Issues

In the Complaint, Lee also described three alternatives relating to the Eighth Amendment issues that are raised by the 2019 Protocol.[9]  Lee respectfully refers the Court to the Complaint for a fuller discussion, but, in summary, those alternatives are (1) the implementation of the safeguards alleged in Paragraph 90 of the Complaint; (2) the bedside administration of pentobarbital (which could reduce or eliminate some of the identified deficiencies); and (3) along with the foregoing, the addition of a pre-dose of an opioid or anti-anxiety medication.  (*See id.*, ¶¶ 91-94.)  Upon information and belief (and subject to additional discovery in this action), these alternatives are available, feasible and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.  (*See id.*)

---

[9]     The alternatives below are based on currently available information and are limited by the fact that the 2019 Protocol contains inadequate details.  The Defendants have sole possession of information relating to other potential alternatives and Lee will seek such information in discovery.  Also, the alternatives are relevant only if the Court determines that the 2019 Protocol complies with the APA.  Lee reserves the right to present other alternatives to the 2019 Protocol or any other protocol relating to his execution.

**X.**     <u>**Procedural Background in the *Lee* Action and Related Cases**</u>

On August 15, 2019, prior to the filing of the Complaint in the *Lee* Action, the Court held a status conference in which it consolidated the then-pending cases relating to the federal lethal execution protocol, required the defendants to produce a list of the contents of the Administrative Record by August 30, 2019, and held that the plaintiffs may conduct depositions of the Defendants under Fed. R. Civ. P. 30(b)(6) by February 28, 2020 in order to obtain facts necessary for filing informed and thorough amended complaints by March 31, 2020. The Court's order did not preclude the taking of other discovery after March 31, 2020.

On August 19, 2019, Alfred Bourgeois ("Bourgeois"), a prisoner whose execution is scheduled for January 13, 2020, moved for a preliminary injunction in *Bourgeois v. U.S. Dep't of Justice et al.*, Case No. 12-cv-00782 (TSC) (the "*Bourgeois* Action") barring his execution. (*See Bourgeois* Action, Dkt. #24; Consolidated Action, Dkt. #2 (re-filed Aug. 29, 2019).)[10] On September 5, 2019, the defendants in the *Bourgeois* Action filed a brief in opposition to the *Bourgeois* PI Motion. (Consolidated Action, Dkt. #6.) Among other things, the *Bourgeois* defendants asked the Court to deny the *Bourgeois* PI Motion without prejudice and stated that Bourgeois should be free to file a new motion "perhaps jointly with other inmates who are already in this consolidated case, such as Daniel Lee, or who might ultimately file suit here." (*Id.*, 2.) While Lee takes no position on whether Bourgeois should file a new motion, Lee is entitled to be heard fully and separately on the arguments raised below.

---

[10]     We will refer to this motion as the "*Bourgeois* PI Motion."

## ARGUMENT

### I.   Relevant Factors on a Motion for Preliminary Injunction

Courts consider four factors before granting a preliminary injunction: (1) the threat of irreparable injury to the plaintiff if an injunction is not granted; (2) the likelihood that other interested parties will suffer substantial harm if injunctive relief is granted; (3) the interests of the public; and (4) the likelihood of the plaintiff's eventual success on the merits.   *See Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Wagner v. Taylor*, 836 F.2d 566, 575 (D.C. Cir. 1987); *Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.*, 102 F. Supp. 3d 334, 336 (D.D.C. 2015) (Chutkan, J.).   As the defendants acknowledged in their opposition to the PI Motion in the *Bourgeois* Action, the "most important factor" is whether the movant has "established a likelihood of success on the merits."   (*See* Consolidated Action, Dkt. #6, 6 (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)).)

### II.   All of the Factors Weigh Heavily in Favor of a Preliminary Injunction

#### A.   Lee Has a Strong Likelihood of Success on the Merits

Lee has alleged nine counts in the Complaint, alleging (1) violations of the APA (*see* Counts V-IX); and (2) violations of the U.S. Constitution (*see* Counts I-IV).   As demonstrated below, Lee has ample evidence and precedent supporting his APA and constitutional claims. While discovery is necessary to allow Lee to fully flesh out his claims, just as the other plaintiffs in the Consolidated Action are doing, Lee has demonstrated that he has a strong likelihood of success on the merits and the Court should give this factor substantial weight.

##### 1.   It Is Highly Likely That Lee Will Prevail on His Multi-Pronged Claims Under the APA

The APA states that a reviewing court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be" one of the following:

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or immunity;

(C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)     without observance of procedure required by law ….”

5 U.S.C. § 706(2) (emphasis added).  Lee has alleged a violation of each of the above sub-sections of Section 706(2) of the APA, and it is evident that the Defendants’ actions in connection with the 2019 Protocol are directly contrary to the APA.  **Thus, Lee has shown that the 2019 Protocol is unlawful and should be set aside pursuant to 5 U.S.C. § 706(2).**

### (i)     The DOJ and BOP Have Exceeded Their Statutory Authority in Developing and Seeking to Implement the 2019 Protocol

The 2019 Protocol is the result of *ultra vires* agency action.  The FDPA simply does not authorize the implementation of executions as set forth in the 2019 Protocol.  *See supra* 5-6.  The 2019 Protocol is directly contrary to the FDPA’s mandatory language and thus violates Section 706(2)(C) of the APA, 5 U.S.C. § 706(2)(C), because it is patently in excess of the statutory authority.  *See, e.g.*, *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 497 (D.C. Cir. 2014) (Brown, J., concurring) (“When an agency has acted beyond its delegated authority, a reviewing court will hold such action *ultra vires* … or a violation of the [APA], 5 U.S.C. § 706(2)(C).”); *Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155, 176 (4th Cir. 1998), *aff’d,* 529 U.S. 120 (2000) (voiding as *ultra vires* an agency rule that conflicted with the governing statute because the agency “exceeded the authority granted to it by Congress”); *Am. Hosp. Ass’n v. Azar*,  Civil Action No. 18-2841 (RMC), 2019 WL 4451984, at **8-12 (D.D.C. Sept. 17, 2019) (holding that rule was *ultra vires* because it exceeded the statutory authority).

The DOJ and BOP have implicitly conceded their lack of statutory authority because they nowhere cite the FDPA in the 2019 Protocol and instead rely on 28 C.F.R. § 26.3(a).   That regulation, however, does not take precedence over the FDPA and it does not cure the DOJ and BOP's failure to abide by the clear terms of the statute.  As the U.S. Supreme has stated, an agency's rule-making power is "not the power to make law."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976).  "Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute."  *Id.* (quotation omitted); *see also Lyng v. Payne*, 476 U.S. 926, 937 (1986) (noting that "an agency's power is no greater than that delegated to it by Congress").  The statute here is mandatory and clear.  Indeed, the DOJ and BOP have expressly acknowledged that they cannot adopt an execution protocol like the 2019 Protocol under the current version of the FDPA; they supported the numerous, unsuccessful efforts to amend the FDPA over the years, and noted in their testimony that the amendment was necessary to allow them to enact a protocol for federal executions under the FDPA.  (*See* Compl., ¶¶ 54-59.)

The 2019 Protocol is also *ultra vires* because it violates the doctrine of separation of powers, which is reflected in the "finely wrought" bicameralism and presentment concepts in the Constitution, *Clinton v. City of N.Y.*, 524 U.S. 417, 440 (1998), and in specific constitutional provisions such as the command that the Executive Branch "take care that the Laws be faithfully executed."   U.S. Const., art. II, § 3.  Thus, an executive agency cannot override the will of Congress by devising a new regulation in derogation of a statute.  Where, as here, the regulation contradicts the statute, the latter prevails.  *See Clinton*, 524 U.S at 438 ("There is no provision in the Constitution that authorizes the President … to amend … or to repeal statutes.").  The 2019

Protocol, therefore, also violates Section 706(2)(B) of the APA, 5 U.S.C. § 706(2)(B), under which a reviewing court must set aside agency action that is contrary to constitutional powers.[11]

### (ii)   The Process of Developing the 2019 Protocol Violated the APA's Notice-and-Comment Requirements

Even if the Court concludes that the DOJ and BOP were acting within their authority in issuing the 2019 Protocol pursuant to 28 C.F.R. § 26.3 (which they were not), the DOJ and BOP violated Section 706(2)(D) of the APA, 5 U.S.C. § 706(2)(D), by failing to follow the notice-and-comment requirements in the rule-making process. The 2019 Protocol is a "rule" within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). In turn, the APA states that the "agency process for formulating, amending, or repealing [such] a rule" must comply with the APA's requirements of notice-and-comment rulemaking. *See* 5 U.S.C. § 551(5); *see also* 5 U.S.C. § 553(b) & (c) (setting forth requirements).

The notice-and-comment requirements are the cornerstone of the APA. The D.C. Circuit has noted that "notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive." *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). "If the Agency, in carrying out its 'essentially legislative task,' has infused the administrative process with the degree of openness, explanation, and participatory democracy required by the APA, it will thereby have 'negate(d) the dangers of arbitrariness and irrationality in the formulation of rules ....'" *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027-

---

[11]    The Court's decision that the DOJ and BOP have exceeded their statutory authority would obviate the need to decide whether they also violated the notice-and-comment requirements that are part of the rulemaking process. *See Am. Bus Ass'n v. Slater*, 231 F.3d 1, 7-8 (D.C. Cir. 2000) ("Because we hold [the agency] had no authority to promulgate that rule in the first instance, the Court finds it unnecessary to take up [appellant's] notice-and-comment claim. The agency has exceeded the scope of the authority delegated to it by Congress, and it matters not that they adhered to the APA's procedural requirements in doing so.").

28 (D.C. Cir. 1978) (quoting *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)); *see also N.C. Growers' Ass'n Inc. v. UFW*, 702 F.3d 755, 764 (4th Cir. 2012) (stating that the importance of the notice-and-comment procedure "cannot be overstated").

There can be no argument here that the DOJ and BOP adhered to the notice-and-comment requirements.  The formulation of the 2019 Protocol took place completely in secret, without any advance notice to the public of the contents or an opportunity to comment.  Thus, the well-recognized benefits of an open and participatory process were lost in relation to the 2019 Protocol.  Accordingly, it must be set aside pursuant to 5 U.S.C. § 706(2)(D).

The Defendants will likely argue that there was no need for such notice and comment in connection with the 2019 Protocol because it is an "interpretive" rule rather than a "legislative" one (the former being exempt from the notice-and-comment requirements).  The applicable case law, however, demonstrates that the 2019 Protocol is a legislative rule.  Where a rule effectively amends the related statute, the courts find that the rule is legislative and thus subject to the notice-and-comment requirements.  *See Am. Academy of Pediatrics v. Food & Drug Admin.*, 379 F. Supp. 3d 461, 497 (D. Md. 2019) (holding that a guidance document was not a mere policy statement and "is tantamount to amendment to the [statute]"); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 45 (D.D.C. 2011) (holding that implementation documents were subject to the notice-and-comment requirements because they made "changes to the statutorily established process").  Here, the 2019 Protocol effectively amends the FDPA because it implements a protocol that is contrary to the statutory requirements.  Thus, this case is like *American Academy* and *Jackson*, where the courts held that the notice-and-comment requirements applied.

The 2019 Protocol also materially amended the single-drug regime that was established under the 2008 Protocol.  Therefore, even if the Court finds that the 2019 Protocol is not *ultra*

*vires*, the modification of the 2008 Protocol triggers the APA notice-and-comment requirements. *See, e.g.*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2435 (2019) (Roberts, J., concurring) (noting that the notice-and-comment requirements under Section 553 of the APA apply to amendments of regulations).

**(iii)**     <u>The 2019 Protocol Is Arbitrary and Capricious</u>

The 2019 Protocol violates the prohibition in Section 706(2)(A) of the APA against arbitrary and capricious rules because it is not the product of reasoned decision-making. "The importance of reasoned [decision-making] cannot be overemphasized," *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 1888 (D.C. Cir. 2011), and an agency breaches its duty when it fails to "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action will be deemed arbitrary and capricious when, among other things, the agency has "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *Id.* at 48-49. Here, the DOJ and BOP failed on both counts.

As discussed above, the DOJ's and BOP's formulation of one protocol for all federal executions is contrary to the mandates of the FDPA. Therefore, the DOJ and BOP engaged in the development of a protocol which Congress in fact barred them from considering.

Moreover, the Administrative Record does not address adequately (or at all) the numerous constitutional issues that Lee and others have identified regarding the use and administration of pentobarbital in executions, including (i) the form, source and quality of the drug; (ii) the procedures for storing, mixing and administering the drug; and (iii) the procedures for intravenously administering the drug. These are not speculative concerns.

As alleged in the Complaint, there are numerous instances of serious problems occurring in executions where the pentobarbital was not properly sourced, compounded or handled. *First*,

20

the compounding facilities have had well-documented problems.  Texas, for example, purchased

its supply of pentobarbital from a compounding pharmacy (Greenpark) whose license was on

probation for providing dangerous mixtures to children.  (*See Inmates Said the Drug Burned as*

*They Died.  This is How Texas Gets its Execution Drugs,* Buzzfeed News (Nov. 28, 2018),

www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-

is-how-texas.)  In addition, the FDA has warned Greenpark about "serious deficiencies in [its]

practices for producing sterile drug products.  (*See* FDA, *Warning Letter: Greenpark*

*Compounding Pharmacy* (Oct. 26, 2018),  www.fda.gov/inspections-compliance-enforcement-

and-criminal-investigations/warning-letters/greenpark-compounding-pharmacy-566233-

10262018.)  Similarly, Missouri purchased pentobarbital for executions from a company

(Foundation Care) that, according to a report from Buzzfeed News, has been repeatedly found to

engage in hazardous pharmaceutical procedures.  (*See Missouri Fought For Years To Hide*

*Where It Got Its Execution Drugs.  Now We Know What They Were Hiding,* Buzzfeed News

(Feb. 20, 2018), www.buzzfeednews.com/article/chrismcdaniel/missouri-executed-17-men-with-

drugs-from-a-high-risk.)

    *Second*, because the proposed compounded pentobarbital is not FDA-approved, it will

have been subjected to less rigorous regulation and oversight relating to the identity, purity and

potency of the drug.  Thus, the DOJ and BOP's sourcing of pentobarbital for executions from a

compounding pharmacy creates a substantial risk that the drug will be contaminated, handled

improperly or sub-potent.  (*See, e.g., Will Texas Have to Push Back the Expiration Dates on its*

*Lethal        Injection        Drugs?,*        Texas        Tribune        (May        17,        2018),

www.texastribune,org/2018/05/17/texas-lethal-injection-drugs-are-set-expire-upcoming-

executions/.)  If the pentobarbital used by the DOJ and BOP has problems with identity, purity

and potency, there is a substantial risk that its use will result in painful or botched executions. For example, five people who were executed in Texas through the use of pentobarbital complained that they felt as if they were burning before they finally died.  (*See Inmates Said the Drug Burned as They Died.  This is How Texas Gets its Execution Drugs,* Buzzfeed News (Nov. 28, 2018), www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas).  In another instance, Georgia cancelled a 2015 execution because the compounded pentobarbital came out of suspension and was therefore unusable.  (*See Secret Sedative: How Missouri Uses Pentobarbital in Executions*, St. Louis Public Radio (Aug. 18, 2017),    https://news.stlpublicradio.org/post/secret-sedative-how-missouri-uses-pentobarbital-executions#stream/0.)[12]

Lethal injection executions have also been plagued by difficulties with setting IVs.  The complaints in the *Roane* Action and the *Bourgeois* Action provide details on those issues in general.  (*See, e.g.*, Compl., ¶ 81.)  Since the filing of the *Bourgeois* Action in 2012, there have been several other instances of IV problems in lethal injections.  For example, at the well-publicized Clayton Lockett execution in 2014, the femoral line was not placed correctly and he regained consciousness before dying.  (*See* https://www.nytimes.com/2014/04/30/us/oklahoma-executions.html.)  In addition, in Ohio (2017) and Alabama (2018), the prison personnel tried unsuccessfully for an extended period of time to set IVs in two prisoners, Alva Campbell and Doyle Lee Hamm.  (*See* https://www.nbcnews.com/news/us-news/alva-campbell-inmate-who-survived-execution-try-dies-ohio-prison-n852961; https://www.nbcnews.com/storyline/ lethal-injection/doyle-lee-hamm-wished-death-during-botched-execution-report-says-n853706.)  Those two executions were called off as a result.

---

[12]    A "suspension" is a heterogeneous mixture in which the solute particles do not dissolve, but get suspended throughout the bulk of the solvent, left floating around freely in the medium.

The Administrative Record ignores or downplays these serious issues.  For example, the Administrative Record is vague on the pentobarbital source.  The DOJ and BOP hint that they have a domestic source for unfinished products that will be compounded at unnamed U.S. facilities (*see* AR 872), but the Administrative Record says nothing about where the pentobarbital was manufactured.  It could be manufactured overseas, but sold domestically, and the reference to a "domestic source" may mean a U.S. distributor.  Given the number of problems in the past with the use of such compounded substances in executions, it is critical that the DOJ and BOP reveal (among other things) the manufacturer, the other steps in the distribution chain, the compounding facility and any procedures in place to ensure quality.  The Administrative Record also includes some testing data, but it is so ill-defined and vague that no conclusions can be drawn from it.  Moreover, even if the testing verified the quality of the pentobarbital <u>at the time</u>, there is no procedure set forth in the 2019 Protocol for testing the substance closer to the execution date.

The Administrative Record is even thinner with regard to the procedures BOP will use to set IVs during executions.  It practically ignores this crucial process and provides <u>no</u> information to suggest that the DOJ and BOP even studied the problems associated with setting and maintaining IVs, let alone considered and recommended safeguards.  Instead, the Administrative Record assumes that mere use of pentobarbital, without more, will pass constitutional muster.

In all, the shallow treatment of the pentobarbital-related issues in the Administrative Record, and the lack of a meaningful discussion of the well-documented problems with IV procedures in executions, confirm that the 2019 Protocol is the result of an arbitrary and capricious process as opposed to the careful rule-making required by the APA.

*   *   *   *   *

Lee would satisfy the first prong of the preliminary injunction standard if he showed that he had a single APA claim with a likelihood of success on the merits. Lee has <u>three</u> such claims. Thus, Lee has demonstrated a strong likelihood of success through his APA claims alone.

<strong>2.    <u>Lee Also Has a High Chance of Success on His Constitutional Claims</u></strong>

There is even more here, however, because Lee has strong constitutional claims as well. In the Complaint, Lee alleged that the 2019 Protocol violated his rights under the (i) Due Process Clause of the Fifth Amendment (Count I); (ii) Eighth Amendment (Counts II-III); and (iii) First, Fifth and Sixth Amendments (Count IV). Even though the Eighth Amendment, in particular, requires additional discovery because many of the relevant facts are in the sole possession of the Defendants, Lee has made a threshold showing on each of his constitutional claims that establishes a likelihood of success for purposes of the preliminary injunction standard.

<strong>(i)    <u>The 2019 Protocol Constitutes a Denial of Due Process</u></strong>

The Due Process Clause of the Fifth Amendment requires notice and an opportunity to be heard before the deprivation of life, liberty or property. As described above, the 2019 Protocol does not disclose sufficient details regarding the procedures that will be used in carrying out Lee's execution. In addition, the procedures that have been (inadequately) described are subject to the unbounded discretion of BOP employees, which means that Lee will not have an adequate notice and opportunity to challenge the manner of execution. Such discretion means that there is no protocol at all. Thus, the 2019 Protocol denies fundamental due process to Lee.

<strong>(ii)    <u>The Manner of Lee's Planned Execution under the 2019 Protocol Violates the Eighth Amendment</u></strong>

It is well settled that an execution will violate the Eighth Amendment's prohibitions against cruel and unusual punishment, or a "deliberate indifference" to the prisoner's medical needs, if it presents a "substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008);

24

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion) (holding that the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain"); *Furman v. Georgia*, 408 U.S. 238, 273 (1972) (holding that imposition of death penalty in cases before it constituted cruel and unusual punishment).  Such a risk exists here because, as alleged in the Complaint and discussed above, the procedures for the implementation of the 2019 Protocol are wholly inadequate and do not provide the various safeguards required by the U.S. Constitution.  *See supra*, 12-13, 20-24.  Thus, even with the limited information that is currently available, Lee has demonstrated a likelihood of prevailing on his claims that the 2019 Protocol violates the Eighth Amendment.

In the opposition to the *Bourgeois* PI Motion, the defendants argued that Bourgeois' Eighth Amendment claim does not justify a preliminary injunction because he has not yet identified a viable alternative manner of execution, as required by *Glossip v. Gross*, 135 S. Ct. 2726 (2015).  Bourgeois noted in his response that this Court granted a preliminary injunction to Mr. Paul even though he did not have a viable Eighth Amendment claim at the time and, in any event, that the Court has granted him the opportunity to take discovery on available alternatives. (Consolidated Action, Dkt. #11, 3-4.)  Here, too, Lee should be permitted to take discovery on the 2019 Protocol, which will help him develop available alternatives.

Moreover, even assuming that Lee is required to identify such alternatives at this early stage of the case, he has done so in the Complaint (with the repeated caveat that other alternatives and information may be developed through the course of discovery).  Given the state of the record, Lee has satisfied his burden under *Glossip* for purposes of establishing a likelihood of success on the Eighth Amendment claims.  Moreover, the Defendants cannot assert that Lee has failed to fully articulate the parameters of his Eighth Amendment claim when they are in sole

possession of relevant facts that can only be adduced through discovery.  It is sufficient that Lee has alleged, with the supporting information available, that the 2019 Protocol lacks the protections and safeguards that are necessary to pass Eighth Amendment muster and that he has proffered several available alternatives that will substantially reduce the risk of severe pain.

(iii)    <u>The Lack of Access to Counsel under the 2019 Protocol<br>Violates the First, Fifth and Sixth Amendments</u>

Prisoners have a right under the First and Fifth Amendment of the U.S. Constitution to access to the courts.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).  They are also entitled under the Sixth Amendment of the U.S. Constitution to have access to counsel at all "critical" stages of criminal proceedings, including through and during the execution procedure.  *U.S. v. Wade*, 388 U.S. 218, 227-28 (1967); *Harbison v. Bell*, 556 U.S. 180, 194 (2009); *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, at *4-5 (S.D. Ohio Dec. 12, 2018); *Cooey v. Strickland*, No. 2:4-CV-1156, 2011 WL 320166, at *5-12 (S.D. Ohio Jan. 28, 2011).

The 2019 Protocol does not provide prisoners with access to counsel during the execution.  Therefore, Lee could be deprived of access to counsel during the execution and would not be able to communicate with counsel regarding any constitutional violations that may arise.  In addition, the 2019 Protocol does not permit witnesses (including attorneys) to view the setting of IVs, so those witnesses have no way of knowing if there are issues with the IV-setting process or other complications that may violate Lee's constitutional rights.  The foregoing are clear violations of Lee's rights under the First, Fifth and Sixth Amendments.

**B.    Lee Will Suffer Irreparable Injury If the Implementation of the 2019 Protocol Is Not Enjoined**

Lee would suffer irreparable injury if the Court were to deny the motion for a preliminary injunction.

*First*, in the absence of an injunction barring the implementation of the 2019 Protocol, Lee could not pursue his APA claims and would face an unconstitutional execution carried out pursuant to an invalid and unlawful procedure.   In analogous circumstances involving APA claims, the courts have held that the plaintiff established irreparable injury for purposes of the preliminary injunction standard.  *See Stellar IT Solutions, Inc. v. U.S.C.I.S.*, Civ. A. No. 18-2015 (RC), 2018 WL 6047413, at *11 (D.D.C. Nov. 19, 2018) (finding irreparable injury where plaintiff would be forced to leave the country under challenged regulations); *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 126-27 (D.D.C. 2015) (finding irreparable injury where challenged regulations would threaten company's existence); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) (finding irreparable injury where plaintiffs faced detention under challenged regulations).   In those cases, the courts stressed the imminence of the harm and the fact that it could not be remediated if an injunction did not issue.   Here, Lee's harm is imminent and similarly would be beyond remediation.

*Second*, Lee has asserted a First Amendment claim relating to his execution.   (*See* Compl., ¶¶112-116.) The U.S. Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably causes irreparable injury."  *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *see also Schad v. Brewer*, No. CV–13–2001–PHX–ROS, 2013 WL 5551668, at *9 (D. Ariz. Oct. 7, 2013) (finding irreparable injury and granting injunction seeking information relating to execution).

*Third*, Lee has demonstrated the likelihood that an execution under the 2019 Protocol would have a substantial risk of resulting in the unnecessary infliction of pain in violation of the Eighth Amendment.   Under similar circumstances, the courts have held that the plaintiffs established irreparable injury.  *See, e.g., Nooner v. Norris*, No. 5:06CV00110 SWW, 2006 WL

8445125, at *3 (E.D. Ark. June 26, 2006) ("The Court finds that Davis has shown that he is personally under a threat of irreparable harm.  If Davis remains or becomes conscious during the execution, he will suffer intense pain that will never be rectified."); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) ("[T]he Court is persuaded that there is an unacceptable and unnecessary risk that Plaintiff Hill will be irreparably harmed absent the injunction, *i.e.,* that Plaintiff Hill could suffer unnecessary and excruciating pain while being executed in violation of his Eighth Amendment right not to be subjected to cruel and unusual punishment."); *Brown v. Beck*, No. 5:06CT3018 H, 2006 WL 3914717, at *7 (E.D. N.C. Apr. 7, 2006) (stating that "[i]f the alleged deficiencies do, in fact, result in inadequate anesthesia prior to execution, there is no dispute that Brown will suffer excruciating pain"); *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("If Plaintiff's contentions [regarding the pain that he would suffer during the execution] are correct, the denial of a TRO will subject Plaintiff to an excruciating death, which certainly qualifies as irreparable harm.").

As in the above cases, the Court should issue an injunction here because — in the absence of an order preliminarily enjoining the Defendants from implementing the 2019 Protocol — there would be an irreparable injury to Lee.

**C.      The Defendants Will Not Suffer "Substantial Harm" If the Court Were to Enjoin the Implementation of the 2019 Protocol**

Lee has not asked the Court to halt his execution permanently, so the Defendants cannot assert that a preliminary injunction would cause them harm by preventing Lee's execution. Instead, Lee merely requests that the Court enjoin the implementation of the 2019 Protocol.  If such an injunction jeopardizes the December 9, 2019 date that the DOJ and BOP have chosen for Lee's execution, they may select a later date once if 2019 Protocol (or another protocol) is properly authorized and complies with the APA and Constitution.  Thus, even if an injunction

28

results in a later execution date, that would not constitute "substantial harm" to the Defendants. *See, e.g.*, *Harris*, 323 F. Supp. 2d at 809 (finding "little potential for injury" as a result of a delayed execution date).

Thus, when the Defendants' lack of harm is compared to the irreparable injury that Lee would suffer in the absence of an injunction, the balance of hardships tips decidedly in Lee's favor and it strongly supports the issuance of a preliminary injunction.

### D.   The Public Interest Would Be Served by An Order Enjoining the Implementation of the 2019 Protocol

The public interest also weighs in favor of an injunction here.   An injunction would vindicate the public's interest in making sure that (a) administrative agencies act within their authority and follow the APA's core requirements; and (b) the federal government does not violate the U.S. Constitution.   To the extent the Defendants assert that the public has an interest in executions taking place, Lee is only seeking an injunction against the implementation of the 2019 Protocol and a delay of the execution would not disserve the public interest.

Instead, as the court stated in *Harris*:

> It is apparent to this Court that confidence in the humane application of the governing laws of the State must be in the public's interest. It is, on the other hand, beyond the Court's comprehension that a temporary restraining order in this case, that would delay but not halt the execution, could disserve the public interest. While the Court understands that it has been 18 years since Mr. Harris' conviction, no significant harm to the public interest could arise from the proper, informed, deliberate adjudication of this claim.

*Id.* at 810; *see also Nooner,* 2006 WL 8445125, at *4 (stating that the "failure to consider Davis's allegations would ignore the equally important public interest in the humane and constitutional application of the State's lethal injection statute"); *Cooey*, 430 F. Supp. 2d at 708 ("[T]his Court is in agreement with Plaintiff Hill that the public interest only is served by

enforcing constitutional rights and by the prompt and accurate resolution of disputes concerning those constitutional rights. By comparison, the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights."). Here, the public interest would not be served by rushing to a determination of the constitutionality of the 2019 Protocol prior to Lee's current execution date of December 9, 2019. Indeed, the DOJ and BOP could have insured that there was ample time and opportunity to vet any issues by announcing the 2019 Protocol and then waiting to schedule executions. But they did not, and now the public interest would be served best by allowing Lee an opportunity to take discovery and obtain an adjudication of his claims on a full record.

**III.   The Court Should Enjoin the Implementation of the 2019 Protocol Until Lee's Claims Are Decided or, in the Alternative, Until Lee Completes Discovery**

Lee has demonstrated that all of the relevant factors weigh heavily in favor of a preliminary injunction and the Court has good cause to enjoin implementation of the 2019 Protocol until Lee's underlying claims are decided. If, however, the Court finds that a shorter duration for an injunction is necessary, Lee respectfully requests that the Court enjoin the implementation of the 2019 Protocol until Lee has completed discovery in this action regarding his claims. Such discovery is necessary so that Lee has the opportunity to support his claims fully and identify all the relevant issues.

**CONCLUSION**

For the foregoing reasons, Lee respectfully requests that the Court enter an order preliminarily enjoining the Defendants from implementing the 2019 Protocol until the claims in the Complaint have been decided. Alternatively, Lee respectfully requests that the Court allow him the opportunity to conduct necessary discovery by preliminarily enjoining the implementation of the 2019 Protocol until after he has completed discovery.

Dated:   September 27, 2019

Respectfully submitted,

HOGAN LOVELLS US LLP


*/s/      Pieter Van Tol*

Pieter Van Tol (admitted *pro hac vice*)
John D. Beck (admitted *pro hac vice*)
Mallik Yamusah
390 Madison Avenue
New York, NY  10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com
john.beck@hoganlovells.com
mallik.yamusah@hoganlovells.com

and

Elizabeth M. Hagerty (Bar No. 1022774)
David S. Victorson (Bar No. 1027025)
Columbia Square
555 13th Street NW
Washington, DC  20004
(202) 637-5600
(202) 637-5910 (fax)
elizabeth.hagerty@hoganlovells.com
david.victorson@hoganlovells.com

*Attorneys for Plaintiff Daniel Lewis Lee*

31

## CERTIFICATE OF SERVICE

I hereby certify that, on September 27, 2019, this Plaintiff's Memorandum of Points and Authorities in Support of Motion for a Preliminary Injunction Barring the Implementation of the Newly Announced Federal Lethal Injection Protocol was filed electronically using the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties that are registered users.  The below parties may access this filing through the Court's CM/ECF System.

**Joshua Christopher Toll**
KING & SPALDING, LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Gerald Wesley King , Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: billy_nolas@fd.org

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: alex_kursman@fd.org

**Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**Jeanne Vosberg Sourgens**
VINSON & ELKINS L.L.P
(202) 639-6633

**William E. Lawler , III**
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**William E. Hoffmann , Jr.**
KING & SPALDING, LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON, LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Denise M. Clark**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
(202) 252-6605
Email: denise.clark@usdoj.gov

**Jean Lin**
U.S. DEPARTMENT OF JUSTICE, CIVIL
DIVISION
FEDERAL PROGRAMS BRANCH
(202) 514-3716
Email: jean.lin@usdoj.gov

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Robert E. Waters**
KING & SPALDING, LLP
(202) 737-0500
Email: rwaters@velaw.com

**Yousri H. Omar**
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Peter S. Smith**
UNITED STATES ATTORNEY'S OFFICE
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

**Robert J. Erickson**
U. S. DEPARTMENT OF JUSTICE
(202) 514-2841
Email: robert.erickson@usdoj.gov

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR, LLC
(410) 444-1500
Email: garyeproctor@gmail.com

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER OFFICE, EASTERN DISTRICT OF PENN
(215) 928-0528
Email: shawn.nolan@fd.org

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Sean D. O'Brien**
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Date:   September 27, 2019

*/s/ Pieter Van Tol*

Pieter Van Tol (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY  10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

and

Elizabeth M. Hagerty (Bar No. 1022774)
David S. Victorson (Bar No. 1027025)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
elizabeth.hagerty@hoganlovells.com
david.victorson@hoganlovells.com

*Attorneys for Plaintiff Daniel Lewis Lee*