**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
| | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No. 19-mc-145 (TSC) |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Lee v. Barr*, *et al.*, 19-cv-2559 | ) | |
| ———————————————— | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF DANIEL LEWIS LEE'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

I.       STATUTORY AND REGULATORY BACKGROUND................................... 4

II.      THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS................................ 6

III.     PROCEDURAL HISTORY................................................................................ 10

STANDARD OF REVIEW ............................................................................................... 11

ARGUMENT ..................................................................................................................... 12

I.       LEE IS UNLIKELY TO SUCCEED ON HIS EIGHTH AMENDMENT CLAIM ......... 12

         A.  The Standard for Method-of-Execution Challenges ................................... 12

         B.       Lee Is Unlikely to Establish that the 2019 Protocol Poses A Substantial
                  Risk of Severe Harm ..................................................................................... 14

              1.       Lee is unlikely to succeed in challenging the use of pentobarbital........................14

              2.       Lee's challenge to the 2019 Protocol is based on speculations. .............................16

         C.       Lee Fails to Propose An Alternative That Will Significantly Reduce A
                  Substantial Risk of Severe Pain ................................................................... 22

II.      LEE IS UNLIKELY TO SUCCEED ON HIS DUE PROCESS CLAIM ........................ 26

III.     LEE IS UNLIKELY TO SUCCEED ON HIS RIGHT TO COUNSEL CLAIM............. 28

IV.      LEE IS UNLIKELY TO SUCCEED ON HIS APA CLAIMS........................................ 30

         A.       Lee Is Unlikely to Succeed on His *Ultra Vires* Claims ......................................... 30

              1.       The 2019 Protocol is authorized by DOJ regulations and does not conflict with the
                       FDPA as applied to Lee. ....................................................................................30

              2.       The 2019 Protocol does not violate the Take Care Clause. ....................................35

         B.       The 2019 Protocol Is Not Subject to the APA's Notice-and-Comment
                  Requirement................................................................................................... 36

         C.       BOP's Adoption of the 2019 Protocol Is not Arbitrary or Capricious ................ 39

V.       THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY
         INJUNCTION.................................................................................................... 43

CONCLUSION.................................................................................................................. 45

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ........................................................................... 12

*ACA Int'l v. FCC*,
  885 F.3d 687 (D.C. Cir. 2018) .............................................................................. 32

*Am. Petroleum Inst. v. EPA*,
  862 F.3d 50 (D.C. Cir. 2017) ................................................................................ 32

*Andres v. United States*,
  333 U.S. 740 (1948) .............................................................................................. 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................. 21

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015) .............................................................................. 38

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ................................................................................................ 39

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) .............................................................................. 36

*Baze v. Rees*,
  553 U.S. 35 (2008) ........................................................................................ *passim*

*Beaty v. Brewer*,
  649 F.3d 1071 (9th Cir. 2011) .............................................................................. 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 20, 21

*Bell v. Wolfish*,
  441 U.S. 520 (1979) .............................................................................................. 14

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ................................................................................ 32

*Boyd v. Beck*,
  404 F. Supp. 2d 879 (E.D.N.C. 2005) .................................................................. 44

*Brewer v. Landrigan*,
    562 U.S. 996 (2010) ................................................................. 19

*Brockett v. Spokane Arcades, Inc.*,
    472 U.S. 491 (1985) ................................................................. 31

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) ...................................................... *passim*

*Calderon v. Thompson*,
    523 U.S. 538 (1998) ....................................................... 4, 44, 45

*Chavez v. Fla. SP Warden*,
    742 F.3d 1267 (11th Cir. 2014) ............................................... 43

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ................................................................. 38

*Clarian Health W., LLC v. Hargan*,
    878 F.3d 346 (D.C. Cir. 2017) ....................................... 36, 37, 38

*Clemons v. Crawford*,
    585 F.3d 1119 (8th Cir. 2009) ............................................ 21, 28

*Cmty. Nutrition Inst. v. Young*,
    818 F.2d 943 (D.C. Cir. 1987) ................................................. 38

*Cohen v. United States*,
    578 F.3d 1 (D.C. Cir. 2009) ..................................................... 37

*Cooey v. Strickland*,
    589 F.3d 210 (6th Cir. 2009) .......................................... 17, 18, 22

*Cooey v. Strickland*,
    No. 2:04-CV-1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011) ................... 29, 30

*Cooey v. Taft*,
    430 F. Supp. 2d 702 (S.D. Ohio 2006) ..................................... 44

*Cook v. Brewer*,
    637 F.3d 1002 (9th Cir. 2011) ........................................... 19, 26

*Creech v. Reinke*,
    No. 1:12-cv-173, 2012 WL 1995085 (D. Idaho June 4, 2012) ................. 15

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ...................................................................... 11

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    No. CV 10-476, 2016 WL 10749142 (D.D.C. Apr. 25, 2016) ............................... 39

*DeYoung v. Owens*,
    646 F.3d 1319 (11th Cir. 2011) ...................................................................... 15

*Emmett v. Johnson*,
    489 F. Supp. 2d 543 (E.D. Va. 2007) .............................................................. 44

*Emmett v. Johnson*,
    532 F.3d 291 (4th Cir. 2008) .................................................................... 18, 21

*EPIC v. U.S. Dep't of Homeland Sec.*,
    653 F.3d 1 (D.C. Cir. 2011) ........................................................................... 36

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*,
    857 F.3d 913 (D.C. Cir. 2017) ...................................................................... 39

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ............................................................................... 17, 25

*FERC v. Elec. Power Supply Ass'n*,
    136 S. Ct. 760 (2016) .................................................................................. 39

*Free Enter. Fund v. Pub. Co. Accounting Bd.*,
    561 U.S. 477 (2010) .................................................................................... 36

*Furman v. Georgia*,
    408 U.S. 238 (1972) ...................................................................................... 4

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ...................................................................... 36

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*,
    779 F.3d 1275 (11th Cir. 2015) .................................................................. 15, 19

*Glossip v. Gross*,
    135 S. Ct. 2726 (2015) ........................................................................... *passim*

*Gomez v. U.S. Dist. Court for N. Dist. of Cal.*,
    503 U.S. 653 (1992) .................................................................................... 44

*Gray v. McAuliffe*,
No. 3:16CV982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017)..................................41, 42

*Grayson v. Warden, Comm'r , Ala. Dep't of Corr.*,
869 F.3d 1204 (11th Cir. 2017)...................................................................................16

*Gregg v. Georgia*,
428 U.S. 153 (1976) ......................................................................................................4

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ....................................................................................................33

*Guttenberg v. Emery*,
26 F. Supp. 3d 88 (D.D.C. 2014) .................................................................................43

*Hamilton v. Jones*,
472 F.3d 814 (10th Cir. 2007)......................................................................................18

*Harbison, v. Little*,
571 F.3d 531 (6th Cir. 2009).........................................................................................18

*Harris v. Johnson*,
323 F. Supp. 2d 797 (S.D. Tex. 2004) .........................................................................44

*Heckler v. Chaney*,
470 U.S. 821 (1985) .....................................................................................................40

*Higgs v. United States*,
711 F. Supp. 2d 479 (D. Md. 2010) ........................................................................33, 34

*Hill v. McDonough*,
547 U.S. 573 (2006) .....................................................................................................45

*In re Mo. Dep't of Corr.*,
839 F.3d 732 (8th Cir. 2016).....................................................................................16, 41

*In re Ohio Execution Protocol Litig.*,
937 F. 3d. 759 (6th Cir. 2019)......................................................................................14

*In re Ohio Execution Protocol Litig.*,
No. 2:11-CV-1016, 2018 WL 6529145, (S.D. Ohio Dec. 12, 2018) .........................30

*In re Ohio Execution Protocol Litig.*,
860 F.3d 881 (6th Cir. 2017)........................................................................................16

*Jackson v. Danberg,*
    594 F.3d 210 (3d Cir. 2010) .................................................................... 26

*Jackson v. Danberg,*
    656 F.3d 157 (3d Cir. 2011) ...................................................................... 7

*James V. Hurson Assocs., Inc. v. Glickman,*
    229 F.3d 277 (D.C. Cir. 2000) ................................................................ 36

*Johnson v. Avery,*
    393 U.S. 483 (1969) ................................................................................. 29

*Johnson v. Precythe,*
    901 F.3d 973 (8th Cir. 2018) ................................................................... 16

*Jones v. Comm'r, Ga. Dep't of Corr.,*
    811 F.3d 1288 (11th Cir. 2016) ............................................................... 27

*Jordan v. Comm'r, Miss. Dep't of Corr.,*
    908 F.3d 1259 (11th Cir. 2018) ............................................................... 15

*Jordan v. Mo. Dep't of Corr.,*
    137 S. Ct. 2180 (2017) ............................................................................. 41

*K-Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ................................................................................. 31

*Ky. Dep't of Corr. v. Thompson,*
    490 U.S. 454 (1989) ................................................................................. 28

*Ladd v. Livingston,*
    777 F.3d 286 (5th Cir. 2015) ................................................... 15, 19, 25

*Lambert v. Buss,*
    498 F.3d 446 (7th Cir. 2007) ................................................................... 44

*Landrigan v. Brewer,*
    No. CV-10-2246, 2010 WL 4269559 (D. Ariz. Oct. 25, 2010), *aff'd,* 625 F.3d 1144
    (9th Cir. 2010) ......................................................................................... 19

*Lenz v. Johnson,*
    443 F. Supp. 2d 785 (E.D. Va. 2006) ..................................................... 44

*Lewis v. Casey,*
    518 U.S. 343 (1996) ........................................................................ 26, 29

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ................................................................................................ 38

*Mayo v. Reynolds,*
  875 F.3d 11 (D.C. Cir. 2017) .................................................................................. 39

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ................................................................................................ 11

*McGehee v. Hutchinson,*
  854 F.3d 488 (8th Cir. 2017)................................................................................... 16

*Miller v. Parker,*
  910 F.3d 259 (6th Cir.), , *cert. denied*, 139 S. Ct. 399 (2018) ................................. 43

*Morrison v. Olson,*
  487 U.S. 654 (1988) ................................................................................................ 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................................ 39, 40

*Munaf v. Geren,*
  553 U.S. 674 (2008) ................................................................................................ 11

*Nat'l Mining Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014) .......................................................................... 36, 38

*Nken v. Holder,*
  556 U.S. 418, (2009) .............................................................................................. 43

*Oken v. Sizer,*
  321 F. Supp. 2d 658 (D. Md. 2004), *vacated*, 542 U.S. 916 (2004) ....................... 26

*Pennsylvania v. Finley,*
  481 U.S. 551 (1987) ................................................................................................ 29

*Phillips v. DeWine,*
  841 F.3d 405 (6th Cir. 2016)............................................................................. 26, 27

*Planned Parenthood of Wisc., Inc. v. Azar,*
  316 F. Supp. 3d 291 (D.D.C. 2018) .................................................................. 37, 38

*Powell v. Thomas,*
  641 F.3d 1255 (11th Cir. 2011).......................................................................... 20, 26

vii

*Printz v. United States,*
 521 U.S. 898 (1997) ........................................................................................ 36

*Pub. Citizen v. Dep't of State,*
 276 F.3d 634 (D.C. Cir. 2002) ....................................................................... 36

*Raby v. Livingston,*
 600 F.3d 552 (5th Cir. 2010) .......................................................................... 15

*Reno v. Flores,*
 507 U.S. 292 (1993) ........................................................................................ 32

*Rhoades v. Reinke,*
 671 F.3d 856 (9th Cir. 2011) .......................................................................... 43

*Rhoades v. Reinke,*
 830 F. Supp. 2d 1046 (D. Idaho), *aff'd,* 671 F.3d 856 (9th Cir. 2011) ........... 45

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r,*
 295 F.3d 16 (D.C. Cir. 2002) ......................................................................... 20

*Roane v. Holder,*
 607 F. Supp. 2d 216 (D.D.C. 2009) ............................................................... 31

*Roane v. Leonhart,*
 741 F.3d 147 (D.C. Cir. 2014) ......................................................................... 6

*Sells v. Livingston,*
 561 F. App'x 342 (5th Cir. 2014) ................................................................... 19

*Sells v. Livingston,*
 750 F.3d 478 (5th Cir. 2014) .......................................................................... 15

*Sepulvado v. Jindal,*
 729 F.3d 413 (5th Cir. 2013) ..................................................................... 27, 28

*Sherley v. Sebelius,*
 644 F.3d 388 (D.C. Cir. 2011) ............................................................ 11, 32, 43

*Tennessee v. Garner,*
 471 U.S. 1 (1985) ........................................................................................... 31

*The Estate of Lockett by and through Lockett v. Fallin,*
 841 F.3d 1098 (10th Cir. 2016) ...................................................................... 29

*Towery v. Brewer*,
   672 F.3d 650 (9th Cir. 2012)............................................................................................. 15

*Trottie v. Livingston*,
   766 F.3d 450 (5th Cir. 2014)............................................................................................. 27

*United States v. Barrett*,
   496 F.3d 1079 (10th Cir. 2007)........................................................................................... 6

*United States v. Bourgeois*,
   423 F.3d 501 (5th Cir. 2005)............................................................................................. 34

*United States v. Chandler*,
   950 F. Supp. 1545 (N.D. Ala. 1996) ................................................................................. 31

*United States v. Fell*,
   No. 5:01-CR-12-01, 2018 WL 7270622 (D. Vt. Aug. 7, 2018)................................................. 34

*United States v. Grace*,
   461 U.S. 171 (1983) ......................................................................................................... 32

*United States v. Lee*,
   374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005) ...................................... 6, 10

*United States v. Lee*,
   No. 4:97-CR-00243-(2), 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008), *aff'd*, 715 F.3d 215
   (8th Cir. 2013), *rehearing denied*, 811 F.3d 272 (8th Cir. 2015), *cert. denied* 135 S. Ct. 72
   (2014) ...................................................................................................................... 10, 11

*United States v. Lee*,
   No. 4:97CR00243-02, 2014 WL 1093197 (E.D. Ark. Mar. 18, 2014), *aff'd*, 792 F.3d 1021
   (8th Cir. 2015), *rehearing denied*, 811 F.3d 272 (8th Cir. 2015), *cert denied*, 137 S. Ct. 1577
   (2017) ........................................................................................................................... 11

*United States v. Nat'l Treas. Emps. Union*,
   513 U.S. 454 (1995) ......................................................................................................... 31

*United States v. Tipton*,
   90 F.3d 861 (4th Cir. 1996)............................................................................................... 31

*United States v. Wade*,
   388 U.S. 218 (1967) ......................................................................................................... 29

*Valle v. Singer*,
   655 F.3d 1223 (11th Cir. 2011).............................................................................. 21, 26, 28

*Wainwright v. Torna*,
  455 U.S. 586 (1982) ............................................................................................... 29

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
  754 F.3d 1260 (11th Cir. 2014) ........................................................... 16, 19, 21, 27

*Whitaker v. Collier*,
  862 F.3d 490 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018) ............ 15, 19, 29

*Whitaker v. Livingston*,
  732 F.3d 465 (5th Cir. 2013) ................................................................... 19, 21, 22

*Williams v. Hobbs*,
  658 F.3d 842 (8th Cir. 2011) ..................................................................................... 27

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 11, 43

*Wood v. Collier*,
  836 F.3d 534 (5th Cir. 2016) ............................................................................... 15, 19

*Wood v. Ryan*,
  759 F.3d 1076 (9th Cir.), *vacated*, 573 U.S. 975 (2014) ........................................ 27

*Workman v. Bredesen*,
  486 F.3d 896 (6th Cir. 2007) ..................................................................................... 26

*Zagorski v. Parker*,
  139 S. Ct. 11 (2018) ..................................................................................................... 16

*Zink v. Lombardi*,
  783 F.3d 1089 (8th Cir. 2015) ............................................................................ *passim*

## Constituitional Provisions

U.S. Const. art. II, § 3 .......................................................................................... 35, 36

U.S. Const. amend. VI ................................................................................................ 29

## Statutes

5 U.S.C. § 301 ............................................................................................................. 31

5 U.S.C. § 553 ................................................................................................. 35, 36, 38

5 U.S.C. § 706 ................................................................................................. 35

18 U.S.C. § 1959 ............................................................................................. 10

18 U.S.C. § 1962 ............................................................................................. 10

18 U.S.C. § 4001 ............................................................................................. 31

18 U.S.C. §§ 3591-99 ....................................................................................... 5

18 U.S.C. § 3591 ............................................................................................... 5

18 U.S.C. § 3592 ............................................................................................... 5

18 U.S.C. § 3593 ............................................................................................... 5

18 U.S.C. § 3596 ....................................................................................... *passim*

18 U.S.C. § 3597 ............................................................................................. 34

21 U.S.C. § 848 ........................................................................................... 4, 5

21 U.S.C. § 848 (1988) ................................................................................. 4, 5

28 U.S.C. § 509 ............................................................................................... 31

28 U.S.C. § 510 ............................................................................................... 31

28 U.S.C. § 566 ............................................................................................... 31

28 U.S.C. § 2241 ............................................................................................. 11

28 U.S.C. § 2255 ............................................................................................. 10

28 U.S.C. § 2401 ............................................................................................. 31

42 Pa. Cons. Stat.  § 9711 ............................................................................. 33

Act of Apr. 30, 1790, 1 Stat. 112 ................................................................ 3, 4

Act of June 19, 1937, 50 Stat. 304 .................................................................. 4

Ala. Code § 15-18-82.1 ................................................................................. 33

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 ............. 5

Ark. Code. Ann. § 5-4-615 ...................................................................... 33

Ark. Code Ann. § 5-4-617 ................................................................. 6, 33

Cal. Penal Code § 3604 .......................................................................... 33

Colo. Rev. Stat. § 18-1.3-1202 ............................................................. 33

Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 .................................... 5

Fla. Stat. § 922.105 ............................................................................... 33

Ga. Code Ann. § 17-10-38 ..................................................................... 33

Ind. Code § 35-38-6-1 ........................................................................... 33

Kan. Stat. Ann. § 22-4001 ..................................................................... 33

Ky. Rev. Stat. § 431.220 ....................................................................... 33

La. Stat. Ann. § 15:569 ......................................................................... 33

Mo. Rev. Stat. § 546.720 ....................................................................... 33

Mont. Code Ann. § 46-19-103 ................................................................ 33

Neb. Rev. Stat. § 83-964 ....................................................................... 33

Okla. Stat. tit. 22 § 1014 ....................................................................... 33

Or. Admin. R. 291-024-0080 ................................................................. 33

Pa. Cons. Stat.  § 9711 ........................................................................... 33

S.C. Code Ann. § 24-3-530 .................................................................... 33

S.D. Codified Laws § 23A-27A-32 ........................................................ 33

Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 ............................................. 4

Tex. Code Crim. Proc. Ann. art. 43.14 .................................................. 33

Utah Code Ann. § 77-19-10 ................................................................... 33

Va. Code Ann. § 53.1-234 ..................................................................... 33

**Other Legislative Materials**

H.R. Rep. 104–879 (1997) ............................................................................................. 34

Testimony of Kathleen M. Hawk, Subcommittee on Crime of the House Committee on the
    Judiciary, June 8, 1995, 1995 WL 352705 .............................................................. 34

**Rules**

Fed. R. Civ. P. 30(b)(6) .................................................................................................. 11

Fed. R. Civ. P. 60(b) ...................................................................................................... 11

**Regulations**

28 C.F.R. Part 26 ................................................................................................. 5, 31, 37

28 C.F.R. § 26.2 ............................................................................................................... 5

28 C.F.R. § 26.3 ................................................................................................ 5, 32, 33, 37

57 Fed. Reg. 56,536-01 (Nov. 30, 1992) ......................................................................... 5

58 Fed. Reg. 4898 (Jan. 19, 1993) ................................................................................... 5

**Other Authorities**

Office of the Attorney General, Press Release No. 19-807 (July 25, 2019),
    https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-
    nearly-two-decade-lapse ........................................................................................... 45

Barnini Chakraborty, *Texas refuses to give back lethal drugs, proceeds with execution*, Fox
    News Politics, (Oct. 9, 2013), http://www.foxnews.com/politics/2013/10/09/texas-execution-
    to-proceed-despite-controversy-over-drug-and-compounding.html ........................ 42

Federal Bureau of Prisons, Historical Information, Capital Punishment, bop.gov ........ 4

Holly Yan & Steve Almasy, *Missouri Inmate Executed Despite Activists' Concerns He Could
    Suffer Because of His Rare Disease*, CNN, Oct. 1, 2019,
    https://www.cnn.com/2019/10/01/us/missouri-execution-russell-bucklew-rare-disease-
    trnd/index.html ......................................................................................................... 15

U.S. Food and Drug Administration, *Compounding and the FDA: Questions and Answers*,
    https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-
    answers ..................................................................................................................... 24

U.S. Food & Drug Administration, *Human Drug Compounding*,
    https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-
    compounding ............................................................................................................................. 8

## INTRODUCTION

Twenty years ago, a federal jury convicted Plaintiff Daniel L. Lee of murdering three people and returned a verdict of death, as authorized by the Federal Death Penalty Act ("FDPA"). Lee's conviction and sentence were affirmed on appeal, and his motions for post-conviction relief have been rejected, culminating in multiple denials of certiorari by the Supreme Court.  Lee's execution has now been scheduled for December 9, 2019, and the Federal Bureau of Prisons ("BOP") has determined that the execution will be conducted using a single-drug pentobarbital lethal injection protocol, which is substantively identical to those protocols that have been upheld by courts—including the Supreme Court in its most recent method-of-execution case, *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019).  Lee now asks this Court to enjoin the application of BOP's lethal injection protocol to his execution.  While there is no question that Lee will not be able to litigate his claims on the merits should his scheduled execution proceed, it is not clear that would constitute irreparable harm in the context of a challenge to the method of execution—rather than to the lawfulness of the execution itself.  Besides, irreparable harm alone would not be a sufficient basis to issue a preliminary injunction.  The Court must further find that Lee is likely to succeed on the merits, as well as that the overall balance of equities favors an injunction.  Lee has not carried his burden on those issues, and thus, his motion should be denied.

Most significantly, Lee has not established that he is likely to succeed on the merits—the key factor in evaluating whether to grant a preliminary injunction.  The Supreme Court has explained that the Eighth Amendment prohibits only methods of execution "seeking to superadd terror, pain, or disgrace" to a prisoner's death.  *Bucklew*, 139 S. Ct. at 1124.  Under that high standard, the Court has "yet to hold that a[ny] State's method of execution qualifies as cruel and unusual." *Id.*  More specifically, a trio of Supreme Court cases—*Baze v. Rees*, 553 U.S. 35 (2008), *Glossip v. Gross*, 135 S. Ct. 2726 (2015), and *Bucklew*—establish that an inmate raising an Eighth Amendment method-of-execution challenge must plead (1) sufficient facts to show that the challenged execution protocol is sure or very likely to cause severe pain, and (2) a known and

available alternative method of execution that is feasible and readily implemented, and that in fact significantly reduces a substantial risk of severe pain.

Lee cannot meet either of those requirements.  The Supreme Court has already rejected the claim that pentobarbital is sure or very likely to cause severe pain.  Indeed, pentobarbital is often proffered as a superior alternative by inmates challenging other lethal injection protocols.  Lee's complaints about the protocol are thus focused on possible pain that may result from maladministration of it, and his proposed alternatives are merely additional procedural safeguards to avoid such maladministration.  But *Baze* makes clear that an inmate cannot establish an Eighth Amendment claim by pointing to the possibility of maladministration or by alleging procedural safeguards that the government could adopt.  As the Supreme Court has explained, to hold otherwise would improperly turn courts into boards of inquiry responsible for assessing best practices for executions.  And as for Lee's suggestion that he be administered a dose of an opioid or anti-anxiety medication prior to pentobarbital, that suggestion lacks sufficient specificity to make it a feasible and readily implemented alternative.  Nor has Lee shown any basis to believe that it would be a significant improvement of the government's protocol.

Lee argues that the Court should stay his execution pending discovery so that he can gather evidence to prove his Eighth Amendment claim and discover other possible alternative methods of execution.  But that is not the law.  The Supreme Court and courts of appeals have uniformly rejected the proposition that an inmate challenging an execution protocol is entitled to discovery to determine whether he has a viable Eighth Amendment claim.  *Glossip* makes clear that failing to plead a method-of-execution claim requires the denial of a preliminary injunction, not the grant of discovery.  And it is well-settled that an inmate does not have an independent constitutional right to information concerning the procedures for implementing his death sentence, whether under the Due Process Clause of the Fifth Amendment or the First Amendment.  Nor is there any right to counsel during execution, whether under the First, Fifth, or Sixth Amendment.

Lee also brings claims under the Administrative Procedure Act ("APA"), but those claims are not likely to succeed, either.  Contrary to Lee's argument, BOP's adoption of the challenged

protocol is not *ultra vires*; rather, the protocol was adopted pursuant to validly enacted regulations, which are consistent with the FDPA as applied to Lee.  Under both the FDPA and the regulations, lethal injection is the proper method for Lee's execution.  The protocol merely provides the details for how to implement that method.

Because statute and regulations already specify the substantive norms, it follows that the protocol is not subject to the APA's notice-and-comment requirement.  Indeed, the protocol does not determine any rights or obligations.  Nor does it have any binding effect, whether on the agency or anyone else.  Lee himself notes the agency discretion provided in the protocol, which is a hallmark of a procedural rule.  And besides, the Administrative Record demonstrates that BOP engaged in reasoned decision-making when adopting the protocol.  BOP took into account the wide-spread use of pentobarbital, explored using it in a three-drug sequence, and considered other options.  It also studied and observed the implementation of similar state protocols, consulted with medical professionals, and reviewed judicial opinions.  Under the APA's highly deferential standard of review, that was sufficient.

Because Lee has not established a likelihood of success on the merits, which is a necessary showing to obtain a preliminary injunction, his motion should be denied.  But even if the Court were to consider the other preliminary injunction factors, they tip against the issuance of an injunction.  In assessing irreparable harm, it is certainly the case that Lee will not be able to litigate his claims to final resolution on the merits absent preliminary relief enjoining his scheduled execution.  But Lee does not contend in this forum that he cannot lawfully be executed; he claims only that he cannot be executed using BOP's selected method because he will experience an unconstitutional level of pain.  Thus, the only asserted harm at issue—whether Lee will suffer an unconstitutional level of pain during the execution—requires that Lee make the same showing as required to establish his Eighth Amendment claim on the merits.  And as explained above, he cannot do so.  On the other hand, the government, the public, and Lee's three murder victims (as well as their survivors) have a compelling interest in the timely enforcement of a lawful death sentence once post-conviction proceedings have run their course.  To delay the implementation of

a valid death sentence in such circumstances, the Supreme Court recognized, is "to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the [government] and the victims of crime alike." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (internal citations omitted).  For these reasons, Lee's motion should be denied.

## BACKGROUND

### I.   STATUTORY AND REGULATORY BACKGROUND

Federal law has authorized capital punishment since 1790, when the First Congress mandated that several federal crimes be punishable by death.  *See* Act of Apr. 30, 1790, ch. 9, §§ 1, 3, 33, 1 Stat. 112, 112, 113, 119.  Until 1937, federal law prescribed hanging as the method of execution.  Act of Apr. 30, 1790, § 33, 1 Stat. at 119; *Andres v. United States*, 333 U.S. 740, 745 n.6 (1948).  In 1937, Congress mandated that each federal execution be carried out in "the manner prescribed by the laws of the State within which the sentence is imposed," or, if that State did not have the death penalty, in accordance with the laws of another State designated by the sentencing court.  Act of June 19, 1937, ch. 367, 50 Stat. 304, 304.  The last federal execution under the Act of 1937 was the hanging of Victor Feguer in 1963.  *See* Federal Bureau of Prisons, Historical Information, Capital Punishment, bop.gov.  The Act was repealed in 1984 through the enactment of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, tit. II, ch. II, 98 Stat. 1987 (1984).

Meanwhile, in 1972, the Supreme Court held in *Furman v. Georgia*, 408 U.S. 238 (1972), that the death penalty could violate the Eighth Amendment if imposed in an arbitrary and capricious manner.  In response to *Furman*, some 35 states enacted new statutes to specify the factors to be weighed and the procedures to be followed in deciding whether to impose a capital sentence, and to make the death penalty mandatory for specified crimes.  *Gregg v. Georgia*, 428 U.S. 153, 180–81 (1976).  In 1976, the Supreme Court held that capital punishment is not *per se* unconstitutional if the sentencing scheme provides objective criteria to direct the sentencing discretion and allows the jury (or the judge if appropriate) to consider the character and record of the defendant.  *Id.* at 206–07.  The next federal execution did not occur until 2001, however.

To comply with *Furman* and *Gregg*, Congress enacted the Anti-Drug Abuse Act of 1988 ("ADAA"), Pub. L. No. 100-690, 102 Stat. 4181; *id.* § 7001(a) (codified at 21 U.S.C. § 848(e)). The ADAA authorized capital punishment for the intentional killing of an individual while engaging in criminal enterprises or drug felonies.   It also provided sentencing procedures that included considerations of the nature and circumstances of the crime committed and the character and record of the defendant.  *See* 21 U.S.C. § 848(g)-(r) (1988).  The ADAA, however, did not specify a method of execution.

To ensure the orderly implementation of federal death sentences, the Department of Justice ("DOJ") promulgated regulations in 1993 to set forth "death sentence procedures."  28 C.F.R. Part 26; *see also* Implementation of Death Sentences in Federal Cases, 58 Fed. Reg. 4898–4901 (Jan. 19, 1993), and Proposed Rule, 57 Fed. Reg. 56536-01 (Nov. 30, 1992).  The regulations require federal prosecutors to propose to the sentencing court that any death sentence be implemented by lethal injection on a date and at a place designated by the BOP Director.  28 C.F.R. § 26.2.   They further provide that, "[e]xcept to the extent a court orders otherwise," a death sentence shall be executed "[b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death," and that the BOP Director shall determine the lethal substance or substances to be used.  28 C.F.R. § 26.3(a).  *Id.*  In this way, the federal government was following the States' trend in adopting lethal injection as "a more humane way to carry out death sentences."  *Glossip*, 135 S. Ct. at 2732.

In 1994, Congress enacted the Federal Death Penalty Act of 1994, Pub. L. No. 103-322, § 60002, 108 Stat. 1796, 1959 (codified at 18 U.S.C. §§ 3591–99), authorizing capital punishment for some 60 offenses under various federal statutes if, after consideration of enumerated factors at a special hearing, *see* 18 U.S.C. §§ 3592, 3593, "it is determined that imposition of a sentence of death is justified," *id.* § 3591.[1]  It also included an implementation provision, 18 U.S.C. § 3596,

---

[1] The FDPA initially did not govern capital sentences imposed under the ADAA, 21 U.S.C. § 848(e) (1988).  In March 2006, Congress repealed the death penalty provisions of § 848,

providing that after the condemned inmate has exhausted "the procedures for appeal of the judgment of conviction and for review of the sentence," *id.* § 3596(a), he or she shall be released "to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," or if that State does not permit capital punishment, then the law of another State that does permit capital punishment, as designated by the sentencing court, *id.*[2]

Lee's sentence was imposed in the State of Arkansas. *See United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004). Arkansas law prescribes the use of lethal injection as the method of execution. Ark. Code Ann. § 5-4-617(a) (2019). Lee is currently scheduled to be executed by lethal injection on December 9, 2019.

## II.     THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS

BOP's manual outlining its "policy and procedures for planning and carrying out [death sentences]" is entitled "BOP Execution Protocol." AR 1016. It provides checklists for pre-execution, execution, and post-execution procedures, as well as detailed steps related to command center operations, contingency planning, news media procedures, and the handling of stays, commutations, and other delays. *See* AR 1016–67. We will refer to it as the "BOP Manual."

The lethal substance(s) and the procedures for administering such substance(s) are set forth in an addendum to the BOP Manual. Prior to 2011, the addendum called for a sequence of three drugs that included sodium thiopental. *See Roane v. Leonhart*, 741 F.3d 147, 149 (D.C. Cir. 2014). In March 2011, after the sole American manufacturer of sodium thiopental exited the market due to pressure from anti-death penalty activists, AR 870, the government announced that it did not have any reserves of sodium thiopental for lethal injections, *Roane*, 741 F.3d at 149. BOP

---

"effectively rendering the FDPA applicable to all federal death-eligible offenses." *United States v. Barrett*, 496 F.3d 1079, 1106 (10th Cir. 2007).

[2] Three executions have taken place pursuant to the above statutory and regulatory framework: Timothy McVeigh and Juan Garza in 2001 and Louis Jones in 2003. AR 864.

thereafter began exploring the possibility of using pentobarbital as the lethal agent, which BOP ultimately found to be most suitable.  AR 871.

Pentobarbital is a barbiturate that affects the activity of the brain and nervous system. Compl. ¶ 69, 19-cv-2559, ECF No. 1.  It is "commonly used to euthanize terminally ill patients who seek death with dignity in States such as Oregon and Washington." *Jackson v. Danberg*, 656 F.3d 157, 165 (3d Cir. 2011) (citation omitted).  In 2010, Oklahoma used pentobarbital in executions as part of a three-drug sequence, AR 870, followed by Ohio the next year in a single-drug execution, AR 871.  Many States subsequently incorporated pentobarbital into their execution protocols or have announced the intention to do so.  *Id.*

As part of its research and study, BOP considered the wide-spread use of pentobarbital by States.  AR 871 ("Currently, fourteen states have used pentobarbital, either as part of a three-drug combination or by itself, in executions.  An additional five states have announced plans to use it."). Five States (Georgia, Idaho, Missouri, South Dakota, and Texas) use a single-drug pentobarbital protocol as the primary method of execution.  *Id.*  Since 2012, two of those States, Missouri and Texas, have conducted a total of almost 100 executions using this protocol.  *Id.*  This method was used in eight state executions in 2017, sixteen executions in 2018, and six executions so far in 2019.  AR 857, 871; *supra* note 5.  BOP visited state execution sites to observe state executions, AR 871, 930, and reviewed state lethal injection protocols, including those of the five States that administer a single-drug pentobarbital protocol, AR 930, 933.

BOP also took into account judicial opinions upholding the use of pentobarbital in executions against Eighth Amendment challenges.  *See* AR 871, n.13 (citing cases), AR 931.  It further considered the fact that state inmates challenging lethal injection protocols frequently propose a single dose of pentobarbital as the alternative, preferred method.  *See* AR 931 (citing cases).  In addition, BOP consulted with medical professionals, AR 525–26, 871, 872, 930, and reviewed publically available expert testimony concerning pentobarbital and other drugs.  AR 934. Specifically, Dr. Joseph F. Antognini, M.D., who had served as an expert in *Bucklew*, concurred with BOP's proposal to use the single-drug pentobarbital protocol.  AR 872.  Another expert, Craig

W. Lindsley, Ph. D, of the Vanderbilt Center for Neuroscience Drug Discovery, similarly opined that BOP's Protocol "is more humane than the other double and triple agent injections still employed" and noted that "[c]ase histories that are available with single agent pentobarbital sodium detail highly consistent results and extremely rapid and peaceful passing (as relayed by witness accounts)." AR 525.

In addition, BOP explored alternatives to the single-drug pentobarbital method. It considered using pentobarbital as the first drug in a three-drug sequence, but determined that a one-drug protocol would avoid "the complications inherent in obtaining multiple drugs" and navigating expiration dates of multiple drugs, AR 871, 930, and would simplify the procedure, thus "reduc[ing] the risk of administration mishaps," AR 871; *see also* AR 931 ("[A]dministering one drug reduces the risk of errors during administration and eliminates the need to orchestrate the pace and sequence of administering multiple drugs and IV line management."). BOP also considered several other drugs, but rejected them as inappropriate lethal agents. AR 871, 964 (propofol); AR 862–65 (fentanyl); AR 931, 966 (midazolam, sufentanil citrate, and potassium chloride); AR 968 (midazolam and hydromorphone).

As for the supply of pentobarbital, which is a controlled substance, BOP selected a domestic bulk manufacturer that is properly registered with the Drug Enforcement Administration ("DEA"). AR 872. The active pharmaceutical ingredient ("API") produced by the manufacturer was subject to quality assurance testing. *Id*. BOP further selected a compounding pharmacy to store the API and to convert it into injectable form as needed. *Id.* Compounding pharmacies are those in which a licensed pharmacist or physician combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual. AR 857; *see also* U.S. Food & Drug Administration, *Human Drug Compounding*, https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.[3] The compounding pharmacy is registered

---

[3] Many states have turned to compounding pharmacies to produce their chosen drug(s) for lethal injection because anti-death penalty advocates' lobbying efforts have led to reduced supply of drugs used for executions. AR 857 (citing *Glossip*, 135 S. Ct. at 2733).

with the DEA and has performed its own testing of the injectable form of pentobarbital it produced. AR 872.  Further, two independent laboratories have performed quality testing of the injectable solution produced by the compounding pharmacy.  *Id.*; *see also* AR 970–1015 (laboratory reports). Finally, BOP confirmed with the DEA that the BOP facility in Terre Haute, Indiana—where Lee's execution will take place—meets the regulatory requirements for storage and handling of pentobarbital.  AR 872.  In assessing the protocol, BOP considered the fact that federal courts of appeals have routinely denied Eighth Amendment challenges to the use of compounded pentobarbital.  AR at 857–58 (citing cases).

On July 25, 2019, at the direction of the Attorney General, BOP adopted a revised addendum to the BOP Manual that replaced the three-drug procedure with the use of a single drug, pentobarbital sodium, as the lethal agent.  AR 868, 874–75.  We will refer to this addendum as the "Lethal Injection Protocol," and will refer to the addendum and the Manual collectively as the "2019 Protocol."  The Lethal Injection Protocol sets forth procedures for BOP to implement the lethal injection "unless modified at the discretion of the Director [of BOP] or his/her designee, as necessary to (1) comply with specific judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) as may be required by other circumstances."  AR 874.

Specifically, it provides that the BOP Director, in conjunction with the U.S. Marshals Service, shall select qualified personnel to serve as the executioner(s) and their alternates.  *Id.* "Qualified personnel" is defined to include licensed physicians, nurses, EMTs, paramedics, phlebotomists, and other medically trained personnel, including those trained in the U.S. Military, who have at least one year of professional experience and other personnel with necessary training and experience in a specific execution-related function.  *Id.*  The Lethal Injection Protocol further specifies that "qualified personnel" who are not medically licensed or certified are required to participate in a minimum of ten execution rehearsals a year and shall have participated in at least two execution rehearsals prior to participating in an actual execution.  *Id.*  Further, the identities

of personnel involved in performing death sentence-related functions, including their qualifications, "shall be protected from disclosure to the fullest extent permitted by law." *Id.*

As for administering the lethal agent, qualified personnel shall place the lethal substance into three sets of numbered and labeled syringes, with two of those sets serving as backups. AR 875. Each set of syringes will consist of two syringes containing 2.5 grams of pentobarbital sodium in 50 ml of diluent, and one syringe containing 60 ml of saline flush. *Id.* Once the inmate is secured, qualified personnel will attach the leads of a cardiac monitor to the inmate, insert a suitable venous access line or lines, and start a slow rate flow of normal saline solution. *Id.* If peripheral venous access is utilized, qualified personnel will insert two separate lines in separate locations, and start a flow of saline in each line to keep the line open. *Id.* One line will be used to administer the lethal substance and the other line will be reserved in the event of the failure of the first line. *Id.*

### III.   PROCEDURAL HISTORY

In 1999, Lee was convicted by a jury of his peers of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. § 1962(c) and (d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959. *United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004). Lee, his codefendant, and others had formed a white supremacist organization, and, in pursuit of the organization's criminal goals, he and his co-defendant robbed and then murdered all three members of an Arkansas family, including an eight-year old child. Lee and his co-defendant shot their victims, placed plastic bags over the victims' heads, sealed the bags with tape, and then threw the bodies laden down with rocks into the Illinois bayou. *Id.* at 641–42. The same jury that convicted Lee returned a death verdict against him on May 14, 1999. *Id.* at 643.

Lee's conviction and sentence were affirmed on appeal, *id.* at 641, and his petition for certiorari was denied, 545 U.S. 1141 (2005). He then unsuccessfully sought post-conviction relief pursuant to 28 U.S.C. § 2255. *See United States v. Lee*, No. 4:97-CR-00243-(2), 2008 WL 4079315, at *1 (E.D. Ark. Aug. 28, 2008), *aff'd*, 715 F.3d 215 (8th Cir. 2013), *rehearing denied*,

811 F.3d 272 (8th Cir. 2015), *cert. denied* 135 S. Ct. 72 (2014).  He also unsuccessfully moved to reopen the § 2255 proceeding pursuant to Fed. R. Civ. P. 60(b) and exhausted all appeals as to that motion.  *See United States v. Lee*, No. 4:97CR00243-02, 2014 WL 1093197, at *1 (E.D. Ark. Mar. 18, 2014), *aff'd*, 792 F.3d 1021 (8th Cir. 2015), *rehearing denied*, 811 F.3d 272 (8th Cir. 2015), *cert denied*, 137 S. Ct. 1577 (2017).  In September 2018, Lee filed a successive § 2255 motion, or in the alternative a Rule 60(b) motion.  *See* Compl. ¶ 33.  The district court denied that motion and Lee's appeal of that denial is pending.  On September 26, 2019, Lee further petitioned for a writ of habeas corpus under 28 U.S.C. § 2241 in the U.S. District Court for the Southern District of Indiana.  That petition remains pending.

On August 23, 2019, Lee filed this suit challenging the 2019 Protocol.  This Court consolidated the suit with the previously consolidated suits of other inmates challenging BOP's prior, three-drug lethal injection protocol, *Roane et al. v. Barr*, No. 19-mc-0145.  In *Roane*, the Court previously allowed the plaintiffs to conduct depositions pursuant to Federal Rule of Civil Procedure 30(b)(6) by February 28, 2020, in order gather information for purposes of amending their complaints by March 31, 2020.  Lee now seeks to enjoin his execution pending that discovery or pending resolution of the merits of his suit.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (citation omitted).  It is "never awarded as of right," *id.*, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).  The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  As Lee concedes, Mot. in Support of Prelim. Inj., ("Mot") at 15, ECF No. 13-1, the "most important factor" is whether the movant

has "established a likelihood of success on the merits," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). In the context of an Eighth Amendment method-of-execution challenge, the Supreme Court has held that an inmate's failure to establish a likelihood of success, alone, warrants denial of the inmate's motion to preliminarily enjoin his execution. *See Glossip*, 135 S. Ct. at 2737. As discussed below, Lee has failed to make the requisite showing.

## ARGUMENT

## I.  LEE IS UNLIKELY TO SUCCEED ON HIS EIGHTH AMENDMENT CLAIM

We begin with Lee's Eighth Amendment claim because the merits of this claim will inform the Court's consideration of many of Lee's other arguments.

Lee argues that "there is a substantial risk" that applying the 2019 Protocol to him "will result in the unnecessary infliction of pain" because the Protocol allegedly "lacks any (or adequate) safeguards" and fails to provide "procedures relating to the source, form and quality of the pentobarbital or the IV administration of the lethal substance." Mot. at 3. In the Complaint, Lee further alleges that pentobarbital could lead to pulmonary edema, and speculates various scenarios in which the execution could go wrong. *See, e.g.*, Compl. ¶¶ 70–73, 80–82, 86–87. As an alternative, Lee proposes that BOP (1) adopt certain procedural safeguards, (2) use "bedside administration," and (3) add an opioid or an anti-anxiety medication to the protocol. Mot. at 13.

Lee's arguments fail to establish that he is likely to succeed in "plead[ing] and prov[ing]" a method-of-execution claim. *Glossip*, 135 S. Ct. at 2739.

## A.  The Standard for Method-of-Execution Challenges

Through a trio of cases—*Baze*, 553 U.S. 35, *Glossip*, 135 S. Ct. 2726, and *Bucklew*, 139 S. Ct. 1112[4]—the Supreme Court has clearly set forth the standard for a method of execution

---

[4] The *Baze* plaintiffs challenged Kentucky's three-drug protocol using sodium thiopental, pancuronium bromide, and potassium chloride. 553 U.S. at 45. The *Glossip* plaintiffs challenged Oklahoma's decision to use midazolam (instead of pentobarbital) in its three-drug sequence. 135 S. Ct. at 2735. And the *Bucklew* plaintiff argued that Missouri's single-drug pentobarbital protocol was unconstitutional as applied to him because of his "unusual medical condition." 139 S. Ct. at 1118.

challenge.  To prevail on such a claim, the inmate must first "establish that the [challenged] method presents a risk that is '*sure or very likely* to cause serious illness and needless suffering and give rise to 'sufficiently *imminent* dangers.'"  *Glossip*, 135 S Ct. at 2737 (quoting *Baze*, 553 U.S. at 50).  "[T]here must be 'a substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Id.* (quoting *Baze*, 553 U.S. at 50).  This is so because the Eighth Amendment is historically understood to forbid "long disused (unusual) forms of punishment that intensified the sentences of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace,'" *Bucklew*, 139 S. Ct. at 1124 (quoting *Baze*, 553 U.S. at 48), and "[it] does not 'demand the avoidance of all risk of pain in carrying out executions,'" *id.* at 1125 (quoting *Baze*, 553 U.S. at 47).  Thus, that "an execution may result in pain, either by accident or as an inescapable consequence of death," is insufficient to state an Eighth Amendment claim.  *Baze*, 553 U.S. at 50.

Next, because the Eighth Amendment analysis is "a *necessarily* comparative exercise," *Bucklew*, 139 S. Ct. at 1126, given that "[o]ur society has . . . steadily moved to more humane methods of carrying out capital punishment," *Baze*, 553 U.S. at 62, an inmate must also "plead and prove a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain,'" *id*. at 2737 (quoting *Baze*, 553 U.S. at 52).  Merely "'showing a slightly or marginally safer alternative,'" *id.* (quoting *Baze*, 553 U.S. at 51), or "[a] minor reduction in risk is insufficient"; rather, "the difference must be clear and considerable," *Bucklew*, 139 S. Ct. at 1130.  Otherwise, courts would become "boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Baze*, 553 U.S. at 51; *accord Bucklew*, 139 S. Ct. at 1125.  Such an approach would also "embroil the courts in ongoing scientific controversies beyond their expertise" and "substantially intrude on the role of [governments] in implementing their execution procedures," despite their "earnest desire to provide for a progressively more humane manner of death." *Baze*, 553 U.S. at 51.

13

Finally, the inmate must demonstrate that the government has refused to adopt the inmate's proposed alternative "without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125. As the Supreme Court recognized, there are "many legitimate reasons why [the government] might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution." *Id.* And "the Constitution affords a measure of deference to [the government's] choice of execution procedures." *Id.* (citation omitted); *see also Bell v. Wolfish,* 441 U.S. 520, 562 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government").

**B.  Lee Is Unlikely to Establish that the 2019 Protocol Poses A Substantial Risk of Severe Harm**

**1.  Lee is unlikely to succeed in challenging the use of pentobarbital.**

Lee has not shown a likelihood of success in establishing that BOP's planned use of pentobarbital in his execution poses a "substantial risk of severe pain" or an "objectively intolerable risk of harm." *Glossip*, 135 S. Ct. at 2737. Lee argues that pentobarbital could lead to pulmonary edema, which is "extremely painful." Compl. ¶ 72. But as *Baze* noted, "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure," and "the Constitution does not demand the avoidance of all risk of pain in carrying out executions." 553 U.S. at 47. Thus, despite the possibility of pain if an inmate develops pulmonary edema during execution, the Sixth Circuit recently held that "neither pulmonary edema nor the symptoms associated with it qualify as the type of serious pain prohibited by the Eighth Amendment." *In re Ohio Execution Protocol Litig.*, 937 F. 3d. 759, 762 (6th Cir. 2019) (vacating preliminary injunction).

Moreover, "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated," *Baze*, 553 U.S. at 53, as is the case with pentobarbital. BOP chose pentobarbital because of its wide-spread use by States in either a three-drug or single-drug protocol. *See* AR 871. At least five States use a single-drug pentobarbital protocol, and they have conducted a total

of 30 executions using such a protocol since 2017.  AR 857, 871, *infra* note 5.  Two of those States, Texas and Missouri, have conducted close to 100 executions using the protocol since 2012.  *Id.*

Courts have routinely upheld the use of pentobarbital in executions.  Only this year the Supreme Court upheld Missouri's single-drug pentobarbital protocol.  *See Bucklew* 139 S. Ct. at 1130–33.[5]  The *Glossip* court recognized that "courts across the country have held that the use of pentobarbital in executions does not violate the Eighth Amendment."  135 S. Ct. at 2733.  Indeed, courts of appeals have upheld the single-drug pentobarbital protocols used in Texas, Missouri, Arizona, and Georgia.  *See, e.g.*, *Whitaker v. Collier*, 862 F.3d 490, 498–99 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018); *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016); *Ladd v. Livingston*, 777 F.3d 286, 289 & n.22 (5th Cir. 2015); *Sells v. Livingston*, 750 F.3d 478, 481 (5th Cir. 2014); *Raby v. Livingston*, 600 F.3d 552, 562 (5th Cir. 2010); *Zink v. Lombardi*, 783 F.3d 1089, 1106-07 (8th Cir. 2015) (en banc); *Towery v. Brewer*, 672 F.3d 650, 658–59 (9th Cir. 2012); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280–83 (11th Cir. 2015); *DeYoung v. Owens*, 646 F.3d 1319, 1325–27 (11th Cir. 2011).[6]  And the U.S. District Court for the District of Idaho refused to grant a preliminary injunction to a condemned inmate, who challenged Idaho's single-drug pentobarbital protocol.  *See Creech v. Reinke*, No. 1:12-cv-173, 2012 WL 1995085, at *14-22 (D. Idaho June 4, 2012).

In fact, inmates challenging different execution protocols frequently proffer pentobarbital as an alternative that would significantly reduce the risk of severe pain as compared to other lethal

---

[5] Although Bucklew argued that he would suffer prolonged suffocation and severe pain due to his rare blood vessel disorder, there were no visible complications during his execution.  *See* Holly Yan & Steve Almasy, *Missouri Inmate Executed Despite Activists' Concerns He Could Suffer Because of His Rare Disease*, CNN, Oct. 1, 2019, https://www.cnn.com/2019/10/01/us/missouri-execution-russell-bucklew-rare-disease-trnd/index.html.

[6] *Cf. Johnson v. Precythe*, 901 F.3d 973 (8th Cir. 2018) (inmate stated an Eighth Amendment method-of-execution claim against Missouri's execution protocol where inmate alleged that due to the surgical results of his atypical parasagittal meningioma brain tumor, he would experience extremely painful, violent and uncontrollable seizures if injected with pentobarbital and that the state-authorized use of lethal gas would significantly reduce that risk), *vacated and remanded for further consideration in light of Bucklew*, 139 S. Ct. 1546 (2019).

agent(s). *See, e.g.*, *Glossip*, 135 S. Ct. at 2738 (inmates proffered that Oklahoma could use single-drug pentobarbital protocol); *Jordan v. Comm'r, Miss. Dep't of Corr.*, 908 F.3d 1259, 1262 (11th Cir. 2018); *Grayson v. Warden, Comm'r , Ala. Dep't of Corr.*, 869 F.3d 1204, 1212 (11th Cir. 2017); *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017); *In re Mo. Dep't of Corr.*, 839 F.3d 732 (8th Cir. 2016); *In re Ohio Execution Protocol Litig.*, 860 F.3d 881, 890-91 (6th Cir. 2017); *see also Baze*, 553 U.S. at 56 (inmates challenging Kentucky's three-drug protocol proposed that the State switch to a single lethal dosage of a barbiturate); *Zagorski v. Parker*, 139 S. Ct. 11, 11–12 (2018) (Sotomayor, J., dissenting) ("Pentobarbital, a barbiturate, does not carry the risks described above; unlike midazolam (a benzodiazepine) pentobarbital is widely conceded to be able to render a person fully insensate.").

In sum, Lee is not likely to succeed in showing that the 2019 Protocol "creates a demonstrated risk of severe pain" warranting a preliminary injunction. *Glossip*, 135 S. Ct. at 2327.

### 2. Lee's challenge to the 2019 Protocol is based on speculations.

Lee's remaining arguments against the 2019 Protocol are premised on his speculation that something could go wrong during his execution—what courts refer to as "maladministration." *See, e.g.*, Mot. at 21 ("substantial risk that the [compounded] drug will be contaminated, handled improperly or sub-potent"); Compl. ¶ 70 (pentobarbital could cause tissue damage and severe pain "if it is inadvertently injected into tissue other than a vein"); *id.* ¶ 73 (pentobarbital could lead to pulmonary edema "if the full dose of pentobarbital is not administered or is administered improperly"); *id.* ¶¶ 80–82, 86–87 (potential risks associated with setting IV catheters, with drug preparation, and with the management of IV drug and fluid administration). Lee alleges that pentobarbital "has an alkaline pH that is significantly higher than normal blood pH" such that "if it is inadvertently injected into tissue other than a vein (such as by insufficiently trained personnel)," it could cause pain. Compl. ¶ 70. Or as Dr. Antognini explained in *Bucklew*, it could cause the sensation of "chemical burn." AR 442–43; *see also Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1264 (11th Cir. 2014) (noting argument that, "if pentobarbital is injected

improperly, it can cause serious chemical burns"); Mot. at 22 (noting that some inmates experience burning sensation during execution).

But to "successfully plead[] facts to demonstrate a substantial risk of severe pain requires the prisoners to plead more than just a hypothetical possibility that an execution could go wrong." *Zink*, 783 F.3d at 1098–99. An "innocent misadventure" or "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'" *Baze*, 553 U.S. at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Again, "what [the] Amendment prohibits is *wanton exposure* to objectively intolerable risk . . . not simply the possibility of pain." *Id.* at 62 (citation omitted) (emphasis added).

In *Baze*, the condemned inmates similarly pointed to "numerous aspects of the [challenged] protocol that they contend create opportunities for error," particularly the possible "improper administration of the first drug" in the three-drug protocol at issue. 553 U.S. at 53.[7] The inmates there were unable to establish that "the risk of an inadequate dose of the first drug [was] substantial," even though it was undisputed that if the first drug was not properly administered, there was "a substantial, constitutionally unacceptable risk of suffocation from the administration of the [second drug] and pain from the injection of [the third drug]." *Id.* at 53–54; *see also Zink*, 783 F.3d at 1101 (Eighth Amendment claim dismissed because even if "any of the hypothetical situations the prisoners identify [as to the risk of using compounded pentobarbital] came to pass, it would amount to an 'isolated mishap' that 'while regrettable,' would not result in an Eighth Amendment violation"); *Cooey v. Strickland*, 589 F.3d 210, 225 (6th Cir. 2009) ("Permitting

---

[7] The *Baze* plaintiffs raised many of the same hypothetical risks as Lee does here. *See Baze*, 553 U.S. at 54 (noting contentions that "there is a risk of improper administration of [the drug] because the doses are difficult to mix into solution form and load into syringes; because the protocol fails to establish a rate of injection, which could lead to a failure of the IV; because it is possible that the IV catheters will infiltrate into surrounding tissue, causing an inadequate dose to be delivered to the vein; because of inadequate facilities and training; and because Kentucky has no reliable means of monitoring the anesthetic depth of the prisoner after the [first drug] has been administered"). The Court nevertheless upheld the challenged execution protocol. *Id.*

constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of our judicial authority"; preliminary injunction denied).

Notably, many aspects of the Kentucky protocol upheld in *Baze* are similar to the 2019 Protocol. For example, the Kentucky protocol required the establishment of "both primary and backup lines" and the preparation of "two sets of lethal injection drugs before the execution commences." 553 U.S. at 55. The 2019 Protocol similarly requires the team to establish two separate IV lines in separate locations if peripheral venous access is utilized. AR 875. The Kentucky protocol required the IV team members to have at least one year of professional experience "as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman" and to participate (along with the execution team) in "at least 10 practice sessions per year." 553 U.S. at 55. The 2019 Protocol similarly defines qualified personnel to be licensed physicians, nurses, EMTs, paramedics, phlebotomists, or other medically trained personnel, including those trained in the U.S. Military, who have at least one year of professional experience, and further requires those who are not medically licensed or certified to participate in a minimum of ten execution rehearsals a year and at least two execution rehearsals prior to participating in an actual execution. AR 874. Courts of appeals have also upheld the qualifications and training requirements similar to those outlined in the 2019 Protocol.[8]

---

[8] *See, e.g.*, *Cooey*, 589 F.3d at 226 (requirement of one year of medical training and the use of medical assistants, phlebotomists, and EMTs were insufficient to ensure competent execution personnel); *Harbison, v. Little,* 571 F.3d 531, 538–39 (6th Cir. 2009) (use of two paramedic technicians to administer the IV and monthly training sessions of the execution team provided sufficient safeguards to assume proper administration of state protocol); *Emmett v. Johnson,* 532 F.3d 291, 295 (4th Cir. 2008) (finding sufficient requirements that the execution personnel undergo eight hours of training per month and that at least two team members "have received training as military corpsmen, cardiac emergency technicians, or should receive on-the-job training from a physician in receiving and dispensing medications, to include starting and administering IV fluids"); *Hamilton v. Jones*, 472 F.3d 814, 816 (10th Cir. 2007) (rejecting challenge to protocol that allowed "an EMT–P or person with similar qualifications and expertise in IV insertion" to establish the IV drips).

As for Lee's speculation that the compounded pentobarbital likely will be mishandled, contaminated, or otherwise sub-potent, *see* Mot. at 21–22, such "speculation cannot substitute for evidence that the use of the [compounded] drug is '*sure or very likely* to cause serious illness and needless suffering.'" *Brewer v. Landrigan*, 562 U.S. 996 (2010) (quoting *Baze*, 553 U.S. at 50). In *Landrigan*, the district court granted a temporary restraining order finding that the inmate was likely to succeed on the merits of his challenge to Arizona's use of sodium thiopental that was manufactured by a foreign source not approved by the FDA. No. CV-10-2246, 2010 WL 4269559, at *4 (D. Ariz. Oct. 25, 2010). Because Arizona did not provide information about whether the foreign company followed standard operating procedures for the drug's manufacture and whether the company had a history of contamination in manufacturing the drug, the court found that the inmate had plausibly alleged that the drug could contain harmful contaminants affecting its efficacy. *Id.* The Ninth Circuit affirmed. 625 F.3d 1144 (9th Cir. 2010).

The Supreme Court, however, vacated the injunction. 562 U.S. at 996. Although the inmates had alleged a plausible scenario, the Supreme Court held that courts may not "speculate as to the risk of harm," when there was "no evidence in the record to suggest that the drug obtained from a foreign source is unsafe." *Id. Landrigan* thus stands for the proposition that a court may not accept an inmate's speculation as to the potential risk of harm without specific factual allegations establishing an actual risk. *See, e.g.*, *Cook v. Brewer*, 637 F.3d 1002, 1007 (9th Cir. 2011) (inmates alleged various potential risks associated with the State's use of a non-FDA approved, foreign-manufactured drug; complaint dismissed because "*Landrigan* . . . advises that [those assertions] are not sufficient to state a plausible Eighth Amendment claim").

Consistent with *Landrigan*, courts routinely reject challenges to the use of compounded pentobarbital, whether the challenge is based on the inherent risks of compounding or the fact of non-FDA approval. *See, e.g.*, *Whitaker*, 862 F.3d at 498–99; *Wood*, 836 F.3d at 540; *Zink*, 783 F.3d at 1101–02; *Gissendaner*, 779 F.3d at 1283; *Ladd*, 777 F.3d at 289; *Wellons*, 754 F.3d at 1265; *Sells v. Livingston*, 561 F. App'x 342, 345 & n. 3 (5th Cir. 2014); *Whitaker v. Livingston*, 732 F.3d 465, 468–69 (5th Cir. 2013).

19

Lee's speculation about the quality of the compounded pentobarbital is particularly unwarranted here because the pentobarbital is produced by a DEA-registered, domestic bulk manufacturer. AR 872. The active pharmaceutical ingredient produced by the manufacturer was subjected to quality assurance testing, and the compounding pharmacy (similarly registered with the DEA) also conducted its own testing of the injectable form of pentobarbital it converted from the API. *Id.* Moreover, two independent laboratories have performed quality testing of the injectable pentobarbital. *Id.*; *see also* AR 970–1015 (laboratory reports). And BOP has confirmed with the DEA that the facility in Terre Haute, where Lee's execution will take place, meets the regulatory requirements for storage and handling of pentobarbital. AR 872. To the extent Lee questions these representations, *see, e.g.*, Mot. at 23 (speculating that the active pharmaceutical ingredient could still be foreign produced); *id.* (arguing that the laboratory reports contained in the Administrative Record are too "vague"), BOP is entitled to a presumption of regularity and good faith. *See Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 20 (D.C. Cir. 2002).

Finally, Lee contends that "many of the relevant facts are in the sole possession of the Defendants," Mot. at 24, and that he is entitled to know more facts—from the storage and preparation of the drug, to the precise manner of establishing IV access, to the qualifications and expertise of the personnel involved, *id.* at 12–13, 24; Compl. ¶¶ 84, 90. This argument does nothing to establish that the challenged protocol exposes him to a substantial risk of severe pain, which is the standard he must meet to obtain a preliminary injunction. If Lee were correct that he is entitled to a preliminary injunction pending discovery, Mot. at 24, then the Supreme Court would have decided *Landrigan* differently, as the inmates there similarly asserted that they needed to know more about the manufacturer of the lethal substance. But there is no "broad Eighth Amendment right to know the details of [an inmate's] execution in order to ensure proper oversight and avoid uncertainty." *Powell v. Thomas*, 641 F.3d 1255, 1258 (11th Cir. 2011).

Indeed, "the Supreme Court has rejected the notion that discovery must be available to a plaintiff who cannot allege sufficient factual matter to suggest plausibly an entitlement to relief." *Zink*, 783 F.3d at 1105–06 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)); *see*

*also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). *Glossip* makes clear that an inmate must both "*plead* and prove" the elements of an Eighth Amendment claim to be entitled to a preliminary injunction. 135 S. Ct. at 2739 (emphasis added). Accordingly, courts routinely deny inmates' motions for a preliminary injunction (or dismiss method-of-execution claims for failure to state a claim), despite the inmates' assertions that more information from the government is needed to determine compliance with the Eighth Amendment. *See, e.g.*, *Zink*, 783 F.3d at 1101 (dismissal of complaint, despite the request for discovery, where prisoners' allegations were "limited to descriptions of hypothetical situation in which a potential flaw in the production of the pentobarbital or in the lethal-injection protocol could cause pain"); *Wellons*, 754 F.3d at 1264 (no preliminary injunction despite argument that inmate needed information to determine whether the compounded pentobarbital was defective and whether the personnel administering the execution was trained); *Whitaker*, 732 F.3d at 468 (no preliminary injunction where inmates "pointed to only hypothetical possibilities that the [execution] process was defective" and argued that if they had more time, "they might discover *something* wrong with the [the compounded pentobarbital newly used by the State]"); *Valle v. Singer*, 655 F.3d 1223, 1234 (11th Cir. 2011) (no preliminary injunction despite inmate's "asserted lack of information as to the efficacy and safety of pentobarbital for use in lethal injections"); *see also Clemons v. Crawford*, 585 F.3d 1119, 1128 (8th Cir. 2009) (granting judgment on the pleadings); *Emmett v. Johnson*, 532 F.3d 291, 307 (4th Cir. 2008) (affirming grant of summary judgment despite inmate's request that the case be remanded "to allow him to develop evidence on the efficacy of alternative methods of carrying out the lethal injection process").

The list of details that Lee is demanding to know also confirms that he is effectively asking the Court "to supervise every step of the execution process." *Whitaker*, 732 F.3d at 468. *See, e.g.*, Compl. ¶ 84 ("Can the execution team establish central line access [*i.e.* access through a larger vein for the central circulation, AR 443]? Can they perform a cut-down? Is there an order of preferred access sites? Is there a time limit for establishing IV access? Is there a limit on the

number of times the team can attempt IV access?").  He has "no such entitlement," however. *Whitaker*, 732 F.3d at 468; *see also Cooey*, 589 F.3d at 227 (inmate not likely to succeed on the merits of his challenge to the lack of time limit to establish IV access because "the training and qualifications of the medical personnel required by the protocol ensure that they can make this determination competently").  Again, Lee must point to more than "hypothetical possibilities that the process [i]s defective," *Whitaker*, 732 F.3d at 468, which he has failed to do.

### C.  Lee Fails to Propose An Alternative That Will Significantly Reduce A Substantial Risk of Severe Pain

Lee also fails to "plead and prove a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain," *id*. at 2737 (citation omitted).

He offers three alternatives.  *See* Mot. at 13.  First, he proposes that BOP adopt certain "safeguards," such as selecting qualified team members whose qualifications are disclosed; establishing two patent, functioning peripheral IV lines and not placing a central line unless it is determined to be necessary by qualified medical professionals; using "FDA-approved pentobarbital or compounded pentobarbital" that has been tested; and disclosing the records of such testing, chain of custody document, and the compounding formula.  Compl. ¶ 92.  Second, he proposes that BOP use "bedside administration"—as opposed to having the IV tubing extend from the wall—to reduce the risks of leakage or pinching of the tubing.  *Id.* ¶ 93.  Third, he suggests that BOP "could add a pre-dose of either an opioid or an anti-anxiety medication in a large clinical dose" to reduce the risk that the prisoner would remain sensate.  *Id.* ¶ 94.

As an initial matter, many of the Lee's suggested safeguards are already part of the Lethal Injection Protocol, including those relating to the qualifications and expertise of the personnel, the independent testing of the domestically sourced, compounded pentobarbital, and the storage of the drug.  While Lee recommends "two patent, functioning peripheral IV lines," Compl. ¶ 92, the Protocol similarly provides that "if peripheral venous access is utilized, two separate lines shall be inserted in separate locations and determined to be patent by qualified personnel," AR 875.  And

while Lee recommends that no central line be placed "unless it is determined to be necessary following a vein assessment by a qualified medical professional," Compl. ¶ 92, the Protocol allows the BOP Director to permit the use of a central line based on the recommendation of the personnel establishing the intravenous access, AR 875, ¶ H.  As for Lee's suggestion to "allow variations to account for individual medical history or condition," *see* Mot. at 11; Compl. ¶ 90d, the Protocol does allow the BOP Director to deviate from the specified procedures based on the recommendations of on-site medical personnel utilizing their clinical judgment or as may be required by other circumstances, AR 874, ¶ A.

In any event, Lee is unlikely to establish that his proposed alternatives would "in fact significantly reduce[] a substantial risk of severe pain."  *Glossip*, 135 S. Ct. at 2737.  His first suggestion primarily concerns best practices for implementing lethal injection and disclosures to allow inmates to supervise the process.  As explained above, "an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the [government] could take as a failsafe for other, independently adequate measures."  *Baze*, 553 U.S. at 60–61.  Thus, even if the "safeguards" Lee suggests would potentially make the execution "slightly or marginally safer," *id*. at 51, or cause a "minor reduction in risk," *Bucklew*, 139 S. Ct. at 1130, that is insufficient.

As for using FDA-approved pentobarbital or compounded pentobarbital, Lee himself alleges that all pharmaceutical manufacturers of FDA-approved injectable pentobarbital products have refused to sell their products for use in executions.  *See* Compl. ¶ 75.  It was accordingly legitimate for BOP to turn to a compounding pharmacy so that a licensed pharmacist or physician could covert the domestically manufactured active pharmaceutical ingredient obtained by the BOP into injectable pentobarbital solution as needed.  *See Glossip*, 135 S. Ct. at 2737–38 (a State cannot be faulted for failing to use lethal injection drugs that it is unable to procure through good-faith efforts); *see also Baze*, 553 U.S. at 47 ("capital punishment is constitutional," and "[i]t necessarily follows that there must be a means of carrying it out").  Drugs prepared by a compounding

pharmacy are necessarily not approved by the FDA,[9] but the Eighth Amendment does not require BOP to use only FDA-approved drugs.  Again, "the Constitution does not demand the avoidance of all risk of pain in carrying out executions."  *Id.*  It only prohibits the "deliberate infliction of pain for the sake of pain—'superadd[ing]' pain to the death sentence."  *Id.* at 48.  Such is not the case with BOP's intended use of compounded pentobarbital.

Lee's next suggestion to use "bedside administration" is yet another procedural safeguard designed to avoid maladministration.  Any marginal benefit it would serve is of no constitutional significance.  Indeed, the IV tubing set-up *Baze* upheld similarly involved having the tube extend from the wall.  *See Baze*, 553 U.S. at 45, 56 (the execution team "administers the drugs remotely from the control room through five feet of IV tubing," while the warden and deputy warden, who had no medical training, remain in the execution chamber to "watch for signs of IV problems, including infiltration").  Moreover, "the Constitution affords a 'measure of deference to [the government's] choice of execution procedure,'" and thus, the government need not adopt the inmate's preferred method of execution if it has legitimate reasons not to do so.  *Bucklew*, 139 S. Ct. at 1125 (quoting *Baze*, 553 U.S. at 51).  The government's IV tubing arrangement at Terre Haute allows the executioners to administer the lethal agent from the other side of the wall, ensuring that they are not visible to those in the witness room.  The government's interest in protecting the executioners' privacy is a legitimate one.

Finally, Lee's suggestion to add a pre-dose of either an opioid or an anti-anxiety medication is also insufficient to warrant an injunction.  Lee does not identify which opioid or anti-anxiety medication should be used, which alone renders his proposal deficient, considering the volume of litigation on the issue of lethal agents.  *Bucklew*, 139 S. Ct. at 1129 ("the inmate's proposal must be sufficiently detailed to permit a finding that the [government] could carry it out 'relatively easily and reasonably quickly'") (citation omitted).  Lee also fails to identify any State that actually adds

---

[9] *See* U.S. Food and Drug Administration, *Compounding and the FDA: Questions and Answers*, https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers ("Compounded drugs are not FDA-approved.").

an opioid or anti-anxiety medication to a pentobarbital protocol. *See id.* at 1130 (a State may decline to utilize an alternative method of execution that "had 'never been used to carry out an execution' and had 'no track record of successful use'"; "choosing not to be the first [State] to experiment with a new method of execution is a legitimate reason to reject it") (citation omitted); *cf. Baze*, 553 U.S. at 53 (fact that "[n]o State uses or has ever used the alternative one-drug protocol" urged by inmates "is probative" of question whether the proposal would in fact significantly reduce a substantial risk of severe pain).

There is no basis to assume that adding an opioid or an anti-anxiety medication to the protocol would in fact significantly reduce the risk of severe pain. The extensive litigation on pentobarbital to date has confirmed that pentobarbital is a fast-acting barbiturate, which will quickly render an inmate unconscious. *See Bucklew*, 139 S. Ct. at 1132 (citing Dr. Antognini's testimony that "pentobarbital . . . would render Mr. Bucklew fully unconscious and incapable of experiencing pain within 20 to 30 seconds" and noting the absence of contrary evidence); AR 428–32, 435–36, 499, 508, 521–24; *see also* AR 406 (discussing eyewitness observations of "a rapid onset of unconsciousness followed by death"). Dr. Lindsley, with whom BOP also consulted, similarly opined that "at the doses administered (2.5 g x 2 IV), the person receiving the infusion will lose consciousness within 10-30 seconds after the first injection, and respiratory depression/heart failure will ensue within minutes. . . . [He] will be unaware of any pain or suffering due to the rapidity of the effect." AR 525. And even assuming IV infiltration, Lee has not shown that adding an opioid or anti-anxiety medication would have any significant effect on reducing any possible burning sensation. *See Ladd*, 777 F.3d at 290 n. 29 ("'Press reports indicate that one prisoner said that '[i]t does kind of burn . . . as the pentobarbital took effect" but that "all movement stopped '[w]ithin seconds.'").

In sum, Lee has no likelihood of success on his Eighth Amendment claim.[10]

_____

[10] Lee's motion also makes a single reference to his "deliberate indifference" claim, *see* Mot. at 24; Compl. ¶ 108, which typically concerns an inmate's medical treatment. Even if it were an appropriate claim here, the "substantial risk of serious harm" standard Lee identifies as originating with the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *see* Mot. at

## II.      LEE IS UNLIKELY TO SUCCEED ON HIS DUE PROCESS CLAIM

Lee is not likely to succeed on his Due Process Claim, either.  He argues that the Due Process Clause requires the government to provide him more information about the planned execution so that he could "specify[] all of the ways that the new procedures violate the Eighth Amendment," "consult[] with medical and other experts concerning those violations," Mot. at 2, and develop alternative methods of execution, Mot. 13 n.9, 25.  He also contends that the BOP Director's discretion to change the procedures provided in the 2019 Protocol means that he "will not have an adequate notice and opportunity to challenge the manner of execution."  Mot. at 24.[11] His arguments have no merit.

Just as there is no "broad Eighth Amendment right to know the details of [an inmate's] execution" as discussed above, *Powell*, 641 F.3d at 1258, there is no freestanding constitutional right to obtain information from the government in order to discover potential Eighth Amendment claims.  *See Lewis v. Casey*, 518 U.S. 343, 354 (1996) (there is no constitutional right "to *discover grievances* or to litigate effectively once in court") (emphasis added).  This is true whether the asserted right to information is characterized as a First or Fifth Amendment claim.

Thus, for example, in a case where the State failed to promptly share its new execution protocol with the inmate and the district court stayed execution based on "fundamental fairness, if not due process," *Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004), the Supreme Court vacated the stay just two days later, 542 U.S. 916 (2004).  And when the Ninth Circuit enjoined the execution of an inmate until the State provided him with specific information about the drugs to be used in his execution, the qualifications of the execution team, and how the State developed

_____

24–25, is the same standard applied in *Baze*.  Thus, courts consistently have rejected "deliberate indifference" challenges to methods of execution, after dismissing the condemned inmates' cruel and unusual punishment claims.  *See, e.g.*, *Zink*, 783 F.3d at 1107; *Valle v. Singer*, 655 F.3d 1223, 1225 (11th Cir. 2011); *Cook*, 637 F.3d at 1008; *Jackson v. Danberg*, 594 F.3d 210, 228-29 (3d Cir. 2010); *Workman v. Bredesen*, 486 F.3d 896, 907 (6th Cir. 2007).

[11] Lee also argues that he was deprived of "the opportunity to raise questions, concerns or issues about the 2019 Protocol" or to participate "in the development of the new protocol as part of the rule-making process."  Mot. at 2.  We will address the argument in the APA section below.

its lethal injection protocol, the Supreme Court unanimously and promptly vacated the injunction as well. *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir.), *vacated*, 573 U.S. 975 (2014).

Courts of appeals routinely reject any asserted constitutional entitlement to information about execution protocols under the Due Process Clause. *See, e.g.*, *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) (denying Due Process, Equal Protection, and access to the court challenges to state law protecting the identity of individuals and entities that participate in the lethal injection process because "no constitutional right exists to discover grievances or to litigate effectively once in court" and "federal courts have repeatedly rejected such theories") (citation omitted); *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016) (rejecting inmate's due process claim that he was deprived of the information necessary to challenge State's lethal injection protocol; observing that "no . . . circuit court has ever recognized the kind of due process right-of-access claim" inmate asserted); *Zink*, 783 F.3d at 1108 (inmates' "claim that they are unable to discover information regarding the execution protocol is . . . insufficient as a matter of law to state a due process claim" because "the Constitution does not require such disclosure"; also no First Amendment right to information regarding the source of the lethal agent); *Wellons*, 754 F.3d at 1267 (rejecting inmate's claim that "the dearth of information regarding the nature of the pentobarbital that will be used in his execution and the expertise of those who will carry it out violates the First Amendment or his right to due process"; holding that there is no constitutional right to know "where, how, and by whom the lethal injection drugs will be manufactured" or "the qualifications of the person or persons who will manufacturer the drugs, and who will place the catheters"); *Trottie v. Livingston,* 766 F.3d 450, 452 (5th Cir. 2014) (no "cognizable liberty interest in obtaining information about execution protocols"; inmate's claim that "there are unknowns regarding the drug to be used which may add an unacceptable risk of pain and suffering" was insufficient because "uncertainty as to the method of execution is not a cognizable liberty interest"); *Sepulvado v. Jindal*, 729 F.3d 413, 419-20 (5th Cir. 2013) (no due process right to prompt and detailed disclosure of State's execution protocol); *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011) (rejecting due process claim where prisoners argued that the lack of

information about State's execution protocol denied them "an opportunity to litigate" their Eighth Amendment claim and that because prison officials could deviate from the establish protocol at any moment, the inmates would be unable to challenge the protocol in court); *Valle*, 655 F.3d at 1236 n.13 (rejecting claim that State's failure to disclose information about the training of the execution team and the source or vendor history of the drugs denied inmates due process of law); *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (affirming denial of motion to stay execution where inmate was informed less than an hour before his execution that pentobarbital would be substituted for sodium thiopental and where inmate argued that he lacked sufficient time to determine whether there are any constitutional concerns with the new drug); *Clemons*, 585 F.3d at 1129 n.9 (noting lack of authority indicating due process right to probe into backgrounds of State's execution personnel).

Lee has cited no contrary authority.  That is not surprising because the "assertion of necessity—that [the government] must disclose its protocol so that [the inmate] can challenge its conformity with the Eighth Amendment—does not substitute for the identification of a cognizable liberty interest," which is lacking in such circumstances.  *Sepulvado*, 729 F.3d at 419; *see also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("an individual claiming a protected interest must have a legitimate claim of entitlement to it").  Of course, the Due Process Clause does require that before Lee may be deprived of his life, he receive due process to contest his death sentence. But Lee was afforded such process in the criminal proceedings.  His Due Process claim is thus not likely to succeed.

## III.     LEE IS UNLIKELY TO SUCCEED ON HIS RIGHT TO COUNSEL CLAIM

Lee argues that his constitutional right to counsel under the First, Fifth, and Sixth Amendments will be violated because "[t]he 2019 Protocol does not provide prisoners with access to counsel during the execution," and thus he "would not be able to communicate with counsel regarding any constitutional violations that may arise."  Mot. at 26; *see also id.* (alleging that the Protocol does not allow witnesses to view "the setting of IVs, so those witnesses have no way of

knowing if there are issues with the IV-setting process or other complications"). This claim is also unlikely to succeed.

To begin, to the extent Lee fears that maladministration or an isolated mishap would occur during his execution, that would not amount to an Eighth Amendment violation because, as discussed above, the Constitution does not require government officials to avoid all risk of pain in carrying out executions. Moreover, there is "no law that would support a right to counsel throughout an execution." *The Estate of Lockett by and through Lockett v. Fallin*, 841 F.3d 1098, 1117 (10th Cir. 2016). The preceding section makes clear that there is no Fifth Amendment due process right to discover problems with the execution. The First Amendment right of access to the court similarly does not guarantee a right "to discover grievances or to litigate effectively once in court." *Lewis*, 518 U.S. at 350–61. And while an accused has a Sixth Amendment right to counsel in all "critical stages" of the criminal proceeding, *United States v. Wade*, 388 U.S. 218, 227–28 (1967), execution is not such a stage. As the Supreme Court has explained, the Sixth Amendment is concerned with "a meaningful 'defense'" of the accused in his "confrontations" with "the prosecution," *id.* (quoting U.S. Const. amend. VI). An execution is not such a confrontation. Moreover, the Supreme Court has repeatedly held that the Sixth Amendment "right to appointed counsel extends [only] to the first appeal of right, and no further." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *accord Whitaker*, 862 F.3d at 501; *see also Johnson v. Avery*, 393 U.S. 483, 488 (1969); *Wainwright v. Torna*, 455 U.S. 586 (1982).

The two cases Lee cites in the Complaint are inapposite. *See* Compl. ¶ 113. *Cooey v. Strickland*, No. 2:04-CV-1156, 2011 WL 320166, at *6 (S.D. Ohio Jan. 28, 2011), merely explained that the court "need not and does not decide" whether a condemned inmate has a right to have counsel attend his execution because "Ohio allows counsel to witness executions regardless of whether the Constitution mandates that the state do so," and thus, the question of "the existence of any such mandate is moot." *Id.* Here, the 2019 Protocol similarly permits Lee to designate two defense attorneys to be present at the execution as witnesses. AR 884. The defense

attorneys will be able to observe the execution chamber from the witness room and hear him make his final statement.  AR 897–99.

*In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, (S.D. Ohio Dec. 12, 2018), similarly does not help Lee.  The district court there adopted the Magistrate Judge's recommendation to deny the government's motion to dismiss the right to counsel claim on the sole basis that *Cooey*, 2011 WL 320166, discussed above, did not require dismissal.  *Id.* at *5.  While the court's reading of *Cooey* was correct in that *Cooey* simply did not reach the issue, the court failed to account for the two crucial factors identified by the Supreme Court:  first, the Sixth Amendment only applies to confrontations between the prosecution and the accused, and second, the right to counsel extends no further than the first appeal of right.

In sum, Lee has not shown that he is likely to succeed on his right to counsel claim.

## IV.    LEE IS UNLIKELY TO SUCCEED ON HIS APA CLAIMS

Lee's motion argues that BOP's adoption of the 2019 Protocol (1) was *ultra vires* in violation of the FDPA and the Take Care Clause of the Constitution; (2) fails to comply with the APA's notice and comment requirement; and (3) was arbitrary and capricious.  Mot. at 15–23. These arguments, like the others, are not likely to succeed.

### A.  Lee Is Unlikely to Succeed on His *Ultra Vires* Claims

#### 1.    The 2019 Protocol is authorized by DOJ regulations and does not conflict with the FDPA as applied to Lee.

Lee first argues that the 2019 Protocol "is patently in excess of the statutory authority," Mot. at 16, because the FDPA requires a federal death sentence be implemented "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), and does not authorize DOJ and BOP to adopt "a protocol that governs <u>all</u> executions under federal law," Mot. at 6.  As discussed below, however, BOP has the authority to adopt the 2019 Protocol pursuant to validly promulgated DOJ regulations on "death sentence procedures," 28 C.F.R. Part 26, which are not in conflict with the FDPA as applied to Lee.

Lee is mistaken in arguing that 28 C.F.R. Part 26 does not supply the authority for the 2019 Protocol. *See* Mot. at 10 n.6.[12] First, Part 26 was validly promulgated because "[t]he Department [of Justice] clearly has the authority (and the obligation) to establish procedures for carrying out the death sentence dictated by Congress." *United States v. Chandler*, 950 F. Supp. 1545, 1580 (N.D. Ala. 1996). As the Fourth Circuit recognized, Congress's authority in this area "is not exclusive of the power of the executive branch" and "Congress has itself authorized the Attorney General to 'prescribe regulations for the government of [his] department, . . . [and] the distribution of its business.'" *United States v. Tipton*, 90 F.3d 861, 902 (4th Cir. 1996) (quoting 5 U.S.C. § 301). Specifically, Congress "has vested all functions of the Department of Justice in the Attorney General, and has authorized officers, employees, and agencies of the Department to perform those functions." *Id.* (citing 28 U.S.C. §§ 509, 510). "Among those agencies are the United States Marshals, whose legislatively conferred obligation is to 'obey, execute, and enforce all orders of the United States District Courts.'" *Id.* (quoting 28 U.S.C. § 566(a)); *see also* 18 U.S.C. § 4001(b) (vesting "[t]he control and management of Federal penal and correctional institutions . . . in the Attorney General").

Second, there is no conflict between the regulations and the FDPA as applied to Lee. Lee is correct that where a regulation contradicts a statute, the latter prevails. Mot. at 16–17. In that circumstance, only the part of the regulation that conflicts with the statute is invalidated, *see K-Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 293–95 (1988), and only "as to a particular application," rather than "the entire provision that appears to encompass it," *United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454, 487 (1995) (O'Connor, J., concurring in part and dissenting in part). *Cf. Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504–05 (1985) (invalidating a state obscenity statute "only insofar as the word 'lust' is taken to include normal interest in sex"); *Tennessee v. Garner*, 471 U.S. 1, 4–5, 11 (1985) (invalidating a statute that authorized "all the necessary

---

[12] Lee does not directly challenge the validity of 28 C.F.R. Part 26, evidently recognizing that such a challenge would be barred by the six-year statute of limitations. *See* 28 U.S.C. § 2401; *Roane v. Holder*, 607 F. Supp. 2d 216, 221, 225 (D.D.C. 2009).

means"—including deadly force—to effectuate an arrest only as applied to the use of deadly force against non-violent offenders); *United States v. Grace*, 461 U.S. 171, 183 (1983) (striking down a statute that banned assembly on the Supreme Court's grounds only as applied to the sidewalks outside the Court's building, even though the statute did not make any distinction between the grounds proper and the sidewalks).

Here, the FDPA's provision that death sentences be carried out "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), and DOJ's regulation that a sentence of death shall be executed by lethal injection unless the court orders otherwise, 28 C.F.R. § 26.3(a)(4), are not in conflict as applied to Lee. Lee's sentence was imposed in Arkansas, and Arkansas law prescribes lethal injection as the only method of execution. Ark. Code Ann. § 5-4-617(a). The regulation is therefore valid as applied to Lee.[13]

The outcome is the same under a severability analysis. The court "will sever and affirm a portion of an administrative regulation" if it can say "without any substantial doubt that the agency would have adopted the severed portion on its own." *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017) (citation omitted); *accord ACA Int'l v. FCC*, 885 F.3d 687, 708 (D.C. Cir. 2018) (same). Here, there is no doubt that DOJ would adopt today the same regulations if 28 C.F.R. § 26.3(a)(4) were replaced by the statutory language that a federal death sentence is to be carried out "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a). Lethal injection is still "by far the most prevalent method of execution" for the States, *Glossip*, 135 S. Ct. at 2732; indeed, all 29 States whose statutes provide for the death penalty

---

[13] To the extent Lee is arguing that Part 26 is facially invalid (and even assuming that he is not barred by the six-year statute of limitation), he "must establish that no set of circumstances exists under which the [regulation] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (citation omitted, brackets in original); *see also Sherley v. Sebelius*, 644 F.3d 388, 397 n.** (D.C. Cir. 2011) (the "no set of circumstances" test applies "to assess the validity of a regulation challenged as facially incompatible with governing statutory law"); *Bldg. & Constr. Trades Dep't v. Allbaugh,* 295 F.3d 28, 33 (D.C. Cir. 2002) (same). He cannot do so because at least one set of circumstance—Lee's—is valid.

authorize lethal injection as a method of execution.[14]  Thus, even without the allegedly offending language in § 26.3(a)(4), BOP would still promulgate regulations to set forth procedures for carrying out executions by lethal injection where, as here, the relevant state law authorized them.

To the extent Lee is arguing that the FDPA's reference to the State's "manner of execution" prohibits DOJ from using pentobarbital for lethal injections (as opposed to whatever lethal agent is used in the State where an inmate was sentenced), he is mistaken.  Such a reading would lead to the absurd result of requiring the federal government to stock all possible lethal agents used by the States.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").  As one court observed when addressing an identical challenge:  "The *manner* of execution authorized by [the relevant state] law is lethal injection," and since both the relevant state law in that case and the federal government authorize lethal injection as the method of execution, there was no issue of compliance with the FDPA.  *Higgs v. United States*, 711 F. Supp. 2d 479, 556 (D. Md. 2010).  In any event, Arkansas law also allows prison officials to use a barbiturate prepared by a compounding pharmacy as the lethal agent.  Ark. Code Ann. § 5-4-617(c), (d).  Thus, even if state law controls these granular details—which it does not—there is no violation of the FDPA.

Equally without merit is Lee's argument that failed amendments to 18 U.S.C. § 3596 suggest that the provision "does not grant [Defendants] the power to implement executions that they are now seeking to exercise."  Mot. at 6.  The legislative efforts related to having "a uniform method of execution for federal prisoners."  *Higgs*, 711 F. Supp. 2d at 556 (citing H.R. Rep. 104–

---

[14] *See* Ala. Code § 15-18-82.1; Ariz. Rev. Stat. Ann.  § 13-757; Ark. Code. Ann. § 5-4-615; Fla. Stat. § 922.105; Ga. Code Ann. § 17-10-38; Idaho Code § 19-2716; Ind. Code § 35-38-6-1; Kan. Stat. Ann. § 22-4001; Ky. Rev. Stat. § 431.220; La. Stat. Ann. § 15:569; Miss. Code Ann. § 99-19-51; Mo. Rev. Stat. § 546.720; Mont. Code Ann. § 46-19-103; Neb. Rev. Stat. § 83-964; Nev. Rev. Stat.  § 176.355; N.C. Gen. Stat.  § 15-188; Ohio Rev. Code Ann.  § 2949.22; Okla. Stat. tit. 22 § 1014; S.C. Code Ann. § 24-3-530; S.D. Codified Laws § 23A-27A-32; Tenn. Code Ann.  § 40-23-114; Tex. Code Crim. Proc. Ann. art. 43.14; Utah Code Ann. § 77-19-10; Va. Code Ann. § 53.1-234; Wyo. Stat. Ann.  § 7-13-904.

879 at 204 (1997) ("this bill proposes to clarify the *method* of execution of Federal prisoners") (emphasis added)).  The BOP official's testimony cited by Lee (*see* Compl. ¶ 57 n.6) similarly reflects that unless Section 3596 is amended, "the only [FDPA]-affected executions that could occur at USP Terre Haute are those for which lethal injection was permissible in the State in which the inmate was convicted."  Testimony of Kathleen M. Hawk, Subcommittee on Crime of the House Committee on the Judiciary, June 8, 1995, 1995 WL 352705.  The above discussion already makes clear the failed amendments do not concern Lee because he was sentenced in a State that specifies lethal injection as the method of execution.

Finally, contrary to Lee's argument, the 2019 Protocol itself is not contrary to the FDPA. As an initial matter, the FDPA clearly authorizes DOJ to implement district courts' orders of death sentences, providing that "a United States marshal . . . shall supervise implementation of the sentence," 18 U.S.C.  § 3596(a), including deciding whether to use state and local officials and facilities to carry out the execution, *id.* § 3597(a).  That authority necessarily includes the authority to specify the time, place, and procedures for carrying out the death sentence.  Thus, the Fifth Circuit has rejected the argument of another plaintiff in this consolidated case, Alfred Bourgeois, that BOP had no power to "determine the particulars of [his] execution," even though the law of the State in which Bourgeois was sentenced, Texas, also specified lethal injection as the method of execution.  *United States v. Bourgeois*, 423 F.3d 501, 509 (5th Cir. 2005).  As the court held, through Sections 3596(a) and 3597(a), "Congress expressly delegated [such] power to the Executive Branch, specifically the Department of Justice in the person of the Attorney General," and the BOP is an agency of DOJ.  *Id.*  Accordingly, the Fifth Circuit said, the Attorney General had authority, "through the auspices of the Director of the Federal Bureau of Prisons, to designate the place of execution and the substances to comprise [the inmate's] lethal injection."  *Id.*; *see also United States v. Fell*, No. 5:01-CR-12-01, 2018 WL 7270622, at *4 (D. Vt. Aug. 7, 2018) ("creation of a federal death chamber [in USP Terre Haute] does not violate the FDPA").  The 2019 Protocol is consistent with that authority.

Lee argues that the Lethal Injection Protocol conflicts in multiple respects with Section 3596's prescription that the U.S. Marshal "shall supervise implementation of the [death] sentence." Mot. at 10–12.  But each of his examples depends on quoting language out of context.  For example, Lee finds fault with the provision in the Lethal Injection Protocol that the lethal substance shall be administered by qualified personnel "selected by the Warden."  *See* Mot. at 10.  The Protocol, however, actually says that the lethal substance shall "be administered by qualified personnel selected by the Warden and *acting at the direction of the United States Marshal*."  AR 874, ¶ A (emphasis added).  And whereas Lee complains that the Protocol allows the BOP Director to appoint a senior-level BOP employee to supervise the personnel preparing and administering the lethal substance, Mot. at 11–12; *see also* Compl. ¶ 59 n.7, the prefatory sentence in the same paragraph makes clear that BOP personnel's role is "*to assist the United States Marshal* in implementing the federal death sentence," AR 874, ¶ E (emphasis added).  Lee also objects to the BOP Director's authority, "in conjunction with the U.S. Marshal," to select the executioners, Mot. at 11; AR 874, ¶ D, but that plainly does not contravene the statutory directive that the U.S. Marshal shall *supervise* the implementation of the death sentence.  Equally meritless are Lee's objections to the BOP Manual's many references to the Warden and the BOP Regional Director, *see* Mot. at 11, because prison officials necessarily must be involved to implement the death sentence.  In any event, Lee cannot claim any possible injury based these alleged trivial differences.

### 2.   The 2019 Protocol does not violate the Take Care Clause.

Lee similarly has no likelihood of success on his *ultra vires* claim based on alleged violation of the Take Care Clause or principles of separation of powers.  Mot. at 17; Compl. ¶¶ 117–22.  This claim is essentially the same as the statutory claim addressed above since it is based on Defendants' alleged noncompliance with the FDPA.  *See* Compl. ¶ 120 (alleging that Defendants' actions are "not in accordance with the law," 5 U.S.C. § 706(2)(A)).  The Take Care Clause cannot form a basis for relief here because it speaks only to the President, assigning him the responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3, cl. 5. *See Free Enter. Fund v. Pub. Co. Accounting Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his*

responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988). Subordinate officials, such as Defendants, cannot violate the President's duty to faithfully execute the law.

### B. The 2019 Protocol Is Not Subject to the APA's Notice-and-Comment Requirement

Lee argues that the 2019 Protocol is a legislative rule that should have been subject to notice and comment, 5 U.S.C. § 553. *See* Mot. at 18–20. The APA requires agencies to undertake rulemaking when promulgating legislative rules. A legislative rule imposes rights and obligations, *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002), and "narrowly constrict[s] the discretion of agency officials by largely determining the issue addressed," *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). It has "the force and effect of law," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014), and binds both the private parties and the agency, *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017). The rulemaking requirement does not apply to "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A), collectively referred to as "procedural rules." *EPIC v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011). A procedural rule is "primarily directed toward improving the efficient and effective operations of an agency." *Batterton*, 648 F.2d at 702 n.34. "The 'critical feature' of a procedural rule is that it covers agency actions that do not themselves alter the rights or interests of parties." *Nat'l Mining Ass'n*, 758 F.3d at 250 (citation omitted). It "does not conclusively bind the agency, the court, or affected private parties," *Batterton*, 648 F.2d at 704, but "ensure[s] that agencies retain latitude in organizing their internal operations," *id.* at 707. Moreover, "a rule with a 'substantial impact' upon the persons subject to it is not necessarily a substantive rule." *EPIC*, 653 F.3d at 5; *see also Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640-41 (D.C. Cir. 2002) (same); *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000) (same).

Despite its admitted impact on condemned federal inmates, the 2019 Protocol is a procedural rule because it does not determine the rights or obligations of anyone. The Protocol

explicitly provides that "[t]his manual explains internal government procedures and does not create any legally enforceable rights or obligations."  AR 1019; *see Cohen v. United States*, 578 F.3d 1, 7 (D.C. Cir. 2009) (whether a rule is a substantive one "turns on whether [the] agency intends to bind itself to a particular legal position").  Indeed, the relevant substantive norms are already specified by duly enacted statute (the FDPA) and duly promulgated regulations (28 C.F.R. Part 26).  Lee's death sentence was imposed by a federal court pursuant to the FDPA and the relevant criminal statute.  The FDPA and DOJ regulations collectively specify how that sentence will be carried out:  Lee will be executed by lethal injection using lethal substance(s) selected by the BOP Director; the lethal substance will be administered by qualified personnel selected by the Warden and acting at the direction of the U.S. Marshal; and the execution will be supervised by the U.S. Marshal and will take place at a date, time, and federal penal or correctional institution designated by the BOP Director.  18 U.S.C. § 3596(a); 28 C.F.R. § 26.3(a)(1)–(3).  The 2019 Execution Protocol merely serves to explain how, in practice, BOP will carry out those instructions, including the choice of lethal agent, the procedural steps of administering the lethal agent, and a whole host of other internal procedures from execution checklists, to command center operations, to news media procedures.  *See* AR 874–75, 1016–67.

Moreover, the 2019 Protocol does not bind the agency (or any party) but rather leaves BOP the discretion to deviate from it, which is a hallmark of a procedural rule.  *See Clarian Health W.*, 878 F.3d at 357 ("we have consistently emphasized that [whether the challenged action has binding effect] is the most important" consideration).  Specifically, the Lethal Injection Protocol provides that the procedures specified therein may be modified at the discretion of the BOP Director as necessary (1) to comply with a court order, (2) to follow medical personnel's recommendation, or (3) "as may be required by other circumstances."  AR 874, ¶ A.  Similarly, the Manual provides that the BOP Director or the Warden may determine that it is appropriate to deviate from the procedures specified in the Manual. AR 1019.  These features of the 2019 Protocol make clear that it is not a legislative rule.  *See, e.g.*, *Clarian Health W.*, 878 F.3d at 358 (agency's manual instructions on how to reconcile Medicare reimbursement payments need not be subject to notice-

37

and-comment, where the statute and regulations provided agency with authority to reconcile payments, and the "Manual itself makes clear that the agency retains the discretion to deviate from the criteria that it set forth"); *Planned Parenthood of Wisc., Inc. v. Azar*, 316 F. Supp. 3d 291, 305–06 (D.D.C. 2018) (agency announcement of criteria for evaluating applications for federal grants was procedural rule because the announcement "did not conclusively bind agency, the court, or affected private parties" but left the agency "free to exercise discretion about who ultimately won [the] grants").

Alternatively, the 2019 Protocol could be considered a "general statement[] of policy," which is also exempt from APA's notice-and-comment requirement. 5 U.S.C. § 553(b)(3)(A). A statement of policy "explains how the agency will enforce a statute or regulation," *Nat'l Mining Ass'n*, 758 F.3d at 252, and serves to "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979)). Here, in providing the lethal agent for the lethal injection, the 2019 Protocol serves to "inform[] the exercise of discretion" embedded in the FDPA and the regulations. *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987)). Again, beyond the limits imposed by the Eighth Amendment, such a selection does not affect a condemned inmate's legal rights; even Lee does not argue that he has a right to choose the lethal agent to be used in his execution.

Finally, Lee argues that because the 2019 Protocol "materially amended the [prior, three]-drug regime," it must go through notice and comment. Mot. at 19–20. BOP's prior execution protocol was not subject to notice and comment because it, too, was a procedural rule. Lee cites no authority for the proposition that an agency must go through notice-and-comment when amending *procedural* rules (as opposed to regulations). In fact, that is not the law. *See Planned Parenthood of Wisc. Inc.*, 316 F. Supp. 3d at 305 (holding that agency announcement of criteria for evaluating applications for federal grants was procedural rule; observing that agency issued previous changes to the criteria also without notice and comment).

### C.  BOP's Adoption of the 2019 Protocol Is not Arbitrary or Capricious

Lee next contends that BOP's adoption of the 2019 Protocol violates the APA's proscription against unreasonable agency action.[15]  He is not likely to succeed on this claim, either.

The scope of review under the "arbitrary and capricious" standard is "narrow," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "highly deferential," *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017).  "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Nor is the court to "substitute its own judgment for that of the agency." *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017) (citation omitted).  Rather, the court's "only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  Even if the agency decision is "of less than ideal clarity," it must be upheld "if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43.  The court only considers "whether there has been a clear error of judgment." *Id.* (citation omitted).

Here, there is no clear error of judgment.  Lee faults BOP for failing to consider the inherent risks associated with using compounded pentobarbital and with IV access. *See* Mot. at 20–23.  But

---

[15] Lee also challenges the sufficiency of the Administrative Record. *See* Mot. at 20.  It is "well established" that an administrative record needs to include "all documents and materials that the agency directly or indirectly considered" at the time the challenged decision was made. *Detroit Int'l Bridge Co. v. Gov't of Canada*, No. CV 10-476, 2016 WL 10749142, at *1 (D.D.C. Apr. 25, 2016) (citation and alterations omitted).  "Common sense dictates that the agency determines what constitutes the whole administrative record because it is the agency that did the 'considering.'" *Id.* at *2 (citation omitted).  Thus, "absent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity, that it properly designated the administrative record." *Id.*  Lee, of course, cannot overcome this presumption because rather than identifying "reasonable, *non-speculative grounds* for [his] belief that [other] documents were *considered* by the agency and not included in the record," *id.*, he merely faults BOP for allegedly failing to consider the numerous issues he identified in the Complaint "regarding the use and administration of pentobarbital in executions." *See* Mot. at 20.  While Lee is free to raise an arbitrary-and-capricious challenge to such alleged failures, that has nothing to do with the completeness of the properly certified Administrative Record.

as discussed above, such risks are tolerated under the Eighth Amendment.  In fact, Lee's APA arguments essentially duplicate his Eighth Amendment challenge through the rubric of arbitrary and capricious review, even though the Supreme Court has expressly warned against "import[ing] profound differences of opinion over the meaning of the Eighth Amendment . . . into the domain of administrative law."  *Heckler v. Chaney*, 470 U.S. 821, 838 (1985).  Lee's litany of arbitrary and capricious challenges to the execution procedures also runs counter to the Supreme Court's admonition, reiterated only this year, that courts are not "boards of inquiry charged with determining 'best practices' for executions," and that the Constitution affords the government "a measure of deference" as to the "choice of execution procedures."  *Bucklew*, 139 S. Ct. at 1125 (citation omitted).

In any event, BOP has "articulate[d] a satisfactory explanation for its decision" to adopt the single-drug pentobarbital protocol.  *State Farm*, 463 U.S. at 43.  As discussed in detail above (*see* Background, Section II), BOP considered the wide-spread use of pentobarbital by the States, including the fact that at least five States use a single-drug pentobarbital protocol as the primary method of execution, and that numerous executions have been conducted successfully using such a protocol.  AR 870–71.  BOP also considered the many judicial opinions upholding the use of pentobarbital in executions, including the Supreme Court's recent decision in *Bucklew*, AR 871, n.13, and the fact that inmates challenging state lethal injection protocols frequently propose a single dose of pentobarbital as the alternative, preferred method.  AR 932.  In addition, BOP reviewed Dr. Antognini's expert report and testimony concerning pentobarbital in *Bucklew*, AR 871, 872, 930, 933, and consulted with him and other medical professionals about the proposed protocol.  AR 872, 525–26.  BOP also explored and rejected using pentobarbital as part of a three-drug sequence, AR 871, *see also* AR 930, and further considered and rejected several other possible lethal agents, *see* AR 862–65, 871, 930–31, 966, 964, 968.

Although not expressly part of the 2019 Protocol (which leaves the BOP Director the discretion to choose the appropriate form of the lethal substance), BOP's decision to use compounded pentobarbital is also reasonable.  Again, Lee himself alleges that no manufacturer of

pentobarbital products is willing to sell its products for executions.  *See* Compl. ¶ 75; *see also* AR 857.  Thus, like many States, BOP reasonably turned to a compounding pharmacy to prepare the injectable pentobarbital solution, AR 872, especially given that federal courts of appeals routinely have upheld the use of compounded lethal agents, AR 857.  Specifically, BOP obtained the active pharmaceutical ingredient from a properly registered domestic bulk manufacturer.  AR 872.  The compounding pharmacy then stores the API and will convert it to injectable solution as needed.  *Id*.  Importantly, BOP ensured that the API produced by the bulk manufacturer was tested for quality assurance, that the compounding pharmacy has performed its own testing of the pentobarbital solution it prepared, and that two independent laboratories have further performed quality testing of the pentobarbital solution.  *Id.*; *see also* AR 970–1015.

Lee also insists that BOP's non-disclosure of the identities of the bulk manufacturer and compounding pharmacy is arbitrary and capricious.  *See* Mot. at 23.  But BOP, like the States, must protect against the disclosure of such information because otherwise the government's ability to obtain the drug from these sources (or any other sources) would be severely impaired.  *See In re Mo. Dep't of Corr.*, 839 F.3d at 736 (the pharmacy's identity had "little, if any, relevance to [the inmates'] Eighth Amendment claim" and disclosure would make it more difficult for Missouri to acquire the necessary drugs), *cert. denied sub nom.*, *Jordan v. Mo. Dep't of Corr.*, 137 S. Ct. 2180 (2017).  The Supreme Court discussed this issue in *Glossip*, explaining that anti-death penalty advocates succeeded in pressuring the sole American manufacturer of sodium thiopental to first cease domestic production and then to exit the market entirely, prompting States to switch to pentobarbital.  135 S. Ct. at 2733.  In fact, before long, pentobarbital also became unavailable due to anti-death penalty advocates' lobbying efforts.  *Id.*; *see also* AR 857 (noting that the supply of pentobarbital declined after 2011, which is why States began using compounding pharmacies to prepare the pentobarbital injection); *Gray v. McAuliffe*, No. 3:16CV982-HEH, 2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017) ("Because death penalty opponents have made it difficult to obtain FDA-approved drugs customarily used in executions, Virginia has recently resorted to obtaining drugs from compounding pharmacies instead of traditional suppliers.").  Manufacturers and

pharmacies also are routinely subject to harassment, threats, and reprisals when their identities are discovered.[16]   BOP's withholding of its sources of pentobarbital therefore is reasonable.

Finally, Lee argues that the Administrative Record provides "<u>no</u> information to suggest that the DOJ and BOP even studied the problems associated with setting and maintaining IVs, let alone considered and recommended safeguards."  Mot. at 23.  Lee does not argue that the current IV procedure in the Lethal Injection Protocol is improper on its face, only that more information is needed for him to determine whether he is likely to experience a drug maladministration during his execution.   Again, such an argument is improper under either the APA or the Eighth Amendment.  Moreover, the Administrative Record contains ample evidence that BOP studied the issues associated with IV access.  Lee cited the example of Oklahoma inmate Clayton Lockett's execution in 2014, where the improper placement of the IV caused the inmate to regain consciousness, *see id.* at 22.  The Administrative Record shows that BOP reviewed "the after action report" of Lockett's execution, which "concluded that the viability of the IV access point was the single greatest factor that contributed to the difficulty in administering the execution drugs."  AR 931.  BOP also considered the Supreme Court's discussion of the Lockett example in *Glossip*.  *Id.* Moreover, discussion of the issue of IV access is prevalent in the case-law reviewed and considered by BOP.  *See* AR 108–400.  Finally, BOP visited several States to observe executions, AR 871, 930, and reviewed state lethal injection protocols, including those of Georgia, Idaho, Missouri, South Dakota, and Texas, AR 933, AR 7-91.

BOP has engaged in reasoned decision-making in adopting the 2019 Protocol, and under the APA's highly deferential standard of review, this Court should uphold it.

---

[16] *See, e.g.*, Barnini Chakraborty, *Texas refuses to give back lethal drugs, proceeds with execution*, Fox News Politics, Oct. 9, 2013, http://www.foxnews.com/politics/2013/10/09/texas-execution-to-proceed-despite-controversy-over-drug-and-compounding.html (pharmacist owner of a compounding pharmacy complained of being put "'in the middle of a firestorm' of protesters, hate calls and press requests" after it was leaked that he sold eight 2.5-gram doses of pentobarbital to Texas for executions).

## V.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION

Because Lee has failed to establish a likelihood of success on the merits, this Court need not proceed further to consider the remaining preliminary injunction factors. *See Winter*, 555 U.S. at 20. Before *Winter*, the D.C. Circuit had adopted a sliding scale approach, under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley*, 644 F.3d at 393. But the D.C. Circuit has construed *Winter* "at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." *Id.* (citation omitted). Indeed, "[e]ven a narrow reading of the Court's holding in *Winter* supports the view that sliding-scale analysis is obsolete." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 n.5 (D.D.C. 2014); *see also Nken v. Holder,* 556 U.S. 418, (2009) (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other."). In this context, the Supreme Court's *Glossip* opinion dispels any ambiguity, as it held that an inmate's failure to establish a likelihood of success on his method-of-execution challenge warrants denial of a motion for a preliminarily injunction. 135 S. Ct. at 2737. And courts routinely do so. *See, e.g.*, *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1273 (11th Cir. 2014); *Rhoades v. Reinke*, 671 F.3d 856, 863 (9th Cir. 2011); *see also Miller v. Parker*, 910 F.3d 259, 261 (6th Cir.), *cert. denied*, 139 S. Ct. 399 (2018) ("in execution protocol challenges, likelihood of success is often the determinative factor") (citation omitted).

Should the Court proceed further, though, the equities tip against the issuance of an injunction. While there is no question that an execution is final and that Lee will not be able to litigate his claims on the merits should his execution proceed, it is not clear that constitutes irreparable harm in the context of a challenge to the *method* of execution (rather than a challenge to the lawfulness of the *execution itself*). In challenges to the method of execution, the "irreparable harm" factor often merges with the merits. Because a sentence of death flows from the criminal judgment—rather than the method of execution—courts considering claims like Lee's often weigh

43

only the likelihood that the inmate will experience an unconstitutional level of pain. *See*, *e.g.*, *Lambert v. Buss,* 498 F.3d 446, 452 (7th Cir. 2007) (finding no irreparable harm from "mere possibility" that unforeseen complications will cause unnecessary pain); *Lenz v. Johnson*, 443 F. Supp. 2d 785, 794 (E.D. Va. 2006) (no irreparable harm because "the chance that an inmate would be conscious and able to feel pain during the administration of the final two chemicals" is small); *Emmett v. Johnson*, 489 F. Supp. 2d 543, 550 (E.D. Va. 2007) (no irreparable harm because it was nearly certain inmate will experience nothing more than a loss of consciousness during his execution); *Boyd v. Beck*, 404 F. Supp. 2d 879, 886–87 (E.D.N.C. 2005) (no irreparable because likelihood of inmate experiencing pain because of possible invasive surgical technique to gain access to his veins during execution is "extremely remote").

All four cases cited by Lee in support of his claim of irreparable harm are consistent with this approach. *See* Mot. at 27–28. Each case considered only the level of pain the inmate likely would suffer during execution in finding irreparable harm. *Id.* at 28 (citing, for example, *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (that inmate "could suffer unnecessary and excruciating pain while being executed") and *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("If Plaintiff's contentions [regarding the pain that he would suffer during the execution] are correct, the denial of a TRO will subject Plaintiff to an excruciating death, which certainly qualifies as irreparable harm") (brackets in original)).

At the same time, the "[government's] interest in finality are compelling" when post-conviction proceedings have run their course. *Calderon*, 523 U.S. at 556; *accord Lambert*, 498 F.3d at 452. Lee's conviction and sentence have been affirmed repeatedly in the 20 years since he was sentenced to death. "Equity must take into consideration the [government's] strong interest in proceeding with [the criminal] judgment . . . ." *Gomez v. U.S. Dist. Court for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992). As the Attorney General explained when announcing the execution dates for Lee and four other inmates:

> Congress has expressly authorized the death penalty through legislation adopted by the people's representatives in both houses of Congress. . . .  Under Administrations

> of both parties, the Department of Justice has sought the death penalty against the worst criminals, including these five murderers, each of whom was convicted by a jury of his peers after a full and fair proceeding.  The Justice Department upholds the rule of law—and we owe it to the victims and their families to carry forward the sentence imposed by our justice system.

Office of the Attorney General, Press Release No. 19-807 (July 25, 2019).[17]

The Supreme Court also has recognized that "the victims of crime have an important interest in the timely enforcement of a [death] sentence." *Hill v. McDonough,* 547 U.S. 573, 584 (2006).  The impact "upon the families of victims and their communities" will "only be compounded by a stay of the execution." *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1048–49 (D. Idaho), *aff'd*, 671 F.3d 856 (9th Cir. 2011).  Once the "lengthy [post-conviction proceedings] have run their course," "finality acquires an added moral dimension," and "[o]nly with real finality can the victims of crime move forward." *Calderon*, 523 U.S. at 556.  "To unsettle these expectations," the Supreme Court said, "is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the [government] and the victims of crime alike." *Id*. For all these reasons, the balance of equities tip against granting a stay of execution.

## CONCLUSION

For the foregoing reasons, this Court should deny Lee's motion for a preliminary injunction.

---

[17] U.S. Dep't of Justice, https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse (internal quotation marks omitted).

Dated:  October 18, 2019

Respectfully submitted,

JESSIE K. LIU
United States Attorney

DANIEL F. VAN HORN
Civil Chief, U.S. Attorney's Office

DENISE M. CLARK (D.C. Bar No. 479149)
Assistant United States Attorney
U.S. Attorney's Office
   for the District of Columbia
Washington, D.C. 20530
202-252-6605
Denise.Clark@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

PAUL R. PERKINS
Special Counsel to the
  Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Counsel
JONATHAN KOSSAK (DC Bar 991478)
Trial Attorney
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
Jonathan.Kossak@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2019, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all plaintiffs' counsel of record:

**Joshua Christopher Toll**
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Gerald Wesley King, Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celestw_bacchi@fd.org

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**\*Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

**\*Jeanne Vosberg Sourgens**
VINSON & ELKINS, L.L.P.
(202) 639-6633

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

**\*Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**Robert E. Waters**
VINSON & ELKINS, L.L.P.
(202) 737-0500
Email: rwaters@velaw.com

2

**William E. Lawler, III**
VINSON & ELKINS, L.L.P.
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**\*William E. Hoffman, Jr.**
KING & SPALDING LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

**Sean D. O'Brien**
PUBLIC INTERSET LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Elizabeth Hagerty**
HOGAN LOVELLS US LLP
(202) 637-3231
Email: elizabeth.hagerty@hoganlovells.com

**\*Yousri H. Omar**
VINSON & ELKINS, L.L.P.
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**\*Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0528
Email: shawn.nolan@fd.org

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

**David Victorson**
(202) 637-2061
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

**John D. Beck**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

**Pieter Van Tol**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

**Amy J. Lentz**
**STEPTOE & JOHNSON**
(202) 429-1320
Alentz@steptoe.com

/s/ *Jean Lin*
JEAN LIN

* No e-mail provided on the docket or counsel no longer with the identified firms.

4