**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| In the Matter of the | ) |
| Federal Bureau of Prisons' Execution | ) |
| Protocol Cases, | ) |
| | ) |
| LEAD CASE: *Roane et al. v. Barr* | )    Case No.  19-mc-0145 (TSC) |
| | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| *Lee v. Barr*, 19-cv-2559 | ) |
| | ) |

_____  )


**PLAINTIFF LEE'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN FURTHER SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ADDITIONAL BACKGROUND .............................................................................3

    I.    Lee's Capital Case .............................................................................3

    II.    Summary of Expert Declarations....................................................4

        A.    Dr. Van Norman ..................................................................4

        B.    Stevens ................................................................................4

ARGUMENT.............................................................................................................4

    I.    Lee Has Demonstrated a Likelihood of Success on All of His Claims .................5

        A.    Lee Has a Strong Likelihood of Success on His Constitutional Claims ...............................................................5

            1.    Eighth Amendment Claim...........................................................5

                (a)    The Defendants Misstate the Applicable Standard for Lee's Challenge by Misconstruing Supreme Court Precedent .......................................................5

                (b)    Lee Has a High Likelihood of Success on His Claim That the 2019 Protocol Poses a Substantial Risk of Serious Harm .......................................................7

                    (1)    The Pentobarbital Dose in the 2019 Protocol Would Not Render Lee Insensate to Pulmonary Edema .......................................................7

                    (2)    Lee's Allegations Regarding the Administration of the 2019 Protocol Are Not Based on Mere Speculation .................10

                (c)    Lee Has a High Likelihood of Proving the Requirements in *Glossip* for His Proposed Alternatives ...............................................15

                    (1)    Pre-Dose of Pain Medication .................15

                    (2)    Safeguards Relating to Substance and Procedures .......................................................16

                    (3)    Bedside Administration.........................17

             2.    Due Process Claim...................................................17

             3.    Access to Counsel Claim..........................................18

         B.    Lee Has a Strong Likelihood of Success on His APA Claims.................19

i

1. The 2019 Protocol Is the Result of *Ultra Vires* Agency Action ........................................................................... 21

2. The 2019 Protocol Is Subject to the Notice-and-Comment Requirement Because It is Not a Procedural Rule or a General Statement of Policy ......................................................... 22

   (a) The 2019 Protocol Is Not a Procedural Rule ..................... 22

   (b) The 2019 Protocol Is Not a General Statement of Policy .................................................................................. 27

3. The 2019 Protocol Resulted from Arbitrary and Capricious Action ................................................................................... 30

II. Lee Will Suffer Irreparable Injury If the Implementation of the 2019 Protocol Is Not Enjoined ....................................................................... 29

III. The Public Interest Would Be Served, and the Defendants Would Not Be Substantially Harmed, if the Court Were to Enjoin the Implementation of the 2019 Protocol ............................................................................. 30

CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987) ..................................................................................... 24, 27

*Batterton v. Marshall*,
648 F.2d 694 (D.C. Cir. 1980) ............................................................................................ 24

*Baze v. Rees*,
553 U.S. 35 (2008) ............................................................................................................ 5, 24

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................ 14

*Brewer v. Landrigan*,
562 U.S. 996 (2010) ............................................................................................................ 12

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019) ................................................................................................. *passim*

*Clarian Health W., LLC v. Hargan*,
878 F.3d 346 (D.C. Cir. 2017) ..................................................................................... 25, 26

*Clemons v. Crawford*,
585 F.3d 1119 (8th Cir. 2009) ........................................................................................... 15

*\*Cooey v. Strickland*,
No. 2:04-CV-1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011) ............................... 18, 19

*\*Electronic Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*,
653 F.3d 1 (D.C. Cir. 2011) .......................................................................................... 23, 24

*Emmett v. Johnson*,
532 F.3d 291 (4th Cir. 2008) ............................................................................................. 15

*Glossip v. Gross*,
135 S. Ct. 2726 (2015) ..................................................................................................... 5, 6

*Harris v. Johnson*,
323 F. Supp. 2d 797 (S.D. Tex. 2004) ............................................................................... 30

*Higgs v. United States*,
711 F. Supp. 2d 479 (D. Md. 2010) ................................................................................... 21

*In re Ohio Execution Protocol Litig.*,
937 F.3d 759 (6th Cir. 2019) ...................................................................................7, 8

*\*In re Ohio Execution Protocol Litig.*,
No. 2:11-CV-1016, 2018 WL 6529145 (S.D. Ohio Dec. 12, 2018)............................19

*\*In re Ohio Execution Protocol Litig.*,
No. 2:11-cv-1016, 2019 WL 5172299 (S.D. Ohio Oct. 15, 2019) ...............................9

*\*Jafarzadeh v. Nielsen*,
321 F. Supp. 3d 19 (D.D.C. 2018) .............................................................................23

*Kirwa v. United States Dep't of Defense*,
285 F. Supp. 3d 21 (D.D.C. 2017) ...............................................................................5

*Lamoille Valley R.R. Co. v. ICC*,
711 F.2d 295 (D.C. Cir. 1983).....................................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).......................................................................................................27

*Nat'l Sec. Counselors v. CIA*,
931 F. Supp. 2d 77 (D.D.C. 2013)........................................................................23, 24

*National Mining Ass'n v. McCarthy*,
758 F.3d 243, 252-53 (D.C. Cir. 2014) .......................................................................27

*Planned Parenthood of Wisc., Inc. v. Azar*,
316 F. Supp. 3d 291(D.D.C. 2018) ........................................................................25, 26

*Pursuing America's Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016).......................................................................................5

*United States v. Bourgeois*,
423 F.3d 501 (5th Cir. 2005) .......................................................................................22

*United States v. Chandler*,
950 F. Supp. 1545 (N.D. Ala. 1996) ...........................................................................20

*United States v. Fell*,
No. 5:0-CR-12-01, 2018 WL 7270622 (D. Vt. Aug. 7, 2018) ...................................22

*\*United States v. Hammer*,
121 F. Supp. 2d 794 (M.D. Pa. 2000) ...................................................................20, 21

*United States v. Tipton*,
90 F.3d 861 (4th Cir. 1996) .............................................................................. 19-20

*Valle v. Singer*,
655 F.3d 1223 (11th Cir. 2011) ..............................................................................15

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
754 F.2d 1260 (11th Cir. 2014) ..............................................................................15

*Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013) ........................................*passim*

*Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015)................................................14, 15

## Statutes and Rules

18 U.S.C. § 3596(a) ...........................................................................................*passim*

21 U.S.C. § 848(e) ...................................................................................................19

28 C.F.R. § 26.3(a)........................................................................................ 19, 20, 21

Fed. R. Civ. P. 30(b)(6).............................................................................................11

Plaintiff Daniel Lewis Lee ("Lee") respectfully submits this memorandum, along with the Reply Declaration of Pieter Van Tol (the "Van Tol Reply Decl."), the Expert Declaration of Gail A. Van Norman, M.D. (the "Van Norman Decl."), and the Expert Declaration of Craig W. Stevens, Ph.D. (the "Stevens Decl."), in further support of the Motion.

## PRELIMINARY STATEMENT

The parties agree that the likelihood of success is a critical factor here. The Court may grant a preliminary injunction (assuming the other factors in the standard are met) if Lee shows a likelihood of success on <u>any</u> of his constitutional claims or claims under the Administrative Procedures Act ("APA"). Lee has demonstrated a strong likelihood of success on all claims.

In their opposition brief (the "Opposition"), the Defendants focus on Lee's cause of action for violation of the Eighth Amendment. The Defendants argue that Lee cannot succeed on his claim because he has not met the U.S. Supreme Court's requirements of pleading (1) sufficient facts showing that, in an execution using pentobarbital, there is a substantial risk of serious harm; or (2) a known and available alternative that is feasible, readily implemented, and would significantly reduce the risk of severe pain. (*See* Opp'n, 1-2.) The Defendants are wrong on both counts.

The Defendants' argument rests on the premise that the dose of pentobarbital set forth in the 2019 Protocol would render Lee unconscious and insensate so that, even if there were pain caused by the lethal injection, Lee would not feel it. Lee, however, has submitted expert evidence demonstrating two scientific facts: (1) pentobarbital in such a dose leads to pulmonary edema, a condition which causes extreme suffering; and (2) Lee would <u>not</u> be rendered insensate by the pentobarbital dose. Therefore, there is more than a "substantial risk of serious harm" here; Lee would in fact endure severe pain and suffering as a result of the pentobarbital injection. Lee has also conclusively rebutted the Defendants' assertion that his alternatives are deficient under the applicable standard. As discussed below, Lee has demonstrated the availability, feasibility and

ready implementation of all three of his alternatives, which address the pain and suffering issue and the maladministration problems identified in the Complaint.

The Defendants repeatedly argue that Lee has not pled the necessary facts for a maladministration claim, but, at the same time, they insist that Lee is not entitled to any discovery of the facts relating to such a claim (which are in the Defendants' sole possession). The cases cited by the Defendants in which the courts denied discovery do not apply here because they involved non-viable Eighth Amendment claims and, unlike here, the plaintiffs in those cases were not already engaged in discovery. This case is different in that (1) Lee has a well-pled Eighth Amendment claim based on the pentobarbital dose itself; and (2) pursuant to Court order, Lee is participating in discovery. Thus, the Defendants' "Catch 22" argument regarding the maladministration claim fails.

The Defendants' responses to Lee's other causes of action, which relate to constitutional violations and violations of the APA, are discussed in further detail below. But the *ultra vires* claim warrants particular attention here because the Defendants still have no answer to Lee's argument. The FDPA simply does not authorize the 2019 Protocol and no amount of conflation of the terms "manner" and "method" can change that. The FDPA clearly does not allow a protocol that sets forth a uniform rule for all executions under the statute and it does not authorize the BOP to create a protocol, set execution dates or carry out such executions. The 2019 Protocol just as clearly seeks to implement such a rule. Where a rule conflicts with a statute, the rule must yield.

In addition to establishing a likelihood of success on the merits, Lee has demonstrated that he would suffer irreparable injury as the result of an unconstitutional execution and there is no public interest that can overcome a constitutional violation. In any event, the Defendants' arguments regarding the public interest — which focus on finality of criminal proceedings and the wishes of the victims' families — are unsupported by the facts, including the recent revelation that several members of the victims' families are opposed to Lee's execution.

Under the circumstances, Lee respectfully requests that the Court enter an order preliminarily enjoining the implementation of the 2019 Protocol.

<u>**ADDITIONAL BACKGROUND**</u>

**I.     <u>Lee's Capital Case</u>**

Lee's conviction and sentencing is described in the Complaint filed on August 23, 2019. (*See* Compl., ¶¶ 26-27.)[1]   In brief, Lee and co-defendant Chevie Kehoe were convicted in the Eastern District of Arkansas in 1999 of counts related to murder and racketeering in the deaths of Nancy Mueller, her husband William Mueller, and her daughter Sarah Powell.   The greater part of the evidence concerned Chevie Kehoe, his efforts to start an organization for "Aryan" people, and his white supremacist family, who knew William Mueller.   The main evidence against Lee came from family members of Kehoe's, who were given vast sentencing reductions and money for their testimony.   The prosecutors sought to drop the death penalty against Lee after the far more culpable Kehoe was given life without parole, but they were compelled to proceed by their superiors at the Department of Justice ("DOJ").   The manner in which Lee's death sentence was returned — through improper reliance on a scientific "test" to prove his future danger and a prior murder he did not commit — has been found to be prejudicial but irremediable through the judicial process.

The Defendants maintain, in the context of legal argument on the public interest, that granting a preliminary injection in this case would harm the victims' family.   (*See* Opp'n, 3-4; *see also id.,* 45).   That is not the case, as the Defendants know.   The family members of the victims have stressed their opposition to Lee's execution, and did so to the DOJ again just weeks before the

---

[1]      The Complaint was filed in *Lee v. Barr et al.*, Case No. 19-02559 (TSC) (the "*Lee* Action"), Dkt. #1.  The *Lee* Action was later consolidated with similar cases under the caption *Roane et al. v. Barr*, Case No. 19-mc-0145 (TSC).  We will refer to the latter below as the "Consolidated Action."

Defendants filed the Opposition.[2] It is incorrect, disingenuous and insulting to those family members, for the Defendants to insist otherwise.

## II.   Summary of Expert Declarations

### A.   Dr. Van Norman

Dr. Van Norman concludes that the administration of the pentobarbital dose in the 2019 Protocol would cause Lee to suffer from pulmonary edema, which produces the sensation of drowning or suffocating. At the same time, however, the pentobarbital dose would not render Lee insensate or unconscious, so he would remain aware and still suffer during an execution.

In addition, Dr. Van Norman discusses (1) anesthesia in general practice as opposed to lethal injections; (2) the risks with IV injection of pentobarbital, including the faulty placement of the catheter, which leads to injection into the flesh rather than the vein ("infiltration" or "extravasation"), and the placement of the catheter in an artery rather than a vein; (3) the risks and deficiencies of the 2019 Protocol; (4) the risks associated with compounded drugs; and (5) the differences between lethal injection executions and physician-assisted suicide.

### B.   Stevens

Stevens provides an opinion on the use on opioid analgesic drugs to relieve the pain and suffering caused by a lethal injection of pentobarbital. He concludes that there are several options available for such relief and that they are commonly and readily used in connection with anesthesia.

## ARGUMENT

The parties agree that the four factors for preliminary injunctions are: (1) the likelihood of the plaintiff's success on the merits; (2) the threat of irreparable injury to the plaintiff if an

---

[2] The victims' family members made their views known directly in various submissions to the DOJ. They were also quoted in a recent article by *The New York Times*. (*See* Campbell Robertson, "She Doesn't Want Her Daughter's Killer To Be Put To Death. Should the Government Listen?," https://www.nytimes.com/2019/10/29/us/arkansas-federal-death-penalty.html (last visited on Nov. 1, 2019).) Embedded in the article is a video statement from the matriarch of the family stating that an execution would dishonor her daughter's and granddaughter's names.

injunction is not granted; (3) the likelihood that other interested parties will suffer substantial harm if injunctive relief is granted; and (4) the interests of the public.  (*See* Initial Br., 15; Opp'n, 11.) When the government opposes a preliminary injunction motion, the third and fourth factors merge. *See, e.g.*, *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (harm to the agency and the public interest "are one and the same, because the government's interest <u>is</u> the public interest") (emphasis in original).  Those two factors are discussed together below.

I.   <u>**Lee Has Demonstrated a Likelihood of Success on All of His Claims**</u>

"Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief."  *Kirwa v. United States Dep't of Defense*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (quotation omitted).  Lee, therefore, will satisfy the first prong of the preliminary injunction standard if he shows a likelihood of success on <u>any</u> of his claims.

A.   <u>**Lee Has a Strong Likelihood of Success on His Constitutional Claims**</u>

Lee has alleged constitutional claims under the First, Fifth, Sixth and Eighth Amendments. The Eighth Amendment claim is central and the other constitutional claims are closely related to it. As shown below, Lee's Eighth Amendment claim is amply supported by scientific evidence, and he has a strong likelihood of success on all of the constitutional claims.

1.   <u>**Eighth Amendment Claim**</u>

(a)   <u>**The Defendants Misstate the Applicable Standard for Lee's Challenge by Misconstruing Supreme Court Precedent**</u>

The Defendants assert that, in *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), the Supreme Court established a "high standard" under which the Eighth Amendment "prohibits only methods of execution 'seeking to superadd terror, pain or disgrace' to a prisoner's death."  (Opp'n, 1 (quoting *Bucklew*).)  The Defendants repeatedly refer to the alleged "superadded pain" standard.  (*See id.*, 13, 24.)  The Defendants, however, have mischaracterized *Bucklew*.

The relevant standards are set forth in *Baze v. Rees*, 553 U.S. 35 (2008), and *Glossip v. Gross*, 135 S. Ct. 2726 (2015).  The Supreme Court held that a prisoner asserting an Eighth Amendment challenge to an execution method must plead (1) sufficient facts to show "a substantial risk of serious harm," *Baze*, 553 U.S. at 50; and (2) a "known and available alternative" that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain," *Glossip*, 135 S. Ct. at 2737, 2739.  The Defendants recognize the applicability of the *Baze-Glossip* test by citing it in the Opposition.  (*See* Opp'n, 12-13.)

The Defendants, however, also cite *Bucklew* as the source of a higher standard.  (*See id.*, 1.) They misstate *Bucklew*.  The Supreme Court merely "(re)confirmed that anyone bringing a method of execution claim alleging the infliction of unconstitutionally cruel pain must meet the *Baze-Glossip* test." *Bucklew*, 139 S. Ct. at 1129.  *Bucklew*, therefore, did not establish a new standard, as the Defendants assert.  The various references to "superadded pain" are merely *dicta* describing the precedent that was reaffirmed in *Bucklew*.  *See, e.g., id.* at 1126-27.  Thus, Lee must satisfy the requirements from *Baze* and *Glossip*, which he has done.  *See infra*, 6-17.

The Defendants similarly overstate the holding in *Glossip*, contending that: "*Glossip* makes clear that an inmate must both 'plead and prove' the elements of an Eighth Amendment claim to be entitled to a preliminary injunction."  (Opp'n, 21 (emphasis added).)  There are two problems with the Defendants' description.  *First*, the "plead and prove" phrase from *Glossip* relates to known and available alternatives, not all the elements of the claim.  *Glossip*, 135 S. Ct. at 2739.  *Second*, and more importantly, *Glossip* affirmed the denial of the preliminary injunction because of a failure to adequately plead an alternative.  *See id.* at 2738-39.  The Supreme Court did not hold that a plaintiff also must "prove" the alternative to obtain a preliminary injunction.  *Glossip* instead applied the usual "likelihood of success" prong for preliminary injunctions.  *See id.* at 2737 ("The parties agree that this case turns on whether petitioners are able to establish a likelihood of success on the merits.")  That is a lesser showing than the proof required at trial.

6

**(b)**  **Lee Has a High Likelihood of Success on His Claim That the 2019 Protocol Poses a Substantial Risk of Serious Harm**

As the Defendants note, Lee challenges both the use of pentobarbital in the 2019 Protocol <u>and</u> the administration issues that the protocol raises.  (*See* Opp'n, 14-22.)  Lee has demonstrated a high likelihood of success on his claim that pentobarbital and its administration under the 2019 Protocol violate the Eighth Amendment because they both pose a substantial risk of serious harm.

**(1)**  **The Pentobarbital Dose in the 2019 Protocol Would Not Render Lee Insensate to Pulmonary Edema**

Lee has shown, through expert evidence, that the dose of pentobarbital (5 grams) required by the 2019 Protocol would in fact cause him severe harm (even apart from any administration issues).  Dr. Van Norman concludes that pulmonary edema, which causes extreme suffering akin to suffocation or drowning, would occur at Lee's execution if Lee were injected with 5 grams of pentobarbital (per the 2019 Protocol).  (*See, e.g.*, Van Norman Decl., ¶¶ 18, 65-72, 111.)  Moreover, the pentobarbital dose would not render Lee insensate and he would retain awareness for the duration of the execution.  (*See, e.g., id.*, ¶¶ 14-18, 64-72, 111.)  Thus, there is far more than a "substantial risk" of serious harm from the use of the pentobarbital dose in the 2019 Protocol.  Serious harm, in the form of extreme suffering, <u>would</u> occur.

The Defendants make three arguments in an effort to show that Lee does not have a likelihood of success on the merits of his claims related to the use of pentobarbital.  *First*, they rely on the Sixth Circuit's holding that "neither pulmonary edema nor the symptoms associated with it qualify as the type of serious pain prohibited by the Eighth Amendment."  (Opp'n, 14 (quoting *In re Ohio Execution Protocol Litig.*, 937 F.3d 759, 762 (6th Cir. 2019)).)  The plaintiffs in that case filed a petition for rehearing *en banc* on October 16, 2019, which points out the numerous errors in the Sixth Circuit's opinion.  (*See* Van Tol Reply Decl., Ex. A.)  Even if, however, rehearing is denied, the Court should not follow the erroneous conclusions in *Ohio Execution*.  Among other things, the Sixth Circuit construed *Bucklew* in the same incorrect manner as the Defendants, stating that

*Bucklew* stands for the proposition that "the Eighth Amendment only prohibits forms of punishment that seek to intensify an inmate's death by "'superadd[ing]" feelings of "terror, pain, or disgrace.'" *Id.* at 762 (quoting *Bucklew*, 139 S. Ct. at 1124).  As discussed above, that is a misreading of *Bucklew*, which did not alter the existing *Baze-Glossip* test.  *See supra*, 5-6.

The Sixth Circuit also erroneously found that the suffocation associated with pulmonary edema is not "constitutionally inappropriate" because the Supreme Court allegedly "reasoned" in *Bucklew* that hanging (in which the prisoner might suffocate) did not violate the Eighth Amendment.  *Ohio Execution*, 937 F.3d at 762.  Again, the Sixth Circuit misinterpreted *Bucklew*. The Supreme Court made no finding in *Bucklew* that suffocation is constitutionally permissible.  It simply stated, in a recitation of the history of executions, that the "significant pain" caused by hanging was not questioned in the 18th century and, at the time, it was not considered to be as egregious as punishments like burning and disemboweling.  *Bucklew*, 139 S. Ct. at 1124.  *Bucklew*, therefore, is <u>not</u> an endorsement of suffocation as a constitutional means of execution.

Finally, the holding in *Ohio Execution* does not support the Defendants' position here.  The Sixth Circuit concluded that: "Without evidence showing that a person deeply sedated by a 500 milligram dose of midazolam is still 'sure or very likely' to experience an unconstitutionally high level of pain, Henness has not met his burden on this prong."  *Ohio Execution*, 937 F.3d at 763. This conclusion has no application here because Lee has demonstrated that he would in fact suffer from pulmonary edema and extreme suffering under the 2019 Protocol.

*Second*, the Defendants rely on cases where the courts have upheld the use of a single-drug pentobarbital protocol.  (*See* Opp'n, 15.)  In those cases, however, there was no challenge to a pentobarbital protocol that is similar to Lee's challenge here, and none of the cases involves expert testimony — based on the latest medical science — that a prisoner remains sensate and aware despite the dose of pentobarbital.  To the contrary, the cases operate on the outdated and

8

scientifically incorrect presumption that pentobarbital renders the prisoner insensate.  The Court should decide Lee's challenge based on the evidence in <u>this</u> case and the current science.

*Third*, the Defendants note that some prisoners challenging execution protocols have proffered pentobarbital as an alternative.  (*See* Opp'n, 15-16.)  Again, those cases do not indicate that the plaintiffs used the data on which Lee relies.  It should not affect the Court's decision here that other prisoners — who may have been relying on an inaccurate and dated understanding of the science and whose record is not before the Court — offered pentobarbital as an alternative.

It is also noteworthy that Lee has proffered expert evidence in connection with his motion for a preliminary injunction, while the Defendants have not.  The Defendants claim to have "consulted" with Joseph F. Antognini, M.D., in connection with the development of the 2019 Protocol and they refer to his expert testimony in other cases.  (*See* Opp'n, 7, 16, 40.)  The Defendants, however, did not submit an expert opinion from Dr. Antognini here.  There is also no evidence that Dr. Antognini's testimony in other cases took into account the scientific literature on which Dr. Van Norman relies.  Furthermore, Dr. Antognini has been criticized in the *Ohio Execution* case.  The Magistrate Judge in the case denied a *Daubert* challenge to the admission of Dr. Antognini's testimony regarding midazolam, but only because he found that *Daubert* is more important in jury trials than hearings and that he could consider "the extent to which [Dr. Antognini's] opinions are outside the scientific consensus" in weighing the evidence.  *See In re Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, 2019 WL 5172299, at *3 (S.D. Ohio Oct. 15, 2019).  The Magistrate Judge also referred to Dr. Antognini's testimony as "an outlier."  *Id.*  Therefore, the Court should credit Dr. Van Norman's opinion, which is detailed and based on the facts in this case, rather than Dr. Antognini's testimony from other cases.[3]

---

[3]     The Defendants also cite to a one-and-half page opinion from Craig W. Lindsley, Ph.D., regarding an earlier draft of the 2019 Addendum (not the full 2019 Protocol).  (*See* Opp'n, 7-8, 25.) Lindsley's conclusory opinion lacks any citations and, as with Dr. Antognini, there is no evidence that Lindsley considered the scientific data cited by Dr. Van Norman.

Under the circumstances, Lee has more than satisfied the *Baze-Glossip* test with respect to pentobarbital and he has a strong likelihood of success on the merits.

> **(2)** **Lee's Allegations Regarding the Administration of the 2019 Protocol Are Not Based on Mere Speculation**

The Defendants assert that Lee does not have a likelihood of success on his claims arising out of (a) the source, form and quality of the pentobarbital; and (b) the procedures for executions under the 2019 Protocol, including IV-related issues.  (*See* Opp'n, 16-22.)[4]  The Defendants' arguments regarding these claims do not withstand scrutiny.

*First*, the Defendants claim that Lee's allegations in the Complaint raise nothing more than a "hypothetical possibility" that his execution could go wrong and that any issue that does arise would be an "innocent misadventure" or "isolated mishap."  (*See id.*, 17-18.)  The Complaint, however, sets forth in detail the specific issues that have arisen in other executions, including the problems directly caused by the use of compounded pentobarbital.  (*See, e.g.*, Compl., ¶¶ 78, 81-82.)  Lee has supplemented those allegations with expert evidence from Dr. Van Norman.  (*See* Van Norman Decl., ¶¶ 21, 94-105, 111.)  The Defendants have admitted that the executions under the 2019 Protocol will use compounded pentobarbital.  Given the number of well-documented problems with such executions, they cannot fairly be described as "hypothetical" or "isolated."[5]

*Second*, the Defendants insist that they will alleviate some of the issues that have led to the numerous botched executions by making sure the personnel involved in the executions are qualified and trained.  (*See* Opp'n, 18.)  The Defendants cite to sections of the 2019 Protocol regarding the alleged qualifications and training of such personnel (*see* AR 0874, § D), arguing that similar qualifications and training have been approved by other courts.  (*See* Opp'n, 18.)  The problem

---

[4]      The Defendants classify these together as "maladministration claims."  (*Id.*, 16.)  Such claims are separate from Lee's claim regarding the effects of the pentobarbital dose.

[5]      Moreover, even if the problems identified by Lee were only hypothetical, a showing of likelihood of severe pain can based on hypothetical situations.  *See infra*, 13.

again is that the Defendants have provided no information here, refusing to confirm the qualifications or training of any such personnel or that they will even participate in the executions. The 2019 Protocol states that, with regard to the personnel on the execution team, "any documentation establishing their qualifications … shall be protected from disclosure to the fullest extent permitted by law."  (AR 0874, § B.)[6]  Indeed, in response to the Rule 30(b)(6) deposition notice issued to the Federal Bureau of Prisons ("BOP"), the Defendants have objected to any questions relating to the qualifications and training of the execution team members, claiming that such information is "not relevant to Plaintiffs' claims" and is protected by privilege.  (Van Tol Decl., Ex. B, 10/18/19 e-mail at 1:11 p.m., 7-8.)  The Defendants cannot tout the qualifications and training of the personnel as the answer to Lee's constitutional challenges and, at the same time, state that information regarding those qualifications and training is irrelevant.[7]  Moreover, the 2019 Protocol does not require the use of the personnel set forth in Section D of the 2019 Addendum. The 2019 Addendum expressly allows for modification of the procedures at the discretion of the BOP Director "as may be required by [the] circumstances" (AR 0874, § A), which means that the qualified and trained personnel referenced by the Defendants might not even participate.

*Third*, the Defendants note that the 2019 Protocol refers to the use of two separate IV lines in separate locations.  (*See* Opp'n, 18 (citing AR 0875, § H).)  The separate IV lines, however, will not address the other IV and qualification/training issues.  (*See* Compl., ¶¶ 80-84; Van Norman Decl., ¶¶ 19-20, 22, 64, 73-93.)   Furthermore, as with the qualifications and training of the personnel, the 2019 Protocol does not <u>require</u> separate IV lines.  The 2019 Addendum refers to

---

[6]    The Defendants have cited to no statute or rule supporting the asserted entitlement to secrecy.

[7]    Also, the release of information regarding qualifications and training does not mean that the identities of the personnel will be disclosed.  The Defendants could easily provide the information while still shielding the identities of the execution team members.  Lee does not waive the right to seek information on the identities of execution team members, but that is not before the Court.

separate IV lines "[i]f peripheral venous access is utilized," and it again gives the BOP Director the discretion to deviate from the execution procedures.  (*See* AR 0875, § D.)

*Fourth*, with regard to the compounded pentobarbital issues, the Defendants rely heavily on the Supreme Court's terse order in *Brewer v. Landrigan*, 562 U.S. 996 (2010), vacating a temporary restraining order.  (Opp'n, 19.)  The Defendants alter the quote from *Landrigan* so that it refers to the use of a "[compounded] drug," but *Landrigan* actually involved Arizona's importation of sodium thiopental from a foreign manufacturer.  The Supreme Court focused on the lack of evidence that the drug from a foreign manufacturer was unsafe.  *Id.*  Here, the Defendants finally stated that the manufacturer of the active pharmaceutical ingredient ("API") is domestic and, unlike *Landrigan*, this case involves compounded pentobarbital.  Lee has identified the issues with compounding pharmacies generally and with compounded pentobarbital specifically.  (*See* Compl., ¶¶ 77-78; Van Norman Decl., ¶¶ 21, 94-105, 111.)  This case, therefore, is unlike *Landrigan*.

The Defendants also cite a series of cases where courts rejected challenges to compounded pentobarbital.  (*See* Opp'n, 19.)  Each case involves the dismissal of a complaint or the denial of a preliminary injunction motion where the plaintiffs had not yet engaged in discovery.  As a result, the plaintiffs in those cases could only speculate and make general allegations about the issues with compounded pentobarbital.  Here, by contrast, Lee has identified the constitutional problems with specificity, and he has shown that the Defendants' purported solutions to the compounding issues in the 2019 Protocol are ineffectual or subject to such wide discretion by the BOP Director as to render them non-existent.  Even more importantly, Lee will be taking Court-ordered discovery in further support of his claims.  Thus, the Defendants' cases do not provide a basis for cutting off Lee's ability to participate fully in discovery because, in those cases (and unlike here), the plaintiffs had not supported their pleading with facts and were not already participating in the discovery process.

One of the Defendants' main cases — *Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013) — is instructive here.  The Fifth Circuit stated:

It is indeed not unreasonable to assume that if a prisoner has the right to be free from a demonstrated risk of severe pain when compared to a known and available alternative, he ought to have the opportunity to prove the risk of pain and the availability of alternatives. Even so, plaintiffs must point to some likelihood that such pain will be severe and that some alternative may exist.

*Id.* at 468 (emphasis in original). In the context of compounded pentobarbital, the *Whitaker* court added that "plaintiffs must point to some hypothetical situation, based on science and fact, showing a likelihood of severe pain." *Id.* (emphasis in original). Lee has already surpassed the "some likelihood" and "some hypothetical situation" thresholds established in *Whitaker*. To the extent possible, Lee will also supplement his showing of a likelihood of severe pain through the upcoming discovery and thereafter (if an injunction is issued).

The Defendants assert that Lee's concerns about compounded pentobarbital are "particularly unwarranted" because the pentobarbital used in executions under the 2019 Protocol will be derived from API produced by a domestic manufacturer and then compounded by a domestic compounding pharmacy.[8] The Defendants state that the compounding pharmacy and independent laboratories have tested the quality of the injectable pentobarbital. (*See* Opp'n, 20.) The Defendants, however, will not identify the API manufacturer or the compounding pharmacy (*see* Van Tol Decl., Ex. B, 10/18/19 e-mail at 1:11 p.m., 7-8), which precludes Lee from determining whether the Defendants are using a reliable manufacturer and compounder. That is a significant concern in light of the well-documented issues with compounded substances. Moreover, the laboratory testing cited by the Defendants does not provide the requisite assurance of quality. The analyses are from several months ago, one dating back to November 2018 (*see* AR 0976), and the Defendants do not state that they relate to the actual substances that would be used at executions under the 2019 Protocol. One

---

[8]     The Defendants criticize Lee for stating in the Initial Brief that the API could be from a foreign source. (*See* Opp'n, 20.) However, the Administrative Record provided by the Defendants expressly refers the BOP importing foreign API (*see* AR 859), and it was not clear from the Administrative Record whether the API manufacturer is domestic or foreign. It was only in the Opposition that the Defendants clarified the API source as domestic.

of the results also indicates that the compounded products failed.  (*See* AR 0976-77.)   Therefore, the Defendants have not provided competent evidence on the source or quality of the pentobarbital.

*Fourth*, the Defendants contend that Lee is not entitled to a preliminary injunction pending discovery because "the Supreme Court has rejected the notion that discovery must be available to a plaintiff who cannot allege sufficient factual matter to suggest plausibly an entitlement to relief." (Opp'n, 20-21 (quoting *Zink v. Lombardi*, 783 F.3d 1089, 1105-06 (8th Cir. 2015)).)   The Defendants rely on *Zink*, which in turn cited the Supreme Court's oft-cited articulation of the general pleading standard in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007).   As the Court is well aware, *Twombly* is the standard that applies to motions to dismiss or motions for judgment on the pleadings, <u>not</u> motions for preliminary injunctions.

In any event, Lee has satisfied both the preliminary injunction standard and the *Twombly* standard because he specifically alleges, with supporting facts, plausible constitutional claims.  The Defendants recently conceded that Lee may make use of the upcoming deposition of a BOP representative in connection with his preliminary injunction.  (*See* Consol. Action, Dkt. #19, 1.) The Defendants cannot logically argue that Lee has failed to meet the *Twombly* standard, while, at the time, they admit that Lee may engage in discovery relating to the preliminary injunction motion. Furthermore, the Court has ordered that Lee and the other Plaintiffs in the Consolidated Action may take discovery regarding the 2019 Protocol.  In his alternative request for a preliminary injunction pending discovery, Lee is merely asking the Court for an opportunity to participate fully in the development of the record, which is relevant to the constitutional issues.  The Defendants, however, are seeking to limit the discovery available to Lee, just as they initially attempted in the *Roane* action to oppose factual development by the plaintiffs so they could argue later that the complaints should be dismissed for lack of facts.  (*See* Van Tol Reply Decl., Ex. C, 14:5-15:14.)

The Defendants also cite *Zink* and other cases for the proposition that a prisoner challenging an execution method cannot seek discovery from the government to support a claim for violation of

the Eighth Amendment.  Those cases are all distinguishable because of the procedural posture of the *Lee* Action and the Court-ordered discovery in the Consolidated Action (in which Lee is participating).  Two of the cases — *Zink* and *Clemons v. Crawford*, 585 F.3d 1119, 1128 (8th Cir. 2009) — involve dispositive motions, not motions for preliminary injunction, and there was no discovery taken by the parties.  As a result, the plaintiffs could only speculate regarding the issues with the compounded pentobarbital or execution personnel.  In this case, by contrast, Lee will be engaging in discovery to further support his well-pled claims.  Three other cases — *Wellons v. Commissioner, Georgia Department of Corrections*, 754 F.2d 1260 (11th Cir. 2014), *Whitaker*, and *Valle v. Singer*, 655 F.3d 1223 (11th Cir. 2011) — involve preliminary injunction motions, but they are similarly inapplicable because the parties had not engaged in any discovery.  The Defendants' final case, *Emmett v. Johnson*, 532 F.3d 291 (4th Cir. 2008), is also inapposite because it involved a grant of summary judgment after discovery.  The question in *Emmett* was whether further discovery should be granted.  *See Emmett*, 532 F.3d at 297.  Here, the Court-ordered discovery is underway and the alternative preliminary injunction sought by Lee would allow him to participate <u>fully</u> in that discovery rather than being limited solely to the upcoming BOP deposition on November 15, 2019.

(c)   <u>Lee Has a High Likelihood of Proving the Requirements in<br>*Glossip* for His Proposed Alternatives</u>

The Defendants argue that Lee has not complied with *Glossip* by proposing any known and available alternative that is feasible, readily implemented and will significantly reduce the substantial risk of severe pain.  (Opp'n, 22.)  Lee, however, has proposed <u>three</u> alternatives that meet the *Glossip* requirements, and the Defendants' criticisms of those alternatives fall short.

(1)   <u>Pre-Dose of Pain Medication</u>

The Defendants assert that the allegations regarding the pre-dose alternative are deficient because the Complaint does not identify which opioids or anti-anxiety medication should be used, but Lee has alleged the general class of medications and further states that the purpose of such drugs

15

is to reduce the risk that the prisoner would remain sensate and would experience the pain of pulmonary edema.   (Compl., ¶ 94.)   This satisfies *Bucklew*, which requires enough information to determine that the government could carry out the alternative "relatively easily and reasonably quickly."  *Bucklew*, 139 S. Ct. at 1129.   Indeed, there are a wide variety of well-known, accessible and easily administered medications that are typically used in procedures involving anesthesia.  (*See* Van Norman Decl., ¶¶ 16, 43, 61-63; Stevens Decl., ¶¶ 5-16.)   The Defendants also state that Lee's proposed alternative has "no track record of successful use," *Bucklew*, 139 S. Ct. at 1130, but, the positive history with patients in the non-lethal setting is extensive.  (*See id.*)   Finally, the Defendants assert that the addition of a pre-dose is not necessary to reduce the risk of severe pain because pentobarbital "will quickly render an inmate unconscious."   (Opp'n, 25.)   The medical evidence, however, is to the contrary.  *See supra*, 7.   The Defendants' reliance on the opinions of Dr. Antognini and Lindsley (*see* Opp'n, 25) does not alter this conclusion because they do not discuss the research on the effects of pentobarbital that is cited by Dr. Van Norman in her declaration.

### (2)     Safeguards Relating to Substance and Procedures

The Defendants' response to Lee's proposed safeguards is that they are already part of the 2019 Protocol.  (*See* Opp'n, 23-24.)   As discussed above, however, those alleged safeguards are so ill-defined and subject to the open-ended discretion of the BOP and others that they cannot be counted on as genuine and effective.   With more transparency, Lee might obtain assurance regarding the safeguards, but his requests for information about the selection and training of executioners, IV procedures, manufacturers and compounding pharmacies have been routinely met with stone-walling.   Also, the inclusion of some safeguards in the 2019 Protocol (even if they are not effective) is an acknowledgment that many problems with lethal injection executions exist and that, in theory, the safeguards proposed by Lee are a feasible and readily implemented alternative.

**(3)**      **Bedside Administration**

The Defendants argue that the bedside administration of drugs would have only a "marginal benefit" of "no constitutional significance." (Opp'n, 24.) The Defendants miss the point.

The key to bedside administration is the proximity of the executioner to the prisoner, which means that he or she can (1) administer the drugs straight into the IV (thereby avoiding the risks of using lengths of IV tubing, including leaks, kinks, and loss of the "feel" of back-pressure) and determine how they are going in; (2) monitor the IV sites to see if there is swelling, which is an indication that the drug is going into flesh; and (3) monitor the prisoner to observe the signs of consciousness, any labored breathing or any outward indication of pain, etc. Thus, the proximity of the executioner touches on all the administration issues.

The Defendants' sole objection to this bedside alternative — which is otherwise feasible, readily implemented and would reduce the pain caused by well-documented IV issues — is that it would mean the executioner would be visible to those in the witness room, whereas the use of IV tubing allows the personnel to remain hidden in a separate room. (*See* Opp'n, 24.) There are, however, many other ways to preserve the executioner's privacy (screens or surgical mouth and head covering, for example) that do not involve the use of IV tubing. Thus, the Defendants' stated rationale for IV tubing does not come close to outweighing the benefits of bedside administration.

**2.**      **Due Process Claim**

The Defendants argue that Lee cannot succeed on his Due Process claim, which focuses on obtaining information regarding the July 2019 Protocol, because the courts have not permitted plaintiffs to seek similar access for the purposes of determining whether they have an Eighth Amendment claim. (*See* Opp'n, 26-28.) As demonstrated above, however, Lee already had a viable Eighth Amendment claim based on the use of pentobarbital in the 2019 Protocol when he filed the Complaint, and he asserted the Due Process claim in order to gain additional information on the new protocol and flesh out the scope of his existing Eighth Amendment claim. This fact

17

distinguishes the Due Process claim here from cases where the courts tether such claims to the viability of the cause of action under the Eighth Amendment and base their rejection of the access to information on a conclusion that the plaintiff had not adequately pled an Eighth Amendment claim. *See, e.g.*, *Whitaker*, 732 F.2d at 467 ("[P]laintiffs' access-to-the-courts argument still hinges on their ability to show a potential Eighth Amendment violation.").

Also, in contrast to the situation in the cases they cite, the Defendants are not completely denying access to information about the 2019 Protocol. At the time of the Complaint, Lee only had access to the 2019 Addendum and the earlier protocol that was superseded by the 2019 Protocol. Since then, Lee has been provided with the complete 2019 Protocol and the Administrative Record. In addition, Lee will ask questions at the upcoming BOP deposition and, pursuant to the Court's August 15, 2019 Order, he has the right to participate in other discovery on the 2019 Protocol. The Defendants should not be permitted to derail the ongoing discovery process by proceeding with the imminent Lee execution, which is on a timetable entirely of their own making, when the denial of discovery cases on which they rely were based on a factor that is absent here (*i.e.*, the fact that the Eighth Amendment claim in those cases was not sufficiently pled).

Therefore, because Lee has a viable Eighth Amendment claim and is seeking to support it further through the Court-ordered discovery, he has a strong likelihood of success on its merits.

### 3.    <u>Access to Counsel Claim</u>

The Defendants oppose Lee's access to counsel claim on the grounds that the Supreme Court purportedly has not recognized that prisoners have such a right during executions, even though the Defendants do not cite any cases where the Supreme Court has determined that particular issue and Lee is not aware of any. (*See* Opp'n, 28-30.) While the Defendants notes that counsel will be "present" at any execution under the 2019 Protocol (*see id.*, 29-30), this does not address the point that Lee must have <u>access</u> to such counsel during the execution. Thus, this case is like *Cooey v. Strickland*, No. 2:04-CV-1156, 2011 WL 320166, at *6 (S.D. Ohio Jan. 28, 2011), and

*In re Ohio Execution Protocol Litigation*, No. 2:11-CV-1016, 2018 WL 6529145, at \*5 (S.D. Ohio Dec. 12, 2018), where counsel was present at the execution pursuant to the Ohio protocol and the courts held that the prisoner must have access to counsel during the execution. *See Cooey*, 2011 WL 320166, at \*5 ("Once a right exists, the inquiry turns to the viable exercise of that right.").

The Defendants assert that these two cases do not assist Lee because they turned on the fact that the Ohio protocol allows counsel to witness executions. (*See* Opp'n, 29-30.)  The 2019 Protocol affords a similar right, which is a fact that strengthens the applicability of the Ohio cases. The Defendants also claim that the *Ohio Execution* court failed to account for "crucial factors" from the Supreme Court (*see id.*, 30), but the Defendants have not cited any case where access to counsel during executions was denied based on those factors.  Under the circumstances, Lee has a strong likelihood of success on his claim regarding access to counsel.

### B.     Lee Has a Strong Likelihood of Success on His APA Claims

#### 1.     The 2019 Protocol Is the Result of *Ultra Vires* Agency Action

The Defendants argue that the regulation on which they rely for their protocol, 28 C.F.R. § 26.3(a), does not conflict with the FDPA and the 2019 Protocol does not exceed the authority granted by the statute because the phrase "the manner prescribed by the law of the State in which the sentence is imposed" in Section 3596(a) is a reference only to the general method of execution (such as lethal injection).  Therefore, according to the defendants, 28 C.F.R. § 26.3(a) and the 2019 Protocol are consistent with the FDPA so long as lethal injection is the method of execution for the state where the sentence was imposed. (*See* Opp'n, 32-33.)  The history and language of the FDPA and 28 C.F.R. § 26.3(a), as well as relevant case law, do not support the Defendants' interpretation.

The Defendants note that 28 C.F.R. Part 26 was promulgated in 1993, before the FDPA came into existence, and that it implemented an earlier statute, the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(e) (the "ADAA").  (*Id.*, 5.)  Therefore, 28 C.F.R. § 26.3(a) sets forth the date, time, place and method of executions under the ADAA.  The Defendants cite two cases, *United States v.*

*Tipton*, 90 F.3d 861, 902 (4th Cir. 1996), and *United States v. Chandler*, 950 F. Supp. 1545, 1580 (N.D. Ala. 1996), for the proposition that 28 C.F.R. Part 26 was validly promulgated. (Opp'n, 31.) Those cases, however, relate only to the ADAA and both note that they are not deciding issues under the FDPA. *See Tipton*, 90 F.3d at 902; *Chandler*, 950 F. Supp. at 1580 n.32. They provide no support to the Defendants' contentions.

Congress enacted the FDPA in 1994 and, unlike the ADAA, the FDPA has an implementation provision in 18 U.S.C. § 3596(a). *See Tipton*, 90 F.3d at 902 (noting this difference between the FDPA and ADAA). The FDPA, in contrast to 28 C.F.R. Part 26, does not establish nationwide procedures for executions and it expressly refers to the procedures prescribed by the state in which the sentence was imposed. *See United States v. Hammer*, 121 F. Supp. 2d 794, 799 (M.D. Pa. 2000) (the FDPA does not establish uniformity in the implementation of death sentences); *see also id.* at 800 ("A death sentence is to be implemented consistent with the law of the state in which the death sentence was imposed. The government's argument regarding uniformity has no merit in light of the language of the statute and its legislative history."). Thus, the Defendants cannot use 28 C.F.R. § 26.3(a) to implement the FDPA because the two are in direct conflict. By the same token, the 2019 Protocol contradicts the FDPA and the agencies exceeded their statutory authority in promulgating a rule for executions under the FDPA.

The Defendants cannot avoid this conclusion by arguing that the "manner" of an execution is synonymous with the "method" of an execution. In *Hammer*, the court rejected that very argument: "The implementation of the death sentence [under the FDPA] involves a process which includes <u>more</u> than just the method of execution utilized." *Hammer*, 121 F. Supp. 2d at 798 (emphasis added). The *Hammer* court based its conclusion on the reference to "implementation" in Section 3596, which means that the statute sets forth the procedures for carrying out death sentences. *Id.*; *see also id.* (holding that "the law of Pennsylvania relating to the implementation of a death sentence applies, including the method of execution and the time of execution").

The Defendants do not discuss *Hammer*, and instead they cite *Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010). (Opp'n, 33.) In *Higgs*, the court stated that the FDPA issue was not properly before it, but added, in *dicta*, that the word "manner" in Section 3596 means the method of execution. *See id.* at 556. The *Higgs* court's rationale is flawed. The court said it is significant that Section 3596 "only speaks to the 'manner' of implementing the sentence without reference to 'procedure.'" *Id.* However, as noted in *Hammer*, Section 3596 is an implementation statute and it relates to the use of procedures to implement death sentences. Thus, to the extent there is a conflict between *Hammer* and *Higgs*, the Court should follow the better reasoned opinion in *Hammer*.

The Defendants also rely on statements made during the failed attempts to amend Section 3596 that mention the "method" of execution. (*See* Opp'n, 33-34.) Those statements do not prove anything because, as discussed above, the term "manner" includes the method of execution as well as the procedures. Moreover, the numerous attempts to amend Section 3596 demonstrate that 28 C.F.R. Part 26 is not an appropriate implementing regulation for the FDPA because, if it were, there would be no need to amend the statute. *See Hammer*, 121 F. Supp. 2d at 799 (citing statements during amendment process that the amended statute would allow for the uniform implementation of sentence through new regulations). This is a recognition that 28 C.F.R. 26 cannot be used to establish nationwide procedures for implementing death sentences, which is exactly what the DOJ and BOP are attempting to do in the 2019 Protocol.

The Defendants further suggest that the Court could sever 28 C.F.R. § 26.3(a)(4), which states that death sentences will be by lethal injection, from the rest of 28 C.F.R. § 26.3(a). The Defendants hypothesize that, without the latter provision, the BOP would promulgate regulations setting forth execution procedures in conformance with the applicable state law. The Court should reject the Defendants' convoluted and speculative argument. The BOP could have promulgated such regulations before developing the 2019 Protocol, developed a new protocol that follows Section 3596 or once again sought an amended FDPA with new regulations. It chose not to do so,

and the Court should not engage in rule-making on behalf of the agencies.  Even more importantly, the severance of 28 C.F.R. § 26.3(a)(4) would not address the underlying problem here, which is that the DOJ and BOP lacked any authority under the FDPA to promulgate the 2019 Protocol.

Finally, the Defendants contend that the 2019 Protocol is not contrary to the FDPA because Section 3596(a) states that "a U.S. marshal … shall supervise implementation of the sentence" and such authority "includes the authority to specify the time, place, and procedures for carrying out the death sentence."  (Opp'n, 34.)  This argument is unavailing because Section 3596 also mandates that the execution shall be carried out in the "manner" (*i.e.*, including the procedures) prescribed by the law of the state where the sentence was imposed.  The Defendants' view that the U.S. marshal has full authority to choose the procedures would nullify the FDPA's requirement that the manner of execution be prescribed by state law.  Congress did not intend such an absurd result.[9]

### 2.     The 2019 Protocol Is Subject to the Notice-and-Comment Requirement Because It is Not a Procedural Rule or a General Statement of Policy

#### (a)     The 2019 Protocol Is Not a Procedural Rule

The Defendants maintain that the 2019 Protocol is a procedural rule and, therefore, it is not subject to the APA's notice-and-comment requirement.  According to the Defendants, the 2019 Protocol "does not determine the rights or obligations of anyone" and does not bind the agency. (*See* Opp'n, 36-38.)  The Defendants' interpretation is not supported by the facts or the law.

*First*, in determining whether a rule is procedural or substantive, the courts focus on the extent to which it has an impact on parties' rights and interests, and the nature of the impact.  In

---

[9]     The Defendants cite *United States v. Bourgeois*. 423 F.3d 501, 509 (5th Cir. 2005), and *United States v. Fell*, No. 5:0-CR-12-01, 2018 WL 7270622, at *4 (D. Vt. Aug. 7, 2018), but neither case supports the proposition urged by the Defendants, which is that a U.S. marshal has the authority to establish the procedures for FDPA executions without reference to the applicable state procedures.  In *Bourgeois*, there was no argument that the procedures in Texas could be ignored and, indeed, the court examined whether the federal and state procedures (not just the method of execution) were consistent.  In *Fell*, the court similarly held that the creation of a death chamber at USP Terre Haute did not contradict Indiana law.  Here, the 2019 Protocol seeks to establish a federal procedure without reference to the state procedures, in violation of the FDPA.

*Electronic Privacy Information Center v. United States Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) ("*EPIC*"), the D.C. Circuit noted that: "[T]he distinction between substantive and procedural rules is 'one of degree' depending upon 'whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.'" *Id.* at 5-6 (quoting *Lamoille Valley R.R. Co. v. ICC*, 711 F.2d 295, 328 (D.C. Cir. 1983)). Here, the Defendants state that the 2019 Protocol has an "admitted impact on condemned federal inmates," but they insist that the effect on the prisoners' rights and interests is not sufficiently grave to trigger the notice-and-comment requirement. (Opp'n, 36.)

The Defendants' position is contrary to *EPIC* and related cases. In *EPIC*, the Transportation Security Administration (the "TSA") argued that the switch to body scanners was a procedural rule that imposed no new substantive obligations on airline passengers, who were already required to pass through a security checkpoint. *See EPIC*, 653 F.3d at 6. The court rejected the TSA's argument, holding that the change "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.* The *EPIC* court noted that the use of body scanners "intrudes upon [passengers'] personal privacy in a way that a magnetometer does not." *Id.* In *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19 (D.D.C. 2018), the court similarly held that the effect of a rule was sufficiently grave where its application could mean "the difference between retaining and losing the right to remain in this country." *Id.* at 47. Thus, *EPIC* and its progeny turn on whether the rule has a substantial effect on a person's fundamental interest.

The relevant interests referred to in *EPIC* are not limited to those "ultimately at stake in the agency proceeding." *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 112 (D.D.C. 2013). Therefore, even where a rule "does not adversely affect" such interests, it will still be subject to the notice-and-comment requirement under the *EPIC* standard "if it intrudes upon other, important or fundamental rights or interests held by affected parties." *Id.*

In this case, the 2019 Protocol would have a substantial effect on Lee and other prisoners with death sentences because it seeks to determine how they will be executed.[10] Also, the Defendants cannot avoid the application of *EPIC* here by arguing that the prisoners are already sentenced to die or that the method of execution (by lethal injection) has been determined. That is because Lee and the other prisoners have an undeniable, fundamental interest in whether the manner of their execution complies with the protections of the Eighth Amendment. *See, e.g., Baze*, 553 U.S. at 50 (prisoners have right to be free from the substantial risk of severe harm in executions); *Whitaker*, 732 F.3d at 458 (prisoners have "the right to be free from a demonstrated risk of severe pain"). In short, the 2019 Protocol is not "primarily directed toward improving the efficient and effective operations" of the BOP, and instead it "conclusively affects" the fundamental interests of prisoners to avoid severe pain. *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980).

*Second*, the D.C. Circuit has held that courts drawing a distinction between procedural and substantive rules must "focus on the underlying purposes" of the notice-and-comment requirement. *Id.* at 703. They are (1) "to reintroduce public participation and fairness to affected parties after government authority has been delegated to unrepresentative agencies;" and (2) "to assure that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). "In order to further these policies, the exception for procedural rules must be narrowly construed." *EPIC*, 653 F.3d at 6 (citation omitted).

The 2019 Protocol involves scientific and highly technical issues that would have benefited from public discourse and consultation. Indeed, where substantive rights are at stake, "it is imperative that potentially affected parties be given a chance to raise concerns and suggest how the agency should craft its rule to protect" such rights. *Nat'l Sec. Counselors*, 931 F. Supp. 2d at 111.

---

[10]     Lee does not waive any arguments regarding the DOJ's and BOP's lack of authority to promulgate the 2019 Protocol under the FDPA or their failure to provide adequate information.

The agencies here claim to have cast a wide net in deciding upon a single-drug protocol, but their own selection of whom to consult (mostly Departments of Corrections) is not a substitute for comment by the public at large.  Nor did the agencies consult with the prisoners and their counsel, who have a depth of experience and expertise in the field, before releasing the 2019 Protocol.  Thus, the underlying purposes of the notice-and-comment requirement further demonstrate that the 2019 Protocol is a substantive, rather than procedural, rule.

*Third*, the Defendants contend that the 2019 Protocol is procedural because it is not binding on the agencies.  (*See* Opp'n, 37-38.)  The Defendants cite the discretion provided to the BOP Director or the Warden to deviate from the procedures in the 2019 Protocol, arguing that it makes this case analogous to two other cases, *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017),  and *Planned Parenthood of Wisc., Inc. v. Azar*, 316 F. Supp. 3d 291, 305-306 (D.D.C. 2018).  (*See* Opp'n, 37-38.)  The Defendants mischaracterize the scope of the discretion under the 2019 Protocol, and the cases that they cite are inapposite.

While, as noted above, the 2019 Protocol gives discretion to the BOP Director and the Warden to modify certain of the procedures (such as IV access), that does not render the protocol itself non-binding.  Through the 2019 Addendum, the 2019 Protocol changes the pre-existing, three-drug protocol and it establishes that all lethal injections shall be conducted with a single drug, pentobarbital.  The fact that the Attorney General <u>directed</u> the BOP to adopt the 2019 Addendum provides additional evidence of the mandatory nature of the single-drug, pentobarbital protocol.  (*See* AR 0868 ("The Attorney General directs the Acting Director of the [BOP] to adopt [the 2019 Protocol].");  <u>https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse</u> (last visited Nov. 1, 2019) (press release stating that the Attorney General "has directed" the adoption of the 2019 Protocol).)

The 2019 Addendum does not state anywhere that the BOP Director or the Warden may use his or her discretion to conduct executions using a three-drug protocol or a different substance.

Indeed, the Administrative Record demonstrates that the DOJ and BOP decided against the continuation of the three-drug protocol and the use of other substances. (*See, e.g.*, AR 871.)  If, as the Defendants assert, the 2019 Protocol were non-binding, there would be no need for a protocol at all, and the DOJ and BOP could conduct executions as they see fit.  The very fact that there were no executions scheduled until the issuance of a new protocol in July 2019 shows that the DOJ and BOP consider the 2019 Protocol to be both necessary and binding.

The *Clarian Health* and *Planned Parenthood* cases cited by the Defendants do not lead to a different conclusion because they are distinguishable on their facts.  *Clarian Heath* involved a 2003 regulation establishing a general formula for the calculation of "outlier" payments under the Medicare Act and a 2010 guidance manual that provided instructions for the reconciliation of such payments.  The 2003 regulation was subject to the notice-and-comment period, but the 2010 manual instructions were not.  *See Clarian Health*, 878 F.3d at 349-51.  The D.C. Circuit held that the 2010 manual instructions were a procedural rule only because the 2003 regulation fixed the affected parties' rights and interests, whereas the 2010 manual instructions merely provided further details regarding those regulations and did not alter the parties' rights and interests.  *See id.* at 355-56.  In this case, by contrast, it is the 2019 Protocol that has a substantial effect on the prisoners' rights and interests because it affects whether or not the procedures for the executions are constitutional.

The *Planned Parenthood* case is even less germane.  *Planned Parenthood* involved criteria established by the U.S. Department of Health and Human Services ("HHS") for grants relating to family planning projects.  In 2018, HHS added an eighth criterion consisting of several factors and the plaintiffs argued that the new criterion should have undergone the notice-and-comment process before promulgation.  *See Planned Parenthood*, 316 F. Supp. 3d at 294-97.   The court found that the criterion was a procedural rule because it did not impose any obligation on the agency or affected parties, and it consisted of recycled factors from previous rules that had not themselves undergone the notice-and-comment process.  *See id.* at 305-06.  Here, however, the 2019 Protocol

affects a fundamental interest of the prisoners and the DOJ has directed that the BOP adopt it.  In addition, the 2019 Protocol is new and different, and it supersedes the previous protocol.  Therefore, the *Planned Parenthood* case, like *Clarian Health*, has no application here.[11]

### (b)    The 2019 Protocol Is Not a General Statement of Policy

The D.C. Circuit has set forth several factors for deciding if a rule is a statement of policy as opposed to a substantive rule, including (1) the effect of the rule on the regulated parties; (2) whether the rule requires "anyone to do anything;" and (3) whether the rule is binding on the regulated parties.  *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252-53 (D.C. Cir. 2014).  An application of the *National Mining* test shows that the 2019 Protocol is not a general statement of policy.  The substantive effect of the 2019 Protocol on prisoners is discussed above.  In addition, the 2019 Protocol is binding upon both the prisoners and the implementing agency.  The prisoners do not have the ability under the 2019 Protocol to choose a different manner of execution and, as noted above, the DOJ directed the BOP to adopt the new protocol.[12]

### 3.    The 2019 Protocol Resulted from Arbitrary and Capricious Action

Lee noted in the Initial Brief that agency action will be deemed arbitrary and capricious when "the agency has 'relied on factors which Congress has not intended it to consider' or 'entirely failed to consider an important aspect of the problem.'"  (Initial Br., 20 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).)  Lee has demonstrated that the 2019 Protocol is contrary to the FDPA's mandates.  Accordingly, the DOJ and BOP relied on factors which Congress did not intend them to consider.

---

[11]    The Defendants also rely on the BOP's statement in the 2019 Protocol that it "does not create any legally enforceable rights or obligations." (Opp'n, 37.)  The D.C. Circuit, however, has expressly stated that the courts are not required to defer to an agency's characterization of its rule. *See Bowen,* 834 F.2d at 1056.

[12]    In finding that the agency guidance at issue in *National Mining* was a general statement of policy, the D.C. Circuit also emphasized that legal challenges could be pursued when the agency applied the guidance to individual cases.  *See id.* at 253.  Lee would not have such an opportunity here, which further distinguishes the 2019 Protocol from general statements of policy.

The Defendants ignore this argument (at least in the context of the APA claim) and focus instead on Lee's second point, asserting that the DOJ and BOP properly considered all the important aspects of lethal injection executions in developing the 2019 Protocol.  (*See* Opp'n, 40-42.)  The record does not support the Defendants' contentions.

*First*, the Defendants tout their evaluation of various potential substances for lethal injections, which includes their consultation with select medical experts about pentobarbital.  (*See id.*, 40.)  The issues with those experts are discussed above, but the Defendants' "study" of pentobarbital is obviously incomplete because, among other things, they did not take into account the medical evidence on which Dr. Van Norman relies.  It appears that the sole purpose of the Defendants' consultation with experts was to lend credence to a result they had already reached, as opposed to exploring fully the potential problems with pentobarbital.

*Second*, the Defendants respond to Lee's criticism of their use of compounded pentobarbital by claiming that (a) they had no choice but to turn to a compounded product; and (b) their refusal to provide information about the API source or compounding pharmacies is reasonable because secrecy is purportedly the only way to ensure the product's availability.  (*See id.*, 40-42.)  The Defendants, however, have overlooked the fact that there are no federal statutes protecting the identities of their source or compounding pharmacy, which means that the Defendants cannot withhold information absent a Court order.   Moreover, Lee has offered to maintain the confidentiality of such information pursuant to the protective order in the *Roane* action (which applies to Lee), but the Defendants still will not disclose it.  (Van Tol Reply Decl., Ex. B, 7-8.)  Without knowing the identities of the API source and compounding pharmacy, Lee cannot determine whether the 2019 Protocol represents reasoned rule-making and the refusal to provide information indicates that the Defendants engaged in an arbitrary and capricious process.[13]

_____

[13]    The Defendants fault Lee for questioning the completeness of the Administrative Record.  (*See* Opp'n., 39 n.15.)   They concede, however, that Lee can overcome the presumption of

## II.       Lee Will Suffer Irreparable Injury If the 2019 Protocol Is Not Enjoined

In the Opposition, the Defendants question whether Lee can show irreparable injury, stating that "it is not clear" that Lee's inability to litigate his claim on the merits "constitutes irreparable harm in the context of a challenge to the method of execution (rather than a challenge to the lawfulness of the execution itself)."   (Opp'n, 43 (emphasis in original).)   The Defendants misapprehend Lee's claim and his argument on irreparable harm.   Lee alleges that the manner of his execution, as set forth in the 2019 Protocol, is unlawful because it raises a substantial likelihood of serious harm.   Lee is challenging the constitutionality of the Defendants' execution procedures, as well as the lawfulness of the 2019 Protocol.

The showing that is required for irreparable harm depends on the nature of the claim.   For the First Amendment claim, the courts have held that any deprivation of the right constitutes irreparable harm.   (*See* Initial Br., 27.)   The Defendants do not address this argument in the Opposition.   With regard to APA claims, the courts have found irreparable injury where there was imminent harm that could not be remediated.   (*See id.*)   The lack of remediation in the event of an execution cannot be doubted.   The imminent harm is that Lee would face an execution where, as demonstrated above, there is a substantial risk of severe suffering.   (*See id.*, 27-28.)

Lee agrees with the Defendants that, in cases involving Eighth Amendment challenges to the method of an execution, the "irreparable injury" factor tends to merge with the merits.   (Opp'n, 43.)   It is also true that the courts in those cases consider the likelihood that the prisoner will experience an unconstitutional level of pain.   (*Id.*, 43-44.)   Here, Lee has established the likelihood of such pain.   Therefore, this case is like the cases cited in the Initial Brief where the courts found that there would be irreparable injury caused by the execution.   (*See* Initial Br., 27-28.)

regularity regarding completeness if he can show that other documents were considered by the agencies, but not included in the Administrative Record.   (*See id.*)   Lee has already begun to do so, based on the Administrative Record itself.   In the Initial Brief, Lee pointed out that several categories of documents are referred to in the Administrative Record, but were not included.   (*See* Initial Br., 8.)   Lee may also learn about additional missing documents at the BOP deposition.

Lee's showing of a substantial likelihood of serious harm also distinguishes this case from the four cases cited by the Defendants. (*See* Opp'n, 44.)  In each of those cases, the plaintiffs could only show a possibility or chance of pain, as opposed to a substantial likelihood, or they could not demonstrate the existence of any pain.  Here, however, Lee has shown that the use of pentobarbital <u>would</u> expose him to pulmonary edema and extreme suffering.  Under the circumstances, Lee has also satisfied the "irreparable injury" prong with respect to the Eighth Amendment claim.

### III.     The Public Interest Would Be Served, and the Defendants Would Not Be Substantially Harmed, if the Court Were to Enjoin the Implementation of the 2019 Protocol

In the Initial Brief, Lee noted that he has not asked the Court to halt his execution permanently, so the Defendants cannot assert that a preliminary injunction would cause them harm by preventing Lee's execution.  (*See* Initial Br., 29 (citing *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004).)  Lee also pointed out that the public has a strong interest in enforcing constitutional rights and ensuring that unconstitutional executions do not occur.  (*See* Initial Br., 29-30 (citing cases).)  The Defendants do not address these points anywhere in the Opposition.

The Defendants instead cite their interest, and the interests of victims' families, in the finality of criminal proceedings.  (*See* Opp'n, 44-45.)  Neither of these claims can carry the day. The Defendants fail to explain how the additional delay as a result of an injunction will be material, given that the government waited more than eight years to announce a new protocol after stating, in March 2011, that it was revising the old protocol, and then chose to set Lee's and other dates on the same day it announced that protocol.  Nor, as noted earlier, can the Defendants credibly cite the wishes of the victims' family as a factor against an injunction here as the victims' family members do not want the execution to go forward at all and have clearly told them so.  *See supra*, 3-4.

### CONCLUSION

For the foregoing reasons and those set forth in the Initial Brief, Lee respectfully requests that the Court grant the relief sought in the Motion.

Dated:    November 1, 2019

Respectfully submitted,

HOGAN LOVELLS US LLP

*/s/       Pieter Van Tol*

Pieter Van Tol (admitted *pro hac vice*)
John D. Beck (admitted *pro hac vice*)
Mallik Yamusah
390 Madison Avenue
New York, NY  10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com
john.beck@hoganlovells.com
mallik.yamusah@hoganlovells.com

and

Elizabeth M. Hagerty (Bar No. 1022774)
David S. Victorson (Bar No. 1027025)
Columbia Square
555 13th Street NW
Washington, DC  20004
(202) 637-5600
(202) 637-5910 (fax)
elizabeth.hagerty@hoganlovells.com
david.victorson@hoganlovells.com

*Attorneys for Plaintiff Daniel Lewis Lee*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 1, 2019, Plaintiff Lee's Reply Memorandum of Points and Authorities in Further Support of Motion for a Preliminary Injunction was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties that are registered users. The below parties may access this filing through the Court's CM/ECF System.

**Joshua Christopher Toll**
KING & SPALDING, LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Gerald Wesley King , Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: alex_kursman@fd.org

**Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: billy_nolas@fd.org

**Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**Jeanne Vosberg Sourgens**
VINSON & ELKINS L.L.P

**Robert E. Waters**
KING & SPALDING, LLP

(202) 639-6633

**William E. Lawler , III**
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**William E. Hoffmann , Jr.**
KING & SPALDING, LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON, LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Denise M. Clark**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
(202) 252-6605
Email: denise.clark@usdoj.gov

**Jean Lin**
U.S. DEPARTMENT OF JUSTICE, CIVIL
DIVISION
FEDERAL PROGRAMS BRANCH
(202) 514-3716
Email: jean.lin@usdoj.gov

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

(202) 737-0500
Email: rwaters@velaw.com

**Yousri H. Omar**
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Peter S. Smith**
UNITED STATES ATTORNEY'S OFFICE
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

**Robert J. Erickson**
U. S. DEPARTMENT OF JUSTICE
(202) 514-2841
Email: robert.erickson@usdoj.gov

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER
OFFICE, EASTERN DISTRICT OF PENN
(215) 928-0528
Email: shawn.nolan@fd.org


Date:   November 1, 2019

**Sean D. O'Brien**
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com



*/s/ Pieter Van Tol*

Pieter Van Tol (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY  10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

and

Elizabeth M. Hagerty (Bar No. 1022774)
David S. Victorson (Bar No. 1027025)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
elizabeth.hagerty@hoganlovells.com

*Attorneys for Plaintiff Daniel Lewis Lee*