**\*\*\*Execution of Dustin Lee Honken Scheduled for January 15, 2020\*\*\***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE FEDERAL | ) | |
| BUREAU OF PRISONS' EXECUTION | ) | |
| PROTOCOL CASES, | ) | |
| | ) | |
| Lead case:    *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Lee v. Barr et al.,* No. 19-cv-2559 | ) | |

## MOTION FOR PRELIMINARY INJUNCTION BARRING
## THE SCHEDULED EXECUTION OF PLAINTIFF DUSTIN LEE HONKEN

Plaintiff-Intervenor Dustin Lee Honken moves the Court to enter a preliminary injunction

pursuant to Fed. R. Civ. P. 65(a), so as to enjoin the Defendants from carrying out the scheduled

execution of Mr. Honken on January 15, 2020, or at any other time until further order of this

Court. The Court should enter a preliminary injunction for the reasons stated in the

accompanying Statement of Points and Authorities. Mr. Honken shows a likelihood of success

on the merits of numerous claims under the Administrative Procedure Act, and all of the relevant

considerations governing a preliminary injunction support its issuance. Pursuant to Local Rule

7(m), counsel have conferred with each other concerning this motion, and Defendants advise that

they oppose a preliminary injunction in favor of Mr. Honken.

Dated:   11/5/2019                          Respectfully Submitted,

                                            /s/ Jon Jeffress
                                            Jon Jeffress
                                            KaiserDillon PLLC
                                            1099 14th Street NW
                                            8th Floor West
                                            Washington, DC 20005
                                            Telephone - 202-640-2850
                                            Email - jjeffress@kaiserdillon.com

                                            Timothy Kane, Assistant Federal Defender
                                            Shawn Nolan, Chief, Capital Habeas Unit
                                            Federal Community Defender Office, E.D. Pa.
                                            601 Walnut Street, Suite 545 West
                                            Philadelphia, PA 19106
                                            Telephone - 215-928-0520
                                            Email – timothy_kane@fd.org
                                            Email – shawn_nolan@fd.org

                                            *Counsel for Plaintiff-Intervenor Dustin Lee Honken*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 5, 2019, a copy of the foregoing motion, together with the accompanying statement of points and authorities and proposed order, were filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Jon Jeffress
Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone - 202-640-2850
Email - jjeffress@kaiserdillon.com

*Counsel for Plaintiff-Intervenor Dustin Lee Honken*

**\*\*\*Execution of Dustin Lee Honken Scheduled for January 15, 2020\*\*\***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL** | ) | |
| **BUREAU OF PRISONS' EXECUTION** | ) | |
| **PROTOCOL CASES,** | ) | |
| | ) | |
| **Lead case:**   *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| *Lee v. Barr et al.,* **No. 19-cv-2559** | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF-INTERVENOR DUSTIN LEE HONKEN'S
## MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Factual and Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.      Plaintiff has a strong likelihood of success on the merits of his APA claims. . . . . . . . . . 8

        A.      Defendants failed to enact the 2019 Protocol through notice-and-comment
                rulemaking under the APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                1.      The 2019 protocol is a substantive rule. . . . . . . . . . . . . . . . . . . . . . . 9

                2.      The 2019 Protocol does not fit any exemption under
                        5 U.S.C. § 553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
                        a.      The 2019 Protocol is not a procedural rule. . . . . . . . . . . . 12
                        b.      The 2019 Protocol is not a general policy statement. . . . . 15
                        c.      The 2019 Protocol is not an interpretive rule.. . . . . . . . . . 18

        B.      The 2019 Protocol is arbitrary and capricious in several respects. . . . . . . . . . . . . 19

                1.      Defendants, who claim to have chosen pentobarbital as an
                        execution drug in order to bring about a medically "humane"
                        death, have arbitrarily ignored the need to comply with federal
                        statutes that exist in order to ensure that a  regulated drug is safe
                        and effective for its intended use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                        a.      No prescription for pentobarbital . . . . . . . . . . . . . . . . . . . . 20
                        b.      No prescription for a compounded version of the drug. . . . 22
                        c.      Copying an FDA-approved and commercially available drug. . 22
                        d.      Defendants' indifference to federal drug laws is arbitrary and
                                capricious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                2.      Defendants arbitrarily and capriciously ignore the risk that the
                        prisoner will experience acute pulmonary edema during the
                        execution and will experience the sensation of drowning and
                        suffocation while still conscious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                3.      Defendants have arbitrarily and capriciously failed to consider
                        the risks of using a compounded drug for executions and have
                        failed to demonstrate that a compounded drug is necessary. . . . . . . . . . 29

                4.      The 2019 Protocol's opaque and unspecified means of IV
                        placement is arbitrary and capricious.. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.   The 2019 Protocol is contrary to law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

   1.   The 2019 Protocol contravenes the FDPA and the judgment
sentencing Plaintiff to death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      a.   The FDPA and the "manner" of execution. . . . . . . . . . . . . . . . 34

      b.   The 2019 Protocol materially differs from Indiana's
manner of execution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   2.   The 2019 Protocol violates the Controlled Substances Act and
the Food, Drug and Cosmetic Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

II.   Plaintiff will suffer irreparable injury if not granted a preliminary injunction. . . . . . . . . 39

III.   The Defendants would not suffer substantial harm if preliminarily enjoined
from implementing the 2019 Protocol. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IV.   A preliminary injunction would serve the public interest. . . . . . . . . . . . . . . . . . . . . . . . . 41

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Alcresta Therapeutics, Inc. v. Azar*, 755 Fed. Appx. 1 (D.C. Cir. 2018).. . . . . . . . . . . . . . . . . . 40

*Am. Bus. Ass'n v. United States*, 627 F.2d 525 (D.C. Cir. 1980).. . . . . . . . . . . . . . . . . . . . . 15, 16

*\*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987).. . . . . . . . . . . . . . . . . . 12-15, 17, 18

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106
   (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 9, 11

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 17

*Arthur v. Thomas*, 674 F.3d 1257 (11th Cir.2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 14

*Beaty v. FDA*, 853 F. Supp. 2d 30 (D.D.C. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Brown v. Beck*, No. 5:06CT3018 H, 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006). . . . . . . . . 39, 40

*Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999). . . . . . . . 12

*Commonwealth ex rel. Conway v. Shepherd*, 336 S.W. 3d 98 (Ky. 2011). . . . . . . . . . . . . . . . . 41

*Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cooey v. Kasich*, 801 F. Supp. 2d 623 (S.D. Ohio 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

*Cooey v. Taft*, 430 F. Supp. 2d 702 (S.D. Ohio 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . 25

*Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.,* 102 F. Supp. 3d 334
   (D.D.C. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*\*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1
   (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 16, 18

*FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000). . . . . . . . . . . . . . . . . . . . . . . 20

*Feguer v. United States*, 302 F.2d 214 (8th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Guardian Federal Savings & Loan Insurance Corp.*, 589 F.2d 658 (D.C. Cir. 1978). . . . . . 11, 12

*General Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harris v. Johnson*, 323 F. Supp. 2d 797 (S.D. Tex. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Heckler v. Chaney*, 470 U.S. 821 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Honken v. United States*, 42 F. Supp. 3d 937 (N.D. Iowa 2013). . . . . . . . . . . . . . . . . . . . . . . 5

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1  (D.C. Cir. 2016). . . . . . . . . . . . . . 40, 42

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*\*Make the Road New York v. McAleenan*, ___ F. Supp. 3d ___, No. 19-CV-2369 (KBJ),
 2019 WL 4738070 (D.D.C. Sept. 27, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 26, 28

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988).. . . . . . . . . . . . . . . . 17

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67 (D.D.C. 2013). . . . . . . . . . . . . . 19

*New Jersey v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Nooner v. Norris*, No. 5:06cv00110 SWW, 2006 WL 8445125
 (E.D. Ark. June 26, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009). . . . . . . . . . . . . . . . 40, 41

*Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153 (3d Cir. 2018).. . . . . . . . . . . . . . . 42

*Pacific Gas & Electric Co. v. Fed. Power Comm'n*, 506 F.2d 33 (D.C. Cir. 1974). . . . . . . . 15, 16

*Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107 (D.C. Cir. 1974). . . . . . . . . . . . . . . . . 12, 13, 14, 19

*Reyblatt v. U.S. NRC*, 105 F.3d 715 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rhoades v. Reinke*, 830 F. Supp. 2d 1046 (D. Idaho 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Ringo v. Lombardi*, 706 F. Supp. 2d 952 (W.D. Mo. 2010). . . . . . . . . . . . . . . . 1, 20, 23, 24, 26

*Roane v. Holder*, 607 F. Supp. 2d 216 (D.D.C. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Rosenberg v. Carroll*, 99 F. Supp. 630 (S.D.N.Y. 1951).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205 (D.C. Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . 8

*\*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . 2, 9, 15, 17, 18

*Texaco, Inc. v. Federal Power Comm'n*, 412 F.2d 740 (3d Cir. 1969). . . . . . . . . . . . . . . . . . . . . 42

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Hammer*, 121 F. Supp. 2d 794 (M.D. Pa. 2000). . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Honken*, 541 F.3d 1146 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Nazir*, 211 F. Supp. 2d 1372 (S.D. Fla. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 21

*Van Hollen, Jr., v. FEC*, 811 F.3d 486 (D.C. Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Weyerhaeuser Co. v. Castle*, 590 F.2d 1011 (D.C. Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Statutes and Court Rules**

5 U.S.C. § 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5 U.S.C. § 551(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

5 U.S.C. § 551(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 12, 15, 18

5 U.S.C. § 553(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5 U.S.C. § 553(b)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5 U.S.C. § 553(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5 U.S.C. § 706(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 27

5 U.S.C. § 706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 19, 34, 39

5 U.S.C. § 706(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 34, 39

5 U.S.C. § 706(2)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

8 U.S.C. § 4001(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

8 U.S.C. § 4002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3596. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 3596(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 35, 37

18 U.S.C. § 3597(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

21 U.S.C. § 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21 U.S.C. § 337(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

21 U.S.C. § 353(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21 U.S.C. § 353a(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 353a(b)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 353a(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 353b(d)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 353b(d)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 355. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 801. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21 U.S.C. § 829(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 509. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 510. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 Stat. 304 (former 18 U.S.C. § 542). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

62 Stat. 837 (former 18 U.S.C. § 3566). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

**Regulations**

21 C.F.R. § 1306.04(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21 C.F.R. § 1308.12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 C.F.R. § 26.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 14

28 C.F.R. § 26.3(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

28 C.F.R. § 26.3(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10, 11, 19, 34

**Other Authorities**

FDA, *Compounded Drug Products That Are Essentially Copies of a Commercially
   Available Drug Product Under Section 503A of the Federal Food, Drug, and
   Cosmetic Act: Guidance for Industry* (Jan. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Office of Legal Counsel, DOJ, "Whether the Food and Drug Administration Has
   Jurisdiction Over Articles Intended for Use in Lawful Executions,"
   (May 3, 2019), available at 2019 WL 2235666. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## **PRELIMINARY STATEMENT**

The government seeks to carry out the ultimate punishment in the people's name but without the people's input – let alone that of Plaintiff and the Court. Eight years after announcing that they were considering protocol revisions, and sixteen years after the last federal execution, the Department of Justice ("DOJ") and the Federal Bureau of Prisons ("BOP") now seek to execute Plaintiff and four other prisoners under their newly-announced protocol. That protocol violates the Administrative Procedure Act ("APA") in numerous respects, and the Court should enjoin the Defendants from executing Plaintiff on January 15, 2020, or on any other date until further order of the Court.

All of the relevant considerations favor issuance of a preliminary injunction. First, Plaintiff shows a strong likelihood of success on the merits of several claims under the APA. The 2019 Protocol is a "rule" under the APA; it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). But Defendants developed the protocol unilaterally and in secret, and without the notice-and-comment procedures required by 5 U.S.C. § 553. An agency's enactment of a rule requires those procedures when, as here, the enactment supplies a necessary legislative basis for the agency to take action, or, otherwise stated, when "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to . . . ensure the performance of duties." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). There can be no executions without a protocol to carry them out. *Ringo v. Lombardi*, 706 F. Supp. 2d 952, 962 (W.D. Mo. 2010) (noting that "the Eighth Amendment requires protocols that include adequate safeguards against unnecessary pain"). In specifying the drug and other mechanisms by which to execute prisoners, the protocol cites 28 C.F.R. § 26.3, which provides for "intravenous injection of a lethal substance or substances" as the federal execution method. Section 26.3, in turn, relies on the Attorney General's authority to prescribe

regulations in order to operate the DOJ and administer prisons. *See* 28 C.F.R. § 26.3 (listing, as authority, 5 U.S.C. § 301, 8 U.S.C. §§ 4001(b), 4002, and 28 U.S.C. §§ 509, 510).

But Defendants cannot execute Plaintiff under blanket authority to conduct lethal injections pursuant to 28 C.F.R. § 26.3. Instead, they have issued a rule – the 2019 Protocol – that modifies and implements the agency's otherwise unenforceable provision for "intravenous injection of a lethal substance or substances in a quantity sufficient to cause death." 28 C.F.R. § 26.3(a)(4). Without the rule governing *how* to carry out lethal injections, there "would not be an adequate legislative basis" for the Defendants to execute prisoners, or for a court to determine whether a BOP-planned execution is legal. *Am. Mining Cong.*, 995 F.2d at 1109, 1112; *accord Cooey v. Kasich*, 801 F. Supp. 2d 623, 624 (S.D. Ohio 2011) ("It is the policy of the State of Ohio that the State follows its written execution protocol, except when it does not. This is nonsense."). The Defendants' rule is one of substance: "[A] substantive rule *modifies* or adds to a legal norm based on the agency's *own authority*." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (emphases in original). "That authority flows from a congressional delegation to promulgate substantive rules, to engage in supplementary lawmaking." *Id.* Because the agency is engaging in supplementary lawmaking, "the APA requires it to comply with notice and comment." *Id.* The 2019 protocol must be set aside because Defendants enacted it "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Plaintiff is also likely to succeed on his other APA claims. The 2019 Protocol is arbitrary and capricious under 5 U.S.C. § 706(2)(A) because (a) Defendants have ignored the need to comply with the Food, Drug, and Cosmetic Act or the Controlled Substances Act and thereby to ensure that the drug they are administering is safe and effective for the claimed purpose of diminishing the risk of pain and suffering; (b) Defendants did not consider the risk that Plaintiff and other prisoners would suffer from acute pulmonary edema and thereby suffer the excruciating experience of drowning while still conscious; (c) Defendants have not justified their

use of a compounded form of pentobarbital or adequately assured the compounded drug's efficacy; and (d) Defendants provide no mandatory or even recommended procedures for the setting of IV lines, leaving medical personnel of unspecified credentials to freelance their way through multiple attempts at IV insertions, even including the possibility of excruciating ad hoc surgery and cut-down procedures.

These failures put Plaintiff and other prisoners at risk: "[T]he Federal Protocol will subject executed prisoners to severe pain and suffering, when they remain conscious and aware prior to their deaths," explains anesthesiologist Gail A. Van Norman, M.D. *See* Ex. 1 (Declaration) at 6-7; Ex. 2 (2019 Protocol). "It is a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of this effect of IV injection of 5 grams of pentobarbital." Ex. 1 at 7. Pathologist Mark Edgar, M.D., agrees with Dr. Van Norman's assessment, based on a careful review of autopsy reports and witness statements from pentobarbital-based executions, which support his conclusion that the prisoners experienced acute pulmonary edema. *See* Ex. 3 (Declaration), at 18-22. Defendants have not considered any suggestion for reducing that risk, including by administering an anesthetic dose of an opioid before the overwhelming dose of pentobarbital. *See* Ex. 4 (Declaration of Craig W. Stevens, Ph.D.), at 2-7. The Defendants' methods of compounding the drug are similarly unsound, creating the "substantial risk" that the pentobarbital will lack the "appropriate quality and potency to cause death without significant suffering." Ex. 5 (Declaration of Michaela Almgren, Pharm.D.), at 10.

The 2019 Protocol is also contrary to law. The Federal Death Penalty Act ("FDPA") does not countenance a single and all-encompassing means of execution for all federally death-sentenced prisoners. Rather, the FDPA requires a prisoner such as Plaintiff (who was sentenced to death in the non-capital punishment state of Iowa) to be executed within a state designated by the federal district court at the time of sentencing, and "in the manner prescribed" by the law of

that state. 18 U.S.C. § 3596(a). The court in Plaintiff's case designated the state of Indiana as the place and manner of Plaintiff's execution, but the 2019 Protocol is inconsistent with Indiana's execution procedures. *United States v. Honken*, N.D. Iowa Case No. 3:01-cr-3047, Judgment, Doc. No. 702-2 at 3. Indeed, Indiana's method is materially better than the one Defendants spent eight years developing behind closed doors: Indiana requires the involvement of a licensed physician, diminishes the need to use compounded pharmaceuticals by offering the state a choice of execution drugs, and specifies a preference for relatively non-invasive means of IV insertion. The 2019 Protocol, then, is "not in accordance with law," and is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

A preliminary injunction is necessary because Plaintiff will suffer irreparable harm without one. Plaintiff's execution would moot his forceful claims that the method of his execution is illegal under the APA. Defendants, by contrast, would not suffer substantial harm from entry of an injunction. The government has no legitimate interest in a prompt execution through illegal procedures, and in any event, Defendants could schedule Plaintiff's execution for a later date after curing those illegalities. That cure would further the public interest, which is served when agencies comply with their procedural obligations under the APA and make better-informed decisions as a result. "[I]f the Agency, in carrying out its essentially legislative task, has infused the administrative process with the degree of openness, explanation, and participatory democracy required by the APA, it will thereby have negated the dangers of arbitrariness and irrationality in the formulation of rules." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027-28 (D.C. Cir. 1978) (quotations omitted). The Court should demand nothing less.

## FACTUAL AND PROCEDURAL HISTORY

As explained in his complaint, Plaintiff Dustin Lee Honken is a federal prisoner who was convicted and sentenced to death on five murder charges in the United States District Court for the Northern District of Iowa. Plaintiff was convicted in 2004, and the district court imposed

sentence on October 11, 2005. Appellate and post-conviction remedies were thereafter unavailing. *See United States v. Honken*, 541 F.3d 1146 (8th Cir. 2008), *cert. denied*, 558 U.S. 1091 (2009); *Honken v. United States*, 42 F. Supp. 3d 937 (N.D. Iowa 2013) (vacating several non-capital convictions on post-conviction review under 28 U.S.C. § 2255, but otherwise denying relief), *aff'd, Honken v. United States*, Case No. 14-1329, Doc. 4150218 (8th Cir. 2014), *cert. denied*, 136 S. Ct. 29 (2015).

On July 25, 2019, Plaintiff received written notice that the Director of the Bureau of Prisons had scheduled him for execution on January 15, 2020. On the same date, the BOP announced the method by which it intends to execute Plaintiff and four other prisoners. *See* "Notice of Adoption of Revised Protocol," *Roane et. al. v. Gonzales et al.,* No. 05-2337 (D.D.C.), ECF Doc. 385 (July 25, 2019).[1] That method involves the administration of a single drug, pentobarbital. *Id.* Defendants later revealed their intention to use a "compounded" version of the drug instead of the FDA-approved and commercially available drug Nembutal. *See* AR 5; Defendants' Opposition to Plaintiff Daniel Lewis Lee's Motion for a Preliminary Injunction, (ECF Doc. 16), at 8-9, 41.

Some eight years before last July's sudden announcement, the Defendants' predecessors disclosed that they were abandoning the BOP's previous execution protocol because they were unable to obtain the first of the three drugs that it required. *See Roane* ECF Doc. 286 (joint motion, filed May 24, 2011). The previous method, which Defendants had adopted in 2004, was itself the object of suit by federal death-sentenced prisoner James Roane and others, beginning in December 2005. Following the parties' joint motion in 2011, the Defendants filed a series of periodic status reports stating that the protocol was under review. The Court effectively stayed

---

[1] Unless otherwise indicated, all ECF citations refer to the consolidated action, *In the Matter of Federal Bureau of Prisons Execution Protocol Cases*, No. 1:19-mc-00145-TSC.

the *Roane* litigation pending that review, and it granted preliminary injunctions barring the scheduling or carrying out of executions as to Mr. Roane and the other plaintiffs. *See Roane* ECF Docs. 5, 27, 67, 68, 336. Parallel suits brought by prisoners Chadrick Fulks and Alfred Bourgeois were similarly stayed. *See Fulks v. United States Dept. of Justice et al.*, No. 1:13-cv-00938-TSC, Order of Sept. 13, 2013 (ECF Doc. 7); *Bourgeois v. United States Dept. of Justice et al.*, No. 1:12-cv-00782-TSC, Order of Jan. 23, 2013 (ECF Doc. 15). Prisoner Julius Robinson's separate suit was not formally stayed, but it too went unadjudicated throughout the Defendants' series of status reports. *See Robinson v. Mukasey et al.,* No. 1:07-cv-02145-TSC.

The plaintiffs in the *Roane* case and the parallel actions brought several claims against the 2004 protocol, including a claim that the protocol amounted to cruel and unusual punishment under the Eighth Amendment, that the Defendants violated the APA by failing to subject the protocol to notice-and-comment rulemaking, and that the protocol violated due process by failing to disclose all material aspects of the prisoners' executions. *See*, *e.g.*, *Roane* ECF Doc. 8 at 28-32. The Court did not resolve the merits of those claims, other than by issuing preliminary injunctions in favor of the claimants and without the government's objection. Following the Court's entry of a stay in July 2011, the Defendants filed monthly status reports for the next five years. *See Roane* ECF Docs. 291-361. Beginning in April 2016, the Court ordered the filing of a joint status report every three months, and such reports followed until May 1, 2019. *See Roane* ECF Docs. 362-83; Minute Order of Apr. 25, 2016. The many status reports explained that the Defendants were reviewing and modifying their execution procedures, but at no point did the Defendants consult Plaintiffs or the public in that process.

After the Defendants announced a new execution method and the setting of five execution dates in July 2019, the Court conducted a status conference, consolidated the several lethal injection cases before it, and established a schedule for the plaintiffs to conduct several Rule 30(b)(6) depositions before amending their complaints. *See* Docket Text Order of Aug. 15,

2019; ECF Doc. 1 (Order of Aug. 20, 2019). Defendants thereafter served Plaintiffs' counsel

with the "Administrative Record." ECF Doc. 4. Defendants represent that the Administrative

Record includes "all documents and materials that the agency directly or indirectly considered"

in developing the 2019 Protocol. ECF Doc. 16 at 39 n.15 (quotation omitted).

As of this writing, the Court has before it three pending motions for preliminary

injunction. One of the motions is brought by Plaintiff Alfred E. Bourgeois, who faces an

execution date of January 13, 2020. Mr. Bourgeois' motion is based on the claims he brought in

2012, and it seeks the same injunctive relief that the Court granted to the *Roane* plaintiffs. *See*

ECF Doc. 2. A second motion for preliminary injunction was filed by prisoner Daniel Lewis Lee,

who is scheduled for execution on December 9, 2019, and filed a complaint against the new

protocol in August. *See* ECF Doc.13. Death-sentenced prisoner Wesley Purkey is scheduled for

execution on December 13, 2019, brought suit on October 25, 2019, and moved for a preliminary

injunction on October 31, 2019. *See Purkey v. Barr et al.*, No. 1:19-cv-03214-TSC (ECF Docs.

1, 6).

Plaintiff Honken brings the following eleven claims in his complaint:

I.     APA – absence of notice-and-comment rulemaking
II.    APA – protocol violates the Federal Death Penalty Act
III.   APA – protocol violates the Controlled Substances Act and the Food, Drug and
       Cosmetic Act
IV.    APA – arbitrary and capricious agency action
V.     APA – failure to exercise enforcement authority under the FDCA
VI.    APA – failure to exercise enforcement authority under the CSA
VII.   Fifth Amendment – due process
VIII.  Fifth and Eighth Amendment – arbitrary selection of prisoners for execution
IX.    Eighth Amendment – cruel and unusual punishment
X.     Fifth and Eighth Amendment – deliberate indifference to medical needs
XI.    First, Fifth, and Sixth Amendment – denial of access to counsel

*See* ECF Doc. 26-1 at 68-88. This motion seeks a preliminary injunction with respect to Claims

I-VI. Additional facts will be described below as they relate to those claims.

**ARGUMENT**

Courts consider and weigh four factors before granting a preliminary injunction: (1) the threat of irreparable injury to the plaintiff if an injunction is not granted; (2) the likelihood that other interested parties will suffer substantial harm if injunctive relief is granted; (3) the interests of the public; and (4) the likelihood of the plaintiff's eventual success on the merits. *See Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Wagner v. Taylor*, 836 F.2d 566, 575 (D.C. Cir. 1987); *Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.,* 102 F. Supp. 3d 334, 336 (D.D.C. 2015). All four factors weigh in Plaintiff's favor and justify equitable relief.

I.    **Plaintiff Has a Strong Likelihood of Success on the Merits of his APA Claims.**

The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" any of the following:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2). Plaintiff's claims show violations of each of these subsections. He has therefore shown that the 2019 Protocol is unlawful and should be set aside pursuant to 5 U.S.C. § 706(2).

A.    **Defendants failed to enact the 2019 Protocol through notice-and-comment rulemaking under the APA.**

The 2019 Protocol is a "rule" within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Typically, the "agency process for formulating, amending, or repealing [such] a rule" must comply with the APA's requirements of notice-and-comment rulemaking. 5 U.S.C. § 551(5). These requirements include advance notice, an

opportunity for public comment, and an explanation of the rule ultimately adopted in light of the public comments. *See* 5 U.S.C. §§ 553(b) & (c) (setting forth requirements). The only exceptions to the APA's notice-and-comment requirements are for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). These exceptions do not apply to the 2019 Protocol because it is a substantive rule.

### 1.      The 2019 protocol is a substantive rule.

Although a substantive rule may share characteristics with other types of rules, its defining feature is that it modifies a legal norm devised by Congress:

> A substantive rule has characteristics of both the policy statement and the interpretative rule; it is certainly in part an exercise of policy, and it is a rule. But the crucial distinction between it and the other two techniques is that a substantive rule *modifies or adds* to a legal norm based on the agency's *own authority*. That authority flows from a congressional delegation to promulgate substantive rules, to engage in supplementary lawmaking. And, it is because the agency is engaged in lawmaking that the APA requires it to comply with notice and comment.

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (emphases in original). To determine whether a rule is substantive, a court should ask whether in the absence of the rule there would be "an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). This is "another way of asking whether the disputed rule really adds content to the governing legal norms." *Syncor Int'l Corp.*, 127 F.3d at 96.

The 2019 Protocol is a substantive rule because it purports to modify the legal norm for carrying out federal executions. *See id.* at 95-96. The federal statutes that authorize imposition of the death penalty specify neither the method nor the means by which that penalty shall be carried out. Instead, the legislative basis for using lethal injection as a method of execution is found in 28 C.F.R. § 26.3(a)(4), which provides as follows:

> [A] sentence of death shall be executed . . . [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal.

28 C.F.R. § 26.3(a)(4). This rule, as adopted by the DOJ in 1993 after notice and comment, does not specify which "substance or substances" shall be used for execution, nor does it specify the procedures for intravenous administration.

The 2019 Protocol, in turn, is intended to provide "[t]he procedures utilized by the BOP to implement federal death sentences." Ex. 2 ¶ A. The protocol directs that "[t]he lethal substances (*sic.*) to be utilized in federal lethal injections shall be Pentobarbital Sodium," *id.* ¶ C, and it outlines the procedures by which this drug will be administered intravenously, *id.* ¶¶ G-H. The BOP's authority to issue the 2019 Protocol flows directly from the express delegation in 28 C.F.R. § 26.3(a)(4) that the "substance or substances" for use in lethal injection are "to be determined by the Director of the Federal Bureau of Prisons."

Without the 2019 Protocol in place, the BOP would have no procedure for implementing a federal death sentence, and thus no constitutional basis for conducting an execution. *See Ringo v. Lombardi*, 706 F. Supp. 2d 952, 962 (W.D. Mo. 2010) (noting that "the Eighth Amendment requires protocols that include adequate safeguards against unnecessary pain"); *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012) (prisoner brought viable equal protection claim "because he alleges that Alabama has substantially deviated from its execution protocol in a manner that significantly reduces inmate safeguards"); *Cooey v. Kasich*, 801 F. Supp. 2d 623, 624 (S.D. Ohio 2011) ("It is the policy of the State of Ohio that the State follows its written execution protocol, except when it does not. This is nonsense."). Lethal injection is a broad method of execution that can be carried out by many different means, not all of which are constitutional. The legislative rule requiring the use of lethal injection to carry out federal executions delegates the selection of precise means to the BOP Director, and the BOP Director

has selected those means in the 2019 Protocol. The constitutionality of federal executions turns

primarily on the selection of means in the protocol, and thus it is only by issuing valid

implementing regulations that the BOP can ensure the legal validity of 28 C.F.R. § 26.3(a)(4)'s

requirement that an inmate be executed via lethal injection. *See Am. Mining Cong.*, 995 F.2d at

1112 (holding that a rule is substantive if "in the absence of the rule there would not be an

adequate legislative basis for enforcement action or other agency action to confer benefits or

ensure the performance of duties").

The necessity of the 2019 Protocol to render 28 C.F.R. § 26.3(a)(4) legally operative

makes the protocol a substantive rule that requires notice-and-comment procedures. The issuance

of the protocol, however, unquestionably failed to adhere to the APA's notice-and-comment

requirements. The protocol was formulated completely in secret and without any advance notice

to the public, without any opportunity for public comments, and without any explanation of why

the protocol was adopted despite those comments (which were themselves never invited or

considered). *See Reyblatt v. U.S. NRC*, 105 F.3d 715, 722 (D.C. Cir. 1997) ("An agency need not

address every comment, but it must respond in a reasoned manner to those that raise significant

problems."). By failing to follow the notice-and-comment requirements in the rule-making

process for the protocol, the DOJ and BOP violated 5 U.S.C. § 553. The Court should hold the

2019 Protocol unlawful and set it aside because Defendants enacted it "without observance of

procedure required by law." 5 U.S.C. § 706(2)(D).

> ### 2.     The 2019 Protocol does not fit any exemption under 5 U.S.C. § 553.

The twofold purpose of according notice and comment opportunities is to (1)

"reintroduce public participation and fairness to affected parties after governmental authority has

been delegated to unrepresentative agencies," *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C.

Cir. 1980), and (2) "assure that the agency will have before it the facts and information relevant

to a particular administrative problem, as well as suggestions for alternative solutions," *Guardian*

*Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978). In keeping with

the purposes underlying the APA, "Congress intended the exceptions to § 553's notice and

comment requirements to be narrow ones." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044

(D.C. Cir. 1987). "The question of whether an agency action qualifies as a substantive rule that is

required to proceed through notice-and-comment rulemaking is a pure question of law that does

not require any special deference to an agency's characterization of its own rule." *Make the Road

New York v. McAleenan*, ___ F. Supp. 3d ___, No. 19-CV-2369 (KBJ), 2019 WL 4738070, at

*27 (D.D.C. Sept. 27, 2019) (quotation and alteration omitted).

      **a.**    ***The 2019 Protocol is not a procedural rule*** – The "distinctive purpose" of

§ 553's exemption for "rules of agency organization, procedure or practice" is to ensure "that

agencies retain latitude in organizing their *internal* operations." *Am. Hosp. Ass'n*, 834 F.2d at

1047 (quoting *Batterton*, 648 F.2d at 707) (emphasis added). A procedural rule "should not be

deemed to include any action which goes beyond formality and substantially affects the rights of

those over whom the agency exercises authority." *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107,

1113 (D.C. Cir. 1974). Unlike a substantive rule, a procedural rule makes no "normative

judgment." *Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir.

1999). "The distinction between substantive and procedural rules is one of degree depending

upon whether the substantive effect is sufficiently grave so that notice and comment are needed

to safeguard the policies underlying the APA," which are to ensure public participation and

fully-informed agency decisionmaking. *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,

653 F.3d 1, 5-6 (D.C. Cir. 2011) (quotation omitted); *see also Am. Hosp. Ass'n*, 834 F.2d at 1044

(notice-and-comment procedures exist to provide "maximum participation and full

information").

      The D.C. Circuit has applied the "procedural rule" exemption "to a freeze placed on the

processing of applications for radio broadcast stations, to procedures accelerating the processing

of applications for abandoning railroad lines and those for processing discrimination charges, and to a directive specifying that requisite audits be performed by nonagency accountants." *Batterton*, 648 F.2d at 707-08 (citations omitted). In contrast, the D.C. Circuit has declined to apply the exemption "where the agency action trenches on substantial private rights and interests":

> [S]ubstantial rights and interests in this light have come into play when railroads are directed to file proposed schedules of rates and tariffs with subscribers; when applicants for food stamps are subject to modified approval procedures; when drug producers are subject to new specifications for the kinds of clinical investigations deemed necessary to establish the effectiveness of drug products prior to FDA approval; and when motor carriers are subject to a new method for paying shippers.

*Id.* at 708 (citations omitted). The D.C. Circuit has increasingly sharpened its inquiry into the normative aspect of the rule or statement at issue:

> Over time, [the D.C. Circuit] in applying the § 553 exemption for procedural rules has gradually shifted focus from asking whether a given procedure has a 'substantial impact' on parties . . . to inquiring more broadly whether the agency action also encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior.

*Am. Hosp. Ass'n*, 834 F.2d at 1047.

In *Pickus*, the D.C. Circuit considered whether the Board of Parole's guidelines for parole selection criteria should have been subject to the APA's notice-and-comment requirements. *See* 507 F.2d at 1110. The Court examined the lengthy and detailed guidelines, noting that they have "significant consequences," a "substantial effect on ultimate parole decisions," and "great[] impact on an inmate's chances for parole." *Id.* at 1112-13. Ultimately, the Court concluded that "the rules which define parole selection criteria . . . are substantive agency action, for they define a fairly tight framework to circumscribe the Board's statutorily broad power." *Id.* at 1113.

The 2019 Protocol is not a procedural rule because it has a substantial impact on substantive rights and interests, and furthermore because it "encodes a substantive value judgment" by putting a "stamp of approval" on the use of pentobarbital in the lethal injection of

human beings. *Am. Hosp. Ass'n*, 834 F.2d at 1047. The protocol has a substantial impact on how exactly a person dies – an interest at least as significant as those deemed "substantial" in previous cases. *See, e.g.*, *Batterton*, 648 F.2d at 708 (listing cases). The execution protocol manual, which is seven chapters and 52 pages long, details many aspects of the administration of pentobarbital, starting with the establishment of an execution date and ending with "procedures to implement last-minute stays." *See* AR 1016-64. This includes separate checklists that apply before the execution, during the execution, and after the execution, each of which organizes the procedures into very specific timeframes and covers activities of the condemned including a final meal and visitation rights. The protocol thus "goes beyond formality," *Pickus*, 507 F.2d at 1113, and properly should be regarded as substantive agency action because "[it] define[s] a fairly tight framework to circumscribe the [BOP]'s statutorily broad power," *id.* – a framework that is absent from the regulations providing for lethal injection, as well as the general statutes allowing the Attorney General to administer the DOJ. *See* 28 C.F.R. § 26.3 and enabling statutes.

In addition to its substantial impact on the interests of federally death-sentenced inmates, the 2019 Protocol "encodes a substantive value judgment," *Am. Hosp. Ass'n*, 834 F.2d at 1047, by putting a "stamp of approval" on the use of pentobarbital under the protocol's terms – as opposed to other drugs, multiple drugs, or other procedures that would comport with clinical, professional, and regulatory standards instead of conflicting with them. *Compare*, *e.g.*, Ex. 2 ¶ C (protocol specifying "pentobarbital sodium," and thereby providing for a single drug allowing for compounded pentobarbital), *with* Ex. 5 at 8-9 (Almgren declaration) (explaining that Defendants' compounding of pentobarbital violates federal statutes), *and* Ex. 4 (Stevens declaration) at 7 (observing that a pre-execution administration of morphine or fentanyl would anesthetize the prisoner from the effects of pentobarbital). The 2019 Protocol also approves the use of numerous procedures to administer the drug, including the selection of personnel with certain qualifications, the preparation and labelling of syringes containing the lethal agent, and

14

the use of two separate IV lines in the event that peripheral access is utilized. *See* Ex. 2 ¶¶ D, F-H. For better or worse, these specifications are "value judgments" that reflect the BOP's determination of how best to extinguish a human life "in an efficient and humane manner." AR 1019 (Protocol, Introduction § IV(A)).

     **b.**    ***The 2019 Protocol is not a general policy statement*** – "The function of the second § 553 exemption, for 'general policy statements,' is to allow agencies to announce their tentative intentions for the future without binding themselves." *Am. Hosp. Ass'n*, 834 F.2d at 1046 (quotation omitted). The D.C. Circuit has described the difference between substantive rules and general statements of policy as follows:

> [W]hile a substantive rule establishes a standard of conduct which has the force of law in subsequent proceedings, a general statement of policy, on the other hand, does not establish a binding norm. It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy.

*Id.* (quotation omitted).

     To determine whether a rule or statement establishes a "binding norm," the D.C. Circuit evaluates it under two criteria. "First, courts have said that, unless a pronouncement acts prospectively, it is a binding norm." *Am. Bus. Ass'n v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980). In other words, "a statement of policy may not have a present effect," *id.*, but instead "announces the agency's tentative intentions for the future," *Pacific Gas & Electric Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974).

     "The second criterion is whether a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion." *Am. Bus. Ass'n*, 627 F.2d at 529. General statements of policy allow the agency "the discretion and the authority to change its position – even abruptly – in any specific case." *Syncor Int'l Corp.*, 127 F.3d at 94; *Pacific Gas & Elec. Co.*, 506 F.2d at 38-39. If the agency's statement "'purports to bind' those subject to it,"

however, then it does not fit the section 553 exemption. *Elec. Privacy Info. Ctr.*, 653 F.3d at 7

(quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)). Otherwise stated, "An

agency cannot escape its responsibility to present evidence and reasoning supporting its

substantive rules by announcing binding precedent in the form of a general statement of policy."

*Pacific Gas & Elec. Co.*, 506 F.2d at 38-39.

   In relatively recent litigation over the Transportation Security Administration's ("TSA")

decision to screen airline passengers by using advanced imaging technology ("AIT") instead of

magnetometers, the D.C. Circuit rejected the TSA's argument that its decision was not "binding"

on grounds that "there are no AIT scanners at some airports and the agency retains the discretion

to stop using the scanners where they are in place." *Elec. Privacy Info. Ctr.*, 653 F.3d at 7.

Instead, the D.C. Circuit focused on the binding nature of the decision with respect to airline

passengers:

> The TSA seems to think it significant that there are no AIT scanners at some
> airports and the agency retains the discretion to stop using the scanners where they
> are in place. More clearly significant is that a passenger is bound to comply with
> whatever screening procedure the TSA is using on the date he is to fly at the airport
> from which his flight departs. . . . To be sure, he can opt for a patdown but . . . the
> agency has not argued that option makes its screening procedures nonbinding and
> we therefore do not consider the possibility. We are left, then, with the argument
> that a passenger is not bound to comply with the set of choices presented by the
> TSA when he arrives at the security checkpoint, which is absurd.

*Id.*

   With respect to the first criterion described above, the binding norm established by the

2019 Protocol unquestionably has "present effect." *Am. Bus. Ass'n*, 627 F.2d at 529. On the same

day it issued the revised addendum to the 2019 Protocol, the DOJ issued a press release stating

that five federal inmates had been scheduled for executions at the USP Terre Haute in December

2019 and January 2020. *See* <<https://www.justice.gov/opa/pr/federal-government-resume-

capital-punishment-after-nearly-twodecade-lapse>>. For these inmates – to say nothing of others

– the 2019 Protocol is far more than a merely tentative or prospective announcement of "what the agency seeks to establish as policy." *Am. Hosp. Ass'n*, 834 F.2d at 1046.

In addition to having present effect, the 2019 Protocol is not a general statement of policy, because it establishes a binding norm for the implementation of federal death sentences. On July 25, 2019, the DOJ and BOP issued a notice and revised addendum to the BOP execution protocol specifying the procedures to be "utilized by the BOP to implement federal death sentences." Ex. 2 ¶ A. This includes the directive that "[t]he lethal substances to be utilized in federal lethal injections shall be Pentobarbital Sodium." *Id.* ¶ C. Although the protocol provides the BOP Director some limited flexibility to modify the procedures "as necessary" under certain circumstances, the protocol nowhere suggests that the Director (or anyone else) retains the discretion to "abruptly" change anything about the protocol "in any specific case." *Syncor Int'l Corp.*, 127 F.3d at 94. Certainly the BOP does not retain discretion to disregard the protocol's selection of pentobarbital sodium and use a different substance as it sees fit for any particular inmate.

Notwithstanding Defendants' argument that the BOP Director may modify the protocol to comply with a court order, to follow the recommendation of medical personnel, or under other circumstances – ECF Doc. 16 at 37 – the 2019 Protocol's directives are just that: directives. They employ the sort of "mandatory, definitive language" that an agency uses to bind itself. *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988). For example, the 2019 Protocol provides that the Director or designee "shall" select the execution personnel, whose identities "shall" be kept secret. Ex. 2 ¶¶ B, D. The substance to be administered "shall" be pentobarbital. *Id.* ¶ C. In fact, the word "shall" is used 16 times in the two-page addendum. In short, the 2019 Protocol "commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

Moreover, even if the BOP Director *did* have the authority and discretion to simply use a

drug other than pentobarbital sodium "in any specific case," or to ignore its seven chapters and 52 pages of detailed procedures for administration, the protocol is surely binding upon and affects the significant interests of federal inmates. Just as in the case concerning airline passenger screening, the "[m]ore clearly significant" aspect of this inquiry is that "a [federal inmate] is bound to comply with whatever [execution] procedure the [BOP] is using on the date he is to [be executed]." *Elec. Privacy Info. Ctr.*, 653 F.3d at 7. Any suggestion that a federal inmate is not bound by the procedures established by the Protocol would be "absurd." *Id.*

      **c.**    ***The 2019 Protocol is not an interpretive rule*** – "The function of § 553's first exemption, that for 'interpretive rules,' is to allow agencies to explain ambiguous terms in legislative enactments without having to undertake cumbersome proceedings." *Am. Hosp. Ass'n*, 834 F.2d at 1045. Interpretive rules "are those which merely clarify or explain existing law or regulations, are essentially hortatory and instructional, and do not have the full force and effect of a substantive rule but are in the form of an explanation of particular terms." *Id.* (internal quotation marks, citations, and alterations omitted).

      "The practical question inherent in the distinction between legislative and interpretive regulations is whether the new rule effects 'a substantive regulatory change' to the statutory or regulatory regime." *Elec. Privacy Info. Ctr.*, 653 F.3d at 6-7 (quotation omitted). A court should probe this inquiry bearing in mind that "the purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation . . . and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations." *Id.* at 7.

      The 2019 Protocol is not an interpretive rule: "It does not purport to construe any language in a relevant statute or regulation; it does not interpret anything." *Syncor Int'l Corp.*, 127 F.3d at 95. The protocol's stated purpose "is to outline Federal Bureau of Prisons (BOP) policy and procedures for planning and carrying out the execution of a person convicted of a

capital offense." AR 1019; *see also* Ex. 2 ¶ A ("The procedures utilized by the BOP to implement federal death sentences shall be as follows . . . ."). The purpose is not to construe any language or interpret any portion of 28 C.F.R. § 26.3(a)(4) – the legislative basis for using lethal injection to execute federal inmates – or any other congressional directive that may justify that regulation. Rather than interpreting anything, the procedures promulgated in the 2019 Protocol are "self-imposed controls over the manner and circumstances in which the agency will exercise its plenary power." *Pickus*, 507 F.2d at 1113. The protocol's directives "are not the kind of action Congress undertook to exempt from statutory requirements that regulate the rule-making process." *Id.*

## B.     The 2019 Protocol is arbitrary and capricious in several respects.

An agency's enactment must be stricken under the APA if it is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). A reviewing court must satisfy itself that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Although review for arbitrariness is deferential and does not allow the court to substitute its own judgment for the agency's, the required deference does not countenance "rubber stamp[ing]" of agency actions or allow the agency to avoid a "thorough, probing, [and] in-depth review" of its decision. *Van Hollen, Jr., v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016); *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 74 (D.D.C. 2013). A court must "hold unlawful and set aside" the challenged action if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or reached a decision that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *see* 5 U.S.C. § 706(2). The agency must rationally

19

explain itself, which Defendants have failed to do.

1.      **Defendants, who claim to have chosen pentobarbital as an execution drug in order to bring about a medically "humane" death, have arbitrarily ignored the need to comply with federal statutes that exist in order to ensure that a regulated drug is safe and effective for its intended use.**

Among the Defendants' chief reasons for crafting the 2019 Protocol as they have, and for selecting an execution method based on the single-drug administration of pentobarbital, is the Defendants' belief that such executions will result in a "humane death." AR 3, 931. Defendants formed that belief in consultation with at least two medical experts. *See* AR 1, 3, 871-72, 929, 931. One of those experts is pharmacologist Craig Lindsley, Ph.D., whose two-page report is in the record. *See* AR 525-26. Citing his own "deep knowledge of the pharmacology of pentobarbital sodium," Dr. Lindsley believes that "the protocol as drafted *will* produce a humane death with limited suffering and pain." AR 525 (emphasis in original). Another expert is anesthesiologist Joseph F. Antognini, M.D., who reportedly "concurs" with the protocol and is "prepared" to submit an expert report in its defense. AR 858, 872. Defendants also retained an unnamed "medical consulting firm." *Id.* In large part, then, Defendants chose pentobarbital as an execution drug because they believe that choice will serve a medical purpose of reducing suffering and pain. AR 1, 3, 525-26, 858, 871-72, 929, 931.

That same objective is served by the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, as well as the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq.* Indeed, the "core" legislative purpose of the FDCA is to ensure that a "drug" is "safe and effective for its intended use." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000). Despite that statutory objective, the Defendants' conduct violates the letter and spirit of numerous safeguards within the FDCA and CSA:

a.      ***No prescription for pentobarbital*** - Defendants intend to execute Plaintiff and other prisoners through the administration of pentobarbital, which is a Schedule II controlled

substance. *See* 21 C.F.R. § 1308.12. The CSA requires the written prescription of a medical practitioner in order for a Schedule II controlled substance to be dispensed and administered. *See* 21 U.S.C. § 829(a). The FDCA similarly conditions the dispensing of FDA-approved drugs, including pentobarbital, upon either (a) "a written prescription of a practitioner licensed by law to administer such drug," or (b) "an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist[.]" 21 U.S.C. § 353(b)(1).

A prescription reflects a professional medical judgment that a particular drug suits a particular individual for a particular purpose. In order to be legally effective, a medical prescription requires "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). A prescription under either statute must be a "bona fide order" reflecting a genuine practitioner-patient relationship. *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002). It directs "the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination or consultation by a licensed doctor – and does not include pieces of paper by which physicians are directing the issuance of a medicine, remedy, or drug to patients who do not need it, persons they have never met, or individuals who do not exist." *Id.*

Defendants do not intend to obtain a medical prescription for the dispensing and administration of pentobarbital for purposes of Plaintiff's execution or those of similarly situated prisoners. The 2019 Protocol and the Administrative Record do not reflect any intent to obtain such a prescription. Moreover, even if Defendants were to obtain a purported prescription for the use of pentobarbital in Plaintiff's execution, they have not, and do not intend, to arrange for a medical practitioner to examine Plaintiff and to determine whether pentobarbital is the appropriate drug to administer in order to meet the objective of a "humane" or otherwise minimally painful death in his particular case – as would be necessary for any such prescription to be legally effective under the CSA and FDCA.

**b.**      *No prescription for a compounded version of the drug* – According to

Defendants, drug compounding takes place when "a licensed pharmacist or physician combines,

mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual

patient." AR 857. But the 2019 Protocol envisions no such "tailoring" of a drug for a particular

patient, so as to justify the risk of a compounded and non-FDA-approved product. To the

contrary, Defendants intend to administer compounded pentobarbital because they successfully

obtained it instead of the commercially available form of the drug. *See* ECF Doc. 16 at 23. But

whatever their motives, the Defendants' conduct is a federal crime. The proposed dispensing and

administration of compounded pentobarbital requires a valid medical prescription reflecting a

medical practitioner's order that "a compounded product is necessary for the identified patient."

21 U.S.C. § 353a(a). Without such a prescription, the compounded drug is subject to the FDCA's

onerous drug-approval process under 21 U.S.C. § 355, and thus, the Defendants' compounded

drug is an illicit, misbranded, and unapproved "new drug" under the FDCA. 21 U.S.C. § 353a(a).

**c.**      *Copying an FDA-approved and commercially available drug* - In addition to the

prescription requirement, section 353a generally prohibits the compounding of drug products that

are "essentially copies of a commercially available drug product." 21 U.S.C. § 353a(b)(1)(D).

The statute distinguishes such a "copied" drug from a traditionally understood compounding

drug "in which there is a change, made for an identified individual patient, which produces for

that patient a significant difference, as determined by the prescribing practitioner, between the

compounded drug and the comparable commercially available drug product." 21 U.S.C. §

353a(b)(2). Nembutal is the FDA-approved and non-compounded version of the drug

pentobarbital. That drug is a "commercially available drug product" under the FDCA, even if the

Defendants are unable to obtain the drug for the purpose of executing prisoners. The question for

purposes of FDCA compliance is not whether the drug is available to a particular dispenser for a

particular purpose. Rather, an FDA-approved drug is "commercially available" under the statute

"if it is a marketed drug product" that has not been discontinued and is not the subject of an

established "drug shortage" as designated by the FDA. *See* FDA, *Compounded Drug Products*

*That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of*

*the Federal Food, Drug, and Cosmetic Act: Guidance for Industry* (Jan. 2018), at 5, available at

<<https://www.fda.gov/media/98973/download>>. Nembutal has not been discontinued, nor is

there a designated shortage of the drug.

Defendants do not plan to "change" the compounded pentobarbital to some version of the

drug that may be more medically appropriate for an individual patient such as Plaintiff. To the

contrary, they plan to administer a compounded drug that is "essentially a copy" of the FDA-

approved version. A compounded drug is "essentially a copy" of the approved drug when it is

"identical or nearly identical to an approved drug" (unless it appears on the FDA's list of drug

shortages), or a drug that contains a "bulk drug substance" contained in the approved drug

(unless the drug has been changed in order to make a "clinical difference" for an individual

patient). 21 U.S.C. §§ 353b(d)(2)(A)-(B). In this instance, laboratory tests obtained by

Defendants show that their objective is to simulate the FDA-approved drug. *See* AR 4-5, 932-33,

970-1015.

> **d.** ***Defendants' indifference to federal drug laws is arbitrary and capricious*** – As

explained above, an agency's action is arbitrary and capricious when, among other things, the

agency has "entirely failed to consider an important aspect of the problem." *State Farm*, 463

U.S. at 43. The FDCA and CSA embody safeguards that govern the very drug that Defendants

plan to compound, dispense, and administer. "[I]gnoring those safeguards, as Plaintiffs allege

Defendants intend to do, places Plaintiffs at risk." *Ringo*, 706 F. Supp. 2d at 958 (holding that

prisoner-plaintiffs had standing to seek a declaratory judgment that the state's former protocol

violated the FDCA). Those safeguards apply even to drugs that are used in executions: "Where

the Eighth Amendment requires protocols that include adequate safeguards against unnecessary

pain . . . and superior courts have indicated that the involvement of medical professionals and rules for administration enhances such safeguards, the safeguards provided by the CSA and FDCA are not irrelevant." *Id.* at 962.

This Court has held unequivocally that the FDCA's text and purposes apply to lethal injection drugs, the DOJ's recent and unilateral declaration to the contrary notwithstanding. *See Beaty v. FDA*, 853 F. Supp. 2d 30 (D.D.C. 2012), *aff'd in relevant part sub nom. Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013); AR 938-63; Office of Legal Counsel, DOJ, "Whether the Food and Drug Administration Has Jurisdiction over Articles Intended for Use in Lawful Executions," (May 3, 2019), available at 2019 WL 2235666. The DOJ believes that the statutory aim of drug safety "markedly conflicts with the purpose of an execution." AR 938-39. But this Court took the contrary position in *Beaty*, explaining that the importation of an unapproved and misbranded execution drug carried risks beyond narcotics trafficking, and that it implicated the FDCA's statutory purpose of drug safety: "Even when in the correct hands," the Court reasoned, "prisoners on death row have an unnecessary risk that they will not be anesthetized properly prior to execution." *Beaty*, 853 F. Supp. 2d at 42-43.

This Court in *Beaty* and the Court of Appeals in *Cook* held that the FDA violated the FDCA by refusing to exercise its jurisdiction to interdict the importation of a misbranded execution drug. *See Cook*, 733 F.3d at 10-11; *Beaty*, 853 F. Supp. 2d at 41-43. Defendants defend their non-acquiescence to *Cook* by arguing that the D.C. Circuit in that case did not "squarely address[] whether FDA has administrative jurisdiction" over lethal injection drugs – AR 938, 958 – even though the court in fact ordered FDA to exercise such jurisdiction. *Cook*, 733 F.3d at 10-11*; accord Beaty*, 853 F. Supp. 2d at 41-43; *see also* Civil Case No. 11-189 (RJL), ECF Doc. 24. To be sure, the FDCA provision at issue in *Cook* concerned drug importation rather than domestic compounding, dispensing, and administration. But the broader point applies: the statute is not irrelevant simply because Defendants are dispensing and

administering execution drugs. Defendants have "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and they are defying the Court's judgment in the process.

Plaintiff anticipates Defendants' objection that his claims involving the CSA and FDCA are barred by *Heckler v. Chaney*, 470 U.S. 821 (1985). They are not. *Heckler* recognizes a presumption against judicial review of an agency's decision not to take enforcement action in a particular case or factual scenario – a species of prosecutorial discretion. *See id.* at 832; *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 675 (D.C. Cir. 1994). That concern is not implicated, though, when the government itself is committing the violation. As this Court recognized: "To the extent the plaintiffs are arguing that the lethal injection protocol itself is unlawful, such a claim is not foreclosed by *Heckler*." *Roane v. Holder*, 607 F. Supp. 2d 216, 227 (D.D.C. 2009). Neither does *Heckler* preclude review of an agency's "general policy" of non-enforcement, including the DEA's policy of not enforcing the CSA's registration requirement against those who participate in lethal injections. *Id.*

In this case, the Defendants' protocol itself violates the CSA and FDCA because (a) it involves the dispensing and administration of a Schedule II controlled substance without a medical prescription; (b) it involves compounding that drug without a prescription or other medical order justifying the compounded form of the drug; and (c) it involves the unregulated compounding of "essentially a copy" of a commercially available drug. Those illegalities underlie Plaintiff's Claim III (violations of CSA and FDCA), Claim IV (arbitrary and capricious for failure to consider compliance with CSA and FDCA), and Claims V and VI (FDA's and DEA's non-enforcement policies concerning lethal injection drugs). Moreover, the Defendants have unilaterally ordered the FDA not to regulate lethal injection drugs, and both the FDA and the DEA have facilitated the protocol's issuance rather than remedying its illegalities. AR 858-59, 872, 938-63.

Neither are Plaintiff's claims impaired by 21 U.S.C. § 337(a). That statute provides that any action to "enforce" the FDCA must be brought "by and in the name of the United States." Plaintiff's claim here is that Defendants acted arbitrarily and capriciously by refusing even to *consider* the statutory violations within their own rulemaking and conduct. That failure would be remedied by an order vacating that rule and conduct until such time as the government rationally explains itself. "[A]t the end of the day, an agency action must be upheld as long as the agency has considered the relevant factors and has articulated a rational explanation for the choice it made, given the facts that it found." *Make the Road New York v. McAleenan,*, ___ F. Supp. 3d ___, No. 19-cv-2369 (KBJ), 2019 WL 4738070, at *28 (D.D.C. Sept. 27, 2019) (quotation omitted). Plaintiff's claim that Defendants have acted arbitrarily and capriciously by ignoring the FDCA, then, is not an action to "enforce" the statute.

But even if Plaintiff's claim could be construed as an "enforcement" action, he is free to seek declaratory relief. *See* ECF Doc. 26-1 at 88. A declaratory claim is viable, because relief would bring about the reasonable likelihood that public servants would conform their conduct to the law as pronounced by the Court. "A declaratory judgment that Defendants are violating the CSA and FDCA would make it likely that Defendants would stop any such violations." *Ringo*, 706 F. Supp. 2d at 958. As Defendants themselves insist, "BOP is entitled to a presumption of regularity and good faith." ECF Doc. 16, at 20.

### 2. Defendants arbitrarily and capriciously ignore the risk that the prisoner will experience acute pulmonary edema during the execution and will experience the sensation of drowning and suffocation while still conscious.

The expert declarations of anesthesiologist Gail A. Van Norman, M.D., and pathologist Mark Edgar, M.D., explain that injection of pentobarbital under the 2019 Protocol will cause Plaintiff to suffer acute pulmonary edema, that Plaintiff will experience the edema while still conscious and aware of it, and that the Plaintiff will suffer the sensation of an excruciating and torturous death by drowning:

26

Not being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man. It is nearly impossible for most untrained human beings to hold their breath voluntarily for more than 1 minute. In under 60 seconds, sensations of asphyxia and compulsion to breathe appear and rapidly overwhelm the brain. Panic and terror, and the attempt to fight take over. Even human beings who are underwater will reach such a level of agony that they will be compelled to take a "breath" within about 1 minute. This is the sensation that is deliberately elicited in "the enhanced interrogation technique" called waterboarding, which is defined by the European Court of Human Rights as a form of torture.

Ex. 1 at 6-8, 32-36; *see also* Ex. 3 (Edgar Declaration) at 18-22.

These concerns are not hypothetical. To the contrary, "It is a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of this effect of injection of 5 grams of pentobarbital." Ex. 1 at 7. It is "extremely likely" that the prisoner will remain conscious and thus "capable of feeling pain, terror, and suffocation." Ex. 1. Those concerns are grounded in objective fact, including autopsy reports of barbiturate-induced executions. Ex. 1 at 33-36; Ex. 3 at 18-21.

For their part, Defendants do not even acknowledge the risk of acute pulmonary edema. The word "edema" appears only once in the Administrative Record. AR 584. Even then, it is from an evidentiary hearing in which the Defendants' later-chosen expert – anesthesiologist Joseph F. Antognini, M.D. – explains the symptoms of "air hunger" within the context of a different execution drug (midazolam) in Ohio. *Id.* Nowhere does the record identify acute pulmonary edema as even a possible risk under the 2019 Protocol, let alone describe alternatives to reduce the likelihood or severity of that risk. Here as elsewhere, Defendants have "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Defendants' legal arguments only demonstrate the defects in their consideration of the protocol's risks. Defendants contend that mere drowning does not violate the Eighth Amendment, that courts have upheld pentobarbital methods under the Eighth Amendment, that it is permissible and non-arbitrary for the BOP to ignore medical risks that do not themselves

violate the Eighth Amendment, and that Eighth Amendment precedents advise courts against micromanaging the details of execution methods. *See* ECF Doc. at 16 (opposition to Lee motion for preliminary injunction), at 14, 40. But Defendants cite no authority for the unstated premise that the APA's concerns are limited to constitutional injuries, including cruel and unusual punishment. The relevant question is whether the protocol is arbitrary and capricious – an inquiry that Congress *requires* over and above the constraints of the Eighth Amendment. *See* 5 U.S.C. § 706(2). The authorities relied on by Defendants are inapposite; they concern federal judicial review of state execution methods under the Eighth Amendment, and of course the federal courts lack authority to review *state* execution procedures under the federal APA. Defendants themselves claim to pursue the objective of a "humane" execution. AR 3, 931. That objective is necessarily an "important aspect of the problem" under the APA. *State Farm*, 463 U.S. at 43.

Neither does it assist Defendants that they considered Dr. Antognini's views about their protocol, the views of "other medical professionals," or the possibility of other execution drugs to use alongside pentobarbital or in lieu of it. ECF Doc. 16 at 40. Defendants seem to suggest that *some* consideration of *some* relevant factors amounts to adequate consideration of all factors. That is not the law. "[I]t is the very definition of arbitrariness in rulemaking if an agency refuses to acknowledge (or fails to obtain) the facts and figures that matter prior to exercising its discretion to promulgate a rule." *Make the Road New York*, 2019 WL 4738070, at *39. Defendants refuse even to consider readily implemented alternatives to the risk of pain, including the administration of opioids prior to the execution, as suggested by pharmacologist Craig Stevens. *Compare* Ex. 4 (Stevens Declaration) at 3-7, *with* ECF Doc. 16 (opposition to Lee motion for preliminary injunction), at 25 (insisting that that a pre-execution drug is unnecessary).

**3.     Defendants have arbitrarily and capriciously failed to consider the risks of using a compounded drug for executions and have failed to demonstrate that a compounded drug is necessary.**

The Administrative Record makes clear that Defendants plan to administer a compounded form of pentobarbital. *See* AR 4-5, 859, 932-33; *accord* ECF Doc. 16 at 8. Legal violations aside, Defendants fail to acknowledge the risks of using a compounded drug or to minimize those risks. Neither do Defendants justify those risks: they have presented no evidence of diligent and good-faith efforts to obtain FDA-approved Nembutal before resorting to their gray market knock-off. Dr. Van Norman explains that compounded drugs often feature impurities and other defects that diminish their potency, that they are not regulated by the FDA, and that they are exempt from "Good Manufacturing Practices" that govern "the facilities and equipment used in manufacturing a drug, training of personnel, calibration and cleaning of processing equipment, and ensuring that validated analytical test procedures are used to guarantee potency, purity, sterility and other characteristics." Ex. 1 at 44, 46, 50. Defendants' practices make it "extremely likely that prisoners will be subjected to injection of an inferior, subpotent drug that vastly increases the risk that execution will be prolonged and the prisoner will suffer prolonged feelings of pain and suffocation." *Id.* at 8.

Pharmacologist Michaela Almgren, Pharm.D., agrees about the risk of a sub-potent or otherwise defective drug. *See* Ex. 5 (declaration), at 4. Aside from Defendants' violations of the laws governing compounded pharmaceuticals, the details of their use and development of those drugs is dangerously unclear. We lack any information about the compounding pharmacy, its equipment, its regulatory track record, the ingredients it used (or will use) to compound the drug, or the "compounding logs" that are necessary to determine the drug's properly-calculated "beyond use date." *Id.* Defendants' "lack of transparency" and "poor pharmacy practices" create a "substantial risk that the drugs that the Board of Prisons intends to use in execution will not be of the appropriate quality and potency to cause death without significant suffering." *Id.* at 10.

The Defendants' assurances to the contrary are insufficient. As an initial matter, Defendants do not adequately justify the use of compounded drugs – instead insisting that the Eighth Amendment permits their usage in executions and that the FDA-approved version of the drug was not available. *See* ECF Doc. 16 (opposition to Lee motion for preliminary injunction) at 40-42. Defendants do not document or even describe any efforts they made to obtain FDA-approved Nembutal. The BOP has failed to "cogently explain why it has exercised its discretion in a given manner," *State Farm*, 463 U.S. at 43 – regardless of whether or not its decision independently violates the Eighth Amendment.

Neither does it assist Defendants to invoke the "quality testing" of its compounded pentobarbital and the powder active pharmaceutical ingredient ("API"). *See* ECF Doc. 16 at 41. Dr. Almgren points out that Defendants' testing of the API failed one of the specifications and showed a "number of impurities," while the stability study of the compounded drug demonstrated "inadequate stability and potency of the compounded drug at elevated temperature." Ex. 5 at 6, 8-10. Based on Defendants' testing and related documents, Dr. Almgren describes the distinct possibility that the BOP plans to administer expired drugs to execute Plaintiff and others. *Id.* at 5-8. It makes no difference that the drugs will be stored at USP Terre Haute in accordance with DEA-imposed regulations, which govern concerns of drug trafficking rather than drug safety. *Id.* at 6-7. Improper storage at the wrong temperature and/or under excessive humidity will render the drugs expired only hours after being compounded. *Id.* at 5, 7-8. Without assurance of proper storage, the drugs could lose potency and result in "prolonged suffering" during execution. *Id.* at 8.

Defendants have failed in their duty to "examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The Defendants' assurances of reliable and quality-tested drugs contradict their own testing documents. *See* Ex. 5 at 6, 8-10; AR 4-5, 977,

1013. Their claims of DEA-compliant storage do not even address questions of the drug's safety and effectiveness. Ex. 5 at 6-7. And the entire enterprise of compounding the drug is nowhere justified as necessary in fact or compliant with industry standards. The protocol's use of compounded drugs is arbitrary and capricious.

**4.     The 2019 Protocol's opaque and unspecified means of IV placement is arbitrary and capricious.**

Failures of IV placement are frequently seen in lethal injections, and the problem is widely recognized and litigated. *See* Complaint (ECF Doc. 26-1) ¶¶ 143-52; ECF Doc. 16 (opposition to Lee motion for preliminary injunction), at 42 ("[D]iscussion of the issue of IV access is prevalent in the case-law reviewed and considered by BOP."). Anesthesiologist Gail A. Van Norman, M.D., describes IV line complications as a "common" occurrence during executions. *See* Ex. 1 (declaration), at 37. Among the 27 post-execution autopsy reports reviewed by Dr. Van Norman, IV-line complications were seen in 56 percent of them. *Id.*

Despite the prevalence of IV problems, the 2019 Protocol is all but silent on how to insert the IV or address any complications. The protocol says that the Director of the BOP or his unspecified "designee" will determine the method of venous access "(1) based on the training and experience of personnel establishing the intravenous access; (2) to comply with specific orders of federal courts; or (3) based upon a recommendation from qualified personnel." Ex. 2 ¶ H. The protocol provides no guidance on the preferred method of venous access, whether peripheral (arm), a central line, or an invasive cut-down surgery. The protocol does not assure that medical personnel will be qualified to make that decision and carry it out. Purportedly "qualified" personnel may have as little professional training and expertise as a phlebotomist, or even less. *Id.* ¶ D.

Rather than specify a preferred means of insertion as well as contingency plans, the protocol leaves medical "personnel" of unknown credentials and skills to freelance their way

through an unknown and apparently unlimited number of attempts and methods:

> [T]he Addendum does not specify the number of lines, if a backup line is necessary, how many attempts are allowed, how much time will be permitted, nor specific access sites that will be used, and the order in which they will be attempted. Will more than an hour of attempts, or hundreds of punctures be permissible? What will be the procedure if extravasation or infiltration is recognized? Will pain be treated while another IV site is sought?

Ex. 1 at 42 (per Dr. Van Norman).

The lack of competent guidance puts Plaintiff at risk. Improper IV insertion may lead to infiltration (in which the drug is injected or bursts into the surrounding tissue instead of the prisoner's vein) or extravasation (leakage of the drug into the surrounding tissue). *See id.* at 36-37. Pentobarbital has a strongly alkaline pH, and as a result, infiltration or extravasation causes "instant, excruciating pain that patients liken to being set on fire." *Id.* at 36. Another hazard is the injection of the drug into an artery instead of a vein, the result of which is "instant arterial spasm, pain, excruciating local tissue destruction, and also immediate ischemia (i.e. lack of oxygen, tissue damage and necrosis) in the area of the body supplied by the artery." *Id.* Improper injection also diminishes the drug's potency: line infiltration and arterial injection "can result in slow suffocation, a lingering and extremely painful death, and/or failure of the execution altogether." *Id.* at 41. The 2019 Protocol provides no rescue measures or backup plan in such an event: "Will the prisoner be given treatment or simply allowed to suffocate as the execution proceeds?" *Id.* at 42. Failed IV insertions, featuring "repeat attempts to establish peripheral or central venous access" are yet another occasion of severe pain and an "excruciating event," with no limits on how long the ordeal might last. *Id.* at 41.

The Protocol's treatment of IV insertion is arbitrary and capricious in multiple respects:

●*First*, by not even specifying a presumptive means of IV insertion or any contingency plans to guide unspecified "medical personnel" of unspecified qualifications, Defendants have "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

"The problem" is that IV-line complications occur frequently with lethal injections, and with potentially excruciating consequences. The 2019 Protocol has no specific plan to address that problem.

●*Second*, the protocol contradicts the materials that Defendants claim to have relied upon in developing it – including all five of the model protocols in the Administrative Record. The executions methods of Idaho, South Dakota, Texas, Georgia, and Missouri state a preference for peripheral IV insertion over a central line insertion, let alone a "cut down." *See* AR 12, 61, 83, 90. Texas's procedure, for example, designates the use of the prisoner's arm for an IV insertion. AR 90. If the prisoner's arms lack a suitable vein, only then must "medically trained personnel" find a "suitable vein in another party of the body." *Id.* In no event may the execution team use a "cut-down procedure to access a suitable vein." *Id.* Idaho's protocol offers similar guidance. It requires the placement of two peripheral lines (primary and backup), with guided medical discretion to determine the point of insertion: "The insertion sites in order of preference shall be: arms, hands, ankles and feet, as determined medically appropriate by the Medical Team leader." AR 61. When – and only when – it is not possible to "reliably" place two peripheral lines, "the Medical Team leader will direct Medical Team members to place an IV catheter in a central line for the purpose of administering the chemicals." *Id.* Missouri's protocol is less pronounced in its preference for peripheral access but nevertheless offers more guidance than the 2019 Protocol. The primary IV line in the Missouri method may be peripheral or central, but the latter is permissible only when the personnel on hand "have appropriate training, education, and experience for that procedure." AR 70. Missouri's protocol at least offers express guidance on the issue, including the requirement that the secondary line be peripheral. *Id.* The BOP's standardless approach to IV insertion cannot be justified by the Administrative Record. Defendant's policy lacks "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

●*Third*, the BOP has failed in its duty to "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48. Neither the protocol nor the record offers any explanation of why Defendants adopted an unspecified approach to IV assertion instead of the guided approach of all five protocols on which they claim to rely.

**C.     The 2019 Protocol is contrary to law.**

The Court must "hold unlawful" and "set aside" an agency action that is "not in accordance with law," or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). As applied to Plaintiff, the 2019 Protocol violates the FDPA, the judgment that sentenced Plaintiff to death, and the federal drug statutes described above.

**1.     The 2019 Protocol contravenes the FDPA and the judgment sentencing Plaintiff to death.**

By enacting the 2019 Protocol, the Defendants purport to establish an over-arching, one-size-fits-all method of execution for all federally death-sentenced prisoners. As authority for their policy, Defendants cite 28 C.F.R. § 26.3(a). *See* Ex. 2 (protocol) ¶ A. That regulation provides for execution by "intravenous injection of a lethal substance or substances in a quantity sufficient to cause death," with substances chosen by the BOP. 28 C.F.R. § 26.3(a)(4). The protocol ostensibly supplements and implements that directive.

**a.     *The FDPA and the "manner" of execution*** – Although Plaintiff was sentenced under the Anti-Drug Abuse Act of 1988, Congress repealed the death penalty provisions of the statute in 2006. That repeal "effectively render[ed] the FDPA applicable to all federal death-eligible offenses*." United States v. Barrett*, 496 F.3d 1079, 1106 (10th Cir. 2007). The government rightly concedes that the FDPA governs ADAA-imposed sentences such as Plaintiff's. *See* ECF Doc. 16 at 5-6 n.1.

The fundamental illegality of the 2019 Protocol is that it establishes a single method for

carrying out *all* federal executions. The FDPA, by contrast, provides for a sentence to be implemented "in the manner prescribed by the law of the State in which the sentence is imposed," unless the sentence was imposed in a non-capital state:

> [T]he Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a). Defendants argue that the statutory "manner" of execution refers to lethal injection of *any* kind – whether by pentobarbital, sodium thiopental, fentanyl, alcohol, or even sodium hydroxide (known popularly as lye or Drano). ECF Doc. 16 at 33. Because every death penalty state in the country allows for execution by "lethal injection," Defendants argue that it is permissible for the 2019 Protocol to prescribe that "manner" of death – regardless of whether the prisoner is sentenced in a capital state such as Texas, or whether the prisoner (like Plaintiff) is sentenced in a non-capital state, like Iowa, and the sentencing court designates a capital state, like Indiana, as the state of execution.

Defendants are wrong about the statute. The term "manner" of execution refers to the procedures governing the prisoner's death at the state's hands and not solely to the type of execution, whether by lethal injection, hanging, electrocution, or otherwise. The court's decision in *United States v. Hammer*, 121 F. Supp. 2d 794 (M.D. Pa. 2000), illustrates the point. Sentenced to death within the Commonwealth of Pennsylvania, prisoner Hammer objected to the proposed Indiana practice of autopsying his body after execution at the federal prison. Because Hammer had been federally sentenced in Pennsylvania, the court held that Pennsylvania law governed the question of whether an autopsy was required and whether Hammer could avoid one through his religious objections. *Id.* at 800 ("The implementation of Mr. Hammer's sentence of death is required to be consistent with the procedures set forth in the Pennsylvania Statutes, and

those procedures include a section addressing whether an autopsy should be conducted."). The

court went on to grant Hammer's motion to preclude an autopsy. *Id.* at 801-02. Hammer's

sentence was governed, then, by the *manner* of execution in Pennsylvania, which allowed him to

avoid an autopsy:

> A death sentence is to be implemented consistent with the law of the state in which
> the death sentence was imposed. The government's argument regarding uniformity
> has no merit in light of the language of the statute and its legislative history.

*Id.* at 800.

Defendants offer a misguided policy argument for a different reading of the statute.

Defendants contend that it would be "absurd" for Congress to require the federal government "to

stock all possible lethal agents used by the States." ECF Doc. 16 at 33. But the FDPA requires no

such thing. If the federal government lacks the chemicals to execute a prisoner in accordance

with the manner of execution in the state where the sentence was imposed, it need only seek that

state's assistance:

> A United States marshal charged with supervising the implementation of a sentence
> of death may use appropriate State or local facilities for the purpose, may use the
> services of an appropriate State or local official or of a person such an official
> employs for the purpose, and shall pay the costs thereof in an amount approved by
> the Attorney General.

18 U.S.C. § 3597(a).

The practice of borrowing state facilities and personnel is consistent with how the federal

government carried out death sentences in the years before the modern death penalty, and it did

so under similar statutory language:

> The manner of inflicting the punishment of death shall be the manner prescribed by
> the laws of the State within which the sentence is imposed. The United States
> marshal charged with the execution of the sentence may use available State or local
> facilities and the services of an appropriate State or local official or employ some
> other person for such purpose, and pay the cost thereof in an amount approved by
> the Attorney General.

50 Stat. 304 (former 18 U.S.C. § 542) (1937), recodified as 62 Stat. 837 (former 18 U.S.C.

§ 3566). That statute was carried out for decades without the "absurd" results feared by

Defendants. For example, Julius and Ethel Rosenberg were federally convicted of espionage and

were electrocuted in New York's Sing Sing prison in 1953.[2] Ten years later, federally convicted

murderer Victor Feguer was hanged at the gallows in the Iowa State Penitentiary.[3] There is

nothing "absurd" about Congress providing for a decentralized system of federal executions. The

choice is Congress's to make.

      **b.**    ***The 2019 Protocol materially differs from Indiana's manner of execution*** –

When sentencing Plaintiff to death in Iowa, the district court invoked the FDPA and ordered an

Indiana-compliant execution:

> Pursuant to 18 U.S.C. § 3596, you are committed to the custody of the Bureau of Prisons until exhaustion of the procedures for appeal of the judgment of conviction and review of sentence. When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State of Indiana.

*United States v. Honken*, N.D. Iowa Case No. 3:01-cr-3047, Judgment, Doc. No. 702-2 at 3.

      Under the sentencing court's order and the FDPA, then, any execution of Plaintiff must

take place in the "manner" of Indiana's death penalty. *Id.*; 18 U.S.C. § 3596(a). A copy of

Indiana's execution protocol accompanies this motion as Exhibit 6. The federal protocol

conflicts with it in numerous material respects:

      ●*IV insertion* - The Indiana procedure provides for the IV Team to make at most four

---

[2] *See Rosenberg v. Carroll*, 99 F. Supp. 630 (S.D.N.Y. 1951); H. Lee, *Julius and Ethel Rosenberg are executed in 1953*, New York Daily News (June 18, 2015); Wikipedia, *Julius and Ethel Rosenberg*, www.wikpedia.org.

[3] *See* R. Willing, *Last federal execution drew little interest in '63*, USA Today (May 9, 2001); Wikipedia, *Victor Feguer*, www.wikipedia.org; The Smoking Gun, *The Last Man Uncle Sam Executed*, www.thesmokinggun.com/documents/crime/last-man- uncle-sam-executed; *Feguer v. United States*, 302 F.2d 214 (8th Cir. 1962).

separate attempts at venous access in each of the prisoner's arms. Ex. 6 at 10. The lethal drugs are injected into only one arm, and the other arm is a "backup in case of a failure to administer the drugs." *Id.* at 15. Only if attempts to insert the line into the prisoner's arms fail, a physician performs a "cut-down" procedure. *Id.* at 5, 10. The "cut-down" procedure itself has several specific steps for the physician to follow, including the use of a local anesthetic. *Id.* at 16-17. The federal protocol, by contrast, offers no guidance or safeguards whatsoever. It provides for the method of venous access to be chosen based on the training, experience, or recommendation of execution personnel, or to comply with a court order. *See* Ex. 2 ¶ H. The federal method creates no presumption in favor of the prisoner's arm, no discouragement of central line access, and no prohibition against a "cut-down." *Id.* It effectively allows execution personnel to freelance at the prisoner's peril.

●*Physician involvement* - The Indiana procedure requires a physician to be present in order to observe the process of IV insertion, to monitor the IV lines through the procedure, to perform a "cut-down" procedure if that becomes necessary, and to monitor the process by which the drugs are prepared and drawn into the syringes. *See* Ex. 6 at 5, 10-11, 18-19. The federal protocol carries no such requirements. Instead, it provides that medically "qualified personnel" may include "currently licensed physicians, nurses, EMTs, Paramedics, Phlebotomists, other medically trained personnel, including those trained in the United States Military having at least one year professional experience and other personnel with necessary training and experience in a specific execution related function." Ex. 2 ¶ D.

●*Different drugs* – The Indiana procedure is a three-drug protocol. For the first drug, the execution team uses a choice of 5 grams of sodium pentothal, pentobarbital, or brevital – a choice that expands the executioners' opportunity to avoid the use of compounded drugs. For the second drug, the team administers either of two paralytic agents: pancuronium or vecuronium. And for the third drug, the team administers potassium chloride to stop the prisoner's heart. Ex. 6

at 15. The federal protocol, of course, consists of only a single drug – 5 grams of pentobarbital,

and it will be administered in compounded form because that is what the Defendants obtained.

Ex. 2 § H; AR 5.

●*Storage and expiration of drugs* – The Indiana protocol specifies that the records must

be kept of the drugs' refrigeration, and that expired drugs will be used only in practice

executions. *See* Ex. 6 at 18. The federal protocol, by contrast, does not describe how the

compounded drugs will be stored, when they will be compounded in relation to their use in an

execution, and indeed, whether the compounded drug may be administered past its United States

Pharmacopeia-designated "beyond use date" in light of the conditions of storage – a shortcoming

described in fuller length by pharmacologist Michaela Almgren above.

### 2.     The 2019 Protocol violates the Controlled Substances Act and the Food, Drug and Cosmetic Act

Plaintiff has already explained, above, that the 2019 Protocol is arbitrary and capricious

on account of Defendants' indifference to complying with the federal drug laws. *See supra*

§ I.B.1. Plaintiff refers the Court to the 2019 Protocol's violations of the CSA and FDCA

described above, which establish that the 2019 Protocol is "not in accordance with law" and is

"in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

## II.     <u>Plaintiff Will Suffer Irreparable Injury if not Granted a Preliminary Injunction</u>

Plaintiff brings several persuasive claims for relief under the APA, but his scheduled

execution under the 2019 Protocol would make those claims moot. Courts have repeatedly held

that a prisoner will suffer irreparable harm if he is executed before his legal challenges to the

method of execution are complete. *See, e.g.*, *Nooner v. Norris*, No. 5:06cv00110 SWW, 2006

WL 8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed threat of irreparable harm

because if he suffered pain during his execution, as alleged, the injury would never be rectified);

*Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No.

5:06CT3018 H, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).

More generally, an irreparable harm is one that is "certain and great, actual and not theoretical,. . . so imminent that there is a clear and present need for equitable relief to prevent [it] . . .[and] the harm must be beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation and quotations omitted). Plaintiff readily makes that showing. Although Plaintiff need not prove that the 2019 Protocol will cause cruel and unusual punishment under the Eighth Amendment, his APA claims involve clear risks of physical harm and prolonged suffering during an execution. Defendants' illegal, arbitrary, and capricious use of compounded pentobarbital, for example, creates the documented risk that Plaintiff will consciously suffer the experience of drowning and suffocation when he dies. It is a "virtual medical certainty" that he will experience acute pulmonary edema, that he will be conscious at the time, and that the experience will be one of "excruciating suffering." Ex. 1 (Van Norman Declaration) at 7; Ex. 3 (Edgar Declaration) at 18-22; *cf. Alcresta Therapeutics, Inc. v. Azar*, 755 Fed. Appx. 1, 5 (D.C. Cir. 2018) (lack of insurance coverage for a "medically necessary item" constitutes irreparable harm).

In any event, a procedural injury under the APA – including an agency's wrongful refusal to engage in notice-and-comment rulemaking – is itself a qualifying harm for purposes of a preliminary injunction. *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 19 (D.D.C. 2009). When, as here, affected parties voice legitimate concerns about the agency's policy, those parties are injured when the agency refuses to hear and consider their views before enacting the policy. *Id.* at 17-19. The APA's notice-and-comment requirement "is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *Id.* at 18 (quoting *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980)). The agency's after-the-fact consideration of a party's suggestions is no substitute. *Id.* If the 2019 Protocol is not

enjoined before it operates, Plaintiff "will never have an equivalent opportunity to influence the Rule's contents." *Id.* That injury is "actual and great, . . .and it is sufficient to weigh in favor of the issuance of an injunction." *Id.* at 19 (quotation omitted).

### III. The Defendants Would Not Suffer Substantial Harm If Preliminarily Enjoined from Implementing the 2019 Protocol.

Plaintiff has not asked the Court to halt his execution permanently, so the Defendants cannot assert that a preliminary injunction would cause them harm by preventing Plaintiff's execution. Instead, Plaintiff merely requests that the Court enjoin the implementation of the 2019 Protocol. If such an injunction jeopardizes the January 15, 2020, date that the DOJ and BOP have unilaterally chosen for Plaintiff's execution, they may select a later date if the 2019 Protocol (or another protocol) is properly authorized and complies with the APA and Constitution. Thus, even if an injunction results in a later execution date, that would not constitute substantial harm to the Defendants. *See*, *e.g.*, *Harris v. Johnson*, 323 F. Supp. 2d 797, 809 (S.D. Tex. 2004) (finding "little potential for injury" as a result of a delayed execution date). In any event, the government does not have a legitimate interest in a prompt execution if its procedures are illegal. "The Commonwealth and the Department [of Corrections] both have a legal obligation to ensure that all statutory and constitutional requirements have been fully complied with prior to any execution." *Commonwealth ex rel. Conway v. Shepherd*, 336 S.W. 3d 98, 104 (Ky. 2011) (upholding injunction on claim that state's execution protocol violated state APA's rulemaking requirements).

### IV. A Preliminary Injunction Would Serve the Public Interest.

"The public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands*, 686 F. Supp. 2d at 21. In particular, the "ordinary procedures" of notice-and-comment rulemaking are "generally presumed to serve the public interest." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012). Congress required notice-

and-comment rulemaking "to give the public an opportunity to participate in the rule-making

process" and to "enable[] the agency promulgating the rule to educate itself before establishing

rules and procedures which have a substantial impact on those regulated." *Texaco, Inc. v.

Federal Power Comm'n*, 412 F.2d 740, 744 (3d Cir. 1969). When that process is subverted, the

public is twice harmed: it is denied its opportunity to participate and is then bound by a poorly

informed rule. By contrast, "[t]here is generally no public interest in the perpetuation of unlawful

agency action." *League of Women Voters*, 838 F.3d at 12.

Plaintiff does not deny that the government and crime victims have a legitimate interest

in the finality of criminal proceedings. *See* ECF Doc. 16 (opposition to Lee motion for

preliminary injunction) at 44-45. But Defendants' actions disserve that interest. Defendants not

only spent eight years developing an execution method, but spent the last six of those years in the

"final phases of finalizing the protocol." *See* Defendant's Status Report of July 3, 2013 (*Roane*

ECF Doc. 323). During the eight years in which Defendants lacked a viable protocol, a total of

17 states carried out 255 executions by lethal injection.[4] Those 17 states include all five whose

procedures the Defendants claim to be imitating. *See* AR 7-91 (lethal injection protocols of

Georgia, Idaho, Missouri, South Dakota, and Texas). Having plodded along for eight years,

Defendants do not explain or justify the sudden urgency. *See Osorio-Martinez v. Attorney Gen.

of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018) ("[T]he fact that the Government has not – until

now – sought to remove SIJ [Special Immigration Juvenile] applicants, much less designees,

undermines any urgency surrounding Petitioners' removal.").

---

[4]*See* Death Penalty Information Center, Execution Database, available at
<<https://deathpenaltyinfo.org/executions/execution-database>>. The database reveals a total of
258 executions between March 4, 2011 (the date on which the Attorney General publicly
announced a lack of execution drugs), and July 25, 2019 (the date on which the Attorney General
announced the new protocol). Of those 258 executions, 255 were carried by lethal injection and
three by electrocution.

Equally hollow is the Defendants' stated concern that the suffering of crime victims and their communities will "only be compounded by a stay of the execution." *See* ECF Doc. 16 at 45 (quoting *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1049 (D. Idaho 2011)). It is the Defendants who unilaterally scheduled executions before the legality of their execution procedures can be determined. It is therefore the Defendants who have created the likelihood of a stay and any resulting disappointment of victims and affected communities. Defendants, after all, abruptly announced the 2019 Protocol on the same morning that the Attorney General scheduled the deaths of five prisoners. Plaintiff is left with no choice but to litigate his claims under warrant. By simultaneously announcing a new execution method *and* the scheduling of five executions, Defendants manufactured the stay-of-execution posture that they now invoke as a reason to deny a preliminary injunction. That invocation should carry little weight under the circumstances.

## **CONCLUSION**

Wherefore, for all the foregoing reasons, the Court should grant a preliminary injunction in favor of Plaintiff-Intervenor Dustin Lee Honken, so as to enjoin Defendants from carrying out the scheduled execution of Mr. Honken under the 2019 Protocol on January 15, 2020, or at any other time until further order of this Court.


Dated: 11/5/2019                               Respectfully Submitted,

                                               /s/ Jon Jeffress
                                               Jon Jeffress
                                               KaiserDillon PLLC
                                               1099 14th Street NW
                                               8th Floor West
                                               Washington, DC 20005
                                               Telephone - 202-640-2850
                                               Email - jjeffress@kaiserdillon.com


                                               Timothy Kane, Assistant Federal Defender
                                               Shawn Nolan, Chief, Capital Habeas Unit
                                               Federal Community Defender Office, E.D. Pa.
                                               601 Walnut Street, Suite 545 West
                                               Philadelphia, PA 19106
                                               Telephone - 215-928-0520
                                               Email – timothy_kane@fd.org
                                               Email – shawn_nolan@fd.org

                                               *Counsel for Plaintiff-Intervenor Dustin Lee Honken*

## **CERTIFICATE OF SERVICE**

I certify that on November 5, 2019, true and correct copies of the foregoing memorandum, together with the motion and proposed order accompanying it, were filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Jon Jeffress
Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone - 202-640-2850
Email - jjeffress@kaiserdillon.com

*Counsel for Plaintiff-Intervenor Dustin Lee Honken*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE FEDERAL** ) | |
| **BUREAU OF PRISONS' EXECUTION** ) | |
| **PROTOCOL CASES,** ) | |
| ) | |
| **Lead case:** *Roane et al. v. Barr et al.* ) | |
| ) | |
| ) | **Case No. 19-mc-00145-TSC** |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | |
| *Lee v. Barr et al.,* **No. 19-cv-2559** ) | |

<u>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**</u>

This matter came before the Court on Plaintiff-Intervenor Dustin Lee Honken's Motion

for Preliminary Injunction which relates to a protocol announced in July 2019 (the "2019

Protocol") and promulgated by Defendants U.S. Department of Justice ("DOJ") and the Federal

Bureau of Prisons ("BOP"). In this matter, Plaintiff has alleged that the 2019 Protocol violates

the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 et seq., as well as the First, Fifth,

Sixth and Eighth Amendments. Having considered the Motion and the documents filed

therewith, including the supporting declaration, Plaintiff's Complaint, and the files and records

herein, and good cause appearing therefor, the Court hereby finds and concludes as follows:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

To obtain a preliminary injunction order, Plaintiff must establish: (1) the threat of

irreparable injury to the plaintiff if an injunction is not granted; (2) the likelihood that other

interested parties will suffer substantial harm if injunctive relief is granted; (3) the interests of the

public; and (4) the likelihood of the plaintiff's eventual success on the merits. *Sea Containers*

*Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Wagner v. Taylor*, 836 F.2d 566, 575

(D.C. Cir. 1987); *Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.,* 102 F. Supp. 3d 334,

1

336 (D.D.C. 2015). The most important factor is whether the movant has established a likelihood

of success on the merits. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

Based on the record before the Court, Plaintiff has satisfied each of the considerations

governing preliminary injunctive relief. First, Plaintiff has come forward with evidence showing

that the DOJ and BOP violated the notice-and-comment requirements of the APA. The evidence

also supports Plaintiff's contention that the Protocol is contrary to law because it violates the

plain language of the Federal Death Penalty Act, the Controlled Substances Act, and the Food,

Drug and Cosmetic Act. The Court is similarly persuaded of Plaintiff's claim that the the DOJ

and BOP acted arbitrarily and capriciously by not adequately explaining and justifying numerous

critical provisions of the protocol, and that Defendants have altogether ignored the need to

comply with federal statutes that govern the effectiveness of regulated drugs even as they have

selected an execution drug for the stated purpose of diminishing the risk of pain during an

execution. Accordingly, the Court concludes that Plaintiff has demonstrated a strong likelihood

of success on the merits.

Second, the Court finds that Plaintiff would suffer irreparable injury in the absence of an

Injunction – not only because Plaintiff has demonstrated a substantial risk of pain aside from the

requirements of an Eighth Amendment claim, but also because this matter is analogous to other

cases where the courts have found that violations of the APA constitute irreparable injury

because he faces an imminent injury that cannot be remediated in the absence of injunctive relief.

Third, Defendants have not established that they would suffer substantial harm if an

injunction were to issue. At this time, Plaintiff does not seek to halt the execution permanently,

and any delay caused by an injunction would not harm Defendants because, if they were able to

satisfy the requirements under the APA that Plaintiff has raised in this case, Defendants could set

a later date for Plaintiff's execution. Thus, the balance of harms tips decidedly in Plaintiff's favor.

Fourth, the public interest would be served by an injunction, which would allow Plaintiff sufficient time to take discovery and present his statutory and constitutional claims to the Court on a full record. The public has an interest in having the Court ensure that administrative agencies act within their authority and follow the APA's core requirements. These interests are paramount, and Defendants have not come forward with any persuasive, countervailing reasons why an injunction would disserve the needs of the public.

## PRELIMINARY INJUNCTION ORDER

Plaintiff's Motion for Preliminary Injunction is therefore GRANTED, and it is hereby ORDERED that:

1. Pending an adjudication of Plaintiff's claims in this matter or further order of this Court, Defendants and all of their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined fully from enforcing or implementing the 2019 Protocol, and from scheduling or administering Plaintiff's execution.

2. Defendants shall immediately provide a copy of this Preliminary Injunction Order to any persons or entities that may be subject to it, including Defendants' officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them or who have any involvement in the 2019 Protocol.

SO ORDERED,

_____   _____
TANYA S. CHUTKAN          Date
United States District Judge

3