**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the<br>Federal Bureau of Prisons Execution<br>Protocol Cases,<br><br>LEAD CASE: Roane et al. v. Barr<br><br>THIS DOCUMENT RELATES TO:<br><br>Purkey v. Barr, et al., 19-cv-3214 (TSC) | Case No. 19-mc-0145 (TSC) |

<u>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION BARRING THE**</u>
<u>**IMPLEMENTATION OF THE NEWLY ANNOUNCED FEDERAL LETHAL**</u>
<u>**INJECTION PROTOCOL**</u>

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiff

Wesley Ira Purkey hereby moves the Court to issue a preliminary injunction enjoining

Defendants from using the new federal lethal-injection protocol and addendum implemented in

July 2019 or otherwise executing Mr. Purkey pending final resolution of his claims or, at a

minimum, until the Court resolves a renewed motion for preliminary relief after Mr. Purkey has

gathered additional evidence in discovery.

In his Complaint, Mr. Purkey alleges violations of his First, Fifth, and Eighth

Amendment rights as well as violations of the Administrative Procedure Act, 5 U.S.C. § 501 *et*

*seq.*  As described in more detail in the attached memorandum of points and authorities, Mr.

Purkey has demonstrated a strong likelihood of success on the merits of his claims.  And he is

likely to uncover additional evidence in support of his claims through discovery.  Yet without an

injunction, Mr. Purkey will suffer irreparable injury.  Finally, the balance of the equities and

public interest also favor a preliminary injunction.

In support of this motion, Mr. Purkey relies upon the attached memorandum of points and authorities and accompanying declaration.  A proposed preliminary injunction order is also attached.  Oral argument is requested.

Pursuant to Local Rule 7(m), the undersigned has conferred with counsel for the Defendants on the relief sought in this motion and they have indicated that the Defendants will oppose the motion.

DATED:        October 31, 2019                      Respectfully Submitted,

<u>/s/ Arin Smith</u>

Arin Smith (D.C. Bar No. 1045248)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6959

Alan Schoenfeld (*pro hac vice* forthcoming)
Ryan Chabot (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons Execution Protocol Cases, <br><br> LEAD CASE: Roane et al. v. Barr <br><br> THIS DOCUMENT RELATES TO: <br><br> Purkey v. Barr, et al., 19-cv-3214 (TSC) | Case No. 19-mc-0145 (TSC) |

**<u>PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 3

    A.  Statutory And Regulatory Background.............................................................. 3

    B.  The 2004 Main Protocol And Related Litigation ................................................ 5

    C.  The 2019 Main Protocol And Addendum........................................................... 7

    D.  Mr. Purkey's Challenge To The 2019 Protocol .................................................. 9

    E.  The Status of Related Litigation ........................................................................ 10

ARGUMENT ....................................................................................................................... 12

    I.      Mr. Purkey Will Suffer Irreparable Harm Without An Injunction ........................ 13

    II.     Mr. Purkey Is Likely To Succeed On The Merits.................................................. 15

    A.  Mr. Purkey Is Likely To Succeed On His APA Claims ..................................... 15

    B.  Mr. Purkey Is Likely To Prevail On His Due Process Claim ............................. 21

    C.  Mr. Purkey Is Likely To Prevail On His Eighth Amendment Claims ................. 22

    D.  Mr. Purkey Needs Discovery To Fully Litigate His Claims................................ 25

    III.    The Balance Of The Equities And Public Interest Weigh In Favor Of A
          Preliminary Injunction ........................................................................................ 27

CONCLUSION..................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000) ............................................................................18

*Automotive Parts & Accessories Ass'n v. Boyd*,
    407 F.2d 330 (D.C. Cir. 1968) .............................................................................17

*Batterton v. Marshall*,
    648 F.2d 694 (D.C. Cir. 1980) .......................................................................17, 18

*Baze v. Rees*,
    553 U.S. 35 (2008) ..........................................................................................21, 26

*Brown v. Beck*,
    No. 5:06CT3018, 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006) ............................14

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) ........................................................................................26

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ..................................................................13, 14, 28

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
    317 F. Supp. 3d 555, 560 (D.D.C. 2018) ......................................................13, 15

*Cooey v. Taft*,
    430 F. Supp. 2d 702 (S.D. Ohio 2006) ..........................................................14, 27

*Cook v. Food & Drug Admin.*,
    733 F.3d 1 (D.C. Cir. 2013) .................................................................................16

*Credit Union Nat'l Ass'n v. National Credit Union Admin. Bd.*,
    573 F. Supp. 586 (D.D.C. 1983) ..........................................................................17

*Glossip v. Gross*,
    135 S. Ct. 2726 (2015) .....................................................................22, 23, 24, 26

*Gregg v. Georgia*,
    428 U.S. 153 (1976) ..........................................................................................3, 23

*Hill v. McDonough*,
    547 U.S. 573 (2006).................................................................................28

*Ingraham v. Wright*,
    430 U.S. 651 (1977).................................................................................21

*John Doe Co. v. CFPB*,
    849 F.3d 1129 (D.C. Cir. 2017).............................................................13

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ..................................................................15

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)....................................................13, 14, 27

*Mack Trucks, Inc. v. EPA*,
    682 F.3d 87 (D.C. Cir. 2012)...................................................................27

*Make the Road N.Y. v. McAleenan*,
    No. 19-cv-2369 (KBJ), 2019 WL 4738070 (D.D.C. Sept. 27, 2019)......................21

*McLouth Steel Prod. Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988).............................................................18

*Michigan v. U.S. Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011) ............................................................14, 15

*Minney v. United States Office of Pers. Mgmt.*,
    130 F. Supp. 3d 225, 236 (D.D.C. 2015).................................................27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).............................................................................17, 18

*National Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)...............................................................18

*National Parks Conservation Ass'n v. Semonite*,
    No. 17-CV-01361-RCL, 2018 WL 3838809 (D.D.C. July 3, 2018) ................13, 15

*National Wildlife Fed'n v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987)...............................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................12, 14, 27

*Nooner v. Norris*,
    No. 5:06cv0110 SWW, 2006 WL 8445125 (E.D. Ark. June 26, 2006) ....................14, 27, 28

*Northern Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009) ..........................................................21, 27

*Osorio-Martinez v. Attorney Gen. of the U.S of America.,*
    893 F.3d 153 (3rd Cir. 2018) ......................................................................28

*Population Inst. v. McPherson,*
    797 F.2d 1062 (D.C. Cir. 1986) .................................................................15

*Portland Cement Ass'n v. EPA,*
    665 F.3d 177 (D.C. Cir. 2011) ...................................................................19

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ...................................................................12

*State of New Jersey Dep't of Envtl. Prot. v. EPA,*
    626 F.2d 1038 (D.C. Cir. 1980) ...........................................................17, 18

*Steele v. United States,*
    287 F. Supp. 3d 1, 3 (D.D.C. 2017) .....................................................13, 15

*Texaco, Inc. v. Federal Power Comm'n,*
    412 F.2d 740 (3d Cir. 1969) .......................................................................27

*Wainwright v. Booker,*
    473 U.S. 935 (1985) ...................................................................................14

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977) .............................................................13, 15

*Wellons v. Comm'r, Ga. Dep't of Corr.,*
    754 F.3d 1260 (11th Cir. 2014) ............................................................21, 22

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .......................................................................................12

*World Duty Free Americas, Inc. v. Summers,*
    94 F. Supp. 2d 61 (D.D.C. 2000) ...............................................................21

## Federal Statutes

5 U.S.C. § 551(4) ............................................................................................16, 17

5 U.S.C. § 553(b)(3)(A) .........................................................................................17

5 U.S.C. § 706(2) ....................................................................................................16

5 U.S.C. § 706(2)(A), (C) .......................................................................................15

5 U.S.C. § 706(2)(D)..................................................................................................16

18 U.S.C. §§ 3591-3599 ..............................................................................................4

18 U.S.C. § 3596 ..........................................................................................................4

18 U.S.C. § 3596(a) ...........................................................................................4, 5, 16

21 U.S.C. § 802(21) ....................................................................................................16

21 U.S.C. § 829(e)(2) ..................................................................................................16

21 U.S.C. § 841(a)(1) ..................................................................................................16

Anti-Drug Abuse Act of 1988, Pub. L. 100-690, 102 Stat. 4181 (enacted Nov. 18, 1988) ........................................................................................................................3

Pub. L. No. 103-322, 108 Stat. 1966 (1994)................................................................4

## Regulations

28 C.F.R. § 26.3(a)(1) ..................................................................................................4

57 Fed. Reg. 56,536 (1992) .........................................................................................3

58 Fed. Reg. 4898 (1993), *codified at* 28 C.F.R. pt. 26....................................................3

## Other Authorities

H.R. 2359 (104th Cong., 1995)....................................................................................5

## INTRODUCTION

Since the federal government reinstituted the death penalty in 1988, it has executed only three people.  It has not executed anyone since 2003, the same year Wesley Purkey was convicted of capital crimes.  In 2011, while Mr. Purkey was litigating collateral challenges to his conviction and sentence, the government informed this Court that it was considering revisions to its lethal injection protocol.  Eight years later and without warning, the government announced a new execution protocol, at the same time scheduling execution dates for Mr. Purkey and four other federal inmates.  Mr. Purkey is scheduled to die on December 13, 2019, less than five months after the government's announcement.

The Court should enjoin the new execution protocol because Mr. Purkey satisfies the relevant criteria for a preliminary injunction.  *First*, Mr. Purkey will suffer irreparable harm in the absence of preliminary relief.  Without the Court's intervention, Mr. Purkey will be executed pursuant to the challenged execution protocol in less than two months, well before he can fully litigate his claims.  And as explained below, there is a substantial risk that Mr. Purkey will experience substantial and avoidable pain in the course of an execution pursuant to the federal government's new protocol.

*Second*, Mr. Purkey is likely to succeed on his claims that the new execution protocol violates various federal statutes and his rights under the U.S. Constitution.  The new execution protocol, designed to govern all federal executions, contravenes the Federal Death Penalty Act, which requires that federal executions follow the procedures of the state where the prisoner was sentenced.  Furthermore, the new protocol violates the Controlled Substances Act by calling for pentobarbital to be dispensed without a valid prescription and by persons who lack a valid registration.  The new protocol also violates the Administrative Procedure Act because it was

1

announced without giving the public any notice or opportunity for comment, and without any stated rationale.  Rather than adhere to the APA's mandatory provisions for informing the public of proposed agency rules and providing the opportunity for comment, the DOJ and BOP developed the protocol secretly.  Indeed, they *still* have not revealed the entire revised protocol to the public, releasing only a two-page addendum on July 25, 2019 that announced the use of a single-drug procedure.

The new protocol also violates Mr. Purkey's constitutional rights.  It purports to deprive Mr. Purkey of his life and liberty without adequate notice or opportunity to be heard, thereby denying him due process.  The protocol would also violate Mr. Purkey's rights under the First, Fifth, and Eighth Amendments by depriving him of access to counsel necessary to vindicate his right to access the courts.  Setting aside whether Mr. Purkey has a freestanding right to counsel during his execution under the Sixth Amendment, to vindicate his right to access the courts he must be able to communicate with his counsel leading up to and during his execution so that counsel, in turn, can access the courts on Mr. Purkey's behalf and present any urgent constitutional claims.  Finally, the protocol violates Mr. Purkey's rights under the Eighth Amendment because it creates a substantial risk of serious harm to Mr. Purkey, and there are readily available alternatives that would mitigate the anticipated harm.

*Finally*, the equities and the public interest favor a preliminary injunction.  The government's interests will not suffer from a preliminary injunction of Mr. Purkey's execution.  Any claimed exigency or need for expediency should not be credited, given the government's lengthy and self-imposed moratorium on executions.  In any event, those concerns are minimal compared to the harm Mr. Purkey is likely to suffer.  The public interest would also be served by an injunction.  The public benefits when agencies comply with their administrative obligations—

2

particularly when those obligations pertain to protocols governing execution of its citizens.  By contrast, unlawful agency actions—particularly those that involve the unlawful or unconstitutional taking of a life—disserve the public and discredit the agencies that perpetuate them.

In light of these factors, the Court should enjoin the implementation of the protocol while Mr. Purkey's claims are being adjudicated.  At the very least, the Court should prohibit the Defendants from seeking to implement the protocol until Mr. Purkey has had an opportunity to conduct discovery that would allow him to identify information integral to his claims and present a renewed motion for preliminary relief.

## BACKGROUND

### A.    Statutory And Regulatory Background

1.    After the Supreme Court lifted the *de facto* nationwide moratorium on capital punishment in *Gregg v. Georgia*, 428 U.S. 153 (1976), Congress reinstated the death penalty for certain federal crimes in 1988.  *See* Anti-Drug Abuse Act of 1988, Pub. L. 100-690, 102 Stat. 4181 (enacted Nov. 18, 1988).  Four years later, under the direction of then-Attorney General William Barr, the DOJ published a proposed rule that would establish "procedures for … obtaining and executing death orders for violations of the Federal criminal law."  57 Fed. Reg. 56,536 (1992).  The proposed rule explained that years earlier, Congress had repealed a statute that "since 1937 had provided that executions in Federal cases were to be conducted in the manner prescribed in the state in which the sentence was imposed."  *Id.*  That repeal "left a need for procedures for obtaining and executing death orders."  *Id.*

In 1993, the DOJ issued a final rule that purported to fill the need for execution procedures, but that in fact provided only very general, high-level guidance.  *See* 58 Fed. Reg. 4898 (1993), *codified at* 28 C.F.R. pt. 26.  From start to finish, the death-penalty regulations

occupy about one page in the Federal Register.  Section 26.3 governs the date, time, place, and method of execution.  It prescribes that the date and time will be those "designated by the Director of the Federal Bureau of Prisons."  28 C.F.R. § 26.3(a)(1).  The place will be "a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons."  *Id.* § 26.3(a)(2).  The executioner will be "a United States Marshal … assisted by additional personnel selected by the Marshal and the Warden of the designated institution and acting at the direction of the Marshal."  *Id.* § 26.3(a)(3).  And the method of execution will be "intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal."  *Id.* § 26.3(a)(4).  The final rule does not specify how the injection will be administered, what lethal substance or quantity will be used, or the qualifications required for the Marshal or his assistants.

2.      The year after the final rule was adopted, Congress passed the Federal Death Penalty Act ("FDPA").  *See* Pub. L. No. 103-322, 108 Stat. 1966 (1994), *codified at* 18 U.S.C. §§ 3591-3599.  The FDPA established statutory procedures for the "[i]mplementation of a sentence of death."  18 U.S.C. § 3596.  In particular, Section 3596(a) provides that a prisoner shall be held in the custody of the Attorney General until the sentence is to be implemented, at which time the prisoner will be released to the custody of the U.S. Marshal.  The statute also provides that the U.S. Marshal "shall supervise implementation of the sentence *in the manner prescribed by the law of the State in which the sentence is imposed*," *id.* § 3596(a) (emphasis added)—just like the earlier federal statute that required use of state execution procedures.  The FDPA further provides that "[i]f the law of the State [in which the sentence was imposed] does

4

not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." *Id.* The statute does not contemplate any exception to this rule or the establishment of a federal death-penalty procedure distinct from state law.

Immediately after the FDPA was enacted, the DOJ and BOP supported proposed legislation that would amend the Act to allow those agencies to carry out executions under their own procedures, rather than in the manner prescribed by the law of the state in which the sentence was imposed. For example, one bill would have amended Section 3596(a) to provide that the death sentence "shall be implemented pursuant to regulations prescribed by the Attorney General." H.R. 2359 (104th Cong., 1995). That bill did not pass the House, nor did any other efforts to amend the FDPA to this effect.

### B.     The 2004 Main Protocol And Related Litigation

Details about the federal government's execution procedures beyond the barebones regulations have become public only through litigation. In 2005, three federal death-row prisoners filed suit against the government alleging that their sentences were to be administered under an execution protocol that violated the Fifth and Eighth Amendments and the Administrative Procedure Act ("APA"). *Roane v. Gonzales*, 1:05-cv-02337 (D.D.C.), Dkt. #1 ¶ 2. The initial plaintiffs in that case were able to allege only "[o]n information and belief" that, "on one or more occasions since" the implementation of the 1993 final rule, the government had "adopted further regulations specifying in detail the means and method by which executions by lethal injection [were] to be carried out." *Id.* ¶ 31. That was because the government had "not disclosed" its lethal injection protocol or "made public all material and relevant details surrounding the process by which [it was] adopted," even though "plaintiffs [had] asked the

5

defendants to specify the procedures to be used in executing the plaintiffs." *Id.* ¶ 32.  The Court

preliminarily enjoined the executions of those plaintiffs.  *Roane*, Dkt. #5.  Three other death-row

inmates later intervened in the lawsuit, and the Court enjoined their executions as well.  *See*

*Roane*, Dkt. #23, 27, 36, 38, 67, 68.[1]

The *Roane* lawsuit eventually exposed the federal execution protocol.  The government

produced a redacted document titled "BOP Execution Protocol," dated 2004 (the "2004 Main

Protocol").  *Roane*, Dkt. #179-3.  Purporting to rely on the authority of the 1993 rule—and

without mentioning the FDPA—the 2004 Main Protocol is a 50-page document that outlines

BOP policies and procedure for planning and carrying out executions.  *See id.* at 1.  The

government also eventually produced two three-page addenda to the 2004 Main Protocol, both of

which were adopted while the *Roane* litigation was ongoing.  *See Roane*, Dkt. #177-1

(Addendum to Protocol, Aug. 1, 2008) (the "2008 Addendum"); *Roane*, Dkt. #177-3 (Addendum

to Protocol, July 1, 2007) (the "2007 Addendum").  Only in these addenda did the BOP indicate

the specific drugs that would be used to execute federal prisoners.

In 2011, the DOJ publicly announced that the BOP lacked the drugs necessary to

implement the 2008 Addendum.  *See* March 4, 2011 Letter from Office of Attorney General to

National Association of Attorneys General, https://files.deathpenaltyinfo.org/legacy/documents/

2011.03.04.holder.letter.pdf.  The government subsequently "inform[ed] the Court that the

Federal Bureau of Prisons has decided to modify its lethal injection protocol but the protocol

revisions have not yet been finalized." *Roane*, Dkt. #288 at 2.  The Court stayed the *Roane*

litigation in response, requiring the government to file periodic status updates concerning the

---

[1] A seventh death-row inmate eventually intervened as well.  *See id.* Dkt. #333.

development of the new protocol.  *See Roane*, Minute Orders dated July 29, 2011 and April 25, 2016.

For the next eight years, the government filed status updates stating only that revisions to the execution protocol were ongoing and that a new protocol was forthcoming.  The latest such update came in May 2019.  *See Roane*, Dkt. #383.

### C.     The 2019 Main Protocol And Addendum

On July 25, 2019, the DOJ issued a press release announcing a new addendum to the federal execution protocol (the "2019 Addendum").  *See* Dep't of Justice, Press Release, "Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse" (July 25, 2019), *available at* https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse; Compl. Ex. 1 (2019 Addendum).

The 2019 Addendum replaces the three-drug protocol of the 2008 Addendum with a single drug: pentobarbital sodium.  *See* Compl. Ex. 1 (2019 Addendum) ¶ C.  Pentobarbital is a barbiturate that affects the brain and nervous system.  It is used as a pre-anesthetic and a sedative, and to treat brain swelling, seizures, and insomnia.

Pentobarbital can cause pulmonary edema, *i.e.*, the movement of fluid from small blood vessels in the lung into air spaces.  Evidence from prior executions shows that pentobarbital is highly likely to cause inmates to suffer the pain of pulmonary edema before they become insensate.

The failure to take proper precautions increases the risks of pentobarbital causing unnecessary pain through other mechanisms, as well.  *See* Compl. ¶¶ 45-54.  Pentobarbital—like any drug—may be inadvertently injected into tissue other than a vein, as has happened in many failed executions.  This is called "extravasation."  Drugs like pentobarbital that have an alkaline pH that is significantly higher than the pH of normal blood can cause tissue damage and severe

7

pain as a result of extravasation.  *See* Compl. Ex. 2, *In re Ohio Execution Protocol Litig.*, 2:11-cv-1016 (S.D. Ohio), Dkt. #2035-1, Expert Report of Dr. Mark Edgar at ¶ 74.  The extravasation of even five grams of pentobarbital—the amount called for in the 2019 Addendum—"would cause excruciating and unrelenting pain."  Compl. Ex. 3, *Creech v. Reinke*, 12-00173 (D. Idaho), Dkt. #30, Affidavit of Dr. David B. Waisel, M.D. at ¶ 7.

The 2019 Addendum does not adopt the precautions necessary to reduce the risk that pentobarbital will cause a prisoner excessive pain and suffering before death, and it lacks critical safeguards that would ensure executions are implemented professionally and as painlessly as possible.  For example, the 2019 Addendum fails to describe how the prisoner's sedation and IV apparatus will be monitored.  It removes the provision of the 2008 Addendum that established a procedure for handling situations that arise unexpectedly during the execution.  And it gives the Director of the BOP, or any designee, discretion to deviate from the procedures that are described in the 2019 Addendum "as may be required by … circumstances"—making it difficult for condemned individuals to evaluate the procedures that will actually be used to execute them.  Compl. Ex. 1 (2019 Addendum) ¶ A.  The risks associated with the government's chosen method of execution are substantial and serious, and on its face the 2019 Addendum fails to implement procedures adequate to safeguard against them.

In addition to the 2019 Addendum, the BOP adopted a new protocol—not mentioned in the DOJ's public announcement—to replace the 2004 Main Protocol (the "2019 Main Protocol").  Rather than provide the public with notice and an opportunity to comment on the 2019 Main Protocol, the DOJ disclosed it for the first time as part of the Administrative Record filed in a related case pending in this District.  *See In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, 19-mc-0145 (D.D.C.), Dkt. #13-1 at 9; Dkt. #4-1 at 5.  The

DOJ has still not released that 2019 Main Protocol to the public or to the inmates currently scheduled to be executed who are not part of that related case.

### D.      Mr. Purkey's Challenge To The 2019 Protocol

The Attorney General announced the execution dates for five federal prisoners on death row at the same time he announced the 2019 Addendum.  One of those prisoners is Wesley Purkey.  Mr. Purkey was convicted of kidnapping resulting in death by the U.S. District Court for the Western District of Missouri in 2003.  *See* Compl. ¶ 25.  He was sentenced to death in 2004.  The U.S. Court of Appeals for the Eighth Circuit affirmed his conviction and sentence in November 2005, and the U.S. Supreme Court denied his petition for a writ of certiorari in October 2006.  *Id.*  Mr. Purkey brought collateral challenges to his conviction and sentence, which concluded in 2013.  *See* Compl. ¶ 26.  The DOJ has scheduled Mr. Purkey to be executed on December 13, 2019.  *See* Compl. ¶ 55.  He will be 67 years old.

Mr. Purkey has filed a complaint raising serious statutory and constitutional concerns with the proposed execution protocol that will apply to Mr. Purkey and the process—or lack thereof—in developing that protocol.  *First*, the government intends to execute Mr. Purkey in a way that presents a substantial risk of serious harm, pain, and suffering despite available alternatives.  *See* Compl. ¶¶ 66-69 (Count I).  *Second*, Mr. Purkey believes that the 2019 Protocol restricts Mr. Purkey's access to counsel and so to the courts prior to and during the execution in violation of his rights under the First, Fifth, and Eighth Amendments.  *See* Compl. ¶¶ 70-74 (Count II).  *Third*, Mr. Purkey was provided no notice or opportunity to be heard on the manner by which he will be deprived of life and liberty by the government, in violation of his Fifth Amendment right to Due Process.  *See* Compl. ¶¶ 75-77 (Count III).  *Fourth,* Mr. Purkey alleges that the 2019 Addendum violates the FDPA, the federal law by which Congress has determined how federal executions are to be carried out, and the Controlled Substances Act, and it therefore

must be set aside under the APA.  *See* Compl. ¶¶ 78-86 (Count IV).  *Fifth*, the DOJ and BOP

failed to provide the public, including Mr. Purkey, with notice and an opportunity to comment

before adopting the 2019 Main Protocol or 2019 Addendum (together, the "2019 Protocol"),

which effect a substantive change in the law.  *See* Compl. ¶¶ 87-92 (Count V).  *Sixth*, the 2019

Protocol is not the product of reasoned decision-making and its enactment was arbitrary and

capricious under the APA.  *See* Compl. ¶¶ 93-96 (Count VI).  If Mr. Purkey's execution

proceeds under the 2019 Protocol, he will suffer serious harm that can never be remedied.

Mr. Purkey has exhausted his administrative remedies as to these claims.  *See* Compl.

¶ 58.  On learning of the 2019 Addendum, Mr. Purkey submitted a BP-11 to the Central Office

of the BOP.  *Id.* ¶ 59.  In his BP-11, Mr. Purkey asserted that the method of execution to be

utilized by the BOP violated his Fifth and Eighth Amendment rights as well as various statutes,

including the FDPA.  He noted the lack of information he had been provided about the

procedures and sought further information regarding the protocol.  The BP-11 was denied on

September 11, 2019.  *Id.* ¶ 60.

### E.  The Status of Related Litigation

After the government's July 2019 announcement of the 2019 Addendum, the Court held a

status conference in the *Roane* action on August 15, 2019.  *See In re Federal Bureau of Prisons'*

*Execution Protocol Cases*, 19-mc-0145 (D.D.C.), Minute Entry dated Aug. 15, 2019

("Consolidated Litigation").  In addition to the *Roane* plaintiffs, the Court heard from counsel for

three other death-row inmates asserting challenges to the federal execution protocol, including

Alfred Bourgeois whose execution date was set for January 13, 2020.  *See* Consolidated

Litigation, Dkt. #12 (Transcript of Aug. 15, 2019 hearing) ("Tr.").  At the conference, the Court

consolidated all the cases challenging the federal lethal-injection protocol under one case

number.  It then observed that "while the parties in the [Consolidated Litigation] engaged in

extensive discovery before the case was stayed pending the review and revisions to the lethal-injection protocol and to effectuate federal death sentences, the parties in the other three cases did not have the opportunity to conduct significant discovery." Tr. 3:11-15. As one inmate's counsel noted, the parties had "spent six years taking discovery into [the earlier] protocol," taking "more than two dozen depositions," engaging "at least half a dozen experts," and taking "all the defendants' depositions" including one deposition that "lasted five or six days"—in short, "a tremendous amount of discovery." Tr. 8:15-24. The Court therefore recognized that "the government has come up with a new protocol, so obviously … discovery does need to be taken as to that protocol." Tr. 11:9-12. Yet when the Court asked the government whether it was willing to stay Mr. Bourgeois's execution, the government said that it was not, nor did it agree that any discovery was necessary. *See* Tr. 6:7-8, 14:10-12. The Court questioned the government's response, asking, "how can [plaintiffs] make an alternative argument [to] say that another drug is better or less painful if [they] don't know how painful this one is?" Tr. 14:22-24. The Court proposed to "bifurcate discovery," "taking sufficient discovery … to provide [plaintiffs] with sufficient information to amend the complaint and then proceeding with further, more extensive discovery." Tr. 17:19-23. The parties agreed, and the Court set the schedule they proposed: that the plaintiffs shall complete 30(b)(6) depositions by February 28, 2020 and file amended complaints by March 31, 2020. *See* Consolidated Litigation, Minute Entry dated Aug. 15, 2019. The Court "assum[ed] … that plaintiffs [would] be filing some kind of motion to stay the execution pending resolution of this issue," which counsel for Mr. Bourgeois—the one plaintiff represented at the conference with a scheduled execution date—agreed to do. Tr. 11:14-17, 18:18-19.

11

On August 29, Mr. Bourgeois moved for a preliminary injunction to enjoin his execution pending discovery and the filing of an amended complaint. *See* 19-mc-0145, Dkt. #2. That motion is still pending.

On August 23, 2019, Daniel Lewis Lee filed a complaint challenging the 2019 Addendum. *See Lee v. Barr*, 1:19-cv-02559 (D.D.C.), Dkt. #1 (Aug. 23, 2019). Mr. Lee is another of the five inmates scheduled for execution under the new federal protocol. The Court consolidated Mr. Lee's action with those of the plaintiffs in the *Roane* action and instructed Mr. Lee to adhere to the established discovery schedule. *See Lee*, Dkt. #10 (Aug. 29, 2019). The Court also noted that Mr. Lee's execution was scheduled for December 9, 2019, and advised that "[t]o the extent Plaintiff Lee intends to seek an order enjoining his execution until further order of the court, Plaintiff Lee may seek leave to join Plaintiff Bourgeois' motion or file a separate motion." *Id.* Mr. Lee filed a separate motion for a preliminary injunction on September 27. *See* Consolidated Litigation, Dkt. #13.

## ARGUMENT

Courts consider four factors on a motion for a preliminary injunction: 1) the threat of irreparable harm to the plaintiff if an injunction is not granted, 2) the likelihood of the plaintiff's success on the merits, 3) the balance of the equities, and 4) the interests of the public. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Irreparable harm and likelihood of success are "the most critical" factors in whether a preliminary injunction is warranted. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Courts in this Circuit traditionally analyzed the four factors using a "sliding-scale" approach, whereby "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). That framework "allows a

movant to remedy a lesser showing of likelihood of success on the merits with a strong showing as to the other three factors, provided that [there is] a 'serious legal question' on the merits." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).  Absent a contrary holding from the D.C. Circuit, courts in this District continue to apply the sliding-scale standard following the Supreme Court's decision in *Winter*. *See, e.g.*, *id.* at 560-61; *National Parks Conservation Ass'n v. Semonite*, No. 17-CV-01361-RCL, 2018 WL 3838809, at *1 (D.D.C. July 3, 2018); *Steele v. United States*, 287 F. Supp. 3d 1, 3 (D.D.C. 2017); *see also John Doe Co. v. CFPB*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (citing *Holiday Tours* when describing the requirements of a preliminary injunction).  In any event, each of these factors independently weighs in favor of a preliminary injunction.

I.      **Mr. Purkey Will Suffer Irreparable Harm Without An Injunction**

Mr. Purkey will suffer irreparable harm if the Court denies the motion for a preliminary injunction.  To constitute irreparable harm, "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and it "must be beyond remediation."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (internal quotation marks and brackets omitted).  Mr. Purkey faces a significant risk that he will suffer from pulmonary edema before becoming insensate.  He also faces the risk of severe pain and suffering arising from the remote (rather than bedside) administration of pentobarbital.  The lengthy IV tubing required for remote administration increases the likelihood of tube pinching and leakage, as well as diminished drug

potency.  Executioners administering pentobarbital several feet from the Mr. Purkey may never

observe these issues or else react to them belatedly, causing Mr. Purkey to suffer needless pain.

Like others facing an imminent execution, Mr. Purkey has alleged a harm that, if realized,

cannot be corrected.  Without the Court's intervention, Mr. Purkey will be executed pursuant to

the challenged protocol and addendum in less than two months, well before he can fully litigate

his claims.  The threatened harm is "beyond remediation," *Newby*, 838 F.3d at 7-8, because no

"adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*,

454 F.3d at 297.  For Mr. Purkey, there is no later date.  His claims are therefore "categorically

irreparable." *Nken*, 556 U.S. at 435.

Recognizing this basic reality, courts have found that the "requirement—that irreparable

harm will result if a stay is not granted—is necessarily present in capital cases." *Wainwright v.

Booker*, 473 U.S. 935, 936 (1985) (Powell, J., concurring).  In similar circumstances, courts have

repeatedly held that a plaintiff suffers irreparable harm if he is executed before his legal

challenges to the execution methods are complete.  *See Nooner v. Norris*, No. 5:06cv00110

SWW, 2006 WL 8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed threat of irreparable

harm because if he suffered pain during his execution, as alleged, the injury would never be

rectified); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No.

5:06CT3018 H, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).

Mr. Purkey need not establish that he will experience an unconstitutional level of pain at

his execution.  Such a requirement would make redundant the requirement that Mr. Purkey

establish a likelihood of success on the merits of his Eighth Amendment claim.  Whereas

assessing success on the merits involves "an early measurement of the quality of the underlying

lawsuit," the question whether Mr. Purkey has shown irreparable harm asks "how urgent the

need for equitable relief really is," that is, "the ability to correct [the harm] if it is created."

*Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). It is "error to

conflate these inquiries." *Id.* at 787. Here, there is no question that Mr. Purkey will face

irreparable harm absent an injunction.

## II.      Mr. Purkey Is Likely To Succeed On The Merits

Mr. Purkey is also likely to succeed on his claims. To demonstrate that success on the

merits is sufficiently likely, a plaintiff "need not establish an absolute certainty of success."

*Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); *see also Holiday Tours*,

559 F.2d at 843. Instead, it is ordinarily sufficient that "the plaintiff has raised questions going

to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for

litigation and thus for more deliberative investigation." *Id.* at 844; *see also Cigar Ass'n*, 317 F.

Supp. 3d at 560-61; *National Parks Conservation Ass'n*, 2018 WL 3838809, at *1; *Steele*, 287 F.

Supp. 3d at 3. But even under a more exacting standard, Mr. Purkey has established a strong

likelihood of success on the merits of each of his claims. Furthermore, a preliminary injunction

is appropriate if the Court finds that any *one* of Mr. Purkey's claims is sufficiently likely to

succeed. *See, e.g.*, *National Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987)

(affirming that, "in light of the district court's conclusion that the [plaintiff] will likely succeed

on … two counts, it correctly declined to reach the merits of the [plaintiff's] other claims");

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,

759 (9th Cir. 2014) (reversing denial of preliminary injunction where "there is a likelihood of

success on the merits on one claim").

### A.      Mr. Purkey Is Likely To Succeed On His APA Claims

Mr. Purkey alleges that the DOJ violated the APA in at least three ways when adopting

the 2019 Protocol. He is likely to succeed on the merits of each of these claims.

*First*, an agency cannot take action that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  But the 2019 Protocol directly contravenes two federal statutes.  The FDPA mandates that the U.S. Marshal "shall supervise implementation of the [death] sentence *in the manner prescribed by the law of the State in which the sentence is imposed*."  18 U.S.C. § 3596(a) (emphasis added).  The statute does not authorize or permit the DOJ to promulgate a rule establishing a distinct federal execution procedure.

The 2019 Protocol also directly conflicts with the Controlled Substances Act ("CSA").  The CSA makes it unlawful to "dispense" any "controlled substance" except pursuant to a valid prescription "issued for a legitimate medical purpose" by a practitioner who is acting "in the course of professional practice" and registered pursuant to the statute.  21 U.S.C. §§ 802(21), 829(e)(2), 841(a)(1).  Pentobarbital is a Schedule II controlled substance, and yet upon information and belief, the 2019 Addendum requires dispensing pentobarbital absent a valid prescription by persons who lack a valid registration, in direct conflict with the CSA.

Because the 2019 Protocol is inconsistent with federal statutes, it is "not in accordance with law" and Mr. Purkey is likely to succeed on his claim that it should be set aside pursuant to 5 U.S.C. § 706(2); *cf. Cook v. Food & Drug Admin.*, 733 F.3d 1, 10–11 (D.C. Cir. 2013) (affirming that acquiring execution drugs in a manner inconsistent with the FDCA is "not in accordance with law" under § 706(2)(A)).

*Second*, even if the DOJ and BOP had the authority to enact the 2019 Protocol, the DOJ violated Section 706(2)(D) of the APA by failing to follow the required procedure before adopting it.  *See* 5 U.S.C. § 706(2)(D) (a court should hold unlawful and set aside agency action found to be "without observance of procedure required by law").  Whenever an agency engages

16

in "rule making," it must provide the public notice of the proposed rule and an opportunity to comment. *Id.* § 553(b)(1)-(3), (c). A "rule" is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* § 551(4).

"The APA's prescription of notice and comment procedures for agency rulemaking together with its broad definition of what amounts to a 'rule' reflect a commitment 'to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies.'" *Credit Union Nat'l Ass'n v. National Credit Union Admin. Bd.*, 573 F. Supp. 586, 591 (D.D.C. 1983) (quoting *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980)) (citations omitted). Notice-and-comment rulemaking "negate[s] the dangers of arbitrariness and irrationality in the formulation of rules," *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968), and "assur[es] that an agency's decisions will be informed and responsive," *New Jersey Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).

The 2019 Protocol was adopted in complete secrecy, in violation of the APA's rulemaking requirements. The public was first alerted to the existence of the 2019 Addendum on the day it was adopted, and the 2019 Main Protocol has still not been made public. Together and separately, these documents constitute an "agency statement of general or particular applicability and future effect," 5 U.S.C. § 551(4), because they prescribe how the DOJ will perform executions going forward, including for Mr. Purkey.

None of the "limited exceptions to the general notice and comment requirement" justify Defendants' avoidance of the required process. *Credit Union Nat'l Ass'n*, 573 F. Supp. at 591; *see State of N.J. Dep't of Envtl. Prot.*, 626 F.2d at 1045 (exceptions to the APA's general

procedural requirements are to be "narrowly construed and only reluctantly countenanced").  The

2019 Protocol is not a "general statement[] of policy" or "agency organization, procedure, or

practice" exempt from notice-and-comment rulemaking.  5 U.S.C. § 553(b)(3)(A).  A procedural

rule is "primarily directed toward improving the efficient and effective operations of an agency."

*Batterton*, 648 F.2d at 702 n.34.  It cannot permissibly alter the "interests of parties."  *National*

*Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014).  The means by which the

government executes its citizens—including something so critical as the drug to be used—cannot

fairly be considered a mere internal policy or procedure; it directly and substantially affects the

rights of those being executed.  Moreover, a procedural rule "does not conclusively bind the

agency."  *Batterton*, 648 F.2d at 704.  But the 2019 Protocol contains the sort of "mandatory,

definitive language" that an agency uses to bind itself.  *McLouth Steel Prods. Corp. v. Thomas*,

838 F.2d 1317, 1321 (D.C. Cir. 1988).  For example, the 2019 Addendum provides that Director

or designee "shall" select the execution personnel, whose identities "shall" be kept secret.

Compl. Ex. 1 (2019 Addendum) ¶¶ B, D.  The substance to be used "shall" be pentobarbital.  *Id.*

¶ C.  In fact, the word "shall" is used 16 times in the two-page addendum.  In short, the 2019

Protocol "commands, it requires, it orders, it dictates."  *Appalachian Power Co. v. EPA*, 208

F.3d 1015, 1023 (D.C. Cir. 2000).  And although the Director or his designee has a troubling

amount of discretion to deviate from the 2019 Protocol in certain circumstances, this cannot

reasonably be interpreted to mean that the protocol "does not conclusively bind the agency."

*Batterton*, 648 F.2d at 704.

  *Third*, the 2019 Protocol is arbitrary and capricious because it is not the result of reasoned

decision-making.  The APA requires that an agency "cogently explain why it has exercised its

discretion in a given manner" in order to demonstrate that it has not "relied on factors which

Congress has not intended it to consider" or "entirely failed to consider an important aspect of

the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43, 48 (1983).  "The importance of reasoned [decision making] . . . cannot be

overemphasized." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 188 (D.C. Cir. 2011).  The

2019 Protocol does not meet this standard because Defendants failed to appropriately consider

important aspects of the 2019 Protocol.  Mr. Purkey's complaint recounts in harrowing detail the

many problems that have arisen in executions involving pentobarbital.  *See* Compl. ¶¶ 47-48, 51,

53-54. Those problems confirm that Mr. Purkey's concerns with the 2019 Protocol's use of

pentobarbital are legitimate and non-speculative.  As Mr. Purkey's complaint further alleges,

there have been numerous issues with the regulation of pentobarbital from compounding

pharmacies.  Compounding pharmacies face far less regulation and oversight than do drug

manufacturers.  As a result, their products pose a higher risk to patients than do FDA-approved

products because they have not been tested for safety and efficacy and they are typically not

made pursuant to the same quality standards.  As Mr. Purkey's complaint recounts, Texas

reportedly purchased its supply of execution drugs from a compounding pharmacy that had been

cited by state regulators for nearly 50 violations, including "keeping out-of-date drugs in stock,

using improper procedures to prepare IV solutions, and inadequate cleaning of hands and

gloves."  *See* Chris McDaniel, *Inmates Said The Drug Burned As They Died.  This Is How Texas*

*Gets Its Execution Drugs.*, Buzzfeed News (Nov. 28, 2018), https://www.buzzfeednews.com/

article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas ("McDaniel

Article").  The company's license was on probation beginning in 2016 after the Texas State

Board of Pharmacy found that it had compounded the wrong drug for three children and forged

quality control documents.  *Id.*  The next year, the same pharmacy was warned by the Food and

Drug Administration about deficiencies in its practices for producing sterile drug products.

Likewise, Missouri reportedly purchased pentobarbital from a pharmacy that has been repeatedly

found to engage in hazardous pharmaceutical procedures.  *Id.*  Yet the Administrative Record

that the DOJ filed in the Consolidated Litigation reflects little to no internal deliberation about

the concerns presented by the use of compounded pentobarbital.  Neither the DOJ's summary of

the record nor the BOP's recommendation memo includes a single reference to concerns about

compounded drugs.  *See* A.R. 0001-0006; 0868-0934.[2]  And there is no evidence in the

Administrative Record that Defendants disclosed their intent to use compounded drugs to their

consulting medical experts.  *See* A.R. 0003; 0872 ("Dr. Antognini concurs with the Addendum,"

which does not mention compounded drugs); 0525-0526 (Letter opinion from Dr. Lindsley

quoting only the 2019 Addendum and not referencing compounded drugs).

Executions by lethal injection have also involved difficulties with setting IVs.  Some of

those issues are documented in the complaints in the *Lee* action and *Bourgeois* action.  See *Lee v.

Barr et al.,* 1:19-cv-02559-TSC (D.D.C.) Dkt. # 1 (Compl.) ¶¶ 80-84; *Bourgeois v. U.S. Dep't of

Justice et al.,* 1:12-cv-00782-TSC (D.D.C.) Dkt. #12 (Amended Compl.) ¶ 61  Yet, again, the

Administrative Record reveals no consideration of concerns surrounding the IV-setting process

or potential procedures to eliminate risks associated with that process.

Because the injection of compounded pentobarbital is the centerpiece of the 2019

Addendum, the lack of reasoned decision-making as to that drug choice makes the 2019

Addendum arbitrary and capricious.  When an agency takes an action that is arbitrary,

capricious, or contrary to law, or fails to conduct required notice-and-comment rulemaking,

---

[2] Citations to the administrative record ("A.R.") are to the administrative record filed in the
Consolidated Litigation.  *See* 19-mc-0145 (D.D.C.), Dkt. #4, 4-1.

courts regularly enjoin the rule at issue while litigation proceeds.  *See, e.g.*, *Make the Road N.Y.*

*v. McAleenan*, No. 19-cv-2369 (KBJ), 2019 WL 4738070, at *28-39 (D.D.C. Sept. 27, 2019);

*Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 15 (D.D.C. 2009); *World Duty*

*Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 65 (D.D.C. 2000).  The Court should do so

here.

### B.     Mr. Purkey Is Likely To Prevail On His Due Process Claim

Under the Due Process Clause of the Fifth Amendment, Mr. Purkey is entitled to notice

and an opportunity to be heard on the manner in which the government will deprive him of his

life and liberty.  Being "deprived of life" unequivocally implicates a constitutionally protected

interest, U.S. Const. amend. V, and the Supreme Court has held that constitutionally protected

"liberty interests are implicated" when the government plans to "inflict[] appreciable physical

pain," *Ingraham v. Wright*, 430 U.S. 651, 674 (1977).  Yet Mr. Purkey has not received either

notice or an opportunity to be heard on the execution procedures the government plans to use.

The vague contents of the 2019 Protocol do not provide Mr. Purkey with sufficient notice

of how the government will take his life.  Indeed, while the 2019 Protocol binds the agency as to

fundamental questions such as the choice of lethal-injection drug, it grants BOP employees near-

total discretion to deviate from the procedures that it sets for executions.  *See* Compl. Ex. 1 (2019

Addendum) ¶ A (This unfettered procedural discretion ensures that Mr. Purkey will have no

notice at all of the method of his execution.  Such lack of notice deprives him of a meaningful

opportunity to challenge the execution procedures.

By its opacity, the government apparently tries to insulate its execution protocol from *any*

meaningful constitutional scrutiny, not just the strictures of the Due Process Clause.  For

example, the Eighth Amendment protects a condemned prisoner from "a substantial risk of

serious harm" or an "objectively intolerable risk of harm."  *Baze v. Rees*, 553 U.S. 35, 49-52

(2008) (internal quotation marks omitted).  But a prisoner cannot know whether he faces such a risk from the sparse information about the lethal-injection drug and its administration that the 2019 Protocol provides.  Based on the 2019 Protocol, Mr. Purkey can "only assume [the government] will be using a substance that purports to be pentobarbital but has been manufactured from unknown ingredients and in unknown circumstances by a compounding pharmacy."  *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267–68 (11th Cir. 2014) (Wilson, J., concurring).  Without further information, Mr. Purkey cannot know whether he faces an objectively intolerable risk of harm.  And if he suspects that he will face that risk, as indeed he does, Defendants' secrecy inhibits his efforts to make the showing required to prove it until it is too late.  This creates a "disturbing circularity problem."  *Id.*  And it undermines the role of the courts as the adjudicators of constitutional rights:  "Unless judges have information about the specific nature of a method of execution, [they] cannot fulfill [their] constitutional role of determining whether a state's method of execution violates the Eighth Amendment's prohibition against cruel and unusual punishment before it becomes too late."  *Id.*  Due process requires that Defendants provide Mr. Purkey with adequate notice of and an opportunity to be heard on the procedures to be used during his execution.

**C.**     **Mr. Purkey Is Likely To Prevail On His Eighth Amendment Claims**

Mr. Purkey is likely to succeed on his Eighth Amendment claim.  To establish such a claim, Mr. Purkey must demonstrate a "substantial risk of serious harm" should he be executed under the 2019 Protocol.  *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).  Moreover, to prevail, Mr. Purkey must come forward with alternative methods of execution that are feasible and readily available.  *Id.*  The government's failure to comply with the APA and the Due Process Clause has handicapped Mr. Purkey's ability to determine the extent to which he faces an unconstitutional risk of "unnecessary and wanton infliction of pain" when the government carries

out his death sentence. *Gregg*, 428 U.S. at 173 (plurality opinion). Even so, Mr. Purkey can

demonstrate a likelihood of prevailing on his Eighth Amendment claims because, on its face, the

2019 Protocol "creates a demonstrated risk of severe pain." *Glossip*, 135 S. Ct. at 2737.

The government acknowledges that it will rely on a compounding pharmacy for

injectable pentobarbital to carry out the scheduled executions. *See* A.R. 0005. As described

above, compounding pharmacies are subject to comparatively less external oversight than are

drug manufacturers and have been widely reported to engage in dangerous conduct. Injectable

pentobarbital compounded outside an FDA-approved facility poses a substantial risk that the

purity, efficacy, and sterility of the drug will be compromised, resulting in a painful or even

torturous death.[3] This is no mere speculation. The use of compounded pentobarbital in

executions is a known cause of unnecessary pain and suffering. At least five out of eleven

people executed in Texas in 2018 alleged that the drug caused a burning feeling as they died.

*See* McDaniel Article. Similarly, Michael Lee Wilson in Oklahoma exclaimed during his

execution that he felt his "whole body burning." *See* Compl. Ex. 4, *Taylor v. Apothecary

Shoppe, LLC.*, 4:14-cv-00063 (N.D. Okla.), Dkt. #2, Declaration of Dr. Larry D. Sasich at ¶ 60.

These reactions are consistent with the use of contaminated pentobarbital. *Id.* at ¶ 61. Witnesses

to the execution of Eric Robert, in South Dakota, reported that he appeared to clear his throat and

gasp heavily, at which point his skin turned bluish-purple. He opened his eyes and they

remained open until his death; his heart continued to beat for ten minutes after his breathing

---

[3] According to Defendants, the BOP has "conferred with DEA to ensure the compounding pharmacy is properly registered." A.R. 0005. Of course, whether a pharmacy is registered with the DEA registered says nothing about whether its drugs are regulated by the FDA. In fact, the FDA does not regulate compounded drugs. *See* U.S. Food & Drug Administration, *Compounding and the FDA: Questions and Answers*, https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

ceased.  This reaction is also consistent with the use of a contaminated or sub-potent drug

product.  *Id.* at ¶ 62.

Apart from sourcing issues, the 2019 Protocol creates a risk of wanton suffering by

failing to include testing protocols, assurances that personnel will be adequately trained, and

procedures to address mishaps.  The 2019 Addendum specifically removed the provision of the

prior protocol that established procedures for handling situations not contemplated during the

execution procedure.  The information that is included in the 2019 Addendum provides little

actual notice of the procedures to be used, and is in fact internally inconsistent with respect to the

person responsible for selecting the executioners.  *Compare* Compl. Ex. 1 (2019 Addendum) ¶ A

with ¶ D.  And the 2019 Addendum gives the Director of the BOP, or any designee, discretion to

deviate from any of the provisions if "circumstances" require, providing virtually unlimited

discretion to vary from the protocol.  Compl. Ex. 1 (2019 Addendum) ¶ A.

The risks presented by the 2019 Protocol are "substantial when compared to the known

and available alternatives."  *Glossip*, 135 S. Ct. at 2737.  Mr. Purkey has identified a number of

viable alternatives that would alleviate these unconstitutional risks.  *See* Compl. ¶¶ 61-65.

*First*, the DOJ could implement certain straightforward and readily adoptable safeguards

to the execution process.  These safeguards include: (1) provisions regarding the selection of

qualified, competent and vetted team members, whose identity and qualifications are disclosed;

(2) a provision that no central line will be placed unless it is determined to be necessary

following a vein assessment by a qualified medical professional, and that any central lines will

be set only by qualified and competent medical professionals; (3) a requirement to use FDA-

approved pentobarbital or compounded pentobarbital (a) that complies with all state and federal

compounding requirements, (b) that has been tested, with the records of this testing and chain of

custody documentation provided to the prisoner, and (c) the compounding formula of which is disclosed to prisoners and their counsel; (4) a provision that the pentobarbital will be administered to the inmate in a semi-vertical position to reduce the risk of experiencing the sensation of severe terror, pain, and panic; and (5) appropriate procedures to respond to unexpected occurrences during an execution.  Upon information and belief, these safeguards are available, are feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

*Second*, the government could provide for the bedside administration of pentobarbital. Beside administration eliminates the need for extension sets of IV tubing and may significantly reduce the risks of leakage or pinching of the tubing, as well as the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing. Bedside administration also would ensure adequate surveillance and monitoring of the IV, the catheter site, and the prisoner.  Upon information and belief, bedside administration is available, is feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

*Third*, along with incorporating safeguards and transparency into the pentobarbital protocol, the DOJ and BOP could add a pre-dose of either an opioid or an anti-anxiety medication in a large clinical dose.

All of these options are readily available to the federal government.  Given that there are serious risks evident on the face of the 2019 Protocol and that alternatives that lessen those risks are readily available, Mr. Purkey is likely to succeed on his Eighth Amendment claim.  As the Court has observed, discovery will both substantiate and expand on these claims.

### D.   Mr. Purkey Needs Discovery To Fully Litigate His Claims

Mr. Purkey has shown a likelihood of success on his claims based on the facts he has available to him.  But to the extent the Court finds that Mr. Purkey has failed to make such a showing, it is a direct result of the Defendants' secrecy and lack of process.  Mr. Purkey should have the opportunity to conduct discovery to fully litigate his claims, as do the defendants in the Consolidated Litigation.

Deliberative investigations are essential in lethal-injection cases.  Indeed, Mr. Purkey's claims cannot be tested without such an investigation.  For example, as the Court put it at the August 15 conference in the related consolidated case, "how can [plaintiffs] make an alternative argument [to] say that another drug is better or less painful if [they] don't know how painful this one is?"  Tr. 14:22-24.  In addition to the risk of pain in general, Mr. Purkey cannot presently determine whether his counsel will be permitted at his execution, the qualifications of his executioners, the process and rationale of adopting the protocols, and many other facts critical to fully assessing his claims.  None of these questions can be answered without careful investigation and analysis fully informed by the facts.  That is why the foundational Supreme Court decisions on lethal-injection protocols arose after—and revolved heavily on—informed fact-finding by the district court after comprehensive discovery and a hearing.[4]  Despite that, if

---

[4] In *Glossip v. Gross*, the Court assessed a preliminary-injunction decision reached only "after discovery" and "a 3-day evidentiary hearing" at which the court "heard testimony from 17 witnesses and reviewed numerous exhibits."  135 S. Ct. 2726, 2735 (2015).  In *Bucklew v. Precythe*, the Court affirmed the entry of summary judgment for the government only after the district court "afforded Mr. Bucklew extensive discovery to explore the viability of" his claims. 139 S. Ct. 1112, 1129 (2019) (quotation marks omitted); *see also id.* at 1131 ("Mr. Bucklew had ample opportunity to conduct discovery and develop a factual record concerning exactly what procedures the State planned to use.").  And in *Baze v. Rees*, the Court considered the merits of a lethal-injection challenge after the state trial court held "extensive hearings and entered detailed findings of fact and conclusions of law"—specifically, "a 7-day bench trial during which the trial court received the testimony of approximately 20 witnesses, including numerous experts."  553 U.S. 35, 41, 46 (2008).

Mr. Purkey is not granted a preliminary injunction to allow him to conduct discovery, he will be executed using a procedure he knows little about.

## III.     The Balance Of The Equities And Public Interest Weigh In Favor Of A Preliminary Injunction

The balance of the equities and public interest also favor a preliminary injunction.  Where the government opposes a preliminary injunction, these two factors merge.  *See Nken*, 556 U.S. at 434-35.

To begin, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands*, 686 F. Supp. 2d at 21.  In particular, the "ordinary procedures" of notice-and-comment rulemaking are "generally presumed to serve the public interest." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).  Congress required notice-and-comment rulemaking "to give the public an opportunity to participate in the rule-making process" and to "enable[] the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Texaco, Inc. v. Federal Power Comm'n*, 412 F.2d 740, 744 (3d Cir. 1969) (citation omitted).  When that process is subverted, the public is twice harmed—it is denied its opportunity to participate and it is bound by a poorly informed rule.  By contrast, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.  And "[a]pplying the law in a way that violates the Constitution is *never* in the public's interest." *Minney v. United States Office of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015).

Courts have further recognized the "important public interest in the humane and constitutional application of [a] lethal injection statute." *Nooner*, 2006 WL 8445125, at *4; *Cooey*, 430 F. Supp. 2d at 708.  When the government decides to take a life, the public interest demands that it do so in a considered and deliberate manner.

The government may have a "strong interest in enforcing its criminal judgments," but that interest is not outweighed by the public's interest in a "humane and constitutional" application of the federal execution protocol. *Nooner*, 2006 WL 8445125 at *4. Indeed, that interest will be served even if Mr. Purkey ultimately succeeds on the merits of his claims. He does not contest his conviction or the sentence of death. He contests only the unconstitutional way in which the government proposes to execute him and the unlawful process by which the government reached that decision. The government, of course, has no valid interest in disregarding the strictures of the Constitution and the APA just to accelerate its timeline. In any event, "the fact that the government has not—until now—sought to" schedule Mr. Purkey's execution "undermines any urgency surrounding" its need to do so. *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (2018). A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the government. *Chaplaincy*, 454 F.3d at 297.

## CONCLUSION

The Court should preliminarily enjoin the government from proceeding to execute Mr. Purkey under the 2019 Main Protocol and/or 2019 Addendum pending final resolution of his claims or, at minimum, until Mr. Purkey can engage in discovery on the schedule the Court has already established in the related litigation and file a renewed motion for preliminary relief.

DATED:        October 31, 2019                     Respectfully Submitted,

                                                   /s/ Arin Smith

                                                   Arin Smith (D.C. Bar No. 1045248)
                                                   WILMER CUTLER PICKERING
                                                   HALE AND DORR LLP
                                                   1875 Pennsylvania Avenue NW
                                                   Washington, DC 20006
                                                   (202) 663-6959

                                                   Alan Schoenfeld (*pro hac vice*
                                                   forthcoming)
                                                   Ryan Chabot (*pro hac vice* forthcoming)
                                                   WILMER CUTLER PICKERING
                                                   HALE AND DORR LLP
                                                   7 World Trade Center
                                                   250 Greenwich Street
                                                   New York, New York 10007
                                                   (212) 230-8800

                                                   *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2019, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system. Pursuant to this Court's August 20, 2019 Order, below is a list of all plaintiffs' counsel of record:

**Joshua Christopher Toll**
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Gerald Wesley King, Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celestw_bacchi@fd.org

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

**\*Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

**\*Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**\*Jeanne Vosberg Sourgens**
VINSON & ELKINS, L.L.P.
(202) 639-6633

**Robert E. Waters**
VINSON & ELKINS, L.L.P.
(202) 737-0500
Email: rwaters@velaw.com

**William E. Lawler, III**
VINSON & ELKINS, L.L.P.
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**\*William E. Hoffman, Jr.**
KING & SPALDING LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR, LLC
(410) 444-1500
Email: garyeproctor@gmail.com

**Sean D. O'Brien**
PUBLIC INTERSET LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Elizabeth Hagerty**
HOGAN LOVELLS US LLP
(202) 637-3231
Email: elizabeth.hagerty@hoganlovells.com

**\*Yousri H. Omar**
VINSON & ELKINS, L.L.P.
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**\*Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER OFFICE, EDPA
(215) 928-0528
Email: shawn.nolan@fd.org

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

**David Victorson**
(202) 637-2061
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

**John D. Beck**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

**Pieter Van Tol**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

**Amy J. Lentz**
**STEPTOE & JOHNSON**
(202) 429-1320
Alentz@steptoe.com

\* No e-mail provided on the docket or counsel no longer with the identified firms.

S/ Arin Smith
Arin Smith