# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
| | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No. 19-mc-145 (TSC) |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Lee v. Barr, et al.*, 19-cv-2559 | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF INTERVENOR
## DUSTIN LEE HONKEN'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 4

I.     STATUTORY AND REGULATORY BACKGROUND ................................. 4

II.    STANDARD FOR METHOD-OF-EXECUTION CHALLENGES ................................ 6

III.   THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS ................................. 7

IV.   PROCEDURAL HISTORY ................................................................. 10

STANDARD OF REVIEW ................................................................................ 11

ARGUMENT ................................................................................................ 11

I.     HONKEN IS UNLIKELY TO SUCCEED ON HIS APA CLAIMS ................................ 11

     A.    The 2019 Protocol Is Not Subject to the APA's Notice-and-Comment
         Requirement ................................................................................ 12

         1.    The 2019 Protocol is a procedural rule. ................................. 12

         2.    The 2019 Protocol could be considered a statement of policy or an
             interpretive rule. ................................................................. 17

     B.    The 2019 Protocol Is Not Contrary to Law ................................. 19

         1.    The 2019 Protocol is consistent with the FDPA as applied to Honken. .....19

         2.    The 2019 Protocol does not violate the Controlled Substance Act ..........22

         3.    The Food, Drug and Cosmetics Act does not govern drugs for lethal
             injections. ................................................................. 25

     C.    BOP's Adoption of the 2019 Protocol Is Not Arbitrary or Capricious ................. 28

         1.    APA review of BOP's Adoption of the 2019 Protocol is highly
             deferential. ................................................................. 28

         2.    BOP's noncompliance with the FDCA and the CSA is reasonable..........31

         3.    BOP's decision to use pentobarbital is reasonable.. ................................. 31

         4.    BOP's decision to use a compounded form of pentobarbital is
             reasonable.. ................................................................. 36

5.      The provisions of the 2019 Protocol governing IV-setting sufficiently
provide staff guidance on intravenous injection.. .....................................41

II.     THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY
INJUNCTION ........................................................................................................... 43

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ......................................................... 11

*ACA Int'l v. FCC*,
  885 F.3d 687 (D.C. Cir. 2018) ........................................................... 20

*Alcresta Therapeutics, Inc. v. Azar*,
  318 F. Supp. 3d 321 (D.D.C. 2018) ................................................... 44

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ......................................................... 29

*Am. Hosp. Ass'n v. Bowen*,
  834 F.2d 1037 (D.C. Cir. 1987) ......................................................... 13

*Am. Min. Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) .................................................... 18, 19

*Am. Petroleum Inst. v. EPA*,
  862 F.3d 50 (D.C. Cir. 2017) ............................................................. 20

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ........................................................... 29

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015) ........................................................... 17

*Aulenback, Inc. v. Fed. Highway Admin.*,
  103 F.3d 156 (D.C. Cir. 1997) ...................................................... 12, 14

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ............................................................................. 28

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) ...................................................... 12, 16

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ............................................................. 20

*Boyd v. Beck*,
  404 F. Supp. 2d 879 (E.D.N.C. 2005) ............................................... 44

*Brewer v. Landrigan*,
  562 U.S. 996 (2010) ........................................................................... 37

*Brockett v. Spokane Arcades, Inc.*,
    472 U.S. 491 (1985) ........................................................................... 20

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) .................................................................... *passim*

*Calderon v. Thompson*,
    523 U.S. 538 (1998) ........................................................................ 4, 45

*Camp v. Pitts*,
    411 U.S. 138 (1973) ....................................................................... 29, 39

*Chavez v. Fla. SP Warden*,
    742 F.3d 1267 (11th Cir. 2014) ............................................................ 44

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ........................................................................... 17

*Citizens to Pres. Overton Park Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................... 29

*Clarian Health W., LLC v. Hargan*,
    878 F.3d 346 (D.C. Cir. 2017) ............................................... 13, 16, 17

*Clifford v. Peña*,
    77 F.3d 1414 (D.C. Cir. 1996) ............................................................. 39

*Commercial Drapery Contractors, Inc. v. United States*,
    133 F.3d 1 (D.C. Cir. 1998) ................................................................ 29

*Cooey v. Strickland*,
    589 F.3d 210 (6th Cir. 2009) ............................................................... 42

*Cook v. Brewer*,
    637 F.3d 1002 (9th Cir. 2011) ............................................................. 37

*Cook v. Food & Drug Administration*,
    733 F.3d 1 (D.C. Cir. 2013) ........................................................... 27, 28

*Creech v. Reinke*,
    No. 1:12-cv-173, 2012 WL 1995085 (D. Idaho June 4, 2012) ............... 32

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 11

*DeYoung v. Owens*,
    646 F.3d 1319 (11th Cir. 2011) ........................................................... 32

*Dunn v. McNabb*,
    138 S. Ct. 369 (2017) ......................................................................................... 44

*Electronic Privacy Information Center v. U.S. Department of Homeland Security*,
    653 F.3d 1 (D.C. Cir. 2011) ............................................................................... 14

*Emmett v. Johnson*,
    489 F. Supp. 2d 543 (E.D. Va. 2007) ................................................................. 44

*Emmett v. Johnson*,
    532 F.3d 291 (4th Cir. 2008) .............................................................................. 43

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*,
    857 F.3d 913 (D.C. Cir. 2017) ........................................................................... 28

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................................... 41

*FERC v. Elec. Power Supply Ass'n*,
    136 S. Ct. 760 (2016) ......................................................................................... 28

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ........................................................................................... 29

*Food and Drug Administration v. Brown & Williamson Tobacco Corporation*,
    529 U.S. 120 (2000) ........................................................................................... 25

*Furman v. Georgia*,
    408 U.S. 238 (1972) ............................................................................................. 4

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*,
    779 F.3d 1275 (11th Cir. 2015) ..................................................................... 32, 38

*Glossip v. Gross*,
    135 S. Ct. 2726 (2015) ................................................................................ *passim*

*Gomez v. U.S. Dist. Court for N. Dist. of Cal.*,
    503 U.S. 653 (1992) ........................................................................................... 45

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ........................................................................................... 23

*Gray v. McAuliffe*,
    No. 3:16cv982, 2017 WL 102970 (E.D. Va. Jan. 10, 2017) ............................. 36

*Grayson v. Warden, Comm'r , Ala. Dep't of Corr.*,
    869 F.3d 1204 (11th  Cir. 2017) ........................................................................ 32

*Gregg v. Georgia*,
428 U.S. 153 (1976) ........................................................................................... 4

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ......................................................................................... 22

*Guttenberg v. Emery*,
26 F. Supp. 3d 88 (D.D.C. 2014) ....................................................................... 43

*Hamilton v. Jones*,
472 F.3d 814 (10th Cir. 2007) ........................................................................... 43

*Harbison, v. Little*,
571 F.3d 531 (6th Cir. 2009) ............................................................................. 43

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............................................................................... 2, 26, 28

*Higgs v. United States*,
711 F. Supp. 2d 479 (D. Md. 2010) ................................................................... 21

*Hill v. McDonough*,
547 U.S. 573 (2006) .................................................................................... 43, 45

*Honken v. United States*,
42 F. Supp. 3d 937 (N.D. Iowa 2013), *aff'd*,
*Honken v. United States*, Case No. 14-1329, Doc 4150218 (8th Cir. 2014),
*cert. denied*, 136 S .Ct. 29 (2015) .................................................................... 11

*In re Mo. Dep't of Corr.*,
839 F.3d 732 (8th Cir. 2016).............................................................................. 32

*In re Ohio Execution Protocol Litig.*,
860 F.3d 881 (6th Cir. 2017).............................................................................. 33

*In re Ohio Execution Protocol Litig.*,
937 F. 3d. 759 (6th Cir. 2019)............................................................................ 34

*Jackson v. Danberg*,
656 F.3d 157 (3d Cir. 2011)................................................................................. 8

*James V. Hurson Assocs., Inc. v. Glickman*,
229 F.3d 277 (D.C. Cir. 2000) ..................................................................... 14, 15

*Jordan v. Comm'r, Miss. Dep't of Corr.*,
908 F.3d 1259 (11th Cir. 2018)......................................................................... 32

*K-Mart Corp. v. Cartier, Inc.*,
   486 U.S. 281 (1988) ...................................................................................... 20

*Ladd v. Livingston*,
   777 F.3d 286 (5th Cir. 2015) ......................................................................... 38

*Lambert v. Buss*,
   498 F.3d 446 (7th Cir. 2007) .................................................................... 44, 45

*Landrigan v. Brewer*,
   2010 WL 4269559 (D. Ariz. Oct. 25, 2010), *aff'd*, 625 F.3d 1144 (9th Cir.),
   *vacated order*, 562 U.S. 996 (2010) ............................................................ 37

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ......................................................................... 30

*Lenz v. Johnson*,
   443 F. Supp. 2d 785 (E.D. Va. 2006) ........................................................... 44

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ...................................................................................... 17

*Marshall Cty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) .................................................................... 29

*Mayo v. Reynolds*,
   875 F.3d 11 (D.C. Cir. 2017) ........................................................................ 28

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...................................................................................... 11

*McGehee v. Hutchinson*,
   854 F.3d 488 (8th Cir. 2017) ......................................................................... 32

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) .................................................................... 12

*Mora-Meraz v. Thomas*,
   601 F.3d 933, 940 (9th Cir. 2010) ................................................................ 15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 28, 29, 31

*Munaf v. Geren*,
   553 U.S. 674 (2008) ...................................................................................... 11

*Nat'l Ass'n of Broadcasters v. FCC*,
   569 F.3d 416 (D.C. Cir. 2009) ...................................................................... 17

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .......................................................................... 12, 17, 18, 19

*Nat'l Sec. Counselors v. CIA*,
    931 F. Supp. 2d 77 (D.D.C. 2013) ........................................................................... 14

*Nken v. Holder*,
    556 U.S. 418, (2009) ................................................................................................ 43

*Olivares v. Transp. Sec. Admin.*,
    819 F.3d 454 (D.C. Cir. 2016) .................................................................................. 39

*Parsons v. Pitzer*,
    149 F.3d 734, 738 (7th Cir. 1998) ............................................................................ 15

*PDK Labs., Inc. v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) .................................................................................. 35

*Pelissero v. Thompson*,
    170 F.3d 442, 447 (4th Cir. 1999) ............................................................................ 15

*Planned Parenthood of Wisc., Inc. v. Azar*,
    316 F. Supp. 3d 291 (D.D.C. 2018) .......................................................................... 16

*Pub. Citizen v. Dep't of State*,
    276 F.3d 634 (D.C. Cir. 2002) ................................................................................ s15

*Baze v. Rees*,
    553 U.S. 35 (2008) ........................................................................................... *passim*

*Reno v. Flores*,
    507 U.S. 292 (1993) .................................................................................................. 20

*Rhoades v. Reinke*,
    671 F.3d 856 (9th Cir. 2011) ............................................................................... 44, 45

*Rhoades v. Reinke*,
    830 F. Supp. 2d 1046 (D. Idaho), ), *aff'd*, 671 F.3d 856 (9th Cir. 2011) ................................ 45

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r*,
    295 F.3d 16 (D.C. Cir. 2002) .................................................................................... 40

*Ringo v. Lombardi*,
    706 F. Supp. 2d 952 (W.D. Mo. 2010) ...................................................................... 27

*Roane v. Leonhart*,
    741 F.3d 147 (D.C. Cir. 2014) .................................................................................... 7

*Sample v. Watts,*
  100 F. App'x 317, 318 (5th Cir. 2004) .................................................................. 15

*Sells v. Livingston,*
  561 F. App'x 342 (5th Cir. 2014) ......................................................................... 38

*Serrato v. Clark,*
  486 F.3d 560, 569 (9th Cir. 2007).......................................................................... 15

*Shalala v. Guernsey Memorial Hospital,*
  514 U.S. 87 (1995) ................................................................................................ 18

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ................................................................... 11, 20, 43

*Sussman v. U.S. Marshals Serv.,*
  494 F.3d 1106 (D.C. Cir. 2007) ............................................................................ 40

*Sacora v. Thomas,*
  628 F.3d 1059, 1070 (9th Cir. 2010)...................................................................... 15

*Tennessee v. Garner,*
  471 U.S. 1 (1985) .................................................................................................. 20

*Theodore Roosevelt Conservation P'Ship v. Salazar,*
  616 F.3d 497 (D.C. Cir. 2010) .............................................................................. 29

*Towery v. Brewer,*
  672 F.3d 650 (9th Cir. 2012)................................................................................. 32

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
  671 F.3d 1113 (9th Cir. 2012)............................................................................... 30

*United States v. Barrett,*
  496 F.3d 1079 (10th Cir. 2007)............................................................................... 5

*United States v. Bourgeois,*
  423 F.3d 501 (5th Cir. 2005).................................................................................. 21

*United States v. Chandler,*
  950 F. Supp. 1545 (N.D. Ala. 1996) ..................................................................... 19

*United States v. Fell,*
  No. 5:01-CR-12-01, 2018 WL 7270622 (D. Vt. Aug. 7, 2018)............................. 22

*United States v. Grace,*
  461 U.S. 171 (1983) .............................................................................................. 20

*United States v. Hammer*,
  121 F. Supp. 2d 794 (M.D. Pa. 2000) ................................................................. 22

*United States v. Honken*,
  541 F.3d 1146 (8th Cir. 2008), *rehearing and rehearing en banc* (2009),
  *cert. denied*, 558 U.S. 1091 (2009) ................................................................. 10, 11

*United States v. Nat'l Treas. Emps. Union*,
  513 U.S. 454 (1995) ................................................................. 20

*United States v. Rutherford*,
  442 U.S. 544 (1979) ................................................................. 26

*United States v. Tipton*,
  90 F.3d 861 (4th Cir. 1996) ................................................................. 19

*Venegas v. Henman*,
  126 F.3d 760, 763 (5th Cir. 1997) ................................................................. 15

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
  435 U.S. 519 (1978) ................................................................. 29

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
  754 F.3d 1260 (11th Cir. 2014) ................................................................. 38

*West v. Schofield*,
  519 S.W.3d 550 (Tenn. 2017) ................................................................. 24

*Whether the Food & Drug Admin. Has Jursidiction Over Articles Intended for Use in
  Lawful Executions*,
  2019 WL 2235666 (May 3, 2019) ................................................................. 25, 26

*Whitaker v. Collier*,
  862 F.3d 490 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018) ................................................................. 32, 38

*Whitaker v. Livingston*,
  732 F.3d 465 (5th Cir. 2013) ................................................................. 38, 41

*Williams v. Van Buren*,
  117 F. App'x 985, 986 (5th Cir. 2004) ................................................................. 15

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................. 11, 43

*Wood v. Collier*,
  836 F.3d 534 (5th Cir. 2016) ................................................................. 38

*Zagorski v. Parker*,
   139 S. Ct. 11 (2018) .......................................................................... 32

*Zink v. Lombardi*,
   783 F.3d 1089 (8th Cir. 2015) ..................................................... 32, 38

**STATUTES**

5 U.S.C. § 553 ....................................................................... 12, 15, 17

18 U.S.C. § 3591 ................................................................................ 5

18 U.S.C. §§ 3591-99 ........................................................................ 5

18 U.S.C. § 3592 ................................................................................ 5

18 U.S.C. § 3593 ................................................................................ 5

18 U.S.C. § 3596 ......................................................................... *passim*

18 U.S.C. § 3597 .............................................................................. 19

21 U.S.C. § 353 ............................................................................... 26

21 U.S.C. § 353a ............................................................................. 27

21 U.S.C. § 802 ............................................................................... 23

21 U.S.C. § 829 ......................................................................... 22, 23

21 U.S.C. § 848 ........................................................................... 4, 5

28 U.S.C. § 2401 ............................................................................. 19

28 U.S.C. § 2255 ............................................................................. 11

65 Del. Laws 281 § 1 (1986) ............................................................ 24

725 Ill. Comp. Stat. 5/119-5 (1983) ................................................. 24

1982 Mass. Acts 554 § 6 ................................................................. 24

1984 Or. Laws 3 § 7 ........................................................................ 24

Act of Apr. 30, 1790, 1 Stat. 112 ...................................................... 4

Act of June 19, 1937, 50 Stat. 304 ..................................................... 4

Anti-Drug Abuse Act of 1988,
   Pub. L. No. 100-690, 102 Stat. 4181 ........................................................... 5

Federal Death Penalty Act,
   Pub. L. No. 103-322, 108 Stat. 1796 ........................................................... 5

Sentencing Reform Act of 1984,
   Pub. L. No. 98-473, 98 Stat. 1987 (1984) ................................................... 4

Ala. Code § 15-18-82.1 (1975) ...................................................................... 21, 24

Ariz. Rev. Stat. Ann. § 13-704 (West 1978) ...................................................... 24

Ariz. Rev. Stat. Ann. § 13-757 (West 1978) ...................................................... 21

Ark. Code. Ann. § 5-4-615 .............................................................................. 21

Ark. Code Ann. § 5-4-617 (Michie 1983) ........................................................ 24

Colo. Rev. Stat. § 16-11-401 (West 1988) ....................................................... 24

Fla. Stat. § 922.105 ......................................................................................... 21

Ga. Code Ann. § 17-10-38 ............................................................................... 21

Idaho Code § 19-2716 (Michie 1982) ......................................................... 21, 24

Ind. Code § 35-38-6-1 (1983) ............................................................. 6, 19, 21, 24

Kan. Stat. Ann. § 22-4001 (1983) ............................................................... 21, 24

Ky. Rev. Stat. § 431.220 ................................................................................. 21

La. Stat. Ann. § 15:569 (West 1991) .......................................................... 21, 24

Md. Code Ann. Art. 27 § 627 (1957)(amended 1994) ...................................... 24

Miss. Code Ann. § 99-19-51 ............................................................................ 21

Mo. Rev. Stat. § 546.720 (1988) ................................................................ 21, 24

Mont. Code Ann. § 46-19-103 .......................................................................... 21

N.C. Gen. Stat. § 15-188 ................................................................................. 21

N.H. Rev. Stat. Ann. § 630:5 (XIII-XIV)(1986) .............................................. 24

N.J. Rev. Rev. Stat. § 2C:49-2 (1983) ............................................................. 24

N.M. Stat. Ann. § 31-14-11 (Michie 1978) ................................................................. 24

Neb. Rev. Stat. § 83-964 ............................................................................................. 21

Nev. Rev. Stat. § 176.355 (Michie 1983) ............................................................ 21, 24

Ohio Rev. Code Ann. § 2949.22 (West 1993) ...................................................... 21, 24

Okla. Stat. tit. 22 § 101 (West 1977) ......................................................................... 24

Okla. Stat. tit. 22 § 1014 ............................................................................................ 21

Or. Rev. Stat. § 137.473 (1985) ................................................................................. 24

Pa. Stat. Ann. tit. 61 § 2121 (West 1990) ................................................................. 24

S.C. Code Ann. § 24-3-530 ......................................................................................... 21

S.D. Codified Laws § 23A-27A-32 (Michie 1984) ............................................... 21, 24

Tenn. Code Ann. § 40-23-114 .................................................................................... 21

Tex. Code Crim. Proc. Ann. art. 43.14 (Vernon 1977) ........................................ 21, 24

Utah Code Ann. § 77-19-10 ........................................................................................ 21

Utah Code Ann. § 77-18-5.5 (1953)(amended 1983) ................................................. 24

Va. Code Ann. § 53.1-234 ........................................................................................... 21

Wyo. Stat. Ann. § 7-13-904 (Michie 1984) ......................................................... 21, 24

**REGULATIONS**

28 C.F.R. Part 26 ............................................................................................. 5, 13, 19

28 C.F.R. § 26.2 ............................................................................................................ 5

28 C.F.R. § 26.3 .............................................................................................. 13, 19, 20

28 C.F.R. § 550.56 ...................................................................................................... 15

**OTHER AUTHORITIES**

AMA, Code of Medical Ethics, Policy E-2.06 Capital Punishment (2000) ................. 25

Black's Law Dictionary (11th ed. 2019) ..................................................................... 27

Office of the Attorney General, Press Release No. 19-807 (July 25, 2019),
U.S. Dep't of Justice, https://www.justice.gov/opa/pr/federal-government-resume-
capital-punishment-after-nearly-two-decade-lapse ................................................................. 45

U.S. Food & Drug Administration, *Facts About the Current Good Manufacturing
Practices (CGMPS)*,
https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-
manufacturing-practices-cgmps ............................................................................................. 40

U.S. Food & Drug Administration, *Compounding Laws and Policies*,
https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies ...... 40

U.S. Food & Drug Administration, *Human Drug Compounding*,
https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-
compounding .......................................................................................................................... 9

**INTRODUCTION**

Fifteen years ago, a federal jury convicted Plaintiff Intervenor Dustin Lee Honken of murdering five people, including two young children, among other crimes. For the murder of those children, the jury recommended, and the trial court imposed, a sentence of death as authorized by the Anti-Drug Abuse Act, since incorporated into the Federal Death Penalty Act ("FDPA"). Honken's conviction and sentence were affirmed on appeal, and he has exhausted his post-conviction remedies. Honken's execution has now been scheduled for January 15, 2020, and the Federal Bureau of Prisons ("BOP") intends to conduct it using a single-drug (pentobarbital) lethal injection protocol, which is substantively identical to protocols that have been upheld by courts, including the Supreme Court in its most recent method-of-execution case, *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019). Relying only on claims under the Administrative Procedures Act ("APA"), Honken now asks this Court to enjoin the application of BOP's lethal injection protocol to his execution. While there is no question that he will not be able to litigate the merits of his claims should his scheduled execution proceed, it is not clear that would constitute irreparable harm in the context of a challenge to the method of execution—rather than to the lawfulness of the execution itself. Besides, irreparable harm alone would not be a sufficient basis to justify a preliminary injunction. To merit such intervention, Honken must also show that he is likely to succeed on the merits and that the overall balance of equities favors an injunction. Honken has not carried his burden on those issues, and thus, his motion should be denied.

Most significantly, Honken has not established that he is likely to succeed on the merits—the key factor in evaluating whether to grant a preliminary injunction. In a typical method-of-execution challenge, the Supreme Court has required through a trio cases—*Baze v. Rees*, 553 U.S. 35 (2008), *Glossip v. Gross*, 135 S. Ct. 2726 (2015), and *Bucklew*—that an inmate (1) show that the challenged execution protocol is sure or very likely to cause severe pain, and (2) plead and prove a known and available alternative method of execution that is feasible and readily implemented, and that in fact significantly reduces a substantial risk of severe pain. This is a heavy burden because the Eighth Amendment is understood to prohibit only methods of execution

"seeking to superadd terror, pain, or disgrace" to a prisoner's death. *Bucklew*, 139 S. Ct. at 1124. Indeed, the Supreme Court has "yet to hold that a[ny] State's method of execution qualifies as cruel and unusual." *Id.*

Apparently recognizing that he cannot meet this stringent standard, Honken focuses his motion on BOP's alleged failures to take steps to avoid inflicting an unconstitutional level of pain on him, among other purported violations of the APA. But the Supreme Court has expressly warned against "import[ing] profound differences of opinion over the meaning of the Eighth Amendment . . . into the domain of administrative law." *Heckler v. Chaney*, 470 U.S. 821, 838 (1985). Moreover, Hoken ignores the APA's highly deferential standard of review, which does not permit this Court to substitute its own judgment for that of BOP or ask whether BOP's execution protocol is the best one possible or even whether it is better than the alternatives. Rather, the Court's review is limited to determining whether there has been a clear error of judgment. And despite Honken's attempt to rely on extra-record declarations to controvert the agency's conclusion, this Court does not act as a factfinder but sits only as an appellate tribunal whose review is limited to the administrative record. This is particularly the case when the Supreme Court has cautioned in the context of method-of-execution challenges that courts are not boards of inquiry responsible for assessing the best practices for executions.

Honken is unlikely to succeed on his claims under the APA. He contends that BOP arbitrarily and capriciously chose pentobarbital for his execution. BOP, however, took into account the widespread use of pentobarbital, explored using it in a three-drug sequence, and considered other options. It also studied and observed the implementation of similar state protocols, consulted with medical professionals, and reviewed judicial opinions. In fact, not only has the Supreme Court rejected the claim that pentobarbital is sure or very likely to cause severe pain, but pentobarbital is often proffered as a superior alternative by inmates challenging other lethal injection protocols. BOP's decision to use a compounded form of pentobarbital is also reasonable, notwithstanding Honken's arguments to the contrary. No pentobarbital drug product is commercially available for lethal injection, and courts have uniformly upheld the use of

compounded agents in executions.  Moreover, the injectable pentobarbital solution BOP intends to use in Honken's execution has been tested by two independent laboratories for quality assurance.  As for BOP's purported failure to provide more guidance in the protocol on IV setting, the agency reasonably determined that the guidance it does provide is sufficient, in light of the need to tailor such insertions to individual inmates, the availability of on-site medical personnel to consult on venous access, and BOP's expertise with respect to IV setting gained from studying and observing state executions.

Honken is not likely to succeed on his other APA challenges, either.  *First*, the protocol is not subject to the APA's notice-and-comment requirement because it is a procedural rule primarily directed toward improving the efficient and effective operations of the agency.  It does not determine any rights or obligations but merely explains how the agency intends to exercise its discretion in implementing the substantive norms specified by statute and regulations.  Indeed, it would impose a substantive burden on Honken only if it inflicted pain beyond that which necessarily, and constitutionally, attends any death sentence, but the Supreme Court has already held that the use of pentobarbital does not do so.  *Second*, application of the challenged protocol to Honken is consistent with the FDPA; under both the FDPA and the protocol, lethal injection is the proper method for Honken's execution.  *Third*, the Food, Drug, and Cosmetics Act does not apply to drugs used for capital punishment, nor are the provisions of the Controlled Substance Act Honken cites applicable here.

Because Honken has not established a likelihood of success on the merits, which is a necessary showing to obtain a preliminary injunction, his motion should be denied.  But even if the Court were to consider the other preliminary injunction factors, they tip against the issuance of an injunction.  In assessing irreparable harm, it is certainly the case that Honken will not be able to litigate the merits of his claims to final resolution absent preliminary relief enjoining his scheduled execution.  But Honken does not contend in this forum that he cannot lawfully be executed.  His motion only argues that he cannot be executed using BOP's selected method because BOP has committed APA violations.  On that question, the Administrative Record

supports BOP's reasonable determination that Honken will not experience an unconstitutional level of pain when he is executed.  Moreover, the government, the public, and Honken's murder victims (as well as their survivors) have a compelling interest in the timely enforcement of a lawful death sentence once post-conviction proceedings have run their course.   To delay the implementation of a valid death sentence in such circumstances, the Supreme Court recognized, is "to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the [government] and the victims of crime alike." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (internal citations omitted).  For these reasons, Honken's motion should be denied.

## BACKGROUND

### I.   STATUTORY AND REGULATORY BACKGROUND

Federal law has authorized capital punishment since 1790, when the First Congress mandated that several federal crimes be punishable by death.  *See* Act of Apr. 30, 1790, ch. 9, §§ 1, 3, 33, 1 Stat. 112, 112, 113, 119.  Until 1937, federal law prescribed hanging as the method of execution.  Act of Apr. 30, 1790, § 33, 1 Stat. at 119.  In 1937, Congress mandated that each federal execution be carried out in the manner prescribed by the laws of the State within which the sentence was imposed.  Act of June 19, 1937, ch. 367, 50 Stat. 304, 304.  The last federal execution under that Act was in 1963.  The Act was repealed in 1984 through the enactment of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, tit. II, ch. II, 98 Stat. 1987 (1984).

Meanwhile, in 1972, the Supreme Court held in *Furman v. Georgia*, 408 U.S. 238 (1972), that the death penalty could violate the Eighth Amendment if imposed in an arbitrary and capricious manner.  In response to *Furman*, some 35 states enacted new statutes to specify the factors to be weighed and the procedures to be followed in deciding whether to impose a capital sentence, and to make the death penalty mandatory for specified crimes.  *Gregg v. Georgia*, 428 U.S. 153, 180–81 (1976).  In 1976, the Supreme Court held that capital punishment is not *per se* unconstitutional if the sentencing scheme provides objective criteria to direct the sentencing

discretion and allows the jury (or the judge if appropriate) to consider the character and record of the defendant. *Id.* at 206–07. The next federal execution did not occur until 2001, however.

To comply with *Furman* and *Gregg*, Congress enacted the Anti-Drug Abuse Act of 1988 ("ADAA"), Pub. L. No. 100-690, 102 Stat. 4181; *id.* § 7001(a) (codified at 21 U.S.C. § 848(e)). The ADAA authorized capital punishment for the intentional killing of an individual while engaging in criminal enterprises or drug felonies, but did not specify a method of execution. To ensure the orderly implementation of federal death sentences, the Department of Justice ("DOJ") promulgated regulations in 1993 to set forth "death sentence procedures." 28 C.F.R. Part 26. The regulations require federal prosecutors to propose to the sentencing court that any death sentence be implemented by lethal injection on a date and at a place designated by the BOP Director. 28 C.F.R. § 26.2. They further provide that, unless a court orders otherwise, a death sentence shall be executed "[b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death," and that the BOP Director shall determine the lethal substance or substances to be used. 28 C.F.R. § 26.3(a).

In 1994, Congress enacted the FDPA, Pub. L. No. 103-322, § 60002, 108 Stat. 1796, 1959 (codified at 18 U.S.C. §§ 3591–99), authorizing capital punishment for some 60 offenses under various federal statutes if, after consideration of enumerated factors at a special hearing, *see* 18 U.S.C. §§ 3592, 3593, "it is determined that imposition of a sentence of death is justified," *id.* § 3591.[1] The FDPA includes an implementation provision, providing that after the condemned inmate has exhausted "the procedures for appeal of the judgment of conviction and for review of the sentence," he or she shall be released "to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," or if that State does not permit capital punishment, then the sentencing

---

[1] The FDPA did not initially govern death sentences, like Honken's, under the ADAA, 21 U.S.C. § 848(e) (1988). In 2006, Congress repealed the capital provisions of § 848, "effectively rendering the FDPA applicable to all federal death-eligible offenses." *United States v. Barrett*, 496 F.3d 1079, 1106 (10th Cir. 2007).

court shall designate the law of another State that does permit capital punishment.  *Id.* § 3596. Three executions have taken place under the FDPA.  AR 864.

Honken's sentence was imposed in Iowa, where state law does not permit capital punishment.  The sentencing court ordered that Honken's death sentence be implemented in the manner prescribed by the law of Indiana.  Indiana law authorizes the use of lethal injection as a method of execution.  Ind. Code § 35-38-6-1.  Honken is currently scheduled to be executed by lethal injection on January 15, 2020.

## II.     STANDARD FOR METHOD-OF-EXECUTION  CHALLENGES

Although Honken does not seek to rely on his Eighth Amendment method-of-execution claim for purposes of seeking preliminary injunctive relief, the standard for such a claim informs the analysis of his APA claims.  The Eighth Amendment forbids "long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace,'" *Bucklew*, 139 S. Ct. at 1124 (quoting *Baze*, 553 U.S. at 48), but "[it] 'does not demand the avoidance of all risk of pain in carrying out executions,'" *id.* at 1125 (quoting *Baze*, 553 U.S. at 47).  Thus, the Supreme Court requires inmates challenging a method of execution to establish initially that the protocol "is '*sure or very likely* to cause serious illness and needless suffering' and give rise to 'sufficiently *imminent* dangers.'"  *Glossip*, 135 S Ct. at 2737 (quoting *Baze*, 553 U.S. at 50).  "[T]here must be 'a substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Id.* (quoting *Baze*, 553 U.S. at 50).  The fact that "an execution may result in pain, either by accident or as an inescapable consequence of death," is insufficient to state an Eighth Amendment claim.  *Baze*, 553 U.S. at 50.

Next, because the Eighth Amendment analysis is "a *necessarily* comparative exercise," *Bucklew*, 139 S. Ct. at 1126, an inmate must also "plead and prove a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain," *id*. at 2737 (quoting *Baze*, 553 U.S. at 52).  Merely "showing a slightly or marginally safer alternative," *id.* (quoting *Baze*, 553 U.S. at

51), or "[a] minor reduction in risk is insufficient"; rather, "the difference must be clear and considerable," *Bucklew*, 139 S. Ct. at 1130.  Otherwise, courts would become "boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology."  *Baze*, 553 U.S. at 51; *accord Bucklew*, 139 S. Ct. at 1125.

Finally, the inmate must demonstrate that the government has refused to adopt the inmate's proposed alternative "without a legitimate penological reason."  *Bucklew*, 139 S. Ct. at 1125.  As the Supreme Court recognized, there are "many legitimate reasons why [the government] might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution."  *Id.*  And "the Constitution affords a measure of deference to [the government's] choice of execution procedures."  *Id.* (citation omitted).

Instead of seeking to meet the "heavy burden" outlined above, *Baze*, 553 U.S. at 51, Honken's motion focuses on BOP's alleged failures to take steps to avoid imposing an unconstitutional level of pain on him, among other purported APA violations.

## III.     THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS

BOP's manual outlining its "policy and procedures for planning and carrying out [death sentences]" is entitled "BOP Execution Protocol."  AR 1016, 1019.  It provides checklists for pre-execution, execution, and post-execution procedures, as well as detailed steps related to command center operations, contingency planning, news media procedures, and the handling of stays, commutations, and other delays.  *See* AR 1016–67.  We refer to it as the "BOP Manual."

The lethal substance(s) and the procedures for injecting such substance(s) are set forth in an addendum to the BOP Manual.  Prior to 2011, the addendum called for a sequence of three drugs that included sodium thiopental.  *See Roane v. Leonhart*, 741 F.3d 147, 149 (D.C. Cir. 2014).  In March 2011, after the sole American manufacturer of sodium thiopental exited the market due to pressure from anti-death penalty activists, AR 870, the government announced that it did not have any reserves of sodium thiopental for lethal injections, *Roane*, 741 F.3d at 149.  BOP

thereafter began exploring the possibility of using pentobarbital as the lethal agent, which BOP ultimately found to be most suitable.  AR 871.

Pentobarbital is a barbiturate that affects the activity of the brain and nervous system.  It is "commonly used to euthanize terminally ill patients who seek death with dignity in States such as Oregon and Washington."  *Jackson v. Danberg*, 656 F.3d 157, 165 (3d Cir. 2011) (citation omitted).  In 2010, Oklahoma used pentobarbital in executions as part of a three-drug sequence, followed by Ohio the next year in a single-drug execution.  AR 870–71.  By the time BOP considered using the drug, fourteen states had used pentobarbital, either as part of a three-drug combination or by itself, in executions, and an additional five states had announced plans to use it.  AR 871.  In settling on the pentobarbital, BOP considered its widespread use for executions and the fact that five States (Georgia, Idaho, Missouri, South Dakota, and Texas) use only pentobarbital to implement death sentences.  AR 871.  Those five States have conducted 31 executions since 2017 (including Mr. Bucklew's execution in October of this year).  Two of those states, Missouri and Texas, have conducted almost 100 executions since 2012 using only pentobarbital.  AR 871.  As part of its research, BOP visited state execution sites, observed state executions, and reviewed state lethal injection protocols, including those of the five States that use a single-drug pentobarbital protocol.  AR 871, 930, 933.

BOP also reviewed judicial opinions upholding the use of pentobarbital in executions against Eighth Amendment challenges.  *See* AR 871, n.13, 932.  It further considered the fact that state inmates challenging lethal injection protocols frequently propose a single dose of pentobarbital as the alternative, preferred method.  *See* AR 931.  In addition, BOP consulted with medical professionals, AR 525–26, 871, 872, 930, and reviewed publically available expert testimony concerning pentobarbital and other drugs.  AR 934.  Specifically, Dr. Joseph F. Antognini, M.D., who served as an expert in *Bucklew*, concurred with BOP's proposed protocol.  AR 872.  Another expert, Craig W. Lindsley, Ph.D, of the Vanderbilt Center for Neuroscience Drug Discovery, similarly opined that the protocol is more humane than other double or triple agent protocols.  AR 525.

In addition, BOP explored alternatives to a single-drug pentobarbital protocol. It considered using pentobarbital as the first drug in a three-drug sequence, but determined that a one-drug protocol would avoid "the complications inherent in obtaining multiple drugs" and in navigating expiration dates of multiple drugs, AR 871, 930, and would simplify the procedure, thus "reduc[ing] the risk of administration mishaps," AR 871. BOP also considered several other drugs, but rejected them. *See* AR 871, 964 (propofol); AR 862–65 (fentanyl); AR 931, 966 (midazolam, sufentanil citrate, and potassium chloride); AR 968 (midazolam and hydromorphone).

No domestic commercial supply of pentobarbital exists for use in executions. Recognizing that, as well as the fact that courts of appeals have routinely denied Eighth Amendment challenges to the use of compounded lethal agents, AR at 857–58, BOP selected a domestic bulk manufacturer that is properly registered with the Drug Enforcement Administration ("DEA") to produce the active pharmaceutical ingredient ("API"). AR 872. The API was subject to quality assurance testing at BOP's behest. *Id.* BOP further selected a compounding pharmacy to store the API and to convert it into injectable form as needed. *Id.* Compounding pharmacies employ a licensed pharmacist or physician who combines, mixes or alters ingredients to create a medication tailored to the needs of an individual. AR 857; *see also* FDA, *Human Drug Compounding*, https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding. The compounding pharmacy contracted by BOP is registered with the DEA and FDA and has performed its own testing of the injectable form of pentobarbital it produced. AR 872; Declaration of Raul Campos, ¶ 3 (Nov. 12, 2019) (attached). Further, two independent laboratories have performed quality testing of the injectable solution. AR 872; *see also* AR 970–1015 (laboratory reports). Finally, BOP confirmed with the DEA that the BOP facility in Terre Haute, Indiana—where Honken's execution will take place—meets the regulatory requirements for storage and handling of pentobarbital. AR 872.

On July 25, 2019, at the direction of the Attorney General, BOP adopted a revised addendum to the BOP Manual that replaced the three-drug procedure with the use of a single drug,

pentobarbital sodium, as the lethal agent.  AR 868, 874–75, 1068–70.  We refer to this addendum as the "Lethal Injection Protocol," and refer to the addendum and the Manual collectively as the "2019 Protocol."  The Lethal Injection Protocol sets forth procedures for BOP to administer the lethal injection.  AR 874.  Specifically, it provides that the BOP Director, in conjunction with the U.S. Marshals Service, shall select qualified personnel to serve as the executioner(s) and their alternates.  *Id.*  "Qualified personnel" is defined to include licensed physicians, nurses, EMTs, paramedics, phlebotomists, and other medically trained personnel, including those trained in the U.S. Military, who have at least one year of professional experience and other personnel with necessary training and experience in a specific execution-related function.  *Id.*  The Lethal Injection Protocol further specifies that "qualified personnel" who are not medically licensed or certified are required to participate in a minimum of ten execution rehearsals a year and shall have participated in at least two execution rehearsals prior to participating in an actual execution.  *Id.*

As for administering the lethal agent, the Lethal Injection Protocol provides that the lethal substance shall be placed into three sets of numbered and labeled syringes, with two of those sets serving as backups.  AR 875.  Each set of syringes will consist of two syringes containing 2.5 grams of pentobarbital sodium in 50 ml of diluent and one syringe containing 60 ml of saline flush. *Id.*  Once the inmate is secured, qualified personnel will attach the leads of a cardiac monitor to the inmate, insert a suitable venous access line or lines, and start a slow rate flow of normal saline solution.  *Id.*  If peripheral venous access is utilized, qualified personnel will insert two separate lines in separate locations, and start a flow of saline in each line to keep the line open.  *Id.*  One line will be used to deliver the lethal substance and the other line will be reserved in the event of the failure of the first line.  *Id.*

## IV.  PROCEDURAL HISTORY

As noted, in 2004 a jury recommended, and the trial court imposed, the death sentence on Honken for the murder of two young girls (aged six and ten).  *United States v. Honken*, 541 F.3d 1146, 1153 (8th Cir. 2008).  The Eighth Circuit affirmed Honken's conviction and sentence on direct appeal, *see id.*, *rehearing and rehearing en banc denied*, , 531 F.3d 1146 (2009), *cert.*

*denied*, 558 U.S. 1091 (2009).  His post-conviction motions were similarly unsuccessful with respect to his death sentence and underlying convictions.  *See Honken v. United States*, 42 F. Supp. 3d 937 (N.D. Iowa 2013) (vacating non-capital convictions under 28 U.S.C. § 2255, but otherwise denying relief), *aff'd*, *Honken v. United States*, Case No. 14-1329, Doc. 4150218 (8th Cir. 2014), *cert denied*, 136 S. Ct. 29 (2015).  Honken is set to be executed on January 15, 2020.

On November 5, 2019, Hoken moved to intervene in *Lee v. Barr*, 19-cv-2559, which, in turn, is one of the consolidated cases in *Roane v. Barr*, 19-mc-00145-TSC.  This Court granted the intervention motion on November 8, 2019.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).  The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The "most important factor" is whether the movant has "established a likelihood of success on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Honken has failed to make the requisite showing.

## ARGUMENT

## I.      HONKEN IS UNLIKELY TO SUCCEED ON HIS APA CLAIMS

Honken raises three primary APA challenges:  first, the 2019 Protocol should have been subject to notice and comment; second, the 2019 Protocol is contrary to law—namely, the Federal Death Penalty Act, the Controlled Substance Act, and the Food, Drug, and Cosmetics Act; and third, BOP's adoption of the 2019 Protocol was arbitrary and capricious.  These challenges are not likely to succeed.

11

### A. The 2019 Protocol Is Not Subject to the APA's Notice-and-Comment Requirement

#### 1. The 2019 Protocol is a procedural rule.

Honken argues that the 2019 Protocol should have been subject to notice and comment pursuant to the rulemaking procedures of 5 U.S.C. § 553. The APA generally provides that an agency shall provide "notice of proposed rule making" and, after providing the required notice, "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). But the APA excepts from this general requirement "rules of agency organization, procedure, or practice." *Id.* § 553(b). In the D.C. Circuit, the "general label" for such rules is the term "procedural rules." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). A procedural rule is "primarily directed toward improving the efficient and effective operations of an agency." *Batterton v. Marshall*, 648 F.2d 694, 702 n.34 (D.C. Cir. 1980). "The 'critical feature' of a procedural rule is that it covers agency actions that do not themselves alter the rights or interests of parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (citation omitted). In other words, a procedural rule does "not impose new substantive burdens." *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997). It also "does not conclusively bind the agency, the court, or affected private parties," *Batterton*, 648 F.2d at 704, but "ensure[s] that agencies retain latitude in organizing their internal operations," *id.* at 707.

The 2019 Protocol is a procedural rule because it is "primarily directed toward improving the efficient and effective operations of an agency." *Id.* at 702 n.34. It details the procedural steps the Warden and BOP staff should follow in the lead-up to, and during, the execution and in carrying out previously imposed death sentences—*e.g.*, the process by which BOP personnel should approve witnesses to the execution, the Warden's role in arranging for the final meal, the timeframe in which the equipment for the execution should be checked, command center operations, news media procedures, the identification of the lethal substance that should be used,

the selection and training of BOP personnel, and how and by whom the lethal substance should be administered.  *See* AR 874–75, 884–90.

The 2019 Protocol does not determine the rights or obligations of anyone or impose any substantive burdens.  Rather, the relevant substantive norms are specified by duly enacted statute (the FDPA) and duly promulgated regulations (28 C.F.R. Part 26).  Honken's death sentence was imposed by a federal court under federal law.  The FDPA and DOJ regulations collectively specify how that sentence will be carried out:  Honken will be executed by lethal injection using substance(s) selected by the BOP Director; the substance(s) will be administered by qualified personnel selected by the Warden and acting at the direction of the U.S. Marshal; and the execution will be supervised by the U.S. Marshal and will take place at a date, time, and federal penal or correctional institution designated by the BOP Director.   18 U.S.C. § 3596(a); 28 C.F.R. § 26.3(a)(1)–(3).   The 2019 Execution Protocol merely provides guidance to BOP staff by explaining how, in practice, BOP will carry out those instructions, including the choice of lethal agent, the procedural steps of administering the lethal agent, and a whole host of other internal procedures.  *See* AR 874–75, 1016–67.  Such a rule is not substantive.  *See Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 358 (D.C. Cir. 2017) (agency manual's instructions on how to reconcile Medicare reimbursement payments need not be subject to notice-and-comment, where the statute and regulations provided agency with authority to reconcile payments).

Honken argues "the 2019 Protocol 'encodes a substantive value judgment,' [*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987)], by putting a 'stamp of approval' on the use of pentobarbital" and by "approv[ing] the use of numerous procedures to administer the drug" for purposes of extinguishing a human life.  Mot. for Prelim. Inj. of Pl., at 14, ECF No. 29 ("Mot.").  The reference to "value judgment" derives from an articulation of the procedural-rule standard, which states that the focus should be on "whether the agency action . . . encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior."  *Am. Hosp. Ass'n*, 834 F.2d at 1047.  This articulation resulted from the D.C. Circuit's "candid recognition that even unambiguously procedural measures affect parties to some degree."  *Id.*

13

Honken's argument has no merit.  BOP's selection of a lethal agent and determination of the best procedures to carry out the death sentence do not encode a value judgment in the relevant sense of the case law.  As the D.C. Circuit has said, "the fact that [an] agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one.  *All* decisions, to the extent that they derive from reasons, necessarily are based on the value judgment that the chosen option is better, in some relevant way, than its alternatives." *James V. Hurson Assocs.*, 229 F.3d at 282; *see also Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013).  Neither the selection of pentobarbital nor the procedures for implementing death sentences impose any "new substantive burdens" on Honken.  *Aulenback*, 103 F.3d at 169. This is so because the imposition of a death sentence carries with it the unavoidable "risk of pain." *Glossip*, 135 S. Ct. at 2733.  The Protocol would impose a "new substantive burden" only if it resulted in the infliction of pain beyond that which necessarily, and constitutionally, attends any death sentence—*i.e.*, if it violates the Eight Amendment.  But the Eighth Amendment standard can be met only if the inmate can demonstrate a substantial risk of severe pain as compared to known and available alternatives.  *Id.* at 2737.  And *Bucklew* upheld the use of pentobarbital and concluded that the inmate there had not shown a superior, alternative method that would significantly reduce the pain that could be caused by pentobarbital.  *See* 139 S. Ct. at 1129–33.

Just so here.  The Administrative Record establishes that pentobarbital is a humane method of execution, and Honken's contrary view does not displace the agency's reasoned judgment on this score.  In other words, Honken has no legal right to any specific procedures, or to choose the lethal agent, for implementing his death sentence.  While he is free to raise Eighth Amendment challenges to any specific procedure or choice of lethal agent, his ability to sue does not transform the Protocol into a substantive rule.

Honken's reliance on *Electronic Privacy Information Center v. U.S. Department of Homeland Security* ("*EPIC*"), 653 F.3d 1 (D.C. Cir. 2011), is misplaced.  There the D.C. Circuit held that the decision of the Transportation Security Administration ("TSA") to screen airline passengers using advanced imaging technology ("AIT") was not a procedural rule because the

decision "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.* at 6. The court emphasized "the privacy interests at the heart of the petitioners' concern with AIT," which was that "by producing an image of the unclothed passenger, an AIT scanner intrudes upon his or her personal privacy in a way a magnetometer does not." *Id.* "[F]ew if any regulatory procedures," the court said, "impose directly and significantly upon so many members of the public." *Id.*[2]

While the screening technology in that case inevitably and indisputably impinged upon the privacy interests of the traveling public as soon as each passenger was subjected to it, the 2019 Protocol does not have a similar impact. Again, as discussed above, the 2019 Protocol imposes a "new substantive burden" only if it violates the Eight Amendment, but the Administrative Record demonstrates that it does not do so. Moreover, whereas *EPIC* was focused on the fact that AIT was a greater privacy intrusion than the prior screening method (magnetometer), the government's choice of pentobarbital is an attempt to utilize a more humane method of execution than those

---

[2] Notably, the D.C. Circuit has repeatedly cautioned that even a rule with a "substantial impact on the rights of individuals" is not necessarily a substantive rule. *James V. Hurson Assocs.*, 229 F.3d at 281; *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640–41 (D.C. Cir. 2002) (recognizing that "even unambiguously procedural measures affect parties to some degree") (citation omitted). That is equally true in the context of prison administration, as many circuits have recognized. *See Sacora v. Thomas*, 628 F.3d 1059, 1070 (9th Cir. 2010) (BOP policies for placing inmates in residential re-entry centers were "not substantive rules" and therefore "not subject to the notice-and-comment requirements of . . . the APA"); *Mora-Meraz v. Thomas*, 601 F.3d 933, 940 (9th Cir. 2010) (BOP policy requiring inmate seeking admission to the Residential Drug Abuse Program to demonstrate substance use within past year "need not follow notice and comment procedures" because it merely interpreted "what it means to have a 'verifiable documented drug abuse problem'" (quoting 28 C.F.R. § 550.56(a)(1)); *Serrato v. Clark*, 486 F.3d 560, 569 (9th Cir. 2007) (BOP decision to terminate early release "boot camp" program "was a 'general statement[] of policy' exempt from notice and comment" (quoting 5 U.S.C. § 553(b)(A))); *Sample v. Watts*, 100 F. App'x 317, 318 (5th Cir. 2004) (unpublished) (BOP Program Statement "prohibiting inmates from possessing copies of their Presentence Report" was not subject to notice-and-comment requirement); *Williams v. Van Buren*, 117 F. App'x 985, 986 (5th Cir. 2004) (unpublished) (BOP policy restricting availability of "compassionate release" was an interpretive rule not subject to notice-and-comment requirement); *Pelissero v. Thompson*, 170 F.3d 442, 447 (4th Cir. 1999) (BOP Policy Statement defining "nonviolent offence" for purposes of early release eligibility was not subject to notice-and-comment requirement); *Parsons v. Pitzer*, 149 F.3d 734, 738 (7th Cir. 1998) (same); *Venegas v. Henman*, 126 F.3d 760, 763 (5th Cir. 1997) (same).

preceding it.  *See* AR 525 ("[BOP's] protocol is more humane than the other double and triple agent injections still employed").  Thus, *EPIC* is factually distinguishable as well.

The 2019 Protocol leaves BOP discretion to deviate from its prescribed processes, the hallmark of a procedural rule.  The Lethal Injection Protocol itself provides that the procedures specified therein may be modified at the discretion of the BOP Director as necessary (1) to comply with a court order, (2) to follow medical personnel's recommendation, or (3) as may be required by other circumstances.  AR 874, ¶ A.  Similarly, the Manual provides that the BOP Director or the Warden may deviate from the procedures specified in the Manual.  AR 1019.  Thus, rather than "narrowly constrict[ing] the discretion of agency officials by largely determining the issue addressed," *Batterton*, 648 F.2d at 702, the 2019 Protocol "ensure[s] that [the] agenc[y] retain[s] latitude in organizing [its] internal operations," *id.* at 707.  This feature confirms that the Protocol is a procedural rule.  *See, e.g.*, *Clarian Health W.*, 878 F.3d at 358 (agency's manual instructions on how to reconcile Medicare reimbursement payments not substantive rule because the "Manual itself makes clear that the agency retains the discretion to deviate from the criteria that it set forth"); *Planned Parenthood of Wisc., Inc. v. Azar*, 316 F. Supp. 3d 291, 305–06 (D.D.C. 2018) (agency criteria for determining federal grants constituted procedural rule because the criteria did "not conclusively bind the agency, the court, or affected private parties" but left the agency "free to exercise discretion about who ultimately w[on] [the] grants") (quoting *Batterton*, 648 F.2d at 704).

Honken disagrees, counting the word "shall" 16 times in the two-page Lethal Injection Protocol, *see* Mot. at 17, and characterizing the Protocol as providing a "tight framework to circumscribe the [BOP]'s statutorily broad power," *id*. at 14 (citation omitted).   But as the above discussion makes clear, BOP's use of the word "shall" is not "binding" in the relevant sense given the agency's discretion explicitly provided in the Protocol.  And while the 2019 Protocol does provide very detailed procedures, or a "tight framework" as Honken characterized it, to guide BOP staff's implementation of death sentences, that is exactly what a procedural rule does—it sets forth procedures for the agency's efficient operation.  But detail alone does not circumscribe the agency's discretion.  Were it otherwise, agency manuals setting forth detailed procedures to

organize operations would need to be subject to notice and comment, a proposition that has no foundation in administrative law.  For this reason, BOP similarly did not subject its prior execution protocol to notice and comment.

### 2. The 2019 Protocol could be considered a statement of policy or an interpretive rule.

The 2019 Protocol could, in the alternative, be considered a "general statement[] of policy," which is also exempt from APA's notice-and-comment requirement.  5 U.S.C. § 553(b)(3)(A).  A statement of policy "explains how the agency will enforce a statute or regulation," *Nat'l Mining Ass'n*, 758 F.3d at 252, and serves to "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979)).  In determining whether an agency has issued a statement of policy rather than a binding rule subject to notice-and-comment, courts conduct a similar analysis as for a procedural rule and "look[] to the effects of the agency's action, asking whether the agency has imposed any rights and obligations or has left itself free to exercise discretion."  *Nat'l Ass'n of Broads. v. FCC*, 569 F.3d 416, 426 (D.C. Cir. 2009).  Courts further consider:  "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency," *Id.* (citation omitted).

Here, the 2019 Protocol serves to "inform[] the exercise of discretion" embedded in the FDPA and the DOJ regulations.  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (citation omitted).  The 2019 Protocol does not determine anyone's rights or obligations, as discussed above, and the Protocol itself explicitly provides:  "[t]his manual . . . does not create any legally enforceable rights or obligations."  AR 1019; *see  Nat'l Mining Ass'n*, 758 F.3d at 252 (agency guidance was a statement of policy where, among other things, it "repeatedly states that it 'does not impose legally binding requirements'").  And the Protocol leaves the agency free to exercise discretion.  *See Clarian Health W.*, 878 F.3d at 357 (noting that the D.C. Circuit has "consistently emphasized that [whether the challenged action has

binding effect] is the most important" consideration).  Indeed, BOP's ability to procure the lethal agent necessarily depends on a host of practical considerations, such as those identified by the Supreme Court in *Glossip*, 135 S. Ct. at 2733.  To carry out its statutory duty of implementing death sentences, DOJ must have discretion to choose both the lethal substance(s) and the form of the chosen substance(s).  It has retained that discretion in the 2019 Protocol, while adhering to the substantive standards set forth in the FDPA and DOJ regulations.  Of course, as the D.C. Circuit has said, "[w]hen the agency applies [a general statement of] policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." *Nat'l Mining Ass'n*, 758 F.3d at 253 (citation omitted).  BOP is doing so here, submitting an administrative record justifying its decision to apply the 2019 Protocol to Honken.  But the agency need not have subjected the 2019 Protocol to notice and comment.

Finally, the 2019 Protocol could also be deemed an "interpretive rule" which "advise[s] the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995).  The D.C. Circuit has asked the following questions in determining whether a rule is an interpretative rule:  "(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule." *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

Here, absent the 2019 Protocol and pursuant to DOJ regulations, BOP would have had the authority to administer pentobarbital to implement the death sentence.  BOP did not publish the protocol in the Code of Federal Regulation, nor did it invoke its general legislative authority when issuing the Protocol.  *See* A.R. at 874–925.  Finally, the 2019 Protocol does not effectively amend a prior legislative rule.  As noted before, BOP also did not subject its prior execution protocol to notice and comment.  And, as the D.C. Circuit has said, "[a] rule does not . . . become an amendment merely because it supplies crisper and more detailed lines than the authority being

18

interpreted." *Am. Min. Cong.*, 995 F.2d at 1112.   In any event, although Defendants believe that the Protocol is more cleanly deemed a procedural rule or statement of policy, we recognize that courts have found the inquiry into how to classify an agency action as "difficult and confused." *Nat'l Min. Ass'n*, 758 F.3d at 251.   Regardless of which category the 2019 Protocol is placed into, it is not a legislative rule requiring notice and comment.

### B. The 2019 Protocol Is Not Contrary to Law

#### 1. The 2019 Protocol is consistent with the FDPA as applied to Honken.

Honken argues that the 2019 Protocol is contrary to the FDPA because the FDPA requires a federal death sentence be implemented "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), and does not authorize DOJ to adopt a "single method for carrying out all federal executions."  Mot. at 34–35.

Honken is unlikely to succeed on this claim because the FDPA does not conflict with the 2019 Protocol as applied to him.   Under Indiana law—the state law designated by the sentencing court to apply to Honken's execution pursuant to the FDPA—the method of execution is lethal injection.   Ind. Code § 35-38-6-1.   As for the Protocol, it informs BOP's implementation of the FDPA.   In BOP's memorandum to the Attorney General recommending the adoption of the Protocol, the agency explained that "implementation of the federal death penalty is governed by 18 U.S.C. §§ 3596, 3597"—*i.e.*, the FDPA.   AR 879.   While no execution can take place except as consistent with the statute, the Protocol seeks to implement validly promulgated DOJ regulations, 28 C.F.R. Part 26.   *See United States v. Tipton*, 90 F.3d 861, 902 (4th Cir. 1996) (upholding DOJ's authority to promulgate 28 C.F.R. Part 26); *United States v. Chandler*, 950 F. Supp. 1545, 1580 (N.D. Ala. 1996) (same).   Those regulations set forth "death sentence procedures" and specify lethal injection as the method of execution, 28 C.F.R. § 26.3(a)(4). Applying the 2019 Protocol to Honken is thus consistent with the FDPA.[3]

---

[3] To the extent that Honken's argument can be construed as a facial challenge to 28 C.F.R. Part 26, as implemented by the 2019 Protocol, the argument is not likely to succeed.   Even assuming such an argument is not barred by the six-year statute of limitations, 28 U.S.C. § 2401, to prevail

Moreover, even if the regulation's provision of lethal injection for federal death sentences were replaced by the statutory language that a federal death sentence is to be carried out "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), the outcome would be the same.  Where a regulation contradicts a statute, only the part of the regulation that conflicts with the statute is invalidated, *see K-Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 293–95 (1988), and only "as to a particular application," rather than "the entire provision that appears to encompass it," *United States v. Nat'l Treas. Emps. Union,* 513 U.S. 454, 487 (1995) (O'Connor, J., concurring in part and dissenting in part).[4]  As demonstrated above, application of 28 C.F.R. § 26.3(a)(4) to Honken through the 2019 Protocol is consistent with the FDPA. Additionally, the remainder of the regulations, including the portion authorizing the BOP Director to select the lethal substance(s) would remain valid.  Under a severability analysis, the court "will sever and affirm a portion of an administrative regulation" if it can say "without any substantial doubt that the agency would have adopted the severed portion on its own."  *Am. Petroleum Inst. v. EPA,* 862 F.3d 50, 71 (D.C. Cir. 2017) (cleaned up); *accord ACA Int'l v. FCC,* 885 F.3d 687, 708 (D.C. Cir. 2018) (same).  Here, DOJ would adopt today the same regulations for carrying out executions by lethal injection where the relevant state law authorizes them.  This is so because

---

on a facial challenge, Honken "must establish that no set of circumstances exists under which the [regulations] would be valid." *Reno v. Flores,* 507 U.S. 292, 301 (1993) (citation omitted, brackets in original); *see also Sherley,* 644 F.3d at 397 n.** (the "no set of circumstances" test applies "to assess the validity of a regulation challenged as facially incompatible with governing statutory law"); *Bldg. & Constr. Trades Dep't v. Allbaugh,* 295 F.3d 28, 33 (D.C. Cir. 2002) (same).  He cannot do so because at least one circumstance—Honken's—is valid.

[4] *Cf. Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 504–05 (1985) (invalidating a state obscenity statute "only insofar as the word 'lust' is taken to include normal interest in sex"); *Tennessee v. Garner,* 471 U.S. 1, 4–5, 11 (1985) (invalidating a statute that authorized "all the necessary means"—including deadly force—to effectuate an arrest only as applied to the use of deadly force against non-violent offenders); *United States v. Grace,* 461 U.S. 171, 183 (1983) (striking down a statute that banned assembly on the Supreme Court's grounds only as applied to the sidewalks outside the Court's building, even though the statute did not make any distinction between the grounds proper and the sidewalks).

lethal injection is still "by far the most prevalent method of execution" for the States, *Glossip*, 135 S. Ct. at 2732. Indeed, all 29 States whose statutes provide for the death penalty authorize lethal injection as a method of execution.[5]

Honken asserts that the FDPA's reference to the State's "manner of execution" prohibits DOJ from using pentobarbital for lethal injections but instead requires BOP to use Indiana's three-drug protocol, which involves sodium pentothal, pentobarbital or brevital for the first drug; pancuronium or vecuronium for the second drug; and potassium chloride for the third drug. Mot. at 38. He also insists that BOP must use all of Indiana's other execution procedures and cites in support of his argument a practice under the 1937 Act in which the government borrowed state facilities to carry out executions. *Id*. at 36–39.

Honken's argument has no merit. As one court observed when addressing an identical argument: "The *manner* of execution authorized by [the relevant state] law is lethal injection," and since both the relevant state law in that case and the federal government authorize lethal injection as the method of execution, there was no issue of compliance with the FDPA. *Higgs v. United States*, 711 F. Supp. 2d 479, 556 (D. Md. 2010). The Fifth Circuit similarly has held that the Attorney General has authority, "through the auspices of the Director of the Federal Bureau of Prisons, to designate the place of execution and the substances to comprise [a condemned inmate's] lethal injection." *United States v. Bourgeois*, 423 F.3d 501, 509 (5th Cir. 2005). The inmate in *Bourgeois*—a plaintiff in this consolidated litigation—had argued that BOP had no power to "determine the particulars of [his] execution," even though the law of the State in which Bourgeois was sentenced, Texas, also specified lethal injection as the method of execution. *Id.* As the court

---

[5] *See* Ala. Code § 15-18-82.1; Ariz. Rev. Stat. Ann. § 13-757; Ark. Code. Ann. § 5-4-615; Fla. Stat. § 922.105; Ga. Code Ann. § 17-10-38; Idaho Code § 19-2716; Ind. Code § 35-38-6-1; Kan. Stat. Ann. § 22-4001; Ky. Rev. Stat. § 431.220; La. Stat. Ann. § 15:569; Miss. Code Ann. § 99-19-51; Mo. Rev. Stat. § 546.720; Mont. Code Ann. § 46-19-103; Neb. Rev. Stat. § 83-964; Nev. Rev. Stat. § 176.355; N.C. Gen. Stat. § 15-188; Ohio Rev. Code Ann. § 2949.22; Okla. Stat. tit. 22 § 1014; S.C. Code Ann. § 24-3-530; S.D. Codified Laws § 23A-27A-32; Tenn. Code Ann. § 40-23-114; Tex. Code Crim. Proc. Ann. art. 43.14; Utah Code Ann. § 77-19-10; Va. Code Ann. § 53.1-234; Wyo. Stat. Ann. § 7-13-904.

held, through Sections 3596(a) and 3597(a) of the FDPA, "Congress had validly delegated the requisite authority to the Department of Justice, of which the Federal Bureau of Prisons is an agency." *Id.*; *see also United States v. Fell*, No. 5:01-CR-12-01, 2018 WL 7270622, at *4 (D. Vt. Aug. 7, 2018) ("creation of a federal death chamber [in USP Terre Haute] does not violate the FDPA"). As for the government's past practice under the 1937 Act of borrowing state facilities for executions, that by no means suggests a concomitant requirement to utilize state procedures for implementing death sentences. Section 3597(a) of the FDPA merely authorizes the U.S. Marshal to borrow state facilities and personnel if the Marshal deems it appropriate.

Honken's reading would lead to an absurd result, requiring the federal government to stock all possible lethal agents used by the States. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available"). Honken suggests that if BOP cannot procure the lethal agents, it need only ask for the State's assistance. Mot. at 36. Given the scarcity of drugs for lethal injections and States' secrecy laws protecting the sources of their lethal agents, that is hardly a simple task. This Court should avoid a construction of the statute that would frustrate the statutory purpose—which is to carry out death sentences.

Honken fares not better in his reliance upon *United States v. Hammer*, 121 F. Supp. 2d 794 (M.D. Pa. 2000). There, the court held that under the FDPA, state law should determine whether an autopsy should be conducted. *Id.* at 800. But neither the FDPA nor the 2019 Protocol mentions autopsies, nor is it evident that an autopsy fits within the term "manner of execution." In any event, if *Hammer* is construed to hold that the FDPA requires BOP to follow a state's choice of lethal agent and all of its attendant execution procedures in carrying out a death sentence, we respectfully submit that *Hammer* was wrongly decided.

### 2. The 2019 Protocol does not violate the Controlled Substance Act.

Honken similarly has no likelihood of success on his claim that the 2019 Protocol violates the prescription requirement of section 829(a) of the Controlled Substances Act ("CSA"), 21 U.S.C. § 829(a). He contends that the 2019 Protocol violates the CSA because the Protocol does

not reflect an intention on BOP's part to obtain a medical prescription for the dispensing and administration of pentobarbital, a Schedule II controlled substance, for purposes of execution. Mot. at 21.  As discussed below, the prescription requirement is inapplicable here.

Section 829(a) provides that "[e]xcept when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule II . . . may be dispensed without the written prescription of a practitioner." 21 U.S.C. § 829(a).  The requirement concerns the dispensing of a Schedule II substance, either directly by a practitioner (in which case no prescription is required) or by a pharmacist (in which case a prescription is required).  The term "dispense" "means to deliver a controlled substance to an *ultimate user* or *research subject* by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery."  *Id.* § 802(10) (emphasis added).  Neither Honken nor anyone identified in the 2019 Protocol is a "research subject" or an "ultimate user"—*i.e.*, "a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household or for an animal owned by him or a member of his household." *Id.* § 802(27).  Honken will not be lawfully obtaining or possessing the pentobarbital for his own use. BOP officials will inject the drug into him pursuant to the 2019 Protocol.

The Supreme Court's decision in *Gonzales v. Oregon*, 546 U.S. 243 (2006), confirms that the CSA's prescription requirement simply does not apply in the context of government lethal injection.  There, the Supreme Court held that the prescription requirement for a legitimate medical purpose did not authorize the Attorney General to bar dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct.  In so holding, the Court found that the CSA is "a statute combating recreational drug abuse," *id.* at 272, and thus, "the prescription requirement is better understood as a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse." *Id*. at 274; *see also id.* (the prescription requirement "bars doctors from peddling to patients who crave the drugs for those prohibited uses").  "To read prescriptions for assisted suicide as

constituting 'drug abuse' under the CSA," the Court said, "is discordant with the phrase's consistent use throughout the statute, not to mention its ordinary meaning." *Id.*

Equally discordant is any argument that the government's use of a controlled substance in lethal injection constitutes "drug abuse" under the CSA. Not only is the legislative purpose embodied in the CSA inapplicable to lethal injections, but Congress clearly agreed when it enacted the FDPA in 1994 to require the government to use the State's manner of execution. At the time, at least a dozen states had already adopted lethal injection as the method of execution.[6] Thus, as one state supreme court correctly observed, "[c]learly, [given 18 U.S.C. § 3596(a),] the federal government does not consider those of its own executions that are conducted by lethal injection to violate a regulatory scheme for the prescription and use of controlled substances." *West v. Schofield*, 519 S.W.3d 550, 571 (Tenn. 2017).

Honken nonetheless argues that even if the CSA does not apply, BOP should abide by the CSA's prescription requirement "to meet the objective of a 'humane' or otherwise minimally painful death." Mot. at 21. Honken's argument is unsustainable. To abide by the prescription requirement would make it impossible to effectuate the purpose of the 2019 Protocol—*i.e.*, to carry out Honken's death sentence—because ethical restrictions preclude physicians from issuing prescriptions that would result in death. *See Baze*, 553 U.S. at 64 (Alito, J., concurring) (noting that the American Medical Association's Code of Medical Ethics prohibits "physician participation in an execution,'" which includes "'prescribing or administering tranquilizers and

---

[6] Ala. Code § 15-18-82.1 (1975); Ariz. Rec. Stat. Ann. § 13-704 (West 1978); Ark. Code Ann. § 5-4-617 (Michie 1983); Colo. Rev. Stat. § 16-11-401 (West 1988); 65 Del. Laws 281 § 1 (1986); Idaho Code § 19-2716 (Michie 1982); 725 Ill. Comp. Stat. 5/119-5 (1983); Ind. Code § 35-38-6-1 (1983); Kan. Stat. Ann. § 22-4001(1993); La. Stat. Ann. § 15:569 (West 1991); Md. Code Ann. art. 27, § 627 (1957) (amended 1994); 1982 Mass. Acts 554 §6; Mo. Rev. Stat. § 546.720 (1988); Nev. Rev. Stat. § 176.355 (Michie 1983); N.H. Rev. Stat. Ann. § 630:5 (XIII-XIV) (1986); N.J. Rev. Rev. Stat. § 2C:49-2 (1983); N.M. Stat. Ann. § 31-14-11 (Michie 1978); Ohio Rev. Code Ann. § 2949.22 (West 1993); Okla. Stat. tit. 22 § 101 (West 1977); 1984 Or. Laws 3 § 7; Or. Rev. Stat. § 137.473(1) (1985); Pa. Stat. Ann. tit. 61, § 2121.1 (West 1990); S.D. Codified Laws § 23A-27A-32 (Michie 1984); Tex. Code Crim. Proc. Ann. art. 43.14 (Vernon 1977); Utah Code Ann. § 77-18-5.5 (1953) (amended 1983); Utah Code Ann. § 77-18-5.5 (1953) (amended 1983); Wyo. Stat. Ann. § 7-13-904 (Michie 1984).

24

other psychotropic agents and medications that are part of the execution procedure") (citing AMA, Code of Medical Ethics, Policy E-2.06 Capital Punishment (2000)).

In sum, the CSA's prescription requirement is inapplicable here and thus, the 2019 Protocol is not contrary to the CSA.

### 3. The Food, Drug and Cosmetics Act does not govern drugs for lethal injections.

Honken is similarly unlikely to succeed in his argument that the 2019 Protocol violates the provisions in the FDCA (1) requiring a prescription for dispensing FDA-approved drugs, and (2) prohibiting the copying of an FDA-approved and commercially-available drug.  The FDCA does not govern the government's use of pentobarbital for carrying out capital punishment because drugs intended for use in executions are not "drugs" or "devices" within the meaning of the FDCA. Indeed, "Congress has repeatedly authorized the death penalty on the assumption that there are lawful means to carry it out, but the regulation of [drugs such as pentobarbital] under the FDCA would effectively require their prohibition because they could hardly be found 'safe and effective' for such an intended use."  *Whether the Food & Drug Admin. Has Jurisdiction over Articles Intended for Use in Lawful Executions*, 2019 WL 2235666, at *1 (May 3, 2019).  The government's position is fully set forth in the cited opinion of the Office of Legal Counsel, Department of Justice, which is in the Administrative Record, AR 938–63 ("OLC Op.").

In short, the FDCA cannot be construed to govern drugs to be used in capital punishment because doing so "would effectively ban those [drugs]" from being used in capital punishment, a result Congress clearly did not intend.  OLC Op., 2019 WL 2235666 at *7, AR 947.  In *Food and Drug Administration v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120, 137–39 (2000), the Supreme Court considered whether the FDA had properly determined that tobacco products could be regulated as "drugs" or "devices" under the FDCA.  The Court found that Congress could not have intended the FDCA to do so because if tobacco products were regulated as "drugs" or "devices," the FDCA would prohibit their sale, because they could not be "safe" or "effective" for their intended use.  *Id.* at 134–37.  The Court explained that Congress's legislative enactments

post-FDCA conveyed a clear intent that "cigarettes and smokeless tobacco [would] continue to be sold in the United States." *Id.* at 139. "The inescapable conclusion," then, "is that there is no room for tobacco products within the FDCA's regulatory scheme. If they cannot be used safely for any therapeutic purpose, and yet they cannot be banned, they simply do not fit." *Id*. at 143.

Applying *Brown & Williamson* to the lethal injection context, it is beyond dispute that a drug meant to bring about death is not being used for a therapeutic purpose. *See* OLC Op., 2019 WL 2235666 at *4, AR 943 (citing *Heckler v. Chaney*, 470 U.S. 821, 827 (1985) (granting certiorari to review the implausible result that "the FDA is required to exercise its enforcement power to ensure that States only use drugs that are 'safe and effective' for human execution")); *see also id*. at *8, AR 948 ("[T]here is no way products intended to carry out capital punishment could ever satisfy [a] . . . test[] under which 'a drug is unsafe if its potential for inflicting death . . . is not offset by the possibility of therapeutic benefit.'" (quoting *United States v. Rutherford*, 442 U.S. 544, 556 (1979))). "Before and after the FDCA's enactment, Congress extended the federal death penalty and required the federal government to adopt States' preferences as to methods of execution. . . . [In doing so], Congress precluded any role for FDA in supplanting States' judgments about those methods." *Id*. at *12, AR 955.

Importantly, "the sheer number of FDCA provisions . . . that would make no sense as applied [to the lethal injection context] reinforces the conclusion" that the FDCA does not govern drugs "intended for use in capital punishment." *Id*. at *9, AR950. Honken's arguments bear this out. Honken suggests that the FDCA "conditions the dispensing of FDA-approved drugs, including pentobarbital, upon either (a) 'a written prescription of a practitioner licensed by law to administer such drug,' or (b) 'an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist[.]'" Mot. at 21 (quoting 21 U.S.C. § 353(b)(1)). Section 353(b)(1) applies only to drugs that are "not safe for use except under the supervision of a practitioner . . . because of its toxicity or other potentiality for harmful effect," 21 U.S.C. § 353(b)(1)(A), or drugs that are approved for use only under the professional supervision of a licensed practitioner, *id*. § 353(b)(1)(B). Pentobarbital, used for purposes of lethal injection, does

not fit into either category.  Even if it did, for the same ethical reasons that prohibit doctors from issuing prescriptions for lethal doses of pentobarbital under the CSA, no doctor would do so pursuant to the FDCA.[7]

The same is true with respect to Honken's argument that BOP's use of a compounded pentobarbital requires "a valid medical prescription reflecting a medical practitioner's order that 'a compounded product is necessary for the identified patient.'"  Mot. at 22 (quoting 21 U.S.C. § 353a(a)).  Again, Section 353a(a) makes no sense in the context of lethal injection—the condemned inmate is not a "patient" under the traditional definition of that word, *i.e.*, "a person under medical or psychiatric care," Black's Law Dictionary (11th ed. 2019).  Moreover, no doctor could write a prescription stating that a lethal dose of pentobarbital is medically necessary for the condemned individual without violating the governing ethics rules.  As for Honken's reliance on Section 353a's prohibition against "the compounding of drug products that are 'essentially copies of a commercially available drug product,'" Mot. at 22 (quoting 21 U.S.C. § 353a(b)(1)(D)), that provision does not apply because it is simply part of a test that allows for drugs to be compounded pursuant to Section 353a(a), which, as stated above, does not apply in this context.

Honken cites *Cook v. Food & Drug Administration*, 733 F.3d 1 (D.C. Cir. 2013), which affirmed this Court's issuance of a permanent injunction requiring the FDA to block the importation of sodium thiopental for use in capital punishment on the grounds that it is unapproved and misbranded.  *Cook* is inapposite because it concerned the FDA's "policy of admitting foreign manufactured thiopental destined for state correctional facilities," *id.* at 10–11, in the face of the FDCA's requirement that the FDA "sample and examine for violations any drug offered for import

---

[7] *Ringo v. Lombardi*, 706 F. Supp. 2d 952 (W.D. Mo. 2010), relied on by Honken, is inapposite.  That court noted that "[i]f the CSA and FDCA apply, they provide safeguards against improper use of lethal injection chemicals by assuring that medical practitioners are adequately involved in the use of those chemicals."  *Id*. at 958.  Given the early stage of the litigation, the court did not consider whether medical practitioners could ethically be involved but simply presumed that there was "a way to use these methods that does not violate the FDCA and CSA."  *Id.* at 960–61.

that has been prepared in an unregistered facility," *id.* at 11.  The question was whether under *Heckler v. Chaney*, 470 U.S. 821 (1985), the court had jurisdiction to review the FDA's exercise of enforcement authority, and if so, whether the policy contravened the FDCA.  The court found that it had jurisdiction because specific "legislative direction in the statutory scheme" set forth "precisely when the agency must determine whether a drug offered for import appears to violate the FDCA, and what the agency must do with such a drug." *Cook*, 733 F.3d at 7 (quoting *Chaney*, 470 U.S. at 833).  In other words, the court's decision "turned solely on whether FDA could exercise enforcement discretion over the imported sodium thiopental," OLC Op. at *14, AR 958, and did not address the broader question of the scope of the FDCA's reach, particularly when the application of the safety provisions of the FDCA to lethal injection drugs would result in the elimination of that method of capital punishment.

### C.  BOP's Adoption of the 2019 Protocol Is Not Arbitrary or Capricious

Honken next contends that BOP's adoption of the 2019 Protocol violates the APA's proscription against unreasonable agency action.  He seeks to rely on extra-record declarations to support his claim.  He is not likely to succeed on this claim, either.

#### 1.  APA review of BOP's adoption of the 2019 Protocol is highly deferential.

The scope of review under the "arbitrary and capricious" standard is "narrow," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "highly deferential," *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017).  "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Nor is the court to "substitute its own judgment for that of the agency." *Mayo v. Reynolds*, 875 F.3d 11, 19–20 (D.C. Cir. 2017) (citation and alteration omitted).  Rather, the court's "only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made," and to ensure that the agency remained "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  Even if the agency decision is "of less than ideal

28

clarity," it must be upheld "if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43. The court only considers "whether there has been a clear error of judgment." *Id.* (citation omitted).

Moreover, the Court "sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see also Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225–26 (D.C. Cir. 1993). Because the court's task is to review the considerations on which the agency relied, and to check that the agency's decision has some basis in the record, "the focal point for judicial review" is "the administrative record . . . , not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). That is, the Court does not act as a factfinder, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985), but its review is limited to "contemporaneous explanation of agency decision," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549 (1978), except "when there has been a 'strong showing of bad faith or improper behavior' or when the record is so bare that it prevents effective judicial review," *Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (quoting *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998)); *see also Citizens to Pres. Overton Park Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("a strong showing of bad faith or improper behavior" is required for the court to look outside the administrative record in APA review).

Given the above standard, Honken's attempt to rely on expert declarations in support of his APA claims are improper. There is no showing of bad faith or improper behavior on the part of the defendants, much less a "strong showing." Nor is the record so bare as to prevent judicial review; to the contrary, as discussed below, BOP has "articulate[d] a satisfactory explanation" for its decision to adopt the single-drug pentobarbital protocol. *State Farm*, 463 U.S. at 43. And while some courts have recognized that supplementation of the administrative record may be appropriate to provide "background information" in order to determine whether the agency considered all of the relevant factors, *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008), the

declarations relied upon by Honken for his APA claims are proffered solely to support his disagreement with the agency's decision. That is not a proper purpose. *See, e.g.*, *id.* at 1002 (denying plaintiff's request to supplement the administrative record with letters from two scientists who stated that they "disagree with the [agency's] interpretation of [the] data" and "believe that [the agency's policy] does not represent the best available scientific information"). As the Ninth Circuit has aptly explained in an APA case, the court "may not impose [itself] 'as a panel of scientists that instructs the [agency] . . ., chooses among scientific studies . . ., and orders the agency to explain every possible scientific uncertainty.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008)). Specifically, "[w]hen specialists express conflicting views, *an agency must have discretion to rely on the reasonable opinions of its own qualified experts* even if, as an original matter, a court might find contrary views more persuasive." *Id.* (quoting *Lands Council*, 537 F.3d at 1000).

Even aside from the limitations imposed by the APA, the Supreme Court has cautioned in the context of method-of-execution challenges that courts are not "boards of inquiry charged with determining 'best practices' for executions," and that the Constitution affords the government "a measure of deference" as to the "choice of execution procedures." *Bucklew*, 139 S. Ct. at 1125 (citation omitted). Thus, "[a] condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative" because otherwise each ruling would be "supplanted by another round of litigation touting a new and improved methodology" and "would embroil the courts in ongoing scientific controversies beyond their expertise." *Baze*, 553 U.S at 51. Such a result, the Supreme Court further said, would "substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death." *Id.* This reasoning, of course, applies equally to Honken's APA challenge to the 2019 Protocol. In fact, Honken is not even attempting to proffer an alternative method of execution that meets the constitutional standard. He only argues that

BOP itself fails to consider his purported alternative methods of execution.   Under the APA's highly deferential standard of review, Honken is not likely to succeed on that argument.

### 2.   BOP's noncompliance with the FDCA and the CSA is reasonable.

Honken argues that BOP's intended application of the 2019 Protocol to him is arbitrary and capricious because the Protocol violates "the spirit of the numerous safeguards within the FDCA and CSA." Mot. at 20.  As already established above, the FDCA and CSA provisions cited by Honken either are not meant to govern the government's use of pentobarbital in capital punishment or are otherwise inapplicable.  Although BOP's choice of pentobarbital is indeed intended to provide Honken with the most humane death, the administration of lethal injection does not have a "medical purpose," as Honken claims.  *Id.* at 21.  Instead, its purpose is to carry out Honken's death sentence pursuant to the FDPA and DOJ regulations.  In effectuating that purpose, BOP took reasonable steps to procure the pentobarbital.  It was under no obligation to voluntarily comply with the FDPA and CSA, when doing so would nullify the endeavor itself. The BOP's judgment in this regard is entitled to deference.  For the same reasons, Honken's argument that the DEA and the FDA (which is not a defendant here) arbitrarily and capriciously failed to enforce the CSA and FDCA is unlikely to succeed, either.

### 3.   BOP's decision to use pentobarbital is reasonable.

Honken has no likelihood of success on his challenge to the reasonableness of BOP's decision to adopt the single-drug pentobarbital protocol.  BOP has "articulate[d] a satisfactory explanation for its decision" and there is no "clear error of judgment." *State Farm*, 463 U.S. at 43. Most significantly, BOP considered the fact that the Supreme Court upheld the use of pentobarbital by Missouri as recently as this year in *Bucklew*.  AR 870.  That holding necessarily means that pentobarbital is not very likely to cause an unconstitutional level of pain, and, as relevant here, it also defeats Honken's claim that BOP arbitrarily chose pentobarbital as the lethal agent.

Of course, BOP also considered the widespread, successful use of pentobarbital by States in either a three-drug or single-drug protocol, including the fact that at least five States use a single-

drug pentobarbital protocol as the primary method of execution.[8]  AR 870–72.  And every one of the five single-drug pentobarbital protocols has been upheld by the courts.  *See, e.g.*, *Whitaker v. Collier*, 862 F.3d 490, 498–99 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018); *Zink v. Lombardi*, 783 F.3d 1089, 1106-07 (8th Cir. 2015) (en banc); *Towery v. Brewer*, 672 F.3d 650, 658–59 (9th Cir. 2012); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280–83 (11th Cir. 2015); *DeYoung v. Owens*, 646 F.3d 1319, 1325–27 (11th Cir. 2011); *Creech v. Reinke*, No. 1:12-cv-173, 2012 WL 1995085, at *14-22 (D. Idaho June 4, 2012).  As the *Baze* plurality observed, "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated."  553 U.S. at 53.

Moreover, BOP considered the fact that inmates challenging state lethal injection protocols frequently propose a single dose of pentobarbital as a superior alternative to other lethal agent(s). *See* AR 932; *see, e.g.*, *Glossip*, 135 S. Ct. at 2738 (inmates proffered that Oklahoma could use single-drug pentobarbital protocol); *Jordan v. Comm'r, Miss. Dep't of Corr.*, 908 F.3d 1259, 1262 (11th Cir. 2018); *Grayson v. Warden, Comm'r , Ala. Dep't of Corr.*, 869 F.3d 1204, 1212 (11th Cir. 2017); *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017); *In re Mo. Dep't of Corr.*, 839 F.3d 732 (8th Cir. 2016); *In re Ohio Execution Protocol Litig.*, 860 F.3d 881, 890-91 (6th Cir. 2017).  And, as BOP noted, dissenting Supreme Court Justices similarly have advocated pentobarbital as a superior lethal agent.  AR 932; *see, e.g.*, *Zagorski v. Parker*, 139 S. Ct. 11, 11–12 (2018) (Sotomayor, J., dissenting) ("Pentobarbital, a barbiturate, does not carry the risks described above; unlike midazolam (a benzodiazepine) pentobarbital is widely conceded to be able to render a person fully insensate.").

In addition, BOP reviewed Dr. Antognini's expert report and testimony concerning pentobarbital in *Bucklew*, AR 871, 872, 930, 933, and consulted with him and other medical professionals about the proposed protocol, AR 872, 525–26.  Dr. Lindsley, Ph. D, of the Vanderbilt

---

[8] Three of those States use the same dosage as the BOP's protocol, which is five grams, *see* AR 18 (Georgia), 59 (Idaho), 90 (Texas), while Missouri uses two syringes of five grams each, AR 70.  The protocol of the fifth State, South Dakota, does not specify the dosage.

Center for Neuroscience Drug Discovery, for example, opined that BOP's single-drug pentobarbital protocol "is more humane than the other double and triple agent injections still employed."  AR 525.  The Administrative Record therefore demonstrates that BOP's decision to adopt the single drug pentobarbital protocol is reasonable and should be upheld.

Relying on the extra-record declarations of Gail A. Van Norman, M.D., and Mark Edgar, M.D.—which, as discussed above, is improper in APA record review—Honken argues that BOP arbitrarily and capriciously ignored the risk that the prisoner will experience acute pulmonary edema during the execution, which will increase the sensation of drowning and suffocation.  Mot. at 26–28.  Honken makes the extraordinary assertion that it is a "virtual medical certainty" that "most, if not all, prisoners" injected with a lethal dose of pentobarbital will experience an "excruciating and torturous death."  Mot. at 26–27 (citations omitted).  But *Bucklew* has already rejected the claim that pentobarbital is sure or very likely to cause an unconstitutional level of pain.  States have also successfully used pentobarbital in executions at least 31 times since 2017, with Missouri and Texas having conducted close to 100 executions since 2012.  *See* AR 857, 871; *see also* AR 871 (noting that, despite media reports of complications in executions, "none of those executions appear to have resulted from the use of single-drug pentobarbital").  Given the APA's highly deferential standard of review, Honken's argument that the APA imposes an additional burden on the agency to ensure that an execution is free from all pain, not just pain that would violate the Eighth Amendment, *see* Mot. at 28, makes no sense.

In any event, BOP's expert, Dr. Antognini, has explained in the Ohio Execution Protocol litigation that "[t]he presence of pulmonary edema is a common finding in drug overdose"—drug overdose being the method by which inmates are executed, whether that drug is midazolam, pentobarbital, or an opioid.  *See In re Ohio Execution Protocol Litig.*, 2-11-cv-1016, 2019 WL 5596645, at ¶¶ 25, 38 (S.D. Ohio July 23, 2019).  Thus, despite the possibility of pain if an inmate develops pulmonary edema during execution, the Sixth Circuit recently held that "neither pulmonary edema nor the symptoms associated with it qualify as the type of serious pain prohibited by the Eighth Amendment."  *In re Ohio Execution Protocol Litig.*, 937 F. 3d. 759, 762

(6th Cir. 2019) (vacating preliminary injunction). As the Sixth Circuit reasoned, "the Eighth Amendment only prohibits forms of punishment that seek to intensify an inmate's death by 'superadd[ing]' feelings of 'terror, pain, or disgrace,'" *id.* (quoting *Bucklew*, 139 S. Ct. at 1124), and, consistent with that understanding, the Supreme Court has said that hanging—which involves slowly suffocating an inmate to death—is not "constitutionally problematic." *Id.* "Because suffocation does not qualify as 'severe pain and needless suffering,'" the Sixth Circuit reasoned, "it follows that Ohio's use of midazolam—which could cause pulmonary edema, i.e., suffocation—is not constitutionally inappropriate." *Id.* That reasoning applies here.

Moreover, even if the Court were to consider and credit the extra-record declarations cited by Honken regarding the sensation of drowning or asphyxiation from pulmonary edema, BOP's decision to use pentobarbital is still reasonable. Honken highlights his experts' view that "it is nearly impossible for most untrained human beings to hold their breath voluntarily for more than 1 minute" and that "within about 1 minute," one will be compelled to take a breath. Mot. at 27 (citation omitted). But as Dr. Antognini also explained in the Ohio litigation, while inmates executed with pentobarbital have been found to have pulmonary edema, those inmates "also became apneic (stopped breathing) almost immediately upon administration of pentobarbital." 2019 WL 5596645, at ¶ 40; *see also id.* ("respiratory depression is a well-known pharmacological effect of pentobarbital, and eyewitness reports indicate that respiratory arrest occurred almost immediately" from pentobarbital injection).

In other words, pentobarbital renders the inmate insensate before the sensation of drowning from pulmonary edema occurs. The extensive litigation on pentobarbital in *Bucklew* confirmed that pentobarbital is a fast-acting barbiturate, which will quickly render an inmate unconscious. *See Bucklew*, 139 S. Ct. at 1132 (citing Dr. Antognini's testimony that "pentobarbital . . . would render Mr. Bucklew fully unconscious and incapable of experiencing pain within 20 to 30 seconds" and noting the absence of contrary evidence); *see also* AR 428–32, 435–36, 499, 508, 521–24; AR 406 (discussing eyewitness observations of "a rapid onset of unconsciousness followed by death"). Dr. Lindsley, with whom BOP also consulted, similarly opined that "at the doses administered (2.5

g x 2 IV), the person receiving the infusion will lose consciousness within 10–30 seconds after the first injection, and respiratory depression/heart failure will ensue within minutes. . . . [He] will be unaware of any pain or suffering due to the rapidity of the effect." AR 525. Dr. Lindsley further reported that "[c]ase histories that are available with single agent pentobarbital sodium detail highly consistent results and extremely rapid and peaceful passing (as relayed by witness accounts)." AR 525. Thus, even if Honken's extra-record declarations were considered, they still would not refute BOP's reasonable determination that pentobarbital would not cause an unconstitutional level of pain.[9]

Finally, although it is an inmate's burden to plead and prove a known and available alternative that is feasible, readily implemented, and that in fact significantly reduces a substantial risk of severe pain, *see Glossip*, 135 S. Ct. at 2737, 2739, Honken seeks to shift that burden to the government, arguing that BOP should have considered "readily implemented alternatives to the risk of pain, including the administration of opioids [fentanyl or morphine] prior to execution," as suggested by Honken's expert, Craig Stevens. *See* Mot. at 28, 14; Decl. of Craig Steven at 7, Ex. 4 to Pl.'s Mot.

BOP did consider alternatives. For example, it explored and rejected using pentobarbital as part of a three-drug sequence, concluding that a one-drug protocol would avoid the complications inherent in obtaining multiple drugs and in navigating expiration dates of multiple drugs. AR 871, 930–31. It would also "reduce the risk of errors during administration and eliminates the need to orchestrate the pace and sequence of administering multiple drugs and IV line management." AR 931. BOP also considered and rejected several other possible lethal agents, including both opioids and anesthetics, either by itself or in combination with other drugs. *See* AR 862–65 (fentanyl); AR 871, 964 (propofol); AR 931, 966 (midazolam, sufentanil citrate, and

---

[9] For similar reasons, even if the administrative record itself does not demonstrate that BOP considered the possibility of an inmate developing pulmonary edema during execution, it is harmless error. Under the APA's "harmless error rule," "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004).

potassium chloride); AR 968 (midazolam and hydromorphone).  For example, BOP considered using fentanyl, a possible pre-dose choice according to the Steven declaration, but decided against it because of concerns that manufacturers of fentanyl would "refuse to provide medications used for clinical treatments of inmates should they find out their drugs are being used for execution," AR 864; because "fentanyl has never been used in an execution and has not been fully litigated," AR 865; and because of concerns about the government "using a drug to which so many Americans are addicted," *id.*  These considerations are reasonable, particularly in light of the Supreme Court's recognition that there are "many legitimate reasons why [the government] might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution." *Bucklew*, 139 S. Ct. at 1125.

### 4.  BOP's decision to use a compounded form of pentobarbital is reasonable.

Although not expressly part of the 2019 Protocol (which leaves the BOP Director the discretion to choose the appropriate form of the lethal substance), BOP's decision to use compounded pentobarbital is also reasonable because of the lack of supply of domestic pentobarbital products.  As the Supreme Court recognized in *Glossip*, 135 S. Ct. at 2733, anti-death penalty advocates' lobbying efforts have led to the unavailability of pentobarbital products.  Just as the States have turned to compounding pharmacies to prepare injectable pentobarbital solution, BOP did so as well.  AR 857, 872; *cf. Gray v. McAuliffe*, No. 3:16CV982, 2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017) ("Because death penalty opponents have made it difficult to obtain FDA-approved drugs customarily used in executions, Virginia has recently resorted to obtaining drugs from compounding pharmacies instead of traditional suppliers.").

Honken faults BOP for not having documented its diligent and good faith effort to obtain FDA-approved pentobarbital.  Mot. at 29.  This argument is frivolous both because of the undisputed lack of availability and Plaintiff Daniel Lewis Lee's admission in this case that all pharmaceutical manufacturers of FDA-approved injectable pentobarbital products have refused to sell their products for use in executions.  *See* Mot. at 30; *Lee v. Barr*, 19-cv-2559, Compl. ¶ 75.

Honken also faults BOP for purportedly failing to consider the inherent risks associated with using a compounding pharmacy to prepare the injectable pentobarbital solution, citing extra-record declarations discussing the potential risks.  *See* Mot. at 29–30.  But such risks are tolerated under the Eighth Amendment.  As the Supreme Court has made clear, "speculation cannot substitute for evidence that the use of the [compounded] drug is '*sure or very likely* to cause serious illness and needless suffering.'"  *Brewer v. Landrigan*, 562 U.S. 996 (2010) (quoting *Baze*, 553 U.S. at 50).  In *Landrigan*, the district court granted a temporary restraining order finding that the inmate was likely to succeed on the merits of his challenge to Arizona's use of sodium thiopental that was manufactured by a foreign source not approved by the FDA.  No. CV-10-2246, 2010 WL 4269559, at *4 (D. Ariz. Oct. 25, 2010).  Because Arizona did not provide information about whether the foreign company followed standard operating procedures for the drug's manufacture and whether the company had a history of contamination in manufacturing the drug, the court found that the inmate had plausibly alleged that the drug could contain harmful contaminants affecting its efficacy.  *Id.*  The Ninth Circuit affirmed.  625 F.3d 1144 (9th Cir. 2010).

The Supreme Court vacated the injunction.  562 U.S. at 996.  Although the inmates had alleged a plausible scenario, the Supreme Court held that courts may not "speculate as to the risk of harm," when there was "no evidence in the record to suggest that the drug obtained from a foreign source is unsafe."  *Id.*  The Court so held despite the fact that Arizona had refused to provide information about the foreign manufacturer.  *Landrigan* thus stands for the proposition that a court may not accept an inmate's speculation as to the potential risk of harm without specific factual allegations establishing an actual risk.  *See, e.g.*, *Cook v. Brewer*, 637 F.3d 1002, 1007 (9th Cir. 2011) (dismissing inmates' complaint that alleged a non-FDA approved, foreign-manufactured drug used by the State could be ineffective, contaminated, and could differ greatly in potency, quality, and formation from other FDA regulated drugs  because "*Landrigan* . . . advises that [those speculative assertions] are not sufficient to state a plausible Eighth Amendment claim").

Consistent with *Landrigan*, courts routinely reject challenges to the use of compounded pentobarbital, whether the challenge is based on the inherent risks of compounding or the fact of non-FDA approval. *See, e.g.*, *Whitaker*, 862 F.3d at 498–99; *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016); *Gissendaner*, 779 F.3d at 1283; *Ladd v. Livingston*, 777 F.3d 286, 289 (5th Cir. 2015); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1265 (11th Cir. 2014); *Sells v. Livingston*, 561 F. App'x 342, 345 & n.3 (5th Cir. 2014); *Whitaker v. Livingston*, 732 F.3d 465, 468–69 (5th Cir. 2013). The Eighth Circuit's decision in *Zink v. Lombardi*, 783 F.3d 1089, 1101 (8th Cir. 2015), rejecting a challenge to Missouri's use of compounded pentobarbital is a good example. Citing *Landrigan*, the court held that the alleged potentialities relating to compounded pentobarbital did not rise to the level of "*sure or very likely*" to cause serious harm or severe pain because the allegations were "limited to descriptions of hypothetical situations in which a potential flaw in the production of the pentobarbital or in the lethal-injection protocol could cause pain." *Id.* at 1101. The court further reasoned that the experts' views cited in the complaint, which noted that "the use of compounding pharmacies 'often results' in 'potentially unsafe drugs,'" actually "underscore that the harms they have identified are hypothetical and not '*sure or very likely*' to occur." *Id.* Moreover, even if "any of the hypothetical situations the prisoners identify [as to the risk of using compounded pentobarbital] came to pass, it would amount to an 'isolated mishap' that 'while regrettable,' would not result in an Eighth Amendment violation." *Id.* (quoting *Baze*, 553 U.S. at 50). The court thus dismissed the complaint for failure to state a claim. The same reasoning applies here.

In addition to the above authority, BOP has also taken steps to protect against the potential risks of using a compounding pharmacy. BOP first ensured that it obtained the active pharmaceutical ingredient from a domestic bulk manufacturer, and that the API produced by the manufacturer was tested for quality assurance. AR 872. BOP also made sure that the compounding pharmacy performed its own testing of the pentobarbital solution it prepared from the API, and that two independent laboratories further performed quality testing of the pentobarbital solution. *Id.* The laboratory reports confirm that the injectable pentobarbital solution

prepared by the compounding pharmacy using the API meets potency, purity, and sterility requirements. *See* AR 970–1015; *see also* AR 985 (laboratory stating that it is registered with the FDA and is compliant with the FDA's CGMP regulations).

Honken questions the testing results, citing to a failed test noted in the reports. *See* Mot. at 30. His concern is unwarranted. As explained in the attached declaration of Raul Campos,[10] although an initial sample of the API—one gram of pentobarbital sodium powder—produced by the bulk manufacture and received on October 26, 2018, failed a portion of the quality assurance testing conducted on November 6, 2018, the manufacturer subsequently refined its production process and produced new API that passed quality assurance testing. *See* Campos Decl. ¶¶ 5–6; AR 976–78, 981–82. Specifically, 3.14 grams of pentobarbital sodium powder, received on February 8, 2019 and tested on February 21, 2019, was found to conform to USP [United States Pharmacopeia] specifications. Campos Decl. ¶ 6; AR 982. The manufacturer then proceeded to produce 150 grams of the API. Campos Decl. ¶ 6l AR 983. Thereafter, the compounding pharmacy converted the API into injectable solution, and testing on the injectable pentobarbital solution at 50 mg/ml was conducted in April 2019, and it passed the test. Campos Decl. ¶ 7. A 365-day study of the stability of the solution was also initiated in April 2019. AR 991. The initial testing results were reported to be within the applicable ranges. *Id.*; AR 1009, 1011.

Honken argues that according to the extra-record declaration of Michaela Almgren, Pharm.M., M.S., the stability testing also purportedly showed that the injectable solution demonstrated inadequate stability and potency at elevated temperature. Mot. at 30. Almgren's declaration, however, merely noted that "one of the stability test points in the accelerated study has failed and is outside the range as specified and acceptable per testing protocol." Almgren

---

[10] The submission of this declaration is permissible because it contains "no new rationalizations," but is "merely explanatory of the original record." *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 464 (D.C. Cir. 2016). In other words, it "'illuminate[s]' the reasons that are implicit in the [record]," *id.* (*quoting Clifford v. Peña,* 77 F.3d 1414, 1418 (D.C. Cir. 1996), and "furnishes an explanation of the administrative action that is necessary to facilitate effective judicial review," *id.* (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

Decl., ¶ 21 (citing AR 1013).  But that is the point of the stability testing, which is to check the injectable solution under extreme conditions, including in that instance at a temperature higher than room temperature.  Campos Decl. ¶ 9.  In any event, in this same test instance the potency/purity of the injectable solution at normal storage conditions was found to be within the acceptable range.  *Id*; AR at 1011.  In subsequent testing on August 21, 2019, the values for extreme conditions were later found to be within the acceptable range for both room temperature and elevated temperature.  *See* Campos Decl. ¶ 9; AR 1014, 1015.

The purpose of the various testing described above is precisely to ensure that the injectable solution ultimately used on an inmate is potent, effective, and free from contaminants.  To suggest that BOP would wantonly disregard a purportedly known risk is contrary to the deference BOP is owed, *see Bucklew*, 139 S. Ct. at 1125, and to the presumption of good faith and regulatory to which it is entitled, *see Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1117 (D.C. Cir. 2007); *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 20 (D.C. Cir. 2002).  Moreover, although not required to do so, BOP selected a compounding pharmacy that is registered with the FDA pursuant to Section 503B of the FDCA.  *See* Campos Decl. ¶ 3.  Section 503B facilities "are subject to the FDA's Current Good Manufacturing Practices ("CGMP") requirements,"[11] which are regulations designed to ensure that human pharmaceuticals "meet quality standards."[12]  Such facilities also "are inspected by FDA according to a risk-based schedule" and "must meet certain other conditions, such as reporting adverse events."[13]

In sum, BOP's decision to use a compounded form of pentobarbital is reasonable.

[11] U.S. Food & Drug Administration, *Compounding Laws and Policies*, https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies.

[12] U.S. Food & Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMPS)*, https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmps.

[13] U.S. Food & Drug Administration, *Compounding Laws and Policies*, https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies.

##### 5. The provisions of the 2019 Protocol governing IV-setting sufficiently provide staff guidance on intravenous injection.

Finally, Honken argues that the 2019 Protocol lacks sufficient specificity to guide the execution team on IV placement. Mot. at 31–32. He relies on the extra-record declaration of Dr. Van Norman, who discusses the various ways IV insertion could go wrong in an execution. *See Id.* at 32. Honken would prefer that the Protocol specify an order of preference of where the IV will be inserted. *See id.* at 33 (noting Idaho's protocol specifying the following order: "arms, hands, ankles and feet, as determined medically appropriate by the Medical Team leader"). He also would prefer that there be a limit on the number of IVs inserted, on the number of attempts to establish an IV line, and on the amount of time for such attempts. *See id.* And he also would like BOP to articulate its contingency plan if things go wrong and to specify how pain will be treated when one IV site is abandoned while another is being established. *See id.* at 31–32.

But Honken has no entitlement to dictate such matters. To the extent he believes that maladministration may occur from the Lethal Injection Protocol's purported lack of specificity, the Eighth Amendment does not provide a basis for him to challenge it. "[W]hat [the Eighth] Amendment prohibits is *wanton exposure* to objectively intolerable risk . . . not simply the possibility of pain." *Baze*, 553 U.S. at 61–62 (citation omitted and emphasis added). An "innocent misadventure" or "an isolated mishap alone does not give rise to an Eighth Amendment violation," the Supreme Court has said, "because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'" *Id.* at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)); *see also Whitaker v. Livingston*, 732 F.3d 465, 468 (5th Cir. 2013) (inmate has no entitlement under the Eighth Amendment "to supervise every step of the execution process"). In *Baze*, the condemned inmates similarly pointed to the challenged protocol's "fail[ure] to establish a rate of injection, which could lead to a failure of the IV," but the Court found such matters insufficient to raise a constitutional concern. *Baze*, 553 U.S. at 54.

Nor does the APA provide a basis to second guess how BOP inserts the IV—a matter that is committed to BOP's discretion. The Lethal Injection Protocol reasonably allows the BOP

Director or his designee to tailor the IV setting to the individual inmate.  *See* AR 875 (the BOP Director or designee shall determine the method of venous access based on the training and experience of personnel establishing the intravenous access and on the recommendation of qualified personnel).  The Protocol does require that if peripheral venous access is utilized, qualified personnel will insert two separate lines in separate locations, and start a flow of saline in each line to keep the line open, with one line being used to deliver the lethal substance while the other being reserved in the event of the failure of the first line.  *Id.*  And it requires that a failure of a venous access line be immediately reported to the BOP Director or his designee.  *Id.*

There is no reason to assume that BOP personnel cannot competently set the IV lines or address issues that may arise by following such guidelines or by following the directions of the BOP Director or his designee about IV access.  This is particularly the case given BOP's expertise.  In addition to the execution rehearsals required by the Lethal Injection Protocol, AR 874, the Administrative Record shows that BOP has studied the issues associated with IV access.  For example, it shows that BOP reviewed "the after action report" of Oklahoma inmate Clayton Lockett's execution in 2014, where the improper placement of the IV caused the inmate to regain consciousness, and explicitly noted the finding of the report, which is that "the viability of the IV access point was the single greatest factor that contributed to the difficulty in administering the execution drugs."  AR 931.  BOP also considered the Supreme Court's discussion of the Lockett example in *Glossip*.  *Id*.  In fact, the expert reports and testimony reviewed by BOP and included in the Administrative Record also discussed the issue of potential IV infiltration.  AR 442–43.  And, discussion of the issue of IV access is prevalent in the case-law reviewed and considered by BOP.  *See* AR 108–400.  Finally, BOP visited several States to observe executions, AR 871, 930, and reviewed state lethal injection protocols, AR 933, AR 7-91.[14]

---

[14] Although Honken also questions the required qualifications of the execution teams, *see* Mot. at 31, both the Supreme Court and courts of appeals have approved qualification requirements similar to those in the 2019 Protocol, *compare* AR 874, ¶ D, *with Baze*, 553 U.S. at 55 (requiring the IV team members to have at least one year of professional experience "as a certified medical

In sum, BOP's decision not to set forth more specific procedures about IV setting in the 2019 Protocol is reasonable. *See Cooey v. Strickland*, 589 F.3d 210, 227 (6th Cir. 2009) (inmate not likely to succeed on the merits of his challenge to the lack of time limit to establish IV access because "the training and qualifications of the medical personnel required by the protocol ensure that they can make this determination competently").

## II.     THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION

Because Honken has failed to establish a likelihood of success on the merits, this Court need not proceed further to consider the remaining preliminary injunction factors. *See Winter*, 555 U.S. at 20.  Before *Winter*, the D.C. Circuit had adopted a sliding scale approach, under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley*, 644 F.3d at 393.  But the D.C. Circuit has construed *Winter* "at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." *Sherley*, 644 F.3d at 393 (citation omitted).  Indeed, "[e]ven a narrow reading of the Court's holding in *Winter* supports the view that sliding-scale analysis is obsolete." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 n.5 (D.D.C. 2014); *see also Nken v. Holder,* 556 U.S. 418, (2009) (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other.").  In the context of method-of-execution challenges, the Supreme Court's *Glossip* opinion confirms that an inmate's failure to establish a likelihood of success on the merits warrants denial of a motion for a preliminarily injunction.  135 S. Ct. at 2737; *see also Hill*, 547 U.S. at 584 ("[I]nmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success

---

assistant, phlebotomist, EMT, paramedic, or military corpsman" and to participate (along with the execution team) in "at least 10 practice sessions per year"); *see also Cooey*, 589 F.3d at 226; *Harbison, v. Little*, 571 F.3d 531, 538–39 (6th Cir. 2009); *Emmett v. Johnson,* 532 F.3d 291, 295 (4th Cir. 2008); *Hamilton v. Jones*, 472 F.3d 814, 816 (10th Cir. 2007).

on the merits."). The Supreme Court has also vacated preliminary injunctions issued by lower courts in method-of-execution cases where the lower court enjoined the execution "without finding that [the inmate] has a significant possibility of success on the merits." *Dunn v. McNabb*, 138 S. Ct. 369 (2017); *see also Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1273 (11th Cir. 2014); *Rhoades v. Reinke*, 671 F.3d 856, 863 (9th Cir. 2011). Although Honken does not seek to rely on his Eighth Amendment claim for purposes of preliminary injunctive relief, the same standard applies.

Should the Court proceed further, though, the equities tip against the issuance of an injunction. While there is no question that an execution is final and that Honken will not be able to litigate his claims on the merits should his execution proceed, it is not clear that constitutes irreparable harm in the context of a challenge to the *method* of execution (rather than a challenge to the lawfulness of the *execution itself*). In challenges to the method of execution, the "irreparable harm" factor often merges with the merits. Indeed, Honken's irreparable harm arguments seek to rely on asserted "risks of physical harm and prolonged suffering during an execution," including the possible development of acute pulmonary edema. Mot. at 40. Because a sentence of death flows from the criminal judgment—rather than the method of execution—courts considering claims like Honken's often weigh only the likelihood that the inmate will experience an unconstitutional level of pain. *See, e.g.*, *Lambert v. Buss*, 498 F.3d 446, 452 (7th Cir. 2007) (no irreparable harm from "mere possibility" that unforeseen complications will cause pain); *Lenz v. Johnson*, 443 F. Supp. 2d 785, 794 (E.D. Va. 2006); *Emmett v. Johnson*, 489 F. Supp. 2d 543, 550 (E.D. Va. 2007); *Boyd v. Beck*, 404 F. Supp. 2d 879, 886–87 (E.D.N.C. 2005).

Honken also alleges that he was irreparably harmed by BOP's failure to engage in notice-and-comment. Mot. at 40–41. Not so. "Courts generally will not base a finding of irreparable injury on a procedural violation standing alone." *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 327 (D.D.C. 2018). Rather, the procedural injury ordinarily must be connected to a concrete harm. *Id.* As discussed above, the Administrative Record demonstrates that Honken will not suffer pain at a level that violates the Eighth Amendment. Thus, the alleged procedural violation alone does not constitute irreparable harm.

At the same time, the "[government's] interest in finality are compelling" when post-conviction proceedings have run their course.  *Calderon*, 523 U.S. at 556; *accord Lambert*, 498 F.3d at 452.  Honken's conviction and sentence have been affirmed repeatedly in the 15 years since he was sentenced to death.  "Equity must take into consideration the [government's] strong interest in proceeding with [the criminal] judgment . . . ."  *Gomez v. U.S. Dist. Court for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992).  As the Attorney General explained when announcing the execution dates for Honken and four other inmates:

> Congress has expressly authorized the death penalty through legislation adopted by the people's representatives in both houses of Congress. . . .  Under Administrations of both parties, the Department of Justice has sought the death penalty against the worst criminals, including these five murderers, each of whom was convicted by a jury of his peers after a full and fair proceeding.  The Justice Department upholds the rule of law—and we owe it to the victims and their families to carry forward the sentence imposed by our justice system.

Office of the Attorney General, Press Release No. 19-807 (July 25, 2019).

The Supreme Court also has recognized that "the victims of crime have an important interest in the timely enforcement of a [death] sentence."  *Hill,* 547 U.S. at 584.  The impact "upon the families of victims and their communities" will "only be compounded by a stay of the execution."  *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1048–49 (D. Idaho), *aff'd*, 671 F.3d 856 (9th Cir. 2011).  Once the "lengthy [post-conviction proceedings] have run their course," "finality acquires an added moral dimension," and "[o]nly with real finality can the victims of crime move forward."  *Calderon*, 523 U.S. at 556.  "To unsettle these expectations," the Supreme Court said, "is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the [government] and the victims of crime alike."  *Id*.

For all these reasons, the balance of equities tip against granting a stay of execution.

## CONCLUSION

For the foregoing reasons, this Court should deny Honken's motion for a preliminary injunction.

Dated:  November 12, 2019

Respectfully submitted,

JESSIE K. LIU
United States Attorney

DANIEL F. VAN HORN
Civil Chief, U.S. Attorney's Office

DENISE M. CLARK (D.C. Bar No. 479149)
Assistant United States Attorney
U.S. Attorney's Office
   for the District of Columbia
Washington, D.C. 20530
202-252-6605
Denise.Clark@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General

ETAN P. DAVIS
Principal Deputy Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

PAUL R. PERKINS
Special Counsel to the
 Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Counsel
JONATHAN KOSSAK (DC Bar 991478)
Trial Attorney
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
Jonathan.Kossak@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2019, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all plaintiffs' counsel of record:

**Joshua Christopher Toll**
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Gerald Wesley King, Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celestw_bacchi@fd.org

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**\*Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

**\*Jeanne Vosberg Sourgens**
VINSON & ELKINS, L.L.P.
(202) 639-6633

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

**\*Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**Robert E. Waters**
VINSON & ELKINS, L.L.P.
(202) 737-0500
Email: rwaters@velaw.com

**William E. Lawler, III**
VINSON & ELKINS, L.L.P.
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**\*William E. Hoffman, Jr.**
KING & SPALDING LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR, LLC
(410) 444-1500
Email: garyeproctor@gmail.com

**Sean D. O'Brien**
PUBLIC INTERSET LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Elizabeth Hagerty**
HOGAN LOVELLS US LLP
(202) 637-3231
Email: elizabeth.hagerty@hoganlovells.com

**\*Yousri H. Omar**
VINSON & ELKINS, L.L.P.
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**\*Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0528
Email: shawn.nolan@fd.org

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

**David Victorson**
(202) 637-2061
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

3

**John D. Beck**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

**Amy J. Lentz**
**STEPTOE & JOHNSON**
(202) 429-1320
Alentz@steptoe.com

**Jon Jeffress**
**KaiserDillon PLLC**
202-640-2850
Email: jjeffress@kaiserdillon.com

**Pieter Van Tol**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

**Arin Smith**
**WILMER CUTLER PICKERING**
(202) 663-6939
Email: Arin.Smith@wilmerhale.com

**Timothy Kane**
**FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA**
(215) 928-0528
Email: timothy_kane@fd.org

/s/ *Jean Lin*
JEAN LIN

\* No e-mail provided on the docket or counsel no longer with the identified firms.