**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
| | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No. 19-mc-145 (TSC) |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Purkey v. Barr*, *et al.*, 19-cv-03214 | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF WESLEY IRA PURKEY'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

BACKGROUND ................................................................. 4

I.      STATUTORY AND REGULATORY BACKGROUND ................................. 4

II.     THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS ................................. 5

III.    PROCEDURAL HISTORY ................................................. 9

STANDARD OF REVIEW ...................................................... 10

ARGUMENT ................................................................. 10

I.      PURKEY IS UNLIKELY TO SUCCEED ON HIS EIGHTH AMENDMENT
CLAIM ................................................................. 10

      A.    The Standard for Method-of-Execution Challenges ......................... 10

      B.    Purkey Is Unlikely to Establish that the 2019 Protocol Poses A Substantial
Risk of Severe Harm ................................................. 11

           1.    Purkey is unlikely to succeed in challenging the use of pentobarbital. .....11

           2.    Purkey's challenge to the 2019 Protocol is based on speculation. ............14

           3.    Purkey is not entitled to discovery to prove his entitlement to preliminary
injunctive relief ...............................................18

      C.    Purkey Fails to Propose An Alternative That Will Significantly Reduce A
Substantial Risk of Severe Pain ....................................... 20

II.     PURKEY IS UNLIKELY TO SUCCEED ON HIS DUE PROCESS CLAIM ............... 23

III.    PURKEY IS UNLIKELY TO SUCCEED ON HIS APA CLAIMS ............................ 25

      A.    The 2019 Protocol Is Not Contrary to Law ............................... 26

           1.    The 2019 Protocol does not contravene the FDPA as applied to Purkey .....26

           2.    The 2019 Protocol does not violate the Controlled Substance Act. ............29

      B.    The 2019 Protocol Is Not Subject to the APA's Notice-and-Comment
Requirement ....................................................... 32

           1.    The 2019 Protocol is a procedural rule .......................................32

2.      The 2019 Protocal could be considered a statement of policy or an interpretive rule. ..........................................................................................37

C.      BOP's Adoption of the 2019 Protocol is Not Arbitrary or Capricious..................38

IV.    The BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION. .....................................................................................41

CONCLUSION................................................................................................................ 44

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ......................................................................... 10

*ACA Int'l v. FCC*,
  885 F.3d 687 (D.C. Cir. 2018) ........................................................................... 27

*Am. Hosp. Ass'n v. Bowen*,
  834 F.2d 1037 (D.C. Cir. 1987) ......................................................................... 34

*Am. Petroleum Inst. v. EPA*,
  862 F.3d 50 (D.C. Cir. 2017) ............................................................................. 27

*Ass'n of Am. Physicians & Surgeons v. Sebelius*,
  746 F.3d 468 (D.C. Cir. 2014) ........................................................................... 29

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015) ........................................................................... 37

*Aulenback, Inc. v. Fed. Highway Admin.*,
  103 F.3d 156 (D.C. Cir. 1997) ..................................................................... 32, 34

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ............................................................................................. 38

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) ............................................................... 32, 35, 36

*Baze v. Rees*,
  553 U.S. 35 (2008) ...................................................................................... *passim*

*Beaty v. Brewer*,
  649 F.3d 1071 (9th Cir. 2011) ........................................................................... 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................... 18

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ............................................................................. 26

*Boyd v. Beck*,
  404 F. Supp. 2d 879 (E.D.N.C. 2005) ............................................................... 42

*Brewer v. Landrigan*,
  562 U.S. 996 (2010) ..................................................................................... 15, 16

*Brockett v. Spokane Arcades, Inc.*,
   472 U.S. 491 (1985) ................................................................................................ 27

*Bucklew v. Precythe*,
   139 S. Ct. 1112 (2019) ..................................................................................... *passim*

*Bucklew v. Precythe*,
   883 F.3d 1087 (8th Cir.), *aff'd*, 139 S. Ct. 1112 (2019) ........................................ 26

*Calderon v. Thompson*,
   523 U.S. 538 (1998) ...................................................................................... 4, 42, 43

*Chavez v. Fla. SP Warden*,
   742 F.3d 1267 (11th Cir. 2014) ............................................................................. 42

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ............................................................................................... 36

*Clarian Health W., LLC v. Hargan*,
   878 F.3d 346 (D.C. Cir. 2017) ......................................................................... 33, 35

*Clemons v. Crawford*,
   585 F.3d 1119 (8th Cir. 2009) ......................................................................... 19, 24

*Cooey v. Strickland*,
   589 F.3d 210 (6th Cir. 2009) ........................................................................... 14, 15

*Cook v. Brewer*,
   637 F.3d 1002 (9th Cir. 2011) ............................................................................... 16

*Cook v. Food & Drug Admin.*,
   733 F.3d 1 (D.C. Cir. 2013) ................................................................................... 31

*Creech v. Reinke*,
   No. 1:12-cv-173, 2012 WL 1995085 (D. Idaho June 4, 2012) ............................... 13

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ............................................................................... 9

*DeYoung v. Owens*,
   646 F.3d 1319 (11th Cir. 2011) ............................................................................. 13

*Dunn v. McNabb*,
   138 S. Ct. 369 (2017) ............................................................................................ 41

*Electronic Privacy Information Center v. U.S. Department of Homeland Security*,
   653 F.3d 1 (D.C. Cir. 2011) ............................................................................. 34, 35

*Emmett v. Johnson,*
    489 F. Supp. 2d 543 (E.D. Va. 2007) ................................................................. 42

*Emmett v. Johnson,*
    532 F.3d 291 (4th Cir. 2008) ................................................................. 15, 19

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury,*
    857 F.3d 913 (D.C. Cir. 2017) ................................................................. 38

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ................................................................. 14

*FERC v. Elec. Power Supply Ass'n,*
    136 S. Ct. 760 (2016) ................................................................. 38

*Furman v. Georgia,*
    408 U.S. 238 (1972) ................................................................. 4

*Gissendaner v. Comm'r, Ga. Dep't of Corr.,*
    779 F.3d 1275 (11th Cir. 2015) ................................................................. 13, 16

*Glossip v. Gross,*
    135 S. Ct. 2726 (2015) ................................................................. *passim*

*Gomez v. U.S. Dist. Court for N. Dist. of Cal.,*
    503 U.S. 653 (1992) ................................................................. 42

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ................................................................. 30

*Grayson v. Warden, Comm'r , Ala. Dep't of Corr.,*
    869 F.3d 1204 (11th Cir. 2017) ................................................................. 13

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ................................................................. 4

*Griffin v. Oceanic Contractors, Inc.,*
    458 U.S. 564 (1982) ................................................................. 28

*Guttenberg v. Emery,*
    26 F. Supp. 3d 88 (D.D.C. 2014) ................................................................. 41

*Hamilton v. Jones,*
    472 F.3d 814 (10th Cir. 2007) ................................................................. 15

*Harbison, v. Little,*
    571 F.3d 531 (6th Cir. 2009) ................................................................. 15

*Heckler v. Chaney*,
 470 U.S. 821 (1985) .......................................................................................... 38

*Higgs v. United States*,
 711 F. Supp. 2d 479 (D. Md. 2010) .................................................................. 28

*Hill v. McDonough*,
 547 U.S. 573 (2006) ............................................................................... 18, 41, 43

*In re Mo. Dep't of Corr.*,
 839 F.3d 732 (8th Cir. 2016) ............................................................................ 13

*In re Ohio Execution Protocol Litig.*,
 860 F.3d 881 (6th Cir. 2017) ............................................................................ 13

*In re Ohio Execution Protocol Litig.*,
 937 F. 3d. 759 (6th Cir. 2019) ..................................................................... 11, 12

*Jackson v. Danberg*,
 656 F.3d 157 (3d Cir. 2011) ............................................................................... 6

*James V. Hurson Assocs., Inc. v. Glickman*,
 229 F.3d 277 (D.C. Cir. 2000) .................................................................... 33, 34

*Jones v. Comm'r, Ga. Dep't of Corr.*,
 811 F.3d 1288 (11th Cir. 2016) ........................................................................ 24

*Jordan v. Comm'r, Miss. Dep't of Corr.*,
 908 F.3d 1259 (11th Cir. 2018) ........................................................................ 13

*K-Mart Corp. v. Cartier, Inc.*,
 486 U.S. 281 (1988) .......................................................................................... 26

*Ladd v. Livingston*,
 777 F.3d 286 (5th Cir. 2015) ............................................................................ 16

*Lambert v. Buss*,
 498 F.3d 446 (7th Cir. 2007) ............................................................................ 42

*Landrigan v. Brewer*,
 2010 WL 4269559 (D. Ariz. Oct. 25, 2010), *aff'd*, 625 F.3d 1144 (9th Cir.),
 *vacated order*, 562 U.S. 996 (2010) ........................................................... 15, 16

*Lenz v. Johnson*,
 443 F. Supp. 2d 785 (E.D. Va. 2006) ............................................................... 42

*Lewis v. Casey*,
 518 U.S. 343 (1996) ................................................................................... 23, 25

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ................................................................................................ 36

*Mayo v. Reynolds,*
   875 F.3d 11 (D.C. Cir. 2017) ................................................................................. 38

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) .................................................................................................. 9

*McGehee v. Hutchinson,*
   854 F.3d 488 (8th Cir. 2017) ................................................................................. 13

*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014) ............................................................................ 32

*Miller v. Parker,*
   910 F.3d 259 (6th Cir.), *cert. denied*, 139 S. Ct. 399 (2018) .............................. 42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................ 38, 39

*Munaf v. Geren,*
   553 U.S. 674 (2008) .................................................................................................. 9

*Nat'l Ass'n of Broadcasters v. FCC,*
   569 F.3d 416 (D.C. Cir. 2009) .............................................................................. 36

*Nat'l Mining Ass'n v. McCarthy,*
   758 F.3d 243 (D.C. Cir. 2014) .................................................................... 32, 36, 37

*Nat'l Sec. Counselors v. CIA,*
   931 F. Supp. 2d 77 (D.D.C. 2013) ........................................................................ 34

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................................ 41

*Oken v. Sizer,*
   321 F. Supp. 2d 658 (D. Md. 2004), *stay vacated*, 542 U.S. 916 (2004) ............... 24

*PDK Labs., Inc. v. DEA,*
   362 F.3d 786 (D.C. Cir. 2004) .............................................................................. 28

*Phillips v. DeWine,*
   841 F.3d 405 (6th Cir. 2016) ................................................................................. 24

*Planned Parenthood of Wisc., Inc. v. Azar,*
   316 F. Supp. 3d 291 (D.D.C. 2018) ...................................................................... 36

*Powell v. Thomas*,
   641 F.3d 1255 (11th Cir. 2011) ................................................................. 18, 23

*Pub. Citizen v. Dep't of State*,
   276 F.3d 634 (D.C. Cir. 2002) ............................................................................ 34

*Purkey v. United States*,
   729 F.3d 860 (8th Cir. 2013), *rehearing denied* (2013), *cert. denied*, 135 S. Ct. 355 (2014).... 9

*Reno v. Flores*,
   507 U.S. 292 (1993) .......................................................................................... 26

*Rhoades v. Reinke*,
   671 F.3d 856 (9th Cir. 2011) ........................................................................ 42, 43

*Rhoades v. Reinke*,
   830 F. Supp. 2d 1046 (D. Idaho), *aff'd*, 671 F.3d 856 (9th Cir. 2011) .................................... 43

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r*,
   295 F.3d 16 (D.C. Cir. 2002) ...................................................................... 17, 40

*Roane v. Leonhart*,
   741 F.3d 147 (D.C. Cir. 2014) .......................................................................... 6

*Sells v. Livingston*,
   561 F. App'x 342 (5th Cir. 2014) ...................................................................... 16

*Sepulvado v. Jindal*,
   729 F.3d 413 (5th Cir. 2013) ...................................................................... 24, 25

*Shalala v. Guernsey Memorial Hospital*,
   514 U.S. 87 (1995) .......................................................................................... 37

*Sheppard v. Sullivan*,
   906 F.2d 756 (D.C. Cir. 1990) .......................................................................... 28

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) .............................................................. 10, 26, 41

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) .................................................................. 17, 40

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ............................................................................................ 27

*The Estate of Lockett v. Fallin*,
   841 F.3d 1098 (10th Cir. 2016) .......................................................................... 25

*Towery v. Brewer*,
  672 F.3d 650 (9th Cir. 2012) ............................................................. 13

*Trottie v. Livingston*,
  766 F.3d 450 (5th Cir. 2014) ............................................................. 23

*United States v. Bourgeois*,
  423 F.3d 501 (5th Cir. 2005) ............................................................. 28

*United States v. Chandler*,
  950 F. Supp. 1545 (N.D. Ala. 1996) .................................................. 26

*United States v. Fell*,
  No. 5:01-CR-12-01, 2018 WL 7270622 (D. Vt. Aug. 7, 2018) ............... 28

*United States v. Grace*,
  461 U.S. 171 (1983) .......................................................................... 27

*United States v. Hammer*,
  121 F. Supp. 2d 794 (M.D. Pa. 2000) ................................................ 28

*United States v. Nat'l Treas. Emps. Union*,
  513 U.S. 454 (1995) .......................................................................... 27

*United States v. Purkey*,
  428 F.3d 738 (8th Cir. 2005), *aff'd*, 428 F.3d 738, *rehearing and rehearing en banc* (2006),
  *cert. denied*, 549 U.S. 975 ................................................................ 9

*United States v. Tipton*,
  90 F.3d 861 (4th Cir. 1996) ............................................................... 26

*United States v. Wade*,
  388 U.S. 218 (1967) .......................................................................... 25

*Valle v. Singer*,
  655 F.3d 1223 (11th Cir. 2011) ..................................................... 19, 24

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
  754 F.3d 1260 (11th Cir. 2014) ................................................ 16, 19, 24

*West v. Schofield*,
  519 S.W.3d 550 (Tenn. 2017) ............................................................ 31

*Whitaker v. Collier*,
  862 F.3d 490 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018) ......... 13, 16

*Whitaker v. Livingston*,
  732 F.3d 465 (5th Cir. 2013) ................................................ 16, 19, 20

ix

*Williams v. Hobbs*,
    658 F.3d 842 (8th Cir. 2011) ................................................................ 24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................... 9, 41

*Wood v. Collier*,
    836 F.3d 534 (5th Cir. 2016) ................................................................ 16

*Wood v. Ryan*,
    759 F.3d 1076 (9th Cir.), *vacated*, 811 F.3d 1288 (11th Cir. 2016).................................. 18, 24

*Zagorski v. Parker*,
    139 S. Ct. 11 (2018).......................................................................... 13

*Zink v. Lombardi*,
    783 F.3d 1089 (8th Cir. 2015) ........................................................... *passim*

## STATUTES

5 U.S.C. § 551 .............................................................................. 32

5 U.S.C. § 553 ........................................................................... 32, 36

18 U.S.C. § 3591 ............................................................................. 5

18 U.S.C. § 3592 ............................................................................. 5

18 U.S.C. § 3593 ............................................................................. 5

18 U.S.C. § 3596 ....................................................................... *passim*

18 U.S.C. § 3597 ............................................................................ 26

21 U.S.C. § 802 ............................................................................. 29

21 U.S.C. § 822 ............................................................................. 30

21 U.S.C. § 829 ............................................................................. 29

21 U.S.C. § 841 ............................................................................. 29

21 U.S.C. § 848 ............................................................................. 4

28 U.S.C. § 2401 ........................................................................... 26

65 Del. Laws 281 § 1 (1986) ................................................................ 30

725 Ill. Comp. Stat. 5/119-5 (1983) ......................................................... 30

1982 Mass. Acts 554 § 6 ................................................................................................. 31

Act of Apr. 30, 1790, 1 Stat. 112 ................................................................................... 4

Act of June 19, 1937, 50 Stat. 304 ................................................................................. 4

Anti-Drug Abuse Act of 1988,
    Pub. L. No. 100-690, 102 Stat. 4181 ..................................................................... 4

Federal Death Sentence Act,
    Pub. L. No. 103-322, 108 Stat. 1796 ..................................................................... 5

Sentencing Reform Act of 1984,
    Pub. L. No. 98-473, 98 Stat. 1987 (1984) .............................................................. 4

Ala. Code § 15-18-82.1 (1975) ................................................................................. 27, 30

Ariz. Rev. Stat. Ann. § 13-757 (West 1978) ............................................................. 27, 30

Ark. Code. Ann. § 5-4-615 ........................................................................................... 27

Ark. Code Ann. § 5-4-617 (Michie 1983) .................................................................... 30

Colo. Rev. Stat. § 16-11-401 (West 1988) ................................................................... 30

Fla. Stat. § 922.105 ....................................................................................................... 27

Ga. Code Ann. § 17-10-38 ............................................................................................ 27

Idaho Code § 19-2716 (Michie 1982) ..................................................................... 27, 30

Ind. Code § 35-38-6-1 (1983) ................................................................................. 27, 31

Kan. Stat. Ann. § 22-4001 (1983) ........................................................................... 27, 31

Ky. Rev. Stat. § 431.220 ............................................................................................... 27

La. Stat. Ann. § 15:569 (West 1991) ....................................................................... 27, 31

Md. Code Ann. Art. 27 § 627 (1957)(amended 1994) .................................................. 31

Miss. Code Ann. § 99-19-51 ........................................................................................ 27

Mo. Rev. Stat. § 546.720 (1988) ....................................................................... 26, 27, 31

Mont. Code Ann. § 46-19-103 ..................................................................................... 27

N.C. Gen. Stat. § 15-188 .............................................................................................. 27

N.H. Rev. Stat. Ann. § 630:5 (XIII-XIV)(1986) .......................................................... 31

N.J. Rev. Rev. Stat. § 2C:49-2 (1983) ...................................................................... 31

N.M. Stat. Ann. § 31-14-11 (Michie 1978) ............................................................... 31

Neb. Rev. Stat. § 83-964 .......................................................................................... 27

Nev. Rev. Stat. § 176.355 (Michie 1983) ............................................................. 27, 31

Ohio Rev. Code Ann. § 2949.22 (West 1993) ...................................................... 27, 31

Okla. Stat. tit. 22 § 101 (West 1977) ........................................................................ 31

Okla. Stat. tit. 22 § 1014 .......................................................................................... 27

Or. Rev. Stat. § 137.473 (1985) ................................................................................ 31

Pa. Stat. Ann. tit. 61 § 2121 (West 1990) ................................................................. 31

S.C. Code Ann. § 24-3-530 ....................................................................................... 27

S.D. Codified Laws § 23A-27A-32 (Michie 1984) ................................................ 27, 31

Tenn. Code Ann. § 40-23-114 ................................................................................... 27

Tex. Code Crim. Proc. Ann. art. 43.14 (Vernon 1977)......................................... 27, 31

Utah Code Ann. § 77-19-10....................................................................................... 27

Utah Code Ann. § 77-18-5.5 (1953)(amended 1983) ................................................ 31

Va. Code Ann. § 53.1-234 ......................................................................................... 27

Wyo. Stat. Ann. § 7-13-904 (Michie 1984) ......................................................... 27, 31

## REGULATIONS

21 C.F.R. § 1301.22 .................................................................................................. 30

28 C.F.R. Part 26..................................................................................... 5, 26, 33

28 C.F.R. § 26.2 .......................................................................................................... 5

28 C.F.R. § 26.3 ................................................................................ 5, 26, 27, 33

## OTHER AUTHORITIES

AMA, Code of Medical Ethics, Policy E-2.06 Capital Punishment (2000) ................................. 34

Office of the Attorney General, Press Release No. 19-807 (July 25, 2019),
    U.S. Dep't of Justice, https://www.justice.gov/opa/pr/federal-government-resume-
    capital-punishment-after-nearly-two-decade-lapse .................................................................. 45

U.S. Food & Drug Administration, *Facts About the Current Good Manufacturing
    Practices (CGMPS)*,
    https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-
    manufacturing-practices-cgmps ................................................................................................ 17

U.S. Food and Drug Administration, *Compounding and the FDA: Questions and Answers*,
    https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-
    and-answers ............................................................................................................................ 21

U.S. Food & Drug Administration, *Compounding Laws and Policies*,
    https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies ....... 17

U.S. Food & Drug Administration, *Human Drug Compounding*,
    https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-
    compounding .......................................................................................................................... 7

**INTRODUCTION**

Fifteen years ago, a federal jury convicted Plaintiff Wesley Ira Purkey of kidnapping, raping, and murdering a 16 year old girl and returned a verdict of death, as authorized by the Federal Death Penalty Act ("FDPA"). Purkey's conviction and sentence were affirmed on appeal, and he has exhausted his post-conviction remedies. Purkey's execution has now been scheduled for December 13, 2019, and the Federal Bureau of Prisons ("BOP") intends to conduct it using a single-drug (pentobarbital) lethal injection protocol, which is substantively identical to protocols that have been upheld by courts—including the Supreme Court in its most recent method-of-execution case, *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019). Purkey now asks this Court to enjoin the application of BOP's lethal injection protocol to his execution. While there is no question that Purkey will not be able to litigate the merits of his claims should his scheduled execution proceed, it is not clear that would constitute irreparable harm in the context of a challenge to the method of execution—rather than to the lawfulness of the execution itself. Besides, irreparable harm alone would not be a sufficient basis to issue a preliminary injunction. To merit such intervention, Purkey must also show that he is likely to succeed on the merits and that the overall balance of equities favors an injunction. He has failed to do so, and thus, his motion should be denied.

Most significantly, Purkey has not established that he is likely to succeed on the merits—the key factor in evaluating whether to grant a preliminary injunction. The Supreme Court has explained that the Eighth Amendment forbids only methods of execution that "intensif[y] the sentence of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace.'" *Bucklew*, 139 S. Ct. at 1124 (quoting *Baze v. Rees*, 553 U.S. 35, 48 (2008)). Thus, through a trio of cases—*Bucklew*, *Baze*, and *Glossip v. Gross*, 135 S. Ct. 2726 (2015)—the Supreme Court requires that an inmate raising an Eighth Amendment method-of-execution challenge must (1) show that the challenged execution protocol is sure or very likely to cause severe pain, and (2) plead and prove a known and available alternative method of execution that is feasible and readily implemented, and that in fact significantly reduces a substantial risk of severe pain. This is a heavy burden.

Indeed, the Court has "yet to hold that a[ny] State's method of execution qualifies as cruel and unusual." *Bucklew*, 139 S. Ct. at 1124.

Purkey cannot meet this burden.  The Supreme Court has already rejected the claim that pentobarbital is sure or very likely to cause severe pain.  Indeed, pentobarbital is often proffered as a superior alternative by inmates challenging other lethal injection protocols.  Purkey's complaints about the protocol are thus focused on possible pain that may result from the maladministration of it, and his proposed alternatives are merely additional procedural safeguards to avoid maladministration.  But *Baze* makes clear that an inmate cannot establish a method-of-execution claim by pointing to the possibility of maladministration or by alleging procedural safeguards that the government could adopt.  To hold otherwise, the Supreme Court said, would improperly turn courts into boards of inquiry responsible for assessing best practices for executions.  And as for Purkey's suggestion that he be administered a dose of an opioid or anti-anxiety medication prior to pentobarbital, that suggestion lacks sufficient specificity to make it a feasible and readily implemented alternative.  Nor has Purkey shown that it would significantly reduce a substantial risk of severe pain as compared to the government's protocol.

Purkey argues that the Court should stay his execution pending final resolution of his claims or, at a minimum, until the Court resolves a renewed motion for preliminary relief after discovery.  But this Court has no authority to stay execution unless Purkey has shown his entitlement to a stay.  The Supreme Court and courts of appeals have also uniformly rejected the proposition that an inmate challenging an execution protocol is entitled to discovery to determine whether he has a viable Eighth Amendment claim.  *Glossip* makes clear that failing to plead a method-of-execution claim requires the denial of a preliminary injunction, not the grant of discovery.  And it is well-settled that an inmate does not have an independent constitutional right to information concerning the procedures for implementing his death sentence, whether under the Due Process Clause or the First Amendment.  All of this is demonstrated by the Supreme Court's vacatur of stays of executions issued by lower courts that contravened these bedrock principles.

Purkey claims under the Administrative Procedure Act ("APA") are not likely to succeed, either. *First*, contrary to Purkey's argument, application of the challenged protocol to him is consistent with the FDPA; under both the FDPA and the protocol, lethal injection is the proper method for his execution. *Second*, the Controlled Substance Act's requirement that a valid prescription accompany the dispensation of pentobarbital is not applicable in the context of the Government's administration of the lethal injection. *Third*, the protocol is not subject to the APA's notice-and-comment requirement because it is a procedural rule primarily directed toward improving the efficient and effective operations of the agency. It does not determine any rights or obligations or impose any substantive burden on Purkey but merely explains how the agency intends to exercise its discretion in implementing the substantive norms specified by statute and regulations. *Fourth*, the Administrative Record demonstrates that BOP engaged in reasoned decision-making when adopting the protocol and thus, did not act arbitrarily or capriciously. In addition to *Bucklew* and other judicial opinions upholding the use of pentobarbital, BOP considered its widespread use, explored using it in a three-drug sequence, and considered other options. It also studied and observed the implementation of similar state protocols, consulted with medical professionals, and ensured that the compounded pentobarbital it intends to use in executions has been tested for quality assurance by independent laboratories. Under the APA's highly deferential standard of review, that was sufficient.

Because Purkey has not established a likelihood of success on the merits, his motion should be denied. But even if the Court were to consider the other preliminary injunction factors, they tip against the issuance of an injunction. In assessing irreparable harm, it is certainly the case that Purkey will not be able to litigate the merits of his claims to final resolution absent preliminary relief enjoining his scheduled execution. But Purkey does not contend in this forum that he cannot lawfully be executed; he claims that he cannot be executed using BOP's selected method because "there is substantial risk that [he] will experience substantial and avoidable pain in the course of [his] execution." Mot. at 1, 19-cv-3214, ECF No. 34. That is, the asserted harm at issue requires that Purkey make the same showing as required to establish his Eighth Amendment claim on the

merits.  And as explained above, he cannot do so.  On the other hand, the government, the public, and Purkey's murder victim (as well as her survivors) have a compelling interest in the timely enforcement of a lawful death sentence once post-conviction proceedings have run their course. To delay the implementation of a valid death sentence in such circumstances, the Supreme Court recognized, is "to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the [government] and the victims of crime alike."  *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (internal citations omitted).

## BACKGROUND

## I.      STATUTORY AND REGULATORY BACKGROUND

Federal law has authorized capital punishment since 1790, when the First Congress mandated that several federal crimes be punishable by death.  *See* Act of Apr. 30, 1790, ch. 9, §§ 1, 3, 33, 1 Stat. 112, 112, 113, 119.  Until 1937, federal law prescribed hanging as the method of execution.  Act of Apr. 30, 1790, § 33, 1 Stat. at 119.  In 1937, Congress mandated that each federal execution be carried out in the manner prescribed by the laws of the State within which the sentence was imposed," Act of June 19, 1937, ch. 367, 50 Stat. 304, 304, and the last federal execution under that Act was in 1963.  The Act was repealed in 1984 through the enactment of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, tit. II, ch. II, 98 Stat. 1987 (1984).

Meanwhile, in 1972, the Supreme Court held in *Furman v. Georgia*, 408 U.S. 238 (1972), that the death penalty could violate the Eighth Amendment if imposed in an arbitrary and capricious manner.  In response to *Furman*, some 35 states enacted new statutes to specify the factors to be weighed and the procedures to be followed in deciding whether to impose a capital sentence, and to make the death penalty mandatory for specified crimes.  *Gregg v. Georgia*, 428 U.S. 153, 180–81 (1976).  In 1976, the Supreme Court held that capital punishment is not *per se* unconstitutional if the sentencing scheme provides objective criteria to direct the sentencing discretion and allows the jury (or the judge if appropriate) to consider the character and record of the defendant.  *Id.* at 206–07.  The next federal execution did not occur until 2001, however.

To comply with *Furman* and *Gregg*, Congress enacted the Anti-Drug Abuse Act of 1988 ("ADAA"), Pub. L. No. 100-690, 102 Stat. 4181; *id.* § 7001(a) (codified at 21 U.S.C. § 848(e)). The ADAA authorized capital punishment for the intentional killing of an individual while engaging in criminal enterprises or drug felonies, but did not specify a method of execution. To ensure the orderly implementation of federal death sentences, the Department of Justice ("DOJ") promulgated regulations in 1993 to set forth "death sentence procedures." 28 C.F.R. Part 26. The regulations require federal prosecutors to propose to the sentencing court that any death sentence be implemented by lethal injection on a date and at a place designated by the BOP Director. 28 C.F.R. § 26.2. They further provide that, unless a court orders otherwise, a death sentence shall be executed "[b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death," and the BOP Director shall determine the lethal substance or substances to be used. 28 C.F.R. § 26.3(a).

In 1994, Congress enacted the FDPA, Pub. L. No. 103-322, § 60002, 108 Stat. 1796, 1959, authorizing capital punishment for some 60 offenses (except the offense under the ADAA, which was separately governed by ADAA until 2006) if, after consideration of enumerated factors at a special hearing, *see* 18 U.S.C. §§ 3592, 3593, "it is determined that imposition of a sentence of death is justified," *id.* § 3591. The FDPA further provides that after the condemned inmate has exhausted "the procedures for appeal of the judgment of conviction and for review of the sentence," he or she shall be released "to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," or, if that State does not permit capital punishment, then the sentencing court shall designate the law of another State that does permit capital punishment. *Id.* § 3596. Three executions have taken place under the FDPA, in 2001 and 2003. AR 864.

## II.     THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS

BOP's manual outlining its "policy and procedures for planning and carrying out [death sentences]" is entitled "BOP Execution Protocol." AR 1016, 1019. It provides checklists for pre-execution, execution, and post-execution procedures, as well as detailed steps related to command

center operations, contingency planning, news media procedures, and the handling of stays, commutations, and other delays. *See* AR 1016–67. We refer to it as the "BOP Manual."

The lethal substance(s) and the procedures for injecting such substance(s) are set forth in an addendum to the BOP Manual. Prior to 2011, the addendum called for a sequence of three drugs that included sodium thiopental. *See Roane v. Leonhart*, 741 F.3d 147, 149 (D.C. Cir. 2014). In March 2011, after the sole American manufacturer of sodium thiopental exited the market due to pressure from anti-death penalty activists, AR 870, the government announced that it did not have any reserves of sodium thiopental for lethal injections, *Roane*, 741 F.3d at 149. BOP thereafter began exploring the possibility of using pentobarbital as the lethal agent, which BOP ultimately found to be most suitable. AR 871.

Pentobarbital is a barbiturate that affects the activity of the brain and nervous system. Compl. ¶ 45, 19-cv-3214, ECF No. 1. It is "commonly used to euthanize terminally ill patients who seek death with dignity in States such as Oregon and Washington." *Jackson v. Danberg*, 656 F.3d 157, 165 (3d Cir. 2011) (citation omitted). In 2010, Oklahoma used pentobarbital in executions as part of a three-drug sequence, followed by Ohio the next year in a single-drug execution. AR 870–71. By the time BOP considered using the drug, fourteen states had used pentobarbital, either as part of a three-drug combination or by itself, in executions, and an additional five states had announced plans to use it. AR 871. In settling on the pentobarbital, BOP considered its widespread use for executions and the fact that five States (Georgia, Idaho, Missouri, South Dakota, and Texas) use only pentobarbital to implement death sentences. AR. Those five states have conducted 31 executions since 2017 (including Mr. Bucklew's execution in October of this year). Two of those states, Missouri and Texas, have conducted almost 100 executions since 2012 using only pentobarbital. AR 871. As part of its research, BOP visited state execution sites,

observed state executions, and reviewed state lethal injection protocols, including those of the five States that use a single-drug pentobarbital protocol.  AR 871, 930, 933.[1]

BOP also reviewed judicial opinions upholding the use of pentobarbital in executions against Eighth Amendment challenges.  *See* AR 871, n.13, 932.  It further considered the fact that state inmates challenging lethal injection protocols frequently propose a single dose of pentobarbital as the alternative, preferred method.  *See* AR 931.  In addition, BOP consulted with medical professionals, AR 525–26, 871, 872, 930, and reviewed publically available expert testimony concerning pentobarbital and other drugs.  AR 934.  Specifically, Dr. Joseph F. Antognini, M.D., who served as an expert in *Bucklew*, concurred with BOP's proposed protocol.  AR 872.  Another expert, Craig W. Lindsley, Ph.D, of the Vanderbilt Center for Neuroscience Drug Discovery, similarly opined that the protocol is more humane than other double or triple agent protocols.  AR 525.  BOP also explored alternatives to a single-drug pentobarbital protocol.  It considered using pentobarbital in a three-drug sequence, but determined that a one-drug protocol would avoid "the complications inherent in obtaining multiple drugs" and in navigating expiration dates of multiple drugs, AR 871, 930, and would simplify the procedure, thus "reduc[ing] the risk of administration mishaps," AR 871.  BOP also considered several other drugs, but rejected them.  *See* AR 871, 964 (propofol); AR 862–65 (fentanyl); AR 931, 966 (midazolam, sufentanil citrate, and potassium chloride); AR 968 (midazolam and hydromorphone).

No domestic commercial supply of pentobarbital exists for use in executions.  Recognizing that federal courts of appeals have routinely denied Eighth Amendment challenges to the use of compounded pentobarbital, AR at 857–58, BOP selected a domestic bulk manufacturer that is properly registered with the Drug Enforcement Administration ("DEA") to produce the active pharmaceutical ingredient ("API").  AR 872.  The API was subject to quality assurance testing at BOP's behest.  *Id.*  BOP further selected a compounding pharmacy to store the API and to convert

---

[1] Three of those States use the same dosage as the BOP's protocol, which is five grams, *see* AR 13 (Georgia), 59 (Idaho), 90 (Texas), while Missouri uses two syringes of five grams each, AR 70.  The protocol of the Fifth State, South Dakota, does not specify the dosage.

it into injectable form as needed.  *Id.*  Compounding pharmacies employ a licensed pharmacist or physician combines, who mixes or alters ingredients to create a medication tailored to the needs of an individual.  AR 857; *see also* U.S. Food & Drug Administration, *Human Drug Compounding*, https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.  The compounding pharmacy contracted by BOP is registered with the DEA and the Food and Drug Administration ("FDA"), *see* Declaration of Raul Campos, ¶ 3 (Nov. 12, 2019), ECF No. 36–1, and has performed its own testing of the injectable form of pentobarbital it produced.  AR 872.  Further, two independent laboratories have performed quality testing of the injectable solution produced by the compounding pharmacy.  AR 872; Campos Decl., ¶¶ 5–9; *see also* AR 970–1015 (laboratory reports).  Finally, BOP confirmed with the DEA that the BOP facility in Terre Haute, Indiana—where Purkey's execution will take place—meets the regulatory requirements for storage and handling of pentobarbital.  AR 872.

On July 25, 2019, at the direction of the Attorney General, BOP adopted a revised addendum to the BOP Manual that replaced the three-drug procedure with the use of a single drug, pentobarbital sodium, as the lethal agent.  AR 868, 874–75, 1068–70.  We refer to this addendum as the "Lethal Injection Protocol," and refer to the addendum and the Manual collectively as the "2019 Protocol."  The Lethal Injection Protocol sets forth procedures for BOP to administer the lethal injection.  AR 874.  Specifically, it provides that the BOP Director, in conjunction with the U.S. Marshals Service, shall select qualified personnel to serve as the executioner(s) and their alternates.  *Id.*  "Qualified personnel" is defined to include licensed physicians, nurses, EMTs, paramedics, phlebotomists, and other medically trained personnel, including those trained in the U.S. Military, who have at least one year of professional experience and other personnel with necessary training and experience in a specific execution-related function.  *Id.*  The Lethal Injection Protocol further specifies that "qualified personnel" who are not medically licensed or certified are required to participate in a minimum of ten execution rehearsals a year and shall have participated in at least two execution rehearsals prior to participating in an actual execution.  *Id.*

8

As for administering the lethal agent, the Lethal Injection Protocol provides that the lethal substance shall be placed into three sets of numbered and labeled syringes, with two of those sets serving as backups.  AR 875.  Each set of syringes will consist of two syringes containing 2.5 grams of pentobarbital sodium in 50 ml of diluent and one syringe containing 60 ml of saline flush.  *Id.*  Once the inmate is secured, qualified personnel will attach the leads of a cardiac monitor to the inmate, insert a suitable venous access line or lines, and start a slow rate flow of normal saline solution.  *Id.*  If peripheral venous access is utilized, qualified personnel will insert two separate lines in separate locations, and start a flow of saline in each line to keep the line open.  *Id.*  One line will be used to deliver the lethal substance and the other line will be reserved in the event of the failure of the first line.  *Id.*

## III.    PROCEDURAL HISTORY

In 2003, a federal jury in Missouri convicted Purkey of the interstate kidnap, rape, and murder of a 16 year old girl named Jennifer Long.  *United States v. Purkey*, 428 F.3d 738, 744 (8th Cir. 2005).  Purkey confessed to the crime against Ms. Long while awaiting prosecution for the murder of an eighty-year-old woman, Mary Ruth Bales.  *Id.* at 745.  He disclosed the location where he had discarded Ms. Long's undergarments and jawbone, but the remainder of Ms. Long's body was unrecoverable because he had dismembered it with a chain saw and then burned the remains.  *Id*.  At the penalty phase of the trial in 2004, the jury found as an aggravating factor that Purkey had indeed killed Ms. Bales by repeatedly striking her in the head with a hammer, and determined that he should be sentenced to death.  *Id*. at 746.

The Eighth Circuit affirmed Purkey's conviction and sentence on direct appeal in 2005, 428 F.3d 738, *rehearing and rehearing en banc denied*, 428 F.3d 738 (2006), and the Supreme Court denied his petition for a writ of certiorari in 2006, *Purkey v. United States*, 549 U.S. 975 (2006).  Purkey exhausted his post-conviction remedies in 2014.  *See Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013), *rehearing denied*, 729 F.3d 860 (2013), *cert. denied*, 135 S. Ct. 355 (2014).  Purkey is set to be executed on December 13, 2019.  On October 25, 2019, he filed this suit challenging the 2019 Protocol.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The "most important factor" is whether the movant has "established a likelihood of success on the merits," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). In the context of an Eighth Amendment method-of-execution challenge, the Supreme Court has held that an inmate's failure to establish a likelihood of success, alone, warrants denial of the inmate's motion to preliminarily enjoin his execution. *See Glossip*, 135 S. Ct. at 2737. As discussed below, Purkey has failed to make the requisite showing.

## ARGUMENT

## I. PURKEY IS UNLIKELY TO SUCCEED ON HIS EIGHTH AMENDMENT CLAIM

### A. The Standard for Method-of-Execution Challenges

The Eighth Amendment forbids "long disused (unusual) forms of punishment that intensif[y] the sentence of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace,'" *Bucklew*, 139 S. Ct. at 1124 (quoting *Baze*, 553 U.S. at 48), but "[it] 'does not demand the avoidance of all risk of pain in carrying out executions,'" *id.* at 1125 (quoting *Baze*, 553 U.S. at 47). Thus, the Supreme Court requires inmates challenging a method of execution to establish initially that the protocol "is '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 50). "[T]here must be 'a substantial risk of serious harm,' an 'objectively intolerable risk

of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* (quoting *Baze*, 553 U.S. at 50). The fact that "an execution may result in pain, either by accident or as an inescapable consequence of death," is insufficient to state an Eighth Amendment claim. *Baze*, 553 U.S. at 50.

Next, because the Eighth Amendment analysis is "a *necessarily* comparative exercise," *Bucklew*, 139 S. Ct. at 1126, an inmate must also "plead and prove a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain,'" *id*. at 2737 (quoting *Baze*, 553 U.S. at 52). Merely "'showing a slightly or marginally safer alternative,'" *id.* (quoting *Baze*, 553 U.S. at 51), or "[a] minor reduction in risk is insufficient"; rather, "the difference must be clear and considerable," *Bucklew*, 139 S. Ct. at 1130. Otherwise, courts would become "boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Baze*, 553 U.S. at 51; *accord Bucklew*, 139 S. Ct. at 1125.

Finally, the inmate must demonstrate that the government has refused to adopt the inmate's proposed alternative "without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125. As the Supreme Court recognized, there are "many legitimate reasons why [the government] might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution." *Id.* And "the Constitution affords a measure of deference to [the government's] choice of execution procedures." *Id.* (citation omitted).

## B. Purkey Is Unlikely to Establish That the 2019 Protocol Poses A Substantial Risk of Severe Harm

### 1. Purkey is unlikely to succeed in challenging the use of pentobarbital.

Purkey is not likely to succeed in showing that BOP's planned use of pentobarbital in his execution poses a "substantial risk of severe pain" or an "objectively intolerable risk of harm." *Glossip*, 135 S. Ct. at 2737. Purkey argues that pentobarbital could cause "pulmonary edema," which he describes as "the movement of fluid from small blood vessels in the lung into air space,"

Mot. at 7, causing sensations similar to drowning or asphyxiation.  But as *Baze* noted, "[s]ome risk of pain is inherent in any method of execution . . . no matter how humane," and "the Constitution does not demand the avoidance of all risk of pain in carrying out executions."  553 U.S. at 47.

Thus, the Sixth Circuit recently held that, despite the possibility of pain if an inmate develops pulmonary edema during the execution, "neither pulmonary edema nor the symptoms associated with it qualify as the type of serious pain prohibited by the Eighth Amendment."  *In re Ohio Execution Protocol Litig.*, 937 F. 3d. 759, 762 (6th Cir. 2019) (vacating preliminary injunction).  As the court reasoned, consistent with the understanding that the Eighth Amendment only prohibits punishments that intensify the sentence of death by superadding pain, terror or disgrace, the Supreme Court has said that hanging—which involves slowly suffocating an inmate to death—is not "constitutionally problematic."  *Id.*  "Because suffocation does not qualify as 'severe pain and needless suffering,'" the Sixth Circuit reasoned, "it follows that Ohio's use of midazolam—which could cause pulmonary edema, *i.e.*, suffocation—is not constitutionally inappropriate."  *Id.* (citing *Bucklew*, 139 S. Ct. at 1124).

Dr. Antognini testified in the Ohio litigation that "[t]he presence of pulmonary edema is a common finding in drug overdose"—drug overdose being the method by which inmates are executed whether that drug is midazolam (at issue in that case), pentobarbital, or an opiod.  *See In re Ohio Execution Protocol Litig.*, 2-11-cv-1016, 2019 WL 5596645,  ¶¶ 25, 38 (S.D. Ohio July 23, 2019).  But while inmates executed with pentobarbital have been found to have pulmonary edema, those inmates "also became apneic (stopped breathing) almost immediately upon administration of pentobarbital."  *Id.* ¶ 40; *see also id.* ("eyewitness reports indicate that respiratory arrest occurred almost immediately" from pentobarbital injection).  In other words, pentobarbital renders the inmate insensate before any sensation of drowning from pulmonary edema occurs.  The litigation on pentobarbital in *Bucklew* confirmed that pentobarbital will quickly render an inmate unconscious.  *See* 139 S. Ct. at 1132 (crediting Dr. Antognini's testimony that pentobarbital would "render Mr. Bucklew fully unconscious and incapable of experiencing pain within 20 to 30 seconds"); *see also* AR 406, 428–32, 435–36, 499, 508, 521–24.  Dr. Lindsley, with whom BOP

also consulted, similarly opined that, "at the doses administered (2.5 g x 2 IV), the person receiving the [pentobarbital] infusion will lose consciousness within 10–30 seconds after the first injection, and respiratory depression/heart failure will ensue within minutes" and "he will be unaware of any pain or suffering due to the rapidity of the effect." AR 525; *see also id.* (noting "highly consistent results and extremely rapid and peaceful passing (as relayed by witness accounts)").

Moreover, "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated." *Baze*, 553 U.S. at 53. BOP chose pentobarbital because of its widespread use by States in either a three-drug or single-drug protocol, with five States using only a single dose of pentobarbital in their executions. Those five States have conducted 31 executions since 2017 (including Mr. Bucklew's execution in October of this year), and two of those States, Texas and Missouri, have conducted close to 100 executions since 2012. AR 857, 871. All five States' single-drug pentobarbital protocol have been upheld by courts. *See, e.g.*, *Whitaker v. Collier*, 862 F.3d 490, 498–99 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018); *Zink v. Lombardi*, 783 F.3d 1089, 1106–07 (8th Cir. 2015) (en banc); *Towery v. Brewer*, 672 F.3d 650, 658–59 (9th Cir. 2012); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280–83 (11th Cir. 2015); *DeYoung v. Owens*, 646 F.3d 1319, 1325–27 (11th Cir. 2011); *Creech v. Reinke*, No. 1:12-cv-173, 2012 WL 1995085, at *14–22 (D. Idaho June 4, 2012); *see also Glossip*, 135 S. Ct. at 2733 ("courts across the country have held that the use of pentobarbital in executions does not violate the Eighth Amendment"). *Bucklew*, of course, upheld Missouri's protocol only this year.

Inmates challenging different execution protocols also frequently proffer pentobarbital as an alternative that would significantly reduce the risk of severe pain as compared to other lethal agent(s). *See, e.g.*, *Glossip*, 135 S. Ct. at 2738 (inmates proffered that Oklahoma could use single-drug pentobarbital protocol); *Jordan v. Comm'r, Miss. Dep't of Corr.*, 908 F.3d 1259, 1262 (11th Cir. 2018); *Grayson v. Warden, Comm'r , Ala. Dep't of Corr.*, 869 F.3d 1204, 1212 (11th Cir. 2017); *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017); *In re Mo. Dep't of Corr.*, 839 F.3d 732 (8th Cir. 2016); *In re Ohio Execution Protocol Litig.*, 860 F.3d 881, 890-91 (6th Cir. 2017); *see also Zagorski v. Parker*, 139 S. Ct. 11, 11–12 (2018) (Sotomayor, J., dissenting)

13

("Pentobarbital, a barbiturate, does not carry the risks described above; unlike midazolam (a benzodiazepine) pentobarbital is widely conceded to be able to render a person fully insensate.").

### 2. Purkey's challenge to the 2019 Protocol is based on speculation.

Purkey's remaining arguments against the 2019 Protocol are premised on his speculation that something could go wrong during his execution—what courts refer to as "maladministration." *See, e.g.*, Mot. at 7 ("failure to take proper precautions"); *id.* at 20 (difficulties with setting IVs); *id.* at 23–24 (using unscrupulous compounding pharmacy); *see also id.* at 24 (challenging the removal of a common sense provision in the 2008 Addendum that requires execution team members to alert responsible officials if the execution was not going as planned).  Those arguments are not likely to succeed in establishing a method-of-execution claim.

To "successfully plead[] facts to demonstrate a substantial risk of severe pain requires the prisoners to plead more than just a hypothetical possibility that an execution could go wrong." *Zink*, 783 F.3d at 1098–99.  An "innocent misadventure" or "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'"  *Baze*, 553 U.S. at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).  Again, "what [the] Amendment prohibits is *wanton exposure* to objectively intolerable risk . . . not simply the possibility of pain." *Id.* at 61–62 (citation omitted) (emphasis added).

In *Baze*, the condemned inmates similarly pointed to "numerous aspects of the [challenged] protocol that they contend create opportunities for error," particularly the possible "improper administration of the first drug" in the three-drug protocol at issue.  553 U.S. at 53; *see id.* at 54.  The inmates there were unable to establish that "the risk of an inadequate dose of the first drug [was] substantial," even though it was undisputed that if the first drug was not properly administered, there was "a substantial, constitutionally unacceptable risk of suffocation from the administration of the [second drug] and pain from the injection of [the third drug]." *Id.* at 53–54; *see also Zink*, 783 F.3d at 1101 (Eighth Amendment claim dismissed because even if "any of the hypothetical situations the prisoners identify came to pass," isolated mishaps "would not result in

14

an Eighth Amendment violation"); *Cooey v. Strickland*, 589 F.3d 210, 225 (6th Cir. 2009) ("Permitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of our judicial authority.").

Notably, many aspects of the Kentucky protocol upheld in *Baze* are similar to the 2019 Protocol. For example, the Kentucky protocol required the establishment of "both primary and backup lines" and the preparation of "two sets of lethal injection drugs before the execution commences." 553 U.S. at 55. The 2019 Protocol similarly requires the team to establish two separate IV lines in separate locations if peripheral venous access is utilized. AR 875. The Kentucky protocol required the IV team members to have at least one year of professional experience "as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman" and to participate (along with the execution team) in "at least 10 practice sessions per year." *Baze*, 553 U.S. at 55. The 2019 Protocol similarly defines qualified personnel to be licensed physicians, nurses, EMTs, paramedics, phlebotomists, or other medically trained personnel, including those trained in the U.S. Military, who have at least one year of professional experience, and further requires those who are not medically licensed or certified to participate in a minimum of ten execution rehearsals a year and at least two execution rehearsals prior to participating in an actual execution. AR 874. Courts of appeals have also upheld the qualifications and training requirements similar to those outlined in the 2019 Protocol.[2]

---

[2] *See, e.g.*, *Cooey*, 589 F.3d at 226 (requirement of one year of medical training and the use of medical assistants, phlebotomists, and EMTs were sufficient to ensure competent execution personnel); *Harbison, v. Little,* 571 F.3d 531, 538–39 (6th Cir. 2009) (use of two paramedic technicians to administer the IV and monthly training sessions of the execution team provided sufficient safeguards to assume proper administration of state protocol); *Emmett v. Johnson,* 532 F.3d 291, 295 (4th Cir. 2008) (finding sufficient requirements that the execution personnel undergo eight hours of training per month and that at least two team members "have received training as military corpsmen, cardiac emergency technicians, or should receive on-the-job training from a physician in receiving and dispensing medications, to include starting and administering IV fluids"); *Hamilton v. Jones*, 472 F.3d 814, 816 (10th Cir. 2007) (rejecting challenge to protocol that allowed "an EMT–P or person with similar qualifications and expertise in IV insertion" to establish the IV drips).

As for Purkey's speculation that the compounded pentobarbital BOP intends to use likely will be contaminated or sub-potent, *see* Mot. at 23–24, such "speculation cannot substitute for evidence that the use of the [compounded] drug is '*sure or very likely* to cause serious illness and needless suffering.'" *Brewer v. Landrigan*, 562 U.S. 996 (2010) (quoting *Baze*, 553 U.S. at 50). In *Landrigan*, the district court granted a temporary restraining order finding that the inmate was likely to succeed on the merits of his challenge to Arizona's use of sodium thiopental that was manufactured by a foreign source not approved by the FDA.  No. CV-10-2246, 2010 WL 4269559, at *4 (D. Ariz. Oct. 25, 2010).  Because Arizona did not provide information about whether the foreign company followed standard operating procedures for the drug's manufacture and whether the company had a history of contamination in manufacturing the drug, the court found that the inmate had plausibly alleged that the drug could contain harmful contaminants affecting its efficacy.  *Id.*  The Ninth Circuit affirmed.  625 F.3d 1144 (9th Cir. 2010).

The Supreme Court vacated the injunction.  562 U.S. at 996.  Although the inmates had alleged a plausible scenario, the Court held that courts may not "speculate as to the risk of harm," when there was "no evidence in the record to suggest that the drug obtained from a foreign source is unsafe."  *Id. Landrigan* thus stands for the proposition that a court may not accept an inmate's speculation as to the potential risk of harm without specific factual allegations establishing an actual risk.  *See, e.g.*, *Cook v. Brewer*, 637 F.3d 1002, 1007 (9th Cir. 2011) (dismissed inmates' complaint that alleged that a non-FDA approved, foreign-manufactured drug used by the State could be ineffective, contaminated, and could differ greatly in potency, quality, and formation from other FDA regulated drugs because "*Landrigan* . . . advises that [those speculative assertions] are not sufficient to state a plausible Eighth Amendment claim").

Consistent with *Landrigan*, courts routinely reject challenges to the use of compounded pentobarbital, whether the challenge is based on the inherent risks of compounding or the fact of non-FDA approval.  *See, e.g.*, *Whitaker*, 862 F.3d at 498–99; *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016); *Gissendaner*, 779 F.3d at 1283; *Ladd v. Livingston*, 777 F.3d 286, 289 (5th Cir. 2015); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1265 (11th Cir. 2014); *Sells v.*

*Livingston*, 561 F. App'x 342, 345 & n.3 (5th Cir. 2014); *Whitaker v. Livingston*, 732 F.3d 465, 468–69 (5th Cir. 2013).  The Eighth Circuit's decision in *Zink v. Lombardi*, 783 F.3d 1089, 1101 (8th Cir. 2015), rejecting a challenge to Missouri's use of compounded pentobarbital is a good example.  Citing *Landrigan*, the court held that the inmates' allegations relating to compounded pentobarbital did not rise to an unconstitutional level of harm because they were "limited to descriptions of hypothetical situations in which a potential flaw in the production of the pentobarbital or in the lethal-injection protocol could cause pain."  *Id.* at 1101.  The court reasoned that the experts' views cited in the complaint, which noted that "the use of compounding pharmacies 'often results' in 'potentially unsafe drugs,'" actually "underscore that the harms they have identified are hypothetical and not '*sure or very likely*' to occur."  *Id.*  The court thus dismissed the complaint for failure to state a claim.  Like the inmates in *Zink*, Purkey similarly relies on "allegations of generalized harms resulting from the use of a compounding pharmacy to produce the pentobarbital and ha[s] failed to provide anything more than speculation that the current protocol carries a substantial risk of severe pain."  *Id.*  If the inmates in *Zink* could not state a claim based on such allegations of generalized harm, then surely Purkey cannot meet the higher standard of establishing a likelihood of success on the merits.

Purkey's speculation about the quality of the compounded pentobarbital is unwarranted.  It is based on the assumption that BOP would choose an unscrupulous compounding pharmacy.  But BOP officials are entitled to a presumption of good faith and regularity.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007); *see also Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 20 (D.C. Cir. 2002).  And, although not required to do so, BOP selected a compounding pharmacy that is registered with the FDA pursuant to Section 503B of the Food, Drug, & Cosmetics Act ("FDCA").  *See* Campos Decl. ¶ 3, ECF No. 36-1.  Section 503B facilities are inspected by the FDA according to a risk-based schedule.  They must meet certain other conditions, such as reporting adverse events, and they are subject to the FDA's Current Good Manufacturing Practices ("CGMP") requirements, which are regulations designed to ensure that

human pharmaceuticals meet quality standards.[3]   In any event, the active pharmaceutical ingredient produced by the bulk manufacturer was subjected to quality assurance testing and the compounding pharmacy also conducted its own testing of the injectable form of pentobarbital it converted from the API.  AR 872.  Moreover, and most crucially, two independent laboratories have performed quality testing of the injectable pentobarbital to ensure potency, purity, and sterility.  *Id.*; *see also* AR 970–1015 (laboratory reports); AR 985 (lab stating that it is registered with the FDA and is compliant with FDA's CGMP regulations).  The independent laboratory reports are part of the Administrative Record, and yet Purkey makes no mention of them, nor does he provide any reason why such testing is insufficient to offset the purported risk he identifies.

### 3.   Purkey is not entitled to discovery to prove his entitlement to preliminary injunctive relief.

Purkey asserts that he is entitled to a preliminary injunction pending discovery "to determine the extent to which he faces an unconstitutional risk of 'unnecessary and wanton infliction of pain'" when he is executed.  Mot. at 22–23.  The need for discovery, however, does not obviate his obligation to establish the preliminary injunction factors.  Were it otherwise, the Supreme Court would have decided *Landrigan* differently.  But there is no "broad Eighth Amendment right to know the details of [an inmate's] execution in order to ensure proper oversight and avoid uncertainty."  *Powell v. Thomas*, 641 F.3d 1255, 1258 (11th Cir. 2011).

More fundamentally, "the Supreme Court has rejected the notion that discovery must be available to a plaintiff who cannot allege sufficient factual matter to suggest plausibly an entitlement to relief."  *Zink*, 783 F.3d at 1105–06 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)).  As *Zink* held, this standard is the same in a method-of-execution case such as this.  Thus, when the Ninth Circuit stayed execution in a method-of-execution case pending the

---

[3] U.S. Food & Drug Administration, *Compounding Laws and Policies*, https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies; *see also Facts About the Current Good Manufacturing Practices (CGMPS)*, https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmps.

State's provision to the inmate of information about the drugs to be used in his execution, the qualifications of the execution team, and how the State developed its lethal injection protocol, the Supreme Court promptly vacated the injunction. *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir.), *vacated by* 573 U.S. 976 (2014). And in *Hill v. McDonough,* 547 U.S. 573 (2006), the Supreme Court held that "inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Id.* at 584.

Accordingly, courts routinely deny inmates' motions for a preliminary injunction (or dismiss method-of-execution claims), despite the inmates' assertions that more information from the government is needed to determine compliance with the Eighth Amendment. *See, e.g.*, *Zink*, 783 F.3d at 1101 (dismissal of complaint); *Wellons*, 754 F.3d at 1264 (no preliminary injunction despite argument that inmate needed information to determine whether the compounded pentobarbital was defective and whether the personnel administering the execution was trained); *Whitaker*, 732 F.3d at 468 (no preliminary injunction where inmates argued that if they had more time, "they might discover *something* wrong with the [the compounded pentobarbital newly used by the State]"); *Valle v. Singer*, 655 F.3d 1223, 1234 (11th Cir. 2011) (no preliminary injunction despite inmate's "asserted lack of information as to the efficacy and safety of pentobarbital for use in lethal injections"); *see also Clemons v. Crawford*, 585 F.3d 1119, 1128 (8th Cir. 2009) (affirming grant of judgment on the pleadings against inmates); *Emmett v. Johnson*, 532 F.3d at 307 (affirming grant of summary judgment against inmate despite inmate's request that the case be remanded "to allow him to develop evidence on the efficacy of alternative methods of carrying out the lethal injection process").

Without confronting this overwhelming authority, Purkey argues that *Baze*, *Glossip*, and *Bucklew* all arose after discovery. *See* Mot. at 26. But neither *Baze* nor *Bucklew* involved preliminary injunction motions, and *Glossip* could not be clearer about an inmate's burden when seeking a preliminary injunction. 135 S. Ct. at 2737 ("The preliminary injunction posture of the present case . . . requires [inmates] to establish a likelihood that they can establish both that [the

challenged] lethal injection protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives.").  Legal standards aside, the parties are not starting from a clean slate.  Pentobarbital is not a new drug without a track record for use in executions; the Supreme Court upheld its use just this year in *Bucklew*.  At this point, Purkey must show that the widely tolerated choice of lethal agent is nevertheless unacceptable based on scientific consensus, which he cannot do.  *See Baze*, 553 U.S. at 67 (2008) (Alito, J. concurring) ("[A]n inmate should be required to do more than simply offer the testimony of a few experts or a few studies"; "[i]nstead, an inmate challenging a method of execution should point to a well-established scientific consensus.").  Moreover, the Eighth Amendment is a "comparative exercise," *Bucklew*, 139 S. Ct. at 1126, and, as discussed below, Purkey has not proposed a sufficient alternative that would require discovery to explore whether the alternative would significantly reduce a substantial risk of severe pain as compared to pentobarbital.[4]

### C. Purkey Fails to Propose An Alternative That Will Significantly Reduce A Substantial Risk of Severe Pain

As noted, Purkey must also show that he is likely to succeed in "plead[ing] and prov[ing] a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain," *id*. at 2737 (citation omitted).  None of the three alternatives he proposed meets this standard.  *See* Mot. at 24–25.  First, he proposes that BOP adopt certain "safeguards," such as selecting qualified team members whose qualifications are disclosed; prohibiting the use of a central line unless it is determined to be necessary by qualified medical professionals; using FDA-approved pentobarbital

---

[4] The list of details Purkey wishes to know shows that he is really demanding to "supervise every step of the execution process." *Whitaker*, 732 F.3d at 468.  *See, e.g.*, Mot. at 8 ("the 2019 Addendum fails to describe how the prisoner's sedation and IV apparatus will be monitored"); Compl. ¶ 40d ("manner in which IV catheters shall be inserted into the prisoner and the amount of tubing that will be used"); *id.* ¶ 40e ("the manner in which a monitoring system shall be installed and used to confirm that the prisoner is deeply sedated while dying"); *id.* ¶¶ 40e & 40f (training and qualification of personnel operating the heart monitor and responsible for addressing issues relating to IV tubing, vales and other apparatus in case of malfunctions and how the apparatus shall repaired).  Purkey has "no such entitlement." *Whitaker*, 732 F.3d at 468.

or compounded pentobarbital that complies with regulatory requirements and has been tested and disclosing the records of such testing, chain of custody document, and the compounding formula; placing the inmate in a semi-vertical position when administering the drug; and having procedures to respond to unexpected occurrences during execution.  *Id.*  Second, he proposes that BOP use "bedside administration"—as opposed to having the IV tubing extend from the wall—to reduce the risks of leakage or pinching of the tubing.  *Id.* at 25.  Third, he suggests that BOP "could add a pre-dose of either an opioid or an anti-anxiety medication in a large clinical dose."  *Id.*

As an initial matter, many of the Purkey's suggested safeguards are already part of the Lethal Injection Protocol, including those relating to the qualifications and expertise of the personnel, the independent testing of the domestically sourced, compounded pentobarbital, and the storage of the drug.  And while Purkey recommends that no central line be placed "unless it is determined to be necessary following a vein assessment by a qualified medical professional," Compl. ¶ 62(2), the Protocol allows the BOP Director to permit the use of a central line based on the recommendation of the personnel establishing the intravenous access, AR 875, ¶ H.

Purkey is unlikely to establish that his proposed alternatives would "in fact significantly reduce[] a substantial risk of severe pain."  *Glossip*, 135 S. Ct. at 2737.  His first proposed alternative primarily concerns best practices for implementing lethal injection and disclosures to allow inmates to supervise the process, which hardly constitutes the type of "alternative method of execution" contemplated by Supreme Court jurisprudence.  Moreover, "an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the [government] could take as a failsafe for other, independently adequate measures."  *Baze*, 553 U.S. at 60–61.  Thus, even if the "safeguards" Purkey suggests would potentially make the execution "slightly or marginally safer," *id.* at 51, or cause a "minor reduction in risk," *Bucklew*, 139 S. Ct. at 1130, that is insufficient.  As for using FDA-approved pentobarbital, none is available for execution due to the lobbying efforts of anti-death penalty advocates.  *See Glossip*, 135 S. Ct. at 2733; *see also id.* at 2737–38 (a State cannot be faulted for failing to use lethal injection drugs that it is unable to procure through good-faith efforts).  It was accordingly legitimate for BOP to turn to a

compounding pharmacy. Although drugs prepared by a compounding pharmacy are by definition not approved by the FDA,[5] as explained in detail above, the injectable pentobarbital solution has been tested for quality assurance by independent laboratories.

Purkey's next suggestion to use "bedside administration" is yet another procedural safeguard designed to avoid maladministration. Any marginal benefit it would serve is of no constitutional significance. Indeed, the IV tubing set-up *Baze* upheld similarly involved having the tube extend from the wall as opposed to being at the inmate's "bedside." *See Baze*, 553 U.S. at 45, 56 (the execution team "administers the drugs remotely from the control room through five feet of IV tubing," while the warden and deputy warden remain in the execution chamber to "watch for signs of IV problems, including infiltration"). Moreover, "the Constitution affords a 'measure of deference to [the government's] choice of execution procedure,'" and thus, the government need not adopt the inmate's preferred method of execution if it has legitimate reasons not to do so. *Bucklew*, 139 S. Ct. at 1125 (quoting *Baze*, 553 U.S. at 51). The government's IV tubing arrangement at Terre Haute allows the executioners to administer the lethal agent from the other side of the wall, ensuring that they are not visible to those in the witness room. The government's interest in protecting the executioners' privacy is a legitimate one.

Finally, Purkey's suggestion to add a pre-dose of either an opioid or an anti-anxiety medication is also insufficient to warrant a preliminary injunction. Purkey does not identify which opioid or anti-anxiety medication should be used and in what form or dosage, which alone renders his proposal deficient. *Bucklew*, 139 S. Ct. at 1129 ("[T]he inmate's proposal must be sufficiently detailed to permit a finding that the [government] could carry it out 'relatively easily and reasonably quickly.'" (citation omitted)). Purkey also fails to identify any State that actually adds an opioid or anti-anxiety medication to a pentobarbital protocol. *See id.* at 1130 (a State may decline to utilize an alternative method of execution that "had 'never been used to carry out an

---

[5] *See* U.S. Food and Drug Administration, *Compounding and the FDA: Questions and Answers*, https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers ("Compounded drugs are not FDA-approved.").

execution' and had 'no track record of successful use'"; "choosing not to be the first [State] to experiment with a new method of execution is a legitimate reason to reject it" (citation omitted)). In fact, one of the reasons BOP decided against using fentanyl was that fentanyl has never been used in an execution.  AR 865.  There was also concern that manufacturers of fentanyl would "refuse to provide medications used for clinical treatments of inmates should they find out their drugs are being used for execution," AR 864.  And there is certainly no scientific consensus that adding an opioid or an anti-anxiety medication to the protocol would in fact significantly reduce the risk of severe pain.  As discussed in detail above, pentobarbital will quickly render an inmate unconscious, making the inmate incapable of experience pain.

In sum, Purkey has no likelihood of success on his Eighth Amendment claim.

## II.     PURKEY IS UNLIKELY TO SUCCEED ON HIS DUE PROCESS CLAIM

Purkey is not likely to succeed on his Due Process Claim, either.  He argues that he needs more information to know "whether he faces an objectively intolerable risk of harm," Mot. at 22, and that he is entitled to an opportunity to be heard before he is "deprived of [his] life" and subjected to "appreciable physical pain."  *Id.* at 21 (citation omitted).  He further argues that, because the 2019 Protocol grants BOP discretion to deviate from the procedures, he purportedly "will have no notice at all of the method of his execution."  *Id.*  His arguments have no merit.

The Government agrees that "'[b]eing deprived of life' unequivocally implicates a constitutionally protected interest," *id.*  at 21, and that Purkey is entitled to process before he may be executed.  But Purkey has already received due process in the criminal proceedings.  His life interest is simply not implicated here.  *See Zink*, 783 F.3d at 1109 (in method-of-execution case, holding that "[t]he prisoners in this case already have received due process for the deprivation of their life interests: They were convicted and sentenced to death after a trial in Missouri court, and their convictions and sentences were upheld on appeal.").

As for any purported liberty interest in the manner of execution, no such interest exists.  Just as there is no "broad Eighth Amendment right to know the details of [an inmate's] execution"

as discussed above, *Powell*, 641 F.3d at 1258, there is no freestanding constitutional right, whether under the Fifth Amendment or otherwise, to obtain information from the government in order to discover potential Eighth Amendment claims. *See Lewis v. Casey*, 518 U.S. 343, 354 (1996) (there is no constitutional right "to *discover grievances*, and to litigate effectively once in court" (emphasis added)); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (there is no "cognizable liberty interest in obtaining information about execution protocols"; inmate's claim that "there are unknowns regarding the drug to be used which may add an unacceptable risk of pain and suffering" was insufficient because "uncertainty as to the method of execution is not a cognizable liberty interest"). Thus, for example, in a case where the State failed to promptly share its new execution protocol with the inmate and the district court stayed execution based on "fundamental fairness, if not due process," *Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004), the Supreme Court vacated the stay just two days later, 542 U.S. 916 (2004). And when the Ninth Circuit enjoined the execution of an inmate until the State provided him with specific information about the drugs to be used in his execution, the qualifications of the execution team, and how the State developed its lethal injection protocol, the Supreme Court unanimously vacated the injunction three days later as well. *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir.), *vacated*, 573 U.S. 976 (2014).

Thus, "no . . . circuit court has ever recognized the kind of due process right-of-access claim" Purkey advances. *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016). Instead, courts have rejected due process claims to a wide range of information. *See, e.g.*, *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) (identity of individuals and entities that participate in the lethal injection process); *Zink*, 783 F.3d at 1108 (execution protocol and source of the lethal agent); *Wellons*, 754 F.3d at 1267 ("where, how, and by whom the lethal injection drugs will be manufactured" and "the qualifications of the person or persons who will manufacturer the drugs, and who will place the catheters"); *Sepulvado v. Jindal*, 729 F.3d 413, 419-20 (5th Cir. 2013) (State's execution protocol); *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011) (information about State's execution protocol); *Valle*, 655 F.3d at 1236 n.13 (training of the execution team and the source or vendor history of the drugs); *see also Beaty v. Brewer*, 649

F.3d 1071, 1072 (9th Cir. 2011) (affirming denial of motion to stay execution where inmate was informed less than an hour before his execution that pentobarbital would be substituted for sodium thiopental and where inmate argued that he lacked sufficient time to determine whether there are any constitutional concerns with the new drug); *Clemons*, 585 F.3d at 1129 n.9 (noting lack of authority indicating due process right to probe into backgrounds of State's execution personnel). And at least one court of appeals has rejected a Due Process claim, like the one Purkey raised here, that prison officials' discretion to deviate from the execution protocol somehow denied the inmates an "opportunity to litigate" their Eighth Amendment claims. *See Williams*, 658 F.3d at 852.

Purkey has cited no contrary authority. That is not surprising because the "assertion of necessity—that [the government] must disclose its protocol so that [the inmate] can challenge its conformity with the Eighth Amendment—does not substitute for the identification of a cognizable liberty interest," which is lacking in such circumstances. *Sepulvado*, 729 F.3d at 419.[6]

## III.  PURKEY IS UNLIKELY TO SUCCEED ON HIS APA CLAIMS

Purkey also raises several APA challenges. He argues that the 2019 Protocol contravenes the FDPA and the Controlled Substance Act, and that BOP's adoption of the Protocol fails to comply with the APA's notice and comment requirement and was arbitrary and capricious. Mot. at 16–21. These arguments, like the others, are not likely to succeed.

---

[6] Purkey further asserts, without elaboration, that he has a right to counsel "leading up to and during his execution" under the Due Process Clause and the First and Eighth Amendments. Mot. at 2. However, there is "no law that would support a right to counsel throughout an execution." *The Estate of Lockett by and through Lockett v. Fallin*, 841 F.3d 1098, 1117 (10th Cir. 2016). The preceding sections make clear there is no Eighth Amendment right to supervise an execution for possible maladministration, and *a fortiori*, no right to have counsel do the same. And there is also no Fifth Amendment due process right to discover problems with the execution. The First Amendment right of access to the court similarly does not guarantee a right "to discover grievances, and to litigate effectively once in court." *Lewis*, 518 U.S. at 350–61. And while an accused has a Sixth Amendment right to counsel in all "critical stages" of the criminal proceeding, *United States v. Wade*, 388 U.S. 218, 227–28 (1967), execution is not such a stage because it is not a confrontation between the prosecution and the defense, *see id.*

## A.  The 2019 Protocol Is Not Contrary to Law

### 1.  The 2019 Protocol does not contravene the FDPA as applied to Purkey.

Purkey first argues that the 2019 Protocol is contrary to the FDPA because the FDPA requires a federal death sentence be implemented "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), and does not authorize DOJ to adopt "a rule establishing a distinct federal execution procedure," Mot. at 16.

Purkey is unlikely to succeed on this claim because the FDPA does not conflict with the 2019 Protocol as applied to him.  Purkey was sentenced in Missouri, and Missouri law provides that "[t]he manner of inflicting the punishment of death shall be by the administration of lethal gas or by means of the administration of lethal injection."  Mo. Rev. Stat. § 546.720(1).  Missouri has not used its gas chambers since 1965, *see Bucklew v. Precythe*, 883 F.3d 1087, 1094 (8th Cir.), *aff'd*, 139 S. Ct. 1112 (2019).  Given Missouri law authorization of lethal injection, that is the method of Purkey's execution under the FDPA.  As for the Protocol, it informs BOP's implementation of the FDPA.  In BOP's memorandum to the Attorney General urging the adoption of the Protocol, the agency clearly explained that "implementation of the federal death penalty is governed by 18 U.S.C. §§ 3596, 3597"—*i.e.*, the FDPA.  AR 856.  While no execution can take place except as consistent with the statute, the Protocol seeks to implement validly promulgated DOJ regulations, 28 C.F.R. Part 26, which specify lethal injection as the method of execution.  *See United States v. Tipton*, 90 F.3d 861, 902 (4th Cir. 1996) (upholding DOJ's authority to promulgate 28 C.F.R. Part 26); *United States v. Chandler*, 950 F. Supp. 1545, 1580 (N.D. Ala. 1996) (same).  Application of the Protocol to Purkey is thus consistent with the FDPA.[7]

---

[7] To the extent that Purkey's argument can be construed as a facial challenge to 28 C.F.R. Part 26, as implemented by the 2019 Protocol, the argument is not likely to succeed.  Even assuming Purkey is not barred by the six-year statute of limitations, 28 U.S.C. § 2401, to prevail on a facial challenge, Purkey "must establish that no set of circumstances exists under which the [regulations] would be valid."  *Reno v. Flores*, 507 U.S. 292, 301 (1993) (citation omitted, brackets in original); *see also Sherley*,  644 F.3d at 397 n.** (the "no set of circumstances" test applies "to assess the validity of a regulation challenged as facially incompatible with governing

Moreover, even if the regulation's provision of lethal injection for federal death sentences, *see* 28 C.F.R. § 26.3(a)(4), were replaced by the statutory language that a federal death sentence is to be carried out "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), the outcome would be the same. Where a regulation contradicts a statute, only the part of the regulation that conflicts with the statute is invalidated, *see K-Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 293–95 (1988), and only "as to a particular application," rather than "the entire provision that appears to encompass it," *United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454, 487 (1995) (O'Connor, J., concurring in part and dissenting in part).[8] Again, as demonstrated above, application of § 26.3(a)(4) to Purkey through the 2019 Protocol is consistent with the FDPA. Additionally, the remainder of the regulations, including the portion authorizing the BOP Director to select the lethal substance(s) would remain valid. Under a severability analysis, the court "will sever and affirm a portion of an administrative regulation" if it can say "without any substantial doubt that the agency would have adopted the severed portion on its own." *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017) (cleaned up); *accord ACA Int'l v. FCC*, 885 F.3d 687, 708 (D.C. Cir. 2018) (same). Here, DOJ would adopt today the same regulations for carrying out executions by lethal injection where, as here, the relevant state law authorizes them. This is so because lethal injection is still "by far the most prevalent method

---

statutory law"); *Bldg. & Constr. Trades Dep't v. Allbaugh,* 295 F.3d 28, 33 (D.C. Cir. 2002) (same). He cannot do so because at least one circumstance—Purkey's—is valid.

[8] *Cf. Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504–05 (1985) (invalidating a state obscenity statute "only insofar as the word 'lust' is taken to include normal interest in sex"); *Tennessee v. Garner*, 471 U.S. 1, 4–5, 11 (1985) (invalidating a statute that authorized "all the necessary means"—including deadly force—to effectuate an arrest only as applied to the use of deadly force against non-violent offenders); *United States v. Grace*, 461 U.S. 171, 183 (1983) (striking down a statute that banned assembly on the Supreme Court's grounds only as applied to the sidewalks outside the Court's building, even though the statute did not make any distinction between the grounds proper and the sidewalks).

of execution" for the States, *Glossip*, 135 S. Ct. at 2732.   Indeed, all 29 States whose statutes provide for the death penalty authorize lethal injection as a method of execution.[9]

Purkey asserts that FDPA's reference to the State's "manner of execution" prohibits DOJ from using pentobarbital for lethal injections (as opposed to whatever lethal agent is used in the State where an inmate was sentenced).   Such a reading, however, would lead to an absurd result, requiring the federal government to stock all possible lethal agents used by the States.   *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").   And as one court observed when addressing an identical challenge:   "The *manner* of execution authorized by [the relevant state] law is lethal injection," and since both the relevant state law in that case and the federal government authorize lethal injection as the method of execution, there was no issue of compliance with the FDPA.   *Higgs v. United States*, 711 F. Supp. 2d 479, 556 (D. Md. 2010).   The Fifth Circuit similarly has held that the Attorney General has authority, "through the auspices of the Director of the Federal Bureau of Prisons, to designate the place of execution and the substances to comprise [a condemned inmate's] lethal injection." *United States v. Bourgeois*, 423 F.3d 501, 509 (5th Cir. 2005).   The inmate in *Bourgeois*—a plaintiff in the consolidated *Roane* litigation—had argued that BOP had no power to "determine the particulars of [his] execution," even though the law of the State in which Bourgeois was sentenced, Texas, also specified lethal injection as the method of execution.   *Id.*   As the court held, through Sections 3596(a) and 3597(a) of the FDPA, "Congress had validly delegated the requisite authority to the Department of Justice, of which the Federal Bureau of Prisons is an agency."   *Id.*;

---

[9] *See* Ala. Code § 15-18-82.1; Ariz. Rev. Stat. Ann.  § 13-757; Ark. Code. Ann. § 5-4-615; Fla. Stat. § 922.105; Ga. Code Ann. § 17-10-38; Idaho Code § 19-2716; Ind. Code § 35-38-6-1; Kan. Stat. Ann. § 22-4001; Ky. Rev. Stat. § 431.220; La. Stat. Ann. § 15:569; Miss. Code Ann.  § 99-19-51; Mo. Rev. Stat. § 546.720; Mont. Code Ann. § 46-19-103; Neb. Rev. Stat. § 83-964; Nev. Rev. Stat. § 176.355; N.C. Gen. Stat.  § 15-188; Ohio Code Rev. Ann.  § 2949.22; Okla. Stat. tit. 22 § 1014; S.C. Code Ann. § 24-3-530; S.D. Codified Laws § 23A-27A-32; Tenn. Code Ann. § 40-23-114; Tex. Code Crim. Proc. Ann. art. 43.14; Utah Code Ann. § 77-19-10; Va. Code Ann. § 53.1-234; Wyo. Stat. Ann.  § 7-13-904.

*see also United States v. Fell*, No. 5:01-CR-12-01, 2018 WL 7270622, at *4 (D. Vt. Aug. 7, 2018) ("creation of a federal death chamber [in USP Terre Haute] does not violate the FDPA"); *but see United States v. Hammer*, 121 F. Supp. 2d 794 (M.D. Pa. 2000) (finding that state law applies to implement federal inmate's death sentence in granting inmate's motion to preclude an autopsy).

In any event, Missouri's uses a single-drug pentobarbital protocol—the very protocol upheld in *Bucklew*—and it also uses a compounded form of the drug. AR 871. Thus, even if state law controls these granular details, which it does not, there is no violation of the FDPA.[10]

### 2.   The 2019 Protocol does not violate the Controlled Substance Act.

Purkey similarly has no likelihood of success on his claim that the Protocol violates the Controlled Substances Act ("CSA"). According to Purkey, a Schedule II controlled substance, such as pentobarbital, may not be lawfully dispensed absent "a valid prescription 'issued for a legitimate medical purpose' by a practitioner who is acting 'in the usual course of professional practice' and registered pursuant to the statute." Mot. at 16 (citing 21 U.S.C. §§ 802(21), 829(e)(2), 841(a)(1)). And although the 2019 Protocol is silent on the question, Purkey states that "on information and belief, the Addendum requires dispensing pentobarbital absent a valid prescription by persons who lack a valid registration." *Id.*

Under the CSA, no prescription is needed in the context of the use of pentobarbital for purposes of carrying out capital punishment. The "prescription" requirement of 21 U.S.C. § 829(a) concerns the dispensing of a schedule II substance, either directly by a practitioner (in which case no prescription is required) or by a pharmacist (in which case a prescription is

---

[10] By the same token, Purkey's notice-and-comment challenge would fail as well because the agency's failure to conduct rulemaking would be harmless. Under the APA's "harmless error rule," "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004); *see, e.g.*, *Sheppard v. Sullivan*, 906 F.2d 756, 761 (D.C. Cir. 1990) (agency failure to subject its benefits calculation method detailed in its program operations manual to notice and comment was harmless); *see also Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472 (D.C. Cir. 2014) (holding that "appellants' claim to notice-and-comment procedures under the APA fails because" a statutory requirement "eliminates any possibility that such procedures could remedy appellants' alleged injury").

required).  21 U.S.C. § 829(a).  The term "dispense," as defined under the CSA, "means to deliver a controlled substance to an *ultimate user* or *research subject* by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery."  21 U.S.C. § 802(10) (emphasis added).  Neither Purkey nor anyone identified in the 2019 Protocol is a "research subject" or an "ultimate user"—*i.e.*, "a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household or for an animal owned by him or a member of his household."  *Id*. § 802(27).  Purkey will not be lawfully obtaining or possessing the pentobarbital for his own use.  BOP officials will inject the drug into him pursuant to the Protocol.[11]

The Supreme Court's decision in *Gonzales v. Oregon*, 546 U.S. 243 (2006), confirms that the CSA's prescription requirement simply does not apply in the context of government lethal injection.  There, the Supreme Court found the CSA's requirement of a prescription for a legitimate medical purpose did not authorize the Attorney General to bar dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct.  In so holding, the Court found that CSA is "a statute combating recreational drug abuse," *id.* at 272, and thus, "the prescription requirement is better understood as a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse."  *Id*. at 274; *see also id.* (the prescription requirement "bars doctors from peddling to patients who crave the drugs for those prohibited uses").  "To read prescriptions for assisted suicide

---

[11] To the extent the CSA's other provisions apply, there is no violation.  For example, both the bulk manufacturer and the compounding pharmacy are DEA registrants.  AR 872.  And, "BOP has additionally confirmed with the DEA that the BOP facility in Terre Haute, Indiana, meets the regulatory requirements for storage and handling of pentobarbital."  *Id.*  Even if BOP's executioners are considered to dispense pentobarbital, they are exempt from registration under the CSA.  *See* 21 U.S.C. § 822(c)(1) and (d); 21 C.F.R. § 1301.22(a) (waiving the requirement of registration for any agent or employee of a registered person, if such agent or employee is acting in the usual course of his/her business or employment).

as constituting 'drug abuse' under the CSA," the Court said, "is discordant with the phrase's consistent use throughout the statute, not to mention its ordinary meaning." *Id.*

Equally discordant is any argument that the government's use of a controlled substance in lethal injection constitutes "drug abuse" under the CSA.  Not only is the legislative purpose embodied in the CSA inapplicable to lethal injection, but Congress clearly agreed when it enacted the FDPA in 1994 to require the Government to use the State's manner of execution.  At the time, at least a dozen states had already adopted lethal injection as the method of execution.[12]  *See West v. Schofield*, 519 S.W.3d 550, 571 (Tenn. 2017) ("Clearly, [given 18 U.S.C. § 3596(a),] the federal government does not consider those of its own executions that are conducted by lethal injection to violate a regulatory scheme for the prescription and use of controlled substances.").  Moreover, to require a physician's prescription would make it impossible to effectuate the purpose of the 2019 Protocol, which is to carry out death sentences, because ethical restrictions preclude physicians from issuing prescriptions that would result in death.  *See Baze*, 553 U.S. at 64 (Alito, J., concurring) (noting that the American Medical Association's Code of Medical Ethics prohibits "physician participation in an execution,'" which includes "'prescribing or administering tranquilizers and other psychotropic agents and medications that are part of the execution procedure") (citing AMA, Code of Medical Ethics, Policy E-2.06 Capital Punishment (2000)).

Finally, *Cook v. Food & Drug Admin.*, 733 F.3d 1, 10–11 (D.C. Cir. 2013), which Purkey cites in support of his statutory challenge, is inapposite.  *Cook* involved States' importation of

---

[12] Ala. Code § 15-18-82.1 (1975); Ariz. Rev. Stat. Ann. § 13-757 (West 1978); Ark. Code Ann. § 5-4-617 (Michie 1983); Colo. Rev. Stat. § 16-11-401 (West 1988); 65 Del. Laws 281 § 1 (1986); Idaho Code § 19-2716 (Michie 1982); 725 Ill. Comp. Stat. 5/119-5 (1983); Ind. Code § 35-38-6-1 (1983); Kan. Stat. Ann. § 22-4001(1993); La. Stat. Ann. § 15:569 (West 1991); Md. Code Ann. art. 27, § 627 (1957) (amended 1994); 1982 Mass. Acts 554 §6; Mo. Rev. Stat. § 546.720 (1988); Nev. Rev. Stat. § 176.355 (Michie 1983); N.H. Rev. Stat. Ann. § 630:5 (XIII-XIV) (1986); N.J. Rev. Rev. Stat. § 2C:49-2 (1983); N.M. Stat. Ann. § 31-14-11 (Michie 1978); Ohio Rev. Code Ann. § 2949.22 (West 1993); Okla. Stat. tit. 22 § 101 (West 1977); Or. Rev. Stat. § 137.473(1) (1985); Pa. Stat. Ann. tit. 61, § 2121.1 (West 1990); S.D. Codified Laws § 23A-27A-32 (Michie 1984); Tex. Code Crim. Proc. Ann. art. 43.14 (Vernon 1977); Utah Code Ann. § 77-18-5.5 (1953) (amended 1983); Utah Code Ann. § 77-18-5.5 (1953) (amended 1983); Wyo. Stat. Ann. § 7-13-904 (Michie 1984).

sodium thiopental for purposes of lethal injection. *Id.* at 3. The FDA had a "policy of admitting foreign manufactured thiopental destined for state correctional facilities." *Id.* at 10–11. The D.C. Circuit found that the policy violated the FDCA because the FDCA requires the FDA "to sample and examine for violations any drug offered for import that has been prepared in an unregistered facility," *id.* at 11, but the FDA policy does not so require. Here, as discussed above, the Protocol does not conflict with the CSA, so *Cook* is of no help to Purkey.

### B. The 2019 Protocol Is Not Subject to the APA's Notice-and-Comment Requirement

#### 1. The 2019 Protocol is a procedural rule.

Purkey next argues that because the 2019 Protocol fits within the APA's broad definition of "rule," 5 U.S.C. § 551(4), it should have been subject to notice and comment pursuant to the rulemaking procedures of 5 U.S.C. § 553. *See* Mot. at 17. The APA generally provides that an agency shall provide "notice of proposed rule making" and, after providing the required notice, "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). But the APA excepts from this general requirement "rules of agency organization, procedure, or practice." *Id.* § 553(b). In the D.C. Circuit, the "general label" for such rules is the term "procedural rules." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). A procedural rule is "primarily directed toward improving the efficient and effective operations of an agency." *Batterton v. Marshall*, 648 F.2d 694, 702 n.34 (D.C. Cir. 1980). "The 'critical feature' of a procedural rule is that it covers agency actions that do not themselves alter the rights or interests of parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (citation omitted). In other words, a procedural rule does "not impose new substantive burdens." *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997). It also "does not conclusively bind the agency, the court, or affected private parties," *Batterton*, 648 F.2d at 704, but "ensure[s] that agencies retain latitude in organizing their internal operations," *id.* at 707.

The 2019 Protocol is a procedural rule.  *First*, it is "primarily directed toward improving the efficient and effective operations of an agency."  *Batterton*, 648 F.2d at 702 n.34.  It details the procedural steps the Warden and BOP staff should follow in the lead-up to, and during, the execution and in carrying out previously imposed death sentences—*e.g*., the process by which BOP personnel should approve witnesses to the execution, the Warden's role in arranging for the final meal, the timeframe in which the equipment for the execution should be checked, command center operations, news media procedures, the identification of the lethal substance that should be used, the selection and training of BOP personnel, and how and by whom the lethal substance should be administered.  *See* AR 874–75, 884–90.

*Second*, the 2019 Protocol does not determine the rights or obligations of anyone or impose any substantive burdens.  Rather, the relevant substantive norms are specified by duly enacted statute (the FDPA) and duly promulgated regulations (28 C.F.R. Part 26).  Purkey's death sentence was imposed by a federal court under federal law.  The FDPA and DOJ regulations collectively specify how that sentence will be carried out:  Purkey will be executed by lethal injection using substance(s) selected by the BOP Director; the substance(s) will be administered by qualified personnel selected by the Warden and acting at the direction of the U.S. Marshal; and the execution will be supervised by the U.S. Marshal and will take place at a date, time, and federal penal or correctional institution designated by the BOP Director.   18 U.S.C. § 3596(a); 28 C.F.R. § 26.3(a)(1)–(3).   The 2019 Execution Protocol merely provides guidance to BOP staff by explaining how, in practice, BOP will carry out those instructions, including the choice of lethal agent, the procedural steps of administering the lethal agent, and a whole host of other internal procedures.  *See* AR 874–75, 1016–67.  Such a rule is not substantive.  *See Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 358 (D.C. Cir. 2017) (agency manual's instructions on how to reconcile Medicare reimbursement payments need not be subject to notice-and-comment, where the statute and regulations provided agency with authority to reconcile payments).

Purkey argues that the means by which the government executes its citizen cannot be a procedural rule because it purportedly "directly and substantially affects the rights of those being

executed." Mot. at 18. But the D.C. Circuit has repeatedly cautioned that even a rule with a "substantial impact on the rights of individuals" is not necessarily a substantive rule. *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000). Indeed, "in applying the § 553 exemption for procedural rules[,] [the D.C. Circuit] has gradually shifted focus from asking whether a given procedure has a 'substantial impact' on parties" because "even unambiguously procedural measures affect parties to some degree." *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640–41 (D.C. Cir. 2002).[13] Rather, the court asks whether the rule imposes "new substantive burdens" on the regulated parties. *Aulenback*, 103 F.3d at 169.[14]

Neither the selection of pentobarbital nor the procedures for implementing death sentences impose any "new substantive burdens" on Purkey. This is so because the imposition of a death

---

[13] That is equally true in the context of prison administration, as many circuits have recognized. *See Sacora v. Thomas*, 628 F.3d 1059, 1070 (9th Cir. 2010) (BOP policies for placing inmates in residential re-entry centers were "not substantive rules" and therefore "not subject to the notice-and-comment requirements of . . . the APA"); *Mora-Meraz v. Thomas*, 601 F.3d 933, 940 (9th Cir. 2010) (BOP policy requiring inmate seeking admission to the Residential Drug Abuse Program to demonstrate substance use within past year "need not follow notice and comment procedures" because it merely interpreted "what it means to have a 'verifiable documented drug abuse problem'" (quoting 28 C.F.R. § 550.56(a)(1)); *Serrato v. Clark*, 486 F.3d 560, 569 (9th Cir. 2007) (BOP decision to terminate early release "boot camp" program "was a 'general statement[] of policy' exempt from notice and comment" (quoting 5 U.S.C. § 553(b)(A))); *Sample v. Watts*, 100 F. App'x 317, 318 (5th Cir. 2004) (unpublished) (BOP Program Statement "prohibiting inmates from possessing copies of their Presentence Report" was not subject to notice-and-comment requirement); *Williams v. Van Buren*, 117 F. App'x 985, 986 (5th Cir. 2004) (unpublished) (BOP policy restricting availability of "compassionate release" was an interpretive rule not subject to notice-and-comment requirement); *Pelissero v. Thompson*, 170 F.3d 442, 447 (4th Cir. 1999) (BOP Policy Statement defining "nonviolent offence" for purposes of early release eligibility was not subject to notice-and-comment requirement); *Parsons v. Pitzer*, 149 F.3d 734, 738 (7th Cir. 1998) (same); *Venegas v. Henman*, 126 F.3d 760, 763 (5th Cir. 1997) (same).

[14] The D.C. Circuit has also sometimes asked whether the rule "encodes a substantive value judgment." *Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1047 (D.C. Cir. 1987). It has explained, however, "the fact that [an] agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one. *All* decisions, to the extent that they derive from reasons, necessarily are based on the value judgment that the chosen option is better, in some relevant way, than its alternatives." *James V. Hurson Assocs.*, 229 F.3d at 282; *see also Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013).

sentence carries with it the unavoidable "risk of pain." *Glossip*, 135 S. Ct. at 2733. The Protocol would impose a "new substantive burden" only if it resulted in the infliction of pain beyond that which necessarily, and constitutionally, attends any death sentence—*i.e.*, if it violates the Eight Amendment. But the Eighth Amendment standard can be met only if the inmate can demonstrate a substantial risk of severe pain as compared to known and available alternatives. *Id.* at 2737. And in *Bucklew*, the Supreme Court upheld the use of pentobarbital and concluded that the inmate there had not shown a superior, alternative method that would significantly reduce the pain that could be caused by pentobarbital. *Bucklew*, 139 S. Ct. at 1129–33. Just so here. The Administrative Record establishes that pentobarbital is a humane method of execution, and Purkey's contrary view does not displace the agency's reasoned judgment on this score. In other words, Purkey has no legal right to any specific procedures, or to choose the lethal agent, for implementing his death sentence. While he is free to raise Eighth Amendment challenges to any specific procedure or choice of lethal agent, his ability to sue does not transform the Protocol into a substantive rule.

   *Electronic Privacy Information Center v. U.S. Department of Homeland Security* ("*EPIC*"), 653 F.3d 1 (D.C. Cir. 2011), is not to the contrary. There the D.C. Circuit held that the decision of the Transportation Security Administration ("TSA") to screen airline passengers using advanced imaging technology ("AIT") was not a procedural rule because the decision "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.* at 6. The court emphasized "the privacy interests at the heart of the petitioners' concern with AIT," which was that "by producing an image of the unclothed passenger, an AIT scanner intrudes upon his or her personal privacy in a way a magnetometer does not." *Id.* "[F]ew if any regulatory procedures," the court said, "impose directly and significantly upon so many members of the public." *Id.*

   While the screening technology in that case inevitably and indisputably impinged upon the privacy interests of the traveling public as soon as each passenger was subjected to it, the 2019 Protocol does not have a similar impact. Again, as discussed above, the 2019 Protocol imposes a "new substantive burden" only if it violates the Eight Amendment, but the Administrative Record

demonstrates that it does not do so.  Moreover, whereas *EPIC* was focused on the fact that AIT was a greater privacy intrusion than the prior screening method (magnetometer), the government's choice of pentobarbital is an attempt to utilize a more humane method of execution than those preceding it.  *See* AR 525 ("[BOP's] protocol is more humane than the other double and triple agent injections still employed").  Thus, *EPIC* is factually distinguishable as well.

 *Third*, the 2019 Protocol leaves BOP discretion to deviate from its prescribed processes, the hallmark of a procedural rule.  *See Clarian Health W.*, 878 F.3d at 357 ("we have consistently emphasized that [whether the challenged action has binding effect] is the most important" consideration).  The Lethal Injection Protocol itself provides that the procedures specified therein may be modified at the discretion of the BOP Director as necessary (1) to comply with a court order, (2) to follow medical personnel's recommendation, or (3) as may be required by other circumstances.  AR 874, ¶ A.  Similarly, the Manual provides that the BOP Director or the Warden may deviate from the procedures specified in the Manual.  AR 1019.  Thus, rather than "narrowly constrict[ing] the discretion of agency officials by largely determining the issue addressed," *Batterton*, 648 F.2d at 702, the 2019 Protocol "ensure[s] that [the] agenc[y] retain[s] latitude in organizing [its] internal operations," *id.* at 707.  This feature confirms that the Protocol is a procedural rule.  *See, e.g.*, *Clarian Health W.*, 878 F.3d at 358 (agency's manual instructions on how to reconcile Medicare reimbursement payments not substantive rule because the "Manual itself makes clear that the agency retains the discretion to deviate from the criteria that it set forth"); *Planned Parenthood of Wisc., Inc. v. Azar*, 316 F. Supp. 3d 291, 305–06 (D.D.C. 2018) (agency criteria for determining federal grants constituted procedural rule because the criteria did "not conclusively bind the agency, the court, or affected private parties" but left the agency "free to exercise discretion about who ultimately w[on] [the] grants") (quoting *Batterton*, 648 F.2d at 704).  Purkey disagrees, counting the word "shall" 16 times in the two-page Lethal Injection Protocol as evidence of BOP's purported intent to bind itself.  *See* Mot. at 18.  But as the above discussion makes clear, BOP's use of the word "shall" is not "binding" in the relevant sense given the agency's discretion explicitly provided in the Protocol.  And the fact that BOP similarly did not

subject its prior execution protocol to notice and comment underscores that the 2019 Protocol is indeed merely an internal agency manual.

### 2.   The 2019 Protocol could be considered a statement of policy or an interpretive rule.

The 2019 Protocol could, in the alternative, be considered a "general statement[] of policy," which is also exempt from APA's notice-and-comment requirement.  5 U.S.C. § 553(b)(3)(A).  A statement of policy "explains how the agency will enforce a statute or regulation," *Nat'l Mining Ass'n*, 758 F.3d at 252, and serves to "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979)).  In determining whether an agency has issued a statement of policy rather than a binding rule subject to notice-and-comment, courts conduct a similar analysis as for a procedural rule and "look[] to the effects of the agency's action, asking whether the agency has imposed any rights and obligations or has left itself free to exercise discretion."  *Nat'l Ass'n of Broadcasters v. FCC*, 569 F.3d 416, 426 (D.C. Cir. 2009).  Courts further consider: "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency," *Id.* (citation omitted).

Here, the 2019 Protocol serves to "inform[] the exercise of discretion" embedded in the FDPA and the DOJ regulations.  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (citation omitted).  The 2019 Protocol does not determine anyone's rights or obligations, as discussed above and as the Protocol itself explicitly provides: [t]his manual . . . does not create any legally enforceable rights or obligations."  AR 1019; *see Nat'l Mining Ass'n*, 758 F.3d at 252 (agency guidance was a statement of policy where, among other things, it "repeatedly states that it 'does not impose legally binding requirements'").  And the Protocol leaves the agency free to exercise discretion.  Indeed, BOP's ability to procure the lethal agent necessarily depends on a host of practical considerations, such as those identified by the Supreme Court in *Glossip*, 135 S. Ct. at 2733.  To carry out its statutory duty of implementing

death sentences, DOJ must have discretion to choose both the lethal substance(s) and the form of the chosen substance(s). It has retained that discretion in the 2019 Protocol, while adhering to the substantive standards set forth in the FDPA and DOJ regulations. Of course, as the D.C. Circuit has said, "[w]hen the agency applies [a general statement of] policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." *Nat'l Mining Ass'n*, 758 F.3d at 253 (citation omitted). BOP is doing so here, submitting an administrative record justifying its decision to apply the 2019 Protocol to Honken. But the agency need not have subjected the 2019 Protocol to notice and comment.

Finally, the Lethal Injection Protocol could also be deemed an "interpretive rule" which "advise[s] the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995). Although Defendants believe that the Protocol is more cleanly deemed a procedural rule or statement of policy, we recognize that courts have found the inquiry into how to classify an agency action as "difficult and confused." *Nat'l Min. Ass'n*, 758 F.3d at 251. Regardless of which category the Lethal Injection Protocol is placed into, it is not a legislative rule requiring notice and comment.

### C. BOP's Adoption of the 2019 Protocol Is Not Arbitrary or Capricious

Purkey next contends that BOP's adoption of the 2019 Protocol violates the APA's proscription against unreasonable agency action. He is not likely to succeed on this claim, either.

The scope of review under the "arbitrary and capricious" standard is "narrow," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "highly deferential," *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017). "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Nor is the court to "substitute its own judgment for that of the agency." *Mayo v. Reynolds*, 875 F.3d 11, 19–20 (D.C. Cir. 2017) (citation omitted). Rather, the court's "only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res.*

*Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  Even if the agency decision is "of less than ideal clarity," it must be upheld "if the agency's path may reasonably be discerned."  *State Farm*, 463 U.S. at 43.  The court only considers "whether there has been a clear error of judgment."  *Id.* (citation omitted).

Here, there is no clear error of judgment.  Purkey faults BOP for failing to consider the inherent risks associated with using pentobarbital, with having a compounding pharmacy prepare the injectable pentobarbital solution, and with IV access.  *See* Mot. at 18–19.  But as discussed above, such risks are tolerated under the Eighth Amendment.  In fact, Purkey's APA arguments essentially duplicate his Eighth Amendment challenge through the rubric of arbitrary and capricious review, even though the Supreme Court has expressly warned against "import[ing] profound differences of opinion over the meaning of the Eighth Amendment . . . into the domain of administrative law."  *Heckler v. Chaney*, 470 U.S. 821, 838 (1985).  To credit Purkey's speculations about possible risks would also run counter to the Supreme Court's admonition that courts are not "boards of inquiry charged with determining 'best practices' for executions," and that the Constitution affords the government "a measure of deference" as to the "choice of execution procedures."  *Bucklew*, 139 S. Ct. at 1125 (citation omitted).

In any event, BOP has "articulate[d] a satisfactory explanation for its action" to adopt the single-drug pentobarbital protocol.  *State Farm*, 463 U.S. at 43.  As discussed in detail above, BOP considered the widespread use of pentobarbital by the States, including the fact that at least five States use a single-drug pentobarbital protocol as the primary method of execution, and that numerous executions have been conducted successfully using such a protocol.  AR 870–71.  The Supreme Court's recent decision in *Bucklew* upholding Missouri's single-drug pentobarbital protocol defeats any argument that BOP acted arbitrarily and capriciously in choosing pentobarbital, not to mention that BOP also considered the many judicial opinions upholding the use of pentobarbital in executions.  AR 871 n.13.  BOP further considered the fact that inmates challenging state lethal injection protocols frequently propose a single dose of pentobarbital as the alternative, preferred method and that dissenting Supreme Court Justices similarly have advocated

39

pentobarbital as a superior lethal agent.  AR 932.  In addition, BOP reviewed Dr. Antognini's expert report and testimony concerning pentobarbital in *Bucklew*, AR 871, 872, 930, 933, and consulted with him and other medical professionals about the proposed protocol.  AR 872, 525–26.  BOP also explored and rejected using pentobarbital as part of a three-drug sequence, AR 871, *see also* AR 930, and further considered and rejected several other possible lethal agents, *see* AR 862–65, 871, 930–31, 964, 966, 968.

Although not expressly part of the 2019 Protocol (which leaves the BOP Director the discretion to choose the appropriate form of the lethal substance), BOP's decision to use compounded pentobarbital is also reasonable because of the lack of domestic supply of pentobarbital products for executions, as the Supreme Court has explicitly recognized in *Glossip*, 135 S. Ct. at 2733.  AR 872.  And far from exhibiting a wanton disregard of the potential risks of using a compounding pharmacy, BOP first determined that federal courts of appeals routinely have upheld the use of compounded lethal agents.  AR 857.  BOP then ensured that it obtained the active pharmaceutical ingredient from a domestic bulk manufacturer, and that the API produced by the manufacturer was tested for quality assurance.  AR 872.  Importantly, BOP further ensured that the compounding pharmacy—an FDA registered facility—performed its own testing of the pentobarbital solution it prepared from the API, and that two independent laboratories have further performed quality testing of the pentobarbital solution.  *Id.*  The laboratory reports confirm that the injectable pentobarbital solution prepared by the compounding pharmacy meets potency, purity, sterility requirements.  *See* AR 970–1015.  BOP acted reasonably, not to mention that it is also entitled to a presumption of good faith and regularity.  *See Sussman*, 494 F.3d at 1117; *Riggs Nat'l Corp. & Subsidiaries*, 295 F.3d at 20.

Finally, Purkey argues that "the Administrative Record purportedly reveals no consideration of concerns surrounding the IV-setting process or potential procedures to eliminate risks associated with that process."  Mot. at 20.  Purkey does not argue that the current IV procedure in the Lethal Injection Protocol is improper on its face, only that "executions by lethal injection have involved difficulties with setting IVs."  *Id.*  Again, such an argument is improper

under either the APA or the Eighth Amendment. *Baze*, 553 U.S. at 50. Moreover, the Administrative Record contains ample evidence that BOP studied the issues associated with IV access. For example, it shows that BOP reviewed "the after action report" of Oklahoma inmate Clayton Lockett's execution in 2014—where the improper placement of the IV caused the inmate to regain consciousness—and explicitly noted the finding of the report, which is that "the viability of the IV access point was the single greatest factor that contributed to the difficulty in administering the execution drugs." AR 931. BOP also considered the Supreme Court's discussion of the Lockett example in *Glossip*. *Id.* In fact, the expert reports and testimony reviewed by BOP and included in the Administrative Record also discussed the issue of potential IV infiltration. AR 442–43. And, discussion of the issue of IV access is prevalent in the case-law reviewed and considered by BOP. *See* AR 108–400. Finally, BOP visited several States to observe executions, AR 871, 930, and reviewed state lethal injection protocols, including the States using a single-drug pentobarbital protocol. AR 7–91, 933.

BOP has engaged in reasoned decision-making in adopting the 2019 Protocol, and under the APA's highly deferential standard of review, this Court should uphold it.

## IV.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION

Because Purkey has failed to establish a likelihood of success on the merits, this Court need not proceed further to consider the remaining preliminary injunction factors. *See Winter*, 555 U.S. at 20. Before *Winter*, the D.C. Circuit had adopted a sliding scale approach, under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley*, 644 F.3d at 392. Purkey argues that this Court should continue to apply the sliding scale approach. Mot. at 12–13. But the D.C. Circuit has construed *Winter* "at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." *Sherley*, 644 F.3d at 392 (citation omitted). Indeed, "[e]ven a narrow reading of the Court's holding in *Winter* supports the view that sliding-scale analysis is obsolete." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 n.5 (D.D.C. 2014); *see also Nken v. Holder*, 556 U.S. 418, 438 (2009) (Kennedy, J.,

41

concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other.").

In the context of method-of-execution challenges, the Supreme Court's *Glossip* opinion dispels any ambiguity, as it held that an inmate's failure to establish a likelihood of success on his method-of-execution challenge warrants denial of a motion for a preliminarily injunction. 135 S. Ct. at 2737; *see also Hill*, 547 U.S. at 584 ("[I]nmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits."). The Supreme Court has also vacated preliminary injunctions issued by lower courts in method-of-execution cases where the lower court enjoined the execution "without finding that [the inmate] has a significant possibility of success on the merits." *Dunn v. McNabb*, 138 S. Ct. 369 (2017). And courts of appeals routinely requires a showing of likelihood of success before issuance of a preliminary injunction. *See, e.g.*, *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1273 (11th Cir. 2014); *Rhoades v. Reinke*, 671 F.3d 856, 863 (9th Cir. 2011); *see also Miller v. Parker*, 910 F.3d 259, 261 (6th Cir.), *cert. denied*, 139 S. Ct. 399 (2018) ("in execution protocol challenges, likelihood of success is often the determinative factor") (citation omitted).

Should the Court proceed further, though, the equities tip against the issuance of an injunction. While there is no question that an execution is final and that Purkey will not be able to litigate his claims on the merits should his execution proceed, it is not clear that constitutes irreparable harm in the context of a challenge to the *method* of execution (rather than a challenge to the lawfulness of the *execution itself*). In challenges to the method of execution, the "irreparable harm" factor often merges with the merits. Indeed, Purkey's irreparable harm arguments repeat his merits arguments that he faces a "significant risk of suffering from pulmonary edema before becoming insensate" and "the risk of severe pain and suffering arising from the remote (rather than beside) administration of pentobarbital." Mot. at 13. Because a sentence of death flows from the criminal judgment—rather than the method of execution—courts considering claims like Purkey's

often weigh only the likelihood that the inmate will experience an unconstitutional level of pain. *See, e.g.*, *Lambert v. Buss,* 498 F.3d 446, 452 (7th Cir. 2007) (no irreparable harm from "mere possibility" that unforeseen complications will cause pain); *Lenz v. Johnson*, 443 F. Supp. 2d 785, 794 (E.D. Va. 2006); *Emmett v. Johnson*, 489 F. Supp. 2d 543, 550 (E.D. Va. 2007); *Boyd v. Beck*, 404 F. Supp. 2d 879, 886–87 (E.D.N.C. 2005).

At the same time, the "[government's] interests in finality are compelling" when post-conviction proceedings have run their course. *Calderon*, 523 U.S. at 556; *accord Lambert*, 498 F.3d at 452. Purkey's conviction and sentence have been affirmed repeatedly in the 15 years since he was sentenced to death. "Equity must take into consideration the [government's] strong interest in proceeding with [the criminal] judgment . . . ." *Gomez v. U.S. Dist. Court for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992). As the Attorney General explained when announcing the execution dates for Purkey and four other inmates:

> Congress has expressly authorized the death penalty through legislation adopted by the people's representatives in both houses of Congress. . . . Under Administrations of both parties, the Department of Justice has sought the death penalty against the worst criminals, including these five murderers, each of whom was convicted by a jury of his peers after a full and fair proceeding. The Justice Department upholds the rule of law—and we owe it to the victims and their families to carry forward the sentence imposed by our justice system.

Office of the Attorney General, Press Release No. 19-807 (July 25, 2019).[15]

The Supreme Court also has recognized that "the victims of crime have an important interest in the timely enforcement of a [death] sentence." *Hill,* 547 U.S. at 584. The impact "upon the families of victims and their communities" will "only be compounded by a stay of the execution." *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1048–49 (D. Idaho), *aff'd*, 671 F.3d 856 (9th Cir. 2011). Once the "lengthy [post-conviction proceedings] have run their course," "finality acquires an added moral dimension," and "[o]nly with real finality can the victims of crime move forward." *Calderon*, 523 U.S. at 556. "To unsettle these expectations," the Supreme Court said,

---

[15] U.S. Dep't of Justice, https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse (internal quotation marks omitted).

"is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the [government] and the victims of crime alike." *Id.* For all these reasons, the balance of equities tip against granting a stay of execution.

## CONCLUSION

For the foregoing reasons, this Court should deny Purkey's motion for a preliminary injunction.

Dated:  November 12, 2019

Respectfully submitted,

JESSIE K. LIU
United States Attorney

DANIEL F. VAN HORN
Civil Chief, U.S. Attorney's Office

DENISE M. CLARK (D.C. Bar No. 479149)
Assistant United States Attorney
U.S. Attorney's Office
    for the District of Columbia
Washington, D.C. 20530
202-252-6605
Denise.Clark@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General

ETAN P. DAVIS
Principal Deputy Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

PAUL R. PERKINS
Special Counsel to the
 Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Counsel
JONATHAN KOSSAK (DC Bar 991478)
Trial Attorney
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
Jonathan.Kossak@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2019, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all plaintiffs' counsel of record:

**Joshua Christopher Toll**
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Gerald Wesley King, Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celestw_bacchi@fd.org

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

**\*Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

**\*Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**\*Jeanne Vosberg Sourgens**
VINSON & ELKINS, L.L.P.

**Robert E. Waters**
VINSON & ELKINS, L.L.P.

(202) 639-6633

**William E. Lawler, III**
VINSON & ELKINS, L.L.P.
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**\*William E. Hoffman, Jr.**
KING & SPALDING LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

**Sean D. O'Brien**
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Elizabeth Hagerty**
HOGAN LOVELLS US LLP
(202) 637-3231
Email: elizabeth.hagerty@hoganlovells.com

(202) 737-0500
Email: rwaters@velaw.com

**\*Yousri H. Omar**
VINSON & ELKINS, L.L.P.
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**\*Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0528
Email: shawn.nolan@fd.org

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

**David Victorson**
(202) 637-2061
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

**John D. Beck**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

**Pieter Van Tol**
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

**Amy J. Lentz**
**STEPTOE & JOHNSON**
(202) 429-1320
Email: Alentz@steptoe.com

**Arin Smith**
**WILMER CUTLER PICKERING**
(202) 663-6939
Email: Arin.Smith@wilmerhale.com

**Jon Jeffress**
**KaiserDillon PLLC**
202-640-2850
Email: jjeffress@kaiserdillon.com

**Timothy Kane**
**FEDERAL COMMUNITY DEFENDER**
**OFFICE, EDPA**
(215) 928-0528
Email: timothy_kane@fd.org

/s/ *Jean Lin*
JEAN LIN

\* No e-mail provided on the docket or counsel no longer with the identified firms.