ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States
## House of Representatives
COMMITTEE ON OVERSIGHT AND REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6143

MAJORITY  (202) 225-5051
MINORITY  (202) 225-5074
http://oversight.house.gov

August 14, 2019

Mr. Hugh J. Hurwitz
Acting Director
Federal Bureau of Prisons
320 First St., NW
Washington, D.C. 20534

Dear Acting Director Hurwitz:

We are writing to request documents and information regarding the Attorney General's July 25, 2019, announcement that the Bureau of Prisons (Bureau) would resume capital punishment. The federal government has only executed three prisoners since 1963, and none since 2003. In 2014, President Barack Obama ordered a review of the death penalty, which the Department of Justice reportedly claims has now been completed.[1] The Trump Administration has now ordered five executions for December 2019 and January 2020.[2]

The Bureau will apparently be abandoning a controversial three-drug cocktail in favor of a single drug – pentobarbital sodium – mirroring protocols used by Georgia, Missouri, and Texas.[3] Numerous reports document the dangers associated with pentobarbital and the difficulty in procuring reliable doses. Texas reportedly purchased its supply from a compounding pharmacy whose state license was on probation for providing dangerous drug mixtures to children; the same pharmacy was warned by the Food and Drug Administration (FDA) about "serious deficiencies in [its] practices for producing sterile drug products."[4] Missouri reportedly

---

[1] *Federal Government to Resume Capital Punishment After Nearly 20-Year Hiatus*, NPR (July 25, 2019) (online at www.npr.org/2019/07/25/745223284/federal-government-to-resume-capital-punishment-after-nearly-20-year-hiatus).

[2] U.S. Department of Justice, *Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse* (July 25, 2019) (online at www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse).

[3] U.S. Department of Justice, *Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse* (July 25, 2019) (online at www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse).

[4] *Inmates Said the Drug Burned as They Died. This is How Texas Gets its Execution Drugs*, Buzzfeed News (Nov. 28, 2018) (online at www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas); U.S Food and Drug Administration, *Warning Letter: Greenpark Compounding Pharmacy* (Oct. 26, 2018) (online at www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/greenpark-compounding-pharmacy-566233-10262018).

**Ex. I**

Acting Director Hurwitz
Page 2

purchased its pentobarbital from a pharmacy that has repeatedly been found to engage in hazardous pharmaceutical procedures.[5]

Texas has also seemingly extended the beyond-use date of its pentobarbital, administering expired drugs that may be less potent than required for use in executions.[6] Additionally, though pentobarbital is supposed to be painless, five people executed in Texas using pentobarbital complained during their executions that they felt as if they were burning before they finally died. One inmate yelled "I can feel that it does burn. Burning!"[7]

These reports, documenting poorly-operated compounding pharmacies providing pentobarbital that causes severe pain, are particularly troubling given the Department of Justice's efforts to bar the FDA from regulating drugs used for executions.[8]

We are extremely concerned about the types of facilities from which the Bureau will obtain its pentobarbital, whether the Bureau will be able to guarantee that its intended method of execution is as painless as possible, and whether the Bureau will be subject to rigorous protocols to prevent the problems that have occurred at the state level.

We request that you provide the following documents to the Subcommittee:

1. A copy of the review ordered by President Obama, the steps undertaken during that review, and the findings and conclusions of that review;
2. Any documents or studies considered or relied upon in conducting the review and in determining the new Execution Protocol;
3. A complete copy of the Bureau's Execution Protocol in place before July 25, 2019; and
4. A complete copy of the Bureau's Execution Protocol in place after July 25, 2019.

Furthermore, we request that you provide written answers to the following questions:

1. What specific portions of the prior Execution Protocol are superseded by the July 25, 2019, addendum?
2. What is the procedure for the Bureau to acquire the pentobarbital it will use for executions?

---

[5] *The Secretive Company Behind Missouri's Lethal Injections*, Buzzfeed News (Feb. 20, 2018) (online at www.buzzfeednews.com/article/chrismcdaniel/missouri-executed-17-men-with-drugs-from-a-high-risk#.ymxRwg94V).

[6] *Will Texas Have to Push Back the Expiration Dates on its Lethal Injection Drugs?*, Texas Tribune (May 17, 2018) (www.texastribune.org/2018/05/17/texas-lethal-injection-drugs-are-set-expire-upcoming-executions/).

[7] *Inmates Said the Drug Burned as They Died. This is How Texas Gets its Execution Drugs*, Buzzfeed News (Nov. 28, 2018) (online at www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas).

[8] U.S. Department of Justice, *Whether the Food and Drug Administration has Jurisdiction over Articles Intended for Use in Lawful Executions* (May 3, 2019) (online at www.justice.gov/olc/opinion/file/1162686/download).

Acting Director Hurwitz
Page 3

3. Does the Bureau currently have pentobarbital that will be used in executions? If so, when and from where did the Department acquire it?
4. Who is the manufacturer of the pentobarbital the Bureau will use for executions? Is that manufacturer approved by the FDA to produce pentobarbital for use in lethal injections?
5. What other sources or manufacturers of pentobarbital did the Bureau consider?
6. What steps will the Department take to ensure that the pentobarbital is not contaminated, that the doses are strong enough and do not deteriorate, and that expired pentobarbital will not be used?
7. How much will the Bureau pay for pentobarbital?
8. How will the Department ensure that staff participating in executions are qualified and trained?
9. Which individuals or parties outside the Bureau of Prisons or the Department of Justice were consulted in determining the new protocol?

Please provide the requested documents and written responses to the above questions no later than August 27, 2019. The Committee on Oversight and Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X.

An attachment to this letter provides additional instructions for responding to the Committees' document request. If you have any questions regarding this request, please contact Committee staff at (202) 225-5051.

Thank you for your prompt attention to this matter.

Sincerely,

Jamie Raskin
Chairman
Subcommittee on Civil Rights and
 Civil Liberties

Ayanna Pressley
Member

Enclosure

cc:  The Honorable Chip Roy, Ranking Member
     Subcommittee on Civil Rights and Civil Liberties

Ex. I

**Responding to Committee Document Requests**

1. In complying with this request, produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2. Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committees.

3. In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4. The Committees' preference is to receive documents in electronic form (i.e., CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions.

5. Documents produced in electronic format should be organized, identified, and indexed electronically.

6. Electronic document productions should be prepared according to the following standards:

    a. The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

    b. Document numbers in the load file should match document Bates numbers and TIF file names.

    c. If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    d. All electronic documents produced to the Committees should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD,

**Ex. I**

INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

7. Documents produced to the Committees should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

8. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

9. When you produce documents, you should identify the paragraph(s) or request(s) in the Committees' letter to which the documents respond.

10. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

11. The pendency of or potential for litigation shall not be a basis to withhold any information.

12. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

13. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

14. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production.

15. In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document: (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted.

16. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17. If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

18. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

19. All documents shall be Bates-stamped sequentially and produced sequentially.

20. Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff. When documents are produced to the Committee on Oversight and Reform, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2105 of the Rayburn House Office Building. When documents are produced to the Committee on Financial Services, production sets shall be delivered to the Majority Staff in Room 2129 of the Rayburn House Office Building and the Minority Staff in Room 4340 of the O'Neill House Office Building. When documents are produced to the Permanent Select Committee on Intelligence, production sets shall be delivered to Majority and Minority Staff in Room HVC-304 of the Capital Visitor Center.

21. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

**Definitions**

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a

3

Ex. I

part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.