**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                   )

| | |
|---|---|
| In the Matter of the | ) |
| Federal Bureau of Prisons' Execution | ) |
| Protocol Cases, | ) |
| | ) |
| LEAD CASE: *Roane et al. v. Barr* | )    Case No. 19-mc-0145 (TSC) |
| | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| *Lee v. Barr*, 19-cv-2559 | ) |
| | ) |
| | ) |

_____ )

## EXPERT DECLARATION OF GAIL A. VAN NORMAN, M.D.

Pursuant to 28 U.S.C. § 1746, Gail Van Norman, M.D. declares as follows

## I.   BACKGROUND AND EXPERT QUALIFICATIONS

1.      I attended the University of Washington School of Medicine in Seattle, Washington from 1977 to 1981, graduating with an M.D. with honors.  During medical school training, I received the following honors:  Medical-Scientist Traineeship Grant 1978, invitation to Alpha Omega Alpha, the medical school honor society in 1980, the Merck Manual Medicine Award in 1981 and the John J. Bonica Anesthesiology Award in 1981.

2.      My postgraduate medical training consisted first of internal medicine residency training at Virginia Mason Medical Center in Seattle, Washington, and board certification from the American Board of Internal Medicine (ABIM) in 1984.  I practiced internal medicine from 1984 to late 1986, including experience in intensive care medicine.  I underwent residency training in anesthesiology from 1986 to 1988 at the University of Washington, obtaining board certification in 1990.  I completed cardiothoracic anesthesia fellowship training in 1989, after

**Ex. M**

which I achieved testamur status in perioperative echocardiography. After 5 years in private practice, I returned as faculty to the University of Washington, where I served as the acting Chief of Cardiothoracic Anesthesiology and Associate Medical Director of the PreAnesthesia Clinic.  I became certified in clinical ethics, and also served as the co-chair of the University of Washington Medical Center Committee on Ethics.   In 2000, I was recruited to join a private practice anesthesia group, Pacific Anesthesia, in Tacoma, Washington, where I served as the Clinical Director, Director of Perioperative Echocardiography, and as Vice-President of Pacific Anesthesia, but I returned to the University of Washington Medical Center to serve as Director of the PreAnesthesia Clinic and the Compliance Officer for the Department of Anesthesiology and Pain Medicine. I currently hold positions as Professor of Anesthesiology and Pain Medicine and Adjunct Professor of Bioethics at the University of Washington.  I maintain an active clinical practice.

3.      As an internist and anesthesiologist, following graduation from residency training, I received honors from the Spokane Urban Indian Health Service, the President's Award from Pacific Anesthesia, and the Mary Jane Kugel Award from the Juvenile Diabetes Research Foundation.

4.      I was recruited in 1992 to serve on the Committee on Ethics for the American Society of Anesthesiology, the national professional organization for the specialty of Anesthesiology. I served for 22 years on the committee, and served as the Chair of the ASA Committee on Ethics for three years.  I attended the Brocher Foundation in Geneva, Switzerland, as an ethics scholar-in-residence in 2011.

5.      I have over 120 publications in peer-reviewed journals, textbooks, and other venues that include topics of cardiac anesthesia research, ethics, geriatric medicine, perioperative

**Ex. M**

medicine and intensive care.  I have also served as a journal reviewer for journals such as *Anesthesia and Analgesia, Anesthesiology, Journal of Obstetrics and Gynecology, Mayo Clinic Proceedings, Journal of Philosophy, Ethics and Humanities, and European Journal of Anaesthesiology.* I was Consulting Editor for the ASA Syllabus on Ethics from 1997-2003, and an Associate Editor for the Journal of Bioethical Inquiry, an international journal, from 2012 to 2017. I published a textbook entitled "The Cambridge Textbook of Clinical Ethics for Anesthesiologists", with Cambridge University Press in 2011, and I have focused expertise and publications in end-of-life issues, including physician assisted suicide, euthanasia and lethal injection.

6.      As an expert in cardiovascular and perioperative issues, I have served internationally and nationally as an invited speaker at such venues as the American Society of Anesthesiologists, American Society of Interventional Pain Physicians, Harvard Medical School, American Society of Bioethics and Humanities, World Congress of Anesthesiologists (Santiago, Chile) and many others. As an expert in ethical issues in anesthesia care, I have been an internationally-invited speaker in London, Rome, Vienna, Prague, Hong Kong, Geneva and throughout the United States.  Full details of my publications and invitational lectures can be found in the *curriculum vitae* attached as **Appendix I**.

7.      A majority of my clinical experience has been based in cardiac and general anesthesiology, as well as perioperative care of the anesthesia patient; because I trained in the 1980s, I have extensive personal experience with intravenous barbiturate administration.

8.      Over the course of my career I have been an expert consultant/witness in approximately 13 medical malpractice cases, both as a defense and as a plaintiff's expert in approximately equal numbers, and both as a paid and as a *pro bono* expert. In 3 of these cases, I

3

**Ex. M**

was consulted as an expert in bioethics: i.e. regarding informed consent and end-of-life issues. In the remainder, I was consulted as an expert in the anesthesia care of a patient. In the last 4 years, I have provided testimony at trial or by deposition in 4 cases; **the list is included in Appendix II following this declaration.** I am not now, nor ever have been, regularly employed by any legal firm or entity, nor do I derive a significant portion of my income from medico-legal expert witness activities. In this case I'm being compensated $350 per hour for consultation and preparation of this declaration and $400 per hour for testimony.

## II.     MATERIALS REVIEWED

9.      I have reviewed and relied upon the following materials in connection with this declaration:

- Case 1:05-cv-02337-TSC-DAR, *Roane v. Gonzales* (and others), Document 385-1, filed 7/25/19: ADDENDUM TO BOP EXECUTION PROTOCOL FEDERAL DEATH SENTENCE IMPLEMENTATION PROCEDURES EFFECTIVE JULY 25, 2019

- Case 1:19-cv-02559-TSC-DAR, *Lee v. Barr* (and others), Document 1, filed 8/23/19: COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE FIRST, FIFTH, SIXTH AND EIGHT AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 551 et seq.

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 13, filed 9/27/19: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION BARRING THE IMPLEMENTATION OF THE NEWLY ANNOUNCED FEDERAL LETHAL INJECTION PROTOCOL

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 13-1, filed 9/27/19: PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION BARRING THE IMPLEMENTATION OF THE NEWLY ANNOUNCED FEDERAL LETHAL INJECTION PROTOCOL

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 13-4, filed 9/27/19: PROPOSED PRELIMINARY INJUNCTION ORDER

4

**Ex. M**

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 16, filed 10/18/19: DEFENDANTS' OPPOSITION TO PLAINTIFF DANIEL LEWIS LEE'S MOTION FOR A PRELIMINARY INJUNCTION

- EXPERT DELARATION OF MARK A. EDGAR, MD, signed October 24, 2019

- Autopsy reports as listed in **Appendix III** of this declaration

- Various authoritative textbooks, peer-reviewed articles, materials from government regulatory agencies such as the FDA, and other publications and materials as included in the references cited and footnoted throughout this declaration.

## III.  THE FEDERAL EXECUTION PROTOCOL

10.   I will refer to the document provided to me, described as Case 1:05-cv-02337-TSC-DAR, Document 385-1 filed 7/25/19, ADDENDUM TO BOP EXECUTION PROTOCOL FEDERAL DEATH SENTENCE IMPLEMENTATION PROCEDURES EFFECTIVE JULY 25, 2019, as the "Federal Protocol" or the "Addendum."

11.   This protocol is briefly described here as a "single-drug" protocol, calling for the intravenous injection of 3 syringes in consecutive series:   #1 containing 2.5 grams of Pentobarbital Sodium in 50 ml of diluent, #2 containing 2.5 grams of Pentobarbital Sodium in 50 ml of diluent, and #3 containing 60 ml of saline flush.

## IV.  EXPERT OPINION QUESTIONS

12.   I have been asked to address the following questions:

- What are the effects of intravenous (IV) barbiturates on consciousness, awareness, and responsiveness?

- What are the potential complications of the intravenous bolus injection of a 5 gm dose of pentobarbital?

- Will administration of 5 grams of pentobarbital assure unconsciousness of the prisoner during parts of the execution that cause the most pain or suffering?

**Ex. M**

- What is the significance of the autopsy findings of pulmonary edema in prisoners executed by similar protocols involving an intravenous injection of a high dose of barbiturates?

- What are the foreseeable complications of IV line placement?

- What are the risks of using compounded drugs for judicial lethal injection?

- What is known about the complications of physician-assisted suicide and legal euthanasia?

- In my medical opinion, do prisoners executed in accordance with the procedures outlined in the Federal Protocol face a substantial risk of pain and suffering?

13.    In order to answer these questions, this declaration addresses 1) known clinical effects of IV barbiturates with regard to pain relief, consciousness, awareness, recall, responsiveness and other relevant issues; 2) known complications of barbiturate overdose, either accidental or for the purpose of suicide; 3) known effects of extravasation or inadvertent arterial injection of IV barbiturates; 4) complications of injections of high-dose IV barbiturates; and 5) relevant autopsy findings in prisoners executed using high-dose barbiturate protocols.   In preparing this declaration, I have relied on my own clinical experience with intravenous barbiturates during induction of general anesthesia, as well as various authoritative textbooks, peer-reviewed articles, materials from government regulatory agencies such as the FDA, and other publications and materials as included in the references cited and footnoted throughout this report.  I reserve the right to revise my opinion should further relevant information come to my attention that clarifies, strengthens, or changes my opinion in the course of continued review.

## V.    SUMMARY OF FINDINGS

14.    As explained thoroughly below, the Federal Protocol will subject executed prisoners to severe pain and suffering, when they remain conscious and aware prior to their

deaths.  All of the opinions I express in this section and throughout the declaration are expressed to a reasonable degree of medical certainty.

15.    Consciousness and unresponsiveness are distinct and should not be confused. Barbiturates do not guarantee lack of consciousness, even when the patients appear to be unconscious by all clinical measures and are unresponsive, and consciousness will permit extreme pain and suffering during the execution process. The effect of IV short-acting barbiturates is unresponsiveness, and it is extremely likely that prisoners given even high doses of barbiturates retain consciousness long enough to experience pain and suffering during the execution process using single-drug pentobarbital.

16.    General anesthesia for surgery and other noxious stimuli differs greatly from administration of drugs for judicial lethal injection. During general anesthesia, both pain and awareness are reduced by the administration of multiple, different classes of potent anesthetic drugs.  This will not be the case in judicial lethal injection with solo pentobarbital.

17.    Barbiturate administration does not prevent pain from being felt during periods of awareness. It is a virtual medical certainty that prisoners who remain aware after high-dose administration of an IV barbiturate such as pentobarbital are capable of feeling pain, terror, and suffocation.

18.    IV injection of high-dose barbiturates, including pentobarbital, has been shown to be associated with "flash" pulmonary edema in both animals and humans. It is a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of this effect of IV injection of 5 grams of pentobarbital.

**Ex. M**

19.     Pentobarbital can cause excruciating pain if injected rapidly into veins, particularly if extravasation or infiltration of the peripheral IV catheter occurs, or if inadvertent intra-arterial injection occurs. It is common for IV problems to result in extravasation or infiltration that would cause significant, excruciating pain for prisoners undergoing judicial lethal injection with IV barbiturates.

20.     It is likely that adherence to the Federal Protocol will lead to protracted efforts and multiple attempts to establish IV access and to faulty IVs. It is therefore likely that a prisoner will experience either significant pain from protracted IV access attempts, severe or excruciating pain from injection of barbiturate into tissues other than veins, and/or prolongation of the execution process due to incomplete delivery of drug into the vein.

21.     Drugs obtained from compounding pharmacies are very likely to suffer from quality issues, the most common of which is lack of potency, and this risk is pervasive, even among more tightly regulated outsourcing facilities.  It is therefore extremely likely that prisoners will be subjected to injection of an inferior, subpotent drug that vastly increases the risk that execution will be prolonged and the prisoner will suffer prolonged feelings of pain and suffocation.

22.     The Federal Protocol is vague, and does not supply sufficient detail to assure the minimization of the risks detailed in this declaration. Additionally, there are obvious deficiencies in the process, personnel, and management of risks to the prisoners that significantly increase the already substantial risks of a protracted execution.  The Federal Protocol has an extremely high risk of causing prisoners severe pain, and is virtually certain to cause prisoners excruciating suffering through their awareness of the sensations of suffocation and drowning caused by pulmonary edema.

**Ex. M**

## VI.    PENTOBARBITAL:  CLINICAL EFFECTS AND CONSCIOUSNESS

23.     Pentobarbital (aka Nembutal, pentobarbitone) and thiopental (aka thiopentone) are both members of a class of drugs called barbiturates. Pentobarbital is classified as a short-acting barbiturate, and thiopental is classified as ultra-short acting.  These drugs differ only slightly; thiopental contains a sulfur molecule, while pentobarbital does not.  For the purposes of judicial lethal injection, only the short-acting barbiturates (short and ultra-short) are relevant. Pentobarbital and thiopental are essentially equivalent in all pharmacological characteristics relevant to my discussion of the federal government's pentobarbital-only execution protocol. For these purposes, data regarding thiopental is also informative of how pentobarbital will act.

### a.    Clinical Effects

24.     The short-acting barbiturate thiopental was introduced in the 1930s as an anesthetic "induction" agent, meaning a drug that starts the administration of general anesthesia,[1] because of its perceived "hypnotic" or sedative effects.  Barbiturates do not have "analgesic," (i.e. pain-relieving), properties and in lower doses actually are "antalgesic," meaning they augment feelings of pain.[2]

25.     Barbiturates have generally not been used much in clinical anesthesia practice in the United States since the late 1980's, due in large part to the more favorable clinical properties of propofol when it became available after about 1987.  Pentobarbital itself was never widely used in humans in the United States for anesthesia because of adverse effects on the cardiovascular system; it has been employed in humans as a sedative, in the treatment of epilepsy, and as a drug to reduce brain swelling in patients with high intracranial pressure

---

[1] Vuyk J, Sitsen E, Reekers M.  Intravenous anesthetics.  In:  Miller's Anesthesia 9th edition.  Gropper MA, Editor-in-Chief.  Elsevier Saunders Publications, Philadelphia PA.  2019. pp 648-53
[2] Sanders RD, Tononi G, Laureys G, Sleigh JW.  Unresponsiveness ≠ unconsciousness.  Anesthesiology 2012; 116:946-9

**Ex. M**

(pressure on the brain) due to trauma, tumors or other causes.[3]   Its most common use in the United States is as an agent in veterinary medicine for euthanasia of animals.

26.     The intended and unintended effects of all barbiturates are highly dependent on factors related to the **pharmacokinetic** characteristics of the drug, e.g. how quickly it is redistributed to places in the body, such as muscle, where it will have no **pharmacologic** (clinical) effects; the method of administration of the drug; the individual to whom it is administered; and the nature of the surgical or other stimulus applied after the drug is administered.

27.     Like all barbiturates, the dose of pentobarbital required to produce its physiologic effects is dependent on the size, sex, and age of the recipient.   Prior or concomitant use of prescription medications can amplify or mute the onset of the clinical actions of barbiturates and shorten or augment their clinical effects and duration of action.   Prior or concomitant illicit drug use by the recipient can both reduce the effects of pentobarbital (thus requiring markedly higher than expected doses to produce a desired effect), or alternatively can augment the effects of the drug through **synergistic** action.[4] The effects of an overdose of all of the short-acting barbiturates, including pentobarbital, are effects on breathing: either inadequate breathing or interruption of breathing that results in subsequent suffocation, obstruction of breathing, or the filling of the air passages with fluid due to pulmonary edema, or with gastric contents due to vomiting.   Barbiturate overdose can cause interference with the brain's regulation of breathing. For example, barbiturate-induced sedation can lead to mechanical airway obstruction due to the collapse of the tissues into the airway because of reduced muscle tone in the throat.

---

[3] Lopez-Munoz F, Ucha-Udabe R, Alamo C.  The history of barbiturates a century after their clinical introduction. Neuropsych Dis Treat 2005; 1:329-43

[4] **Synergism** between drugs means that the total effect of 2 or more drugs administered together is greater than the effect that would be expected by simply adding them together:  they interact in such a way that 2 + 2 does not equal 4, but rather results in 8, for example).  Each drug is said to enhance, or *potentiate* the effects of the other(s).

**Ex. M**

28.     Pentobarbital and other short-acting barbiturates owe their short duration of action to "redistribution" within body tissues, rather than to "clearance," or removal, of the drug from the body.  This means that after the drug enters the bloodstream and flows to the brain, where it has its effects, it then immediately begins to leave the brain and bloodstream as it is "soaked up" by muscle and fat.  This latter process occurs so rapidly in fact that the drug levels in the brain are already falling (and the sedative properties of the drug are decreasing) in less time than it would generally take to inject the total volume of drug called for in the Federal Protocol (160 cc via manual IV "push" through a standard IV line).[5]  The drug is later removed from the body by the kidneys and liver, long after the action of the drugs has ended.  The onset and duration of the clinical actions of short acting barbiturates like pentobarbital are also strongly affected by the dose and how quickly the drug is injected: the larger the dose, the quicker the onset.  The more rapid the injection the quicker the onset, but the faster the drug is redistributed, and the shorter the duration of action for a given dose.

29.     Short acting barbiturates such as pentobarbital have an initial onset of action within a few seconds, and cause unresponsiveness within about 1.5 minutes of injection. Redistribution of the drug out of the brain begins immediately, and drug levels in the brain begin to fall 1.5 to 2 minutes after injection, as the drug is "soaked up" into other tissues.[6]  Most patients become responsive again within 3 to 5 minutes of a 2.5 mg/kg dose of thiopental. Barbiturates cause a dose-dependent depression of respiratory function with maximum depression after 1 to 1.5 minutes after a 3.5 mg/kg injection.  Additional effects are depression of

---

[5] In my personal experience, IV injection of 150 cc of fluid (as designated in the Federal Protocol) into a peripheral vein, even given as rapidly as possible via the syringe method described, takes several minutes.  Faster injection of any fluid through a peripheral IV, aside from being very difficult to accomplish, predisposes to infiltration and extravasation, loss of drug, excruciating pain, and other issues.  Central IV lines (e.g. femoral, jugular and subclavian vein catheters) have a much greater length than peripheral IV catheters, exhibit much higher resistance to injection, and will require slower injections that peripheral lines.

[6] Vuyk J, Sitsen E, Reekers M.  Intravenous anesthetics.  In:  Miller's Anesthesia 9th edition.  Gropper MA, Editor-in-Chief.  Elsevier Saunders Publications, Philadlephia PA.  2019. pp 648-53.  See Figure 23.7, page 651.

**Ex. M**

the strength of contraction of the heart, dilation of peripheral veins causing low blood pressure ("hypotension") and a reflex rise in heart rate.  The degree of these latter actions appears largely unrelated to dose in higher dosing ranges.[7]

### b.     Brain Effects of Pentobarbital

30.     "Neurotransmitters" are the chemicals largely responsible for transmitting information in the brain and peripheral nervous system.  They are manufactured and stored by nerve cells, and released in response to various conditions in the cell's environment. These chemicals can be excitatory (causing increased metabolic, electrical and chemical activity in the cells they reach) or inhibitory (reducing the metabolic, electrical and chemical activity in the cells they reach).   A balance of excitatory and inhibitory influences governs how the brain, spinal cord and nerves will react to a given stimulus.  The mechanisms of action of barbiturates are grouped into 2 categories:  1) enhancement of the actions of inhibitory neurotransmitters and 2) blockade of the actions of excitatory neurotransmitters. The mechanisms of action of barbiturates are largely unknown, except for their actions at the "GABA" receptor.

31.     GABA (gamma aminobutyric acid) is the primary *inhibitory* neurotransmitter in the mammalian central nervous system (i.e. brain and spinal cord). One receptor for GABA, the $GABA_A$ receptor, is the only proven site of action of the barbiturates in producing unresponsiveness.  Barbiturates bind a site on the $GABA_A$ receptor and are able to 1) enhance the effects of the brain's intrinsic GABA at its receptor site, as well as 2) mimic GABA itself with a direct action on the receptor without using GABA.

### c.     Consciousness, Unconsciousness, Awareness, Responsiveness, and Recall

---

[7] Vuyk J, Sitsen E, Reekers M.  Intravenous anesthetics.  In:  Miller's Anesthesia 9th edition.  Gropper MA, Editor-in-Chief.  Elsevier Saunders Publications, Philadlephia PA.  2019. pp 648-53

**Ex. M**

32.     "Pain" and "suffering" are terms that refer to subjective experiences of physical sensations.  In order to feel either pain or suffering, awareness or consciousness of the sensation is necessary.  So an important question regarding judicial lethal injection with pentobarbital is the effects it is likely to have on consciousness.

33.     The medical study of "consciousness" and drugs that affect it is plagued by the indiscriminate and inaccurate use and interchange of the terms "consciousness" and "recall," which are two entirely different things.  This misuse has led to confusion and false claims about how anesthesia itself affects consciousness. In order to understand these issues and how they impact a prisoner's experience of pain and suffering during judicial lethal injection, it is important to understand the concepts of **consciousness, awareness, responsiveness** and **recall**. Although traditional textbooks and authors report that the inhibitory effects of barbiturates cause "unconsciousness," authoritative publications now describe barbiturates as producing "unresponsiveness," since how, and even whether, they affect consciousness is under serious question.

34.     The term "**consciousness**" describes a state of having a subjective experience of something.  Consciousness can be "connected" or "disconnected".  **Connected consciousness**— also called **awareness**—is the subjective experience of an event related to the "real" environment in a physical, emotional or psychological way. Awareness is present, for example, when an awake person savors a meal.  They are having a subjective experience that is directly related to a "real world" occurrence.  **Disconnected consciousness** usually occurs when we are dreaming, for example and are unaware of our "real world" environment.[8]  Dreams are also

---

[8] The special case of "lucid" dreaming is a state in which a person is dreaming, but probably does have connected consciousness.  They are aware they are dreaming, and can communicate to the external world.  It is not known if they will take commands and much more research is needed to fully define this state of consciousness as either connected or unconnected.

13

**Ex. M**

subjective experiences—we might remember them when we wake, may have intense emotional reactions to them, and may even respond physically to them by moving and vocalizing in our sleep—but the dreamer is not usually reacting to what is happening to them in the physical world.   When the physical world intrudes, and the dreamer "awakes," they move from disconnected consciousness to connected consciousness—aware of and responding to their environment once again.

35.    Unfortunately, **consciousness** is often confused—even in the medical literature—with **responsiveness**, although these terms refer to entirely different things.    While consciousness is the subjective experience of something, responsiveness is the ability to react physically to that experience.   Consciousness and responsiveness do not go hand in hand.   A person can respond to a stimulus but not have connected consciousness of it, and, conversely, a person can have connected consciousness, and yet be unable to respond and demonstrate that they are conscious.   Sleepwalking is an example of a state in which a person is responsive (e.g. can navigate walking around their physical environment), but does not have connected consciousness (is not aware of the environment) and does not take commands.[9] There are many examples where people have connected consciousness and are aware and experiencing their environment, but are unable to respond to it.   Unresponsiveness can occur due to physical impediments, e.g. a person may be given a drug that paralyzes their muscles so that they relax enough that the surgeon can work within the belly, and yet remain fully awake; by nonphysical impediments, e.g. being "frozen" by terror; and by physiological problems within the brain itself, e.g. strokes, and drug effects that prevent purposeful movement even though muscles are not paralyzed.

---

[9] Sanders RD, Tononi G, Laureys S, Sleigh JW.  Unresponsivenes ≠ unconsciousness.  Anesthesiology 2012; 116:946-59

**Ex. M**

36.     In considering the actions of a barbiturate such as pentobarbital on the brain during judicial lethal injection, we are concerned primarily with connected consciousness—the subjective experiences of the prisoner in his/her physical environment—such as whether they are able to experience pain or sensations including suffocation, despite being unresponsive.  A lack of responsiveness is not a reliable, nor even a good, indicator of connected consciousness, as a vast amount of research in anesthesia demonstrates.

37.     As it relates to a lethal injection protocol, it is absolutely critical to understand that **awareness** (another term for connected consciousness) and **recall** are distinctly different, and that lack of recall in no way equates to a lack of consciousness.  Research into awareness under anesthesia, and other conditions such as strokes, is fraught with the misuse of terms regarding awareness, and a lack of understanding of how awareness is determined.  Many clinicians and researchers, and even experienced and expert anesthesiologists, erroneously use the terms awareness and recall interchangeably, and rely on data regarding *recall* to comment on the incidence of *awareness*.[10],[11]  The vast majority of our conscious experiences will all be forgotten and never recalled.  But the failure to remember an event is not an indication that it did not occur, nor that it did not result in terrible suffering.  Who among us has not had the experience of driving home from work after a long day, and realizing once we arrived that we had no memory of parts of the drive?  But we clearly were not unconscious on the drive:  we were able to negotiate complex streets, read and respond to traffic signs and lights, and put on the brakes to avoid colliding with the car stopping ahead of us. This is especially true of

---

[10] Absalom A, Nagels W.  Fentanyl and midazolam anaesthesia for coronary artery bypass surgery. [letter to the editor].  Br J Anaesth 2000; 85:940-1
[11] Russel IF. Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993; 70:42-6

**Ex. M**

physically, emotionally or psychologically traumatic events, which are known to be associated with significant *lapses* in memory.

38.     Unfortunately, it is common for physicians and laypersons to mistakenly believe that patients who do not *recall* intraoperative events were not therefore conscious or aware of them at the time they occurred.  Quite the opposite has been clearly shown in multiple clinical studies to be true.[12,13,14,15,16,17]  Reports regarding these studies in humans demonstrate that a disturbing number of patients retain some awareness of what is happening to them during surgery, but simply cannot recall it later.  One reason is that drugs such as barbiturates are adept at causing *amnesia* (or memory loss), even when they don't produce unconsciousness.

39.     Many studies purporting to be of *awareness* during anesthesia are in fact studies of *recall*, and because even accomplished authors have misused these terms, studies involving "awareness" must be read and interpreted very carefully.  *Recall* is estimated to happen in less than 0.5% of anesthesia cases, but current research shows that *awareness* is disturbingly common.  Obviously in the case of lethal injection, recall is irrelevant.  However, *awareness*, which can permit extreme pain and suffering during the execution process, is extremely relevant.

40.     Further complicating the study and understanding of awareness during general anesthesia and other uses of "anesthetic" drugs, such as barbiturates, is the fact that connected consciousness is also related to the level of stimulus that the subject receives.  A sleeping person

---

[12] Mainzer J.  Awareness during fentanyl anesthesia.  Anesthesiology 1982; 56:331-2
[13] Mark JB, Greenberg LM.  Intraoperative awareness and hypertensive crisis during high-dose fentanyl-diazepam-oxygen anesthesia.  Anesth Analg 1983; 62:698-700
[14] Hilgenberg JC.  Intraoperative awareness during high-dose fentanyl-oxygen-anesthesia.  Anesthesiology 1981; 54:341-3;
[15] Mummaneni N, Rao T, Montoya A.  Awareness and recall with high-dose fentanyl-oxygen anesthesia.  Anesth Analg 1980; 59:948-9
[16] Mainzer J.  Awareness during fentanyl anesthesia.  Anesthesiology 1982; 56:331-2
[17] Andrade J, Stapleton CL, Harper C, Englert L, Edwards ND.  The contribution of surgery to learning and memory in anaesthesia.  In:  Memory and Awareness in Anaesthesia IV.  Jordan C, Vaughan DJA, Newton DEF, eds.  Imperial College Press, London UK.  2000.  Pp 141-63

**Ex. M**

without connected consciousness may not respond to softly spoken words in their physical environment because the stimulus is too little to rouse them to connected consciousness, but will awaken if the same words are shouted.  The level of stimulus bears little relationship to whether recall is reported later. However, as the level of stimulus increases—louder sounds, greater pain, growing air hunger—so does the probability that connected consciousness (awareness) will occur.  It is common for an anesthesiologist to induce unresponsiveness in a non-paralyzed patient, observe them "sleeping" quietly while their body is prepped and draped for surgery, only to have them move, groan and even try to reach or sit up when the surgery begins.  Additional anesthetic drugs have to be administered by the time the surgery starts (this is called "deepening the anesthetic") to adjust the level of drugs to meet the stimulus that is now occurring.  For example, during lethal injection, as the prisoner begins to experience suffocation and the sensations of drowning with flash pulmonary edema (discussed later in this report), they will become progressively more aware.

41.     Multiple case reports and clinical studies in the literature have demonstrated that even "massive" doses of non-barbiturate drugs or simple combinations of one or two classes of non-barbiturate drugs that supposedly produce "unconsciousness" actually do not guarantee that a surgical patient is unconscious. These studies are important and relevant here, even when they do not involve short-acting barbiturates, because they illustrate past misperceptions about anesthetic drugs and show that hypnotic (sleep) drugs do not apparently ablate (i.e. remove) awareness, *regardless of the class of drug.*

42.     A spate of publications in the 1980s showed that high-dose diazepam or another benzodiazepine, usually in combination with fentanyl (which enhances the benzodiazepine

**Ex. M**

effects), failed to prevent intraoperative awareness.[18,19,20,21] In 1987, investigators demonstrated significant levels of perioperative awareness in patients who received a combination of high doses of the drugs lorazepam (another potent benzodiazepine) and fentanyl (a narcotic) for induction of anesthesia. Two patients had recall during their surgery that was specific enough to report details of conversations in the operating room.[22] Similarly, in a study reported in 2011, in patients who received high doses of lorazepam plus temazepam plus midazolam (all members of the same class of drugs, benzodiazepines), a significant number were found to have awareness after induction, some with recall specific enough to report noises and conversations in the operating room.[23] Is this also the case with short-acting barbiturates like pentobarbital? A few studies using a special technique to determine awareness, rather than recall, show that it is indeed true of them as well (see below).

43.     The normal conduct of a general anesthetic involves several stages: induction, maintenance and emergence. Induction is the phase in which hypnotic ("sleep") drugs, sometimes accompanied by narcotic analgesic (pain relieving) drugs are given in sufficient doses to allow the patient to tolerate procedures that precede the actual surgery and that would generally be intolerable without medication, such as placement of a breathing tube into the trachea. During this time, other things are also happening, such as positioning of the patient, sterile prep of the surgical field, possible placement of additional peripheral or central

---

[18] Mainzer J. Awareness during fentanyl anesthesia. Anesthesiology 1982; 56:331-2
[19] Mark JB, Grreenberg LM. Intraoperative awareness and hypertensive crisis during high-dose fentanyl-diazepam-oxygen anesthesia. Anesth Analg 1983; 62:698-700
[20] Hilgenberg JC. Intraoperative awareness during high-dose fentanyl-oxygen-anesthesia. Anesthesiology 1981; 54:341-3;
[21] Mummaneni N, Rao T, Montoya A. Awareness and recall with high-dose fentanyl-oxygen anesthesia. Anesth Analg 1980; 59:948-9
[22] Robinson JF, Boright WA, Ligier B, Mclivena K, Metcalf LR, Truong DT. The incidence of awareness, and amnesia for perioperative events, after cardiac surgery with lorazepam and fentanyl anesthesia. J Cardiothor Anesth 1987; 1:524-30
[23] Lala HM, Lala MP, Kibblewhite DP, Chan BO, Barnard JPM. Awareness during cardiac surgery—a single centre prospective clinical audit of 1060 patients. Anaesth Intensive Care 2011; 39:973-4

**Ex. M**

intravenous lines, etc. Immediately following tracheal intubation while these events take place, the anesthesiologist begins to "deepen" the anesthetic by administering additional drugs.  This can include administering more of the drugs that were given during induction, but also includes different drugs, such as inhaled anesthetic gases (e.g. sevoflurane or others), nitrous oxide, and possibly intravenous drugs of different classes.  When anesthetic gases are given, unlike IV administration of medications, the rise in concentration of these agents in the patient does not occur instantaneously, but takes a variable amount of time—from 5 to 10 minutes. The amount of these additional drugs and repeat boluses of drugs that can be given before surgical incision is somewhat limited, because they can cause potentially deleterious effects on blood pressure, heart rate, and other vital organ functions of patients, that will be offset by a rise in blood pressure and heart rate once surgical incision is made.  After incision, additional drugs can generally be given.

44.     The phase from just prior to incision, through to the end of surgery, is the "maintenance" phase of anesthesia.  "Emergence" is the phase in which surgery is ending, the anesthetic drugs are wearing off and/or being discontinued, and the awakening of the patient begins. The period from first administration of induction drugs to incision is highly variable, but in most studies of awareness using a special technique called the isolated forearm technique (see below), when this length of time was recorded, it was between 9 and 10 minutes in length.[24] Studies of awareness during this period of anesthesia—from the administration of induction drugs to the point of stimulation by surgical incision—are the most informative about how consciousness, pain and suffering occurs during judicial lethal injection.

45.     Because many anesthetic techniques require administration of a drug to paralyze the muscles (in order to place a breathing tube, or so that they are sufficiently relaxed for the

---

[24] Russell IF, Wang M.  Absence of memory for intraoperative information during surgery under adequate general anaesthesia.  Br J Anaesth 1997; 78:3-9

**Ex. M**

surgeon to work within body cavities such as the abdomen), researchers realized that movement and other potential signals of awareness and pain would be impossible to detect.   A special technique, called the "isolated forearm technique" (IFT), was developed to study true awareness under these conditions. It is now considered the "gold standard" in researching awareness during anesthesia. With the IFT technique, prior to administration of the paralytic drug, one forearm is isolated from the circulation to prevent the arm from being paralyzed and allow the patient to move that arm in response to commands if they are aware.   This is done by placing a tourniquet on the forearm and inflating it to prevent blood from entering the forearm while the paralytic drug is being given.   Following a specific command (such as "move your right arm" or "raise your right hand") *requires awareness:* the patient must hear the instruction, realize what they are being told to do, and carry out the action in the instruction.

46.     In one study of high dose IV anesthetic agents using the IFT technique *72%* of patients—all of whom the anesthesiologists assessed to be "asleep" after administration of a combination of 2 non-barbiturate induction drugs for general anesthesia was given — responded to explicit commands, causing the author to question whether a combination of these drugs was actually an anesthetic at all.[25] The same author found that other anesthetic inductions using midazolam and fentanyl were also associated with a 44% rate of response to commands with this technique, indicating awareness.[26] Other studies have shown awareness in 73% of patients undergoing major gynecologic surgery with anesthesia involving induction with one drug.[27]

---

[25] Russell IF.  Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6
[26] Russell IF.  Comparison of wakefulness with two anaesthetic regimens.  Total i.v. balanced anaesthesia.  Br J Anaesth 1986; 58:965-8
[27] Russell IF.  The ability of bispectral index to detect intraoperative wakefulness during total intravenous anaesthesia compared with the isolated forearm technique.  Anaesthesia 2013; 68:502-11

**Ex. M**

47.     Studies using the IFT technique, and others have demonstrated that no clinical parameters (i.e. changes in heart rate, blood pressure, loss of eyelash reflex, response to moderately painful stimuli, tearing or sweating) reliably identify whether a patient is aware[28,29,30,31,32,33,34] and *no reliable technical monitor for detecting connected consciousness in anesthetized patients has ever been found*.  IFT studies have shown that physical maneuvers, such as calling the patient's name, testing for eyelash reflex, or providing a mild to moderately painful stimulus such as pinch or sternal rub do not predict whether a patient is aware, nor whether they will have recall.[26-30]  Research also has proven that ("brain wave") monitors (e.g. EEG, BIS, Lifescan and other processed EEG methodologies) cannot reliably detect consciousness.[35,36,37,38,39]  Vice President and Medical Director of Aspect Corporation, the company that made and marketed the BIS monitor, Scott Kelley in fact himself stated that there is no assurance that "BIS monitoring alone would prevent an inmate from suffering" during

---

[28] Baker AB.  Induction of anesthesia with diazepam.  Anaesth 1969; 24:388-92

[29] Blackmon BB, Mahaffey JE, Baker JD.  Clinical comparison of midazolam hydrochloride and midazolam maleate for anesthesia induction.  Anesth Analg 1984; 63: 1116-20

[30] Gamble JAS, Kawar P, Dundee JW, Moore J, Briggs LP.  Evaluation of midazolam as an intravenous induction agent.  Anaesthesia 1981; 36:868-73

[31] Russell IF.  Comparison of wakefulness with two anaesthetic regimens.  Br J Anaesth 1986; 965-8

[32] Russell IF.  Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6

[33] Russell IF.  Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6

[34] Russell IF.  Comparison of wakefulness with two anaesthetic regimens.  Total i.v. balanced anaesthesia.  Br J Anaesth 1986; 58:965-8

[35] Russell IF.  The Narcotrend 'depth of anaesthesia' monitor cannot reliably detect consciousness during general anaesthesia:  an investigation using the isolated forearm technique.  Br J Aanesth 2006; 96:346-52

[36] Schneider G, Wagner K, Reeker W, Hanel F, Werner C, Cochs E.  Bispectral index (BIS) may not predict awareness reaction to intubation in surgical patients.  J Neurosurg Anesthesiol 2002; 14:7-11

[37] Kerssens C, Gaither JR, Sebel PS.  Preserved memory function during bispectral index-guided anesthesia with sevoflurane for major orthopedic surgery.  Anesthesiology 2009; 111:18-24

[38] Avidan MS, Zhang L, Burnside BA, et al.  Anesthesia awareness and the bispectral index.  N Eng J Med 2008; 358: 1097-108

[39] Gaskell AL, Hight DF, Winders J, et al. Frontal alphas-delta EEG does not preclude volitional response during anaesthesia: prospective cohort study of the isolated forearm technique.  Br J Anaesth 2017; 119:664-73

**Ex. M**

lethal injection.[40]   Processed brainwave monitors in the OR have long since been proven to unreliable in detecting awareness, even in patients in whom the IFT shows awareness is present.[41,42]   Studies using the BIS and other brain wave monitors as evidence of lack of awareness must therefore be disregarded.

48.     Because the barbiturates stopped being widely used in clinical anesthesia practice about 40 years ago, only a few studies of awareness using the IFT have specifically involved pentobarbital or other short-acting barbiturates, such as thiopental.   But those studies have indicated that barbiturates do not guarantee unconsciousness, even when the patients appear to be unconscious by all clinical measures, including EEG monitoring.

49.     In 1993, King et al. demonstrated recall in patients undergoing C-section after induction with thiopental as a solo agent. Following thiopental administration, and after disappearance of the eyelash reflex, patients received taped instructions to flex their fingers to indicate if they could hear, make a fist or squeeze the researcher's hand if they felt pain, and to respond with various physical cues during interviews after the anesthetic.   They also were given 6 target words to remember.   Over 96% of patients (who were assessed by traditional measures as being "asleep") responded and indicated awareness at one minute after induction.   Twenty percent indicated persistent awareness for an additional 2 minutes.   It should be noted that EEG monitoring (via Lifescan®) showed *no activity* during intubation, a very noxious stimulus, even while 1/3 of patients indicated that they were awake.   *None* of the patients had later recall of the

---

[40] Steinbrook R.  New technology, old dilemma—monitoring EEG activity during executions.  New Eng J Med 2006; 354:2525-27
[41] Russell IF.  The ability of bispectral index to detect intraoperative wakefulness during total intravenous anaesthesia compared with the isolated forearm technique.  Anaesthesia 2013; 68:502-11
[42] Russell IF. The ability of bispectral index to detect intra-operative wakefulness during isoflurance/air anaesthesia, compared with the isolated forearm technique.  Anaesthesia 2013; 68:1010-20

**Ex. M**

events.[43] Gaitini et al. found that over half of women undergoing C-section after thiopentone induction moved their hands in response to commands, although none recalled the operation later.[44] In 1997, Russell and Wang, using the IFT and similar instructions and commands following induction of anesthesia with thiopentone in 68 women, found that even though none of their patients followed commands after induction, five women later showed evidence of explicit recall of intraoperative events, including hearing voices and conversation, and being aware of incision.[45] Slavov et al. demonstrated movement in response to intubation (placement of an endotracheal tube) despite no apparent change in the EEG monitoring (BIS® monitor) in 24% of patients who were induced with fentanyl plus thiopental. No patient had recall of events later.[46] In 1989, Tunstall and Shiek found using the IFT that 42% of women were responsive to command 2 minutes after the beginning of the injection of thiopentone for induction of general anesthesia—at the time in which the clinical effects of the drug would be at their peak. None of the women had recall of the events.

50. Overall, awareness has been reported to occur in up to 71% of patients studied who received IV anesthesia induction,[47] and furthermore appears to be more common with IV anesthetic induction compared to inhalational anesthetic drugs. Are the other 29% of patients who did not respond under IFT "unaware"? Not necessarily. Even the IFT itself almost certainly underestimates awareness: for the technique to work the patient must not only be

---

[43] King H, Ashley S, Brathwaite D, Decayette J, Wooten D. Adequacy of general anesthesia for cesarean section. Anesth Analg 1993; 77:84-8

[44] Gaitini L, Vaida S, Collins G, Somri M, Sabo E. Awareness detection during Caesarean section under general anaesthesia using EEG spectrum analysis. Can J Anaesthesia 1995; 42:377-81

[45] Russell IF, Wang M. Absence of memory for intraoperative information during surgery under adequate general anaesthesia. Br J Anaesth 1997; 78:3-9

[46] Slavov, v, Motamed C, Massou N, Rebufat Y, Duvaldestin P. Systolic blood pressure, not BIS, is associated with movement during laryngoscopy and intubation. Can J Anaesth. 2002; 49:918-21

[47] Russell IF. Comparison of wakefulness with two anaesthetic regimens. Total i.v. balanced anaesthesia. Br J Anaesth 1986; 58:965-8

**Ex. M**

aware, but be capable of understanding the command, capable of perceiving that movement is required, and physically capable of producing that movement.  Terror and pain are known to impair the ability of persons to understand, and carry out complex tasks during traumatic events, "freezing" them from being able to respond even when they are conscious and not under the influence of drugs. Recent research regarding how the brain processes and responds to information offers a more fundamental explanation for involuntary unresponsiveness during awareness, and scientific evidence suggests that the very drugs we often rely upon to produce unconsciousness may actually produce unresponsiveness that mimics unconsciousness, even as a person retains awareness.

51.     While the "cortex" of the brain (the so-called "gray matter" that makes up a large part of the brain and gives the brain its traditional shape) is traditionally thought of as ruling thought, consciousness, and responsiveness, it turns out that much deeper core brain structures and their interactions with the cortex are even more critical to consciousness, recall, and responsiveness. Much of the current research regarding mechanisms of consciousness focuses on the thalamus and other structures, such as the amygdala.

52.     The thalamus lies buried deep within the core of the brain, and it is responsible for receiving and selecting among the billions of bits of data and sensory input received by the nervous system every moment.  It processes data and sensory input by selecting some and rejecting others, and then connects with the cortex as well as arousal centers deeper in the brain to integrate consciousness of and responsiveness to those inputs. The thalamus thus behaves much like a giant, multimodal switching center in a hugely complex railyard of electrical signals and inputs, sending millions of signals at nearly the speed of light along some tracks to the cortex and others along different tracks to arousal centers or other areas of the midbrain for processing,

24

**Ex. M**

and sometimes simply allowing some signals to be extinguished. Along the way, the signals that travel the tracks are amplified or dampened by additional signaling and chemicals in the brain.

53.     Experiments have shown that during deep, dreamless sleep, connections and relays between the thalamus and the cortex break down.  In dreaming sleep (so-called REM sleep for the Rapid Eye Movements seen in dreaming subjects) cortico-thalamic connectedness looks essentially the same as the connections during full wakefulness.[48]  In other words, intact cortico-thalamic connectedness, for all intents and purposes, indicates consciousness, either connected or disconnected. Experiments have shown that cortical connectivity (and therefore connected consciousness or awareness) changes *independently* from responsiveness:  one can be suppressed while the other is intact.  In other words, unresponsiveness does not equal unconsciousness, even when nothing is physically preventing the subject from responding. To produce unconsciousness, a drug must therefore reduce cortical-thalamic connectivity, and not merely suppress responsiveness.

54.     An important chemical in maintaining cortico-thalamic connectivity and consciousness is norepinephrine.  Norepinephrine suppression reduces the brain's attention to external stimuli, even while still allowing sensory information to occur.  Experiments have shown that during administration of individual anesthetic drugs (as opposed to administration of multiple anesthetic drugs together, as is done in the practice of anesthesia, see below), connectivity of attention-rousing areas of the brain to the corticothalamic network are not suppressed, and norepinephrine signaling continues.  Rises in levels of another adrenergic

---

[48] Sanders RD, Tononi G, Laureys S, Sleigh JW.  Unresponsiveness ≠ unconsciousness.  Anesthesiology 2012; 116:946-59

chemical, adrenalin, have been shown in rats subjected to pentobarbital and chloral hydrate anesthesia, to enhance learning and awareness.[49,50]

55.     *GABAergic anesthetic drugs such as barbiturates— including pentobarbital—*are known to be poor at suppressing norepinephrine signaling in the human brain, and it is felt that this may explain why patients who receive anesthetic drugs and who are aware may still not move— will appear to be asleep— even when connected consciousness is present.  The thalamus receives major input via norepinephrine.   And GABAergic drugs are poor at suppressing thalamic activity at doses that are known to prevent spontaneous responsiveness.[51]   The continued actions of norepinephrine during GABAergic drug administration leave the brain able to perceive sensory input, even while it is unable to respond.

56.     Additionally, other areas of the brain, such as the amygdala, appear to play a role in selecting a response out of the infinite number of responses that the brain could make when a stimulus is received.  Connectivity of these areas to the cortex can determine whether an "aware" brain is able to select and perform any response.   It has been shown that in various states of consciousness, damage to this area (or drug effects on this area) can prevent spontaneous responses to events, while leaving the brain's ability to follow direction (so-called "goal-directed" responses) intact.  This may explain why some patients who are aware and report recall after an anesthetic, do not move during the anesthetic in response to pain or noxious stimuli (or even during IFT when given commands) even though they are not paralyzed. [52] It is generally

---

[49] Gold PE, Weinberger NM, Sternberg DB.  Epinephrine-induced learning under general anesthesia:  retention performance at several training-testing intervals.  Behav Neurosci 1985; 99:1019-22

[50] Weinbergerger NM, Gold PE, Sternberg DB.  Epinephrine enables Pavlovian fear conditioning under general anesthesia.  Science 1984;233:605-7

[51] Mashour GA, Pryor KO.  Consciousness, Memory and Anesthesia.  IN:  Miller's Anesthesiology 9th Ed.  Gropper MA, Ed.  Elsevier , Inc.  Philadelphia PA.  2002.  Pp 260-66

[52] Sanders RD, Tononi G, Laureys S, Sleigh JW.  Unresponsiveness ≠ unconsciousness.  Anesthesiology 2012; 116:946-59

**Ex. M**

recognized, that although IFT is a "gold standard" in detecting awareness, even it does not detect *all* cases of awareness.

57.     Since connected consciousness, unresponsiveness and recall have been reported together in general anesthesia only on exceedingly rare occasions (< 0.5%), it is difficult to ask people what it feels like under those circumstances.  However, conditions involving the failure of cortico-thalamic connections that leave a conscious person unable to move despite not being paralyzed are well-described and are called "locked-in syndromes."  They can give us an idea of what patients who have awareness under general anesthesia might be experiencing.  Some forms of locked-in syndrome are produced by certain neurological diseases, particularly a special type of stroke affecting the deep brain. In about 1% of strokes, despite having intact nerves and muscles, intact sensation, and full consciousness, patients are partially or wholly unable to move.[53]  Survivors, which are uncommon, frequently report terror, loneliness, and desperation.  One patient reported being able to hear every word and understand everything around him, including the doctors telling his wife that he had a less than 2% chance of survival, but was unable to tell them he was alive, "…in my mind I was screaming 'No!'"[54]

58.     Locked-in syndrome has also been reported as an occasional complication after the administration of a certain class of drugs used in both anesthesia and psychiatric treatment, the butyrophenones (haldol and droperidol).  The condition consists of being awake and aware, yet unable or minimally able to initiate movement despite not being physically paralyzed.  Patients and anesthesiologists described the condition as "outward calm, but inner panic."  The anesthetic technique using butyrophenones has been all but abandoned due in large part because

---

[53] Patterson JR, Crabois M.  Locked-in syndrome: a review of 139 cases.  Stroke 1986; 17:758-64
[54] Locked-in syndrome: rare survivor Richard March recounts his ordeal.  The Guardian.  Aug 7 2012

**Ex. M**

so many patients reported terrible nightmares, panic, and feelings of "being locked in" during induction of anesthesia.[55,56,57,58]

### d.    Many Patients Who Are Aware By IFT Report Pain and Other Distress

59.    Studies using the IFT not only demonstrate that patients are aware in a significant portion of cases, but also that they can and do experience pain, panic and other distress during that awareness. Studies of awareness that occurs between the time of the administration of induction drugs to the point of stimulation by surgical incision and shortly thereafter are the most informative about how pain is affected during the administration of solo drugs, simple combinations and then under full general anesthesia when multiple classes of drugs are being administered.

60.    Gaitini found that over half of patients given thiopental for induction were aware for more than 12 minutes after induction, and that awareness began to fall as halothane and nitrous oxide, two different inhaled anesthetic gases, began to reach their effective levels. Furthermore, during this critical period of time, not only was awareness found in both of these studies, but 63% of patients in the King study indicated they felt pain.  Pain with awareness has been confirmed in other studies using the IFT—in one study pain was demonstrated in 42% of patients who were aware, and "pain and distress" in 75%—but both decreased awareness and decreased pain occurred when volatile anesthetic gases were added.[59]  Thus, awareness occurs in

---

[55] Rennemo F, Larsen R, Breivik H.  Avoiding psychic adverse effects during induction of neurolept anaesthesia with levomepromazine.  A double-blind study of levomepromazine and droperidol.  Acta Anaestheesiol Scan. 1982; 26:108-11

[56] Anesthesia Basics.  University of Sidney.  Sydney, AU.  Available at: http://www.anaesthesia.med.usyd.edu.au/resources/lectures/anaesthesia_basics.html  Accessed Oct 27, 2019

[57] Brown E, Purdon PL, Van Dort CJ.  General anesthesia and altered states of arousal:  a systems neuroscience analysis.  Ann Rev Neurosci 2011; 34:601-28

[58] Russell IF.  Balanced anaesthesia:  does it anesthetize?  Anesth Analg 1985:64:941-2

[59] Sander RD, Gaskell A, Rax A, et al.  Incidence of connected consciousness after tracheal intubation.  A prospecgive, international, multicenter cohort study of the isolated forearm technique.  Anesthesiology 2017; 126:214-22

**Ex. M**

many patients during the induction and early maintenance phases of general anesthesia, and pain is reported with awareness in a significant number of them. Both pain and awareness are reduced during the general anesthesia after the further administration of additional, different classes of potent anesthetic drugs. This will not be the case in judicial lethal injection with solo pentobarbital.

## VII.  GENERAL ANESTHESIA PRACTICE AND JUDICIAL LETHAL INJECTION: RELEVANT CRITICAL DIFFERENCES

61.    It should be emphasized that the administration of general anesthesia is critically different from administration of drugs for judicial lethal injection, even though they may involve some of the same drugs. General anesthesia for severely noxious stimuli, such as the procedures performed during surgery, virtually *never* consists of giving only one drug or one class of drug. While single "brain chemicals" can be administered as "anesthesia" for techniques involving minor amounts of pain or discomfort, or that are extremely brief in duration, today it is very uncommon to do so because our understanding of the deficiencies of such techniques has evolved. Solo anesthetic drugs are never sufficient to produce appropriate anesthesia for significant procedures that involve significant pain. Multiple drugs are given during anesthesia to target multiple areas in the brain with the intent of diminishing pain and awareness, both of which occur when only one or even a couple of drugs are given.

62.    Even a very simple, balanced anesthesia technique requires administration of multiple chemicals targeting different areas of the brain and different neurotransmitter systems, and some primarily targeting the musculoskeletal system. General anesthesia combines entirely different classes of drugs to produce its multiple effects in the brain.[60] The administration of a

---

[60] Examples include 1) propofol, etomidate, barbiturates, and benzodiazepines that affect the $GABA_A$ receptor and GABA itself; 2) inhaled anesthetics such as isoflurane and sevoflurane that have multiple effects throughout the

**Ex. M**

single drug that acts at very narrowly defined areas in the brain can in no way be equated to, nor act in even similar ways to, general anesthesia, which aims to produce unconsciousness, immobility, analgesia and amnesia.

63.     In studies of patients undergoing anesthesia, awareness as measured by IFT was highest when only one or two IV drugs have been administered, and fell as the actions of multiple drugs that affect different types of receptors in the brain were rising to effective levels in the body.  In the studies of awareness in which thiopental was the solo induction agent or was used in combination with just one other drug (usually a narcotic), awareness was most pronounced during the first 10 to 12 minutes of the anesthetic, or from the period immediately following injection of the barbiturate, to several minutes following incision, when the additional drugs—often an anesthetic gas plus nitrous oxide[61]—could be expected to have reached their effective doses.   Russell found that awareness following administration of thiopental as measured by IFT was highest for several minutes, until nitrous oxide and other drugs were given.[62]  King found that after thiopental induction, in 30 patients, 76% demonstrated awareness on IFT at surgical incision, and that IFT responses began to fall thereafter at the time when the halothane and nitrous oxide (that had been started after induction) would finally have reached their effective levels.[63]

---

brain and spinal cord that are independent of GABA and the GABA$_A$ receptor but that affect other sites, such as potassium channels and direct effects on the spinal cord; 3) the inhaled analgesic nitrous oxide that relies on N-methyl-D-aspartate (NMDA) receptors and potassium channel activation; 4) ketamine that relies on NMDA receptor effects; dexmedetomidine that promotes alpha adrenergic neurotransmitter effects; 5) droperidol that acts on sites affected by the neurotransmitters norepinephrine, dopamine, and serotonin; 6) scopolamine or other anticholinergic agents that act on cholinergic receptors; and 7) opioids such as fentanyl, sufentanil, alfentanil, remifentanil, morphine, demerol and other that act on specific opioid binding sites in the brain and spinal cord; as well as many others.

[61] Nitrous oxide is not an "anesthetic" gas, since at its maximum dose it does not as a solo drug prevent response to surgical incision. It does, however, reduce pain and is termed an "analgesic".

[62] Russell IF.  Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6

[63] Russell IF.  Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6

**Ex. M**

## VIII.   COMPLICATIONS OF BARBITURATES IN JUDICIAL LETHAL INJECTION

64.     The high incidence of awareness, and the finding that painful stimuli and other distress happens after intravenous administration of single and double "anesthetic" agents, is one reason why anesthesia for significantly painful or prolonged procedures does not rely on a single barbiturate, but rather on multiple drugs that target multiple areas in the brain.  In the context of judicial lethal injection, it is critical to understand that a single dose of barbiturate is insufficient to ablate awareness, including the sensations of pain and the extreme suffering of suffocation and asphyxiation that will occur during the barbiturate IV injection that is proposed in the Federal Protocol.

### a.     Flash Pulmonary Edema

65.     Flash pulmonary edema is an excruciating complication that occurs in the vast majority, if not all, judicial lethal injections using pentobarbital or thiopental. Acute pulmonary edema (or fluid in the lungs) is a process in which fluid from the bloodstream floods the lungs, causing failure of the lungs to transfer sufficient oxygen into the bloodstream.  In addition, the lungs become stiff from increased fluid, and it becomes harder physically for the victim to draw breath.  Actual spasm of the airways (bronchospasm) occurs as the swelling ("edema") of airway passages makes breathing increasingly difficult as the airways themselves swell shut.  The victim has to work harder and harder to breath, and suffers sensations of shortness of breath and excruciating air hunger, similar to the sensations experienced in drowning and near-drowning victims (see below: Drowning/Suffocation).  "Flash" pulmonary edema or "acute" pulmonary edema refers to a phenomenon in which this entire process happens rapidly, e.g. over seconds to minutes, rather than over the course of hours or days.  Symptoms of flash pulmonary edema in patients include cough, shortness of breath, air hunger rapid breathing, sweating, falling levels of

31

**Ex. M**

oxygen in the bloodstream, frothy sputum (sometimes pink or red due to blood) or fluid in the airway, and acute excruciating sensations of doom and/or drowning.[64,65]

66.     Pulmonary edema is a well-known complication of barbiturate overdoses in humans and nonhuman animals.[66,67,68,69,70]  Its occurrence involves several mechanisms relevant to lethal injection: 1)  acute left heart failure due to direct toxic effects of barbiturates on the heart, leading to "backing up" of blood into the lungs, 2) direct toxic/caustic damage to the lung capillaries as extremely high concentrations of barbiturates (which are highly alkaline and caustic) make physical contact with the lung and capillary surfaces, causing immediate leakage of fluid through the damaged capillaries into the lungs (non-cardiogenic pulmonary edema), and 3) obstruction or partial obstruction of the upper airway due to effects of barbiturates on respiratory centers in the brain, or due to laryngospasm (a spasmodic, involuntary closure of the larynx) while respiratory efforts continue against the obstruction or partial obstruction, "sucking" fluids from the capillaries into the lung air spaces ("negative pressure" pulmonary edema).  It should be noted that laryngospasm is also an independent complication of very high-dose barbiturate administration.[71]  Non-cardiogenic pulmonary edema is facilitated by catecholamine

---

[64] Wedro B.  Pulmonary edema.  Emedicinehealth.  Updated 2/1/19.  Available at:
http://emedicinehealth.com/pulmonary_edema/article_em.htm#what_are_the_symptoms_of_pulmonary_edema.
Accessed October 18, 2019
[65] Gagne D.  Acute pulmonary edema.  CathLabDigest September 5, 2012.  Volume 20.  Available at:
https://cathlabdigest.com/Acute-Pulmonary-Edema  Accessed Oct 18, 2019
[66] Nilsson E.  Care of respiration and air passages in connections with barbiturate poisoning.  Int Anaesthesiol Clin. 1966; 4:309-22
[67] Goodman JM, Bischel MD, Wagers PW, Barbour BH.  Barbiturate intoxication:  morbidity and mortality.  West J Med 1976; 124:179-86
[68] Lee WJ, Rie EU. OH DR, et al.  A patient with pulmonary edema and cardiac arrest after phenobarbital overdose. J Korean Soc Emerg Med 1999; 10:294-300
[69] Suddock J, Cain M.  Barbiturate toxicity.  StatPearls.  A service of the national library of medicine.  Updated Nov 15, 2018.  Stat Pearls publishing, January 2019.  Available at:  https://www.ncbi.nlm.nih.gov/books/NBK499875/
Accessed Oct 21, 2019
[70] Schoenfeld MR.  Acute pulmonary edema caused by barbiturate poisoning: a consideration of its genesis and therapy.  Angiology 1964; 15:445-53
[71] Barron DW, Dundee JW.  Clinical studies of induction agents.  XVII: relationship between doseage and side effects of intravenous barbiturates.  Brit J Anaesth 2967; 39:24-30

**Ex. M**

(adrenalin) release into the bloodstream in combination with known precipitating drugs.[72,73] Excitement, fear, and anxiety release large amounts of adrenalin into the bloodstream, and all set up conditions for non-cardiogenic pulmonary edema.

67.     Onset of pulmonary edema following IV barbiturate injection can be *virtually instantaneous*.  Potts, for example, reported a case in which hypoxia, pulmonary edema, and pleural effusions developed in a patient *immediately* following IV administration of just 325 mg of sodium thiopentone.[74] Since the patient was intubated (i.e. had an endotracheal tube in place), the mechanism that triggered pulmonary edema in that particular case was most likely a combination of rising pulmonary venous pressure as the left ventricle of the heart suddenly failed from barbiturate poisoning, and direct damage by the barbiturate when it came into contact with the lung capillaries, causing fluid that was under increased pressure from the heart to pour from the capillaries into the lungs.[75]

### b.     The Drowning/Suffocation Sensation

68.     Respiration involves two primary functions:  maintenance of viable oxygen levels in the bloodstream and extraction of (toxic) carbon dioxide (CO2) that is constantly accumulating as the "waste" of living cells.  To accomplish these functions, air is pulled into the lungs when the diaphragm actively contracts, and oxygen passively crosses from the air in the lungs into the bloodstream while CO2 simultaneously passes from the bloodstream into the air in the lungs.  The diaphragm passively relaxes, and the air flows passively out of the body. The normal percentage saturation of oxygen in the blood of the average person breathing room air at

---

[72] Pate P.  The shocking truth about non-cardiogenic pulmonary edema.  Vetbloom.  July 26, 2016.  Available at: http://blog.vetbloom.com/ecc/non-cardiogenic-pulmonary edema.   Accessed Oct 21, 2019
[73] Stone CA, Loew ER.  Effect of various drus on epinephrine-induced pulmonary edema in rabbits.  Proc Soc Exp Biol Med  1949; 71:122-6
[74] Potts MW, Smethurst PW.  Pleural effusion complicating thiopentone administration.  A case report.  Br J Anaesth 1967;39:78-8
[75] Nilsson E.  Care of respiration and air passages in connections with barbiturate poisoning.  Int Anaesthesiol Clin. 1966; 4:309-22

**Ex. M**

sea level is around 97%. There is enough oxygen in the lungs after a normal breath of room air to maintain oxygen at levels in the bloodstream above 92% for about 3 to 4 minutes, even if the person is not breathing, after which the oxygen levels start to fall. After another 1 to 2 minutes, oxygen levels in the bloodstream will be dangerously low. Unconsciousness due to hypoxia appears to occur in most people 30 seconds to a minute after that, when oxygen saturation is below 40%. Timing is affected by patient size, obesity, increased or decreased metabolism, smoking history and other patient-specific factors.

69.     Not being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man. It is nearly impossible for most untrained human beings to hold their breath voluntarily for more than 1 minute. In less than 60 seconds, sensations of asphyxia and compulsion to breathe appear and rapidly overwhelm the brain. Panic and terror, and the attempt to fight take over. *Even human beings who are underwater will reach such a level of agony that they will be compelled to take a "breath" within about 1 minute.*[76] This is the sensation that is deliberately elicited in " the enhanced interrogation technique" called waterboarding, which is defined by the European Court of Human Rights as a form of torture.[77] These sensations occur whether or not the victim is able to take that breath. They may be physically unable (for example paralyzed by a paralytic drug), or physiologically impaired, for example by drugs that "lock in" the brain and make it impossible for the brain to act on these sensations. A lack of visible breathing effort therefore does not indicate that these sensations are absent.

---

[76] Parkes MJ. The limits of breath holding. Scientific American. April 2012; pp74-9

[77] European Court of Human Rights  Former fourth section: case of Husayn (Abu Zubaydah) v Poland. (Application no. 7511/13) judgement. Strasbourg 24 July 2014. FINAL 16/02/2015. Treatment to which the applicant was subjected at the relevant time. Paragraph 511.  http://hudoc.echr.coe.int/eng?i=001-146047  Accessed October 18, 2019

**Ex. M**

### c.    Autopsy Evidence Regarding Flash Pulmonary Edema and Lethal Injection Protocols with Barbiturates.

70.    As part of this report I have reviewed autopsy findings in 27 prisoners who were executed in Florida, Arizona, Georgia, and Oklahoma between 2001 and 2018 by judicial lethal injection of barbiturates alone or in combination with other drugs (see **Appendix III**).  Of the 27 autopsies, the pathologist failed to comment on the presence or absence of pulmonary edema and/or failed to report taking sections of lung tissue dissection in 7 cases.[78]  Of the 20 cases in which any commentary was made on the lungs, ***100% demonstrated pulmonary congestion and pulmonary edema***, which are not normal autopsy findings.  In 40% of the cases (n = 8), edema was rated as moderate, and in 50% of cases (n = 10) edema was rated as severe, abundant, intense, and/or was associated with fluid in the main airways, (indicating severe pulmonary edema).  In 2 cases, edema was present, but not characterized.  Three-quarters of severe cases (n = 6) demonstrated *fluid filling the main airways and tracheobronchial tree*—in one case filling the airways all the way up to the back of the throat (larynx).    Thus at least 90% of the cases of pulmonary edema were moderate to severe, many with fluid filling their major airways

71.    Because this finding had to develop while the prisoner was still alive during the execution protocol, (i.e. not over hours or days), they all represent flash pulmonary edema.  In addition, pulmonary edema was found in a woman as well as men, across a wide age range, and in individuals who had no signs of heart disease on autopsy, indicating that this was not due to heart failure, and is rather due to immediate toxic damage to the pulmonary capillaries by the barbiturate, possibly combined with negative pressure pulmonary edema due to upper airway

---

[78] Three of these cases took place in Arizona and were autopsied by the same examiner, so this may represent a local practice, and two more were performed by the same pediatric pathologist, and represent personal practice, or pediatric practice rather than routine adult practice.

**Ex. M**

edema and other causes of airway obstruction, including barbiturate-triggered laryngospasm and bronchospasm.

72.     Experience in humans and animal models indicate that flash pulmonary edema occurs virtually immediately during and after high-dose barbiturate injection, and well within a time frame before peak drug effects on the brain have occurred.  In my opinion, it is a virtual medical certainty that immediate, flash pulmonary edema occurred in the prisoners whose autopsies I reviewed, and it is extremely likely that they were aware and experienced sensations of drowning and suffocation as they died.

**d.     Problems With IV Access: Extravasation, Infiltration, and Inadvertent Intra-arterial Injection of Barbiturates; and Complications of Central Line Access**

73.     Barbiturates are strongly alkaline, and cause immediate caustic destruction of tissues when direct contact occurs (akin to lye).[79]  With dilution in IV fluid and further dilution in blood, the drug is reasonably well tolerated in small doses with IV injection, but infiltration or extravasation of even small amounts of the drug causes instant, excruciating pain that patients liken to being set on fire, and requires emergency intervention to reduce extensive tissue damage. Often, gangrene of the arm and hand results.[80]  Inadvertent arterial injection (the catheter has been unintentionally placed in an artery rather than a vein) causes instant arterial spasm, pain, excruciating local tissue destruction, and also immediate ischemia (i.e. lack of oxygen, tissue damage and necrosis) in the area of the body supplied by the artery—e.g. infiltration of pentobarbital in an IV at the elbow (antecubital or AC location) can cause the entire arm from the IV site down to the hand to immediately turn white and generate excruciating pain.

[79] Shibata Y, Yokooji T, Itamura R, et al.  Injury due to extravasation of thiopental and propofol:  risks/effects of local cooling/warming in rats. Biochem Biophys Rep 2016; 8:207-11
[80] Davies DD.  Local complications of thiopentone injection.  Br J Anaesth 1966; 38:530-2

**Ex. M**

74.     In reviewing 27 autopsies of patients executed with pentobarbital or thiopental single or multiple-drug protocols (see **Appendix III**), complications of peripheral line placement was common:  only 44% of cases in which IV lines were described appeared to be uncomplicated.  Problems included multiple attempts in 32%, evidence of apparent extravasation in 12%, and necessity of central line placement in 24% of cases.  Some lines were associated with multiple problems.

75.     Central venous access catheters (CV lines) are, in the words of one author "relatively  dangerous,  problem-prone  devices"  for  which  mechanical  complications  during placement remain "a significant cause of morbidity and mortality".[81]   The majority of mechanical complications are vascular injuries,[82] and several complications are relevant to judicial lethal injection, because they are either extremely painful in and of themselves; would lead to extravasation, infiltration or intra-arterial injection of the pentobarbital, which would be excruciating; or lead to failure of delivery of the intended dose of pentobarbital, potentially prolonging death while excruciating suffocation occurs.   The overall rate of vascular complications during placement ranges as high as almost 1 in 5.[83]   All complications are significantly affected by the experience of the person placing the line, with rates of complications in hospitals from relatively inexperienced providers (e.g. interns) nearly double that of more senior house staff.[84]

76.     Intra-arterial puncture occurs in almost 1 in 10 cases in experienced hands, and a small number (about 1% of all CV lines) result in intra-arterial placement of the entire line.

---

[81] Bowdle A.  Vascular complication of central venous catheter placement:  evidence-based methods for prevention and treatment.  J Cardiothor Vasc Anesth 2014; 28:358-68
[82] Domino KB, Bowdle TA, Posner KL, et al.  Injuries and liability related to central vascular catheters:  a closed claims analysis.  Anesthesiology 2004; 100:1411-8
[83] Kusminsky RE.  Complications of central venous catheterization.  J Am Coll Surg 2007; 204:681-96
[84] Eisenhauer ED,  Derveloy RJ, Hastins PR.  Prospecitve evaluation of central venous pressure (CVP) catheters in a large city-county hospital.  Ann Surge 1982; 196:760-4

**Ex. M**

This can result in rapid loss of large amounts of blood, or intra-arterial injection of pentobarbital in the neck, chest wall, or groin, depending on the location of the line.  Both are both gruesome and excruciating injuries, the latter leading to both excruciating pain and prolongation of the execution due to failure to deliver drug into the bloodstream.  This injury is most common with femoral line placement,[85] which appears to be common in judicial executions:  24% of autopsies I reviewed in which venous access was documented included a triple lumen femoral line.

77.        Through-and-through injuries of the vein also occur.  This increases the risk that pentobarbital will be injected into soft tissue surrounding the vein in the neck, groin, or chest, also causing excruciating pain due to the caustic effects of the drug on soft tissues, and potentially also prolonging the execution by failing to deliver all or part of the drug to the bloodstream.

78.        Injury to large nerves in the neck (the brachial plexus, a bundle of all of the nerves running to the arm) or groin (femoral nerve supplying sensation and muscle movement and strength to the leg) during placement is not rare, leading to immediate piercing pain when the needle damages the nerves.

79.        To summarize, placement of a central line for venous access during judicial lethal injection is common, is fraught with potential mechanical complications, and requires personnel experienced and adept in their placement.  While many complications of central line placement occur, the most relevant to lethal injection are mechanical complications of line placement that cause vascular injury and inadvertent injection of pentobarbital into surrounding tissues, and failure to deliver all or part of the pentobarbital into the blood stream, leading to prolongation of the execution and excruciating pain.

---

[85] Dornbau C, Lee KC, Hughes GD, Firstenberg MS.  Central line complications. Int J Illn Inj Sci. 2015; 5:170-8

**Ex. M**

IX.    **RISKS AND DEFICIENCIES OF THE FEDERAL EXECUTION PROTOCOL PROCESSES**

80.    The Federal Protocol is inherently vague, and lacks sufficient detail to provide assurance that "qualified" personnel will be in charge of and carry out the execution. It also does not provide sufficiently explicit instruction on the procedure of the execution itself to assure either a lack of severe pain and/or suffering, or the efficiency of the execution.  The lack of detail in the Addendum furthermore obscures important aspects of the Bureau of Prisons' (BOP's) intended preparation for and implementation of the execution itself. By obscuring these critical details, the Addendum poses a significant impediment to expert review.  Indeed, the only explicit element in the Addendum is that the protocol is a single-drug protocol relying on the intravenous injection of 2 doses of 2.5 gm of pentobarbital sodium, each in 50 ml of solution, followed by a 60 ml saline flush.

a.    **Information That Is Missing or Deficient**

81.    The Federal Protocol states no explicit requirement regarding the expertise, experience and psychology of the personnel who will be directly involved in the execution process—a process that spans the medical treatment of the prisoner prior to the execution (e.g. management of medications that might interfere with or cause complications to the execution, administration of sedatives, if any, etc.) to the declaration of death at the end of the execution.

b.    **Paragraph D:  definition of qualified personnel**

82.    Broad categories of personnel are designated as "qualified," e.g. physician, nurses, EMTs, paramedics, etc.  But such persons, even if licensed, are only qualified to perform certain tasks necessary to the execution, and none are qualified for all of the tasks.  Expertise required for specific tasks are not detailed.  For example, a "phlebotomist" (a person who draws blood at a laboratory) is listed as a "qualified person," but the task assigned to the phlebotomist

39

is not defined. Phlebotomists are not professionally trained, nor necessarily expert in medication management, intravenous line placement, or administration of medications.   Indeed, a phlebotomist might not be qualified to carry out any of the tasks associated with executions.

83.    The Addendum specifies that the qualified person must have 1 year of professional experience, but, again, does not designate the tasks that experience must include. The Addendum states only that it must be "a specific execution related function," but does not state anywhere what those execution-related functions are.   Without that information, it is impossible to determine if the persons assigned to execution "functions" will be qualified for the tasks to which they are assigned.   What would constitute a professional disqualification?   Under the terms of the Addendum, licensed physicians, nurses and others who had committed proven professional malpractice, or been subject to professional disciplinary action would be considered "qualified."

c.    **What skills are required of each "qualified" person?**

84.    The Addendum also does not specify what skills and experience are required of each "qualified" person.   In order to select and assign properly qualified personnel, the Addendum must state the skills, training and experience necessary for personnel who obtain intravenous (IV) access, monitor intravenous line function, recognize and interrupt the execution process if in the course of execution the IV line malfunctions, infiltrates, or becomes occluded, and obtain alternate venous access if necessary, including central venous access via the jugular vein, femoral vein cut-down or other procedures.

85.    Whether central IV access is successful is significantly affected by the number of lines and the frequency with which the provider places them.   The incidences of line infiltration and inadvertent placement into an artery instead of a vein are high in personnel without significant, ongoing and routine practice of those lines, even if they have the technical expertise

to know how to do them.  Repeat attempts to establish peripheral or central venous access, line infiltration and/or inadvertent intra-arterial injection of pentobarbital sodium are excruciating events and can result in slow suffocation if only partial injection is achieved, and a lingering and extremely painful death and/or failure of the execution altogether.

86.     There is no explicit instruction regarding the implementation of the protocol from the day prior to the execution to the declaration of death. Details that are missing and may significantly affect the course of the execution include:

87.     **How will the prisoner's medical issues and medications be managed from the day prior to the execution going forward, and who will provide that management?**  Sodium pentobarbital is associated with severe bronchospasm in asthmatics, for example.  Will measures be taken to prevent this?

88.     **What form of Pentobarbital Sodium will be used and how will it be handled prior to, and on the day of execution?**  No details are provided about the source of the drug, and there are indications that this will be obtained from a compounding pharmacy, which presents significant risks of improper drug management (see section below on compounding pharmacies).  How long prior to execution will the drug be obtained?  Will the drug be supplied in solution or as a powder to be reconstituted on the day of execution?  If it requires reconstitution, who will do that, since it requires the experience of a person who is professionally qualified, in order to be sure the drug is reconstituted in the right solution, in the right dilution, and then stored/refrigerated properly.  Pentobarbital sodium is loses potency over time.  How with the drugs be labeled?  What happens if the execution is delayed and the drug is in solution an hour longer than permitted?  Who will examine the reconstituted drug to be sure it is of the proper color and not degraded prior to injection?

**Ex. M**

89.     **What equipment will be used?  What size of IV will be required?**  Infiltration and extravasation increase with small IV size and shorter IV catheter length and can lead to an excruciating death.  The length of tubing permitted from the injection port for the drug and the prisoner's vein is important—the longer the tubing the higher the resistance and pressure in the IV line, leading to increased risk of infiltration and extravasation, and to insufficiently rapid injection to ablate awareness.

90.     **What fallback measures will be undertaken if venous access cannot be obtained?**  There are no explicit instructions regarding contingency plans in the event the executioners struggle to obtain or cannot obtain IV access.  In fact, the Addendum does not specify the number of lines, if a backup line is necessary, how many attempts are allowed, how much time will be permitted, nor specific access sites that will be used, and the order in which they will be attempted.  Will more than an hour of attempts, or hundreds of punctures be permissible?  What will be the procedure if extravasation or infiltration is recognized?  Will pain be treated while another IV site is sought?

91.     **How will the executioners manage severe complications that arise during the execution?**  How will personnel manage bronchospasm and/or laryngospasm, both well-known side effects of IV barbiturate administration, if they occur? Will the prisoner be given treatment or simply allowed to suffocate as the execution proceeds? There is no anticipation of these likely developments and no instruction, much less detailed instruction, of how the personnel should respond.

92.     **How exactly will the drug be given?**  The effects of pentobarbital sodium are absolutely dependent not only on dose, but also on rate of administration. Fast redistribution of the drug can cause significant awareness to linger while the prisoner experiences suffocation (see

**Ex. M**

below), and rapid administration can cause pulmonary edema within seconds, with associated sensations of drowning.  Rapid administration is also associated with increased probability of extravasation and infiltration.

93.     **What is the protocol for mishaps that happen during the execution?**  The addendum merely states that mishaps must be "reported to the Director," but there is no instruction of what should actually be done to assure the prisoner does not experience a lingering and excruciating death due to a mishap.

## X.     RISKS OF DRUGS OBTAINED FROM COMPOUNDING PHARMACIES

94.     The Federal Protocol states that pentobarbital will be acquired from a compounding pharmacy. It is important to understand the significant safety issues associated with drugs that come from these facilities.

95.     The FDA regulates virtually all commercial pharmaceutical manufacturing to assure safety, consistency and quality. FDA-approved drugs are made and tested under Good Manufacturing Practice regulations ("GMPs").  However, states generally regulate pharmacies, including compounding pharmacies.   State regulations include matters of storage, record keeping, labeling, and safety regulations related to drug origins, authenticity, chain of custody, product expiration dates, purity, sterility.[86]   The states also grant authority to "compound" or mix pharmaceuticals into a patient-ready product.   The classic role of a compounding pharmacy in general is to produce a formulation of a drug which fits a single patient's specialized needs: for example, the manufacturer's formulation contains a preservative to which a patient is allergic, and a single version of the drug in a different preservative is needed by the patient.

96.     Regulatory oversight of compounding pharmacies is much less rigorous than for FDA-approved drugs.  Compounding pharmacies, for example, are exempt from GMPs.  GMPs

---

[86] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8

include regulation of the facilities and equipment used in manufacturing a drug, training of personnel, calibration and cleaning of processing equipment, and ensuring that validated analytical test procedures are used to guarantee potency, purity, sterility and other characteristics. GMPs require that all ingredients and components coming in to the manufacturer be tested upon receipt; that an independent quality control unit oversee the manufacturing, packaging, and testing process; that substandard batches be rejected; and that stability studies are done to support expiration dates.[87]   It should be noted that "compounded drugs" are different from "generic drugs." Generic drug manufacturers are regulated by the FDA and do have to meet GMP regulations, and their generic drugs must meet FDA regulatory standards.

97.     It is not required that pharmaceuticals from compounding pharmacies be tested to assure product quality and consistency, and generally they are not tested, and not evaluated for safety or for efficacy.   They do not have the same product labeling or prescribing information to instruct safe usage.   Compounding pharmacies are not required to report adverse events to the FDA.   Thus, the FDA's knowledge of adverse events from these chemicals comes from voluntary reporting, direct patient reporting, reports of caregivers, and sometimes whistleblowers.   The compounding industry often uses the low reported rate of adverse events as evidence of safety of compounded pharmaceuticals, which is a stark misrepresentation.[88]

98.     Pharmaceutical preparation errors are much more common among compounding pharmacies than commercial manufacturers:   independent testing of compounding pharmacies by the FDA and state agencies consistently shows that compounded drugs fail to meet specifications at a much higher rate than FDA-approved drugs.[89]   Problems associated with drug compounding

---

[87] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[88] Dohm J, Kim J, Woodcock J.  Improving adverse event reporting for compounded drugs.  JAMA Intern Med 2019;  Sept 9, 2019.  Available at".  https://jamanetwork.com  Accessed Oct 23, 2019
[89] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8

**Ex. M**

include several types of risk: subpotency (the compound contains less drug than labelled); superpotency (the compound contains more drug than labelled); contamination; overmedication (too much drug is prescribed by the physician of the compounded drug), and medication-replacement.   Contamination and overmedication are not the main issue concerning judicial lethal injection, although they speak to a pharmacy's ability to accurately and safely carry out compounding activities.   Sub- and super potencies, however, are important issues to examine. **Subpotency** appears to be the most common type of compounding error, occurring in around one-third of compounded drug samples tested, as noted above.   Over half of subpotent drugs in one survey had < 70% of the labeled value.[90] **Superpotency** also occurs, with cases in which the compounded drug contained 1000% of the labeled value.[91]   **Medication replacement** occurs when a compounding pharmacy substitutes an untested compound for a commercially available, FDA-screened compound—and thus does not guarantee similar clinical effectiveness.

99.   More recently, compounding pharmacies have departed from their traditional role in meeting single-patient, specified needs, and have entered large-scale production of compounded medications without single patient prescriptions, effectively manufacturing drugs without FDA approval that are merely copies of FDA-approved drugs.   Thus, large-scale release has occurred at times of medications that have never been FDA approved, or alternatively, were removed from use by the FDA for safety reasons, skirting FDA safety oversight.[92]

---

[90] Boodoo JM.  Compounding problems and compounding confusion:  federal regulation of compounded drug products and the FDAMA circuit split.  Am J Law Med 2010; 36:220-47

[91] Schwam E.  Severe accidental overdose of 4-aminopyridine due to a compounding pharmacy error.  J Emerg Med 2011; 41:51-4

[92] For example, domperidone, which led the FDA to issue warning letters to compounding pharmacies that had obtained the drug from foreign source.  The drug was being touted to assist lactation, but had been shown to cause sudden cardiac arrest and death. See U.S. Food and Drug Administration.  FDA Talk paper:  FDA warns against women using unapproved drug, domperidone, to increase mild production.  4/18/2016.  Available at: https://www.fda.gov/drugs/information-drug-class/fda-talk-paper-fda-warns-against-women-using-unapproved-drug-domperidone-increase-milk-production  Accessed Oct 24, 2019

**Ex. M**

100.    The FDA undertook a limited survey in 2001 of 29 compounded drugs from 12 compounding pharmacies.  They tested 8 drugs against established quality standards.  Ten of the 29 (34%) failed quality testing, most for substandard potency—the drugs that failed ranged from 59 to 89% of the labeled dose.  This compares to a less than 2% failure rate among over 3000 FDA-approved drugs tested from a similar time period.[93]  A follow-up survey in 2006 found no improvement in these discrepancies:  33% of 36 compounded products failed quality testing and potency, with the products containing from about *0.68 to over 2.5 times* the amount of drug on the labeled dose.[94]  Failure rates in drugs tested between 2005 and 2009 were between 11.6% and 25.2%, with potency ranging from *0 (meaning none of the expected drug is present) to 4.5 times the labeled drug dose.*[95]  In Ohio in 2007, potency results ranged from 27% to 87% of the labeled dose, and over 1300 doses of products were found that were contaminated with fungus.  Three out of five formulations of one set of drugs included drug combinations that were not approved by the FDA.[96]  In Texas from 2008 to 2010, 23% of compounded drugs tested by the state compounding pharmacy board failed potency testing.[97]  In other studies, almost half of compounded nitroglycerin ointments for heart patients (84,000 prescriptions for compounding in 2004) failed in potency and content[98], and diaminopyridine products (for myasthenia gravis

---

[93] U.S. Food and Drug Administration.  Limited FDA Survey of Compounded Drug Products, 2001.  Available at: https://www.fda.gov/drugs/human-drug-compounding/report-limited-fda-survey-compounded-drug-products Accessed Oct 23, 2019
[94] US Food and Drug Administration.  Pharmacy compounding.  2006 limited survey of compounded drug products.  2012.  Cited in Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[95] Missouri Board of Pharmacy Compounding Report.  FY2006-2009.  Each of the annual reports available at: https://pr.mo.gov/pharmacists-compounding.asp  Accessed Oct 23, 2019
[96] Sasich LD, Sukkari SR. Unknown risks of pharmacy-com-pounded drugs. J Am Osteopath Assoc. 2008;108(2):86.
[97] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[98] Azarnoff DL, Lee JC, Lee C, et al.  Qualityof extemporaneously ompounded nitroglycerin ointment.  Dis Colon Rectum 2007;  50:509-16

**Ex. M**

patients) varied in potency from 22% to 125% of the labeled dosage.[99]  In the case of one agent, sodium tetradecyl sulfate, used to sclerose (i.e. close) veins, compounding pharmacies were found to have used a low-quality starting ingredient that cause the drug to contain toxic levels of a contaminant, carbitol—a solvent used in staining wood.

101.   After a deadly outbreak of fungal meningitis (a brain infection) due to contaminated drugs compounded at New England Compounding Center in Massachusetts, (NECC), a follow-up inspection by the FDA found that no corrective action to decontaminate the facility had been undertaken, and there was no evidence that NECC sterilization processes were effective.[100,101] FDA inspectors who performed follow-up inspections in 30 other compounding pharmacies after the NECC disaster found spiders, rust and mold in "clean rooms" and technicians wearing gloves with tears in the them who were compounding "sterile" injectable drugs. Five of the pharmacies tried to deny the FDA access to their facilities and records, and the agency had in at least one case to obtain a court-ordered inspection warrant.   Another 12 facilities underwent lower priority inspection:  in New Jersey, a company recalled 83 of its compounded products when a nurse found mold floating in medicine bags, and in Georgia, a compounding company recalled 60 products after patients reported eye infections.

102.   All in all, from 2002 to 2012, the FDA did 197 inspections of compounding pharmacies and found "objectionable" safety issues in one-third of them.   In the following 2 years, the FDA carried out 148 inspections at compounding sites, and found safety problems in *9*

---

[99] Green DM, Jones AC, Grain KR.  Content variability of active drug substance in compounded oral 3,4-diaminopyridine products.  J Clin Pharm Ther 2012;37:53-7
[100] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[101] Food and Drug Administration Inspectional Observations (Form 483) New England Compounding Center issued October 26th, 2012. 2012.   Available at:  http://www.fda.gov/downloads/AboutFDA/Centers Offices/OfficeofGlobalRegulatoryOperationsandPolicy/ORA/ ORAElectronicReadingRoom/UCM325980.pdf. Accessed Nov 2012

*out of 10 of them.*[102]  Far from cooperating with improvements in the safety of compounded drugs, a number of compounding pharmacies fight back.  NuVision Pharmacy in Dallas refused to recall products the FDA identified as potentially dangerous that were also associated with patient reactions, despite two warnings.[103]  As of 2019, only four states had enacted laws to tighten regulation of compounding pharmacies.[104]  Only twenty-eight states reported in 2016 that they even had expectations or requirements for special training in sterile compounding.  Hospitals, in contrast, are responding to concerns about the safety of compounded drugs.  In 2013, the Department of Health and Human Services reported that over half of 298 acute-care hospitals they surveyed are discontinuing use of compounding pharmacies for sterile IV injection drugs due to safety reasons.[105]

103.    In 2013, Congress passed the Drug Quality and Security Act (DQSA) in response to problems with contamination at compounding pharmacies.  It established a new voluntary category of compounding pharmacies, called "outsourcing facilities."  Outsourcing facilities are subject to GMP requirements, and may distribute compounded drugs either in response to a patient-specific need, or in response to an order from a health care provider (a hospital or health care facility) that is not for an individual patient. They are inspected by the FDA according to a "risk-based" schedule and must report to the FDA adverse events and details about products they

---

[102] Eisler P, Schnaars C.  Safety, sanitary problems prompt scores of drug recalls.  USA Today.  Oct 2, 2014. Available at: https://www.usatoday.com/story/news/nation/2014/10/07/compounding-pharmacy-recalls-inspections-contamination/16472741/  Accessed Oct 23, 2019
[103] Ibid.
[104] Compounding pharmacies.  National Conference of State Legislatures.  Available at: http://www.ncsl.org/research/health/compounding-pharmacies-and-states.aspx  Accessed Oct 24, 2019
[105] Sun LH.  FDA finds widespread safety issues at compounding pharmacies.  The Washington Post.  April 11 2013.  Available at:  https://www.washingtonpost.com/national/health-science/fda-finds-widespread-safety-issues-at-compounding-pharmacies/2013/04/11/5321e17a-a20d-11e2-be47-b44febada3a8_story.html  Accessed Oct 23, 2019

**Ex. M**

compound.[106]   As of this month, only about 1% of all compounding pharmacies were registered as outsourcing facilities—75[107] of the more than 7500[108] compounding pharmacies believed to exist.[109,110] Of the 75 outsourcing facilities currently registered with the FDA, 13 (17%) have not yet been inspected, and of the 62 that have been inspected, *92%* have received warning letters or other disciplinary actions as of 10/11/19, most in the last 2 years.[111] Also, as of the last FDA report from summer of 2019, which lists all of the drugs that these facilities compound, pentobarbital is not listed as being compounded at any of the registered pharmacies,[112] suggesting that this drug is probably being produced by a non-registered compounder.

104.   As of 10/11/2019, the FDA lists over 595 compounding facilities total as having received inspections, warnings, recalls or other regulatory actions.[113] There is no data at this time that demonstrates that regulatory action decreases problems with compounded drugs in these facilities, only a hope that it will do so.   However, if the current recall, regulatory action list at the FDA is any indicator, this does not seem to be a realistic hope at this time, as many if not most of the disciplined pharmacies are the subject of repeat actions over years.   Moreover, as

---

[106] U.S. Food and Drug Administration.  Compounding Laws and Policies.  Updated 7/23/18.  Available at: https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies  Accessed 10/25/2019
[107] U.S. Food and Drug Administration.  Registered Outsourcing Facilities.  Updated 10/22/19.  Available at: https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities  Accessed Oct 24, 2019
[108] Peters K.  Those involved in compound pharmaceuticals beware:  law enforcement is focused on you.  Food and Drug Law Institute. Nov/Dec 2017.  Available at: https://www.fdli.org/2017/12/involved-compound-pharmaceuticals-beware-law-enforcement-focused/  Accessed Oct 24, 2019
[109] Gulfo J.  Pharmaceutical compounding:  the FDA is not the problem.  Forbes.  August 29, 2016.  Available at: https://www.forbes.com/sites/realspin/2016/08/29/pharmaceutical-compounding-the-fda-is-not-the-problem/#725ada4778df  Accessed Oct 23, 2019
[110] Wilson LE< Blythe D, Sharfstein JM.  Fungal meningitis form injection of contaminated steroids:  a compounding problem.  JAMA 2012; 308:2461-2
[111] U.S. Food and Drug Administration.  Compounding: inspections, recalls and other actions,  Updated 10/11/2019.  Available at: https://www.fda.gov/drugs/human-drug-compounding/compounding-inspections-recalls-and-other-actions  Accessed Oct 24, 2019
[112] U.S. Food and Drug Administration.  Information for Outsourcing Facilities.  Updated 9/4/19.  Available at: https://www.fda.gov/drugs/human-drug-compounding/information-outsourcing-facilities/#reporting%20information  Accessed Oct 24, 2019
[113] U.S. Food and Drug Administration.  Compounding: inspections, recalls and other actions,  Updated 10/11/2019.  Available at: https://www.fda.gov/drugs/human-drug-compounding/compounding-inspections-recalls-and-other-actions  Accessed Oct 24, 2019

**Ex. M**

noted above, even after repeat inspections, some compounding pharmacies failed to show any signs of improved facilities, personnel training or product handling.

105.    The use of compounded chemicals in lethal injection introduces potentially critical errors in judicial executions:

- Compounding pharmacies have a much higher rate of serious errors in drug preparation than FDA regulated manufacturers.
- Assertions that compounded pharmaceuticals are "as safe" or "safer" than FDA-regulated drugs are patently false; this is a misrepresentation of the fact that most compounding pharmacies do not even report or keep records of adverse events, rather than a reflection of fewer adverse events.
- The most common compounding error is that of potency: compounded drugs are *very likely* to be less potent than the label indicates, and *very likely* to *not* be within 30% of their labeled potency, compared to less than 2% of FDA-regulated compounds.
- Compounded drugs do not have to be subjected to the FDA-required stability studies guaranteeing their stability in solution once compounded, and this is a particular problem when the drug has a relatively short recommended time-to-utilization (i.e. 24 hours) as in the case of short-acting barbiturates; compounded barbiturates *pose a risk of poor potency, instability and accelerated degradation of drug*.
- There is no guarantee that an outsourcing facility will be used for drug compounding. Even if one is used, these facilities are also fraught with errors, with more than *92%* of all inspected registered facilities to date having received FDA warning letters and regulatory actions, most in the last 2 years.

## XI.    COMPARISON OF JUCIDIAL LETHAL INJECTION AND PHYSICIAN-ASSISTED SUICIDE AND LEGAL EUTHANASIA

106.    **Physician-assisted suicide ("PAS")** is a procedure where a patient, following approval, chooses to end his or her life and receives a prescription for oral medications to take to commit suicide. In the United States, PAS requires that patients take the drugs unassisted and orally.  Two barbiturates have predominantly been used in PAS: seconal (secobarbital), a short-acting barbiturate similar to pentobarbital that was developed for treatment of seizures and insomnia, in a 9gm oral dose, and phenobarbital, an ultra slow-acting barbiturate originally used for treating epilepsy.  The practice is legal in only 10 jurisdictions in the United States (legalized

in 8 states and the District of Columbia, and "permissible" in Montana).[114] It is therefore not a common, nor even widely accepted, medical practice at this time, and there remain grave concerns about whether the drug protocols themselves cause a "cruel" and "inhumane" form of death that "results from asphyxia due to cardiorespiratory depression"[115] and that may well be accompanied by awareness.

107.   PAS and euthanasia are frequently confused in both the lay and medical literature. PAS differs significantly from euthanasia, in that with euthanasia, someone other than the patient administers the drugs to cause death, sometimes without the patient's knowledge or agreement and almost always via IV injection of the drugs.[116,117]

a.   **Oral Versus IV Administration of Barbiturates**

108.   Drugs behave differently when given orally versus intravenously, and therefore equating barbiturate use in PAS (which is oral administration) to its IV use and effects is inappropriate and not supportable. Differences in action for the same drug between or and IV administration include different onset and peak of action (much longer with oral administration), and clearance of the drug from the bloodstream, brain, and body.  In addition, after oral administration, a large dose of barbiturate will remain in the stomach and continue to be slowly absorbed.  The stomach acts as a reservoir of drug, allowing it to continue to enter the bloodstream for hours after oral dosing, and thus keeps drug levels from falling in the bloodstream and brain over a longer period of time than IV injection.  These characteristics have a strong influence on the drugs' clinical effects, and rates and types of complications.

---

[114] Assisted Suicide in the States.  Charlotte Lozier Institute.  June 12, 2019.  Available at: https://lozierinstitute.org/map-assisted-suicide-in-the-states/  Accessed Oct 26, 2019
[115] Sinmyee S, Pandit VJ, Pascual JM, et al.  Legal and ethical implications of defining an optimum means of achieving unconsciousness in assisted dying. Anaesthesia 2019; 74:630-7
[116] McKenney J.  Informed consent and euthanasia:  an international human rights perspective. Internat Comp Law Rev 2018; 18: 118-33
[117] Pereira J.  Legalizing euthanasia or assisted suicide: the illusion of safeguards and controls.  Curr Oncol. 2011; 18:e38-e45

**Ex. M**

109.     There are also important differences in the way a barbiturate acts when used as a *solo* drug for judicial lethal injection, versus in PAS, where it is both administered orally and combined with other drugs (referring to the practice in the United States). Many references in studies and textbooks allude to "unconsciousness" following oral barbiturate overdose, however this again is a misuse of the term "unconsciousness," and the authors are invariably referring to "unresponsiveness."  Actual studies of awareness have never been done on unresponsive patients after oral barbiturate administration.   As explained earlier in this report, the recall of such patients if they survive is severely impaired, no matter what the experience of awareness at the time might have been.

110.     Pulmonary edema is a well-known complication of oral barbiturate overdose,[118] but the time course of this complication is almost entirely unknown, since patients are seldom in the presence of physicians or other medical professionals who would be able to watch for and recognize the onset of this complication when the overdose is taken.   Equally important, the prevalence of pulmonary edema in PAS patients has never been studied and is unknown.   In contrast, pulmonary edema appears to be almost immediate following a large IV overdose, as demonstrated in both humans and animals (see previous Pulmonary Edema section), and appears to occur in virtually 100% of prisoners when pentobarbital or thiopental is used in their executions, as evidenced in autopsy reports.   It is possible, for example, that in PAS patients, pulmonary edema is rare, slower in onset, and less potentially symptomatic than when it occurs during lethal injection. It is equally possible that it is no different, or that onset is more prolonged, and that the experience is even worse.

---

[118] Goodman JM, Bischel MD, Wagers PW, Barbour BH.  Barbiturate intoxication:  morbidity and mortality.  West J Med 1976; 124:179-86

**Ex. M**

## XII.   CONCLUSIONS

111.   For all of the reasons laid out above, it is my conclusion, to a reasonable degree of medical certainty, that prisoners executed by lethal injection in accordance with the Federal Protocol will remain conscious and able to experience extreme pain and suffering related to the caustic effects of pentobarbital and occurrence of flash pulmonary edema. I also conclude that the Federal Protocol creates additional risks of pain and suffering that are likely to occur, including (1) that the compounded pentobarbital will be defective, most likely subpotent; (2) that the personnel selected to be on the execution team will not be qualified to perform their assigned tasks and therefore will not be able to perform them correctly; and (3) that complications of faulty IV line placement will lead to delivery of the pentobarbital outside the vein or into an artery, both of which would cause extreme pain and suffering, as well as prolong the execution process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Seattle, Washington on November 1, 2019.

Gail A. Van Norman, M.D.

**Ex. M**

# **APPENDIX I**

CURRICULUM VITAE
**Gail A. Van Norman, M.D.**

## Education:

| | | | |
|---|---|---|---|
| 1973-1977 | University of Washington, Seattle, Washington | Honors B.S, Microbiology | |
| 1977-1981 | University of Washington School of Medicine, Seattle, Washington | M.D. with Honors | |

## Postgraduate Training:

| | | | |
|---|---|---|---|
| 1981-1982 | Virginia Mason Hospital, Seattle Washington | Internship | Internal Medicine |
| 1982-1984 | Virginia Mason Hospital, Seattle, Washington | Residency | Internal Medicine |
| 1986-1988 | University of Washington, Seattle, Washington | Residency | Anesthesiology |
| 1988-1989 | University of Washington, Seattle, Washington | Fellowship | Cardiothoracic Anesthesiology |
| 1992-1993 | University of Washington, Seattle, Washington, Department of Biomedical Ethics | Certification | Health Care Ethics |
| 2001 | Perioperative Transesophageal Echocardiography Examination | Testamur | |
| 2011 | ASA Business Management Certification | Certification | |

## Faculty Positions Held:

| | |
|---|---|
| 1989-1994 | Clinical Acting Instructor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1994-1995 | Acting Instructor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1995-1997 | Acting Assistant Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1997-2000 | Assistant Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1997-2000 | Adjunct Assistant Professor, Department of Internal Medicine, University of Washington, Seattle, Washington |
| 2000-2001 | Clinical Assistant Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 2001 -2008 | Clinical Associate Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 2008- | Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 2008- | Adjunct Professor, Department of Biomedical History and Ethics, University of Washington, Seattle, Washington |

**Ex. M**

**Hospital Positions Held:**

| | |
|---|---|
| 1984-1985 | Attending Internist, Jefferson Memorial Hospital, Port Townsend, Washington |
| 1985-1986 | Attending Internist, Highline Community Hospital, Burien, Washington |
| | |
| 1989-1992 | Staff Anesthesiologist, Northwest Hospital, Seattle, Washington |
| 1992-1994 | Staff Anesthesiologist, Swedish Hospital, Seattle, Washington |
| 2000 – 2008 | Staff Anesthesiologist, St. Joseph Medical Center, Tacoma, Washington |
| 2000 – 2006 | Director, Transesophageal Echocardiography Education, Department of Anesthesiology, St. Joseph Medical Center, Tacoma, Washington |
| 2003-2004 | Clinical Director, Department of Anesthesiology, St. Joseph Medical Center, Tacoma, Washington |
| 2008-2013 | Medical Director, PreAnesthesia Clinic, University of Washington Medical Center, Seattle, Washington |
| 2010- | Physician Champion, Compliance Officer, Dept of Anesthesiology and Pain Medicine, University of Washington, Seattle WA |

**Non-Hospital Positions Held:**

| | |
|---|---|
| 1984-1985 | Consulting Internist, Spokane Urban Indian Health Center, Spokane, Washington |
| 1985-1986 | Consulting Internist, Seattle Community Health Clinics serving economically disadvantaged patients; for Group Health Cooperative of Puget Sound, Seattle, Washington |
| 2005-2006 | Chair CQI Process, Pacific Anesthesia, Inc., Tacoma, Washington |
| 2006 -2008 | Board of Directors, Pacific Anesthesia, Inc., Tacoma, Washington |
| 2007-2008 | Vice President, Pacific Anesthesia, Inc., Bellevue, Washington |

**Honors:**

| | |
|---|---|
| 1978 | Medical-Scientist Traineeship Grant, University of Washington, Seattle, Washington |
| 1980 | Alpha Omega Alpha |
| 1981 | Merck Manual Medicine Award |
| 1981 | John J. Bonica Anesthesiology Award, Department of Anesthesiology, University of Washington |
| 1985 | Award of Merit for Service to the Health Care Needs of Native Americans, Spokane Urban Indian Health Service |
| 2000 | President's Award, Pacific Anesthesia, Inc.  Tacoma, Washington |
| 2008 | Mary Jane Kugel Award, Medical Science Review Committee, Juvenile Diabetes Research Foundation International |
| 2011 | Brocher Foundation Residency in Ethics |

**Board Certification:**

| | |
|---|---|
| 1984 | American Board of Internal Medicine |
| 1990 | American Board of Anesthesiology |

**License to Practice:**

| | |
|---|---|
| 1981- | Washington State |
| 1991-2003 | Wisconsin |

**Ex. M**

**Professional Organizations:**

| | |
|---|---|
| 1984-1987 | American Society of Internal Medicine |
| 1989-2000 | King County Medical Society |
| 1989-2000 | Washington State Society of Anesthesiologists;  Co-chair, Medical Education Committee, 1994-1997 |
| 1989-2013 | American Society of Anesthesiologists;  Committee on Ethics, 1992-2013 |
| 2003-2007 | Society of Cardiovascular Anesthesiologists; Committee on Ethics; 2003-2007 |
| 2008-2013 | American Society of Bioethics and Humanities |
| 2015-present | International Academy of Law and Mental Health |
| 2015-present | Overseas Fellow, Royal Society of Medicine |

**Teaching Responsibilities:**

**Lectures:**

**Undergraduate Student Lectures:**

| | |
|---|---|
| 1999-2008 | University of Washington, Undergraduate Introduction to Bioethics Course (MHE 411) "Informed Consent" |
| 2001 | University of Washington, Seattle Biomedical Ethics for Medical Students Lecture Series, "Informed Consent" |
| 2008 | University of Washington Dept. of Biomedical History and Ethics: MHE 597C, Informed Consent in Clinical Practice |
| 2009-2017 | University of Washington Dept. of Biomedical History and Ethics: MHE 597C, Informed Consent |

**Resident Lectures:**

| | |
|---|---|
| 1992-1994 | University of Washington, Department of Anesthesiology, "Clinical Ethical Issues in Anesthesia Practice" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture series, "Perioperative Diabetes Management" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series "Anesthetic Implications of Neuromuscular Disease" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Pathophysiology of Ischemic Heart Disease" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Intraoperative Management of the Patient with Ischemic Heart Disease" |
| 1994-2000 | University of Washington, Department of Anesthesiology Resident Core Lecture Series, "Preoperative Evaluation of the Patient for Anesthesia and Surgery" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "CQI: Quality Improvement in Practice" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Post Operative Cognitive Dysfunction" |
| 1994- | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Clinical Ethical Issues in the Practice of Anesthesiology," |
| 1994- | University of Washington, Department of Anesthesiology R2 Core Lecture series, "Ethical Issues of Informed Consent" |
| 1994- | University of Washington, Department of Anesthesiology R2 Core Lecture series, "Do Not Resuscitate Orders in the Operating Room" |
| 1994- | University of Washington, Department of Anesthesiology R3 Core Lecture series, "Ethics of Surrogate Consent" |

3

**Ex. M**

| | |
|---|---|
| 1994- | University of Washington, Department of Anesthesiology R3 Core Lecture series, "Ethical Issues in Organ Transplantation" |
| 1994- | University of Washington, Department of Anesthesiology R4 Core Lecture series, R4 Seminar: "Allocation of Scarce Resources in a Managed Care Environment" |
| 1995 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology, "Informed Consent and Surrogate Consent: Who Speaks for the Patient?" |
| 1995 | University of Washington, Department of History and Ethics, Ethics Brown Bag Lecture Series, "Ethical Dilemmas in the Operating Room" |
| 1995, 1997 | University of Washington Department of Anesthesiology, Evening Resident Special Workshop, " Fiberoptic Intubation and Management of the Difficult Airway" |
| 1996 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology, "Ethical Issues in Organ Transplantation, and The Impaired Practitioner" |
| 1997 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology, "Physician-Assisted Suicide, and the Impaired Physician," |
| 1997 | University of Washington, Department of History and Ethics; Ethics Brown Bag Lecture Series "DNR in the Operating Room: Should Different Rules Apply?" |
| 1997 | University of Washington, Department of History and Ethics, Ethics Brown Bag Lecture Series "Ethical Pain Management in the Addicted Patient Undergoing Surgery--Is There A Duty to Rescue?" |
| 1999 | University of Washington, Department of Biomedical Ethics and History, Master's Course in Biomedical Ethics, "Informed Consent." |
| 1999 | University of Washington, Department of Biomedical Ethics and History Ethics, Brown Bag Lecture Series, "Who is Captain of the Ship on the Multidisciplinary Team: Lessons from the Operating Room" |
| 2004 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology "Ethics of Organ Transplantation" |
| 2008- | University of Washington, R2 Core lecture "Introduction to Preoperative Evaluation." |
| 2008-present | University of Washington CA1 PAC lecture series:  "informed Consent/Informed Refusal" |
| 2010-present | University of Washington Resident Introductory Lecture series:  "EHR Integrity" |
| 2010-present | University of Washington R2 and R3 Core Lectures:  "Coding and Documentation" |

## GRAND ROUNDS LECTURES

| | |
|---|---|
| 1994-1996 | New England Deaconess Hospital, Boston, Massachusetts: "Ethical Issues in Anesthesia Practice" |
| 1994 | University of Washington, Ethics Grand Rounds, "DNAR in the Operating Room" |
| 1996 | University of Washington, Hematology Grand Rounds, "Antifibrinolytics, Use, Clinical Efficacy, and Cost Effectiveness" |
| 1998 | Providence Medical Center, Department of Surgery, Surgery Grand Rounds "Ethical Issues in Surgical Care: A Panel Discussion" |
| 1998 | University of Washington School of Medicine: Combined Cardiothoracic Surgery/Cardiology Grand Rounds, "Brain Death and Organ Donation" |
| 2001 | Rush-Presbyterian-St. Luke's Medical Center, Anesthesia Grand Rounds, Department of Anesthesiology Chicago, Illinois, "Historical Perspectives on the Ethics of Clinical Research" |

4

**Ex. M**

2002        University of Pittsburgh Medical Center, Pittsburgh, Pennsylvania, Department of Anesthesiology, Anesthesia Grand Rounds, "Ethical Issues in Brain Death"

2008        University of Washington Anesthesiology Grand Rounds:  "Perioperative Management of Pacers and AICDs"

2009        University of Washington Medical Center Combined Anesthesiology and Surgery Grand Rounds "Preoperative Evaluation:  Where Have We Been, Where are We Going?"

2009        University of Oklahoma Anesthesiology Grand Rounds, "Is a Free Pen Just a Free Pen?  Conflicts of Interest in Clinical Practice, Research and Industry." February, 2009.

2009        University of Washington Department of Anesthesiology; DNR in the Operating Room  April, 2009

2010        University of Washington Department of Orthopedics;  Preoperative Testing: Should Your Patient have a Preoperative Chest XRay? April, 2010.

2010        University of Washington Department of Obstetrics and Gynecology: Preoperative Testing:  Less is More.  May, 2010

2011        MD Anderson Cancer Center; Houston Texas.  Dept of Anesthesiology.  Fraud and Plagiarism in Medical Research.  February 14, 2011

2012        MD Anderson Cancer Center:  Houston Texas.  Dept of Anesthesiology. Physician Assisted Suicide and Euthanasia.  April 18, 2012

2012        MD Anderson Cancer Center, Houston Texas. Risk Management Department. Fraud and Plagiarism in Medical Research.  April 18 2012

2012        Overlake Medical Center Department of Anesthesiology: Lifeboat Ethics. April, 2012 Bellevue, WA

2018        University of Washington "Respecting Patient Privacy".  Feb 28, 2018

**Resident Journal Club:**

1995        University of Washington, Department of Anesthesiology "Use of Magnesium for Cardiac Surgery Patients"

1996        University of Washington, Department of Anesthesiology; "Anesthesia for IVF, Teratogenicity of Anesthetics, and Anesthesia and the Breast-Feeding Patient"

1996        University of Washington, Department of Anesthesiology, "N2O:  Friend or Foe?"

**Faculty Lectures:**

1995        University of Washington, Department of Anesthesiology, CME lecture, "Ethics and the Examiners"

**Workshops:**

1994-1996      University of Washington, Department of Anesthesiology, CME Workshop, "Difficult Airway"

1996        University of Washington School of Medicine CME Workshop, "Aprotinin and Other Antifibrinolytics," Blood Therapy: Applications and Alternatives"

**Nursing Lectures:**

1996-1997      University of Washington Medical Center, Pre-Surgical Clinic Nursing Lecture Series; "Preoperative Assessment of the Patient for Anesthesia"

1999        University of Washington Medical Center Operating Room, Nurses Weekly Conference, "Informed Consent in the Operating Room."

**Ex. M**

| | |
|---|---|
| 1999 | University of Washington, Association of Operating Room Nurses, Perioperative Nursing Internship Program "Informed Consent in the Operating Room" |
| 2000 | University of Washington, Department of Radiology Nursing Staff Lectures, "Sedation of the Patient with Severe Liver Disease for TIPS Procedure" |
| 2008 | University of Washington Medical Center Operating Room Nursing Conference, "Informed Consent in the Operating Room." |
| 2011 | Overlake Medical Center, Bellevue WA. Perioperative Nursing Education. DNR in the OR. |

**Editorial Responsibilities:**

| | |
|---|---|
| 1997-2003 | Consulting Editor, ASA Syllabus on Ethics, American Society of Anesthesiologists, Park Ridge, Illinois |
| 2004- | Editor, ASA Syllabus on Ethics, American Society of Anesthesiologists, Park Ridge, Illinois. |
| 2009 | Editor-in-Chief, *Clinical Ethics for Anesthesiologists, a Cambridge University Press Case-Based Textbook*. |
| 2012-2017 | Associated Editor, North America Clinical Ethics, Journal of Bioethical Inquiry. |

**Special National Responsibilities:**

| | |
|---|---|
| 1992-2014 | Committee on Ethics, American Society of Anesthesiologists, Park Ridge, Illinois |
| 1994 | Panelist, American Society of Anesthesiologists Annual Meeting, Panel on Ethics:  Ethical Issues in Anesthesiology |
| 1995 | Moderator Ethics Panel, American Society of Anesthesiologists, Annual Meeting, "Is There a Role for the Anesthesiologist in Physician-Assisted Suicide?" |
| 1996-2006 | Moderator Clinical Forum, American Society of Anesthesiologists, Annual Meeting, "Ethics/Geriatrics" |
| 1996-1999 | Moderator Problem-Based Learning Discussion, American Society of Anesthesiologists Annual Meeting, Ethics cases |
| 1997 | Panelist, American Society of Anesthesiologists Annual Meeting Panel on Education, "Can Ethics be Taught?" |
| 1998 | Workshop Organizer and Lecturer,  American Society of Anesthesiologists, "Teaching Clinical Ethics in Anesthesia Residency" |
| 1999 | Invited Participant, Duke University, Durham, North Carolina, Second Duke Conference on Surgery and the Elderly |
| 2001 | Panelist, American Society of Anesthesiologists Annual Meeting Panel on Professionalism, "Defining and Demanding Excellence in Anesthesia Job Performance" |
| 2004 | Panelist International Liver Transplantation Society Annual Meeting, "Ethics of Liver Transplantation, NHB/DCD Donors: Perioperative Issues in Liver Transplantation" |
| 2005 | Representative for the American Society of Anesthesiologists (one of four), First National (UNOS) Conference on Donation After Cardiac Death, Philadelphia [please see Bernat J.L. et al.  Report of a National Conference on Donation After Cardiac Death.  Am J Transpl  6: 281-91, 2006.] |
| 2005- | Ethics Reviewer, Research and Funding Department, Juvenile Diabetes Research Foundation, New York |
| 2006 | Panelist, American Society of Anesthesiologists Annual Meeting, Panel on Professionalism, "Role of the Anesthesiologist in End-of-Life Care –Do physicians have conflicts of interest?" |

6

**Ex. M**

| | |
|---|---|
| 2006 | Panel Moderator, American Society of Anesthesiologists Annual Meeting, Panel on Professionalism, "Working Hard—or Sleeping at the Wheel. Should the ASA adopt aviation-style standards for work hours for anesthesiologists?" |
| 2006 | Panel Moderator, American Society of Anesthesiologists Annual Meeting: Panel on Ethics, "Should Anesthesiologists Participate in Executions?" |
| 2007 | Panelist, ASA Panel on Ethical Issues in Perioperative Medicine |
| 2007 | Panelist, ASA Panel on Professionalism in Multidisciplinary Teams:  Palliative Care and Multidisciplinary Pain Management |
| 2007 | Panelist, ASA Panel "What is Professionalism?  Do I Need it?  Do I Have it?" |
| 2007 | ASA Clinical Forum:  Special Topics in Bioethics |
| 2008-2011 | Chair, American Society of Anesthesiologists Committee on Ethics |
| 2008 | Panelist, ASA Panel "Lethal Injection." |
| 2008 | Panelist, ASA Panel "DCD—do we need it?  Con." |
| 2008 | Moderator, ASBH panel "Opioid Pain Medication for Chronic Nonmalignant Pain:  A Right or a Wrong?"  American Society of Bioethics and Humanities |
| 2008 | Invited lecturer: 37th Annual Advances in Family Practice and Primary Care, August. Seattle  WA: "DNR and Other Advance Directives in the OR" |
| 2008 | Invited Lecturer: AANA.  "Preoperative Testing" and "Perioperative beta blockade."  September.  Spokane, WA |
| 2009 | Refresher Course Lecture:  Ethics for Anesthesiologists in the 21st Century.  New Orleans LA. |
| 2010 | Refresher Course Lecture:  Protecting Vulnerable Subjects in Research:  Ethical Obligations to Human and Animal Research Subjects.  San Diego, CA |
| 2010 | Panelist, ASA Panel "Health Care Reform."  ASA Annual Meeting, San Diego, CA. |
| 2011 | Invited lecturer: "DNR Orders in the Perioperative Period."  Overlake Medical Center, Bellevue Washington. |
| 2011 | Should Anesthesiologists Participate in Physician-Assisted Suicide?  Pro and Con.  American Society of Anesthesiologists Annual Meeting.  Chicago, Il. 2011 |
| 2012 | Invited Lecturer:  Informed Consent and Informed Refusal in the OR.  Puget Sound Multi-Chapter AORN Coalition.  Kent, WA Jan 2012 |
| 2012 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review.  Fraud in Anesthesia Research, and Ethics of Interventional Pain Management.  April 2012 Phoenix, AZ |
| 2012 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review.  Fraud in Anesthesia Research, and Ethics of Interventional Pain Management.  August 2012 San Francisco, AZ |
| 2012 | Invited Lecturer:  41st Annual Refresher Course for Nurse Anesthetists.  Ethics of Informed Consent; Ethics of Informed Refusal; Ethical Issues in Preoperative Testing.  Nov 2012 Orlando, FL. |
| 2012 | Invited Lecturer:  Idaho State Society of Anesthesiologists:  The Ethics of Preoperative Testing.  Boise, Idaho,  Spring 2012. |
| 2013 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Ethics of Interventional Pain Management.  February 2012 Phoenix, AZ |
| 2013 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Ethics of Interventional Pain Management.  October 2013 Denver, CO |
| 2013 | Panelist:  Controversial Cases in Organ Donation and End-of-Life Care, American Society of Anesthesiologists Annual Meeting, San Francisco CA. |
| 2014 | Panelist:  Controversies in Organ Transplantation, American Society of Anesthesiologists Annual Meeting, New Orleans LA |
| 2014 | Ethical Issues Regarding Open Access Journals, American Society of Bioethics and Humanities Annual Meeting, San Diego CA. |

**Ex. M**

2015 Harvard Anesthesia Update 2015.  Point/Counterpoint.  Physician Involvement in Lethal Injection.  May 2015
2015 Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Ethics of Interventional Pain Management.  Chicago Il, July 2015
2015 Faculty, Moya Annual CRNA Refresher Course.  Orlando, FA.  Nov 2015


**Special Regional Responsibilities:**

1991-1993 Member, Medical Ethics and Practice Committee, King County Medical Society, Seattle, Washington
1992-1994 Member, Professional Liability Panel, King County Medical Society, Seattle, Washington
1992-1996 Co-chair, Committee on Education, Washington State Society of Anesthesiologists, Seattle, Washington
1995 Program Chair, Washington State Society of Anesthesiologists Spring Meeting, "Controlling Our Destiny:  Leadership Opportunities Beyond the Operating Room"
1995 Program Chair, Washington State Society of Anesthesiologists Fall Meeting, "The Difficult Airway:  Clinical Approaches and Risk Management"
1996 Program Co-Chair, Washington State Society of Anesthesiologists Spring Meeting,  "Preoperative Issues for the Surgical Patient"
1996 Representative, Washington State Society of Anesthesiologists, ASA Legislative Session, Washington, DC


**Special Local Responsibilities:**

1991-1993 Ethics Committee, Swedish Hospital, Seattle, Washington
1995-2000 Associate Medical Director, Pre-surgery Clinic, University of Washington Medical Center, Seattle, Washington
1996-1997 Member, Advisory Committee on Ethics, University of Washington Medical Center, Seattle, Washington
1998-2000 Chair, Continual Quality Improvement University of Washington Medical Center, Department of Anesthesiology
1997-2000 Co-chair, Advisory Committee on Ethics, University of Washington Medical Center, Seattle, Washington
1999-2000 Acting Chief, Cardiothoracic Anesthesia, University of Washington Department of Anesthesiology
2006 - Regional Ethics Committee member, Franciscan Health Care Systems, Tacoma, Washington
2006-2008 Member, Regional Committee on Organ Transplantation, Franciscan Health Care System, Tacoma, Washington

2008-2009 Member, Joint Transfusion Committee, HMC and UWMC
2009-2010 Member, Standards and Finance Committee, University of Washington Department of Anesthesiology and Pain Medicine
2010-2016 Member, Business Excellence Committee, University of Washington Physicians
2010- Chair/co-chair Standards and Finance Committee, University of Washington Department of Anesthesiology and Pain Medicine
2010-present Compliance Officer, Department of Anesthesiology and Pain Medicine, University of Washington, Seattle WA.
2014-present Member, Dept of Anesthesiology and Pain Medicine Promotions Committee

**Ex. M**

**Research Funding:**

University of Washington Department of Anesthesiology; "The Effects of PTCA vs. CABG in Reducing Postoperative Cardiac Morbidity in Patients Undergoing Noncardiac Surgery"; 1995; $500 [Investigators: Chan V, Van Norman G, Posner K]

Washington State Society of Anesthesiologists;   The Effects of PTCA vs. CABG in Reducing Postoperative Cardiac Morbidity in Patients Undergoing Noncardiac Surgery; 1995; $2000; [Investigators: Chan V, Van Norman G, Posner K]

Washington State Society of Anesthesiologists:  Echocardiography Screening in the PreAnesthesia Clinic.  2010.  $5000 [Investigators:  Wako E, Van Norman GA, Rooke A, Otto C.]

**Ex. M**

**BIBLIOGRAPHY**

**Publications in Refereed Journals:**

1. Van Norman G., Groman N..  A Method of Quantitating Sensitivity to a Staphylococcal Bacteriocin.  Infection and Immunity 26(2): 787-789, 1979.

2. Dreis D., Winterbauer R., Van Norman G, Sullivan S., Hammer S.  Cephalosporin-Induced Interstitial Pneumonitis.  Chest 86(1): 138-140, 1984.

3. Winterbauer R., Hammer S., Van Norman G.  Histiocytosis X, Case Report and Discussion.  J Resp Dis February 1985.

4. Van Norman G, Pavlin E, Eddy C, Pavlin J.  Hemodynamic and Metabolic Effects of Aortic Unclamping Following Emergency Surgery for Traumatic Thoracic Aortic Tear in Shunted and Unshunted Patients.  J Trauma 31(7): 1007-1016, 1991.

5. Van Norman, G.  Diabetes in the Operating Room:  Metabolic Challenges for the Anesthesiologist.  Seminars Anesth 14(3): 210-220,1995

6. Van Norman, G. Preoperative Assessment of Common Diseases in the Outpatient Setting. Anesthesiology Clinics of North America. 14(4): 631-654,1996.

7. Van Norman G.  Preoperative Management of Common Minor Medical Issues in the Outpatient Setting. Anesthesiology Clinics of North America. 14(4): 655-678, 1996.

8. Aziz S, Haigh W, Van Norman G, Kenney R, Kenney M.  Blood Ionized Magnesium Concentration During Cardiopulmonary Bypass and Their Correlation with Other Circulating Cations.  J Card Surg Sep-Oct 11(5): 341-7, 1996.

9. Van Norman G, Gernsheimer T, Chandler W, Cochran P, and Spiess B.  Indicators of Fibrinolysis During Cardiopulmonary Bypass After Exogenous Antithrombin III Administration for Acquired Antithrombin III Deficiency. J. Cardiothoracic Vasc Anesth 11(6): 760-763, 1997.

10. Jackson S, Palmer S, Van Norman G, et al.  Ethical Issues in Anesthesia.  Adv Anesth 14:227-260, 1997.

11. Van Norman G. A Matter of Life and Death:  What every anesthesiologist should know about the medical, legal, and ethical aspects of declaring brain death.  Anesthesiology 91(1): 275-287, 1999.

12. Posner K, Van Norman G, Chan V.  Adverse Cardiac Events Following Noncardiac Surgery in Patients with Coronary Artery Disease Undergoing Prophylactic PTCA. Anesth Analg  89: 553-60, 1999.

13. Reilly DF, McNeely JM, Doerner D, Greenberg DL, Staiger TO, Geist MJ, Vedovatti PA, Coffey JE, Mora MW, Johnson TR, Guray Ed, Van Norman GA, Fihn S.  Self-Reported Exercise Tolerance and the Risk of Serious Perioperative Complications.  Arch Int Med 159: 2185-92,1999.

14. Van Norman G.  Ethics and The Elderly Patient.  Current Anesth Rep 1:13-17, 1999.

15. Pavlin DJ, Arends RH, Gunn H, Van Norman G, Keorschgen M, Shen D.  Optimal Propofol-Alfentanil Combinations for Supplementing Nitrous Oxide for Outpatient Surgery.  Anesthesiology 91(1): 97-108, 1999.

**Ex. M**

16. Jackson S, <u>Van Norman, G</u>.  Goals and Values Directed Approach to Informed Consent in the "DNR" Patient Presenting for Surgery--More Demanding of the Anesthesiologist?  Editorial. Anesthesiology  90:3-6, 1999.

17. Pavlin JD, Colley PS, Weymuller EA, <u>Van Norman GA</u>, Gunn HC and Koerschgen M.  Propofol Versus Isoflurane For Endoscopic Sinus Surgery. Am J Otolaryn; 10: 96-101, 1999.

18. <u>Van Norman, G</u>. Angioplasty and Noncardiac Surgery:  Risks of Myocardial Infarction.  Current Opinion in Anesthesiology, 12(1):15-20, 1999.

19. <u>Van Norman, G</u>.  Response: Re: Can Brain Death Testing Be Perfect? Anesthesiology. 92(4): 1204-5, 2000.

20. <u>Van Norman G</u>, Patel MA, Robledo J, Chandler W, and Vocelka C.  Effect of Hemofiltration on Serum Aprotinin Levels in Patients Undergoing Cardiopulmonary Bypass.  J. Cardiothor Vasc Anesth 14(3): 253-256, 2000.

21. <u>Van Norman G</u>, Palmer S.  Coercion and Restraint in Anesthesia Practice.  International Clinics of Anesthesiology.  Medical Ethics 39(3): 131-143, 2001.

22. <u>Van Norman, G</u>.  Ethical Issues and the Role of Anesthesiologists in Non-Heart-Beating Organ Donation.  Current Opinion Anesthesiology 16(2): 215-9, 2003

23. <u>Van Norman G</u>.  Another Matter of Life and Death; What Every Anesthesiologist Should Know About the Ethical, Legal and Policy Implications of the Non-Heart-Beating Organ Donor. Anesthesiology 2003.  98(3):763-73.

24. <u>Van Norman G</u>, Jackson S, Waisel D.  Ethical Issues in Informed Consent. Current Opinions in Anesthesiology 17(2): 177-81, 2004.

25. <u>Van Norman GA</u>.  Ethical Issues of Importance to Anesthesiologists Regarding Organ Donation After Cardiac Death.  Current Opinion Organ Transplant 10(2): 105-109, 2005.

26. <u>Van Norman GA</u>. Controversies in Organ Donation:  Donation After Cardiac Death.  Periop Nurs Clin, 3(3):233-240, 2008

27. <u>Van Norman GA</u>. Ethical Issues in Informed Consent. Periop Nurs Clin 3(3):213-222, 2008

28. Ivashkov Y, <u>Van Norman GA</u>.  Informed Consent and Ethical Management of the Elderly Patient. Anesthesiology Clinics  2009; 27(3):569-80

29. Souter M, <u>Van Norman GA</u>.  Ethical Controversies at End-of-Life After Traumatic Brain Injury: Defining Death and Organ Donation.  Critical Care Medicine.  Accepted for publication, anticipated Fall 2010.

30. Souter M, <u>Van Norman GA</u>.  [Letter to the Editor] Reply to:  Concerns regarding definition of brain death. Critical care medicine 2011;39(3):606-7

31. Sara Kim, PhD; Sinan Jabori, BS; Jessica O'Connell, MD, FACS; Shanna Freeman, APRN; Cha Chi Fung, PhD; Sahrish Ekram, BA; Amruta Unawame, MD; <u>Gail Van Norman, MD</u>.  Current Trends of Research Methodologies in Informed Consent Studies: Time to Re-examine?  Patient Educ Couns 2013; 93:559-66

**Ex. M**

32. Van Norman G.  Physician Aid-in-Dying: Cautionary Words.  Curr Opinion Anesthesiol  2014; 27:177-82

33. Van Norman GA.  Five Days at Memorial: Life and Death in a Storm-Ravaged Hospital.  Book Review.  Anesth Analg  2014; 199:494

34. Van Norman GA.  Abusive and Disruptive Behavior in the Surgical Team. *AMA Journal of Ethics*. 2015; 17:215-220. . http://journalofethics.ama-assn.org/2015/03/ecas3-1503.html. Accessed March 3, 2015.

35. Van Norman GA.  A Matter of Mice and Men:  Ethical Controversies in Animal Experimentation.  Int Anesthesiol Clin. 2015; 53:63-78.

36. Rooke GA, Lombaard SA, Dziersk J, Natrajan KM, Van Norman G, Larson LW, Poole JE.  Initial experience of an anesthesiology-based service for perioperative management of pacemakers and implantable cardioverter defibrillators.  Anesthesiology 2015; 123:1024-32.

37. Nair BG, Grunzweig K, Peterson GN, Horibe M, Nerdilek MB, Newman SF, Van Norman G, et al.  Intraoperative blood glucose management: impact of a real-time decision support system on adherence to institutional protocol.  J Clin Monitor Comput  June 12, 2015; epub ahead of print

38. Grunzweig K, Nair BG, Peterson GN, Horibe M, Neirdilek MB, Newman SF, Van Norman G, et al.  Decisional practices and patterns of intraoperative glucose management in an academic medical center. 2016; 32:214-23

39. Van Norman G.  Drugs, devices and the FDA:  an overview of the approval processes:  Part 1 Approval of drugs.  JACC Basic Translation Sci  2016; 1: 170-9

40. Van Norman G.  Drugs, devices and the FDA:  an overview of the approval processes:  Part 2 Approval of medical devices.  JACC Basic Translation Sci  2016; 1:277-87

41. Van Norman G.  Drugs and Devices Part 3:  a Comparison of U.S. and European Processes.  JACC Basic Translation Sci  2016; 1:399-412

42. Van Norman GA.  Decisions regarding foregoing life-sustaining treatments.  Curr Opin Anesth 2016; Nov 30 [epub ahead of print].

43. Van Norman GA, Eisenkott R.  Technology Transfer: From the Research Bench to Commercialization. Part 1. Intellectual Property Rights-Basics of Patents and Copyrights.  JACC Basic Translation Sci 2017; 2:85-97

44. Van Norman GA, Eisenkott R.  Technology Transfer.  Part 2.  The Commercialization Process.  JACC Basic Translation Sci 2017; 2:197-208

45. Van Norman GA.  Overcoming the declining trends in innovation and investment in cardiovascular therapeutics: beyond EROOM's law.  JACC Basic Translational Sci 2017; 2:613-25

46. Van Norman GA.  Expanding Patient Access to Investigational Drugs:  Single Patient INDs and "Right to Try".  JACC Basic Translational Sci 2018; 3:280-91

47. Van Norman GA.  Expanding Patient Access to Investigational Drugs:  Overview of Intermediate and Widespread Treatment INDs, and Emergency Authorization in Public Health Emergencies.  JACC Basic Translational Sci 2018; 3:403-14

**Ex. M**

48. <u>Van Norman GA</u>. Expanded patient access to investigational new devices: review of emergency and non-emergency expanded use, custom and 3D printed devices.  JACC Basic Translational Sci.  2018; 3:533-44

49. Shah AC, Ma K, Faraoni D, Oh D, Rooke A, <u>Van Norman GA</u>.  Self-reported functional status predicts post-operative outcomes I noncardiac surgery patients with pulmonary hypertension.  PLOS ONE.  Aug 16, 2018.  https://doi.org/10.1371/journal.pone.0201914

50.  <u>Van Norman GA</u>.  The problem of Phase II clinical trials:  reducing costs and predicting success.  JACC Basic Translational Sci 2019; 4:428-37

51. Suhr W, <u>Van Norman GA</u>.  Ethical issues in organ transplantation at end of life:  defining death.  Anesthesiology Clinics:  Anesthesia at the Edge of Life.  Elsevier.  Accepted, anticipate publication Winter 2020.

52. <u>Van Norman GA</u>.  Limitations of animal studies for predicting toxicity in clinical trials:  part 1:  is it time to rethink our current approach?  JACC Basic Transl Sci. Accepted, publication anticipated Winter 2020


**<u>Books:</u>**

Cambridge Textbook of Clinical Ethics for Anesthesiologists.  Van Norman G, Ed.  Palmer S, Jackson S, Rosenbaum S co-ed.  Cambridge University Press, 2011.  London, UK.


**<u>Book Chapters:</u>**

1. <u>Van Norman, G</u>.  Jehovah's Witnesses, in Atlee, J. (ed): *Complications in Anesthesiology*. WB Saunders, Philadelphia., 1999, pp. 937-939.

2. <u>Van Norman, G</u>.  Patient Confidentiality, in Atlee, J. (ed):  *Complications in Anesthesiology*. WB Saunders, Philadelphia, 1999. Pp. 931-933.

3. <u>Van Norman, G</u>.  DNR in the Operating Room, in Atlee, J (ed): *Complications in Anesthesiology*. WB Saunders, Philadelphia, 1999, pp. 934-936.

4. <u>Van Norman G</u>.  Ethical Considerations:  Informed Consent, Advanced Directives, DNR Orders.  In Hanson, E.(ed):  *Medical Clerkship Companion 2*.  Harcourt Brace, Chestnut Hill, MA, 2003.

5. <u>Van Norman G</u>.  Ethical Decisions/End-of-Life Care in Patients with Vascular Disease.  In Kaplan, J. (ed):  *Vascular Anesthesia, 2nd Edition*.  Churchill Livingstone, Philadelphia, PA, 2004, pp. 387-406.

6. <u>Van Norman, G</u>.  DNR in the Operating Room.  In Atlee, J. (ed):  *Complications in Anesthesiology, 2nd Edition*.  WB Saunders, Philadelphia.  2005.

7. <u>Van Norman, G</u>.  Jehovah's Witnesses. In Atlee, J. (ed):  *Complications in Anesthesiology, 2nd Edition*.  WB Saunders, Philadelphia, 2005.

8. <u>Van Norman, G</u>.  Patient Confidentiality. In Atlee, J. (ed):  *Complications in Anesthesiology, 2nd Edition*.  WB Saunders, Philadelphia, 2005.

9. <u>Van Norman GA</u>.  Anesthesiology Ethics.  *IN* Singer P, Viens A (eds):  *The Cambridge Textbook of Clinical Ethics.* 2008. Cambridge University Press, London.

**Ex. M**

10. <u>Van Norman GA</u>, Rosenbaum S.  Ethical Issues in Anesthesia Care.  *IN* Miller R, Ed. *Miller's Anesthesia, 7th Ed.*  Elsevier Publications, Philadelphia PA. 2009

11. <u>Van Norman GA.</u> Informed Consent:  Respecting Patient Autonomy.  *IN* Van Norman GA, Ed. *Cambridge Textbook of Ethics for Anesthesiologists.*  2011 Cambridge University Press, London, UK.

12. <u>Van Norman, GA.</u> Informed Consent for Preoperative Testing:  Pregnancy Testing and Other Tests Involving Sensitive Patient Issues. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

13. <u>Van Norman GA.</u>  Revising the Anatomical Gift Act—the Role of Physicians in Shaping Legislation. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

14. <u>Van Norman GA.</u>  Animal Subjects Research Part II:  Ethics of Animal Experimentation. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

15. <u>Van Norman GA.</u>  Publication Ethics:  Obligations of Authors, Peer-Reviewers and Editors. *IN* Van Norman GA, Ed.  2011*Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

16. <u>Van Norman GA.</u> Sexual Harassment, Discrimination, and Faculty-Student Intimate Relationships in Anesthesia Practice. *IN* Van Norman GA, Ed.  2011*Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK..

17. <u>Van Norman GA.</u>  Physician Participation in Executions. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

18.  Wako E, <u>Van Norman GA.</u> Laboratory Testing in Spine Disease.  *IN* Chapman JR, Dettori JR, Norvell, DC (2011) *Measurements in Spine Care.* 1st ed. Stuttgart New York: Thieme.

19. <u>Van Norman GA.</u>  Ethical Standards in Medical Practice.  *IN* Manchikanti L, Christo P, Trescot A, Falco FJE (eds). *Foundations of Pain Medicine and Interventional Pain Management Board Review.* 2011 ASIPP Publishing, Paducah, KY 42001

20. <u>Van Norman GA.</u>  Ethics of Research in Pain Management.  *IN* Manchikanti L, Christo P, Trescot A, Falco FJE (eds). 2011 *Foundations of Pain Medicine and Interventional Pain Management Board Review.* ASIPP Publishing, Paducah, KY 4200

21. <u>Van Norman GA.</u>  Ethics in Anesthesiology.  *IN* Miller R, Ed. *Miller's Anesthesia, 8th Ed.*  Elsevier Publications, Philadelphia PA, 2015.

22. <u>Van Norman GA.</u>  Anesthesia Pearls.  *IN* Wong C, Hamlin N Eds.  *The Medicine Consult Handbook.*  Springer Science and Business Media Inc.  New York, NY.  2012

23. <u>Van Norman GA.</u>  Organ Transplantation.  *IN* Brennan. Michael (ed.). The A-Z of Death and Dying: Social, Medical and Cultural Aspects. Santa Barbara, CA: ABC-Clio. 2013

24. <u>Van Norman GA.</u>  Life Support Systems.  *IN*: Brennan. Michael (ed.). The A-Z of Death and Dying: Social, Medical and Cultural Aspects. Santa Barbara, CA: ABC-Clio. 2013

**Ex. M**

25. Jackson S, <u>Van Norman GA</u>. Anesthesia, Anesthesiologists and Modern Medical Ethics. *IN* The Wondrous Story of Anesthesiology, Eger EI II, Saidman L, Westhorpe RN Eds. Springer, NY. 2014 pp205-218

26. <u>Van Norman G</u>, Rosen J. Michael Jackson:  Medical Ethics and What Went Wrong. In; Pediatric Sedation Outside of the Operating Room: a Multispecialty International Collaboration, Second Edition.  Mason KP Ed.  Springer, NY  2015 pp685-698

27. <u>Van Norman, GA</u>.   Ethics and clinical aspects of palliative sedation in the terminally ill child. In;  Pediatric Sedation Outside of the Operating Room: a Multispecialty International Collaboration,  Second Edition.  Mason KP Ed.  Springer, NY  2015 pp699-710

28. <u>Van Norman G.</u>  Anesthesia Pearls.  *In* The Perioperative Medicine Consult Handbook, Jackson M, ed.  Springer, 2015.

29. <u>Van Norman GA</u>.  Preoperative Testing:  Ethical Challenges, Evidence-Based Medicine and Informed Consent.  In:  Ethical Issues in Anesthesiology and Surgery.  Springer publications. Jericho B, Ed.  Springer, New York, 2016.

30. <u>Van Norman GA</u>. Ethics and Evidence Regarding Animal Subjects Research:  Splitting Hares--or Swallowing Camels? In:  Ethical Issues in Anesthesiology and Surgery.  Jericho B, ed. Springer, New York, 2016.

31. Jackson S, <u>Van Norman GA</u>.  Ethics in Research and Publication.  In:  Ethical Issues in Anesthesiology and Surgery.  Jericho B, Ed. Springer, New York.  2016.

32. <u>Van Norman GA</u>.  Ethical Issues in Elderly Patients:  Informed Consent.  In:  Barnett S, ed. Perioperative Care of the Elderly Patient.  Cambridge University Press, Cambridge UK.  2017

33. <u>Van Norman GA</u>.  Ethical Issues: Withdrawing, Withholding and Futility.  In Principles of Geriatric Critical Care.  Akhtar S, Rosenbaum S, Eds.  Cambridge University Press, UK.  Dec 6, 2018.

34. <u>Van Norman GA</u>, Rosenbaum S.  Ethics in Anesthesiology.  Miller's Anesthesia 9th Ed. Elsevier.  Accepted 2018, anticipated publication Autumn 2019

## **Other Publications:**

### **Print Publications**

1. <u>Van Norman, G</u>. Cheney F.  Falsely Elevated Oximeter Reading Dangerous on One Lung.  APSF Newsletter (letter to the editor) Issue 23. June, 1989.

2. <u>Van Norman G</u>.  Ethics of Informed Consent.  ASA Newsletter 58(8): 15-17, 1994

3. <u>Van Norman, G</u>.  Special Paper:  Implementation of an Ethics Curriculum:  Getting Started. In Waisel D, Van Norman G (eds):  *ASA Syllabus on Ethics:  Informed Consent.*  ASA publications, Park Ridge, Illinois. 1997, pp. 1-6.

4. Jackson S, Fine P, Palmer S, Rosebaum S, Truog R, <u>Van Norman G</u>.  Letter to Editor, Comment on Bastron, D.  Response to:  Ethical Concerns in Anesthetic Care for Patients with Do-Not-Resuscitate Orders.  Anesthesiology 87(1): 176-177, 1997.

**Ex. M**

5. <u>Van Norman, G</u>. Who Speaks for the Patient?  Ethical Principles in Assessing Patient Competence and Appropriate Use of Proxy Decision-Makers in the Practice of Anesthesiology. In Waisel D, Van Norman G (eds*): ASA Syllabus on Ethics:  Informed Consent.*  ASA publications, Park Ridge, Illinois.  1997, pp. B2-B34.

6. Waisel D, <u>Van Norman G</u>, Fine P.  Special Article, Hospice Care:  Live All the Days of Your Life. An Interview with Perry G. Fine.  In Waisel D, Van Norman G (eds). *ASA Syllabus on Ethics: Informed Consent.*  ASA publications, Park Ridge, Illinois.  1997, pp. 1-9.

7. <u>Van Norman G</u>.  Redefining Death.  Ethical, Legal and Medical Implications of Brain Death Determination in Anesthesia Practice.  In Waisel D., Van Norman G. (eds):  *ASA Syllabus on Ethics:  End of Life Issues.*  ASA publications, Park ridge, Illinois.  1999, pp. G1-G7.

8. <u>Van Norman G</u>.  Chapter 17: Misinformed Consent--A Problem in the OR?  In*:  ASA Refresher Courses in Anesthesiology*. ASA Publications, Chicago Ill.  1999, pp.215-223.

9.  <u>Van Norman G</u>, and Posner K.  Coronary Stenting or Percutaneous Transluminal Coronary Angioplasty Prior to Noncardiac Surgery Increases Adverse Perioperative Cardiac Events; the Evidence is Mounting.  (letter to the editor).  J Amer Coll Cardiol 36(7):  2351, 2000.

10. <u>Van Norman, G</u>, Palmer S.  When Should Anesthesiologists Restrain Uncooperative Patients?  ASA Newsletter 65(3), 2001.

11. <u>Van Norman G</u>.  The Student-Teacher Relationship in Medicine:  Are Intimate Relationships Between Faculty and Medical Trainees Ethical?  In Van Norman G, Waisel D. (eds):  *ASA Syllabus on Ethics:  Ethics of Professional and Personal Relationships in Anesthesiology Training and Practice.* ASA, Park Ridge, Illinois.  2004.

12. <u>Van Norman G</u>.  Non-Heart-Beating Cadaver Organ Donation:  Ethical Issues for Anesthesiologists.  ASA Newsletter 67(11), 2003.

13. <u>Van Norman GA</u>, Palmer SK, Jackson SH.  The Ethical Role of Medical Journal Editors. [Letter} Anesth Analg 100:603-4, 2005.

14. Brown S, <u>Van Norman G</u>.  Compassion and Choice in End-of-Life Decisions.  Editorials and Opinions, *The Seattle Times*, April 1, 2005

15. <u>Van Norman GA</u>.  Practical Ethical Concerns Regarding Intimate Relationships in the Operating Room.  ASA Newsletter 2007, 71(5).

16. <u>Van Norman G, Brown S</u>.  Organ Donation a Personal Decision.  Opinion, *The Seattle Post Intelligencer,* March 20, 2007.

17. <u>Van Norman GA.</u> Contributing Writer:  *Handbook of Anesthesia and Co-Existing Disease.* Elsevier publications, Philadelphia PA. 2009.

18. Sweitzer BJ, Vidoga M, Milokjic, et al.  Resident's knowledge of ACC/AHA Guidelines for Preoperative Cardiac Evaluation is Limited.  Cleveland Clinic J Med 2010; 77(ESuppl):eS11-eS12.

19. <u>Palmer SK, Van Norman GA, Jackson SL.</u>  Letter to the editor. Routine pregnancy testing before elective anesthesia is not an American Society of Anesthesiologists standard.  Anesth Analg. 2009; 208(5):1715-6.

20. <u>Van Norman GA</u>, Jackson SL.  Back to our roots:  the importance of enforcing professionalism at the ASA.  ASA Newsletter.  May, 2011.  75(5):10-12

**Ex. M**

21. Jackson SL, <u>Van Norman GA.</u> Ethical issues in the publication of medical research. ASA Newsletter. May 2011.  75(5):14-15

22. <u>Van Norman GA</u>.  Misinformed Consent:  A problem in the Operating Room?  Ethical principles of informed consent and their application for the anesthesiologist.  Refresher Courses Anesth  2011; 39(1):215-223

23. <u>Van Norman GA</u>.  Ethics of Ending Life; Physician-Assisted Suicide and Euthanasia, Part 1. California Society of Anesthesiologists Bulletin, CA.  Winter 2012.

24. <u>Van Norman GA</u>.  Physician Assisted Suicide.  ASA Newsletter. Spring 2012.

25. <u>Van Norman GA</u>.  Ethics of Ending Life; Physician-Assisted Suicide and Euthanasia, Part 2. California Society of Anesthesiologists Bulletin, CA.  Summer 2012.

26. <u>Van Norman GA</u>.  Ethical Challenges of Routine Preoperative Tests.  ASA Newsletter, Nov. 2012

27. Rooke A, Natrajan K, Lombaard S, Dziersk J, <u>Van Norman GA</u>, Poole J.  Letter to the Editor In Reply: Initial experience of an anesthesiology based service for perioperative management of pacemakers and implantable cardioverter defibrillators.  Anesthesiology 2016; 124: 1195


**Web publications**

1. Update Author, *Sleisinger and Fordtran's Gastrointestinal and Liver Disease, 7th Edition,* on-line version.  Mark Feldman MD, Editor.  Elsevier Scientific Publications, Philadelphia *[www.sfgastro.com],* 2003 to 2006.

2. Update Author, *Anesthesia, 6th Edition,* on-line version.  Ron Miller MD, Editor.  Elsevier Scientific Publications, Philadelphia. *[www.anesthesiatext.com]* 2004 to present.

3. Update Author, *Diseases of the Heart, 6th Edition,* on-line version.  Eugene Braunwald MD, Editor.  Elsevier Scientific Publications, Philadelphia [*www.branwalds.com],* 2004 to present.

4. Update Author, *Murry and Nadel's Textbook of Respiratory Medicine,* on-line version. Robert J. Mason MD, John F. Murray MD, V. Courtney Broaddus MD, and Jay A Nadel MD, editors. Elsevier Scientific Publications, Philadelphia *[www.respmedtext.com],* 2005-2006.

5. Update Author, *Drugs for the Heart,* on-line version.  Lionel H Opie MD and Bernard J Gersh MD, editors.  Elsevier Scientific Publications, Philadelphia *[www.opiedrugs.com],,* 2005 to 2008

6. Update Author, *Clinical Gastroenterology and Hepatology,* on-line version, Wilfred M Weinstein MD, C J Hawkey MD, J Bosch MD, editors.  Elsevier Scientific Publications, Philadelphia *[www.clingastrotext.com],* 2005-2006.

7. Medifile author for *FirstConsult*,  Medical website for primary care physicians.  Elsevier Scientific Publications, London UK  *[www.firstconsult.com],* 1998 to 2008.

8. Topic Editor, *First Consult.*  Medical website for primary care physicians.  Elsevier Scientific Publications, London UK, *[www.firstconsult.com],* 1998 to 2008

9. Medical writer, Clinical Procedures website, Elsevier Scientific Publications, Philadelphia, 2008 to present

**Ex. M**

**Abstracts:**

1. Van Norman G, Pavlin E, Eddy C, and Pavlin J.  Hemodynamic and Metabolic Effects of Aortic Unclamping Following Emergency Surgery for Traumatic Thoracic Aortic Tear in Shunted and Unshunted Patients.  Presented to the 50th Annual Meeting of the American Association for the Surgery for Trauma, 1989.

2. Van Norman G, Pavlin E, Eddy C, and Pavlin J.  Hemodynamic and Metabolic Effects of Aortic Unclamping Following Emergency Surgery for Traumatic Thoracic Aortic Tear in Shunted and Unshunted Patients.  Presented to the American Society of Anesthesiologists Annual Meeting, 1989.

3. Van Norman G, Spiess B, Lu J, et al.  Aprotinin Versus Aminocaproic Acid in Moderate-to-High-Risk Cardiac Surgery:  Relative Efficacy and Costs of Transfusion.  Anes Anal Supplement,  March 1995.

4. Kenney M, Van Norman G, Hague G, et al.  Variations in Ionized Magnesium During Cardiopulmonary Bypass.  Presented to the Cardiopulmonary Bypass Meeting, San Diego, California, 1995.

5. Pavlin J, Gunn H, Van Norman G, et al.  Optimal Propfol/Alfentanil Combinations for Supplementing N20 For Outpatient Surgery.  Presented to the Annual Meeting of the American Society of Anesthesiologists, 1997. Anesthesiology  87(3S) Supplement 308A, 1997.

6. Van Norman G, Posner K, Wright I, et al.  Adverse Cardiac Events Following Noncardiac Surgery in Patients with Prior PTCA versus Normal Patients, and Patients with Nonrevascularized CAD.  Presented to the Scientific Sessions of the American Heart Association, Orlando, Florida, 1997, published in supplement to Circulation, October 1997.

7. Simmons E, Van Norman G, Robledo J, et al.  Effect of Hemofiltration on Aprotinin Activity in Patients Undergoing Cardiopulmonary Bypass.  Presented to  WARC (Western Anesthesia Residents Conference,  1998.

8. Lee J, Karjeker S, Van Norman GA et al.  Advance Directives in the Perioperative Period.  Presented to WARC (Western Anesthesia Residents Conference), 2009

9. Karjeker S, Van Norman G, et al.  Advance Directives in the PreAnesthesia Clinic.  Presented at the American Society of Anesthesiologists' Annual Meeting, New Orleans, LA.  2009

10. Rooke, G.A., Natrajan, K., Lombaard, S., Dziersk, J., Van Norman, G., Poole, J.:  Initial experience of an anesthesia-based service for perioperative management of CIEDs.  Anesthesiology 117:A835, 2012.

11. Shah A, Ma K, Rooke GA, Van Norman G.  Pulmonary HTN in the perioperative patient.  (working title).  Accepted to IARS Annual Meeting, Honolulu HI.  March 2015.

12. Rooke A, Natrajan K, Lombaard S, Dziersk J, Van Norman G, Poole J.  Poster:  Initial experience of an anesthesia-based service for perioperative management of CIEDs.  ASA American Society of Anesthesiologists Annual Meeting, Washington DC, 2012

**Ex. M**

**OTHER**

**International and National Invitational Lectures:**

1. "DNR in the OR:  Am I a Bad Doctor if I Let My Patient Die?" American Society of Anesthesiologists, Refresher Course, San Francisco, CA, June 29, 1996.

2. "Misinformed Consent:  Is This a Problem in the Operating Room?" American Society of Anesthesiologists Refresher Course, San Francisco, CA, June 29, 1996.

3. "Ethics:  A New Hot Topic in Resident Education," The Society for Education in Anesthesia Fall Meeting: Educational Strategies for the 21st Century, New Orleans, 1996.

4. "Ethics:  A New Hot Topic in Resident Education," The Society for Education in Anesthesia Fall Meeting: Educational Strategies for the 21st Century, San Diego, CA, October 1997.

5. "Misinformed Consent:  A Problem in the Operating Room?" American Society of Anesthesiologists Workshop in Practical Bioethics for the Anesthesiologist, Boston, MA, 1997.

6. "Brain Dead, or Only Mostly Dead**?**  What's the Difference, I'm Just the Anesthesiologist!" American Society of Anesthesiologists Workshop in Practical Bioethics for the Anesthesiologist, Boston, MA, 1997.

7. "PTCA prior to Noncardiac Surgery." World Congress of Cardiovascular Anesthesiologists, Santiago, Chile, 1998.

8. "Ethics Case Discussion: Assessing Cardiac Risks for Patients with Coronary Artery Disease Undergoing Noncardiac Surgery" and "Ethics Case Discussion: Assessing Brain Death" Rush-Presbyterian-St. Luke's Medical Center, Chicago Illinois, Visiting Professorship, 1998

9. "Brain Death:  What Every Anesthesiologist Should Know" Midwest Anesthesia Conference and Peri-Anesthesia Care Symposium, Chicago, Il, 1999.

10. "Ethical Issues in the Operating Room," American Society of Anesthesia Technologists and Technicians, Seattle, WA, 2000.

11. "Ethical Issues in the Operating Room," American Society of Extracorporeal Technologists, Seattle, WA, 2000.

12. "Ethical Boundaries of Persuasion: Coercion and Restraint in Pediatric Anesthesia Practice," Mid-Year SAMBA meeting, New Orleans, LA, 2001.

13. "Ethics: Brain Death and Organ Donation" Rush-Presbyterian-St. Luke's Medical Center and Rush University, Chicago, Illinois Department of Anesthesiology and Undergraduate Medical School; Inaugural Speaker, Katalin Selemczi MD Memorial Lecture Series in 2001

14. "Donation After Cardiac Death—Stretching the Definitions of Death Too Far?"  Invited lecturer; European Society of Anesthesiology, Copenhagen Denmark, May 2008.

**Ex. M**

15. "Conflicts of Interest: Industry Reps." February 2009; Visiting Professor, University of Oklahoma Department of Anesthesiology. Oklahoma City, OK

16. "DNR in the Patient Undergoing Surgery and Anesthesia." Sept 2009 Primary Care Medicine. Seattle, WA

17. Perioperative Beta Blockers." National Association of Nurse Practitioners. Aug 2010. Seattle, WA

18. Ghosts of OR Cancellations Past and Present." Combined WSSA, BCAA international meeting. Dec 2010 (Elizabeth Wako MD and Gail Van Norman MD speakers)

19. Ethics of Organ Donation After Cardiac Death. Society for Cardiovascular Anesthesiologist. Annual Meeting, April 2011. Savannah, Georgia.

20. Ethics of Organ Donation After Cardiac Death. Dept of Anaesthesiology and Intensive Care, St. Mary's Hospital. London, UK. August 2011.

21. Physician-assisted Suicide and Euthanasia. Brocher Foundation. Hermance, Switzerland, August 2011.

22. Fraud in Publication and Medical Research. Dept of Anaesthesiology and Intensive Care Medicine, University of Geneva. Geneva, Switzerland. Sept 2011.

23. Informed Consent and Informed Refusal in the Operating Room. AORN annual meeting, Seattle, WA Jan. 2012

24. Fraud and Plagiarism in Research. Risk Management Division, MD Anderson Medical Center, Houston TX, April 18, 2012

25. Physician-Assisted Suicide and Euthanasia, Department of Anesthesiology, MD Anderson Medical Center, Houston TX, April 18, 2012

26. Ethics in Anesthesiology. Annual Review Course for Certified Nurse Anesthetists. Orlando Florida, November 2012

27. Invited Lecturer: Ethics of Interventional Pain Management. ASIPP. Phoenix, AZ. Feb 2012

28. Invited Lecturer: Ethics of Interventional Pain Management. ASIPP. San Francisco CA Aug 2012.

29. Invited Lecturer: Ethics of Interventional Pain Management. ASIPP. Phoenix, AZ. July 2013

30. Invited Lecturer: Ethics of Interventional Pain Management. ASIPP. Denver CO; Oct 2013

31. Invited Lecturer; Controversial Cases in Organ Transplantation: clinical forum. American Society of Anesthesiologists Annual Meeting. San Francisco CA. Oct 2013

32. Invited Lecture: Ethics of DCD Organ Donation. St. Mary's Hospital Dept of Anesthesiology and Critical Care, London UK. Dec 2014

33. Invited Lecture: DNR in the OR. London Soc Anesthesiology, UK. Dec 2014

**Ex. M**

34. International Academy of Law and Mental Health.  Moderator: Brain Death, Personhood, Body Integrity:  Ethical and Legal Considerations in Vital Organ Transplantation.  Vienna Austria July 2015

35. Invited Lecturer:  Harvard Anesthesia Update Spring 2015.  Pro/Con Debate:  Should Physicians Participate in Lethal Injection.

36. Invited Lecturer:  Ethics of Interventional Pain Management.  ASIPP, Chicago Il. July, 2015

37. Keynote Speaker:  Terminal Sedation in Pediatric Sedation:  Suffering, Palliation and Transcendance (working title).  Conference for Pediatric Sedation Outside of the Operating Room.  Cancun, Mexico  Sept 2015

38. Invited Ethics Lecturer:  Moya Review Course for Nurse Anesthetists.  Orlando Fl, November 2015

39. Invited Participant;  2015 Alumni Meeting of the Scholars of the Brocher Foundation, Geneva Switzerland, June 16-18, 2015.

40. Invited Speaker: 2016 World Congress of Anesthesiologists.  Ethics Section.  Hong Kong, Aug 27-Sept 1, 2016

41. Invited Lecturer; Medical Professionalism.  St. Mary's Hospital Department of Anesthesiology and Critical Care.  London, UK. July 2016

42. 2017 International Academy of Law and Mental Health. Invited panelist, moderator.  Ethics of Psychosurgery.  Prague, Czech Republic, July 2017

43. 2017 Mazama Spine Summit, Mazama WA.  Invited Speaker:  What is Professionalism and the Practice of Medicine?  Lessons from the Michael Jackson Case.

44. 2019 International Academy of Law and Mental Health. Invited panelist, moderator.  Physician Assisted Suicide in the United States:  Current Status.  Rome, Italy.  July 2019.

45. Brocher Foundation Reunion of Scholars, 2019.  Lethal Injection in the United States:  personal experience as an expert witness for the prisoner.  Geneva, Switzerland.  June 2019

**Regional Invitational Lectures:**

1. "Treatment of Intraoperative Emergencies:  Wheezing; Inability to Ventilate" CME Lecture, Washington State Society of Anesthesiologists, Seattle, WA, 1991.

2. "Ethical Issues in Anesthesiology," Washington State Society of Anesthesiologists, Moderator and CME Lecturer, Seattle, WA, 1993.

3. Washington State Association of Nurse Anesthetists, Tukwila, Washington "Ethical Issues in Anesthesia  Practice",  1995.

4. Washington State Association of Nurse Anesthetists "Ethical Issues in Anesthesia Practice" Seattle, WA, 1998.

5. "Management Issues In the Preoperative Clinic." Society for Ambulatory Anesthesia (SAMBA), Seattle, Washington, 1999.

**Ex. M**

6.  "Physiology of Perioperative Myocardial Blood Flow." Washington State Society of Nurse Anesthetists, Seattle, WA, 1999.

7.  "Ethical Issues in the Operating Room." American Society of Anesthesiology Technologists, Seattle, WA, 2000.

8.  "DNR orders in the Operating Room," Combined Anesthesia and Surgery Grand Rounds, Southwest Washington Medical Center, Vancouver, WA, 2001.

9.  "Medical Ethics: Balancing Patient Advocacy and Managed Care." Western Pension and Benefits Conference, Seattle, WA, 2003.

10. "Conscious Sedation for Radiological Procedures in the Outpatient," Northwest Hospital Radiology Department, Seattle, WA, 1991.

11. Instructor, Certified Post Anesthesia Nurse (CPAN) Certification Course, Northwest Hospital, Seattle, WA, 1991.

12. Conflicts of Interest with Industry.  AORN winter meeting, Kent WA, 2009

13. "Preoperative Testing."  Wash. State Nurse Anesthetists.  Sept 2009, Spokane, WA

13. "Implementing Intra-Operative Glucose Control:  What Does it Take?"  Washington State Hospital Association.  April 2014, Seattle, WA

14. "Who's Doing Your Surgery and Anesthesia?  Ethical Issues in Informed Consent in Medical Direction and Overlapping Surgeries."  Washington Ambulatory Surgery Association 2018 Conference.  November 2018, Seattle WA.

15. The MAD physician and why he is a constant danger to your patients and your institution. Ethical management of the abusive physician in the operating room.  Washington Ambulatory Surgery Association 2019 Conference.  November 2019, Everett WA.


**Invited Journal Reviews:**


1.  Invited Journal Reviewer, cardiovascular anesthesia, *Anesthesia and Analgesia,* 1998 to present.
2.  Invited Journal Reviewer, medical ethics, *Anesthesiology*, 1998 to present.
3.  Invited Journal Reviewer, medical ethics, *Journal of Obstetrics and Gynecology*, 1998.
4.  Clinical Reviewer, *FirstConsult.* Medical website for primary care physicians, Elsevier publications, London UK. *[www.firstconsult.com]* ,1998 to present.
5.  Invited Journal Reviewer, medical ethics, *Mayo Clinic Proceedings,* 2006-2009.
6.  Invited Journal Reviewer, *Journal of Philosophy, Ethics, and Humanities*, 2007.
7.  Invited Journal Reviewer, *European Journal of Anaesthesiology,* 2013

**Web Authorships**

1. Update Author, *Anesthesia, 6th Edition,* on-line version.  Ron Miller MD, Editor.  Elsevier Scientific Publications, Philadelphia. *[www.anesthesiatext.com]* 2004 to present.

2. Update Author, *Sleisinger and Fordtran's Gastrointestinal and Liver Disease, 7th Edition,* on-line version.  Mark Feldman MD, Editor.  Elsevier Scientific Publications, Philadelphia *[www.sfgastro.com],* 2003 to 2006.

**Ex. M**

3. Update Author, *Diseases of the Heart, 6th Edition,* on-line version.  Eugene Braunwald MD, Editor.  Elsevier Publications, Philadelphia [*www.branwalds.com],* 2004 to present.

4. Update Author, *Murray and Nadel's Textbook of Respiratory Medicine,* on-line version. Robert J. Mason MD, John F. Murray MD, V. Courtney Broaddus MD, and Jay A Nadel MD, editors.  Elsevier publications, Philadelphia *[www.respmedtext.com],* 2005-2006.

5. Update Author, *Drugs for the Heart,* on-line version.  Lionel H Opie MD and Bernard J Gersh MD, editors.  Elsevier publications, Philadelphia *[www.opiedurgs.com],* 2005 to present.

6. Update Author, *Clinical Gastroenterology and Hepatology,* on-line version, Wilfred M Weinstein MD, C J Hawkey MD, J Bosch MD, editors.  Elsevier publications, Philadelphia *[www.clingastrotext.com],* 2005-2006

7. Medifile Author for *FirstConsult*,  Medical website for primary care physicians.  Elsevier publications, London UK *[www.firstconsult.com],* 1998 to 2006

8.  Medical Writer, *Procedures Consult*, Anesthesia Procedures.  Elsevier publications, Philadelphia, PA.  2007-2008

**Miscellaneous:**

Consulting Anesthesiologist, Woodland Park Zoological Society, 1992-2002.
Medical writer Handbook for Stoelting's Anesthesia and Co-Existing Disease, 3rd Edition 2009
Content/formatting editor, Journal of American College of Cardiology 2015-present
Medical Writer, Journal of American College of Cardiology 2016-present

Updated, September 2019

gvn

23

**Ex. M**

# **APPENDIX II**

**Gail Van Norman MD Depositions and Court Testimony in the Last 4 Years**

2019  McGehee Et al V Governor Asa Hutchinson.  No 4:17-CV-00179-KGB. (for
        Federal Public Defender)

2018  (for plaintiff). Goff v. State of Washington

2017  (for defendant) Rodecap v. Multicare (Washington)

2014  (for plaintiff) Duke v. Valley Endoscopy Center (Ohio)

# APPENDIX III

**Relevant Autopsy Findings Regarding Pulmonary Edema and Vascular Access During Executions involving pentobarbital or thiopental as the solo drug or in combination with other drugs**.

1)  Daniel Wayne Cook.  Execution: August 8, 2012, Arizona
    1-drug pentobarbital protocol, 5 grams
    a)  IV catheters and punctures:  5 peripheral attempts
    b)  Weight of lungs:  R 940 gm, L 395 gm
    c)  Pulmonary edema not mentions, although lungs are "heavy".  No apparent lung
        sections taken.

2)  Thomas Arnold Kemp
    Execution: April 25, 2012, Arizona
    1-drug pentobarbital protocol, 5 grams
    a)  1 peripheral IV, 1 central line ("triple lumen) in groin
    b)  Weight of lungs:  R 1070 gm, L 980 gm
    c)  Pulmonary edema not mentioned, lungs are very heavy.  Apparently no sections taken

3)  Samuel Villegas Lopez
    Execution: June 27, 2012, Arizona
    1-drug pentobarbital protocol, 5 grams
    a)  2 peripheral IVs
    b)  Weight of lungs:  R 970 gm, L 720 gm
    c)  Pulmonary edema:  yes, severe.  Cut surfaces of lungs "exude abundant blood and
        frothy fluid

4)  Robert Henry Moorman
    Execution: February 29, 2012, Arizona
    1-drug pentobarbital protocol, 5 grams
    a)  2 peripheral IVs
    b)  Weight of lungs:  R 560 gm, L 170 gm
    c)  Pulmonary edema:  yes. Moderate.  Moderate amounts of blood and frothy fluid.

5)  Robert Charles Towry
    Execution: March 8, 2012, Arizona
    1-drug pentobarbital protocol, 5 grams
    a)  1 peripheral line, R groin central line "triple lumen"
    b)  Weight of lungs:  R 740 gm, L 690 gm
    c)  Pulmonary edema:  apparently no lung sections taken and no mention

6)  Thomas Paul West
    Execution: July 19, 2011, Arizona
    3-drug protocol with pentobarbital, 5 grams
    a)  1 peripheral line, 1 peripheral puncture, 1 central line "triple lumen" R groin
    b)  Weight of lungs:  R 920 gm, L 740 gm

1

**Ex. M**

    c) Pulmonary edema:  yes, moderate.  "moderate amounts of pink frothy fluid from cut surfaces"

7) Donald Edward Beaty.
    Execution:  May 25, 2011, Arizona
    3-drug thiopental protocol, 5 grams
        a) Single "triple lumen" in R groin with 2 hubs labeled A and B.  No backup line.
        b) Weight of lungs:  R 960 gm, L 830 gm
        c) Pulmonary edema:  yes, severe.  "intense dependent congestion, cut surfaces exude abundant frothy fluid

8) Richard Lynn Bible
    Execution: June 30, 2011, Arizona
    3-drug thiopental protocol, 5 grams
        a) Single triple lumen line R groin, no back up
        b) Weight of lungs:  R 840 gm, L 1000 gm
        c) Pulmonary edema:  yes, severe.  "severe congestion and edema"

9) Marshall Gore
    Execution: October 1, 2013, Florida
    3-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines
        b) Weight of lungs:  R 945 gm, L 715 gm
        c) Pulmonary edema:  Yes, at least moderate.  "oozing bloody froth"

10) Joshua Daniel Bishop
    Execution: March 31, 2016, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines, 1 puncture hand.
        b) Weight of lungs:  R 760 gm, L 620 gm
        c) Pulmonary edema:  not mentioned, apparently no lung sections done.

11) Robert Earl Butts Jr.
    Execution: May 4, 2018, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines
        b) Weight of lungs:  R 780 gm, L 680 gm
        c) Pulmonary edema:  yes, moderate. "moderate amount of bloody foam, moderate amount of white froth in airways.

12) Roy W. Blankenship
    Execution: June 23, 2011, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral IVs, one appears infiltrated.
        b) Weight of Lungs:  R 860 gm, L 720 gm
        c) Pulmonary edema: yes, moderate.  "moderately edematous"

**Ex. M**

13) Andrew Howard Brannan
    Execution: January 1m 2015, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines
        b) Weight of Lungs:  R 820 gm, L 720 gm
        c) Pulmonary edema: yes, severe.  "parenchyma edematous, frothy fluid in lower
           airways"

14) John Conner
    Execution: July 15, 2016, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines
        b) Weight of Lungs:  R 860 gm, L 820 gm
        c) Pulmonary edema:  not mentioned, and no lung slices taken.

15) Andrew Cook
    Execution: February 21, 2013, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines
        b) Weight of lungs:  R 720 gm, L 640 gm
        c) Pulmonary edema:  yes, severe.  "frothy fluids in tracheobronchial tree and larynx"

16) Kenneth E. Fults
    Execution: April 12, 2016, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines
        b) Weights of Lungs:  R 560 gm, L 460 gm
        c) Pulmonary edema:  yes, severe.  "moderate congested and edematous, and moderate
           amount of fluid in the major airways.

17) Kelly Renee Gissendaner.
    Execution: September 20, 2015, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 2 peripheral lines
        b) Weight of Lungs:  R 620 gm, L 530 gm
        c) Pulmonary edema:  yes, severe.  "Moderate amount of white foam" in upper airway,
           "parenchyma exudes moderate amounts of blood tinged foamy fluid".

18)  Warren Lee Hill Jr.
    Execution: January 27, 2015, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 4 peripheral IVs, additional areas suggesting 5th puncture.
        b) Weight of Lungs:  R 760 gm, L 700 gm
        c) Pulmonary edema:  yes, moderate.  "blood and frothy fluid in cross sections"

**Ex. M**

19) Travis Hitson
Execution: February 17, 2016, Georgia
1-drug pentobarbital protocol, 5 grams
 a) 2 peripheral IVs
 b) Weight of Lungs:  R 580 gm, L 580 gm
 c) Pulmonary edema: yes, mild-mod. "pulmonary parenchyma edematous"

20) Robert Wayne Holsey
Execution: December 9, 2014, Georgia
1-drug pentobarbital protocol, 5 grams
 a) 3 peripheral lines.
 b) Weight of lungs:  R 740 gm, L 580 gm
 c) Pulmonary edema: yes, moderate. "moderate congestion"

21) Marcus Ray Johnson
Execution: November 19, 2015, Georgia
1-drug pentobarbital protocol, 5 grams
 a) 2 peripheral lines, 1 with extravasation
 b) Weight of lungs:  R 760 gm, L 640 gm
 c) Pulmonary edema: Yes, moderate. "parenchyma congested and edematous"

22) Brandon A Jones
Execution: February 3, 2016, Georgia
1-drug pentobarbital protocol, 5 grams
 a) 3 peripheral IVs, 2 of which appear to have extravagated.  1 central line, triple lumen in R groin, with hemorrhage
 b) Weight of Lungs:  R 720 gm, L 600 gm
 c) Pulmonary edema:  not mentioned, and apparently no lung slices taken.

23) Daniel Anthony Lucas.
Execution: April 27, 2016, Georgia
1-drug pentobarbital protocol, 5 grams
 a) 2 peripheral lines
 b) Weight of lungs:  R 520 gm, L 540 gm
 c) Pulmonary edema: Yes, severe. "prominent amount of white frothy fluid in tracheobronchial tree"

24) Bryan Terrell
Execution: December 19, 2015, Georgia
1-drug pentobarbital protocol, 5 grams
 a) 2 peripheral IVs, 2 additional punctures.
 b) Weight of lungs:  R 800 gm, L 640 gm
 c) Pulmonary edema:  Yes, severe. "frothy material in mainstem bronchi and into the smaller airways.

4

**Ex. M**

25) Marcus Wellons
   Execution: June 17, 2014, Georgia
   1-drug pentobarbital protocol, 5 grams
       a) 3 peripheral IVs.
       b) Weight of lungs:  R 860 gm, L 720 gm
       c) Pulmonary edema:  yes, moderate. "moderately congested"

26) Michael Wilson
   Execution: January 9, 2014, Oklahoma
   3-drug pentobarbital protocol, 5 grams
       a) No exam included in file and no mention about lungs.

27) Lloyd Lafevers
   Execution: January 30, 2001, Oklahoma
   3-drug thiopental protocol, 5 grams
       a) No info on IVs.
       b) Weight of lungs:  R 800 gm, L 700 gm
       c) Pulmonary edema:  yes, "edema and congestion" not further characterized.

**Summary of my review:**

I.      Note that normal lung weights are approximately R 445 gm, L 395 gm.  Moorman L lung was noted at 170 gm, which may be an error.  With that exception all lungs were significantly heavier than normal.

II.     Pulmonary edema was present in at least 20 of the 27 autopsies (77%).  In the remaining 7 there was no comment, and/or lung slices were not taken.

III.    In the 20 cases of pulmonary edema, autopsy findings suggest severe pulmonary edema in 8 (40%) and moderate pulmonary edema in 10 (50%).  Edema was not characterized in 2 cases.

IV.     For autopsies in which lung examination was documented, 100% demonstrated pulmonary edema, which was moderate to severe in 90% of the cases.  In the remaining cases, severity was not characterized.

V.      Of 27 autopsies, 2 did not comment on IV access.  Of those in which there is a description, 8 cases (32%) had multiple attempts, 6 (24%) had femoral central lines placed, 3 (12%) had signs of extravasation or infiltration, only 11 (44%) appear uncomplicated.

**Ex. M**

## CERTIFICATE OF SERVICE

I hereby certify that, on November 1, 2019, this Expert Declaration of Gail A. Van Norman, M.D. was filed electronically using the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties that are registered users.  The below parties may access this filing through the Court's CM/ECF System.

**Joshua Christopher Toll**
KING & SPALDING, LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Gerald Wesley King , Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: alex_kursman@fd.org

**Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: billy_nolas@fd.org

**Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**Jeanne Vosberg Sourgens**
VINSON & ELKINS L.L.P
(202) 639-6633

**William E. Lawler , III**
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**William E. Hoffmann , Jr.**
KING & SPALDING, LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON, LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Denise M. Clark**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
(202) 252-6605
Email: denise.clark@usdoj.gov

**Jean Lin**
U.S. DEPARTMENT OF JUSTICE, CIVIL
DIVISION
FEDERAL PROGRAMS BRANCH
(202) 514-3716
Email: jean.lin@usdoj.gov

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Robert E. Waters**
KING & SPALDING, LLP
(202) 737-0500
Email: rwaters@velaw.com

**Yousri H. Omar**
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Peter S. Smith**
UNITED STATES ATTORNEY'S OFFICE
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

**Robert J. Erickson**
U. S. DEPARTMENT OF JUSTICE
(202) 514-2841
Email: robert.erickson@usdoj.gov

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

2

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR, LLC
(410) 444-1500
Email: garyeproctor@gmail.com

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER OFFICE, EASTERN DISTRICT OF PENN
(215) 928-0528
Email: shawn.nolan@fd.org

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Sean D. O'Brien**
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Date:   November 1, 2019

/s/ *Pieter Van Tol*

Pieter Van Tol (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY  10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

and

Elizabeth M. Hagerty (Bar No. 1022774)
David S. Victorson (Bar No. 1027025)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
elizabeth.hagerty@hoganlovells.com
david.victorson@hoganlovells.com

*Attorneys for Plaintiff Daniel Lewis Lee*

3

**Ex. M**