## EXPERT DECLARATION OF DR. MICHAELA ALMGREN

### I. Background and Qualifications

1. My name is Michaela Almgren, Pharm.D., M.S. I am over the age of eighteen and competent to testify to the truth of the matters contained herein. The factual statements I make here are true and correct to the best of my knowledge.

2. I am a Clinical Assistant Professor in the Department of Clinical Pharmacy and Outcomes Sciences at the College of Pharmacy at University of South Carolina. I teach principles of sterile compounding per USP Chapters 797 and 800, aseptic technique and pharmacy regulations applicable in 503b compounding environment, as well as pharmacokinetics and biopharmaceutics courses. I specialize in sterile compounding, medication safety and pharmacy regulations that relate to pharmacy compounding practices. I also provide continuing education courses for pharmacists in those topics. I received my Doctor of Pharmacy degree from the USC campus of the South Carolina College of Pharmacy in 2010. Additionally, I have a Master's Degree in Pharmaceutical Chemistry from University of Florida.

3. In conjunction with my academic appointment, I currently maintain a practice site at a 503b outsourcing pharmacy where I perform duties of outsourcing pharmacist, clinical advisor and pharmacy student preceptor.  Previously I worked in pharmacy operations in a local large teaching hospital as a pharmacist. I have over ten years of experience in sterile compounding and aseptic technique. Prior to joining the faculty at the University of South Carolina I worked for several years in pharmaceutical manufacturing where I was involved in drug formulation, quality assurance, quality control and analytical method development. My professional qualifications are Doctor of Pharmacy and Master of Science in Pharmacy with focus on Pharmaceutical Chemistry.  A copy of my CV is attached.

4. I have been asked by the attorneys of the Office of Federal Defenders who represent death-sentenced prisoners Alfred Bourgeois, Dustin Honken, Chadrick Fulks, and Jeffrey Paul to submit an expert medical and scientific opinion based on the information and documentation provided to me, about whether there is a risk of harm and unnecessary suffering that can be caused by the use of compounded pentobarbital in lethal injection.

## II. The Lack of Compounding Information Regarding the Preparation of the Pentobarbital Injection Raises Concerns Due to the Chemical and Physical Properties of Pentobarbital Sodium and the Complexity of the Compounding Procedure of Pentobarbital Injection.

5. Based on the information provided for my review, it appears that the Board of Prisons is using a compounding pharmacy to prepare the pentobarbital injection but is it not clear how the vials that are to be used for the execution will be compounded. It appears that the Board of Prisons has not made available records of the formulation recipe used to compound the injectable pentobarbital from pentobarbital API powder to be used to execute the prisoners. Accordingly, it is not possible to confirm that the drug was or will be properly compounded.

6. The process for compounding pentobarbital is complex. It is typically performed in one of two ways, though other compounding recipes may be available. A pharmacy preparing this type of compound should have an extensive parenteral compounding experience in order to be able to prepare this drug correctly. Again, it is important that the compounding pharmacy logs and records should be available for review to assure that the pharmacy compounding this preparation has the expertise as well as the equipment necessary to prepare this drug.

7. In the first version of the compounding procedure, pursuant to the drug monograph listed in ASHP's Handbook of Injectable Drugs, a commercially prepared injection of pentobarbital 50 mg/mL (trade name Nembutal, AHFS classification 28:24.04) is prepared as a mixture containing pentobarbital sodium, propylene glycol 40% v/v, and alcohol 10%[1]. Additional ingredients, such as sodium hydroxide and hydrochloric acid may be used to stabilize the solution and to produce the final pH of 9.5.

8. There are many considerations when preparing sodium pentobarbital injection in a compounding pharmacy setting per USP <797> under 503a regulations, applicable to traditional compounding pharmacies as opposed to "outsourcing facilities." Pentobarbital sodium powder Active Pharmaceutical Ingredient (API) is not water soluble. Additionally, aqueous solutions of pentobarbital sodium are also not stable per AHFS reference. According to a formulation recipe listed in literature, the API has to be dissolved in water, but the solution must be alkalinized using sodium hydroxide pellets to bring the pH to 12. Otherwise the drug

will produce a suspension rather than a solution, meaning that some of the particles will settle out of the mixture. A suspension is not suitable for parenteral use, so it cannot be safely injected, as this could cause extreme pain and suffering to the prisoner. Hydrochloric acid is then added to the solution to bring the pH back down to around 9.8 (until pentobarbital just barely stays in solution). Propylene glycol needs to be added (40% v/v) and alcohol is then also added. The drug is then filtered using a 0.22 micron filter to assure sterility. To assure filter integrity a quality assurance report should be issued documenting that the filter had undergone and passed pressure testing. Any changes in pH can cause precipitation out of the solution, formation of suspension and a change in the potency of this drug solution. This preparation closely mimics the commercial formulation of the drug.

9. In the alternative, pentobarbital may be compounded by dissolving the bulk powder in alcohol initially, and then adding polypropylene glycol and water while adjusting the pH, in order to keep the drug in solution without precipitation.[1]

10. As the two common examples of formulation recipes for pentobarbital injection described above illustrate, the preparation of this compounded sterile product is complex, and involves a number of ingredients and chemical adjustments. It is important to make sure that all the ingredients that are used for compounding are of pharmaceutical grade, with expiration dates past the BUD of the compounded product. No information regarding the process used to compound the pentobarbital injection for BOP has been made available, making it impossible to confirm the adequacy of the compounding procedure used, the suitability of the inactive ingredients and their expiration dates, the ingredients and amounts/concentrations used, and whether any adjustments that were made to assure that the medication was prepared correctly and thus will produce desired effect. Only pharmacies with extensive experience in compounding and aseptic technique should prepare this type of preparation, as special equipment, such as pH meter, filter integrity pressure gage, and stirring apparatus need to be

---

[1] https://www.medschool.umaryland.edu/media/SOM/Offices-of-the-Dean/OAWA/docs/non-usp-grade-pentobarbital-policy.pdf

on hand, and calibrated, with usage logs and procedures describing maintenance, cleaning and calibration of each equipment used.

11. Deviations from the appropriate procedure can significantly impact the efficacy and safety of pentobarbital injection. For example, if there is a shift in concentration of one of the ingredients (perhaps due to the improper storage conditions), this can lead to the formation of precipitant and oxidation of the product often indicated by a colour change of the solution, which will also impact potency of the drug and its pharmacological effects. A change in pH of the drug due to improper storage can lead to extreme pain during the injection stage of the execution and suffering of the prisoner.

12. The possibility of precipitation of pentobarbital out of solution due to improper preparation or storage is in particular extremely concerning. Injection of a solution containing particles may lead to directly causing severe tissue injury and occlusion of the affected vasculature can result in thromboembolism which can be extremely painful. Furthermore, if the drug has precipitated out of solution, the potency of the injection will be lower leading potentially to slow and excruciatingly painful death. More generally, subpotent pentobarbital containing particulate matter can produce unpredictable pharmacokinetic and pharmacodynamic effects causing potentially prolonged death in which the prisoner may suffer the experience of suffocation, drowning, or otherwise severe respiratory distress.

13. In general, compounding logs must be maintained by the compounding pharmacy and all the details listed above must be recorded to assure the traceability and quality of the compounded product. Such logs must also include the criteria used to determine the beyond use date, a master work sheet containing amounts used for each ingredient, storage requirements, quality certificates of all ingredients used, any adjustments/deviations from the procedure performed, calibration reports, and documentation of performance of quality control procedures. Without access to these logs, it is not possible to verify that the pentobarbital injection for BOP was properly prepared and is safe to be used without causing unnecessary suffering to the prisoner.

### III. Concerns About Compliance With USP Standards Pertaining to the Sterile Compounding of the Pentobarbital Injection.

14. It is my understanding that the Board of Prisons intends to execute prisoners by an intravenous injection of compounded pentobarbital sodium. For each execution the Board of Prisons plans to use compounded pentobarbital preparation prepared by an undisclosed compounding pharmacy.

15. According to USP Chapter <797>, the set of regulations which provides guidelines (enforceable by FDA and Boards of Pharmacy) for sterile compounding in 503a pharmacy environment, sterile medications that are prepared from initially non-sterile components, such as APIs, or using a methodology that causes the preparation potentially to lose sterility, are considered high-risk sterile compounds. The preparation then must be terminally sterilized if it is to be used for parenteral (i.e. non-oral) application.

    a. **The compounded pentobarbital injection will be expired by the time it is intended to be used.**

16. If the compounded drug intended for use in upcoming BOP executions has already been prepared, it is now considered to be expired, as it is far beyond the USP specified Beyond Use Date (BUD).

17. A Beyond Use Date is defined in USP Chapter <797> as "the date or time after which a compounded sterile product (CSP) shall not be stored or transported." The BUD is determined from the date and time the preparation was compounded. A compounded product's beyond-use date shall be determined as outlined in USP Chapter <797>, Pharmacy Compounding--Sterile Preparations of the USP/NF. The maximum Beyond Use Date for high-risk compounded sterile preparations such as compounded pentobarbital are:

    - 24 hours, if stored at room temperature;
    - 72 hours, if kept refrigerated, or
    - 45 days, if kept in a solid, frozen state.[2]

---

[2] Chapter 797, Pharmacy Compounding--Sterile Preparations of the USP/NF.

Page 5

**Ex. N**

18. A drug that has surpassed its Beyond Use Date is at risk of stability and sterility failings and may not retain sufficient potency.

19. From the records provided for my review it appears that the contract independent laboratory has been studying stability of the injectable solution, most likely with intent to extend BUD of the compounded injectable preparation, as the laboratory reports indicate (see AR pages 992-1015). This is a 365 Day study that was initiated 4/4/2019, when the test batch of injectable pentobarbital was initially compounded and will be completed on 4/4/2020. There is also an accelerated arm of the study initiated using higher temperature and humidity, as specified in the protocol on page 996 of AR.

20. It is not clear from the protocol whether an "In Vial Sample Stability" study has been initiated to confirm that container closure and the storage container itself are appropriate for this long term storage, but that would be the prevailing industry standard in order to completely validate the intent of the study to verify that the compounded medication can be stored properly in a specified container over a prolonged period of time without the vial or container closure negatively impacting the quality and potency of the stored drug solution.

21. Additionally, it appears that one of the stability test points in the accelerated study has failed and is outside of the range as specified and acceptable per testing protocol (Page 1013 of AR). This indicates that the compounded injectable pentobarbital preparation may have shorter shelf life than predicted. It may also indicate that improper storage conditions (for example higher temperature than 25 degrees C and/or higher humidity than 60% RH) can severely negatively impact the quality of this preparation reducing its potency, and thus decreasing its effectiveness leading to the prisoner's unnecessary suffering due to lesser efficacy of the drug.

    b. **Unknown Storage Conditions (Temperature and Humidity)**

22. Per the records provided to me, the BOP states that is has confirmed with the DEA that the BOP facility in Terre Haute, Indiana meets the regulatory requirements for storage and handling of pentobarbital sodium. These requirements, as set by DEA, relate to controlled substance storage conditions that describe security and tracking measures to be taken by the facility

storing the controlled substances. This is important in order to minimized drug diversion for unauthorized use.

23. However, the records provided for my review do not state anything about the actual physical conditions of the storage facility where API and the prepared drug vials are stored. When it comes to storing medications in pharmacies and healthcare facilities, proper procedure typically requires pharmacists to maintain records of storage conditions for each compounded sterile product. Storage conditions must be continuously monitored and recorded on a regular basis (for example daily) until the product is used. Poor physical storage conditions such as high humidity and temperature frequently cause degradation and contamination of drug products. Pentobarbital and other compounded sterile products need to be kept in proper storage conditions (as defined by the manufacturer, or USP) or they can become damaged, unusable, and unsafe as the temperature and humidity may vary greatly in unmonitored spaces throughout the year. The same is true for pentobarbital's active pharmaceutical ingredient powder, which is used to prepare the injectable product. Typically in the pharmacy, a temperature log is maintained to show compliance with storage temperature requirements. Temperature is checked daily or as required based on products stored to assure compliance. Any excursions outside of the required temperature range are recorded and must be explained. An assessment is then performed on products that were exposed to suboptimal storage conditions to determine whether they should be used or discarded.

24. Due to the lack of records documenting current storage conditions of the API and compounded product provided for my review, the storage conditions for the compounded pentobarbital injections intended to be used for execution do not appear to have been monitored or recorded, as those records are not available and cannot be verified. It is also unknown how the drugs and active ingredients were transferred to the BOP, and whether such transfer took place with appropriate handling and under the appropriate temperature and humidity-controlled conditions.

25. Because the records provided for my review do not confirm that compounded pentobarbital will be stored at the appropriate temperature and humidity levels, there is a risk that the drugs

could lose potency and thus the drugs would not have the pharmacological effect as expected, potentially leading to the prisoner's prolonged suffering as a result. That danger is all the more pronounced in light of the test results that demonstrate inadequate stability and potency of the compounded drug at elevated temperature. (AR at 1013).

## IV. The compounding pharmacy is not complying with the Food, Drug, and Cosmetic Act, including section 127 of the Food and Drug Administration Modernization Act of 1997.

26. Per the administrative record provided to me for review, the BOP has secured a compounding pharmacy that is properly registered according to the BOP statement. However, the pharmacy appears to be clearly violating section 127 of the Food and Drug Administration Modernization Act of 1997, as explained below. The pharmacy is not following the proper regulations as outlined by the FDA, and its good standing with state board of pharmacy in which this pharmacy is registered and permitted should be questioned. Furthermore, the pharmacy license should be provided for review to assure that it is in good standing in the state in which it is registered to assure that it has no violations and quality issues on its record.

27. Per the Food and Drug Administration Modernization Act of 1997, section 127, the compounding pharmacy is required to compound a drug for specific patient according to a prescription from a physician or an authorized licensed prescriber. It does not appear that a prescription was issued prior to compounding the pentobarbital injection. If so, it was not provided for my review.

28. Moreover, under section 127, per section iii (D) of the section 503A of the Food and Drug Administration Modernization Act of 1997, a pharmacy is not allowed to compound a product that is an essential copy of a commercially available product available in the United States. To further define the copy of the commercial product: "for purposes of paragraph (1)(D), the term 'essentially a copy of a commercially available drug product' does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product".

**Ex. N**

29. To my knowledge based on the information provided, the compounded pentobarbital is most likely a copy of a commercially available medication sold under the brand name Nembutal.

## V. Concerns about the Lack of Information about the Source of the Active Pharmaceutical Ingredient (API) that is to be Used in the Compounding of the Pentobarbital Sodium Injection.

30. The manufacturer of the API will typically provide a Certificate of Analysis, but every lot of pentobarbital powder must still undergo independent quality testing prior to use since the source of API is not disclosed for review to assure that it meets all requirements for quality, as described in the USP monograph for pentobarbital sudium. The testing must be performed on every lot of API and reviewed prior to compounding of pentobarbital powder to the injectable form. This is requirement is specified by the Food and Drug Administration Modernization Act of 1997, section 127, section 503A.

31. I have reviewed the Certificate of Analysis that was provided to me by the Office of Federal Defenders. This analytical report was prepared and submitted on 12/06/18 (page 977 of AR) to BOP. The analysis was performed to test the quality of the API pentobarbital per USP monograph and the results reflect that the USP quality standards for pentobarbital sodium have not been met. The above-mentioned lot of pentobarbital that was tested on 11/06/18 failed one of the specifications. Additionally, a number of unidentified impurities were noted in the report. Unfortunately, due to limited information on the analytical certificate provided, it is difficult to determine which lot(s) was/were tested that failed to meet the USP monograph standards. It would also be helpful to review the original API Certificate of Analysis that was provided by the original manufacturer to determine why there is a discrepancy, but unfortunately it was not available for my review. The BOP Execution Protocol does not address any of these potential problems and how to properly resolve them.

32. The failing result of the analysis brings up further concerns: what happened to this lot? Was it still used for drug preparation, or was it destroyed? No further information was provided regarding the disposition of this lot. The number of impurities in this API is certainly concerning. API quality can often be compromised by the presence of chemical impurities arising from toxic solvents and unapproved reagents used in API synthesis. Moreover, some

APIs may exhibit undesired physical and chemical properties, such as uncharacterized polymorphic structures and impurities that can make the resulting drug have undesirable quality attributes that prevent adequate uptake of APIs and reduce the intended effect of the drug.

## VI. Concerns about BOP Execution Protocol and Use of Compounded Pentobarbital Sodium Injection.

33. While the BOP Execution Protocol Manual addresses many important issues, it completely fails to address any concerns in regard to the quality, origin, review and handling of the compounded drug that is to be used for execution. The Manual lacks guidance on how is the quality of the API going to be monitored, when is it to be tested, who will test it, what happens if the reports show that the quality of API is outside of acceptable range, who reviews the pharmacy compounding records, who determines that the pharmacy selected to perform the compounding has the expertise to perform the compounding, who reviews the analytical records from the outside laboratory performing testing of the prepared drug, how to address any quality issues, storage conditions log, compounding pharmacy log, etc. By not addressing these issues many concerns arise about the quality of the preparation, and whether the drug will work or cause suffering to the prisoner.

34. Poor pharmacy practices and a lack of transparency create the substantial risk that the drugs that the Board of Prisons intends to use in execution will not be of the appropriate quality and potency to cause death without significant suffering.

35. The potency of a drug is contingent on a number of factors, including the quality of the active pharmaceutical ingredient, conditions, practices, and regulatory records of the compounding pharmacy, conditions of the testing laboratory, conditions and manner of storage and handling, and the time between compounding and use. No policies are in place to review, monitor and address these factors.

36. Here, knowledge gaps and potential improper pharmacy practices create the risk that these drugs will not be sufficiently potent and effective. The quality and origin of the active ingredients used to compound these drugs are unknown.

**Ex. N**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 31st day of October 2019.

                                                Michaela Almgren, PharmD, MS