**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the<br>Federal Bureau of Prisons' Execution<br>Protocol Cases,<br><br>LEAD CASE: Roane et al. v. Barr<br><br>THIS DOCUMENT RELATES TO:<br><br>*Purkey v. Barr*, et al., 19-cv-3214 (TSC) | Case No. 19-mc-0145 (TSC) |

**PLAINTIFF PURKEY'S REDACTED REPLY MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I. Mr. Purkey Will Suffer Irreparable Harm Without An Injunction ..................... 2

II. Mr. Purkey Is Likely To Succeed On The Merits.............................................. 4

  A. Mr. Purkey Is Likely To Succeed On His APA Claims ..........................4

    1. The 2019 Protocol contravenes two federal statutes.................................. 4

    2. The 2019 Protocol violates the APA's notice-and-comment requirements................................................................................. 9

    3. The 2019 Protocol does not reflect reasoned decision-making ............... 13

  B. Mr. Purkey Is Likely To Prevail On His Eighth Amendment Claims.................16

    1. Mr. Purkey has demonstrated that the 2019 Protocol poses a substantial risk of serious harm................................................. 16

      a. Mr. Purkey is likely to consciously endure the excruciating pain of pulmonary edema......................................... 16

      b. Mr. Purkey has demonstrated non-speculative risks regarding the administration of the 2019 Protocol ...................... 18

    2. Mr. Purkey is likely to succeed in proving alternative methods of execution that are feasible and readily available .................. 22

III. The Balance Of Equities And Public Interest Weigh In Favor Of An Injunction ................................................................................... 25

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alcestra Therapeutics, Inc. v. Azar*, 755 F. App'x 1 (D.C. Cir. 2018) ............................................3

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) .................................................13

*Baze v. Reese*, 553 U.S. 35 (2008) ................................................................................. *passim*

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) .........................................................................17, 24

*Center for Auto Safety, Inc. v. National Highway Traffic Safety Administration*, 342 F. Supp. 2d 1 (D.D.C. 2004) ............................................................13

*Cook v. Food & Drug Administration*, 733 F.3d 1 (D.C. Cir. 2013)..............................................8

*Electronic Privacy Information Center. v. United States Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) ..............................................9, 10, 11, 12

*General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ......................................................11

*Glossip v. Gross*, 135 S. Ct. 2726 (2015) ...............................................................................20, 22

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ..................................................................................8

*Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010) ........................................................6

*In re Ohio Execution Protocol Litigation*, 937 F.3d 759 (6th Cir. 2019) .........................16, 17, 18

*Jones* v. *Commissioner, Georgia Department of Corrections*, 811 F.3d 1288 (11th Cir. 2016).....................................................................................................25

*Kirwa v. United States Department of Defense,* 285 F. Supp. 3d 21 (D.D.C. 2017) ..................................................................................................................4

*Make the Road New York v. McAleenan*, No. 19-CV-2369 (KBJ), 2019 WL 4738070 (D.D.C. Sept. 27, 2019) ...............................................................................12

*McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)................................11

*Mendiola-Martinez v. Arpaio*, 836 F.3d 1239 (9th Cir. 2016) ....................................................18

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ...............................................................9, 13

*Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017) ......................................................5

*Mora-Meraz v. Thomas*, 601 F.3d 933 (9th Cir. 2010)...............................................................11

*Motor Vehicle Manufacturers Association of U.S. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)..................................................14

*National Association of Farmworkers Orgs. v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980) ...............................................................................................3, 4

*National Mining Association v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014)..................................12

*Nelson v. Shuffman*, 603 F.3d 439 (8th Cir. 2010) ........................................................18

*Osorio-Martinez v. Attorney General. of the United States*, 893 F.3d 153 (2018) ..................................................................................................................25

*Parsons v. Pitzer*, 149 F.3d 734 (7th Cir. 1998) ..........................................................11

*Pelissero v. Thompson*, 170 F.3d 442 (4th Cir. 1999) ...................................................11

*Republican National Committee v. FEC*, 76 F.3d 400 (D.C. Cir. 1996) ......................................14

*Sacora v. Thomas*, 628 F.3d 1059 (9th Cir. 2010).........................................................11

*Sample v. Watts*, 100 F. App'x 317 (5th Cir. 2004)........................................................11

*Sierra Club v. Salazar*, 177 F. Supp. 3d 512 (D.D.C. 2016) ............................................15

*Syncor International Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997)............................................11

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005)..........................................6, 7

*United States v. Chandler*, 950 F. Supp. 1545 (N.D. Ala. 1996)...................................................6

*United States v. Fell*, 2018 WL 7270622 (D. Vt. Aug. 7, 2018) ....................................................7

*United States v. Hammer*, 121 F. Supp. 2d 794 (M.D. Pa. 2000)...........................................5, 6

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)........................................................6

*Venegas v. Henman*, 176 F.3d 760 (5th Cir. 1997)...........................................................11

*Williams v. Hobbs*, 658 F.3d 842 (8th Cir. 2011) ..........................................................25

*Williams v. Van Buren*, 117 F. App'x 985 (5th Cir. 2004) ................................................11

*Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015)...........................................................25

## DOCKETED CASES

*Ringo v. Lombardi*, No. 2:09-cv-4095 (W.D. Mo.) ..........................................................7

## STATUTES, RULES, AND REGULATIONS

57 Fed. Reg. 56,536 (1992) ................................................................4, 5

58 Fed. Reg. 4898 (1993) ...................................................................4

18 U.S.C.
    § 3566...........................................................................................4
    § 3596.......................................................................................5, 6
    § 3597...........................................................................................6

21 U.S.C.
    § 802(21)......................................................................................7
    § 802(27)......................................................................................8
    § 829(e)(2)...................................................................................8
    § 841(a)(1)...................................................................................8

Pub. L. 103-322, 108 Stat. 1967 .......................................................5, 6

## OTHER AUTHORITIES

Merriam-Webster's Collegiate Dictionary (11th ed. 2014)......................5, 6

## INTRODUCTION

Wesley Purkey has asserted that the 2019 Protocol violates both his rights under the Administrative Procedure Act and his constitutional rights.  At every turn, however, Defendants argue that Mr. Purkey is not entitled to relief unless he is likely to succeed on his Eighth Amendment claim and can show irreparable harm in the form of an Eighth Amendment violation.  That argument entirely ignores the distinct claims and distinct harms that stem from Defendants' violation of the APA.  Regardless whether the irreparable harm and likelihood-of-success inquiries merge for purposes of an Eighth Amendment claim, they do not fuse for claims stemming from the APA.  The APA is not concerned solely with constitutional violations, and there is no reason that the harm stemming from a procedural violation of the APA should have to reach a constitutional level of pain and suffering to justify a preliminary injunction (although Mr. Purkey has demonstrated that it does).

Defendants are equally incorrect that the likelihood of success on Mr. Purkey's APA claims hinges on the success of his Eighth Amendment claim.  To demonstrate that the 2019 Protocol is a legislative rule subject to notice-and-comment rulemaking, Mr. Purkey is not required to show that the protocol violates the constitutional rights of the public.  Mr. Purkey need show only that the 2019 Protocol substantially affects his rights and interests and is binding on the agency and private parties ███████████████████████████████████ Nor does Mr. Purkey need to establish that the 2019 Protocol was unconstitutional to show that it was the result of arbitrary and capricious decision-making in contravention of the APA.  It is sufficient that he has demonstrated that Defendants' decision-making *process*—as opposed to the substance of the protocol—relied on improper factors and ignored relevant data.  In other words, whether the 2019 Protocol violates the APA in the ways alleged does not simply collapse into the

Eighth Amendment inquiry.  The APA is concerned with harms separate from the infliction of cruel and unusual punishment, and it guarantees rights independent of and beyond those secured by the Constitution.

In any event, Mr. Purkey has shown that the 2019 Protocol violates the Eighth Amendment.  It is virtually certain that the use of single-dose pentobarbital will cause him to consciously endure pulmonary edema, an excruciating condition akin to torture.  Moreover, he has demonstrated various non-speculative risks regarding the administration of the 2019 Protocol, including inadequate procedures for proper IV administration and for ensuring that the drugs used to execute him are sterile, non-expired, and potent.  Mr. Purkey has also offered several alternative execution methods that would substantially reduce his suffering and are feasible and readily available.  So even if Defendants were correct that all of Mr. Purkey's claims turn on proving an Eighth Amendment violation, Mr. Purkey still would be entitled to relief.

## ARGUMENT

## I.    Mr. Purkey Will Suffer Irreparable Harm Without An Injunction

Mr. Purkey explained in his opening brief (Mot. 13-14) that several aspects of the 2019 Protocol place him at significant risk of severe pain and suffering.  The expert reports submitted by plaintiffs in the consolidated cases (which Mr. Purkey incorporates), confirm the severity and imminence of that suffering.

As Dr. Van Norman explains, the injection of pentobarbital is *virtually certain* to cause flash pulmonary edema—an "excruciating" condition that will cause Mr. Purkey to have the sensation of "drowning" or "asphyxiation."  Dkt. 24 at 7, 31-34.  Indeed, it is the sensation deliberately elicited during waterboarding, which the European Court of Human Rights has defined as torture.  *Id.* at 34.  Dr. Van Norman concludes that flash pulmonary edema "occurs in

the vast majority [of], if not all, judicial lethal injections using pentobarbital." *Id.* at 31; *see also id.* at 35-36 (finding evidence of pulmonary edema in 100% of the autopsy reports reviewed in which there was commentary on the lungs); Dkt. 26-12 at 1-8, 18, 21-22.

Absent a preliminary injunction, Mr. Purkey is also likely to suffer from maladministration.  Indeed, 56% of the autopsy reports that Dr. Van Norman reviewed in which IV lines were described appeared to involve some complication, ranging from multiple attempts to establish IV access to extravasation or inadvertent arterial injection, in which the patient would suffer "instant, excruciating pain" that feels like "being set on fire."  Dkt. 24 at 36-37.  For Mr. Purkey, these risks are only increased by Defendants' failure to identify a method for setting IVs or an appropriate rate of administration for the pentobarbital, and by remote administration of the drug by potentially unqualified personnel.  *See id.* at 39-43.

Such certain pain and suffering constitute harm sufficient to justify a preliminary injunction; indeed, it eclipses many situations in which courts readily found irreparable harm. *Cf. Alcestra Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 5 (D.C. Cir. 2018) (per curiam) (loss of medical treatment); *National Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613-614 (D.C. Cir. 1980) (exposure to pesticides).  And there is no doubt that Mr. Purkey's harm would be irreparable:  No amount of relief after final judgment could unwind the excruciating suffering.

Defendants' only response (Opp. 42) is that none of the identified harms would constitute an Eighth Amendment violation; therefore, it is "not clear" that they are cognizable for purposes of the preliminary-injunction analysis.  Even if Mr. Purkey were not likely to succeed on his Eighth Amendment claim (*but see infra* 16-25), Defendants' argument requires ignoring Mr. Purkey's other claims.  A plaintiff alleging claims under the APA, for example, need not show an unconstitutional level of harm, because the APA is not concerned with constitutional injuries

alone.  *See National Ass'n of Farmworkers*, 628 F.2d at 613-614, 620-622.  There is no reason to think that the standard for a preliminary injunction in an APA case is higher simply because the APA claim is combined with an Eighth Amendment claim or is brought by an inmate threatened with execution.  The cases that Defendants cite (Opp. 43) each involved *only* method-of-execution claims; none addressed the irreparable-harm requirement in an APA case.

Mr. Purkey has demonstrated that, absent an injunction, he *will* suffer irreparable harm from pulmonary edema, and is *highly likely* to suffer irreparable harm from maladministration. Because he is likely to succeed on the merits of his APA claims, that irreparable harm is grounds for an injunction, whether or not it also establishes an Eighth Amendment violation.

## II.    Mr. Purkey Is Likely To Succeed On The Merits

A preliminary injunction is appropriate if Mr. Purkey is likely to succeed on *any* of his claims.  *See Kirwa v. United States Dep't of Defense*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017).

### A.    Mr. Purkey Is Likely To Succeed On His APA Claims

#### 1.    The 2019 Protocol contravenes two federal statutes

The 2019 Protocol—along with the regulations on which it purports to rely—violate the Federal Death Penalty Act ("FDPA").  Prior to the Sentencing Reform Act of 1984, federal law provided that "[t]he manner of inflicting punishment of death shall be that prescribed by the laws of the place within which the sentence is imposed."  18 U.S.C. § 3566 (1982); *see* 57 Fed. Reg. 56,536, 56,536 (1992).  In 1984, Congress repealed § 3566, which "left a need for procedures for obtaining and executing death orders."  57 Fed. Reg. at 56,536.  Accordingly, in 1993, DOJ promulgated regulations providing for distinct federal death-sentence procedures.  58 Fed. Reg. 4898 (1993).  Two years later, however, Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, which once again required that the death sentence be implemented "in the manner prescribed by the law of the State in which the sentence is imposed."  Pub. L. 103-

322 § 60002, 108 Stat. 1967 (codified at 18 U.S.C. § 3596).  Congress thus rejected the creation

of distinct federal death-sentence procedures, and abrogated the 1993 regulations that DOJ

claims provide authority for the 2019 Protocol.

Defendants argue (Opp. 26-28) that § 3596 incorporates the state manner of execution at

only the broadest level—e.g., lethal injection, gas, or electrocution.  Therefore, they argue, if

state law permits use of lethal injection, the U.S. Marshal must execute the inmate using lethal

injection, but can choose any drug or procedures.  That is an untenable interpretation of the

statute, which requires the Marshal to implement the death sentence in the same "manner" as the

States.  "Manner" means "a mode of procedure or way of acting."  Merriam-Webster's

Collegiate Dictionary 756 (11th ed. 2014).  "Manner" thus includes all execution procedures,

from the choice of lethal agent to the details of its administration.  Defendants' contrary

interpretation ignores the plain meaning of the word "manner."  *Cf. Mexichem Fluor, Inc. v.*

*EPA*, 866 F.3d 451, 458-459 (D.C. Cir. 2017) (Kavanaugh, J.) (agency's reading of a word

"beyond its ordinary meaning" to give itself "indefinite authority" to regulate a substance was a

"boundless interpretation … [that] borders on the absurd").[1]

Moreover, the pre-1984 statute used "manner" just as § 3596 does, yet DOJ did not think

there was any need for distinct federal death-penalty procedures until that statute was repealed.

*See* 57 Fed. Reg. at 56,536.  Just as Congress created a need for federal death-penalty procedures

by repealing a statute that pointed to the "manner" of state executions in 1984, it eliminated the

need for those procedures by reenacting virtually the same provision in 1994.  The court in

*United States v. Hammer* reached the same conclusion, explaining that the FDPA requires the

---

[1] ████████████████████████████████████████████████████

████████████

federal government to follow state procedures even in establishing the time an execution will take place.  121 F. Supp. 2d 794, 798 (M.D. Pa. 2000).

Defendants claim (Opp. 28) that Mr. Purkey's plain reading of the statute is "absurd" because it would "requir[e] the federal government to stock all possible lethal agents used by the States."  That result is not "absurd" at all; rather, it is exactly what Congress intended.  Congress intended federal executions to be carried out in the manner used by the States, so the federal government must stock the same supplies used by the States.  If States provided for execution by hanging and electrocution, the federal government also would have to maintain gallows and an electric chair (or use the States', *see* 18 U.S.C. § 3597).  If that is infeasible, Congress must change the law, not DOJ.  In any case, many States use overlapping, if not identical, lethal agents, *see* Opp. 39, which will lessen any burden on the federal government to stock drugs.

The cases cited by Defendants (Opp. 26, 28-29) are unavailing.  In *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), and *United States v. Chandler*, 950 F. Supp. 1545 (N.D. Ala. 1996), the courts recognized DOJ's authority to promulgate regulations governing implementation of the death penalty only because they expressly recognized that the 1994 Crime Act—and thus § 3596—"d[id] not by its terms apply" to executions for the crimes of which the defendants were convicted.  *Tipton*, 90 F.3d at 902; *see also Chandler*, 950 F. Supp. at 1581. The discussion of the FDPA in *Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010), is dicta, since the court concluded that the plaintiff's Eighth Amendment claim was "not yet ripe for review."  *Id.* at 555.  In any case, the court's reasoning is unpersuasive.  The court stated that the FDPA "speaks to the 'manner' of implementing the sentence without reference to 'procedure,'" *id.* at 556, but failed to recognize that "manner" is defined to mean "a mode of *procedure* or way of acting,"  Merriam-Webster 756 (emphasis added).  In *United States v.*

*Bourgeois*, 423 F.3d 501, 509 (5th Cir. 2005), the Fifth Circuit's language was unconsidered

because the plaintiff did not argue that Texas's procedures were at odds with those prescribed in

the federal protocol.  And in *United States v. Fell*, 2018 WL 7270622, at *4 (D. Vt. Aug. 7,

2018), the court upheld the creation of a federal death chamber in Indiana because Indiana law

provides for lethal injection.  But the court did not sanction the use of that chamber to execute

prisoners in a manner different than that prescribed in the State in which they were sentenced.

Finally, Defendants contend (Opp. 29) that, in any event, Missouri uses a single-drug

pentobarbital protocol like that adopted by the 2019 Protocol.  But the 2019 Protocol differs in

significant respects from the Missouri procedures.  For example, Missouri requires a physician,

nurse, and pharmacist to participate in the execution.  AR70.  The federal protocol does not.

Missouri also offers the inmate a sedative prior to the execution.  *See Ringo v. Lombardi*, No.

2:09-cv-4095, Dkt. 210-7 (W.D. Mo. Jan. 21, 2011) ("Chronological Sequence of Execution").

The federal protocol does not.  *See also* AR71 (Missouri protocol providing—unlike the federal

protocol—that "[t]he gurney shall be positioned so that medical personnel can observe the

prisoner's face directly or with the aid of a mirror" and that "[m]edical personnel shall monitor

the prisoner during the execution").

Where, as here, regulations contravene the terms of a federal statute, the regulations are

*ultra vires*.  The 2019 Protocol, which relies on the *ultra vires* regulations, is likewise contrary to

law, and should be set aside.

The 2019 Protocol also contravenes the Controlled Substances Act ("CSA").  The CSA

makes it unlawful to "dispense" any "controlled substance" except pursuant to a valid

prescription "issued for a legitimate medical purpose" by a practitioner who is acting "in the

course of professional practice" and registered pursuant to the statute.  21 U.S.C. §§ 802(21),

829(e)(2), 841(a)(1).  Defendants argue that the "prescription" requirement does not pertain because the 2019 Protocol does not call for a controlled substance to be "dispensed" to an "ultimate user or research subject," as those terms are defined by statute.  Defendants' cramped reading of the statute is unconvincing.  Without doubt the 2019 Protocol calls for pentobarbital— a controlled substance—to be "dispensed" to Mr. Purkey.  Nor can Defendants credibly claim that Mr. Purkey is not an "ultimate user," defined as "a person who has lawfully obtained, and who possesses, a controlled substance for his own use."  21 U.S.C. § 802(27).  When he is injected with pentobarbital, Mr. Purkey will have obtained and certainly will possess that lethal agent pursuant to a federal regulation.  *Cf. Cook v. Food & Drug Admin.*, 733 F.3d 1, 10-11 (D.C. Cir. 2013) (affirming that acquiring execution drugs in a manner inconsistent with the FDCA is "not in accordance with law").

Defendants rely (Opp. 30) on *Gonzales v. Oregon*, 546 U.S. 243 (2006), to argue that the prescription requirement in the CSA "simply does not apply in the context of government lethal injection."  But that case had nothing to do with controlled substances dispensed as part of a federal execution protocol.  *Gonzales* answered the question whether the CSA authorized the Attorney General to promulgate a rule announcing that dispensing federally controlled substances to assist suicide violated the Act and threatening to revoke the registration of any physician who dispended controlled substances for that purpose.  546 U.S. at 254.  Defendants cite dicta from that opinion stating that the CSA was designed to "combat[] recreational drug abuse," Opp. 30 (quoting *Gonzales*, 546 U.S. at 272), while ignoring what the Court described as the other "main objective" of the statute: "controlling legitimate and illegitimate traffic in controlled substances."  546 U.S. at 250; *id*. at 269.

### 2. The 2019 Protocol violates the APA's notice-and-comment requirements

Mr. Purkey is also likely to succeed on his claim that the 2019 Protocol violates the APA because it was promulgated without notice and comment. The 2019 Protocol is a "legislative" or "substantive" rule subject to those requirements because it "'alter[s] the rights or interests of parties.'" *Mendoza v. Perez*, 754 F.3d 1002, 1021, 1023 (D.C. Cir. 2014). As Mr. Purkey has already explained (Mot. 13-14; *supra* 2-4), the drugs and procedures in the 2019 Protocol will cause the physical pain and suffering inmates endure during an execution. Certainly, such a rule affects those inmates' interests and imposes a substantive burden.

Defendants claim (Opp. 32-37) that the 2019 Protocol is a procedural rule. Procedural rules "are 'primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights or interests of affected parties.'" *Mendoza*, 754 F.3d at 1023 (alterations omitted). The D.C. Circuit has explained that "the distinction between substantive and procedural rules is 'one of degree' depending upon 'whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.'" *Electronic Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 653 F.3d 1, 5-6 (D.C. Cir. 2011) (*EPIC*). The procedural-rule exemption from the notice-and-comment requirements "'must be narrowly construed.'" *Id.* at 6.

Contrary to Defendants' assertion (Opp. 33), the 2019 Protocol is not primarily directed at internal agency operations and procedures. Rather, it governs how Defendants will treat and physically handle members of the public like Mr. Purkey. And although the protocol contains some arguably procedural details—for example, restrictions on access to prison property leading up to the execution, AR894—that cannot provide cover for BOP to promulgate other clearly substantive provisions—for example, the lethal substance to be used, AR874, the inmate's access

to clergy, AR894, or the number of IV lines to be established, AR875—without notice and comment. The 2019 Protocol affects Mr. Purkey's interest in how his life is ended and his bodily integrity. Those interests are sufficiently grave to "implicate the policy interests animating notice-and-comment rulemaking." *EPIC*, 653 F.3d at 6.

Defendants argue (Opp. 33) that any substantive burdens are imposed by the FDPA and DOJ regulations, not the 2019 Protocol. But it is only the 2019 Protocol that identifies the drug and procedures to be used during the execution. The choice of drug and procedures imposes its own burden, as that will determine the amount of pain Mr. Purkey endures. The D.C. Circuit rejected a similar argument in *EPIC*, where the agency claimed that a new policy of using advanced imaging technology (rather than magnetometers) to screen airline passengers was procedural. 653 F.3d at 6. The court rejected the agency's argument that the rule did not impose substantive burdens because a statute required the agency to screen passengers, explaining that the provision for screening by advanced imaging technology imposed an additional burden because it "substantially changes the experience of airline passengers." *Id.* at 3, 6-7. Even though the FDPA provides for the death penalty, and DOJ regulations provide for lethal injection, the further choice of drug and the manner of injection substantially affect how Mr. Purkey will experience his execution.

Defendants next conflate Mr. Purkey's APA and Eighth Amendment claims, arguing (Opp. 35) that "[t]he Protocol would impose a 'new substantive burden' only if it resulted in the infliction of pain beyond that which … violates the Eight[h] Amendment." But there is no basis to claim that a rule is procedural unless it violates the *constitutional* rights of the public. Congress enacted the APA to provide the public procedural rights beyond those already guaranteed by the Constitution. Plus, Defendants' argument only confirms that the 2019

Protocol is a substantive rule:  Defendants seemingly concede that if the protocol called for using drugs intended to cause excessive pain in violation of the Eighth Amendment, then it would be a substantive rule and notice and comment would be required.  The government cannot argue that the government's ultimate choice of drug is what determines whether the 2019 Protocol is a substantive rule.  Notice-and-comment is an independent procedural requirement that applies even if the substance of a rule is constitutional and otherwise lawful.[2]

Equally unavailing is Defendants' claim (Opp. 36) that the 2019 Protocol is a procedural rule because it does not bind the agency.  "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding."  *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citations omitted).  The protocol is replete with "mandatory, definitive language" that is binding on BOP, *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988).  ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[2]  Defendants' reliance (Opp. 34 n.13) on select prison administration cases misses the point.  Unlike the 2019 Protocol, the BOP policies at issue in many of those cases did not bind the agency.  *See, e.g.*, *Sacora v. Thomas*, 628 F.3d 1059, 1070 (9th Cir. 2010) (guidance about how to exercise discretion granted by a recent statutory amendment was "not binding"); *Williams v. Van Buren*, 117 F. App'x 985, 987 (5th Cir. 2004) (BOP policy that "generally restrict[ed]" compassionate release "permit[ted] the exercise of discretion").  Other cases—like *Pelissero v. Thompson*, 170 F.3d 442, 447 (4th Cir. 1999), *Parsons v. Pitzer*, 149 F.3d 734, 738 (7th Cir. 1998), and *Venegas v. Henman*, 126 F.3d 760, 763 (5th Cir. 1997)—involved interpretive rules, a concept inapplicable to the 2019 Protocol because it "does not purport to construe any language in a relevant statute or regulation."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997).  And the remaining cases involved agency action of an entirely different "degree," *EPIC*, 653 F.3d at 5, than the 2019 Protocol.  *See Mora-Meraz v. Thomas*, 601 F.3d 933, 940 (9th Cir. 2010) (policy concerning type of evidence required to show "verifiable documented drug abuse problem" for purposes of regulation); *Sample v. Watts*, 100 F. App'x 317, 318 (5th Cir. 2004) (policy permitting inmates access to their presentence reports but prohibiting possession of reports in "prison area[s]" for inmates' own safety).

That the BOP may depart from provisions of the 2019 Protocol under certain circumstances does not render the protocol altogether discretionary.  Defendants note (Opp. 36), for example, that the BOP Director may modify the death-sentence protocol "to comply with a court order."  But an agency must *always* comply with a court order.  Similarly, that the 2019 Protocol permits BOP to deviate from ordinary procedures in certain unforeseen circumstances does not render the protocol procedural.  Instead, the limited exceptions to deviate from the Protocol to follow medical personnel's recommendations or as may be required by other circumstances only prove that the rule is binding where those exceptions do not apply.  Indeed, Defendants cannot possibly mean that the 2019 Protocol permits BOP, on the day of execution, to substitute a new, untested three-drug protocol for pentobarbital on a whim.  *Cf. EPIC*, 653 F.3d at 7 ("The TSA seems to think it is significant that … the agency retains the discretion to stop using scanners where they are in place.  More clearly significant is that a passenger is bound to comply with whatever screening procedure the TSA is suing on the date he is to fly."); *Make the Rd. New York v. McAleenan*, No. 19-CV-2369 (KBJ), 2019 WL 4738070, at *32 (D.D.C. Sept. 27, 2019) ("Although individual immigration officers have the power to opt on a case-by-case basis to stay their hands with respect to their new-found authority, the New Designation plainly binds the undocumented non-citizens.").

Defendants fare no better with their alternative argument (Opp. 37-38) that the 2019 Protocol is a "general statement[] of policy" or an "interpretive rule."  "The question raised by the policy exception 'is whether a statement is … of present binding effect'; if it is, then the APA calls for notice and comment."  *EPIC*, 653 F.3d at 7; *see also National Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (courts ask whether a rule tells "regulated parties what they must do" and whether the agency is "free to ignore it").  As explained, █████████████

█████████████████████████ the protocol lays out binding requirements for the execution process, subject to limited and defined exceptions. It "use[s] … mandatory language that suggests the rigor of a rule, not the pliancy of a policy." *Center for Auto Safety, Inc. v. National Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 18 (D.D.C. 2004) (quotation marks and citations omitted), *aff'd*, 452 F.3d 798 (D.C. Cir. 2006).

Defendants note (Opp. 37) that courts sometimes consider an agency's characterization of its action, and that the 2019 Protocol claims not to create any legally enforceable rights or obligations. But courts are not bound to adopt the agency's characterization of its action as a general policy statement, and an examination of the entire 2019 Protocol makes clear that Defendants reference "boilerplate" language in an otherwise binding document. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). █████████████████ █████████████████████████████████████████ █████████████████████████████████████.

The 2019 Protocol is also not an interpretive rule, because it does not "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track' preexisting requirements and explain something the statute or regulation already required." *Mendoza*, 754 F.3d at 1021 (alterations omitted). It imposes *new* burdens on Mr. Purkey and other death-row inmates (*supra* 9-10), identifying the drug and procedures that will be used in their executions. Such a rule must undergo notice and comment.

### 3.    The 2019 Protocol does not reflect reasoned decision-making

As Mr. Purkey has explained (Mot. 18-21), the 2019 Protocol is not the product of reasoned decision-making but instead is arbitrary and capricious. Once again, Defendants try (Opp. 39) to merge Mr. Purkey's APA and Eighth Amendment claims, arguing that the 2019 Protocol cannot be arbitrary and capricious if it does not run afoul of the Eighth Amendment.

But the APA and constitutional inquiries are separate.  The APA inquiry asks about the *process* of rulemaking and *rationality* of a decision—i.e., whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The constitutional inquiry, in contrast, asks whether the *substance* of the government's execution procedures would result in a substantial risk of severe pain.  An agency decision may be arbitrary and capricious because the agency failed to consider all relevant factors, even though the rule is otherwise lawful.  *See Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 407 (D.C. Cir. 1996) ("a permissible statutory construction under *Chevron* is not always reasonable under *State Farm*").

The government's defense of its process falls flat.  Defendants argue (Opp. 39-40) that they chose pentobarbital after considering the practices of States and consulting with certain experts.  Specifically, the administrative record includes a pro-pentobarbital opinion by Craig W. Lindsley, Ph.D.  Barely over a page, Dr. Lindsley's opinion contains no citations and considers an earlier draft of the 2019 Addendum.  AR525-526.  Defendants also claim (Opp. 7) to have "consulted" with Dr. Joseph Antognini regarding the development of the 2019 protocol.  But they have produced no expert report showing Dr. Antognini's conclusions.  And as Plaintiff Lee points out, Dr. Antognini's testimony was questioned in other litigation, *see* Dkt. 22 at 9, and like Dr. Lindsley, Dr. Antognini appears not have taken account of the scientific evidence considered by Dr. Van Norman, *id.* at 9 n.3.  ██████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

"Such cherry-picking embodies arbitrary and capricious conduct."  *Sierra Club v. Salazar*, 177

14

F. Supp. 3d 512, 540 (D.D.C. 2016).

The record also does not indicate that Defendants' decision to rely on compounded pentobarbital was rational.  Defendants argue (Opp. 40) that two independent laboratories tested the pentobarbital solution for quality assurance.  If that solution has already been prepared for use in the upcoming executions, however, it "is now considered to be expired" and risks losing its stability, sterility, and potency.  Dkt. 26-15 at 5-6.  Likewise, the 2019 Protocol does not include provisions to ensure that the API and prepared drug vials are stored properly to prevent "degradation and contamination."  *Id.* at 7.  As Dr. Michaela Almgren has explained, pentobarbital and its API powder must be "kept in proper storage conditions" or else risk becoming "damaged, unusable, and unsafe."  *Id.*  Nor does the 2019 Protocol ensure that the drugs have been or will be transferred to the BOP under appropriate conditions.  *See id.*  Because the 2019 Protocol fails to account for the possibility that the drugs will be mishandled or stored improperly and to include provisions to address those risks, it is arbitrary and capricious.

Likewise, the record indicates that Defendants gave little, if any, consideration to issues surrounding the setting of IVs.  Defendants argue (Opp. 41) that BOP reviewed the "after action report" of Clayton Lockett's execution, which concluded that "the viability of the IV access point was the single greatest factor that contributed to the difficulty in administrating the execution drugs."  But that makes BOP's failure to adopt the IV recommendations from that action report all the more irrational.  For example, the 2019 Protocol ignores the recommendation that "[t]he IV catheter insertion point(s) should remain visible during all phases of the execution and continuously observed by a person with proper medical training in assessing the ongoing viability of an IV."  AR851. █████████████████████████

████████████████████████████████████████████████████

15

██████████████████████████████████████████████   The 2019 Protocol also

ignores recommendations about having certain medical equipment available, AR852, and did not

adopt the recommendation that the entire execution team—not simply the members lacking

formal medical training—perform execution rehearsals, AR853; ████████████ Defendants

have not explained their failure to adopt these straightforward and available safeguards.[3]

### B.     Mr. Purkey Is Likely To Prevail On His Eighth Amendment Claims

####    1.     Mr. Purkey has demonstrated that the 2019 Protocol poses a substantial risk of serious harm

#####        a.     *Mr. Purkey is likely to consciously endure the excruciating pain of pulmonary edema*

Relying on current medical evidence, Mr. Purkey has shown that the use of pentobarbital

will almost certainly cause him to suffer flash pulmonary edema, "an excruciating complication

that occurs in the vast majority [of], if not all, judicial lethal injections using pentobarbital."  Dkt.

26-14 at 31; *see also* Dkt. 26-12 at 18.  According to evidence from prior executions, inmates are

highly likely to endure this terrifying condition before becoming insensate.  Indeed, Dr. Van

Norman states "that most, if not all, prisoners will experience excruciating suffering [related to

pulmonary edema], including sensations of drowning and suffocation, as a result of [the]

injection of 5 grams of pentobarbital."  Dkt. 26-14 at 7; *see also* Dkt. 26-12 at 21.  Mr. Purkey

has thus not merely identified "some risk of pain" that is "inherent in any method of execution,"

Opp. 12 (quoting *Baze v. Reese*, 553 U.S. 35, 47 (2008)); he has presented a grave risk that will

occur with "virtual medical certainty," Dkt. 26-14 at 7.

Defendants highlight (Opp. 12) the Sixth Circuit's recent decision in *In re Ohio*

---

[3]     Defendants claim (Opp. 40) that Mr. Purkey does not challenge the IV procedure on its face.  That is wrong.  Mr. Purkey's initial brief challenged (Mot. 20) the lack of any "potential procedures [in the 2019 Protocol] to eliminate risks associated with [the IV-setting] process."

*Execution Protocol Litigation*, 937 F.3d 759 (6th Cir. 2019), concluding that neither pulmonary edema nor its associated symptoms qualify as the sort of suffering prohibited by the Eighth Amendment.  That decision, however, rests on a mischaracterization of the standard for proving a violation of the Eighth Amendment.  Like Defendants, the Sixth Circuit panel read *Bucklew v. Precythe* to prohibit only "forms of punishment that seek to intensify an inmate's death by 'superadd[ing]' feelings of 'terror, pain, or disgrace.'"  937 F.3d at 762; *see also* Opp. 1, 10.  But *Bucklew* did not heighten the existing *Baze-Glossip* test by requiring a plaintiff to show that a challenged execution method would "superadd" pain and suffering.  Rather, *Bucklew* "(re)confirmed that anyone bringing a method of execution claim alleging the infliction of unconstitutionally cruel pain must meet the *Baze-Glossip* test."  *Bucklew*, 139 S. Ct. at 1129.

The Sixth Circuit also concluded that the suffocation associated with pulmonary edema was constitutional, extrapolating from a discussion in *Bucklew* about the constitutionality of hanging.  *Ohio Execution Protocol*, 937 F.3d at 762.  But nowhere did *Bucklew* suggest that suffocation would be acceptable today under the Eighth Amendment.  Rather, the Supreme Court observed that sometimes-painful hangings were tolerated in the Eighteenth Century because they were "considered more humane than some of the [other] punishments of the Old World," *Bucklew*, 139 S. Ct. at 1124; that is, other execution alternatives at that time were far more excruciating.  But Mr. Purkey has proposed several modern alternatives that would minimize the risk that Mr. Purkey will suffer pulmonary edema while he is conscious and lessen his suffering.  *See infra* at 22-25.  Furthermore, Mr. Purkey's evidence of the *near-certain* risk of pulmonary edema also differentiates his case from *Ohio Execution Protocol*, where the court concluded that the plaintiff had failed to put forward any evidence that a person was certain or very likely to

17

experience unconstitutional pain.  937 F.3d at 763.[4]

Defendants also point (Opp. 13) to cases upholding the use of a single-drug pentobarbital protocol.  But those cases were devoid of expert testimony that a prisoner is likely to consciously experience pulmonary edema, as well as the pain and terror associated with that condition.  Nor can Defendants rely on other execution challenges where prisoners have proposed pentobarbital as an alternative.  Again, prisoners in those cases did not rely on current data demonstrating pentobarbital will not likely render a prisoner insensate to pain.

**b.    *Mr. Purkey has demonstrated non-speculative risks regarding the administration of the 2019 Protocol***

The evidence submitted in this litigation demonstrates that the 2019 Protocol creates non-speculative risks of maladministration that will cause Mr. Purkey unnecessary and substantial pain.  Risks are inherently uncertain, and Mr. Purkey need not show that identified events will necessarily arise to prove a violation of the Eighth Amendment.  *See, e.g.*, *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1254 (9th Cir. 2016) (jury could find that restraining a woman while in labor and postpartum recovery involves a "substantial risk of serious harm"); *Nelson v. Shuffman*, 603 F.3d 439, 447 (8th Cir. 2010) (jury could find substantial risk of serious harm where officials assigned a prisoner a cellmate known to have sexually assaulted other inmates).  Rather, he must show a "substantial risk" of severe harm.  *Baze*, 553 U.S. at 50.

---

[4]    Defendants point out (Opp. 12) that in the Ohio litigation, Dr. Antognini testified that a patient would be rendered unconsciousness by the anticipated dose of *midazolam*.  Leaving aside that Dr. Antognini did not opine on the effects of pentobarbital, he appears not to have considered any of the relevant medical data that Dr. Van Norman considered.  Furthermore, Dr. Antognini's testimony in that case was criticized.  The magistrate judge denied a *Daubert* challenge to the testimony regarding midazolam only because he found that *Daubert* is more important in jury trials than hearings and that the court itself could take into account "the extent to which [Dr. Antognini's] opinions are outside the scientific consensus" in weighing the evidence.  *See Ohio Execution Protocol*, 2019 WL 5172299, at *3 (S.D. Ohio Oct. 15, 2019).  The magistrate judge also described Dr. Antognini's testimony as "an outlier."  *Id.*

*IV Administration.*  The evidence in this case establishes a substantial risk of severe harm from improper IV administration.  Improper IV insertion can cause infiltration (in which the drug is injected or bursts into the surrounding tissue instead of the prisoner's vein) or extravasation (leaking of the drug into the surrounding tissue).  *See* Dkt. 26-14 at 36.  This can lead to "significant, excruciating pain for prisoners" that "patients liken to being set on fire."  *Id.* at 8, 36.  For example, infiltration of pentobarbital in an IV at the elbow "can cause the entire arm from the IV site down to the hand to immediately turn white and generate excruciating pain."  *Id.* at 36.  Drugs may also be injected into an artery instead of a vein, the result of which is "instant arterial spasm, pain, excruciating local tissue destruction, and also immediate ischemia (i.e. lack of oxygen, tissue damage and necrosis) in the area of the body supplied by the artery."  *Id.*

Improper injection also diminishes the drug's potency:  Line infiltration and arterial injection "can result in slow suffocation[,] … a lingering and extremely painful death and/or failure of the execution altogether."  Dkt. 26-14 at 41.  Administering the drug too quickly "can cause significant awareness to linger while the prisoner experiences suffocation, … and rapid administration can cause pulmonary edema within seconds, with associated sensations of drowning."  *Id.* at 42-43.  Rapid administration also increases the "probability of extravasation and infiltration."  *Id.* at 42.  And should an execution team recognize that they have not managed to properly insert the IV, repeated attempts to establish venous access are themselves a source of substantial and unnecessary pain.  *Id.* at 41.

The evidence in this litigation—as well as the administrative record reviewed by Defendants when developing the 2019 Protocol—establishes that improper IV insertions are neither speculative nor "isolated mishap[s]," Opp. 14 (citing *Baze*, 553 U.S. at 50), but common occurrences.  Dr. Van Norman's review of autopsies of patients executed by lethal injection

revealed that only 44% of the cases were "uncomplicated." Dkt. 26-14 at 37. The administrative record itself documents at least 29 executions by lethal injection that were plagued by issues with IV administration. AR814-821. And yet the 2019 Protocol is devoid of appropriate procedures to ensure that the IV-setting and drug administration will go smoothly, thereby minimizing the known likelihood of causing unnecessary pain.

Although Defendants rely heavily on *Baze* to argue that the identified risks are merely speculative, there are critical differences between the 2019 Protocol and the one at issue in *Baze*. The *Baze* Court held that "in light of [certain] safeguards" in the written protocol, it "[could] not say that the risks identified by prisoners are so substantial or imminent as to amount to an Eighth Amendment violation." 553 U.S. at 56; *see also Glossip v. Gross*, 135 S. Ct. 2726, 2742 (2015). The "most significant" of those safeguards was the "requirement that members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman." *Baze*, 553 U.S. at 55. And the protocol required the full team to participate in at least ten complete walk-throughs of the execution procedures, "including the siting of IV catheters into volunteers." *Id.*

The 2019 Protocol lacks the very safeguards *Baze* relied on in finding the Kentucky protocol constitutional. The 2019 Protocol provides that "personnel with necessary training and experience in a specific execution related function" are qualified to serve as "executioner(s)," AR874 ¶ D, but establishes no minimum licensure or certifications the executioner(s) must possess. In other words, the Protocol does not require the presence of anyone with a medical license or certification, and an execution lawfully could be carried out by a team of individuals with no prior medical training. ███████████ The 2019 Protocol also does not set forth any requirements about the content of execution rehearsals, including whether IV-siting is practiced

20

(it is not, *see id.* at 216:12-17), and requires the attendance only of personnel without medical licenses or certification.  AR874 ¶ D.  Members of the execution team with medical certification need not have participated in *any* execution rehearsals.  From this dearth of appropriate procedures, Dr. Van Norman concluded that "[i]t is likely that adherence to the Federal Protocol will lead to protracted efforts and multiple attempts to establish IV access and to faulty IVs," and "likely that a prisoner will experience … significant pain from protracted IV access attempts, severe or excruciating pain from injection of barbiturate into tissues other than veins, and/or prolongation of the execution process due to incomplete delivery of drug."  Dkt. 26-14 at 8.

*Compounded Drugs.*  The evidence in this case also establishes that Defendants' use of compounded drugs creates a substantial risk of harm to Mr. Purkey.  The use of compounded pentobarbital is a known cause of unnecessary pain and suffering.  *See* Dkt. 26-14 at 8, 43-50. One common problem with compounded drugs is subpotency, *id.* at 50; Dkt. 26-15 at 4, which can bring about a "slow and excruciatingly painful death" in which the prisoner experiences the feeling of drowning or suffocation for an extended period of time, Dkt. 26-15 at 4.  A drug administered after the "beyond use date" may also lose potency.  *Id.* at 6.

These risks, too, are real and non-speculative.  "Pharmaceutical preparation errors are much more common among compounding pharmacies than commercial manufacturers."  Dkt. 26-14 at 44.  Compounded drugs are "*likely* to be less potent than the label indicates, and *very likely* to not be within 30% of their labeled potency, compared to … FDA-regulated compounds."  *Id.* at 50.  In fact, in an FDA survey of compounded drugs, 34% failed quality testing—mostly for subpotency.  *Id.* at 46.  Indeed, one lot of Defendants' API failed one of the specifications in testing.  Dkt. 26-15 at 9 (citing AR977).  Dr. Almgren noted a disturbing "number of impurities" in those test results that are "certainly concerning" and could impair the

compounded drug's potency.  *Id.* at 9-10.

The evidence in this case also suggests that the BOP may further increase the risk of using subpotent drugs by using them past their "beyond-use date."  The United States Pharmacopeia ("USP") standards establish a beyond-use date for compounded pentobarbital of no more than 45 days, depending on how the drug is stored.  Dkt. 26-15 at 5.  But BOP has asserted in a memorandum to the Attorney General that compounded pentobarbital has a "shelf-life" of "approximately two years."  AR859.  Furthermore, Defendants have been carrying out a "stability study" of their compounded drug, which suggests an attempt to extend the beyond-use date.  *See* Dkt. 26-15 at 6.  And "one of the stability test points in the accelerated study has failed and is outside of the range as specified and acceptable per testing protocol."  *Id.*  In sum, Dr. Van Norman found it "extremely likely that prisoners will be subjected to injection of an inferior, subpotent drug that vastly increases the risk that execution will be prolonged and the prisoner will suffer prolonged feelings of pain and suffocation."  Dkt. 26-14 at 8.

## 2. Mr. Purkey is likely to succeed in proving alternative methods of execution that are feasible and readily available

Mr. Purkey has offered (Mot. 24-25) three execution alternatives, each of which would significantly reduce the risk of severe pain and each of which is "feasible" and "readily implemented."  *Glossip*, 135 S. Ct. at 2739.

Defendants err in arguing (Opp. 21-22) that many of Mr. Purkey's proposed safeguards are already incorporated in the 2019 Protocol.  For example, the Protocol does not require the qualifications of Mr. Purkey's executioners to be disclosed, a particularly worrying omission given that the protocol does not require that anyone with medical training participate in the execution.  AR874 ¶ D.  Nor does the protocol ensure that the pentobarbital will be administered to the inmate in a semi-vertical position to reduce the sensations of terror and panic that

accompany pulmonary edema. *See* Dkt. 26-12 at 3 (feelings of "panic and terror … are increased when subjects lay flat"). Contrary to Defendants' assertions (Opp. 21), Mr. Purkey's proposed alternatives would do more than cause a "minor reduction in risk." They are proven to reduce the pain he is almost certain to experience with the onset of pulmonary edema, *see* Dkt. 26-14 at 7, and to reduce the demonstrated risk that his execution will involve a subpotent or otherwise unsafe drug, *see* Dkt. 26-15 at 7-8 (current disclosures regarding compounded pentobarbital do not guarantee adequate storage or handling to ensure potency).

Defendants likewise argue (Opp. 22) that Mr. Purkey's suggestion of bedside administration would not provide a constitutionally significant benefit and that remote administration serves the government's interest in protecting the executioners' privacy. On the first point, the government cites no evidence that the benefit of bedside administration would be *de minimis*. Instead, Defendants merely point out that, like the 2019 Protocol, the protocol upheld in *Baze* involved tubing extending from the wall. Defendants thus do not confront Mr. Purkey's explanation that longer tubing increases "the resistance and pressure in the IV line, leading to increased risk of infiltration and extravasation, and to insufficiently rapid injection to ablate awareness." Dkt. 26-14 at 42. Furthermore, whereas the procedure in *Baze* at least contemplated that the warden and deputy warden would "watch for signs of IV problems, including infiltration," Opp. 22 (citing *Baze*, 553 U.S. at 56), the 2019 Addendum contains no such provisions. Executioners administering pentobarbital remotely thus may never observe the problems identified above or else become aware of them only after Mr. Purkey has suffered needless pain. On the second point, the government may have a legitimate interest in protecting the executioners' privacy, Opp. 22, but that interest does not outweigh Mr. Purkey's interest in an execution process that comports with the Eight Amendment. In any case, the government can

satisfy its interest while using bedside administration by, for example, permitting executioners to don surgical masks or head coverings.

Finally, Defendants argue (Opp. 22-23) that Mr. Purkey's suggested pre-dose of either an opioid or an anti-anxiety medicine is insufficiently detailed.  *Bucklew* requires only that Mr. Purkey provide enough information about an alternative "to permit a finding that the State could carry it out relatively easily and reasonably quickly."  139 S. Ct. at 1129.  Mr. Purkey satisfies this standard.  He has identified a defined class of medications, *see* Dkt. 25 at 3-7, and also the precise condition they are designed to target, *i.e.*, "[to] substantially reduce the risk that the prisoner would remain sensate to experience pain," Compl. ¶ 64.  Dr. Craig Stevens' declaration identifies morphine and fentanyl as two readily available opioids that could "prevent the pain and suffering from the lethal dose of pentobarbital."  Dkt. 25 at 7.

Defendants also note (Opp. 22-23) that there is no record of States successfully using Mr. Purkey's proposed alternative in their lethal-injection protocols.  There is, however, a robust record of opioids being used to treat patients for pain in non-execution settings.  *See* Dkt. 25 at 3-7.  Finally, Defendants question (Opp. 23) whether an opioid or anti-anxiety medication "would in fact" significantly reduce the risk of severe pain, noting that "pentobarbital will quickly render an inmate unconscious."  After consulting reliable and current data, however, Dr. Van Norman rejects that conclusion.  In fact, she states with medical certainty that the proposed dose of pentobarbital would *not* render Mr. Purkey unconscious, and that he would experience pain for the duration of his execution.  *See, e.g.*, Dkt. 26-14 at 7, 11.[5]

---

[5]     Mr. Purkey is also likely to succeed on his claim that the 2019 Protocol violates due process.  Defendants cite (Opp. 24-25) several out-of-circuit cases denying claims that due process entitles a plaintiff to information about a particular execution protocol.  Unlike the plaintiffs in many of those cases, however, Mr. Purkey does not seek information to determine

**III.     The Balance Of Equities And Public Interest Weigh In Favor Of An Injunction**

As Mr. Purkey explained (Mot. 27-28), the public is served when agencies comply with the APA's requirements of notice-and-comment and reasoned decision-making.  And the public has a signficant interest in ensuring that capital punishment is carried out in a humane and considered manner.  Defendants address neither of these points in their opposition.  Instead, they insist (Opp. 43) that the government and the family members of the victim have an interest in finality and enforcing criminal judgments.  Even assuming the government's claimed interest was comparable to the interest of the public and Mr. Purkey in a legal and humane execution process, an injunction would not disturb the government's interest in finality.  Mr. Purkey does not contest his conviction or his sentence of death.

To the extent the government's interest is not simply in the execution of Mr. Purkey but in his *timely* execution, Defendants cannot plausibly claim any harm from whatever delay an injunction might impose.  After all, the *government* has chosen not to carry out an execution in over fifteen years, and it waited more than eight years to unveil a new protocol after announcing in March 2011 that it was revising its old protocol.  Any claimed urgency in imposing the death penalty is belied by "the fact that the government has not—until now—sought to" schedule Mr. Purkey's execution.  *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (2018).

**CONCLUSION**

The Court should grant a preliminarily injunction.

---

*whether* he has a viable Eighth Amendment claim.  *See, e.g.*, *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015) (denying due-process claim to information where the "prisoners … have not pleaded a deprivation of rights under the Eighth Amendment").  Even without the requested information about the execution protocol, Mr. Purkey's complaint adequately pleads an Eighth Amendment violation.  For that reason, his case is also different from cases cited by defendants in which plaintiffs continue to press due process claims after their Eighth Amendment claims have been dismissed.  *See, e.g.*, *Jones* v. *Commissioner, Ga. Dep't of Corr.*, 811 F.3d 1288, 1294 (11th Cir. 2016); *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011).

DATED:        November 18, 2019            Respectfully Submitted,

                                          /s/ Arin Smith

                                          Arin Smith (D.C. Bar No. 1045248)
                                          WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                          1875 Pennsylvania Avenue NW
                                          Washington, DC 20006
                                          (202) 663-6959
                                          Arin.Smith@wilmerhale.com

                                          Alan Schoenfeld (*pro hac vice*)
                                          Ryan Chabot (*pro hac vice*)
                                          WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                          7 World Trade Center
                                          250 Greenwich Street
                                          New York, New York 10007
                                          (212) 230-8800
                                          Alan.Schoenfeld@wilmerhale.com
                                          Ryan.Chabot@wilmerhale.com

                                          *Attorneys for Plaintiff Wesley Purkey*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2019, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record:

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN & ELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: Brandon.almond@troutmansanders.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celestw_bacchi@fd.org

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

*Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Kathryn B. Codd
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

*Jeanne Vosberg Sourgens
VINSON & ELKINS, L.L.P.
(202) 639-6633

Robert E. Waters
VINSON & ELKINS, L.L.P.
(202) 737-0500
Email: rwaters@velaw.com

William E. Lawler, III
VINSON & ELKINS, L.L.P.
(202) 639-6676
Email: wlawler@velaw.com

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

Elizabeth Hagerty
HOGAN LOVELLS US LLP
(202) 637-3231
Email: elizabeth.hagerty@hoganlovells.com

*Yousri H. Omar
VINSON & ELKINS, L.L.P.
(202) 639-6500
Email: yomar@velaw.com

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

*Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0528
Email: shawn.nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

David Victorson
HOGAN LOVELLS US LLP
(202) 637-2061
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

Mallik Yamusha
HOGAN LOVELLS US LLP
(212) 981-3000
Email:mallisk.yamusha@hoganlovells.com

Amy J. Lentz
STEPTOE & JOHNSON
(202) 429-1320
Email: Alentz@steptoe.com

Steven Albertson
Skadden, Arps, Slate, Meagher & Flom LLP
(202) 371-7112
Email: steven.albertson@skadden.com

Jon Jeffress
KaiserDillon PLLC
202-640-2850
Email: jjeffress@kaiserdillon.com

Jean Lin
Civil Division, Department of Justice
 (202) 514-3716
Email: Jean.lin@usdoj.gov

Alan Burch
US States Attorney's Office, Civil Division
(202) 252-2550
Email: alan.burch@usdoj.gov

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Peter S. Smith
United States Attorney's Office
 (202) 252-6769
Email: peter.smith@usdoj.gov

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0528
Email: timothy_kane@fd.org

Charles F. Walker
Skadden, Arps, Slate, Meagher & Flom LLP
 (202) 371-7862
Email: charles.walker@skadden.com

Jon Jeffress
KaiserDillon PLLC
202-640-2850
Email: jjeffress@kaiserdillon.com

Jonathan Kossak
Civil Division, Department of Justice
 (202) 514-3716
Email: Jonathan.kossak@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
 (202) 514-7830
Email: Ethan.P.Davis@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of
Columbia
202-252-6605
Email: Denise.Clark@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

\* No e-mail provided on the docket or counsel no longer with the identified firms.

_/s/ Arin Smith_
Arin Smith