

# LABORATORY REPORT

**Account #:**
**Sample Name:** Pentobarbital Sodium Injection - 50 mL
**Lot #:** 11▇▇▇▇
**Storage Conditions:** Room Temperature

Date Received: 11/27/2019

**Submission #:**

## Microbiology Tests:

**Particulate Count Test**   Date Started: 12/2/2019   Date Completed: 12/4/2019
   Test Method: USP<788> - Method 1 Light Obscuration Particulate Count Test
   Small Volume Injection - 10um (Numerical): 203.3333 Particles/Container
   Small Volume Injection - 10um (Pass/Fail): Pass
   Small Volume Injection - 25um (Numerical): 3.3333 Particles/Container
   Small Volume Injection - 25um (Pass/Fail): Pass

**ScanRDI Sterility Test**   Date Started: 12/2/2019   Date Completed: 12/3/2019
   Result: Pass

**USP <85> Bacterial Endotoxin Test**   Date Started: 12/2/2019   Date Completed: 12/3/2019
   Numerical Value (EU/mL): <1
   Result: Pass

Respectfully submitted,



# LABORATORY REPORT

Account #:
Sample Name: Pentobarbital Sodium 50 mg/mL Injection Solution
Lot #: 11
Storage Conditions: Room Temperature

Date Received: 12/4/2019

Submission #:

Date Started: 12/4/2019    Date Completed: 12/5/2019

## Chemistry Tests:

**Potency (Pentobarbital Sodium : 50.00000 mg/mL)**
- Measured Concentration: 48.8 mg/mL
- Potency: 97.6 %
- Method: HPLC
- Below Detection Limit: False
- Inconclusive: False

Respectfully submitted,



Print Date: 2/3/2020 3:42:38 PM                                                                 Page 1 of 1




# LABORATORY REPORT

Account #:  
Sample Name: Pentobarbital Sodium - 50 mL SDV  
Lot #: 12  
Storage Conditions: Room Temperature  

Date Received: 12/5/2019

Submission #:

## Chemistry Tests:

**pH**                    Date Started: 12/5/2019     Date Completed: 12/6/2019  
   pH:                                 10.08

**Potency (Pentobarbital Sodium : 50.00000 mg/mL)**     Date Started: 12/5/2019     Date Completed: 12/6/2019  
   Measured Concentration:        50.0 mg/mL  
   Potency:                          100 %  
   Method:                         HPLC  
   Below Detection Limit:           False  
   Inconclusive:                   False

## Microbiology Tests:

**Particulate Count Test**     Date Started: 12/12/2019     Date Completed: 12/13/2019  
   Test Method:                                 USP<788> - Method 1 Light Obscuration Particulate Count Test  
   Small Volume Injection - 10um (Numerical):     2631.6667 Particles/Container  
   Small Volume Injection - 10um (Pass/Fail):     Pass  
   Small Volume Injection - 25um (Numerical):     85 Particles/Container  
   Small Volume Injection - 25um (Pass/Fail):     Pass

**ScanRDI Sterility Test**     Date Started: 12/6/2019     Date Completed: 12/6/2019  
   Result:                            Pass

**USP <85> Bacterial Endotoxin Test**     Date Started: 12/6/2019     Date Completed: 12/6/2019  
   Numerical Value (EU/mL):      <1  
   Result:                            Pass

Respectfully submitted,

# CERTIFICATE OF ANALYSIS

| | |
|---|---|
| Customer: | Storage: Room Temperature |
| Received: 11/27/2019 | Device/Amount: vial(s) 2 x 25 ml |
| Compound: Pentobarbital Sodium 50mg/mL Injectable | Sample Number: |
| Lot Code: 11■ | DEA: Yes |

## RESULTS

| Test | Active | Test Spec | Test Result | Test Date | Tech Review Date | Comment |
|---|---|---|---|---|---|---|
| Potency/Purity : HPLC [Retest 1][1] | Pentobarbital Sodium | 92.0 - 108.0 % | 96.8% (48.4 mg/mL) | 12/12/2019 | 12/12/2019 | |
| Potency/Purity : HPLC [Retest 2][1] | Pentobarbital Sodium | 92.0 - 108.0 % | 96.4% (48.2 mg/mL) | 12/12/2019 | 12/12/2019 | |
| Potency/Purity : HPLC [Retest 3][1] | Pentobarbital Sodium | 92.0 - 108.0 % | 97.0% (48.5 mg/mL) | 12/12/2019 | 12/12/2019 | |
| Potency/Purity : HPLC [Retest 4][1] | Pentobarbital Sodium | 92.0 - 108.0 % | 96.7% (48.4 mg/mL) | 12/16/2019 | 12/17/2019 | |
| pH : USP <791> | | Report Results | 10.25 | 12/02/2019 | 12/03/2019 | |

**Compounded By:**
**Date Compounded: 11/26/2019**

1. Method has been validated to meet USP<1225> criteria of accuracy, recovery, linearity, range, robustness, precision, ruggedness, and stability indicating for non-customer specific formulations.

**Limited Warranty**



Final QA By:     Date: 12/23/2019

# INVESTIGATION REPORT   No.

## SECTION 1: Initiation Information

Initiated By: ▮  Date Initiated: 12/3/2019

## SECTION 2: Sample / Original Test Information

▮ 503B

| Test | Dur Sched | Tested | QC | Specification | Result | Comment |
|---|---|---|---|---|---|---|
| Pentobarbital Sodium 50mg/mL Injectable | | Injection | | 1▮ | W-1-92 | |
| Potency/Purity: HPLC | 12/2/2019 | 12/3/2019 | ✗ | 92.0 - 108.0 % | 90.1% (45.0 mg/mL) | Pentobarbital Sodium |
| Potency/Purity: HPLC | 12/4/2019 | 12/12/2019 | ✗ | 92.0 - 108.0 % | 90.5% (45.3 mg/mL) | Pentobarbital Sodium For investigation purposes only. Do not report on C of A |
| Original prep reinjection. Add to IR ▮. ▮ 12/04/19 | | | | | | |
| Potency/Purity: HPLC | 12/4/2019 | 12/12/2019 | ✗ | 92.0 - 108.0 % | 90.6% (45.3 mg/mL) | Pentobarbital Sodium For investigation purposes only. Do not report on C of A |
| Original stock redilution. 1 ml stock vp --> 20 ml vf. QS with DIL028. Add to IR ▮. 12/04/19 | | | | | | |
| Potency/Purity: HPLC | 12/4/2019 | 12/12/2019 | ✓ | 92.0 - 108.0 % | 93.0% (46.5 mg/mL) | Pentobarbital Sodium For investigation purposes only. Do not report on C of A |
| Original vial reinjection. Add to IR ▮. ▮ 12/04/19 | | | | | | |
| Potency/Purity: HPLC | 12/4/2019 | 12/12/2019 | ✓ | 92.0 - 108.0 % | 96.8% (48.4 mg/mL) | Pentobarbital Sodium |
| Retest 1. 0.1 ml spl ep --> 25 ml VF. QS with DIL028. 1 ml stock vp --> 20 ml vf. QS with DIL028. Add to IR ▮. 12/04/19 | | | | | | |
| Potency/Purity: HPLC | 12/4/2019 | 12/12/2019 | ✓ | 92.0 - 108.0 % | 96.4% (48.2 mg/mL) | Pentobarbital Sodium |
| Retest 2. 0.1 ml spl ep --> 25 ml VF. QS with DIL028. 1 ml stock vp --> 20 ml vf. QS with DIL028. Add to IR ▮. 12/04/19 | | | | | | |
| Potency/Purity: HPLC | 12/4/2019 | 12/12/2019 | ✓ | 92.0 - 108.0 % | 97.0% (48.5 mg/mL) | Pentobarbital Sodium |
| Retest 3. 0.1 ml spl ep --> 25 ml VF. QS with DIL028. 1 ml stock vp --> 20 ml vf. QS with DIL028. Add to IR ▮. 12/04/19 | | | | | | |
| Potency/Purity: HPLC | 12/12/2019 | 12/16/2019 | ✓ | 92.0 - 108.0 % | 96.7% (48.4 mg/mL) | Pentobarbital Sodium |
| Retest 4. 0.1 mL spl e.p. ------> 25mL v.f. QS DIL028. 1 ml stock v.p.-----> 20 mL V.F. QS DIL 028. Add to IR ▮. 12/12/19 | | | | | | |

## SECTION 3: Questions

Section 3A: Laboratory Investigation (Completed by Lead or ▮)

| # | Question | Answer |
|---|---|---|
| 1 | Record date of discovery | Yes |
| | 12/03/19 ▮ 12/03/19 | |
| 2 | Verify and document the correct method | Yes |
| | ▮ 12/03/19 | |
| 3 | Verify the correct sample preparation procedure was followed. If not, explain the deviation from correct sample prep. | Yes |
| 4 | Verify that the result calculation is correct. If not, explain the error. | Yes |
| 5 | Document any notes regarding sample appearance prior to testing | Not Applicable |
| 6 | Verify sample prep was homogeneous, in solution, and stored properly. If not, explain the error. | Yes |
| 7 | Document any notes regarding sample prep appearance after or during prep. | Not Applicable |
| 8 | Document any robustness parameters used and record their purpose | Not Applicable |
| 9 | Is invalid data included with the investigation? If yes, record reasonings for invalid data packet(s). | Not Applicable |
| 10 | Verify all chromatograms (samples and standards) are properly integrated. Explain any abnormalities. | Yes |
| 11 | List the ▮ number and next calibration dates for any instruments used, including invalid data packets. | Yes |
| | ▮ Cal:07/2020 ▮ 12/03/19 | |
| 12 | List the ▮ number and next calibration date of any additional equipment used. | Yes |
| | Pipet ▮ Cal: 02/2020 ▮ 12/03/19 | |
| 13 | Record any discovered abnormalities regarding the instrument or equipment used | Not Applicable |
| 14 | Note total of OOS samples and number of samples in the run | Yes |
| | 1 sample in run; 1 OOS ▮ 12/03/19 | |
| 15 | Were standards prepared per SOP/CoA/USP? Were adjusted weights entered correctly? Dilutions correct? | Yes |
| 16 | Were the standard preps stored properly? | Yes |

| | | INVESTIGATION REPORT | No. | |
|---|---|---|---|---|

| # | Question | Answer | Date |
|---|---|---|---|
| 17 | Was a standard comparison performed? | Yes | |
| | Standard comparison performed using standard concentration and area of previously approved standard. No observed issues. | | 12/03/19 |
| 18 | Were any reagents, solutions or standards expired? | No | |
| 19 | Are there any environmental factors, such as temperature, that occurred during the testing process that may have affected the test? | No | |
| 20 | Who is the analyst involved with the investigation? | Yes | |
| | 12/03/19 | | |
| 21 | Record batch date and date handed off to OOS group. | Yes | |
| | Batched: 12/03/19 | | |
| | Handed to OOS: 12/03/19 | | |
| | 12/03/19 | | |
| 22 | Additional findings or comments. | Not Applicable | |

Section 3B: Laboratory Investigation Review (Completed by OOS ▬▬)

| # | Question | Answer |
|---|---|---|
| 1 | Who are the technical reviewers involved with the investigation? | Yes |
| | ▬▬ 12/04/19 | |
| 2 | For high OOS results, has potential co-elution been evaluated by PDA analysis? | Not Applicable |
| 3 | Does review of the chromatography indicate degradation/anomolies/poor peak shape? | No |
| 4 | Do the requested salt form, tested and reported salt form agree? | Yes |
| 5 | Does the specification range match the USP monograph and/or customer notes? | Yes |
| 6 | For multi-active samples, do other active results support the failure? If yes, document which active(s) and the result(s). | Not Applicable |
| 7 | For time studies, does historical data the support the failure? | Not Applicable |
| 8 | Is this a diversion monitoring sample? | No |
| 9 | Is this an adverse event sample? | No |
| 10 | Is this a training or process check sample? | No |
| 11 | Is this a mixing study? If yes, include results for each sample location. | No |
| 12 | If a bag volume was performed, is the result 15% more or 15% less than the specified volume? | Not Applicable |
| 13 | Are other lots effected by root cause of this OOS investigation? If yes, provide lot numbers or OOS numbers. | Not Applicable |
| 14 | Has an internal error been identified? | No |
| 15 | Does the investigation support a retest/reprep? | No |
| 16 | If retesting, add retest instruction. | Not Applicable |
| 17 | Record ▬▬ and next calibration date for all equipment used in retesting. | Not Applicable |
| 18 | Additional findings or comments. | No |

Section 3C: Investigation Summary (Completed by the OOS ▬▬)

| # | Question | Answer |
|---|---|---|
| 1 | Review customer history. If sufficient data, add review to investigation. | Yes |
| | Customer email sent. ▬▬ 12/04/19 | |
| 2 | Was customer formula reviewed for investigation? | Yes |
| | ▬▬ 12/04/19 | |
| 3 | Were any errors identified in the formula that would explain the OOS result? | No |
| 4 | Is there a known issue with the storage conditions/container-closure system of the sample? | No |
| 5 | Does the customer have a OOS testing protocol? | No |
| 6 | Has the customer been informed of the results? If grossly OOS (<50% or >150% of target) verbal notification is required by an investiation analyst. | Yes |
| | Customer email sent. ▬▬ 12/04/19 | |
| 7 | Has the customer failed to respond within 5 business days? If yes, NA remainder of 3C and close in investigation. | No |
| 8 | Does the customer accept the results? | No |
| 9 | Does the customer dispute the results? | No |
| 10 | Does the customer request a retest/reprep? | Yes |
| | Customer requested retesting. ▬▬ 12/18/19 | |
| 11 | If customer requested retest, record retesting plan. | Yes |
| | triplicate retesting alongside a reinjection of the original HPLC vial, original sample preparation, and a redilution of the original stock solution. ▬▬ 12/18/19 | |
| 12 | Record all equipment ▬▬ and calibration dates used during customer requested retesting. | Yes |
| | ▬▬, cal due 08/2020. ▬▬, cal due 02/2020. ▬▬, cal du e02/2020. ▬▬ 12/18/19 | |
| 13 | Record any additional DOE or hypothesis studies performed. | Yes |
| | 4th confirmation test performed to confirm the triplicate retest results. ▬▬ 12/18/19 | |



# INVESTIGATION REPORT                                                          No.   

| SECTION 4: Customer Communication |||||
|---|---|---|---|---|
| No. | Status | Action | Assigned To | Action Due Date |
|  | Closed | Dear ▉▉▉ 503B,<br><br>This email is to notify you that Pentobarbital Sodium 50mg/mL Injectable Lot: 11▉▉▉ has been tested and (Pentobarbital Sodium) resulted out of the established specification (OOS). The results are 90.1% of target (45.1 mg/mL) compared to the specification of 92.0 - 108.0 %.<br><br>Per our internal procedures, an investigation was opened and the laboratory and technical reviews have been completed. During this review we have evaluated all chromatographic conditions including the integration and method parameters, sample preparation calculations, sample preparation glassware, standard preparation and formula where applicable. At this time, we have not identified an internal error.<br><br>To take the next step in the investigation, please contact us to learn more about this result or for assistance with potentially identifying a root cause Please notify us within 5 business days. You can reach all of our investigation analysts by replying to this email or sending an email to the following address: ▉▉▉▉▉▉▉▉▉. If a response is not received, we will post the result and complete the investigation.<br><br>If additional testing is requested and the results confirm the original OOS, each test will be charged at the standard billing rate. If the investigation indicates that a laboratory error is the root cause of the OOS, no additional charges will be billed beyond a single retest.<br><br>For more information regarding our OOS Investigation process, please follow the following link:<br>▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br><br>Thank you, |  | 12/17/2019 |
|  | Closed | Hello,<br><br>Retesting for Pentobarbital Sodium 50mg/mL Injectable - 11▉▉▉ has been completed. The summary of the results are below.<br><br>Original result: 90.1%<br>Reinjection of the original HPLC vial (for investigational purposes only) : 93.0% (46.5 mg/mL)<br>Reinjection of the original sample prep (for investigational purposes only) : 90.5% (45.3 mg/mL)<br>Redilution of the original stock solution (for investigational purposes only) : 90.6% (45.3 mg/mL)<br>Retest 1 (same container): 96.8% (48.4 mg/mL)<br>Retest 2 (same container): 96.4% (48.2 mg/mL)<br>Retest 3 (same container): 97.0% (48.5 mg/mL)<br><br>We believe the triplicate retesting results do not confirm the original result.  A 4th retest will be added to confirm the retest results. You can expect results within 3 business days. Please let me know if you have any questions.<br><br>Thank you, |  | 12/17/2019 |
|  | Closed | Hello,<br><br>Retesting for Pentobarbital Sodium 50mg/mL Injectable - 11▉▉▉ has been completed. The summary of the results are below.<br><br>Original result: 90.1%<br>Reinjection of the original HPLC vial (for investigational purposes only) : 93.0% (46.5 mg/mL)<br>Reinjection of the original sample prep (for investigational purposes only) : 90.5% (45.3 mg/mL)<br>Redilution of the original stock solution (for investigational purposes only) : 90.6% (45.3 mg/mL)<br>Retest 1 (same container): 96.8% (48.4 mg/mL)<br>Retest 2 (same container): 96.4% (48.2 mg/mL)<br>Retest 3 (same container): 97.0% (48.5 mg/mL)<br><br>We believe the triplicate retesting results do not confirm the original result.  A 4th retest will be added to confirm the retest results. You can expect results within 3 business days. Please let me know if you have any questions.<br><br>Thank you, |  | 12/20/2019 |



# INVESTIGATION REPORT   No. 

## SECTION 5: Conclusion

| By | On | Comment |
|---|---|---|
|  | 12/18/2019 | The root cause for OOS# ▮ was determined to be internally attributable due to a sample prep error. The sample initially resulted at 115.8%. The customer requested retesting. The sample was retested in triplicate alongside a re-injection of the original HPLC vial, a re-vial of the original sample preparation, and a redilution of the original stock solution. The original HPLC vial, a re-vial of the original sample preparation and the redilution of the original stock solution were included for investigation purposes only. The re-injection of the original HPLC vial resulted at 93.0%, the re-vial of the original sample prep resulted at 90.5%, and the redilution of the original stock solution resulted at 90.6%. The retest results were 96.8%, 96.4%, 97.0%. Per ▮ procedure, the retesting results confirm the original result if all results have a %RSD of less than or equal to 3.0% and the variablity between all retest results and the original results is less than or equal to 5.0%. The %RSD for the original test and triplicate retests was found to be 3.5% with all retest results having a variability greater than 5.0%. Because the retest results did not confirm the original result, the sample was retested one time to confirm the retest results. The confirmatory retest resulted at 96.7%. The confirmation retest results confirm the triplicate retest results. Grubb's Outlier Test was used in conjunction with the triplicate retest and confirmatory retest to determine if the original result was deemed to be an outlier. The initial result was determined to be an outlier by the Grubb's Outlier Test. The standard could not be investigated as the root cause due to the standard having a one day stability and being discarded. This sample was the only sample of this active tested during the run. Because all of the reinjections confirmed the original result, it was determined that the there is two possible root causes. One possible root cause is that the analyst slightly over QS'd the volumetric flask of the stock solution. A second possible root cause is that the analyst had poor pipette techniques and the analyst had added less volume to the stock solution before filling. The analyst was interviewed and did not state any abnormalities that occured during testing. The analyst was informed of proper pipetting and QS techniques. The sample prep error will be tracked and trended for Continuous Improvement using Occurrence ▮. The initial result will not be reported and all retest results will be reported. Submitted to Quality for review and approval. ▮ 12/18/19 |

## SECTION 6: Summary

| Group | Cause | Source Type | Source |  |
|---|---|---|---|---|
| Type | No. | Status | Assigned To | Action |
| Internal Error Identified | Sample Prep, Storage or Handling Issue/Error | Employee |  |  |

## SECTION 7: Supporting Documentation (see listed documents attached)

| By | On | File | Description |
|---|---|---|---|
|  | 12/18/2019 11:59:20 AM |  |  |

 INVESTIGATION REPORT            No.

### SECTION 8: Final Technical and Quality Assurance Reviews

Test Level Technical Review(s) By:             On:

                                               12/12/2019
                                               12/17/2019
                                               12/4/2019

Final Quality Assurance IR Review

Investigation Electronically Signed By:

12/23/2019



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

*Office of the Regional Director*          *Kansas City, KS 66101*

March 10, 2020

MEMORANDUM FOR   Ken Hyle
                 General Counsel

FROM:            J. E. Krueger
                 Regional Director

SUBJECT:         General Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions

Department of Justice regulations authorize the Director of the Federal Bureau of Prisons (BOP) to select the date and time and the lethal substance for federal executions. 28 C.F.R. § 26.3(a)(1), (a)(4). BOP currently has the ability to acquire the active pharmaceutical ingredient (API) for pentobarbital sodium from a domestic bulk manufacturer. BOP also currently works with a pharmacy (the Pharmacy) to store the API until BOP requests the Pharmacy to compound it into an injectable solution appropriate for use in executions. The Pharmacy is registered as a Human Drug Compounding Outsourcing Facility under Section 503B of the Food, Drug, and Cosmetics Act (FDCA), 21 U.S.C.A. § 353b.[1] Such facilities ordinarily must comply with Current Good Manufacturing Practice (CGMP) requirements, are inspected by the Food and Drug Administration (FDA), and must meet certain other conditions, such as reporting adverse events.[2] The FDA's CGMP regulations require the Pharmacy to subject samples from each batch of compounded injectable solution it produces to quality assurance testing by an independent laboratory to ensure that the batch meets appropriate specifications and statistical quality control criteria before it is released. To date, the Pharmacy has worked with two independent laboratories to conduct such quality assurance testing, which determines whether samples from the same batch of

---

[1] In the event BOP no longer works with a 503B facility, or works with a different 503B facility, to compound the API into an injectable solution, BOP may revise these guidelines as appropriate.

[2] It is the Government's position that the FDCA is inapplicable to lethal injection drugs and that the FDA has no jurisdiction over such drugs. Nevertheless, BOP understands that as a 503B registered pharmacy, the Pharmacy intends to comply with all CGMP requirements, including quality assurance testing, for the pentobarbital injectable solution its compounds for BOP. In addition, BOP believes it prudent to ensure that the injectable pentobarbital solution produced by the Pharmacy passes quality assurance testing before it is used in executions.

injectable solution have returned values within the applicable ranges for pH, potency/purity, particulate count, sterility, and bacterial endotoxin. Although expedition is sometimes possible, BOP understands that in the ordinary course, it takes approximately two to three weeks from the time the Pharmacy receives BOP's order to compound, test, and ship the injectable solution to BOP.

To ensure that quality assurance testing is completed and the results are verified by BOP prior to a scheduled execution, BOP will follow the below guidelines, subject to unforeseen circumstances and to the discretion of the BOP Director:

1. BOP will use a given batch of injectable solution compounded by the Pharmacy if it is already available for use. Injectable solution is "available for use" if (1) its expiration date has not passed; (2) it has passed quality assurance testing conducted by at least one independent laboratory; and (3) BOP has received a copy of the written laboratory report confirming the same.

2. All portions of the quality assurance testing generally should be completed by the same independent laboratory. If any portion of the quality assurance testing returns a value outside of the applicable range, a different independent laboratory may perform the same test (e.g., pH, potency/purity, particulate count, sterility, or bacterial endotoxin) on samples from the same batch. If the second independent laboratory's testing returns a result within the applicable range, samples of the same batch will be re-tested by the first laboratory. If the subsequent retesting by the first laboratory yields a result within the applicable range and both the initial laboratory and the Pharmacy are satisfied that the initial failure is a false result, BOP may use the batch in an execution.

3. If no injectable solution is available for use, BOP will determine whether API needs be produced by the bulk manufacturer, and if it does, BOP will order a sufficient quantity. Such request shall be made as soon as practicable, ordinarily within eighty (80) days prior to the scheduled execution.

4. If the Pharmacy has a sufficient quantity of API, BOP will request that the Pharmacy compound the API into injectable solution. Any such request should occur sixty (60) days prior to the scheduled execution, or as close to sixty (60) days as practicable. If multiple executions are scheduled relatively close in time, efforts may be made, to the extent practicable, to compound the API in a volume large enough for those executions.

5. Once the Pharmacy compounds the API into injectable pentobarbital solution, BOP will ask the Pharmacy to ensure that it is available for use at least thirty (30) days prior to the scheduled execution, or as close to thirty (30) days as practicable.