**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases,<br><br>LEAD CASE: *Roane et al. v. Barr*<br><br>THIS DOCUMENT RELATES TO:<br><br>*Lee v. Barr, et al.*, 19-cv-2559<br><br>*Purkey v. Barr, et al.*, 19-cv-3214<br><br>*Nelson v. Barr, et al.*, 20-cv-557 | Case No. 19-mc-0145 (TSC) |

<u>**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**</u>

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiffs

Dustin Honken, Daniel Lee, Keith Nelson, and Wesley Purkey hereby move the Court to issue a

preliminary injunction barring Defendants from proceeding with their executions pending the

resolution of their challenges to the federal lethal-injection protocol announced in July 2019 (the

2019 Protocol).

As described in more detail in the attached memorandum of points and authorities,

Plaintiffs are likely to succeed on their claims that the 2019 Protocol (1) is arbitrary and

capricious under the Administrative Procedure Act; (2) constitutes cruel and unusual punishment

in violation of the Eighth Amendment to the U.S. Constitution; (3) contravenes the Food, Drug,

and Cosmetic Act and the Controlled Substances Act; and (4) deprives Plaintiffs of their rights to

access the courts and counsel under the First, Fifth, and Sixth Amendments to the U.S.

Constitution.  Moreover, Plaintiffs are likely to suffer irreparable injury in the absence of an

injunction, and the equities weigh in their favor.  They have accordingly satisfied this Court's standard for a preliminary injunction.

In support of this motion, Plaintiffs rely upon the attached memorandum of points and authorities and the evidence cited therein.  A proposed order is also attached.  Oral argument is requested, and Plaintiffs have contemporaneously filed a separate motion requesting an expedited evidentiary hearing including live testimony.

Pursuant to Local Civil Rule 7(m), the undersigned have conferred with counsel for Defendants on the relief sought in this motion and Defendants oppose the motion.


DATED:        June 19, 2020          /s/ Alan E. Schoenfeld
                                     Alan E. Schoenfeld (admitted pro hac vice)
                                     Ryan M. Chabot (admitted pro hac vice)
                                     Wilmer Cutler Pickering Hale and Dorr LLP
                                     7 World Trade Center
                                     250 Greenwich Street
                                     New York, New York 10007
                                     (212) 230-8800
                                     alan.schoenfeld@wilmerhale.com
                                     ryan.chabot@wilmerhale.com

                                     Andres Salinas (DC Bar No. 156118)
                                     Wilmer Cutler Pickering Hale and Dorr LLP
                                     1875 Pennsylvania Avenue NW
                                     Washington, DC 20006
                                     (202) 663-6289
                                     andres.salinas@WilmerHale.com

                                     Counsel for Plaintiff Wesley Purkey

                                     /s/ Pieter Van Tol
                                     Pieter Van Tol (admitted pro hac vice)
                                     Hogan Lovells US LLP
                                     390 Madison Avenue
                                     New York, NY 10017
                                     (212) 918-3000
                                     (212) 918-3100 (fax)
                                     pieter.vantol@hoganlovells.com

David S. Victorson (Bar No. 1027025)
Kathryn Marshall Ali (Bar No. 994633)
Danielle D. Stempel (admitted *pro hac vice*)
Hogan Lovells US LLP
555 13th Street NW
Washington, DC 20004
(202) 637-5600
(202) 637-5910 (fax)
david.victorson@hoganlovells.com
kathryn.ali@hoganlovells.com
danielle.stempel@hoganlovells.com

*Counsel for Plaintiff Daniel Lewis Lee*

/s/ Kathryn L. Clune
Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington D.C. 20004-2595
(202) 624-2705
kclune@crowell.com

Harry P. Cohen (*pro hac vice* pending)
Michael K. Robles (*pro hac vice* pending)
James K. Stronski (*pro hac vice* pending)
Crowell & Moring LLP
590 Madison Avenue
New York, NY 10022
(212) 223-4000
(212) 223-4134 (fax)
hcohen@crowell.com
mrobles@crowell.com
jstronski@crowell.com

Jon M. Sands
Dale A. Baich
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602-382-2816
602-889-3960 (fax)
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*

/s/ *Jon Jeffress*
Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone – 202-640-2850
jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone – 215-928-0520
timothy_kane@fd.org
shawn_nolan@fd.org

*Counsel for Plaintiff-Intervenor Dustin Lee Honken*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases, <br><br> LEAD CASE: *Roane et al. v. Barr* <br><br> THIS DOCUMENT RELATES TO: <br><br> *Lee v. Barr, et al.*, 19-cv-2559 <br><br> *Purkey v. Barr, et al.*, 19-cv-3214 <br><br> *Nelson v. Barr, et al.*, 20-cv-557 | Case No. 19-mc-0145 (TSC) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................................2

ARGUMENT ...................................................................................................................4

I.    Plaintiffs Are Likely To Succeed On The Merits ...............................................5

    A.    The 2019 Protocol Is Arbitrary And Capricious Under The APA.........................5

        1.    Defendants failed to consider the risk that pentobarbital would cause flash pulmonary edema. .............................................................................6

        2.    Defendants failed to consider the problem of IV insertion. .......................10

        3.    Defendants failed to consider the risks associated with compounding pharmacies. ..........................................................................................14

    B.    The 2019 Protocol Violates The Eighth Amendment............................................21

        1.    The 2019 Protocol creates a demonstrated risk of severe pain. .................21

        2.    Plaintiffs have identified two feasible alternatives. ...................................24

    C.    The 2019 Protocol Violates The CSA And FDCA.................................................28

    D.    The 2019 Protocol Deprives Plaintiffs Of Their Right To Counsel .....................33

II.    Plaintiffs Will Suffer Irreparable Harm Without An Injunction.......................................38

III.    The Balance Of The Equities And Public Interest Factors Favor Plaintiffs ....................41

CONCLUSION..................................................................................................................42

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alcestra Therapeutics, Inc. v. Azar*,
    755 F. App'x 1 (D.C. Cir. 2018) (per curiam) .................................................................40

*Allentown Mack Sales & Services, Inc. v. NLRB*,
    522 U.S. 359 (1998) ..........................................................................................................10

*Arthur v. Dunn*,
    137 S. Ct. 725 (2017) ........................................................................................................27

*Athenex Inc. v. Azar*,
    397 F. Supp. 3d 56 (D.D.C. 2019) ..............................................................................30, 31

*Baze v. Rees*,
    553 U.S. 35 (2008) ............................................................................................................10

*Beaty v. FDA*,
    853 F. Supp. 2d 30 (D.D.C. 2012), *aff'd in relevant part sub nom. Cook v. FDA*,
    733 F.3d 1 (D.C. Cir. 2013) ...............................................................................................32

*Bechtel v. F.C.C.*,
    10 F.3d 875 (D.C. Cir. 1993) ..............................................................................................5

*Bounds v. Smith*,
    430 U.S. 817 (1977) ..........................................................................................................33

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1 (D.D.C. 2009) ......................................................................................40

*Brown v. Beck*,
    No. 5:06CT3018 H, 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006) .....................................39

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) ..................................................................................22, 23, 25, 27

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .................................................................................4, 38, 42

*Coe v. Bell*,
    230 F.3d 1358 (6th Cir. 2000) ..........................................................................................34

*Coe v. Bell*,
    89 F. Supp. 2d 962 (M.D. Tenn. 2000) .............................................................................34

*Cooey v. Strickland,*
    No. 2:04-cv-1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011)..........................33, 34, 35

*Cooey v. Taft,*
    430 F. Supp. 2d 702 (S.D. Ohio 2006) ........................................................................39, 41

*Cook v. FDA,*
    733 F.3d 1 (D.C. Cir. 2013)..........................................................................................32

*Department of Homeland Security v. Regents of the University of California,*
    No. 18-587, slip op. (U.S. June 18, 2020) ........................................5, 10, 14, 19

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)......................................................................................................30

*Fishman v. Paolucci,*
    628 F. App'x 797 (2d Cir. 2015) ................................................................................40

*Glossip v. Gross,*
    135 S. Ct. 2726 (2015).........................................................................................21, 24, 28

*Harbison v. Bell,*
    556 U.S. 180 (2009).......................................................................................................33

*In re Federal Bureau of Prisons' Execution Protocol Cases,*
    955 F.3d 106 (D.C. Cir. 2020) (per curiam) ................................................................3, 41

*In re Federal Bureau of Prisons' Execution Protocol Cases,*
    No. 19-5322 (D.C. Cir. May 15, 2020)............................................................................3

*In re Ohio Execution Protocol Litigation,*
    946 F.3d 287 (6th Cir. 2019) ......................................................................................23

*In re Ohio Execution Protocol Litigation,*
    No. 2:11-cv-1016, 2018 WL 3207419 (S.D. Ohio June 29, 2018).....................................24

*Independent Petroleum Association of America v. Babbitt,*
    92 F.3d 1248 (D.C. Cir. 1996) ......................................................................................5

*James Madison Limited by Hecht v. Ludwig,*
    82 F.3d 1085 (D.C. Cir. 1996) ......................................................................................5

*James V. Hurson Associates, Inc. v. Glickman,*
    229 F.3d 277 (D.C. Cir. 2000).......................................................................................5

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016).................................................................................4, 38, 41

*Lewis v. Casey*,
    518 U.S. 343 (1996)..........................................................................................33

*Make the Road New York v. McAleenan*,
    405 F. Supp. 3d 1 (D.D.C. 2019) ................................................................5, 10

*McGehee v. Hutchinson*,
    No. 4:17-cv-00179 KGB, 2017 WL 1381663 (E.D. Ark. Apr. 15, 2017).......................34

*McGehee v. Hutchinson*,
    No. 4:17-cv-00179 KGB, 2020 WL 2841589 (E.D. Ark. May 31, 2020).................34, 35

*Michigan v. EPA*,
    576 U. S. 743 (2015)..........................................................................................19

*Minney v. United States Office of Personnel Management*,
    130 F. Supp. 3d 225 (D.D.C. 2015) ...................................................................41

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ................................................................5, 10, 19, 20

*National Association of Farmworkers Organizations v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980)..........................................................................40

*Nken v. Holder*,
    556 U.S. 418 (2009)......................................................................................38, 41

*Nooner v. Norris*,
    No. 5:06cv00110 SWW, 2006 WL 8445125 (E.D. Ark. June 26, 2006) ..................39, 41

*Northern Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................................41

*Oceana, Inc. v. Pritzker*,
    126 F. Supp. 3d 110 (D.D.C. 2015) ....................................................................6

*Open Communities Alliance v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................................40

*Osorio-Martinez v. Attorney General United States of America*,
    893 F.3d 153 (3d Cir. 2018)..............................................................................42

*Perez v. Mortgage Bankers Association*,
    575 U.S. 92 (2015)............................................................................................5

*Ringo v. Lombardi*,
    706 F. Supp. 2d 952 (W.D. Mo. 2010) ..............................................................33

*United States v. Dawara*,
  No. CR 19-414-1, 2020 WL 2404898 (E.D. Pa. May 12, 2020) ......................................36

*Wainwright v. Booker*,
  473 U.S. 935 (1985)........................................................................................................38

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
  475 F.3d 319 (D.C. Cir. 2006)........................................................................................19

*Wolff v. McDonnell*,
  418 U.S. 539 (1974)........................................................................................................33

## DOCKETED CASES

*Bourgeois v. United States Department of Justice*,
  No. 1:12-cv-00782-TSC (D.D.C.) ...................................................................................12

*In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-5322 (D.C. Cir.)...............41

*Purkey v. Barr*, No. 1:19-cv-03570 (D.D.C.) .................................................................24

*Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C.) ........................................12, 42

*Taylor v. Apothecary Shoppe, LLC*, No. 4:14-cv-00063 (N.D. Okla.)...........................17

## STATUTES, RULES, AND REGULATIONS

21 C.F.R. § 1308.12 ........................................................................................................29

5 U.S.C.
  § 702(2)(A) ....................................................................................................................28
  § 706(2)(A) ......................................................................................................................5

18 U.S.C. § 3599 ............................................................................................................33

21 U.S.C.
  § 353(b)(1) ....................................................................................................................30
  § 353b.....................................................................................................................30, 31
  § 353b(a)(2)(A) ............................................................................................................30
  § 353b(a)(5) ..................................................................................................................30
  § 353b(d)(2)(A) ............................................................................................................31
  § 353b(d)(2)(B) ............................................................................................................31
  § 802(10) .......................................................................................................................29
  § 802(21) .......................................................................................................................29
  § 802(27) .......................................................................................................................29
  § 829(a) .........................................................................................................................29
  § 829(e)(2) .....................................................................................................................29
  § 841(a)(1) .....................................................................................................................29

Miss. Code Ann. § 99-19-51(4) ....................................................................28

Okla. Stat. tit. 22 § 1014(D)........................................................................28

Utah Code Ann. § 77-18-5.5........................................................................28

## OTHER AUTHORITIES

503B Bulks List, https://www.fda.gov/media/120692/download (last visited June 19, 2020) .....31

American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003) ............................................................36

*BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 19, 2020)...........36

Bowdle, *Vascular Complication of Central Venous Catheter Placement: Evidence-Based Methods for Prevention and Treatment*, 28 J. Cartiothor. Vasc. Anesth. 358 (2014) .......26

Connor, *Doyle Lee Hamm Wished for Death During Botched Execution, Report Says*, NBC NEWS (Mar. 5, 2018), https://www.nbcnews.com/storyline/ lethalinjection/doyle-lee-hamm-wished-death-during-botched-execution- report-says-n853706 .......................................................................12

Connor, *Ohio Cancels Execution of Alva Campbell After Failing to Find Vein*, NBC NEWS (Nov. 15, 2017), https://www.nbcnews.com/storyline/lethal-injection/ohio-set- execute-inmate-alva-campbell-who-needs-wedge-pillow-n820956;...............................12

*COVID-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 19, 2020) ........................................36

Eckholm, *One Execution Botched, Oklahoma Delays the Next*, N.Y. TIMES (Apr. 29, 2014), https://www.nytimes.com/2014/04/30/us/oklahomaexecutions.html ..............................11

FDA Drug Shortages, https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm (last visited June 19, 2020) ...........................................................31

*Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited June 19, 2020) .......................................................36

Hunzinger, *Secret Sedative: How Missouri Uses Pentobarbital in Executions*, St. Louis Public Radio (Aug. 18, 2017), https://news.stlpublicradio.org/post/secret-sedative- how-missouri-uses-pentobarbitalexecutions.........................................................17

McDaniel, *Inmates Said The Drug Burned As They Died. This Is How Texas Gets Its Execution Drugs*, Buzzfeed News (Nov. 28, 2018), https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas...............................................................15, 16

McDaniel, *Missouri Execution Drug Purchases Revealed*, Buzzfeed News (Jan. 8, 2017), https://www.buzzfeednews.com/article/chrismcdaniel/missouri-execution-drug-purchases-revealed.............................................................................................................20

Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (2014).............28

Scott, *Georgia Department of Corrections Using Compounding Pharmacy for Execution Drug*, WABE (July 11, 2013), https://www.wabe.org/georgia-department-corrections-using-compounding-pharmacy-execution-drug .........................32

Technical Manual of Utah Department of Corrections (Ex. H), http://cdn.muckrock.com/foia_files/2017/03/22/3-13-17_MR34278_RES.pdf...............28

Last November, this Court preliminarily enjoined the executions of Alfred Bourgeois, Dustin Lee Honken, Daniel Lewis Lee, and Wesley Ira Purkey.  All four men were scheduled to be executed under a new federal lethal-injection execution protocol (the "2019 Protocol" or the "Protocol") announced on the same day the executions were scheduled.  This Court held, however, that the 2019 Protocol likely contravened the Federal Death Penalty Act ("FDPA"), that movants would suffer irreparable harm in the absence of relief, and that the equities favored an injunction.  A fractured panel of the D.C. Circuit vacated that injunction in April 2020.  A petition for certiorari seeking to vindicate this Court's view is now before the U.S. Supreme Court.  Just days after the court of appeals issued its mandate, however, the government set new execution dates: Mr. Lee on July 13, 2020, Mr. Purkey on July 15, 2020, and Mr. Honken on July 17, 2020.  The government did not set a new execution date against Mr. Bourgeois, but did set an execution date against Keith Dwayne Nelson[1] for August 28, 2020.[2]

When first enjoining the executions, this Court considered the merits of only the FDPA claim.  But Plaintiffs are also likely to succeed on their other claims: that the 2019 Protocol was an arbitrary and capricious agency action in violation of the Administrative Procedure Act ("APA"); that it violates the Eighth Amendment to the U.S. Constitution; that it contravenes the Food, Drug, and Cosmetic Act ("FDCA") and the Controlled Substances Act ("CSA"); and that it violates the prisoners' right to access the courts and counsel in violation of the First, Fifth, and Sixth Amendments to the U.S. Constitution (a problem that has only been exacerbated by the COVID-19 crisis and the resulting inability of Plaintiffs to confer with counsel).  And, as this

---

[1] BOP failed to comply with the 90-day notice requirement in setting Mr. Nelson's execution date.  Mr. Nelson has moved to strike the execution notice and reserves all rights.

[2] Mr. Honken, Mr. Lee, Mr. Purkey, and Mr. Nelson are referred to collectively as "Plaintiffs."

Court has already concluded once, Plaintiffs' irreparable harm and the balance of equities weigh against allowing the government to execute Plaintiffs while their claims are pending.  That conclusion is unaffected by the D.C. Circuit decision and applies equally here on the current record.  Plaintiffs, therefore, respectfully request that the Court enjoin their executions pursuant to the 2019 Protocol while their remaining claims are resolved.[3]

## BACKGROUND

In July 2019, the Bureau of Prisons ("BOP") announced a new execution procedure for carrying out federal death sentences using a lethal injection of the barbiturate pentobarbital.  It simultaneously scheduled execution dates in December 2019 and January 2020 for five death-sentenced prisoners.[4]

A challenge to the prior federal execution protocol had been pending before this Court since 2005.  When Mr. Lee, Mr. Purkey, Mr. Bourgeois, and Mr. Honken brought challenges to the government's newly announced procedure, this Court consolidated the cases in this single action.  All four sought preliminary injunctions to prevent the government from executing them while the legality of the 2019 Protocol was adjudicated.  They sought relief on several grounds, including that: (1) the 2019 Protocol violates the FDPA, which does not permit the creation of a uniform federal protocol implemented by BOP and instead requires the United States Marshals Service ("USMS") to implement death sentences as prescribed by state law; (2) Defendants violated the APA by failing to undertake notice-and-comment rulemaking; (3) the 2019 Protocol is arbitrary and capricious in violation of the APA in that it fails to consider important aspects of the problem; (4) the 2019 Protocol fails to comply with the FDCA and the CSA; and (5) the 2019

---

[3] In accordance with the Court's order dated February 19, 2020, *see* Dkt. #81, Mr. Lee has also submitted supplemental briefing that discusses issues particular to him.

[4] Mr. Mitchell's execution was later stayed in separate proceedings.

Protocol is unconstitutional because it will inflict unnecessary and excruciating pain amounting to cruel and unusual punishment in violation of the Eighth Amendment.

In November 2019, this Court granted a preliminary injunction, finding likelihood of success on the merits of the claim that the 2019 Protocol violates the FDPA, that movants would suffer irreparable harm in the absence of relief, and that the equities favored movants.  *See* Dkt. #50 ("P.I. Op.").  Having found a likelihood of success on the FDPA claim, this Court did not address the remaining claims on which movants had sought preliminary injunctive relief.  *Id.*

In April 2020, a divided D.C. Circuit panel vacated the preliminary injunction.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020) (per curiam) ("*In re FBOP*").  In a per curiam opinion joined by Judges Katsas and Rao, and over a dissent from Judge Tatel, the court held that the "primary FDPA claim"—based on the requirement to implement federal executions in the manner provided by state law—failed on the merits.  *See id.* at 112 (per curiam).  The two judges reached this conclusion for different reasons, which they explained in separate concurrences, but Judge Katsas joined those portions of Judge Rao's opinion necessary to produce a majority on the interpretation of "law of the State" and the Protocol.  *See id.* at 113-121 (Katsas, J., concurring); *id.* at 129-133 (Rao, J., concurring).  In addition, Judges Katsas and Rao rejected the notice-and-comment claim on the merits, concluding that the 2019 Protocol is exempt from the APA's notice-and-comment requirement—notwithstanding that this Court had not ruled on that claim.  *Id.* at 112 (per curiam).  The panel explicitly declined to reach the FDCA and CSA claims, and it acknowledged that those and the other remaining claims "would remain open on remand."  *Id.* at 113.  The en banc court denied a petition for rehearing, despite Judge Tatel deeming the case "en banc worthy."  Order, *In re*

*FBOP*, No. 19-5322 (D.C. Cir. May 15, 2020) (Statement of Tatel, J.).  A petition for a writ of certiorari seeking review of the D.C. Circuit's decision is now pending.[5]

In this Court, plaintiffs in the consolidated action filed a single amended complaint on June 1.  The amended complaint asserts eleven claims, including that the 2019 Protocol is arbitrary and capricious under the APA; that the Protocol violates the Eighth Amendment's ban on cruel and unusual punishment; that the Protocol is not in accordance with law because it violates both the CSA and the FDCA; and that the Protocol violates Plaintiffs' right to counsel under the First, Fifth, and Sixth Amendments.  *See* Am. Compl. ¶¶ 122-126, 135-142, 159-166, 186-191 (Dkt. #92).

On June 15, the next business day after the D.C. Circuit's mandate issued, Defendants scheduled Plaintiffs' executions for mid-July and August.  Plaintiffs now move for a preliminary injunction so that Defendants cannot execute them before their claims are adjudicated.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted).  The moving party must show (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of relief; (3) that the balance of the equities weighs in his favor; and (4) that an injunction is in the public interest.  *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).  That standard is met here.

---

[5] Plaintiffs reserve the right to seek relief from this Court in relation to their FDPA and notice-and-comment claims if the Supreme Court grants their petition for certiorari and vacates any aspect of the D.C. Circuit's decision.  *See* Am. Compl. ¶¶ 143-155 (Dkt. #92).

I.      **Plaintiffs Are Likely To Succeed On The Merits**

A.      **The 2019 Protocol Is Arbitrary And Capricious Under The APA**

Plaintiffs are likely to succeed on their claim that Defendants acted arbitrarily and capriciously in promulgating the 2019 Protocol.  *See* Am. Compl. ¶¶ 159-166 (Count VIII).  The APA provides that an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" must be "h[e]ld unlawful and set aside."  5 U.S.C. § 706(2)(A).  Every agency action is subject to the strictures of arbitrary and capricious review, regardless of whether notice and comment is required.  *See generally Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-106 (2015); *see also, e.g.*, *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 279 (D.C. Cir. 2000) (permitting plaintiff to amend complaint to assert arbitrary and capricious claim against a procedural rule exempt from notice-and-comment requirement); *Indep. Petrol. Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1256-58 (D.C. Cir. 1996) (agency letter exempt from notice-and-comment requirement was nevertheless arbitrary and capricious); *Bechtel v. F.C.C.*, 10 F.3d 875, 887 (D.C. Cir. 1993) (same, for policy statement exempt from notice and comment).

As the Supreme Court recently reaffirmed, an agency's decision is arbitrary and capricious when, among other things, the agency has "entirely failed to consider [an] important aspect of the problem."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, slip op. at 23 (U.S. June 18, 2020) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  This Court may consider "background information" outside the administrative record "in order to determine whether the agency considered all of the relevant factors."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *see also, e.g.*, *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 53 (D.D.C. 2019) (relying on "supporting declarations" in determining that an agency's action was arbitrary and capricious for

failing to consider several important aspects of the problem); *Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 113 (D.D.C. 2015) (extra-record evidence may be considered where "the agency … failed to examine all relevant factors" (internal quotation marks and citation omitted)).  This makes sense, as the administrative record necessarily will not include information about aspects of the problem the agency has failed to consider.

Here, the 2019 Protocol is arbitrary and capricious because Defendants failed to consider at least three important issues associated with the procedures outlined in the federal death-penalty Protocol: the risk that pentobarbital risk will cause flash pulmonary edema, an excruciating condition akin to drowning; the risks associated with IV insertion; and the risks of obtaining pentobarbital from a compounding pharmacy.

1. **Defendants failed to consider the risk that pentobarbital would cause flash pulmonary edema.**

Selecting pentobarbital as an execution drug without considering the risk that it will cause acute "flash" pulmonary edema in prisoners is arbitrary and capricious.  *See* Am. Compl. ¶¶ 76-83, 163.  As reflected in the Administrative Record, the Protocol adopts a single-drug pentobarbital protocol "because of the complications inherent in obtaining multiple drugs," pentobarbital's "widespread use by the states," and its "acceptance by many courts."  AR 871. BOP purportedly reached this conclusion after observing state executions and consulting with medically trained personnel.  *See id.*  But Defendants' review was grossly insufficient.  Indeed, had Defendants performed a complete review of state executions and qualified medical expert opinions—which has developed a substantial body of research regarding pentobarbital and its effects, following widespread use of that drug in executions—they would have recognized that use of pentobarbital as a lethal-injection drug raises serious risk of flash pulmonary edema.

Flash pulmonary edema is an excruciating drowning sensation caused by foam or froth in the airways.  As anesthesiologist and pain specialist Dr. Gail A. Van Norman explains, it results from the "direct toxic/caustic damage to the lung capillaries as extremely high concentrations of barbiturates (which are highly alkaline and caustic)"—such as pentobarbital—"make physical contact with the lung and capillary surfaces, causing immediate leakage of fluid through the damaged capillaries into the lungs."  Decl. of Dr. Gail A. Van Norman at 32 (Dkt. #24). Similarly, pathologist and neuropathologist Dr. Mark A. Edgar explains that "[p]entobarbital may also be producing … pulmonary edema during lethal injection executions as the result of injection of a high volume of alkaline solution which travels from a peripheral vein, then to the right side of the heart, and then directly to the lungs."  Decl. of Dr. Mark A. Edgar at 19-20 (Dkt. #29-3).  Flash pulmonary edema produces "foam or froth in the … airways (bronchi and trachea) resulting from the mixture of air, edema fluid, and pulmonary surfactant."  *Id.* at 4.  This causes "obstruction or partial obstruction of the upper airway … while respiratory efforts continue against the obstruction or partial obstruction, 'sucking' fluids from the capillaries into the lung air spaces."  Van Norman Decl. at 32.

Flash pulmonary edema occurs "virtually immediately during and after high-dose barbiturate injection"—before prisoners become insensate.  Van Norman Decl. at 36.  Thus, conscious and sensate prisoners experience "sensations of drowning and asphyxia" that "result in extreme pain, terror and panic."  Edgar Decl. at 21.  Indeed, "[n]ot being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man," during which "[p]anic and terror, and the attempt to fight take over."  Van Norman Decl. at 34. This sensation "is deliberately elicited in 'the enhanced interrogation technique' called waterboarding, which is defined by the European Court of Human Rights as a form of torture."

*Id.*  The feeling is so painful that "[e]ven human beings who are underwater will reach such a level of agony that they will be compelled to take a 'breath' within about 1 minute."  *Id.* (emphasis omitted).

Injection of a single dose of pentobarbital makes flash pulmonary edema nearly certain. Review of over two dozen autopsy reports shows "a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of … injection of 5 grams of pentobarbital."  Van Norman Decl. at 7; *see also* Edgar Decl. at 18 ("[A]t least two-thirds of autopsies showed findings consistent with development of acute pulmonary edema during execution by lethal injection with pentobarbital.").  Witnesses confirmed what those autopsies showed:  Before losing consciousness, prisoners injected with a single dose of pentobarbital experienced acute symptoms of pulmonary edema, including burning sensations, labored breathing, gasping, and other signs of severe pain and respiratory distress.  *See* Edgar Decl. at 18-21.  There is thus an "extremely high risk" that the 2019 Protocol will "caus[e] prisoners severe pain, and [it] is virtually certain to cause prisoners excruciating suffering through their awareness of the sensations of suffocation and drowning caused by pulmonary edema."  Van Norman Decl. at 6-8.

These experiences are consistent with the medical profession's current understanding of the effects of barbiturates like pentobarbital—that they diminish *responsiveness* rather than *consciousness*.  Although outdated "traditional textbooks and authors report that the inhibitory effects of barbiturates cause 'unconsciousness,'" "authoritative publications now describe barbiturates as producing 'unresponsiveness,' since how, and even whether, they affect consciousness is under serious question."  Van Norman Decl. at 13; *see also id.* at 22-23, 28-29. The distinction between unresponsive and unconscious prisoners is crucial:  "[E]ven when the

patients appear to be unconscious by all clinical measures and are unresponsive … consciousness will permit extreme pain and suffering during the execution process."  *Id.* at 7.

Despite this risk, Defendants failed to consider the likelihood that pentobarbital would cause flash pulmonary edema and—because the prisoner is sensate when it occurs—a torturous death.  In the Administrative Record's approximately 345 pages of expert material, there is not a single reference to pulmonary edema.  Nowhere does the Administrative Record account for the most recent medical studies on the inability of barbiturates to render a person insensate.  The only expert material that directly addresses the BOP's execution protocol is a brief letter from Dr. Craig W. Lindsley that contains, in total, less than a single page of substantive opinion.  *See* AR 525-526.  And that opinion—that "the draft protocol" Dr. Lindsley was provided for review in 2017 "*does not* present a risk that its application is sure or very likely to cause serious illness and needless suffering," AR 526—never mentions the risk of pulmonary edema.  Indeed, it has no supporting documentation or analysis.  The more than 340 remaining pages of medical expert material referenced in the Administrative Record concern the opinions of Dr. Joseph F. Antognini in other cases involving different state protocols, many of which do not use pentobarbital.  But Dr. Antognini is not an expert on the effects of pentobarbital, *see* AR 485, 493, and he has not produced a report on the 2019 Protocol—despite having apparently offered to do so.  *See* AR 872.  And, again, not one of Dr. Antognini's opinions accounts for flash pulmonary edema.

Defendants' failure to engage with contemporary medical research and to consider, or even acknowledge, the excruciating pain that their choice of lethal-injection drug will cause demonstrates a failure to consider an important aspect of the problems associated with creating a lethal-injection protocol.  "[I]t is the very definition of arbitrariness in rulemaking if an agency

refuses to acknowledge (or fails to obtain) the facts and figures that matter prior to exercising its discretion to promulgate a rule." *Make the Road N.Y.*, 405 F. Supp. 3d at 60.

Defendants have previously argued that they were not required to consider any specific medical risk, so long as the Protocol satisfies the requirements of the Eighth Amendment. *See, e.g.*, Dkt. #36 at 30-38, 41-43. That argument conflates the APA's procedural standards and the Eighth Amendment's substantive standards. Under the APA, "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but *the process* by which it reaches the result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (emphasis added). Irrespective of whether the 2019 Protocol complies with the Eighth Amendment (it does not, *see infra* pp. 21-28), Defendants failed to consider whether the Protocol they developed would cause a foreseeable risk that condemned prisoners will experience unnecessary, unreasonable pain and suffering due to the administration of a five-gram dosage of pentobarbital. That is clearly an "important aspect of the problem." *State Farm*, 463 U.S. at 43. Defendants' failure to consider it renders the Protocol arbitrary and capricious. *See Regents*, slip op. at 23 (the failure to discuss or consider a "legally distinct" issue renders an agency's "decision arbitrary and capricious").

### 2.    Defendants failed to consider the problem of IV insertion.

The 2019 Protocol is also arbitrary and capricious because Defendants failed to address the risk of faulty IV-line placement. *See* Am. Compl. ¶¶ 99-108.

Setting an IV line is a delicate, complicated, and invasive procedure that requires skill, experience, and training. *Cf. Baze v. Rees*, 553 U.S. 35, 55 (2008) (plurality op.) ("[t]he most significant" safeguard in Kentucky's protocol is the requirement that "members of the IV team" have sufficient experience). Ensuring that IV access is properly established, functioning,

maintained, and monitored is essential to ensure that lethal injection will bring about death in a humane and constitutional manner.  *See* Am. Compl. ¶¶ 99-100; *cf.* Van Norman Decl. at 38.

Improper IV insertion, on the other hand, is likely to cause "either significant pain from protracted IV access attempts, severe or excruciating pain from injection of barbiturate into tissues other than veins, and/or prolongation of the execution process due to incomplete delivery of drug into the vein."  Van Norman Decl. at 8.  Specifically, improper IV insertion may lead to infiltration (in which the drug is injected or bursts into the surrounding tissue instead of the prisoner's vein) or extravasation (leakage of the drug into the surrounding tissue).  *See id.* at 36-37.  Extravasation and infiltration often cause "significant, excruciating pain for prisoners," including "instant, excruciating pain that patients liken to being set on fire."  *Id.* at 8, 36.  Moreover, arterial injection (injection of pentobarbital into an artery instead of a vein) may result in "instant arterial spasm, pain, excruciating local tissue destruction, and also immediate ischemia (i.e., lack of oxygen, tissue damage and necrosis) in the area of the body supplied by the artery."  *Id.* at 36.  Infiltration, extravasation, and arterial injection "can result in slow suffocation if only partial injection is achieved, and a lingering and extremely painful death, and/or failure of the execution altogether."  *Id.* at 41.  "All complications are significantly affected by the experience of the person placing the line."  *Id.* at 37.

IV-insertion issues have caused numerous complications in recent executions.  *See* Am. Compl. ¶¶ 106-107.  For example, at the well-publicized Clayton Lockett execution in 2014, the executioners did not place the femoral IV correctly, and Mr. Lockett regained consciousness before dying.[6]  In addition, in Ohio (2017) and Alabama (2018), prison personnel had to call off

---

[6] *See* Eckholm, *One Execution Botched, Oklahoma Delays the Next*, N.Y. TIMES (Apr. 29, 2014), https://www.nytimes.com/2014/04/30/us/oklahomaexecutions.html.

the executions of Alva Campbell and Doyle Lee Hamm after trying unsuccessfully for an

extended period of time to set their IVs.[7]  Other prisoners have experienced "excruciating pain"

and a delayed execution from kinked tubing and an improperly inserted IV needle, Compl.,

*Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C. filed Dec. 6, 2005), Dkt. #1 ¶ 45(c);

suffered a prolonged execution due to a clogged IV tube that could have been prevented by

"proper procedures taught in 'IV 101,'" *id*. ¶ 45(f); and "grimac[ed]" and "tried to mouth words"

for 34 minutes before being declared dead as a result of a needle that improperly injected

chemicals into soft tissue, rather than into a vein, Compl., *Bourgeois v. United States Dep't of*

*Justice*, No. 1:12-cv-00782-TSC (D.D.C. filed May 15, 2012), Dkt. #1 ¶ 59(k).

 In short, IV insertion is an important consideration for a lethal-injection protocol.  It

should go without saying that a lethal-*injection* protocol should consider how the injection will

occur—particularly given the frequency with which such injections go awry, and the well-

documented and horrendous consequences that occur as a result.  But the Administrative Record

disregards the IV-setting process entirely and reveals no consideration of procedures to mitigate

the risks associated with that process.  *See* Am. Compl. ¶ 102.

 The Protocol states only that the Director of the BOP or his unspecified "designee" will

determine the means of venous access "(1) based on the training and experience of personnel

establishing the [IV] access; (2) to comply with specific orders of federal courts; or (3) based

---

[7] *See* Connor, *Ohio Cancels Execution of Alva Campbell After Failing to Find Vein*, NBC
NEWS (Nov. 15, 2017), https://www.nbcnews.com/storyline/lethal-injection/ohio-set-execute-
inmate-alva-campbell-who-needs-wedge-pillow-n820956; Connor, *Doyle Lee Hamm Wished for*
*Death During Botched Execution, Report Says*, NBC NEWS (Mar. 5, 2018),
https://www.nbcnews.com/storyline/ lethalinjection/doyle-lee-hamm-wished-death-during-
botched-execution-report-says-n853706.

upon a recommendation from qualified personnel."  2019 Addendum ¶ H (AR 1069-1070).  The Protocol contains no criteria or requirements regarding, among other things:

- the manner in which the IV catheters are to be inserted (for example, whether to establish peripheral or central line access or perform a cut-down), whether there is an order of preferred access sites, whether there is a time limit for establishing IV access, whether there is a limit on the number of times the team can attempt IV access, and how disagreements among execution team members are to be resolved;

- requirements to ensure that the team member responsible for the critical task of determining the method of venous access has sufficient and appropriate training, experience, and qualifications to undertake the task, *see* Decl. of Alan E. Schoenfeld, Ex. 1 (Nov. 15, 2019 Deposition of Rick M. Winter ("Nov. 2019 Winter Dep.")) at 162:20-163:4 (acknowledging that nothing in the protocol requires that the person starting the IV-line have significant experience); *see also* 2019 Addendum ¶ D (requiring certain professionals to have one year of experience and requiring non-medically licensed or certified qualified personnel to participate in rehearsals, but not specifying who will set the IV and why that person is qualified to do so);

- the manner in which the prisoner will be monitored to ensure that he or she is anesthetized and insensate during the entire execution process, or the qualifications and expertise required for the person monitoring; or

- the manner in which the IV tubing, three-way valve, saline solution, or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that

13

shall be used in exercising this discretion.

The 2019 Protocol also allows the training and experience of the execution team member placing the IVs to change from one execution to the next, and it does not require that person to take into account the prisoner's unique physical, health, and medical conditions, including the viability or sufficiency of his veins, in order to determine the appropriate means of venous access.

As these failures demonstrate, the 2019 Protocol lacks requirements and safeguards to ensure that IV access is properly established and maintained throughout the execution. Instead, the Protocol leaves myriad critical questions regarding IV insertion unanswered and unconsidered. In light of the severe risk of excruciating pain posed by improper IV insertion, Defendants' failure to consider this important aspect of the problem renders the 2019 Protocol arbitrary and capricious. *See Regents*, slip op. at 23.

### 3. Defendants failed to consider the risks associated with compounding pharmacies.

Defendants intend to use an active pharmaceutical ingredient ("API") that will be compounded into injectable pentobarbital in Plaintiffs' executions. *See* AR 872. But the Administrative Record indicates that Defendants did not adequately consider the well-documented problems associated with compounding pharmacies. *See* Am. Compl. ¶¶ 87-98.

Compounding pharmacies face far less regulation and oversight than manufacturers of FDA-approved drugs. In general, "[t]he FDA regulates virtually all commercial pharmaceutical manufacturing to assure safety, consistency, and quality." Van Norman Decl. at 43. States, however, are the traditional regulators of pharmacies that compound drugs, *i.e.*, "mix pharmaceuticals into a patient-ready product." *Id.* Pharmacies have traditionally been permitted to manufacture drugs in this way to "produce a formulation of a drug which fits a single patient's specialized needs," such as when a patient is allergic to a preservative in the manufacturer's

14

formulation.  *Id.*  Due to the reduced oversight, compounding pharmacies—including those used to compound drugs for executions at the state level—are routinely found to have engaged in prohibited conduct, including "keeping out-of-date drugs in stock, using improper procedures to prepare IV solutions, and inadequate cleaning of hands and gloves."[8]  Drugs produced by compounding pharmacies pose a higher risk to patients than do FDA-approved products because they have not been tested for safety and efficacy and they are typically not made pursuant to the same quality standards.  *See, e.g.*, Van Norman Decl. at 8, 43-50.  Experts in the field have explained that "[d]rugs obtained from compounding pharmacies are very likely to suffer from quality issues, the most common of which is lack of potency."  *Id.* at 8; *see also id.* at 46 (in an FDA test of 29 compounded drugs from 12 compounding pharmacies, 34% of the drugs "failed quality testing, most for substandard potency," compared to "a less than 2% failure rate among over 3000 FDA-approved drugs tested from a similar period").  Use of subpotent drugs in executions "vastly increases the risk that execution will be prolonged and the prisoner will suffer prolonged feelings of pain and suffocation."  *Id.* at 8.  As Doctor of Pharmacy Michaela Almgren describes, the use of a subpotent drug increases the risk of severe pain and harm because it "would not have the pharmacological effect as expected, potentially leading to the prisoner's prolonged suffering as a result."  Decl. of Michaela Almgren (Dkt. #26-15) at 8.

The risk that pentobarbital obtained from a compounding pharmacy will be subpotent is particularly acute.  *See* Am. Compl. ¶¶ 93-94.  That is because "[t]he process for compounding pentobarbital is complex" and requires "extensive parenteral compounding experience in order to

---

[8] McDaniel, *Inmates Said The Drug Burned As They Died.  This Is How Texas Gets Its Execution Drugs*, BUZZFEED NEWS (Nov. 28, 2018), https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas.

be able to prepare this drug correctly."  Almgren Decl. at 2.  Even minor deviations from a detailed and technical procedure can change the acidity of the drug solution, and "[a]ny changes in pH can cause precipitation out of the solution, formation of suspension and a change in … potency."  *Id.* at 2-3.  Prevention of these problems requires careful attention to the compounding procedures and logs to ensure that the drug is "properly prepared and is safe to be used without unnecessary suffering to the prisoner"—a task compounding pharmacies have proven incapable of doing.  *Id.* at 4.

The limited criteria Defendants have set forth for choosing a pentobarbital supplier has not mitigated any of these risks.  To the contrary, the Department of Justice and the Office of the Attorney General have testified that the chosen compounding facility had no previous experience compounding pentobarbital.  *See* Schoenfeld Decl., Ex. 2 (January 29, 2020 Deposition of Brad Weinsheimer ("Weinsheimer Dep.")), at 217:2-5.  Indeed, the quality of at least one batch of Defendants' compounded pentobarbital—which they intended to use in Plaintiffs' executions as scheduled in December 2019 and January 2020—has been called into question.  *See id.* at 199:1-5, 243:2-10.

Use of subpotent or improperly compounded pentobarbital in executions can cause—and recently has caused—"prolonged death in which the prisoner may suffer the experience of suffocation, drowning, other otherwise severe respiratory distress."  Almgren Decl. at 4; *see also id.* ("A change in pH of the drug due to improper storage can lead to extreme pain during the injection stage of the execution and suffering of the prisoner.").  In 2018, five people who were executed in Texas through the use of compounded pentobarbital said that they felt as if they were burning before they finally died, indicating that the drug used was subpotent.[9]  In 2015, Georgia

_____

[9] *See* McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets its*

canceled an execution because the compounded pentobarbital came out of suspension and was therefore unusable.[10]  Similarly, Michael Lee Wilson in Oklahoma exclaimed during his execution (which was administered with compounded drugs) that he felt his "whole body burning."  *See* Compl. Ex. 4, *Taylor v. Apothecary Shoppe, LLC*, No. 4:14-cv-00063 (N.D. Okla. filed Feb. 11, 2014), Dkt. #2, Decl. of Dr. Larry D. Sasich ¶ 60.  And when Eric Robert was executed in South Dakota using solely compounded pentobarbital, witnesses reported that he appeared to clear his throat and gasp heavily, at which point his skin turned bluish-purple.  He opened his eyes and they remained open until his death; his heart continued to beat for ten minutes after his breathing ceased.  *See id.* ¶¶ 61-62.  All of these reactions are consistent with the use of a contaminated or subpotent drug.

This information was available to Defendants when they were formulating the Protocol. But the Administrative Record indicates that Defendants never considered these risks at all.  The Administrative Record provides virtually no information about how the pentobarbital that Defendants propose to use will be compounded or how that process will be overseen.  *See* Am. Compl. ¶¶ 95-98.  In particular, the 2019 Protocol fails to ensure that the pentobarbital is properly compounded in accordance with applicable standards and best practices.  It omits any discussion of: the quality of the API; the formulation recipe; the procedures by which the drug has been or will be compounded; the ingredients and their concentrations; the equipment used and how that equipment is maintained and calibrated; or the contents of "compounding logs" that

---

*Execution Drugs*, BUZZFEED NEWS (Nov. 28, 2018), https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas.

[10] *See* Hunzinger, *Secret Sedative: How Missouri Uses Pentobarbital in Executions*, St. Louis Public Radio (Aug. 18, 2017), https://news.stlpublicradio.org/post/secret-sedative-how-missouri-uses-pentobarbitalexecutions.

include the criteria used to determine the beyond use date, a master work sheet containing storage requirements, and documentation of performance of quality control procedures. *See* Almgren Decl. at 4. Without that information, it is impossible to verify that the pentobarbital has been properly compounded and is "safe to be used without causing unnecessary suffering to the prisoner." *Id.*; *see also* Van Norman Decl. at 8 & 41.

The Administrative Record provides bare information that Defendants have a domestic source for the API that will be compounded into injectable pentobarbital at an unnamed U.S. facility, *see* AR 872, but says nothing more about where or how the pentobarbital API will be produced. And although the Record includes some testing data, *see* AR 970-1015, it is so ill-defined and vague that no conclusions can be drawn from it. As one expert aptly summarized:

> The Manual lacks guidance on how is the quality of the [pentobarbital] going to be monitored, when is it to be tested, who will test it, what happens if the reports show that the quality of [pentobarbital] is outside of acceptable range, who reviews the pharmacy compounding records, who determines that the pharmacy selected to perform the compounding has the expertise to perform the compounding, who reviews the analytical records from the outside laboratory performing testing of the prepared drug, how to address any quality issues, storage conditions log, compounding pharmacy log, etc.

Almgren Decl. at 10. Failure to consider these important problems renders the Protocol arbitrary and capricious.

Now seemingly aware of the deficiencies, Defendants recently supplemented the Record with a two-page memorandum dated March 10, 2020—over seven months after the Protocol was initially announced—clarifying that Defendants will use a compounding pharmacy that will comply with the FDA's Current Good Manufacturing Practice requirements and employ undefined quality assurance testing procedures that will be "verified by BOP prior to a scheduled execution." AR 1084-1085. But Defendants' reliance on this memorandum is insufficient to establish that they engaged in reasoned decision-making, for several reasons.

18

First, the memorandum cannot salvage Defendants' deficient decision-making process because it was developed well after the 2019 Protocol was announced.  "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked *when it took the action*.'"  *Regents*, slip op. at 13 (quoting *Michigan v. EPA*, 576 U. S. 743, 758 (2015)) (emphasis added).  "[A]gency rationales developed for the first time during litigation do not serve as adequate substitutes."  *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (quotation marks omitted).  This is "particularly [true] when so much is at stake."  *Regents*, slip op. at 17 (discussing rescission of DACA.  The March 10 memorandum therefore does not demonstrate that Defendants *actually* "consider[ed] [this] important aspect of the problem."  *State Farm*, 463 U.S. at 43.

Second, as Defendants concede, the March 10 memorandum is, on its face, non-binding. *See* AR 1084-1085 & n.1; Schoenfeld Decl., Ex. 3 (May 12, 2020 Deposition of Rick M. Winter ("May 2020 Winter Dep.")) at 75:23-25 ("Q: And does this memo bind the BOP Director? A: No.); *id.* at 76:2-5 ("Q: So does that mean that the BOP director has the discretion to deviate from the five guidelines articulated on page 5 [of Exhibit 20]? A: Yes, that's exactly what that means.").  The memorandum therefore offers no assistance in determining what procedures and safeguards will *actually* be observed in order to prevent botched executions with subpotent drugs.

Third, the memorandum still does not provide any information on the compounding procedure to be employed in the first place.  There is therefore no way to know that Defendants have adequately addressed the above-described "critical errors" that could easily result from the use of compounded drugs.  Van Norman Decl. at 50.

19

More generally, the Administrative Record nowhere justifies a need to use compounded drugs in the first instance, as opposed to FDA-approved drugs that carry greater assurances of purity and efficacy.  Defendants have elsewhere argued that FDA-approved pentobarbital is unavailable to them.  Dkt. #36 at 36.  But the Administrative Record does not document any good-faith efforts to obtain the FDA-approved product, as the State of Missouri appears to have done for purposes of its own executions.[11]  By failing to explain or prove that FDA-approved pentobarbital is unavailable, or even that they made meaningful efforts to obtain it, the Defendants have not "cogently explain[ed]" why they have "exercised [their] discretion in a given manner."  *State Farm*, 463 U.S. at 48.

*     *     *     *     *

Defendants' deficient approach to developing the 2019 Protocol is further illustrated by a proposed rule, dated May 29, 2020, that the Department of Justice submitted to the Office of Information and Regulatory Affairs entitled "Manner of Federal Executions."  *See* https://www.reginfo.gov/public/do/eoDetails?rrid=130616.  The title of the proposed rule indicates that it is directly relevant to the APA issues regarding the 2019 Protocol, but Defendants have refused to provide any additional information to Plaintiffs on its contents.  Plaintiffs are seeking limited discovery on the proposed rule in connection with this Motion.  However, based on the title of the proposed rule alone, it is evident that the 2019 Protocol is problematic from an APA perspective and Defendants are actively engaged in rulemaking with regard to the subject matter of this Motion.

---

[11] *See* McDaniel, *Missouri Execution Drug Purchases Revealed*, BUZZFEED NEWS (Jan. 8, 2017), https://www.buzzfeednews.com/article/chrismcdaniel/missouri-execution-drug-purchases-revealed.

B.      **The 2019 Protocol Violates The Eighth Amendment**

Plaintiffs are likely to succeed on their Eighth Amendment claim.  At the preliminary-injunction stage, Plaintiffs must "establish a likelihood that they can establish both that [the 2019 Protocol] creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).  Plaintiffs have made that showing.  The 2019 Protocol's mechanism of lethal injection creates a demonstrated risk of severe pain: it adopts the use of pentobarbital, which is nearly certain to cause flash pulmonary edema—"an excruciating complication [which] occurs in the vast majority [of], if not all, judicial lethal injections using pentobarbital," Am. Compl. ¶¶ 76-82; it exacerbates the risks of pentobarbital by proposing to acquire the drug from a compounding pharmacy; and it neglects commonsense procedural safeguards necessary to mitigate the risk of severe pain from lethal injection.  These risks are substantial when compared to at least two known and available alternatives: Defendants could modify their lethal-injection protocol to require a clinical dose of an opioid or other comparable and appropriate pain-relieving medication along with other readily adoptable procedural safeguards, or Defendants could avoid the risks of lethal injection altogether and instead execute Plaintiffs by firing squad.  *See* Am. Compl. ¶ 114.

1.      **The 2019 Protocol creates a demonstrated risk of severe pain.**

The 2019 Protocol's choice of lethal-injection drug along with its disregard for sourcing and procedural safeguards creates a demonstrated risk of severe pain in prisoners.  To begin, the use of pentobarbital will almost certainly cause Plaintiffs to suffer flash pulmonary edema.  As discussed above, flash pulmonary edema causes an accumulation of fluid or froth in the lungs, which will force sensate prisoners to experience the sensation of drowning—"an excruciating complication."  Van Norman Decl. at 31.  Evidence from prior executions with pentobarbital

21

shows that prisoners are very likely to suffer this terrifying condition *before* becoming insensate. *See id.* at 35-36.  In fact, the autopsy reports from dozens of executions demonstrate that it is a "virtual medical certainty that most, if not all, prisoners will experience excruciating suffering [related to pulmonary edema], including sensations of drowning and suffocation, as a result of [the] injection of 5 grams of pentobarbital."  *Id.* at 7; *see* Am. Compl. ¶¶ 76-82 (flash pulmonary edema "occurs in the vast majority [of], if not all," judicial lethal injections using pentobarbital). This evidence corroborates witness reports of pentobarbital executions, which describe sensate prisoners continuing to breathe after experiencing acute symptoms including burning sensations, labored breathing, gasping, and other signs of severe pain and respiratory distress.  *See supra* at 8; Edgar Decl. at 19-21.  By adopting pentobarbital without measures to mitigate the near certainty of flash pulmonary edema, the Protocol creates a demonstrated risk of severe pain.

Decisions upholding the constitutionality of execution by pentobarbital have not accounted for the current medical and scientific information about the risk of flash pulmonary edema.  *Bucklew v. Precythe*, for example, never considered the risk of flash pulmonary edema at all.  139 S. Ct. 1112 (2019).  Rather, Mr. Bucklew argued that his unique medical condition (cavernous hemangioma) made it likely that he would suffer unconstitutional pain from pentobarbital, but he conceded that "the State's lethal injection protocol is constitutional in most applications."  *Id.* at 1118.  Plaintiffs here have never made such a concession, and the record medical evidence in this case proves that statement to be inaccurate.

Other cases Defendants have cited are based on similarly outdated medical information. For example, the view that a five-gram dose of pentobarbital will quickly make a prisoner unconscious and unable to experience pain has been thoroughly discredited.  *See* AR 428-432, 435-436, 499, 508, 521-524, 871, 872, 930, 933; *see also* Van Norman Decl. at 7, 13-29;

*Bucklew*, 139 S. Ct. at 1132.  The most recent scientific studies instead demonstrate that a short-acting barbiturate like pentobarbital diminishes a person's *responsiveness* as opposed to his *consciousness*—and thus someone injected with such a lethal dose of pentobarbital will consciously experience the flash pulmonary edema that ensues.  *See* Am. Compl. ¶ 74.  So Defendants are wrong to suggest that caselaw has—or could—inexorably establish "that pentobarbital is not very likely to cause an unconstitutional level of pain."  Dkt. #36 at 31. Instead, cases considering pentobarbital executions without the benefit of current scientific studies on the risk of flash pulmonary edema have little bearing here.[12]

Other elements of the 2019 Protocol further increase the risks associated with its chosen execution procedure.  As noted above, compounded drugs like those Defendants propose to use in Plaintiffs' executions are more frequently impure and/or subpotent than manufactured drugs, and impure or subpotent pentobarbital can cause a prolonged, torturous death.  *See supra* 14-20. The 2019 Protocol also fails to include testing protocols, assurances that personnel will be adequately trained, or procedures to address mishaps.  *See supra* 12-20.

---

[12] In *In re Ohio Execution Protocol Litigation*, 946 F.3d 287 (6th Cir. 2019), the Sixth Circuit held that the excruciating sensation of drowning caused by pulmonary edema was not "severe" enough to be constitutionally cognizable.  *Id.* at 290.  That conclusion was based on the false premise that because hanging was once considered constitutional, the suffocation associated with pulmonary edema is also constitutional.  But nowhere did *Bucklew* suggest that suffocation would be acceptable today under the Eighth Amendment.  Rather, the Supreme Court observed that sometimes-painful hangings were tolerated in the eighteenth century because they were "considered more humane than some of the [other] punishments of the Old World," *Bucklew*, 139 S. Ct. at 1124—that is, other execution alternatives at that time were far more excruciating.

### 2.       Plaintiffs have identified two feasible alternatives.[13]

The risks presented by the 2019 Protocol are "substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737.  Plaintiffs have identified two viable alternatives:  Defendants can either (a) reasonably modify the 2019 Protocol's lethal-injection procedure or (b) abandon lethal injection in favor of execution by firing squad.

### a)       Defendants can modify the lethal-injection protocol.

To substantially reduce the risk of pain and suffering, Defendants could make fairly modest, commonsense modifications to their lethal-injection protocol.  Most importantly, the lethal-injection protocol could require a clinical dose of an opioid or other comparable and appropriate pain-relieving medication prior to the execution.  *See* Am. Compl. ¶ 114(a).  As Doctor of Pharmacology Craig Stevens explains, opioids "inhibit the activity of the pain neurons," which "produces the analgesia, or relief of pain, that characterizes the therapeutic action of morphine and other opioid analgesics."  Decl. of Craig W. Stevens, Ph.D. at 3 (Dkt. #25).  "Barbiturates" like pentobarbital, on the other hand, "do not have 'analgesic,' (i.e. pain-relieving), properties and in lower doses actually are 'antalgesic,' meaning they augment feelings of pain."  Van Norman Decl. at 9.  Administration of a clinical dose of a pretreatment opioid (after IVs are set but before the injection of pentobarbital commenced) would "exert a clinical

---

[13] Mr. Purkey is unable or incompetent to consult with counsel concerning alternative methods of execution.  Allegations concerning alternative methods of execution with respect to him are pled solely by counsel acting on his behalf.  *See* Am. Compl. ¶ 114 n.1.  Mr. Purkey's competency to be executed is at issue in separate litigation pending before this Court, *see Purkey v. Barr*, No. 1:19-cv-03570 (D.D.C. filed Nov. 26, 2019), and thus he is relieved of the obligation to plead alternative methods of execution to state an Eighth Amendment claim, *see In re Ohio Execution Protocol Litigation*, No. 2:11-cv-1016, 2018 WL 3207419, at *2 (S.D. Ohio June 29, 2018) ("A fortiori, a person incompetent to be executed is also incompetent to stand trial and also to properly consult with his attorney about pleading an alternative method of execution.").

effect of analgesia"—eliminating or significantly reducing a prisoner's ability to feel pain. Stevens Decl. at 2.  Many analgesic opioids are fast-acting as well—clinical studies have showed significant analgesic effects within five to six minutes of administration of a dose of morphine (or as quickly as one minute after an IV bolus injection of an 8mg dose).  *Id.* at 5; *see also id.* at 5-6 (discussing clinical trials concluding that the onset of fentanyl's analgesic effect is from two to five minutes, depending on dosage).  Given the near certainty that the current execution protocol will result in prisoners experiencing pulmonary edema while sensate, pretreatment with an opioid would significantly reduce the pain and suffering experienced by prisoners.  Use of opioid pre-medications would also "reduce … anxiety."  *Id.* at 4.  And because Defendants would be utilizing such opioids in clinical doses, they "are commercially available and obtainable as these drugs would be used for medical purposes, like other medications ordered and used by the prison medical staff."  *Id.* at 6.[14]  Pretreatment of prisoners with an opioid is therefore both "feasible and readily available."  *Bucklew*, 139 S. Ct. at 1127.

Defendants could also modify the lethal-injection protocol to incorporate certain readily available procedural safeguards.  Plaintiffs have alleged several necessary but modest modifications.  *See* Am. Compl. ¶ 114.  Three of them bear emphasis: procedures for placing IV lines, for bedside administration of the lethal-injection drug, and for unexpected occurrences.

As to IV lines, the Protocol must be modified to require two functioning peripheral IV lines and to prohibit use of a central line (unless deemed necessary and placed by qualified and

---

[14] The Administrative Record reveals that Defendants explored the use of fentanyl as a lethal substance, *see* AR 862, but doubted their ability to obtain commercially available fentanyl due to the drug manufacturers' efforts to prevent that use.  *Id.* at 864-865.  These doubts say nothing, however, about Defendants' ability to obtain fentanyl for use as an anesthetic, which would not kill the prisoner but instead would reduce his pain and suffering.

competent medical professionals).[15]  The Protocol only requires that the "qualified personnel" insert and inspect the IV line—it does not even specify how many venous access lines will be inserted, and leaves the entirety of the IV protocol to the discretion of the Director (or designee) and the execution personnel.  *See* 2019 Addendum ¶ G.  That is unacceptable.  As discussed in detail above, improperly placed IVs are extremely common in executions, and can have devastating consequences; numerous botched executions involved gruesome repeated attempts to insert IVs.  *See supra* 11-12.[16]  It would require minimal modification of the Protocol to address the virtual certainty of IV placement issues in the executions Defendants propose to carry out.

Next, the lethal-injection drug must be administered at the bedside.  The Protocol, as written, does not require bedside administration.  Bedside administration would eliminate the need for extension sets of IV tubing and therefore significantly reduce the risks of leakage or pinching of the tubing.  *See* Am. Compl. ¶ 114(a).  And, by eliminating the need for lengthy IV tubing, bedside administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing.  *See id*.  It also would allow (with the correct personnel) for close observation, which would help ensure adequate surveillance and monitoring of the IV, the catheter site, and the prisoner.  *See id*.

---

[15] "Central venous access catheters (CV lines) are … 'relatively dangerous, problem-prone devices' for which mechanical complications during placement remain 'a significant cause of morbidity and mortality.'"  Van Norman Decl. at 37 (quoting Bowdle, *Vascular Complication of Central Venous Catheter Placement: Evidence-Based Methods for Prevention and Treatment*, 28 J. Cartiothor. Vasc. Anesth. 358 (2014)).  Thus "placement of a central line for venous access … is fraught with potential mechanical complications."  *Id.* at 38.

[16] IV lines must be placed only by trained, qualified professionals.  As described above, the 2019 Protocol contains no requirements regarding the minimum training, experience, or qualifications required for the person setting the IV.  *See* Nov. 2019 Winter Dep. at 162:20-163:4.  And the 2019 Protocol does not require the presence of a doctor or anyone with a medical license to be present at or oversee the executions.  *See id.* at 171:8-174:19; *see also* Weinsheimer Dep. at 96:4-16, 100:6-101:7, 102:11-21.

Implementing bedside administration is also readily feasible.  Bedside administration requires *fewer* supplies and is less complex than administering pentobarbital from a distance.  There is *no* indication BOP considered and rejected bedside administration because it was not feasible.

Finally, the current Protocol has *no* guidelines for how to handle unexpected occurrences during executions.  "There are no explicit instructions regarding contingency plans in the event the executioners struggle to obtain or cannot obtain IV access."  Van Norman Decl. at 42. Rather, the Protocol merely provides that it may be modified at the BOP Director's "discretion" "as may be required by other circumstances," but provides no guidelines for how to determine when and what modification is necessary.  2019 Addendum ¶ A.  Nor does the Protocol discuss mishaps that may occur during executions—instead, it says only that IV mishaps must be "reported to the Director," *id.* ¶ H—and "there is no instruction of what should actually be done to assure the prisoner does not experience a lingering and excruciating death due to a mishap." Van Norman Decl. at 43.  Indisputably, establishing a plan to mitigate or compensate for disastrous mishaps is likely to reduce their negative consequences, including those that involve the pain and suffering of prisoners.  Defendants know this: The 2019 Protocol's lack of detail on this topic is a departure from the 2008 protocol, which included a detailed plan for responding to unexpected occurrences during executions.  That the government was able to formulate such plans in 2008 indicates that it is feasible and wise to do so.

> **b)**      **Defendants can conduct executions by firing squad.**

Alternatively, Defendants could carry out Plaintiffs' executions by firing squad.  *See* Am. Compl. ¶ 114(c).  Execution by firing squad causes a faster and less painful death than execution by lethal injection.  *See Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative); *Arthur v. Dunn*, 137 S. Ct. 725, 733-734 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly

27

instantaneous death, be comparatively painless, and have a lower chance of a botched execution).

Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip*, 135

S. Ct. at 2796 (Sotomayor, J., dissenting).

Recent studies have confirmed that execution by firing squad is statistically much less

likely to result in "botched" executions than lethal injection. *See* Sarat, *Gruesome Spectacles:*

*Botched Executions and America's Death Penalty* 120, App. A (2014). Execution by firing

squad is currently authorized by the laws of three states: Utah Code Ann. § 77-18-5.5; Okla. Stat.

tit. 22 § 1014(D); Miss. Code Ann. § 99-19-51(4). Since 1976, Utah has carried out three

executions by firing squad, most recently on July 18, 2010. Protocols for execution by firing

squad are known and available. Utah's technical manual, specifying the state's execution

protocol in great detail, is publicly accessible.[17] The use of a firing squad is available, feasible,

and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

### C.     The 2019 Protocol Violates The CSA And FDCA

Plaintiffs are also likely to succeed on their claims that the 2019 Protocol violates the

CSA and FDCA and is therefore "not in accordance with law." *See* 5 U.S.C. § 702(2)(A); Am.

Compl. ¶¶ 186-191 (Count XI). The 2019 Protocol does not provide for Defendants to obtain a

valid written prescription for the pentobarbital it will use to execute Plaintiffs, and Defendants

have confirmed that they do not intend to obtain such a prescription. *See, e.g.*, Nov. 2019 Winter

Dep. at 315:4-6; Schoenfeld Decl., Ex. 4 (Dep. of Loren Thomas Miller (Feb. 14, 2020) ("Miller

Dep.")) at 29:18-21. The Protocol therefore directly conflicts with the CSA's and FDCA's

requirements for dispensing pentobarbital.

---

[17] Technical Manual of Utah Department of Corrections (Ex. H),
http://cdn.muckrock.com/foia_files/2017/03/22/3-13-17_MR34278_RES.pdf (last visited June
19, 2020).

Under the CSA, it is unlawful to "dispense" to an "ultimate user" any "controlled substance" except pursuant to a valid prescription "issued for a legitimate medical purpose" by a practitioner who is acting "in the course of professional practice" and registered pursuant to the statute. 21 U.S.C. §§ 802(21), 802(27), 829(e)(2), 841(a)(1). Pentobarbital is a Schedule II controlled substance. *See* 21 C.F.R. § 1308.12. The CSA thus requires a written prescription of a medical practitioner in order to dispense and administer pentobarbital. *See* 21 U.S.C. § 829(a).

Defendants have argued that the CSA does not apply because no drug is being "dispensed" in the context of an execution and that prisoners injected with pentobarbital are not "ultimate users" under the CSA because they never "possess[] a controlled substance for [their] own use." 21 U.S.C. § 802(27); *see* Dkt. #36 at 23. But this contention cannot be squared with the CSA's broad definition of "dispense," which includes "the prescribing *and administering* of a controlled substance." 21 U.S.C § 802(10) (emphasis added). Indeed, the 2019 Protocol on its face makes clear that the contemplated executions necessarily require pentobarbital to be administered to Plaintiffs. *See, e.g.,* 2019 Addendum ¶ E ("The Director or designee shall appoint an additional senior level Bureau employee to supervise the activities of personnel preparing and administering the lethal substances.") and ¶ H ("Lethal substances shall be administered intravenously.").

Defendants' arguments that lethal injections are not "dispensed" and do not require a prescription is not consistent with earlier DEA guidance on CSA requirements. A DEA presentation outline from 2011 given to state officials about navigating the CSA for acquiring lethal-injection drugs noted that, "[f]or purposes of the CSA, [giving a prisoner the drugs] is called dispensing" and that they would "need[] a registration that authorizes dispensing in order to give it to an inmate." Schoenfeld Decl., Ex. 5 (Miller Dep. Ex. 20) at 31, 35. This was not an

aberrant statement from the United States:  In 2009, Washington State Department of

Corrections administrators seeking authority to order execution drugs were told by the DEA that

"a licensed mid-level or MD must prescribe, administer & dispense" the drugs.  Schoenfeld

Decl., Ex. 6 (Miller Dep. Ex. 19).  The DEA has had no policy change on this since 2009.

Despite having no recollection of the 2011 presentation, the DEA's 30(b)(6) deponent stated that

these documents did not represent the agency's position at the time on the grounds that he had

not been aware of the policy.  *See* Miller Dep. at 134, 136, 151.

The 2019 Protocol also directly conflicts with similar provisions of the FDCA.  The

"core" legislative purpose of the FDCA is to ensure that a "drug" is "safe and effective for its

intended use."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  One

way the FDCA ensures that a drug is safe and effective for its intended use is to condition the

dispensation of controlled substances, including pentobarbital, upon either (a) "a written

prescription of a practitioner licensed by law to administer such drug," or (b) "an oral

prescription of such practitioner which is reduced promptly to writing and filed by the

pharmacist."  21 U.S.C. § 353(b)(1).

That Defendants intend to procure the pentobarbital from an "outsourcing facility," *see*

AR 1084, does not free them from this FDCA prescription requirement.  The FDCA provides a

number of rules that all such facilities must follow when compounding drugs in order to be

exempt from the premarketing and labeling requirements found elsewhere in the FDCA, and the

"new drug" approval process to demonstrate the product's efficacy.  *See Athenex Inc. v. Azar*,

397 F. Supp. 3d 56, 59-60 (D.D.C. 2019); 21 U.S.C. § 353b.  For example, an outsourcing

facility is ineligible for that exemption if it produces a drug that is "essentially a copy of one or

more approved drugs."  21 U.S.C. § 353b(a)(5).  "[E]ssentially a copy" means a drug that is

"identical or nearly identical to an approved drug" (unless it appears on the FDA's list of drug shortages), or contains a "bulk drug substance that is a component of an approved drug" (unless the drug has been changed in order to make a "clinical difference" for an individual patient). 21 U.S.C. § 353b(d)(2)(A)-(B). Here, laboratory tests obtained by Defendants show that their objective is to use an outsourcing facility to produce a compounded product that simulates FDA-approved pentobarbital. *See* AR 4-5, 932-933, 970-1015. Accordingly, the compounded pentobarbital Defendants intend to use to execute Plaintiffs must comply with the FDCA's premarketing, labeling, and prescription requirements. 21 U.S.C. § 353b. It does not.

Further, those exempt "503B" facilities must compound drugs that either (1) use APIs that the FDA has placed on the "503B Bulks list" based on a determination of "clinical need," or (2) appear on the FDA's list of drug shortages (a shortage would justify use of a comparatively risky compounded drug rather than the more thoroughly regulated FDA-approved version). *See* 21 U.S.C. § 353b(a)(2)(A). To date, the FDA has not placed any APIs on the "503B Bulks list," and it has not identified a shortage of pentobarbital.[18] Moreover, there is no "clinical need" for a particular API when an "FDA-approved drug that could be used to meet the very [same] patient needs" is "already available on the market," *Athenex*, 397 F. Supp. 3d at 58—as is true here with respect to Defendants' compounded pentobarbital, AR 4-5, 932-33, 970-1015.

Contrary to Defendants' assertions, the D.C. Circuit has already definitively held that the FDCA applies in the context of executions, and other courts have reached the same conclusion with respect to the CSA. Citing a May 2019 Office of Legal Counsel opinion, *see* AR 938-963, Defendants have insisted that, if the FDCA's and CSA's requirements applied to lethal-injection

---

[18] 503B Bulks List, https://www.fda.gov/media/120692/download (last visited June 19, 2020); FDA Drug Shortages, https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm (last visited June 19, 2020).

drugs, it would be impossible to execute Plaintiffs because no physician will issue the required

prescription.  *See* Dkt. #36 at 24-25, 27, 31.[19]  And to "nullify" lethal injection itself, Defendants

say, is not an outcome that Congress intended.  *See id.* at 25, 31.  This argument cannot be

squared with case law from this district and elsewhere.  Indeed, in *Beaty v. FDA*, 853 F. Supp. 2d

30, 42 (D.D.C. 2012), *aff'd in relevant part sub nom. Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013),

the court explained not only that the FDCA applies to execution drugs, but also that the statute

helps to ensure that such drugs accomplish the pain-diminishing purpose for which the

executioners have selected them.  The court in *Beaty* therefore concluded—and the D.C. Circuit

affirmed—that death-sentenced individuals are permitted to challenge the FDA's noncompliance

with the FDCA when importing drugs for executions.  853 F. Supp. 2d at 37-43; *see also* Cook,

733 F.3d at 10-11.  The agency's noncompliance, the court reasoned, exposed the individuals "to

the risk that the drug will not function as intended," which contradicts the FDCA's over-arching

purpose of "ensur[ing] that when a citizen takes a prescription drug, that individual has absolute

assurance that the product is safe and effective."  853 F. Supp. 2d at 37, 42; *see also Cook*, 733

F.3d at 10-11.

   In sum, both the CSA and the FDCA apply to executions by lethal injection.  Both

statutes "provide safeguards against improper use of lethal-injection chemicals by assuring that

---

[19] This assertion is flatly contradicted by the Administrative Record, which discusses the execution protocols of two states (supposedly used as models by Defendants) whose protocols involve the issuance of prescriptions for execution drugs.  *See* AR 70 (noting that Missouri's execution protocol includes the individuals who "prescribe … the chemicals for use in the lethal injection procedure."); Scott, *Georgia Department of Corrections Using Compounding Pharmacy for Execution Drug*, WABE (July 11, 2013), https://www.wabe.org/georgia-department-corrections-using-compounding-pharmacy-execution-drug.  To be sure, it is likely that the prescriptions obtained by these states do not comply with the requirements of the FDCA and CSA.  But it misrepresents the evidence in the Administrative Record to baldly assert that obtaining a prescription would be impossible.

medical practitioners are adequately involved in the use of those chemicals." *Ringo v. Lombardi*, 706 F. Supp. 2d 952, 958 (W.D. Mo. 2010).  "[I]gnoring those safeguards, as Plaintiffs allege Defendants intend to do, places Plaintiffs at risk." *Id.*

    **D.**    **The 2019 Protocol Deprives Plaintiffs Of Their Right To Counsel**

    Finally, Plaintiffs are likely to succeed on their claim that the 2019 Protocol deprives them of access to counsel and the courts, in violation of their First, Fifth, and Sixth Amendment rights.  *See* Am. Compl. ¶¶ 135-142 (Count IV).

    Prisoners must be afforded "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)) (internal quotation marks omitted). The "unusual context" of an execution "present[s] an inherent risk of actual injury to the timely and meaningful presentation of non-frivolous claims to a court." *Cooey v. Strickland*, No. 2:04-cv-1156, 2011 WL 320166, at *11 (S.D. Ohio Jan. 28, 2011).  Whether conceived of as a First Amendment right to petition the government for redress of grievances, *see Lewis*, 518 U.S. at 404-405 & n.1 (Stevens, J., dissenting); as a Fifth Amendment due process right to access the courts to present allegations concerning violations of fundamental constitutional rights, *id.* at 380-382 (Thomas, J., concurring) (citing *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)); or as a Sixth Amendment or statutory right under 18 U.S.C. § 3599 not to be "put to death without meaningful access to the 'fail-safe' of our justice system," *Harbison v. Bell*, 556 U.S. 180, 194 (2009),[20] Plaintiffs have a right to access the courts through their counsel.

---

[20] Elsewhere Defendants object that the Sixth Amendment does not apply because an execution is not a "critical stage" in the criminal process, *see* Dkt. #16 at 29; Dkt. #37 at 25 n.6, but this argument "largely misses the point," *Cooey*, 2011 WL 320166, at *5.  "It does not matter for this specific analysis whether there is [an] overarching right to counsel … because there is unquestionably a right to access the courts involved in the context of execution that inherently

Access to counsel and to the courts is particularly necessary to ensure that Plaintiffs are not subject to cruel and unusual punishment—a right that extends throughout the entirety of an execution. Any number of events during an execution could give rise to Eighth Amendment concerns. In order to vindicate those concerns, Plaintiffs must have the "right to meaningful access to the courts to assert [their Eighth Amendment] right[s]," and "counsel [must] have some access to the prisoner during the last hour before the execution and be permitted to witness his execution and have access to a telephone until [the] execution has been successfully carried out." *Coe v. Bell*, 89 F. Supp. 2d 962, 966 (M.D. Tenn. 2000);[21] *see also Cooey*, 2011 WL 320166, at *8-11 (a prisoner "possesses a constitutional right of access to counsel and to the courts to challenge the conditions of his or her execution—the manner in which Defendants currently intend to execute the inmate"—"[i]t is the unique nature of an execution that sets this type of conditions of confinement case apart from other prisoner civil rights litigation that would not warrant such concurrent access to the court via access to counsel"); *McGehee v. Hutchinson* ("*McGehee I*"), No. 4:17-cv-00179 KGB, 2017 WL 1381663, at *29-30 (E.D. Ark. Apr. 15, 2017); *McGehee v. Hutchinson* ("*McGehee II*"), No. 4:17-cv-00179 KGB, 2020 WL 2841589, at *45-46 (E.D. Ark. May 31, 2020). Even if "the means of access compelled by the Constitution do not guarantee a remedy to any constitutional infraction that might arise, it is sufficient that they promote the constitutional aims involved in the execution process," such as by serving to deter unconstitutional acts. *Cooey*, 2011 WL 320166, at *11.

---

injects the issue of access to counsel into this discussion." *Id.* at *7 (footnote omitted).

[21] Although the Sixth Circuit vacated this holding, the vacatur was a response to the plaintiff being put to death prior to the full resolution of his claims, not to any infirmities in the district court's analysis. *See Coe v. Bell*, 230 F.3d 1358 (6th Cir. 2000); *Cooey*, 2011 WL 320166, at *9 n.6 (making this same point).

The 2019 Protocol, however, "create[s] an environment that can likely suppress the timely assertion of non-frivolous constitutional claims." *Cooey*, 2011 WL 320166, at *7. The 2019 Protocol provides Plaintiffs no right to access counsel leading up to and during the execution. *See* AR 1034 (providing that, in the twelve to three hours prior to the execution, visits by attorneys will be "at the discretion of the Warden"). It does not allow Plaintiffs' attorneys or medical consultants to view the setting of the IV, a critical junction with a high likelihood of harm if done incorrectly. And it does not provide a means for Plaintiffs to communicate with their counsel during the execution process itself, or specify whether and how counsel will communicate with courts if needed. Such critical issues, at a crucial moment, cannot be left to Defendants' whim. *See McGehee II*, 2020 WL 2841589, at *48 ("Minutes matter during an execution."). Instead, the 2019 Protocol allows counsel only to witness the executions and hear Plaintiffs make their final statements, *see* Dkt. #16 at 29-30 (citing what is now AR 1037-1039), but "[p]assive observation without necessary communication undercuts"—rather than vindicates—"meaningful access to the courts," *Cooey*, 2011 WL 320166, at *11. In order to assert an Eighth Amendment violation in real time, it is essential that Plaintiffs have a means of communicating with counsel prior to and during the execution and that counsel have a means of communicating with the court if an emergency need arises. *See id.* at *10-11.

The 2019 Protocol on its face thus deprives Plaintiffs of their constitutionally-guaranteed right to counsel. The global COVID-19 pandemic and related nationwide shutdown orders provide additional, independent bases for a temporarily enjoining Defendants from carrying out executions.

First, the pandemic has, if temporarily, even more thoroughly curtailed Plaintiffs' constitutional right to counsel. COVID-19 is highly communicable, particularly in prisons.

Despite BOP's precautions, as of June 19, 2020, at least six prisoners at USP Terre Haute have tested positive for COVID-19, out of 212 prisoners tested.[22]  In order to reduce community spread both inside and outside the prisons, BOP indefinitely suspended Plaintiffs' visits (including legal visits) in mid-March.[23]  BOP officials have attempted to replace legal visits with phone calls, and have stated that "case-by-case accommodation will be made at the local level."[24] But, as one court has explained, "there is no record of how [case-by-case accommodations] occur[] or the standards the BOP applies to approve counsel for an in-person visit."  *United States v. Dawara*, No. CR 19-414-1, 2020 WL 2404898, at *2 (E.D. Pa. May 12, 2020).

Moreover, there is no adequate substitute for in-person meetings between client and counsel during the warrant period, when the role of counsel involves assessing the client's evolving mental health; explaining to the client all matters pertaining to litigation, which at this stage often moves extraordinarily quickly; addressing with the client on-the-ground developments; helping prepare the client to make end-of-life decisions; serving as liaison with prison staff and counsel for the prison; and witnessing the execution itself so they can take any necessary legal action on the spot.  Indeed, counsel representing condemned prisoners under warrant are obligated to maintain regular client contact to maintain rapport, to evaluate their mental condition, and to make critical, informed decisions regarding clemency, litigation, and end-of-life decisions.  *See* Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* § 4.1, Commentary & n.98 (2003).  The alternate forms

---

[22] *See COVID-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 19, 2020).

[23] *Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited June 19, 2020).

[24] *BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 19, 2020).

of communications proposed by BOP (telephone calls, video conferences, etc.) are mediated

through prison staff who are employed by the Defendants in this lawsuit, raising significant

issues regarding lack of confidentiality.  Nor is it adequate to permit lawyers to visit their clients

now, despite the virus.  Counsel—all of whom would be required to travel great distances to

reach Terre Haute—should not have to subject themselves (or their families upon return) to those

health risks, particularly given that it was Defendants that knowingly created these risks by

setting execution dates in the middle of a pandemic.

Second, COVID-19 may affect the availability of personnel to carry out executions and

the training of those individuals.  The 2019 Protocol fails to include necessary safeguards for the

qualifications, experience, and training of the individuals to conduct Plaintiffs' executions.  The

pandemic restricts the availability of qualified personnel, given the risks to those individuals'

health associated with traveling to and entering Terre Haute.  And because BOP will not disclose

the execution personnel, Plaintiffs have no opportunity to assess their qualifications.  Likewise,

the 2019 Protocol requires non-medical personnel to participate in ten execution rehearsals per

year and at least two rehearsals before any execution.  2019 Addendum ¶ D.  In light of the

prison shutdown, it is unclear whether these training requirements have been or will be met and

whether they will be conducted close to the dates of execution to ensure the training isn't stale.

This is particularly important because BOP has not conducted an execution in seventeen years so

the personnel have no recent experience to draw from with an *actual* execution.

Finally, COVID-19 may present specific complications for the execution itself, which

Plaintiffs need the opportunity to explore through expert discovery.  As noted, flash pulmonary

edema is caused when pentobarbital makes physical contact with the lung and capillary surfaces.

COVID-19 attacks lung and heart tissue.  Even patients who have recovered from the virus

report ongoing symptoms, and it is believed many suffer permanent lung and heart damage, either from the virus itself or from the cytokine storm that follows in its wake.  It is not yet clear how pentobarbital affects lung and heart tissue compromised by the virus and whether the drug's likelihood of causing sensations of drowning and asphyxia increases in someone who has or had COVID-19.  Nor is it clear whether, in light of the shutdowns occasioned by the pandemic, the API Defendants propose to use has been tested for quality assurance.

## II.    **Plaintiffs Will Suffer Irreparable Harm Without An Injunction**

This Court has already found that it would be "manifestly irreparable" if Plaintiffs were "unable to pursue their claims" and were "executed under a procedure that may well be unlawful."  P.I. Op. 13.  This conclusion was not disturbed by the D.C. Circuit.

To constitute irreparable harm, "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and it "must be beyond remediation."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citing *Chaplaincy*, 454 F.3d at 297) (internal quotation marks and brackets omitted).  Plaintiffs have alleged a harm that, if realized, cannot be corrected. Without a preliminary injunction, Plaintiffs will be executed pursuant to an unlawful protocol next month, well before they can fully litigate their claims.  The threatened harm is "beyond remediation," *id.*, because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at 297.  For Plaintiffs, there is no later date.  Their claims are therefore "categorically irreparable." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Recognizing this basic reality, courts have found that the "requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases."  *Wainwright v. Booker*, 473 U.S. 935, 936 n.1 (1985) (Powell, J., concurring).  In similar circumstances, courts have repeatedly held that a plaintiff suffers irreparable harm if he is executed before his legal

challenges to the execution methods are complete.  *See Nooner v. Norris*, No. 5:06cv00110

SWW, 2006 WL 8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed threat of irreparable

harm because if he suffered pain during his execution, as alleged, the injury would never be

rectified); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No.

5:06CT3018 H, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).  Here, too, there is no

question that Plaintiffs will suffer irreparable harm absent an injunction.

          If that were not enough, extensive evidence demonstrates that Plaintiffs are likely to

suffer unnecessary, protracted, severe pain if executed pursuant to the 2019 Protocol.  Again, as

explained above, according to multiple expert reports, it is a "virtual medical certainty" that the

injection of pentobarbital will immediately cause Plaintiffs to experience flash pulmonary

edema.  Van Norman Decl. at 7, 31-33, 36; *see also* Edgar Decl. at 21; Stevens Decl. at 2.  With

the pentobarbital dosage "insufficient to ablate awareness" and "the sensations of pain,"

Plaintiffs will consciously feel themselves suffocate as fluid rapidly floods their lungs and their

airways swell shut.  Van Norman Decl. at 31-32.  The resulting pain will be "one of the most

powerful, excruciating feelings known to man"—akin to the experience of drowning or being

waterboarded.  *Id.* at 31-32, 34; *see also* Edgar Decl. at 3, 21-22.

          The 2019 Protocol also makes it likely that Plaintiffs will suffer severely from drug

maladministration.  Indeed, "infiltration or extravasation of even small amounts of

[pentobarbital] causes instant, excruciating pain that patients liken to being set on fire."  Van

Norman Decl. at 36.  For Plaintiffs, this risk is substantial, because the 2019 Protocol fails to

identify an IV-setting method or rate of drug administration and allows for remote administration

by potentially unqualified personnel.  *Id.* at 37, 42-43.  Maladministration would cause a reduced

dosage of the pentobarbital to be delivered into Plaintiffs' bloodstream.  *Id.* at 38.  And given

Defendants' use of a compounding pharmacy, the drug is likely to be subpotent to begin with. *Id.* at 44-45; Almgren Decl. at 7-8.  Thus, the 2019 Protocol does not just subject Plaintiffs to unnecessarily *severe* suffering; it subjects them to unnecessarily *prolonged* suffering as well.

In short, the 2019 Protocol's deficiencies will cause Plaintiffs to experience unnecessary, excruciating physical pain and suffering that can never be undone.  Courts have previously granted injunctive relief to prevent harm to health and bodily integrity that was far less definite, direct, or severe.  *See, e.g.*, *Alcestra Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 5 (D.C. Cir. 2018) (per curiam) (loss of medical coverage); *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613-614 (D.C. Cir. 1980) (possible exposure to pesticides); *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015) ("A lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address."); *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 175-176 (D.D.C. 2017) (exposure to unsafe neighborhood); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) (environmental impact of possible firearm use in national parks, even though "not fully known," as well as plaintiffs' inability to "enjoy their [park] visits … because they [felt] less safe").

Finally, the current COVID-19 pandemic alone is creating a deprivation of access to counsel that will result in irreparable harm.  Since March 13, 2020, Plaintiffs have not been able to meet with counsel due to a blanket prohibition on in-person visits at USP Terre Haute.  Should the prison lift that ban in light of the scheduled executions, counsel will be put in the untenable position of having to choose between adequate representation of their clients and their own health, given that the necessary travel will require otherwise unnecessary exposure to COVID-19, including for counsel with particular vulnerability to the virus.  These visits are crucial for counsel to assess whether Plaintiffs remain competent to be executed.  Plaintiffs' inability to

meet with counsel in person in the months prior to their execution only amplifies the likelihood

of an Eighth Amendment injury occurring if Plaintiffs are not afforded access to counsel prior to

and during the execution, and the alternatives BOP has provided—including telephone and video

calls with no assurance of confidentiality—are not adequate.

**III.     The Balance Of The Equities And Public Interest Factors Favor Plaintiffs**

The balance of the equities and public interest also favor a preliminary injunction.  *See*

*Nken*, 556 U.S. at 434-435.  This Court has already decided that the balance of the equities

favors Plaintiffs because "the potential harm to the government caused by a delayed execution is

not substantial" and "[t]he public interest is not served by executing individuals before they have

had the opportunity to avail themselves of legitimate procedures to challenge the legality of their

executions."  P.I. Op. 14.

More generally, "[t]he public interest is [also] served when administrative agencies

comply with their obligations under the APA."  *N. Mariana Islands v. United States*, 686 F.

Supp. 2d 7, 21 (D.D.C. 2009).  By contrast, "[t]here is generally no public interest in the

perpetuation of unlawful agency action."  *Newby*, 838 F.3d at 12.  And "[a]pplying the law in a

way that violates the Constitution is *never* in the public's interest."  *Minney v. U.S. Office of*

*Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015).  Courts have further recognized the

"important public interest in the humane and constitutional application of [a] lethal injection

statute."  *Nooner*, 2006 WL 8445125, at *4; *Cooey*, 430 F. Supp. 2d at 708.  When the

government decides to take a life, the public interest demands that it do so in a considered and

deliberate manner.

Defendants have argued—and Judge Katsas alone has agreed—that the interest in

"finality" of death sentences outweigh these interests.  *See, e.g.*, Br. for Appellants at 49, *In re*

*FBOP*, No. 19-5322 (D.C. Cir. filed Dec. 23, 2019); Dkt. #36 at 45; *In re FBOP*, 955 F.3d at

41

126-128 (Katsas, J., concurring) (stressing the "important governmental and public interest in the timely implementation of capital punishment").  But Defendants' interest in the conclusion of litigation cannot eclipse Plaintiffs' rights by allowing them to permanently extinguish potentially meritorious claims.  In fact, "finality" will be served even if Plaintiffs do not ultimately succeed on the merits of their claims, as their death sentences would be undisturbed by this Court's preliminary injunction.  Defendants spent eight years revising their lethal-injection protocol, including six years engaged in the "final phases of finalizing the protocol." *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C. filed July 3, 2013), Dkt. #323.  Defendants cannot now credibly allege that their interest in finality or in expeditious executions would be seriously hampered by allowing Plaintiffs' claims to be fully litigated—nor can Defendants blame the lapse between the imposition of Plaintiffs' sentences and the setting of execution dates on any litigation strategy employed by Plaintiffs.  "[T]he fact that the government has not—until now— sought to" schedule Plaintiffs' executions "undermines any urgency surrounding" its need to do so. *Osorio-Martinez v. Att'y Gen. U.S. of Am.*, 893 F.3d 153, 179 (3d Cir. 2018).  A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the government. *Chaplaincy*, 454 F.3d at 297.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily enjoin Defendants from proceeding with Plaintiffs' executions.

DATED:      June 19, 2020

/s/ *Alan E. Schoenfeld*
Alan E. Schoenfeld (admitted *pro hac vice*)
Ryan M. Chabot (admitted *pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com
ryan.chabot@wilmerhale.com

Andres Salinas (DC Bar No. 156118)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6289
andres.salinas@WilmerHale.com

*Counsel for Plaintiff Wesley Purkey*

/s/ *Pieter Van Tol*
Pieter Van Tol (admitted *pro hac vice*)
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

David S. Victorson (Bar No. 1027025)
Kathryn Marshall Ali (Bar No. 994633)
Danielle D. Stempel (admitted *pro hac vice*)
Hogan Lovells US LLP
555 13th Street NW
Washington, DC 20004
(202) 637-5600
(202) 637-5910 (fax)
david.victorson@hoganlovells.com
kathryn.ali@hoganlovells.com
danielle.stempel@hoganlovells.com

*Counsel for Plaintiff Daniel Lewis Lee*

/s/ *Jon Jeffress*
Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone – 202-640-2850
jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D.
Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone – 215-928-0520
timothy_kane@fd.org
shawn_nolan@fd.org

*Counsel for Plaintiff-Intervenor Dustin Lee Honken*

/s/ Kathryn L. Clune
Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington D.C. 20004-2595
(202) 624-2705
kclune@crowell.com

Harry P. Cohen (*pro hac vice* pending)
Michael K. Robles (*pro hac vice* pending)
James K. Stronski (*pro hac vice* pending)
Crowell & Moring LLP
590 Madison Avenue
New York, NY 10022
(212) 223-4000
(212) 223-4134(fax)
hcohen@crowell.com
mrobles@crowell.com
jstronski@crowell.com

Jon M. Sands
Dale A. Baich
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602-382-2816
602-889-3960 (fax)
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record.  The names marked with an asterisk (*) have no email provided on the docket or are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of
Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 514-7830
Email: Ethan.P.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of
Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Email: gerald_king@fd.org
Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
VINSON & ELKINS, L.L.P.(202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221

Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Email: mhulkower@steptoe.com

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn.nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-2850
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
Email: nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513
Email: Ryan.Chabot@wilmerhale.com

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Email: Dale_Baich@fd.org

Harry P. Cohen
CROWELL & MORING LLP
(212) 223-4000
Email: hcohen@crowell.com

Michael K. Robles
CROWELL & MORING LLP
(212) 223-4000
Email: mrobles@crowell.com

James Stronski
CROWELL & MORING LLP
(212) 223-4000
Email: jstronski@crowell.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
Email: kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Email: Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Email: Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 925-0520

Jeffrey Lyn Ertel
FEDERAL DEFENDER PROGRAM, INC.
(303) 688-7530
Email: Jeff_Ertel@fd.org

Stephen Northup
TROUTMAN SANDERS LLP
(804) 697-1240
Email: steve.northup@troutmansanders.com

*Jon M. Sands
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2816

*Amy Karlin
INTERIM FEDERAL PUBLIC DEFENDER
(213) 894-2854

Danielle Desaulniers Stempel
HOGAN LOVELLS US LLP
(202) 804-7798
Email: danielle.stempel@hoganlovells.com

*/s/ Alan E. Schoenfeld*
Alan E. Schoenfeld