# EXHIBIT B



Deposition of:
## Rick Winter

*November 15, 2019*

In the Matter of:

# IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES

Veritext Legal Solutions

|  |  |
|---|---|
| Page 38<br>1  beyond that, I'm instructing you not to answer.<br>2      THE WITNESS: I'm sorry.  It was legal<br>3  advice, and it was before, as well.  I must have<br>4  misunderstood.<br>5  BY MR. VAN TOL:<br>6    Q  Well, let me remind you that in a<br>7  response to an earlier question, you told me there<br>8  was such an instruction.<br>9    A  There was an instruction.<br>10   Q  Did that instruction still exist in 2019?<br>11   A  Yes.<br>12   Q  All right.  Let's talk now about -- and<br>13  for now, I'm just getting the scope of these<br>14  visits.  I'm going to go back and ask some<br>15  specific questions.<br>16   A  Okay.<br>17   Q  You also mentioned, I believe, visits to<br>18  Mississippi.<br>19   A  Yes.<br>20   Q  When did those take place?<br>21   A  One visit took place in 2011.<br>22   Q  Which protocol was Mississippi using at | Page 40<br>1  mistaken about that.  It was the -- it was an<br>2  execution that would have involved midazolam and<br>3  hydromorphone.  I may be wrong about the year.<br>4    Q  So there was a two-drug protocol?<br>5    A  Correct.<br>6    Q  And did an execution take place?<br>7    A  No.<br>8    Q  What did the meetings or the visit by the<br>9  BOP personnel entail?<br>10   A  Similar to Texas.  We were -- our agency<br>11  was interested in seeing how Ohio was going to<br>12  carry out an execution involving midazolam and<br>13  hydromorphone.  We wanted to observe their<br>14  procedures or practices, meet their personnel,<br>15  tour their facilities, gain knowledge.<br>16   Q  In connection with any of those state<br>17  visits, did BOP personnel review training<br>18  materials that the states had developed?<br>19   A  Yes.<br>20   Q  Which states?<br>21   A  For preparing for Ohio or for anything?<br>22   Q  Any state. |
| Page 39<br>1  the time?<br>2    A  A single-drug protocol involving<br>3  pentobarbital.<br>4    Q  And during that visit, did BOP personnel<br>5  observe an execution?<br>6    A  Yes.<br>7    Q  Which one?<br>8    A  I don't know.<br>9    Q  And during that visit to Mississippi in<br>10  2011, was there a similar course of conduct and<br>11  that they met with personnel, got briefings and a<br>12  tour?<br>13   A  Yes.<br>14   Q  Same question about documentation then:<br>15  Did the BOP personnel generate any documentation<br>16  in connection with that 2011 visit to Mississippi?<br>17   A  Not that I'm aware of.<br>18   Q  I think you also mentioned two visits to<br>19  Ohio; is that right?<br>20   A  There was one visit to Ohio.<br>21   Q  Okay.  What year was that?<br>22   A  It was probably around 2014.  I may be | Page 41<br>1    A  Well, they're -- the administrative<br>2  record contains several of the protocols that we<br>3  reviewed.<br>4    Q  Other than the -- those protocols that<br>5  are in the administrative record, did the BOP<br>6  personnel review any other training materials?<br>7      MR. PERKINS:  Objection.  Vague.<br>8      MR. VAN TOL:  Thank you for that.  I'll<br>9  narrow it down.<br>10  BY MR. VAN TOL:<br>11   Q  So just to understand the context, I'm<br>12  asking about visits by BOP to Missouri -- I'm<br>13  sorry -- Mississippi, Texas and Ohio.  In<br>14  connection with those visits, did the BOP<br>15  personnel review any training materials other than<br>16  the written execution protocols?<br>17   A  I believe in Texas we reviewed their<br>18  press packet.  Other than that, I don't recall.<br>19   Q  You used --<br>20   A  I do not know.<br>21   Q  Sorry.  You used the word we there.  Did<br>22  you participate in any of these visits? |

11 (Pages 38 - 41)

Page 354

1  BOP execution protocol effective August 1, 2008,
2  was marked.)
3  BY MS. SMITH:
4     Q   Do you recognize Exhibit 7?
5     A   Yes.
6     Q   What is this document?
7     A   This is an addendum to the BOP execution
8  protocol effective August 1, 2008.
9     Q   Can you please turn to look at
10 Provision L in the third page?  This provision
11 provides procedures for what is to occur if a
12 situation is not contemplated in the procedure,
13 right?
14    A   Yes.
15    Q   Why is this provision not included in the
16 2019 addendum?
17    A   I think because the statement -- and we
18 thought because the statement was so common sense
19 and logical that it didn't need to be included in
20 an addendum.  There isn't a member of the
21 execution team that doesn't know that they can
22 advise a supervisory team member of a problem, and

Page 355

1  that the Director's on-site designee can do
2  exactly what's described in there.  It was just
3  made to -- it was omitted -- as I understand it,
4  the agency made the determination that -- to make
5  the addendum more simple and more on point as to
6  what the purpose of the addendum is, which is
7  mainly to cover qualifications of personnel, the
8  medications to be used.
9     Q   Pursuant to the 2008 addendum, was the
10 team required to follow the procedures laid out in
11 Provision L?
12        MR. PERKINS:  Objection to form.
13        THE WITNESS:  Yes.
14 BY MS. SMITH:
15    Q   Are they still required to follow these
16 procedures, even though they're not in this 2019
17 addendum?
18    A   Yes.  It's based -- it just says if you
19 see a problem, tell someone.  We all practice
20 that.  Yes, they all know that.
21    Q   It says considerably more than that,
22 right?  Doesn't it identify the specific people

Page 356

1  who are to be informed of the problem and what
2  order?
3        MR. PERKINS:  Objection to form.
4        THE WITNESS:  Well, it's overcomplicated.
5  If we have -- if we have -- and the team members
6  know if they witness a problem, they can get on
7  the radio and notify all staff on the radio, which
8  would include the on-site designee referenced
9  here, who can then make a decision and consult
10 with the U.S. Marshals Service.  And if necessary,
11 probably higher up the chain to the Director or
12 even the Attorney General.
13        Obviously, if an I.V. line isn't flowing
14 correctly, then that statement about a complete
15 assessment of the situation may be done, if
16 necessary, input from on site medical personnel.
17 So it just seemed to be such, you know, basic
18 language the -- the agency didn't feel it was
19 necessary to continue to list this in an addendum.
20 BY MS. SMITH:
21    Q   So the execution team is still trained to
22 follow the procedures laid out in Paragraph L?

Page 357

1     A   They are still trained that if they see
2  something going wrong, they will notify relevant
3  staff who can then act accordingly.
4     Q   The relevant staff as laid out in
5  Paragraph L?
6     A   Yes.  Again, anybody who gets on our
7  radio will immediately be in contact with the --
8  the BOP -- the on-site designee as referenced in
9  Paragraph L.  That person can then make a decision
10 based on their experience and training, which they
11 practice frequently, as to how to proceed next.
12 It also includes the Marshals Service.  They're
13 all on the same frequency, so they're all there.
14 If you see a problem, identify it.
15    Q   Is that practice in writing anywhere?
16    A   Not on an addendum.
17    Q   Is it in writing anywhere?
18    A   Not that I'm aware of.
19    Q   In any of the executions that BOP
20 attended, was BOP made aware of any unanticipated
21 occurrences?
22    A   The only -- the only thing I can think of