## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
|  | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No. 19-mc-145 (TSC) |
|  | ) | |
|  | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
|  | ) | |
| *Lee & Honken v. Barr, et al.*, 19-cv-2559 | ) | |
| *Purkey v. Barr*, et al., 19-cv-03214 | ) | |
| *Nelson v. Barr, et al.*, 20-cv-557 | ) | |

### DEFENDANTS' NOTICE OF CORRECTION

Defendants respectfully submit this Notice of Correction concerning their Opposition to Motion For a Preliminary Injunction of Plaintiffs Daniel Lee, Dustin Honken, Wesley Purkey, and Keith Nelson, ECF No. 111, which Defendants filed yesterday.

On page 19 of the opposition, we stated, "Specific to the suggestion of adding an opioid to the protocol, no State actually adds an opioid to a pentobarbital protocol or any other lethal injection protocol for that matter." *Id.* at 19. After filing the opposition, undersigned counsel learned that the State of Nebraska had in fact used fentanyl, as part of a four-drug protocol (that does not include pentobarbital), in one execution. Accordingly, we hereby file a corrected opposition, which strikes the phrase "or any other lethal injection protocol for that matter" from the sentence on page 19. We also made a corresponding change on page 2 to include the underlined phrase: "no State uses opioids in a pentobarbital protocol during executions."

We regret the errors. A corrected opposition is attached to this Notice.

Dated:  June 26, 2020
Respectfully submitted,


MICHAEL R. SHERWIN                          JOSEPH H. HUNT
Acting United States Attorney                Assistant Attorney General

DANIEL F. VAN HORN                          DAVID M. MORRELL
Civil Chief, U.S. Attorney's Office          Deputy Assistant Attorney General

ALAN BURCH (D.C. Bar 470655)                PAUL R. PERKINS
Assistant United States Attorney             Special Counsel
U.S. Attorney's Office
for the District of Columbia                  /s/*Jean Lin*
Washington, D.C. 20530                       JEAN LIN (NY Bar 4074530)
202-252-2550                                 Special Litigation Counsel
alan.burch@usdoj.gov                         JONATHAN KOSSAK (D.C. Bar 991478)
                                             CRISTEN C. HANDLEY (MO Bar 69114)
                                             Trial Attorneys
                                             Civil Division
                                             Federal Programs Branch
                                             Civil Division, Department of Justice
                                             1100 L Street, N.W.
                                             Washington, D.C. 20005
                                             (202) 514-3716
                                             Jean.lin@usdoj.gov
                                             Jonathan.kossak@usdoj.gov
                                             Cristen.handley@usdoj.gov


                                             *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all plaintiffs' counsel of record (as most recently identified in the signature pages of the Consolidated Amended Complaint, ECF No. 92):

Alan E. Schoenfeld (admitted *pro hac vice*)
Ryan M. Chabot (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8880
Alan.Schoenfeld@WilmerHale.com
Ryan.Chabot@WilmerHale.com

Andres C. Salinas (DC Bar No. 156118)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6289
Andres.Salinas@WilmerHale.com

*Counsel for Wesley I. Purkey*

Joshua C. Toll
D.C. Bar No. 463073 King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 737-8616
jtoll@kslaw.com

Margaret O'Donnell
P.O. Box 4815
Frankfort, KY 40604
(502) 320-1837
mod@dcr.net

*Counsel for Plaintiff Anthony Battle*

Ginger D. Anders (Bar No. 494471)
Jonathan S. Meltzer (Bar No. 888166546)
Brendan Gants (Bar No. 1031419)
MUNGER, TOLLES & OLSON LLP

1

1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
(202) 220-1100

*Counsel for Plaintiff Brandon Bernard*

Alex Kursman, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – alex_kursman@fd.org

*Counsel for Plaintiff Alfred Bourgeois*

Joseph Luby, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
 601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – joseph_luby@fd.org

*Counsel for Plaintiff Chadrick Fulks*

Amy Lentz (DC Bar No. 990095)
Steptoe & Johnson, LLP
1300 Connecticut Avenue NW
Washington, DC 20036
202.429.1320

*Counsel for Plaintiff Orlando Hall*

Scott W. Braden
Assistant Federal Defender
Arkansas Federal Defender Office
Ark Bar Number 2007123
1401 West Capitol, Suite 490
Little Rock, Arkansas 72201
(501) 324-6114
Scott_Braden@fd.org

Jennifer Ying (DE #5550)
Andrew Moshos (DE #6685)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market St.
P.O. Box 1347
Wilmington, Delaware 19801

2

(302) 658-9300
jying@mnat.com
amoshos@mnat.com

*Counsel for Plaintiff Norris G. Holder, Jr.*

Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone - 202-640-2850
Email - jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – timothy_kane@fd.org
Email – shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Lee Honken*

Donald P. Salzman (D.C. Bar No. 479775)
Charles F. Walker (D.C. Bar No. 427025)
Steven M. Albertson (D.C. Bar No. 496249)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Plaintiff Corey Johnson*

David S. Victorson
Hogan Lovells US LLP
Columbia Square
555 13th Street NW
Washington, DC  20004
(202) 637-5600
(202) 637-5910 (fax)
david.victorson@hoganlovells.com

Pieter Van Tol (admitted *pro hac vice*)
Hogan Lovells US LLP
390 Madison Avenue

3

New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

*Counsel for Plaintiff Daniel Lewis Lee*

Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington D.C. 20004-2595
(202) 624-2705
kclune@crowell.com

Harry P. Cohen (pro hac vice application pending)
Michael K. Robles (pro hac vice application pending)
James Stronski (pro hac vice application pending)
Crowell & Moring LLP
590 Madison Avenue New York, NY 10022
(212) 223-4000
(212) 223-4134(fax)
hcohen@crowell.com
mrobles@crowell.com
jstronski@crowell.com

Jon M. Sands (pro hac application to be filed)
Dale A. Baich (pro hac application to be filed)
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602-382-2816
602-889-3960 (fax)
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*

Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – timothy_kane@fd.org
Email – shawn_nolan@fd.org

*Counsel for Plaintiff Jeffrey Paul*

4

Paul F. Enzinna
D.C. Bar No. 421819
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553

*Counsel for Plaintiff James H. Roane, Jr.*

Amy Karlin
Interim Federal Public Defender
Celeste Bacchi
Jonathan C. Aminoff
Deputy Federal Public Defenders
321 E. Second Street
Los Angeles, CA 90012
(213) 894-2854

*Counsel for Plaintiff Julius O. Robinson*

Gerald W. King, Jr. Ga. Bar No. 140981
Jeffrey Lyn Ertel Ga. Bar No. 249966
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org
Jeff_Ertel@fd.org

Stephen Northup
VSB #16547
Troutman Sanders LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240
(fax) (804) 698-5120
steve.northup@troutmansanders.com

Frederick R. Gerson VSB #39968
Bank Of America Center
1111 East Main Street, 16th Floor Richmond,
Virginia 23219
(804) 482-1121
fgerson@dagglaw.com

*Counsel for Richard Tipton, III.*

Evan Miller (DC Bar # 219310)
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6605
(202) 478-1815 (fax)
emiller@velaw.com

*Counsel for Bruce Webster*


        */s/Jean Lin*
        Attorney for Defendants

6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
| | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No. 19-mc-145 (TSC) |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Lee & Honken v. Barr, et al.*, 19-cv-2559 | ) | |
| *Purkey v. Barr, et al.*, 19-cv-03214 | ) | |
| *Nelson v. Barr, et al.*, 20-cv-557 | ) | |

## [CORRECTED] DEFENDANTS' OPPOSITION TO
## MOTION FOR A PRELIMINARY INJUNCTION OF PLAINTIFFS
## <u>DANIEL LEE, DUSTIN HONKEN, WESLEY PURKEY, AND KEITH NELSON</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

I.       STATUTORY AND REGULATORY BACKGROUND ........................................... 4

II.      THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS ......................................... 5

III.     PROCEDURAL HISTORY ........................................................................................ 7

STANDARD OF REVIEW ................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

I.       PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR EIGHTH AMENDMENT
         CLAIM ....................................................................................................................... 8

         A.   The Standard for Method-of-Execution Challenges .................................... 8

         B.      The 2019 Protocol Does Not Pose A Substantial Risk of Severe Harm ................ 9

             1.   Plaintiffs are unlikely to succeed in challenging the use of pentobarbital. .............. 9

             2.   Plaintiffs' remaining challenge to the Protocol is based on speculation. .............. 14

         C.      Plaintiffs Fail to Propose An Alternative That Will Significantly Reduce A
                 Substantial Risk of Severe Pain ........................................................................ 18

II.      PLAINTIFFS ARE UNLIKELY TO SUCCEED IN SHOWING THAT BOP'S
         ADOPTION OF THE PROTOCOL IS ARBITRARY AND CAPRICIOUS ................. 24

         A.      APA Review of BOP's Adoption of the Protocol Is Narrow and Highly
                 Deferential .......................................................................................................... 25

         B.      BOP's Adoption of the Protocol Is not Arbitrary or Capricious ......................... 27

             1.   BOP need not consider the possibility that pulmonary edema may result from
                 pentobarbital injection. ....................................................................................... 28

             2.   BOP properly considered the problem of IV insertion. ......................................... 28

             3.   BOP's decision to use a compounded form of pentobarbital is reasonable. .......... 31

III.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CLAIMS THAT THE
         PROTOCOL IS CONTRARY TO THE CSA AND FDCA .......................................... 32

         A.      The Protocol Does Not Contravene the CSA ...................................................... 32

         B.      The Protocol Does Not Contravene the FDCA .................................................... 36

IV.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR ACCESS TO THE
         COURTS CLAIM ..................................................................................................... 40

i

V.      THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY
        INJUNCTION ........................................................................................................... 43

CONCLUSION ..................................................................................................................... 45

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) ........................................................................................ 8

*Am. Bioscience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001) ...................................................................................... 24

*Am. Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008) ........................................................................................ 25

*Athenex Inc. v. Azar,*
   397 F. Supp. 3d 56 (D.D.C. 2019) .................................................................................. 37

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
   462 U.S. 87 (1983) .......................................................................................................... 24

*Barr v. Roane,*
   140 S. Ct. 353 (2019) ........................................................................................................ 1

*Baze v. Rees,*
   553 U.S. 35 (2008) ................................................................................................... *passim*

*Beaty v. Brewer,*
   649 F.3d 1071 (9th Cir. 2011) ........................................................................................ 28

*Beaty v. FDA,*
   853 F. Supp. 2d 30 (D.D.C. 2012) .................................................................................. 38

*Boyd v. Warden, Holman Corr. Facility,*
   856 F.3d 853 (11th Cir. 2017) ........................................................................................ 22

*Brewer v. Landrigan,*
   562 U.S. 996 (2010) ........................................................................................................ 15

*Bucklew v. Precythe,*
   139 S. Ct. 1112 (2019) ............................................................................................. *passim*

*Calderon v. Thompson,*
   523 U.S. 538 (1998) .................................................................................................... 4, 43

*Camp v. Pitts,*
   411 U.S. 138 (1973) ........................................................................................................ 24

*Chavez v. Fla. SP Warden*,
    742 F.3d 1267 (11th Cir. 2014) ........................................................... 43

*Clemons v. Crawford*,
    585 F.3d 1119 (8th Cir. 2009) ............................................................. 28

*Coe v. Bell*,
    89 F. Supp. 2d 962 (M.D. Tenn. 2000)................................................. 40

*Coe v. Bell*,
    230 F.3d 1358 (6th Cir. 2000) .............................................................. 40

*Colvin v. Caruso*,
    605 F.3d 282 (6th Cir. 2010) ............................................................... 41

*Commercial Drapery Contractors, Inc. v. United States*,
    133 F.3d 1 (D.C. Cir. 1998)................................................................. 25

*Cooey v. Strickland*,
    589 F.3d 210 (6th Cir. 2009) ........................................................ 14, 29

*Cooey v. Strickland*,
    No. 2:04-CV-1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011)........... 40

*Cook v. Brewer*,
    637 F.3d 1002 (9th Cir. 2011) .............................................................. 15

*Cook v. FDA*,
    733 F.3d 1 (D.C. Cir. 2013).................................................................. 38

*Creech v. Reinke*,
    No. 1:12-cv-173, 2012 WL 1995085 (D. Idaho June 4, 2012)............... 10

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) .............................................................. 7

*Dunn v. McNabb*,
    138 S. Ct. 369 (2017)........................................................................... 43

*Emmett v. Johnson*,
    532 F.3d 291 (4th Cir. 2008) ............................................................... 29

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*,
    857 F.3d 913 (D.C. Cir. 2017).............................................................. 24

iv

*Estate of Lockett by and through Lockett v. Fallin*,
   841 F.3d 1098 (10th Cir. 2016) ............................................................ 39

*Farmer v. Brennan*,
   511 U.S. 825 (1994) .................................................................... 11, 14

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................... *passim*

*FERC v. Elec. Power Supply Ass'n*,
   136 S. Ct. 760 (2016) ....................................................................... 24

*Florida Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................ 24

*Furman v. Georgia*,
   408 U.S. 238 (1972) ......................................................................... 4

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*,
   779 F.3d 1275 (11th Cir. 2015) ....................................................... 10, 15

*Glossip v. Gross*,
   135 S. Ct. 2726 (2015) ................................................................ *passim*

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ........................................................................ 34

*Gray v. McAuliffe*,
   No. 3:16CV982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017) ................... 20, 30

*Grayson v. Warden, Comm'r , Ala. Dep't of Corr.*,
   869 F.3d 1204 (11th Cir. 2017) .......................................................... 10

*Greater New Orleans Fair Hous. Action Ctr. v. United States Dep't of Hous. & Urban Dev.*,
   639 F.3d 1078 (D.C. Cir. 2011) .......................................................... 42

*Gregg v. Georgia*,
   428 U.S. 153 (1976) ......................................................................... 4

*Hamilton v. Jones*,
   472 F.3d 814 (10th Cir. 2007) ........................................................... 29

*Harbison, v. Little*,
   571 F.3d 531 (6th Cir. 2009) ............................................................ 29

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................................. 3, 23, 36, 38

*Hill v. McDonough*,
    547 U.S. 573 (2006) ...................................................................................... 22, 42, 43

*In re Federal Bur. of Prisons' Execution Protocol Cases*,
    955 F.3d 106 (D.C. Cir. 2020) ....................................................................... 7, 24, 28, 44

*In re Mo. Dep't of Corr.*,
    839 F.3d 732 (8th Cir. 2016) ........................................................................... 10

*In re Ohio Execution Protocol,*
    *Litig.*, 860 F.3d 881 (6th Cir. 2017) ................................................................ 10

*In re Ohio Execution Protocol Litig.*,
    946 F.3d 287 (6th Cir. 2019) ........................................................................... 11, 27

*In re Ohio Execution Protocol Litig.*,
    No. 2:11-CV-1016, 2019 WL 244488 (S.D. Ohio Jan. 14, 2019) ..................... 12

*In re Ohio Execution Protocol Litig.*,
    2-11-cv-1016, 2019 WL 5596645,  (S.D. Ohio July 23, 2019) ......................... 12

*Jones v. Comm'r, Ga. Dep't of Corr.*,
    811 F.3d 1288 (11th Cir. 2016) ........................................................................ 40

*Jordan v. Comm'r, Miss. Dep't of Corr.*,
    908 F.3d 1259 (11th Cir. 2018) ........................................................................ 10

*Ladd v. Livingston*,
    777 F.3d 286 (5th Cir. 2015) ............................................................................ 15

*Landrigan v. Brewer*,
    No. CV-10-2246-PHX-ROS, 2010 WL 4269559 (D. Ariz. Oct. 25, 2010) ........... 15

*Landrigan v. Brewer*,
    625 F.3d 1144 (9th Cir. 2010) ........................................................................... 15

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ............................................................................ 25

*Lewis v. Casey*,
    518 U.S. 343 (1996) ......................................................................................... 40

*Marshall Cty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) .............................................................................. 24

*Mayo v. Reynolds*,
    875 F.3d 11 (D.C. Cir. 2017) ................................................................................ 24

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) .............................................................................................. 7

*McGehee v. Hutchinson*,
    No. 4:17-cv-00179, 2020 WL 2841589 (E.D. Ark. May 31, 2020) ................... 21, 40

*McGehee v. Hutchinson*,
    854 F.3d 488 (8th Cir. 2017) ............................................................................... 10

*Miller v. Parker*,
    910 F.3d 259 (6th Cir.), *cert. denied*, 139 S. Ct. 399 (2018) ............................... 43

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................... 24, 25, 26

*Munaf v. Geren*,
    553 U.S. 674 (2008) .............................................................................................. 7

*PDK Labs. Inc. v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) .............................................................................. 27

*Phillips v. DeWine*,
    841 F.3d 405 (6th Cir. 2016) ............................................................................... 28

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014) .............................................................................................. 39

*Powell v. Thomas*,
    641 F.3d 1255 (11th Cir. 2011) ............................................................................ 27

*Rhoades v. Reinke*,
    671 F.3d 856 (9th Cir. 2011) ............................................................................... 43

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r*,
    295 F.3d 16 (D.C. Cir. 2002) ......................................................................... 41, 42

*Roane v. Leonhart*,
    741 F.3d 147 (D.C. Cir. 2014) .............................................................................. 5

*Sells v. Livingston*,
  561 F. App'x 342 (5th Cir. 2014) ......................................................... 15

*Sepulvado v. Jindal*,
  729 F.3d 413 (5th Cir. 2013) .............................................................. 28

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ............................................................. 8

*Storey v. Lombardi*,
  135 S. Ct. 1198 (2015) ...................................................................... 44

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ........................................................ 41

*Theodore Roosevelt Conservation P'Ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) .......................................................... 25

*Towery v. Brewer*,
  672 F.3d 650 (9th Cir. 2012) ............................................................ 10

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012) .......................................................... 25

*Trottie v. Livingston*,
  766 F.3d 450 (5th Cir. 2014) ............................................................ 27

*United States v. Fausto*,
  484 U.S. 439 (1988) .......................................................................... 33

*United States v. Rutherford*,
  442 U.S. 544 (1979) .......................................................................... 36

*United States v. Wade*,
  388 U.S. 218 (1967) .......................................................................... 40

*Valle v. Singer*,
  655 F.3d 1223 (11th Cir. 2011) ........................................................ 28

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
  435 U.S. 519 (1978) .......................................................................... 24

*Warner v. Gross*,
  135 S. Ct. 824 (2015) ........................................................................ 44

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
  754 F.3d 1260 (11th Cir. 2014) ...................................................................... 15, 28

*West v. Schofield*,
  519 S.W.3d 550 (Tenn. 2017) ................................................................................ 34

*Whitaker v. Collier*,
  862 F.3d 490 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018) ................... 10, 15

*Whitaker v. Livingston*,
  732 F.3d 465 (5th Cir. 2013) ................................................................................. 15

*Wilkerson v. Utah*,
  99 U.S. 130 (1878) ................................................................................................ 22

*Williams v. Hobbs*,
  658 F.3d 842 (8th Cir. 2011) ................................................................................ 28

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................... 8

*Wood v. Collier*,
  836 F.3d 534 (5th Cir. 2016) ................................................................................ 15

*Zagorski v. Parker*,
  139 S. Ct. 11 (2018) ............................................................................................. 10

*Zink v. Lombardi*,
  783 F.3d 1089 (8th Cir. 2015) ..................................................................... *passim*

**Statutes**

5 U.S.C. § 706 .......................................................................................................... 31

18 U.S.C. § 3596 .................................................................................................... 5, 7

21 U.S.C. § 337 ....................................................................................................... 39

21 U.S.C. § 351 ......................................................................................................... 6

21 U.S.C. § 352 ....................................................................................................... 38

21 U.S.C. § 353 ....................................................................................................... 35

21 U.S.C. § 353a ................................................................................................ 35, 37

21 U.S.C. § 353b ................................................................................................. 6, 37

ix

21 U.S.C. § 355 ................................................................................................ 38

21 U.S.C. § 381 ................................................................................................ 38

21 U.S.C. § 802 ........................................................................................... 31, 32

21 U.S.C. § 829 ................................................................................................ 31

21 U.S.C. § 841 ........................................................................................... 31, 35

21 U.S.C. § 842 ................................................................................................ 35

21 U.S.C. § 843 ................................................................................................ 35

21 U.S.C. § 848 .................................................................................................. 4

21 U.S.C. § 871 ................................................................................................ 35

21 U.S.C. § 877 ................................................................................................ 35

21 U.S.C. § 882 ................................................................................................ 35

28 U.S.C. § 3596 .............................................................................................. 23

65 Del. Laws 281(1986) .................................................................................. 33

725 Ill. Comp. Stat. 5/119-5 (1983) ............................................................... 33

1982 Mass. Acts 554 ....................................................................................... 33

Act of Apr. 30, 1790, ch. 9, 1 Stat. 112 .......................................................... 4

Act of June 19, 1937, ch. 367, 50 Stat. 304 ..................................................... 4

Ala. Code § 15-18-82.1 (1975) ....................................................................... 33

Ariz.  Rev. Stat. Ann. § 13-757 (West 1978) .................................................. 33

Ark. Code Ann. § 5-4-617 (Michie 1983) ...................................................... 33

Colo. Rev. Stat. § 16-11-401 (West 1988) ...................................................... 33

Idaho Code § 19-2716 (Michie 1982) ............................................................. 33

Ind. Code § 35-38-6-1 (1983) ......................................................................... 33

Kan. Stat. Ann. § 22-4001 ......................................................................... 33

La. Stat. Ann. § 15:569 (West 1991) .......................................................... 33

Md. Code Ann. art. 27, § 627 (1957) (amended 1994) ................................ 33

Miss. Code. Ann. § 99-19-51 ...................................................................... 23

Mo. Rev. Stat. § 546.720 (1988) ................................................................. 33

N.H. Rev. Stat. Ann. § 630:5 ...................................................................... 33

N.J. Rev. Rev. Stat. § 2C:49-2 (1983) ........................................................ 33

N.M. Stat. Ann. § 31-14-11 ......................................................................... 33

Nev. Rev. Stat. § 176.355 ............................................................................ 33

Ohio Rev. Code Ann. § 2949.22 (West 1993) ............................................. 33

Okla. Stat. tit. 22 § 101 ................................................................................ 33

Okla. Stat. tit. 22 § 1014 .............................................................................. 23

Or. Rev. Stat. § 137.473 ............................................................................... 33

Pa. Stat. Ann. tit. 61, § 2121.1 (West 1990) ............................................... 33

Pub. L. No. 100-690,102 Stat. 4181 (codified at 21 U.S.C. § 848) .............. 4

Pub. L. No. 103-322,108 Stat. 1796 .............................................................. 4

S.D. Codified Laws § 23A-27A-32 ............................................................. 33

Tex. Code Crim. Proc. Ann. art. 43.14 (Vernon 1977) ............................... 33

Utah Code Ann. § 77-18-5.5 (2015) ..................................................... 22, 33

Wyo. Stat. Ann. § 7-13-904 ......................................................................... 33

**Regulations**

21 C.F.R. § 1306.04 .................................................................................... 32

28 C.F.R. §  26.1 ........................................................................................... 4

28 C.F.R. § 26.2 ........................................................................................................ 4

28 C.F.R. § 26.3 ........................................................................................................ 4

28 C.F.R. § 26.14 ...................................................................................................... 4

28 C.F.R. § 26.5 ........................................................................................................ 4

57 Fed. Reg. 56,536 (Nov. 30, 1992) ...................................................................... 33

58 Fed. Reg. 4898 (Jan. 19, 1993) ............................................................................ 4

## **Other Authorities**

Black's Law Dictionary (11th ed. 2019) .................................................................. 32

FDA, *Facts About the Current Good Manufacturing Practices (CGMPS)*,
     https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-
     manufacturing-practices-cgmps .......................................................................... 6

FDA, Guidance for the Industry, https://www.fda.gov/regulatory-information/search-fda-
     guidance-documents/investigating-out-specification-test-results-pharmaceutical-production  17

Sanders RD, Tononi G, Laureys S, Sleigh JW. Unresponsiveness ≠ unconsciousness.
     Anesthesiology 2012; 116:946-59 ..................................................................... 13

The Marshall Project, *After Lethal Injection* (June 1, 2015),
     https://www.themarshallproject.org/2015/06/01/after-lethal-injection ................... 22

*Whether the Food & Drug Admin. Has Jurisdiction over Articles Intended for Use in Lawful
     Executions*, 2019 WL 2235666 (May 3, 2019) .................................... 35, 36, 37, 38

## INTRODUCTION

Plaintiffs Daniel Lewis Lee, Dustin Lee Honken, Wesley Ira Purkey, and Keith Nelson (collectively, "Plaintiffs") each were convicted of "exceptionally heinous" crimes of murdering children in violation of federal criminal law. *Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (statement of Alito, J.). Each received a lawful death sentence imposed over fifteen years ago. Lee was convicted by a federal court in Arkansas of murdering three members of a family, including an eight-year-old girl. Purkey was convicted by a federal court in Missouri of the kidnap, rape, and murder of a 16-year-old girl whose body he burned after dismembering it with a chainsaw. Honken was convicted by a federal court in Iowa for the murder of two prospective federal witnesses, along with one of their girlfriends and her two young daughters. And Nelson pled guilty before a federal court in Missouri to the kidnap, rape, and murder of a ten-year-old girl.

The Federal Bureau of Prisons ("BOP") intends to conduct Plaintiffs' executions using a single-drug (pentobarbital) lethal injection protocol, which is substantively identical to protocols that have been used by States in more than 100 executions and repeatedly upheld by courts— including the Supreme Court just last year in *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019). Despite obtaining this Court's authorization to conduct discovery before the amendment of the complaint, Plaintiffs' motion for a preliminary injunction, *see* Motion, ECF No. 102 ("Mot."), is hardly any different than their prior attempts.

Plaintiffs' claims are equally unlikely to succeed this time around. First, Plaintiffs are unlikely to meet the heavy burden required to prevail on a method-of-execution claim. The Supreme Court has explained that the Eighth Amendment forbids only methods of execution that "intensif[y] the sentence of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace.'" *Bucklew*, 139 S. Ct. at 1124 (quoting *Baze v. Rees*, 553 U.S. 35, 48 (2008)). That is not remotely what the federal government is seeking to do in carrying out Plaintiffs' capital sentences by lethal injection using a drug widely accepted as a humane method of execution. Under a trio of cases— *Bucklew*, *Baze*, and *Glossip v. Gross*, 135 S. Ct. 2726 (2015)—an inmate raising an Eighth Amendment method-of-execution challenge must (1) show that the challenged execution protocol

is sure or very likely to cause severe pain, and, if the inmates makes that showing, (2) plead and prove a known and available alternative method of execution that is feasible and readily implemented, and that in fact significantly reduces a substantial risk of severe harm.  The Supreme Court has "yet to hold that a[ny] State's method of execution qualifies as cruel and unusual." *Bucklew*, 139 S. Ct. at 1124.   In fact, the Court has already held that the use of pentobarbital is humane.  *Id*.  Plaintiffs are exceedingly unlikely to show that use of the same lethal agent by the federal government supports a different result.

Even if Plaintiffs could reach the second prong of the analysis, they are equally unlikely to satisfy it, because they have not identified an alternative method of execution that is feasible, readily implemented, and significantly reduces a substantial risk of severe harm.  As before, Plaintiffs propose introducing additional drugs (opioids or pain-relieving medication) into the protocol and adding certain procedural safeguards to avoid possible maladministration.  Neither proposal suffices.  As to the former, aside from lacking the requisite specificity as to the drug, dosage or dosage form, no State uses opioids in a pentobarbital protocol during executions, which is sufficient by itself to disqualify it as "a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "'feasible [and] readily implemented,'" *id*. at 2737 (quoting *Baze*, 553 U.S. at 52).  As to the latter, *Baze* makes clear that an inmate cannot establish a method-of-execution "claim simply by showing one more step the [government] could take as a failsafe for other, independently adequate measures."  *Baze*, 553 U.S. at 60–61.  This is so because courts are boards of inquiry responsible for assessing best practices for executions.  *See id*. at 51.

Plaintiffs also offer using a firing squad as the method of execution, which is a transparent attempt to forestall their executions.  The firing squad exists as a method of last resort in only three states, none of which are the states of conviction of these Plaintiffs.  It has been used only twice since 1980, and every court that has considered its use has rejected it as an alternative that would "significantly reduce a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737.

Plaintiffs' arbitrary and capricious arguments under the Administrative Procedure Act ("APA") are equally specious.  It was hardly unreasonable for the federal government to choose

the same lethal substance that numerous States also have chosen to carry out many executions. *See*, *e.g.*, Petition for Certiorari 21-23, *Roane v. Barr*, No. 19-1348 (filed June 5, 2020).   The Supreme Court has expressly warned against "import[ing] profound differences of opinion over the meaning of the Eighth Amendment . . . into the domain of administrative law." *Heckler v. Chaney*, 470 U.S. 821, 838 (1985).  The APA's highly deferential standard of review does not permit this Court to substitute its own judgment for that of BOP or ask whether BOP's Protocol is the best one possible or even whether it is better than the alternatives.  Rather, the Court's review is limited to determining whether there has been a clear error of judgment.  And despite Plaintiffs' attempts to rely on extra-record declarations to controvert the agency's reasoned conclusion, this Court does not act as a factfinder but sits only as an appellate tribunal whose review is limited to the administrative record.  This is particularly the case in method-of-execution cases such as this, in which the Supreme Court has cautioned that courts are not boards of inquiry responsible for assessing the best practices for executions.   And here, the Administrative Record fully demonstrates that BOP engaged in reasoned decision-making when adopting the Protocol.

Plaintiffs' claims that the Protocol violates the prescription requirements of the Controlled Substances Act ("CSA") and the Federal Food, Drug, and Cosmetic Act ("FDCA"), also are not likely to succeed.  Those statutes' prescription provisions do not apply in the context of the Government's use of lethal injection.  Put simply, abiding by such provisions would make execution by lethal injection impossible, which Congress could not have intended when it enacted the Federal Death Penalty Act ("FDPA").

Finally, Plaintiffs are not likely to succeed on their access-to-counsel claim.  A constitutional right to counsel throughout an execution does not exist, and Plaintiffs' concerns about COVID-19 are a far cry from a constitutional violation, as they have no basis in fact and, in any event, were not raised in the Amended Complaint.

As the Supreme Court made clear in *Glossip*, Plaintiffs' failure to establish a likelihood of success on the merits necessarily means their motion should be denied.  But even if the Court were to consider the other preliminary injunction factors, the equities decidedly tip against issuance of

an injunction.  Plaintiffs do not contend in this forum that they cannot lawfully be executed; and the government, the public, and the victims' families have a compelling interest in the timely enforcement of a lawful death sentence once post-conviction proceedings have run their course. To delay the implementation of a valid death sentence in such circumstances, the Supreme Court recognized, is "to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the [government] and the victims of crime alike."  *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (internal citations omitted).

## BACKGROUND

### I.     STATUTORY AND REGULATORY BACKGROUND[1]

Federal law has authorized capital punishment since 1790.  *See* Act of Apr. 30, 1790, ch. 9, §§ 1, 3, 33, 1 Stat. 112, 112, 113, 119.  For the next 147 years, federal law prescribed "hanging . . . by the neck until dead" as the method of execution.  Act of Apr. 30, 1790, § 33, 1 Stat. at 119. In 1937, Congress mandated that each federal execution be carried out "in the manner prescribed by the laws of the State within which the sentence was imposed."  Act of June 19, 1937, ch. 367, 50 Stat. 304, 304 ("1937 Act").  Following the Supreme Court's decisions in *Furman v. Georgia*, 408 U.S. 238 (1972), and *Gregg v. Georgia*, 428 U.S. 153 (1976), placing procedural limits on the imposition of capital sentences, Congress repealed the 1937 Act and in 1988 reinstated the federal death penalty for certain federal crimes, *see* ADAA, Pub. L. No. 100-690, 102 Stat. 4181; *id.* § 7001(a) (codified at 21 U.S.C. § 848(e)).  In 1993, the Department of Justice ("DOJ") issued a rule providing for lethal injection as the method of execution for federal capital crimes.  58 Fed. Reg. 4898 (Jan. 19, 1993); *see* 28 C.F.R. 26.1-26.5 (codifying the rule). A year later, Congress enacted the FDPA, Pub. L. No. 103-322, § 60002, 108 Stat. 1796, 1959, which provides that a

---

[1] This Court is familiar with the statutory and regulatory background relevant in this case, as articulated in the Court's memorandum opinion of November 20, 2019, *see* Mem. Op. at 2-5, ECF No. 50, as well as in Defendants' prior oppositions to Plaintiffs' previous motions for preliminary injunction, *see* ECF No. 6 at 2-5, No. 16 at 4-10, No. 36 at 4-11, No. 37 at 4-10.  Accordingly, we only briefly address such background herein.

4

federal death sentence shall be carried out "in the manner prescribed by the law of the State in which the sentence is imposed."  18 U.S.C. § 3596(a).

## II.    THE 2019 PROTOCOL FOR FEDERAL EXECUTIONS

BOP has an internal manual outlining its policy and procedures for planning and carrying out death sentences.  AR 1016–67 ("BOP Manual").  The lethal substance(s) and the procedures for injecting such substance(s) are set forth in an addendum to the BOP Manual.  Prior to 2011, the addendum called for a sequence of three drugs.  *See Roane v. Leonhart*, 741 F.3d 147, 149 (D.C. Cir. 2014).  In 2011, after it could no longer obtain one of the drugs, BOP began exploring the possibility of using pentobarbital as the lethal agent.  BOP visited state execution sites, observed state executions, and reviewed state lethal injection protocols.  AR 7–105, 871, 930, 933.

In ultimately selecting pentobarbital, BOP considered its "widespread use by the states," including the fact that the five states that use only a single-drug pentobarbital protocol collectively have conducted more than 100 executions using such a protocol.  AR 871.  BOP also reviewed numerous judicial opinions upholding the use of pentobarbital in executions against Eighth Amendment challenges, *see* AR 871, n.13, 932, and considered the fact that state-condemned inmates frequently propose a single dose of pentobarbital as the alternative, preferred method, *see* AR 931.  Moreover, BOP consulted with medical professionals, AR 525–26, 871, 872, 930, and reviewed expert testimony concerning pentobarbital and other drugs.  AR 934.  In addition, BOP explored alternatives, including using pentobarbital in a three-drug sequence, AR 871, and using other drugs, AR 871, 964 (propofol); AR 862–65 (fentanyl); AR 931, 966 (midazolam, sufentanil citrate, and potassium chloride); AR 968 (midazolam and hydromorphone).

No domestic commercial supply of pentobarbital exists for use in executions.  Recognizing that federal courts of appeals have routinely denied Eighth Amendment challenges to the use of compounded pentobarbital, AR at 857–58, BOP selected a DEA-registered domestic bulk manufacturer to produce the active pharmaceutical ingredient ("API"), and ensured that the API was subjected to quality assurance testing.  AR 872.  BOP further selected a DEA-registered compounding pharmacy to store the API and to convert it into injectable form as needed.  AR 872,

857. The pharmacy is also registered with the FDA pursuant to section 503B of the FDCA, 21 U.S.C. § 353b. AR 1084; Decl. of Raul Campos, ¶ 3 (Nov. 12, 2019), ECF No. 36–1. Section 503B facilities are subject to the FDA's "Current Good Manufacturing Practice ('CGMP') requirements," 21 C.F.R. Pts. 201 & 211, which are regulations designed to ensure that human pharmaceuticals "meet quality standards."[2] *See* AR 1084. To date, the pharmacy has also worked with two independent laboratories to conduct quality assurance testing of the compounded pentobarbital solution it produces from the API. AR 1084, 970–1015, 1075–1083. Further, BOP confirmed with the DEA that the BOP facility in Terre Haute, Indiana meets the regulatory requirements for storage and handling of pentobarbital. AR 872. And in March 2020, BOP adopted "General Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions" to ensure that quality assurance testing is completed and the results verified by BOP prior to a scheduled execution. AR 1084–85.

On July 25, 2019, at the Attorney General's direction, BOP adopted a revised addendum ("Addendum") to the BOP Manual that replaced the three-drug procedure with the use of a single drug, pentobarbital sodium, as the lethal agent. AR 868, 874–75, 1068–70. We refer to the Addendum and the Manual collectively as the "Protocol." The Addendum sets forth procedures for BOP to administer the lethal injection. AR 874. Specifically, it provides that the BOP Director, in conjunction with the U.S. Marshals Service, shall select "qualified personnel" to serve as the executioner(s) and their alternates. AR 874. The Addendum further specifies that "qualified personnel" who are not medically licensed or certified are required to participate in a minimum of ten execution rehearsals a year and shall have participated in at least two execution rehearsals prior to participating in an actual execution. AR 874. As for administering the lethal agent, the Addendum provides that the lethal substance shall be placed into three sets of numbered and

---

[2] FDA, *Facts About the Current Good Manufacturing Practices (CGMPS)*, https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmps.
.

labeled syringes, with two of those sets serving as backups.  AR 875.  Each set of syringes will consist of two syringes containing 2.5 grams of pentobarbital sodium in 50 ml of diluent and one syringe containing 60 ml of saline flush.  AR 875.

## III.   PROCEDURAL HISTORY

On November 20, 2019, the Court granted a preliminary injunction prohibiting the government from executing Plaintiffs Lee, Honken, Purkey and Bourgeois.  *See* ECF No. 50, Mem. Op.  The Court held that those Plaintiffs had demonstrated a likelihood of success on a single ground:  that the Protocol conflicts with the FDPA's requirement that federal executions be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. 3596(a); *see* Mem. Op. at 7-8.[3]  Defendants appealed, and in April 2020, the D.C. Circuit vacated the preliminary injunction and directed entry of judgment for the government on Plaintiffs' FDPA and APA notice-and-comment claims.  955 F.3d 106, 108-113 (D.C. Cir. 2020) (per curiam).  Those Plaintiffs have petitioned for a writ of certiorari and sought a stay pending disposition of that petition, and the Supreme Court will consider those requests at its June 25, 2020, conference.  *Roane v. Barr*, No. 19A1050, Order in Pending Case (June 18, 2020).

While the appellate process has proceeded, all of the plaintiffs in this consolidated action filed a consolidated Amended Complaint, *see* ECF No. 92.  Plaintiffs Lee, Honken, Nelson, and Purkey now move for a preliminary injunction to prevent the BOP from carrying out their executions.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek*

---

[3]  Honken was convicted by a federal district court in Iowa, a State that does not have a death penalty.  Mem. Op. at 11 n.4.  Pursuant to the FDPA's direction for such a circumstance, the sentencing court designated Indiana—which provides for execution by lethal injection—to serve as the "death penalty state" for purposes of his execution.  *Id.*; *see* 18 U.S.C. 3596(a).

*v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).   The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).   The "most important factor" is whether the movant has "established a likelihood of success on the merits," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).   In the context of an Eighth Amendment method-of-execution challenge, the Supreme Court has held that an inmate's failure to establish a likelihood of success, alone, warrants denial of the inmate's motion to preliminarily enjoin his execution. *See Glossip*, 135 S. Ct. at 2737.   As discussed below, Plaintiffs have failed to make the requisite showing.

## ARGUMENT

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR EIGHTH AMENDMENT CLAIM

### A.  The Standard for Method-of-Execution Challenges

The Eighth Amendment forbids "long disused (unusual) forms of punishment that intensif[y] the sentence of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace,'" *Bucklew*, 139 S. Ct. at 1124 (quoting *Baze*, 553 U.S. at 48), but "[it] 'does not demand the avoidance of all risk of pain in carrying out executions,'" *id.* at 1125 (quoting *Baze*, 553 U.S. at 47).   Thus, the Supreme Court requires inmates challenging a method of execution to establish initially that the method "is '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 50).   "[T]here must be 'a substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* (quoting *Baze*, 553 U.S. at 50).   The fact that "an execution may result in pain, either by accident or as an inescapable consequence of death," is insufficient to state an Eighth Amendment claim. *Baze*, 553 U.S. at 50.

Even if an inmate does show a substantial risk of severe harm, the Eighth Amendment analysis is "a *necessarily* comparative exercise," *Bucklew*, 139 S. Ct. at 1126, so an inmate must also "plead and prove a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain,'" *id*. at 2737 (quoting *Baze*, 553 U.S. at 52).  Merely "'showing a slightly or marginally safer alternative,'" *id.* (quoting *Baze*, 553 U.S. at 51), or "[a] minor reduction in risk is insufficient"; rather, "the difference must be clear and considerable," *Bucklew*, 139 S. Ct. at 1130.  Otherwise, courts would become "boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Baze*, 553 U.S. at 51; *accord Bucklew*, 139 S. Ct. at 1125.

Finally, the inmate must demonstrate that the government has refused to adopt the inmate's proposed alternative "without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125.  As the Supreme Court recognized, there are "many legitimate reasons why [the government] might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution." *Id.*  And "the Constitution affords a measure of deference to [the government's] choice of execution procedures." *Id.* (citation omitted).

### B.  The 2019 Protocol Does Not Pose A Substantial Risk of Severe Harm

#### 1.  Plaintiffs are unlikely to succeed in challenging the use of pentobarbital.

Plaintiffs are not likely to succeed in showing that pentobarbital poses a "substantial risk of severe pain" or an "objectively intolerable risk of harm." *Glossip*, 135 S. Ct. at 2737.

*Baze* recognizes that "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated."  553 U.S. at 53.  That is the case with pentobarbital.  *Bucklew* upheld Missouri's single-drug pentobarbital protocol only last year, and "courts across the country have held that the use of pentobarbital in executions does not violate the Eighth Amendment," *Glossip*, 135 S. Ct. at 2733.  More than one hundred executions using a single-drug pentobarbital protocol have been carried out by five States.  AR 871.  Those States' protocols have withstood Eighth

Amendment challenges. *See Whitaker v. Collier*, 862 F.3d 490, 498–99 (5th Cir. 2017) (Tex.), *cert. denied*, 138 S. Ct. 1172 (2018); *Zink v. Lombardi*, 783 F.3d 1089, 1106–07 (8th Cir. 2015) (en banc) (Mo.); *Towery v. Brewer*, 672 F.3d 650, 658–59 (9th Cir. 2012) (Ariz.); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280–83 (11th Cir. 2015) (Ga.); *Creech v. Reinke*, No. 1:12-cv-173, 2012 WL 1995085, at *14–22 (D. Idaho June 4, 2012) (Idaho).

Moreover, inmates challenging different execution protocols frequently proffer pentobarbital as an alternative that would significantly reduce the risk of severe pain as compared to other lethal agents. *See, e.g.*, *Glossip*, 135 S. Ct. at 2738; *Jordan v. Comm'r, Miss. Dep't of Corr.*, 908 F.3d 1259, 1262 (11th Cir. 2018); *Grayson v. Warden, Comm'r , Ala. Dep't of Corr.*, 869 F.3d 1204, 1212 (11th Cir. 2017); *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017); *In re Mo. Dep't of Corr.*, 839 F.3d 732 (8th Cir. 2016); *In re Ohio Execution Protocol Litig.*, 860 F.3d 881, 890-91 (6th Cir. 2017); *see also Zagorski v. Parker*, 139 S. Ct. 11, 11–12 (2018) (Sotomayor, J., dissenting) ("Pentobarbital . . . does not carry the risks described above; unlike midazolam . . . pentobarbital is widely conceded to be able to render a person fully insensate.").

The two experts with whom BOP consulted—Drs. Joseph F. Antognini, M.D., and Craig W. Lindsley, Ph.D—confirmed that BOP's single-drug pentobarbital protocol is humane. AR 525, 872. Dr. Antognini, whose testimony was credited by the Supreme Court in *Bucklew*, opined that the "[i]njection of massive doses of barbiturates [pentobarbital] would not inflict mild, moderate, or severe pain." AR 406, ¶ 26; *see also* Ex. D, Decl. of Dr. Joseph Antognini, M.D. ("Antognini Decl."), ¶ 23 (June 25, 2020); AR 405 ("numerous eyewitness observations of [19] executions in Missouri . . . indicate that pentobarbital has its intended effect: a rapid onset of unconsciousness followed by death"); AR 407–524. Dr. Lindsley similarly opined that "at the doses administered (2.5 g x 2 IV), the person receiving [pentobarbital] . . . will lose consciousness within 10–30 seconds after the first injection, and respiratory depression/heart failure will ensue within minutes," and that "he will be unaware of any pain or suffering due to the rapidity of the effect." AR 525; *see also id.* (noting "highly consistent results and extremely rapid and peaceful passing

(as relayed by witness accounts)").  In addition, Dr. Lindsley opined that the Protocol "is more humane than the other double and triple agent injections still employed."  AR 525.

Nevertheless, Plaintiffs insist that an inmate "given a five-gram dose of pentobarbital" "will remain sensate" and experience "'extreme pain and suffering during the execution process.'" Am. Compl. ¶ 74 (quoting Decl. of Gail Van Norman, M.D. at 7 (Nov. 11, 2019, ECF No. 24)). In Plaintiffs' view, unbeknownst to all the states that use pentobarbital for executions and every court that has upheld its use, including the Supreme Court in *Bucklew* last year, pentobarbital actually causes an unconstitutional level of pain.  That cannot be correct.  Given the widespread use of pentobarbital in executions and the amount of litigation that has already occurred across the country, Plaintiffs "should be required to do more than simply offer the testimony of a few experts or a few studies" and "should point to a well-established scientific consensus." *Baze*, 553 U.S. at 67 (Alito, J. concurring).  "Only if [the government] refused to change its method in the face of such evidence would [its] conduct be comparable to circumstances that the [Supreme] Court has previously held to be in violation of the Eighth Amendment." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 836 (1994)).  Here, the consensus is the other way around.

There is also no new scientific breakthrough regarding the effect of using a lethal dose of pentobarbital.  Plaintiffs' theory is that flash pulmonary edema occurs "virtually immediately during and after high-dose barbiturate injection."  Mot. at 7.  Plaintiffs liken it to "waterboarding" and maintain that an inmate would experience the sensation of drowning or suffocation due to "an accumulation of fluid or froth in the lungs."  *Id.* at 21, 22.  According to Plaintiffs, *Bucklew* is therefore not dispositive because it did not address the issue of flash pulmonary edema, as the inmate in that case did not raise it despite raising numerous health concerns.

But the Sixth Circuit recently addressed this issue in *In re Ohio Execution Protocol Litigation*, and held that pulmonary edema does not "qualify as the type of serious pain prohibited by the Eighth Amendment."  946 F.3d 287, 289 (6th Cir. 2019).  At issue there was the inmate's claim that the State's use of midazolam for his execution would cause pulmonary edema.  As the court analyzed, the risk of pain associated with pulmonary edema is comparable to that "associated

with" other forms of execution that have long been upheld as constitutional, "such as hanging." *Id.* If anything, the court observed, pulmonary edema "indeed may present fewer risks in the typical lethal-injection case." *Id.* at 290; *see also id.* (noting *Bucklew*'s observation that "'many and perhaps most hangings were evidently painful for the condemned person . . . because they caused death slowly,' namely through suffocation over several minutes'" (quoting *Bucklew*, 139 S. Ct. at 1124)). Accordingly, the court held that pulmonary edema does not meet the "very high bar" required by *Glossip*'s first prong. *Id.*[4] This conclusion is consistent with *Bucklew* because *Bucklew* did not assume that an inmate would feel no pain; to the contrary, it allowed for the possibility that the inmate could experience feelings of "suffocation and excruciating pain" for as long as 20 to 30 seconds. *See* 139 S. Ct. at 1132 (citation omitted).

But Plaintiffs in fact are unlikely to experience any pain. Dr. Antognini, who served as the State's expert in the Ohio execution protocol litigation, acknowledged in that case that "[t]he presence of pulmonary edema is a common finding in drug overdose"—drug overdose being the method by which inmates are executed whether that drug is midazolam (at issue in that case), pentobarbital, or an opioid. *See In re Ohio Execution Protocol Litig.*, 2-11-CV-1016, 2019 WL 5596645, ¶¶ 25, 38 (S.D. Ohio July 23, 2019). However, Dr. Antognini also stated that "the presence of pulmonary edema and frothy fluid likely occurred post-mortem." *Id.* ¶ 40. As Dr. Antognini explained, the inmate would not feel the sensation of pain or "air hunger" (i.e. suffocation) because "upon administration of pentobarbital," reports show that inmates "became apneic (stopped breathing) almost immediately." *Id.* ¶¶ 25, 40. In other words, even if pulmonary edema occurs prior to death, inmates do not feel the sensation of drowning or suffocation before death occurs.

Significantly, Plaintiffs' experts do not dispute, as the Supreme Court found in *Bucklew* based on Dr. Antognini's testimony, that pentobarbital will render an inmate insensate rapidly.

---

[4] Notably, the court so held in spite of the testimony of Dr. Mark A. Edgar, M.D., *see In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2019 WL 244488, at *11 (S.D. Ohio Jan. 14, 2019), who is also Plaintiffs' expert in this litigation.

*See* 139 S. Ct. at 1132.  As the attached declaration of Dr. Antognini further explains, pentobarbital administered to humans results in unconsciousness in 20 to 30 seconds on average.   Ex. D, Antognini Decl. ¶ 8.  This effect is dose dependent, and in a 100-kg person, this dose would be 500 mg, which is only 10% of the dose used in the BOP Protocol.  *Id.*  Thus, once 500 mg has been injected, a 100-kg person would become insensate, and that would be before the occurrence of pulmonary edema because pulmonary edema would only result from a much larger dosage (*i.e.* an overdose).  *Id.*  That is, before becoming unconscious, the individual would not feel the sensation of pain, suffocation, or air hunger.  *Id.*  And as the additional 4500 mg of pentobarbital is administered, the inmate would have progressive brain depression, with electrical brain silence occurring, followed by cardiovascular collapse.  *Id.* In other words, the inmate would not feel the sensation of pain, suffocation, or air hunger after becoming unconscious, either.  *Id.*

Plaintiffs assert that the scientific consensus upon which many courts and BOP's experts rely is "outdated" and "thoroughly discredited."  Mot. at 22.  They cite as support their own expert Dr. Van Norman's declaration and portions of the *Bucklew* opinion discussing Dr. Antognini's testimony.  *See id.* (citing *Bucklew*, 139 S. Ct. at 1131).  First, the portion of the *Bucklew* opinion cited by Plaintiffs indisputably shows that the Supreme Court credited Dr. Antognini's testimony.  *See Bucklew*, 139 S. Ct. at 1132 (noting that the primary study relied upon by the inmate's expert actually "appear[ed] to bolster Dr. Antognini's time estimate").  Second, the vast majority of Dr. Van Norman's citations are dated; many are more than a decade old.  *See, e.g.*, Van Norman Decl., ¶¶ 25, 37, 38, 49, 75, 100, 110.  And even the more recent articles Dr. Van Norman cites do not speak to the precise issue before the Court.  For instance, one such article from 2012 concerns pulmonary edema generally or consciousness during anesthesia, rather than consciousness after a lethal overdose of a barbiturate.  *See, e.g.*, Van Norman Decl. ¶¶ 24, 35, 53, 56 (citing, Sanders RD, Tononi G, Laureys S, Sleigh JW. Unresponsiveness ≠ unconsciousness. Anesthesiology 2012; 116:946-59).  Indeed, that article specifically limits its goal to "define more clearly the component features of the anesthetic state that subserve the experience of surgery."  Sanders at 116:946-59.

As Dr. Antognini observed, Dr. Van Norman focuses much of her report on consciousness during anesthesia, consciousness versus responsiveness, awareness during anesthesia and the isolated forearm technique (whereby "relatively 'light' levels of anesthesia" was used), and ignores the profound central nervous system depression that is caused by a massive dose of pentobarbital. Ex. D, Antognini Decl. ¶ 12.  In Dr. Antognini's view, Dr. Van Norman "provides no evidence that perception and awareness occur when the brain is profoundly depressed by pentobarbital for the simple reason that there is none." *Id.*  "Conscious awareness, as we typically think of it, and the ability to suffer and experience pain, are not consistent with such profound brain suppression." *Id.*

Similarly, the principal sources Dr. Edgar cites on pulmonary edema are more than 15 years old.  *See* Declaration of Mark A. Edgar, M.D., ECF No. 26-12, ¶¶ 5, 83, 84.  Moreover, as Dr. Antognini noted, Dr. Edgar's report focuses on the findings of pulmonary edema and lung congestion at autopsy in inmates executed with pentobarbital, and on witness accounts of executions using pentobarbital, but does not provide any evidence that pulmonary edema occurred during the brief 20-30 second period when the inmate was conscious and aware after the initiation of pentobarbital infusion.   Ex. D, Antognini Decl. ¶ 20.  Again, Dr. Antognini opines that "[w]hether pentobarbital causes pulmonary edema directly, or indirectly as a natural consequence of the dying process, is immaterial inasmuch as the inmate would be profoundly unconscious, to the point of electrical brain silence." *Id. ¶* 21.

### 2.  Plaintiffs' remaining challenge to the Protocol is based on speculation.

Plaintiffs' remaining arguments under the first prong of *Glossip* are premised on speculation that something could go wrong with either the preparation of the pentobarbital or the IV insertion during their executions—what courts refer to as "maladministration."  *Baze*, 553 U.S. at 41.  These arguments are not likely to succeed in establishing a method-of-execution claim.

To "successfully plead[] facts to demonstrate a substantial risk of severe pain requires the prisoners to plead more than just a hypothetical possibility that an execution could go wrong."

*Zink*, 783 F.3d at 1098–99.  An "innocent misadventure" or "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'"  *Baze*, 553 U.S. at 50 (quoting *Farmer*, 511 U.S. at 842.  Again, "what [the Eighth] Amendment prohibits is *wanton exposure* to objectively intolerable risk . . . not simply the possibility of pain."  *Id.* at 61–62 (citation omitted) (emphasis added).  In *Baze*, the method-of-execution challenge failed despite the fact that the condemned inmates similarly pointed to "numerous aspects of the [challenged] protocol that they contend create opportunities for error." 553 U.S. at 53; *see id.* at 54.  And following *Baze*, appellate courts have routinely rejected maladministration arguments of the type raised by Plaintiffs here.  *See, e.g.*, *Zink*, 783 F.3d at 1101 ("[Even if] any of the hypothetical situations the prisoners identify came to pass," isolated mishaps "would not result in an Eighth Amendment violation"); *Cooey v. Strickland*, 589 F.3d 210, 225 (6th Cir. 2009) ("Permitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of our judicial authority.").

Plaintiffs speculate that the compounded pentobarbital BOP intends to use likely will be contaminated or sub-potent.  Mot. 14–20.  This is so because in their view "[d]rugs produced by compounding pharmacies pose a higher risk to patients than do FDA-approved products because they have not been tested for safety and efficacy and they are typically not made pursuant to the same quality standards."  *Id.* at 15.  But Plaintiffs' "speculation cannot substitute for evidence that the use of the [compounded] drug is '*sure or very likely* to cause serious illness and needless suffering.'"  *Brewer v. Landrigan*, 562 U.S. 996 (2010) (quoting *Baze*, 553 U.S. at 50).  Supreme Court precedent is clear on this point.

In *Landrigan*, the district court granted a temporary restraining order finding that the inmate was likely to succeed on the merits of his challenge to Arizona's use of sodium thiopental that was manufactured by a foreign source not approved by the FDA.  No. CV-10-2246, 2010 WL 4269559, at *4 (D. Ariz. Oct. 25, 2010).  Because Arizona did not provide information about

15

whether the foreign company followed standard operating procedures for the drug's manufacture and whether the company had a history of contamination in manufacturing the drug, the court found that the inmate had plausibly alleged that the drug could contain harmful contaminants affecting its efficacy. *Id.* The Ninth Circuit affirmed. 625 F.3d 1144 (9th Cir. 2010).

The Supreme Court vacated the injunction. 562 U.S. at 996. Although the inmates had alleged a plausible scenario, the Court held that courts may not "speculate as to the risk of harm," when there was "no evidence in the record to suggest that the drug obtained from a foreign source is unsafe." *Id. Landrigan* thus stands for the proposition that a court may not accept an inmate's speculation as to the potential risk of harm without specific factual allegations establishing an actual risk. *See, e.g.*, *Cook v. Brewer*, 637 F.3d 1002, 1007 (9th Cir. 2011) (dismissing inmates' complaint that alleged that a non-FDA approved, foreign-manufactured drug used by the State could be ineffective, contaminated, and could differ greatly in potency, quality, and formation from other FDA regulated drugs because "*Landrigan* . . . advises that [those speculative assertions] are not sufficient to state a plausible Eighth Amendment claim").

Consistent with *Landrigan*, courts routinely reject challenges to the use of compounded pentobarbital, whether the challenge is based on the inherent risks of compounding or the fact of non-FDA approval. *See, e.g.*, *Whitaker*, 862 F.3d at 498–99; *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016); *Gissendaner*, 779 F.3d at 1283; *Ladd v. Livingston*, 777 F.3d 286, 289 (5th Cir. 2015); *Wellons*, 754 F.3d at 1265; *Sells v. Livingston*, 561 F. App'x 342, 345 & n.3 (5th Cir. 2014); *Whitaker v. Livingston*, 732 F.3d 465, 468–69 (5th Cir. 2013).

The Eighth Circuit's decision in *Zink v. Lombardi*, 783 F.3d 1089, 1101 (8th Cir. 2015), rejecting a challenge to Missouri's use of compounded pentobarbital is a good example. Citing *Landrigan*, the court held that the inmates' allegations relating to compounded pentobarbital did not rise to an unconstitutional level of pain because they were "limited to descriptions of hypothetical situations in which a potential flaw in the production of the pentobarbital or in the lethal-injection protocol could cause pain." *Id.* at 1101. The court reasoned that the experts' views cited in the complaint, which noted that "the use of compounding pharmacies 'often results' in

16

'potentially unsafe drugs,'" actually "underscore that the harms they have identified are hypothetical and not '*sure or very likely*' to occur." *Id.* The court thus dismissed the complaint for failure to state a claim. If the inmates in *Zink* cannot state a claim, then Plaintiffs surely are unlikely to succeed in establishing the first prong of *Glossip* on the strength of similar speculation.

Plaintiffs' speculation about the quality of the compounded pentobarbital is particularly unwarranted because BOP uses an FDA-registered 503B facility to produce the injectable pentobarbital. *See* AR 1084; Campos Decl., ¶ 3. As explained above, unlike the vast majority of the compounding pharmacies, facilities registered with FDA under section 503B as "outsourcing facilities" are inspected by the FDA and subject to the FDA's regulations designed to ensure that human pharmaceuticals meet quality standards. *See* AR 1084. For example, 503B facilities must subject samples from each batch of compounded injectable solution they produce to quality assurance testing to ensure that the batch meets appropriate specifications and quality control criteria before it is released. *See id.* To date, the pharmacy has worked with two independent laboratories to conduct such quality assurance testing, *id.*, and both confirmed that the injectable solution produced by the compounding facility to date met quality assurance standards. *See id.* at 970–1015, 1075–1083 (laboratory reports and investigation report).

Plaintiffs nevertheless assert that they have established a substantial risk of harm because the chosen pharmacy had not previously compounded pentobarbital, and that the quality of at least one batch of the pentobarbital intended for use in last year's execution "has been called into question." Mot. at 16. These assertions are legally irrelevant for the reasons explained above. Moreover, the pharmacy has since acquired experience compounding pentobarbital, having produced pentobarbital solution before the adoption of the Protocol for quality assurance testing and shelf-life study by independent laboratories, *see* AR 970–1015, as well as in preparation for the executions scheduled in December 2019 and January 2020, *see id.* 1075–78. Although one of the latter batches initially returned a result outside the applicable range for potency and purity, the independent laboratory that produced the result conducted an investigation consistent with the

17

FDA's guidance on investigating out-of-specification test results.[5]  AR 1079–83.  It determined that the pentobarbital solution produced by the pharmacy was in fact within the applicable range, *see id.* at 1078, but that the laboratory's sample preparation error had contributed to a false out-of-specification result, *id.* at 1082.  *See* Ex. B, Dep. of Rick Winter (Nov. 15, 2019), Tr. 41:7-18.

If that were not enough, in March 2020, BOP adopted "General Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions."  *See* AR at 1084–85. The Guidelines set forth timelines for preparation of pentobarbital injection solution so as to ensure that there is pentobarbital solution "available for use" in an execution, defined to mean that the drug has not expired; has passed quality assurance testing conducted by at least one independent laboratory; and that BOP has received a copy of the written laboratory report confirming the same. AR 1085.  It also describes the further testing necessary to determine whether a batch that has initially returned a value outside any of the applicable ranges may be used in an execution.  AR 1085.  Given the care BOP is taking to ensure that the pentobarbital to be used in executions will meet quality assurance standards, Plaintiffs are unlikely to succeed in showing that they face a substantial risk of severe pain due to BOP's use of a compounding pharmacy.

### C.  Plaintiffs Fail to Propose An Alternative That Will Significantly Reduce A Substantial Risk of Severe Pain

Even if they were somehow able to show that pentobarbital creates a substantial risk of severe pain, Plaintiffs are unlikely to meet the second prong of the stringent standard for a method-of-execution challenge, which requires an inmate to "plead and prove a known and available alternative," *Glossip*, 135 S. Ct. at 2739, that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain," *id.* at 2737 (citation omitted), and that the government has no legitimate reason not to implement, *Bucklew*, 139 S. Ct. at 1125.  None of the three alternatives Plaintiffs propose meets this standard.  *See* Mot. at 25–28.

---

[5] *See* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/investigating-out-specification-test-results-pharmaceutical-production.

First, Plaintiffs suggest BOP adopt a two-drug protocol by adding "a clinical dose of an opioid or other comparable and appropriate pain-relieving medication" prior to injecting pentobarbital to address any pain they might feel from the pentobarbital.  Mot. at 21.  Plaintiffs do not identify which opioid or pain-relieving medication should be used and in what form or dosage. The lack of specificity alone renders the proposal deficient.  *See Bucklew*, 139 S. Ct. at 1129 (rejecting inmate's "bare-bones" proposal as insufficient; "the inmate's proposal must be sufficiently detailed to permit a finding that the [government] could carry it out 'relatively easily and reasonably quickly'" (citation omitted)).  The litigation over lethal injection protocols also leaves no doubt that moving from a one-drug protocol to a two-drug protocol will trigger additional litigation.  Moreover, BOP has concluded that a one-drug protocol would avoid the complications inherent in obtaining multiple lethal injection drugs and in navigating expiration dates of multiple drugs.  AR 871, 930–31.  It also would "reduce the risk of errors during administration and eliminate the need to orchestrate the pace and sequence of administering multiple drugs."  AR 931. These are legitimate reasons for not expanding the number of drugs being administered.

Specific to the suggestion of adding an opioid to the protocol, no State actually adds an opioid to a pentobarbital protocol.  Because the approach "ha[s] 'never been used to carry out an execution' and ha[s] 'no track record of successful use,'" BOP is not required to adopt it.  *Bucklew*, 139 S. Ct. at 1130.  As the Supreme Court recognized, "choosing not to be the first [State] to experiment with a new method of execution is a legitimate reason to reject it."  *Id.*  In fact, one of the reasons BOP decided against using fentanyl was that it had never been used in an execution. AR 865.  There was also concern that manufacturers of fentanyl would "refuse to provide medications used for clinical treatments of inmates should they find out their drugs are being used for executions."  *Id.* at 864.  And there is certainly no scientific consensus that adding an opioid or, for that matter, a pain-relieving medication, to the protocol would in fact *significantly* reduce the risk of severe pain, as pentobarbital will quickly render an inmate unconscious.

Second, Plaintiffs propose that BOP adopt certain "safeguards," such as specifying procedures for placing IV lines, for bedside administration (so as to reduce the risks of leakage or

pinching of the tubing), and for unexpected occurrences.  Mot. 25–27.  These suggestions hardly constitute the type of "alternative method of execution" contemplated by Supreme Court jurisprudence.  This is so because "an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the [government] could take as a failsafe for other, independently adequate measures."  *Baze*, 553 U.S. at 60–61.

Indeed, Plaintiffs' suggestion to modify the Protocol to *require* two functioning peripheral IV lines and to *prohibit* the use of a central line (unless deemed necessary and placed by qualified and competent medical professions), *see* Mot. at 25-26, is only marginally different than the Protocol.  Although the BOP Director or his designee has the discretion to determine the method of venous access based on the recommendation of a qualified person and the training and experience of personnel establishing intravenous access, the Protocol provides that if peripheral venous access is utilized, qualified personnel will insert two separate lines in separate locations, and start a flow of saline in each line to keep the line open, with one line being used to deliver the lethal substance while the other is reserved in case the first line fails.   AR 875, ¶ H.  Notably, Plaintiffs' suggestion for a rigid rule is in tension with their argument that BOP somehow would fail to flexibly account for an inmate's individual health conditions. *See, e.g.*, Mot. at 14.

Plaintiffs' suggestion to use "bedside administration," Mot. at 26,  is yet another procedural safeguard designed to avoid maladministration and thus any marginal benefit it would provide has no constitutional significance.  Notably, the IV tubing set-up *Baze* upheld similarly involved extending the tube from the wall as opposed to being at the inmate's "bedside."  *Baze*, 553 U.S. at 45, 56.  Moreover, "the Constitution affords a 'measure of deference to [the government's] choice of execution procedure'"; the government need not adopt the inmate's preferred method of execution if it has legitimate reasons not to do so. *Bucklew*, 139 S. Ct. at 1125 (quoting *Baze*, 553 U.S. at 51).  The IV tubing arrangement at Terre Haute allows the executioners to administer the lethal agent from the other side of a wall, ensuring that they are not visible to those in the witness room.  The government has a legitimate interest in protecting the executioners' privacy.

Plaintiffs fault BOP for removing "a detailed plan for responding to unexpected occurrences during execution" from the 2008 protocol. Mot. at 27; *see also* 2008 Addendum, ECF No. 26-3, ¶ L. But as the BOP representative testified, BOP "thought because the statement [i.e., what Plaintiffs refer to as a "detailed plan"] was so common sense logical that it didn't need to be included in an addendum. There isn't a member of the execution team that doesn't know that they can advise a supervisory team member of a problem, and that the Director's on-site designee can do exactly what's described in there." Ex. B., Dep. of Rick Winter (Nov. 15, 2019), Tr. 354:17-355:2.

Third, Plaintiffs propose a firing squad as a constitutionally superior method. Mot. at 27–28. They are unlikely to show that a firing squad would significantly reduce a substantial risk of severe pain as compared to lethal injection (much less a single-drug pentobarbital protocol). Every court that has considered the issue agrees that firing squad is not constitutionally superior to lethal injection. In *Gray v. McAuliffe*, No. 3:16CV982-HEH, 2017 WL 102970, at *19 (E.D. Va. Jan. 10, 2017), for example, the court found that the inmate failed to carry the requisite burden because the court could not "weigh a risk of human error in a not-yet-adopted firing squad protocol against any harm that [the inmate] might face if the compounded midazolam does not render him fully unconscious and insensate." That was particularly so because the inmate's expert admitted that the inmate would be conscious when the bullet hits the inmate's chest but the expert could not quantify "with any degree of certainty how much pain an individual would experience." *Id.* (citation omitted). The expert also agreed that "if the bullet missed the target, the individual 'could suffer' and would experience an 'agonizing death.'" *Id.*

Similarly, the court in *McGehee v. Hutchinson*, found that the plaintiffs "fail[ed] to prove that execution by a firing squad in fact significantly reduces a substantial risk of severe pain" as compared to Arkansas' midazolam protocol. No. 4:17-CV-00179 KGB, 2020 WL 2841589, at *37 (E.D. Ark. May 31, 2020). The court found that even crediting all of the inmate's expert's testimony, the expert "has never treated a gunshot victim within 60 seconds of receiving an injury to the chest, nor within 10 to 15 seconds of receiving an injury to the chest; has never treated a

gunshot victim who has received five gunshot wounds to the chest with a .30 caliber rifle, which would be comparable to a firing squad; [and] acknowledges that there is nothing in the medical literature that addresses this situation." *Id.*  Overall, the court found that this proof fell short of meeting the plaintiffs' burden under the second prong of *Glossip.  Id.* at *37.

Indeed, Dr. Antognini, who also testified in *McGehee*, opines that "execution by firing squad would not significantly reduce the risk of severe pain that Plaintiffs claim is inherent in the BOP protocol." Ex. D, Antognini Decl. ¶ 22.  In his view, while "individuals who are shot through the chest, with the bullets exiting the back and shattering the spine, would not survive," "for the 8-10 seconds of consciousness after bullet entry, the injury would be severely painful, especially related to shattering of bone and damage to the spinal cord." *Id.*  And, it goes without saying, "not all firing squad executions go smoothly." *Id.*

Here, Plaintiffs make no serious effort to meet their heavy burden under the second prong of *Glossip.*  They cite a single 2014 source for the proposition that "execution by firing squad is statistically much less likely to result in 'botched' executions than lethal injection."  Mot. at 28 (citing *Sarat, Gruesome Spectacles:  Botched Executions and America's Death Penalty* 120 (2014) ("Sarat App.")).  The source does not discuss firing squad, much less whether it would be significantly less painful than lethal injection.  And the statistical information provided in the appendix to the book is not significant.  It shows that between 1980 and 2020, there were only two executions by firing squad, as compared to 1,054 executions by lethal injection.  *See* Ex. A, Sarat App.  Based on those numbers, firing squad had a 0% error rate whereas the error rate for lethal injection is 7.12%.  A mere two executions is hardly enough to extrapolate the generalization Plaintiffs proffer.  And it certainly says nothing about the relative level of pain between firing squad and lethal injection.

Even if Plaintiffs had pled sufficient facts to show that firing squad is significantly less painful than lethal injection of pentobarbital, the Supreme Court recognizes that there are many legitimate reasons why a State might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution, including for example, a legitimate interest in selecting

a method it regards as "preserving the dignity of the procedure." *Baze*, 553 U.S. at 57. Thus, while "a prisoner may point to a well-established protocol in another State as a potentially viable option," the "court would still have to inquire into the possibility that one State possessed a legitimate reason for declining to adopt the protocol of another." *Bucklew*, 139 S. Ct. at 1128. "And existing state law might be relevant to determining the proper procedural vehicle for the inmate's claim." *Id.* (citing *Hill v. McDonough*, 547 U.S. 573, 582–583 (2006)).

Here, Defendants do not dispute that the Supreme Court has long upheld the use of firing squad. *See Wilkerson v. Utah*, 99 U.S. 130, 131–32 (1878) (affirming sentence requiring that the defendant be "shot until . . . dead." (quotation marks omitted)). But the Supreme Court has noted that it is a "more primitive" method from days past, *Glossip*, 135 S. Ct. at 2739; *see also Baze*, 553 U.S. at 62 (recognizing that "[t]he firing squad, hanging, the electric chair, and the gas chamber have each in turn given way to more humane methods[ of execution], culminating in today's consensus on lethal injection"). No State, including the federal government, is constitutionally required to "make this type of regressive change." *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 870–71 (11th Cir. 2017).

Indeed, even Utah, the only state that has actually used the punishment in the last 100 years, authorizes the method only as a last resort. Utah actually abandoned the method in 2004 because "it was too much of a spectacle, detracting attention from the victim and the crime and allowing prisoners 'one last magnificent manipulation of the system to bring attention to themselves.'"[6] Although Utah has reinstated the method due to the lack of lethal injection drugs, it allows for execution by firing squad only if, among other things, "a court holds that execution by lethal injection is unconstitutional on its face" or "as applied," or "the sentencing court determines the

---

[6]   The Marshall Project, *After Lethal Injection* (June 1, 2015), https://www.themarshallproject.org/2015/06/01/after-lethal-injection (quoting representative Sheryl Allen); *see id.* (noting foreign media's report of Utah's last execution in 2010 where the inmate had "his heart ripped to pieces by bullets blasted from the rifles of five expert marksmen hidden behind a brick wall").

state is unable to lawfully obtain the substance or substances necessary to conduct an execution by lethal intravenous injection," Utah Code Ann. § 77-18-5.5(3), 4 (2015).  The other two states that also authorize firing squad, Oklahoma and Mississippi, similarly put firing squad at the bottom of their order of preference.  Both states provide for firing squad as the quaternary option for carrying out an execution, making it available only in the event execution by lethal injection, nitrogen hypoxia, and electrocution are all declared unconstitutional.  *See* Okla. Stat. tit. 22, § 1014; Miss. Code. Ann. § 99-19-51.

Given the foregoing, it is hard to take seriously Plaintiffs' suggestion that they would actually prefer to be executed by firing squad than by pentobarbital in order to avoid pain.  Conspicuously, none of them are sentenced in a state that authorizes firing squads, and thus they appear to be relying on the fact that the FDPA would by its terms preclude the use of firing squads for their executions.  18 U.S.C. § 3596(a).  The Court should reject this transparent and cynical.  Indeed, the gambit would not work even if its premise were correct:  if this Court were to hold that use of pentobarbital violated the Eighth Amendment given the hypothetical firing-squad alternative, then that would effectively mean that the FDPA's prohibition on firing squads in these states is unconstitutional as applied, and so the government would be entitled to carry out Plaintiffs' executions using a firing squad.

In sum, Plaintiffs are unlikely to succeed on their Eighth Amendment claim.

## II.    PLAINTIFFS ARE UNLIKELY TO SUCCEED IN SHOWING THAT BOP'S ADOPTION OF THE PROTOCOL IS ARBITRARY AND CAPRICIOUS

Plaintiffs devote most of their attention to contending that the Protocol is not the result of reasoned decision-making.  They recast their Eighth Amendment arguments as alleged failures by BOP to consider the issues or to explicitly account for the issues in the Protocol itself.  And they seek to rely on extra-record declarations for all of those arguments.  Essentially, Plaintiffs attempt to do exactly what the Supreme Court has expressly warned against—"import[ing] profound differences of opinion over the meaning of the Eighth Amendment . . . into the domain of administrative law." *Heckler*, 470 U.S. at 838.  They do so while ignoring the fact that the Protocol

24

need not be the product of rulemaking; it merely reflects internal agency procedure and practice on specified topics, and as such, its failure to include every last possible detail related to the procurement and administration of pentobarbital by no means suggests that the agency did not consider those details or has otherwise acted unreasonably. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020) (per curiam); *id.* at 125-126 (Katsas, J., concurring); and *id.* at 144-45 (Rao, J., concurring). As discussed below, Plaintiffs' artful pleading fails.

### A. APA Review of BOP's Adoption of the Protocol Is Narrow and Highly Deferential

The scope of review under the "arbitrary and capricious" standard is "narrow," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "highly deferential," *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017). "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Nor is the court to "substitute its own judgment for that of the agency." *Mayo v. Reynolds*, 875 F.3d 11, 19–20 (D.C. Cir. 2017) (citation and alteration omitted). Rather, the court's "only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made," and to ensure that the agency remained "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court only considers whether there has been a clear error in judgment. *Id.*

Moreover, the Court "sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see also Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225–26 (D.C. Cir. 1993). Because the court's task is to review the considerations on which the agency relied, and to check that the agency's decision has some basis in the record, "the focal point for judicial review" is "the administrative record . . . , not some new record made initially in the reviewing court." *Camp v.*

*Pitts*, 411 U.S. 138, 142 (1973).  That is, the Court does not act as a factfinder, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985), but its review is limited to "contemporaneous explanation of agency decision," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549 (1978), except "when there has been a 'strong showing of bad faith or improper behavior' or when the record is so bare that it prevents effective judicial review," *Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (quoting *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998)).

As a preliminary matter, the above standard makes it clear that Plaintiffs cannot rely on the extra-record declarations of their experts for purposes of their APA claims.  There is no showing of bad faith or improper behavior on the part of Defendants, much less a "strong showing."  Nor is the record bare, preventing judicial review.  To the contrary, as discussed below, BOP has "articulate[d] a satisfactory explanation" for its decision to adopt the single-drug pentobarbital protocol, and there is no clear error of judgment.  *State Farm*, 463 U.S. at 43.

To be sure, some courts have recognized that supplementation of the administrative record may be appropriate to provide "background information" in order to determine whether the agency considered all of the relevant factors.  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).  But the declarations relied upon by Plaintiffs are proffered solely to support their disagreement with the agency's decision.  That is not a proper purpose.  *See, e.g.*, *id.* (denying plaintiff's request to supplement the administrative record with letters from two scientists who "disagree[d] with the [agency's] interpretation of [the] data" and "believe[d] that [the agency's] policy] does not represent the best available scientific information").  As one court of appeals has aptly explained, in an APA case the court "may not impose [itself] 'as a panel of scientists that instructs the [agency] . . ., chooses among scientific studies . . ., and orders the agency to explain every possible scientific uncertainty.'"  *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (citation omitted).  Specifically, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified

experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* (quoting *Lands Council*, 537 F.3d at 1000).

Even aside from the limitations imposed by the APA, the Supreme Court has cautioned in the context of method-of-execution challenges that courts are not "boards of inquiry charged with determining 'best practices' for executions," and that the Constitution affords the government "a measure of deference" as to the "choice of execution procedures." *Bucklew*, 139 S. Ct. at 1125 (citation omitted). Thus, "[a] condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative" because otherwise each ruling would be "supplanted by another round of litigation touting a new and improved methodology" and "would embroil the courts in ongoing scientific controversies beyond their expertise." *Baze*, 553 U.S at 51. Such a result, the Supreme Court further said, would "substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death." *Id.* This reasoning, of course, applies equally to Plaintiffs' APA challenge to the Protocol.

## B.  BOP's Adoption of the Protocol Is not Arbitrary or Capricious

Applying the above standard, it is evident that Plaintiffs are unlikely to succeed in showing that BOP acted unreasonably. BOP has "articulate[d] a satisfactory explanation for its action" and there is no "clear error of judgment." *State Farm*, 463 U.S. at 43. BOP considered the widespread use of pentobarbital by the States, including the fact that at least five States use a single-drug pentobarbital protocol as the primary method of execution, and that numerous executions have been conducted successfully using such a protocol. AR 870–71. It also considered the Supreme Court's decision in *Bucklew* upholding Missouri's single-drug pentobarbital protocol as humane. AR 871 n.13. Moreover, it took into account that courts across the country have also upheld the use of pentobarbital. And it further considered the fact that inmates challenging state lethal injection protocols frequently propose a single dose of pentobarbital as the superior, alternative method, while even dissenting Supreme Court Justices similarly have advocated pentobarbital as

27

a superior lethal agent.  AR 932.  In addition, BOP reviewed Dr. Antognini's expert report and
testimony concerning pentobarbital in *Bucklew*, AR 871, 872, 930, 933, and consulted with him
and Dr. Lindsley about the proposed protocol.  AR 872, 525–26.  BOP also explored and rejected
using pentobarbital as part of a three-drug sequence, AR 871, *see also* AR 930, and further
considered and rejected several other possible lethal agents, *see* AR 862–65, 871, 930–31, 964,
966, 968.  The Court may reasonably discern the agency's path in adopting the Protocol, and
Plaintiffs are unlikely to succeed in showing otherwise.  Plaintiffs nevertheless claim that BOP
failed to properly consider three issues.

### 1.  BOP need not consider the possibility that pulmonary edema may result from pentobarbital injection.

Improperly relying on the extra-record declarations, Plaintiffs argue that BOP arbitrarily
and capriciously ignored the risk that the inmate will experience flash pulmonary edema.  Mot. at
6–10.  But even Plaintiffs' experts do not dispute, as the Supreme Court has concluded in *Bucklew*,
that pentobarbital is a fast-acting barbiturate, which will quickly render an inmate unconscious.
BOP consulted with, and reasonably relied upon the views of, its experts, Drs. Antognini and
Lindsley, in concluding that the Protocol is humane.  The APA does not require BOP to further
search through scientific studies to determine whether pentobarbital would nevertheless cause
pain.  And even assuming BOP acted unreasonably in not specifically considering pulmonary
edema, as discussed above, the Sixth Circuit has held that pulmonary edema does not "qualif[y]
as the type of serious pain prohibited by the Eighth Amendment."  *In re Ohio Execution Protocol
Litig.*, 946 F.3d at 289.  Any error thus would be harmless.  *See PDK Labs. Inc. v. DEA*, 362 F.3d
786, 799 (D.C. Cir. 2004).

### 2.  BOP properly considered the problem of IV insertion.

Plaintiffs argue that the Administrative Record purportedly "disregards the IV-setting
process entirely and reveals no consideration of procedures to mitigate the risks associated with
that process."  Mot. at 12.  They also argue that the Protocol lacks sufficient specificity to guide
the execution team on IV placement.  *Id.* at 12–14.  But Plaintiffs have no constitutional entitlement

to dictate such matters.[7]   Nor does the APA provide a basis to second guess how BOP inserts the

IV.  Plaintiffs' transparent attempt to recast their claim as one about the Protocol's purported lack

of specificity fails because, as the D.C. Circuit held, "the 2019 protocol and addendum are rules

of agency organization, procedure, or practice."   *See In re Fed. Bureau of Prisons' Execution

Protocol Cases*, 955 F.3d at 112.  BOP certainly is free to decide the level of detail to include in

the addendum, and it chose to allow the BOP Director or designee to determine the method of

venous access based on the training and experience of personnel establishing the intravenous

access and on the recommendation of qualified personnel.  AR 875.  The Protocol also provides

the proper procedures to follow if peripheral venous access is utilized.  *Id.*  This approach is

certainly not arbitrary and capricious.

Moreover, there is no reason to assume that BOP personnel cannot competently set the IV

lines or address issues that may arise by following the directions of the BOP Director or his

designee about IV access.  This is particularly the case given the required rehearsals.  AR 874

(qualified personnel who are non-medically licensed or certified shall participate in a minimum of

---

[7]  *See Powell v. Thomas*, 641 F.3d 1255, 1258 (11th Cir. 2011) (no "broad Eighth Amendment right to know the details of [an inmate's] execution in order to ensure proper oversight and avoid uncertainty"); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (no "cognizable liberty interest in obtaining information about execution protocols"); *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) (rejecting request to discover identity of individuals and entities that participate in the lethal injection process); *Zink*, 783 F.3d at 1108 (rejecting request to discover information on execution protocol and source of the lethal agent); *Wellons*, 754 F.3d at 1267 (rejecting request to discover "where, how, and by whom the lethal injection drugs will be manufactured" and "the qualifications of the person or persons who will manufacturer the drugs, and who will place the catheters"); *Sepulvado v. Jindal*, 729 F.3d 413, 419-20 (5th Cir. 2013) (rejecting request to discover information about execution protocol); *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011) (same); *Valle v. Singer*, 655 F.3d 1223, 1236 n.13 (11th Cir. 2011) (rejecting request to discover information about training of the execution team and the source or vendor history of the drugs); *see also Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (affirming denial of motion to stay execution where inmate was informed less than an hour before his execution that pentobarbital would be substituted for sodium thiopental and where inmate argued that he lacked sufficient time to determine whether there are any constitutional concerns with the new drug); *Clemons v. Crawford*, 585 F.3d 1119, 1129 n.9 (8th Cir. 2009) (no right to probe into backgrounds of State's execution personnel).

ten execution rehearsals a year and shall have participated in at least two execution rehearsals prior to participating in an actual execution).

Although Plaintiffs also question the qualifications of the execution team, *see* Mot. at 13, both the Supreme Court and courts of appeals have approved qualification requirements similar to those in the Protocol, *compare* AR 874, ¶ D ("qualified personnel" include currently licensed physicians, nurses, EMTs, Paramedics, Phlebotomists, other medically trained personnel, including those trained in the United States Military having at least one year of professional experience and other personnel with necessary training and experience in a specific execution related function) *with Baze*, 553 U.S. at 55 (requiring the IV team members to have at least one year of professional experience "as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman" and to participate (along with the execution team) in "at least 10 practice sessions per year"); *see also Cooey*, 589 F.3d at 226; *Harbison, v. Little,* 571 F.3d 531, 538–39 (6th Cir. 2009); *Emmett v. Johnson,* 532 F.3d 291, 295 (4th Cir. 2008); *Hamilton v. Jones*, 472 F.3d 814, 816 (10th Cir. 2007).  BOP's decision not to include more specific procedures about IV setting in the Protocol is reasonable.  *See Cooey*, 589 F.3d at 227 (challenge to the lack of time limit to establish IV access unlikely to succeed).

In any event, the Administrative Record does reflect that BOP studied the issues associated with IV access.  For example, it shows that BOP reviewed "the after action report" of Oklahoma inmate Clayton Lockett's execution in 2014, where the improper placement of the IV caused the inmate to regain consciousness, and explicitly noted the finding of the report, which is that "the viability of the IV access point was the single greatest factor that contributed to the difficulty in administering the execution drugs."  AR 931.  BOP also considered the Supreme Court's discussion of the Lockett example in *Glossip*.  *Id*.  And the expert reports and testimony reviewed by BOP and included in the Administrative Record also discussed the issue of potential IV infiltration.  AR 442–43.  Moreover, discussion of the issue of IV access is prevalent in the case-law reviewed and considered by BOP.  *See* AR 108–400.

### 3.  BOP's decision to use a compounded form of pentobarbital is reasonable.

Finally, Plaintiffs argue that the Administrative Record fails to (1) indicate that Defendants adequately considered the problems associated with using a compounding pharmacy or (2) provide information about the "formulation recipe"; the procedures by which the drug will be compounded; "the ingredients of their concentrations"; and "the equipment used and how the equipment is maintained and calibrated," among numerous other things.  Mot. at 17–18.

But as discussed in detail above, any risks associated with using compounding pharmacies to produce lethal agents is tolerated under the Eighth Amendment.  And BOP's consideration of this issue is reflected in its selection of a compounding pharmacy registered with the FDA as a 503B facility, which, unlike most compounding pharmacies, must comply with the FDA's regulations governing quality assurance standards.  Also, in March 2020, BOP adopted certain "General Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions" to ensure that quality assurance testing is completed and the results verified by BOP prior to a scheduled execution.  *See* AR 1084–85.[8]

Plaintiffs also fault BOP for failing to justify its use of a compounding pharmacy as opposed to commercially available, FDA-approved pentobarbital.  Mot. at 20.  BOP's decision to use compounded pentobarbital is obviously reasonable because of the lack of supply of domestic pentobarbital products.  As the Supreme Court recognized in *Glossip*, 135 S. Ct. at 2733, anti-death penalty advocates' lobbying efforts have led to the unavailability of pentobarbital products.  Just as the States have turned to compounding pharmacies to prepare injectable pentobarbital solution, BOP did so as well.  AR 857, 872; *cf. Gray v. McAuliffe*, No. 3:16CV982, 2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017) ("Because death penalty opponents have made it difficult

---

[8]  Plaintiffs argue that the Court cannot consider the March guidelines because they were adopted after the Administrative Record was filed in August 2019.  *See* Mot. at 19.  Plaintiffs are wrong. Defendants properly supplemented the Administrative Record with the March guidelines, ECF No. 97, after Plaintiffs filed their Amended Complaint on June 1, 2020, challenging the quality of the compounded pentobarbital.  These agency guidelines will govern the lethal injection drugs that BOP intends to use for Plaintiffs' executions.  They are properly before the Court.

to obtain FDA-approved drugs customarily used in executions, Virginia has recently resorted to obtaining drugs from compounding pharmacies instead of traditional suppliers.").

BOP has engaged in reasoned decision-making in adopting the 2019 Protocol, and under the APA's highly deferential standard of review, this Court should uphold it.

## III.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CLAIMS THAT THE PROTOCOL IS CONTRARY TO THE CSA AND FDCA

Plaintiffs also challenge the Protocol as allegedly contravening the CSA and FDCA.  5 U.S.C. § 706(2)(A) and (C).  They are unlikely to succeed on these arguments.

### A.  The Protocol Does Not Contravene the CSA

Plaintiffs are not likely to succeed in showing that the Protocol violates the CSA.  They argue that under the CSA, a Schedule II controlled substance, such as pentobarbital, may not be lawfully dispensed "except pursuant to a valid prescription 'issued for a legitimate medical purpose' by a practitioner who is acting 'in the usual course of professional practice' and registered pursuant to the statute."  Mot. at 29   (citing 21 U.S.C. §§ 802(21), 802(27), 829(e)(2), and 841(a)(1)).

Plaintiffs are incorrect.  Under the CSA, no prescription is required to carry out capital punishment through the injection of pentobarbital.  The "prescription" requirement of 21 U.S.C. § 829(a) concerns the "dispens[ing]" of a schedule II substance.  21 U.S.C. § 829(a).  The term "dispense," as defined under the CSA, "means to deliver a controlled substance to an *ultimate user* or *research subject* by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery."  21 U.S.C. § 802(10) (emphasis added).  Plaintiffs are neither "research subject[s]" nor "ultimate user[s]," the latter defined under the CSA as "a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household. . . ."  *Id.* § 802(27).  Plaintiffs will not be lawfully obtaining or possessing the pentobarbital for their own use, and the government is not a "person" obtaining the drug "for his own use."  Rather, BOP officials will inject the drug into each inmate pursuant to the

Protocol.  Thus, the prescription requirement under Section 829(a) is inapplicable in the lethal injection context because the controlled substance is not "dispensed" as that term is defined under the CSA.

Plaintiffs do not argue they are "ultimate users" or "research subjects."  Instead, they merely argue that the Protocol contemplates that pentobarbital will be "administered" to them in the course of the execution, and that since "administer" is part of the definition of "dispense," *a fortiori*, the prescription requirement of Section 829(a) must be applicable in the lethal injection context.  Mot. at 29.  This is wrong for at least two reasons.  First, the term "administer" is defined as "the direct application of a controlled substance to the body of a patient or research subject." 21 U.S.C. § 802(2)).  In the context of lethal injection, a condemned inmate is not a "patient" under the traditional definition of that word, *i.e.*, "a person under medical or psychiatric care," Black's Law Dictionary (11th ed. 2019).  Nor, again, is the condemned inmate a research subject.  To the extent Plaintiffs are arguing that they are "ultimate users," under the definition of "dispense," their analysis fails to contend with the definition of an "ultimate user"—which is one who possesses a controlled substance for his own use.  Plaintiffs simply do not qualify as "ultimate users" and therefore the definition of "dispense" is inapplicable to them in the lethal-injection context.

Second, Plaintiffs fail to grapple with the obvious conflict between their argument, on the one hand, that the Protocol is invalid because it does not require a prescription for pentobarbital, and on the other hand, with their allegation that lethal injection was for a "use that is not a legitimate medical purpose."  *See* Am. Compl. ¶¶ 64, 171.[9]  Under 21 C.F.R. § 1306.04, "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  Thus, as Plaintiffs would have it, even if the Protocol required a prescription for pentobarbital, the Protocol would be contrary to law because any such prescription would be invalid.  Under

---

[9]  This is a reversal of Plaintiffs' prior position.  *See* ECF No. 44, Pl. Honken's Reply in Support of his Mot. for Prelim. Inj. at 16 (arguing that the government was wrong in "insist[ing] that execution rugs do not serve a 'medical purpose'").

Plaintiffs' reasoning, Defendants lose with or without a prescription.  That cannot be the proper reading of CSA's prescription requirement in the lethal injection context.

Moreover, it is inconceivable that Congress enacted the FDPA in 1994 under the assumption that the CSA's prescription requirement applied to the lethal-injection context, particularly if, as Plaintiffs would have it, no valid prescription may be issued for the lethal injection of controlled substances due to the absence of a legitimate medical purpose.  As the Supreme Court has explained, when a statute is first enacted, "it may have a range of plausible meanings.  Over time, however, subsequent acts can shape or focus those meanings." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  "The 'classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.'" *Id.* (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)).  "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.*

Here, the FDPA requires the federal government to use the State's manner of execution. At the time, at least a dozen states had already adopted lethal injection as the method of execution, and the Department of Justice in issuing execution regulations had identified lethal injection as "increasingly … the method of execution in the states."  57 Fed. Reg. 56,536, 56,536 (Nov. 30, 1992).[10]  So Congress clearly anticipated that the federal government would execute federal

---

[10] Ala. Code § 15-18-82.1 (1975); Ariz.  Rev. Stat. Ann. § 13-757 (West 1978); Ark. Code Ann. § 5-4-617 (Michie 1983); Colo. Rev. Stat. § 16-11-401 (West 1988); 65 Del. Laws 281 § 1 (1986); Idaho Code § 19-2716 (Michie 1982); 725 Ill. Comp. Stat. 5/119-5 (1983); Ind. Code § 35-38-6-1 (1983); Kan. Stat. Ann. § 22-4001(1993); La. Stat. Ann. § 15:569 (West 1991); Md. Code Ann. art. 27, § 627 (1957) (amended 1994); 1982 Mass. Acts 554 §6; Mo. Rev. Stat. § 546.720 (1988); Nev. Rev. Stat. § 176.355 (Michie 1983); N.H. Rev. Stat. Ann. § 630:5 (XIII-XIV) (1986); N.J. Rev. Rev. Stat. § 2C:49-2 (1983); N.M. Stat. Ann. § 31-14-11 (Michie 1978); Ohio Rev. Code Ann.  § 2949.22 (West 1993); Okla. Stat. tit. 22 § 101 (West 1977); Or. Rev. Stat. § 137.473(1) (1985); Pa. Stat. Ann. tit. 61, § 2121.1 (West 1990); S.D. Codified Laws § 23A-27A-32 (Michie 1984); Tex. Code Crim. Proc. Ann. art. 43.14 (Vernon 1977); Utah Code Ann. § 77-18-5.5 (1953) (amended 1983); Utah Code Ann. § 77-18-5.5 (1953) (amended 1983); Wyo. Stat. Ann. § 7-13-904 (Michie 1984).

condemned inmates using lethal injection.  The CSA's prescription requirement must be construed in the context of Congress' enactment of the FDPA, *see Brown & Williamson*, 529 U.S. at 133, and as a matter of statutory construction, the CSA's prescription requirement does not apply in the lethal injection context.  *See also West v. Schofield*, 519 S.W.3d 550, 571 (Tenn. 2017) ("Clearly, the federal government does not consider those of its own executions that are conducted by lethal injection to violate a regulatory scheme for the prescription and use of controlled substances.").

*Gonzales v. Oregon*, 546 U.S. 243 (2006), makes it even clearer that the CSA's prescription requirement simply does not apply in the lethal injection context.  There, the Supreme Court found that the CSA's requirement of a prescription for a legitimate medical purpose did not authorize the Attorney General to bar dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct.  In so holding, the Court found that the CSA is "a statute combating recreational drug abuse," *id*. at 272, and thus, "the prescription requirement is better understood as a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse."  *Id*. at 274.  "To read prescriptions for assisted suicide as constituting 'drug abuse' under the CSA," the Court said, "is discordant with the phrase's consistent use throughout the statute, not to mention its ordinary meaning."  *Id*. Equally discordant is any argument that the BOP's use of pentobarbital for purposes of its Protocol constitutes "drug abuse" under the CSA.

Nevertheless, Plaintiffs contend that their view is buttressed by positions DEA has allegedly taken in prior years.  *See* Mot. 29-30.  For example, they cite an informal written outline of an oral presentation a DEA employee made in 2011 to state officials entitled "Registration Issues," Mot. at 29 (citing Schoenfeld Decl., Ex. 5 at 31, 35), and an unauthenticated, double hearsay email from Washington State Department of Corrections administrators about a conversation they supposedly had with an unnamed official at DEA.  *Id*. at 30 (citing Schoenfeld Decl., Ex. 6).  As stated by DEA's 30(b)(6) representative, who has been aware of DEA's policy position on this subject since 2005, neither of those documents reflects DEA's position on the CSA's prescription requirement in the lethal injection context at the time or today.  *See id*. at 28,

Schoenfeld Decl., Ex. 4 (Miller Dep. Tr. 29:18-21).  In any event, neither document supports the position Plaintiffs are urging here, which is that the CSA's prescription requirement precludes the federal government from using lethal injection as a method of execution.  Hence, Plaintiffs are not likely to succeed on their claim that the Protocol violates the CSA.

Moreover, "there is no private right of action under federal law to enforce … alleged violations" of the CSA—including allegations that "the use of compounded pentobarbital as a lethal drug in executions violates the … [CSA]."  *Zink*, 783 F.3d at 1113.  The CSA is a criminal statute whose enforcement is committed to the Attorney General, and in which Congress carefully delimited the ways in which others can seek review of the government's choices.  *See, e.g.*, 21 U.S.C. §§ 841-843, 871, 877, 882(c).  Plaintiffs cannot use the APA to evade these limits and seek relief from what they contend are BOP's violations of the CSA.

### B.  The Protocol Does Not Contravene the FDCA.

Plaintiffs similarly are not likely to succeed on their claim that the Protocol violates the FDCA's prescription requirement.  *See* Mot. 30-33.  Plaintiffs allege that "[u]nder the FDCA, the proposed dispensing and administration of compounded pentobarbital requires a valid medical prescription reflecting a medical practitioner's order that 'a compounded product is necessary for the identified patient.'"  Am. Compl. ¶ 179 (quoting 21 U.S.C. § 353(a)); *see also id.* ¶¶ 65-69 (citing 21 U.S.C. § 353(b)(1)(B)).  In their Motion, Plaintiffs argue that the FDCA's prescription requirement under 21 U.S.C. § 353(b)(1) is "[o]ne way the FDCA ensures that a drug is safe and effective for its intended use."  Mot. at 30.

Plaintiffs' allegations have no merit.  The FDCA does not govern the government's use of pentobarbital for carrying out capital punishment because articles intended for use in executions cannot be regulated "drugs" or "devices" under the FDCA.  Indeed, "Congress has repeatedly authorized the death penalty on the assumption that there are lawful means to carry it out, but the regulation of [drugs such as pentobarbital] under the FDCA would effectively require their prohibition because they could hardly be found 'safe and effective' for such an intended use." *Whether the Food & Drug Admin. Has Jurisdiction over Articles Intended for Use in Lawful*

*Executions*, 2019 WL 2235666, at *1 (May 3, 2019).  The government's position is fully set forth in the cited opinion of the Office of Legal Counsel, Department of Justice, which is in the Administrative Record, AR 938–63 ("OLC Op.").

In short, the FDCA cannot be construed to govern drugs to be used in capital punishment because doing so "would effectively ban those [drugs]" from being used in capital punishment, a result Congress clearly did not intend.  OLC Op., 2019 WL 2235666 at *7, AR 947.  In *Brown & Williamson*, the foundational case relied upon by Plaintiffs, the Supreme Court considered whether the FDA had properly determined that customarily marketed tobacco products could be regulated as "drugs" or "devices" under the FDCA.  The Court found that Congress could not have intended the FDCA to do so because if tobacco products were regulated as "drugs" or "devices," the FDCA would prohibit their sale, because they could not be "safe" or "effective" for their intended use. 529 U.S. at 134–37.  The Court explained that Congress's legislative enactments post-FDCA conveyed a clear intent that "cigarettes and smokeless tobacco [would] continue to be sold in the United States."  *Id.* at 139.  "The inescapable conclusion," then, "is that there is no room for tobacco products within the FDCA's regulatory scheme.  If they cannot be used safely for any therapeutic purpose, and yet they cannot be banned, they simply do not fit."  *Id.* at 143.

Applying *Brown & Williamson* to the lethal injection context, it is indisputable that a drug, intended for use in bringing about death as part of an execution, cannot be approved by the FDA as "safe and effective."  *See* OLC Op., 2019 WL 2235666 at *4, AR 943 (citing *Heckler*, 470 U.S. at 827 (granting certiorari to review the "implausible" result that "the FDA is required to exercise its enforcement power to ensure that States only use drugs that are 'safe and effective' for human execution")); *see also id.* at *8, AR 948 ("[T]here is no way products intended to carry out capital punishment could ever satisfy [a] . . . test[] under which 'a drug is unsafe if its potential for inflicting death . . . is not offset by the possibility of therapeutic benefit.'" (quoting *United States v. Rutherford*, 442 U.S. 544, 556 (1979)))).  But the FDPA "presuppose[s] that capital punishment will remain available."  OLC Op. at 11.  As such, the basic tools of statutory interpretation preclude

reading the FDCA's prescription requirements as applicable to the lethal injection context. *See Brown & Williamson*, 529 U.S. at 133.

In fact, as noted above in the CSA section, Plaintiffs admit that there is "no legitimate medical purpose" for using pentobarbital for lethal injection. Am. Compl. ¶ 64; *see also id.* ¶ 171. Accordingly, Plaintiffs' claim is essentially that BOP cannot use lethal injection drugs *at all* because the FDCA both prohibits dispensing such drugs without a prescription and prohibits the validity of a prescription written to supply drugs that have no legitimate medical purpose. This Catch-22 argument is identical to the one Plaintiffs urge with respect to the CSA and, again, is belied by the fact that Congress enacted the FDPA and required the federal government to adopt States' preferences as to methods of execution at a time when at least a dozen states had already adopted lethal injection as the method of execution.

Plaintiffs' Motion focuses specifically on 21 U.S.C. § 353b. Mot. at 30-31. As helpfully explained in *Athenex Inc. v. Azar*, 397 F. Supp. 3d 56 (D.D.C. 2019), if certain statutory criteria are met, Section 353b permits an "outsourcing facility" to "compound drug products in large quantities . . . [for] health care practitioners and hospitals as 'office stock,' . . . without obtaining a prescription for 'an identified individual patient,'" as required by Section 353a. *Athenex*, 397 F. Supp. 3d at 59 (*comparing* 21 U.S.C. § 353b(d)(4)(C) *with* 21 U.S.C. § 353a). But the pharmacy is neither compounding pentobarbital in large quantities for office stock nor compounding it for an identified patient. As previously noted in the CSA section, in the context of lethal injection, a condemned inmate is not a "patient." As such, Section 353a and 353b illustrate why the FDCA's regulatory scheme is not a good fit for the lethal-injection context.

Plaintiffs nevertheless argue that *Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013), refutes Defendants' position. *See* Mot. at 31–32. In *Cook*, the D.C. Circuit addressed a specific FDCA provision regarding the FDA's treatment of imported drugs, 21 U.S.C. § 381, and concluded that FDA was required to apply that provision to drugs "destined for" lethal-injection use in "state correctional facilities." 733 F.3d at 11. The D.C. Circuit rested its analysis on the particular language of section 381, which is not in play here. That section provides that the FDA "shall" take

certain actions with respect to the import of drugs manufactured at "an unregistered establishment" that "appear" to violate that provision. *Id.* at 8-10. The court's holding turned on the scope of the agency's enforcement discretion under section 381. *Id.* at 8. On that basis, the D.C. Circuit specifically distinguished the Supreme Court's holding in *Chaney* that the FDCA provisions regarding misbranding and drug approval, 21 U.S.C. §§ 352(f)(1), 355, did not "supply [the Court] with law to apply" and that its "enforcement provisions . . . commit complete discretion to the Secretary." *Chaney*, 470 U.S. at 835-36 (quotation marks omitted). *See* 733 F.3d at 7-10. That distinction was limited to Section 381; thus, *Cook* has no bearing on any of the FDCA provisions on which Plaintiffs rely.

In any event, neither the D.C. Circuit in *Cook*, nor the district court in the underlying case, *Beaty v. FDA*, 853 F. Supp. 2d 30 (D.D.C. 2012), "addressed the broader question of FDA's jurisdiction" over articles intended to be used for capital punishment. *See* OLC Op., 2019 WL 2235666, at *14, AR958. In fact, "the FDA [had] conceded before the district court that the … shipments" were a covered "unapproved new drug." *Cook*, 733 F.3d at 11 (quotation marks omitted). Here, where the issue is squarely presented, this Court should conclude that—as articulated by the OLC Opinion—the FDCA's regulatory scheme does not apply. Otherwise, the federal government would be left in the position of being unable to carry out capital punishment authorized by one act of Congress (the FDPA), due to the requirements of a prior act of Congress (the FDCA). That construction is untenable under the basic tools of statutory interpretation. *See Brown & Williamson*, 529 U.S. at 133.

Plaintiffs' inability to force the FDA to act does not mean that Plaintiffs themselves may seek relief for BOP's supposed violations of the FDCA. On the contrary, in the FDCA itself, Congress specified "all … proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). This requirement forecloses actions by private parties seeking to restrain third parties' putative violations of the FDCA's general strictures, leaving "the United States with nearly exclusive enforcement authority" over those matters. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 109 (2014). The federal

government clearly does not believe that it is violating the FDCA by using pentobarbital to conduct lethal injections, and that judgment is reserved to the Executive Branch under the FDCA's plain terms. Plaintiffs cannot end-run the non-reviewability of the FDA's enforcement decisions by invoking the APA against BOP.  And because the *Cook* plaintiffs sought to require the FDA to act, rather than to enforce the FDCA directly themselves, this Court there had no occasion to address Section 337's prohibition on private enforcement actions.  Thus, even under *Cook*'s logic, Plaintiffs have no basis to ask this Court to second-guess the government's decisions regarding the FDCA's intersection with lethal-injection drugs.

## IV.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR ACCESS TO THE COURTS CLAIM

Finally, Plaintiffs are unlikely to succeed in showing that the Protocol denies them access to counsel and the courts in violation of the First, Fifth, and Sixth Amendments.  Mot. at 33–37.

Plaintiffs argue that "[a]ccess to counsel and to the courts is particularly necessary to ensure that [they] are not subject to cruel and unusual punishment—a right that extends throughout the entirety of an execution."  Mot. at 34.  Plaintiffs are incorrect.  Critically, there is "no law that would support a right to counsel throughout an execution."  *The Estate of Lockett by and through Lockett v. Fallin*, 841 F.3d 1098, 1117 (10th Cir. 2016).  The preceding sections make clear that there is no Eighth Amendment right to supervise an execution for possible maladministration, and *a fortiori*, no right to have counsel do the same.  *See supra* Part I.  Nor is there a Fifth Amendment due process right to discover information about an execution protocol.  *See, e.g.*, *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016) ("no . . . circuit court has ever recognized the kind of due process right-of-access claim" advanced by Plaintiffs).  The First Amendment right of access to the court similarly does not guarantee a right "to discover grievances, and to litigate effectively once in court."  *Lewis v. Casey*, 518 U.S. 343, 350–61 (1996).  And while an accused has a Sixth Amendment right to counsel in all "critical stages" of the criminal proceeding, *United States v. Wade*, 388 U.S. 218, 227–28 (1967), an execution is not such a stage because it is not a confrontation between the prosecution and the defense, *see id*.

40

The out-of-circuit district court cases Plaintiffs cite to the contrary are inapposite. *See* Mot. at 36-37 ¶ 113. In *Cooey v. Strickland*, No. 2:04-CV-1156, 2011 WL 320166, at *6 (S.D. Ohio Jan. 28, 2011), the court explained that it "need not and does not decide" whether a condemned inmate has a right to have counsel attend his execution because "Ohio allows counsel to witness executions regardless of whether the Constitution mandates that the state do so," and thus, the question of "the existence of any such mandate is moot." *Id*. Here, the 2019 Protocol similarly permits Plaintiffs to designate two defense attorneys to be present at the execution as witnesses. AR 1024. On the day of the execution, once the condemned inmate has been secured to the table, the condemned individual's witnesses are admitted to the witness rooms, and staff open the drapes covering the windows of the witness rooms. AR 1037-39. The condemned inmate is then permitted to make a final statement. AR 1039. Witnesses, including counsel, are permitted to stay and view the execution until the pronouncement of death has been made. AR 1041-42. Nothing in the Protocol prohibits counsel from witnessing first-hand whether the execution is proceeding in such a way as to "superadd terror, pain, or disgrace." *Bucklew*, 139 S. Ct. at 1124. In *Coe v. Bell*, 89 F. Supp. 2d 962 (M.D. Tenn. 2000), which was vacated by *Coe v. Bell*, 230 F.3d 1358 (6th Cir. 2000), the state statute at issue there did not even allow for the presence of counsel at the execution. *See* 89 F. Supp. 2d at 963-64. Finally, in *McGehee v. Hutchinson*, No. 4:17-cv-00179 KGB, 2020 WL 2841589, at *50 (E.D. Ark. May 31, 2020), the court noted that the parties had previously negotiated terms of viewing the execution and that those same terms remained feasible.

In addition, Plaintiffs here have not set forth any allegations in the Amended Complaint, or arguments in the Motion, that the Protocol prohibits Plaintiffs' counsel from communicating with the courts. In fact, BOP provides counsel witnessing the execution appropriate access to the courts. *See* Ex. C, Decl. of Tom Watson ("Watson Decl.") ¶ 12 ("While an inmate's attorney(s) will not be permitted to maintain their personal cell phone or other electronic devices in the witness room, if legitimate need arises (such as need to contact a court) an attorney may request the use of a phone and will have immediate access to one outside of the witness room.").

Perhaps in recognition of these facts, Plaintiffs make a series of speculative arguments in light of the COVID-19 pandemic about their access to counsel. *See* Mot. 35–37. Yet, despite the fact that COVID-19 was declared a pandemic in March of this year, Plaintiffs failed to allege anything in their Amended Complaint about the pandemic's effect on their access to counsel or their forthcoming executions in general. *See* Am. Compl. ¶¶ 135-142. Indeed, the Protocol and the pandemic are separate issues. Nothing in the Protocol has affected Plaintiffs' ability to communicate with their counsel over the last several months and currently. Rather, Plaintiffs claim that the pandemic—not the Protocol—has caused BOP officials to "replace legal visits with phone calls." Mot. at 36. And it is the pandemic—not the Protocol—that has caused Plaintiffs' counsel to fear visiting their clients in person. *Id.* at 37. Thus, there is no relationship between the conduct asserted in the Amended Complaint regarding the Protocol and the injury claimed in the Motion related to the pandemic. As a result, the Court may not provide injunctive relief based on Plaintiffs' pandemic-related arguments. *See, e.g.*, *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) ("[Plaintiff] had no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his original complaint.").

Furthermore, Plaintiffs' pandemic-related claims are rank speculation that ignores the fact that federal officials are entitled to a presumption of good faith and regularity. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007); *see also Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 20 (D.C. Cir. 2002). For example, Plaintiffs speculate that BOP officials are listening in on their phone calls with their counsel, *see* Mot. at 37 (arguing that the participation of BOP staff in arranging the calls "rais[es] significant issues regarding lack of confidentiality"), citing no such evidence. No such evidence exists either. "In accordance with BOP Program Statement 5264.08 "Inmate Telephone Regulations," at 10-11, an inmate's properly placed call to an attorney is not monitored by staff." Ex. C, Watson Decl. ¶ 6. Nor is there evidence that inmates fear that BOP is monitoring their calls—during the pandemic, weekly legal calls from inmates housed in FCC Terre Haute's Special Confinement Unit (SCU) have "increased substantially." *Id.* ¶ 8.

Plaintiffs further speculate that the pandemic will "restrict[] the availability of qualified personnel," Mot. at 37, will prevent training requirements from being fulfilled, *id.*, and will cause their clients to suffer additional pain if injected with pentobarbital if their clients have contracted the coronavirus. *Id.* at 37-38. These speculative arguments have nothing to do with the Protocol or access-to-counsel issues and as a result, fail to show that Plaintiffs are likely to succeed on their access-to-counsel/courts claim.

## V.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION

Because Plaintiffs have failed to establish a likelihood of success on the merits, this Court need not proceed further to consider the remaining preliminary injunction factors. "In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits." *Greater New Orleans Fair Hous. Action Ctr. v. United States Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011). This is particularly so in the context of method-of-execution challenges, in light of the Supreme Court's holding in *Glossip* that an inmate's failure to establish a likelihood of success on his method-of-execution challenge warrants denial of a motion for a preliminary injunction. 135 S. Ct. at 2737; *see also Hill*, 547 U.S. at 584 ("[I]nmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits."). In fact, the Supreme Court has vacated preliminary injunctions issued by lower courts in method-of-execution cases where the lower court enjoined the execution "without finding that [the inmate] has a significant possibility of success on the merits." *Dunn v. McNabb*, 138 S. Ct. 369 (2017). And courts of appeals routinely require a showing of likelihood of success before issuance of a preliminary injunction. *See, e.g.*, *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1273 (11th Cir. 2014); *Rhoades v. Reinke*, 671 F.3d 856, 863 (9th Cir. 2011); *see also Miller v. Parker*, 910 F.3d 259, 261 (6th Cir.), *cert. denied*, 139 S. Ct. 399 (2018) ("in execution protocol challenges, likelihood of success is often the determinative

factor") (citation omitted).  Because Plaintiffs have shown no likelihood of success on the merits of their claims, the Court should deny their motion for a preliminary injunction.

Should the Court proceed further, though, the equities tip against issuing an injunction. Plaintiffs cannot dispute the government's overwhelming interest in the enforcement of the criminal sentences imposed by unanimous federal juries after fair trials and upheld through extensive appellate and post-conviction proceedings in federal courts.  *See Bucklew*, 139 S. Ct. at 1123.  The American people have chosen to make capital punishment available in the federal system; if that decision is to be given meaningful effect, sentences must be enforced in cases like these.  Although this Court asserted that "the potential harm to the government caused by a delayed execution is not substantial," Mem. Op. at 14, the Supreme Court has rejected that view, emphasizing that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)); *see also Calderon*, 523 U.S. 556 (explaining that once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension").  "Only with an assurance of real finality can the [government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out."  *Calderon*, 523 U.S. at 556.  Unduly delaying executions can frustrate the death penalty by undermining its retributive and deterrent functions.  *See Bucklew*, 139 S. Ct. at 1134; *id*. at 1144 (Breyer, J., dissenting).  For these reasons, Judge Katsas concluded in his concurrence that this Court erred in finding that the balance of equities was in Plaintiffs' favor.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 126 ("In this case, the district court failed to recognize the important governmental and public interest in the timely implementation of capital punishment.").

Indeed, the Supreme Court has routinely denied stay-of-execution applications by other condemned inmates while their challenges to execution protocols were pending.  *See Storey v. Lombardi*, 135 S. Ct. 1198 (2015) (denying stay-of-execution applications by Missouri inmates while challenges to Missouri's single-drug pentobarbital protocol were pending) and *Warner v.*

44

*Gross*, 135 S. Ct. 824 (2015) (same, involving a challenge to Oklahoma's execution protocol). Plaintiffs have not (and indeed cannot) distinguish their challenge from those for which the Supreme Court has repeatedly refused to grant stays to permit an adjudication on the merits. For all these reasons, the balance of equities tip against granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should deny the motion for a preliminary injunction.

Dated:  June 26, 2020
Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN
Civil Chief, U.S. Attorney's Office

ALAN BURCH (D.C. Bar 470655)
Assistant United States Attorney
U.S. Attorney's Office
for the District of Columbia
Washington, D.C. 20530
202-252-2550
alan.burch@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

PAUL R. PERKINS
Special Counsel

 /s/*Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
JONATHAN KOSSAK (D.C. Bar 991478)
CRISTEN C. HANDLEY (MO Bar 69114)
Trial Attorneys
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.lin@usdoj.gov
Jonathan.kossak@usdoj.gov
Cristen.handley@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all plaintiffs' counsel of record (as most recently identified in the signature pages of the Consolidated Amended Complaint, ECF No. 92):

Alan E. Schoenfeld (admitted *pro hac vice*)
Ryan M. Chabot (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8880
Alan.Schoenfeld@WilmerHale.com
Ryan.Chabot@WilmerHale.com

Andres C. Salinas (DC Bar No. 156118)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6289
Andres.Salinas@WilmerHale.com

*Counsel for Wesley I. Purkey*

Joshua C. Toll
D.C. Bar No. 463073 King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 737-8616
jtoll@kslaw.com

Margaret O'Donnell
P.O. Box 4815
Frankfort, KY 40604
(502) 320-1837
mod@dcr.net

*Counsel for Plaintiff Anthony Battle*

Ginger D. Anders (Bar No. 494471)
Jonathan S. Meltzer (Bar No. 888166546)
Brendan Gants (Bar No. 1031419)
MUNGER, TOLLES & OLSON LLP

1

1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
(202) 220-1100

*Counsel for Plaintiff Brandon Bernard*

Alex Kursman, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – alex_kursman@fd.org

*Counsel for Plaintiff Alfred Bourgeois*

Joseph Luby, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
 601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – joseph_luby@fd.org

*Counsel for Plaintiff Chadrick Fulks*

Amy Lentz (DC Bar No. 990095)
Steptoe & Johnson, LLP
1300 Connecticut Avenue NW
Washington, DC 20036
202.429.1320

*Counsel for Plaintiff Orlando Hall*

Scott W. Braden
Assistant Federal Defender
Arkansas Federal Defender Office
Ark Bar Number 2007123
1401 West Capitol, Suite 490
Little Rock, Arkansas 72201
(501) 324-6114
Scott_Braden@fd.org

Jennifer Ying (DE #5550)
Andrew Moshos (DE #6685)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market St.
P.O. Box 1347
Wilmington, Delaware 19801

(302) 658-9300
jying@mnat.com
amoshos@mnat.com

*Counsel for Plaintiff Norris G. Holder, Jr.*

Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone - 202-640-2850
Email - jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – timothy_kane@fd.org
Email – shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Lee Honken*

Donald P. Salzman (D.C. Bar No. 479775)
Charles F. Walker (D.C. Bar No. 427025)
Steven M. Albertson (D.C. Bar No. 496249)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Plaintiff Corey Johnson*

David S. Victorson
Hogan Lovells US LLP
Columbia Square
555 13th Street NW
Washington, DC  20004
(202) 637-5600
(202) 637-5910 (fax)
david.victorson@hoganlovells.com

Pieter Van Tol (admitted *pro hac vice*)
Hogan Lovells US LLP
390 Madison Avenue

3

New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

*Counsel for Plaintiff Daniel Lewis Lee*

Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington D.C. 20004-2595
(202) 624-2705
kclune@crowell.com

Harry P. Cohen (pro hac vice application pending)
Michael K. Robles (pro hac vice application pending)
James Stronski (pro hac vice application pending)
Crowell & Moring LLP
590 Madison Avenue New York, NY 10022
(212) 223-4000
(212) 223-4134(fax)
hcohen@crowell.com
mrobles@crowell.com
jstronski@crowell.com

Jon M. Sands (pro hac application to be filed)
Dale A. Baich (pro hac application to be filed)
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602-382-2816
602-889-3960 (fax)
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*

Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – timothy_kane@fd.org
Email – shawn_nolan@fd.org

*Counsel for Plaintiff Jeffrey Paul*

4

Paul F. Enzinna
D.C. Bar No. 421819
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553

*Counsel for Plaintiff James H. Roane, Jr.*

Amy Karlin
Interim Federal Public Defender
Celeste Bacchi
Jonathan C. Aminoff
Deputy Federal Public Defenders
321 E. Second Street
Los Angeles, CA 90012
(213) 894-2854

*Counsel for Plaintiff Julius O. Robinson*

Gerald W. King, Jr. Ga. Bar No. 140981
Jeffrey Lyn Ertel Ga. Bar No. 249966
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org
Jeff_Ertel@fd.org

Stephen Northup
VSB #16547
Troutman Sanders LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240
(fax) (804) 698-5120
steve.northup@troutmansanders.com

Frederick R. Gerson VSB #39968
Bank Of America Center
1111 East Main Street, 16th Floor Richmond,
Virginia 23219
(804) 482-1121
fgerson@dagglaw.com

*Counsel for Richard Tipton, III.*

Evan Miller (DC Bar # 219310)
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6605
(202) 478-1815 (fax)
emiller@velaw.com

*Counsel for Bruce Webster*


                    */s/Jean Lin*
                    Attorney for Defendants