**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases, <br><br> LEAD CASE: *Roane et al. v. Barr* <br><br> THIS DOCUMENT RELATES TO: <br><br> *Lee v. Barr et al.*, 19-cv-2559 <br><br> *Purkey v. Barr et al.*, 19-cv-3214 <br><br> *Nelson v. Barr et al.*, 20-cv-557 | Case No. 19-mc-0145 (TSC) |

<u>**PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................................2

I.     Plaintiffs Are Likely To Succeed On The Merits ...................................................2

        A.       The 2019 Protocol Is Arbitrary And Capricious ........................................2

        B.       The 2019 Protocol Violates The Eighth Amendment.................................8

        C.       The 2019 Protocol Violates The CSA And FDCA .................................13

        D.       The 2019 Protocol Deprives Plaintiffs Of Their Right To Counsel .....................18

II.    The Remaining Preliminary Injunction Factors Also Favor Plaintiffs ..............................24

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Beaty v. FDA*,
  853 F. Supp. 2d 30 (D.D.C. 2012), *aff'd in relevant part sub nom. Cook v. FDA*,
  733 F.3d 1 (D.C. Cir. 2013) ...................................................................................17

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................22

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) ...........................................................................8, 9, 12, 13

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ...............................................................................................4

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) .............................................................................................17

*City of Dania Beach v. FAA*,
  628 F.3d 581 (D.C. Cir. 2010) ...............................................................................3

*Coe v. Bell*,
  89 F. Supp. 2d 962 (M.D. Tenn. 2000) .................................................................19

*Colvin v. Caruso*,
  605 F.3d 282 (6th Cir. 1982) ...............................................................................23

*Cooey v. Strickland*,
  No. 2:04-cv-1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011) ................18, 19, 21

*Cook v. FDA*,
  733 F.3d 1 (D.C. Cir. 2013) .................................................................................17

*Department of Homeland Security v. Regents of the University of California*,
  __ S. Ct. __, 2020 WL 3271746 (June 18, 2020) ...........................................2, 3, 6

*Estate of Lockett by & through Lockett v. Fallin*,
  841 F.3d 1098 (10th Cir. 2016) ...........................................................................21

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .............................................................................................14

*Glossip v. Gross*,
  135 S. Ct. 2726 (2015) ...........................................................................................1

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ............................................................................................4

*In re Ohio Execution Protocol Litigation,*
   No. 2:11-cv-1016, 2019 WL 244488 (S.D. Ohio Jan. 14, 2019), *aff'd*, 946
   F.3d 287 (6th Cir. 2019) ...................................................................................10

*In re Ohio Execution Protocol Litigation,*
   946 F.3d 287 (6th Cir. 2019) ....................................................................6, 9, 10

*Level the Playing Field v. FEC,*
   381 F. Supp. 3d 78 (D.D.C. 2019), *aff'd*, __ F.3d __, 2020 WL 3108233 (D.C. Cir.
   June 12, 2020) ....................................................................................................3

*Lewis v. Casey,*
   518 U.S. 343 (1996) .....................................................................................19, 20

*McGehee v. Hutchinson,*
   No. 4:17-cv-00179 KGB, 2017 WL 1381663 (E.D. Ark. Apr. 15, 2017) ...............19

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983)..........................................................................................2, 4

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015)...............................................................................................3

*Ringo v. Lombardi,*
   706 F. Supp. 2d 952 (W.D. Mo. 2010) ..............................................................14

*Sierra Club v. Salazar,*
   177 F. Supp. 3d 512 (D.D.C. 2016) .....................................................................4

*United States v. Bartee,*
   479 F.2d 484 (10th Cir. 1973) *abrogated on other grounds by United States v.*
   *Moore*, 423 U.S. 122 (1975) ..............................................................................15

*United States v. Nazir,*
   211 F. Supp. 2d 1372 (S.D. Fla. 2002) ..............................................................16

*University of Texas v. Camenisch,*
   451 U.S. 390 (1981)...........................................................................................15

*Wolff v. McDonnell,*
   418 U.S. 539 (1974)...........................................................................................20

## STATUTES

5 U.S.C.
  § 702 .................................................................................................................17
  § 706(2)(A) .......................................................................................................17

18 U.S.C. § 3599(e) .............................................................................................22

21 U.S.C.
  § 353b(d)(4)(C) ................................................................................................17
  § 802(27) ..........................................................................................................14

## OTHER AUTHORITIES

Berman, *Arizona execution lasts nearly two hours; lawyer says Joseph Wood was
   'gasping and struggling to breathe,'* WASH. POST (July 23, 2014),
   https://www.washingtonpost.com/news/post-nation/wp/2014/07/23/arizona-
   supreme-court-stays-planned-execution/ .............................................................21

H.R. Rep. No. 164, 75th Cong., 1st Sess. (1937) ..........................................................9

Radford, *COVID-19 outbreak confirmed at prison in Bonne Terre*, DAILY JOURNAL ONLINE
   (Jun. 19, 2020), https://dailyjournalonline.com/news/local/govt-and-politics/covid-19-
   outbreak-confirmed-at-prison-in-bonne-terre/article_c7222072-e242-513d-871a-
   c63a9c30cfbc.html ............................................................................................22

Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (2014)............13

In opposing Plaintiffs' request for a preliminary injunction, Defendants do not dispute that Plaintiffs will suffer irreparable harm absent injunctive relief, nor do Defendants seriously contest the equities of executing Plaintiffs pursuant to an unlawful protocol before their legal challenges to that protocol can be fully adjudicated.  Rather, Defendants' primary argument is that Plaintiffs are unlikely to succeed on their Eighth Amendment claim, and so cannot establish likelihood of success on the merits of any of their claims.  That is doubly wrong.

As an initial matter, Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim:  As the expert declarations Plaintiffs offer demonstrate, it is a virtual medical certainty that the injection of a five-gram dose of pentobarbital will cause them to experience flash pulmonary edema, an excruciating condition akin to torture.  Defendants' assertion that Plaintiffs will be rendered unconscious by the initial injection of pentobarbital—and thus will not feel the excruciating pain that is likely to follow—is simply incorrect.  Further, the "demonstrated risk of severe pain" of flash pulmonary edema is "substantial when compared to the known and available alternatives" offered by Plaintiffs, including modifying the lethal-injection protocol to include appropriate pain-relieving medication and other procedural safeguards, or switching to firing squad.  *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).

But in any event, contrary to Defendants' assertions, Plaintiffs' other claims do not rise and fall with their Eighth Amendment claim.  The limits of Eighth Amendment review do not, for example, "appl[y] equally" to Plaintiffs' arbitrary and capricious claim.  Opp. 27.  Rather, the APA requires that Defendants' decision-making *process* properly account for all important aspects of the problem and consider all relevant data.  Defendants failed to do that here.

Similarly, notwithstanding Defendants' contentions, neither the CSA nor FDCA provides a categorical exemption for execution drugs.  Defendants therefore cannot avoid otherwise

1

applicable statutory restrictions by claiming, without support, that the restrictions would inhibit their ability to implement death sentences.  Nor does Plaintiffs' access to counsel claim hinge on whether there is an "Eighth Amendment right to supervise an execution for possible maladministration."  Opp. 40.  Plaintiffs have a constitutional right of access to counsel in order to challenge the conditions of their executions.  The 2019 Protocol deprives them of that right—a deprivation that is particularly consequential now due to the added difficulties of communicating with counsel during the COVID-19 pandemic, which is now dangerously resurgent.

For these reasons, Plaintiffs are likely to succeed on the merits of all of the claims raised in their motion.  The Court should therefore enjoin Defendants from moving forward with their executions while this lawsuit is pending.  The denial of Plaintiffs' petition for certiorari earlier today in no way undermines Plaintiffs' likelihood of success on the claims presented here, which have not been determined by this Court and were not before the Supreme Court—it only increases the urgency of obtaining injunctive relief.

## ARGUMENT

### I.  Plaintiffs Are Likely To Succeed On The Merits

#### A.  The 2019 Protocol Is Arbitrary And Capricious

The 2019 Protocol is arbitrary and capricious because Defendants "entirely failed to consider" several important issues associated with implementing death sentences, including the risk that pentobarbital will cause flash pulmonary edema, the risks related to IV insertion, and the risks of procuring pentobarbital from a compounding pharmacy.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, __ S. Ct. __, 2020 WL 3271746, at *14 (June 18, 2020) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Rather than articulate a reasoned decision-making process that accounts for these important

considerations, Defendants simply insist that this Court lacks the power to ensure that they engage in reasoned decision-making at all.

At the outset, Defendants argue that this Court's review of the Protocol is cabined because the D.C. Circuit held that the Protocol is a procedural rule exempt from notice and comment. *See* Opp. 25. But Defendants provide no authority in support of this premise— because none exists. To the contrary, the Supreme Court and the D.C. Circuit have stressed that the arbitrary and capricious standard is always a "constraint[] on agency decisionmaking," even in instances where the APA's notice-and-comment provisions do not apply. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-106 (2015); *see, e.g.*, *Regents*, 2020 WL 3271746, at *14 (vacating as arbitrary and capricious the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals (DACA) program, even though the agency had not engaged in notice and comment prior to taking that action); *see also* P.I. 5 (collecting cases).

Nor can Defendants truncate the record upon which the Court bases its review. *See* Opp. 25-26 (arguing that "Plaintiffs cannot rely on the extra-record declarations of their experts for purposes of their APA claims"). As this Court recently explained, and Defendants appear to concede (Opp. 26), evidence outside the administrative record may be considered in determining whether an agency engaged in reasoned decision-making where "background information [is] needed 'to determine whether the agency considered all the relevant factors.'" *Level the Playing Field v. FEC*, 381 F. Supp. 3d 78, 89 (D.D.C. 2019) (alteration in original) (quoting *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010), *aff'd*, __ F.3d __, 2020 WL 3108233 (D.C. Cir. June 12, 2020)). Here, evidence outside the administrative record is necessary to show that Defendants entirely failed to consider authoritative and well-recognized scientific evidence that undermines their conclusions. Otherwise, the agency could exclude critical

evidence from its review, and then argue that a reviewing court has no authority to consider that evidence in determining whether the agency acted arbitrarily or capriciously.  So Defendants are incorrect that "the declarations relied upon by Plaintiffs are proffered solely to support their disagreement with the agency's decision."  Opp. 26.  The point of this expert testimony is to lay bare the issues Defendants failed to consider—issues of significant import in creating an execution protocol—and the evidence they failed to address—which has been well recognized in the field.  This is not a case where "specialists express conflicting views" and "an agency must have discretion to rely on … its own qualified experts."  *Id.* at 26-27.  Rather, the agency selectively considered only opinions that supported its decision.  "Such cherry-picking embodies arbitrary and capricious conduct."  *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 540 (D.D.C. 2016).

Defendants' attempts to shoehorn Plaintiffs' APA claims into an Eighth Amendment framework are similarly wrong-headed.  *See* Opp. 27.  Defendants cite cases concerning *state* execution protocols, which consider whether state execution methods comply with constitutional standards.  But state action is not constrained by the APA; federal agency action is.  And the APA requires that federal agency action be the product of reasoned decision-making and that the decision reached be rational—*i.e.*, that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Demanding that Defendants meet this low bar does not, as Defendants suggest, require "'import[ing] profound differences of opinion over the meaning of the Eighth Amendment … into the domain of administrative law.'"  Opp. 24 (quoting *Heckler v. Chaney*, 470 U.S. 821, 838 (1985)) (alterations in Opp.).  It simply means

4

that Defendants cannot *avoid* the requirements of administrative law because their actions concern the death penalty.

On the merits, Defendants' arguments fare no better.  The Administrative Record makes clear that Defendants selected pentobarbital as an execution drug based on a partial record that omitted critical, well-known evidence reflecting a scientific consensus about the drug's effectiveness (or lack thereof) and risk of harm.  To justify use of pentobarbital, Defendants were required to consider a number of important issues that they clearly ignored.

*First*, Defendants do not even attempt to show that they actually considered the risk of pulmonary edema before finalizing the Protocol, even though that risk obviously affects whether a prisoner will suffer unreasonable pain.  Instead, in the single paragraph they devote to this subject, Defendants argue that they were not required to consider that risk because "pentobarbital is a fast-acting barbiturate, which will quickly render an inmate unconscious."  Opp. 28.  That is inaccurate, as explained in further detailed below.  *See infra* pp. 10-12.  "[B]arbiturates like pentobarbital … diminish *responsiveness* rather than *consciousness*."  P.I. 8.  Although outdated "traditional textbooks and authors report that the inhibitory effects of barbiturates cause 'unconsciousness,'" "authoritative publications now describe barbiturates as producing 'unresponsiveness,' since how, and even whether, they affect consciousness is under serious question."  Van Norman Decl. at 13; *see also id*. at 22-23, 28-29.  The distinction between responsiveness and consciousness is critical because even if "the patients *appear to be* unconscious by all clinical measures and are unresponsive," they still may be conscious, and "consciousness will permit extreme pain and suffering during the execution process."  *Id.* at 7 (emphasis added).  At the very least, Defendants were required to *consider* the risk that pentobarbital would cause flash pulmonary edema.

Nor is the Sixth Circuit's conclusion that pulmonary edema is not "the type of serious pain prohibited by the Eighth Amendment," *In re Ohio Execution Protocol Litigation*, 946 F.3d 287, 289-290 (6th Cir. 2019), relevant to Plaintiffs' arbitrary and capricious claim.  *See* Opp. 28. That case was wrongly decided (P.I. 23 n.12) and involved a materially different execution method (*see infra* pp. 9-10).  Further, it was not issued until after the Protocol was promulgated, and thus cannot explain Defendants' failure to consider the risk of flash pulmonary edema. Given that "so much is at stake, … [t]his is not the case for cutting corners to allow [Defendants] to rely upon reasons absent from [their] original decision."  *Regents*, 2020 WL 3271746, at *11. In any event, the Eighth Amendment's cruel-and-unusual standard is not coextensive with the APA's requirement that the agency engage in reasoned decision-making.  Had Defendants performed a complete review of state executions and qualified medical expert opinions—where a substantial body of research regarding pentobarbital and its effects, following widespread use of that drug in executions, has developed—they would have recognized that use of pentobarbital as a lethal-injection drug raises a serious risk of flash pulmonary edema, and that this risk must be accounted for in considering whether an execution will cause unreasonable pain.  *See* P.I. 6-10.

*Second*, Defendants argue both that "Plaintiffs have no constitutional entitlement to dictate" IV placement and that the APA does not provide "a basis to second guess how BOP inserts the IV."  Opp. 28-29.  Again, Defendants confuse the Eighth Amendment and the APA. Even if Defendants were correct that the Eighth Amendment does not require any particular IV placement, they must have at least considered the risk of faulty IV-line placement and the need to take steps to mitigate that risk, given the horrific consequences that can result (and have resulted) from the failure to do so in an execution.  *See* P.I. 10-14.  Nor does BOP's supposed

"free[dom] to decide the level of detail to include in the [Protocol]" because it is not constrained by notice and comment relieve Defendants of the obligations to consider these risks.  Opp. 29.

Defendants cannot establish that they adequately considered the issue of IV insertion. The only evidence Defendants actually say they considered is the "after action report" from the Lockett execution and stray references in the expert testimony to IV infiltration.  *See* Opp. 30. That hardly amounts to a *full* consideration of IV placement procedures, which also include IV-placement considerations and training requirements.  *See* P.I. 13-14.  On those crucial issues, Defendants' argument boils down to "trust us"—embodied by their unsubstantiated assertion that "there is no reason to assume that BOP personnel cannot competently set the IV lines or address issues that may arise by following the directions of the BOP Director or his designee about IV access."  Opp. 29.  That is cold comfort to Plaintiffs, as the Protocol provides absolutely no guidance regarding these issues.  Nor does the fact that the Protocol requires several "rehearsals" substitute for detailed guidance about training requirements, particularly because the Protocol lacks guidance regarding whether these rehearsals will train the team for setting the IV, and it is not clear whether these rehearsals have even taken place in light of the COVID-19 crisis. Further, the Protocol explicitly exempts any team members with medical licenses or certifications from the rehearsals, even though there is no indication that these exempt individuals have any experience in setting remote IVs.

*Third*, Defendants argue that their "decision to use a compounded form of pentobarbital is reasonable," primarily based on an assertion that "any risks associated with using compounding pharmacies to produce lethal agents is tolerated under the Eighth Amendment." Opp. 31.  At the risk of repetition, that is insufficient for purposes of Plaintiffs' APA claims. And in any event, the only support Defendants cite for this argument is the March 2020

memorandum purportedly assuring that Defendants will use a compounding pharmacy that will comply with the FDA's Current Good Manufacturing Practice requirements. *See id.* As explained (P.I. 18-19), the memorandum was issued months after the Protocol was announced, and thus could not possibly demonstrate that Defendants engaged in a rational decision-making process in July 2019. And in any event, Defendants concede that the memorandum is non-binding, so there is no way to know whether the FDA practices invoked will actually be observed. Nor can the purported "lack of supply of domestic pentobarbital products," Opp. 31, itself justify the use of compounded pentobarbital, in light of Defendants' failure to account for the serious and well-documented problems associated with the compounded products, *see* P.I. 14-18. Otherwise, mere unavailability of one drug could justify the decision to use another drug—even if there was no consideration of whether the substitute drug would result in unreasonable pain or cause the execution to be inhumane.

**B.     The 2019 Protocol Violates The Eighth Amendment**

Plaintiffs are likely to succeed in establishing that the 2019 Protocol's mechanism of lethal injection creates a demonstrated risk of severe pain and that this risk is substantial when compared to at least two known and available alternatives. *See* P.I. 21-28.

**1.     Case law does not foreclose Plaintiffs' Eighth Amendment challenge.**

Defendants argue that because *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), and out-of-circuit cases have upheld pentobarbital-based formulas against Eighth Amendment challenges, Plaintiffs' challenge cannot succeed. Opp. 9-10. But each of those cases is predicated on the factual record amassed by the parties, and none of the cases address the near medical certainty that administration of a massive dose of pentobarbital will cause the prisoner to experience the torturous sensations of flash pulmonary edema. *See* Van Norman Decl. at 7. Indeed, *Bucklew* in particular was an as-applied challenge to Missouri's execution protocol that was limited to Mr.

8

Bucklew's specific medical condition.  Nothing prevents this Court from reaching a different result where Plaintiffs' claim is based on a more current and comprehensive scientific understanding.  *See id.* at 13 (contrasting outdated, "traditional textbooks and authors" in the field of anesthesia with more "authoritative publications," concerning the effects of barbiturates).

Defendants next argue that pulmonary edema is a non-event under the Eighth Amendment because the experience is similar to hanging, which has never been held unconstitutional.  *See* Opp. 11-12 (citing *Ohio Execution Protocol*, 946 F.3d 287).  That misses the point.  In *Bucklew*, the Court observed that hangings were tolerated in the Eighteenth Century because they were more humane than other execution methods *at that time*.  *See* 139 S. Ct. at 1124.  That analysis hardly establishes that drowning and suffocation are acceptable today, especially when they can be easily avoided.  In fact, concerns about the relative inhumanity of hangings are what first motivated the federal government's adoption of the state-focused approach to executions found in the FDPA.  *See* H.R. Rep. No. 164, 75th Cong., 1st Sess., at 1 (1937).  As for *Ohio Execution Protocol*, that case is tentative in its analysis of pulmonary edema.  It states that the risk of feeling the sensation of drowning or asphyxiation "*looks a lot like the risks of pain associated with hanging.*"  946 F.3d at 290 (emphasis added).  That does not establish that acute pulmonary edema is an insubstantial hazard as a matter of law.

More importantly, the Ohio case involved a three-drug protocol in which midazolam is the first drug, and the court's suppositions about the effects of midazolam do not apply to pentobarbital.  As Plaintiffs' experts explained, pentobarbital carries a highly alkaline pH of 10.0 or more, and it causes flash pulmonary edema based on the "direct toxic effect of alkaline pentobarbital solution on the lung capillaries."  Edgar Decl. at 20; *see also* Van Norman Decl. at 32.  Midazolam, by contrast, is a benzodiazepine rather than a barbiturate.  It carries a strongly

acidic pH of 3.0 to 3.5 instead of a highly alkaline one.  *See In re Ohio Execution Protocol Litig.*,

No. 2:11-cv-1016, 2019 WL 244488, at *29 (S.D. Ohio Jan. 14, 2019), *aff'd*, 946 F.3d 287 (6th

Cir. 2019).  As Defendants' expert, Dr. Antognini, testified in the Ohio case, a prisoner's blood

is likely to buffer the acidic midazolam, thus diminishing the likelihood and severity of damage

to lung tissue.  *Id.* at *58.  Thus, not only are pentobarbital and midazolam different drugs that

work by different mechanisms and carry different effects of different severity, *see* Van Norman

Decl. at 7 (effects of high-dose IV barbiturates), but also the risk of pulmonary edema associated

with pentobarbital is *worse* than that associated with midazolam.  *Compare Ohio Execution*

*Protocol*, 946 F.3d at 290 ("*Many and perhaps most* hangings were evidently painful for the

condemned person." (emphasis added)), *with* Van Norman Decl. at 8 ("The Federal Protocol …

is *virtually certain* to cause prisoners excruciating suffering through their awareness of the

sensations of suffocation and drowning caused by pulmonary edema." (emphasis added)).

> **2.** **Expert evidence demonstrates that Plaintiffs are virtually certain to experience the sensation of pulmonary edema.**

Defendants rely on Dr. Antognini to attempt to refute the conclusions of Drs. Van

Norman and Edgar.  Opp. 13-14.  According to Defendants, a prisoner will be rendered

"unconscious" within 20 to 30 seconds when injected with only one-tenth of the five-gram dose

of pentobarbital called for in the 2019 Protocol, and brain functioning will progressively

diminish as the remainder of the pentobarbital is injected.  The crux of their argument is that the

prisoner will be insensate before the onset of edema or feelings of suffocation because

pulmonary edema results from the large "overdose" of pentobarbital.  *Id.* at 13.

Defendants' explanation suffers from two critical flaws.  *First*, it is contradicted by the

objective witness reports and autopsy findings from pentobarbital executions.  Reports of

gasping and other signs of respiratory distress, together with the presence of foam or froth-like

10

edema fluid in the airway, demonstrate that "the drug had not yet acted on the brain to produce deep sedation."  Edgar Decl. at 20.  Foam or froth results from "the active mixing of edema fluid with air," which means that the prisoner was still breathing "before the drug had acted on the brain to stop breathing."  *Id.*  Consistent with the autopsy findings, Dr. Van Norman explains that "flash pulmonary edema occurs *virtually immediately* during and after high-dose barbiturate injection, and well within a time frame before peak drug effects on the brain have occurred." Van Norman Decl. at 36 (emphasis added).  Further, as Dr. Van Norman explains, circulation and a heartbeat must be present in order for pulmonary edema to occur.  *See* Supp. Decl. of Dr. Gail A. Van Norman (Van Norman Supp. Decl.) (June 29, 2020) at 2, 9-10 (Dkt. #117-1). Therefore, pulmonary edema cannot occur post-mortem, as Dr. Antognini suggests.  Opp., Ex. D, Decl. of Dr. Joseph F. Antognini at 4 (Dkt. #111-4).  Regardless of whether pentobarbital can ever render a prisoner insensate to the excruciating pain and suffering of pulmonary edema—and Dr. Van Norman opines that it cannot, *see* Van Norman Supp. Decl. at 4—with low dosages of the drug, pulmonary edema can occur within seconds of drawing a breath, and certainly will occur before condemned prisoners reach an insensate level of unconsciousness.  *Id.* at 4, 8.

*Second*, Dr. Antognini relies on an outdated understanding of consciousness, in which he equates unresponsiveness with unconsciousness.  They are not the same, and the fact that a prisoner is unresponsive does not mean he or she is unconscious.  As Dr. Van Norman explains, "[t]he idea that unresponsiveness indicates unconsciousness was invalidated by research in consciousness approximately 30 years ago."  Van Norman Supp. Decl. at 3.  Although outmoded, "traditional" textbooks and authors reported that barbiturates cause "unconsciousness," Dr. Van Norman explained that "authoritative publications now describe barbiturates as producing 'unresponsiveness.'"  Van Norman Decl. at 13; *see also* Van Norman

Supp. Decl. at 9 ("[S]tudies of unconsciousness in patients anesthetized with barbiturates indicate that they remain conscious for a significant period of time").  In light of "recent research" and newly emerged "scientific evidence," barbiturates are now known to induce unresponsiveness before the point (if any) at which they induce unconsciousness, even as the person's unresponsiveness mimics unconsciousness.  Van Norman Decl. at 7, 24.  The studies on which Dr. Antognini relies, however, examine only the subject's unresponsiveness, rather than unconsciousness.  *See* Van Norman Supp. Decl. at 4, 8.  Although pentobarbital will induce unresponsiveness, "it is extremely likely that prisoners given even high doses of barbiturates retain consciousness long enough to experience pain and suffering during the execution process using single-drug pentobarbital."  Van Norman Decl. at 7.

> ### 3.    Plaintiffs have identified feasible and available alternative methods.

Finally, Defendants attack as "bare-bones" Plaintiffs' proposed alternative of administering an opioid before the pentobarbital, primarily on the ground that Plaintiffs do not specify which drug to administer and in what amount.  Opp. 19.  To the contrary, Dr. Stevens's report specifies that information in detail.  He recommends the use of either morphine or fentanyl, both of which are commercially available.  *See* Stevens Decl. at 4-6.  Morphine "should be given in an IV bolus dose in the range of 2 mg to 10 mg/70 kg of body weight at least 10 minutes before the injection of pentobarbital."  *Id.* at 5.  Fentanyl "should be given in an IV bolus dose of 2 mcg/kg to 20 mcg/kg (0.002 mg/kg to 0.02 mg/kg) at least 5 minutes before the injection of pentobarbital."  *Id.* at 6.  Dr. Stevens also details the "dose formulations," manufacturers, and brand names of both drugs.  *Id.* at 7.  Dr. Stevens's suggestions, then, could be carried out "relatively easily and reasonably quickly."  *Bucklew*, 139 S. Ct. at 1129.

Equally meritless is Defendants' argument that the use of an opioid in a "pentobarbital protocol" is purportedly novel, and that they therefore need not adopt this otherwise feasible

alternative.  Opp. 19.  Defendants themselves acknowledge that Nebraska recently carried out a

four-drug execution with the use of fentanyl.  *See* Dkt. #113 at 1 ("Defendants' Notice of

Correction").  The Nebraska method and Plaintiffs' proposal share the same core feature: the use

of fentanyl as an analgesic to prevent the prisoner from experiencing severe pain from the drugs

administered thereafter.  It therefore rings hollow for Defendants to argue that they are "choosing

not to be the first to experiment with a new method of execution." *Bucklew*, 139 S. Ct. at 1130.

 Defendants' attacks on the firing squad are similarly unsound.  Defendants call the firing

squad "regressive" and "primitive," but they provide no evidence that it would not in fact

minimize the risk of extreme pain and suffering.  Opp. 23.  Quantitatively, Defendants take issue

with Professor Sarat's study and complain that a "mere two" botch-free firing squad executions

do not evidence the method's superiority.  Opp. 22.  In fact, the Sarat study and Defendants' own

exhibit say the same thing: based on contemporaneous news reports of *all* American executions

from 1900 to 2010, zero out of thirty-four firing squad executions were "botched."  Sarat,

*Gruesome Spectacles: Botched Executions and America's Death Penalty* 177, App. A (2014);

Opp., Ex. A, Sarat Excerpt (Dkt. #111-1).

C.     **The 2019 Protocol Violates The CSA And FDCA**

Plaintiffs are also likely to succeed on their claims that the 2019 Protocol violates the

CSA and FDCA and is therefore "not in accordance with law," including because the Protocol

flouts both statutes' prescription requirements.  *See* P.I. 28-33.

Defendants insist that they selected pentobarbital as an execution drug for the medical

purpose of preventing pain, and to otherwise ensure a "humane" death.  AR 1, 3, 525-526, 858,

871-872, 929, 931.  Having crafted a protocol to achieve a specific medical purpose, enlisted

scientific experts to assist in that purpose, and defended the protocol as "humane" because it

allegedly achieves that purpose, Defendants now claim they are exempt from laws that ensure

that a drug is "safe and effective for its intended use." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). The Government cannot have it both ways. "Where the Eighth Amendment requires protocols that include adequate safeguards against unnecessary pain … the safeguards provided by the CSA and FDCA are not irrelevant." *Ringo v. Lombardi*, 706 F. Supp. 2d 952, 962 (W.D. Mo. 2010).

*First*, the 2019 Protocol is not in accordance with the CSA because Defendants intend to dispense a controlled substance without a valid medical prescription. In arguing to the contrary, Defendants deny that they "dispense" pentobarbital under the CSA, chiefly because that term requires the delivery of a controlled substance to "an ultimate user." Opp. 32-33. An "ultimate user," is someone who "has lawfully obtained, and who possesses, a controlled substance for his own use." *Id.* (quoting 21 U.S.C. § 802(27)). Defendants simply conclude, without analysis, that "Plaintiffs will not be lawfully obtaining or possessing the pentobarbital for their own use." *Id.* at 32.

As an initial matter, Defendants' argument departs from the position DEA took when advising state officials how to comply with the CSA when carrying out lethal injections. The DEA advised the states: "In this instance, the DoC wants the controlled substances to be able to give them to inmates … For purposes of the CSA, that act is called 'dispensing.'" Schoenfeld Decl., Ex. 5 at 35. Moreover, DEA advised Washington State Department of Corrections administrators that "a licensed mid-level or MD must prescribe, administer & dispense" lethal-injection drugs. Schoenfeld Decl., Ex. 6. The Government's response to this apparent flip-flop is to deny that it ever happened and to cast aspersions at the authenticity of the documents. *See* Opp. 35-36. However, the fact that DEA's Rule 30(b)(6) deponent does not recall a consistent policy clearly outlined in multiple documents is hardly evidence that the documents did not once

14

reflect DEA policy.  And Defendants' complaints about the use of unauthenticated documents only highlight the importance of allowing this litigation to advance to the stage at which such arguments would be appropriate, after Plaintiffs have had an opportunity to authenticate them through discovery and testimony.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").

Defendants also miss the mark when arguing that a prisoner does not "possess" or "obtain" the drug "for his own use."  Opp. 32-33.  They offer no authority for the unstated premise that statutory "use" and reception of a drug is limited to a person's voluntary use, as opposed to the involuntary administration of a drug for the medical benefit of the person receiving it.  Under Defendants' reasoning, any person could freely inject anti-psychotic medications into an incompetent, unconscious, or otherwise dangerous psychiatric patient, on the ground that the patient does not "possess" the drug "for his own use."  That is not the law. Indeed, the few courts to have considered the scope of the "own use" language in the "ultimate user" requirement have interpreted the phrase broadly.  *See, e.g.*, *United States v. Bartee*, 479 F.2d 484, 487 (10th Cir. 1973) (holding that undercover officers are "ultimate users" despite their lack of any intent to ingest or use the drugs that are dispensed to them), *abrogated on other grounds by United States v. Moore*, 423 U.S. 122, 124 (1975).

Defendants next falsely attribute to Plaintiffs a contention that lethal-injection drugs can *never* be prescribed for a legitimate medical purpose, then insist that this view would make all lethal injections illegal under both the CSA and FDCA, contrary to congressional intent.  *See* Opp. 33-36, 38 (criticizing purported "Catch-22 argument").  But Plaintiffs have never made such an argument.  Nowhere do Plaintiffs contend that *all* execution drugs lack a legitimate

15

medical purpose; rather, they contend that no such purpose is validly advanced *by the 2019 Protocol*, because no medical practitioner has made a clinical judgment that the particular drug is well suited for an individual prisoner in light of that prisoner's medical needs. *See* Am. Compl. ¶¶ 62-67, 171-172 (Dkt. #92). The 2019 Protocol lacks the type of prescription that the CSA and FDCA require: a "bona fide" order directing "the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination or consultation by a licensed doctor." *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002). The problem is not that every prescription for a lethal-injection drug will fail to serve the legitimate medical purpose of avoiding pain. Indeed, the Administrative Record makes clear that in developing the 2019 Protocol, the Government considered state protocols that include prescription requirements. *See* AR 70 (noting that Missouri's execution protocol includes the individuals who "prescribe ... the chemicals for use in the lethal injection procedure"). The problem, then, is that Defendants have made no effort to obtain a prescription that reflects such medical judgment.

Finally, given that some states do obtain prescriptions, it strains credulity for Defendants to argue that that they are not "administering" pentobarbital in the lethal-injection context because death-sentenced individuals categorically are not "patients" under the traditional definition of the word. Opp. 33. The Government's sole support for this proposition is Black's Law Dictionary's definition of "patient" as a "person under medical or psychiatric care." *Id.* And even if this bare-bones argument were compelling, Black's definition applies here: The 2019 Protocol does adopt medical procedures. Defendants cannot have it both ways—invoking and renouncing medical practice whenever it is convenient.

*Second*, relying primarily on an OLC opinion, Defendants argue that the FDCA does not

apply in the lethal-injection context.  Opp. 36-37.  As explained, the D.C. Circuit previously

rejected the position that OLC has now adopted.  *See* P.I. 32-33 (citing *Cook v. FDA*, 733 F.3d 1,

10-11 (D.C. Cir. 2013); *Beaty v. FDA*, 853 F. Supp. 2d 30, 37, 42 (D.D.C. 2012), *aff'd in*

*relevant part sub nom. Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013)).  Defendants attempt to

distinguish *Beaty* and *Cook* by arguing that those cases did not "address[] the broader question of

FDA's jurisdiction" over execution drugs.  Opp. 39.  But *Beaty* unambiguously held that lethal-

injection drugs are properly "considered 'drugs' under the FDCA" because "they are 'intended to

affect the structure or any function of the body of man,'" 853 F. Supp. 2d at 34 (quoting 21

U.S.C. § 321(g)(1)))—a conclusion the D.C. Circuit necessarily adopted in *Cook*.  Defendants

apparently disagree with those rulings, but the OLC memo cannot displace binding precedent.

Nor is it relevant that the FDCA provision in *Beaty* and *Cook* was mandatory.  *See* Opp. 38-39.

The question here is whether all execution drugs are exempt from the statute; the answer is no.

Similarly unavailing is the Government's analysis of the FDCA's restrictions on

outsourcing facilities.  Defendants seem to suggest that those restrictions do not apply to them,

because their supplier is not compounding "large quantities for office stock."  Opp. 38.  But that

language does not appear in the statute.  As explained, the FDCA's restrictions apply to all

outsourcing facilities, regardless of whether the quantity of drugs produced is "large" or destined

for "office stock," and regardless of whether the manufacturing facility itself—as opposed to

those who later sell, dispense, or administer the drug—"obtain[s] prescriptions."  21 U.S.C.

§ 353b(d)(4)(C); Opp. 38.

*Third*, Defendants contend that Plaintiffs lack a right of action to enforce either the CSA

or the FDCA.  *See* Opp. 36, 39-40.  The APA, however, provides a cause of action when agency

action is "not in accordance with law."  5 U.S.C. §§ 702, 706(2)(A); *Chrysler Corp. v. Brown*,

441 U.S. 281, 316-318 (1979) (finding no private right of action to enforce the Trade Secrets Act, but holding that any governmental disclosures that violate the Act are reviewable and "not in accordance with law" under the APA).  Importantly, Plaintiffs do not seek to compel enforcement of the CSA or FDCA against a third party, but rather seek to compel Defendants' compliance with the statutes' substantive requirements in agency decision-making (and avoid the arbitrary and capricious result of enforcing a Protocol that requires others to violate the statutes).

### D.      The 2019 Protocol Deprives Plaintiffs Of Their Right To Counsel

Plaintiffs are likely to succeed on their claim that the 2019 Protocol deprives them of access to counsel and the courts because it prevents counsel from observing the critical moments at which Eighth Amendment violations are likely to occur and from conferring with their clients—communication that is essential in order to raise and establish a claim.  *See* P.I. 33-38.

Defendants oppose Plaintiffs' access to counsel claim by glossing over a right that undeniably extends throughout the entirety of an execution: the Eighth Amendment right to be free from cruel and unusual punishment.  The First, Fifth, and Sixth Amendments ensure that throughout the administration of the death penalty, Plaintiffs have access to counsel in order to assert violations of that foundational right.  Under Defendants' cramped reading, "there is no Eighth Amendment right to supervise an execution for possible maladministration, and *a fortiori*, no right to have counsel do the same."  Opp. 40.  But there is surely a "constitutional right of access to counsel and to the courts to challenge the conditions of … execution."  *Cooey v. Strickland*, No. 2:04-cv-1156, 2011 WL 320166, at *8-11 (S.D. Ohio Jan. 28, 2011).  This right is illusory, and irremediably so, unless counsel can preserve communication with the client and

with the courts.  *See id.* at *11 (access to counsel deters unconstitutional acts); *Coe v. Bell*, 89 F. Supp. 2d 962, 966 n.7 (M.D. Tenn. 2000) (same).[1]

Defendants also fail to grapple with—or even acknowledge—"the unique circumstances presented by the execution context," in which "the circumstances surrounding an execution present an inherent risk of actual injury to the timely and meaningful presentation of non-frivolous claims to a court." *McGehee v. Hutchinson*, No. 4:17-cv-00179 KGB, 2017 WL 1381663, at *26, *28 (E.D. Ark. Apr. 15, 2017) (internal quotation marks and citation omitted). Defendants quote *Lewis v. Casey* for the proposition that prisoners have no First Amendment right to "discover grievances, and to litigate effectively once in court."  Opp. 40 (quoting *Lewis*, 518 U.S. 343, 354 (1996) (emphasis omitted)).  Yet *Lewis* acknowledged an "(already well-established) right of *access to the courts*"—the Court merely held that the plaintiffs could not allege "an abstract, freestanding right to a law library or legal assistance," but rather had to "go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."  *Lewis*, 518 U.S. at 350-351 (emphasis in original).  Plaintiffs have taken that necessary step here by demonstrating that the shortcomings in the 2019 Protocol would irreparably hinder their efforts to pursue an Eighth Amendment claim.  *See* P.I. 35.  Under the 2019 Protocol, legal visits may be barred in the hours before the execution, counsel is prohibited from viewing the setting of the IVs (during which Eighth Amendment violations can and are likely to occur), and there is neither a way for counsel to

---

[1] Defendants' reliance on the fact that the state statute in *Coe* "did not even allow for the presence of counsel at the execution" is puzzling.  Opp. 41.  This statutory prohibition led the court to grant an injunction after concluding that "[i]t is clear that prisoners have a constitutional right to have meaningful access to the courts" and "that right requires that counsel have some access to the prisoner during the last hour before the execution and be permitted to witness his execution and have access to a telephone."  *Coe*, 89 F. Supp. 2d at 963-964, 966.

actively communicate with Plaintiffs during the execution, nor a guarantee that counsel will have access to a phone to communicate with the court.  *Id.*[2]

Indeed, it is only now that Defendants have finally provided clarification regarding counsel's access to a phone during the execution itself.  *See* Opp. 41.  A new declaration from Tom Watson, Complex Warden at FCC Terre Haute, explains, with no reference to the Protocol or another section of the Administrative Record, that "if legitimate need arises (such as need to contact a court) an attorney may request the use of a phone and will have immediate access to one outside of the witness room."  Opp., Ex. C, Decl. of Tom Watson ¶ 12 (Dkt. #111-3).  Assuming, for the moment, that BOP will not question counsel's own assessment of when contact with a court is necessary or legitimate, this new declaration does little to assuage the numerous shortcomings Plaintiffs have identified.  Indeed, the declaration confirms that counsel will be confined to a witness room, *id.* ¶ 11 (citing AR 1024, 1038), which Defendants note has "windows" separating witnesses from the execution, Opp. 41 (citing AR 1037-39).  Although Defendants explain that counsel will hear the prisoner's final statement and will be permitted to "view the execution until the pronouncement of death has been made," *id.* (citing AR 1041-42), they do not dispute that counsel is barred from viewing the setting of the IV—a critical junction—or from having a means of communicating with Plaintiffs throughout the entirety of

---

[2] Defendants fail to respond to Justice Thomas's suggestion that there is a Fifth Amendment due process right to access the courts to present allegations concerning violations of fundamental constitutional rights.  *See Lewis*, 518 at 380-382 (Thomas, J., concurring) (citing *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)).  This right is the only Fifth Amendment claim encompassed in Plaintiffs' briefing in support of a preliminary injunction.  Plaintiffs have not raised, and reserve all rights and arguments pertaining to, all other Fifth Amendment claims alleged in their Amended Complaint.  *See* Am. Compl. ¶¶ 116-121, 127-134 (Counts I, III).

the execution.[3]  But "the ability of an inmate to confer with his or her counsel" is what "makes

the presence of counsel of any potential value to an inmate and that renders meaningful the

ability of counsel to access a court on an inmate's behalf." *Cooey*, 2011 WL 320166, at *7.

Defendants thus obstruct "the timely assertion of non-frivolous constitutional claims." *Id.*

As for the Sixth Amendment, Defendants recycle their claim that an execution is not a

"critical stage" in the criminal process, *see* Opp. 40; *see also* Dkt. #16 at 29; Dkt. #37 at 25 n.6,

citing a case concerning pre-trial line-ups.  They have no rejoinder for *Cooey*'s conclusion, in a

more analogous situation, that this debate "largely misses the point," because whether or not

there is an "overarching right to counsel," "there is unquestionably a right to access the courts

involved in the context of executions that inherently injects the issue of access to counsel into

[the] discussion." *Cooey*, 2011 WL 320166, at *5, *7.  Indeed, in support of their sweeping

proposition that "no law … would support the right to counsel throughout an execution,"

Defendants cite only one case: a Tenth Circuit decision that devoted all of three sentences in a

46-page opinion to this issue.  Opp. 40 (quoting *Estate of Lockett by & through Lockett v. Fallin*,

841 F.3d 1098, 1117 (10th Cir. 2016)).  That out-of-circuit § 1983 case, holding that a plaintiff,

on different facts and legal claims, failed to establish that a right to counsel during his execution

was "clearly established" is hardly the complete statement of law Defendants make it out to be.

These access to counsel issues have now been greatly exacerbated by the COVID-19

crisis, which has grown even more dire over the past two weeks.  *See* P.I. 35-38.  Even with the

---

[3] In a botched 2014 execution, the presence of counsel was critical to gaining access to
the courts through an emergency petition when the execution drugs failed to bring about death,
leaving the prisoner gasping for air for nearly two hours.  *See* Berman, *Arizona execution lasts
nearly two hours; lawyer says Joseph Wood was 'gasping and struggling to breathe,'* WASH.
POST (July 23, 2014), https://www.washingtonpost.com/news/post-
nation/wp/2014/07/23/arizona-supreme-court-stays-planned-execution/.

situation on the ground rapidly deteriorating, Defendants sidestep issues about the effects the pandemic will have on Plaintiffs' access to counsel—a right that is constitutionally guaranteed, promised through all phases of end-stage litigation by the FDPA,[4] and embedded in the BOP's own execution protocol.

Defendants do not deny that Plaintiffs have been deprived of in-person legal visits—nor could they, given that BOP itself suspended those legal visits beginning in mid-March.  Nor do Defendants deny that Plaintiffs' lawyers now face an intolerable choice: either meet with their clients in person at this critical stage of proceedings, or preserve their own health and that of their families and communities.[5]  Instead, Defendants contend that the Court may not grant relief based on Plaintiffs' pandemic-related arguments because the pandemic was not mentioned in the Amended Complaint.  Opp. 42.  Plaintiffs, however, have established that there is a relationship between the pandemic and their access to counsel, a claim that was extensively pled in the Amended Complaint.  Plaintiffs are not required to allege in their pleadings every particular fact in support of their claims—all that Federal Rule of Civil Procedure 8(a)(2) requires is "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the … claim is and the grounds upon which it rests."  *Bell Atl.*

---

[4] A death-sentenced prisoner is entitled to counsel at every step of end-stage litigation including "applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and [counsel] shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant."  18 U.S.C. § 3599(e).

[5] Indeed, in the sole jurisdiction in which an execution has taken place since the onset of the pandemic, Missouri, the prison saw an enormous increase in COVID-19 infections just weeks later.  *See* Radford, *COVID-19 outbreak confirmed at prison in Bonne Terre*, DAILY JOURNAL ONLINE (Jun. 19, 2020), https://dailyjournalonline.com/news/local/govt-and-politics/covid-19-outbreak-confirmed-at-prison-in-bonne-terre/article_c7222072-e242-513d-871a-c63a9c30cfbc.html.

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  When it comes time to prove those claims, Plaintiffs are not constrained by the facts alleged in the complaint.  The sole case Defendants cite (Opp. 42), *Colvin v. Caruso*, 605 F.3d 282 (6th Cir. 1982), is not to the contrary.  There, the court denied the request for injunctive relief because the plaintiff "did not bring his wrongful removal *claim* in his original complaint."  *Id.* at 299 (emphasis added).  Here, Plaintiffs plausibly alleged an access-to-counsel claim in the Amended Complaint, and now point to additional facts to support that claim.

And although Defendants criticize Plaintiffs' arguments as purely "speculative" (Opp. 42-43), that is clearly not the case.  Defendants do not provide any information about how counsel will be protected once inside Terre Haute.  And no matter how carefully they might prepare the prison for an influx of visitors packed into small rooms, or the large numbers of people needed to perform and manage federal executions at Terre Haute,[6] Defendants cannot promise safe travel for Plaintiffs' lawyers, who are located in various states.  Instead, Defendants again simply say "trust us" that legal calls are treated confidentially.  *See* Opp. 42 (citing the "presumption of good faith and regularity" afforded to federal officials).  Even if that is true, legal phone calls are not a substitute for in-person client visits, which last six hours a day and enable face-to-face conversation, or for witnessing the execution in a manner that allows for necessary intervention should the process go awry.

In sum, access to counsel is vital to ensuring Plaintiffs' executions are conducted in compliance with law.  Having waited years to execute Plaintiffs, it is not clear why Defendants

---

[6] *See* Winter Decl., Dkt. #54, ¶¶ 5-11 (Nov. 21, 2019) (execution team consists of over 40 BOP staff members; 200 FCC Terre Haute staff will serve as institution security and support during an execution; 50 individuals from other prisons will serve as Response Team (SORT) and Disturbance Control Team (DCT) members; victims' family members will be present).

insist on scheduling their executions during an unprecedented national health crisis that risks not only legal protections but also the health and safety of those involved.

## II.     The Remaining Preliminary Injunction Factors Also Favor Plaintiffs

As this Court previously held, "Plaintiffs have clearly shown that, absent injunctive relief, they will suffer the irreparable harm of being executed under a potentially unlawful procedure before their claims can be fully adjudicated." P.I. Op. 14.  "This harm is manifestly irreparable." *Id.* at 13.  The D.C. Circuit did not disturb this conclusion, and Defendants make no effort to challenge it here.  Instead, they claim that "the equities tip against issuing an injunction" because executions must proceed in order to give "meaningful effect" to the public's decision to make capital punishment available in the federal system.  Opp. 44.  But the public's interest in capital punishment is best served when the agencies carrying it out comply with the law.  And the public has a significant interest in ensuring that capital punishment is administered humanely and through a process developed by reasoned decision-making.  *See* P.I. Op. 14-15 ("The public interest is not served by executing individuals before they have had the opportunity to avail themselves of legitimate procedures to challenge the legality of their executions.")

Nor does the government's and victims' interest in "real finality" trump Plaintiffs' interest in being executed pursuant to a lawful protocol.  Opp. 44.  This sacrifice in the name of expediency is only more incongruous given Defendants' reliance on "extensive appellate and post-conviction proceedings in federal courts" to assure the finality of sentences and convictions. *Id.*  Defendants' rehashed arguments regarding "[u]ndu[e] delay[]" are similarly unavailing.  *Id*. As this Court has already held, the "urgency and weight" of any "legitimate interest in the finality of criminal proceedings" is "undermine[d]" by "the eight years that [Defendants] waited to establish a new protocol."  P.I. Op. 14.  Preserving the status quo while Plaintiffs litigate their

claims that the Protocol is unlawful will not create "[u]ndu[e]" delay.  Opp. 44.  Rather, an

injunction will simply give these weighty issues the respect, and process, that they are due.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily

enjoin Defendants from proceeding with Plaintiffs' executions.


DATED:       June 29, 2020                          */s/ Alan E. Schoenfeld*
                                                    Alan E. Schoenfeld (admitted *pro hac vice*)
                                                    Ryan M. Chabot (admitted *pro hac vice*)
                                                    Wilmer Cutler Pickering Hale and Dorr LLP
                                                    7 World Trade Center
                                                    250 Greenwich Street
                                                    New York, New York 10007
                                                    (212) 230-8800
                                                    Alan.Schoenfeld@WilmerHale.com
                                                    Ryan.Chabot@WilmerHale.com

                                                    Andres C. Salinas (DC Bar No. 156118)
                                                    Wilmer Cutler Pickering Hale and Dorr LLP
                                                    1875 Pennsylvania Avenue NW
                                                    Washington, DC 20006
                                                    (202) 663-6289
                                                    Andres.Salinas@WilmerHale.com

                                                    *Counsel for Plaintiff Wesley Purkey*

                                                    */s/ Jon Jeffress*
                                                    Jon Jeffress
                                                    KaiserDillon PLLC
                                                    1099 14th Street NW
                                                    8th Floor West
                                                    Washington, DC 20005
                                                    (202) 640-2850
                                                    jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office,
 E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
timothy_kane@fd.org
shawn_nolan@fd.org

*Counsel for Plaintiff-Intervenor Dustin Lee
Honken*

*/s/ Pieter Van Tol*
Pieter Van Tol (admitted *pro hac vice*)
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

David S. Victorson (Bar No. 1027025)
Kathryn Marshall Ali (Bar No. 994633)
Danielle Stempel* (admitted *pro hac vice*)
Hogan Lovells US LLP
555 13th Street NW
Washington, DC 20004
(202) 637-5600
(202) 637-5910 (fax)
david.victorson@hoganlovells.com
kathryn.ali@hoganlovells.com
danielle.stempel@hoganlovells.com

* *Admitted only in Maryland; practice
supervised by principals admitted in D.C.*

*Counsel for Plaintiff Daniel Lewis Lee*

*/s/ Kathryn L. Clune*
Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington D.C. 20004-2595
(202) 624-2705
kclune@crowell.com

26

Harry P. Cohen (*pro hac vice* pending)
Michael K. Robles (*pro hac vice* pending)
James K. Stronski (*pro hac vice* pending)
Crowell & Moring LLP
590 Madison Avenue
New York, NY 10022
(212) 223-4000
(212) 223-4134 (fax)
hcohen@crowell.com
mrobles@crowell.com
jstronski@crowell.com

Jon M. Sands
Dale A. Baich
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816
(602) 889-3960 (fax)
jon_sands@fd.org
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record.  The names marked with an asterisk (*) have no email provided on the docket or are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 514-7830
Email: Ethan.P.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN & MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Email: gerald_king@fd.org
Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
VINSON & ELKINS, L.L.P.(202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221

29

Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Email: mhulkower@steptoe.com

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn.nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-2850
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
Email: nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513
Email: Ryan.Chabot@wilmerhale.com

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Email: Dale_Baich@fd.org

Harry P. Cohen
CROWELL & MORING LLP
(212) 223-4000
Email: hcohen@crowell.com

Michael K. Robles
CROWELL & MORING LLP
(212) 223-4000
Email: mrobles@crowell.com

James Stronski
CROWELL & MORING LLP
(212) 223-4000
Email: jstronski@crowell.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
Email: kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Email: Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Email: Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 925-0520

Jeffrey Lyn Ertel
FEDERAL DEFENDER PROGRAM, INC.
(303) 688-7530
Email: Jeff_Ertel@fd.org

Stephen Northup
TROUTMAN SANDERS LLP
(804) 697-1240
Email: steve.northup@troutmansanders.com

31

\*Jon M. Sands
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2816

\*Amy Karlin
INTERIM FEDERAL PUBLIC DEFENDER
(213) 894-2854

Danielle Desaulniers Stempel
HOGAN LOVELLS US LLP
(202) 804-7798
Email: danielle.stempel@hoganlovells.com

*/s/ Alan E. Schoenfeld*
Alan E. Schoenfeld