# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
|  | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No. 19-mc-145 (TSC) |
|  | ) | |
|  | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
|  | ) | |
| *Lee & Honken v. Barr, et al.*, 19-cv-2559 | ) | |
| *Purkey v. Barr, et al.*, 19-cv-03214 | ) | |
| *Nelson v. Barr, et al.*, 20-cv-557 | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ALLOW FILING OF SUPPLEMENTAL EXPERT DECLARATION OF GAIL A. VAN NORMAN, M.D., OR, IN THE ALTERNATIVE, CONSENT MOTION FOR LEAVE TO FILE A SURREPLY AND SUPPLEMENTAL DECLARATION OF DR. JOSEPH F. ANTOGNINI

Defendants respectfully file this Opposition to Plaintiffs' Motion to Allow Filing of Supplemental Expert Declaration of Gail A. Van Norman, M.D. ("Motion to Supplement"), ECF No. 117, or in the alternative, move this Court for leave to file a three-page surreply in support of their opposition to Plaintiffs' motion for preliminary injunction, along with a supplemental declaration from Joseph F. Antognini, M.D.  *See* Ex. A (proposed surreply and attached supplemental declaration).  Counsel for Defendants conferred with counsel for Plaintiffs, who consented to Defendants' filing of a surreply and supplemental declaration.

In support of their motion for preliminary injunction, Plaintiffs submitted a 53-page declaration of Dr. Van Norman as well as the declarations of several other experts.  In response, Defendants made clear that because this is a record review case under the Administrative Procedure Act, consideration of extra-record declarations is improper.  It makes no difference that Plaintiffs have raised an Eighth Amendment Claim.  *See* 5 U.S.C. § 706(2)(B) (in an APA case,

"the reviewing court shall hold unlawful agency action found to be "contrary to constitutional right"). Nevertheless, to fully respond to Plaintiffs' motion and its reliance on the extra-record declarations, Defendants submitted the declaration of Dr. Antognini to address some of the issues raised by Dr. Van Norman as well as Plaintiffs' other experts. In their reply in support of their motion for preliminary injunction, ECF No. 118 ("Reply"), Plaintiffs additionally seek to rely on a supplemental declaration from Dr. Van Norman, *see* Reply at 11-12, while simultaneously seeking leave to file the supplemental declaration.

Given the length of Dr. Van Norman's original declaration, there is no basis for Plaintiffs to submit yet another declaration from Dr. Van Norman, particularly given that the current briefing schedule does not permit Defendants to respond to the new opinions in the new declaration. *Cf. Pub. Citizen Health Research Grp. v. Nat'l Institutes of Health*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) ("By placing a new argument in the Reply, Plaintiff does not permit Defendant[s] . . . to competently respond to such an argument."). Moreover, Plaintiffs should not be permitted to rely on the new declaration in their Reply when no leave has yet been granted by this Court. Accordingly, Defendants respectfully oppose Plaintiffs' request for leave to file the supplemental declaration of Dr. Van Norman and to strike those portions of the Reply that rely on that supplemental declaration.

If this Court nevertheless grants Plaintiffs leave, then Defendants respectfully request that they similarly be given leave to file the attached three-page surreply, which responds to only those portions of Plaintiffs' reply that relied on Dr. Van Norman's supplemental declaration, as well as a supplemental declaration from Dr. Antognini. Courts "routinely grant[ motions for leave to file a surreply] when a party is 'unable to contest matters presented to the court for the first time' in the last scheduled pleading." *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001)); *Alexander v. F.B.I.*, 186 F.R.D. 21, 52 (D.D.C. 1998) ("Because plaintiffs have presented new evidence before the court . . . , good cause exists to permit [defendant] to file a surreply addressing the contents of this filing."); *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 13 (D.D.C. 2011) (plaintiff permitted to file a

surreply where new evidence was submitted in the reply); *accord Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 101 (D.D.C. 2005).

Accordingly, if the Court grants Plaintiffs leave to file Dr. Van Norman's supplemental declaration, good cause would exist to permit Defendants' filings submitted here.  Defendants' filings would also be "helpful to the adjudication of the motion."  *Akers v. Beal Bank*, 760 F. Supp. 2d 1, 3 (D.D.C. 2011); *see also Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) (court's exercise of its discretion to allow surreply, like any use of its inherent powers, "should reflect our judicial system's strong presumption in favor of adjudications on the merits"). And given Plaintiffs' consent to the proposed filings, leave should be granted here.

A proposed order consistent with this motion is also attached.

Dated:  June 30, 2020
Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN
Civil Chief, U.S. Attorney's Office

ALAN BURCH (D.C. Bar 470655)
Assistant United States Attorney
U.S. Attorney's Office
for the District of Columbia
Washington, D.C. 20530
202-252-2550
Alan.burch@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

PAUL R. PERKINS
Special Counsel

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
JONATHAN KOSSAK (D.C. Bar 991478)
CRISTEN C. HANDLEY (MO Bar 69114)
Trial Attorneys
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 305-2677
Jean.lin@usdoj.gov

*Attorneys for Defendants*

3

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all plaintiffs' counsel of record (as most recently identified in the signature pages of the Consolidated Amended Complaint, ECF No. 92):

Alan E. Schoenfeld (admitted *pro hac vice*)
Ryan M. Chabot (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8880
Alan.Schoenfeld@WilmerHale.com
Ryan.Chabot@WilmerHale.com

Andres C. Salinas (DC Bar No. 156118)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6289
Andres.Salinas@WilmerHale.com

*Counsel for Wesley I. Purkey*

Joshua C. Toll
D.C. Bar No. 463073 King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 737-8616
jtoll@kslaw.com

Margaret O'Donnell
P.O. Box 4815
Frankfort, KY 40604
(502) 320-1837
mod@dcr.net

*Counsel for Plaintiff Anthony Battle*

Ginger D. Anders (Bar No. 494471)

Jonathan S. Meltzer (Bar No. 888166546)
Brendan Gants (Bar No. 1031419)
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
(202) 220-1100

*Counsel for Plaintiff Brandon Bernard*

Alex Kursman, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – alex_kursman@fd.org

*Counsel for Plaintiff Alfred Bourgeois*

Joseph Luby, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
 601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – joseph_luby@fd.org

*Counsel for Plaintiff Chadrick Fulks*

Amy Lentz (DC Bar No. 990095)
Steptoe & Johnson, LLP
1300 Connecticut Avenue NW
Washington, DC 20036
202.429.1320

*Counsel for Plaintiff Orlando Hall*

Scott W. Braden
Assistant Federal Defender
Arkansas Federal Defender Office
Ark Bar Number 2007123
1401 West Capitol, Suite 490
Little Rock, Arkansas 72201
(501) 324-6114
Scott_Braden@fd.org

Jennifer Ying (DE #5550)

Andrew Moshos (DE #6685)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market St.
P.O. Box 1347
Wilmington, Delaware 19801
(302) 658-9300
jying@mnat.com
amoshos@mnat.com

*Counsel for Plaintiff Norris G. Holder, Jr.*

Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone - 202-640-2850
Email - jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – timothy_kane@fd.org
Email – shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Lee Honken*

Donald P. Salzman (D.C. Bar No. 479775)
Charles F. Walker (D.C. Bar No. 427025)
Steven M. Albertson (D.C. Bar No. 496249)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Plaintiff Corey Johnson*

David S. Victorson
Hogan Lovells US LLP
Columbia Square
555 13th Street NW
Washington, DC  20004

(202) 637-5600
(202) 637-5910 (fax)
david.victorson@hoganlovells.com

Pieter Van Tol (admitted *pro hac vice*)
Hogan Lovells US LLP
390 Madison Avenue
 New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

*Counsel for Plaintiff Daniel Lewis Lee*

Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington D.C. 20004-2595
(202) 624-2705
kclune@crowell.com

Harry P. Cohen (pro hac vice application pending)
Michael K. Robles (pro hac vice application pending)
James Stronski (pro hac vice application pending)
Crowell & Moring LLP
590 Madison Avenue New York, NY 10022
(212) 223-4000
(212) 223-4134(fax)
hcohen@crowell.com
mrobles@crowell.com
jstronski@crowell.com

Jon M. Sands (pro hac application to be filed)
Dale A. Baich (pro hac application to be filed)
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602-382-2816
602-889-3960 (fax)
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*

Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
 601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – timothy_kane@fd.org
Email – shawn_nolan@fd.org

*Counsel for Plaintiff Jeffrey Paul*

Paul F. Enzinna
D.C. Bar No. 421819
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553

*Counsel for Plaintiff James H. Roane, Jr.*

Amy Karlin
Interim Federal Public Defender
Celeste Bacchi
Jonathan C. Aminoff
Deputy Federal Public Defenders
321 E. Second Street
Los Angeles, CA 90012
(213) 894-2854

*Counsel for Plaintiff Julius O. Robinson*

Gerald W. King, Jr. Ga. Bar No. 140981
Jeffrey Lyn Ertel Ga. Bar No. 249966
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org
Jeff_Ertel@fd.org

Stephen Northup
VSB #16547
Troutman Sanders LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240
(fax) (804) 698-5120
steve.northup@troutmansanders.com

Frederick R. Gerson VSB #39968
Bank Of America Center
1111 East Main Street, 16th Floor Richmond,
Virginia 23219
(804) 482-1121
fgerson@dagglaw.com


*Counsel for Richard Tipton, III.*

Evan Miller (DC Bar # 219310)
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6605
(202) 478-1815 (fax)
emiller@velaw.com
*Counsel for Bruce Webster*

<u>*Jean Lin*</u>
JEAN LIN

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
| | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No. 19-mc-145 (TSC) |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Lee & Honken v. Barr, et al.*, 19-cv-2559 | ) | |
| *Purkey v. Barr, et al.*, 19-cv-03214 | ) | |
| *Nelson v. Barr, et al.*, 20-cv-557 | ) | |
| | ) | |

**DEFENDANTS' SURREPLY IN OPPOSITION TO PLAINTIFFS' PI MOTION**

Defendants respectfully submit this surreply to respond to three points in Plaintiffs' reply in support of their motion for preliminary injunction, ECF No. 118, that rely on the Supplemental Declaration of Dr. Gail A. Van Norman, ECF No. 117-1, submitted along with the Reply.

*First*, Plaintiffs rely on Dr. Van Norman's opinion that "with low dosages of the drug [pentobarbital], pulmonary edema can occur within seconds of drawing a breath, and certainly will occur before condemned prisoners reach an insensate level of unconsciousness." Reply at 11 (citing Van Norman Supp. Decl. at 4, 8). The only authority Dr. Van Norman appears to cite for the proposition is the "Potts study"—a 1967 case study of a single patient—as well as Dr. Van Norman's own experience with a single patient. *See* Van Norman Suppl. Decl. ¶ 24. As explained by Dr. Antognini in the attached supplemental declaration, such evidence is insufficient. *See* Antognini Suppl. Decl. (attached as Ex. A-1), ¶ 8 n.2. The incidence of pulmonary edema occurring "after small, subanesthetic doses of pentobarbital and other barbiturates, such as thiopental . . . must be quite rare," because "[t]hese barbiturates, especially thiopental, were used for decades (from the 1930s until about 1990) for induction of anesthesia worldwide—millions upon millions of patients." *Id.* If, as Dr. Van Norman suggests, "normal clinical doses caused pulmonary edema, even in a small subset of patients, then these drugs would have been abandoned

1

decades ago." *Id*. But in fact, "millions of patients [have] received thiopental and pentobarbital safely [for] over six decades." *Id*. n.2.

*Second*, Plaintiffs rely on Dr. Van Norman's opinion that flash pulmonary edema seen in autopsies of prisoners could not have occurred as a postmortem event. *See* Reply at 11; Van Norman Supp. Decl. ¶ 23. But as Dr. Antognini explains in the attached supplemental declaration, one cannot reasonably extrapolate from autopsies whether pulmonary edema "occurs immediately after administration, or immediately prior to death, or if the fluid accumulation [in the lungs] occurs post-mortem, or some combination of all three." Antognini Supp. Decl., ¶ 22. In any event, as Dr. Antognini further explains, "even if pulmonary edema occurred after administration (within 1 minute) the brain would be so profoundly depressed that the inmate would not experience it." *Id*.

*Third*, Plaintiffs rely (Reply at 11) on Dr. Van Norman's opinion that "[t]he idea that unresponsiveness indicates unconsciousness was invalidated by research in consciousness approximately 30 years ago." Van Norman Supp. Decl. ¶ 9. The opinion was intended to show that Dr. Antognini purportedly had an outdated understanding of consciousness. *See* Reply at 11. But as Dr. Antognini explains in the attached declaration, his discussion of consciousness is based on the lethal injection context, "when the brain is massively depressed by the pentobarbital." Antognini Supp. Decl., ¶ 9. As Dr. Antognini points out, Dr. Van Norman, on the other hand, relies on "evidence for a setting . . . when the person is only at 'light' levels of anesthesia," *i.e.*, when it is possible for someone to be "conscious, but not responsive." *Id*. There is "no evidence," and in fact Dr. Van Norman cites none, "that responsiveness is possible when the brain is massively depressed by the pentobarbital.

For example, Dr. Van Norman relies on a study in which "0.3% isoflurane [was] administered during prolonged surgery"—a concentration that is "about 25% of the dose needed to prevent movement in response to noxious stimulation"—which simply cannot be "equate[d] . . .with a 5-gram dose of pentobarbital." Antognini Supp. Decl., ¶ 12. Dr. Antognini identifies similar flaws in Dr. Van Norman's reliance on other studies, *see id.* ¶¶ 13-18, and concludes that

her evidence, even if credited, "say little about responsiveness occurring after 5 grams of pentobarbital." *Id*. ¶ 7.  Importantly, as Dr. Antognini notes, Dr. Van Norman "conspicuously [does] not address the issue of how a person who is administered 5 grams of pentobarbital and subsequently develops cardiovascular collapse, with little to no blood pressure or cardiac output, is able to maintain sufficient blood flow to the brain to maintain consciousness." *Id*. ¶ 7.

In sum, for these and other reasons set forth in Defendants' opposition brief, Plaintiffs have not established that using five grams of pentobarbital for their execution is sure or very likely to cause Plaintiffs an unconstitutional level of pain or that BOP's adoption of the Protocol was arbitrary or capricious.

Dated:  June 30, 2020

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN
Civil Chief, U.S. Attorney's Office

ALAN BURCH (D.C. Bar 470655)
Assistant United States Attorney
U.S. Attorney's Office
for the District of Columbia
Washington, D.C. 20530
202-252-2550
Alan.burch@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

PAUL R. PERKINS
Special Counsel

 /s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
JONATHAN KOSSAK (D.C. Bar 991478)
CRISTEN C. HANDLEY (MO Bar 69114)
Trial Attorneys
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 305-2677
Jean.lin@usdoj.gov
*Attorneys for Defendants*

# Exhibit A-1

## SUPPLEMENTAL DECLARATION OF JOSEPH F. ANTOGNINI, M.D., M.B.A.

JOSEPH F. ANTOGNINI, does hereby declare and say:

1.     My name is Joseph F. Antognini.  I submit this declaration in response to the supplemental declaration submitted by Dr. Gail Van Norman dated 6-29-2020, in the case *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145.

2.     The opinions presented in this supplemental declaration are my opinions and mine alone and are based on information available to me at this time.  Should additional documents or information be provided to me for review and analysis, I may take those additional materials into account, and modify and/or supplement my opinions accordingly.  If I am present at hearings and/or trial in this case, I may take into account any testimony or other evidence to the extent related to my opinions and modify and/or supplement my opinions accordingly.  In performing my analysis, I have relied on my professional training, education and experience.  I have reviewed and considered the supplemental declaration by Dr. Van Norman, the references she cites, as well as references listed below in the "References Cited" section.

3.     Dr. Van Norman writes that "Rapid injection of a massive dose of pentobarbital leads to a rapid rise in peak levels of the drug within about 2 minutes, followed by a rapid redistribution of the drug out of the brain." (¶3, page 2 of her declaration dated 6-29-2020). Only the first part of that sentence is correct: there is a rapid rise of the drug concentration in the brain, but there is not a rapid redistribution of the drug out of the brain. The flaw in Dr. Van Norman's assertion is that she attempts to apply the normal pharmacokinetics[1] that are observed with a clinical dose to the setting of a massive pentobarbital dose, such as a dose of 5 grams.

---

[1] Pharmacokinetics is a term that describes what happens to a drug after it is administered to a subject, i.e., the concentration of the drug in the blood, brain and other tissues over time. It is "what the body does to the drug", as opposed to pharmacodynamics, which is "what the drug does to the body".

1

4.      When a drug like thiopental or pentobarbital is injected, the drug enters the blood, is transported to the heart and then distributed first to organs with the greatest blood flow, such as the brain. But, over time, as the blood in the body continues to circulate, the drug will begin to distribute to other organs that have less blood flow than the brain. This effect, in large part, starts to decrease the drug concentration in the blood. Because the drug concentration in the brain is now greater than the drug concentration in the blood, the drug moves out of the brain into the blood, and then into the other organs. This process is called redistribution and is shown in the figure below.



Figure from  https://www.slideshare.net/HarithDaggupati/barbiturates-70316729 (accessed 6-29-2020). Note that the peak concentration in the brain occurs at about 1 minute. As time goes on, and the blood circulates through the body, the barbiturate enters other tissues, which causes the blood concentration of the barbiturate to decrease, which then causes the brain barbiturate concentration to decrease.

2

5.      The *important* difference between what I just described above for the *normal* clinical dose and what occurs after a *massive* dose is that in the latter case, there is a rapid decrease in blood pressure, heart function and blood flow. That is, in order for drug redistribution to occur, there must be relatively normal blood flow and heart function. But, this does not happen when 5 grams of pentobarbital is injected. The drug enters the brain, but little or no drug is redistributed because of the cardiovascular collapse caused by the massive dose of pentobarbital.

6.      In the Buhl et al. (2013) study in horses, the heart sounds were not detectable about 80-90 seconds after the initiation of the pentobarbital (dose 66.6 mg/kg; see their table 2 on page 486), consistent with cardiovascular collapse.

7.      Dr. Van Norman (and indeed Drs. Stevens and Edgar as well) conspicuously do not address the issue of how a person who is administered 5 grams of pentobarbital and subsequently develops cardiovascular collapse, with little to no blood pressure or cardiac output, is able to maintain sufficient blood flow to the brain to maintain consciousness.

8.      Dr. Van Norman writes that "massive overdoses of pentobarbital, as well as smaller subanesthetic doses, cause flash pulmonary edema within seconds of administration" (¶4, page 2 of her declaration). I first address the effect of "smaller subanesthetic doses". If pulmonary edema occurs after small, subanesthetic doses of pentobarbital and other barbiturates, such as thiopental, then the incidence must be quite rare.[2] These barbiturates, especially thiopental, were used for decades (from the 1930s until about 1990) for induction of anesthesia worldwide— millions upon millions of patients. If normal clinical doses caused pulmonary edema, even in a small subset of patients, then these drugs would have been abandoned decades ago.

---

[2] The Potts study cited by Dr. Van Norman is not persuasive. A <u>single</u> report of a patient who developed pulmonary edema after anesthesia induction, as well as Dr. Van Norman's experience with a single patient, do not stand against the millions of patients who received thiopental and pentobarbital safely over six decades of use.

9.      Dr. Van Norman faults me for failing to understand the difference between consciousness and responsiveness, unconsciousness and unresponsiveness, etc. I fully understand the differences. In fact, Dr. Van Norman is incorrectly relying on evidence for a setting of someone who is conscious, but not responsive, when the person is only at "light" levels of anesthesia. She cites no evidence that responsiveness is possible when the brain is massively depressed by the pentobarbital.

10.      Dr. Van Norman writes about the lock-in syndrome, in which patients with strokes are unable to move, except for perhaps small movements of the eyes. She states that these patients can have "profound feelings of panic and terror" (¶8, page 3). In fact, clinical studies indicate that many of these patients have meaningful lives despite having locked-in syndrome (Lule et al., 2009; Rousseau et al., 2015). Furthermore, and more importantly, the clinical findings in the locked-in syndrome do not inform our understanding of massive overdose of pentobarbital. Patients with locked-in syndrome have normal brain function (which is why they are awake and aware), which is completely unlike the profound brain depression that follows a massive overdose of pentobarbital.

11.      Dr. Van Norman discusses the difference between awareness and recall during and after general anesthesia and cites various studies that used the isolated forearm technique. While few anesthesiologists, if any, would dispute that awareness and recall are different, the studies she cites do not inform our understanding of the issues in this case.

12.      For example, in the Russell (2013a) study, the patients received a thoracic epidural, a small amount of fentanyl prior to induction, followed by propofol. The thoracic epidural[3] prevents the noxious stimulation of the surgical procedure from getting transmitted to the brain. Aside from the

---

[3] The thoracic epidural is similar, in many respects, to a spinal anesthesia, or a lumbar epidural used for childbirth.

thoracic epidural, anesthesia was <u>maintained only with isoflurane</u>, which was adjusted to maintain a BIS = 55-60 (BIS = bispectral index, a measure of anesthetic depth). It is critical to note that in that study the median isoflurane concentration during the periods when patients had responses was 0.3% (Tables 3 & 4 of Russell 2013a). This isoflurane concentration is about 25% of the dose needed to prevent movement in response to noxious stimulation. This concentration of isoflurane (by itself) is well below what any anesthesiologist would normally deliver during surgery. Accordingly, some patients responded as expected. But in terms of consciousness, it is plainly wrong to equate 0.3% isoflurane administered during prolonged surgery (Russell 2013a) with a 5-gram dose of pentobarbital.

13.     In addition, Dr. Van Norman does not fully and fairly represent the data of the Russell (2013a) study. Although 32% of patients had responses, there were only 32 responses to 2146 commands. Thus, the overall response rate to command was 1.5%.

14.     Dr. Van Norman has also relied upon a study published by Russell using the isolated forearm technique (Russell, 1993) in which patients received midazolam and alfentanil (an opiate similar in action to morphine). Although 72% of the patients had a response during some portion of the surgery, that number does not fairly represent the incidence of responsiveness to commands, which is probably closer to 3%.[4]

15.     In a similar study using propofol and remifentanil (an opiate), responses occurred to 5% of commands (Russell, 2013b). And, again, Russell noted that BIS (a measure of anesthetic depth)

---

[4] In that study, patients received a recorded message <u>every minute,</u> from the time when the patients were connected to the ventilator to about 5 minutes prior to the end of surgery.  The median surgical time was 60 minutes (an average was not reported) and assuming that the time between connecting the ventilator to initiation of surgery was about 15 minutes (which allows for prepping the patient), the average time that the tape was played was about 70 minutes (60 + 15 − 5). There were 32 patients included in the analysis (see his table IV; one patient of 33 was excluded); 32 x 70 = 2240, which is an estimate of the total number of times the 32 patients received the command to respond. There were 64 responses (see his table IV, total of verified and unverified responses = 64); 64 responses/2240 commands = 3%.

was a poor predictor of consciousness during general anesthesia. Furthermore, others agree about the effect of using exceptionally low anesthetic doses (Andrzejowski & Wiles, 2013): they state that Russell "….has correctly concluded that patients may respond to command with a BIS <60. He has gone on to demonstrate that by deliberately giving an inadequate anesthetic this becomes more likely."

16.     In an earlier study, Russell (1986) compared a primarily nitrous oxide technique with etomidate infusion. Both of these techniques were specifically designed to achieve light, if not inadequate, levels of anesthesia. Again, as expected, patient responses were elicited.

17.     Dr. Van Norman also cites the King et al. (1993) study in which obstetric patients were administered thiopental for anesthesia induction for cesarean section. These patients received relatively low doses of thiopental (3 mg/kg) and so the finding of responsiveness is not surprising. These data say little about responsiveness occurring after 5 grams of pentobarbital.

18.     Dr. Van Norman writes that the isolated forearm technique is considered the 'gold standard' for assessing consciousness during anesthesia, yet it is rarely used during clinical anesthesia cases. This lack of use signifies that the utility of the isolated forearm technique in the clinical setting has little clinical impact, and is even less so in the context of a massive dose of pentobarbital sufficient to cause cardiovascular collapse.

19.     Dr. Van Norman also writes about the electroencephalogram (EEG) and questions its utility as a monitor of anesthetic depth. True, the EEG is not a perfect monitor for anesthetic depth—but that is not the point. I cited the thiopental-EEG work in my prior declaration to show that, at the doses of pentobarbital administered in a lethal injection, the inmate would quickly develop profound brain depression, which would manifest itself as slowing of the EEG, followed

by burst suppression[5], followed by cortical electrical silence (flat line).

20.     Dr. Van Norman's use of the isolated forearm studies, the locked-in syndrome, awareness during anesthesia, etc., is, at the core, based on deeply flawed logic. In a nutshell, she is arguing that: 1) people given anesthetics can have awareness; 2) pentobarbital is an anesthetic; 3) therefore someone given pentobarbital anesthesia will have awareness. By giving examples when patients are responsive during light anesthesia, or in the locked-in syndrome, she concludes, illogically, that the same must be true when the brain is profoundly depressed by 5-grams pentobarbital.

21.     Another issue that Dr. Van Norman does not adequately address is the timing of the pulmonary edema relative to the onset of profound brain depression when pentobarbital is administered. As cited above, widespread barbiturate use over six decades was not associated with pulmonary edema, indicating that pulmonary edema would not occur when a patient is unconscious from the barbiturate. As more barbiturate is administered, and one assumes that the barbiturate causes pulmonary edema, then the risk of pulmonary edema might be increasing (a theoretical risk that I do not concede is true) but so too is the depth of anesthesia. Dr. Van Norman asserts that pulmonary edema is occurring during a period when the pentobarbital concentration is falling because of redistribution. But, as I have already explained, the cardiovascular collapse caused by an overdose of barbiturate prevents drug redistribution.

22.     I do not dispute the autopsy findings of lung congestion, pulmonary edema, "heavy" lungs, etc., but the inmates' experts misunderstand my point and use of the term "if it occurs at all". It's not a question of if it occurs, but if it occurs immediately after administration, or

---

[5] Burst suppression is the EEG pattern seen immediately before electrical silence. The EEG will have "bursts" of electrical activity for a few seconds, followed by a few seconds of electrical silence. As the brain becomes more depressed, the periods of electrical silence grow longer, until no bursts occur and there is complete silence.

immediately prior to death, or if the fluid accumulation occurs post-mortem, or some combination of all three. And, as mentioned in my prior declaration and above, even if pulmonary edema occurred after administration (within 1 minute) the brain would be so profoundly depressed that the inmate would not experience it.

23.     Finally, Dr. Van Norman faults me for relying on the horse study. In the Buhl et al. study (a setting of a massive overdose of pentobarbital), collapse of the horse was part of the triad used to define clinical death ("Clinical signs of death, indicated by collapse, cessation of auscultable heart beat and absence of palpebral and corneal reflexes"; see page 485, at bottom, of Buhl et al.). Notwithstanding Dr. Van Norman's personal experience and discussion of the "stay apparatus", i.e., the muscular and skeletal mechanism that permits horses to stand while asleep, three of authors in the Buhl et al. paper are from a veterinary school, the paper was published in a veterinary journal and the paper was presumably reviewed by veterinarians prior to publication. The findings of the Buhl study are credible.

Date: June 30, 2020     _____

Joseph F. Antognini, M.D., M.B.A.

8

### References Cited

Aleman M, Williams DC, Guedes A, Madigan JE. Cerebral and brainstem electrophysiologic activity during euthanasia with pentobarbital sodium in horses. J Vet Int Med 2015; 29:663-72

Andrzejowski J, Wiles M. Bispectral index compared with the isolated forearm technique. Anaesthesia 2013; 68:871-72

Buhl R, Andersen LOF, Karlshoj M, Kanters JK. Evaluation of clinical and electrocardiographic changes during the euthanasia of horses. The Veterinary Journal 2013; 196:483-91

King H, et al. Adequacy of general anesthesia for cesarean section. Anesth Analg1993; 77:84-8

Lule D, Zickler C, Hacker S, Bruno MA, Demertzi A, Pellas F, Laureys S, Kubler A. Life can be worth living in locked-in syndrome. Progress Brain Research 2009; 177:339-51

Rousseau MC, Baumstarck K, Alessandrini M, Blandin V, Billette de Villemeur T, Auquier P. Quality of life in patients with locked-in syndrome over a 6-year period. Orphanet J Rare Diseases 2015; 10:88

Russell IF. Comparison of wakefulness with two anaesthetic regimens. Total IV balanced anaesthesia. Br J Anaesthesia 1986; 58:965-8.

Russell IF. Midazolam-alfentanil: an anaesthetic? An investigation using the isolated forearm technique. British J Anesthesia 1993; 70:42-46

Russell IF. The ability of bispectral index to detect intra-operative wakefulness during isoflurane/air anaesthesia, compared with the isolated forearm technique. Anaesthesia 2013a. 68:1010-20

Russell IF. The ability of bispectral index to detect intra-operative wakefulness during total intravenous anaesthesia compared with the isolated forearm technique. Anaesthesia 2013b. 68:502-11

9

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

In the Matter of the                  )
Federal Bureau of Prisons' Execution   )
Protocol Cases,                    )
                             )
LEAD CASE: *Roane et al. v. Barr*     )     Case No. 19-mc-145 (TSC)
                             )
                             )
THIS DOCUMENT RELATES TO:    )
                             )
*Lee & Honken v. Barr, et al.*, 19-cv-2559  )
*Purkey v. Barr*, *et al.*, 19-cv-03214    )
*Nelson v. Barr, et al.*, 20-cv-557     )
_____)

## [PROPOSED] ORDER

Upon consideration of Defendants' Consent Motion for Leave to File a Surreply and

Supplemental Declaration of Dr. Joseph F. Antognini, and the entire record herein, and for good

cause shown, it is hereby **ORDERED** that Defendants' Consent Motion is **GRANTED**.

It is further **ORDERED** that the Clerk of the Court shall docket Defendants' proposed

surreply and supplemental declaration, which Defendants attached to their Consent Motion.

It is **SO ORDERED** this ____day of _____, 2020.


_____
TANYA S. CHUTKAN
UNITED STATES DISTRICT COURT JUDGE