## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In the Matter of the<br>Federal Bureau of Prisons' Execution<br>Protocol Cases, | ) ) ) ) ) | |
| LEAD CASE: *Roane, et al. v. Barr* | ) ) | Case No. 19-mc-145 (TSC) |
| THIS DOCUMENT RELATES TO: | ) ) | |
| *Lee v. Barr, et al.*, 19-cv-2559 | ) ) | |
| *Purkey v. Barr, et al.*, 19-cv-3214 | ) ) | |
| *Nelson v. Barr, et al.*, 20-cv-557 | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

In *Callins v. Collins*, Justice Blackmun, writing in dissent, declared that he would "no longer . . . tinker with the machinery of death." 510 U.S. 1141, 1145 (1994). More than twenty-five years later, this court is tasked with doing just that, in addressing challenges to the manner in which the federal government seeks to execute inmates who have been sentenced to death under federal statutes.

After a hiatus in federal executions of more than fifteen years, on July 25, 2019, the U.S. Department of Justice (DOJ) announced plans to execute five inmates who had been sentenced to death under the federal death penalty statute.[1] *See* Press Release, Dep't of Justice, Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse (July 25, 2019), https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-

---

[1] Plaintiffs Bourgeois, Mitchell, Lee, and Purkey were sentenced under the Federal Death Penalty Act, 18 U.S.C. §§ 3591–3599. Plaintiff Honken was sentenced under the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(e).

decade-lapse.  To implement these executions, the Federal Bureau of Prisons (BOP) adopted a new execution protocol: the 2019 Protocol.  (ECF No. 39-1, Admin. R. at 1021–75.)

On November 20, 2019, the court preliminarily enjoined the executions of four inmates: Alfred Bourgeois, Daniel Lewis Lee, Dustin Lee Honken, and Wesley Ira Purkey.  (ECF No. 50, Mem. Op. (2019 Order), at 15.)  The court found that these four Plaintiffs had demonstrated a likelihood of success on the merits of their claims that the 2019 Protocol violates the Federal Death Penalty Act (FDPA), but the court did not rule on their other statutory and constitutional claims.  (*Id.* at 13–14.)  In April of this year, a divided D.C. Circuit panel vacated the preliminary injunction.  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 113 (D.C. Cir. 2020), *cert. denied sub nom. Bourgeois v. Barr*, No. 19-1348, 2020 WL 3492763 (June 29, 2020).  That Court based its ruling solely on the Plaintiffs' claims under the FDPA and the APA, and noted that "regardless of our disposition, several claims would remain open on remand." *Execution Protocol Cases*, 955 F.3d at 113 (per curiam).

On June 15, 2020, the DOJ and BOP scheduled new execution dates for three of the four Plaintiffs whose executions had been preliminarily enjoined by the 2019 Order.  (ECF No. 99, Defs. Notice Regarding Execution Dates.)  Defendants intend to execute Lee on July 13, 2020, Purkey on July 15, 2020, and Honken on July 17, 2020.  (*Id.*)  Keith Dwayne Nelson is scheduled for execution on August 28, 2020.  (*Id.*)

Because these four Plaintiffs are scheduled to be executed before their claims can be fully litigated, they have asked this court, pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1, to preliminarily enjoin Defendants from executing them while they litigate their remaining claims.  (ECF No. 102, Pls. Mot. for Prelim. Inj.)

On July 2, 2020, the Seventh Circuit stayed Purkey's execution, and at the time of this filing, that stay remains in place.[2] *Purkey v. United States*, No. 19-3318, 2020 WL 3603779 (7th Cir. July 2, 2020).  On July 10, 2020, the Southern District of Indiana preliminarily enjoined Lee's execution, *see Peterson v. Barr*, No. 2:20-cv-350 (S.D. Ind. July 10, 2020), ECF No. 21, but on July 12, 2020, the Seventh Circuit vacated the injunction.  *See Peterson v. Barr*, No. 20-2252 (7th Cir. July 12, 2020).

The last-minute nature of this ruling is unfortunate, but no fault of the Plaintiffs.  *Cf. Bucklew v. Precythe*, 139 S. Ct. 112, 1134 (2019) ("the last-minute nature of an application that could have been brought earlier . . . may be grounds for denial of a stay.") (internal quotations omitted).  The succession of last-minute rulings is the result of the Government's decision to set short execution dates even as many claims, including those addressed here, were pending.[3]  The Government is entitled to choose dates, but the court cannot take short cuts in its obligations in order to accommodate those dates.  As the Seventh Circuit wrote last week, "just because the death penalty is involved is no reason to take shortcuts—indeed, it is a reason not to do so."  *Purkey v. United States*, 2020 WL 3603779, at *11.

## I.   BACKGROUND

The Eighth Amendment to the Constitution provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S.

---

[2] Because the Seventh Circuit affirmed the district court's denial of Purkey's petition for writ of habeas corpus, and only temporarily stayed his execution "pending the completion of proceedings in the Seventh Circuit," this court finds it appropriate to preliminarily enjoin his execution as well as those of the other Plaintiffs. *Id.* at *11.

[3] Three Plaintiffs filed complaints shortly after the DOJ announced the 2019 Protocol, months before their initially scheduled executions, and Nelson filed his complaint before Defendants even announced his execution date.

CONST. amend. VIII.  The Supreme Court declared capital punishment constitutional in 1976, in *Gregg v. Georgia*. 428 U.S. 153, 187 (1976) (lifting a *de facto* moratorium on the death penalty).  Therefore, "there must be a constitutional means of carrying it out."  *Glossip v. Gross*, 135 S. Ct. 2726, 2732–33 (2015) (citation omitted).  Balancing the constitutional legitimacy of capital punishment with the Eighth Amendment's prohibition on cruel and unusual methods of execution has long been the subject of intense debate and litigation since the advent of hanging, electrocution, and, most recently, lethal injection.  *Baze v. Rees*, 553 U.S. 35, 41–42 (2008).

The Supreme Court first addressed the application of the Eighth Amendment to lethal injection in *Baze*, upholding Kentucky's then-practice of execution by injection with a three-drug combination: (1) sodium thiopental, a fast-acting barbiturate sedative; (2) pancuronium bromide, a paralytic agent that paralyzes the body and stops the lungs; and (3) potassium chloride, which induces cardiac arrest.  *Id.* at 44.  The plaintiffs in that case conceded that, if administered properly, the three drugs in combination eliminated any "meaningful risk" that the inmate would experience severe pain but argued that the risk of improper administration was so significant that the protocol violated the Eighth Amendment.  *Id.* at 49.

Although the Court upheld Kentucky's use of the three-drug injection in *Baze*, state methods have changed in recent years.  Many of the companies that manufacture drugs such as sodium thiopental have either ceased production or declined to sell them to states for use in executions.  *Glossip*, 135 S. Ct. at 2733.  Some states have sought to maintain their three-drug protocols while replacing sodium thiopental with sedatives such as propofol, pentobarbital sodium, and midazolam, the latter of which was upheld by the Supreme Court in *Glossip*.  *Id.* at 2731.  Other states have opted to conduct executions with a single-drug protocol consisting of a lethal dose of a single sedative.  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1120 (2019).

The federal government has likewise changed its execution protocol. In 2005, three federal death row inmates sued, alleging that their executions were to be administered under an unlawful and unconstitutional execution protocol. *Roane v. Gonzales*, 1:05-cv-02337 (D.D.C.), ECF No. 1 ¶ 2. The court preliminarily enjoined their executions. *Roane*, ECF No. 5. Four other death row inmates intervened, and their executions were enjoined as well. *See Roane*, ECF Nos. 23, 27, 36, 38, 67, and 68. During this litigation, the government produced a 50-page document (2004 Main Protocol) outlining BOP execution procedures. *Roane*, ECF No. 179-3. The government then produced two three-page addenda to the 2004 Main Protocol. *See Roane*, ECF No. 177-3 (Addendum to Protocol, July 1, 2007) (the 2007 Addendum); ECF No. 177-1 (Addendum to Protocol, Aug. 1, 2008) (the 2008 Addendum). In 2011 the DOJ announced that the BOP did not have the drugs it needed to implement the 2008 Addendum. *See* Letter from Office of Attorney General to National Association of Attorneys General, (Mar. 4, 2011), https://files.deathpenaltyinfo.org/legacy/documents/2011.03.04.holder.letter.pdf. The government informed the court that the BOP "has decided to modify its lethal injection protocol but the protocol revisions have not yet been finalized." *Roane*, ECF No. 288 at 2. In response, the court stayed the *Roane* litigation.

No further action was taken in the cases for over seven years. On July 24, 2019, the DOJ announced a new addendum to the execution protocol, (Admin. R. at 874–78), replacing the three-drug protocol of the 2008 Addendum with a single drug: pentobarbital sodium. (*Id.* at 879–80.) The BOP also adopted a new protocol to replace the 2004 Main Protocol. (*Id.* at 1021–72.) The 2019 Protocol provides for three injections, the first two containing 2.5 grams of pentobarbital in 50 milliliters of diluent each, and the third containing 60 milliliters of a saline flush. (*Id.* at 880.) The 2019 Protocol makes no reference to the form or source of the drug, or

measures of quality control, and its description of the intravenous administration of the drug simply provides that the Director or designee "shall determine the method of venous access" and that "[i]f peripheral venous access is utilized, two separate lines shall be inserted in separate locations and determined to be patent by qualified personnel." (*Id.*)

Following this announcement, the court held a status conference in *Roane* on August 15, 2019. (*See* Minute Entry, Aug. 15, 2019.) In addition to the *Roane* plaintiffs, the court heard from counsel for three other death row inmates, all of whom cited the need for additional discovery on the new protocol. (*See* ECF No. 12, Status Hr'g Tr.) The government indicated that it was unwilling to stay the executions, and the court bifurcated discovery and ordered Plaintiffs to complete 30(b)(6) depositions by February 28, 2020, and to file amended complaints by March 31, 2020. (*See* Minute Entry, Aug. 15, 2019.)

Four inmates with scheduled execution dates filed complaints or motions to intervene in the *Roane* action challenging the 2019 Protocol, and they each subsequently moved to preliminarily enjoin their executions.[4] On November 20, 2019, the court granted the four Plaintiffs' motions for preliminary injunction, finding that they had demonstrated a likelihood of success on their claims that the 2019 Protocol exceeds statutory authority. (Mem. Op. at 13, 15.) The court did not rule on Plaintiffs' other claims, including that the 2019 Protocol is arbitrary and capricious under the Administrative Procedure Act (APA), that it violates the Food, Drug,

---

[4] Lee filed his complaint on August 23, 2019 (*see Lee v. Barr*, 1:19-cv-02559 (D.D.C.), ECF No. 1), and his motion for a preliminary injunction on September 27, 2019. (ECF No. 13, Lee Mot. for Prelim. Inj.) On August 29, 2019, Bourgeois moved to preliminarily enjoin his execution. (ECF No. 2, Bourgeois Mot. for Prelim. Inj.) Honken filed an unopposed motion to intervene in *Lee v. Barr*, which was granted. (ECF No. 26, Honken Mot. to Intervene.) He then moved for a preliminary injunction on November 5, 2019. (ECF No. 29, Honken Mot. for Prelim. Inj.) Purkey filed a complaint and a motion for a preliminary injunction under a separate case number, 1:19-cv-03214, which was consolidated with *Roane*. (ECF No. 34, Purkey Mot. for Prelim. Inj.)

and Cosmetic Act (FDCA) and the Controlled Substances Act (CSA), that it violates Plaintiffs'

right to counsel in violation of the First, Fifth, and Sixth Amendments, and that it is cruel and

unusual in violation of the Eighth Amendment. (*Id.* at 13.) Following the court's order, three

additional death row inmates filed complaints under separate case numbers, which in turn were

consolidated with *Roane*.[5] Defendants moved to stay the court's preliminary injunction, which

the court denied. (*See* Minute Order, Nov. 22, 2019.) The D.C. Circuit likewise denied

Defendants' motion to stay, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-

5322 (D.C. Cir. Dec. 2, 2019), as did the United States Supreme Court on December 6, 2019.

*Barr v. Roane*, 140 S. Ct. 353 (2019). However, three Justices issued a statement indicating their

belief that Defendants were likely to prevail on the merits. *Id.*

Defendants also filed an interlocutory appeal of the court's 2019 Order on November 21,

2019. (*See* ECF No. 52.) On April 7, 2020, the D.C. Circuit reversed. *Execution Protocol*

*Cases*, 955 F.3d at 108. Neither of the two judges on the panel who voted to reverse agreed on

the FDPA's statutory requirements. *Id.* at 112 (per curiam). Nonetheless, they agreed that

Plaintiffs were unlikely to prevail on the merits of their claims that the 2019 Protocol exceeds

statutory authority. *Id.* The panel expressly declined to rule on Plaintiffs' remaining statutory

and constitutional claims, as "the government did not seek immediate resolution of all the

plaintiffs' claims" and the claims "were neither addressed by the district court nor fully briefed

in this Court." *Id.* at 113. The Court of Appeals denied Plaintiffs' petition for rehearing en banc

on May 15, 2020, and the Supreme Court denied Plaintiffs' application for a stay of the mandate

and petition for a writ of certiorari on June 29, 2020. *Bourgeois*, 2020 WL 3492763.

---

[5] These plaintiffs are Norris G. Holder, Jr., 1:19-cv-3520; Brandon Bernard, 1:20-cv-474; and
Keith Dwayne Nelson, 1:20-cv-557.

Meanwhile, Plaintiffs filed their Amended Complaint on June 1, 2020, (ECF No. 90, Am. Compl.), the same day Holder filed a separate supplemental complaint. (ECF No. 94, Holder Compl.)

On June 15, 2020, the DOJ announced new execution dates for Plaintiffs. (Defs. Notice Regarding Execution Dates.) Four days later, Plaintiffs filed a joint motion for a preliminary injunction on the basis of their unresolved claims. (Pls. Mot. for Prelim. Inj.) Plaintiffs thus ask the court to preliminarily enjoin Defendants from executing Lee, Purkey, Honken, and Nelson while they litigate their claims.

## II.    ANALYSIS

The court's 2019 Order sets forth the legal standard for considering a motion for a preliminary injunction, which is an "extraordinary remedy" requiring courts to assess four factors: (1) the likelihood of the plaintiff's success on the merits, (2) the threat of irreparable harm to the plaintiff absent an injunction, (3) the balance of equities, and (4) the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008) (citations omitted); *John Doe Co. v. Consumer Fin. Prot. Bureau,* 849 F.3d 1129, 1131 (D.C. Cir. 2017). The D.C. Circuit has traditionally evaluated claims for injunctive relief on a sliding scale, such that "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius,* 644 F.3d 388, 392 (D.C. Cir. 2011). It has been suggested, however, that a movant's showing regarding success on the merits "is an independent, free-standing requirement for a preliminary injunction." *Id.* at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).

A.    **Likelihood of Success on the Merits of Plaintiffs' Eighth Amendment Claims**

Plaintiffs bringing an Eighth Amendment challenge to the method of execution face a high bar.  They must demonstrate that the 2019 Protocol presents a "substantial risk of serious harm," and they must identify an alternative method of execution that will significantly reduce the risk of serious pain and that is feasible and readily implemented.  *Glossip*, 135 S. Ct. at 2737; *see also Bucklew*, 139 S. Ct. at 1129 (confirming that "anyone bringing a method of execution claim alleging the infliction of unconstitutionally cruel pain must meet the *Baze-Glossip* test.").

1.    Substantial Risk of Serious Harm

It is not enough for Plaintiffs to argue that Defendants' planned use of pentobarbital will potentially cause pain.  "[B]ecause some risk of pain is inherent in any method of execution, we have held that the Constitution does not require the avoidance of all risk of pain."  *Glossip*, 135 S. Ct. at 2733.  For the 2019 Protocol to constitute cruel and unusual punishment in violation of the Eighth Amendment, Plaintiffs must show that it presents a risk of severe pain that is "sure or very likely to cause serious illness and needless suffering" and gives rise to "sufficiently imminent dangers," such that prison officials cannot later plead "that they were subjectively blameless."  *Baze*, 553 U.S. at 49–50 (citations omitted).  Although the Supreme Court has cautioned against federal courts becoming "boards of inquiry charged with determining 'best practices' for executions," *id.* at 51, this question necessarily requires some weighing of scientific evidence.  *See, e.g.*, *Glossip*, 135 S. Ct. at 2739 (affirming district court's findings that midazolam was "highly likely" to render inmates unable to feel pain during execution).

The scientific evidence before the court overwhelmingly indicates that the 2019 Protocol is very likely to cause Plaintiffs extreme pain and needless suffering during their executions.  The declarations submitted by Plaintiffs' experts illustrate that the majority of inmates executed

via pentobarbital injection suffered flash pulmonary edema during the procedure.  (*See* ECF No. 26-12, Expert Decl. of Mark Edgar, ¶ 74; ECF No. 24, Expert Decl. of Gail Van Norman, Autopsy Findings, at 85.)  Pulmonary edema, which interferes with breathing, "produces sensations of drowning and asphyxiation" resulting in "extreme pain, terror and panic."  (Edgar Decl., ¶¶ 78–80.)

Eyewitness accounts of executions using pentobarbital describe inmates repeatedly gasping for breath or showing other signs of respiratory distress, and indicate that flash pulmonary edema is common and extremely painful.  (*Id.*)  Dr. Gail Van Norman concluded that it is a "virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation" during an execution conducted in accordance with the 2019 Protocol.  (Van Norman Decl. ¶ 18.)

Defendants urge the court to disregard these findings.  They first contend that the Supreme Court has already upheld similar methods of execution, and that the pain associated with pulmonary edema is not severe enough to render the 2019 Protocol unconstitutional.  (*See* ECF No. 113-1, Defs. Opp. to Pls. Mot., at 22–25.)  But the cases upon which Defendants rely are inapposite.  Neither *Baze* nor *Glossip* involved a single-drug protocol or the use of pentobarbital, and the fact that some plaintiffs in those and other cases suggested that pentobarbital would be a constitutional alternative does not invalidate the expert testimony before the court, which indicates otherwise.  *Glossip*, 135 S. Ct. at 2738; *Baze*, 553 U.S. at 56–57.  *Bucklew* did involve a challenge to pentobarbital, but one unique to that plaintiff's medical condition—he argued that vascular tumors caused by his cavernous hemangioma would prevent the pentobarbital from working as intended, and thus brought an as-applied challenge to a procedure that he conceded was "constitutional in most applications."  139 S. Ct. at 1118, 1120.

10

Plaintiffs, of course, concede no such thing, and in fact allege the opposite.  (*See* Pls. Mot. for Prelim. Inj. at 34.)

Defendants also urge the court to follow the Sixth Circuit's recent decision, *In re Ohio Execution Protocol Litigation*, which rejected an Eighth Amendment claim based on the risk of pulmonary edema during execution, and which Plaintiffs claim misinterpreted *Bucklew*.  946 F.3d 287 (6th Cir. 2019), (Pls. Mot. for Prelim. Inj. at 35 n.12.)  Defendants initially relied on the Sixth Circuit's holding that "neither pulmonary edema nor the symptoms associated with it qualify as the type of serious pain prohibited by the Eighth Amendment," but after the first round of briefing in this case last year, the Sixth Circuit issued an amending and superseding opinion omitting this language.  *Compare* 937 F.3d 759, 762 (6th Cir. 2019), *with* 946 F.3d at 290.  Although the Sixth Circuit's amended opinion does suggest that the risk of pain associated with sensations of drowning and suffocation is akin to that of hanging, it does not reach a conclusion as to whether pulmonary edema can result in pain that is so severe as to violate the Eighth Amendment.  946 F.3d at 290.

In any event, this case is factually distinct from *Ohio Execution Protocol*.  That case not only involved a different execution protocol using a different drug—a three-drug protocol employing midazolam as the first drug rather than a one-drug protocol relying exclusively on pentobarbital—but it held that the plaintiff had failed to provide "evidence showing that a person deeply sedated by a 500 milligram dose of midazolam is still 'sure or very likely' to experience an unconstitutionally high level of pain."  *Id.*  Here, Plaintiffs have amassed an extensive factual record, and their experts have concluded that there is a "virtual medical certainty" that the 2019 Protocol will result in "excruciating suffering."  (Van Norman Decl. at 7.)

Defendants do not contest Plaintiffs' evidence that the majority of individuals executed via pentobarbital suffer flash pulmonary edema, but they have submitted expert testimony arguing that the pulmonary edema occurs either post-mortem or after the inmate has been rendered insensate. (*See* Defs. Opp. to Pls. Mot. at 12–13; ECF No. 111-4, Expert Decl. of Joseph Antognini, ¶ 8.) Thus, the question of whether the 2019 Protocol is significantly likely to cause serious pain turns on the narrower question of whether the pentobarbital is likely to render inmates insensate or dead before they experience the symptoms of pulmonary edema.

Plaintiffs have the better of the scientific evidence on this question. Dr. Van Norman demonstrates that flash pulmonary edema can only occur in still-living subjects, and that it develops "almost instantaneously" following injection. (ECF No. 117-1, Supp. Decl. of Gail Van Norman, ¶¶ 19–24.) Defendants argue that Plaintiffs concede that pentobarbital renders patients insensate very rapidly, (Defs. Opp. to Pls. Mot. at 12), but the evidence indicates no such concession. Dr. Van Norman specifically states that barbiturates like pentobarbital render patients "unresponsive" but still conscious and capable of experiencing the severe pain associated with flash pulmonary edema. (Van Norman Supp. Decl. ¶¶ 10–13, 21.) While Dr. Antognini disputes these findings, he does not undermine them. (*See* ECF No. 122-2, Supp. Decl. of Joseph Antognini, ¶¶ 20–23.) Dr. Van Norman's conclusion is also supported by eyewitness accounts of previous executions using pentobarbital, in which inmates visibly gasped for breath, and autopsies that revealed "foam or froth" in the inmates' airways, a phenomenon that occurs when the edema fluid mixes with air while the inmate is still attempting to breathe. (*See, e.g.*, Edgar Decl. ¶¶ 78–79.)

While it is difficult to weigh competing scientific evidence at this relatively early stage, the factual record indicates that Plaintiffs are likely to succeed on the merits of their claims that

the 2019 Protocol poses a substantial risk of serious pain.  They have thus met the first prong of their burden on their Eighth Amendment claims.

2.   Known and Available Alternatives

Plaintiffs argue that several alternative methods of execution will significantly reduce the substantial risk of serious pain.  (Pls. Mot. for Prelim. Inj. at 36–40.)

*Procedural safeguards*.  Plaintiffs claim Defendants could implement a number of procedural safeguards, including (1) requiring the use of two functioning peripheral IV lines and placing limits on the use of a central line, (2) administering the lethal-injection protocol bedside, and (3) implementing additional procedures to respond to unexpected occurrences.  (*Id.* at 37–39.)

Defendants correctly characterize these proposals as mere "failsafes" that do not render the planned method of execution unconstitutional.  *Baze*, 553 U.S. at 60–61.  Plaintiffs' proposal regarding the placement of IV lines is the type of "slightly or marginally safer alternative" that the Supreme Court has previously rejected.  *Id.* at 51.  Moreover, the vague suggestion of adding procedures to better respond to problems that may arise during the execution seems aimed at an "isolated mishap," rather than the substantial risk of serious pain from the use of pentobarbital.  *See id.* at 50.  The alleged benefits of bedside administration of pentobarbital are likewise aimed at reducing the risk of maladministration.  (*See* Pls. Mot. for Prelim. Inj., at 38–39.)  In sum, it appears likely that implementing these measures would result in a "minor reduction in risk" at best.  *Bucklew*, 139 S. Ct. at 1130.

*Pre-dose of opioid pain or anti-anxiety medication*.  Plaintiffs have demonstrated that a pre-dose of certain opioid pain medication drugs, such as morphine or fentanyl, will significantly reduce the risk of severe pain during the execution.  (Pls. Mot. for Prelim. Inj. at 36–37; ECF No.

25, Expert Decl. of Craig Stevens, ¶¶ 15–16.)  Defendants argue that this proposal lacks

sufficient detail, that no state currently uses analgesics in its execution procedures, and that

pentobarbital alone is sufficiently painless.  (Defs. Opp. to Pls. Mot. at 32.)

This court has already found that pentobarbital alone poses an unconstitutionally

significant risk of serious pain, and it finds Defendants' remaining arguments to be unavailing.

While *Bucklew* emphasized that a proposed alternative method of execution must be not just

"theoretically feasible but also readily implemented," this simply means that the proposal must

be "sufficiently detailed to permit a finding that the State could carry it out relatively easily and

reasonably quickly."  139 S. Ct. at 1129 (internal quotation marks omitted).  *See also id.* at 1128

(noting that the burden of identifying an alternative means of execution "can be overstated.").

The class of medications identified by Plaintiffs, and the proposed dosage of morphine and

fentanyl more specifically, meet this standard.  (Stevens Decl. ¶¶ 7–16.)

The fact that other states have not adopted Plaintiffs' proposed method of using pain

medication is also not dispositive.  *See Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring)

("I write to underscore the Court's additional holding that the alternative method of execution

need not be authorized under current state law. . . . Importantly, all nine Justices today agree on

that point.").

Defendants argue that as in *Bucklew and Baze*, Plaintiffs' proposed alternative has "no

track record of successful use," *id.* at 1130, and is "untried and untested."  *Baze*, 553 U.S. at 41.

But this case presents a different scenario.  In *Bucklew*, the plaintiff proposed execution by

nitrogen hypoxia, but even after "extensive discovery," he provided only a "bare-bones"

proposal premised on "unsupported, if not affirmatively contradicted" assertions regarding its

effectiveness.  139 S. Ct. at 1121, 1129–30.  In *Baze*, the plaintiff's proposal of a one-drug

protocol was offered "without any findings on [its] effectiveness" and relied heavily on comparisons to animal euthanasia. 553 U.S. at 56–58. Here, Plaintiffs' proposal is simpler, and is supported by substantial scientific evidence of its effectiveness in non-lethal human treatment. Moreover, the parties agree that Nebraska recently used a pre-dose of fentanyl for the precise purpose of reducing the risk of serious pain during an execution. In sum, Plaintiffs have not proposed a complex medical procedure, lacking in detail and possibly requiring years of further research, but a simple addition to the execution procedure that is likely to be as effective as it is easily and quickly administered. *See Bucklew*, 139 S. Ct. at 1129.

Finally, Defendants contend that the BOP already considered and rejected using fentanyl in executions, in part due to speculation that manufacturers would refuse to supply it. (Defs. Opp. to Pls. Mot. at 32.) Although Defendants do not make the same argument regarding the availability of morphine, it is true that the government cannot be faulted for failing to use a drug it has been unable to obtain through good-faith efforts. *Glossip*, 135 S. Ct. at 2738. But Defendants have provided no evidence of such efforts; they merely assert that manufacturers would "most likely" resist efforts to use fentanyl in executions. (Admin. R. at 869.) This is a far cry from showing that they are unable to procure fentanyl for Plaintiffs' executions.

*Firing squad*. Alternatively, Plaintiffs proffer execution by firing squad. (Pls. Mot. for Prelim. Inj. at 39–40.) Because that method of execution is feasible, readily implemented, and would significantly reduce the risk of severe pain, it satisfies the *Blaze-Glossip* requirements for proposed alternatives. Execution by firing squad is currently legal in three states, Utah, Oklahoma, and Mississippi, and can hardly be described as "untried" or "untested" given its historical use as a "traditionally accepted method of execution." *Bucklew*, 139 S. Ct. at 1125.

Furthermore, the last execution by firing squad in the United States occurred just over a decade ago, on June 18, 2010, in Utah.

Both the historical use of firing squads in executions and more recent evidence suggest that, in comparison to the 2019 Protocol, execution by firing squad would significantly reduce the risk of severe pain.  *See, e.g.*, Deborah Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century*, 35 Wm. & Mary L. Rev. 551, 688 (1994) ("A competently performed shooting may cause nearly instant death"); Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* 117, App. A. (2014) (calculating that, of all executions conducted since 1900, executions by firing squad had the lowest rate of "botched" executions—zero out of thirty-four—of any method).

Defendants point to several cases from other Circuits in which courts appeared skeptical of these conclusions.  (Defs. Opp. to Pls. Mot. at 34–35.)  Again, however, they overlook the Supreme Court's guidance in *Bucklew* that a plaintiff's burden in identifying an alternative method of execution "can be overstated" and that there is "little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative."  139 S. Ct. at 1128–29. Indeed, members of the Court, including at least one Justice in the *Bucklew* majority, have opined that the firing squad may be an immediate and sufficiently painless method of execution. *See, e.g.*, *id.* at 1136 (Kavanaugh, J., concurring); *Arthur v. Dunn*, 137 S. Ct. 725, 734 (2017) (Sotomayor, J., dissenting from denial of cert.) ("In addition to being near instant, death by shooting may also be comparatively painless.").  Moreover, given that use of the firing squad is "well established in military practice," *Baze*, 553 U.S. at 102 (Thomas, J., concurring), Defendants are, if anything, more capable than state governments of finding "trained marksmen

who are willing to participate," and who possess the skill necessary to ensure death is near-instant and comparatively painless.  *McGehee v. Hutchinson*, 854 F.3d 488, 494 (8th Cir. 2017).

Defendants also argue that execution by firing squad is not a "readily available" method of execution.  It is true that, compared to the relative ease with which opioids could be added to the existing execution protocol, execution by firing squad would mean a complete transformation of the government's method of execution.  Therefore, Defendants argue, the court should defer to the government's "legitimate reasons" for choosing not to adopt the firing squad as a method of execution—that legitimate reason being that the firing squad is so rarely used.  (Defs. Opp. to Pls. Mot. at 36.)

Defendants' logic is somewhat circular.  *See, e.g.*, *Arthur*, 137 S. Ct. at 729 (Sotomayor, J., dissenting from denial of cert.) (reasoning that allowing a state to conduct an unconstitutional execution simply because it declines to authorize any alternative "cannot be right").  *See also Bucklew*, 139 S. Ct. at 1128 ("The Eighth Amendment is the supreme law of the land, and the comparative assessment it requires can't be controlled by the State's choice of which methods to authorize in its statutes.").  Indeed, Defendants' argument implicitly asks the court to follow the Eleventh Circuit's holding that a proposed alternative method of execution must be authorized by law.  *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1317–18 (11th Cir. 2016).  Yet the Eleventh Circuit acknowledged last year that *Bucklew* "demonstrates our conclusion in *Arthur* was incorrect."  *Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1326 (11th Cir. 2019), *cert. denied sub nom. Price v. Dunn*, 139 S. Ct. 1542 (2019).

The court declines to opine on whether the firing squad would be an acceptable alternative method of execution in every case.  However, it finds that Defendants could readily adopt Plaintiffs' proposal.  Even if *Bucklew* is read as requiring Plaintiffs to plead a method of

execution that is currently authorized by at least one state, the firing squad is currently authorized by three states and was used relatively recently in one.  More importantly, the federal government is uniquely capable of consulting with Utah and adopting its existing protocol. Defendants' final argument is that Plaintiffs' stated preference for execution by firing squad is insincere.  (Defs. Opp. to Pls. Mot. at 37.)  But the court notes that Plaintiffs have argued for it at length, and have adequately shown that it is readily implemented, available, and would significantly reduce the risk of severe pain.  *Cf. Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (rejecting possibility of execution by firing squad where the plaintiff had chosen not to plead it as an alternative).

Plaintiffs have identified two available and readily implementable alternative methods of execution that would significantly reduce the risk of serious pain: a pre-dose of opioid pain or anti-anxiety medication, or execution by firing squad.  Thus, they have established a likelihood of success on the merits of their claims that the 2019 Protocol's method of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Given this finding, the court need not reach Plaintiffs' other remaining claims.[6]

---

[6] The court is mindful of the prudential rule that when a case can be decided on purely statutory grounds, courts should avoid constitutional questions.  *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).  But this "is a rule of prudence, not an absolute command."  *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 351 (4th Cir. 2018) (Harris, J., concurring) (citations omitted), *vacated on other grounds*, 138 S. Ct. 2710 (2018); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2434 (2018) (Sotomayor, J., dissenting) ("That rule of thumb is far from categorical, and it has limited application where, as here, the constitutional question proves far simpler than the statutory one.").  Plaintiffs' remaining statutory claims raise novel and complex questions that, as Defendants themselves note repeatedly, could result in far-reaching and unpredictable consequences.  In contrast, Plaintiffs' Eighth Amendment claims require the court to preliminarily enjoin the 2019 Protocol for the "more fundamental reason" that it creates an unconstitutionally significant risk of serious pain.  *Id.*

### B.   <u>Irreparable Harm</u>

The court's analysis of irreparable harm is unchanged from its 2019 Order.  In order to prevail on a request for preliminary injunction, irreparable harm "must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and it "must be beyond remediation."  *League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (internal quotation marks and brackets omitted).  Here, without injunctive relief, Plaintiffs would be unable to pursue their remaining claims, including the claims that the method of planned execution under the 2019 Protocol is cruel and unusual in violation of the Eighth Amendment, and would therefore be executed under a procedure likely to be unconstitutional.  This harm is manifestly irreparable.

Other courts in this Circuit have found irreparable harm in similar, but less dire circumstances.  *See, e.g.*, *Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) (finding irreparable injury where plaintiffs faced detention under challenged regulations); *Stellar IT Sols., Inc. v. USCIS*, No. 18-2015 (RC), 2018 WL 6047413, at *11 (D.D.C. Nov. 19, 2018) (finding irreparable injury where plaintiff would be forced to leave the country under challenged regulations); *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 126–27 (D.D.C. 2015) (finding irreparable injury where challenged regulations would threaten company's existence); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 19 (D.D.C. 2009) (finding irreparable injury where challenged regulations would limit guest workers).  No member of the D.C. Circuit panel on appeal challenged the court's finding in its 2019 Order that Plaintiffs would suffer irreparable harm absent preliminary relief, and Defendants do not dispute that irreparable harm is likely.

Based on the record before it, the court finds that Plaintiffs have shown that absent injunctive relief, they will suffer the irreparable harm of being executed under a likely unconstitutional procedure before their claims can be fully adjudicated.

**C.      Balance of Equities**

Defendants argue that if the court preliminarily enjoins the 2019 Protocol, they will suffer the harm of having to delay the scheduled execution dates.  (*See* Defs. Opp. to Pls. Mot. at 57.) The government's interest in the finality of criminal proceedings, including capital cases, is compelling.  *Calderon v. Thompson*, 523 U.S. 538, 556 (1998).  On the other hand, the fact that the government waited eight years to establish a new protocol undermines its arguments regarding the urgency and weight of that interest.  The government may have had valid reasons to proceed with caution, but it can hardly now claim that any further delay would cause it substantial harm.  The court notes that while almost eight months have passed since its 2019 Order, Plaintiffs still have not been afforded sufficient opportunity to evaluate the 2019 Protocol—it was Defendants who initially declined to stay Plaintiffs' executions to allow discovery on the Protocol.  (Status Hr'g Tr. at 6, 10–11.)

Indeed, where the Supreme Court has been sympathetic to the government's need for finality in capital cases, it has generally been in cases where plaintiffs waited until the last minute to bring claims that could have been brought earlier, or engaged in a clear "attempt at manipulation" of the judicial process.  *Bucklew*, 139 S. Ct. at 1134 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)).  Here, however, three of the four Plaintiffs filed their complaints shortly after the DOJ announced the 2019 Protocol, months before their initially scheduled executions, and Nelson filed his complaint before Defendants even announced his execution

date.  Plaintiffs are not raising new claims that they could have brought in their initial complaints, but rather renewing the Eighth Amendment arguments made in their initial motions.

Given this background, the court finds that the potential harm to the government caused by a delayed execution is not substantial, and is outweighed by the irreparable harm Plaintiffs would face absent an injunction.[7]

### D.   Public Interest

As noted in the court's 2019 Order, the public interest is not served by executing individuals before they have had the opportunity to avail themselves of the legal process to challenge the legality of their executions.  "Applying the law in a way that violates the Constitution is *never* in the public's interest."  *Minney v. United States Office of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015) (emphasis in original).  *See also Purkey v. United States*, 2020 WL 3603779, at *11 ("Just because the death penalty is involved is no reason to take shortcuts—indeed, it is a reason not to do so."); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) ("The public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights."); *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("Confidence in the humane application of the governing laws . . . must be in the public's interest.").  Accordingly, the court finds that the public interest is served by preliminarily enjoining Plaintiffs' executions because it will allow judicial review of whether the United States Government's planned execution protocol complies with the Eighth Amendment, and to ensure that it does so in the future.

---

[7] In his separate Opinion, Judge Katsas found that this was a case in which the balance of equities favored the government.  *Execution Protocol Cases*, 955 F.3d at 126 (Katsas, J., concurring).  However, he noted that this was partly because the claims then before the Court presented no "colorable dispute that pentobarbital will cause anything but a swift and painless death."  *Id.* at 128–29.  Plaintiffs' Eighth Amendment claims now raise precisely this dispute.

### III.   CONCLUSION

The court finds that at least one of Plaintiffs' claims has a likelihood of success on the merits, and that absent a preliminary injunction, Plaintiffs will suffer irreparable harm.  It further finds that the likely harm that Plaintiffs would suffer if the court does not grant injunctive relief far outweighs any potential harm to Defendants.  Finally, because the public is not served by short-circuiting legitimate judicial process, and is greatly served by attempting to ensure that the most serious punishment is imposed in a manner consistent with our Constitution, the court finds that it is in the public interest to issue a preliminary injunction.  Accordingly, having reviewed the parties' filings, the record, and the relevant case law, and for the reasons set forth above, the court will GRANT Plaintiffs' Motion for a Preliminary Injunction.  A corresponding order will be issued simultaneously.


Date:  July 13, 2020


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge