# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>In the Matter of the )<br>Federal Bureau of Prisons' )<br>Execution Protocol Cases )<br> )<br>LEAD CASE: *Roane et al. v.* )<br>*Barr* )<br> )<br> )<br>THIS DOCUMENT )<br>RELATES TO: )<br> )<br>ALL CASES | Case No. 19-mc-0145 (TSC) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS NON-APA
CLAIMS AND FOR SUMMARY JUDGMENT REGARDING APA CLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................1

I.  Plaintiffs Sufficiently State a Claim for Violation of the Eighth Amendment ...................1
    A.  Defendants misconstrue the motion to dismiss standard .........................................1
    B.  Plaintiffs have adequately alleged that the 2019 Protocol creates a
        demonstrated risk of severe pain.......................................................................3
    C.  Plaintiffs have adequately alleged known and available alternatives ....................9

II.  Plaintiffs Allege a Plausible Claim that Defendants Are Acting with
     Deliberate Indifference to Plaintiffs' Serious Medical Needs ...........................................12

III.  Plaintiffs Plead a Viable Due Process Claim ....................................................................14

IV.  Plaintiffs State a Viable Claim That the 2019 Protocol Deprives Them of
     Access to Counsel ................................................................................................................18

V.  Plaintiffs State a Viable Claim that the FDPA, As Implemented by
    Defendants, Unconstitutionally Delegates Legislative Power .........................................21
    A.  Congress has repeatedly refused to delegate to the Attorney General
        the authority to determine a single federal method of execution.........................22
    B.  Under the nondelegation doctrine, DOJ cannot achieve by bureaucratic
        fiat what it failed to convince Congress to adopt..................................................25

VI.  Defendants Are Not Entitled to Judgment on Plaintiffs' Claim that BOP's Adoption
     of the Protocol Is Arbitrary and Capricious .....................................................................27
     A.  Defendants have failed to explain their use of unspecified procedures
         for IV placement .................................................................................................28
     B.  Defendants have not explained or justified their use of compounded
         pentobarbital .......................................................................................................31

VII.  Summary Judgment is Improper on the Unresolved Aspects of Plaintiffs' Claims
      under the Federal Death Penalty Act .................................................................................32
      A.  The 2019 Protocol violates the FDPA because it assigns to the BOP
          the authority that Congress delegated to the Marshals Service ...........................32
 .    B.  The 2019 Protocol violates the FDPA because it conflicts
          with execution procedures that are set forth in numerous state statutes ...............35

VIII.   Defendants Are Not Entitled to Summary Judgment on Plaintiffs' CSA and FDCA-
         Based APA Claims ...................................................................................................38
         A.      The 2019 Protocol violates the FDCA and must be set aside...............................38
                 1.   The purpose of the FDCA...............................................................................38
                 2.   Drugs used in executions are subject to the FDCA .......................................39
                 3.   Defendants additionally violate the FDCA's restrictions on
                      compounded drugs .........................................................................................41
                 4.   The APA provides a right of action to redress the federal
                      statutory violations committed by the Government itself...............................43
         B.      The 2019 Protocol violates the CSA and must be set aside..................................43

CONCLUSION...........................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) ....................................................27

*Andres v. United States*, 333 U.S. 740 (1948) ....................................................16, 23

*Andrx Pharm. v. Biovail Corp.*, 256 F.3d 799 (D.C. Cir. 2001)....................................16

*Aref v. Holder*, 774 F. Supp. 2d 147 (D.D.C. 2011) ................................................4, 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................19, 20

*Athenex Inc.* v. *Azar*, 397 F. Supp. 3d 56 (D.D.C. 2019) ....................................41, 42

*Banzhaf v. Smith*, 737 F.2d 1167 (D.C. Cir. 1984) ....................................................43

*Barber v. Dist. of Columbia Gov't*, 394 F. Supp. 3d 49 (D.D.C. 2019) ...........................3

*Barr v. Lee*, — S. Ct. —, No. 20A8, 2020 WL 3964985 (U.S. July 14, 2000)...................6, 7, 40

*Barr v. Purkey*, — S. Ct. —, No. 20A10, 2020 WL 4006821 (U.S. July 16, 2020) ...................40

*Baze v. Rees*, 553 U.S. 35 (2008)..........................................................3, 5, 14

*Beaty v. FDA*, 853 F. Supp. 2d 30 (D.D.C. 2012) ............................................13, 39, 40

*Bechtel v. F.C.C.*, 10 F.3d 875 (D.C. Cir. 1993) ....................................................28

*Beck v. U.S. Gov't*, 318 F. Supp. 3d 55 (D.D.C. 2018) ................................................2

*Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991)..............................................13, 14

*Bucklew v. Lombardi*, 783 F.3d 1120 (8th Cir. 2015) ................................................2

*Bucklew v. Lombardi*, No. 14-08000-CV-W-BP, 2016 WL 6917289
(W.D. Mo. Jan. 29, 2016) ..........................................................................6

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ....................................................2, 9

*Butte Cnty. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)..........................................28, 31

*Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010) ...........................33

*Chester v. Beard*, 657 F. Supp. 2d 534 (M.D. Pa. 2009) .............................................6

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .............24

*Chrysler Corp.* v. *Brown*, 441 U.S. 281 (1979) ...................................................................43

*Cooey v. Strickland*, No. 04-cv-1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011) ........19, 20, 21

*Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013) ....................................................................13, 39, 40

*Cooper v. Casey*, 97 F.3d 914 (7th Cir. 1996) ...............................................................13

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ...26, 27, 28

*Estelle v. Gamble*, 429 U.S. 97 (1976)*A*) ......................................................................12

*Evans v. Hood*, No. 1:19-cv-03346 (CJN), 2020 WL 3605651 (D.D.C. July 2, 2020) .................11

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................................38, 42

*Farmer v. Brennan*, 511 U.S. 825 (1994)) ......................................................................12

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996) ......................................................45

*Fridman v. Bean LLC*, No. CV 17-2041 (RJL), 2019 WL 231751
(D.D.C. Jan. 15, 2019) ...............................................................................................9

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ..........................................................................14

*Fulks v. United States*, 875 F. Supp. 2d 535 (D.S.C. 2010) ...............................................11

*Glossip v. Gross*, 135 S. Ct. 2726 (2015) .............................................................. passim

*Gonzalez v. Oregon*, 546 U.S. 243 (2006) .....................................................................44

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ...............................................22, 26, 27

*Harbison v. Bell*, 556 U.S. 180 (2009) ..........................................................................20

*Heckler v. Chaney*, 470 U.S. 821 (1985) ...................................................................40, 41

*Helling v. McKinney*, 509 U.S. 25 (1993) ......................................................................13

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016) ..................8, 9

*In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106
(D.C. Cir. 2020) ........................................................................................27, 32, 34, 35

*In re Medley*, 134 U.S. 160 (1890) ...............................................................................18

*In re Ohio Execution Protocol Litig.*, 946 F.3d 287 (6th Cir. 2019) ..........................................7, 8

*Indep. Petrol. Ass'n of Am. v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996) ........................................28

*J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) ................................................22

*James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277 (D.C. Cir. 2000) ..............................28

*Jannazzo v. United States*, No. 15-cv-3506(ADS)(AYS), 2016 WL 1452392
(E.D.N.Y. April 13, 2016) .........................................................................................................7

*Kellum v. Mares*, 657 F. App'x 763 (10th Cir. 2016) .................................................................5

*Koon v. United States*, 518 U.S. 81 (1996) .........................................................................41, 45

*Lewis v. Casey*, 518 U.S. 343 (1996) ...............................................................................19, 20

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ........................................................33

*Mistretta v. United States*, 488 U.S. 361 (1989)) .......................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...............28, 32

*Nelson v. Campbell*, 541 U.S. 637 (2004) .................................................................................12

*Odom v. Dist. of Columbia*, 248 F. Supp. 3d 260 (D.D.C. 2017) ....................................................2

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ..............................................................27, 28

*Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1 (D.D.C. 2018) ...............................6

*Roane v. Leonhart*, 741 F.3d 147 (D.C. Cir. 2014) ...............................................................15, 16

*Rogers v. Tennessee*, 532 U.S. 451 (2001) ...............................................................................18

*SunPower Corp. Sys. v. SunLink Corp.*, No. C 08-2807 SBA, 2009 WL 10702548
(N.D. Cal. July 31, 2009) ...........................................................................................................7

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ...................................................................41

*Thorson v. Epps*, No. 4:08CV129-WAP-DAS, 2009 WL 1766806
(N.D. Miss. June 22, 2009) ......................................................................................................3, 6

*United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ...........................................34

*United States v. Ghana Soc. Mktg. Found.*, No. 11-418 (RC), 2012 WL 13076832
(D.D.C. Aug. 8, 2012) ..................................................................................................................2

*United States v. Giordano*, 416 U.S. 505 (1974) .......................................................................35

*United States v. Kanner*, 603 F.3d 530 (8th Cir. 2010) ................................................44

*United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007)..............................................35

*United States v. Moore*, 423 U.S. 122 (1975).................................................................44

*United States v. Nazir*, 211 F. Supp. 2d 1372 (S.D. Fla. 2002) ....................................39

*United States v. Newman*, No. 16-1169 (CKK), 2017 WL 3575848
(D.D.C. Aug. 17, 2017)....................................................................................................12

*United States v. Smith*, 573 F.3d 639 (8th Cir. 2009) ....................................................44

*United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37 (D.D.C. 2011)...........................11

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 6 L. Ed. 253 (1825) ...............................22

*West v. Atkins*, 487 U.S. 42 (1988) ................................................................................14

*Wilson v. Dunn*, No. 2:16-CV-364-WKW, 2017 WL 5619427
(M.D. Ala. Nov. 21, 2017) ................................................................................................5

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ....................................................................20

## **Statutes**

1 Stat. 112 (1790)............................................................................................................23

5 U.S.C. § 701(a)(2)...................................................................................................41, 45

5 U.S.C. § 702................................................................................................................43

5 U.S.C. § 706(2)(A)..................................................................................................27, 43

5 U.S.C. § 706(2)(C)......................................................................................................33

18 U.S.C. § 542 (Supp. III 1937))..................................................................................23

18 U.S.C. § 3566 (repl.)............................................................................................24, 26

18 U.S.C. § 3596 .................................................................................................... passim

18 U.S.C. § 3597....................................................................................................25, 32, 33

18 U.S.C. § 3599............................................................................................................20

21 U.S.C. § 301..............................................................................................................38

21 U.S.C. § 331(d) .................................................................................................43

21 U.S.C. § 337(a) .................................................................................................43

21 U.S.C. § 352(f)(1) .............................................................................................42

21 U.S.C. § 353(b)(1)(B) ........................................................................................38

21 U.S.C. § 353b ....................................................................................................42

21 U.S.C. § 353b(a) ...............................................................................................42

21 U.S.C. § 353b(a)(2)(A) ......................................................................................42

21 U.S.C. § 353b(a)(5) ...........................................................................................41

21 U.S.C. § 353b(d)(2) ......................................................................................41, 42

21 U.S.C. § 355 ......................................................................................................42

21 U.S.C. § 360eee-1 .............................................................................................42

21 U.S.C. § 801 ......................................................................................................38

21 U.S.C. § 801(27) ...............................................................................................44

21 U.S.C § 802(10) .................................................................................................44

21 U.S.C. § 802(21) ...............................................................................................44

21 U.S.C. § 829(e)(2) .............................................................................................44

21 U.S.C. § 841(a)(1) .............................................................................................44

28 U.S.C. § 2516(1) (1970) ....................................................................................35

48 U.S.C. § 20913 ..................................................................................................26

Ark. Code § 5-4-617(d) ..........................................................................................36

Ark. Code § 5-4-617(f) ...........................................................................................36

Ind. Code § 35-38-6-1(b) ..................................................................................36, 37

Ga. Code § 17-10-41 ..............................................................................................36

Mo. Rev. Stat. § 546.720.1 .....................................................................................37

S.C. Code § 24-3-530(A) ..........................................................................................36

Tex. Code of Crim. Proc. Art. 43.14(a) ..................................................................37

VA Code Ann. § 53.1-234 .......................................................................................36

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................1, 2, 10, 45

Fed. R. Civ. P. 15(d) ...............................................................................................17

**Other Authorities**

58 Fed. Reg. 4898 (Jan. 19, 1993) ...........................................................23, 24, 26

H.R. 851, 110th Cong. (2007)..................................................................................25

H.R. 1087, 105th Cong. (1997) ...............................................................................25

H.R. Rep. No. 101-170 (1989)................................................................................23

H.R. Rep. No. 102-405 (1991) (Conf. Rep.).........................................................23

H.R. Rep. No. 104-23 (1995)..................................................................................25

*Hearing on H.R. 2359 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*,
104th Cong. 2 (1995) ...............................................................................................25

McDaniel, *Missouri Execution Drug Purchases Revealed*, Buzzfeed News (Jan. 8, 2017) .........32

Office of Legal Counsel Op., *Whether the Food & Drug Admin. Has Jurisdiction
over Articles Intended for Use in Lawful Executions* (May 3, 2019), OLC Op.,
2019 WL 2235666 ...................................................................................................41

Stetson & Friedman, *The Justice Department's Shameful Rush to Federal Executions*,
NY Times (July 17, 2020) ..................................................................................18, 19

## INTRODUCTION

Continuing the Government's rush to execute the Plaintiffs in this action before the constitutionality and legality of the 2019 Protocol can be determined, Defendants now move for dismissal and summary judgment. *See* ECF Nos. 169, 170. But neither drastic measure is remotely warranted at this stage of the proceedings. Many of Defendants' arguments reduce to factual disagreements that cannot justify summary judgment, let alone dismissal for failure to state a claim. Other arguments misapprehend the law governing Plaintiffs' claims, as well as the preliminary injunction posture from which this Court, the D.C. Circuit, and the Supreme Court have addressed some of those claims. But Defendants cannot avoid what the Amended Complaint makes clear: the Plaintiffs have stated claims that justify factual development and trial. For the reasons that follow, the Court should (a) deny the motion to dismiss in its entirety, and (b) deny the motion for summary judgment except as to Plaintiffs' claim that the 2019 Protocol violates the Administrative Procedure Act for lack of notice-and-comment procedures (Count VI).

## ARGUMENT

### I.   Plaintiffs Sufficiently State a Claim for Violation of the Eighth Amendment

Plaintiffs have stated a claim for violation of their Eighth Amendment rights. The Amended Complaint contains detailed and specific allegations regarding the extreme pain and needless suffering Plaintiffs will endure if executed pursuant to the 2019 Protocol. By seeking to dismiss this claim on the pleadings, Defendants ask this Court to take them at their word that their proffered facts and evidence are more compelling—at the motion to dismiss stage, no less—than Plaintiffs' well-pleaded allegations. That is precisely what the law precludes; this Court must accept Plaintiffs' well-pleaded allegations as true and deny Defendants' motion to dismiss.

#### A.   Defendants misconstrue the motion to dismiss standard

As a threshold matter, a motion to dismiss under Rule 12(b)(6) seeks to test the legal

sufficiency of a complaint, *not* "a plaintiff's ultimate likelihood of success on the merits." *United States v. Ghana Soc. Mktg. Found.*, No. 11-418 (RC), 2012 WL 13076832 at *1 (D.D.C. Aug. 8, 2012); *Beck v. U.S. Gov't*, 318 F. Supp. 3d 55, 60 (D.D.C. 2018), *aff'd*, 777 F. App'x 525 (D.C. Cir. 2019). "In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiffs and 'must *assume the truth* of all well-pleaded allegations.'" *Odom v. Dist. of Columbia*, 248 F. Supp. 3d 260, 264 (D.D.C. 2017) (emphases added) (citation omitted). As Defendants concede, the Court's review on a motion to dismiss is generally limited to the complaint itself, along with documents referenced or incorporated therein, and matters as to which the Court may take judicial notice. Mot. at 9.

Notwithstanding these well-established principles, Defendants confuse the standard of review and attempt to impose "an exceedingly high bar" on Plaintiffs' pleading (*id.* at 10), repeatedly invoking cases that were decided at the *evidentiary* stage rather than the *pleading* stage. For example, Defendants rely heavily on *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) (Mot. at 11-14, 17-20), which was decided at the summary judgment stage only after the parties had engaged in "extensive discovery." *Bucklew*, 139 S. Ct. at 1121. Tellingly, at an earlier stage of the litigation, the Eighth Circuit in *Bucklew* faulted the district court for dismissing the plaintiff's claims after "conclud[ing] that the expert affidavits Bucklew submitted . . . d[id] not contain the specificity necessary to prevail on an Eighth Amendment claim." *Bucklew v. Lombardi*, 783 F.3d 1120, 1123 (8th Cir. 2015). The Eighth Circuit held that such a conclusion "was a merits analysis appropriate in ruling on a motion for summary judgment, not an analysis of whether the complaint plausibly pleaded an Eighth Amendment claim." *Id.*

Defendants also rely heavily on *Glossip v. Gross*, 135 S. Ct. 2726 (2015). Mot. at 11-12, 14-15, 17-20. But, as Defendants are no doubt aware, *Glossip* was an appeal of the denial of a motion for preliminary injunction in which the plaintiffs were required to establish "a likelihood

of success on the merits of their claim," which was decided after "a 3-day evidentiary hearing." *Glossip*, 135 S. Ct. at 2735-36. Perhaps most egregiously, Defendants rely upon *Baze v. Rees*, 553 U.S. 35 (2008) (Mot. at 11-15, 17, 20), which was decided "[a]fter a 7-day bench trial during which the trial court received the testimony of approximately 20 witnesses, including numerous experts." *Baze*, 553 U.S. at 46.

These cases lend no support to Defendants' argument that Plaintiffs' Eighth Amendment claim should be dismissed outright at the pleading stage. *See Barber v. Dist. of Columbia Gov't*, 394 F. Supp. 3d 49, 58 (D.D.C. 2019) (defendants' attempt to "dispute . . . the alleged facts . . . improperly ignores the Court's duty to accept the allegations of the complaint as true and to construe the complaint liberally at the motion-to-dismiss stage"); *see also Thorson v. Epps*, No. 4:08CV129-WAP-DAS, 2009 WL 1766806 at *1 (N.D. Miss. Jun. 22, 2009) (denying motion to dismiss Eighth Amendment challenge to Mississippi's execution protocol and emphasizing that *Baze* was decided "only after the factual record had been completely developed").

### B. Plaintiffs have adequately alleged that the 2019 Protocol creates a demonstrated risk of severe pain

As the Supreme Court has explained, "the requirements of an Eighth Amendment method-of-execution claim" necessitate that "'the condemned prisoner establish[] that the . . . lethal injection protocol creates a demonstrated risk of severe pain.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 61). Plaintiffs' pleaded facts readily meet this standard.

The Amended Complaint contains allegations that prisoners executed with pentobarbital will suffer flash pulmonary edema, which "produces sensations of drowning and asphyxiation," resulting in "extreme pain, terror and panic." ECF No. 135 (Memorandum Order, July 13, 2020) at 10 (citation omitted). Plaintiffs have further alleged, in specific detail, that:

- "[b]arbiturates such as pentobarbital 'do not guarantee lack of consciousness'";

- "Defendants' supplies of pentobarbital . . . show [elevated] pH readings";

3

- "[a]s a result of pentobarbital's high pH level, injection of a high dose of pentobarbital . . . will cause 'flash' or non-cardiogenic pulmonary edema 'virtually instantaneous[ly],'" before prisoners are rendered unconscious or insensate;

- "[t]he experience of acute pulmonary edema prior to the loss of consciousness 'produces sensations of drowning and asphyxia,' and therefore, 'the experience of this condition in an inmate who was still sensate would result in extreme pain, terror and panic'";

- "[a] review of over two dozen autopsy reports confirms that it is a 'virtual medical certainty' that most, if not all, prisoners executed with a single dose of pentobarbital, as is contemplated by the 2019 Protocol, experienced 'immediate, flash pulmonary edema'"; and

- "[w]itness reports of executions also confirm that prisoners who were executed with a single dose of pentobarbital . . . experienced acute symptoms of pulmonary edema, including burning sensations, labored breathing, gasping, and other signs of severe pain and respiratory distress."

Am. Compl. ¶¶ 74-76, 78, 81-82, 86, 90.

These allegations are supported by the declarations of medical experts. *See, e.g.*, *id.* ¶ 74 (citing Decl. of Gail Van Norman, M.D., at 7 (Nov. 11, 2019), ECF No. 24); ¶ 75 (citing Decl. of Mark A. Edgar, M.D., at 19 (Oct. 24, 2019), ECF No. 26-12).[1] The Amended Complaint also contains similar, detailed allegations with regard to the 2019 Protocol's use of compounded pentobarbital (Am. Compl. ¶¶ 87-98) and its intravenous administration (*id.* ¶¶ 99-108).

Without citing to any specific allegations, Defendants claim that Plaintiffs' allegations regarding severe harm "are premised on speculation" of "maladministration." Mot. at 15. But, as catalogued above, Plaintiffs' allegations are anything but "speculation"—they are detailed and specific claims, backed by scientific evidence, and thus more than sufficient to satisfy the pleading standards. *See Aref v. Holder*, 774 F. Supp. 2d 147, 165 (D.D.C. 2011) (allegations about disparity in prisoners' access to phone calls were "specific and detailed" enough to plausibly state a claim

---

[1] Contrary to Defendants' assertion that Plaintiffs rely "on the opinion of a single expert," the Amended Complaint cites to not only Dr. Van Norman's expert declaration (*e.g.*, Am. Compl. ¶ 74) but also Dr. Edgar's (*e.g.*, *id.* ¶ 75), Dr. Almgren's (*e.g.*, *id.* ¶ 85), and Dr. Stevens's (*id.* ¶ 114).

for constitutional violation); *see also Kellum v. Mares*, 657 F. App'x 763, 770 (10th Cir. 2016) (denying motion to dismiss where plaintiff "included in her complaint the specific underlying factual allegations in support of her [Eighth Amendment] claim"); *Wilson v. Dunn*, No. 2:16-CV-364-WKW, 2017 WL 5619427 at *4 (M.D. Ala. Nov. 21, 2017) (inmate is "not required to try his claim [challenging Alabama's execution protocol] in the pleadings"). Moreover, Plaintiffs' claims do not rely on the risk of maladministration. Rather, Plaintiffs allege that the execution procedure laid out in the 2019 Protocol, even if administered exactly as written, is sure or very likely to "produce[] sensations of drowning and asphyxia" in Plaintiffs while they are conscious. Am. Compl. ¶¶ 78-80, 83 (citing reports of Drs. Edgar and Van Norman).

In seeking to dismiss the Amended Complaint, Defendants suggest that Plaintiffs' well-pleaded allegations regarding pulmonary edema should not be credited at all, arguing that Plaintiffs "have failed to adequately allege a *scientific consensus*" about this risk. Mot. at 14. Tellingly, Defendants do not cite any cases for the untenable notion that Plaintiffs must somehow demonstrate a "scientific consensus" in order to survive dismissal.

Defendants' assertion that pentobarbital is "widely tolerated" is of no moment. Mot. at 12 (quoting *Baze*, 553 U.S. at 53).) As alleged in the Amended Complaint, there are significant differences between the states' use of pentobarbital and the 2019 Protocol's – *see* Am. Compl., Appendix A (listing differences between the 2019 Protocol and state protocols) – and the fact that different protocols may use pentobarbital does not support dismissal of Plaintiffs' well-pleaded and scientifically-supported allegations that the 2019 Protocol creates a demonstrated risk of severe pain. Moreover, the allegedly "wide" toleration of pentobarbital reflects the outdated understanding that a prisoner's unresponsiveness to the barbiturate demonstrates his unconsciousness—according to Plaintiffs' well-pleaded allegations that the Court must accept as true. Am. Compl. ¶ 74.

Defendants' reliance on the Supreme Court's vacatur of this Court's July 13 order preliminarily enjoining the executions of Plaintiffs Lee, Purkey, and Honken is equally unavailing. Mot at 10, 13. That decision was issued in the context of those Plaintiffs' motion for a preliminary injunction, where the burden was on them to demonstrate a "*substantial likelihood of success*" on the merits—a standard which the Court viewed as substantially heightened by what the Court described as the "last-minute" nature of the intervention. *Barr v. Lee*, — S. Ct. —, No. 20A8, 2020 WL 3964985 at *2 (U.S. July 14, 2000) ("Last-minute stays like that issued this morning should be the extreme exception, not the norm.") (quotation omitted). The Supreme Court's conclusion that those Plaintiffs had not demonstrated a substantial likelihood of success – which was based on an incomplete record that included matters from outside the four corners of the Amended Complaint – simply does not bear on whether Plaintiffs' claim is sufficient to survive a motion to dismiss. *See Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 20 n.1 (D.D.C. 2018) ("[T]he Court does not regard its prior [preliminary injunction] determinations as binding for purposes of assessing Defendants' Motion to Dismiss. Rather, . . . the Court finds dismissal unwarranted based on consideration of the record and arguments presently before the Court.").[2]

In fact, the Supreme Court expressly acknowledged that the parties had presented

---

[2] Significantly, nearly all of Defendants' cited decisions occurred at the evidentiary stage of the proceedings, *after* a State's motions to dismiss had been *denied*. *See, e.g.*, *Warner v. Gross*, No. CIV-14-0665-F (W.D. Okla. Dec. 12, 2014), ECF No. 155, at 4 (*Glossip* district court denying motion to dismiss Eighth Amendment claims, in part, because "defendants' moving brief relies on cases in which courts made determinations not at the pleadings stage, but at an evidentiary stage"); *Bucklew v. Lombardi*, No. 14-08000-CV-W-BP, 2016 WL 6917289 at *5 (W.D. Mo. Jan. 29, 2016) (*Bucklew* district court denying motion to dismiss Eighth Amendment claims, in part, because "the issues Defendants raise regarding lethal gas are issues of proof, not pleading"); *Wilson*, 2017 WL 5619427 at *4 (denying motion to dismiss Eighth Amendment claims because allegations "at least call into question" risk of harm associated with method of execution and noting that inmate is "not required to try his claim in the pleadings"); *Chester v. Beard*, 657 F. Supp. 2d 534, 544–45 (M.D. Pa. 2009) (rejecting motion to dismiss Eighth Amendment claims where prisoners alleged additional safeguards were necessary to prevent the risk of extreme pain and suffering); *Thorson*, 2009 WL 1766806 at *1 (denying motion to dismiss Eighth Amendment challenge to Mississippi's execution protocol).

"competing expert testimony" regarding Plaintiffs' Eighth Amendment claim in litigating the preliminary injunction. *Lee*, 2020 WL 3964985 at \*2. Even if Defendants' "competing" evidence could be accepted for purposes of the motion to dismiss (and it cannot), at the very most, it presents factual disputes that defeat Defendants' motion. *See Jannazzo v. United States*, No. 15-cv-3506(ADS)(AYS), 2016 WL 1452392 at \*4 (E.D.N.Y. Apr. 13, 2016) (refusing to consider a report submitted by defendants at the motion to dismiss phase). As this Court has acknowledged, "the question of whether the 2019 Protocol is significantly likely to cause serious pain turns on the narrower question of whether the pentobarbital is likely to render inmates insensate or dead before they experience the symptoms of pulmonary edema"—a factual question on which "Plaintiffs have the better of the scientific evidence." ECF No. 135 (Memorandum Order of July 13, 2020) at 12. Defendants' attempt to avoid having these issues fully resolved on the merits should be rejected.[3]

Defendants fare no better relying, as they have before, on the Sixth Circuit's decision in *In re Ohio Execution Protocol Litig.*, 946 F.3d 287 (6th Cir. 2019). *See* Mot. at 14. This Court correctly discounted the Ohio case in its previous order, observing among other things that Plaintiffs here had "amassed an extensive factual record," including experts concluding "that there is a 'virtual medical certainty' that the 2019 Protocol [using a high dose of pentobarbital] will result in 'excruciating suffering.'" ECF No. 135 at 11. Defendants wrongly suggest that the Court "misapplied the relevant Eighth Amendment standard," under which the prisoner must show that an execution method is "sure or very likely to cause serious illness and needless suffering, and

---

[3] Defendants contend that a battle of experts "would embroil the courts in ongoing scientific controversies beyond their expertise," Mot. at 13, and Plaintiffs agree that it would indeed be inappropriate for the Court to analyze "which side has more convincing experts" (*id.*) at the motion to dismiss stage. *See, e.g.*, *SunPower Corp. Sys. v. SunLink Corp.*, No. C 08-2807 SBA, 2009 WL 10702548, at \*7 (N.D. Cal. July 31, 2009) ("This 'battle of experts' clearly requires the Court to weigh evidence and make determinations of credibility, both of which are inappropriate tasks on a motion to dismiss.") (citation omitted).

give rise to sufficiently imminent dangers." Mot. at 14-15 (quoting *Glossip*, 135 S. Ct. at 2737). What Defendants *actually* offer is mere disagreement with Dr. Van Norman's conclusion of a "virtual medical certainty" that the Plaintiffs will experience excruciating suffering. Defendants are certainly free to disagree with Plaintiffs' experts, or even to speculate that the risk of experiencing asphyxiation while conscious "looks a lot like the risks of pain associated with hanging." *Ohio Execution Protocol*, 946 F.3d at 290. But the proper forum to resolve such disagreements is at a trial with live testimony and cross-examination, enabling the trier of fact to make credibility determinations and resolve disputed facts.

Defendants' arguments with respect to Plaintiffs' well-pleaded allegations regarding the qualifications of the compounding facility are likewise unavailing. Am. Compl. ¶ 90. Defendants fail to acknowledge that, contrary to the BOP's suggestions, "the DEA has advised that the [compounding] facility is not a compounding pharmacy, but rather a dosage manufacturer." *Id.* Furthermore, as the Amended Complaint explains, the 2019 Protocol itself "contains no provisions . . . to ensure verification that the API supplier and compounding pharmacy are qualified, experienced, properly licensed, and have a satisfactory regulatory track record." *Id.* ¶ 91. As a result, Plaintiffs have adequately alleged that they face "a substantial risk that compounded drugs will be contaminated, handled improperly from quality issues, the most common and concerning of which is lack of potency." *Id.* ¶ 89. Even if the BOP's factual contentions were true, Defendants' references to the FDA requirements for pharmacies go beyond the bounds of the pleadings and, as such, are inappropriate on a motion to dismiss. *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 70 (D.D.C. 2016).

Defendants also ask the Court to stray beyond the pleadings and take judicial notice of news reports regarding certain recent executions because the reports supposedly fail to mention "needless suffering." Mot. at 15, n.3. This argument is flawed for several reasons. First, the Court

should not take judicial notice of documents Defendants provide "in order to present new factual allegations to counter the factual allegations underlying Plaintiffs' claims as set forth in the Complaint." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 71-72. Second, even if the Court were to take judicial notice of these reports, their failure to include reports of visible pain does not mean that pain was not suffered by the executed prisoners—especially in light of Dr. Van Norman's medical conclusion that pentobarbital merely disables the prisoner from *responding* to the severe pain of flash pulmonary edema, rather than from *experiencing* such pain while still conscious. Am. Compl. ¶ 74. Third, and perhaps most importantly, this line of inquiry is clearly fact-based and inappropriate for the motion to dismiss phase. *See Fridman v. Bean LLC*, No. CV 17-2041 (RJL), 2019 WL 231751 at *5 (D.D.C. Jan. 15, 2019) (rejecting defendants' request to take judicial notice of news articles at the motion to dismiss stage, in part, because it required "consideration of facts outside of the complaint") (citation omitted).

### C.     Plaintiffs have adequately alleged known and available alternatives

Plaintiffs have also adequately alleged *Glossip*'s second prong—a feasible alternative method of execution. "[T]o establish an Eighth Amendment violation, 'a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain.'" Am. Compl. ¶ 113 (quoting *Bucklew*, 139 S. Ct. at 1125). Plaintiffs have specifically alleged three such alternatives: (i) "FDA-approved pentobarbital" accompanied by "a pre-dose of a pain-relieving, anesthetic drug in a sufficiently large clinical dose"; (ii) "compounded pentobarbital that complies with all state and federal compounding requirements, and has been tested for purity and potency" also accompanied by "a pre-dose of a pain-relieving anesthetic drug"; and (iii) the firing squad. *Id.* ¶ 114.

The Amended Complaint contains detailed and specific allegations regarding these alternatives and provides case law and other support for Plaintiffs' claim that they would

significantly reduce the risk of severe pain to Plaintiffs in connection with their executions. *Id.* Moreover, the Amended Complaint alleges that the firing squad alternative is "currently authorized by the laws of three states (Utah, Oklahoma, Mississippi)." *Id.* ¶ 114(c). These allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss. *See* ECF No. 135 at 15-16 (court observing that "execution by firing squad . . . is feasible, readily implemented, and would significantly reduce the risk of severe pain"); *see also Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting) (noting evidence that death by firing squad is "relatively quick and painless").

In the face of these well-pleaded allegations, Defendants argue that use of "FDA-approved pentobarbital is a nonstarter given BOP's inability to purchase commercially available pentobarbital." Mot. at 17. Even assuming that Defendants' unsupported assertions were true, they fall squarely outside the pleadings and cannot constitute proper grounds for dismissal. Similarly, Defendants argue that adding an opioid to the Protocol is not feasible based on the "likely" response of drug manufacturers who have supposedly "threatened to refuse to provide medications for clinical treatments of inmates should they find out their drugs are being used for executions." Mot. at 19. But this stands in stark contrast to the allegations in the Amended Complaint that the BOP "has confirmed that it has located a lawfully licensed compounding pharmacy in the United States that is able and willing to 'lawfully provide [BOP] with commercially manufactured medications as they are available,' and to compound fentanyl as needed." Am. Compl. ¶ 114. Such an allegation raises a plausible inference, based on the BOP's own statements, that it can obtain fentanyl. At best, then, Defendants' arguments merely raise issues of fact that are not properly decided on a motion to dismiss.

As Defendants concede, this Court has already expressed skepticism regarding the extent to which they "made any efforts to obtain fentanyl." ECF No. 135 at 15. This is a classic issue of fact that precludes dismissal, and accordingly, Defendants' motion should be denied. *See United*

*States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 50 (D.D.C. 2011) (question of degradation of body armor was "a question of fact inappropriate for resolution at the pre-discovery motion to dismiss stage"); *Evans v. Hood*, No. 1:19-cv-03346 (CJN), 2020 WL 3605651, at *4 (D.D.C. July 2, 2020) (timing of individual's licensing was "a question of fact not suitable for resolution on a Motion to Dismiss").

Defendants' assertion that the BOP "concluded that a one-drug protocol would avoid . . . 'complications . . . and reduce[] the risk of administrative mishaps'" is belied by the Government's previous positions in lethal injection litigation. Mot. at 18. In fact, the Government previously asserted that its prior three drug protocol "compares favorably with other execution protocols that have recently passed Eighth Amendment scrutiny." *Fulks v. United States*, 875 F. Supp. 2d 535, 622 (D.S.C. 2010). Additionally, as the Amended Complaint notes, multiple states still use a multi-drug protocol, establishing for purposes of a motion to dismiss that adding another drug to the Protocol is a feasible alternative. *See* Am. Compl., Appendix A (identifying Arkansas and Indiana as using three-drug protocols). And, as Defendants also concede, this Court has already concluded that "adding an opioid to the [2019] Protocol would be 'simple' and 'easily and quickly administered.'" Mot. at 18 (citation omitted).

Finally, Defendants' arguments regarding the firing squad misconstrue *Glossip*. *See* Mot. at 20 ("[T]he Supreme Court . . . has also noted that firing squad is a 'more primitive' method of execution."). In reality, the "more primitive" description was taken from *Glossip*'s "principal dissent" and was not the plurality's holding. *Glossip*, 135 S. Ct. at 2739 (citing the dissent at 2796). To the contrary, *Glossip* reaffirmed the constitutionality of the firing squad. *See id.* Defendants nevertheless attempt to introduce facts outside of the pleadings by arguing about the specifics of the firing squad as authorized by Utah, Oklahoma, and Mississippi. Mot. at 21. As with Defendants' previous attempts on this score, the Court should reject this improper argument on a

motion to dismiss. *See United States v. Newman*, No. 16-1169 (CKK), 2017 WL 3575848 at *8 (D.D.C. Aug. 17, 2017) ("The Court will not dismiss this case at the outset merely because the allegations in the complaint are rebutted by assertions . . . in [defendant's] briefing").

## II.   Plaintiffs Allege a Plausible Claim that Defendants Are Acting with Deliberate Indifference to Plaintiffs' Serious Medical Needs

Plaintiffs state a viable claim for deliberate indifference, which is cognizable under the Eighth Amendment when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Plaintiffs plead that they have a serious medical need to be free from gratuitous pain during their executions, and that Defendants act with deliberate indifference to that need by subjecting them to the harms described by Drs. Van Norman, Edgar, and Almgren. *See generally* Am. Compl. ¶¶ 72-108.

Defendants are obligated to attend to prisoners' medical needs until the moment of their deaths. "In the worst cases, . . . a failure [to provide medical care] may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Eighth Amendment." *Estelle*, 429 U.S. at 103 (citation and internal quotation marks omitted). The obligation to provide medical care that prevents "a lingering death" or gratuitous pain includes the Government's action or inaction during executions. *See Nelson v. Campbell*, 541 U.S. 637, 645 (2004) ("We see no reason on the face of the complaint to treat petitioner's [deliberate indifference claim] differently solely because he has been condemned to die.").

As this Court has previously recognized, the fact that Defendants are subjecting Plaintiffs to these medical risks while executing them by lethal injection does not relieve Defendants of the legal obligations that would apply in any other context. *See* ECF No. 145 (Memorandum Opinion) at 12 ("Because violations of the FDCA carry 'the risk that the drug[s] will not function as intended,' . . . the statute must apply in the lethal-injection context, because a lethal injection drug

that does not function as intended may 'result in conscious suffocation, pain, and cardiac arrest.'")
(quoting *Beaty v. FDA*, 853 F. Supp. 2d 30, 37 (D.D.C. 2012), *aff'd in relevant part sub nom. Cook
v. FDA*, 733 F.3d 1 (D.C. Cir. 2013)). Moreover, the obligation to attend to prisoners' medical
needs exists whether or not Defendants concede that their lethal injection Protocol is a "medical"
procedure. Instead, the relevant inquiry is (a) whether the 2019 Protocol subjects Plaintiffs to
specific medical risks, (b) whether Defendants know of those risks, and (c) whether Defendants
are deliberately indifferent to them. *See Helling v. McKinney*, 509 U.S. 25 (1993) (holding that a
prisoner stated a claim for deliberate indifference when the prison subjected him to his cellmate's
cigarette smoke). Here, Defendants have a stated goal of providing a "humane" execution, *see*
AR931, but have chosen to disregard substantial risks that the 2019 Protocol will instead cause
Plaintiffs severe pain and suffering, including a sensation of "drowning or asphyxiation" that
creates an experience of "panic," "terror," and "agony." Van Norman Decl. (ECF No. 24) at 34.

Defendants argue that Plaintiffs' deliberate indifference claim is subject to the same legal
standard as Plaintiffs' claim that the 2019 Protocol violates the Eighth Amendment's prohibition
against cruel and unusual punishment. Although Plaintiffs have satisfied that standard as well, *see*
Section I, *supra*, deliberate indifference need not involve torturous pain and suffering in order to
be actionable as a wrongful deprivation of appropriate medical care. Courts have held, for instance,
that prisoners who have been beaten but have not suffered from broken bones or other visible
injuries can prevail on a deliberate indifference claim when medical care is delayed. *Cooper v.
Casey*, 97 F.3d 914, 917 (7th Cir. 1996). Likewise, a prisoner who alleged that defendants delayed
wound care and failed to provide pain medication for several days stated a claim for deliberate
indifference, even though his wound ultimately healed successfully and without infection. *Boretti
v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991).

Finally, *Baze* deals only with Eighth Amendment method-of-execution claims, and nothing

in *Baze* purports to address (much less foreclose) other constitutional claims. Plaintiffs have pled that Defendants' deliberate indifference to their medical needs also violates their Fifth Amendment right to substantive due process. "[A] physician who acts on behalf of the State to provide needed medical attention to a person involuntarily in state custody (in prison or elsewhere) and prevented from otherwise obtaining it, and who causes physical harm to such a person by deliberate indifference, violates the Fourteenth Amendment's protection against the deprivation of liberty without due process." *West v. Atkins*, 487 U.S. 42, 58 (1988) (Scalia, J., concurring). Here, Plaintiffs are confined by the Government; they are administered sub-standard medical care in the form of unregulated compounded drugs that are selected by Defendants for the purported purpose of reducing the risk of pain; and they are unable to choose alternative providers or FDA-compliant drugs as other patients would. Plaintiffs have therefore stated a claim for relief under the Fifth Amendment in addition to their Eighth Amendment claim.

## III.   Plaintiffs Plead a Viable Due Process Claim

Plaintiffs have adequately alleged a violation of their due process rights stemming from Defendants' refusal to disclose all material aspects of their execution method, which prevents Plaintiffs from fully determining and remedying the ways in which the 2019 Protocol "presents an avoidable risk of pain and suffering." Am. Compl. at 34. Put simply, Plaintiffs cannot fully prevent Defendants from unconstitutionally and illegally injuring them because Defendants have refused to notify them exactly how they intend to execute them. "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

The informational deficits are material and several. Among other shortcomings, the 2019 Protocol (a) does not specify a means of IV access or monitoring that access, the qualifications of medical personnel who insert the IV line and otherwise administer the drug, or any methods by

which the executioners might account for the individualized medical needs of a particular prisoner (Am. Compl. at 25-29); (b) does not specify any requirements or safeguards to ensure the potency, purity, and reliability of the compounded execution drug or the soundness of the Government's suppliers and their methods (*id.* at 19-24); (c) does not specify any process by which the executioners determine whether and how to deviate from the written Protocol even though it expressly allows such deviation (*id.* at 29-30); and (d) prohibits the disclosure of the professional qualifications of execution personnel "to the fullest extent permitted by law" (*id.* at 30). Even worse, the Protocol allows Defendants to change the execution method for essentially any reason they deem necessary, and even during the execution itself. *See id.* (modifications allowed "as necessary to (1) comply with specific judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) as may be required by other circumstances"). Such modifications will deprive Plaintiffs of "sufficient notice and opportunity to challenge the manner of their executions." *Id.* at 34.

Defendants argue that due process does not entitle Plaintiffs to information about the Protocol and that "no circuit court has ever recognized" the type of claim Plaintiffs assert. Mot. at 22-23 (quotation omitted). Although Defendants rely on several out-of-circuit decisions, they neglect to mention the only one that binds this Court: the D.C. Circuit's ruling in *Roane v. Leonhart*, 741 F.3d 147 (D.C. Cir. 2014). The Court in *Roane* ordered this Court to allow death-sentenced prisoner Jeffrey Paul to intervene in the litigation that preceded and was later consolidated into the present case. The Court of Appeals held that Paul's due process claim remained actionable even after the withdrawal of Defendants' prior three-drug protocol: "The inmates' due process challenge, which attacks a refusal to disclose the procedures that will be used to execute them, is an independent claim that remains live regardless of whether the Government can use the particular combination of drugs it has used in the past." *Roane*, 751 F.3d at 150. The

15

D.C. Circuit thereby recognized a substantial and independent claim that "remains live." *Id.* Defendants may argue that the D.C. Circuit was addressing only the question of whether the claim was moot, but subsequent developments confirm the claim's merits. On remand, this Court enjoined Defendants from scheduling or carrying out Paul's execution. *Roane* ECF No. 336 (order dated Apr. 3, 2014). That Defendants ultimately agreed to the injunction is beside the point, as it does not diminish the Court's conclusion that the injunction was warranted, including on Paul's due process claim. *See Andrx Pharm. v. Biovail Corp.*, 256 F.3d 799, 814 (D.C. Cir. 2001) (stipulated preliminary injunction requires the court to consider "the public interest and the likelihood of success on the merits"); *Roane* ECF No. 334 at 9-10.

Defendants' recent actions underscore the merit of Plaintiffs' adequately-pleaded claim, as well as the importance of the notice that the claim seeks to guarantee them. The Government has recently taken the position that its entire execution Protocol – and not just the "addendum" that describes the execution drug and its administration – is "nonbinding." ECF No. 109 at 2-3. The Protocol states that its provisions should be followed as written "unless deviation or adjustment is *required*, as determined by the Director of the BOP or the Warden." AR1019 (emphasis added). By its own terms the Protocol specified that Defendants must give a prisoner at least 90 days' notice of an initial execution date. AR1023.[4] Nevertheless, the Government provided Keith Nelson with only 74 days' notice of his execution date, a departure from the Protocol that it claimed was "required" primarily by its desire to execute him "promptly" in light of "the nearly 18 years that have passed since Mr. Nelson's capital conviction." ECF No. 109 at 2 n.1. A deviation from the Protocol, then, appears to be "required" when the Government says it is. *But see* ECF No. 114 at 3 (Nelson arguing that a "preference is not a requirement"). Plaintiffs cannot know what

---

[4]Defendants have since amended the Protocol to provide only 50 days' notice of an initial execution date. *See* ECF No. 171 at 1-2.

bureaucratic whim might motivate subsequent deviations from the suddenly "nonbinding protocol." ECF No. 109 at 2-3.

Still more troubling are the circumstances surrounding the recent executions of Daniel Lee and Wesley Purkey.[5] Both executions were stayed throughout the designated execution day, and in both cases, the stays were vacated by the Supreme Court at around 2:00 a.m. the next morning. The 2019 Protocol addresses the re-setting of execution dates as follows:

> If the designated execution date is stayed, notice of the new execution date must be given no later than 20 days before the execution, if time permits and if not, as, soon as possible.

AR1023.

In both the Lee and Purkey cases, however, the Government announced a "new execution date" within minutes of the Supreme Court's vacatur, scheduling pre-dawn executions with, at most, a mere *two hours* of notice. *See* Ex. 1 (Email to counsel for Lee, dated July 14, 2020 at 2:34 a.m. eastern time; attaching notice of new execution date); Ex. 2 (Email to counsel for Purkey, dated, July 16, 2020, at 2:56 a.m.). Whether or not the timetable violates the 2019 Protocol, the immediate point is that a prisoner cannot know when he will be executed even if he has a viable stay on the scheduled date, because the Government claims the authority to reset an execution at any time of day or night with little to no notice.

At or around 2:34 a.m. on the day after Mr. Lee's previously designated execution date, the Government scheduled the execution to begin at 4:00 a.m. that day. Mr. Lee then spent the last four hours of his life strapped to a gurney while litigation continued after the pre-dawn vacatur.

---

[5] As currently pled, Plaintiffs' Amended Complaint is sufficient to survive a motion to dismiss. To the extent the Court is inclined to grant the motion as to this claim, Plaintiffs respectfully request leave to amend and supplement the complaint in order to add these supervening factual allegations, which further bolster the claim and illustrate its merits. *See* Fed. R. Civ. P. 15(d) (allowing a supplemental pleading to allege post-pleading events "even though the original pleading is defective in stating a claim or defense").

He was executed at around 8:00 a.m., even as stay remedies remained pending. *See* Stetson & Friedman, *The Justice Department's Shameful Rush to Federal Executions*, NY Times, July 17, 2020, available at https://www.nytimes.com/2020/07/17/opinion/justice-department-federal-execution.html. Mr. Purkey's execution was similarly problematic, even though the Government disclosed the time of his hastily rescheduled execution to counsel as a professional "courtesy." *See* Ex. 3 (Email to counsel for Purkey, July 14, 2020, at 3:03 a.m.). Mr. Purkey was executed at 8:45 a.m., despite the pendency of litigation to stay his execution on account of mental incompetency.

A prisoner's inability to know when he will be executed, and his consequent inability to prepare for death, create "an immense mental anxiety amounting to a great increase of the offender's punishment" and independently violates the right to due process. *In re Medley*, 134 U.S. 160, 172 (1890) (Colorado statute enacted after prisoner's crime and allowing him to be executed, at any date chosen by and known only to the warden, increased the prisoner's punishment and was an ex post facto law); *see also Rogers v. Tennessee*, 532 U.S. 451, 459 (2001) (ex post facto laws implicate "core due process concepts").

## IV. Plaintiffs State a Viable Claim That the 2019 Protocol Deprives Them of Access to Counsel

Plaintiffs have stated a claim for deprivation of access to counsel. Under the First, Fifth, and Sixth Amendments, Plaintiffs assert their rights of access to counsel and the courts throughout their execution procedures. Am. Compl. ¶¶ 136-38. The 2019 Protocol, as written and as applied, infringes on these rights in multiple ways. Am. Compl. ¶¶ 139-41. The 2019 Protocol entirely prohibits counsel and other witnesses from having any contact or communication while the prisoner is strapped to the gurney and the intravenous lines are set, and for additional minutes or hours thereafter. *See* Am. Compl. ¶ 140-41; AR1034-39. At some point after the intravenous lines are set, Defendants raise the curtains between the execution chamber and witness rooms, but even then, counsel cannot communicate with the prisoner, and the prisoner may communicate with

counsel only to the extent the Defendants permit him to make a final statement through a microphone they control. *See* Am. Compl. ¶ 140-41; AR1038-39. The prisoner's access to the microphone then ceases after his final statement, and no communication is permitted once the lethal injection begins.

Under these circumstances, Plaintiffs cannot access their counsel or the courts to seek redress for constitutional violations occurring during the setting of IV lines or after the final statement. Moreover, in utilizing the Protocol during the COVID-19 pandemic, Defendants have infringed on Plaintiffs' right to access counsel and the courts by forcing counsel to risk their own health and lives, and the health and lives of their loved ones, to attend their clients' executions.[6]

Defendants nonetheless insist that Plaintiffs do not state a viable claim for relief. Mot. at 24. They argue first that Plaintiffs' claim lacks any legal basis. *Id.* at 24-25. But this Court has already acknowledged "compelling" arguments that the Due Process Clause provides a basis for this claim, and other courts have recognized similar legal grounds. ECF No. 145 (Memorandum Opinion) at 14 (citing *Lewis v. Casey*, 518 U.S. 343, 380-82 (1996) (Thomas, J., concurring), and *Cooey v. Strickland*, No. 04-cv-1156, 2011 WL 320166 at *6 (S.D. Ohio Jan. 28, 2011)). It is true that, in the absence of *controlling* precedent, this Court declined to find a likelihood of success on the merits of this claim. *See id.* But just as the of the legal issues precluded Plaintiffs from meeting their considerable burden at the preliminary injunction stage, so too such novelty precludes Defendants from demonstrating, as a matter of law, that Plaintiffs do not "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[6] The July 14 execution of Daniel Lee demonstrated this risk in stark terms: Mr. Lee's counsel were unable to attend the execution due to the pandemic; Mr. Lee was strapped to the gurney awaiting execution for four hours; and his counsel were in the dark about his condition during their client's final hours and during the execution itself. *See* Stetson & Friedman, "The Justice Department's Shameful Rush to Federal Executions," N.Y. Times (July 17, 2020), *available at* https://www.nytimes.com/2020/07/17/opinion/justice-department-federal-execution.html.

Prisoners are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis*, 518 U.S. at 351 (internal quotation omitted). The "unusual context" of an execution "present[s] an inherent risk of actual injury to the timely and meaningful presentation of non-frivolous claims to a court." *Cooey*, 2011 WL 320166 at *11. Whether conceived of as a First Amendment right to petition the government for redress of grievances, *see Lewis*, 518 U.S. at 404-05 & n.1 (Stevens, J., dissenting); as a Fifth Amendment due process right to access the courts to present allegations concerning violations of fundamental constitutional rights, *id.* at 380-82 (Thomas, J., concurring) (citing *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)); or as a Sixth Amendment or statutory right under 18 U.S.C. § 3599 not to be "put to death without meaningful access to the 'fail-safe' of our justice system," *Harbison v. Bell*, 556 U.S. 180, 194 (2009), prisoners facing imminent execution have a right to access the courts through their counsel. Defendants elide these violations of Plaintiffs' rights to *access* the courts through counsel by changing the subject to whether Plaintiffs have the right to counsel at certain critical stages of criminal proceedings. Mot. at 24-25. This argument "largely misses the point": "It does not matter for this specific analysis whether there is [an] overarching right to counsel . . . because there is unquestionably a right to access the courts involved in the context of execution that inherently injects the issue of access to counsel into this discussion." *Cooey*, 2011 WL 320166 at *5, 7.

Defendants also contend that "no factual allegations . . . support the conclusory assertions that the 2019 Protocol somehow denies Plaintiffs access to the courts or to counsel regarding any constitutional violations." Mot. at 25. This contention overlooks the Amended Complaint's specific allegations that the Protocol limits, and outright precludes, communications between counsel and condemned prisoners during and after the setting of intravenous lines, and after the prisoner's final statement. Am. Compl. ¶¶ 139-41. Although counsel might be present to observe

the execution, such "[p]assive observation without necessary communication undercuts"—rather than vindicates—"meaningful access to the courts," *Cooey*, 2011 WL 320166 at *11.

Indeed, during the 24 hours preceding an execution, the 2019 Protocol provides that, "[v]isiting privileges [with counsel] will be suspended when preparations for the execution require suspension." AR1032. During the final hours and minutes before the execution, counsel have no contact with their client but instead are escorted to a witness room where a curtain prevents viewing of the execution chamber until the execution begins. *See* AR1038-39; Am. Compl. ¶¶ 140-41. Counsel have no ability to communicate with their client during the setting of the intravenous lines or in the minutes or hours after the lines are set until the execution proceeds. *See* AR1034-39. Counsel's only ability to hear their client is during the final statement, when the prisoner is briefly given access to a microphone, which is controlled by Defendants. In order to assert a constitutional violation in real time, it is essential that Plaintiffs have a means of communicating with counsel prior to and during the execution and that counsel have a means of communicating with the courts when such a need arises. *See Cooey*, 2011 WL 320166 at *10-11. By alleging the specific ways in which the 2019 Protocol precludes such access, Plaintiffs have stated a viable claim.

## V.   Plaintiffs State a Viable Claim that the FDPA, As Implemented by Defendants, Unconstitutionally Delegates Legislative Power

Plaintiffs adequately state a claim for unconstitutional delegation of legislative power. Am. Compl. ¶¶ 156-58. Plaintiffs contend that "[i]f it is determined that Section 3596, which directs that the U.S. Marshal 'shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed,' authorizes the Attorney General to implement the sentence under a federal protocol, then the statute has failed to provide 'an intelligible principle to which the person or body authorized . . . is directed to conform,' and thus constitutes 'a forbidden delegation of legislative power.'" *Id.* ¶ 158. Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United

States." § 1. That assignment of power constitutes a bar on its further delegation; Congress may not transfer to another branch "powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43, 6 L. Ed. 253 (1825).

Understanding, however, that the Constitution does not deny the flexibility and practicality necessary for Congress to perform its functions, "the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Such assistance does not run afoul of the Constitution so long as "Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id*. (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The "nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). "The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion. So the answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." *Id*. Statutory interpretation is a "holistic endeavor," which refuses to construe words in a vacuum, and instead looks at the "text in context, along with purpose and history." *Id*. at 2126.

### A.   Congress has repeatedly refused to delegate to the Attorney General the authority to determine a single federal method of execution

Congress enacted the FDPA in 1994. Pub. L. 103-322, Title VI, § 60002(a), Sept. 13, 1994, 108 Stat. 1967. Section 3596 of the FDPA provides:

> A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide

> for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596.

Congress did not enact the FDPA in a vacuum. Until 1937, federal law mandated that the U.S. Marshals Service ("USMS") carry out federal executions by hanging. 1 Stat. 112, 119 (1790). In 1937, however, Congress replaced the federal execution procedure with a decentralized system to ensure that federal executions would mirror those of the States. Specifically, Congress required that the USMS carry out federal executions in "the manner prescribed by the laws of the State within which the sentence is imposed." 18 U.S.C. § 542 (Supp. III 1937). If the State where the sentence was imposed had no death penalty, the sentencing court was required to "designate some other State in which such sentence shall be executed in the manner prescribed by the laws thereof." *Id.*; *see also Andres v. United States*, 333 U.S. 740, 745 & n.6 (1948).

In 1984, Congress repealed the federal death penalty statute as part of the Sentencing Reform Act, leaving the federal government without a mechanism for carrying out executions. Pub. L. No. 98-473, § 211, 98 Stat. 1837, 1987 (1984). In the ensuing years, Congress considered but did not enact various bills that would have provided such a mechanism. *See*, *e.g*., H.R. Rep. No. 101-170, at 12-13 (1989); H.R. Rep. No. 102-405, at 9-10 (1991) (Conf. Rep.).

In the meantime, the DOJ issued a final rule in 1993 to fill the gap created by the repeal of the 1937 law and "establish[] procedures" for carrying out federal executions. 58 Fed. Reg. 4898, 4898 (Jan. 19, 1993) (Final Rule). The Final Rule required executions to take place by lethal injection, but left the specific drugs to be used and other key decisions to the discretion of the BOP Director. *Id*. at 4902. In explaining his decision to promulgate rules implementing the death penalty even though Congress had repealed the federal death-penalty statute, then-Attorney General William P. Barr stated:

> Reasonable explanations exist for repeal of [18 U.S.C.] section 3566 by a Congress that still wanted the death penalty implemented: Perhaps, for instance, Congress no longer wanted the federal method of execution dependent on procedures in the states, some of which were increasingly under constitutional challenge. On the other hand, to contend that Congress has decreed that the sentence of death ought to be imposed for certain crimes, but also decreed that the sentence not be implemented, is to attribute to Congress irrational conduct.

*Id*. at 4899.

In asserting that that the Executive Branch did, in fact, have the authority to establish the time, place, and method of federal executions, the Attorney General rejected the notions (1) that DOJ needed to support this claimed authority by interpreting any particular statute; (2) that such authority required deference to DOJ's interpretation of any particular statute under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984); or (3) that such authority would be illicit under "the non-delegation doctrine and other theories implicating the executive power." 58 Fed. Reg. at 4899. The Attorney General expanded:

> *Chevron* is inapposite. That case concerns the courts' and executive agencies' relative authorities to interpret certain statutory language. If *Chevron* may be said to speak at all to the Executive Branch's authority to implement the laws, it does so only insofar as the issue is whether the Executive Branch has adopted a permissible construction of particular statutory language.

*Id.* And in explaining that the DOJ did not need "explicit authority" to issue regulations after Congress's repeal of the 1984 statute, the Attorney General explained that the DOJ "is authorized to rely on the authority of the federal courts" by filing with the federal court "a proposed Judgment and Order consistent with the regulations." *Id.*

A year after DOJ issued the Final Rule, however, Congress enacted the FDPA, and with it, returned to its earlier approach of requiring the federal government to look to the manner of executions used by the States, displacing the 1993 regulations. The FDPA requires that a U.S. Marshal "supervise implementation" of the death penalty "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). The FDPA – like the 1937 law

– permits the Marshal to "use appropriate State or local facilities" and "the services of an appropriate State or local official" or employee to carry out executions. *Id*. § 3597(a).

In enacting the FDPA, Congress rejected DOJ's recommendation to amend the bill. As expressed by then-Attorney General Janet Reno, the DOJ was concerned that the FDPA's "procedures contemplate a return to an earlier system in which the Federal Government does not directly carry out executions, but makes arrangements with states to carry out capital sentences in Federal cases." H.R. Rep. No. 104-23, at 22 (1995). The DOJ recommended an "amendment of the legislation to perpetuate the current approach, under which the execution of capital sentences in Federal cases is carried out by Federal officials pursuant to uniform regulations issued by the Attorney General." Despite the DOJ's concerns, Congress declined to adopt such an amendment.

The DOJ has, on several occasions, asked Congress to amend the FDPA to grant the BOP authority to perform executions "pursuant to uniform regulations." H.R. Rep. No. 104-23, at 22. For example, a 1995 bill would have amended Section 3596 to allow a death sentence to be "implemented pursuant to regulations prescribed by the Attorney General," which the bill sponsor explained "was the law prior to the passage of [the FDPA]." *Hearing on H.R. 2359 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 104th Cong. 2, 10 (1995) (statement of Rep. McCollum); *see* H.R. 2359, 104th Cong. (1995). That bill was never enacted, and Congress has since declined to pass eight additional bills proposing to amend the FDPA to allow the DOJ to develop its own manner of implementing the death penalty and to grant the BOP authority to carry out executions—the power and authority they now claim as their own. *See*, *e.g*., H.R. 1087, 105th Cong. (1997); H.R. 851, 110th Cong. (2007).

## B.     Under the nondelegation doctrine, DOJ cannot achieve by bureaucratic fiat what it failed to convince Congress to adopt

Despite DOJ's multiple requests to Congress to amend the FDPA, Congress has consistently refused to delegate authority to the BOP to perform executions or to develop uniform

regulations governing the manner of implementing the death penalty. This is no oversight. Faced with similar concerns in other areas, Congress has amended statutes to "establish a comprehensive national system" in light of divergent approaches to the underlying issue by states, and has explicitly granted the Attorney General the authority and discretion to implement such statutes. That is precisely what Congress did by enacting the federal Sex Offender Registration and Notification Act (SORNA), as the Supreme Court held in *Gundy*, 139 S. Ct. at 2126-29, and what Congress has consistently refused to do by declining to amend the FDPA as the DOJ has persistently requested.

In holding that SORNA had not unconstitutionally delegated legislative power to the Attorney General, the Supreme Court analyzed how the delegee had interpreted such delegation. *Gundy*, 139 S. Ct. at 2128. The Court found that "no Attorney General has used (or, apparently, thought to use) [48 U.S.C.] § 20913 (d) in any more expansive way. To the contrary." *Id*. Here, in contrast, then-Attorney General Barr interpreted the repeal of the previous death penalty statute as a *carte blanche*, signaling Congress's intent in repealing § 3566 in 1984 as "Congress no longer want[ing] the federal method of execution dependent on procedures in the states, some of which were increasingly under constitutional challenge." 58 Fed. Reg. at 4899. And in defending his interpretation of the statutory repeal, the Attorney General stated that *Chevron* did not apply to his actions because there was no statute to interpret. *Id*. The Attorney General cannot now disavow that previous interpretation. "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020). Since 1993, Congress has spoken clearly, and yet the Attorney General continues to act as if rules promulgated to "fill the gap" have not been impacted by Congress's enactment of the FDPA, nor by Congress' continuous refusal to amend the FDPA in accordance with the Attorney General's 1993 Final Rule.

If the nondelegation doctrine means anything, it means that an agency cannot usurp power Congress refuses to cede. *Gundy*, 139 S. Ct. at 2129 ("[T]he Court has stated that a delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.") (citing *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). Here, given the determination that Section 3596 authorizes the Attorney General to implement the sentence under a federal protocol – *see In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020) – the statute then lacks an intelligible principle because Congress has failed to make clear (1) who the delegee is, (2) the general policy he or she must pursue, or (3) the boundaries of his or her authority. The FDPA is therefore an unconstitutional delegation of legislative power.

## VI.    Defendants Are Not Entitled to Judgment on Plaintiffs' Claim that BOP's Adoption of the Protocol Is Arbitrary and Capricious

Defendants are not entitled to summary judgment on Plaintiffs' claim under the APA that the 2019 Protocol is arbitrary and capricious, for two independent reasons. First, the APA requires a federal agency not only to arrive at a rational decision, but also to explain *why* it arrived at the decision. *See Department of Homeland Security v. Regents of Univ. of California*, 140 S. Ct. 1891, 1893, 1912 (2020). Defendants have completely failed to meet this latter requirement, which by itself renders the Protocol arbitrary and capricious. Second, although Defendants point to the Court's denial of a preliminary injunction on the arbitrary-and-capricious claim, *see* ECF No. 145 at 8-10, the Court did not resolve Plaintiffs' claim that the 2019 Protocol and the accompanying Administrative Record lack adequate explanations for the challenged policy decisions.

The APA provides that an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" must be "h[e]ld unlawful and set aside." 5 U.S.C. § 706(2)(A). Every non-exempt agency action is subject to review for arbitrariness and capriciousness, whether or not notice and comment is required. *See generally Perez v. Mortg.*

*Bankers Ass'n*, 575 U.S. 92, 105-106 (2015); *see also, e.g., James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 279 (D.C. Cir. 2000) (permitting plaintiff to amend complaint to assert arbitrary and capricious claim against a procedural rule exempt from notice-and-comment); *Indep. Petrol. Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1256-58 (D.C. Cir. 1996) (agency letter exempt from notice and comment was nevertheless arbitrary and capricious); *Bechtel v. F.C.C.*, 10 F.3d 875, 887 (D.C. Cir. 1993) (same, for policy statement exempt from notice and comment).

To pass muster, the agency must have "examine[d] the relevant data and *articulate[d] a satisfactory explanation* for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added); *accord Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[T]he agency must explain why it decided to act as it did."). Indeed, the failure of the agency to explain its decision was central to the Supreme Court invalidating the Department of Homeland Security's decision to rescind the Deferred Action for Childhood Arrival policy: "But [the Secretary's] memo offers *no reason* for terminating forbearance. She instead treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, *without explanation*." *Regents*, 420 U.S. at 1912 (emphases added).

### A.   Defendants have failed to explain their use of unspecified procedures for IV placement

The Administrative Record contains no explanation of the Protocol's vagueness on the important issue of where and how to place the IV line. Four out of the five states that BOP used as models (and whose protocols all appear in the Administrative Record) provide much greater detail than the 2019 Protocol regarding IV placement, and all contain additional safeguards. For example, the Idaho protocol contains the following details:

> The assigned Medical Team members shall determine the best sites on the offender to insert a primary IV catheter and a backup IV catheter in two (2) separate locations in the peripheral veins utilizing appropriate medical procedures. The insertion sites

in order of preference shall be: arms, hands, ankles and feet, as determined medically appropriate by the Medical Team leader. Both primary and backup IV lines will be placed unless in the opinion of the Medical Team leader it is not possible to reliably place two (2) peripheral lines. In the event that it is not possible to reliably place two (2) peripheral lines, the Medical Team leader will direct Medical Team members to place an IV catheter in a central line for the purpose of administering the chemicals.

At the discretion of the Medical Team leader, a localized anesthetic may be used to numb the venous access site.

To ensure proper insertion in the vein, the assigned Medical Team members should watch for the flashback of blood at the catheter hub in compliance with medical procedures.

The assigned Medical Team members shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the offender's hands. A flow of heparin/saline shall be started in each line and administered at a slow rate to keep the line open.

The primary IV catheter will be used to administer the chemicals and the backup catheter will be reserved in the event of the failure of the first line. Any failure of a venous access line shall be immediately reported to the IMSI warden.

The IV catheter in use shall not be covered and shall remain visible throughout the procedure.

The IMSI warden shall physically remain in the execution chamber with the offender throughout the administration of the chemicals in a position sufficient to clearly observe the offender and the primary and backup IV sites for any potential problems and shall immediately notify the Medical Team leader and director of the IDOC should any issue occur. Upon receipt of such notification, the director of the IDOC will stop the proceedings and take all steps necessary in consultation with the Medical Team leader prior to proceeding further with the execution.

Should it be determined that the use of the backup IV catheter is necessary, a complete set of backup chemicals will be administered in the backup IV as set forth in the applicable chemical chart.

Should it become necessary to use an alternate means of establishing an IV line because, in the opinion of the Medical Team leader, it is not possible to reliably place a peripheral line in the offender, a Medical Team member may utilize a central line catheter if, in the opinion of the Medical Team leader, such a line may be reasonably placed. The Medical Team member responsible for placing a central line catheter shall have at least one year of regular and current professional experience conducting that procedure. The Medical Team member will place the central line catheter utilizing appropriate medical procedures. The Medical Team member shall ensure the catheter is properly secured with the use of tape or

adhesive material, properly connected to the IV line and out of reach of the offender's hands. This line shall be utilized for the administering of all chemicals. Upon successful insertion of the catheter into a central line, a Medical Team member will inject a solution of heparin/saline into the catheter to ensure patency of the catheter.

AR61-62; *see also* AR12 (Georgia procedures for intravenous access); AR70 (Missouri procedures

for intravenous access); AR90-91 (Texas procedures for intravenous access).

By contrast, the 2019 Protocol states in relevant part:

Lethal substances shall be administered intravenously. The Director or designee shall determine the method of venous access (1) based on the training and experience of personnel establishing the intravenous access; (2) to comply with specific orders of federal courts; or (3) based upon a recommendation from qualified personnel….

If peripheral venous access is utilized, two separate lines shall be inserted in separate locations and determined to be patent by qualified personnel. A flow of saline shall be started in each line and administered at a slow rate to keep the line open. One line will be used to administer the lethal substances and the second will be reserved in the event of the failure of the first line. Any failure of a venous access line shall be immediately reported to the Director or designee.

AR1070.

Given the vague guidance offered by the 2019 Protocol and lack of safeguards when

compared to the state protocols, Plaintiffs Lee, Purkey, and Honken argued in their preliminary

injunction motion that the Defendants failed to properly consider the risk of faulty IV placement,

and that this failure constituted an arbitrary and capricious decision. ECF No. 102 at 10-14. The

Court disposed of this claim as follows:

The evidence before the court suggests that Defendants did consider the risks of faulty IV placement, at least enough to survive the arbitrary and capricious standard. Defendants studied the "after action report" of the botched execution of Clayton Lockett in Oklahoma, in 2014, where faulty IV placement caused Lockett to regain consciousness. (Admin. R. at 931.) Defendants also considered the risks in their consultation with experts (Admin. R. at 442–43), and in their review of the case law. (See Admin. R. at 108–400.) The court is sympathetic to Plaintiffs' dissatisfaction with the guidance provided by the 2019 Protocol, particularly given the botched executions of Lockett and others, and the additional difficulties associated with the ongoing COVID-19 crisis. But, based on the record before it, the court finds that Defendants adequately considered the risks of faulty IV

placement in designing the 2019 Protocol.

ECF No. 145 at 9.

Putting aside the merits of BOP's decision against offering more specific guidance, the BOP has never explained why it made that choice instead of following the more detailed protocols that it used as models. The Administrative Record contains no discussion of why BOP chose to make the Protocol to be so vague regarding IV insertion and to omit the safeguards contained in the model state protocols. Given the myriad problems that can occur with faulty IV placement, the lack of discussion on this point in the Administrative Record does not meet the requirement of a "reasoned analysis." This failure to explain constitutes an arbitrary and capricious decision under the APA.

**B.     Defendants have not explained or justified their use of compounded pentobarbital**

Although this Court has already ruled that the Defendants' decision to select compounded pentobarbital is not arbitrary and capricious, that question does not resolve the Defendants' failure to *explain* their decision. Specifically, in declining to issue a preliminary injunction on this ground, the Court ruled that the concerns raised by Plaintiffs Lee, Purkey, and Holder "do not rise to the level of an APA violation." ECF No. 145 at 9. The Court observed that those three Plaintiffs were "correct to highlight the risks of using compounding pharmacies," but it concluded that Defendant's "*decision* to [use compounded drugs] was not arbitrary and capricious" in light of the Supreme Court's approval of compounded pentobarbital "where domestic supplies were unavailable." *Id.* (citing *Glossip*, 135 S. Ct. at 2737-38) (emphasis added).

Once again, the Court's ruling does not resolve the entirety of Plaintiffs' claim. As explained above, the APA also requires that an agency "explain why it decided to act as it did." *Butte Cnty.*, 613 F.3d at 194. Defendants have elsewhere argued that FDA-approved pentobarbital is unavailable to them. ECF No. 6 at 36. But the Administrative Record does not document any

good-faith efforts to obtain the FDA-approved product, as the State of Missouri appears to have done for purposes of its own executions.[7] By failing to explain or show that FDA-approved pentobarbital is unavailable, or even that they made meaningful efforts to obtain it, Defendants have not "cogently explain[ed]" why they have "exercised [their] discretion in a given manner." *State Farm*, 463 U.S. at 48.

**VII.    Summary Judgment is Improper on the Unresolved Aspects of Plaintiffs' Claims under the Federal Death Penalty Act**

Defendants' motion for summary judgment on the entirety of Plaintiffs' FDPA claim is unwarranted and should be denied. Although Defendants base their motion on the D.C. Circuit's ruling in *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020), the Court of Appeals did not resolve two key aspects of Plaintiffs' claim. First, as Defendants acknowledge, the D.C. Circuit did not decide whether the 2019 Protocol illegally assigns authority to the BOP that rightfully belongs to the Marshals Service. Second, the D.C. Circuit did not resolve the question of whether the 2019 Protocol conflicts with the manner of execution prescribed by the "law" of each relevant state involved here, which the controlling opinion defined as each such state's "statutes and formal regulations." *Id.* at 129 (Rao, J., concurring).

**A.    The 2019 Protocol violates the FDPA because it assigns to the BOP the authority that Congress delegated to the Marshals Service**

When it enacted the FDPA, Congress explicitly assigned responsibility for implementing federal death sentences to the USMS. Section 3596(a) provides that "a United States marshal . . . shall supervise implementation of the sentence." 18 U.S.C. § 3596(a). Section 3597(a) states that the "United States marshal charged with supervising the implementation" of a death sentence "may

---

[7] *See* McDaniel, Missouri Execution Drug Purchases Revealed, BuzzFeed News (Jan. 8, 2017), https://www.buzzfeednews.com/article/chrismcdaniel/missouri-execution-drug-purchases-revealed.

use appropriate State or local facilities for the purpose." *Id.* § 3597(a). Neither section grants *any* authority to the BOP. An agency "literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "When an agency has acted beyond its delegated authority," a reviewing court will hold such action invalid as "a violation of the [APA], 5 U.S.C. § 706(2)(C)." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 497 (D.C. Cir. 2010).

The 2019 Protocol violates the FDPA because the BOP arrogated to itself primary authority to determine the manner of federal executions. The 2019 Protocol is entitled "BOP Execution Protocol," AR1016, and the Administrative Record makes clear that it was the BOP – not the USMS – that formulated the Protocol, *see* AR1. Furthermore, the 2019 Protocol purports "to outline Federal Bureau of Prisons (BOP) policy and procedures for planning and carrying out the execution of a person convicted of a capital offense." AR1019. And it states that the procedures in the 2019 Protocol may be changed only by the BOP Director or the Warden of USP-Terre Haute, who is an employee of the BOP. *See id.* The 2019 Protocol also purports to give the BOP authority over critical aspects of an execution, including authority to select the drugs used in lethal injections, AR1069; to "supervise the activities of personnel preparing and administering the lethal substances," AR1069; to "determine the method of venous access," AR1070; and, significantly, to order execution personnel to depart from the established procedures, AR1069. Throughout the 2019 Protocol, the BOP (including the Warden) is the party providing the direction for executions. At most, the USMS plays only a secondary role. *See*, *e.g.*, AR1023-24, 1029, 1031, 1033-34. By issuing the 2019 Protocol, BOP has made itself "responsible for implementing federal death sentences." AR1 (citing 28 C.F.R. Part 26). The FDPA assigned this responsibility exclusively to the USMS, so the 2019 Protocol is illegal.

Defendants' arguments for judgment as a matter of law are meritless. First, they rely on

Judge Katsas's concurring opinion in *Execution Protocol Cases*, which expresses the view that the 2019 Protocol assigns certain supervisory tasks to the Marshal, such as directing "which personnel may be present" at an execution. Mot. at 32-33 (quoting *Execution Protocol Cases*, 955 F.3d at 124-25 (Katsas, J., concurring)). But Judge Katsas's assessment is just that: a single judge's concurrence that was not joined by either of his colleagues, on an issue that the court did not decide. *See id.* at 33 n.11 (noting Judge Rao's decision not to reach the merits). Judge Katsas himself explained that the issue would "remain live on remand" as an "alternative FDPA claim." *Execution Protocol Cases*, 955 F.3d at 125 n.11 (Katsas, J., concurring).

More importantly, the mere fact that the USMS is assigned *some* supervisory tasks under the 2019 Protocol does not alter the fact that under that protocol, it is the BOP, and not the USMS, that is "supervis[ing] implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). The BOP Director, for example, makes "the final selection of qualified personnel to serve as the executioner(s) and their alternates." AR1069. The BOP Director makes that choice "in conjunction with the United States Marshal[s] Service," but is ultimately responsible for it. *Id.* More generally, the 2019 Protocol obtained the USMS's "*deference* to the BOP on all matters related to the time, place, and manner of carrying out federal executions." AR872 (emphasis added). Thus, whereas the FDPA requires the USMS to have a "supervis[ory]" role on these matters, 18 U.S.C. § 3596(a), the 2019 Protocol merely allows the Marshal to come along for the ride.

Defendants next argue that the Attorney General may freely reassign the USMS's authority to the BOP, since both entitles reside within the DOJ. Mot. at 33-34. Not so. When a statute delegates authority to a particular agency, that agency may not subdelegate its responsibility to another agency that is not its subordinate "absent an affirmative showing of congressional authorization." *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004). Under

the terms of the FPDA, the USMS could not itself shift authority over federal executions to the BOP. Nor has it done so; rather, the DOJ has usurped Congress's authority by reassigning to BOP the duties that Congress expressly gave to the USMS.

*United States v. Giordano*, 416 U.S. 505 (1974), illustrates why DOJ's action violates the FDPA. There, the Supreme Court held that a statute providing that the "Attorney General" or "any Assistant Attorney General specially designated by the Attorney General" to authorize wiretap applications did not permit the Attorney General's Executive Assistant to authorize such an application. *Id.* at 513 (quoting 28 U.S.C. § 2516(1) (1970)). Because "the matter of delegation" was "expressly addressed" in the statute, the statute "was intended to limit the power to authorize wiretap applications" to the persons mentioned in the statute. *Id.* at 514.

Those principles apply equally here. In the FDPA, Congress "expressly addressed" who would supervise the implementation of federal death sentences: the USMS. It assigned no role to the BOP. Because the statute assigns the duties associated with federal executions to a particular agency within the DOJ, and not to the DOJ itself, the Attorney General cannot reassign those responsibilities to a different agency. *See United States v. Libby*, 498 F. Supp. 2d 1, 13–14 (D.D.C. 2007) (a "general" statute that "permits the delegation of any function of the Attorney General . . . cannot trump the clear language of the more specific prohibition on delegation").

### B. The 2019 Protocol violates the FDPA because it conflicts with execution procedures that are set forth in numerous state statutes

The FDPA requires a federal death sentence to be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Judge Rao's controlling opinion concluded that the phrase "law of the State" requires the Government to follow only those execution procedures set forth in state statutes and "formal regulations." *Execution Protocol Cases*, 955 F.3d at 112, 124 n.10, 129.

Defendants argue that the D.C. Circuit's opinion extinguishes the entirety of Plaintiffs'

FDPA claim. They point out that the Court of Appeals directed that judgment on the claim be issued in Defendants' favor. Mot. at 31. But that directive did not refer to Plaintiffs' later-filed Amended Complaint of June 1, 2020, nor specifically to Plaintiffs' showing that the 2019 Protocol materially conflicts with the applicable "law" of numerous states in which Plaintiffs were sentenced. *See* Am. Compl. at 39 & App. A. The 2019 Protocol in fact conflicts with the statutes of several such states:

●**South Carolina and Virginia** – The laws of South Carolina (where Plaintiff Fulks was sentenced) and Virginia (where Plaintiffs Tipton, Johnson, and Roane were sentenced) allow the prisoner to choose between electrocution and lethal injection. S.C. Code § 24-3-530(A); VA Code Ann. § 53.1-234. The 2019 Protocol, by contrast, provides that the lethal substance in all executions "shall be Pentobarbital Sodium." AR1069.

●**Georgia** – The law of Georgia (applicable to Plaintiff Battle) requires the presence of "two physicians to determine when death supervenes." Ga. Code § 17-10-41. The 2019 Protocol, however, does not require the presence of any physicians at any point.

●**Arkansas** – Arkansas law, which applies to Plaintiff Paul and former Plaintiff Lee, requires that "catheters, sterile intravenous solution, and other equipment" used in executions "be sterilized and prepared in a manner that is safe and commonly performed in connection with the intravenous administration of drugs of that type." Ark. Code § 5-4-617(f). The statute also requires that the state use execution drugs that are either (1) FDA-approved, (2) obtained from an FDA-registered facility, or (3) obtained from a nationally-accredited compounding pharmacy. Ark. Code § 5-4-617(d). The 2019 Protocol embodies no such requirements regarding the equipment, the use of medical standards to prepare the equipment, or the provenance of execution drugs. AR1069-70.

●**Indiana and Texas** – The laws of both states place temporal limits on when an execution may occur. Indiana law (applicable to former Plaintiff Honken) provides: "The death penalty shall

be inflicted before the hour of sunrise on a date fixed by the sentencing court." Ind. Code § 35-38-6-1(b). Texas law (applicable to Plaintiffs Bernard, Bourgeois, Hall, Robinson, and Webster) states that executions shall take place "at any time after the hour of 6 p.m. on the day set for the execution." Tex. Code of Crim. Proc. Art. 43.14(a). The 2019 Protocol, by contrast, places no limit on the time of day that an execution might occur. The difference is not a trivial one. The ability to schedule an execution at any time of day or night enabled the Defendants to reschedule and carry out the Lee and Purkey executions almost immediately after the expiration or vacatur of a stay, despite the pendency of additional legal challenges, and with or without notice to the prisoners' attorneys. *See Supra* § III (regarding due process claim).

●**Missouri** – The law of Missouri (applicable to Plaintiffs Holder and Nelson and former Plaintiff Purkey) provides that executions may be carried out "by the administration of lethal gas or by . . . the administration of lethal injection." Mo. Rev. Stat. § 546.720.1. But the 2019 Protocol offers no such choice to the executioners, even if they harbor concerns about pentobarbital and the risks that it carries. *See* AR1069 (the lethal substance "shall be Pentobarbital Sodium").

Notwithstanding these differences between the 2019 Protocol and the laws of the relevant states, Defendants claim the authority to deviate from the Protocol when necessary to comply with state law. Mot. at 32. Defendants discern "no facts" to suggest that they would follow the 2019 Protocol when doing so would violate controlling state law. *Id.* But there are ample such facts. For example, the 2019 Protocol states clearly and plainly that the execution drug "shall" be pentobarbital. AR1069; *see also* ECF Doc. 101-2 at 90-91 (BOP's Rule 30(b)(6) witness agreeing that the written Protocol "has to be followed"). Nowhere, for example, do Defendants indicate that they will offer a choice of electrocution to the four prisoners who were sentenced in South Carolina and Virginia. To the contrary, Defendants now ask the Court to vacate the preliminary injunctions in favor of Plaintiffs Tipton, Johnson, and Roane – and to do so in light of the Government's

37

newly-devised Protocol "that provides for the use of a single drug, pentobarbital sodium, as the lethal agent." ECF No. 173 (motion to vacate seven preliminary injunctions) at 5; *see also id.* at 9 ("The government is now prepared to carry out these capital sentences under the protocol that the Supreme Court, the D.C. Circuit, and this Court have allowed it to use in recent executions."). Perhaps the Government will change its mind and offer a choice to those Plaintiffs, but that theoretical possibility does not warrant summary judgment.

## VIII. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' CSA and FDCA-Based APA Claims

Defendants' motion for summary judgment on Counts VIII-XI of the Amended Complaint should be denied. Through these claims, Plaintiffs demonstrate Defendants' violations of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA") and the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA").

### A.     The 2019 Protocol violates the FDCA and must be set aside

According to Defendants, the Supreme Court's decision in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), "leads inexorably to the conclusion that the Protocol does not violate the FDCA." Mot. at 39. Defendants are wrong for several independent reasons.

#### 1.     The purpose of the FDCA

The "core" legislative purpose of the FDCA is to ensure that a "drug" is "safe and effective for its intended use." *Brown & Williamson*, 529 U.S. at 133. One way the FDCA ensures that a drug is safe and effective for its intended use is to expressly condition the dispensing of controlled substances, including pentobarbital, upon either (i) "a written prescription of a practitioner licensed by law to administer such drug," or (ii) "an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist." 21 U.S.C. § 353(b)(1)(B). Here, Defendants have confirmed that they have not obtained, and do not intend to obtain, a prescription for the pentobarbital they intend to use to execute Plaintiffs. *See, e.g.*, Nov. 2019 Winter Dep. (ECF No.

102-2) at 315:4-6; Miller Dep. (ECF No. 102-5) at 29:18-21. Under the circumstances, the 2019 Protocol indisputably violates the FDCA because it requires the dispensing and administration of pentobarbital without a valid medical prescription.

Defendants falsely attribute to Plaintiffs a contention that lethal injection drugs can *never* be prescribed for a legitimate medical purpose, then insist that this view would make all lethal injections illegal—because the drugs require a prescription and yet cannot be validly prescribed. *See* Mot. at 41. But Plaintiffs have never made such an argument. Nowhere do Plaintiffs contend that *all* execution drugs lack a legitimate medical purpose; rather, Plaintiffs contend that no such purpose is validly advanced *by the 2019 Protocol*, because no medical practitioner has made a clinical judgment that the particular drug is well suited to execute an individual prisoner in light of that prisoner's medical needs. *See* Am. Compl. ¶¶ 62-67, 171-172. The 2019 Protocol lacks the type of prescription that the FDCA requires: a "bona fide" order directing "the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination or consultation by a licensed doctor." *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002).

### 2.      Drugs used in executions are subject to the FDCA

As this Court recognized in its decision on Plaintiffs' motion for a preliminary injunction, the D.C. Circuit has definitively held that the FDCA applies to the use of drugs in the context of executions. *Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013). Specifically, in *Beaty v. FDA*, 853 F. Supp. 2d 30, 34, 37-42 (D.D.C. 2012), which the D.C. Circuit affirmed in *Cook*, this Court confirmed that "lethal injection drugs are 'drugs' under the FDCA." ECF No. 145 (Memorandum Order) at 12. Such a determination makes eminent sense. As this Court explained, "[b]ecause violations of the FDCA carry 'the risk that the drug[s] will not function as intended,'…the [FDCA] must apply in the lethal-injection context, because a lethal injection drug that does not function as intended

may 'result in conscious suffocation, pain, and cardiac arrest'." *Id.* at 12 (*quoting Beaty*, 853 F. Supp. 2d at 37).

That rationale is, as this Court also noted, "especially" compelling "where, as here, Defendants have justified the 2019 Protocol on the grounds that pentobarbital will render inmates insensate during the execution process." ECF No. 145 at 12. Specifically, "[w]here the government argues that a lethal injection drug is legally and constitutionally permissible because it will ensure a 'humane' death, it cannot then disclaim a responsibility to comply with federal statutes that exist in order to ensure that the drugs operate humanely." *Id.*[8]

The D.C. Circuit affirmed this Court's finding in denying Defendants' motion to stay the injunction. The Court of Appeals rejected Defendants' argument that "the logic of [the Supreme Court's decision in *Brown & Williamson Tobacco Corp.*] prevents reading the FDCA to authorize the FDA to regulate drugs used for executions." USCA Case #20-5206, Doc. #1851933 at 3. Pointing to its prior statement in *Cook* "that thiopental is a 'drug' within the meaning of the FDCA even when it is intended for use in an execution," the D.C. Circuit held that the "government's argument conflicts with the necessary premise of a published precedential decision of our court." *Id.*

*Cook's* continuing vitality also forecloses Defendants' request for summary judgment on Count X, which alleges that the FDA arbitrarily and capriciously refuses to enforce the FDCA in

---

[8] The Supreme Court vacated this Court's preliminary injunction. *See Barr v. Purkey*, — S. Ct. — , No. 20A10, 2020 WL 4006821 (U.S. July 16, 2020). However, a vacatur on appeal of a preliminary injunction is limited to a review of the injunction on that record. The Court's order does not state its reasons, let alone abrogate the D.C. Circuit's precedent in *Cook* that the FDCA applies to lethal injection drugs. Rather than impairing the merits of the FDCA claim, the vacatur reflects the unique posture in which the Government urged its issuance. *See Barr v. Purkey*, No. 20A10 (U.S. July 15, 2020), Application for Stay or Vacatur at 7 ("In sum, the district court's last-minute injunction today again falls well short of the "extreme exception" necessary to warrant stopping a lawful execution on the day it is scheduled to occur.") (quoting *Barr v. Lee*, — S. Ct. —, No. 20A8, 2020 WL 3964985, at *2 (U.S. July 14, 2020)).

the lethal injection context. *See* Mot. at 42; Am. Compl. at 44-46. Defendants cite *Heckler v. Chaney*, 470 U.S. 821 (1985), in support of their view that the APA entrusts the FDA's enforcement decisions to the agency's discretion. Mot. at 42. But the FDA has not exercised any such discretion. Instead, the agency is under orders from the DOJ *never* to enforce the FDCA against execution drugs. *See* Office of Legal Counsel Op., *Whether the Food & Drug Admin. Has Jurisdiction over Articles Intended for Use in Lawful Executions* (May 3, 2019), OLC Op., 2019 WL 2235666 (AR938-63). That directive contradicts *Cook*, and itself is reviewable under the APA because it "affirmatively confer[s]" lawful status on an entire range of counter-statutory conduct. *Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015) (invalidating the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)). The FDA's categorical non-enforcement, then, is not "committed to agency discretion by law" under the APA. *See* 5 U.S.C. § 701(a)(2); *Koon v. United States*, 518 U.S. 81, 100 (1996) ("The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.").

### 3. Defendants additionally violate the FDCA's restrictions on compounded drugs

Defendants procured the pentobarbital from an "outsourcing facility," AR1084, but their non-compliance with important limitations on outsourcing facilities independently violates the FDCA. The statute provides a number of rules that such outsourcing facilities must follow when compounding drugs in order to be exempt from the premarketing and labeling requirements found elsewhere in the FDCA, as well as the "new drug" approval process to demonstrate the product's safety and efficacy. *See Athenex Inc.* v. *Azar*, 397 F. Supp. 3d 56, 59-60 (D.D.C. 2019); 21 U.S.C. § 353b. An outsourcing facility is ineligible for those exemptions if it produces a drug that is "essentially a copy of one or more approved drugs." 21 U.S.C. § 353b(a)(5). "[E]ssentially a copy" means a drug that is "identical or nearly identical to an approved drug" (unless it appears on the FDA's list of drug shortages), or contains a "bulk drug substance that is a component of an

approved drug" (unless the drug has been changed in order to make a "clinical difference" for an individual patient). 21 U.S.C. § 353b(d)(2)(A)-(B). Here, laboratory tests obtained by Defendants show that their objective is to use an outsourcing facility to produce a compounded product that is essentially a copy of FDA-approved pentobarbital. *See* AR4-5, 932-33, 970-1015. Accordingly, the compounded pentobarbital Defendants intend to use to execute Plaintiffs must comply with the FDCA's premarketing, labeling, and prescription requirements. 21 U.S.C. § 353b. It is undisputed that Defendants have not complied with those requirements.

In addition, any active pharmaceutical ingredient [API] that an outsourcing facility uses to make compounded drugs *must* appear either (1) on the FDA's "503B Bulks list" based on the agency's determination of "clinical need," or (2) on the FDA's list of drug shortages – two designations that would justify the use of a comparatively risky compounded drug rather than the more thoroughly regulated FDA-approved version. *See* 21 U.S.C. § 353b(a)(2)(A). Here, however, the FDA has not placed pentobarbital API on the "503B Bulks list," and it has not identified pentobarbital on its list of drug shortages. Moreover, there is no "clinical need" for a particular API when an "FDA-approved drug that could be used to meet the very [same] patient needs" is "already available on the market," *Athenex*, 397 F. Supp. 3d at 58, as is true here with respect to Defendants' compounded pentobarbital, AR4-5, 932-33, 970-1015.

Defendants' compounding violations implicate the FDCA's purpose of ensuring that a regulated "drug" is "'safe' and 'effective' for its intended use." *Brown & Williamson*, 529 U.S. at 133. Because Defendants are violating the FDCA's restrictions on outsourcing facilities, the resulting compounded pentobarbital falls outside of the FDCA's safe harbor for production of compounded drugs. *See id.* at 66. The execution drug is therefore an unapproved "new drug" under the FDCA. *See* 21 U.S.C. § 353b(a) (exempting such compounded drugs from 21 U.S.C. §§ 352(f)(1), 355, and 360eee-1; *Athenex*, 397 F. Supp. 3d at 66 (describing "bulk compounding as

an exception within an exception"). The introduction of that drug into interstate commerce is a federal crime. *See* 21 U.S.C. § 331(d).

### 4.      The APA provides a right of action to redress the federal statutory violations committed by the Government itself

Defendants contend that the FDCA precludes Plaintiffs' claims because the statute limits enforcement actions to the federal government. Mot. at 42-43 (citing 21 U.S.C. § 337(a)). Defendants are wrong because the APA provides a cause of action when agency action is "not in accordance with law," 5 U.S.C. §§ 702, 706(2)(A), and it applies whether or not the statute that the Government is violating provides a private right of action by itself. *See Chrysler Corp.* v. *Brown*, 441 U.S. 281, 316-18 (1979) (finding no private right of action to enforce the Trade Secrets Act, but holding that any governmental disclosures that violate the Act are reviewable and "not in accordance with law" under the APA). The APA presumptively allows judicial review "unless there is persuasive reason to believe that such was the purpose of Congress." *Banzhaf v. Smith*, 737 F.2d 1167, 1168-1169 (D.C. Cir. 1984). Nothing in the FDCA (including § 337(a)) cuts off review of the federal government's own statutory violations. The D.C. Circuit recognized as much when it declined to stay or vacate this Court's most recent injunction. *See Execution Protocol Case*s, No. 20-5206, Doc. No. 1851933, at 3 (D.C. Cir. July 15, 2020) ("[T]he government contends that plaintiffs cannot argue that the Protocol is unlawful because only the FDA may enforce the FDCA. But plaintiffs do not seek preliminary injunction on an enforcement claim, they claim that the Protocol is contrary to law under the APA.").[9]

### B.      The 2019 Protocol violates the CSA and must be set aside

Defendants assert that they are entitled to summary judgment on Plaintiffs' CSA claims

---

[9] The same reasoning applies to Defendants' misguided argument that the CSA does not confer a private right of action. *See* Mot. at 38.

because: (1) the CSA does not apply by its terms; and (2) the claim is foreclosed by the Supreme Court's decision in *Gonzalez v. Oregon*, 546 U.S. 243 (2006). Both arguments are unavailing.

First, as this Court observed in its July 15, 2020, decision on Plaintiffs' motion for a preliminary injunction, "[a] plain reading of the [CSA] indicates that Plaintiffs are correct that the CSA applies to the government's lethal injection procedures." ECF 145 at 11. Under the CSA, it is unlawful to "dispense" to an "ultimate user" any "controlled substance" except pursuant to a valid prescription "issued for a legitimate medical purpose" by a practitioner who is acting "in the course of professional practice" and registered pursuant to the statute. 21 U.S.C. §§ 802(21), 801(27), 829(e)(2), 841(a)(1). Contrary to Defendants' arguments, the CSA's broad definition of "dispense" includes "the prescribing *and administering* of a controlled substance." 21 U.S.C § 802(10) (emphasis added). The 2019 Protocol on its face makes clear that the contemplated executions necessarily require administering pentobarbital to Plaintiffs. AR1069 ("The Director or designee shall appoint an additional senior level Bureau employee to supervise the activities of personnel preparing and administering the lethal substances"); AR1070 ("Lethal substances shall be administered intravenously.").

Second, Defendants misread *Gonzalez v. Oregon*. *Gonzales* stands for the proposition that the CSA does not authorize the federal government to define the standards of accepted medical practice, as the Attorney General tried to do with an "interpretive rule" outlawing physician-assisted suicide. 546 U.S. at 263-75. But *Gonzales* did not change the fact that a physician violates the CSA when he or she dispenses controlled substances in a manner that is *already* considered to be outside the scope of accepted practice. *E.g.*, *United States v. Kanner*, 603 F.3d 530, 533-35 (8th Cir. 2010) (rejecting such a reading of *Gonzales*); *United States v. Smith*, 573 F.3d 639, 646-48 (8th Cir. 2009); *see also United States v. Moore*, 423 U.S. 122, 124 (1975). Plaintiffs do not seek to alter what constitutes "accepted medical practice" or to usurp state authority to regulate it. By

dispensing pentobarbital without a valid prescription and without the individualized clinical judgment that it reflects, Defendants' actions *already* violate accepted medical practice.

Moreover, because Defendants (including the DEA) are mistaken in their view that lethal injection drugs are categorically exempt from the CSA, the Court must deny summary judgment on Claim IX (concerning DEA's arbitrary non-enforcement of the CSA) for the same reasons that apply to Claim X (concerning FDA's arbitrary non-enforcement of the FDCA). The DEA's non-enforcement reflects the agency's mistaken view that the relevant statute does not apply to execution drugs, rather than DEA's discretionary decision to direct its enforcement resources elsewhere. *See* 5 U.S.C. § 701(a)(2) (APA review unavailable when "agency action is committed to agency discretion by law"); *Koon*, 518 U.S. at 100 ("A district court by definition abuses its discretion when it makes an error of law.").

## CONCLUSION

For all the foregoing reasons, this Court should deny Defendants' Motion to Dismiss and for Summary Judgment, except as to Count VI of Plaintiffs' Amended Complaint (as to which Plaintiffs do not contest Defendants' motion). To the extent that the Court finds that any of Plaintiffs' claims are insufficient to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs respectfully request that they be given the opportunity to amend their pleading in order to cure any such defects. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (dismissal with prejudice is appropriate only when the court "determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency").

Dated:   August 10, 2020                     Respectfully submitted,

                                             */s/ Shawn Nolan*
                                             Shawn Nolan, Chief, Capital Habeas Unit
                                             Federal Community Defender Office, E.D. Pa.
                                             601 Walnut Street, Suite 545 West
                                             Philadelphia, PA 19106
                                             (215) 928-0520
                                             shawn_nolan@fd.org
                                             timothy_kane@fd.org

                                             *Counsel for Plaintiff Jeffrey Paul*


Scott W. Braden
Assistant Federal Defender
Arkansas Federal Defender Office
Ark Bar Number 2007123
1401 West Capitol, Suite 490
Little Rock, Arkansas 72201
(501) 324-6114
scott_braden@fd.org

Jennifer Ying (DE #5550)
Andrew Moshos (DE #6685)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market St.
P.O. Box 1347
Wilmington, Delaware 19801
(302) 658-9300
jying@mnat.com
amoshos@mnat.com

*Counsel for Plaintiff Norris G. Holder, Jr.*


Paul F. Enzinna
D.C. Bar No. 421819
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553

*Counsel for Plaintiff James H. Roane, Jr.*

Amy Karlin
Interim Federal Public Defender
Celeste Bacchi
Jonathan C. Aminoff
Deputy Federal Public Defenders
321 E. Second Street
Los Angeles, CA 90012
(213) 894-2854

*Counsel for Plaintiff Julius O. Robinson*


Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington D.C. 20004-2595
(202) 624-2705
kclune@crowell.com


Harry P. Cohen (admitted *pro hac vice*)
Michael K. Robles (admitted *pro hac vice*)
James K. Stronski (admitted *pro hac vice*)
Crowell & Moring LLP
590 Madison Avenue
New York, NY 10022
(212) 223-4000
(212) 223-4134(fax)
hcohen@crowell.com
mrobles@crowell.com
jstronski@crowell.com


Jon M. Sands (pro hac application to be filed)
Dale A. Baich (pro hac application to be filed)
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602-382-2816
602-889-3960 (fax)
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*

Joshua C. Toll
D.C. Bar No. 463073
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 737-8616
jtoll@kslaw.com

Margaret O'Donnell
P.O. Box 4815
Frankfort, KY 40604
(502) 320-1837
mod@dcr.net

*Counsel for Plaintiff Anthony Battle*


Ginger D. Anders (Bar No. 494471)
Jonathan S. Meltzer (Bar No. 888166546)
Brendan Gants (Bar No. 1031419)
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
(202) 220-1100

*Counsel for Plaintiff Brandon Bernard*

Alex Kursman, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone – 215-928-0520
Email – alex_kursman@fd.org

*Counsel for Plaintiff Alfred Bourgeois*


Joseph Luby, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone – 215-928-0520
Email – joseph_luby@fd.org

*Counsel for Plaintiff Chadrick Fulks*


Amy Lentz (DC Bar No. 990095)
Steptoe & Johnson, LLP
1300 Connecticut Avenue NW
Washington, DC 20036
202.429.1350
Email - alentz@steptoe.com

*Counsel for Plaintiff Orlando Hall*

Donald P. Salzman (D.C. Bar No. 479775)
Charles F. Walker (D.C. Bar No. 427025)
Steven M. Albertson (D.C. Bar No. 496249)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Plaintiff Corey Johnson*


Gerald W. King, Jr.
Ga. Bar No. 140981
Jeffrey Lyn Ertel
Ga. Bar No. 249966
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org
Jeff_Ertel@fd.org

Stephen Northup
VSB #16547
Troutman Sanders LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240
(fax) (804) 698-5120
steve.northup@troutmansanders.com

Frederick R. Gerson
VSB #39968
Bank Of America Center
1111 East Main Street, 16th Floor
Richmond, Virginia 23219
(804) 482-1121
fgerson@dagglaw.com

*Counsel for Plaintiff Richard Tipton, III*

Evan Miller (DC Bar # 219310)
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6605
(202) 478-1815 (fax)
emiller@velaw.com

*Counsel for Plaintiff Bruce Webster*

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system. Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record. The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN & MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Donald P. Salzman

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Margaret O'Donnell
(502) 320-1837

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Robert A. Ayers
STEPTOE & JOHNSON LLP

Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301

(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

Dated:  August 10, 2020

*/s/ Shawn Nolan*
Shawn Nolan
Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org

# EXHIBIT 1

| | |
|---|---|
| **From:** | Katherine Siereveld |
| **To:** | Amy Donnella; Elizabeth Luck; George Kouros; Morris Moon; Ruth Friedman |
| **Cc:** | Andrew Sutton; Cory Shepherd; Rob Schalburg |
| **Subject:** | RE: Contact info today |
| **Date:** | Tuesday, July 14, 2020 1:34:02 AM |
| **Attachments:** | Lee memo.pdf |

Please see the attached notice which was just given to Mr. Lee.  The number for the holding cell at the execution facility is 812-238-3388 if you wish to make a call.  He should be out there shortly.

Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# EXHIBIT 2

| | |
|---|---|
| **From:** | Katherine Siereveld |
| **To:** | esv@advancechange.org; Michelle Law; Rebecca Woodman; AlanSchoenfeld |
| **Subject:** | Execution notice for Wesley Purkey |
| **Date:** | Thursday, July 16, 2020 2:56:04 AM |
| **Attachments:** | Purkey Letter_1.pdf |

Counsel:

Please see the attached execution notice which was just delivered to Wesley Purkey.

Thank you,

Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# EXHIBIT 3

| | |
|---|---|
| **From:** | Mooppan, Hashim (OSG) |
| **To:** | AlanSchoenfeld |
| **Cc:** | Sofer, Gregg (OAG); Grieco, Christopher (ODAG); Wall, Jeffrey B. (OSG); Michel, Christopher (OSG) |
| **Subject:** | Courtesy notice |
| **Date:** | Thursday, July 16, 2020 3:03:40 AM |
| **Attachments:** | Purkey Notice 7_16_2020_2.pdf |
| | Purkey Letter_5.pdf |

**EXTERNAL SENDER**

Alan,

 Per our prior discussion, this is to notify you, as a courtesy, that the govt has notified Mr. Purkey, pursuant to the applicable regulatory provisions, of the re-designation of his execution for today, July 16, 2020. The designated time is 4:30 am.

 Also, one of your colleagues called to inform me that a 2241 petn has been filed in SD Ind., along with an accompanying stay application. Your colleague asked whether the govt would delay the execution to allow the judge in SD Ind. to consider the stay application. In light of the Supreme Court's orders today and on Tuesday morning, the government will not delay the execution further. Absent a court order barring the execution, the govt intends to proceed.

Best,

Hashim Mooppan
Counselor to the Solicitor General