# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases<br><br>LEAD CASE: *Roane et al. v. Barr*<br><br><br>THIS DOCUMENT RELATES TO:<br><br>*Holder v. Barr, et al.*, 19-cv-3520 (TSC) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.   19-mc-0145 (TSC) |

**PLAINTIFF NORRIS G. HOLDER, JR.'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... II

I.     INTRODUCTION .......................................................................................... 1

II.    CONCISE STATEMENT OF FACTS ........................................................... 1

       A.     Mr. Holder's Epilepsy and Medication ........................................... 1

       B.     Procedural History ........................................................................... 2

III.   LEGAL STANDARD ..................................................................................... 4

IV.    ARGUMENT .................................................................................................. 6

       A.     Mr. Holder has stated a claim that the 2019 Protocol poses a
              substantial risk of serious harm to him because of his
              particular medical condition and prescribed medication ........................ 6

       B.     Mr. Holder has proposed an alternative execution method
              that is feasible and readily implemented and that will
              significantly reduce the risks posed by the 2019 Protocol. ..................... 11

       C.     Defendants have not refuted any of Mr. Holder's factual
              allegations .................................................................................... 14

V.     CONCLUSION ............................................................................................. 15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 4

*Barber v. Dist. of Columbia Gov't*,
394 F. Supp. 3d 49 (D.D.C. 2019) ................................................................................ 9

*Barr v. Lee*,
— S. Ct. —, No. 20A8, 2020 WL 3964985 (U.S. July 14, 2000) ...................................... 4, 10

*Baze v. Rees*,
553 U.S. 35 (2008) .......................................................................................... 5, 6, 10, 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................... 4

*Bucklew v. Lombardi*,
783 F.3d 1120 (8th Cir. 2015) .................................................................................. 7, 8

*Bucklew v. Lombardi*,
No. 14-08000-CV-W-BP, 2016 WL 6917289 (W.D. Mo. Jan. 29, 2016) .............................. 8

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019) ........................................................................................ *passim*

*Estelle v. Gamble*,
429 U.S. 97 (1976) .................................................................................................. 6, 14

*Farmer v. Brennan*,
511 U.S. 825 (1994) ................................................................................................ 6, 14

*Glossip v. Gross*,
135 S. Ct. 2726 (2015) ......................................................................................... *passim*

*Holder v. Barr, et al.*,
No. 19-3520-TSC (D.D.C. Nov. 22, 2019) ...................................................................... 3

*Odom v. Dist. of Columbia*,
248 F. Supp. 3d 260 (D.D.C. 2017) .............................................................................. 5

*United States v. Ghana Soc. Mktg. Found.*,
No. 11-418 (RC), 2012 WL 13076832 (D.D.C. Aug. 8, 2012) ............................................ 5

*United States v. Newman*,
 No. 16-1169 (CKK), 2017 WL 3575848 (D.D.C. Aug. 17, 2017) ....................................... 10

*Warner v. Gross*,
 No. CIV-14-0665-F (W.D. Okla. Dec. 12, 2014) ................................................................. 8

*Wood v. Ryan*,
 759 F.3d 1076 (9th Cir. 2014) .......................................................................................... 13

**Constitutional Provisions**

U.S. Const. Amendment VIII .................................................................................................. 5

**Rules and Statutes**

Federal Rule of Civil Procedure 12(b)(6) .......................................................................... 4, 5, 6

## I.      INTRODUCTION

Plaintiff Norris G. Holder. Jr. ("Mr. Holder") submits this supplemental opposition in addition to Plaintiffs' consolidated opposition to Defendants' Motion to Dismiss and for Summary Judgment (D.I. 169) (the "Motion").  Mr. Holder respectfully requests that the Court deny the Motion as to his Supplemental Complaint (D.I. 94), which asserts an as-applied challenge to the 2019 Protocol unique to Mr. Holder's serious medical condition.

At no point in their 43-page Motion do Defendants direct any argument specifically to Mr. Holder, and in fact, Defendants' Motion does not even mention Mr. Holder's Supplemental Complaint.  Defendants have not moved for summary judgment on any non-APA claims.  Mr. Holder has asserted an individual, supplemental, as-applied claim under the Eighth Amendment. Defendants' Motion for Summary Judgment thus does not apply to the Supplemental Complaint, and if granted, should have no effect on the as-applied claim Mr. Holder has asserted.  To the extent Defendants' Motion to Dismiss can be construed as an answer or other response to Mr. Holder's Supplemental Complaint, he responds below and asks the Court to deny Defendants' Motion.

## II.     CONCISE STATEMENT OF FACTS

### A.      Mr. Holder's Epilepsy and Medication

Mr. Holder has suffered from epilepsy for most of his life, a condition that went undiagnosed until 2017.  D.I. 94 ¶ 7. At the age of 15, Mr. Holder's leg was amputated after an accident involving a moving train.  When he was 16, he was hit in the head with a thrown brick, resulting in a fractured skull and emergency craniotomy.  *Id.*  His seizures began later that year and have continued throughout his life.  *Id.*  He was not correctly diagnosed until 2017.  *Id.*  He was prescribed anti-convulsants to treat his epilepsy, and his current prescription is for the drug carbamazepine in a dosage of 200 mg three times a day. Mr. Holder has been taking his prescribed

medication consistently since at least November 2019.  D.I. 94 ¶¶ 7-8.  Without this medication, Mr. Holder has suffered and would continue to suffer from seizures, particularly during his sleep.

Carbamazepine is metabolized by and induces the CYP2C9 enzyme, the same enzyme that metabolizes barbiturates such as pentobarbital.  D.I. 94-1 ¶¶ 18-20.  As the undisputed expert testimony explains, for this reason, Mr. Holder's body will have significantly increased levels of this enzyme and will metabolize barbiturates, such as pentobarbital, more quickly than other people who are not consistently taking such an epilepsy drug.  *Id.* ¶¶ 20-21; *see also* Ex. A ¶¶ 12-13, 18-19.  Consequently, barbiturate drugs such as pentobarbital will have less effect on Mr. Holder than they would on a prisoner not taking carbamazepine.  D.I. 94-1 ¶¶ 18-20; *see also* Ex. A ¶¶ 18-19.

This metabolic effect is not a temporary or isolated phenomenon, as the elevated level of the CYP2C9 enzyme persists long after a triggering medication is discontinued.  Thus, if Mr. Holder were to discontinue taking carbamazepine, it would take several weeks to months after before his enzyme level would return to the pre-inducement level. D.I. 94-1 ¶ 22; *see also* Ex. A ¶¶ 14-15.  During this time, Mr. Holder would be likely to suffer seizures and would be at a greatly increased risk of sudden unexplained death in epilepsy ("SUDEP").[1] D.I. 94-1 ¶ 22; *see also* Ex. A ¶ 16.

### B.    Procedural History

Mr. Holder is a federally death-sentenced inmate incarcerated at the United States Penitentiary in Terre Haute, Indiana.  On July 25, 2019, the Attorney General directed, and the

---

[1] As Dr. Van Norman explains, the vast majority of anti-convulsant medications function in a similar manner to carbamazepine and would cause similar metabolic enzymatic activity, creating the same risk that pentobarbital will be metabolized more quickly than the 2019 Protocol contemplates.  *See* Ex. A ¶¶ 16-17.

BOP adopted, a revised addendum to the federal execution protocol (the "2019 Protocol") adopting a single drug protocol using pentobarbital sodium as the lethal injection drug.  At the same time, the government announced execution dates for five inmates.  Mr. Holder was not included in these execution dates, yet still began diligently and immediately exhausting his potential claims with regard to the 2019 Protocol.

In November of 2019, without an execution date or any indication that one was near, Mr. Holder filed an individual complaint against the Defendants asserting, among other claims, an as-applied challenge against the 2019 Protocol relating to the problematic interaction between his prescribed medication and pentobarbital.  *Holder v. Barr, et al.*, No. 19-3520-TSC, D.I. 1 (D.D.C. Nov. 22, 2019).  In December 2019, Mr. Holder's complaint was consolidated into this case. *Holder v. Barr*, No. 19-3520-TSC, D.I. 5 (D.D.C. Dec. 4, 2019).  On June 1, 2020, the consolidated Plaintiffs filed a consolidated amended complaint.  D.I. 92.  The same day, Mr. Holder filed his Supplemental Complaint, again asserting his as-applied challenge, pursuant to this Court's February 19, 2020 Order.  D.I. 81 ("If the circumstances warrant such a filing, any party (or parties) may submit a separate filing [to the consolidated Amended Complaint] with regard to issues that are particular to that party.").  Defendants' Motion fails to address or respond directly to Mr. Holder's as-applied challenge, and the claim dates back to November 2019.  Mr. Holder is nevertheless filing this opposition in order to diligently pursue that claim.

Again, Mr. Holder's Supplemental Complaint alleged that he has epilepsy for which he takes the medication carbamazepine to prevent seizures.  The Supplemental Complaint further alleged that the carbamazepine in Mr. Holder's system is likely to affect the way he metabolizes pentobarbital, the drug Defendants intend to use to execute him, and that this drug interaction creates a serious risk that Mr. Holder will suffer brain damage and excruciating pain and suffering

upon the administration of Defendants' 2019 Protocol either before succumbing or without, in fact, being killed.  Mr. Holder also submitted the expert declaration of Dr. Arthur Grant, a neurologist specializing in the treatment of epilepsy, in support of his allegations.  D.I. 94-1, Exhibit A.

On July 13, 2020, this Court entered a memorandum opinion and order finding that the consolidated Plaintiffs demonstrated a likelihood of success on their facial Eighth Amendment challenges to the 2019 Protocol. D.I. 135.  The Supreme Court disagreed.  *Barr v. Lee*, — S. Ct. —, No. 20A8, 2020 WL 3964985 (U.S. July 14, 2000).  On July 31, 2020 Defendants filed the present motion to dismiss Plaintiffs non-APA claims, including their facial Eighth Amendment claims.  Defendants have not filed any direct response to Mr. Holder's supplemental as-applied Eighth Amendment claim and do not mention his Supplemental Complaint in their Motion.  The Plaintiffs have filed a consolidated opposition to Defendants' Motion (D.I. 184).  Mr. Holder joins Plaintiffs' opposition and submits this memorandum of points and authorities as supplemental opposition in reference to his as-applied challenge.

### III.   LEGAL STANDARD

Defendants moved to dismiss all of Plaintiffs' non-APA claims pursuant to Federal Rule of Civil Procedure 12(b)(6). To the extent Defendants' Motion can be construed to relate to the Supplemental Complaint – a point Mr. Holder does not concede – Mr. Holder's as-applied challenge states a cognizable Eighth Amendment claim and should not be dismissed.

In order to state a claim for relief under Rule 12(b)(6), a complaint does not need to contain "detailed factual allegations."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  A complaint must only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

"A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim."  *United States*

*v. Ghana Soc. Mktg. Found.*, No. 11-418 (RC), 2012 WL 13076832, at *1 (D.D.C. Aug. 8, 2012). "In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiffs and 'must assume the truth of all well-pleaded allegations.'" *Odom v. Dist. of Columbia*, 248 F. Supp. 3d 260, 264 (D.D.C. 2017) (citation omitted).

The Eighth Amendment prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. The Supreme Court has established a test to determine whether a plaintiff has made out a cognizable Eighth Amendment challenge, whether facial or as-applied, to an execution protocol. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019). To survive dismissal, the claim must include: (1) a showing of a "substantial risk of serious harm," *Baze v. Rees*, 553 U.S. 35, 50 (2008), and (2) a pled alternative method of execution that is "feasible" and "readily implemented." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).

A showing of "substantial risk of serious harm" requires a showing that the protocol presents a risk of severe pain that is "sure or very likely to cause serious illness and needless suffering" and gives rise to "sufficiently imminent dangers," such that prison officials cannot later plead "that they were subjectively blameless." *Baze*, 553 U.S. at 49–50 (citations omitted). Although the court must be careful not to judicially craft "best practices" for executions, it is proper for the court to consider scientific evidence as necessary. *See, e.g., Glossip*, 135 S. Ct. at 2739, 2750 (affirming district court's scientific findings that midazolam was "highly likely" to render inmates unable to feel pain during execution).

A plaintiff must plead an alternative method of execution that is "feasible" and "readily implemented." *Glossip*, 135 S. Ct. at 2737. "An inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's

law." *Bucklew*, 139 S. Ct. at 1128.  While *Bucklew* emphasized that a proposed alternative method of execution must be not just "theoretically feasible but also readily implemented," this simply means that the proposal must be "sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Id.* at 1129 (internal quotation marks omitted).

The Eighth Amendment also prohibits "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble,* 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994).

### IV.   ARGUMENT

**A.   Mr. Holder has stated a claim that the 2019 Protocol poses a substantial risk of serious harm to him because of his particular medical condition and prescribed medication.**

Mr. Holder has stated a valid claim for relief.  Accepting his allegations as true, unchallenged as they are by anything in Defendants' motion, Mr. Holder's Supplemental Complaint states a short and plain statement of the claim and includes the required factual allegations necessary to survive a Rule 12(b)(6) motion to dismiss.

While an allegation of some pain is not sufficient to support an Eighth Amendment challenge "because some risk of pain is inherent in any method of execution,", *Glossip*, 135 S. Ct. at 2733, Mr. Holder has alleged a sufficient risk of additional and extreme pain and suffering to satisfy *Glossip*.  The required standard is whether the protocol is "sure or very likely to cause serious illness and needless suffering" and gives rise to "sufficiently imminent dangers."  *Baze*, 553 U.S. at 49–50 (citations omitted).

As alleged in Mr. Holder's Supplemental Complaint, because he must take carbamazepine to control his epilepsy, his body will metabolize pentobarbital more rapidly than would an inmate who has not been prescribed and is not taking carbamazepine for epilepsy.  D.I. 94 ¶ 11.  Since he

will metabolize pentobarbital more quickly, it is likely Mr. Holder will survive the execution, and is more than likely that he will suffer severe brain damage if he survives. *Id.* ¶¶ 11-13.

Moreover, Mr. Holder is at even greater risk of pulmonary edema than the average prisoner due to the combined effects of carbamazepine and pentobarbital on his body. *Id.* ¶¶ 14-15. For example, Mr. Holder is at a greater risk of pulmonary edema than Wesley Purkey, whose autopsy showed significant pulmonary edema. D.I. 183-2 ¶¶ 19-21. As Dr. Van Norman has stated consistently and repeatedly in her numerous declarations (D.I. 24, D.I. 123, D.I. 183-2), the 2019 Protocol poses significant and serious risks to prisoners in the form of pulmonary edema. Pulmonary edema involves the conscious experience of drowning, which includes both pain and terror. As described *infra*, Mr. Holder's execution would very likely take longer than the 2019 Protocol anticipates, and even assuming it succeeds in killing Mr. Holder, he would remain sensate and conscious for a longer period of time before death, making him very likely to experience the painful and terrifying effects of flash pulmonary edema. D.I. 94-1 ¶ 24; *see also* D.I. 123 ¶¶ 22-25; Ex. A ¶¶ 8-10, 12-13, 19.

A risk of surviving the execution yet suffering severe brain damage, along with a heightened risk of experiencing pulmonary edema, exceeds the level of potential pain and suffering that *Bucklew* and *Glossip* contemplated as necessarily incident to an execution. See *Glossip*, 135 S. Ct. at 2733 (finding that "some risk of pain is inherent in any method of execution" and that the Constitution prohibits a "substantial risk of severe pain").

In *Bucklew*, the plaintiff included factual allegations of his medical condition in his complaint and attached an expert declaration opining that he had a substantial risk of suffering extreme pain, including abnormal circulation of the lethal drug, a prolonged execution, and a risk of an adverse event from drug interactions. *Bucklew v. Lombardi*, 783 F.3d 1120, 1125 (8th Cir.

2015).  Following the district court's dismissal of the complaint, the Eighth Circuit held that the

dismissal and conclusion that the expert affidavits did not contain the required specificity "was a

merits analysis appropriate in ruling on a motion for summary judgment, not an analysis of whether

the complaint plausibly pleaded an Eighth Amendment claim under Baze and Lombardi."

*Bucklew*, 783 F.3d at 1123.  On remand, the district court denied a subsequent motion to dismiss.

*See Bucklew v. Lombardi*, No. 14-08000-CV-W-BP, 2016 WL 6917289 at *5 (W.D. Mo. Jan. 29,

2016) (district court denying motion to dismiss Eighth Amendment claims, in part, because "the

issues Defendants raise regarding lethal gas are issues of proof, not pleading").[2]  Similarly, the

court in *Glossip* denied the motion to dismiss plaintiff's Eighth Amendment claims, in part,

because "defendants' moving brief relies on cases in which courts made determinations not at the

pleadings stage, but at an evidentiary stage."  *Warner v. Gross*, No. CIV-14-0665-F (W.D. Okla.

Dec. 12, 2014), ECF No. 155 at 4.

Similarly here, Mr. Holder has supported his detailed allegations with expert declarations

and plausibly and sufficiently alleged that he faces a substantial risk of serious harm in violation

of the Eighth Amendment.  These allegations are not based on mere speculation.  Alongside his

Supplemental Complaint, Mr. Holder submitted the Declaration of Dr. Arthur Grant.  D.I. 94-1,

Exhibit A.  This declaration explains the scientific foundation and support for Mr. Holder's claims

that the drug interactions between his prescribed carbamazepine and pentobarbital create a serious

risk of severe harm.  Id. ¶¶ 20-25.  These risks include surviving the execution while suffering

---

[2]     Ultimately, the court granted summary judgment against Mr. Bucklew after "extensive
discovery," because even though his expert testimony presented a triable issue concerning
substantial risk, he failed to provide evidence that his proposed alternative would reduce that risk.
*Bucklew*, 139 S. Ct. at 1122.  Here, however, the case is still at the pleadings stage and there has
not been "extensive discovery."

severe brain damage and remaining sensate for an increased period of time and suffering pulmonary edema. Id. Dr. Grant's affidavit has not been rebutted by Defendants.

Dr. Grant's unchallenged affidavit is further supported by Dr. Gail Van Norman. *See* Ex. A. As Dr. Van Norman previously explained in declarations submitted to this Court, prisoners executed by lethal injection under the 2019 Protocol will remain conscious and able to experience the pain and suffering of immediate onset flash pulmonary edema. D.I. 123 ¶¶ 22-26. Dr. Van Norman further explains the scientific basis for Mr. Holder's claim that the 2019 Protocol creates an intolerable risk of flash pulmonary edema as-applied to him. *See* Ex. A ¶¶ 6-13. As Dr. Van Norman explains, the pulmonary edema necessarily occurs while a prisoner undergoing execution is still alive. D.I. 123 ¶ 24. It is a scientific impossibility that pulmonary edema could develop in a person after death in these circumstances. *See* D.I. 183 ¶ 22. Due to his more rapid metabolism of pentobarbital, Mr. Holder is *even more* likely to remain sensate and experience the sensations of flash pulmonary edema. D.I. 94-1 ¶¶ 24-25; *see also* Ex. A ¶ 19. Also, it is extremely likely, assuming *arguendo* that the 2019 Protocol kills Mr. Holder, that it will take considerably more time for him to die. D.I. 94-1 ¶¶ 24-25; *see also* Ex. A ¶ 19. Mr. Holder is thus highly likely to remain sensate for a longer period of time during a longer execution while experiencing the sensations of pulmonary edema when compared to a similarly situated inmate without his medical condition and prescribed medication. D.I. 94-1 ¶¶ 20-25; *see also* Ex. A ¶¶ 18-19. Dr. Van Norman's declaration supports Mr. Holder's showing of a substantial risk of serious harm.

Defendants' Motion includes no argument or evidence to counter Mr. Holder's well-pled allegations. And even if Defendants had done so, it would not warrant dismissal of the Supplemental Complaint, as Mr. Holder has more than met the applicable pleading requirements. *See Barber v. Dist. of Columbia Gov't*, 394 F. Supp. 3d 49, 58 (D.D.C. 2019) (defendants' attempt

to "dispute . . . the alleged facts . . . improperly ignores the Court's duty to accept the allegations of the complaint as true and to construe the complaint liberally at the motion-to-dismiss stage"); *United States v. Newman*, No. 16-1169 (CKK), 2017 WL 3575848, at *8 (D.D.C. Aug. 17, 2017) ("The Court will not dismiss this case at the outset merely because the allegations in the complaint are rebutted by assertions . . . in [defendant's] briefing on her motion to dismiss.").  In the Supreme Court's vacatur of this Court's preliminary injunction of July 13, 2020 based on the facial, consolidated Eighth Amendment challenge, the Supreme Court relied on the past use of pentobarbital in state executions and Defendants' citations to experts of their own.  *Barr v. Lee*, 2020 WL 3964985 at *1-2.  Yet the past use of pentobarbital in executions does not speak to Mr. Holder's challenge, as there is no record of pentobarbital being successfully administered to execute an inmate with a similarly problematic prescription drug interaction.  Moreover, as discussed *infra*, Defendants have neither addressed, rebutted, nor denied Mr. Holder's individual, as-applied claim.  Defendants, in their Motion, often cite *Bucklew*, *Glossip*, and *Baze*, but none of those cases were decided at the pleading stage.  *See Bucklew*, 139 S. Ct. at 1121 (decision at summary judgment after "extensive discovery"); *Glossip*, 135 S. Ct. at 2735-36 (decision on appeal of a preliminary injunction denial after a "3-day evidentiary hearing"); *Baze*, 553 U.S. at 46 (decided after "a 7-day bench trial during which the trial court received the testimony of approximately 20 witnesses, including numerous experts").

And while Defendants may argue that three executions have been carried out smoothly using the 2019 Protocol, none of those individuals had epilepsy or was taking prescribed medication such as carbamazepine.  Moreover, the only executed inmate who underwent an autopsy showed signs of significant pulmonary edema.  D.I. 183-2 ¶¶ 19-21, 23.  Therefore, no conflicting expert testimony or evidence is before this Court, and Mr. Holder's factual allegations

are both supported by expert declarations and unrebutted, and must be taken as true at this stage.
*See* D.I. 135, at 12-13 ("While it is difficult to weigh competing scientific evidence at this
relatively early stage, the factual record indicates that Plaintiffs are likely to succeed on the merits
of their claims that the 2019 Protocol poses a substantial risk of serious pain.").  Mr. Holder has
thus sufficiently stated a claim that the 2019 Protocol and the use of pentobarbital poses a
substantial risk of serious harm to him, in violation of the Eighth Amendment.

> **B.     Mr. Holder has proposed an alternative execution
> method that is feasible and readily implemented and that
> will significantly reduce the risks posed by the 2019
> Protocol.**

Mr. Holder has proposed the use of a firing squad as an alternative execution method that
is feasible and readily implemented and will significantly reduce the specific risks to him of a
pentobarbital execution method.  First, the firing squad as pled is feasible and readily implemented.
Mr. Holder alleged that the government would be able to find trained marksman and necessary
equipment to carry out an execution by firing squad.  D.I. 94 ¶ 23.  Even though the alternative
need not be authorized by the government, at least one state, Utah, authorizes the firing squad.
D.I. 94 ¶ 21.  *See also Bucklew*, 139 S. Ct. at 1128 ("The Eighth Amendment is the supreme law
of the land, and the comparative assessment it requires can't be controlled by the State's choice of
which methods to authorize in its statutes.").  Furthermore, this Court has found the firing squad a
feasible and readily implemented alternative.  *See* D.I. 135 at 17-18 ("Defendants could readily
adopt plaintiffs' proposal . . . .  Plaintiffs have argued for [the firing squad] at length, and have
adequately shown that it is readily implemented, available, and would significantly reduce the risk
of severe pain.").  The federal government is arguably more capable than state governments of
implementing the firing squad.  *Id*. at 16-17 ("Moreover, given that use of the firing squad is 'well
established in military practice,' Defendants are, if anything, more capable than state governments

of finding 'trained marksmen who are willing to participate,' and who possess the skill necessary to ensure death is near-instant and comparatively painless.") (internal citations omitted).

Second, Mr. Holder alleged that the firing squad would significantly reduce his risk of severe pain. D.I. 94 ¶¶ 21-24.  Execution by firing squad does not pose a risk of adverse drug interactions.  *Id.*  It thus does not pose the same risk that Mr. Holder would survive with severe brain damage or live through a sensate experience of pulmonary edema.  *Id.*

Mr. Holder's allegations, once again, do not stand alone.  They are supported by a medical expert's declaration.  *See* D.I. 94-1 ¶ 26 ("I am of the opinion that these significant and likely risks would be eliminated by an alternative method of execution that does not involve a single drug lethal injection of a barbiturate such as pentobarbital.  For example, execution by firing squad would have no chance of resulting in permanent brain damage rather than death, a prolonged interval of retained consciousness, or the experience of pulmonary edema.").  Mr. Holder has sufficiently shown through his pleading and the attached declaration that the firing squad is a feasible and readily implemented alternative that would eliminate the risk posed by Defendants' present execution protocol.

In moving to dismiss the consolidated Plaintiffs' non-APA claims, Defendants argue only generally against the firing squad.  They claim that refusing to use a firing squad is aimed at preserving the dignity of the execution process.  D.I. 169 at 20.  But the executioner's concern for dignity should not outweigh the legitimate and substantial risk of an Eighth Amendment violation that a pentobarbital execution poses to Mr. Holder.  And should Mr. Holder's execution take longer than the 2019 Protocol contemplates, potentially failing ultimately to kill him yet leaving him severely brain damaged, the procedure will be a horrific spectacle lacking in "dignity" as well as violating the Constitution.

In their attempts to dismiss the use of a firing squad as a feasible alternative, Defendants' misquote Judge Kozinski's dissent in the Ninth Circuit's later-overturned case of *Wood v. Ryan*. Defendants claim this dissent supports the federal government's interest in "declining as a policy matter to opt for 'the splatter from an execution carried out by firing squad.'" *Wood v. Ryan*, 759 F.3d 1076, 1103 (9th Cir. 2014) (Kozinski, J., dissenting). In reality, Judge Kozinski *endorsed* executions by firing squad. He wrote: "If we, as a society, cannot stomach the splatter from an execution carried out by firing squad, then we shouldn't be carrying out executions at all." *Id.*

Defendants also suggest that the firing squad is more primitive and less humane than lethal injection by pentobarbital. D.I. 169 at 20. But the Supreme Court has stated that the advent of newly approved methods of execution does not render traditional methods any less constitutional. *See Bucklew*, 139 S. Ct. at 1125 ("Nor do *Baze* and *Glossip* suggest that traditionally accepted methods of execution—such as hanging, the firing squad, electrocution, and lethal injection—are necessarily rendered unconstitutional as soon as an arguably more humane method like lethal injection becomes available.").

Defendants further attempt to distinguish the State of Utah's use of the firing squad, since the state "authorizes the method only as a last resort" in the event of a lack of lethal injection drugs. D.I. 169 at 21. That argument effectively supports, rather than refutes Mr. Holder's challenge. Whether the method is viewed as a "last resort" does not matter, because Mr. Holder has carried his burden of pleading a feasible and readily implemented alternative that would significantly reduce the risk of severe pain regardless of whether the alternative is authorized under state law. *Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring).

Finally, Defendants cannot argue that they could avoid the need for an alternative execution method by halting Mr. Holder's prescribed medication in advance of his execution. But the Eighth

Amendment forbids "deliberate indifference" to a prisoner's medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  If Defendants failed to provide Mr. Holder with an appropriate dose of carbamazepine or a similar anti-convulsant medication on a regular basis as prescribed, he would be at an increased risk of suffering from seizures during the night and would be at risk of sudden unexplained death in epilepsy ("SUDEP").  D.I. 94-1 ¶ 22.  Seizures and sudden death during the night due to medical withdrawal are surely the type of substantial risk of serious harm the Eighth Amendment is meant to protect against.  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (noting the Eighth Amendment requires prisons to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and *medical care*") (emphasis added).

### C.    Defendants have not refuted any of Mr. Holder's factual allegations

Defendants have not responded to Mr. Holder's factual allegations and as-applied claim. Their consolidated Motion to Dismiss and for Summary Judgment does not mention, let alone address, Mr. Holder's challenge.

In fact, Defendants own statements appear to ignore Mr. Holder's supplemental, as-applied challenge, directly contradicting the record.  First, Defendants affirmatively argue that no Plaintiffs have alleged as-applied challenges.  "The *Bucklew* Court's rejection of that inmate's Eighth Amendment challenge makes its holding that much more applicable *here, where none of the Plaintiffs have alleged similar health sensitivities*." Motion, D.I. 169, at 13 (emphasis added). Whether purposeful or accidental, the Court should not grant this Motion as to Mr. Holder's Supplemental Complaint when Defendants have completely disregard his well-pled and supported allegations.

Moreover, Defendants' own statements show that they value the very same ideas on which Mr. Holder's claim is grounded.  Mr. Holder's challenge rests on his medical condition and need for prescribed medications.  It is founded on the potential interactions between his prescribed medication and Defendants' lethal injection drug of choice, pentobarbital.

Defendants in their Motion note that "as BOP has already determined, an important consideration of using [a drug] is its potential side effects and the potential interactions with other drugs." Motion, D.I. 169, at 18.  Defendants on one hand ignore the potential interactions between Mr. Holder's prescribed carbamazepine and pentobarbital, but then purport to rely on "potential side effects and the potential interactions with other drugs" to dismiss the use of fentanyl in executions.  *Id*.  To the extent Defendants' position can be construed as applicable to Mr. Holder's Supplemental Complaint, Defendants' Motion to Dismiss should be denied.

## V.       CONCLUSION

At this stage of the proceedings, Mr. Holder merely needed to plead factual allegations that, when taken as true, meet the *Baze-Glossip* pleading standard.  His Supplemental Complaint meets this standard, and Defendants have offered no opposition to his as-applied challenge.  Mr. Holder therefore respectfully requests that this Court deny the Defendants' Motion to Dismiss to the extent it can be construed as applicable to his individual, as-applied challenge to the 2019 Protocol.

Dated:   August 10, 2020                    Respectfully submitted,

                                            */s/* Scott W. Braden
                                            Scott W. Braden
                                            Assistant Federal Defender
                                            Arkansas Federal Defender Office
                                            Ark Bar Number 2007123
                                            1401 West Capitol, Suite 490
                                            Little Rock, Arkansas 72201
                                            (501) 324-6114
                                            Scott_Braden@fd.org

                                            Jennifer Ying (DE #5550)
                                            Andrew Moshos (DE #6685)
                                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                            1201 N. Market St.
                                            P.O. Box 1347
                                            Wilmington, Delaware 19801
                                            (302) 658-9300
                                            jying@mnat.com
                                            amoshos@mnat.com

                                            Counsel for Plaintiff Norris G. Holder, Jr.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ----------------------------------------------------- )<br>In the Matter of the )<br>Federal Bureau of Prisons' )<br>Execution Protocol Cases )<br> )<br>LEAD CASE: *Roane et al. v.* )<br>*Barr* )<br> )<br> )<br>THIS DOCUMENT )<br>RELATES TO: )<br> )<br>*Holder v. Barr, et al.*, 19-cv- )<br>3520 (TSC) ) | Case No.     19-mc-0145 (TSC) |

### [PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dismiss Plaintiffs' non-APA Claims, Mr.

Holder's Opposition to the Extent Defendants' Motion relates to Mr. Holder's supplemental

complaint and as-applied challenge, and the entire record herein, it is hereby

**ORDERED** that the Motion is **DENIED.**

So ordered this _____ day of _____ 2020.


_____
TANYA S. CHUTKAN
United States District Judge

Supplemental Report of Gail A. Van Norman MD
Norris Holder v. William Barr, et al.
In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases
Case No. 19-mc-0145 (TSC)

I.     Introduction

1.  On November 1, 2019, I provided Plaintiff's counsel with my opinions regarding the
    Federal Execution Protocol in a declaration that included detailed discussion and cited
    evidence.  On June 29, 2020 I provided a supplemental expert declaration addressing
    specific questions regarding flash pulmonary edema in prisoners executed by IV
    administration of 5 grams of pentobarbital.  I also provided a secondary supplemental
    declaration to the Court dated August 7, 2020,  addressing findings of pulmonary edema
    following the execution of Wesley Purkey on July 16, 2020.  Counsel have provided me
    with medical records for Norris Holder as well as an expert report by Dr. Arthur C.
    Grant, MD, PhD, who examined Mr. Holder and reviewed his history of epilepsy.

2.  Counsel asked me to comment on 1) the question of possible effects of chronic
    administration of carbamazepine (CBZ), an anti-seizure medication, on the
    pharmacological and clinical effects of pentobarbital, the drug designated by the Federal
    Protocol as a solo drug for judicial lethal injection, 2) the issue of withdrawal of CBZ
    therapy in general, and in Mr. Holder specifically, 3) the expected time course and other
    implications of substituting an alternate antiseizure medication to avoid drug interactions
    during judicial lethal injection with pentobarbital.

3.  In addition to the materials listed in my Expert Declaration dated November 1, 2019, and
    in my Supplemental Report dated June 29, 2020, I have reviewed and relied upon the
    following materials:
    - Declaration by Arthur C. Grant, MD, PhD dated May 22, 2020.
    - Letter from Arthur C. Grant, MD, PhD, to counsel detailing his evaluation of
      Mr. Holder
    - Medical Records for Mr. Holder, including St. Louis Children's Hospital
      #782062; St John's Mercy Medical Center dated Dec 22, 1992; Forest Park
      Medical Clinic dated Feb 3, 1992; SSM Cardinal Glennon children's hospital
      dated March 18, 1998
    - Bureau of Prisons Health Services Records
    - Various authoritative textbooks, peer-reviewed articles, materials from
      government regulatory agencies such as the FDA, and other publications and
      materials as included in the references cited throughout this declaration

4.  As I have stated previously, if additional documents or materials are provided to me for
    specific review and analysis, or if I become aware of other scientific or clinical evidence
    that impacts my opinions, or if in attendance at any hearings or trials in this case I learn
    of relevant evidence, I may choose to modify these opinions accordingly.  To aid counsel
    and the Court, I will summarize some of my previous conclusions in this declaration, in
    addition to addressing counsel's questions.

Exhibit A

II.   **Summary of Opinions**

    a.  Norris Holder suffers from epilepsy, which has resulted in grand mal, generalized seizure activity.  He has been on antiepilepsy drug (AED) therapy since 2017, and has been taking carbamazepine (CBZ) chronically for over six months. He therefore has induced enzymes in his system that are responsible for enhanced metabolism of barbiturates, and that will alter pentobarbital drug levels in the blood and brain, placing him at further risk for awareness and suffering, as well as prolonged death due to altered drug levels.

    b.  Most alternative AEDs have similar effects on the enzymes involved in barbiturate metabolism, and if substituted for CBZ will not mitigate the problem of enhanced barbiturate clearance, but will themselves also continue to induce enzymes that enhance the metabolism of barbiturates.

    c.  Experts and the FDA recommend that when conversion to another AED therapy is needed, it be accomplished by first titrating in the new therapy over a period of weeks, and then withdrawing the original AED (in this case CBZ) over an additional period of weeks.  In accordance with expert consensus withdrawal of CBZ and substitution of another AED will take a minimum of 9 to 13 weeks.

    d.  Discontinuing the CBZ prior to execution without monotherapy substitution carries a virtually certain outcome of rapid (within hours to days) recurrence of frequent seizures.

III.   **Clinical Background and Evidence**

A.  Barbiturate metabolism and action

    5.  Please refer to pages 9-12 of my November 1, 2019 Declaration for a discussion with references of clinical and pharmacological effects of pentobarbital, and to thiopental which is identical in all relevant characteristics to pentobarbital for the purpose of this discussion.

    6.  In brief, the intended and unintended effects of barbiturates are dependent on factors related to the pharmacokinetic characteristics of the drug, e.g. how quickly the drug is taken up after intravenous (IV) injection by the heart, lungs, and brain, and how quickly the drug leaves these tissues after arrival.  In the case of short-acting barbiturates like pentobarbital, a main mechanism of their short duration of action is "redistribution".  After initially traveling to the tissues where its clinical effects are expressed (e.g. the brain), short-acting barbiturates are quickly redistributed to other tissues in the body, such as muscle, where they have no clinical effects relevant to this discussion.  A number of factors that determine how rapidly the drug enters the brain also affect how rapidly the drug is redistributed away from the brain.  One such factor is plasma drug concentration.

    7.  The body can be thought of as a "multiple compartment" system, in which the different "compartments"—e.g. brain, muscle, fat, bone—are connected by the blood stream. Given enough time, a drug injected in the blood stream will "equalize" through all

compartments (if it is not being actively removed). This occurs because the concentration gradient of the drug between different compartments drives the flow of the drug: drug travels from high concentration areas to lower concentration areas. The greater the difference between the concentrations of drugs, the more rapidly the drug will tend to travel. Other factors also determine how fast a drug gets into a given compartment. For example, the fat "compartment" has significantly fewer blood vessels per volume than muscle, and so after IV injection, many substances flowing through the bloodstream "find" the muscle more rapidly, and the concentration of the drug in muscle early after injection is much higher than that of fat.

8. In the case of barbiturates, after IV injection, the drug travels rapidly to the brain, and as soon as the concentration in the brain is significantly higher than elsewhere, the drug begins to "redistribute" back out of the brain to other tissues. This redistribution is actually beginning even as the drug is still being injected, but flow out of the brain is slower than drug entry into the brain during injection, and for a time during drug injection, brain levels rise. Levels of the drug are also beginning to rise in other tissues as well, albeit more slowly. Once injection stops, the brain concentration reaches its peak, and then falls immediately as the drug flows from area of high concentration in the brain, to seek tissues with lower concentrations—first to muscle, because that compartment has plentiful blood flow, then to other areas with fewer blood vessels, such as fat.

9. Redistribution is responsible for most of the large shifts in concentration of the barbiturates in the brain, but at the same time a "substantial amount"[1] of the drug is also being removed from the bloodstream via metabolism to inactive byproducts in the liver. This metabolism reduces the absolute rise of blood levels in the brain by reducing available drug in the bloodstream, and also then contributes to the rapid decline of blood levels in the brain by reducing plasma concentration of drug. This increases the concentration difference between the brain and bloodstream and promotes faster redistribution out of the brain to the bloodstream and then on to the muscle compartment. Under most circumstances, metabolism of the barbiturate contributes little to termination of drug action in the brain compared to redistribution. In certain circumstances, however, specific enzymes in the liver that are responsible for removal of barbiturates from the bloodstream can be boosted through a process called "induction", leading to much more rapid removal of drug from the bloodstream and lower drug concentrations—thus reducing the amount of drug available to enter the brain, while enhancing the rapidity with which it leaves the brain.

10. In the case of judicial lethal injection, these considerations become important when we consider that a prisoner who is taking medication that induces barbiturate metabolism is at risk of 1) lower achievable blood levels in the brain, thus increasing risks of awareness and suffering from pulmonary edema, and 2) more rapid metabolism of barbiturate with resultant lower blood levels, that then cause more rapid exit of barbiturate from the brain, also increasing risks of awareness and suffering, and potentially prolonging death.

---

[1] Vuyk J, Stisen E, Reekers M. Intravenous anesthestics. From: Miller's Anesthesia, 9th Ed. Gropper, et al., eds. Elsevier Inc. Philadelphia PA. 2020. Pp 648-53

11. One of the best known drugs that enhances the enzymes specifically responsible for barbiturate metabolism is CBZ. Evidence of induction of enzymes involved in barbiturate metabolism can be seen via altered levels of affected drugs in the bloodstream within a few days of the first dose of an inducing drug, however, full induction of the enzymes is believed to take several weeks.[2]

B.   Cytochrome P450 (CYP) Enzyme System and Barbiturate Metabolism

12. The main system responsible for metabolizing barbiturates in the liver, transforming them to their inactive byproducts, is a group of enzymes called CYP enzymes (also referred to as the cytochrome P450 enzyme family).  Some drugs can cause the body to produce increased levels of CYP enzymes ("induce them"), which can cause increased or decreased levels of other drugs in the bloodstream (depending on the drug), or increased or decreased drug action at the target organ.  Such effects can continue for prolonged periods of time (i.e. weeks to months) even after the inducing drug has been discontinued. The induction of CYP enzymes is a significant issue with AEDs, and occurs with most AEDs. The relevance of these interactions is important not only when administering a new drug to a person who is on antiepileptic therapy, but also when discontinuing drugs in such persons.[3]  CBZ and several other AEDs are major enzyme-inducing drugs, and stimulate the rate of metabolism of most co-administered AEDs.[4]

13. Pentobarbital is metabolized in the liver via the CYP system, but there is virtually no information in the literature about how CYP interactions affect pentobarbital metabolism specifically, since pentobarbital is not widely used in human clinical practice (please refer to my November 1, 2019 report, pages 9-12).  In order to understand the effects of CBZ on pentobarbital, we can, however, refer to the effects on another barbiturate for which drugs interactions in humans is better described, phenobarbital (or phenobarbitone) (PB).  PB is used in the treatment of epilepsy, and its interactions with the CYP enzymes and with other antiepileptic drugs are well documented in the literature. Most barbiturates, including thiopental and pentobarbital, are metabolized almost exclusively by the liver.  Although some of PB's elimination also occurs in the kidneys, the portion of PB's metabolism that occurs in the liver follows the same pathways as all other barbiturates, via three particular enzymes of the CYP system;  CYP2C9, CYP2C19, and

---

[2] Brodie MJ, Mintzer S, Alison M, et al.  Enzyme induction with antiepileptic drugs: cause for concern?  Epilepsia 2013; 54:11-27
[3] Patsalos PN, Froscher W, Pisani F, van Rijn CM.  The importance of drug interactions in epilepsy therapy.  Epilepsia 2002; 43:365-85
[4] Johannessen SI, Johannessen-Landmark C.  Antiepileptic drug interactions—principles and clinical implications.  Curr Neruopharmacol 2010; 8:254-67

Exhibit A

CYP2E1.[5,6,7]  CBZ is an "inducer" of the first two of these enzymes (as well as CYP1A2), and both of those enzymes inactivate barbiturates.[8] Patsalos et al., point out that co-administration of multiple AEDs in the presence of an enzyme inducer like CBZ usually results in increased rate of metabolism of the co-administered drug, followed by a decrease in plasma concentration and "possibly loss of clinical efficacy".[9]  Studies examining effects of co-administering CBZ and PB have only reported the effect on CBZ plasma levels, which were significantly reduced. The effect on PB plasma levels did not receive comment, however PB is known to not only be an inducer of CYP2C9 and CYP2C19, but also a substrate of the enzyme (i.e. the enzymes also act upon PB and metabolize it)[10]. PB would therefore be predicted to undergo enhanced metabolism after CBZ induction of the CYP enzymes

C.  Timing of Induction and De-induction of the CYP Enzyme System with CBZ

14. Administration of CBZ causes the body to synthesize larger amounts of CYP enzymes (i.e. "induces" the enzymes).  Enzyme synthesis does not turn on or off instantly, and usually takes time to respond to the presence or absence of an inducing agent.  Once enzymes are manufactured, they last for a significant period time before they break down. Therefore discontinuance of CBZ does not lead to immediate reversal of the enhanced barbiturate elimination.  This occurs for several reasons. First, CBZ must be completely eliminated from the body before the induction of new enzyme actually stops, since residual amounts of it continue to induce enzymes for some time even after the last dose. Then, even after all of the CBZ has been eliminated, cessation of the excess production of CYP enzymes lags behind for a period of time because enzyme synthesis is not instantly responsive to the lack of CBZ.  This process is can be thought of as analogous to putting on the brakes in a car—the car doesn't stop moving instantly, but continues to roll forward until the braking is fully engaged enough to bring it to a stop. Finally, the excess amount of enzyme as a result of the induction must also be then eliminated from the body before drug clearances to return to normal.

15. Determining how long it takes CYP enzyme levels and activity to return to normal after the final dose of any given drug has been fraught; specific studies and reasonable models are scarce, and various authors disagree significantly.  For CBZ, the drug elimination and "de-induction" phase was estimated to last about two weeks in studies done on several

[5] Patsalos PN, Froscher W, Pisani F, van Rijn CM.  The importance of drug interactions in epilepsy therapy.  Epilepsia 2002; 43:365-8
[6] Johannessen SI, Johannessen-Landmark C.  Antiepileptic drug interactions—principles and clinical implications.  Curr Neruopharmacol 2010; 8:254-67
[7] Perucca E.  Clinically relevant drug interactions with antiepileptic drugs.  Brit J clin Pharmacol. 2005; 61:246-255
[8] Patsalos PN, Froscher W, Pisani F, van Rijn CM.  The importance of drug interactions in epilepsy therapy.  Epilepsia 2002; 43:365-8
[9] Ibid.
[10] Ibid.

CYP enzymes that are not involved in barbiturate metabolism, CYP3A4, and CYP1A2.[11] However, other authors studying drug-to-drug interactions found that the interval for CYP enzymes to be eliminated was approximately 4 weeks.[12] For CYP2E1, Imai et al., estimated that elimination of induced enzymes would take about 2 weeks.[13] Added together with an estimate of two weeks for CBZ clearance followed by cessation of enzyme production, four weeks again emerges as about the total time course for CYP enzymes to return to normal after discontinuance of CBZ.

D.  Consequences of Discontinuing Carbamazepine

16. Discontinuing CBZ presents the obvious and severe problem of recurrent frequent seizures.  Because CBZ is its own inducer (meaning CBZ induces the very CYP enzymes responsible for its own metabolism), chronic CBZ administration is associated with very rapid clearance of the drug to levels that are below clinical efficacy, and correspondingly rapid seizure recurrence can occur hours to days after CBZ withdrawal if no other therapy is offered.  Furthermore, since most common antiepileptic drugs also similarly induce CYP enzymes involved in barbiturate metabolism, AED substitution will be expected in most cases to also induce pentobarbital metabolism themselves.  While some newer classes of AEDs are purported to cause less drug to drug interaction with regard to metabolism, recent studies have suggested that this is not always true, and these interactions are not necessarily eliminated.

17. If conversion to another AED is contemplated, providers should expect it to take a prolonged period of time.  Garnett et al., state that sudden changes in AEDs put the patient "at risk for catastrophic seizure worsening, raising the risk for acute repetitive seizures or even status epilepticus."[14] The FDA states that  during conversion to monotherapy with oxycarbezepine, for example, concomitant AEDs should be withdrawn over a period of no less than 3-6 weeks.[15]  In general, for monotherapy conversions, the new AED must be initiated and titrated to therapeutic levels prior to withdrawal of the original AED, in this case CBZ.   Expert consensus now recommends up-titration timelines for the replacement AEDs that vary with the drug, but that for most fall

---

[11] Imai H, Kotegawa T, Ohashi K.  Duration of drug interactions: putative time courses after mechanism-based inhibition or induction of CYPs.  Expert Rev Clin Pharmacol 2011; 4:409-11

[12] Reitman ML, Chu X, Cai X, et al.  Rifampin's acute inhibitory and chronic inductive drug interactions: experimental and model-based approaches to drug-drug interactions trial design.  Clin Pharmacol Ther 2011; 89:234-242

[13] Imai H, Kotegawa T, Ohashi K.  Duration of drug interactions: putative time courses after mechanism-based inhibition or induction of CYPs.  Expert Rev Clin Pharmacol 2011; 4:409-11

[14] Garnett WR, St Louis EK Henry TR, Bramleuy T.  Transitional polytherapy: tricks of the trade for monotherapy to monotherapy AED conversions.  Curr neuropharmacol 2009; 7:83-95

[15] Oxcarbazepine.  FDA prescribing information.  Drugs.com.  Available at: https://www.drugs.com/pro/oxcarbazepine.html  Accessed August 8, 2020

Exhibit A

between four and eight weeks in duration.  They further recommend that CBZ specifically be withdrawn over no less than five weeks.[16] Thus the expert consensus on monotherapy states the replacement process should take between nine and 13 weeks to safely accomplish.

E.  Review of  Medical Records and Neurology Report for Mr. Norris

18. Mr. Norris Holder suffered from febrile seizures as a child.  He did not discover that he had an adult seizure disorder until 2017, when a prisoner in an adjacent cell heard his head hitting the wall during a generalized seizure that occurred in Mr. Norris's sleep.  A corrections officer arrived in time to witness the seizure, providing confirmation.  Mr. Holder has taken CBZ daily for his seizures since that time.  Retrospectively, after his diagnosis Mr. Holder recognized that he had been having seizures since 1992, at the time of a traumatic brain injury at age 16.  While these seizures were not witnessed, evidence of them came from instances in which he woke up on the floor, felt sore all over, had bitten his tongue, and been incontinent of urine.   Further details of Mr. Norris's neurological history as well as a neurological examination are summarized in Dr. Grant's report.

19. It is my expert opinion that because Mr. Holder has been on chronic CBZ therapy for several years, he has certainly undergone enzyme induction that will interfere with the metabolism and redistribution of barbiturates, such as pentobarbital.  Because of his substantially increased level of relevant, activated CYP enzymes, his body will both metabolize and redistribute pentobarbital much more rapidly than usual, in my opinion negatively affecting drug levels in the brain and increasing his risks for prolonged awareness, protracted death, and pain and suffering and sensations of drowning and suffocation due to the pulmonary edema that occurs during massive pentobarbital IV overdose.  It is also my expert opinion that withdrawal of CBZ presents specific and risks for Mr. Holder of severe injury and suffering due to recurrent seizures.  It is further my opinion that substitution of a different AED, if it is to be undertaken in a safe manner in keeping with medical standards, would take a minimum of nine to 13 weeks to accomplish, but that substitution of a different AED is nevertheless unlikely to mitigate the risks related to rapid metabolism of pentobarbital, since most AEDs have similar effects to CBZ on barbiturate metabolism.

20. I declare under the penalty of perjury that the forgoing is true and correct to a reasonable degree of medical certainty.

Dated this 7th day of August, 2020.

_Gail A. Van Norman, MD_

Gail A. Van Norman, MD

---

[16] St Luis EK, Gidal BE, henry TR< Kaydnanova Y, et al.  Conversions between monotherapies in epilepsy: expert consensus.  Epilepsy Behav 2007; 11:222-234