**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the ) | |
| Federal Bureau of Prisons' Execution ) | |
| Protocol Cases, ) | |
| ) | |
| LEAD CASE: *Roane et al. v. Barr* ) | Case No. 1:19-mc-145 (TSC) |
| ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| *LeCroy v. Barr, et al.*, 1:20-cv-2481 ) | |

**DEFENDANTS' CONSOLIDATED OPPOSITION TO
PLAINTIFF WILLIAM LECROY'S MOTIONS FOR
A PRELIMINARY INJUNCTION AND FOR AN EXPEDITED HEARING**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT ....................................................................................................................... 3

    I.      LEGAL BACKGROUND ....................................................................................... 3

    II.     FACTUAL AND PROCEDURAL HISTORY ....................................................... 7

STANDARDS OF REVIEW ................................................................................................ 10

ARGUMENT ....................................................................................................................... 12

    I.      LECROY'S MOTION SHOULD BE DENIED BASED ON DELAY
           ALONE ................................................................................................................... 12

    II.     LECROY'S STATUTORY AND CONSTITUTIONAL CLAIMS LACK
          MERIT ................................................................................................................... 14

        A.     LeCroy Has Not Shown Any Material Inconsistency Between The
              Federal Protocol And Georgia Laws That Fall Within The Scope
              Of The FDPA ............................................................................................15

              1.     Two-physician requirement (Ga. Code Ann. § 17-10-41) ............ 16

              2.     Resetting of execution date (Ga. Code Ann. § 17-10-40)............. 19

              3.     Prescription requirement for compounders (Ga. Code Ann.
                   § 26-4-86 and Ga. Comp. R. & Regs. 480-11.01(6))................... 21

        B.     LeCroy Is Unlikely To Succeed on His Remaining Claims .....................26

    III.    LECROY FAILS TO SHOW IRREPARABLE HARM ..................................... 27

    IV.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
           WEIGH AGAINST A PRELIMINARY INJUNCTION...................................... 32

    V.     LECROY'S MOTION SHOULD BE DENIED WITHOUT A HEARING ........ 35

CONCLUSION.................................................................................................................... 36

# TABLE OF AUTHORITIES

## Federal Cases

*Amoco Production Co. v. Gambell*,
480 U.S. 531 (1987) .................................................................................................. 32

*\*Barr v. Lee*,
No. 20A8, 2020 WL 3964985 (U.S. July 14, 2020) ....................................... 1, 7, 28

*Barr v. Purkey*,
No. 20A10, 2020 WL 4006821 (U.S. July 16, 2020) ......................................... 7, 28

*Barr v. Purkey*,
No. 20A9, 2020 WL 4006809 (U.S. July 15, 2020) ................................................ 7

*Barr v. Roane*,
140 S. Ct. 353 (2019) ............................................................................................... 6

*Baze v. Rees*,
553 U.S. 35 (2008) ................................................................................................... 4

*Beaty v. Brewer*,
649 F.3d 1071 (9th Cir. 2011) ............................................................................... 28

*Beyond Nuclear v. U.S. Dep't of Energy*,
233 F. Supp. 3d 40 (D.D.C. 2017) ........................................................................ 11

*Bourgeois v. Barr*,
Nos. 19-1348, 19A1050, 2020 WL 3492763 (U.S. June 29, 2020) .............. 3, 7, 28

*Bowles v. Desantis*,
934 F.3d 1230 (11th Cir.), *cert. denied*, 140 S. Ct. 26 (2019) ............................... 34

*\*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019) ..................................................................................... passim

*Calderon v. Thompson*,
523 U.S. 538 (1998) ................................................................................................ 33

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................................................ 11

*Coe v. McHugh*,
968 F. Supp. 2d 237 (D.D.C. 2013) ....................................................................... 11

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................................ 10

*Dunn v. McNabb*,
    138 S. Ct. 369 (2017) ......................................................................................... 32

*eBay Inc. v. MercExhcange, L.L.C.*,
    547 U.S. 288 (2006) ........................................................................................... 12

*Envtl. Def. Fund, Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) ............................................................................ 11

*Free Enter. Fund v. Pub. Co. Acct. Bd.*,
    561 U.S. 477 (2010) ........................................................................................... 27

*Gomez v. U.S. Dist. Ct. for N. Dist. of California*,
    503 U.S. 653 (1992) ...................................................................................... 12, 33

*Greater New Orleans Fair Hous. Action Ctr. v. United States Dep't of Hous. &*
    *Urban Dev.*,
    639 F.3d 1078 (D.C. Cir. 2011) .......................................................................... 32

*Hill v. McDonough*,
    547 U.S. 573 (2006) .............................................................................. 12, 14, 33

*\*In re Federal Bureau of Prisons' Execution Protocol*,
    955 F.3d 106, 108-11 (D.C. Cir.), *cert. denied sub nom Bourgeois v. Barr*, No.
    19-1348, 2020 WL 3492763 (U.S. June 29, 2020) ...................................... passim

*LeCroy v. United States*,
    739 F.3d 1297 (11th Cir. 2014), *cert. denied*, 575 U.S. 904 (2015) ..................... 9

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ........................................................................................... 11

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ........................................................................................... 10

*Miller v. Parker*,
    910 F.3d 259 (6th Cir.), *cert. denied*, 139 S. Ct. 399 (2018) .............................. 32

*Mitchell v. United States*,
    No. 20A32, 2020 WL 5016766 (U.S. Aug. 25, 2020) ......................................... 28

*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................................................... 27

iii

*Munaf v. Geren*,
553 U.S. 674 (2008) .................................................................................. 10

*Nelson v. Campbell*,
541 U.S. 637 (2004) .................................................................................. 14

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................. 12

*NLRB v. SW General, Inc.*,
137 S. Ct. 929 (2017) ............................................................................... 24

*Peterson v. Barr*,
965 F.3d 549 (7th Cir. 2020) ....................................................... 17, 19, 20

*Printz v. United States*,
521 U.S. 898 (1997) .................................................................................. 27

*Ringo v. Lombardi*,
No. 09-cv-4095, 2010 WL 4103201 (W.D. Mo. Oct. 18, 2010) ............. 31

*Sampson v. Murray*,
415 U.S. 61 (1974) .................................................................................... 27

*See League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................... 28

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) .................................................................. 11

*Storey v. Lombardi*,
135 S. Ct. 1198 (2015) .............................................................................. 34

*United States v. LeCroy*,
441 F.3d 914 (11th Cir. 2006) .................................................................. 7, 8

*United States v. Lee*,
No. 4:97-CR-243, 2020 WL 3921174 (E.D. Ark. July 10, 2020) ........... 35

*United States v. Mitchell*,
No. 20-9909, 2020 WL 4815961 (9th Cir. Aug. 19, 2020) ............. passim

*Wainwright v. Booker*,
473 U.S. 935 (1985) .................................................................................. 35

*Warner v. Gross,*
   135 S. Ct. 824 (2015) .......................................................................................... 34

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................................................... 11, 33

*Wisconsin Gas v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 29, 31


**Federal Statutes and Constitutional Provision**

U.S. Const. art. II, § 3 ....................................................................................... 26, 27

5 U.S.C. § 706 ........................................................................................................ 10

18 U.S.C. § 3596 ................................................................................... 4, 6, 15, 20


**Regulations**

28 C.F.R. § 26.3 ..................................................................................................... 19

28 C.F.R. § 26.4 ............................................................................................... 19, 30


**State Statutes**

22 Tex. Admin. Code §§ 281.1 *et seq.* .................................................................. 26

856 Ind. Admin. Code 1-1.1-2 *et seq.* .................................................................. 26

Ark. Admin. Code §§ 070.00.1-01-00-0001 *et seq.* ............................................. 26

Ark. Code. Ann. §§ 17-92-101 *et seq.* .................................................................. 26

Ga. Code Ann. § 17-10-38 ............................................................................ 23, 24, 25

Ga. Code Ann. § 17-10-40 ................................................................................. 19, 21

Ga. Code Ann. § 17-10-41 ............................................................................ 16, 17, 19

Ga. Code Ann. § 17-10-42.1 ................................................................................... 25

Ga. Code Ann. § 26-4-3 ................................................................................ 22, 23, 25

Ga. Code Ann. § 26-4-4 .......................................................................................... 22, 23

Ga. Code Ann. § 26-4-86 .................................................................................. 21, 22, 24

Ga. Code Ann. §§ 26-4-1 *et seq.* ............................................................................ 22

Ga. Comp. R. & Regs. 480-11-.01 ................................................................... 22, 23, 24

Ind. Code §§ 25-26-13-1 *et seq.* ............................................................................ 26

Mo. Ann. Stat. §§ 338.010 *et seq.* ......................................................................... 26

Mo. Code Regs. Ann. tit. 20, §§ 2220-1.010 *et seq.* ............................................. 26

Tex. Occ. Code §§ 551.001 *et seq.* ........................................................................ 26

**State Cases and Briefs**

Brief on Behalf of Appellee, *Gissendaner v. Commissioner, Georgia Dep't of Corrections*,
  779 F.3d 1275 (11th Cir. 2015) ............................................................................ 24

Brief on Behalf of Appellees, *Hill v. Owens*,
  Ga. S. Ct. No. S13W0834, available at 2013 WL 808958 ................................... 24

*West v. Schofield*,
  519 S.W.3d 550 (Tenn.), *cert. denied*, 138 S. Ct. 476 (2017) .............................. 29

**Other Authorities**

LCvR 7 .................................................................................................................... 35

Order, *Nelson v. Barr*, No. 20-5260 (D.C. Cir. Aug. 27, 2020) ....................... 12, 28, 33

# INTRODUCTION

William LeCroy is before this Court after having been convicted and sentenced to death in 2004 for the heinous carjacking, rape, and murder of a 30-year-old nurse, merely seven weeks after he was released from previous terms of state and federal imprisonment.  In the nearly two decades since, LeCroy's conviction and sentence have been upheld by every court to review them.  Now, more than a year after the United States adopted its current lethal injection protocol, more than a month after he received notice of his execution date, and just two weeks before that date, LeCroy has moved to enjoin his execution on the grounds that the federal protocol is inconsistent with language from the Federal Death Penalty Act ("FDPA") included in his sentencing judgment and that executing him under that protocol would violate the FDPA, the Administrative Procedure Act ("APA"), and the Take Care Clause of the Constitution.  LeCroy's motion should be denied for several independent reasons.

First, it is untimely.  LeCroy could have brought this motion a year ago when the protocol was adopted.  Indeed, several other inmates sentenced to death brought claims last year in this district court seeking to enjoin their executions on the same ground that LeCroy now asserts (an alleged conflict with the FDPA) as part of a consolidated case encompassing several separate suits challenging the federal lethal injection regulation and protocol.  And 2019 filings that LeCroy now relies on to show exhaustion of administrative remedies confirm that he was well aware of the basis for his current protocol challenges more than a year ago.

But now, after other inmates' claims were rejected as "without merit" by the D.C. Circuit and the Supreme Court declined review, LeCroy files in this Court two weeks before his execution. That inexcusable delay alone forecloses the "last-minute" reprieve that LeCroy seeks, which the Supreme Court recently reiterated "should be the extreme exception, not the norm."  *Barr v. Lee*, No. 20A8, 2020 WL 3964985, at *2 (U.S. July 14, 2020) (quoting *Bucklew v. Precythe*, 139 S. Ct.

1

1112, 1134 (2019)); *see Bucklew*, 139 S. Ct. at 1134 (explaining that "the last-minute nature of an application" that "could have been brought" earlier, or "an applicant's attempt at manipulation," "may be grounds for denial of a stay") (citation omitted).

Second, LeCroy has shown no likelihood of succeeding on his claims under the FDPA or the APA. Those claims are predicated principally on alleged conflicts between the federal protocol and aspects of Georgia execution procedures, but the alleged conflicts are all illusory, for one or more reasons. The FDPA does not, for example, require federal executions to track state procedures for setting execution dates or providing prisoners and their lawyers notice of the date, as the Ninth Circuit recently held. *United States v. Mitchell*, No. 20-9909, 2020 WL 4815961, at *3 n.6 (9th Cir. Aug. 19, 2020) (per curiam). Even assuming that the Georgia law requiring the presence of two physicians to determine death falls within the FDPA's scope, the Bureau of Prisons has arranged for two physicians to be present at LeCroy's execution to determine when death supervenes, thus eliminating any even potential difference between the federal protocol and relevant state law. *See* Exh. 1, Winter Decl., ¶ 7. And LeCroy's third asserted conflict fails chiefly because Georgia law does not, in fact, require the State to obtain a prescription for the substances it uses in conducting a lethal injection, and so the FDPA does not obligate the federal government to adhere to that made-up requirement.

Third, the remaining factors relevant to awarding an injunction weigh against relief. LeCroy has failed to establish irreparable harm where he does not (and cannot) challenge the lawfulness of his conviction and sentence in this Court, and has asserted only injury to his generalized interest in being executed under a lawful protocol. Courts have rejected similarly abstract claims of legal harm as insufficient to enjoin an execution, *see, e.g., Mitchell*, 2020 WL 4815961, at *5, and nothing about the minor differences between federal and state execution

2

protocols alleged by LeCroy distinguishes his case from those.  Nor does the balance of equities favor LeCroy given the last-minute character of his motion, his extensive delay in bringing suit, and the government's strong interest in timely enforcement of a long-affirmed capital sentence imposed for a staggeringly brutal crime.  LeCroy's request for an eleventh-hour reprieve should be denied.

**STATEMENT**

## I.   LEGAL BACKGROUND

The background of the federal execution protocol is described in *In re Federal Bureau of Prisons' Execution Protocol*, 955 F.3d 106, 108-11 (D.C. Cir.) (per curiam), *cert. denied sub nom Bourgeois v. Barr*, No. 19-1348, 2020 WL 3492763 (U.S. June 29, 2020) (*Execution Protocol Cases*), and is familiar to the Court.  In brief, federal law has made crimes punishable by death since the Crimes Act of 1790, which also prescribed that the "manner of inflicting death" would be by hanging.  955 F.3d at 108-09.  Congress changed the law in 1937 to make "the 'manner' of federal executions follow state law."  *Id.* at 109.  In 1984, Congress repealed the 1937 law while leaving capital crimes on the books.  *Id.*  To fill the gap, in 1993, the Attorney General promulgated regulations providing that lethal injection would be the method of execution and also "address[ing] various other matters," such as "the time and place of execution, when the prisoner must be notified of the execution, and who may attend it."  *Id.* (citing 28 C.F.R. Part 26).

In 1994, Congress enacted the Federal Death Penalty Act ("FDPA").  The FDPA provides, in a section entitled "[i]mplementation of a sentence of death," that "[a] person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence," and "[w]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise

3

implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). The statute further provides that "[i]f the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." *Id.*

Three federal defendants—Timothy McVeigh, Juan Raul Garza, and Louis Jones, Jr.— were executed in the first decade after the FDPA's enactment, all under the federal legal-injection regulation, and without reference to subsidiary details of state execution procedures. For more than 15 years after Jones's 2003 execution, however, legal and practical impediments prevented federal executions from going forward. Legally, several federal prisoners sentenced to death filed civil suits in this district challenging the then-existing federal execution protocol. *Execution Protocol Cases*, 955 F.3d at 110. The litigation was stayed while, *inter alia*, the Supreme Court considered constitutional challenges to state executions conducted by lethal injection, including in *Baze v. Rees*, 553 U.S. 35 (2008). *Execution Protocol Cases*, 955 F.3d at 110. The Bureau of Prisons ("Bureau" or "BOP") memorialized its use of a three-drug injection protocol following the decision in *Baze*, but a practical obstacle then emerged: by 2011, "anti-death-penalty advocates [had] induced the company that manufactured" one of the drugs in the federal protocol "to stop supplying it for use in executions." *Bucklew*, 139 S. Ct. at 1120.

The Bureau eventually explored a single-drug execution protocol using the sedative pentobarbital and, after careful study, adopted that protocol in 2019. *Execution Protocol Cases*, 955 F.3d at 110. BOP noted that recent state executions had used that drug without difficulty and that courts had rejected constitutional challenges to its use, *id.*, including the Supreme Court in *Bucklew*. BOP was also able to "locate[] a 'viable source' for obtaining it." *Id.* In addition to

4

specifying pentobarbital as the lethal agent, an Addendum to the 2019 protocol provides details about the "qualified personnel" conducting the execution, the arrangement of and dosages in the syringes, procedures for strapping the prisoner to the execution table, and instructions for accessing the prisoner's veins.  ECF No. 39-1, A.R. 1069-70;[1] *see also* ECF No. 39-1, A.R. 1041 (describing the procedure for "a specified qualified person" to examine the inmate "to ensure that death has occurred").[2]  The addendum states that it may be "modified at the discretion of the" BOP Director "(1) [to] comply with specific judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) as may be required by other circumstances." ECF No. 39-1, A.R. 1069; *see also* ECF No. 39-1, A.R. 1019 (stating that the protocol "should be observed and followed as written unless deviation or adjustment is required, as determined by the Director of the BOP or the Warden").

Meanwhile, on July 25, 2019, the Attorney General announced the resumption of federal executions and scheduled the first of those for December 2019 and January 2020.  *Execution Protocol Cases*, 955 F.3d at 111.  Several of the prisoners with scheduled execution dates then moved this Court for a preliminary injunction, arguing that the Bureau's 2019 protocol (including the addendum) violated provisions of the Administrative Procedure Act, the FDPA, the Food Drug, and Cosmetic Act, and the Constitution.  *Id.*  This Court granted a preliminary injunction after finding that the plaintiffs were likely to succeed on their argument that the federal protocol

---

[1] In this brief, filings in the Master Case in this Court are referenced by their ECF number, while the Complaint in No. 20-cv-2481 is cited as "Compl."  "DE" refers to docket entries in the Northern District of Georgia criminal case, *United States v. LeCroy*, No. 2:02-cr-38 (N.D. Ga.).

[2] BOP has supplemented the administrative record on several occasions and, following the decision in the *Execution Protocol Cases*, issued an updated 2020 version of the protocol and its Addendum effective July 31, 2020.  *See* ECF No. 171, A.R. 1086-1139.

conflicts with the FDPA's requirement that federal executions be implemented "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a).  The court of appeals, and then the Supreme Court, declined to disturb that injunction pending the government's appeal, but three Justices joined a statement expressing the view that the government was "very likely to succeed" on its argument that "manner" in Section 3596(a) means only the top-line choice among methods of execution (such as lethal injection or hanging), and not all subsidiary details of state execution protocols.  *Barr v. Roane*, 140 S. Ct. 353 (2019) (statement of Alito, J.).

The D.C. Circuit vacated the preliminary injunction in a per curiam opinion, with Judges Katsas and Rao issuing concurring opinions to explain their reasoning for rejecting the prisoners' FDPA claims as "without merit," and with Judge Tatel dissenting.  *Execution Protocol Cases*, 955 F.3d at 108-13.  As relevant here, Judge Katsas would have held that "the FDPA regulates only the top-line choice among execution methods."  *Id.* at 112.  Judge Rao reasoned that the FDPA requires the government to comply with "execution procedures enacted or promulgated by states as part of their binding law," but not "aspects of a state execution procedure that were not formally enacted or promulgated."  *Id.* at 133, 135.[3]  She explained that the prisoners' claims failed under her reading of the FDPA because "[f]ew of the procedural details" they claimed the FDPA incorporates "carry the force of law," and, in any event, the federal protocol "allows departures as needed to comply with state law."  *Id.* at 142, 143.  For his part, Judge Tatel agreed with the prisoners' argument that the FDPA requires federal executions to be carried out using even procedures listed in state execution protocols not entrenched in state statutes or binding regulations, but even he acknowledged that the FDPA incorporated only those state procedures

---

[3] Judge Katsas "agree[d] with Judge Rao that the FDPA's reference to the 'law of the State' covers only state statutes and binding regulations," making that proposition a holding of the court of appeals.  *See* 955 F.3d at 124 n.10 (Katsas, J., concurring).

"that effectuate death," such as "choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Id.* at 151.

The Supreme Court denied certiorari and a stay application in the *Execution Protocol Cases* in June 2020. *Bourgeois v. Barr*, Nos. 19-1348, 19A1050, 2020 WL 3492763. Since that time, five federal prisoners have been executed: Daniel Lewis Lee, Wesley Ira Purkey, Dustin Lee Honken, Lezmond Mitchell, and Keith Dwayne Nelson. In several of those cases, the executions proceeded after the Supreme Court vacated last-minute injunctions entered by the lower courts, including this Court. In entering those orders, the Supreme Court stressed the demanding "showing required to justify last-minute intervention by a Federal Court," and reaffirmed that "'[l]ast-minute stays . . . should be the extreme exception, not the norm.'" *Barr v. Lee*, No. 20A8, 2020 WL 3964985, at *2 (U.S. July 14, 2020) (quoting *Bucklew*, 139 S. Ct. at 1134); *see also Barr v. Purkey*, No. 20A9, 2020 WL 4006809 (U.S. July 15, 2020); *Barr v. Purkey*, No. 20A10, 2020 WL 4006821 (U.S. July 16, 2020).

## II.    FACTUAL AND PROCEDURAL HISTORY

LeCroy's crime predates even the earliest protocol litigation in this district. In October 2001, just weeks after being released from prior terms of state and federal imprisonment, LeCroy broke into the residence of Joann Tiesler armed with a loaded shotgun, a knife, and plastic cable ties. *United States v. LeCroy*, 441 F.3d 914, 918-19 (11th Cir. 2006). When Tiesler returned to her home, LeCroy struck her in the back of her head with his shotgun and discharged the weapon in the hallway outside her bedroom. LeCroy then tied Tiesler's ankles together and bound her hands behind her back with the plastic cable ties. He stripped Tiesler and forced her to kneel at the foot of her bed, where he raped her vaginally and anally. Afterward, LeCroy strangled Tiesler with an electrical cord, slit her throat, and stabbed her repeatedly in the back. LeCroy left Tiesler's

naked body bound on her bed, where she was discovered by neighbors the following day.  He loaded Tiesler's Ford Explorer with supplies and drove toward Canada.  *Id.* at 919-20.

LeCroy was apprehended two days later at the U.S.-Canadian border driving Tiesler's vehicle.  The knife LeCroy used to kill Tiesler was in the vehicle, as were two notes LeCroy had written on the back of a torn map.  One note stated, "Please call the police and report this vehicle as stolen.  Thanks, The Thief," and the other note stated, "Please, please, please forgive me Joanne [sic]. You were an angel and I killed you.  Now I have to live with that and I can never go home. I am a vagabond and doomed to hell."  441 F.3d at 919-20 & nn.2, 3.

In 2002, LeCroy was charged in the Northern District of Georgia with taking a motor vehicle by force, violence, and intimidation from Joann Tiesler resulting in her death, in violation of 18 U.S.C. § 2119(3).  The jury found him guilty and, at the conclusion of the sentencing phase, returned a sentence of death. 441 F.3d at 920.  The district court entered a judgment committing LeCroy to the Attorney General's custody while he pursued his appeals and also providing that, when the judgment became final, "the Attorney General shall release [LeCroy] to the custody of the United States Marshal who shall make the arrangements for the execution and supervise implementation of the sentence."  DE417 at 3.  The judgment further stated that "[t]he manner of execution shall be by any means prescribed by law in the State of Georgia at the time of the execution."  *Id.*

LeCroy's conviction and sentence were affirmed on direct appeal.  *LeCroy*, 441 F.3d at 914-31. The Supreme Court denied his petition for a writ of certiorari in 2007.  550 U.S. 905.  The next month, LeCroy moved the district court to appoint counsel to prepare and file a collateral attack.  DE476. The court granted that motion and appointed John R. Martin and Sandra L. Michaels.  DE479.  In April 2008, those attorneys filed on LeCroy's behalf a motion to vacate, set

aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  DE493.  The motion raised several

issues, including claims of ineffective assistance of counsel.  The district denied the motion after

a three-day evidentiary hearing, DE551; the court of appeals affirmed, 739 F.3d 1297 (11th Cir.

2014), and the Supreme Court again denied certiorari, 575 U.S. 904 (2015).

In April 2015, LeCroy filed a letter motion seeking the reappointment of attorneys Martin

and Michaels under 18 U.S.C. § 3599(e) "for whatever remaining legal processes are available to

him, as well as a request for commutation of his sentence by the President."  DE577.  The district

court granted the motion and ordered counsel to prepare a proposed budget and submit it under

seal to the court by May 30, 2015.  DE578.  In a motion to extend that deadline, counsel explained

that they needed additional time to prepare a budget in part because it was "unclear exactly what

future proceedings may be necessary regarding execution protocols in light of the fact that the

Attorney General has not yet approved any such protocols and issues regarding legal injection are

pending before the [U.S.] Supreme Court."  DE581 at 2; *see id.* (further stating that, if litigation

on the protocol "issue is required, expert services would be necessary").

LeCroy did not join or initiate any protocol litigation before the Bureau issued the amended

protocol in 2019.  Nor did he join the *Execution Protocol Cases* litigation in 2019.  Rather, during

the relevant period, LeCroy submitted (and then withdrew) a clemency petition in late 2016,

DE598-1; requested the appointment of additional counsel to assist with clemency, DE583; and

sought the administrative remedy from the Bureau of Prisons discussed further below, Exh. 2.  His

case otherwise remained dormant until after the D.C. Circuit reversed this Court's preliminary

injunction in the *Execution Protocol Cases* and the Supreme Court denied review.  Specifically,

on July 31, 2020, the Bureau of Prisons informed LeCroy and his counsel that his execution had

been scheduled for September 22, 2020.  *See* DE593 at 4 (motion in which LeCroy states that,

"[o]n July 31, 2020, Mr. LeCroy and his attorneys received notice that his execution date had been set for September 22, 2020").  The government entered notice on the Georgia district court docket the next day providing additional notice.  DE591.

More than three weeks later, LeCroy filed a motion in the Georgia district court to modify or reset his execution based on concerns relating to the COVID-19 pandemic.  DE593.[4]  After briefing and a motions hearing, the court denied LeCroy's motion on September 4, 2020, DE601, a ruling he has since appealed to the Eleventh Circuit, DE602.

Hours before the Georgia district court ruled and five weeks after LeCroy and his counsel were notified of his execution date, LeCroy filed a civil complaint in this Court seeking injunctive and declaratory relief.  Compl. at 22.  The complaint and ensuing motion for a preliminary injunction (ECF No. 233), filed four days later, allege that the use of the 2019 federal execution protocol in carrying out the death sentence violates the FDPA; the APA, 5 U.S.C. § 706; and the Constitution's Take Care Clause, principally based on three asserted differences between the federal protocol and the state law of his district of conviction (Georgia).

## STANDARDS OF REVIEW

LeCroy has moved for a preliminary injunction, which "is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).  The movant must

---

[4] LeCroy's motion initially rested in part on limitations on counsel's ability to meet with him in person for the purpose of filing a clemency application.  While the motion was pending, however, LeCroy submitted such an application to the Department's Office of the Pardon Attorney.  *See* DE599.

satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The "most important factor" is whether the movant has "established a likelihood of success on the merits," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

If the Court converts LeCroy's motion into one for summary judgment, *see* ECF No. 232, the standard governing summary judgment in the APA context would govern for his APA claims. In that context, "the standard under Fed. R. Civ. P. 56(a) does not apply." *Beyond Nuclear v. U.S. Dep't of Energy*, 233 F. Supp. 3d 40, 47 (D.D.C. 2017) (citing *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013)).  "Instead, the court must decide as a matter of law 'whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Id.* (citation omitted).  "The court's review is 'highly deferential' and begins with a presumption that the agency's actions are valid." *Beyond Nuclear*, 233 F. Supp. 3d at 47 (quoting *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981)).  The court is "not empowered to substitute its judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but instead must consider only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Overton Park*, 401 U.S. at 416).

Moreover, before ordering an injunction as a remedy for the claimed violation, a court must conclude that the plaintiff has satisfied "a four-factor test" that requires the plaintiff to show, among other things, irreparable injury, an inadequate remedy at law, that the balance of hardships warrants an injunction, and "that the public interest would not be disserved by a permanent

injunction." *eBay Inc. v. MercExhcange, L.L.C.*, 547 U.S. 288, 391 (2006).  As the D.C. Circuit recently emphasized in vacating a permanent injunction entered in this litigation based on an asserted inconsistency between the federal execution protocol and federal law, any injunction entered must "comply with Fed. R. Civ. P. 65(d)" by, "*inter alia*," being supported by "findings and conclusions that irreparable injury will result from" any "statutory violation."  Order, *Nelson v. Barr*, No. 20-5260 (D.C. Cir. Aug. 27, 2020).

## ARGUMENT

## I.   LECROY'S MOTION SHOULD BE DENIED BASED ON DELAY ALONE

The Supreme Court has specifically criticized suits that are "dilatory or speculative" or that seek to employ "[r]epetitive or piecemeal litigation" to delay the carrying out of capital sentences. *Hill v. McDonough*, 547 U.S. 573, 584-85 (2006).  The Court has therefore required that courts "take into consideration" an inmate's "attempt at manipulation" and "the last-minute nature of an application . . . in deciding whether to grant equitable relief."  *Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 503 U.S. 653, 654 (1992) (per curiam).  And it has employed "a strong equitable presumption against the grant of a stay"—an equitable remedy similar to an injunction, *see Nken v. Holder*, 556 U.S. 418, 428, 434 (2009)—"where a claim could been brought at such a time as to allow consideration of the merits without requiring entry of a stay."  *Hill*, 547 U.S. at 584 (citation omitted).

Here, these principles alone foreclose LeCroy's request for equitable relief in the form of an injunction because he offers no persuasive justification for failing to bring this suit at several earlier points.  As noted above, LeCroy's longtime post-conviction lawyers were aware of litigation over the former protocol as early as 2015, when they sought an extension of time to prepare a budget based in part on the possibility of conducting such litigation and using "expert services" to do so.  DE581 at 2.  Moreover, LeCroy's arguments concerning exhaustion of

administrative remedies (ECF No. 233-1 at 12) confirm that he had personally considered substantively similar challenges to the federal protocol more than a year before he filed this motion. Specifically, in August 2019, LeCroy submitted a request for administrative remedy to BOP asserting that "[t]he method by which the federal government intends to execute prisoners violates the laws and Constitution of the United States" for the reasons alleged in a typed attachment. *See* Exh. 2, *infra*. The attachment, in turn, made allegations tracking those in the *Execution Protocol Cases*—*i.e.*, that the federal protocol violates the FDPA, the APA, and other provisions of federal law, including by creating potential "conflicts-of-laws issues." *Id.* at 7. And although the administrative appeal process concluded in December 2019, *id.* at 1, LeCroy did not pursue his allegations by suing or seeking to intervene in the *Execution Protocol Cases*.

LeCroy now suggests that he had to wait "until the FDPA was interpreted to require adherence to binding state law and the Government set his execution date without any plan to do so." ECF No. 233-1 at 22. Of course, several other inmates brought suit over a year ago in an effort to convince this Court that the FDPA "require[s] adherence to binding state law." *See id.* In any event, LeCroy offers no valid reason for declining to join in the *Execution Protocol Cases* after this Court adopted that very interpretation almost ten months ago. Nor does he explain why he failed to file suit after the D.C. Circuit's decision on appeal from this Court in April 2020 or, at the latest, immediately upon receiving notice of his execution date on July 31, 2020. Indeed, another prisoner who received notice of his execution date on the same day as LeCroy (Christopher Vialva) at least filed suit in this Court in June 2020, after the D.C. Circuit's decision in the *Execution Protocol Cases* and before the Supreme Court denied certiorari. *See* Compl., ECF No. 1, No. 20-cv-1693 (filed June 22, 2020). LeCroy did not match even that very belated filing, even though he was equally on notice of the need to file because the Attorney General's 2019

13

statement announcing the resumption of federal executions made clear that the inmates scheduled for execution had, like both LeCroy and Vialva, "exhausted their appellate and post-conviction remedies," such that "no legal impediments prevent their executions."   DOJ, Office of Public Affairs, *Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse* (July 25, 2019), at https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.

Instead, LeCroy waited until weeks after being notified of his execution date, filed separate claims in the Georgia district court, and then waited 10 more days to file suit in this Court, just hours before the Georgia court denied relief in a ruling now on appeal.   That is the type of repetitive, piecemeal litigation that the Supreme Court has cautioned against countenancing.   *Hill*, 547 U.S. at 584-85.   It also amounts to unnecessary delay "in bringing [a] claim," *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004), which alone supports denying LeCroy's motion.

## II.   LECROY'S STATUTORY AND CONSTITUTIONAL CLAIMS LACK MERIT

Apart from delay**,** LeCroy cannot satisfy the first and most important criteria for injunctive relief:   actual (or a likelihood of) success on the merits of his claims.   As explained below, LeCroy's principal claim of a conflict between the federal protocol and Georgia law fails either because the FDPA does not require compliance with the cited state-law procedures, those procedures are inapplicable as a matter of state law, or the Bureau of Prisons has chosen (whether or not the FDPA so requires) to arrange for certain procedures to match Georgia's for LeCroy's execution, as the 2019 protocol permits.   *See Execution Protocol Cases*, 955 F.3d at 143 (Rao, J., concurring).   And his remaining statutory and constitutional arguments are meritless.

14

A.     **LeCroy Has Not Shown Any Material Inconsistency Between The Federal Protocol And Georgia Laws That Fall Within The Scope Of The FDPA**

The FDPA provides in relevant part that a United States marshal "shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed."  18 U.S.C. § 3596(a).  LeCroy contends that his execution will violate this provision, and thus constitute unlawful agency action under the APA, because the D.C. Circuit has interpreted Section 3596(a) to require that federal executions adhere to state procedures set forth in binding law and the federal protocol that the Bureau of Prisons will use in his execution differs from Georgia's procedures in three ways: (1) Georgia law, but not the federal protocol, requires the presence of two physicians to determine the inmate's death; (2) Georgia's procedures for resetting an execution date that has passed are distinct from those in the federal protocol and the regulations in 28 C.F.R. Part 26; and (3) Georgia law, but not the federal protocol, LeCroy argues, requires the compounding pharmacy that supplies an execution drug to prison officials to obtain a prescription.  ECF No. 233-1 at 13-19.

None of these arguments establishes a violation of the FDPA (or the APA).  First, even assuming the two-physician requirement is within the scope of the FDPA under the *Execution Protocol Cases*, the Bureau of Prisons has confirmed that two physicians will be present in LeCroy's case to determine when death supervenes, thereby eliminating any even potential divergence with state law.  *See* Exh. 1, Winter Decl., ¶ 7.  Second, LeCroy has not demonstrated that the rescheduling and notice provisions he cites are even applicable to the circumstances of his case, and those provisions are clearly *not* incorporated by the FDPA in any event.  And third, Georgia's prescription laws do not apply to executions, as the State of Georgia has repeatedly explained in appellate court filings, and even if state law were otherwise, those pharmaceutical provisions also fall outside the FDPA's scope.

15

1.     Two-physician requirement (Ga. Code Ann. § 17-10-41)

LeCroy first argues that executing him under the federal protocol will violate the FDPA because that protocol does not include Georgia's requirement that two physicians be present for the execution.  ECF No. 233-1 at 8-9.  In particular, LeCroy relies on Ga. Code Ann. § 17-10-41 (2010), which states in pertinent part that, "[t]here shall be present at the execution of a convicted person the superintendent of the state correctional institution or a deputy superintendent thereof, at least three executioners, two physicians to determine when death supervenes, and other correctional officers, assistants, technicians, and witnesses as determined by the commissioner of corrections."  The federal protocol, by contrast, permits but does not require the presence or participation of physicians.  The protocol provides that "qualified personnel" shall serve as the executioners or their alternates and defines "qualified personnel" to include "currently licensed physicians," as well as "nurses, EMTs, Paramedics, Phlebotomists, [and] other medically trained personnel, including those trained in the United States Military having at least one year professional experience . . . in a specific execution related function."   ECF No. 171, A.R. 1138; *see* Exh. 1, Winter Decl., ¶ 5.  It further provides that "a specified qualified person" will be the one to examine the inmate "to ensure that death has occurred."  ECF No. 39-1, A.R. 1041.

For several reasons, however, LeCroy's claim does not make out a violation of the FDPA. First, under the government's view of the statute—persuasively explained in Judge Katsas's concurring opinion in the *Execution Protocol Cases*—Section 3596(a) requires only that the federal government adhere to the States' top-line choice of execution method, not subsidiary procedures such as the presence of particular individuals to declare death.  *See* 955 F.3d at 112 (per curiam); *id.* at 113-19 (Katsas, J., concurring).[5]  In addition, even on Judge Rao's view of the

---

[5] The government recognizes that Judge Katsas' opinion does not constitute the law of the circuit and that Judge Rao's opinion is instead controlling on this question about the meaning of

FDPA, it is questionable at best whether Georgia's two-physician requirement falls within the scope of Section 3596(a).  As the Seventh Circuit has explained, "the debate among the D.C. Circuit judges was limited to state laws, regulations, and protocols governing *procedures for effectuating death*."  *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020) (emphasis in original); *see also Execution Protocol Cases*, 955 F.3d at 122 (per curiam) (describing Judge Rao's conclusion "that the FDPA also requires the federal government to follow *execution procedures* set forth in state statutes and regulations") (emphasis added).  And while Judge Tatel's dissent included "medical-personnel requirements" among the procedures that "effectuate death," 955 F.3d at 151, it is doubtful that he or Judge Rao viewed that category as encompassing not just those who "carry out" the execution by preparing the inmate or administering the lethal drug, *see United States v. Mitchell*, No. 20-9909, 2020 WL 4815961 (9th Cir. Aug. 19, 2020) (per curiam), but also individuals present simply to confirm that death has *already* occurred.  This Court can therefore reject LeCroy's claim on the threshold ground that Georgia's two-physician requirement falls outside the scope of Section 3596(a).

The Court need not decide that question, however, because the Bureau of Prisons has arranged for two physicians to be present at LeCroy's execution to determine that death has occurred.  *See* Exh. 1, Winter Decl., ¶ 7.  As a result, the procedures for LeCroy's execution will align with Georgia's statutory requirement that "two physicians" be present "to determine when death supervenes," Ga. Code Ann. § 17-10-41, even if that aspect of state law falls within the FDPA's scope.

---

Section 3596(a).  *See* 955 F.3d at 124 n.10, 126 n.12 (Katsas, J., concurring).  But the government does maintain—and seeks to preserve here—its position that Judge Katsas' interpretation of the FDPA is the correct one.

LeCroy does not dispute that the Bureau has the authority to tailor its execution procedures in this fashion, ECF No. 233-1 at 8, and with good reason.  Nothing in the federal protocol suggests any limit on BOP's ability to have physicians participate in federal executions; indeed, a physician has been involved in all five recent federal executions.  *See* Exh. 1, Winter Decl., ¶ 6.  And even if the federal protocol did actually conflict with Georgia law on this point, the Addendum to the execution protocol reserves to the Bureau Director or his designee the discretion to modify the procedures used to implement federal death sentences, *inter alia*, "to comply with specific judicial orders" and "as may be required by other circumstances."  ECF No. 39-1, A.R. 1019, 1069; ECF No. 171, A.R. 1138.  Thus, a majority of the panel recognized in the *Execution Protocol Cases* that "[s]hould cases arise in which the protocol differs from state law . . . DOJ remains free to depart from the federal protocol."  955 F.3d at 143 (Rao, J., concurring); *id.* at 126 n.12 (Katsas, J., concurring) (agreeing "with Judge Rao that [the federal protocol] may be adjusted to conform to state law to whatever extent the FDPA may require").

The Ninth Circuit's decision in *Mitchell* confirms that a court may rely on a BOP declaration in considering an implementation challenge under Section 3596(a).  There, the prisoner claimed several conflicts between the federal protocol and Arizona execution procedures.  The Ninth Circuit determined that some of the cited state law provisions fell outside the scope of Section 3596(a) and saw little substantive difference between other state provisions and the protocol.  2020 WL 4815961, at *3-*4.  But as to those where it could not rule out that federal protocol differed from state requirements, the court relied on a declaration from the Bureau of Prisons "certifying that it will comply with th[e Arizona] procedures" that Mitchell had identified.  *Id.* at *4 & n.8.  The outcome should be the same here—*viz.*, that because the Bureau has averred in a sworn declaration that it has arranged for two physicians to be present at LeCroy's execution

to determine when death supervenes, the execution will be conducted in the manner required by Ga. Code Ann. § 17-10-41.  The execution thus will comply with the FDPA even on LeCroy's reading of Section 3596(a).

2.    Resetting of execution date (Ga. Code Ann. § 17-10-40)

LeCroy next argues that the federal protocol and the 1993 regulations diverge from Georgia law in circumstances where "a previously-set time period for an execution passes by reason of a stay of execution or otherwise."  ECF No. 233-1 at 14.  In particular, LeCroy points out that a Georgia statute empowers a superior court judge to "fix[] a new time period for the execution" and establishes a window within which the date must be set, Ga. Code Ann. § 17-10-40(a)-(b), whereas federal regulations and the protocol provide that the BOP Director will designate "a new date."  28 C.F.R. § 26.3(a); *see* ECF No. 39-1, A.R. 1023 (2019 protocol); ECF No. 171, A.R. 1093 (2020 protocol).  He further observes that the same Georgia statute has implications for the notice that a prisoner and his counsel will receive when the execution date is reset and that these differ from those in the federal protocol and regulations.  *Compare* Ga. Code Ann. § 17-10-40(a), *with* 28 C.F.R. § 26.4(a) and ECF No. 171, A.R. 1093.  LeCroy is correct that the Georgia statute is a "binding" state law under the *Execution Protocol Cases*.  *See* 955 F.3d at 132 (Rao, J., concurring); *id.* at 126 n.12 (Katsas, J., concurring).  But his claim nevertheless fails for two reasons.

*First*, Georgia's laws on resetting and advising prisoners of a rescheduled execution date plainly fall outside the scope of Section 3596(a)'s implementation requirement.  As explained above, "the debate among the D.C. Circuit judges" in the *Execution Protocol Case*s "was limited to state laws, regulations, and protocols governing procedures for effectuating death."  *Peterson*, 965 F.3d at 554 (emphasis omitted).  And procedures for resetting an execution date that has passed, or for notifying the prisoner's counsel of that date, are not among those that effectuate or carry out death.

19

Recent decisions of the Seventh and Ninth Circuits strongly support that conclusion.  In *Peterson*, for example, the Seventh Circuit considered whether Section 3596(a) requires that federal executions comply with state laws governing witness attendance at an execution. Reviewing the opinions in the *Execution Protocol Cases*, the court pointed out that even Judge Tatel's dissent "accepted that § 3596(a) does not require the BOP to follow 'every nuance' of state execution procedure, but rather only 'those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements.'"  965 F.3d at 554 (quoting 955 F.3d at 151).  The court then determined that "Section 3596(a) cannot be reasonably read to incorporate every aspect of the forum state's law regarding execution procedure" and that, because Section 3596(a) "concerns how the sentence is carried out, not who watches," it does not incorporate state-law "details such as witnesses."  *Id.*

The Ninth Circuit's decision in *Mitchell* is even more directly on point.  In denying a capital defendant's motion for a stay of execution, that court agreed with the Seventh Circuit that Section "§ 3596(a) addresses, at most, state laws that set forth procedures for giving practical effect to a sentence of death," meaning "'only those [state] procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements.'"  *Mitchell*, 2020 WL 4815961, at *2 (quoting *Peterson*, 965 F.3d at 554).  The Ninth Circuit then considered alleged inconsistencies between the federal protocol and Arizona procedures that the prisoner had briefed on appeal, as well as five other purported inconsistencies that he had identified in the district court.  *Id.* at *3 & n.6.  This latter group included a state statute governing "notice of an execution date" and a rule of criminal procedure addressing "judicial postponement of execution dates upon a finding of impracticality."  *Id.* at *3 n.6.  The Ninth Circuit held that those and two other provisions "fall outside the scope of 18 U.S.C. § 3596(a), because

they are not pertinent to effectuating death."  *Id*.  The same is true of the execution-rescheduling

and notice aspects of Georgia law that LeCroy cites here.

*Second*, LeCroy's claim fails for the independent reason that he has not demonstrated that

the Georgia procedures for *resetting* a previously scheduled execution have any application in the

circumstances of his case, which involves an execution that has been scheduled for the first time.

By its terms, the cited Georgia law authorizes a state judge to set a new date "[w]here the time

period for the execution of any convicted person in a capital case has passed by reason of a

supersedeas incident to appellate review, a stay of execution by the State Board of Pardons and

Paroles, or for any other reason."  Ga. Code Ann. § 17-10-40(a).  But it is undisputed here that

LeCroy has never been subject to an execution date that "passed."  *See id.*  Indeed, the Georgia

district court explained just days ago that it "did not elect to take on the initial responsibility for

setting the date of execution when imposing judgment" and instead "delegated the authority to

implement or carry out the sentence to the Attorney General."  DE601 at 9.[6]  LeCroy therefore has

not established any material difference between the federal protocol's application to his case and

the timing or notice provisions of Georgia law that he cites.

3.  Prescription requirement for compounders (Ga. Code Ann. § 26-4-86 and
     Ga. Comp. R. & Regs. 480-11.01(6))

LeCroy finally contends that, in order to perform a lethal injection, Georgia law "requires

that a compounder of drugs must obtain a prescription to make and provide" the Department of

---

[6] LeCroy's judgment did state that "[t]he sentence shall be carried out within sixty days of the date when the conviction and sentence are final and no further direct appeal is allowable." DE417 at 3.  But an execution date was not set even though LeCroy's "direct appeal" ended in 2007 and collateral review continued until 2015.  LeCroy does not mention the language of the judgment in his Complaint or motion, and he understandably does not suggest that either the Georgia district court or the parties understood it to constitute an operative time period for carrying out the execution.

Corrections an execution drug, such as pentobarbital.  ECF No. 233-1 at 11, 16 (citing Ga. Comp. R. & Regs. 480-11-.01(6) and Ga. Code Ann. § 26-4-86).  LeCroy is incorrect.  Georgia law is unmistakably clear that any requirement for drug compounders to obtain a prescription does not apply in the context of an execution.  And even if Georgia law were otherwise, such a requirement would fall outside the scope of the FDPA's implementation provision.

a.  The Georgia Pharmacy Practice Act (GPPA), Ga. Code Ann. §§ 26-4-1 *et seq.*, was enacted in 1998 in order "to promote, preserve, and protect the public health, safety, and welfare by and through the effective control and regulation of the practice of pharmacy . . . and the regulation and control of such other materials as may be used in the diagnosis, treatment, and prevention of injury, illness, and disease of a patient or other individual."  Ga. Code Ann. § 26-4-3.  The GPPA defines the "practice of pharmacy" as "the interpretation, evaluation, or dispensing of prescription drug orders in the patient's best interest." Ga. Code Ann. § 26-4-4.  With respect to compounding practices, the GPPA provides that the Georgia State Board of Pharmacy "shall establish rules and regulations governing the compounding and distribution of drug products by pharmacists, practitioners, and pharmacies licensed or registered by this state."  Ga. Code Ann. § 26-4-86(a).

Pursuant to that authority, the Board established rules for pharmaceutical compounding, including—and as relied upon by LeCroy here—defining compounding in part as "the preparation, mixing, assembling, packaging, or labeling of a drug or device as the result of a practitioner's prescription drug order or initiative based on the relationship between the practitioner, patient, and pharmacist in the course of professional practice . . . ."  Ga. Comp. R. & Regs. 480-11-.01(6). Those rules further define "practitioner" as a "person licensed under the laws of this state to use, mix, prepare, dispense, prescribe, and administer drugs in connection with medical treatment to

the extent provided by the laws of this state," Ga. Comp. R. & Regs. 480-11-.01(26), and "prescription drug order" as "a lawful order of a practitioner for a drug or device for a specific patient." Ga. Comp. R. & Regs. 480-11-.01(27).

By their own terms, however, the GPPA and the rules promulgated pursuant to it have no application in the death penalty context.  Executions are not "medical treatments," Ga. Comp. R. & Regs. 480-11-.01(26); the condemned is not a "patient," Ga. Comp. R. & Regs. 480-11-.01(27); and a lethal injection does not involve "the diagnosis, treatment, [or] prevention of injury, illness, [or] disease of a patient or other individual." Ga. Code Ann. § 26-4-3; *see also* Ga. Code Ann. § 26-4-4 (defining the practice of pharmacy as "the interpretation, evaluation, or dispensing of prescription drug orders *in the patient's best interest*") (emphasis added).  The GPPA and its rules establish licensing requirements for pharmacists and govern prescriptions used for medical treatments; they do not regulate executions.

The Georgia legislature made this indisputably clear when it amended Ga. Code Ann. § 17-10-38 to its current form two decades ago.  Ga. Code Ann. § 17-10-38(a) provides that all persons who have "imposed upon them a sentence of death shall suffer such punishment by lethal injection," which the statute describes as "the continuous intravenous injection of a substance or substances sufficient to cause death into the body of the person sentenced to death until such person is dead."  Critically, that same statute provides that "*[n]otwithstanding any other provision of law*, prescription, preparation, compounding, dispensing, or administration of a lethal injection authorized by a sentence of death by a court of competent jurisdiction shall not constitute the practice of medicine or any other profession relating to health care which is subject by law to regulation, licensure, or certification."  Ga. Code Ann. § 17-10-38(c) (emphasis added).  In other words, the Georgia legislature expressly established that "prescription," "compounding," or

23

"administration of a lethal injection authorized by a sentence of death" is *not* subject to the provisions of the GPPA and its regulations, for lethal injections are not the "practice of medicine or any other profession relating to health care."  Even if the pharmacy provisions cited by LeCroy were otherwise applicable here, which they are not, the Georgia legislature made plain that Ga. Code Ann. § 17-10-38(c) governs when it comes to executions.  *See NLRB v. SW General, Inc.*, 137 S. Ct. 929, 939 (2017) (explaining that the use of "notwithstanding" in statutes "'shows which provision prevails in the event of a clash'") (citation omitted).

Consistent with this straightforward reading of Georgia law, the State of Georgia has repeatedly and consistently explained, in both state and federal appellate court filings, that the GPPA and its regulations do not apply to executions. *See, e.g.*, Brief on Behalf of Appellee 30-34, *Gissendaner v. Commissioner, Georgia Dep't of Corrections*, 779 F.3d 1275 (11th Cir. 2015); Brief on Behalf of Appellees, *Hill v. Owens*, Ga. S. Ct. No. S13W0834, available at 2013 WL 808958.  And while the Georgia Department of Corrections and its compounders may choose to obtain a prescription for pentobarbital prior to an execution, *see* ECF No. 233-1 at 11, 16, they do so voluntarily and not because that is required by Georgia law.  Indeed, the Georgia Department of Corrections' Execution Protocol—which contains detailed processes for handling and administering pentobarbital—does not mention, let alone require, that authorities obtain a prescription in order to perform a lethal injection.  *See* ECF 39-1, A.R. 16-18.  Put simply, LeCroy's assertion that Georgia law, including Ga. Comp. R. & Regs. 480-11-.01(6) and Ga. Code Ann. § 26-4-86, requires the state to obtain a prescription in order to perform a lethal injection is without merit.

b.  Even if Georgia law required state authorities and their compounders to obtain a prescription for pentobarbital before performing an execution, such a requirement would fall

outside the scope of the FDPA's implementation provision. Under Judge Rao's controlling opinion, the FDPA's implementation provision applies only to "execution procedures set forth in state statutes and regulations." *Execution Protocol Cases*, 955 F.3d at 112 (per curiam); *id.* at 129 (Rao, J., concurring) ("[T]he FDPA requires the federal government to apply only those execution procedures prescribed by a state's statutes and formal regulations."). The Georgia law provisions relied on by LeCroy do not set forth "execution procedures." Rather, as noted, the statute and regulations cited by LeCroy are part of the Georgia Pharmacy Practice Act, which promotes "the public health, safety, and welfare by and through the effective control and regulation of the practice of pharmacy." Ga. Code Ann. § 26-4-3.

In fact, as explained above, the Georgia statutes that set forth the state's execution procedures, such as Ga. Code Ann. § 17-10-38, expressly provide that the carrying out "of a lethal injection authorized by a sentence of death" is not subject to any of the state statutes or regulations governing "the practice of medicine or any other profession relating to health care which is subject by law to regulation, licensure, or certification"—such as the practice of pharmacy. Ga. Code Ann. § 17-10-38(c); *see also* Ga. Code Ann. § 17-10-42.1 ("Participation in any execution of any convicted person carried out under this article shall not be the subject of any licensure challenge, suspension, or revocation for any physician or medical professional licensed in the State of Georgia."). And to the extent LeCroy seeks to rely on a practice by Georgia authorities of voluntarily obtaining a prescription for pentobarbital prior to an execution, that practice does not "carry the force of law, so the federal government need not follow [it]" under the FDPA. *Execution Protocol Cases*, 955 F.3d at 142 (Rao, J., concurring).

Finally, LeCroy's interpretation of the FDPA—that state statutes and regulations governing the general practice of pharmacy fall within the scope of the FDPA—is contrary to

Judge Rao's observation that "[s]tate execution statutes tend to be rather brief, specifying lethal injection without adding further details." *Execution Protocol Cases*, 955 F.3d at 142 (Rao, J., concurring).  Each of the states that were at issue in *Execution Protocol Cases* have statutes and formal regulations that govern pharmacists and pharmacies, and they are anything but "brief." *See, e.g.*, Tex. Occ. Code §§ 551.001 *et seq.* (Texas Pharmacy Act); 22 Tex. Admin. Code §§ 281.1 *et seq.* (Texas Pharmacy Rules); Ark. Code. Ann. §§ 17-92-101 *et seq.* (Arkansas Pharmacy Practice Act); Ark. Admin. Code §§ 070.00.1-01-00-0001 *et seq.* (Arkansas Pharmacy Regulations); Ind. Code §§ 25-26-13-1 *et seq.* (Indiana Pharmacy Practice Act); 856 Ind. Admin. Code 1-1.1-2 *et seq.* (Indiana Board of Pharmacy Regulations); Mo. Ann. Stat. §§ 338.010 *et seq.* (Missouri Pharmacy Practice Act); Mo. Code Regs. Ann. tit. 20, §§ 2220-1.010 *et seq.* (Missouri State Board of Pharmacy Regulations).  Indeed, none of the plaintiffs in *Execution Protocol Cases* advanced a construction of the FDPA that included a state's general pharmacy provisions. And for good reason. The general pharmacy provisions cited by LeCroy fall far outside the scope of any reasonable interpretation of the FDPA.

### B.    LeCroy Is Unlikely To Succeed on His Remaining Claims

LeCroy also briefly suggests at points in his motion and Complaint that the entire federal protocol should be set aside as *ultra vires* agency action under the APA and that it was issued in violation of the Take Care Clause, U.S. Const. art. II, § 3.  *See* ECF No. 233-1 at 17; Compl. ¶¶ 46, 59.  Those claims also lack merit.

1.  To the extent LeCroy argues that the entire protocol must be aside as unlawful or *ultra vires* agency action based on a conflict with the FDPA, that argument is foreclosed by the D.C. Circuit's decision in the *Execution Protocol Cases*.  The court there rejected as "without merit" the FDPA implementation argument that forms the basis for LeCroy's APA challenge.  955 F.3d at 112 (per curiam).  The D.C. Circuit directed that judgment be entered for Defendants on the

FDPA claim and issued its mandate to this Court. *Id.* at 108; *see also* ECF No. 156 (mandate). And the fact that both the court of appeals and the Supreme Court have permitted executions to go forward under the federal protocol since the *Execution Protocol Cases* decision dispels any doubt that the decision resolved the FDPA argument at issue.

2.  LeCroy's claim under the Take Care Clause (or the separation of powers) is equally unavailing. That claim is essentially the same as the statutory claim addressed above—and fails for the same reasons LeCroy's FDPA claim fails—because LeCroy argues that the FDPA is the law that Defendants have failed to "faithfully execute" as required by the Take Care Clause. *See* ECF No. 233-1 at 12.  In any event, the Take Care Clause cannot form a basis for relief here because it speaks only to the President, assigning him the responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  *See Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 492-93 (2010) ("It is his responsibility to take care that the laws be faithfully executed."); *id.* at 495-97; *Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689-90 (1988). Subordinate Executive Branch officials, such as the named Defendants, cannot violate the President's duty to faithfully execute the law.

## III.   LECROY FAILS TO SHOW IRREPARABLE HARM

LeCroy's request for injunctive relief should be denied for the independent reason that he has failed to show irreparable harm, an indispensable requirement for both preliminary and permanent injunctive relief.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm").  While being executed is certainly "irreparable," that is not the relevant "injury" at issue in LeCroy's motion, which does not and cannot challenge the lawfulness of his conviction or sentence.  Rather, his asserted injury is that he could be executed by means of an illegal protocol.  *See* Compl. ¶ 64; ECF No. 233-1 at 20.  As discussed extensively, LeCroy fails to show the federal protocol is "illegal" under any

27

relevant statute or constitutional provision.  It has already been used to execute five other federal inmates, with the Supreme Court repeatedly vacating further stays of those executions.  *See, e.g.*, *Lee*, 2020 WL 3964985; *Purkey*, 2020 WL 4006821.  The Supreme Court, moreover, denied those and other inmates' requests for a stay pending further review of the FDPA claim that LeCroy now asserts, notwithstanding arguments very similar to those LeCroy makes here.  *Bourgeois v. Barr*, Nos. 19-1348, 19A1050, 2020 WL 3492763 (U.S. June 29, 2020); *see also Mitchell v. United States*, No. 20A32, 2020 WL 5016766 (U.S. Aug. 25, 2020).

But regardless, to obtain injunctive relief, LeCroy must do more than allege that he will be executed under a federal protocol that deviates in three ways from Georgia law.  He must show that the asserted differences between the federal protocol and Georgia procedures are likely to inflict actual, non-speculative harm during his execution.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (explaining that "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief") (citation omitted); *see also* Order, *Nelson v. Barr*, No. 20-5260 (D.C. Cir. Aug. 27, 2020) (reversing order enjoining execution of Keith Nelson for "insufficient findings and conclusions that irreparable injury will result from the statutory violation found by the district court").  And absent such a showing, courts have declined to stay or enjoin executions based solely on an inmate's asserted interest in an execution that conforms to written law.  *See Mitchell*, 2020 WL 4815961, at *2, *4 (concluding that inmate had not carried his burden of showing irreparable harm, which he had based on "the possibility that he 'could be executed by means of an illegal protocol'"); *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (denying stay of execution because, although inmate had "a strong interest in being executed in a constitutional manner, . . . he has not shown that this interest is threatened in this case").

LeCroy has not shown concrete injury arising from any of his asserted conflicts between the federal protocol and Georgia law.  He will not suffer any harm from alleged non-compliance with Georgia's two-physician requirement because BOP has arranged for two physicians to be present at his execution to determine death.  *See* p.  17, *supra*; Exh. 1, Winter Decl., ¶ 7.  But even in cases where BOP is unable to make that arrangement, the protocol calls for "a qualified person to be present at the execution and to declare the executed individual deceased," and elsewhere defines the term "qualified person" to include currently licensed physicians.  ECF No. 39-1, A.R. 874; ECF No. 171, A.R. 1097.  At least one physician has participated in all five federal executions conducted this year.  Exh. 1, Winter Decl., ¶ 6.  LeCroy does not assert that any problems concerning the determination of death, much less ones that involve a risk of actual harm, have arisen.[7]  And the prophylactic assurance afforded by a *second* physician is, at a minimum, not necessary to avoid a "certain and great" risk of irreparable harm from an improper determination of death.  ECF No. 226 at 2 (quoting *Wisconsin Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).[8]

---

[7] LeCroy's failure to allege (or establish) concrete harm attributable to his claimed legal violations distinguishes this case from the district court decisions he cites, ECF No. 233-1, at 20, all of which involved Eighth Amendment challenges based on allegations that existing procedures would subject inmates to severe pain.  The only remotely analogous allegations in LeCroy's Complaint (¶ 55) concern the risk that execution with pentobarbital could result in lingering death. Although LeCroy bases that suggestion on testimony from a Tennessee state court proceeding, he fails to note the trial court's ultimate finding in that case that the plaintiffs "did not carry their burden to establish that Tennessee's use of pentobarbital in its protocol entails a substantial risk of lingering death because they did not demonstrate even a minimal risk that inmates will awake after being declared dead following a lethal injection execution."  *West v. Schofield*, 519 S.W.3d 550, 563 (Tenn.) (citation omitted), *cert. denied*, 138 S. Ct. 476 (2017).

[8] To be clear, because the absence of a second physician would not amount to irreparable injury for the reasons stated in the text, the government not believe that an injunction would be appropriate to require compliance with the Georgia statute even if it falls within the scope of the FDPA.  *See Mitchell*, 2020 WL 4815961, at *4-*5 (denying stay and relying on BOP "declaration certifying that it will comply with th[e state] procedures" that the court assumed were applicable under the FDPA).

LeCroy likewise faces no harm from any difference between Georgia's procedures for resetting and notifying counsel of an execution date and the procedures in the federal scheme. He cannot identify any harm flowing from the asserted conflict between the federal protocol and the Georgia statute governing rescheduled executions because, as explained above (Part II.A.2, *supra*), his execution has never been rescheduled. As for notice, this Court determined just days ago that another capital defendant (Keith Nelson) could not show irreparable harm "from receiving sixteen fewer days' notice of his impending execution" than contemplated by the protocol. ECF No. 209 at 3. The same rationale applies *a fortiori* here, where LeCroy received *more* than the 50 days' advance notice provided for in the 2020 protocol that took effect the day he was notified of his execution, ECF No. 171, A.R. 1093—a period that is itself longer than the minimum 20-day period required by federal regulation. ECF No. 39-1, A.R. 1023; 28 C.F.R. § 26.4(a). Finally, while LeCroy points out that the federal protocol does not expressly require notice to counsel, ECF No. 233-1 at 10, his lawyers recently represented in the Georgia district court that both they and LeCroy received notice of his execution on July 31, 2020. DE593 at 4. The government also docketed a notice of execution date in that court the next day (August 1), ensuring that counsel received prompt electronic notice as well.

LeCroy has also failed to establish that he would suffer irreparable harm from the absence of a prescription for the pentobarbital that will be used at his execution. LeCroy speculates that the absence of a prescription raises "a concern with the quality of the lethal substance and the humaneness of [his] execution." ECF No. 233-1 at 11. But that conclusory assertion overlooks (1) that BOP has adopted guidelines to ensure the safety, efficacy, and reliability of the drug used to effectuate death, ECF No. 171, A.R. 1084-85; (2) that BOP has in fact subjected the drugs it intends to use to quality assurance testing by two independent laboratories, *see* ECF No. 39-1,

A.R. 970-1015; ECF No. 97-2, A.R. 1075-1083; and (3) that the protocol also specifies the qualifications of those who administer the drug, ECF No. 171, A.R. 1138.  Especially in light of those protections, which have repeatedly proven successful during the five executions to take place in recent months, LeCroy cannot show that the lack of prescription poses a risk of harm separate and apart from his death.  *Cf. Ringo v. Lombardi*, No. 09-cv-4095, 2010 WL 4103201, at *1-*2 (W.D. Mo. Oct. 18, 2010) ("[A]ny harm to Mr. Nunley from being executed with a drug that is not prescribed by a physician or approved by the FDA for the purpose of execution, is relatively small in comparison to the State of Missouri's interest in having its death penalty enforced.").  Indeed, LeCroy has not asserted any problems with the quality of the lethal substance used in, or the humaneness of, any of the five executions that have taken place this year under the federal protocol.  He simply has not alleged any cognizable harm he may suffer from the absence of a prescription for the drug that will end his life.[9]

In this respect, although LeCroy does not raise any claims under the FDCA, his assertion of irreparable harm should fail for reasons similar to those that this Court recognized in its recent order rejecting plaintiff Keith Nelson's claim of irreparable injury under the FDCA.  ECF No. 226.  In that case, Nelson alleged that irreparable injury would result from being "executed with a drug that has not [been] prescribed by a physician."  *Id.* at 2.  As this Court recognized, in order to prevail, Nelson had to prove that the irreparable injury alleged was "'both certain and great' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *Id.* (quoting *Wisconsin Gas*, 758 F.2d at 674).  This Court determined that "a showing of

---

[9] To the extent LeCroy suggests that his unsubstantiated concerns would be alleviated if BOP obtained a prescription for the pentobarbital it plans to use, he does not allege that any prescription issued under Georgia law would in fact be compliant with the FDCA.

irreparable harm [was] far from 'certain," *id.* (citation omitted) and denied Nelson's motion for relief. The same conclusion follows here.

In short, any deviations on technical details postulated by LeCroy will not cause him any harm whatsoever, much less irreparable harm. *See Mitchell*, 2020 WL 4815961, at *4-*5. This factor therefore does not support enjoining his execution.

## IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION

Because LeCroy's contentions fail on the merits and he has failed to show irreparable harm, this Court need not proceed further to consider the remaining injunction factors. "In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits." *Greater New Orleans Fair Hous. Action Ctr. v. United States Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011); *see also Amoco Production Co. v. Gambell*, 480 U.S. 531, 546 n.12 (1987) (noting that "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction," except that a permanent injunction requires "actual success" on the merits and not just "a likelihood of success"). In fact, the Supreme Court has vacated injunctions issued by lower courts in method-of-execution cases where the lower court enjoined the execution "without finding that [the inmate] has a significant possibility of success on the merits." *Dunn v. McNabb*, 138 S. Ct. 369 (2017); *see also Miller v. Parker*, 910 F.3d 259, 261 (6th Cir.) ("in execution protocol challenges, likelihood of success is often the determinative factor") (citation omitted), *cert. denied*, 139 S. Ct. 399 (2018). The Court has similarly made clear that irreparable injury is essential. *See Amoco Production Co.*, 480 U.S. at 542 ("[T]he bases for injunctive relief are irreparable injury and inadequacy of legal remedies."). And the D.C. Circuit underscored that requirement just weeks ago when it vacated an order enjoining Keith Nelson's execution based on an insufficient showing

32

of irreparable harm.  Order, *Nelson v. Barr*, No. 20-5260 (D.C. Cir. Aug. 27, 2020).  Because LeCroy cannot prevail on the merits of his claims and has not met his burden of showing irreparable harm, the Court should deny his motion for an injunction on those grounds alone.

Should the Court proceed further, however, the equities weigh heavily against issuing an injunction.  *See Winter*, 555 U.S. at 32 ("[T]he balance of equities and consideration of the public interest are pertinent in assessing the propriety of any injunctive relief.") (punctuation omitted). While LeCroy's claims to harm are abstract and speculative, the interests of the United States, the public, LeCroy's victim, and her family members are not.  LeCroy was sentenced to death more than 16 years ago for the brutal murder of Joann Tiesler.  "Equity must take into consideration the State's strong interest in proceeding with its judgment."  *Gomez*, 503 U.S. at 654; *see also Hill*, 547 U.S. at 584 (recognizing the government's "strong interest in enforcing its criminal judgments"); *Bucklew*, 139 S. Ct. at 1133 (emphasizing that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence").

As LeCroy acknowledges (ECF No. 233-1 at 24), the fact that his conviction and sentence have been repeatedly upheld, on both direct appeal and collateral review, provides the United States with a strong interest in finality.  "Only with an assurance of real finality can the [government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out."  *Calderon v. Thompson*, 523 U.S. 538, 556 (1998).  Finality is not just a strong interest of the United States as a litigant; "[f]inality is essential to both the retributive and the deterrent functions of criminal law," and "[w]ithout finality, the criminal law is deprived of much of its deterrent effect."  *Id.* at 555 (citation omitted)*; see also Bucklew*, 139 S. Ct. at 1134; *id*. at 1144 (Breyer, J., dissenting).  LeCroy's

crimes were heinous and depraved.  The public has a strong interest in carrying out the moral judgment and just punishment of a penalty imposed in 2004 and repeatedly affirmed since.

For these reasons, Judge Katsas concluded in his concurrence in the *Execution Protocol Cases* that the district court erred in finding that the balance of equities was in favor of death-row inmates seeking preliminary injunctions as to their executions.  *See* 955 F.3d at 126 ("In this case, the district court failed to recognize the important governmental and public interest in the timely implementation of capital punishment.").  Furthermore, the Supreme Court has routinely denied stay-of-execution applications by other condemned inmates while their challenges to execution protocols were pending.  *See Storey v. Lombardi*, 135 S. Ct. 1198 (2015) (denying stay-of-execution applications by Missouri inmates while challenges to Missouri's single-drug pentobarbital protocol were pending); *Warner v. Gross*, 135 S. Ct. 824 (2015) (same, involving a challenge to Oklahoma's execution protocol).  LeCroy has not (and indeed cannot) distinguish his challenge from those for which the Supreme Court has repeatedly refused to grant stays to permit an adjudication on the merits.

LeCroy does suggest that the equities favor him because the legal arguments he raises "should not entail lengthy delay," since they are not "particularly complicated" and would not "require lengthy factual development."  ECF No. 233-1 at 21-22.  But as the Eleventh Circuit has explained, each delay in carrying out an execution "where the conviction and sentence are valid" is, "for its span, . . . a commutation of a death sentence to one of imprisonment."  *Bowles v. Desantis*, 934 F.3d 1230, 1248 (11th Cir.) (citation omitted), *cert. denied*, 140 S. Ct. 26 (2019). Just as significant, LeCroy's other actions give reason to doubt that the additional delay he seeks would be minimal.  In opposing the conversion of his preliminary-injunction motion to one for summary judgment, for example, LeCroy has suggested that the record is "not yet fully-developed"

and that he might benefit from "discovery," including into actions of Georgia's Department of Corrections. ECF No. 235 at 2-3. And "[t]here will always be more litigation to file." *United States v. Lee*, No. 4:97-CR-243, 2020 WL 3921174, at *6 (E.D. Ark. July 10, 2020) (order denying motion to postpone execution date).

Finally, LeCroy twice cites Justice Powell's concurrence in *Wainwright v. Booker*, 473 U.S. 935, 937 (1985), which was a concurrence in an order *vacating* a stay of execution. ECF No. 233-1 at 20-21. That concurrence, which stressed the state's strong interest in carrying out the sentence "for a particularly brutal murder" after more than a decade of appeals, seems tailor-made for LeCroy's case. *Id.* "None of the many opinions that have been filed in this protracted litigation suggests that respondent is innocent or that his conviction raises any serious constitutional issues," and "[f]or our system of justice to function effectively, litigation in cases such as this one must cease when there is no reasonable ground for questioning either the guilt of the defendant or the constitutional sufficiency of the procedures employed to convict and sentence him." *Id.* No less than the state in *Wainwright*, the United States, the public, the victim, and her family "deserve better" than any delay of LeCroy's lawful, twice-affirmed sentence. *Bucklew*, 139 S. Ct. at 1134.

## V.   LECROY'S MOTION SHOULD BE DENIED WITHOUT A HEARING

LeCroy has separately moved the Court to hold an expedited hearing on his motion for injunctive relief. ECF No. 234. For the reasons discussed above, an expeditious ruling from the Court is essential given the approaching execution date and the last-minute nature of LeCroy's motion. And if a hearing would facilitate the Court's consideration, the government will make itself available at any time convenient for the Court.

But in the government's view, a hearing is unnecessary to resolve LeCroy's motion. *See* LCvR 7(f) (request for oral hearing is "within the discretion of the Court"). The Court has already taken measures to expedite the proceedings by entering a truncated briefing schedule, including

35

requiring LeCroy to file his reply on a weekend and within two days of this response.  That briefing

will adequately frame the issues for the Court, which is already familiar with the subject matter

because it has presided over extensive litigation concerning the execution protocol for more than

a year.  Holding a hearing, in short, would needlessly delay resolution of LeCroy's motion and

leave less time for any further proceedings that become necessary.

## CONCLUSION

For the foregoing reasons, LeCroy's request for injunctive relief should be denied.


Dated:  September 11, 2020

Respectfully submitted,

BYUNG J. PAK                                    BRIAN C. RABBITT
United States Attorney                          Acting Assistant Attorney General
Northern District of Georgia

                                                ROBERT A. ZINK
                                                Acting Deputy Assistant Attorney General
CAROLYN "TIPPI" CAIN BURCH
Assistant United States Attorney

                                                */s/ Scott Meisler*
*Attorneys for Defendants*                      SCOTT MEISLER, D.C. Bar #983239
                                                PAUL CRANE
                                                Criminal Division, Appellate Section
                                                U.S. Department of Justice
                                                Washington, D.C. 20530
                                                202-514-2550
                                                scott.meisler@usdoj.gov
                                                paul.crane@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2020, I caused a true and correct copy of foregoing to be served via the Court's CM/ECF system on counsel of record in *LeCroy v. Barr, et al.*, 1:20-cv-2481, and that I also transmitted a copy by e-mail to the following attorneys upon the request of plaintiff LeCroy's counsel:

John R. Martin (*pro hac vice pending*)
    jack@martinbroslaw.com

Steven Kissinger, Assistant Federal Public Defender (E.D. Tenn.)
    stephen_kissinger@fd.org

*/s/ Scott Meisler*
Attorney for Defendants

# Exhibit 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| In the Matter of the<br>Federal Bureau of Prisons' Execution<br>Protocol Cases<br><br>LEAD CASE: *Roane et al. v. Barr*<br><br><br><br>THIS DOCUMENT RELATES TO:<br><br>*LeCroy. v. Barr, et al.*, No. 20-cv-2481 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 19-mc-145 |

**<u>DECLARATION OF RICK WINTER</u>**

I, Rick Winter, do hereby declare and state as follows:

1.    I am employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP"), as Regional Counsel for the BOP's North Central Region.  I have held this position since October 2016.  I have been employed by the BOP since 1994.

2.    The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.

3.    The BOP, under the supervision of the United States Marshals Service, is responsible for implementing federal death sentences.  *See* 18 U.S.C. § 3596(a); 28 C.F.R. Part 26. William LeCroy's execution is scheduled to take place on September 22, 2020.

4.    I am aware that LeCroy claims that the BOP execution protocol conflicts with Georgia law. *See* ECF No. 233-1 at 8-9.  Specifically, LeCroy claims BOP's practices do not comport with the Georgia death sentence implementation statute, which requires that two physicians

1

be present at an execution "to determine when death supervenes."  *See* Ga. Code Ann. §

17-10-41 (2010).  LeCroy cites 28 C.F.R. Part 26 and the 2019 federal Protocol, and notes

neither requires physician presence at an execution as Georgia statutory law requires.  ECF

No. 233-1 at 8-9.

5.      The 2020 BOP Execution Protocol does not require the presence of any physician at an

execution, but states in relevant part that qualified personnel to serve as executioner(s) and

their alternates includes "currently licensed physicians, nurses, EMTs, Paramedics,

Phlebotomists, [and] other medically trained personnel, including those trained in the

United States Military having at least one year professional experience in a specific

execution related function."  ECF No. 171, A.R. 1138.[1]

6.      Although the presence of a physician is not required by the BOP Execution Protocol or any

federal regulation, BOP did have a physician in attendance for each of the five executions

that took place in July and August 2020.

7.      For William LeCroy's execution on September 22, 2020, the BOP has made arrangements

for two physicians to be present to determine when death supervenes.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and
correct.

Executed this   __11th__   day of September, 2020.

                             *Rick M. Winter*

                             Rick Winter
                             Federal Bureau of Prisons

---

[1] The same definition of qualified personnel is included in the 2019 BOP Execution
Protocol.  *See* ECF No. 39-1, A.R. 1069.

# Exhibit 2

**Administrative Remedy No. 987995-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you indicate you are appealing the Regional response
and are reiterating your previous allegations and relief sought.
Specifically, you contend the method by which the government intends
to execute prisoners violates the laws and Constitution of the United
States.  You argue the current protocol calls for administration
by inadequately trained and unqualified medical personnel, and is
likely to cause severe pain.  You further assert that you lack
knowledge of the personnel involved and the procedures related to
the protocol, and are unaware of the process for compounding the
lethal drug used.  Finally, you contend those selected and scheduled
for execution under the protocol are chosen in a secretive and
arbitrary fashion by the Attorney General, resulting in
discriminatory executions.  You request the current execution method
be modified to remedy the alleged illegalities as discussed in your
"Attachment A."

In accordance with Title 28, Code of Federal Regulations (C.F.R.),
Section 26.3, a sentence of death shall be executed by intravenous
injection of a lethal substance or substances in a quantity sufficient
to cause death.  The lethal injection procedures prescribed by the
Bureau of Prison's (BOP) Execution Protocol are administered in a
humane manner by appropriately trained and qualified personnel.
The method of execution currently used by the BOP is in accordance
with 28 C.F.R. §26.3.  In addition, the lethal injection procedures
prescribed by the Execution Protocol have been properly promulgated
in accordance with applicable laws and regulations.

The Attorney General does not select inmates that are sentenced to
death for execution.  Pursuant to 28 C.F.R. §26.3, a sentence of
death shall be executed on a date and at a time designated by the
Director of the BOP.  There is no credible evidence inmates are
selected for execution in a discriminatory manner.

I trust this has been response to your appeal.  However, if you are
seeking additional information/documentation not releasable at the
institution level, you may submit a request through a Freedom of
Information/Privacy Act (FOIA) request.  Such requests must be made
in writing and addressed to the following office with both the face
of the letter and envelope clearly marked, "Freedom of Information
Request.": Federal Bureau of Prisons Office of General Counsel, FOIA
Section, Room 936, 320 First Street, NW, Washington, DC 20534.

This response is provided for informational purposes.

_12 | 12 | 19_
Date

_____
Ian Connors, Administrator
National Inmate Appeals

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

| From: | Lecroy William E. Jr. | 45795-019 | SCU | USP Terre Haute3 |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A - REASON FOR APPEAL** This is an appeal of the Regional Administrative Remedy Appeal No.987995-R1. I herby re-raise my allegations andrelief stated in teh Request.

| 10/29/19 | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B - RESPONSE**

RECEIVED

NOV 0 5 2019

Administrative Remedy Section
Federal Bureau of Prisons

| | |
|---|---|
| DATE | GENERAL COUNSEL |

FIRST COPY: WASHINGTON FILE COPY          CASE NUMBER: 987995 A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

| | |
|---|---|
| DATE | SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL |

UPN LVN

BP-231(13)
JUNE 2002

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Administrative Remedy Number**: 987995-R1

This is in response to your Regional Administrative Remedy Appeal received in this office on September 5, 2019, in which you contend the method the federal government intends to execute prisoners violates the law and Constitution of the United States. For relief, you request the execution method be modified to remedy the alleged illegalities.

The information presented in your Regional Administrative Remedy Appeal, Request for Administrative Remedy, and the Warden's response, dated August 22, 2019, was reviewed. The Warden has accurately and adequately addressed the issues you raised. In accordance with Title 28, Code of Federal Regulations, Section 26.3(a)(4), a sentence of death in a federal case shall be implemented by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death. The lethal injection procedures prescribed by the Bureau of Prisons Execution Protocol have been established in accordance with 28 C.F.R. § 26.3, and comply with all applicable laws and regulations.

Based on the above information, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_10-6-19_
Date

J. E. Krueger, Regional Director

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: LaCroy William E. Jr          45795-019          SCU          Terre Haute
　　　　LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A - REASON FOR APPEAL**
This is an appeal of Administration Remedy: Number 987995-F1   I Hereby Re-raise
My Allegations and relief stated in the Request

8-27-19
_____
DATE

_William LeCroy Jr._
_____
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____                          _____
DATE                                     REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

SECOND COPY: RETURN TO INMATE                    CASE NUMBER: _____

**Part C - RECEIPT**
                                                 CASE NUMBER: _____

Return to: _____
　　　　LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

_____                          _____
DATE                                     SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-230(13)
JUNE 2002

Remedy No.:  987995-F1                                    FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted August 19, 2019, in which you allege the execution method violates the law and Constitution of the United States. For relief, you request the execution method be modified to remove alleged illegalities.

A review of your request reveals 28 C.F.R. 26.3(a)(4) requires that a sentence of death be implemented by "intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal."  The Bureau of Prisons execution protocol complies with this, and all applicable laws and regulations.

Therefore, this response to your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.


_____9/22/19_____

Date                                               T. J. Watson, Complex Warden

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: **LeCroy, William E., Jr.**     **45795-019**     **SCU**     **USP-THA**

LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A– INMATE REQUEST**

The method by which the federal government intends to execute prisoners violates the laws and Constitution of the United Staes for the reassons enumerated in the attached document. (see Attachment A).

I request that the execution method be modified to remedy the illegalities described in in the attached document, and that the federal government's method of execution be promulgated in accordance with the Administrative Procedure Act.

8/15/19

DATE     SIGNATURE OF REQUESTER

**Part B– RESPONSE**

**RECEIVED**

**USP Terre Haute**

AUG 19 2019

**Administrative
Remedy Clerk**

DATE     WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**THIRD COPY: RETURN TO INMATE**     CASE NUMBER: 787795-F1

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

DATE     RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP–229(13)
APRIL 1982

Attachment A

The method by which the federal government intends to execute prisoners violates the laws and Constitution of the United States for the reasons that follow:

1.  The document entitled "Addendum to BOP Execution Protocol" (hereafter referred to as "protocol"), as well as the preceding execution method, violate the Administrative Procedure Act ("APA") because they were issued without notice-and-comment rulemaking, and the protocol was therefore enacted "without observance of procedure required by law." 7 U.S.C. § 706(2)(D); 5 U.S.C. § 553.

2.  The protocol is "not in accordance with law," is "in excess of statutory jurisdiction, authority, or limitations," is "short of statutory right" and is "arbitrary, capricious, [and] an abuse of discretion" under the APA in that (a) the protocol's use, dispensing, and administration of pentobarbital – including but not limited to a compounded version of the drug – violates the Controlled Substances Act, 21 U.S.C. §§ 801, et seq. and its implementing regulations, as well as the Food Drug and Cosmetic Act, 21 U.S.C. §§ 301, et seq., and its implementing regulations; because (i) the protocol calls for the dispensing and administration of a Schedule II and III controlled substance without a valid prescription issued for a legitimate medical purpose in the usual course of a practitioner's medical practice and through a bona fide practitioner-patient relationship; and (ii) any compounded version of pentobarbital would be "essentially a copy" of an FDA-approved drug and thus an unapproved "new drug"; (b) the protocol violates Indiana law governing the dispensing of pentobarbital and similar controlled substances and compounded drugs, including but not limited to Ind. Code §§ 35-48-2-6(e), 35-48-2-8(c), 35-48-3-9, 35-48-4-2; (c) the purportedly enabling regulations codified at 28 C.F.R. §§ 26.1-26.5 lack statutory authority; (d) the protocol violates the FDPA's requirements that federal executions (i) take place within state facilities under 18 U.S.C. §§ 3596-3597, and (ii) use either the execution method employed by the state in which the sentence was imposed (only a few of which states use pentobarbital), or that of another state chosen by the sentencing court situated within a state that lacks the death penalty (most of which use an execution method different from the protocol's); (e) the protocol may be carried out against mentally incompetent or intellectually disabled persons in violation of 18 U.S.C. § 3596(c); and (f) those who are selected and scheduled for execution under the protocol are chosen in a secretive and arbitrary fashion by the Attorney General, resulting in executions based on race, religion, geography, and other arbitrary factors.

3.  The protocol is likely to cause severe pain in violation of the Eighth Amendment, including with the protocol's use, dispensing, and administration of compounded pentobarbital, as well as the likelihood of such use, dispensing, and administration by inadequately trained and unqualified medical personnel.

4.  The administration of the protocol is violative of my rights under the FDPA and creates potential separation-of-powers and conflicts-of-laws issues.

5.  The protocol is deliberately indifferent to the prisoner's serious medical need to be free from pain and suffering during the execution process, in violation of the Eighth Amendment as well as the prisoner's right to due process of law, for reasons including but not limited to (a) The protocol does not accommodate my specific medical conditions; (b) the protocol does not provide adequate guidance for cancellation of the execution and life-saving measures should something go wrong in the execution; (c) the execution facility is physically inadequate; and (d) the protocol contains no provisions to safeguard against an execution of an incompetent person.

6.  The protocol, and the actions of those who developed it and plan to implement it, violate the due process rights of prisoners to notice and an opportunity to be heard, to equal protection of the law, and to be free of cruel and unusual punishment, in that (a) the prisoners lack knowledge of (i) the procedures that will be used to carry out their executions, (ii) the persons or entities who will be involved in executions and the training and qualifications of such persons, (iii) the persons or entities who compound and/or manufacture the pentobarbital with which the prisoners will be executed, and (iv) the processes by which the lethal drug will be compounded or manufactured; and (b) those who are selected and scheduled for execution under the protocol are chosen in a secretive and arbitrary fashion by the Attorney General, resulting in executions based on race, religion, geography, and other arbitrary factors.

7.  The protocol is without instruction to accommodate my religious/spiritual last rites and my religious/spiritual advisor in violation of my First Amendment rights.

RECEIVED
USP Terre Haute

AUG 19 2019

Administrative
Remedy Clerk