**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| In the Matter of the | ) | |
| Federal Bureau of Prisons' Execution | ) | |
| Protocol Cases, | ) | |
| | ) | |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No.       1:19-mc-0145 (TSC) |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *LeCroy v. Barr et al.*, 1:20-cv-2481 | ) | |

_____

## PLAINTIFF'S CONSOLIDATED REPLY BRIEF IN SUPPORT OF HIS MOTIONS FOR A PRELIMINARY INJUNCTION AND AN EXPEDITED HEARING

NOW COMES Plaintiff William LeCroy, by and through undersigned counsel, and submits this Consolidated Reply Brief in support of his Motions for a Preliminary Injunction and an Expedited Hearing.

### OVERVIEW

Plaintiff has moved this Court for a preliminary injunction to prevent an illegal execution.  In this context, where the United States Government through its Executive Branch has expressed a determination to proceed with extinguishing the life of an American citizen, it is the appropriate role of the Courts to ensure that these Executive Branch officials scrupulously follow the laws, as codified in federal statutes and the U.S. Constitution governing their actions.  The solemnity, and irreversibility, of their contemplated actions call for such adherence, and society's willingness to continue to countenance a death penalty carries with it an expectation that the Courts will perform their essential role of ensuring that any executions are only carried out lawfully.

It is against this backdrop that the Government now responds in a manner that would

put that balance at risk.  First, despite that its own federal protocols have been a moving target, with fully five amendments (including another just this week) announced since their first 2019 iteration – and despite revealing *for the very first time in their Friday filing* that "BOP has made arrangements" for two physicians to attend Mr. LeCroy's execution – the Government argues that Mr. LeCroy's challenges are so untimely they should not even be heard on their merits.  It does not appear that the Government has made this argument in other cases, and with good reason.  Reduced to its essence, this argument is that, even if this execution is illegal, this Court should simply declare that the courthouse doors closed two weeks before Mr. LeCroy's execution, and allow even an illegal execution to proceed. Rather than abdicating its judicial responsibilities, this Court instead should categorically reject the Government's aggressive, and even offensive, suggestion here.

Second, the Government's efforts to avoid the Plaintiff's request for an injunction that would ensure adherence to binding federal (and incorporated Georgia) laws are often incomplete and at times inaccurate, as described more fully below.  18 U.S.C. § 3596(a) requires that this federal execution must be conducted "in the manner prescribed by the law of the State in which the sentence is imposed," and this Court should issue a preliminary injunction that would ensure that requirement is honored.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 130, 132 n.4, 135, 142 & n.14, 143 & n.15 (D.C. Cir. 2020) (Rao, J., concurring) (requiring federal government to follow all binding state laws and regulations in implementing execution); *id.* at 124 n.10 (Katsas, J., concurring).

At the end of the day, all that Mr. LeCroy seeks here is what he is entitled to receive: a court ruling stating that any execution conducted by these Federal Defendants must

comport with the applicable laws.  Indeed, nothing at all should prevent these Defendants from fully satisfying all parameters of that preliminary injunction, once entered, if they will simply perform what the law requires.  Instead, they are resisting that request in order to insist on proceeding with a hurry-up execution less than sixty days after the Government claims it was "scheduled for the first time" on July 31, 2020, on a 20-year old crime, without any prior notice to this Defendant or his counsel.  Given its irreversible nature, the focus instead should be on getting any execution right.  By issuing a preliminary injunction, this Court can be confident that it has ensured relevant legal requirements will be honored, and that any execution of Mr. LeCroy will in fact be conducted in conformity with the law.

## ARGUMENT AND CITATION OF AUTHORITIES

### I.      Plaintiff LeCroy's Motion for a Preliminary Injunction is Not Untimely

The Government's claims of untimeliness are extraordinary and invite obvious questions, such as:  How can the Government argue a timeliness bar when it is just now letting Plaintiff know what law they intend to follow?  Plaintiff, for example, literally learned on Friday for the first time, and only because of this lawsuit, that the Government says it plans to adhere to Georgia's two-doctor requirement.  How can Plaintiff be "late" when he is challenging protocols adopted at a date even later than he filed this lawsuit?

On July 31, 2020 (and without seeking the approval of LeCroy's sentencing court), the Bureau of Prisons (BOP) notified Mr. LeCroy that, 52 days later, it intended to inflict a punishment it had only created on July 25, 2019 (*see* Notice of Adoption of Revised Protocol, *Bourgeois v. U.S. Dep't of Justice*, No. 1:12-cv-782-TSC (D.D.C. July 25, 2019), ECF No. 18), to execute the sentence of death imposed upon LeCroy eighteen years earlier. While Defendants complain that LeCroy comes too late to seek an order staying their hand

even a day, this motion and its timing were precipitated their own actions on July 31, 2020.

The Government's claims of untimeliness are selective, and also omit significant legal developments in this and other cases.  For example, Mr. LeCroy's counsel in fact previously *did file* a challenge to the federal lethal injection protocols earlier, as a part of his habeas corpus petition.  The Government at that time affirmatively argued that "this issue is not ripe for consideration at this time," and the District Court ultimately agreed that the matter was "premature," essentially advising LeCroy's habeas counsel that that he should not raise such a claim until an execution date became likely.  *United States v. LeCroy*, 2012 WL 1114238, at *74 (N.D. Ga. Mar. 30, 2012).

The Government nevertheless also now claims that Mr. LeCroy could have challenged a different punishment, a former lethal injection protocol, as early as 2015.  ECF 242 at 12.  However, even had he done so, this would have done nothing to alleviate the need for the preliminary injunctive relief LeCroy seeks now.  Defendants did not express their intent to execute LeCroy's sentence by means of their 2015 punishment on July 31, 2020.  They now rely on a protocol that did not even exist in 2015.

 The Government also claims Plaintiff LeCroy should have challenged the protocols they now wish to use after he was denied administrative relief in December of 2019.  *See* ECF 242 at 13.  But the D.C. Circuit's *Execution Protocol Cases* decision – including Judge Rao's important opinion, declaring that all "binding law" of the applicable state's execution protocols is required for federal executions under 18 U.S.C. § 3596(a) – did not issue until April 2020, and it was only thereafter finalized when the Supreme Court denied certiorari in June.  Prior to the D.C. Circuit's issuance of *Execution Protocol Cases*, the Government had consistently argued that an execution by

4

lethal injection was all that was needed to satisfy the "state law" issue of the FDPA. It cannot now fairly or plausibly argue that every Petitioner should have assumed that its position was legally wrong. It is this controlling decision of Judge Rao that provided a judicial imprimatur and gave birth to Plaintiff's claims. It cannot possibly be said that every reasonable observer surely understood before that decision issued that the FDPA should be read to require what Judge Rao has now held that it does. Indeed, even now, the issue of what it actually means for the BOP to follow what Judge Rao referred to as "binding" state law has never been addressed by any court, including in recent Supreme Court decisions – hence, Justice Sotomayor's recent call that "this [Supreme] Court should address this issue in an appropriate case." *Mitchell v. United States*, 2020 U.S. LEXIS 3674, at *2 (Sotomayor, J., concurring).

The basis of this action did not viably arise until the D.C. Circuit interpreted the FDPA – contrary to the wishes of Defendants – to require adherence by the federal BOP to all "binding state law" in carrying out executions. *Execution Protocol Cases*, 955 F.3d at 130, 132 n.4, 135, 142 & n.14, 143 & n.15 (Rao, J., concurring); *id.* at 124 n.10 (Katsas, J., concurring). Moreover, while Defendants contend that Plaintiff LeCroy should somehow have raised this claim on a prior protocol, or one that had not yet been interpreted in this manner, it continues even now to purport to change the protocol at will. Defendants now essentially admit that they have the power under the current protocol to accomplish at least part of the relief Plaintiff LeCroy has requested, *i.e.,* by purportedly attempting to comply with Georgia law's requirement that two physicians be present and declare when death supervenes. *See* Doc. 242, Page 22 of 44, citing Winter Decl. ¶ 7. Not only is LeCroy's action timely, but also it is difficult to see what harm the Defendants have

suffered in light of this timing.[1]  And the Government's attempt to use alleged delays to bar claims in a time of pandemic, when COVID-19 has severely restricted access to Mr. LeCroy and interactions generally, and particularly for Mr. LeCroy's lead counsel – as the Government knows – is particularly unwarranted.

Finally, the Government recently changed their own protocol to shorten the notice time capital defendants receive.  Plaintiff's counsel have not been "waiting" improperly, but rather scrambling now that these issues are ripe to get pleadings together, find appropriate local counsel, etc.  The Government at present controls not only the timing of the execution date, but also the amount of notice Mr. LeCroy and his counsel received, including (now) the changing facts of their execution procedure.  Defendants have made a strategic choice to set LeCroy's execution on a date that it now hopes will prevent any effective challenge to their actions, given the limits LeCroy may face in demonstrating a probability of success without the benefit of factual development.  Under these circumstances, the timing of Plaintiff's filing cannot be fairly criticized, and in any event the Government cannot demonstrate any reasonable harm from Plaintiff's modest request that the status quo be maintained until his motion can be presented on the merits – particularly given their *eight-year* protocol delay that preceded this notice of execution.

---

[1] The Government argues, for example, that Plaintiff LeCroy did not seek a preliminary injunction on the same date as another inmate, Christopher Vialva.  *See* ECF 242, at 13-14.  But what difference did this supposed "delay" make in the manner that LeCroy's motion for preliminary injunction has come before this Court?  Indeed, the two men's cases are now joined.

## II.      Plaintiff LeCroy is Entitled to a Preliminary Injunction

### A.  Plaintiff LeCroy is Highly Likely to Succeed on the Merits of His Claims

#### 1.  Georgia's Requirement of Two Physicians at an Execution to Determine When Death Supervenes (O.C.G.A. § 17-10-41)

As noted, federal law (18 U.S.C. § 3596(a)) requires that any federal execution must be implemented "in the manner prescribed by the law of the State in which the sentence is imposed."  *See Execution Protocol Cases*, 955 F.3d at 130, 132 n.4, 135, 142 & n.14, 143 & n.15 (Rao, J., concurring);  *id.* at 124 n.10 (Katsas, J., concurring).  Here, that state is Georgia, where O.C.G.A. § 17-10-41 specifically states that "[t]here shall be present at the execution of a convicted person … two physicians to determine when death supervenes." As the Government acknowledges, this provision "contrast[s]" with the federal protocol, which "permits but does not require the presence or participation of physicians," and "further provides that 'a specified qualified person' will be the one to examine the inmate 'to ensure that death has occurred.'" ECF 242, at 16.

Under this Circuit's binding precedent, that Georgia statutory requirement must be followed by the Federal Government when conducting any execution of this Plaintiff, who was convicted in the U.S. District Court for the Northern District of Georgia.  *See Federal Execution Protocol Cases*, 955 F.3d at 112 (per curiam); *id.* at 113-19.

The Government has no real answer to this.  First, it cites to Judge Katsas' concurring opinion in the Execution Protocol Cases, and his (minority) view that "Section 3596(a) requires only that the federal government adhere to the States' top-line choice of execution method," with the Government claiming this is also "the government's view of the statute."  ECF 242, at 16.  But ultimately, the Government concedes (in a footnote) – as it must – that "Judge Katsas' opinion does not constitute the law of the circuit and that

Judge Rao's opinion is instead controlling on this question." *Id.* at 16 n.5.  Indeed, the D.C. Circuit's majority rejected the Government's desired reading of the statute.  Because O.C.G.A. § 17-10-41 is a *statutory* requirement and represents binding Georgia law, any federal execution of a defendant convicted in Georgia must adhere to its requirements.

The Government nevertheless tries to question even this position, however.  Its argument here is weak.  It acknowledges that Judge Rao's opinion expressly states that "the FDPA also requires the federal government to follow execution procedures set forth in state statutes and regulations." ECF 242 at 17.  And it further acknowledges that Judge Tatel, in his dissenting opinion, had specifically referenced "medical-personnel requirements" as among the procedures that "effectuate death," *id.*, with Judge Rao never rejecting or questioning in any way Judge Tatel's claim in that regard.  Apparently attempting to read these Circuit Judges' minds, however, the Government asserts (with no basis) that it is "doubtful" either of these judges would have viewed that category as encompassing individuals at an execution "present simply to confirm that death has already occurred." ECF 242, at 17.

Of course, there is no basis for this assertion that Georgia (via O.C.G.A. § 17-10-41) wanted two doctors in the execution room only to "confirm that death has already occurred" – in fact, given the negative publicity of botched executions, the likelihood they were required for health and safety purposes appears just as likely.  Moreover, as the exhibits attached to Plaintiff's Complaint confirm, even determinations of death can have health and safety repercussions, given the possibilities of resuscitation.  And in any event, why would this phrase ("medical-personnel requirements") not most naturally be read to include all "medical personnel"?  The Government invites this Court to ignore or twist the

meaning of the Opinion's own language, and speculate about what these judges may have thought (but never said), so it can avoid binding Circuit precedent.  This Court should decline that invitation and instead issue the preliminary injunction Plaintiff requests.

Perhaps recognizing its weak legal position here, the Government finally argues that a preliminary injunction is unnecessary, because it "has arranged for two physicians to be present at LeCroy's execution to determine that death has occurred."  ECF 242 at 17 (citing Exh. 1, Winter Decl. ¶ 7.  Citing to *Mitchell*, 2020 WL 4815691, at *4 & n.8, in which it says the Ninth Circuit relied on a declaration from the BOP "certifying that it will comply with th[e] Arizona procedures," ECF 242, at 18, the Government essentially claims that this Court can "trust us," and need not issue a preliminary injunction.  Plaintiff disagrees.

The Government's assertion, and Mr. Winter's Declaration, states nothing more than that BOP has "made arrangements" for two physicians to be present.  That is not a certification the law will be followed.  What if a physician gets sick, changes his mind, or fails to show up for any reason?  No certification or assured compliance exists here at all.[2]

What if a doctor did fail to show?  The Government has given this Court every reason to believe Plaintiff's execution may proceed anyway.  As noted above, the Government has stated in writing that it does not believe the law of this Circuit really

---

[2] Another issue arises from ambiguity about who will have the authority to declare death. The Government's brief says the federal protocol "provides that 'a specified qualified person' will be the one to examine the inmate to ensure that death has occurred."  ECF 242 at 16.  Is this protocol being altered here so this "specified person" will now be both of the two physicians required by Georgia law to "determine when death supervenes"? The Government never says.  If not, that too would violate O.C.G.A. § 17-10-41.  *See* Winter Decl. at ¶ 7 (merely stating that "BOP has made arrangements for two physicians *to be present* to determine when death supervenes") (emphasis added).  The Government also has not said what type of physicians it has made "arrangements" to bring.  All of this ambiguity only highlights the need for a hearing at which such answers can be obtained.

requires two doctors here.  Later in its brief, it goes even further, stating that "[t]o be clear, because the absence of a second physician would not amount to irreparable injury … the government [does] not believe that an injunction would be appropriate to require compliance with the Georgia statute even if it falls within the scope of the FDPA."  ECF 242, at 29 n.8.  The Government thus could hardly be stating more openly that it ultimately would feel free to proceed anyway, even without two doctors present and determining when death supervenes at this execution.  Accordingly, this Court must issue a preliminary injunction, to promote compliance with this Circuit's binding precedent and to insure no illegal execution occurs.  If the Government truly plans to have two physicians present at Plaintiff's execution to determine when death supervenes, it can comply quite easily with any such injunction, and will suffer *no prejudice whatsoever* from its issuance here.

Ultimately, the Government's arguments, and new Declaration from Winter, only highlight the need for a hearing and factfinding by this Court.  On Friday afternoon, the Government revealed for the very first time its "arrangements" to bring two physicians to LeCroy's scheduled execution.  In previous proceedings, Winter had been deposed about various aspects of how the federal protocols would work – yet now, the Government apparently has suddenly changed those.  Various questions remain, such as:  What will those doctors do?  How will they fit in with the prior participants? The fact that the Government gave this information in earlier discovery, yet now suddenly changes those protocols, raises more questions than it answers, and highlights the need for a hearing.

## 2.  Georgia's Requirements for Execution Dates (O.C.G.A. § 17-10-40)

Because federal law (18 U.S.C. § 3596(a)) requires that any federal execution must be implemented "in the manner prescribed by the law of the State in which the sentence is

imposed," it must also comply with O.C.G.A. § 17-10-40, which sets forth the notice requirements for Georgia executions. In this case, on July 31, 2020, the Attorney General directed the Bureau of Prisons to set a date for Plaintiff's execution, and BOP announced a scheduled execution date of September 22, 2020. But O.C.G.A. § 17-10-40 does not allow this. Georgia law references courts scheduling execution dates, and only within limited windows. And even if a judge (rather than BOP) had acted on July 31, 2020, that scheduling order is now statutorily expired under Georgia law, rendering it legally invalid.

On this issue, the Government concedes that "LeCroy is correct that the Georgia statute is a 'binding' state law under *Execution Protocol Cases*. *See* 955 F.3d at 132 (Rao, J., concurring); *id.* at 126 n.12 (Katsas, J., concurring)." But it argues that Plaintiff's claim fails for two reasons. But the Government is wrong, and an injunction should be issued.

First, the Government claims that O.C.G.A. § 17-10-40 "falls outside the scope" of § 3596(a)'s implementation requirement. Rather than citing to this Circuit's admittedly-binding opinion for that proposition, however, the Government relies on another (the Seventh) Circuit's characterization of this Circuit opinion, which claimed *Execution Protocol Cases* "was limited to state laws, regulations, and protocols governing procedures for effectuating death." *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020). There is nothing in Judge Rao's opinion that limits its holding to "procedures for effectuating death," however. And even if there were, why in the world is a "procedure for resetting an execution date" not "among those that effectuate or carry out death"? The Government never says. Nor is any such conclusion intuitive – if no execution date is set, the effectuation or carrying out of death would obviously *never occur*. Setting the date is the obvious first step in that effectuation. Under § 3596(a), and this Circuit's binding

precedent, that Georgia *statutory* requirement had to be implemented before the execution of a defendant convicted in Georgia can occur.

The Government's citations to *Peterson* and *Mitchell* are not to the contrary. *Peterson*, for example, involved an entirely different issue – third party witnesses. Perhaps the issue of third parties attending executions may not involve "procedures effectuating death," since it could still proceed with or without any third party witnesses. But setting an execution date, as noted, is the obvious (and necessary) first step in that effectuation, and it directly affects the defendant himself, as well as others and the entire process that it launches. It is not some tangential issue, but a pivotal piece in any execution's process.

*Mitchell* is no different. The Government claims that the Ninth Circuit in *Mitchell* considered and rejected an argument that various Arizona state execution procedures were included within § 3596(a)'s implementation requirement, including "a state statute governing 'notice of an execution date' and a rule of criminal procedure addressing 'judicial postponement of execution dates upon a finding of impracticality.'" ECF 242 at 20. But that is not so. While the opinion does say Mr. Mitchell "identified" three categories of Arizona procedures that he said conflicted with the federal protocols, *id.* at *4 (citing "Arizona statutes," "the Arizona Rules of Criminal Procedure," and Arizona's DOC "Department Order Manual"), it ultimately only examined only procedures in the last of these categories – the Department Order Manual. *Id.* at *6. In a footnote, the Ninth Circuit mentioned that "[i]n District court, Mitchell identified five additional purported inconsistencies," including an Arizona statute relating to "notice of an execution date," but the Ninth Circuit was clear: "Because Mitchell has not raised these purported inconsistencies in connection with his motion to stay his execution pending appeal, *we do*

*not consider them.*"  *Id.* at *7 n.6 (emphasis added).  And this failure to properly raise these statutory claims before the Ninth Circuit is likely what led Justice Sotomayor to later lament that "these questions are not adequately preserved for our review in the pending case."  *See Mitchell,* 2020 U.S. LEXIS 3674, at *1 (Sotomayor, J., concurring).

Admittedly, the Ninth Circuit's Per Curiam Opinion did later state, apparently as a mere aside (since it had expressly declared that "we do not consider them"), that certain Arizona statutes, such as one relating to "notice of an execution date," would "fall outside the scope of 18 U.S.C. § 3696(a)."  202 U.S. App. LEXIS 26475, at *7 n.6.  But even if this comment were not mere *obiter dictum*, *Mitchell* would not control the instant case.  O.C.G.A. § 17-10-40 is not a mere "notice of execution date" statute, but goes much further, establishing a strict window of time within which the scheduled execution must take place.  Under O.C.G.A. § 17-10-40 the new time period for execution is limited to a seven-day window, which "shall commence not less than ten nor more than 20 days from the date of the order."  Plainly, Georgia has determined that there are humane limits to the amount of time a capital prisoner should reasonably be expected to have to live under the fear of impending death with an active execution warrant hanging over one's head.  And to cite *Mitchell*'s own language, Georgia's law also establishes a strict deadline for any execution to be "implemented" and "carried out," to "ensure the actual fulfilment of concrete measures."  *See* 2020 U.S. App. LEXIS 26475, at 7.  Those limits are codified by Georgia in O.C.G.A. § 17-10-40, and the BOP's decision to hold its warrant over Mr. LeCroy for a lengthy 52 days runs directly afoul of Georgia's codified, statutory limits.

Ultimately, this Court need not turn to these other Circuits, or their short opinions in *Peterson* and *Mitchell* for guidance.  It is this Circuit's *Execution Protocol Cases* that

provides "the most detailed analysis provided by a lower court to date." *See Mitchell,* 2020 U.S. LEXIS 3674, at \*1 (2020) (Sotomayor, J., concurring). And as noted above (and as the Government concedes), "LeCroy is correct that th[is] Georgia statute is a 'binding' state law under *Execution Protocol Cases*." Accordingly, this Court should enter a preliminary injunction and prevent Plaintiff's September 22 execution, because that execution, based on a July 31, 2020 agency notice, is illegal under Georgia statutory law.

Separately, the Government also tries to advance an "independent" argument that Plaintiff has not shown that his new September 22, 2020 execution date represents the "resetting [of] a previously scheduled execution," ECF 242 at 21, which it then tries to suggest is all that O.C.G.A. § 17-10-40 covers. But that is simply not so. In fact, O.C.G.A. § 17-10-40 does not use the phrase "previously scheduled execution" at all. Instead, it sets forth Georgia's procedures to set a date for execution, which should be done anytime "the *time period for the execution* of any convicted person in a capital case *has passed* by reasons of a supersedeas incident to appellate review, a stay of execution by the State Board of Pardons and Paroles, or for *any other reason*." (emphasis added).

Here, as the Government quietly concedes in a footnote, *see* ECF 242 at 21 n.6, Plaintiff's Judgment itself stated that "[t]he sentence shall be carried out within sixty days of the date when the conviction and sentence are final and no further direct appeal is allowable." DE417 at 3. The mere fact that no specific execution date was set after Mr. LeCroy's direct appeals ended, through inadvertence or for whatever reason, does not take it out of the scope of § 17-10-40(a). Instead, it places this case squarely within it: there was undeniably a "time period for the execution" outlined in the Judgment itself, which then "passed" for a reason "other" than a supersedeas incident to appellate review or a stay

(due to inadvertence or "any other" reason). The fact that the District Judge may have recently stated that he never took upon himself the initial responsibility of specifying a single execution date is irrelevant; his Judgment nevertheless clearly did set forth a "time period" that then "passed," which is sufficient to trigger O.C.G.A. § 17-10-40's mandatory resetting requirements. And to be clear, O.C.G.A. § 17-10-40 in no way bars the Government from setting a new execution date. It remains free to follow Georgia state law and reset a new execution date in conformity with its requirements. But the BOP's July 31, 2020 scheduled date did not comply with those requirements, and it is also now expired. Because the window for execution dates permitted under O.C.G.A. § 17-10-40 has passed, any execution of Mr. LeCroy on September 22, 2020 would be illegal. Because these requirements are a part of Georgia's statutory law, imputed to the federal Government through 18 U.S.C. § 3596(a) and this Circuit's binding precedent, this Court should enter a preliminary injunction barring any execution of Plaintiff until the federal Government complies with the requirements of O.C.G.A. § 17-10-40.

### 3.   Georgia's Prescription Requirement for Compounded Pharmaceuticals

The Government acknowledges that "the Georgia Department of Corrections and its compounders may choose to obtain a prescription for pentobarbital prior to an execution," but it claims this is done "voluntarily and not because that is required by Georgia law." ECF 242 at 24. Plaintiff disagrees, and continues to submit that, under 18 U.S.C. § 3596(a), the federal government should not be allowed to proceed with an execution under conditions that differ so dramatically from the health and safety protections used and customarily followed by Georgia state authorities when conducting executions.

It is too facile for the government to argue that the Georgia Department of

Corrections' Execution Protocol "does not mention, let alone require, that authorities obtain a prescription in order to perform a lethal injection." ECF 242 at 24. The Government had previously argued that state protocols are not binding (and thus even irrelevant), but under the authority from the D.C. Circuit (per Judge Rao's vote) in *Execution Protocol Cases*, it is now clear that the FDPA requires compliance with all "binding law" of the states.  In Georgia, "binding law" requires a prescription in order to get a compounded drug, and the Georgia DOC in fact does gets a prescription because it is binding state law.  *See, e.g., Owens v. Hill*, 295 Ga. 302, 310 (2014) ("The parties agree that the State willingly provided Hill with information indicating that Hill's execution drug had been manufactured by a compounding pharmacy, which is a type of pharmacy that produces individually-produced medications according to the directions provided in individual prescriptions written by physicians.").[3]

The government's reliance on the so-called safe-harbor law in O.C.G.A. § 17-10-38, *see* ECF 242 at 23-25, is inapposite. That capital sentencing statute merely states that "[n]otwithstanding any other provision of law, prescription, preparation, compounding, dispensing, or administration of a lethal injection authorized by a sentence of death by a court of competent jurisdiction shall not constitute the practice of medicine or any other profession relating to health care which is subject by law to regulation, licensure, or certification."  O.C.G.A. § 17-10-38(c).  By its terms, this statute clarifies that lethal injection cannot be considered "practicing medicine" – *not* that no prescription is required.

The purpose of such safe harbor laws (many states have them) is to prevent lawsuits against the medical professionals (malpractice or efforts at professional censure).

---

[3] In contrast to *Owens*, the Government notably does not cite to any case law, but merely relies on the Georgia Attorney General's briefs as the authority for its claim that no prescription is required in Georgia.

Moreover, what the Government's argument actually points out is that the capital sentencing statute itself *anticipates* the use of a prescription and says it will not be the practice of medicine/pharmacy in this context (again in order to give the doctors and pharmacists involved safe harbor from challenge and censure).  The statute does not say that the prescription requirement is not applicable in this context.  In fact, inclusion of "prescription" in the safe harbor provision arguably undercuts the Government's alternative argument, *see* ECF 242 at 24-25, that Georgia's prescription requirement falls outside the FDPA's implementation provision because "Judge Rao's controlling opinion" concludes that "the FDPA's implementation provision applies only to 'execution procedures set forth in state statutes and regulations.'"  ECF 242 at 25.  Georgia's capital sentencing statute specifically recognizes that prescriptions *will* be used, and it is written to protect the medical practitioners involved accordingly.  The Government  even makes this very point — though they misconstrue it — later, *see* ECF 242, at 25, by (1) mischaracterizing the safe harbor provision and then (2) pointing to O.C.G.A. § 17-10-42.1 ("Participation in any execution of any convicted person carried out under this article shall not be the subject of any licensure challenge, suspension, or revocation for any physician or medical professional licensed in the State of Georgia.").  Again, protecting medical practitioners from censure is not the same as saying the laws do not apply.

Ultimately, the issues the Government is raising about Georgia's procedures and customs of practice at least present a question of fact, which ought to be determined and fleshed out at a hearing.  And even if the Government were to ultimately prevail in its interpretation of Georgia's statutory and regulatory prescription requirements – and they should not – this issue remains viable.  At least under Judge Tatel's analysis, "section

3596(a), best understood, requires federal executions to be carried out using the same procedures that states use to execute their own prisoners." 955 F.3d at 146 (Tatel, J., dissenting). Just as the Government "seeks to preserve here its position that Judge Katsas' interpretation of the FDPA is the correct one, ECF 242 at 17 n.5, Plaintiff preserves an argument here that Judge Tatel's view of the FDPA ought to be adopted instead.[4]

**B.    Plaintiff LeCroy Will Face Irreparable Harm Without an Injunction**

Without a preliminary injunction, Plaintiff LeCroy will be illegally executed pursuant to unlawful protocol in a matter of days, well before he can fully litigate his APA claims. As Plaintiff noted in his original Motion, courts have held in many analogous circumstances involving APA claims that the plaintiffs had established irreparable injury for purposes of the preliminary injunction standard. *See* Plaintiff's Memorandum of Points and Authorities in Support of Motion for a Preliminary Injunction, at 19-20 (citing cases).

The Government's brief overlooks and never addresses these APA cases, nor does it address Plaintiff's various citations verifying how courts have repeatedly held that a plaintiff suffers irreparable injury if he is executed before his legal challenges to execution methods are complete. *Id.* at 20 (citing cases).

Instead, the Government begins by claiming that it recently killed 5 other defendants whose executions were not stayed despite those defendants (such as Mitchell) supposedly raising arguments that were "very similar to those LeCroy makes here." ECF 242, at 28.

---

[4] It is also worth noting here that Mr. LeCroy has joined the "Motion for Partial Summary Judgment and Permanent Injunction on APA Claim Concerning Defendants' Violations of the Food, Drug and Cosmetic Act," recently filed by all Plaintiffs in this Consolidated Action. Thus, not only does the 2019 federal protocol violate the FDPA because it fails to require the Defendants to comply with binding Georgia law in Mr. LeCroy's execution, which requires the use of a prescription to obtain the execution drug, but also because the Defendants are violating the FDCA by failing to use a prescription.

As noted above, any notion such issues were fully presented in those other cases is false. *See Mitchell*, 2020 U.S. LEXIS 3674, at \*2 (Sotomayor, J. concurring) ("Here, the Ninth Circuit did not need to resolve the key issue on which the D.C. Circuit panel split.").

Even beyond the irreparable harm of the fact that his contemplated execution on September 22 would be illegal, Mr. LeCroy has established actual and likely harms that must be viewed through the lens of irreversibility that executions necessarily present. With respect to Georgia's requirement of "two physicians" present at all executions, "to determine when death supervenes," Mr. LeCroy has attached to his Complaint sworn testimony from Dr. Becker, describing the realities of modern medical resuscitation, and the risks of a premature declaration of death even many minutes after breathing stops. Under the federal protocols, the Government admits this declaration can be made by "a specified qualified person," who need not even be a physician. ECF 242 at 16. At present, it is not even clear if the two physicians that BOP "made arrangements" to attend Plaintiffs' scheduled execution will be the ones to declare death, since the Government has never actually said if one or both doctors have been given this role. Based on Dr. Becker's sworn statements, irreparable harm to Plaintiff in proceeding with an execution at which he may be prematurely declared dead, by less than the two physicians Georgia expects, is apparent.

Similarly, irreparable harm exists in BOP's failure to comply with O.C.G.A. § 17-10-40. Indeed, such irreparable harm exists now, as Plaintiff continues to endure daily, as he now has for many weeks, the stress of knowing that an active execution warrant is hanging over his head, with an execution date looming. Staring down such a tunnel 52 days long would never have happened if the federal government had implemented this sentence "in the manner prescribed by the law of the State in which the sentence is

imposed,"  The highly stressful days continue, and Plaintiff cannot later get them back, despite a Georgia statute clarifying that no more than 20 days was appropriate.

Risks arising from non-prescription compounds would also be irreparable.  The fact that Plaintiff has not yet presented evidence of safety failures in other executions does not mean they do not exist.  No citizen should be forced to take an unprescribed drug.  Botched executions are known to exist and have been publicly reported.  Without certified reliability of any drug being utilized in the execution process, Plaintiff is at risk of imminent harm.

Given the Government's demands that Plaintiff must "establish" irreparable harm, however, that only reinforces the need for a hearing, where this Court can make findings of fact, and further supports the need for a preliminary injunction that will preserve the status quo to allow this matter to be fully litigated before Mr. LeCroy's execution proceeds.

**C.    The Equities and Public Interest Favor a Preliminary Injunction**

Finally, the balance of equities and public interest favor a preliminary injunction. After waiting eight years to come up with a federal execution protocol at all, the Government cannot claim that a modest delay of a few weeks or months to ensure that incorporated Georgia law is followed as 18 U.S.C. § 3596(a) requires is unwarranted, or will disserve the public interest.  After 18 years, it makes no sense for the Government to now suddenly rush forward toward an execution that would be illegal.  Given the irreversibility of the death penalty, the paramount concern should be on getting this right, not on speed, and a preliminary injunction would ensure that these issues get examined.

**III.    An Expedited Hearing Should be Scheduled on this Motion**

Plaintiff also submits that this Court should schedule a hearing on Plaintiff's Motion for a Preliminary Injunction.  While the Government claims a hearing is "unnecessary," it

ultimately does not oppose this request, stating that "if a hearing would facilitate the Court's consideration, the government will make itself available."  ECF 242 at 35.

Particularly given the D.C. Circuit's recent Opinion in *Nelson v. Barr*, No. 20-5260 (D.C. Cir. Aug. 27, 2020), Plaintiff submits that a hearing is essential.  The Government cites to *Nelson* and states that it "understored" the need for this Court to make factual findings, including on issues such as irreparable harm.  That is best accomplished at a hearing where both arguments and additional evidence, if necessary, can be presented.

Accordingly, Plaintiff William LeCroy requests that this Court issue a preliminary injunction to preserve the status quo while this challenge is being litigated, and set a hearing so that the issues raised in Plaintiff's Motion, and the Georgia statutory procedures that the federal government is required to be implement under 18 U.S.C. § 3596(a) for any execution of this Plaintiff, can be assured by this Court as warranted.

Dated:  September 13, 2020          Respectfully submitted,

       /s/ Gregory S. Smith
Gregory S. Smith (DC Bar #472802)
Law Offices of Gregory S. Smith
913 East Capitol Street, S.E.
Washington, D.C.  20003
Telephone: (202) 460-3381
Email: gregsmithlaw@verizon.net

       /s/ John R. Martin
John R. Martin (*pro hac vice* pending)
Martin Brothers P.C.
1099 St. Louis Place
Atlanta, GA  30306
Telephone: (404) 433-7446
Email: jack@martinbroslaw.com

*Attorneys for Plaintiff William LeCroy*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document is being served upon all

counsel of record through this Court's Electronic Case Filing (ECF) system.

This 13th day of September 2020.

_/s/ Gregory S. Smith_____
Gregory S. Smith
gregsmithlaw@verizon.net