**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

————————————————————

| | |
|---|---|
| In the Matter of the ) | |
| Federal Bureau of Prisons' Execution ) | |
| Protocol Cases, ) | |
| ) | |
| LEAD CASE:  *Roane et al. v. Barr* ) | Case No.      1:19-mc-0145 (TSC) |
| ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| *LeCroy v. Barr et al.*, 1:20-cv-2481 ) | |

————————————————————

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### I.

### Nature of Action

1.    This is a civil action for declaratory and injunctive relief brought by Plaintiff William LeCroy for violations of the Federal Death Penalty Act, 18 U.S.C. § 3591 *et. seq.* ("FDPA"), the Administrative Procedure Act 5 U.S.C. § 551 *et seq.* ("APA"), the Food, Drug, and Cosmetic Act 21, U.S.C. § 301 *et seq.*  ("FDCA"), and the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA"), and the Take Care Clause of the United States Constitution. U.S. Const., art. II, § 3 ("Take Care Clause").

2.    Plaintiff has been sentenced to death in the United States District Court for the Northern District of Georgia, pursuant to the FDPA. Defendants are the individuals charged by the federal government with carrying out the death sentences of Plaintiff and similarly situated federal prisoners. On July 25, 2019, the United States Department of Justice ("DOJ") announced that  executions of federal prisoners will be administered by the Federal Bureau  of Prisons ("BOP") using a revised addendum to the BOP

Execution Protocol ("2019 Protocol"), released the same day. The 2019 Protocol provides that all federal executions will be conducted via a uniform procedure utilizing intravenous injection of five grams of Pentobarbital Sodium ("pentobarbital"), a controlled substance under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA").

3.    On July 31, 2020, DOJ announced that Plaintiff's execution will be carried out on September 22, 2020 through the BOP's current lethal injection procedures, which as noted above, replaces an earlier three-drug combination with the injection of a single drug: pentobarbital. On the same day, DOJ announced further revisions to the BOP Execution Protocol, including revisions to a provision related to notification of the death-sentenced prisoner of the execution date.

4.    Upon information and belief, Defendants currently intend to carry out the execution of Plaintiff pursuant to the 2019 Protocol, and, as required under the 2019Protocol, the execution of the Plaintiff will be administered at the U.S. Penitentiary in Terre Haute, Indiana ("USP Terre Haute").

5.    As described more fully below, Defendants' implementation and use of the 2019 Protocol violates the FDPA, the APA, the FDCA, the CSA and the Take Care Clause. Plaintiff therefore seeks a preliminary and permanent injunction preventing Defendants from executing him pursuant to their announced procedures; an order declaring that the adoption and use of the 2019 Protocol to implement Plaintiff's death sentence violates the FDPA, the APA, the FDCA, the CSA and U.S. Constitution; and such other equitable relief as the Court deems just and proper.

6.    The claims in this Complaint are cognizable under the constitutional and

statutory grounds identified herein and as described in more detail below. This action is not, and should not be treated as, a successor habeas corpus petition. Through this action Plaintiff is not challenging the validity of his conviction or death sentence (which has become final). Rather, he asserts that the 2019 Protocol, under which—upon information and belief—his execution is to be implemented, violates the FDPA, the APA, the FDCA, the CSA and the U.S. Constitution.

## II.
## Parties

7.    Plaintiff William LeCroy is a United States citizen and a death-sentenced prisoner in the custody of Defendants and under the control and supervision of the BOP, which is a department of the DOJ. He is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"). Unless this Court grants the injunctive relief sought in this action (or his capital conviction and/or death sentence are overturned in another judicial proceeding), Plaintiff will face execution at USP Terre Haute on Tuesday, September 22, 2020.

8.    Defendant William P. Barr is the Attorney General of the United States. Plaintiff was remanded into the Attorney General's custody upon his conviction and the imposition of his death sentence. To the extent authorized by Congress, the Attorney General either directly or indirectly prescribes the means for implementing federal judicial death sentences. Under the 2019 Protocol, he is the final executive authority responsible for carrying out sentences of death against federal prisoners. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

9.    Defendant Michael Carvajal is the Director of the BOP. As Director of the BOP, Defendant Carvajal is charged with prescribing and directing the promulgation of

rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and executions. The DOJ has also assigned Defendant Carvajal roles relating to the implementation of the sentence.  Defendant Carvajal is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

10.  Defendant Jeffrey E. Krueger is the Regional Director of the North Central Region of the BOP. As Regional Director, Defendant Krueger has responsibility for USP Terre Haute, and plays a critical role in the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and execution procedures. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

11.  Defendant Donald W. Washington is the Director of the U.S. Marshals Service  ("USMS") and is responsible for all agency operations.  Under Section 3596 of the FDPA, a U.S.  Marshal "shall supervise implementation" of federal death sentences "in the manner  prescribed by the law of the State in which the sentence is imposed." Mr. Washington is sued  here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

12.  Defendant Chris Bina is the Acting Assistant Director, Health Services Division, of the BOP. In his position, Defendant Bina is responsible for overseeing the provision of medical care to prisoners at all BOP facilities, including USP Terre Haute, and  for promulgating and implementing BOP policy with respect to medical care provided by the BOP. Defendant Bina is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

13.  Defendant T.J. Watson is the Complex Warden of USP Terre Haute. In his

position as complex warden, Defendant Watson is charged with management of USP Terre Haute and the oversight and implementation of operations there, including the oversight and implementation of executions at the prison. Defendant Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

14. Defendant William E. Wilson, M.D., is the Clinical Director at USP Terre Haute. In his position as Clinical Director, Defendant Wilson is responsible for overseeing the provision of medical care to prisoners at USP Terre Haute. Defendant Wilson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

15. Defendant Timothy Shea is the Acting Administrator of the U.S. Drug Enforcement Administration ("DEA"). In that role, Mr. Shea is responsible for overseeing all controlled substances, including pentobarbital (a Schedule II drug under the CSA). Mr. Shea is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief. 13.

16. Defendant Stephen M. Hahn, M.D., is the Commissioner of Food and Drugs at the Food and Drug Administration ("FDA"). As Commissioner, Defendant Hahn is responsible for overseeing drugs that are regulated by the FDA and that otherwise fall under the FDCA, 21 U.S.C. § 301 et seq., including compounded and non-compounded pentobarbital.  Dr. Hahn is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

17. The Defendants identified in Paragraphs 9-10 & 12-14 above will be referred to below as the "BOP Defendants".

18. Defendants John/Jane Does 1-10 (the "John/Jane Doe Defendants") are

employed by, or have contracted with, the BOP to consult with, prepare for, and/or carry out Plaintiff's execution. Plaintiff does not know, and Defendants have refused to reveal, the identities or positions of the John/Jane Doe Defendants. To the extent that the John/Jane Doe Defendants are federal government employees, they are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

17.  Upon information and belief, unless preliminarily or permanently enjoined, the BOP Defendants will act in their respective official capacities and under the authority of federal law in executing Plaintiff, in violation of Plaintiff's constitutional and/or statutory rights. The foregoing allegation also applies to the John/Jane Doe Defendants to the extent that they are federal government employees.

### III.
### Jurisdiction and Venue

18.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this action arises and seeks relief under the laws and Constitution of the United States, specifically the FDPA, § 3596, the APA, 5 U.S.C. §§ 702-706, the Food, Drug, and Cosmetic Act 21, U.S.C. § 301 *et seq.*  ("FDCA"), and the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA") the Food, Drug, and Cosmetic Act 21, U.S.C. § 301 *et seq.*  ("FDCA"), and the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA"), the Take Care Clause of the U.S. Constitution, art. II, plus 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

19.  This Court has venue under 28 U.S.C. § 1391(b)(2) because the DOJ and BOP headquarters are located in this District and a substantial part of the events giving rise to the claims made herein by Plaintiff—including the formulation of the BOP lethal injection procedures that are at issue here—took place and continue to take place in this

District.

# IV.
# Facts

## Plaintiff's Conviction History and Post-Conviction Motions

20.  In 2004 Plaintiff was convicted in the U.S. District Court for the Northern District of Georgia under 18 U.S.C. § 2119(3) of taking a motor vehicle transported in interstate commerce from the person or presence of Joann Lee Tiesler, by force and with intent to cause physical harm, resulting in her death.  Plaintiff was sentenced to death. The District Court conducted sentencing on March 10, 2004 and directed that:

> When the judgment is final upon appeal, the Attorney General shall release you to the custody of the United States Marshal who shall make the arrangements for the execution and supervise implementation of the sentence. The manner of execution shall be by any means prescribed by law in the State of Georgia at the time of the execution.

*United States v. LeCroy*, No. 2:02-CR-00038-RWS-JCF, Judgment, Doc. No. 417 (N.D. Ga. Mar. 11, 2004).  Plaintiff's convictions and sentence were affirmed on direct appeal.

*United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006), *cert denied*, 550 U.S. 905 (2007).

21.  On April 22, 2008, Plaintiff filed a Motion for Relief Pursuant to 28 U.S.C. § 2255. *See LeCroy*, No. 2:02-CR-00038-RWS-JCF, Doc. No. 493 (N.D. Ga. April 22, 2008). On March 30, 2012, the District Court denied the motion. *United States v. LeCroy*, Nos. 2:02-CR-00038-RWS-SSC, 2:08-CV-2277-RWS, 2012 WL 1114238 (N.D. Ga. Mar. 30, 2012).  The Eleventh Circuit affirmed the District Court's denial of relief, and the U.S. Supreme Court denied certiorari. *LeCroy v. United States*, 739 F.3d 1297 (11th Cir. 2014), *cert denied*, 575 U.S. 904 (2015).

## The History of the Federal Lethal Injection Protocol

22.  Beginning in 1937, Congress required federal executions to be conducted

in the manner prescribed by the state of conviction. *See* 50 Stat. 304 (formerly 18 U.S.C. § 542 (1937)), recodified as 62 Stat. 837 (formerly 18 U.S.C. § 3566) (the "1937 Act"). Upon information and belief, the USMS supervised the implementation of federal executions pursuant to the 1937 Act.

23. The death penalty was briefly held unconstitutional. *See Furman v. Georgia*, 408 U.S. 238 (1972). The Supreme Court's decision in *Gregg v. Georgia*, 428 U.S. 153 (1976), reaffirmed the constitutionality of the death penalty.

24. In 1984, Congress repealed the 1937 Act, leaving the federal government without a mechanism for carrying out executions. In 1988, Congress passed the Anti-Drug Abuse Act, which reinstated the death penalty for certain federal crimes but did not specify a procedure for implementation.

25. On November 30, 1992, the DOJ published a proposed rule seeking to "establish[] procedures" for carrying out federal death-penalty sentences. *See* Implementation of Death Sentences in Federal Cases, 57 Fed. Reg. 56,536 (Nov. 30, 1992) (to be codified at 28 C.F.R. pt. 26). The DOJ received and considered comments from (among others) medical associations, physicians, criminal defense attorneys, and advocates for prisoners' rights.

26. On February 18, 1993, the DOJ issued a set of regulations, referred to as the "Final Rule," that purported to establish a protocol for carrying out the executions of prisoners "sentenced to death for commission of an offense described in any federal statute." 28 C.F.R. § 26.1. The Final Rule provided that executions would take place at a federal prison by "intravenous injection of a lethal substance." *Id.* § 26.3(a)(4). The Final Rule provided little detail about the manner of execution and did not

identify the drug or drugs to be used in executions. In addition, the Final Rule did not provide for any role for the USMS in connection with the implementation of death sentences.

27. In 1994, Congress enacted the FDPA, establishing that federal death sentences shall be implemented as follows:

> When the [death] sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.

18 U.S.C. § 3596(a). The FDPA superseded the Final Rule and once again assigned to the USMS sole responsibility and authority to supervise the implementation of federal death sentences – and contrary to the regulations, returned to the requirement that federal executions take place in the manner prescribed by law in the state of conviction.

28. The FDPA provides only one exception to this "law of the State" requirement: "If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." 18 U.S.C. § 3596(a). The FDPA therefore does not provide or contemplate the establishment of a separate, uniform federal execution protocol or procedure.

29. The FDPA also does not grant any authority to the BOP to create a uniform federal execution protocol, set execution dates, times, or places, or administer executions.

30. Following enactment of the FDPA in 1994, there were several legislative

attempts, all  supported by the DOJ and the BOP, to amend the FDPA to eliminate the requirement that death  sentences be implemented "in the manner prescribed by the law of the State in which the sentence  is imposed," and, instead, grant authority to the BOP to devise and implement procedures and  protocols for the executions of prisoners sentenced under the FDPA.  All of those efforts failed. None  of the  proposed amendments to the FDPA were  enacted  by  Congress, and the FDPA  continues to require the federal government to carry out executions in the manner prescribed by  the law of the state in which the prisoner's sentence was imposed, and continues to assign sole  authority  and  responsibility  to  the  USMS  to  supervise  the  implementation  of federal  death  sentences.

31. In  2004,  the  DOJ,  without  notice  or  comment,  adopted  a  new  BOP Execution Protocol  for  carrying  out  federal  death  penalty  sentences  (the  "2004 Protocol"). The  2004  Protocol  included additional detail about how executions would be administered, but was silent about the  drug or drugs to be used in executions.

32. In  December  2005,  several  individuals  under  federal  death  sentence initiated a lawsuit challenging the 2004  Protocol  as  violating  the  APA,  the  CSA,  and their  rights  pursuant  to  the  Fifth  and  Eighth  Amendments of the U.S. Constitution. This Court issued preliminary injunctions preventing the  executions of those individuals during the pendency of the litigation.

33. While  this  litigation  was  pending,  the  BOP  updated  the  2004  Protocol by issuing addenda in 2007 and 2008 (the "2008 Addendum"). The 2008 Addendum specified  that  executions would be carried out using three drugs: sodium pentothal, pancuronium bromide, and  potassium chloride. (The 2004 Protocol and 2008 Addendum

will collectively be referred to as  the "2008 Protocol.")

34.  In May 2011, the BOP announced that it did not have the drugs necessary to implement  the 2008 Protocol and was considering revisions to the execution protocol. After the  announcement  by  the  BOP  that  it  was  unable  to  implement  the  2008 Protocol,  the  ongoing  litigations  were  stayed.  For  the  next  eight  years,  the  DOJ submitted  quarterly  status  reports  indicating that protocol revisions were ongoing.

35.  On  July  25,  2019,  the  DOJ  issued  a  press  release  announcing  the scheduling of five executions: three within a single week in December 2019, and another two  during  a  single  week  in  January  2020,  all  to  be  carried  out  at  USP  Terre  Haute pursuant to a unified federal procedure.

36.  On  the  same  day,  the  DOJ  announced  that,  at  the  direction  of  Attorney General  Barr,  the  BOP  had  adopted  an  Addendum  ("the  2019  Addendum")  to  the existing Protocol. The 2019 Addendum replaced the previous three-drug procedure with a procedure using a five-gram dose of one drug:  pentobarbital.

37.  On November 13, 2019, the BOP publicly filed an Administrative Record, including  a  revised  execution  protocol—the  2019  Protocol—which  replaced  the 2008  Protocol.  *See*  Doc. 39-1, Administrative Record, *Roane et al. v. Barr*, 1:19-mc-00145-TSC,  1016-1067,  0874-0875  (D.D.C.  Nov.  13,  2019).  (The  Administrative Record was supplemented five times thereafter.)  The 2019 Protocol included the  2019 Addendum and also removed key provisions that had been included in the 2008 Protocol, including a detailed plan for responding to unexpected occurrences during executions. On July 31, 2020, the same day that this Plaintiff was notified of his execution date, the 2019 Protocol was supplemented with a new provision related to changing the notification

11

period for prisoners under death sentence of their execution dates. *See* Doc. 171, Defendants' Notice of Fourth Supplement to Administrative Record, *Roane et al. v. Barr*, 1:19-mc-00145-TSC (D. D.C. July 31, 2020).

38. The 2019 Protocol, including the 2019 Addendum and the July 31, 2020 supplemental revisions, constitute DOJ/BOP "statement[s]  of general or particular applicability and future effect designed to implement, interpret, or  prescribe law or policy or describing the organization, procedure, or practice requirements of an  agency." 5 U.S.C. § 551(4).  They are therefore "rule[s]," as defined by the APA.  *Id.*

39. The 2019 Protocol was adopted by the BOP and the DOJ without any advance notice  to the Plaintiff or the public.  Between the BOP's May 2011 announcement that it was unable  to implement the 2008 Protocol and the July 25, 2019 announcement of the 2019 Addendum and  five scheduled execution dates, neither the DOJ nor the BOP provided any information to the public or to  Plaintiff about the 2019 Protocol, the 2019 Addendum, or any of the other processes or details  of any revisions to the execution protocol that were planned or under discussion or consideration.

**Implementation of Plaintiff's Death Sentence Under the 2019 Protocol**

40. The FDPA expressly provides that a "United States marshal . . . shall supervise  implementation of the sentence in the manner prescribed by the law of the State in which the  sentence is imposed."  18 U.S.C. § 3596(a). The D.C. Circuit has interpreted this provision to require that the federal government must follow the "binding" law of the State in implementing death sentences, which includes state statutes. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 130, 132 n.4, 135, 142 & n.14, 143 & n.15 (D.C. Cir. 2020) (Rao, J., concurring); *id.* at 124 n.10 (Katsas, J.,

concurring).

41. Defendants, in applying the 2019 Protocol in the implementation of Plaintiff's death sentence, flout that Congressional directive and violate the FDPA by purporting to establish and implement for all federal executions a separate and uniform federal execution protocol that, upon information and belief, does not follow and is materially different from the manner prescribed by the laws of the State of Georgia, the state in which Plaintiff's sentence was imposed. Upon information and belief, Defendants will utilize the procedures identified in the 2019 Protocol, instead of the procedures deemed binding under Georgia law where Plaintiff was sentenced. In the alternative, to the extent the Court finds that the 2019 Protocol grants Defendants the discretion to change or depart from the procedures laid out in the 2019 Protocol in order to implement executions in the manner prescribed by the laws of the States, Defendants have failed to provide notice of which Georgia procedures they will follow and what changes they will make to comply with the binding Georgia law.

42. Binding Georgia law related to the implementation of death sentences contains mandatory statutory provisions that are not accounted for or that differ significantly from federal regulations and the 2019 Protocol in significant respects.

43. First, the Georgia death sentence implementation statute requires that <u>two physicians</u> must be present at an execution:

> There shall be present at the execution of a convicted person the superintendent of the state correctional institution or a deputy superintendent thereof, at least three executioners, two physicians to determine when death supervenes, and other correctional officers, assistants, technicians, and witnesses as determined by the commissioner of corrections.

*See* O.C.G.A. 17-10-41 (2010). Neither the federal regulations related to implementation

of death sentences, 28 C.F.R. Part 26, nor the federal 2019 Protocol, provides for physician presence at the execution as Georgia statutory law requires.

44. Defendants' departure from Georgia's statutory requirement that two physicians be present to "to determine when death supervenes" is not *de minimis*. Under Georgia law, "death intervenes" only if "it is determined that the individual has sustained either (1) irreversible cessation of circulatory and respiratory function or (2) irreversible cessation of all functions of the entire brain, including the brain stem." Ga. Code Ann. § 31-10-16(a)(2017)

45. Whether a cessation of "circulatory <u>and</u> respiratory function" and/or of "all functions of the entire brain, including the brain stem" is "irreversible" is a complex medical question, requiring specialized medical training and knowledge.

46. In a 2015 case involving a one-drug 5 gram pentobarbital lethal injection protocol similar to the Georgia protocol that Defendants are required to obey, Dr. Lance Becker (the Founder and then-Director of the Center for Resuscitation Science at the Hospital of the University of Pennsylvania Department of Emergency Medicine, Philadelphia, Pennsylvania, and Division Chief of Emergency Critical Care within the Department of Emergency Medicine),[1] testified during deposition that, for a substantial number of executed inmates, the cessation of the inmate's heartbeat resulting from an one-drug pentobarbital execution can be reversed up to 90 minutes later.[2]

47. Under Ga. Code Ann. § 31-10-16(a), the determination of the complex

---

[1] *See* Exhibit 1, Declaration of Lance B. Becker, M.D., FAHA.
[2] *See* Exhibit 2, 6/23/15, Deposition of Lance Becker, *West v. Schofield*, Case No. 12-1627-I, Chancery Court, Davidson County, Tennessee pages 73-74. *See also* Exhibit 3, 7/8/2015, Trial Transcript, *West v. Schofield*, Case No. 12-1627-I, Chancery Court, Davidson County, Tennessee, pages 547-48.

medical question described above, *i.e.*, when death supervenes, is to be determined only by a doctor, or by other specialized medical professionals acting under the supervision and authority of a doctor.

48.   Second, the Georgia statutes contain binding procedures, relating to the circumstances in which a previously-set time period for an execution passes by reason of a stay of execution or otherwise, that diverge from the federal regulations and 2019 Protocol:

(a) Where the time period for the execution of any convicted person in a capital case has passed by reason of a supersedeas incident to appellate review, a stay of execution by the State Board of Pardons and Paroles, or for any other reason, a judge of the superior court of the county where the case was tried shall have the power and authority to pass an order fixing a new time period for the execution of the original sentence without requiring the convicted person to be brought before him by a writ of habeas corpus. The order shall be recorded on the minutes of the court and a certified copy of the order shall be sent immediately to the convicted person's attorney of record, to the Attorney General, and to the superintendent of the state correctional institution at the place of execution.

(b) The new time period for the execution shall be seven days in duration and shall commence at noon on a specified date and shall end at noon on a specified date. The new time period for the execution fixed by the judge shall commence not less than ten nor more than 20 days from the date of the order.

(c) The Department of Corrections shall set the day and time for execution within the time period designated by the judge of the superior court. If the execution is not carried out on the day and at the time originally set by the Department of Corrections, the Department of Corrections is authorized to set new dates and times for execution within the period designated by the judge of the superior court.

*See* O.C.G.A. 17-10-40 (2010). In contrast to these Georgia statutory directives, the relevant federal regulations and 2019 Protocol, for example, leave the scheduling of new execution dates to the discretion of the BOP Director: "If the date designated for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted." *See*

28 C.F.R. § 26.3(a)(1); *see also* Ch. 1, Sec. II(B), BOP Execution Protocol. The same Georgia statutory provision also carries implications regarding notice to the condemned when a previously scheduled execution date passes due to a stay or otherwise: whereas binding Georgia law requires a court to set a specific seven-day period for a rescheduled execution, the federal regulation—where a postponement of a previously scheduled execution date of fewer than 20 days occurs—provides only that "the Warden shall notify the prisoner as soon as possible." *See* 28 C.F.R. § 26.4(a); *see also* Ch. 1, Sec. II(C), BOP Execution Protocol ("notice of the new execution date will be given as soon as possible" by the Warden). The Georgia statue further mandates notice to the attorney of record, a requirement the Defendants do not adhere to.

49. O.C.G.A. § 17-10-40 also is more than a mere "notice of execution date" statute, but rather goes further, establishing a strict window of time within which the scheduled execution must take place. Any new time period established for execution, as noted, is limited to a seven-day window, which "shall commence not less than ten nor more than 20 days from the date of the order." Through this statute, Georgia has decided there are humane limits on the amount of time a capital prisoner should reasonably be expected to have to live under the fear of impending death with an active execution warrant hanging over his head. These statutory limits, established via binding Georgia statutory law, are also applicable to any federal execution of Plaintiff through 18 U.S.C. 3596(a). The BOP has violated this provision by issuing a July 31, 2020 directive that scheduled Plaintiff's execution date on September 22, 52 days thereafter – a directive that, because it violates Georgia's maximum 20-day limits, is presently expired, such that any execution of Plaintiff on September 22 would be illegal under 18 U.S.C. § 3596(a).

50. Third, binding Georgia law requires that a compounder of drugs must obtain a prescription to make and provide a drug. *See* Ga. R&R, Rule 480-11-.01(6). Compounding pharmacies must obey that requirement. O.C.G.A. § 26-4-86. Upon information and belief, the Georgia Department of Corrections and its compounders adhere to this practice and obtain a prescription for drugs to be used in lethal injections at executions. *See Owens v. Hill*, 295 Ga. 302, 310, 758 S.E.2d 794, 801 (2014)(Georgia execution drugs have "been manufactured by a compounding pharmacy, which is a type of pharmacy that produces individually-produced medications according to the directions provided in individual prescriptions written by physicians.") The federal government does not adhere to any such practice in its implementation of sentences of death.

51. Defendants' use of the 2019 Protocol in the implementation of Plaintiff's death sentence, without accounting for binding Georgia law, violates the FDPA and is thus "not in accordance with [the] law," and under the APA must be prohibited. *See Execution Protocol Cases,* 955 F.3d at130, 132 n.4, 135, 142 & n.14, 143 & n.15 (Rao, J., concurring); *id.* at 124 n.10 (Katsas, J., concurring) (upholding FDPA on ground that statute requires adherence to binding state law). *See also id.* at 124 n.10 (Katsas, J., concurring) ("To be clear, I agree with Judge Rao that the FDPA's reference to 'law of the State' covers … state statutes and binding regulations…. Accordingly, those propositions constitute holdings of this Court.").

52. In addition, Defendants' failure to obtain a prescription for the pentobarbital they intend to use to execute Plaintiff also violates the FDCA and CSA.

51. The FDCA, which applies to drugs used in lethal injection executions,

conditions the dispensing of FDA-approved drugs such as pentobarbital upon either (a) "a written prescription of a practitioner licensed by law to administer such drug," or (b) "an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist."   21 U.S.C. § 353(b)(1)(B).

53. A prescription must be a "bona fide order" reflecting a genuine practitioner-patient relationship.  *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002).   A prescription directs "the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination or consultation by a licensed doctor—and does not include pieces of paper by which physicians are directing the issuance of a medicine, remedy, or drug to patients who do not need it, persons they have never met, or individuals who do not exist." *Id.*

54. The 2019 Protocol violates the FDCA because it requires the dispensing and administration of pentobarbital and/or compounded pentobarbital without a valid medical prescription. Medical prescriptions are available for pentobarbital and/or compounded pentobarbital as evidenced by the fact that two of the five states whose methods Defendants relied on in crafting the 2019 Protocol utilize such prescriptions.

55.  The FDCA also prohibits compounding of a drug that is "essentially a copy of one or more approved drugs." 21 U.S.C. § 353b(a)(5).  Upon information and belief, the compounded pentobarbital Defendants intend to use to execute Plaintiff is "essentially a copy" of, is "identical or nearly identical to," and contains a "bulk drug substance" contained in, FDA-approved pentobarbital, including Nembutal and generic products. 21 U.S.C. § 353b(d)(2)(A)-(B).

56. The  2019  Protocol  violates  the  FDCA  because  FDA-approved

pentobarbital, including Nembutal and generic products, are marketed and commercially available drug products under the FDCA.

57. The 2019 Protocol violates the FDPA and the FDCA, is thus "not in accordance with [the] law," and under the APA must be set aside. In addition, the 2019 Protocol violates the APA because the DOJ and the BOP failed to provide advance notice or opportunity for the public to comment upon the 2019 Protocol prior to its promulgation, and its adoption was not the product of reasoned decision-making.

58. Under the APA, any agency action that is "not in accordance with [the] law," "in excess of statutory jurisdiction, authority, or limitations," "contrary to constitutional right, power, privilege, or immunity," or taken "without observance of procedure required by law" must be set aside. 5 U.S.C. § 706(2)(A)-(D).

59. The Take Care Clause of the U.S. Constitution also imposes a duty on the Executive Branch to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The Take Care Clause forbids the Executive Branch from making acts of Congress unlawful by refusing to enforce them as written. The Take Care Clause preserves the principles of separation of powers inherent in the U.S. Constitution by preventing the Executive Branch from arrogating to itself the legislative power to revoke or rewrite laws.

60. Here, Defendants' blatant refusal to enforce the plain and explicit mandate of the FDPA to: a) comport with binding Georgia law in implementing Plaintiff's death sentence; and, b) comport with the requirements of the FDCA violate the Take Care Clause, and therefore must be prohibited.

**Exhaustion of Administrative Remedies**

61. Plaintiff has exhausted all available  administrative remedies by filing an Application for Administrative Remedies, or he believes exhaustion is not necessary under the Prison Litigation Reform Act, 42 U.S.C. § 1997e  (because this suit does not challenge prison conditions, and because there are no available administrative remedies that could address the challenged constitutional violations). Mr. LeCroy sought an Administrative Remedy to the Federal Government's proposed violation of his rights on August 15, 2019 and argued that "[t]he method by which the federal government intends to execute prisoners violates the laws and Constitution of the United States."  Plaintiff's request for administrative remedies was denied.

**V.**
**Claims for Relief**

**Count I – Violation of APA – *Ultra Vires* Agency Action**
**Contrary to the FDPA and U.S. Constitution**

62. Plaintiff re-alleges and incorporates herein by reference all of the preceding paragraphs  of the Complaint as if set forth in full below.

63. The APA requires a reviewing court to set aside any agency action that is "not in accordance with [the] law," "in excess of statutory jurisdiction, authority, or limitations,"  "contrary to constitutional right, power, privilege or immunity," or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

64. The Take Care Clause of the U.S. Constitution imposes a duty on the Executive Branch to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The Take Care  Clause forbids the Executive Branch from making acts of Congress unlawful by refusing to  enforce them as written.  The Take Care Clause also

preserves the principles of separation of powers inherent in the U.S. Constitution by preventing the Executive Branch from arrogating to itself the legislative power to revoke or rewrite laws.

65. Defendants' use of the 2019 Protocol in the implementation of Plaintiff's death sentence violates Section 3596 of the FDPA, which mandates that executions be "implement[ed] . . . in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a); *Execution Protocol Cases,* 955 F.3d at 130, *et seq.* (Rao, J., concurring). Defendants' federal death penalty implementation regime differs in material respects from binding Georgia law, which requires two physicians to be present for the execution, and contains additional provisions regarding the scheduling of an execution date that passes and related time limits thereon, as well as mandatory compounding prescription requirements, that differ significantly from the federal regulations and 2019 Protocol.

66. Upon information and belief, Defendants will utilize the 2019 Protocol in Plaintiff's execution without complying with the binding law of the state of Georgia, where he was sentenced. In the alternative and assuming that there is a finding that Defendants have the discretion to deviate from the 2019 Protocol in order to implement executions in the manner prescribed by the laws of the States, Defendants have failed to provide notice of which Georgia procedures they will follow and what changes they will make to comply with the binding law of Georgia.

67. Defendants' application of the 2019 Protocol to Plaintiff in implementing his death sentence illegally contravenes Congressional statute and intent insofar as it purports to prescribe the manner of the execution of Plaintiff, who was sentenced to

death  under the FDPA, without complying with binding Georgia law as federal law requires here.  The 2019 Protocol constitutes *ultra vires* agency action because the DOJ and the BOP lacked the authority under the FDPA to issue the 2019 Protocol, and issued it in violation of the Take Care Clause and principles of separation of powers; the actual and contemplated application and use of the 2019 Protocol in implementing Plaintiff's death sentence also violates the APA, 5 U.S.C. § 706(2), the Take Care Clause of the Constitution and the principles of separation of powers, and must therefore be prohibited.

68. Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2), and this Court should enjoin any implementation of that 2019 Protocol against this Plaintiff unless it complies with the FDPA and all Georgia state laws as incorporated therein.

### <u>Count II</u>
### (Violation of the APA — Arbitrary and Capricious Agency Action)

69.  Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs  of the Amended Complaint as if set forth in full below.

70.  The APA requires a reviewing court to set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5  U.S.C. § 706(2)(A).

71.  Any Agency action that is not the product of reasoned decision-making is arbitrary and  capricious.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  To satisfy the requirement of reasoned decision-making, an agency must "cogently explain why it has exercised its discretion

in a given manner." *Id.* at 48.

72. An agency's rule is also arbitrary and capricious when, among other circumstances, the  agency has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

73. Neither the DOJ nor the BOP provided any explanation for the basis or reasons for the  decision to adopt the 2019 Protocol or the procedures contained therein. In particular, neither the DOJ nor the BOP has adequately considered or provided any explanation or justification for  their planned use of pentobarbital as an execution drug, their failure to comply with applicable laws, including the CSA and FDCA, or the absence of necessary safeguards to protect against  the significant risk of pain and suffering that the use of pentobarbital will cause to Plaintiff, including the risk of acute pulmonary edema and the harm caused by the use of sub-potent or improperly compounded drugs.

74. The adoption of the 2019 Protocol was not the product of reasoned decision-making and entirely failed to consider important aspects of the problem, and is thus  arbitrary and capricious, in violation of the APA.

75. The DOJ's and the BOP's violation of the APA caused harm to Plaintiff by depriving him of the right and opportunity to consider and address issues and concerns with the 2019  Protocol, including, but not limited to, Defendants' failure to provide adequate notice of the procedures to which Plaintiff would be subjected; the protocol's failure to protect Plaintiff's right of access to counsel and the courts; and the risk of an  unavoidably painful execution, on account of the properties of pentobarbital, the undefined and unrestricted procedures to be used in  executions, and/or the absence of

sufficient safeguards.

76. Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

### Count III
**(Violation of the APA — Arbitrary and Capricious Failure to  Exercise Enforcement Authority under the CSA)**

77. Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs  of the Amended Complaint as if set forth in full below.

78. The CSA makes it unlawful to "dispense" any "controlled substance," 21  U.S.C. § 841(a)(1), except pursuant to a valid prescription "issued for a legitimate medical purpose" by a practitioner who is "acting in the usual course of professional practice" and registered pursuant  to the statute.  21 U.S.C. §§ 802(21), 829(e)(2).

79. Regulations promulgated by the DEA provide that every person who "dispenses" a  "controlled substance" is required to obtain a registration.  21 C.F.R. § 1301.11. The regulations also provide that the DEA Administrator "shall deny" an application for registration unless the issuance of a registration is "required" under the CSA.  21 C.F.R. § 1301.35.

80. Pentobarbital is a Schedule II controlled substance.  21 C.F.R. § 1308.12(e)(3).

81. The 2019 Protocol violates the CSA because it requires the dispensing and administration of pentobarbital without a valid prescription, for use that is not a  legitimate medical purpose, and by persons who are not acting in the course of professional practice and/or  lack a valid registration.

82. Defendant Shea has arbitrarily and capriciously failed to exercise his

authority to enforce the CSA by not requiring the persons who will dispense the pentobarbital to apply for a registration, and will continue to act arbitrarily and capriciously by permitting them to dispense the pentobarbital without obtaining such registration or without obtaining a valid medical prescription.

83. Such arbitrary and capricious action violates the APA.

84. This violation of the APA causes harm to Plaintiff because, as alleged above, an execution under the 2019 Protocol—with the use of pentobarbital in violation of the CSA—has the substantial probability of resulting in unnecessary punishment in the form of bodily harm and/or illness due to the properties of pentobarbital.

85. Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

**Count IV**
**(Violation of the**
**APA —**
**Arbitrary and Capricious Failure to Exercise**
**Enforcement Authority Under the FDCA)**

86. Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of this Amended Complaint as if set forth in full below.

87. The FDCA's "core" legislative purpose is to ensure that a drug is "'safe' and 'effective' for its intended use." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

88. The FDCA conditions dispensing of FDA-approved drugs such as pentobarbital upon either (a) "a written prescription of a practitioner licensed by law to administer such drug," or (b) "an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist." 21 U.S.C. § 353(b)(1).

89. Under the FDCA, the proposed dispensing and administration of compounded pentobarbital requires a valid medical prescription reflecting a medical practitioner's order that "a compounded product is necessary for the identified patient." 21 U.S.C. § 353a(a).

90. Upon information and belief, Defendants have not obtained medical prescriptions to use either FDA-approved or compounded pentobarbital in connection with executions of Plaintiff.

91. The 2019 Protocol violates the FDCA by allowing the dispensing, administration, and use of pentobarbital and/or compounded pentobarbital without a valid medical prescription. *See* 21 U.S.C. §§ 353(b)(1), 353a(a), 353a(b)(1)(D), 353a(b)(2), 353b(a)(5), and 353b(d)(2).

92. Defendant Hahn has acted in an arbitrary and capricious manner by failing to exercise his authority to enforce the FDCA, by not requiring the persons who will dispense the pentobarbital to have a valid registration. Upon information and belief, Defendant Hahn will also continue to act arbitrarily and capriciously by permitting these persons to dispense the pentobarbital without a proper registration and without obtaining a valid medical prescription.

93. Such arbitrary and capricious action violates the APA.

94. This violation of the APA causes harm to Plaintiff because, as alleged above, an execution under the 2019 Protocol—with the use of pentobarbital in violation of the FDCA—has the substantial probability of resulting in unnecessary punishment in the form of bodily harm and/or illness due to the properties of pentobarbital.

95. Accordingly, the 2019 Protocol should be held unlawful and set aside

pursuant to 5 U.S.C. § 706(2)(A).

### Count V
### Violation of the
### APA –
### Agency Action that is Contrary to Law
### Because it Violates the FDCA and
### CSA

96.  Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of this Amended Complaint as if set forth in full below.

97.  Under the APA, a reviewing court must set aside any agency action that is "not in  accordance with [the] law," or is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A) and (C).

98. As explained above, the 2019 Protocol violates both the CSA and the FDCA.

99. The APA provides a private right of action when, as here, an agency's action is "not in  accordance with [the] law," 5 U.S.C. § 706(2)(A), and regardless of whether those two underlying statutes provide a right of action by themselves. *See Chrysler Corp. v. Brown*, 441  U.S. 281, 317-18 (1979).

100. Defendants' violations of the federal drug laws will cause injury to Plaintiff by circumventing the statutory purposes of the CSA and FDCA to ensure that all drugs, including  those used to carry out an execution, are safe and effective and dispensed and administered  properly. *See FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000).  "[I]gnoring those safeguards, as Plaintiffs allege Defendants intend to do, places Plaintiffs at  risk." *Ringo v. Lombardi*, 706 F. Supp. 2d 952, 958 (W.D. Mo. 2010); *see also id.* at 962;  *Beaty v. FDA*, 853 F. Supp. 2d 30, 42-43 (D.D.C. 2012) (explaining that  importation  of  a  misbranded  execution  drug  implicates  the

FDCA's statutory purposes, including the need to ensure that a drug is safe and effective: "Even when in the correct hands, prisoners on death row have an unnecessary risk that they will not be anesthetized properly prior to execution."), *aff'd in part, vacated in part sub nom. Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013).

101.  Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## <u>Prayer for Relief</u>

WHEREFORE, in order to prevent Defendants' violations of the APA, the FDPA, the FDCA, the CSA and the Take Care Clause of the U.S. Constitution in carrying out Plaintiff's execution, as alleged above, Plaintiff respectfully requests that the Court enter a judgment:

a.   declaring that the Defendants' contemplated use of the 2019 Protocol in carrying out Plaintiff's execution is illegal and violates the APA and the Take Care Clause of the U.S. Constitution, because it fails to comply with binding Georgia law and federal statutory and constitutional law requiring its application;

b.   declaring that the Defendants' contemplated use of the 2019 Protocol in carrying out Plaintiff's execution is illegal and violates the APA, the FDPA, and the Take Care Clause of the U.S. Constitution, because it fails to comply with the FDCA and CSA;

c.   enjoining Defendants and all persons acting on their behalf from using the 2019 Protocol in carrying out Plaintiff's execution, or using any revised protocol that violates Plaintiff's rights and the law, for the same reasons challenged above;

d.      granting Plaintiff reasonable attorneys' fees, pursuant to any applicable

laws of the United States or otherwise; and

e.      granting such other and further relief as the Court deems just and proper.

Dated   September 13, 2020.

Respectfully submitted,

_____/s/ Gregory S. Smith_____
Gregory S. Smith (DC Bar #472802)
Law Offices of Gregory S. Smith
913 East Capitol Street, S.E.
Washington, D.C.  20003
Telephone: (202) 460-3381
Email: gregsmithlaw@verizon.net

_____/s/ John R. Martin_____
John R. Martin (*pro hac vice* pending)
Martin Brothers P.C.
1099 St. Louis Place
Atlanta, GA  30306
Telephone: (404) 433-7446
Email: jack@martinbroslaw.com

*Attorneys for Plaintiff*

# Declaration of Lance B. Becker, M.D, FAHA

1.    My name is Lance B. Becker, M.D.  I am the Founder and Director, Center for Resuscitation Science, Hospital of the University of Pennsylvania Department of Emergency Medicine, Philadelphia, Pennsylvania.  I also am the Division Chief of Emergency Critical Care, within the Department of Emergency Medicine.

2.    I have been asked by counsel representing Inmates Stephen West, David Miller, and Nicholas Sutton to provide opinions regarding how long after an inmate's heart and respiration have been stopped under Tennessee's Lethal Injection Protocol, the inmate's condition becomes irreversible.

3.    My professional qualifications are fully expressed in the attached curriculum vitae. Brief highlights include the following: From 1989 through 1997, I was the Director of Research, Section of Emergency Medicine, University of Chicago.  In 1999 I founded and from 1999 until 2006 served as Director of, the Emergency Resuscitation Center, University of Chicago and Argonne National Laboratory.  In 2006, I founded, and became the Director of, Center for Resuscitation Science, Hospital of the University of Pennsylvania Department of Emergency Medicine, Philadelphia, Pennsylvania.

4.    In connection with this declaration, I was given the Tennessee 5 gram pentobarbital one-drug execution protocol.

5.    I have also reviewed scientific studies regarding the resuscitation of human beings following cardiac arrest, including, but not limited to, cardiac arrest resulting from the administration of drugs causing the cessation of heartbeat.

6.    In a trial from Australia detailed in the Resuscitation Journal (*Refractory cardiac arrest treated with mechanical CPR, hypothermia, ECMO and early reperfusion (the "CHEER" trial)*, Stub, *et al.* Resuscitation 2015) doctors combined an advanced resuscitation strategy that included a mechanical chest compression device, intra-arrest cooling with IV cold saline, plus emergency cardiopulmonary bypass with rapid percutaneous coronary artery revascularization.  The trial began in a selected group of patients who had CPR initiated within 10 minutes of their collapse, but did not start until after the patient had 30 minutes of standard ACLS measures like CPR, defibrillation.  After these measures all failed for 30 minutes, advanced treatment began.  It included placement of a chest compression device applied to the patient's chest, intra-arrest cooling started while the patient remained in cardiac arrest, and the patient was then surgically placed on emergency cardiopulmonary bypass, then transferred to the cardiac

catheterization lab where acute coronary occlusions were sought and corrected emergently to restore blood flow to any ischemic area of the heart. After this "salvage" therapy, nearly all (25 of 26, 92%) of the patient's hearts were restarted and full survival to hospital discharge with good neurological function was observed in 14/26 (54%) of the patients. The median time interval that the patient had no detectable pulse (from patient collapse to the beginning of ECPR flow) was 56 minutes and this ranged from 40 - 85 minutes for the whole group.

7.     These results indicate that in about 50% of patients who experience 10 minutes of cardiac arrest before treatment, and remain in cardiac arrest notwithstanding 30 minutes or more of standard ACLS measures like CPR, defibrillation, may, with appropriate advanced care, be restored with good neurological outcome and full function 30 minutes or longer after the cardiac arrest.

8.     In *Neurological outcomes after extracorporeal cardiopulmonary resuscitation in patients with out-of-hospital cardiac arrest: a retrospective observational study in rural tertiary care center*, Mochizuki, *et al.*, Journal of Intensive Care 2014, an observational study was done in a rural setting in Japan where the traditional survival rates from out-of-hospital cardiac arrest are 2%. In this study, when patients who suffered an out-of-hospital cardiac arrest, EMS responders would attempt resuscitation on the scene with CPR and defibrillation. If these efforts failed they would go to the hospital that could offer very advanced resuscitation using emergency cardiopulmonary bypass. Ten of 50 (20%) of the patients survived with good neurological recovery. The average time between cardiac arrest and the initiation of emergency cardiopulmonary bypass was 78 minutes for the 10 survivors with good function.

9.     In *Sequelae-free long term survival of a 65-year-old women after 8 hours and 40 minutes of cardiac arrest from deep accidental hypothermia*, Meyer, *et al.*, 2014, a case report detailed a 65-year old women who was depressed, took medications, and fell into a snowbank for a night. She suffered cardiac arrest at about 7:15 am the next morning. When found, she was administered CPR for 4 hours and 48 minutes, followed by ECPB for 3 hours and 52 minutes (a total of 8 hours and 40 minutes). After this time her heart restarted and she made a good recovery. On medical exam 5 years later, she had no neurological damage from the event.

10.     Even the administration of cardiotoxic drugs that stop the heart can often be completely reversed with the use of ECPB.

11.     A 2012 paper reviewed the literature available on ECPB being used to save the lives of persons who are poisoned with strong drugs that stop the heart's ability to beat. *A Review of Emergency Cardiopulmonary Bypass for Severe Poisoning by Cardiotoxic Drugs*, Johnson, *et al.*, 2012.  These are typically overdoses of calcium channel antagonists and beta blockers that are the most common poisoning.  They result in progressive cardiac dysfunction, lowered blood pressure, and frequently death, because there are no know antidotes for this poisoning when it stops the heart. These patients were placed on ECPB when they become hemodynamically unstable or have cardiac arrest.  The literature describes 11 cases where the cardiotoxic poisoning would have very likely killed the patient, but these patients were placed on ECPB and 7 (64%) survived and were restored to full baseline health.

12.     Even after very long periods of cardiac arrest, survival with full neurological function is possible.

13.     In *Emergency cardiopulmonary bypass in cardiac arrest: Seventeen years of experience*, Wallmuller, *et al.*, 2013, data was examined from 55 patients from 1993 to 2010 with cardiac arrest who were placed on ECPB as a salvage therapy.  Selected patients in cardiac arrest but who had no response to standard therapies could be started on ECPB at the discretion of the emergency attending. Of the 55 patients, 8 were discharged with good neurological function.  The average time period from the cessation of heartbeat until the start of ECPB was 85 minutes.

14.     In *Early induction of Hypothermia during cardiac arrest improves neurological outcomes in patients with out of hospital cardiac arrest who undergo emergency cardiopulmonary bypass and percutaneous coronary intervention*, Nagao, *et al.*, 2010, the study reports the results of 171 patients who were in refractory cardiac arrest and who all failed to respond to traditional medical therapies.  These patients were then treated more aggressively with ECPB, hypothermia, and coronary interventions.  Overall approximately 12% of these patients had a good 1 year status. In subgroup analysis, the quartile of patients who were treated with hypothermia most rapidly (<95 min) did the best. Out of these 45 patients who received rapid cooling to protect the brain, ten (out of 45) had a good neurological status after one year.

15. The ability to restore life remains true even when the cessation of cardiac function is caused by cardiotoxic drugs. *Extracorporeal life support in severe drug intoxication: a retrospective cohort study of 17 cases*, Daubin *et al.*, 2009, outlines 17 cases of patients with severe cardiotoxic poisoning leading to progressive cardiac dysfunction, hypotension, and expected death from the poisoning. When placed on ECPB, 13 (76%) of the 17 were resuscitated without any neurological sequelae. The mean duration of cardiac arrest until ECPB was started was 101 minutes.

16. Tennessee's primary method of execution is an intravenous injection of five grams of pentobarbital, consisting of 100 ml of a 50 mg/mL solution divided into two syringes.

17. The written policy provides that an additional five grams of pentobarbital in the same volume and concentration may be prepared and kept available in the Lethal Injection Executioner's Room for contingent use.

18. Though Tennessee's written policy does not state the manner in which the physician determines whether the inmate is deceased, I am informed that unwritten policy followed by the physician is to check for the absence of a pulse (heartbeat) and to examine what the physician describes as "certain neurological parameters" in the inmates eyes, in other words examining the inmate to determine whether his pupils are fixed and dilated.

19. Based upon my expertise and experience in resuscitative medicine and my review of the medical literature regarding the resuscitation of humans following the cessation of heartbeat, it is my opinion that it is highly probable to a reasonable degree of medical and scientific certainty that the cessation cardiac function caused by the administration of 5 grams of pentobarbital in the manner prescribed by Tennessee's execution policies can be reversed in a substantial number of inmates through medical treatment up to 90 minutes after the cessation of heartbeat. It is further my opinion that in 50% of inmates, heartbeat can be restored without significant neurological impairment 30 minutes after the "death" is declared under Tennessee's execution policies.

20. Under Tennessee's execution policies, the warden or his designee announces that the inmate's sentence has been carried out immediately after the physician has declared the inmate "dead."

21.    After reviewing Tennessee's execution policies, I believe it is highly probable to a reasonable degree of medical and scientific certainty that the cessation cardiac function caused by the administration of pentobarbital in the manner prescribed by Tennessee's execution policies can be reversed through medical treatment in 50% of inmates at the time the warden or his designee declares the sentence carried out.

22.    Under Tennessee's execution policies, the warden or his designee informs appropriate State officials that the inmate's sentence has been carried out immediately after he declares the sentences carried out.

23.    After reviewing Tennessee's execution policies, I believe it is highly probable to a reasonable degree of medical and scientific certainty that the cessation cardiac function caused by the administration of pentobarbital in the manner prescribed by Tennessee's execution policies can be reversed through medical treatment in 50% of inmates at the time the Commissioner or his designee informs appropriate State officials that the inmate's sentence has been carried out.

24.    Under Tennessee's execution policies, the inmate's body is removed and placed in a body bag immediately after the warden or his designee informs appropriate State officials that the inmate's sentence has been carried out.

25.    After reviewing Tennessee's execution policies, I believe it is highly probable to a reasonable degree of medical and scientific certainty that the cessation cardiac function caused by the administration of 5 grams of pentobarbital in the manner prescribed by Tennessee's execution policies can be reversed through medical treatment in 50% of inmates at the time their body is removed and placed in a body bag.

26.    I declare under penalty of perjury that the foregoing is true and correct.

_____
Dr. Lance B. Becker

Dated:  June 19, 2015

LANCE B. BECKER, M.D., FAHA

 1   prison --

 2        A.     Yes, ma'am.

 3        Q.     -- is that correct?

 4        A.     That was my understanding.

 5        Q.     Okay.  And that the inmates or the

 6   inmate has experienced cardiac arrest following

 7   the IV of pentobarbital; is that correct?

 8        A.     That's correct.

 9        Q.     And the pupils are fixed and dilated;

10   is that correct?

11        A.     That's correct.

12        Q.     And the physician has pronounced them

13   to be dead and there's an absence of pulse or

14   heartbeat.

15               And are you familiar with the

16   definition, the uniform definition of death in

17   Tennessee, the legal definition?

18        A.     No, ma'am.

19        Q.     It is the irreversible cessation of

20   circulatory and respiratory functions or the

21   irreversible cessation of all functions of the

22   entire brain including the brain stem.

23               So the physician has entered the

24   chamber and has declared the inmate -- pronounced

25   him to be dead.  And your opinion is that it's

LANCE B. BECKER, M.D., FAHA

Page 74

1    highly probable to a reasonable degree of medical

2    and scientific certainty that the cessation of

3    cardiac function caused by the administration of

4    five grams of pentobarbital in the manner

5    prescribed my Tennessee's execution policies can

6    be reversed in a substantial number of inmates

7    through medical treatment up to 90 minutes after

8    the cessation of heartbeat.  It is further his

9    opinion that in 50 percent of inmates heartbeat

10   can be restored without significant neurological

11   impairment 30 minutes after death is declared

12   under Tennessee execution policies.

13             So the opinion that you have is that

14   it is highly probable that an inmate could be

15   resuscitated 30 minutes after death and then up to

16   90 minutes?  Am I stating that correctly?

17       A.   Yes, ma'am.

18             MR. KISSINGER:  You know, let me

19        interject.  I hate to interrupt again.  But

20        even though he did answer, what he said was

21        that it was highly probable that 50 percent

22        of inmates could be -- that 50 percent could

23        be reversed, not that it's highly probable.

24        I think that it's kind of a

25        mischaracterization of his testimony.

Case 1:19-mc-00145-TSC   Document 245-3   Filed 09/13/20   Page 1 of 3

**STEPHEN MICHAEL WEST, ET AL. v. DERRICK D. SCHOFIELD, ET AL.**
**Transcript of Proceedings - Vol. 2 on 07/08/2015**                    Page 276

```
   IN THE CHANCERY COURT PART I, FOR THE STATE OF
TENNESSEE, TWENTIETH JUDICIAL DISTRICT, NASHVILLE
              AND DAVIDSON COUNTY



STEPHEN MICHAEL WEST, et al., )
                              )
     Plaintiffs,              )
                              )
     and                      )
                              )
EDMUND ZAGORSKI, et al.       )
                              ) No. 13-1627-I
     Intervening Plaintiffs,  )
                              )
v.                            ) Death Penalty Case
                              )
DERRICK D. SCHOFIELD, in his  )
official capacity as          )
Commissioner of the Tennessee )
Department of Correction, et  )
al.,                          )
                              )
     Defendants.              )
_____)
```

PROCEEDINGS

Volume 2

Had Before the Honorable Claudia Bonnyman

July 8, 2015

_____

VOWELL, JENNINGS & HUSEBY
Court Reporting Services
207 Washington Square
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

1    that correct?

2          A    So I have never witnessed it myself.

3    But from reading that, that would be my

4    understanding.

5          Q    Okay.  Dr. Becker, can the heartbeat and

6    full neurological function of an inmate be

7    restored, looking at this timeline, at the time

8    they are pronounced dead -- at the time the

9    physician is pronouncing them dead and the warden

10   has announced that their sentence has been served?

11         A    I believe it would be pretty

12   straightforward and simple to fully revive an

13   individual right after that pronouncement was

14   made.

15         Q    As long as the proper steps are taken,

16   can, in fact, the heartbeat and full neurological

17   function of 50 percent of my clients be restored a

18   full 30 minutes after they have been pronounced

19   dead and the State of Tennessee has deemed their

20   sentence served?

21         A    That's what the science would suggest.

22   That's not my opinion.  That's what scientific

23   evidence would suggest, sir.

24         Q    And under those circumstances, even 90

25   minutes after they've been pronounced dead and

 1   their sentences have been served, can the

 2   heartbeat and full neurological function of a

 3   substantial number of inmates be restored?

 4        A    I believe, assuming that steps were

 5   taken sort of after that pronouncement was made

 6   to, for example, begin CPR, yes, I believe that a

 7   substantial number of those individuals would

 8   be -- would survive to a full neurologic recovery

 9   if they were -- if they had attempted

10   resuscitation.

11        Q    Okay.  When we talk about a substantial

12   number of inmates, if I recall your declaration,

13   you said about 15 percent of inmates?

14        A    In that -- in that area, yes, sir.

15        Q    Okay.  And if I remember correctly, I

16   think there are 33 inmates; is that correct?  33

17   inmates who are Plaintiffs in this action.  So 15

18   percent of those inmates would be about five of

19   them; is that right?

20        A    I would agree with your calculations

21   that it would be something like that.

22        Q    So that means that almost five of our

23   clients, as a matter of scientific fact, will not

24   be dead 90 minutes under the conditions we talked

25   about, 90 minutes after the State of Tennessee has