**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the ) | |
| Federal Bureau of Prisons' Execution ) | |
| Protocol Cases, ) | |
| ) | |
| LEAD CASE: *Roane et al. v. Barr* ) | Case No. 19-mc-145 (TSC) |
| ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| ALL CASES ) | |
| ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.    STATEMENT OF FACTS REGARDING STATUTORY AND REGULATORY
BACKGROUND AND BOP'S PROTOCOL .................................................... 3

II.   PROCEDURAL HISTORY.................................................................................. 6

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ................................................................................................................... 11

I.    BOP's PROTOCOL IS NOT CONTRARY TO THE FDCA ........................... 11

II.   PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUISITE IRREPARABLE
HARM FOR ISSUANCE OF A PERMANENT INJUNCTION ...................... 19

  A.  A Violation of the FDCA Does Not Establish Injury *Per Se* ........................... 19

  B.  Plaintiffs Cannot Establish Harm Based on the Possibility of Pulmonary Edema ........... 20

  C.  Plaintiffs' Remaining Arguments Also Lack Merit.......................................... 25

III.  EQUITY DOES NOT WARRANT A PERMANENT INJUNCTION........................... 30

CONCLUSION................................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ........................................................................ 10

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................ 10

\*Barr v. Lee,
  2020 WL 3964985, No. 20A8, 591 U.S. __ (2020) ........................................... *passim*

*Barr v. Purkey*,
  591 U.S. ___ (July 16, 2020) ................................................................. 2

*Barr v. Purkey*,
  No. 20A9, 2020 WL 4006809, 591 U.S. ___ (July 16, 2020) ................................ 17

\*Barr v. Purkey,
  No. 20A10, 591 U.S. ___ (July 16, 2020) .............................................. 7, 16, 17

*Baze v. Rees*,
  553 U.S. 35 (2008) ........................................................................... 4

*Beaty v. FDA*,
  853 F. Supp. 2d 30 (D.D.C. 2002) *aff'd in relevant part sub nom. Cook v. FDA*,
  733 F.3d 1 (D.C. Cir. 2013) ................................................................. 11

*Beyond Nuclear v. U.S. Dep't of Energy*,
  233 F. Supp. 3d 40 (D.D.C. 2017) ........................................................ 9, 10

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ........................................................................ 16

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) ..................................................................... *passim*

*Calderon v. Thompson*,
  523 U.S. 538 (1998) ........................................................................ 31

*Camara v. Mastro's Rests. LLC*,
  340 F. Supp. 3d 46 (D.D.C. 2018), *aff'd*, 952 F.3d 372 (D.C. Cir. 2020) ............... 18

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ............................................................... 3, 10

*Coe v. McHugh*,
  968 F. Supp. 2d 237 (D.D.C. 2013) ......................................................... 9

*Cook v. Food & Drug Admin.*,
  733 F.3d 1 (D.C. Cir. 2003) ........................................................... 5, 11, 17

*Dunn v. McNabb*,
  138 S. Ct. 369 (2017) .............................................................................. 30

*Durr v. Strickland*,
  No. 10-cv-288, 2010 WL 1610592 (S.D. Ohio Apr. 15, 2010), *aff'd*, 602 F.3d 788
  (6th Cir. 2010), *cert. denied*, 559 U.S. 1087 (2010) .............................. 21

*\*eBay v. MercExchange, LLC*,
  547 U.S. 388 (2006) ...................................................................... 8, 10, 30

*Envtl. Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981) ................................................................. 10

*\*FDA v. Brown & Williamson Tobacco,Co.*,
  529 U.S. 120 (2000) ....................................................................... *passim*

*Glossip v. Gross*,
  576 U.S. 863 (2015) ................................................................................. 4

*Gomez v. U.S. Dist. Ct. for the N. Dist. of Cal.*,
  503 U.S. 653 (1992) ............................................................................... 31

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................. 5

*Hill v. McDonough*,
  547 U.S. 573 (2006) .......................................................................... 30, 31

*\*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
  955 F.3d 106 (D.C. Cir. 2020) ........................................................ 4, 6, 20

*In re NETtel Corp., Inc.*,
  No. 00-01771, 2007 WL 2119029 (Bankr. D.D.C. July 20, 2007) .......... 11

*Jackson v. Danberg*,
  656 F.3d 157 (3d Cir. 2011) .................................................................... 22

*LaShawn A. v. Barry*,
  87 F.3d 1389 (D.C. Cir. 1996) ............................................................. 11

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ........................................................................... 17

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................... 18

*POM Wonderful LLC v. Coca-Cola Co.*,
  573 U.S. 102 (2014) ........................................................................... 16

*Purkey v. Barr*,
  20A12, 591 U.S. ___ (2020) ............................................................... 30

*Richards v. INS*,
  554 F.2d 1173 (D.C. Cir. 1977) ............................................................. 9

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r*,
  295 F.3d 16 (D.C. Cir. 2002) ............................................................... 29

*Ringo v. Lombardi*,
  No. 09-cv-4095, 2009 WL 1406980 (W.D. Mo. May 19, 2009) ............................................ 21

*Ringo v. Lombardi*,
  No. 09-cv-4095, 2010 WL 4103201 (W.D. Mo. Oct. 18, 2010)............................................. 21

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ........................................................... 29

*United States v. Bernard*,
  299 F.3d 467 (5th Cir. 2002)................................................................. 9

*United States v. Fausto*,
  484 U.S. 439 (1988) ........................................................................... 15

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ....................................................................... 17, 18

*United States v. Mitchell*,
  -- F.3d --, 2020 WL 4815961 (9th Cir. Aug. 19, 2020) ........................................... 20

*United States v. Nazir*,
  211 F. Supp. 2d 1372 (S.D. Fla. 2002)................................................... 16, 25

*United States v. Rutherford,*
    442 U.S. 544 (1979) ................................................................................................ 12

*United States v. Vialda,*
    No. W-99-CR-070(1)-ADA, Order on Motion for Injunctive Relief, ECF No. 690
    (W.D. Tex. Sept. 11, 2020) ............................................................................... 20, 31

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ................................................................................................ 10

*West v. Schofield,*
    519 S.W.3d 550 (Tenn. 2017) ................................................................................ 15

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,*
    810 F.2d 243 (D.C. Cir. 1987) ................................................................................ 11

*\*Winter v. Nat. Resources Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................... 10, 19, 21, 31

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ...................................................................... 2, 8, 19

*Withrow v. Larkin,*
    421 U.S. 35 (1975) .................................................................................................... 8

**Statutes**

18 U.S.C. § 3596 ............................................................................................................. 5, 14

21 U.S.C. § 301 ..................................................................................................................... 7

21 U.S.C. § 321 ..................................................................................................................... 4

21 U.S.C. § 337 ........................................................................................................ 2, 16, 18

21 U.S.C. § 353b ............................................................................................................. 5, 29

21 U.S.C. § 355 ................................................................................................................... 12

21 U.S.C. § 387 *et seq* ........................................................................................................ 13

Act of June 25, 1938, ch. 675, 52 Stat. 1040 ........................................................................ 4

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 9, 10

**Regulations**

21 C.F.R. Pt. 201 .................................................................................................. 5, 29

21 C.F.R. Pt. 211 .................................................................................................. 5, 29

28 C.F.R. § 26.3 ................................................................................................... 5, 14

57 Fed. Reg. 56,536 (Nov. 30, 1992) ......................................................................... 14

**Other Authorities**

Death Penalty Information Center, Execution Database, https://deathpenaltyinfo.org/
   executions/execution-database ............................................................................... 4

Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State
   Uses of Electrocution and Lethal Injection and What It Says About Us*,
   63 Ohio St. L.J. 63 (2002) ...................................................................................... 5

FDA, *Facts About the Current Good Manufacturing Practices (CGMPS)*, https://www.fda.gov/
   drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-
   cgmps ............................................................................................................... 6

Whether the Food & Drug Admin. Has Jurisdiction over Articles Intended for Use in Lawful
   Executions (May 3, 2019) ("OLC Op."),
   2019 WL 2235666................................................................................... 12, 13, 14, 17

**INTRODUCTION**

The Court should deny Plaintiffs' motion for partial summary judgment and permanent injunction on Count XI of the Amended Complaint concerning the Federal Bureau of Prisons' ("BOP") alleged violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"). Defendants recognize that the Court previously has concluded, with respect to former plaintiff Keith Nelson, that BOP's lethal injection protocol ("Protocol") violates the FDCA. Defendants respectfully request the Court's reconsideration because the Court's prior reasoning was incorrect and cannot be reconciled with the purpose of the FDCA or the logic of the Supreme Court's decision in *FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120 (2000). In any event, Plaintiffs have not established the requisite irreparable injury to justify issuance of a permanent injunction to enjoin the impending executions of plaintiffs Christopher Vialva or William LeCroy, or the future executions of the other plaintiffs.

The upshot of the Court's prior conclusion—that a prescription for pentobarbital is necessary before Plaintiffs' lawful sentences can be carried out—would be to make execution by lethal injection impossible. But an effective ban of the BOP's use of lethal injection to carry out capital sentences simply cannot be what Congress intended when it passed the Federal Death Penalty Act ("FDPA")—particularly given that Congress necessarily contemplated that federal executions would be carried out by lethal injection. *See Brown & Williamson*, 529 U.S. at 143 ("[R]econciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute."). Nor do Plaintiffs even have a private right of action to enforce the FDCA because Congress specified that "all . . . proceedings for the enforcement, *or to restrain violations*, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a) (emphasis added).

Ruling in favor of Plaintiffs on Count XI would also be extraordinary at this point in the litigation, given that the Supreme Court previously vacated, with no dissenting opinions, this Court's preliminary injunction entered on the ground that the Protocol likely violated the FDCA. *Barr v. Purkey*, No. 20A10, 591 U.S. __ (July 16, 2020) (per curiam). Even if the Supreme Court

did not agree with the government on all scores when vacating the injunction, it at least either agreed with the government on the merits or found the balance of equities tip in favor of allowing the execution to proceed.  Nothing has changed as to either of those conclusions: the legal question on the merits remains the same, and there is no material change in the facts that would tip the balance of equities in favor of a permanent injunction.  And this is particularly so considering that pentobarbital has been used in over one hundred executions, despite the FDCA, and that the Supreme Court has approved of its use as a "less painful and more humane" method of execution. *See Barr v. Lee*, No. 20A8, 591 U.S. __, 2020 WL 3964985, at *2 (2020) (per curiam).

Even assuming Plaintiffs were to prevail on the merits of their FDCA claim, this Court should not permanently enjoin the government from carrying out Plaintiffs' executions under the Protocol.  Plaintiffs have not established, as they must, that any cognizable harm would result from BOP's alleged violations of the FDCA.  *See Roane v. Barr*, No. 20-5260 (D.C. Cir. Aug. 27, 2020).  As this Court recognized recently in denying Nelson's motion for a permanent injunction and allowing his execution to proceed, a violation of the FDCA, standing alone, does not constitute the required harm, which must be "certain."  *See* Order, ECF No. 226 at 2 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  And, like Nelson, Plaintiffs have not met their burden.  Plaintiffs allege that they will suffer from pulmonary edema if they are executed using pentobarbital.  Yet, even assuming that were true, which the government strongly contests, it would not support entry of an injunction, because that alleged injury would not result from the purported violation of the FDCA—specifically, the lack of a prescription.  According to Plaintiffs' own claims regarding the effects of pentobarbital, the same harm (*i.e.*, pulmonary edema) would result regardless of whether the government obtained a prescription.  Especially having failed to establish an Eighth Amendment violation based on the alleged harm from pulmonary edema, Plaintiffs' irreparable harm from the asserted FDCA violations must be traceable to those violations, not to harm that would allegedly occur even if the government could comply with Plaintiffs' own (mistaken) view of the FDCA.

Defendants respectfully submit that, because Plaintiffs cannot succeed on their FDCA claim, the Court should deny Plaintiffs' motion and grant Defendants summary judgment on Count XI.  At a minimum, the Court should not simply credit Plaintiffs' evidence regarding the alleged effects of pentobarbital—and indeed, cannot credit them absent an evidentiary hearing.  *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (vacating even a preliminary injunction issued without an evidentiary hearing regarding contested allegations about irreparable injury).  The opinions of Plaintiffs' expert, Dr. Gail Van Norman, are refuted by the declarations of Drs. Joseph F. Antognini and Kendall Von Crowns, as discussed in depth below.  Even as to plaintiff Norris Holder, who is the only plaintiff who has alleged that he is taking medication (carbamazepine) that could potentially interact with pentobarbital, the claims of harm are purely speculative.  The evidence in the record strongly suggests that an inmate executed using 5 grams of pentobarbital would not be sensate if pulmonary edema were to result and even with the presence of carbamazepine.  Plaintiffs have also failed to show that non-speculative harm would result from the fact that the pentobarbital is compounded; in fact, BOP has used compounded pentobarbital to execute five inmates recently without incident.

Finally, Plaintiffs also cannot meet the requirements for a permanent injunction because the balance of the equities tips against Plaintiffs.  Plaintiffs' speculative claims of harm are far outweighed by the interests of the United States, Plaintiffs' victims and their family members, and the public at large.  That is particularly true given the heinous nature of Plaintiffs' crimes and the many years that have passed since their lawful sentences were imposed.  Accordingly, this Court should not grant Plaintiffs a partial summary judgment or a permanent injunction on Count XI.

## BACKGROUND

## I.    STATEMENT OF FACTS REGARDING STATUTORY AND REGULATORY BACKGROUND AND BOP'S PROTOCOL

This Court is well aware of the relevant statutory and regulatory background in this case.  We therefore summarize only briefly herein.  The "Constitution allows capital punishment," and Congress has authorized the death penalty for the most egregious federal crimes since 1790.

*Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019).  It "necessarily follows that there must be" a lawful "means of carrying" out executions.  *Baze v. Rees*, 553 U.S. 35, 47 (2008) (plurality opinion); *see Glossip v. Gross*, 576 U.S. 863, 869–70 (2015).  In the Nation's early years, hanging was the "standard method of execution" for both States and the federal government.  *Glossip*, 576 U.S.  at 868; *see In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 108–09 (D.C. Cir. 2020) (per curiam) ("*Execution Protocol Cases*").

Over time, States replaced hanging with new methods of execution such as electrocution and lethal gas.  In 1937, when Congress changed the federal method of execution from hanging to the manner prescribed by the state of conviction or an alternatively designated state, "nearly 30 States were using cyanide gas or the electric chair."  AR 954.  Shortly thereafter, Congress enacted the FDCA.  *See* Act of June 25, 1938, ch. 675, 52 Stat. 1040.  The statute authorized the Food and Drug Administration ("FDA") to regulate drugs and devices, defined, among other things, as those non-food articles "intended to affect the structure or any function of the body of man or other animals," a definition that has not changed in any respect material here since 1938.  21 U.S.C. § 321(g)(1), (h)(3); AR 939.  In the decades that followed, FDA has declined to assert jurisdiction over articles intended for use in capital punishment, despite the hundreds, if not thousands, of executions that have occurred during that time. *See* AR 955; Death Penalty Information Center, Execution Database, https://deathpenaltyinfo.org/executions/execution-database.

States' efforts to create "more humane methods" of execution eventually "culminat[ed] in [a] consensus on lethal injection."  *Baze*, 553 U.S. at 62 (plurality opinion).  When Congress enacted the Federal Death Penalty Act ("FDPA") in 1994, reimposing the requirement that the federal government look to state execution methods, 18 U.S.C. § 3596(a), many states with capital punishment provided for execution by lethal injection.  *See* Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 63 app. 2 at 188–206 (2002).  The governing federal regulation at that time similarly provided for lethal injection (and still does).  *See* 28 C.F.R. § 26.3(a)(4).  Consistent with decades of practice, the FDA did not assert—and indeed

disclaimed—authority to regulate the drugs used in lethal injections just as with lethal gases or electrocution devices.  *See* AR 955–56 (discussing the litigation yielding *Heckler v. Chaney*, 470 U.S. 821 (1985)).  BOP accordingly executed three federal inmates between 2001 and 2003, including Timothy McVeigh, using lethal-injection drugs without a prescription.  Only in 2015, in order to comply with a district court order and injunction, did the FDA exert limited authority over a State's attempt to import a drug for use in capital punishment.  AR 958; *see Cook v. Food & Drug Admin.*, 733 F.3d 1, 3 (D.C. Cir. 2003).

Plaintiffs' suit challenges BOP's Protocol, AR 1068–70, which was recently revised in minor ways that are immaterial here, AR 1086–1139, as BOP still intends to use pentobarbital for purposes of lethal injection.  BOP is unable to procure a supply of FDA-approved pentobarbital sodium for use in executions.  Recognizing that federal courts of appeals have routinely denied Eighth Amendment challenges to the use of compounded pentobarbital, AR at 857–58, BOP selected a DEA-registered domestic bulk manufacturer to produce the active pharmaceutical ingredient ("API"), and ensured that the API was subjected to quality assurance testing.  AR 872. BOP further selected a DEA-registered compounding pharmacy to store the API and to convert it into an injectable form as needed.  AR 857, 872.  The pharmacy is also registered with the FDA pursuant to Section 503B of the FDCA, 21 U.S.C. § 353b.  AR 1084; Decl. of Raul Campos, ¶ 3 (Nov. 12, 2019), ECF No. 36–1.  Section 503B facilities are subject to the FDA's "Current Good Manufacturing Practice ('CGMP') requirements," 21 C.F.R. Pts. 201 & 211, which are regulations designed to ensure that human pharmaceuticals "meet quality standards."  *See* AR 1084.[1]  To date, the pharmacy has also worked with two independent laboratories to conduct quality assurance testing of the compounded pentobarbital solution it produces from the API.  AR 1084, 970–1015, 1075–1083.  And the pharmacy has worked with an independent laboratory to conduct a 365-day shelf-life study to determine the expiration dates for compounded pentobarbital solutions to be

---

[1] FDA, *Facts About the Current Good Manufacturing Practices (CGMPS)*, https://www.fda. gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmps.

used by BOP for lethal injection purposes.  *See* AR 992–1015; ECF No. 231 & AR 1140–49. Further, BOP confirmed with the DEA that the BOP facility in Terre Haute, Indiana meets the regulatory requirements for storage and handling of pentobarbital.  AR 872.  And in March 2020, BOP adopted "General Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions" to ensure that quality assurance testing is completed and the results are verified by BOP prior to a scheduled execution.  AR 1084–85.

## II.    PROCEDURAL HISTORY

Plaintiffs in this case are federal inmates who have been convicted of capital offenses and sentenced to death.  Throughout this litigation, current and former plaintiffs have raised a number of claims repeatedly before this Court, the D.C. Circuit, and the Supreme Court.  Yet, the Supreme Court, the D.C. Circuit, and/or this Court have allowed five executions to proceed so far.

Specifically, in April 2020, the D.C. Circuit vacated this Court's first injunction, which was predicated on the Protocol's alleged inconsistency with the FDPA.  *See Execution Protocol Cases*, 955 F.3d at 106 (per curiam).  In mid-June, after Plaintiffs filed their consolidated Amended Complaint, former plaintiffs Daniel Lee, Wesley Purkey, and Dustin Honken were scheduled for execution on July 13, 15, and 17, respectively, and former plaintiff Nelson was scheduled for execution on August 28.  Lee, Purkey, Honken and Nelson (the "PI Movants") moved for a preliminary injunction on several of their claims, including the FDCA claim at issue here—none of the Plaintiffs here joined that motion, including plaintiff Vialva (whose post-conviction challenge to his sentence was complete as early as January 2020, *see* Compl., *Vialva v. Barr*, No. 1:20cv01693, ECF No. 1, ¶ 27), and plaintiff LeCroy (whose post-conviction challenge to his sentence was complete in 2015, *see* Compl., *LeCroy v. Barr*, No. 1:20cv02481, ECF No. 1, ¶ 21). On July 13, this Court issued a preliminary injunction based on its view that the pentobarbital protocol violated the Eighth Amendment.  After the D.C. Circuit declined to stay that injunction, the Supreme Court, by a 5 to 4 vote, vacated it on July 14, concluding that the PI Movants had not established the requisite likelihood of success on the merits of that claim.  *Lee*, No. 20A8 at 1.  The Court further noted that "'[l]ast-minute stays'" should "'be the extreme exception, not the norm.'"

*Id.* at 3 (quoting *Bucklew*, 139 S. Ct. at 1134).  The Court "vacate[d] the [this] Court's preliminary injunction so that the plaintiffs' executions may proceed as planned."  *Id.*  BOP carried out Lee's execution that day.

On July 15, this Court issued its third preliminary injunction, barring the then-imminent executions of Purkey and Honken.  *See* ECF Nos. 145, 146.  The Court relied solely on the ground that BOP's Protocol failed to comply with the FDCA's prescription requirement, 21 U.S.C. § 301 *et seq.*  *See* ECF No. 145 at 10–13.  The Court also concluded that the PI Movants had not demonstrated a likelihood of success on their claims that the Protocol is arbitrary and capricious under the Administrative Procedure Act ("APA"), *see* ECF No. 145 at 7–10, that the Protocol violates the CSA, *id.* at 11, or deprives them of access to counsel, *id.* at 13–15.  The D.C. Circuit denied the government's motion to stay or vacate the injunction.  *See* Order, Case No. 20-5206 (D.C. Cir. July 15, 2020) (per curiam).  On July 16, however, the Supreme Court again vacated this Court's preliminary injunction—this time without any noted dissents.  *Barr v. Purkey*, No. 20A10, 591 U.S. ___ (July 16, 2020) (per curiam).  BOP then carried out the executions of Purkey and Honken.

On July 31, 2020, Defendants moved to dismiss Plaintiffs' Eighth Amendment, Due Process, access to counsel, and non-delegation claims and for summary judgment on Plaintiffs' remaining APA claims, including those under the FDCA.  ECF Nos. 169, 170.  In response, Nelson moved for an expedited trial on the Eighth Amendment claim, ECF No. 174, and filed an emergency cross-motion for summary judgment on the FDCA claim, ECF No. 180.  This Court denied the motion for expedited trial, granted Defendants' motion to dismiss on the Eighth Amendment claim, and later entered partial final judgment as to all Plaintiffs (except as to Plaintiff Holder) on that claim.  ECF Nos. 193, 205.[2]  But this Court then granted in part Nelson's cross-motion for summary judgment on his FDCA claim and enjoined the government from carrying out

---

[2] Despite their prior consent to entry to judgment, Plaintiffs have moved to modify the judgment.  ECF No. 238.

his execution until it had "met the requirements of the FDCA."  Mem. Op. at 13, ECF No. 213.

At the same time, the Court granted summary judgment for the government on Count X (Plaintiffs'

failure-to-enforce claim against the FDA Commissioner), *see id*. at 10-12, and on Count VIII

(Plaintiffs' failure-to-consider claim as to the FDCA), *see id*. at 12.  Upon the government's

emergency motion to stay or vacate the permanent injunction, the D.C. Circuit vacated the

injunction on the basis that "inter alia, there are insufficient findings and conclusions that

irreparable injury will result from the statutory violation found by [this] court."  *Roane v. Barr*,

No. 20-5260, Doc. No. 1858770 (D.C. Cir. Aug. 27, 2020) (citing *eBay Inc. v. MercExchange*,

*LLC*, 547 U.S. 388, 391 (2006); *Withrow v. Larkin*, 421 U.S. 35, 44–45 (1975)).

Nelson then moved the Court to amend its prior memorandum and opinion to include

specific findings and conclusions concerning the irreparable injury and to issue another injunction.

*See* ECF No. 222.  As this Court characterized it, "Nelson's alleged irreparable injury [was] that

he would be executed with a drug that ha[d] not be prescribed by a physician," among other alleged

violations of the FDCA.  Order at 2, ECF No. 226.  Nelson also "pointed to the [alleged] lack of

potency testing in the record to demonstrate irreparable harm."  *Id.* This Court denied Nelson's

request on the basis that Nelson had failed to "raise these arguments in his summary judgment

briefing."  Order at 2, ECF No. 226.  The Court noted that "the interpretation and significance of

this record evidence is disputed by the government," and held that "[i]n light of this dispute, a

showing of irreparable harm is far from 'certain.'"  *Id*. (quoting *Wisconsin Gas Co*, 758 F.2d at

674).  Nelson was executed as scheduled later that day.

There are currently two additional executions scheduled to occur imminently:  LeCroy on

September 22, 2020, and Vialva on September 24, 2020.  Vialva was convicted in 2000 of leading

fellow gang members in the kidnapping, robbery, and murdering of two youth ministers, Todd

Bagley and his wife Stacie.  *See United States v. Bernard*, 299 F.3d 467, 471 (5th Cir. 2002).  The

gang stole the Bagley's money, jewelry, and ATM cards, and then locked the Bagleys in the trunk

of their own car while the gang drove around for hours attempting to withdraw money from the

Bagleys' account and pawn Stacie's wedding ring.  *Id*.  Upon Vialva's insistence, the gang poured

lighter fluid inside the car, while the Bagleys sang and prayed in the trunk.  *Id.*  Vialva then ordered

the trunk open, and shot both Todd and Stacie in the head.  *Id.* at 472–73.  Todd was instantly

killed, but Stacie survived the gunshot long enough to burn alive, after one of the accomplices set

the car on fire.  *Id.* at 473.

LeCroy was convicted in 2004 of the rape and murder of 30-year-old Joann Tiesler, a nurse.

*United States v. LeCroy*, 441 F.3d 914, 919 (11th Cir. 2006).  While on supervised released,

LeCroy broke into Ms. Tiesler's home, and attacked her after she returned home, striking her in

the back of the head with his shotgun.  *Id.*  LeCroy bound Ms. Tiesler's hands behind her back

with cable ties and strangled her with an electrical cord.  *Id.*  LeCroy then stripped Ms. Tiesler of

her underwear and forced her to kneel at the foot of her bed, where LeCroy raped and anally

sodomized her.  *Id.* at 919–20.  Thereafter, LeCroy fatally slashed Ms. Tiesler's throat.  *Id.* at 920.

LeCroy then stabbed Ms. Tiesler five times, stole her car, and headed toward Canada.  He was

later captured at the U.S.-Canadian border.  *Id.*

Plaintiffs now move for partial summary judgment and a permanent injunction on their

FDCA claim, as alleged in Count XI of the Amended Complaint.  *See* Pls.' Mot. for Partial

Summary Judgment ("Pls.' Mot.), ECF No. 236; *see also* Am. Compl., ¶¶ 186–91 (Count XI),

ECF No. 92.[3]

## STANDARD OF REVIEW

Plaintiffs bring their FDCA claim under the APA.  *See, e.g.*, Pls.' Mot. at 4.  "When

reviewing motions for summary judgment in a suit seeking review of an agency's actions, the

standard under Fed. R. Civ. P. 56(a) does not apply."  *Beyond Nuclear v. U.S. Dep't of Energy*,

233 F. Supp. 3d 40, 47 (D.D.C. 2017) (Chutkan, J.) (citing *Coe v. McHugh*, 968 F. Supp. 2d 237,

239 (D.D.C. 2013)).  "Instead, the court must decide as a matter of law 'whether the agency action

---

[3] Count XI also alleges that the Protocol violates the Controlled Substances Act ("CSA").  *See* Am. Compl., ¶¶ 186–91 (Count XI).  Plaintiffs do not move for summary judgment on the CSA-related portions of Count XI.  Defendants' Motion for Summary Judgment on the APA claims, including Count XI, remains pending.  *See* ECF Nos. 169, 170.

is supported by the administrative record and otherwise consistent with the APA standard of review.'"  *Id.* (quoting *Coe*, 968 F. Supp. 2d at 240, and citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).  "The court's review is 'highly deferential' and begins with a presumption that the agency's actions are valid."  *Beyond Nuclear*, 233 F. Supp. 3d at 47 (quoting *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981)).[4]

Moreover, wholly apart from the merits, well-established principles of equity require a plaintiff seeking a permanent injunction to satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc.*, 547 U.S. at 391 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–13 (1982); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).  In order to conclude that Plaintiffs have satisfied these equitable requirements for issuance of a permanent injunction, the Court must weigh the competing evidence and conclude that there are no "genuine issues of material fact." *See Cobell*, 391 F.3d at 261.  The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court.  *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 32 (2008).  Simply crediting Plaintiffs' evidence over the government's, without a hearing or the opportunity for the government to test Plaintiffs' claims, would be improper.  *See Cobell*, 391 F.3d at 261 (concluding that the district court erred by entering a preliminary injunction without holding an evidentiary hearing given disputed issues of fact).

---

[4] Even if the Rule 56 summary judgment standard were to apply, the Court could grant Plaintiffs' motion only if Plaintiffs could show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment under Rule 56, the Court must draw all reasonable inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**ARGUMENT**

**I.      BOP'S PROTOCOL IS NOT CONTRARY TO THE FDCA**

In moving for summary judgment on their FDCA claim, Plaintiffs largely hew to the Court's reasoning in granting Nelson's Motion for Summary Judgment on the FDCA claim. Plaintiffs assert that the Court's decision as to Nelson that the Protocol violates the FDCA is "law of the case as reflected in a final judgment." Pls.' Mot. at 10–11. Plaintiffs are incorrect, because the Court's holding and partial final judgment applied only to Nelson. ECF No. 214; *see In re NETtel Corp., Inc.*, No. 00-01771, 2007 WL 2119029, at *1 (Bankr. D.D.C. July 20, 2007) (concluding that the law of the case doctrine did not apply because the prior holding was in a separate adversary proceedings between different parties in the same bankruptcy case). Moreover, although Defendants appealed the Court's decision and final judgment, the D.C. Circuit did not address the Court's merits ruling in vacating the injunction, and Defendants' appeal was mooted by Nelson's execution. Thus, even if the law of the case doctrine applied, it would be necessary for Defendants to challenge Plaintiffs' FDCA claim on the merits in order to avoid possible waiver in a subsequent appeal. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987). In any event, Defendants respectfully ask the Court to revisit its prior decision, because the decision was clearly erroneous and would work a manifest injustice for the reasons discussed below. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996).

It is undisputed that a "'core' legislative purpose of the FDCA is to ensure that a 'drug' is 'safe and effective for its intended use.'" Pls.' Mot. at 5 (quoting *Brown & Williamson*, 529 U.S. at 133). The Court previously held that, because "[v]iolations of the FDCA carry 'the risk that drug[s] will not function as intended,' . . . the statute must apply in the lethal injection context." Mem. Op., ECF No. 213 at 7 (quoting *Beaty v. FDA*, 853 F. Supp. 2d 30, 37 (D.D.C. 2002), *aff'd in relevant part sub nom. Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013)). This is so, the Court found, "because a lethal injection drug that does not function as intended may 'result in conscious suffocation, pain, and cardiac arrest.'" *Id.* (quoting *Beaty*, 853 F. Supp. 2d at 37). But the FDCA is not intended to simply reduce a drug's risk of not functioning as intended—it first requires that

11

"the product's probable therapeutic benefits . . . outweigh its risk of harm." *Brown & Williamson.*, 529 U.S. at 140.  If a product's probable therapeutic benefits do not outweigh its risk of harm, then the FDA cannot approve it if the FDCA applies.  *Id*. at 143.  The FDA lacks jurisdiction to regulate articles intended for a use not traditionally regulated by the FDA when (1) other statutes clearly assume such articles will remain lawful and available for that use, but (2) if regulated under the FDCA, would be prohibited.  *See id.* (holding that "there is no room for tobacco products within the FDCA's regulatory scheme" because "they cannot be used safely for any therapeutic purpose, and yet they cannot be banned").

Defendants respectfully submit that the Court previously erred in concluding that the application of the FDCA to BOP's use of pentobarbital in the lethal injection context will make it safer for the condemned inmate by ensuring that the pentobarbital functions as intended.  It will not.  A lethal injection drug that functions as intended will, in fact, result in the *death* of the inmate.  Accordingly, if lethal substances and other articles intended for use in capital punishment were regulated by the FDCA, such lawful executions would not be safer—rather, they would effectively be banned, and BOP would be prohibited from carrying out executions by lethal injection altogether.  This is so because, as noted, "[s]everal provisions in the [FDCA] require the [FDA] to determine that the product itself is safe as used by consumers"—that is, that "the product's probable therapeutic benefits . . . outweigh its risk of harm."  *Brown & Williamson*, 529 U.S. at 140; *see* 21 U.S.C. § 355(b)(1), (d).  That standard is inapposite for drugs intended to cause death as part of an execution.  *See* Office of Legal Counsel Op., Whether the Food & Drug Admin. Has Jurisdiction over Articles Intended for Use in Lawful Executions (May 3, 2019) ("OLC Op."), 2019 WL 2235666, *8, AR 948 (explaining that "there is no way products intended to carry out capital punishment could ever satisfy that test"); *see also United States v. Rutherford*, 442 U.S. 544, 556 (1979) (explaining that, under the FDCA, "a drug is unsafe if its potential for inflicting death . . . is not offset by the possibility of therapeutic benefit").

Plaintiffs, unsurprisingly, have never argued that pentobarbital can be used safely as a *lethal-injection* drug—after all, it is intended to bring about death in the context of implementing

a capital sentence, which is the antithesis of finding a drug "safe" under the FDCA. Plaintiffs have always argued just the opposite—asserting that not only will pentobarbital definitely kill them, but that there is "'a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of . . . injection of 5 grams of pentobarbital.'" Pls.' Mot. at 12 (quoting Van Norman Decl. (ECF No. 24) at 7).[5]

As explained further below, Plaintiffs are incorrect that pentobarbital will cause them the pain they allege, but that does not mean that pentobarbital, when used to bring about death in the lethal injection context, is "safe" or can be made "safer." In *Brown & Williamson*, the FDA had sought to regulate customarily marketed tobacco products, which the agency conceded were "unsafe, as that term is conventionally understood." 529 U.S. at 139 (citations omitted). The FDA did not deem the products unsafe under the FDCA because banning them could cause "tobacco users [to] suffer from extreme withdrawal, . . . and [engender] a black market offering cigarettes even more dangerous than those currently sold legally would likely develop." *Id.* The Supreme Court rejected this outcome, explaining that the FDA, consistent with the FDCA, could not allow a "product to remain on the market," while also concluding that it "cannot be used safely for any therapeutic purpose." *Id.* at 141; *see also* OLC Op., 2019 WL 2235666 at *8, AR948 (explaining that "[i]t would not be sufficient to show that the substance is safer or more effective than other means of execution" because "*Brown & Williamson* dismissed such an interpretation of 'safety' as involving a 'qualitatively different inquiry' from that required by the FDCA"). It is implausible that the FDA would find pentobarbital safe when intended to be used for the purposes of bringing about death as part of a lethal injection protocol.

Accordingly, were the FDCA applicable in this context, the FDA could not approve pentobarbital for the purpose of bringing about death. Indeed, the reading of the FDCA embraced by Plaintiffs and this Court would mean that all articles traditionally used by the federal

---

[5] Congress subsequently granted FDA regulatory authority specific to tobacco products in the Tobacco Control Act, 21 U.S.C. § 387 *et seq*.

government and the States in executions—such as electric chairs, lethal gas, and perhaps even firing-squad rifles—would be regulated by the FDCA so as to ensure they function as intended. But in the many decades over which the FDCA and capital punishment have coexisted, it does not appear that any party has seriously advanced that argument. And for good reason: "If the FDCA applied to electric chairs, gallows, gas chambers, firearms used in firing squads, and substances used in lethal-injection protocols, the statute would effectively ban those articles. Yet the Constitution and laws of the United States presuppose the continued availability of capital punishment for the most heinous federal and state crimes." OLC Op., 2019 WL 2235666 at *7, AR947.

Because neither the Court nor Plaintiffs have ever grappled with the repercussions of the FDCA's regulation of articles intended to bring about death in the context of capital punishment—*i.e.*, an effective ban—neither has ever rebutted Defendants' consistent argument that such a result would be fundamentally inconsistent with Congress's intent in enacting the FDPA, which requires the federal government to use the State's manner of execution. 18 U.S.C. § 3596(a). At the time of the FDPA's enactment in 1994, many States permitted execution exclusively by lethal injection, and lethal injection was the sole method of execution prescribed by federal regulation, 28 C.F.R. § 26.3(a)(4); *see* 57 Fed. Reg. 56,536, 56,536 (Nov. 30, 1992) (identifying lethal injection as "increasingly . . . the method of execution in the states"). Yet Congress enacted the FDPA's detailed execution framework without referencing the FDCA. That is powerful evidence of the common-sense view that Congress did not intend drugs intended for use in lethal injection to be regulated under the FDCA. *Brown & Williamson*, 529 U.S. at 143 ("The 'classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.'" (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)); *see also West v. Schofield*, 519 S.W.3d 550, 571 (Tenn. 2017) ("Clearly, the federal government does not consider those of its own executions that are conducted by lethal injection to violate a regulatory scheme for the prescription and use of controlled substances."). Likewise, the lack of any apparent objection from

14

the executive, legislative, or judicial branches to the hundreds of state executions conducted by lethal injection of substances that have never been required to meet the FDCA's prescription requirements strongly reinforces this view. Today, all States that provide for a death penalty allow lethal injection as the primary if not the only method. Accordingly, any interpretation of the FDCA in the lethal injection context must take into account Congress's enactment of the FDPA and the use of lethal injection by the federal government and the States in hundreds if not thousands of executions over multiple decades.

Plaintiffs ignore that obvious problem—that the FDCA would effectively ban lethal injection drugs if it were applicable. Instead they adhere to the Court's holding that because "Defendants had chosen . . . a drug to produce a 'humane' and minimally painful death, . . . the FDCA applies to lethal injections." Pls.' Mot. at 5 (quoting ECF No. 213 at 7). Following that logic would lead to the perverse outcome that the more the federal government tries to use a humane method of execution, the more likely it is that the method's instrument of death (whether drug, electric chair, gas chamber, or fire arm) will fall under the regulation of the FDCA, which, if applicable, would effectively ban the method entirely because the instrument cannot meet the approval standard when intended to be used to bring about death in a lawful execution. But as just discussed, Congress's enactment of the FDPA forecloses that result. Rather, the government's effort to make sure it chose a lethal injection protocol that is humane merely demonstrates its commitment to compliance with the Eighth Amendment and is not a reflection that the drug has "probable therapeutic benefits . . . outweigh[ing] its risk of harm," *Brown & Williamson*, 529 U.S. at 140, such that the drug could plausibly be subject to regulation under the FDCA.

Plaintiffs' arguments about the ways in which the Protocol purportedly violates the FDCA, *see* Pls.' Mot. at 6-8, are irrelevant in light of that statute's inapplicability. In fact, those arguments further demonstrate why the FDCA cannot apply in the context of the use of lethal injection drugs to implement a lawful capital sentence. *See, e.g.*, Pls.' Mot. at 7 (arguing that a prescription is valid only if intended for a "'real patient who actually needs it,'" *United States v. Nazir*, 211 F.

15

Supp. 2d 1372, 1375 (S.D. Fla. 2002), which makes no sense in the capital punishment context where an inmate is not a "patient" who "needs" a lethal injection of pentobarbital).

In all events, Plaintiffs have no actionable claim that the Protocol violates the FDCA.  It is true, as Plaintiffs argue, *see* Pls.' Mot. at 9, that the Court previously held that the PI Movants likely had such a cause of action, *see* ECF No. 145 at 10, and the D.C. Circuit declined to stay or vacate that injunction, *see Execution Protocol Cases*, No. 20-5206, Doc. No. 1851933, at 3.  But the Supreme Court ultimately vacated the Court's preliminary injunction, rendering the D.C. Circuit's opinion of no precedential value.  *Barr v. Purkey*, No. 20A10, 591 U.S. ___ (July 16, 2020) (per curiam).  Moreover, this Court has separately held that Plaintiffs' lack-of-enforcement claim under the FDCA (Count X) is foreclosed by Supreme Court precedent.  *See* Mem. Op., ECF No. 213, at 10–12 (citing *Chaney*).  It is illogical to conclude that the enforcement of the FDCA is left to the FDA Commissioner's discretion, while allowing Plaintiffs to enforce the FDCA against the BOP for alleged violations of the FDCA.  Indeed, in the FDCA itself, Congress specified that "all . . . proceedings for the enforcement, *or to restrain violations*, of this chapter shall be by and in the name of the United States."  21 U.S.C. § 337(a) (emphasis added).  This requirement forecloses actions by private parties seeking to restrain third parties' putative violations of the FDCA's general strictures, leaving "the United States with nearly exclusive enforcement authority" over those matters.  *POM Wonderful LLC v. Coca-Cola Co*., 573 U.S. 102, 109 (2014).  The federal government clearly does not believe that it is violating the FDCA by using pentobarbital to conduct lethal injections, and that judgment is reserved to the Executive Branch under the FDCA's plain terms.  Plaintiffs cannot make an end-run around the non-reviewability of the FDA's enforcement decisions by invoking the APA against BOP.  Any conclusion to the contrary cannot be squared with the Supreme Court's instructions in *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984), that APA actions are precluded by federal statutes even where the statutes implicitly foreclose certain private-party enforcement, let alone where, as here, they expressly do so.

Given all that, it is unsurprising that the Supreme Court vacated, without any noted dissent, this Court's preliminary injunction, ECF No. 145, issued in favor of the PI Movants on the basis that the Protocol likely violated the FDCA. *Barr v. Purkey*, No. 20A10, 591 U.S. ___ (July 16, 2020) (per curiam).[6] This Court, in entering summary judgment for Nelson, said it was "mindful" of the Supreme Court's vacatur order, but that it would be "guided by what the D.C. Circuit has held—and what the Supreme Court has not." Mem. Op. at 7, ECF No. 213.

However, both the Court and Plaintiffs ignore the clear implications of the Supreme Court's decision in *Brown v. Williamson*. Instead, they favor the D.C. Circuit's decision in *Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013), even though *Cook* issued no "holding" on the FDA's jurisdiction over lethal-injection drugs because that issue was neither pressed nor passed upon by the D.C. Circuit. The issue in *Cook* was whether the FDA could exercise enforcement discretion over shipments of sodium thiopental that were being imported by various state departments of corrections for use in executions. Importantly, "the FDA [had] conceded before the district court that the . . . shipments" were an "unapproved new drug." *Id.* at 11; *see generally* OLC Op., 2019 WL 2235666 at *14, AR 958. The D.C. Circuit, therefore, had no occasion to address the antecedent question of whether the FDA has jurisdiction over articles intended for use in capital punishment. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The effect of the omission was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not a binding precedent on this point."); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J. dissenting) ("Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed."); *see also Camara v. Mastro's Rests. LLC*, 340 F. Supp. 3d 46, 54 (D.D.C. 2018) ("Of course, a decision 'is not a binding precedent' on an issue not pressed by the parties or passed on by the Court." (quoting *L.A. Tucker*, 344 U.S. at 38)), *aff'd*, 952 F.3d 372 (D.C. Cir. 2020)). Likewise, *Cook* did not

---

[6] *Compare with Barr v. Purkey*, No. 20A9, 591 U.S. __, 2020 WL 4006809, (July 16, 2020) (per curiam) (vacating this Court's preliminary injunction on Purkey's *Ford* claim over four dissents) and *Barr v. Lee*, No. 20A8, 591 U.S. __, 2020 WL 3964985, (July 14, 2020) (per curiam) (vacating this Court's preliminary injunction on Eighth Amendment grounds over four dissents).

present or pass upon 21 U.S.C. § 337(a)'s prohibition on private enforcement actions, since the plaintiffs there sought to require *FDA* to take action in accordance with a specific importation provision that the D.C. Circuit held constrained the agency's discretion. The *Cook* plaintiffs themselves did not seek to enforce the FDCA directly against a party whose conduct they alleged violated the FDCA. Accordingly, the D.C. Circuit had no occasion in *Cook* to address whether plaintiffs may use an APA action to end-run Congress's decision to reserve FDCA enforcement authority solely to the government.

Plaintiffs contend, *see* Pls.' Mot. at 9–10, that this Court was correct to decline to "interpret the Supreme Court's vacatur as an indication of how [it] should resolve the dispute on the merits." Mem. Op. at 8, ECF No. 213. The Court did so based on procedural differences between the preliminary injunction stage and the summary judgment stage, namely that the relief a preliminary injunction provides is merely to preserve the status quo while summary judgment substitutes for trial. *Id.* at 8–9. But in order to obtain emergency relief from the Supreme Court, the government needed to show (at a minimum) a likelihood of success on the merits. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). And nothing about the merits of Plaintiffs' FDCA claim has changed between the preliminary injunction stage and the summary judgment stage. This Court did not base its summary judgment decision on any new facts or new legal arguments. Thus, the Court was incorrect to refuse to interpret the Supreme Court's vacatur as an indication of how this Court should resolve the dispute on the merits.

In any event, even assuming that the Supreme Court vacated this Court's preliminary injunction without disagreeing on the merits, that would necessarily mean it vacated the injunction based on the equitable injunction factors. And it is clear that the timing of the injunction was not dispositive because, when the Supreme Court vacated the injunction, Nelson's execution was still weeks away. *Cf.* Order, ECF No. 193 at 4 (recognizing that the Eighth Amendment preliminary injunction issued in favor of the PI Movants "was not remotely 'last-minute' with respect to Nelson, but the [Supreme Court] nonetheless vacated the injunction as to him," thus "suggest[ing] that timing was neither dispositive nor weighty because, "[i]f it was, the injunction for Nelson

18

would stand, or at the very least the [Supreme] Court would have noted that any heightened standard caused by the last-minute injunction did not apply to him"). The D.C. Circuit has also now squarely reaffirmed that this Court cannot grant a permanent injunction without considering the same equitable injunction factors the Supreme Court considered when vacating the FDCA preliminary injunction. *See* Order, ECF No. 226 at 1 (citing *Execution Protocol Cases*, No. 20-5260 (D.C. Cir. Aug. 27, 2020)); *see also Winter*, 555 U.S. at 32 (emphasizing that the equitable factors are the same at the preliminary- and permanent-injunction stages). As demonstrated below, the equities do not support a permanent injunction and, importantly, there is no material and timely change in fact on that front either since the Supreme Court vacated the FDCA preliminary injunction. Thus, whether on the merits or the equities, the Supreme Court's vacatur of the preliminary injunction, with no noted dissent, strongly cuts against any entry of a permanent injunction based on the same exact FDCA claim.

## II.    PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUISITE IRREPARABLE HARM FOR ISSUANCE OF A PERMANENT INJUNCTION

### A.    A Violation of the FDCA Does Not Establish Injury *Per Se*

Plaintiffs cannot meet their burden to establish that irreparable injury is "'both certain and great,'" as this Court has recognized is required by binding circuit precedent. *See* Order, ECF No. 226 at 2 (quoting *Wisconsin Gas Co.*, 758 F.2d at 674). According to Plaintiffs, they face irreparable injury if they are executed with the administration of a drug without the benefit of both a prescription (and thus physician involvement) and the use of an FDA-approved (not compounded) drug. *See* Pls.' Mot. at 12–14. Although Plaintiffs attempt to obscure it, their fundamental argument is that it is *per se* harm to be executed with a drug in violation of the FDCA. But the D.C. Circuit's most recent order regarding Nelson and this Court's August 28, 2020 denial of Nelson's motion for a permanent injunction make clear that violations of the law are not *per se* irreparable harm, and that a plaintiff must demonstrate concrete, real-world irreparable injury to warrant a permanent injunction. *See Roane*, No. 20-5260, Doc. No. 1858631 (D.C. Cir. Aug. 27, 2020); Order, ECF No. 226 at 2–3. If a violation of the FDCA necessarily caused harm in the

19

context of execution by lethal injection, then Nelson would have established irreparable harm. But this Court concluded that he had not. Order, ECF No. 226 at 3.

The Ninth Circuit's recent ruling in *United States v. Mitchell* is also instructive. There, the inmate argued that he would "suffer an irreparable harm, due to the possibility that he 'could be executed by means of an illegal protocol.'" *Mitchell*, -- F.3d --, 2020 WL 4815961 at *2 (9th Cir. Aug. 19, 2020). The Ninth Circuit assumed without deciding that Mitchell was correct that various provisions within Arizona's execution manual constituted the "law of the State" incorporated by the FDPA. *Id.* The court nonetheless rejected Mitchell's argument regarding the allegedly "illegal" federal protocol, concluding that Mitchell had not "carried his burden of showing that it is more probable than not that he will suffer any irreparable harm." *Id.* at *4 (citation omitted). The court's rejection of Mitchell's irreparable harm argument necessarily meant that Mitchell's then-impending execution, standing alone, did not constitute irreparable harm, and that an alleged statutory violation—whether of the FDPA as in Mitchell's case, or the FDCA here—is not irreparable harm even if the inmate will be executed. *See also United States v. Vialva*, No. W-99-CR-070(1)-ADA, Order on Motion for Injunctive Relief at 9–10, ECF No. 690 (W.D. Tex. Sept. 11, 2020) ("*Vialva* Order") (concluding that Vialva had not established irreparable harm on his claim that his execution would violate the FDPA, "even though "the death penalty itself is irreversible").

**B.     Plaintiffs Cannot Establish Harm Based on the Possibility of Pulmonary Edema**

Because a violation of FDCA, standing alone, is insufficient to justify an injunction, Plaintiffs are forced to dust off their Eighth Amendment arguments, asserting primarily that pentobarbital will cause them to suffer pulmonary edema. *See* Pls.' Mot. at 12. But those arguments fail because the relevant question for purposes of irreparable harm under their FDCA claim is not whether pentobarbital will have the alleged effect, but rather whether, under Plaintiffs' view of the FDCA's prescription requirement, BOP's compliance with that requirement would eliminate the effect. The answer to this latter question is "no" because the alleged underlying risk

of using pentobarbital remains the same whether there is a prescription or not (and in fact, whether the drug is FDA-approved or not).  This Court necessarily came to that conclusion when denying Nelson's motion for a permanent injunction.  *See* Order, ECF No. 226 at 2 ("Nelson's notice and request for amended judgment fails to supply a sufficient basis for finding that he will be irreparably harmed by the government's violation *of the FDCA*." (emphasis added)).  And other courts have similarly held that a statutory violation, standing alone, is not *per se* irreparable harm. *Ringo v. Lombardi*, No. 09-cv-4095, 2009 WL 1406980, at *3 (W.D. Mo. May 19, 2009) (denying stay of execution because "it is uncertain how mere compliance with the CSA and FDCA would impact" the inmate's execution); *Ringo v. Lombardi*, No. 09-cv-4095, 2010 WL 4103201, at *1–2 (W.D. Mo. Oct. 18, 2010) ("[A]ny harm to Mr. Nunley from being executed with a drug that is not prescribed by a physician or approved by the FDA for the purpose of execution, is relatively small in comparison to the State of Missouri's interest in having its death penalty enforced."); *Durr v. Strickland*, No. 10-cv-288, 2010 WL 1610592, at *4 (S.D. Ohio Apr. 15, 2010) (concluding that a violation of the FDCA suggests at most "an injury to" the State officials, "not to" the inmate, because the State officials could be prosecuted for violating federal law), *aff'd*, 602 F.3d 788 (6th Cir. 2010).

The Supreme Court's analysis in *Winter* is instructive and strongly indicates that Plaintiffs are not entitled to a permanent injunction.  The *Winter* plaintiffs' "ultimate legal claim" was based on a procedural violation of the National Environmental Policy Act, which required the preparation of an environmental impact statement before the conduct of military training exercises, while the plaintiffs' alleged harm was the impact of military training exercises on marine life.  *Winter*, 555 U.S. at 32–33.  The Court concluded that the alleged harm was not sufficiently clear to warrant a permanent injunction.  *See id.*  Likewise here, even if the use of pentobarbital under the Protocol violates the FDCA, Plaintiffs have not shown that there is a sufficient likelihood of harm resulting from the alleged FDCA violation to justify enjoining the implementation of Plaintiffs' lawfully imposed capital sentences.

Plaintiffs have repeatedly argued that pentobarbital will cause them near-instant excruciating pain, and they do so again in their motion for partial summary judgment.  *See* Pls.' Mot. at 12–13.  Yet, Plaintiffs do not explain how having a physician issue a prescription for pentobarbital would prevent pulmonary edema.  In fact, the PI Movants have previously suggested that any such prescription would be unlawful.  *Cf.* Pls.' Mot. for Preliminary Injunction, ECF No. 102 at 32 n.19 (discussing States having obtained prescriptions for executions and stating: "To be sure, it is likely that the prescriptions obtained by these states do not comply with the requirements of the FDCA and CSA").  Their objection is to the use of pentobarbital in the first place.  Insofar as the implied premise of their argument is that, if a prescription is required, BOP will be unable to carry out executions using pentobarbital (because no doctor would prescribe a drug that causes excruciating pain), Plaintiffs' irreparable harm argument is just another attempt to achieve what Plaintiffs could not show under the Eighth Amendment—that the use of pentobarbital is inhumane.  That argument is fundamentally at odds with the fact that the Supreme Court has upheld the use of pentobarbital and allowed executions to proceed in this very case, noting, *inter alia*, that pentobarbital "has been used to carry out over 100 executions, without incident," and that its use was "upheld by this Court last year, as applied to a prisoner with a unique medical condition that could only have increased any baseline risk of pain associated with pentobarbital as a general matter."  *Lee*, No. 20A8, 2020 WL 3964985 at *2 (citing *Bucklew*, 139 S. Ct. at 1130).  It is also at odds with the well-known fact that pentobarbital is "commonly used to euthanize terminally ill patients who seek death with dignity in States such as Oregon and Washington," *Jackson v. Danberg*, 656 F.3d 157, 165 (3d Cir. 2011) (citation omitted).  *See also* Declaration of Kendall Von Crowns, M.D., ¶ 1 (August 10, 2020) (attached as Exhibit 1) ("Pentobarbital . . . has been promoted by pro-euthanasia groups . . . and in euthanasia-related publications . . . as an easy, reliable and peaceful way of achieving death and the premier drug for self-deliverance.").

Plaintiffs attempt to bolster their well-worn arguments against the use of pentobarbital by pointing to purportedly "new" evidence:  (1) the autopsy report of Wesley Purkey, which shows "severe bilateral acute pulmonary edema" as reflected by significantly elevated lung weights, Pls.'

Mot. at 12 (citing ECF No. 183-1), and (2) Dr. Gail Van Norman's declaration opining that Purkey was aware of the acute pulmonary edema, *id.* (citing ECF No. 183-2 at 3).  But the Court cannot simply credit Plaintiffs' evidence, which the government disputes.  The autopsy, which was performed a week after Purkey's death, does not indicate when the "acute pulmonary edema" set in.  *See* ECF No. 183-1.  And the opinion of Dr. Van Norman, who is not a pathologist, is refuted by Dr. Crowns, a board-certified forensic pathologist, who has determined the cause and manner of death in thousands of autopsies, including cases of suicides in which an intentional overdose of pentobarbital was a direct or contributing factor in the cause of death.  *See* Crowns Decl. ¶ 1.  As Dr. Crowns explains, "[o]ne cannot determine from the post-mortem lung weights when the edema occurred[,] [n]or can the lung weights provide any clue as to whether the inmate experienced any pain while conscious."  *Id.* ¶ 7; *see also id.* ¶ 10 ("[t]here is no way to determine based on autopsy findings how quickly the pulmonary edema occurred, but even if the edema was from a 'flash' situation it would take minutes to occur," by which time the inmate is already "asleep/unconscious").

Dr. Crowns' view is consistent with Dr. Antognini's opinion that the increase in lung weight could have occurred post-mortem.  As Dr. Antognini explains in the attached Second Supplemental Declaration, "[m]ore recent studies in humans using post-mortem computed tomography (PMCT) show that fluid accumulates in lung over time in the post-mortem period." Antognini 2d Suppl. Decl. ¶ 30 (Sept. 11, 2020) (attached as Exhibit 2) (citing study concluding that "PMCT findings of the lung are not fixed and change with the passage of time after death in accordance with progression of postmortem changes (pulmonary congestion and edema) in the corpse"); *see also id.* ¶¶ 31–33 (describing studies indicating increase of lung weight post mortem). "Likewise, fluid accumulation in the airways increases during the post-mortem period," which is "akin to the fluid that has been found at autopsy in inmates executed with pentobarbital."  *Id.*

Dr. Crowns also disagrees with Dr. Van Norman's opinion that an inmate injected with 5 grams of pentobarbital would remain sensate to experience the sensations of flash pulmonary edema.  *See* Crowns Decl. ¶ 12.  Dr. Crowns explains that, "[d]ue to the large amount of the drug

administered, there would not be enough time for the pentobarbital to clear from the respiratory and cardiac receptors of the brainstem," and, "[w]ithout the pentobarbital being cleared from those receptors," the inmate "would not experience pain from pulmonary edema."  *Id.*  Dr. Crowns further explains that there also "would be contributing factors of cardiac effects of decreasing heartbeat and decreasing circulation of the blood that would further hinder the metabolism and clearance of the pentobarbital from the body."  *Id.*

Dr. Crown's opinion is consistent with Dr. Antognini's opinion that "[w]hether pentobarbital causes pulmonary edema directly, or indirectly as a natural consequence of the dying process, is immaterial inasmuch as the inmate [injected with 5 grams of pentobarbital] would be profoundly unconscious, to the point of electrical brain silence."  ECF No. 111 at 14 (citation omitted).  That is, the inmate "would have been deeply anesthetized, with profound depression of the brain such that [he] would not experience the sensation associated with pulmonary edema."  Antognini 2nd Suppl. Decl. ¶ 19.  Plaintiffs dispute that conclusion, but Plaintiffs' expert, Dr. Van Norman, "conspicuously d[id] not address the issue of how a person who is administered 5 grams of pentobarbital and subsequently develops cardiovascular collapse, with little to no blood pressure or cardiac output, is able to maintain sufficient blood flow to the brain to maintain consciousness."  Antognini Suppl. Decl. ¶ 7 (July 1, 2020), ECF No. 124-1.

Moreover, as part of his analysis as a forensic pathologist, Dr. Crowns reviewed witness accounts of the three federal executions conducted in July, which indicated that the inmates "experienced no physical response to pulmonary edema."  Crowns Decl., ¶ 11; *see also id.* ¶¶ 5–6.  He explains that each execution followed a similar pattern: "within two minutes after injection the inmate was asleep, exhibited snoring for a minute or so and then was noted to be in a deep sleep with steady and unlabored breathing that slowly stopped."  *Id.* ¶ 6.  And the inmates were not noted to exhibit any of the symptoms "that would be seen in acute (flash) pulmonary edema," which would include "shortness of breath (dyspnea), increased respiration (tachypnea)[,] wheezing, gasping, coughing, [and] noisy labored breathing."  *Id.* ¶ 11.  Rather, "[t]he breathing of all three individuals was noted to be steady and unlabored," and there were "no reports of

obstructed breathing beyond minimal snoring" or "pain on a conscious level." *Id.* As Dr. Crowns further explains, "the decedents were able to breath without obstruction[,] but due to the respiratory depression and cardiac depression caused by the pentobarbital[,] their brains just did not realize their need for oxygen." *Id.*

Dr. Crowns' view is corroborated by Dr. Antognini, who, in his Second Supplemental Declaration, cited to studies and data showing that "pulmonary edema and lung congestion do not necessarily go hand-in-hand with sensations of breathlessness"—*i.e.*, the former does not necessarily cause the latter. Antognini 2d Suppl. Decl. ¶ 34. Dr. Antognini also reviewed media witnesses' accounts of the three executions in July and Keith Nelson's execution in August, and found that those accounts "comport with the expected action of a massive overdose of pentobarbital." *Id.* ¶ 27; *see also id.* ¶ 28 (describing expected effects of barbiturates on breathing patterns).

In light of Drs. Antognini's and Crowns' well-supported opinions, Plaintiffs cannot meet their burden to establish that a prescription for pentobarbital would make BOP's use of pentobarbital for purposes of lethal injection any safer, more effective, or less painful, because Plaintiffs will not experience any such pain from a massive overdose of pentobarbital.

## C. Plaintiffs' Remaining Arguments Also Lack Merit

Plaintiffs fare no better in arguing that "a prescription [ ] reflects a practitioner's clinical judgment that a particular drug serves a particular medical purpose for a particular patient." Pls.' Mot. at 12 (citing *Nazir*, 211 F. Supp. 2d at 1375). That argument fails at the outset because an inmate whose death sentence is being carried is not a "patient" at all, and lethal injection does not serve a "medical purpose." Far from it; the "purpose" of lethal injection is to kill the inmate as part of the implementation of a lawful capital sentence. Accordingly, the Protocol requires the use of 5 grams of pentobarbital. ECF 171, AR 1139. As Dr. Antognini explains, that amount is *ten times* the ordinary clinical dose for pentobarbital. *See* Antognini 2d Suppl. Decl. ¶ 16. Nowhere do Plaintiffs suggest that a dose of 5 grams of pentobarbital will not achieve its "purpose" in the context of lethal injection. And, in any event, Plaintiffs cannot show that having a prescription for

pentobarbital would, in fact, alleviate any actual or certain harm in terms of suffering because as already explained above, no such suffering would occur.

Plaintiffs also suggest that "a prisoner might be taking medications that could slow the effects of pentobarbital or reduce its efficacy," and that a prescription from a physician could safeguard against that risk. *See* Pls.' Mot. at 13. And plaintiff Holder goes on to assert separately that Defendants' alleged violation of the FDCA "poses a particularized risk of irreparable harm to [him]" because the medication he is prescribed to control his epilepsy, carbamazepine, will cause pentobarbital to be metabolized faster and thus will be less effective, leading to brain damage rather than death, a longer period of consciousness, and an enhanced risk of pulmonary edema while conscious. Pl. Norris Holder's Suppl. Statement of Irreparable Harm ("Holder Br.") at 1, 3, ECF No. 237. But those arguments lack merit.

Starting with Holder, the only plaintiff who has alleged that he is taking a medication that could potentially interact with pentobarbital, he has not established that his use of carbamazepine makes any material difference. Dr. Antognini explains that any increased metabolism of pentobarbital that might occur due to chronic carbamazepine therapy will have little or no significance on a person on such therapy, let alone on the lethal effects of a massive dose of 5 grams of pentobarbital administered intravenously. *See* Antognini 2d Suppl. Decl. ¶ 3(a), (b). When a person is injected with a clinical dose of pentobarbital, Dr. Antognini explains, the pentobarbital first goes to the body organs that have high blood flow, such as the brain and the heart, and then redistributes to other tissues, such as muscle and fat. *Id.* ¶ 4. Redistribution is different than metabolism. The body does not metabolize the pentobarbital until the drug reaches the liver, *id.* ¶ 3(c), in what is known as the "'elimination' phase," *id.* ¶ 4, and "any effect of carbamazepine on pentobarbital levels in the blood would impact primarily the elimination phase," *id.* ¶ 5. Holder claims that carbamazepine will speed up his body's metabolism of pentobarbital, but that is a relative matter. As Dr. Antognini explains, pentobarbital is metabolized slowly, *id.*

¶ 3(a), over many hours.[7]   As a result, any "enhance[d] elimination [of pentobarbital] via carbamazepine therapy . . . is meaningless in the setting of a lethal injection of pentobarbital in which the inmate would be dead within 20-30 minutes," *id*. ¶ 5, and in which "unconsciousness [sets in] within 20-30 sec[onds]," *id*. ¶ 3(g).  It is no surprise, then, that carbamazepine therapy has been reported to have minimal effects on the metabolism and blood levels of phenobarbitone, a barbiturate that is similarly metabolized by the liver, *id.* ¶ 13, and the FDA designates carbamazepine as a "weak" inducer of CYP2C9, the same enzyme that metabolizes pentobarbital, *see id.*, ¶ 13; *see also*  Holder Br. at 3 (acknowledging that "[c]arbamazepine is metabolized by and induces the CYP2C9 enzyme, the same enzyme that metabolizes barbiturates such as pentobarbital").

Notably, the effect of carbamazepine on the metabolism of pentobarbital is even less significant when an inmate is given a massive amount (5 grams) of pentobarbital.  As Dr. Antognini explains, that massive dosage causes profound cardiovascular depression (extremely low blood pressure and blood flow), which in turn minimizes redistribution of pentobarbital, Antognini 2d Suppl. Decl. ¶ 6, including to the liver, thereby drastically decreasing the body's metabolism of pentobarbital, *id.* ¶ 7.  That is, "[a]ny enhanced metabolism that might occur from carbamazepine would be minimized because little of the drug is getting to the liver."  *Id.*  In addition, because 5 grams of pentobarbital would stop the inmate's breathing after just a few minutes, the oxygen levels in the liver would be so low that the liver would cease metabolizing pentobarbital.  *Id.* ¶ 9.

Given Dr. Antognini's opinion and analysis, Holder fails to establish that he will be harmed by the drug interaction he alleges.  Indeed, both of Holder's experts spoke in equivocal terms on

---

[7] The rapidity of the "elimination phase" is often described using the term "half-life" to indicate how long it takes for the drug level to decrease by one half.  Antognini 2d Suppl. Decl. ¶ 4.  The half-life for pentobarbital is 22.3 hours, *id.* ¶ 14 (or in the range of 15 to 50 hours, *id.* ¶ 5), and a quantitative analysis shows that, even if carbamazepine tripled the elimination rate (clearance) of pentobarbital, pentobarbital blood levels in the first 30 minutes after administration would still be at 97 to 99 percent, *id.* ¶ 14.

the effects of carbamazepine therapy on pentobarbital, *id.* ¶ 13, and failed to provide any quantitative analyses to support their view that any enhanced metabolism of pentobarbital by carbamazepine therapy will affect the actions of pentobarbital, let alone when 5 grams of pentobarbital is injected, *see id.* ¶ 11. Because carbamazepine has no effect on a lethal quantity of pentobarbital being injected to cause death, it also follows that the lack of a physician prescription alone cannot cause Holder any harm. And, of course, the lack of any actual injury is all the more apparent for the remaining plaintiffs, who do not even allege they are taking any medication that could potentially interact with pentobarbital. *See, e.g.*, Pls.' Mot. at 12–13.

Plaintiffs also suggest that they are harmed by the absence of a prescription because, if a physician were involved in prescribing pentobarbital, he or she might prescribe the use of an entirely separate drug, such as an opioid or a similar analgesic, in addition to pentobarbital. *See id.* at 13. This argument is untethered to any plausible harm that could flow from their alleged FDCA claim. As discussed above, the parties agree that "the legislative purpose of the FDCA is to ensure that a 'drug' is 'safe and effective for its intended use.'" Pls.' Mot. at 5 (quoting *Brown & Williamson*, 529 U.S. at 133). The drug in question here is pentobarbital, and the Court must evaluate whether the lack of a prescription *for that drug* causes harm (which Defendants contest). It is irrelevant for the purposes of the FDCA—and therefore any harm that could result from a violation of that statute—whether BOP could secure a prescription for an entirely *separate* drug in order to carry out an execution.

Plaintiffs argue, finally, that they will be harmed because the drug is compounded, and thus, not FDA "approved." Pls.' Mot. at 13–14. Any risk of using a compounded drug is purely speculative given that the Administrative Record clearly shows that the pentobarbital BOP intends to use has passed quality assurance testing by two independent laboratories. *See* AR 970–1015, 1075–83. Moreover, BOP's Guidelines specify that BOP will not use an injectable solution of pentobarbital for an execution unless "it has passed quality assurance testing conducted by at least one independent laboratory." AR 1085. Plaintiffs cite no facts to indicate that BOP will deviate from its Guidelines and therefore cannot overcome the well-settled presumption of good faith to

which BOP is entitled.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007); *see also Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 20 (D.C. Cir. 2002).

As to Plaintiffs' concern about the risk of using a drug from a compounding pharmacy, *see* Pls.' Mot. at 13–14, such concern is entirely speculative, not to mention that courts of appeal routinely reject Eighth Amendment challenges to the use of compounded drugs in carrying out executions.   As discussed above, the Administrative Record makes clear that the pharmacy selected by BOP is registered with the FDA pursuant to Section 503B of the FDCA, 21 U.S.C. § 353b, and thus the pharmacy (1) is subject to the FDA's "Current Good Manufacturing Practice ('CGMP') requirements," 21 C.F.R. Pts. 201 & 211, (2) is inspected by the FDA, and (3) must meet certain other conditions, such as reporting adverse events.  The FDA's CGMP regulations require the pharmacy to subject samples from each batch of compounded injectable solution it produces to quality assurance testing by an independent laboratory to ensure that the batch meets appropriate specifications and statistical quality control criteria before it is released.  AR 1084. Plaintiffs concede that the FDCA permits compounded drugs under certain circumstances, *see* Pls.' Mot. at 14, and they fail to show any concrete or certain harm from their use in this circumstance, particularly given the quality-control requirements that are in place.

Because Plaintiffs cannot show "certain" irreparable harm, their request for a permanent injunction must be denied on that basis alone.  At most, however, there is a factual dispute regarding whether any cognizable injury in connection with an FDCA violation would result in the absence of a prescription.  The government strongly contests Plaintiffs' allegations of harm resulting specifically from any violation of the FDCA, and, as discussed above, the evidence in the record strongly suggests that no such harm will result.  Accordingly, it would be improper for the Court to credit Plaintiffs' claims of injury without an evidentiary hearing.  *See* Standard of Review, *supra*.  And at least with respect to LeCroy and Vialva—whose executions are scheduled for September 22 and 24, 2020, respectively—it would be improper for the Court to enter an injunction at this late stage in order to conduct the further fact-finding that, at an absolute minimum, would be required in order to credit Plaintiffs' evidence.  *See Dunn v. McNabb*, 138 S.

Ct. 369 (2017) (vacating injunction of execution for failure to satisfy "'all of the requirements for a stay'" (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)).

## III.   EQUITY DOES NOT WARRANT A PERMANENT INJUNCTION

As demonstrated above, Plaintiffs are not entitled to the relief they seek principally because the FDCA does not govern BOP's use of pentobarbital as the lethal agent, and, even if it somehow did, Plaintiffs have failed to show how any such violation causes them irreparable harm.  Should the Court proceed further, though, Plaintiffs must establish that, "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and . . . that the public interest would not be disserved by a permanent injunction."  *eBay Inc.*, 547 U.S. at 391. Plaintiffs cannot make this showing.

The Supreme Court has repeatedly warned against last-minute injunctions in the death penalty context, including in this very case, *see Lee*, No. 20A8 at 3 ("'Last-minute stays' like that issued this morning 'should be the extreme exception, not the norm.'").  This case is not an extreme exception.  In fact, the PI Movants sought an injunction identifying the same injuries in June.  *See* ECF No. 102 at 30–33.  None of the current Plaintiffs joined that motion.  Nelson later filed his cross-motion for summary judgment on this very issue, ECF No. 180, which the current Plaintiffs also did not join.  And it is not as though Plaintiffs were waiting for new facts to emerge—they have not identified any information that was unavailable to Nelson.  Plaintiffs simply made the strategic decision to wait, which is exactly the sort of "attempt[] . . . to interpose unjustified delay," that the Supreme Court has warned against.  *Bucklew*, 139 S. Ct. at 1134.

The fact is that pentobarbital has been used in over one hundred state and federal executions over the last ten years without incident.  *Id.*  In none of those cases was the purported FDCA violation at issue here found to provide just cause to stop an execution at the last minute.  This case should not be the first, given LeCroy's and Vialva's impending execution dates, particularly in light of the fact that the Supreme Court already vacated this Court's last-minute preliminary injunction on the same grounds without a noted dissent just weeks ago.  *Purkey v. Barr*, 20A12, 591 U.S. ___ (2020).  Indeed, this Court itself has recently acknowledged the "very high bar" that

is "required to justify last-minute intervention by a Federal Court" with respect to the same FDCA claim that Plaintiffs again press here.  *See* Order, ECF No. 226 at 2, 3 (citation omitted).

What is more, while Plaintiffs' claims of harm are abstract and speculative, the interests of the United States, the public, Plaintiffs' victims, and their family members are concrete and imminent.  Plaintiffs cannot dispute the government's overwhelming interest in the enforcement of their criminal sentences, imposed by unanimous federal juries after fair trials and upheld through extensive appellate and post-conviction proceedings in federal courts.  *See Bucklew*, 139 S. Ct. at 1123.  "Equity must take into consideration the [government's] strong interest in proceeding with its judgment."  *Gomez v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) (emphasis added).  *See also Hill*, 547 U.S. at 584 (recognizing the government's "strong interest in enforcing its criminal judgments"); *Bucklew*, 139 S. Ct. at 1133 (emphasizing that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence"); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (explaining that once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension"); *Vialva* Order at 11, No. W-99-CR-070(1)-ADA (W.D. Tex.), ECF No. 690 ("Granting Vialva an injunction would clearly inhibit the Government's vested interest in carrying out an otherwise valid sentence and would impair the finality of this Court's criminal judgment.").  Again, just as in *Winter*, Plaintiffs' speculative harm cannot outweigh the government and the public's overwhelming interest that weigh against an injunction.  *See* 555 U.S. at 33.

The American people have chosen to make capital punishment available in the federal system; if that decision is to be given meaningful effect, sentences must be enforced in cases like these.  "Only with an assurance of real finality can the [government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out."  *Calderon*, 523 U.S. at 556.  Finality is not just a strong interest of the United States as a litigant; "[f]inality is essential to both the retributive and the deterrent functions of criminal law," and "[w]ithout finality, the criminal law is deprived of much of its deterrent effect."  *Calderon*, 523 U.S. at 554; *see also Bucklew*, 139 S. Ct. at 1134; *id*. at 1144

(Breyer, J., dissenting).  Plaintiffs' crimes were heinous, cruel, and depraved.  The public has a strong interest in executing the moral judgment and just penalties imposed long ago and repeatedly affirmed since.  Equity would abhor the notion that Plaintiffs could demand that their executions by pentobarbital be halted until the government could obtain a prescription.  Plaintiffs' victims' loved ones have waited long enough for the implementation of these lawful sentences in response to Plaintiffs' horrific crimes.  Indeed, some of Viala's and LeCroy's victims' loved ones are already planning to attend the respective executions.  The equities here plainly tip against issuing a permanent injunction.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for partial summary judgment and a permanent injunction.

Dated:  September 14, 2020

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN
Civil Chief, U.S. Attorney's Office

ALAN BURCH (D.C. Bar 470655)
Assistant United States Attorney
U.S. Attorney's Office
for the District of Columbia
Washington, D.C. 20530
202-252-2550
alan.burch@usdoj.gov

SCOTT G. STEWART
Deputy Assistant Attorney General

PAUL R. PERKINS
Special Counsel

 /s/*Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
JONATHAN KOSSAK (D.C. Bar 991478)
CRISTEN C. HANDLEY (MO Bar 69114)
BRADLEY P. HUMPHREYS (D.C. Bar 988057)
Trial Attorneys
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716

Jean.lin@usdoj.gov
Jonathan.kossak@usdoj.gov
Cristen.handley@usdoj.gov
Bradley.humphreys@usdoj.gov

*Attorneys for Defendants*

# EXHIBIT 1

## DECLARATION OF KENDALL VON CROWNS, M.D.

I, KENDALL VON CROWNS, under the penalty of perjury, declare the following to be true and correct:

1. My name is Kendall Von Crowns, MD. I am board-certified by the American Board of Pathology in Anatomy Pathology with subspecialty certification in Forensic Pathology. I practice forensic pathology full time in the State of Texas. I am also the Deputy Chief Medical Examiner of the Travis County Medical Examiner's Office in Austin, TX. In addition, I am an Assistant Professor of Practice and Director of the Forensic Fellowship Program at the University of Texas - Austin, a Clinical Assistant Professor at the University of Texas Medical Branch, and an Adjunct Assistant Professor at the Texas A & M Health Science Center. I have determined cause and manner of death in thousands of autopsies including cases of suicides in which an intentional overdose of pentobarbital was a direct or contributing factor in the cause of death. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

2. I have reviewed the declarations and supplemental declarations of Dr. Mark Edgar (dated October 24, 2019), Dr. Gail Van Norman (dated November 1, 2019, June 29, 2020, and August 7, 2020), and Dr. Joseph F. Antognini (dated June 25, 2020 and June 30, 2020). I have also reviewed the preliminary autopsy report prepared by Dr. Joyce L. DeJong, D.O., redacted witness statements (Exhibit B), as well as numerous articles/papers, regarding the executions of condemned federal inmates Daniel Lee, Wesley Purkey, and Dustin Honken by lethal injection of pentobarbital on July 14, 16, and 17, 2020, respectively.

3. Pentobarbital is in the class of short acting barbiturates whose duration of action occur within seconds/minutes and whose effects last for up to 2 hours. Barbiturates are sedative hypnotic drugs and have initial sedative effects that have been described as similar to the effects of alcohol. Pentobarbital is well absorbed and rapidly distributed in the tissues of the body. Pentobarbital is commonly used in veterinary medicine for the practice of humanely euthanizing animals and has been promoted by pro-euthanasia groups (e.g., Exit International) and in euthanasia-related publications such as "Final Exit" and the "Peaceful Pill Handbook" as an easy, reliable and peaceful way of achieving death and the premier drug for self-deliverance.

4. Pentobarbital penetrates the brain tissue quickly and acts on receptors present in the brain stem responsible for the respiratory drive (breathing) and the heartbeat. The action of pentobarbital on the respiratory receptors causes respiratory depression (decreased effort to breath) of the lungs and the action of the drug on the cardiac receptors cause cardiac depression which slows the heartbeat. These effects will lead to anoxia (lack of oxygen) of the tissue/organs due to the decreased oxygen in the blood and the slowing of the heartbeat with associated slowing of the circulation. Due to these effects there is development of pulmonary edema and eventual cardiac collapse (heart failure). Pentobarbital can also act on receptors in the peripheral nervous system that regulate the sleep rhythm and can exacerbate sleep apnea resulting in snoring which can contribute slightly to the anoxia.

5. Details of three recent federal executions using pentobarbital were provided by the Department of Justice for evaluation. They include redacted statements by a Federal Bureau of Prisons' official who was in the execution room during the execution of each of the inmates (Ex. B), and logs of drug administration for each of the inmates (Ex. C). As noted, I have also reviewed media reports of the executions. They are summarized as follows:

   a. It was noted that the administration of pentobarbital to Mr. Honken began at 4:06 pm. At 4:08 pm, Mr. Honken took a big breath, moved his mouth and lips wider, took a few breaths and twitched his hand. At 4:09 pm (3 minutes) he fell asleep and began snoring for about ten seconds. He appeared to be in a deep sleep and did not exhibit any difficulty breathing. At 4:10 pm, a saline solution was started, and the last breath was visualized by a reporter. Courtney Crowder, *Whose justice was served by Iowa man's execution*, Des Moines Register (July 21, 2020). At 4:16 pm his lips turned blue and his hands became ashen. Death was declared at 4:36 pm. The entire execution took a total of 30 minutes.

   b. Observations of the execution of Mr. Purkey show that pentobarbital was administered at 7:58 am. One minute after administration of the pentobarbital Mr. Purkey asked the minister to "pray less." He was then observed to fall asleep and began snoring for one minute. A saline solution was started at 8:02 am. He was noted to be in a deep sleep with steady and unlabored breathing which was noted to slow down and eventually stop. After he stopped breathing his skin was noted to be gray and ashen. He was pronounced dead at 8:19 am. The entire execution took a total of 21 minutes.

   c. Observations of the execution of Mr. Lee show that pentobarbital was administered at 7:48 am. Shortly after administration of the drug Mr. Lee remarked, "pull the F**king switch already." After about two minutes, he was observed to fall asleep. He began to snore for approximately one and a half minutes and appeared to be in a deep sleep. At 7:53 am, a saline solution was started. After he stopped snoring, his breathing was noted to be steady and unlabored until it eventually slowed down and stopped. He was noted to look gray and ashen. He was pronounced dead at 8:09 am. The entire execution took a total of 21 minutes.

6. Each execution followed a similar pattern. Within two minutes after injection the inmate was asleep, exhibited snoring for a minute or so and then was noted to be in a deep sleep with steady and unlabored breathing that slowly stopped. The average time of these three executions from injection to death was 24 minutes.

7. Of these three inmates, Wesley Purkey was the only one autopsied. Dr. DeJong of the Western University School of Medicine performed the autopsy. Her preliminary findings showed acute bilateral pulmonary edema. The right lung weighed 1140 grams and the left lung weighed 1160

grams. There was a frothy edema in the trachea and the mainstem bronchi. It was also noted that Mr. Purkey had severe coronary atherosclerosis (hardening of the arteries around the heart). These lung weights are significantly elevated because of pulmonary edema. But one cannot determine from the post-mortem lung weights when the edema occurred. Nor can the lung weights provide any clue as to whether the inmate experienced any pain while conscious.

8.  In Dr. Van Norman's November 1, 2019, report there is information provided on 27 autopsy reports of individuals put to death by lethal injection. The only noted finding reported in the summarization is pulmonary edema. No other pathologic findings are volunteered. The findings of abundant blood and frothy fluid, intense dependent congestion, oozing bloody froth and frothy fluids in the tracheobronchial tree are all findings that are associated with pulmonary edema. The findings of pulmonary edema are typically what is found in individuals who took an overdosage of pentobarbital and other barbiturates to commit suicide.

9.  Pulmonary edema and congestion are common nonspecific findings often found in autopsy pathology. It can be caused from reasons related to the heart (cardiogenic) or not related to the heart (noncardiogenic). It can be present in cases associated with cardiomyopathy (heart failure), severe hypertension, coronary artery disease, diseases of the heart valves, kidney failure, acute inflammation of the lung tissue, non-inflammatory lung injury, pulmonary embolism, organ failure, high altitude exposures and in drug overdoses particularly with opioids (heroin, fentanyl or morphine).

10. The type of pulmonary edema associated with pentobarbital would be due to noncardiogenic pulmonary edema. It results from disruption of the alveolar (lung) capillary membrane (vascular) interface in the lung tissue. When this interface is disrupted the capillaries become more permeable (leaky) and causes fluid to spill out into the alveolar spaces (lung tissue). This effect is unrelated to the pressures in the heart. There is no way to determine based on autopsy findings how quickly the pulmonary edema occurred, but even if the edema was from a "flash" situation it would take minutes to occur. Based on the time frame seen from the executions of Honken, Purkey, and Lee, the inmates were asleep/unconscious before the pulmonary edema occurred or became severe.

11. From the eyewitness accounts of the three executions, there is no evidence of distress that would be seen in acute (flash) pulmonary edema. If they were reacting to the effects of pulmonary edema, they would be observed to have shortness of breath (dyspnea), increased respiration (tachypnea) wheezing, gasping, coughing, noisy labored breathing. The decedents were not noted to exhibit any of these symptoms during their executions. The breathing of all three individuals was noted to be steady and unlabored. This fact establishes that the decedents experienced no physical response to the pulmonary edema. There is no evidence of pain on a conscious level. There are no reports of obstructed breathing beyond minimal snoring. The decedents were able to breath without obstruction but due to the respiratory depression and cardiac depression caused by the pentobarbital their brains just did not realize their need for oxygen.

12. Dr. Van Norman opined that inmates executed with 5 grams of pentobarbital "would remain sensate and able to experience the extreme pain and suffering related to the occurrence of flash pulmonary edema." I disagree. Due to the large amount of the drug administered, there would not be enough time for the pentobarbital to clear from the respiratory and cardiac receptors of the brainstem. Without the pentobarbital being cleared from those receptors, the inmate would not regain consciousness and would not experience pain from pulmonary edema. And once a maximum respiratory depression is achieved, there would be no decrease in respiratory depression before the decedent died of the effects. Also, there would be contributing factors of cardiac effects of decreasing heartbeat and decreasing circulation of the blood that would further hinder the metabolism and clearance of the pentobarbital from the body.

13. Due to the rapidity in which pentobarbital is absorbed and the fact that onset of action is almost immediate, the inmates were to a reasonable degree of medical certainty unconscious when pulmonary edema set in. The respiratory depression and cardiac depression would continue from this point until there was anoxic damage of the brain and cardiovascular collapse resulting in the death of the inmate. In fact, there is no evidence of the inmate reacting to pain and suffering while conscious.

14. My opinions are reached to a reasonable degree of medical certainty and I reserve the right to change my opinions should more or different information become available.

Date: 8/10/2020

_____
Kendall Von Crowns, MD

# EXHIBIT A

# KENDALL VON CROWNS, M.D.

## CURRENT POSITION

❖ <u>**2018 - Present**</u> Deputy Chief Medical Examiner Travis County Medical Examiner's Office, Austin, Texas

Duties: Discuss and determine office policies with the chief medical examiner, Participate in budgetary discussions. Participated in the hiring of two deputy medical examiners (evaluated CVs, scheduled interviews, conducted interviews and made determinations of best hire for office). Participated in the hiring of a full time histotechnologist (Evaluated CVs, conducted interviews and made decisions on best fit for the office). Supervise six deputy medical examiners and a single histotechnologist. Create a monthly schedule for the morgue. Create performance goals for doctors. Support office policies created by the Chief Medical Examiners. Lead and direct discussions at morning and afternoon report. Review the deputy medical examiners protocols. Review monthly reports regarding autopsy protocols turnaround times and discuss strategies with Deputies regarding improving their turn around times. Participate in monthly Doctor policy meetings. Conducted review of office for NAME inspection and delegated responsibilities to each department for completion of NAME checklist. Discuss policy issues, case related questions and donation requests with doctors and office staff.

## WORK EXPERIENCE

❖ <u>**2009 – 2018**</u> Deputy Medical Examiner Travis County Medical Examiner's Office, Austin, Texas

❖ <u>**2000 – 2009**</u> Deputy Medical Examiner Office of the Medical Examiner, Chicago, Illinois

Performed 2,070 Autopsies (514 homicides) 2,061 Inspections (External Examinations Only)

Duties: Performed autopsies and inspections on individuals who died within Cook County and generated autopsy protocols. Determined cause and manner of deaths. Determined which cases need a complete autopsy versus an inspection. Determined if case was a medical examiner's case. Worked with Gift of Hope (Organ Donation). Worked with Chicago Police department, Cook County Sherriff's Office and other city police agencies within Cook County. Testified in court on criminal and civil cases. Attended certain scenes (predominately deaths in custody). Gave lectures to fellows, residents, colleagues and law enforcement. Supervised fellows and residents in the performance of autopsies.

❖ <u>**2004 – 2009**</u> Forensic Pathologist (Weekend and Holidays)
2007 – 2009 Managing Forensic Pathologist
DuPage County Coroner's office, DuPage County Illinois

Performed 138 autopsies (Nine Homicides).

Duties: Performed autopsies and obtained evidence at the request of the DuPage County Coroner. Determined cause of death. Generated reports and discussed manner of death with corner and his staff. Worked with DuPage County Sherriff's Office and police agencies of cities within DuPage County. Trained autopsy technicians in proper autopsy procedures. As Managing Forensic Pathologist created schedules and recommended other forensic pathologists to be hired by the corner and dealt with complaints/grievances by the coroner or the pathologists.

❖ **<u>1997 – 2000</u>** Managing Prosector Lab Corp of Mississippi

Duties: Created monthly schedule for prosectors, hired and trained new prosectors and turned in time for billing. Processed all specimens and dictated descriptions.

❖ **<u>1996 – 2000</u>** Assistant Medical Examiner Shelby County, TN

Duties: Performed inspections (external examinations only) for the medical examiner and reported findings to the on call medical examiner via phone. Performed supervised autopsies on an as needed basis.

❖ **<u>1999 – 2000</u>** Autopsy Technician, Desoto County Corner, Desoto County Mississippi

Duties: Assisted Coroner's Pathologist in the performance of autopsies and Performed specific procedures at their direction. Cleaned and maintained morgue and morgue equipment.

❖ **<u>1987 – 1991</u>** Autopsy Technician, St. Francis Medical Center, Pathology Department, Wichita, Kansas

Duties: Assisted doctors in performance of autopsies and Performed specific duties at their direction. Cleaned and maintained morgue and morgue equipment. Trained new technicians and new residents in autopsy procedures. Disposed of chemical and biohazardous waste for the hospital.

## MASS FATALITY EXPERIENCE

❖ **<u>2000 – 2009</u>** Yearly mass disaster training at O'Hare International Airport or Midway Airport, Chicago Illinois.

Duties: Participated in mock airplane disaster scenes. Interacted with law enforcement, emergency medical personnel, fire department and airport personnel.

❖ **<u>February 17, 2003</u>** E2 Nightclub Stampede

21 Deaths

Duties: Performed autopsies on individuals who died in this small disaster. Determined cause and manner of death. The consequence of these deaths resulted in increased safety inspections of city night clubs.

❖ **<u>October 17, 2003</u>** 69 W. Washington Building Fire

6 Deaths

Duties: Performed all autopsies on individuals who perished in the fire. Determined cause and manner of death. Participated in subsequent investigations and committees associated with the fire. The consequence of these deaths resulted in changes in building codes in Cook County, changes in the handling of large building fires by the Chicago Fire Department and changes in how buildings are secured.

# WORKPLACE SHOOTINGS

❖ **<u>February 5, 2001</u>** Navistar International Corporation diesel engine plant shootings, Melrose Park Illinois.

5 Deaths

Duties: Distributed cases between Dr. Scott Denton and myself. Performed autopsies and determined cause and manner of death.

❖ **<u>August 27, 2003</u>** Windy City Core Supply warehouse shootings

7 Deaths

Duties: Distributed cases between Dr. Lawrence Cogan, Dr. Ponni Arunkumar and myself. Performed autopsies and determined cause and manner of death.

# COURT EXPERIENCE

❖ Testified over 250 times.

❖ Certified as an expert in forensic pathology every time.

❖ Testified in both criminal and civil cases in court and in depositions.

❖ Criminal Cases include: Gunshot/Shotgun wounds, stabbings, blunt force injuries, strangulations, and child abuse.

❖ Civil cases include: Officer involved shootings, product failures, fires, medical misadventures, Norian Bone Cement related deaths, motor vehicle accidents, electrocutions and industrial accidents

❖ **2014** Testified in front of the House Select Committee on Child Protection. Texas House of Representatives.

# MEDICAL SPECIALTY TRAINING

❖ <u>**2000 – 2002**</u> Office of the Medical Examiner of Cook County, Forensic Pathology Fellow

Duties: As part of subspecialty training in forensics Performed autopsies and inspections while supervised on individuals who died within Cook County and generated autopsy protocols. Determined causes and manners of death. Testified in court on criminal cases on behalf of pathologists who no longer worked for Cook County. Attended certain scenes (predominately deaths in custody). Rotated through Illinois State Crime Lab, Chicago police department crime scene investigation unit, and rotated through the following departments at the Cook County Medical Examiner's Office: Investigations, Toxicology and Photography.

❖ <u>**1996 - 2000**</u>    University of Tennessee/Baptist Memorial Hospitals, Memphis Tennessee,

Residency in Anatomic and Clinical Pathology.

Duties: As a resident rotated through the various subspecialties of pathology and had progressing responsibilities and duties. Rotated for four years through the Various Memphis/Shelby County area hospitals which include the following: Baptist Memorial Hospital Main and East, the Regional Medical Center of Memphis (The Med), Veteran's Hospital Memphis, University of Tennessee Hospital (UT-Bowld), Shelby County Medical Examiner's Office and Saint Jude's Research Hospital. Taught medical and nursing students and helped train junior residents in the performance of autopsies and processing of surgical specimens. Spent extra elective rotations as a senior resident at the medical examiner's office and at Saint Jude's Research Hospital.

# EDUCATION

❖ <u>**1991-1996**</u> University of Kansas School of Medicine

  Degree in Medicine, Kansas City, and Wichita, Kansas, M.D.

❖ <u>**1987-1991**</u> Wichita State University, Wichita, Kansas

  B.S., Chemistry

❖ <u>**1983-1987**</u> Southeast High School Wichita, Kansas

# HONORS

❖ <u>**2006**</u> President's Council on Integrity and Efficiency (PCIE) Investigations Award for Excellence

Awarded for case work and testimony in the Federal case of the U.S. vs. Ronald Mikos ("The Medicare Murderer") which resulted in only the 2nd person to be condemned to death by a federal jury in the City of Chicago.

❖ **2006** Office of Inspector General Integrity Award

Awarded for case work and testimony in the Federal case of the U.S. vs. Ronald Mikos

❖ **2000** The Sonia Masoud award for Academic Excellence (Resident of the Year Award).

Awarded for excellence in academic and work performance during the year at the University of Tennessee Baptist Memorial

❖ **1991** Graduated Cum Laude Wichita State University

❖ **1988-1991** Dean's Honor Roll at Wichita State University

❖ **1987-1990** Emory Lindquist Honors Society at Wichita State University

❖ **1987-1991** Wichita State University Academic Scholarships


# PROFESSIONAL ASSOCIATIONS

❖ **2002-Present** American Academy of Forensic Sciences

❖ **2000-Present** National Association of Medical Examiners

❖ **1998-Present** College of American Pathologists

❖ **1998-2004, 2009-Present** American Society of Clinical Pathologists

❖ **1991-2002** American Medical Association


# MEDICAL LICENSES

❖ **2009-present** Texas medical license

❖ **Inactive** Illinois medical license

❖ **Inactive** Tennessee medical license


# SPECIALTY BOARDS

❖ Board certified in Anatomic and Forensic Pathology            Recertified   2016

# PROFESSIONAL APPOINTMENTS

❖ **2012 – Present** Travis County Child Death Review Team

Duties: Represent Medical Examiner's Office and Multi-disciplinary meeting to include child protective services, states attorney, representatives from Austin police department, Travis County Sheriff's Office, Texas Department of Public Safety, Austin Fire Department, and pediatricians from area hospitals. Presented cases to the group, answered questions regarding findings and participated in ensuing discussions as to what actions and recommendations can be made to prevent pediatric deaths.

Currently participating in efforts to disseminate safety information regarding car seat safety  and safe swimming practices to the public to increase awareness of what services are available throughout Travis County.

❖ **2006 – 2009** Illinois Department of Children and Family Services Child Death Review Team

(Cook Area Team B).

Duties: Represented Medical Examiner's Office in a multi-disciplinary meeting to include  child protective services, Health department, States attorney, representatives from Chicago  police department, Representative from the Illinois State Police, pediatricians, emergency  room physicians and psychiatrists from area hospitals and a Cook County judge. Presented cases to  the group, answered questions regarding findings and participated in ensuing discussions as to  what actions and recommendations can be made to prevent pediatric deaths.

❖ **2007 – 2009** Organizer/Moderator of Cook County Educational Conference Lectures.

Duties: Organized conference schedule. Obtained multiple guest speakers on a variety of topics

(Including involvement of local religious leaders for discussions of the different ways the various religions deal with death, autopsies and burials). Introduced speakers and participated  in moderating question and answer sessions after completion of lectures.

❖ **2005 – 2009** Chairman, Autopsy Report Quality Assurance Committee for Cook County Medical Examiner's Office

Duties: Reviewed autopsy protocols for comprehensive content and accuracy to ensure NAME standards were met which aided in reaccreditation with NAME in 2006. Recruited four  other doctors to aid in the review process, delegated responsibilities and compiled the data.  Worked with medical records department to get proper material for review. Every month presented findings to Chief Medical Examiner and discussed deficiencies directly with pathologist responsible for them.

❖ **2005 – 2006** Member of the Pathology – Biology Scientific Program Abstract Review Committee for the American Academy of Forensic Sciences.

Duties: Reviewed abstracts submitted for the American Academy of Forensic Sciences (AAFS) and determined with other members of the committee if they were worthy for submission to the AAFS annual meeting.

# TEACHING APPOINTMENTS

❖ **2020 – Present:** Director of Forensic Fellowship Program, Austin Texas

Duties: Create syllabus and educational curriculum for the year. Generate didactic lecture schedule and lectures. Supervise fellows in the performance of Autopsies, generating protocols and deciding what tests to order. Teach fellows autopsy techniques and procedures. Give didactic lectures on multiple subjects in forensics and lectures on health and well-being. Interact with ACGME and review and follow ACGME standards. Schedule extracurricular activities for fellows. Plan schedules and faculty meetings; participate in evaluations; and participate in recruitment of future fellows

❖ **2019 – Present** Assistant Professor of Practice University of Texas –Austin

Class: NSC 309 Introduction to Forensic Sciences

Created class and team teach with Michelle Montonera, M.S.

❖ **2018 – 2020** Co-Director Forensic Fellowship Program, Austin Texas

Duties: Supervise fellows in the performance of Autopsies, generating protocols and deciding what tests to order. Teach fellows autopsy techniques and procedures. Give didactic lectures on multiple subjects in forensics. Follow ACGME standards; plan schedules and faculty meetings; participate in evaluations; and participate in recruitment of future fellows

❖ **2009 – Present** Clinical assistant professor, University of Texas Medical Branch-Galveston, Austin, Texas

Duties: Teach medical students about forensic pathology, autopsy procedures, general pathology and the proper way to fill out death certificates.

❖ **2009 – Present** Adjunct Assistant Professor, Texas A&M Health Science Center College of Medicine. Austin, Texas

Duties: Teach residents about forensic pathology supervise them in performance of autopsies and perform comprehensive reviews of autopsy protocols that are generated.

❖ **2002 – 2009** Attending Cook County Medical Examiner's Office Forensic Fellowship Program. Chicago Illinois

Duties: Supervised and taught Fellows in forensic pathology. Taught lectures in specific topics of forensics. Reviewed and corrected autopsy protocols generated by the fellows. Participated in the maintenance of accreditation with the Accreditation Council for Graduate Medical Education (ACGME) by organizing a lecture series with guest lectures and aiding in determining and meeting requirements.

❖ **2007 – 2009** Adjunct Clinical faculty at Loyola University Medical Center EMT-Paramedic Program, Chicago Illinois

Duties: Gave lectures in forensic pathology combined with emergency medical procedures to Paramedics and Emergency Medical Technicians.

❖ **2007 – 2009** Lecturer, Northwestern University Forensics Professional Development Program, Chicago Illinois

Duties: Gave lectures to 40 – 50 students in Forensic sciences on natural disease processes and motor vehicle accidents.

❖ **1998 – 2000** Pathology Lab Instructor, the University of Tennessee Health Science Center College of Medicine – Memphis, Memphis Tennessee

Duties: Taught 30 medical students weekly general pathology labs.

❖ **1997 - 1998** Lecturer, School of Allied Health Pathology Course Instructor, UT/BMH,

Memphis Tennessee

Duties: Gave lectures on tuberculosis and infectious disease to nursing and physician assistant students.

# PUBLICATIONS

1) K. Crowns, W. Gunther: A crack pipe in the hospital: Chronic cocaine addiction and dilated cardiomyopathy. American Academy of Forensic Sciences Proceedings, 1998, Vol. 4, page 149.

2) K. Crowns, T. Deering: A case study of cocaine toxicity in a decomposed body, American Academy of Forensic Sciences Proceedings, 1999, Vol. 5, page 186.

3) K. Crowns, W. Gunther: Soap Bubble Skull: Multiple osteosclerotic lesions in the skull of an 18-year-old. American Academy of Forensic Sciences Proceedings, 2000, Vol. 6, page 177-178.

4) K.Crowns, E. Donoghue: Pulmonary thromboembolism in Cook County Medical Examiner cases from 1998-2000, Abstracts of the National Association of Medical Examiners, 2001, Page 29.

5) M. Kalekar, K. Crowns, E. Donoghue: Venous air embolism - A difficult postmortem diagnosis. American Academy of Forensic Sciences Proceedings, 2002, Vol. 8, page 178-179.

6) D. Mark Courtney and Kendall V Crowns: Are African American females at increased risk of sudden death from pulmonary embolism? Acad Emerg Med Volume 9, Number 5, Pages 458-459.

7) K. Crowns, A. Segovia: Isolated noncompaction of the left ventricle: A rare cause of sudden death. American Academy of Forensic Sciences Proceedings, 2003, Page 226.

8) K. Crowns, A. Segovia: Death by Defibrillator: A unique homicide by electrocution. American Academy of Forensic Sciences Proceedings, 2004, Page 229.

9) K.Crowns, B. Roberts, M. Montonera, J. Beaman: Fatal Launch: Fireworks Fatality and the Determination of Generated Recoil Force. American Academy of Forensic Sciences Proceedings, 2017, Page 627

10) K. Addison, T. Vanek, K. Crowns, A. Segovia, Ta'Kena Stewart-Muhammad: A comparison of Accidental Self-Inflicted Gunshot Wounds Occuring in Rural vs. Urban Settings. American Academy of Forensic Sciences Proceedings, 2017, Page 745

11) K. Crowns, A. Segovia, S. Powers, E. Zakariya, L. Watkins, Z. Michalicek, M. Montonera, S. Andrews, G. Karim: The RIP Bullet: Presentation of cases and discussion of this new novel

ammunition. Forensic Science International 277, 2017, Page 206

12) K. V. Crowns, M. Montonera: Determination of Manner of Death in Snake Bite Related Fatalities: A Comparison of Accident vs. Suicide. Abstracts of the National Association of Medical Examiners, 2017, Page 55.

13) K. V. Crowns, Michelle S. Montonera, MS, and Adrienne Segovia, MD: A Review of Multiple Dog-Mauling Fatalities of Infants Less Than Six Months of Age and Neonates in Travis. American Academy of Forensic Sciences Proceedings, 2018, Page 775

14) K. V. Crowns, M. Montonera, MS, J. Pinckard and A. Segovia, MD: Equine Fatalities: Classifying Mechanisms of Injury and Use of Occult Hoof/Impact Pattern to Assist In Injury Classification. Abstracts of the National Association of Medical Examiners, 2018, Page 67.

15) Miller CR, Von Crowns K, Willoughby V. Fatal Ludwig's Angina: Cases of Lethal Spread of Odontogenic Infection. Acad Forensic Pathol. 2018;8(1):150-169. doi:10.23907/2018.011

16) Hannah Elysse Bielamowicz, MD; Kendall V. Crowns, MD; Keith Pinckard, MD, PhD; Michelle S. Montonera, MS: Fatal Clostridial Necrotizing Fasciitis Resulting From Skin Popping in Heroin Abusers American Academy of Forensic Sciences Proceedings, 2019, Page 910

17) Paniagua, D., Crowns, K., Montonera, M. et al. Postmortem histopathology and detection of venom by ELISA following suicide by cobra (Naja kaouthia) envenomation. Forensic Toxicol 38, 523–528 (2020). https://doi.org/10.1007/s11419-020-00535-w

# PRESENTED LECTURES

❖ **2019** Annual Education Program for Coroners and Pathologists, Toronto, Canada: Keynote Address

Audience: Forensic Pathologists and Coroners

Caesar to CTs: The Texas Perspective on Modern Forensic Pathology

❖ <u>**2019**</u> Society of Forensic Toxicologists Annual Meeting, San Antonio, Texas: Keynote Address

Audience: Forensic Toxicologists

Forensic Toxicology: The Last Hope For An Answer

❖ <u>**2018 - Present**</u> Travis County Medical Examiner's Office Core Curriculum Lecture Series

Audience: Forensic pathology fellows and pathology residents.

Sharp Force Wounds

Gunshot Wounds

Decompositional changes

❖ <u>**2013 - Present**</u> Texas Rangers Advanced Crime Scene Investigations Course

Audience: Texas Rangers, State Police Officers and Crime Scene Investigators

Scene Documentation of Postmortem Changes

Autopsy Protocol

❖ <u>**2009 – 2014**</u> Travis County Medical Examiner's Office Educational Lectures

Audience: Investigators, autopsy technicians, toxicologists and forensic pathologists.

Inhalants: Case studies and review of literature.

Envenomation: Case studies and review of literature.

Dog Mauling: Case Studies and review of literature.

❖ **2009 - 2014** Death Investigation for Law Enforcement: Travis County Medical Examiner's Office Annual Winter Conference

Audience: Local and out of county police officers and sheriff's officers, crime scene investigators, justices of the peace and fire investigators.

Sharp force injuries.

Decompositional changes.

"What the heck happened" A discussion of unusual causes and manners of death with review of literature

❖ **2013 - Present** Saint Edwards University Forensic Science Program

Audience: Forensic science students.

Forensic Pathology (Case studies)

❖ **2010 - Present** Area High Schools, Middle Schools and Elementary School Career Days

Audience: High School, Middle school and grade school students.

Forensic pathology as a career.

❖ **2015** Texas Division of the International Association for Identification, 78th Annual Educational Conference

Audience: Law Enforcement, Lawyers, Crime Scene Personnel

Death Investigation with the Travis County Medical Examiner's Office

❖ **2007 – 2009** Loyola University Medical Center EMT-Paramedic Program Lecture Audience: Paramedics and emergency medical technicians.

Sharp force injuries.

❖ **2000 -2009** Cook County Educational Conference Lectures

Audience: Investigators, toxicologists and forensic pathologists.

Heat stroke: A case study and review of literature.

Buzzkill: A midsummer's day tragedy. (Case report of a fatal bee sting and a review of literature).

A fatal failure: A case report of MRI interaction with a pacemaker.

Workplace Homicide: Discussion of Navistar and Windy City warehouse auto shop mass shootings with review of other work-related shootings and literature.

Full Moon Madness: Does the full moon effect case load at Cook County Medical Examiner's Office? (Review of the effects of full moon on cases over a one-year period).

Magic Mushrooms: Review of literature.

Narcotizing Fasciitis: Case report and review of literature

Isolated noncompaction of the left ventricle: Case report and review of literature.

Death by Defibrillator: Case report and review of literature.

Death from Gastric Bypass: Discussion of case, procedures and review of literature.

❖ **2007 – 2009** Northwestern University Death and Death Scene Investigation Course Lectures

Audience: Forensic science students.

Death from natural disease.

Forensic aspects of motor vehicle accidents

❖ DePaul University Forensics Seminar

Moot Court Participant with law students.

❖ **2003 - 2009** Cook County Medical Examiner's Office Core Curriculum Lecture Series

Audience: Forensic pathology fellows and pathology residents.

Sharp Force Wounds

EXHIBIT B



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**TO:**       BOP Office of General Counsel (Execution Protocol litigation file)

**FROM:**

**DATE:**     July 31, 2020

**SUBJECT**:  Observations Regarding Execution of Daniel Lee

I am providing this memorandum in response to a request from BOP legal staff. On July 14, 2020, I witnessed the execution of inmate Daniel Lewis Lee. In preparation for the execution, inmate Lee was placed on a bed and restrained in a manner that would ensure the appropriate placement of an IV line and the administration of lethal injection substances, while also ensuring a maximum level of comfort for inmate Lee. During the placement of the IV line, inmate Lee appeared to be comfortable and relaxed. He did not appear to be in any discomfort or pain, and he did not voice any concerns about being uncomfortable or experiencing any pain. Unforeseen delays related to litigation resulted in inmate Lee remaining restrained on the bed for approximately four hours before the lethal injection substances were administered. During this time, inmate Lee did not complain about the restraints, nor did he voice any distress or discomfort. In fact, during this time, inmate Lee appeared relaxed. While we waited for the execution to proceed, inmate Lee talked to his Minister of Record who remained in the room. Inmate Lee and his Minister of Record were often joking and laughing with each other. Inmate Lee also talked to me and asked me questions about what was going to happen next in the process. It didn't appear that inmate Lee was in distress or discomfort during this entire period of time. After the execution procedure began, inmate Lee remained relaxed and appeared comfortable. He was given the opportunity to make a statement and did so. When he was finished making a statement, the administration of the lethal injection substances began. During the administration of the substances, inmate Lee did not voice any concerns about being uncomfortable or in pain, and he did not appear to me to be in any discomfort or pain. Shortly after the administration of the lethal injection substances began, inmate Lee stated, "pull the fucking switch already." I interpreted his statement as a desire for the process to speed up. He did not sound angry or uncomfortable when he said it. As the administration of the substances continued, inmate Lee and his Minister of Record were reciting what appeared to me to be religious chants, with the Minister of Record chanting and inmate Lee repeating the chant. After approximately two minutes, inmate Lee stopped repeating the chants and fell asleep. I did not observe inmate Lee gasp for air and it didn't appear that he was having any difficulty breathing. Rather, he began to snore for approximately one and a half minutes, and he appeared to be in a

1

deep sleep. After inmate Lee stopped snoring, he made no other sounds and his breathing was steady and unlabored. I observed inmate Lee's chest and stomach rising and falling steadily, which began to slow down and eventually stop. After inmate Lee stopped breathing, the natural color of his skin appeared to drain and it looked grey and ashen. Inmate Lee's time of death was pronounced at 8:07 a.m. During the entirety of the execution, inmate Lee did not appear to be in any sort of distress, discomfort, or pain. He did not grimace or make any sounds or movement which would indicate he was experiencing discomfort, pain, or distress.



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**TO:**      BOP Office of General Counsel (Execution Protocol litigation file)

**FROM:**

**DATE:**    July 31, 2020

**SUBJECT**:   Observations Regarding Execution of Wesley Purkey

     I am providing this memorandum in response to a request from BOP legal staff. On July 16, 2020, I witnessed the execution of inmate Wesley Ira Purkey. In preparation for the execution, inmate Purkey was placed on a bed and restrained in a manner that would ensure the appropriate placement of an IV line and the administration of lethal injection substances, while also ensuring a maximum level of comfort for inmate Purkey. During the placement of the IV line, inmate Purkey appeared to be comfortable and relaxed. He did not appear to be in any discomfort or pain, and he did not voice any concerns about being uncomfortable or experiencing any pain. After the execution procedure began, inmate Purkey was given the opportunity to make a statement and did so. When he was finished making a statement, the administration of the lethal injection substances began. During the administration of the substances, inmate Purkey remained relaxed and appeared comfortable. He did not voice any concerns about being uncomfortable or in pain. During the procedure, inmate Purkey's Minister of Record was praying out loud, and approximately one minute after the administration of the lethal injection substances began, inmate Purkey said to his Minister of Record, "pray less." Inmate Purkey did not say anything else during the remainder of the execution. I observed inmate Purkey fall asleep and begin snoring. Inmate Purkey continued to snore for approximately one minute. Inmate Purkey did not appear to be having difficulty breathing and he was not gasping for air. Rather, he appeared to be in a deep sleep. After inmate Purkey stopped snoring, he made no other sounds and his breathing remained steady and unlabored. I observed inmate Purkey's chest and stomach rising and falling steadily, which began to slow down and eventually stop. After inmate Purkey stopped breathing, the natural color of his skin appeared to drain and it looked grey and ashen. Inmate Purkey's time of death was pronounced at approximately 8:19 a.m. During the entirety of the execution, inmate Purkey did not appear to be in any sort of distress, discomfort, or pain. He did not grimace or make any sounds or movement which would indicate he was experiencing discomfort, pain, or distress.

1



**U.S. Department of Justice
Federal Bureau of Prisons**

---

**TO:**        BOP Office of General Counsel (Execution Protocol litigation file)

**FROM:**

**DATE:**        July 31, 2020

**SUBJECT**:        Observations Regarding Execution of Dustin Honken

I am providing this memorandum in response to a request from BOP legal staff. On July 17, 2020, I witnessed the execution of inmate Dustin Honken. In preparation for the execution, inmate Honken was placed on a bed and restrained in a manner that would ensure the appropriate placement of an IV line and the administration of lethal injection substances, while also ensuring a maximum level of comfort for inmate Honken. During the placement of the IV line, inmate Honken appeared to be comfortable and relaxed. He did not appear to be in any discomfort or pain, and he did not voice any concerns about being uncomfortable or experiencing any pain. After placement of the IV line, inmate Honken's Minister of Record entered the room and performed a religious ceremony with him. Inmate Honken remained calm and appeared comfortable during the ceremony. He was able to participate meaningfully in the ceremony by praying with his Minister of Record and receiving communion. After the religious ceremony was complete and the execution procedure began, inmate Honken was given the opportunity to make a statement. Inmate Honken recited the Hail Mary prayer and also said another prayer. When he was finished praying, the administration of the lethal injection substances began. During the administration of the substances, inmate Honken remained relaxed and appeared comfortable. He did not voice any concerns about being uncomfortable or in pain. In fact, inmate Honken said nothing during the duration of the execution procedure. After approximately three minutes, inmate Honken fell asleep and began snoring for about ten seconds. I did not observe inmate Honken gasping for air or experiencing any difficulty breathing. Rather, he appeared to be in a deep sleep. He made no sounds and his breathing remained steady and unlabored. I observed inmate Honken's chest and stomach rising and falling steadily, which began to slow down and eventually stop. It also appeared to me that the natural color of inmate Honken's skin turned grey in color and it appeared ashen. Several minutes after it appeared that inmate Honken had stopped breathing, a doctor entered the room and checked his heartbeat with a stethoscope. Thereafter, inmate Honken's time of death was pronounced at approximately 4:36 p.m. During the entirety of the execution, inmate Honken did not appear to be in any sort of distress, discomfort, or pain. He did not grimace or make any sounds or movement which would indicate he was experiencing discomfort, pain, or distress.

EXHIBIT C

FEDERAL LETHAL SUBSTANCE INJECTION CHECKLIST (TBD)                                PAGE 1 OF 2

DATE: _07/14/20_____                    Inmate: _____559_____

IV (s) site: __~~Hand~~ Brachial_____
              Infiltrate

Inserted and determined to be patent by:_____34_____       Time: _~~3:52~~ AM___
                                                                      4:16 AM - infiltrate

| Syringe # | Contents | Prepared by | Witness | Administered or disposed by | Time: | Witness |
|-----------|----------|-------------|---------|----------------------------|-------|---------|
| 1 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 12 | 7:48 Am | 11 |
| 2 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 43 | | 11 |
| 3 A | 60 mL saline flush | 11 | 44 | 35 | 7:53 AM | 11 |

X EXECUTION                    Γ  EXECUTION PRACTICE

FEDERAL LETHAL SUBSTANCE INJECTION CHECKLIST (TBD)                    PAGE 1 OF 2

DATE: _07/16/20_____          Inmate: _____560_____

IV (s) site: _Hand_____

Inserted and determined to be patent by: _____34_____          Time: _7:46 AM_____

| Syringe # | Contents | Prepared by | Witness | Administered or disposed by | Time: | Witness |
|-----------|----------|-------------|---------|-----------------------------|-------|---------|
| 1 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 43 | 7:58 AM | 11 |
| 2 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 34 |  | 11 |
| 3 A | 60 mL saline flush | 11 | 44 | 35 | 8:02 AM | 11 |

✗ EXECUTION                    Γ  EXECUTION PRACTICE

FEDERAL LETHAL SUBSTANCE INJECTION CHECKLIST (TBD)                    PAGE 1 OF 2

DATE: 7/17/20                          Inmate: 561

IV (s) site: Brachial

Inserted and determined to be patent by: 35                    Time: 3:44 PM

| Syringe # | Contents | Prepared by | Witness | Administered or disposed by | Time: | Witness |
|-----------|----------|-------------|---------|------------------------------|-------|---------|
| 1 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 34 | 4:06 PM | 11 |
| 2 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 35 | ▓ | 11 |
| 3 A | 60 mL saline flush | 11 | 44 | 12 | 4:10 PM | 11 |

X EXECUTION                    Γ  EXECUTION PRACTICE

# EXHIBIT 2

SECOND SUPPLEMENTAL DECLARATION OF JOSEPH F. ANTOGNINI, M.D.

I, JOSEPH F. ANTOGNINI, hereby declare and say:

1. My name is Joseph F. Antognini. I submit this second supplemental declaration in further response to the declarations submitted by Dr. Gail Van Norman (dated 11-1-2019, 6-29-2020, 8-7-2020 and 8-9-2020), Dr. Arthur C. Grant (dated 5-22-2020) and Dr. Mark Edgar (dated 10-24-2019), in the case *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145.

2. The opinions presented in this supplemental declaration are based on information available to me at this time. Should additional documents or information be provided to me for review and analysis, I may take those additional materials into account, and modify and/or supplement my opinions accordingly. If I am present at hearings and/or trial in this case, I may take into account any testimony or other evidence to the extent related to my opinions and modify and/or supplement my opinions accordingly. In performing my analysis, I have relied on my professional training, education and experience. I have reviewed and considered the declarations by Dr. Van Norman, the references she cites, the declaration by Dr. Arthur C Grant, the declaration by Dr. Mark Edgar as well as references listed below in the "References Cited" section. I have also reviewed the pentobarbital and saline injection times provided to me by the Department of Justice ("DOJ") for the executions of Daniel Lewis Lee (7-14-2020), Wesley Purkey (7-16-2020) and Dustin Honken (7-17-2020). See Exhibit A ("Injection Check Lists").

SUMMARY OF OPINIONS

3. a) Pentobarbital is metabolized slowly, so any enhanced metabolism of pentobarbital will not alter the lethal effects of 5 grams of pentobarbital administered intravenously.

b) Increased metabolism of pentobarbital which might occur in a person on chronic

1

carbamazepine therapy will be of little or no significance in a person on such therapy who received 5 grams of pentobarbital intravenously for purposes of execution.

c) Because pentobarbital is metabolized by the liver, blood flow to the liver is necessary as that is the mechanism by which pentobarbital is delivered to the liver.

d) Because 5 grams of pentobarbital administered intravenously causes profound cardiovascular collapse within 2-4 minutes after injection, blood flow to the liver (and to all organs) will be drastically reduced. Also, cessation of breathing caused by pentobarbital will produce profound tissue hypoxia (low oxygen levels) which will similarly depress metabolism of pentobarbital.

e) The profound cardiovascular collapse will not only prevent any substantive liver metabolism of pentobarbital, it will also prevent substantive redistribution of the pentobarbital, e.g., the pentobarbital in the brain, heart and other 'high-blood flow organs' will not be significantly redistributed to other organs.

f) Redistribution of pentobarbital from high-blood flow organs, such as brain and heart, to low-blood flow organs, such as muscle and fat, is the major determinant of the declining blood levels of pentobarbital in the first 20-30 minutes after intravenous administration. Metabolism of pentobarbital plays virtually no role in the decline of pentobarbital blood levels in the first 20-30 minutes after intravenous administration.

g) Five (5) grams of pentobarbital administered intravenously to a person on carbamazepine therapy will result in the expected actions: unconsciousness within 20-30 sec, followed by apnea (absence of breathing), cardiovascular collapse and death.

h) Pulmonary edema, lung congestion and fluid in airways found at autopsy in inmates executed with pentobarbital likely occurred post mortem, and not ante mortem, based on animal

2

and human studies. Even if pulmonary edema did occur ante mortem, the inmates would have been profoundly anesthetized (with cessation of brain activity) and would not have experienced any sensations of pulmonary edema.

CARBAMAZEPINE THERAPY EFFECTS ON PENTOBARBITAL

4.      A drug like pentobarbital, when injected intravenously in *usual clinical doses* first goes to the body organs that have high blood flow (brain, heart, kidney), but after peaking at about 1-2 minutes, the concentrations in these organs and in the blood begin to fall as the drug is 'redistributed' to other tissues such as muscle and fat (the redistribution phase). Pentobarbital will undergo metabolism which will cause pentobarbital levels to decrease over time and this phase is called the 'elimination' phase. The rapidity of the elimination phase is often described using the term 'half-life', which essentially states how long does it take for the pentobarbital level in the blood to decrease by one half (e.g., going from 10 mcg/ml to 5 mcg ml).

5.      The elimination half-life for pentobarbital is in the range of 15-50 hours.[1] And, as described below, any effect of carbamazepine on pentobarbital levels in the blood would impact primarily the elimination phase. It should be obvious, therefore, that enhancing elimination via carbamazepine therapy (for example, by changing half-life from 25 hours to 12 hours) is meaningless in the setting of a lethal injection of pentobarbital in which the inmate would be dead within 20-30 minutes.

6.      A key difference between what is observed with a *clinical dose* of pentobarbital and that observed when a *5-gram (lethal) dose* is given is that profound cardiovascular depression (extremely low blood pressure and blood flow) minimizes redistribution of pentobarbital. In order for the pentobarbital to go from tissues such as brain and heart to other tissues like muscle, there

---

[1] https://www.akorn.com/documents/catalog/package_inserts/76478-501-20.pdf accessed 9-11-2020

must be adequate blood flow. But the profound cardiovascular depression prevents this process from occurring.

7.    The profound cardiovascular depression also minimizes blood flow to the liver. Because the liver metabolizes pentobarbital, when liver blood flow is drastically decreased by the cardiovascular depression, the metabolism is necessarily decreased simply because there is little blood flow bringing the pentobarbital to the liver. Any enhanced metabolism that might occur from carbamazepine would be minimized because little of the drug is getting to the liver.

8.    This overall process has been well documented in models of shock in which the actions of a wide variety of drugs used for anesthesia are affected by shock (low blood pressure): "in shock the body becomes a blood-brain circuit, at the expense of circulation to the gut, liver, and muscles" (Shafer, 2004).

9.    In addition, because 5 grams of pentobarbital would stop breathing, the inmate would develop hypoxia (low oxygen levels in tissues) which would decrease organ function, including the liver. After just a few minutes, oxygen levels in the liver would be so low that metabolic processes would cease, and the liver would effectively cease metabolizing pentobarbital. (Park, 1996; Elliot et al., 1993)

10.    Pentobarbital, like other barbiturates, produces cardiovascular depression in part by action in the central nervous system (brain, brainstem), but also by actions in the heart and periphery, contrary to what Dr. Grant has described. Thus, as the pentobarbital is getting into the brain, it is also getting into the heart and peripheral blood vessels, which leads to rapid and profound cardiovascular depression (Manders et al., 1976; Segal et al., 1986).

11.    Dr. Van Norman and Dr. Grant do not provide any quantitative analyses to support their contention that enhanced metabolism of pentobarbital by carbamazepine therapy will affect the

4

actions of pentobarbital, particularly in the setting of administration of 5 grams of pentobarbital.
A closer look at the kinetics of pentobarbital and other available data indicates that
carbamazepine will not significantly impact pentobarbital action.

12.    Brodie and colleagues (Brodie et al., 1953) showed that large doses of pentobarbital in
humans (as much as 2.5 grams) had prolonged anesthetic effects. Pentobarbital, when
administered intravenously at 12 mg/kg, produced anesthesia for 1.5-3 hours, compared to 20-40
minutes when thiopental was administered intravenously at 12 mg/kg. The authors attributed this
prolonged duration of pentobarbital to slower elimination (metabolism) and estimated the
metabolism of pentobarbital at 4% per hour, compared to 15% per hour for thiopental. An inmate
who received 5 grams pentobarbital (about 70mg/kg in a 70 kg person) according to the protocol
would be long dead before enhanced pentobarbital metabolism could have an effect.

13.    Carbamazepine therapy has been reported to have minimal effects on the metabolism and
blood levels of phenobarbitone, another barbiturate that is similar to pentobarbital in that it is
also metabolized by the liver (Eadie et al., 1977). Also, the Food and Drug Administration has
designated carbamazepine to be a "weak" inducer of CYP2C9, the main CYP enzyme that
metabolizes pentobarbital (Table 3-3 at FDA website "Drug development and drug interactions:
Table of substrates, inhibitors and inducers"[2]). Thus, there is evidence that enzyme induction by
carbamazepine is weak or minimal. Furthermore, as acknowledged by Dr. Van Norman, there
are no apparent data on the effects of carbamazepine therapy on pentobarbital blood levels
(Paragraph 13, page 4 of Dr. Van Norman's declaration dated 8-9-2020). Interestingly, Dr. Van
Norman extrapolates by citing the effects of carbamazepine therapy on phenobarbitone
metabolism, yet the paper cited by Dr. Van Norman (Pastolos et al. 2002) indicates that

---

[2] https://www.fda.gov/drugs/drug-interactions-labeling/drug-development-and-drug-interactions-table-substrates-inhibitors-and-inducers#table2-3 accessed 8-24-2020

phenobarbitone's half-life is not affected by antiepileptic drugs that induce CYP enzymes (see Table 2 in the Pastolos paper, where phenobarbitone half-life is 80-100 hours *with or without* a drug that induces CYP enzymes).

14.     The pharmacokinetic data and model of intravenous pentobarbital reported by Ehrnebo (1974) indicate that the elimination half-life of pentobarbital is 22.3 hours. Application of the Ehrnebo model and data[3] shows that even if carbamazepine *tripled* the elimination rate (clearance) of pentobarbital, with the half-life reduced to about 7 hours, pentobarbital blood levels in the first 30 minutes after administration of 5 grams pentobarbital would be at 97-99% of blood levels without carbamazepine therapy. Furthermore, this analysis does not incorporate the reduced redistribution, metabolism and elimination that would occur from the cardiovascular collapse caused by the large pentobarbital dose of 5 grams.

15.     Drs. Van Norman's declaration and Dr. Grant's declaration both contain equivocal statements regarding the effects of carbamazepine therapy on pentobarbital (emphasis added):

- "there is *virtually no* information in the literature about how CYP interactions affect pentobarbital metabolism" (Paragraph 13, page 4 of 8-9-2020 Dr. Van Norman declaration)

- carbamazepine therapy might result in a situation where there is "*possibly* loss of clinical efficacy" (Paragraph 13, page 5 of 8-9-2020 Dr. Van Norman declaration)

- carbamazepine therapy would result in a dose of pentobarbital that would be "higher by an *unpredictable* amount" (Paragraph 20, page 6 of 5-22-2020 Dr. Grant declaration)

This last statement by Dr. Grant is particularly telling. If the amount is unpredictable, one cannot draw reasonable conclusions about the impact of carbamazepine therapy on pentobarbital

---

[3] The Ehrnebo data and model were entered into a spreadsheet and the pentobarbital blood levels simulated using Ehrnebo's Equation 1:     $Cp = Ae^{-\alpha t} + Be^{-\beta t}$

metabolism. And as I have explained above the speculative impact of carbamazepine therapy on pentobarbital metabolism is nonexistent in the lethal injection setting.

<u>IMPACT OF PULMONARY EDEMA</u>

16.     Pulmonary edema and lung congestion are common findings in autopsies on humans who have died from drug overdose (Chen & de Jong, 2017; Pelltier & Andrew, 2017). It is my opinion that inmates administered 5 grams pentobarbital, a dose ten times a clinical dose, would have profound brain depression such that they would not experience sensations associated with pulmonary edema.

17.     Dr. Van Norman writes in her 8-7-2020 declaration (paragraph 10, on pages 4-5): "Peak effects of IV barbiturates are well described and occur within 2 minutes after IV injection". But the *onset* of unconsciousness occurs *before* the peak effect, especially when a large dose of pentobarbital (such as 5 grams) is administered. As I have stated before, pulmonary edema does not occur with the first 500 mg of pentobarbital,[4] as prior studies using pentobarbital and thiopental, and the vast clinical experience over decades, show that pulmonary edema is a rare complication of clinical doses of barbiturates. Also, the subjects in the Brodie (1953) study received large pentobarbital doses but did not apparently develop pulmonary edema.

18.     Dr. Van Norman engages in circular reasoning. For example, at paragraph 17, on page 7 of her 11-1-2019 declaration, she writes: "It is a virtual medical certainty that prisoners who remain aware after high-dose administration of an IV barbiturate such as pentobarbital are capable of feeling pain, terror and suffocation".  But she incorrectly links awareness with administration of high-dose pentobarbital. As I have stated before, high-dose pentobarbital

---

[4] 500 mg of pentobarbital would be a usual clinical dose that would produce unconsciousness within 20-30 seconds.

administration produces profound brain suppression (including electrical silence) and there is no evidence, nor has Dr. Van Norman cited any, that humans have awareness with such profound brain suppression.

19.     Drs. Van Norman and Edgar opine that pentobarbital produces pulmonary edema by virtue of its high pH (about 10). But, as already noted, pentobarbital and thiopental have been used clinically for decades without any documented association with lung damage or pulmonary edema. And, when administered at as much as 10 mg/kg (twice the normal induction dose), thiopental (with nearly identical actions and pH to pentobarbital) is not known to cause pulmonary edema (Wyant et al., 1957). Even if pentobarbital did cause pulmonary edema ante mortem, the subject would have been deeply anesthetized, with profound depression of the brain such that the subject would not experience the sensation associated with pulmonary edema.

20.     Dr. Van Norman has described her one experience of flash pulmonary edema occurring with one breath (paragraph 10, on page 4 of her 8-7-2020 declaration) and cites a case report.[5] But Dr. Van Norman fails to weigh her experience and the case report, which together total two patients, against the millions of patients who have safely received thiopental or pentobarbital.

21.     Frothy fluid and foam are sometimes found in humans and animals after death, and there is evidence that this froth can occur immediately prior to death (in the period from apnea to cardiac death; see Swann 1964) and after death.[6] Thus, the finding of froth in inmates who were

---

[5] Potts & Smethurst. Pleural effusion complicating thiopentone administration. Brit J Anaesth 1967; 39:78-82. The patient described in this report had severe heart disease so the presence of pulmonary edema after induction could be unrelated to thiopental.

[6] Animals (rabbits) made uremic (kidney failure) and who subsequently developed pulmonary edema were found to not only have increasing lung weights as the period between death and post mortem exam increased, but the presence of froth was found in animals that had later post mortem exams, while none was found upon immediate post mortem examination. See Acta Scandinavica Medica 1964 in References Cited

executed by lethal injection does not indicate that this froth was generated ante mortem, as proposed by Drs. Edgar and Van Norman.

22.     Post mortem froth and foam could be generated by the release of gasses from the lung tissues and interacting with the lung surfactant, a substance that, during life, keeps alveoli (small lung units, or air sacs) open. Related to this issue, Pattle (1955) wrote that "….oedema foam is thus not produced by agitation of the oedema fluid with air during respiration; it can only have been formed by air originally in the fine air spaces of the lung being broken up into bubbles and afterwards expelled into the bronchi and trachea.".[7] Thus, the post mortem finding of froth in inmates who were executed by lethal injection does not necessarily indicate that this froth was generated ante mortem, as proposed by Drs. Van Norman and Edgar.

23.     Drs. Van Norman and Edgar state that the movement of air during respiration in the presence of edema fluid produces the froth and foam found at autopsy (similar to a washing machine producing foam). Specifically, Dr. Edgar writes in his declaration dated 10-24-2019 at paragraph 79, page 20: "Put another way, the presence of froth in the airways indicates that there was continued breathing for a significant period of time after pulmonary edema had commenced…". Thus, his proposed mechanism requires that breathing is occurring after the formation of pulmonary edema.

24.     Wyant et al. (1957) showed, however, that apnea (absence of breathing) occurred after the large doses of thiopental. And, as Wyant et al. showed, and as vast clinical experience has shown, pulmonary edema is not found in patients administered thiopental or pentobarbital for induction of anesthesia. That is, the dose that causes apnea is lower than a dose that *might* cause

---

[7] Pattle was a co-discoverer of lung surfactant and his pioneering research advanced treatment on neonatal lung pathology.

pulmonary edema. This means that the presence of froth in the airways is not caused by breathing because a person executed with a 5 grams of pentobarbital will become apneic (stop breathing) well before any speculative formation of ante mortem pulmonary edema.

25.     Additionally, the dose of thiopental (about 10 mg/kg) used in the Wyant study produced apnea, as expected, and indicates the ability of barbiturates such as pentobarbital and thiopental to produce profound central nervous system depression. Furthermore, thiopental, at doses of 4-13 mg/kg injected over 1-5 minutes, causes burst suppression[8] on the electroencephalogram (EEG) (Homer & Stanski, 1985).[9] Thus, barbiturates produce profound brain depression at doses that do not cause "flash pulmonary edema".

26.     Various eyewitness accounts of breathing patterns in inmates given pentobarbital include descriptions of gasping and snoring. Barbiturates can cause upper airway collapse (similar to what occurs with sleep-induced airway collapse that leads to snoring) (Drummond, 1989). Drummond reported "Noisy breathing or airway obstruction developed in 10 [of 14] patients" who were administered thiopental.

27.     Eyewitness accounts of federal executions performed in July and August 2020 indicate no problems and support the contention that pentobarbital causes rapid unconsciousness and death:

---

[8] Burst suppression is a feature of the EEG that signifies profound brain depression. Burst suppression, which has alternating periods of EEG electrical activity and EEG electrical silence, immediately precedes total EEG electrical silence if more barbiturate is administered, as in the case of lethal injection.
[9] It is important to note that, as expected, the large doses of thiopental administered in the Homer & Stanski study did not apparently result in "flash pulmonary edema".

Hailey Fuchs writing about the execution of Daniel Lee: "Then his breaths became heavy. In just a few short moments, his chest remained still, his lips turned blue, and his fingers became ashy."[10]

Mark Berman writing about the execution of Wesley Purkey: "After Purkey's final words, the lethal drug was injected and Purkey took several deep breaths. He eventually stopped and remained motionless for several minutes before his time of death was announced."[11]

Courtney Crowder writing about the execution of Dustin Honken: "….Honken took a big breath….a few breaths…..a last breath…..his lips had turned blue and his hands had gone ashen…."[12]

Les Steed writing about the execution of Keith Nelson: "Nelson, who displayed no outward signs of pain or distress during the execution, was pronounced dead nine minutes after the injection was administered."[13]

These accounts comport with the expected action of a massive overdose of pentobarbital. In particular, Purkey demonstrated an expected response to pentobarbital: "deep breaths" followed by motionlessness.

28.     Dr. Edgar also writes that "If pentobarbital caused only respiratory depression and arrest, inmates would be expected to demonstrate only decreased movements of breathing, without

---

[10] https://www.nytimes.com/2020/07/14/us/politics/daniel-lewis-lee-execution-crime.html accessed 8-6-2020
[11] https://www.washingtonpost.com/national/wesley-purkey-execution-terre-haute-supreme-court/2020/07/16/e074dbca-c75f-11ea-b037-f9711f89ee46_story.html accessed 8-6-2020
[12] Courtney Crowder, "Whose justice was served by Iowa man's execution? Des Moines Register 7-21-2020
[13] https://nypost.com/2020/08/29/man-who-raped-killed-girl-is-5th-federal-inmate-executed-in-2020/ accessed 9-5-2020

gasping and evidence of labored or heavy breathing." (paragraph 78, page 20 of his 10-24-2019

declaration).  But Dr. Edgar ignores the literature and clinical experience of the effects of

barbiturates on breathing patterns, including those shown by Wyant et al. (1957) and the well-

known effects observed during euthanasia of pets (which often have agonal breaths). As shown

in Figure 8 of Wyant et al. (see figure below), after initiation of thiopental administration, but

prior to apnea, the tidal volumes (volume of a breath) increase, and almost double in size. These

increases in tidal volume are what are observed during pentobarbital executions as "deep

breaths".  Furthermore, the observed "gasping" could be confused with yawning, which occurs

commonly during intravenous administration of barbiturates. (Kim et al., 2000). Inmate

"snoring" that is observed in executions using pentobarbital are likely due to airway collapse, an

expected action of anesthetics.



Fig. 8
Respiratory tracing for thiopentone showing triple apnoea, the first
during injection, the second immediately following end of injection
and main period of apnoea 46 seconds later. (Scale as in fig. 1.)

29.     Dr. Van Norman relies on the study by Joachim et al. (1978) to assert that normal lungs have a weight of approximately 234 grams, on average, and that after trauma, lungs rapidly gain weight over minutes, hours and days in the surviving period prior to death. More to the point, Dr. Van Norman relies on the assertion by Joachim et al. (1978) that there was no correlation between lung weight and the interval between death and autopsy. But this statement in the Joachim et al. study is made in passing, with no actual data being reported. Most likely, the autopsies were performed at intervals of several to many hours (and perhaps days) after death, and the correlation would have been missed. For example, if lung weights increase in the 6-8 hour period after death and then remain stable (as shown by Durlacher et al. 1950—see below at paragraph 32) then performing autopsies after this 6-8 hour period would show no correlation of lung weight to the death-autopsy interval.

30.     More recent studies in humans using post-mortem computed tomography (PMCT) show that fluid accumulates in lung over time in the post-mortem period (Shiotani et al., 2011). Shiotani et al. write in their concluding paragraph: "PMCT findings of the lung are not fixed and change with the passage of time after death in accordance with progression of postmortem changes (pulmonary congestion and edema) in the corpse."

31.     Likewise, fluid accumulation in the airways increases during the post-mortem period (Ishida et al. 2014); these authors showed that fluid accumulated in the airways (main bronchi) as the interval between death and PMCT increased.  This fluid accumulation is akin to the fluid that has been found at autopsy in inmates executed with pentobarbital.

32.     Published data on how post mortem pulmonary edema and lung congestion occur and

progress is based in large part on animal studies.[14] Dr. Van Norman has also relied upon animal

studies to support her opinions related to pulmonary edema.[15]

33.     Durlacher et al. (1950) examined post mortem changes in rabbit lung after various causes

of death, including pentobarbital overdose. They found that lung weight increased as the time

between pentobarbital-induced death and autopsy increased, as shown in their table 2:

TABLE 2

EFFECT OF INTERVAL AFTER SACRIFICE BY NEMBUTAL (100 MG./KG.) ON LUNG WEIGHT

| Interval after sacrifice | Treatment | Number of animals | Lung weight per kilo $\pm$ S.E. mean |
|---|---|---|---|
| | | | Grams |
| Immediate | | 5 | 3.83 $\pm$ .27 |
| 1 hours | Cannula in trachea | 5 | 5.42 $\pm$ .58 |
| 2 hours | Cannula in trachea | 5 | 7.09 $\pm$ 1.39 |
| 3 hours | Cannula in trachea | 19 | 9.46 $\pm$ .62 |
| 4 hours | Cannula in trachea | 5 | 10.88 $\pm$ 1.53 |
| 6 hours | Cannula in trachea | 5 | 10.95 $\pm$ .74 |

Note that lung weight increased when comparing lung weight at immediate autopsy to lung

weight at 1, 2, 3, 4 and 6 hours after death, indicating that lungs can develop edema *after* death.

These researchers (and others[16]) also found that, for a variety of causes of death, lung weight

increased as the interval between death and autopsy increased (see table 1 in Durlacher et al.,

1950). These data indicate that post mortem edema formation is a generalized phenomenon and

is not specific to pentobarbital overdose. Notably in the Durlacher et al. study (their table 2

above), the ratio of the heaviest lung weights (at 6 hours) to the lung weight at immediate

---

[14] In an individual human or animal, an autopsy is done once at a specific time after death. To understand post-mortem changes, a researcher studies groups of animals. For example, in one group of animals the post mortem is done immediately after death, in another group the post mortem is done 1 hour after death, in a third group 2 hours after death, and so forth. See Durlacher et al. (1950)

[15] See Dr. Van Norman's citation in footnote #73, on page 33 of her first declaration (dated 11-1-2019): Stone CA, Loew ER. Effect of various drugs on epinephrine-induced pulmonary edema in rabbits. Proc Soc Exp Biol Med 1949; 71:122-6 and her statement in the same declaration at paragraph 72, on page 36: "Experience in humans and animal models indicate that flash pulmonary edema occurs virtually immediately during and after high-dose barbiturate injection, and well within a time frame before peak drug effects on the brain have occurred."

[16] See Acta Scandinavica Medica 1964 in References Cited

autopsy is 2.86 (10.95/3.83), which is in the range of that described by Dr. Van Norman

("minimum of 2.5 times normal weight to a maximum of almost 4 times normal total weight"—

paragraph 17 on page 7 of her 8-7-2020 declaration). Thus, the animal data indicate that all of

the pulmonary edema in inmates executed with pentobarbital can be generated post-mortem.

34.     Symptoms of pulmonary edema vary, and many people with pulmonary edema are

asymptomatic. Large portions of patients with pulmonary edema due to renal failure, re-

expansion pulmonary edema and high-altitude pulmonary edema report no symptoms

(Mallamaci et al., 2010; Enia et al., 2013; Marino et al., 2015; Bouzat P et al., 2013; Devine

2014; Kim et al., 2009; Baik et al., 2010).  These data indicate that pulmonary edema and lung

congestion do not necessarily go hand-in-hand with sensations of breathlessness.

35.     As indicated in the attached injection log provided by the DOJ, the pentobarbital injection

times were approximately 5, 4 and 4 minutes for the executions of Lee, Purkey and Honken,

respectively, based on the initiation of the pentobarbital injections and when the saline flush

injections commenced. The estimated time between when the pentobarbital infusion starts and

when the inmate becomes unconscious is about 125-135 sec, or a little over 2 minutes.

36.     A volume of 100 ml (two 50 ml syringes of pentobarbital) injected over 4 minutes

corresponds to an injection rate of 0.41 ml/second (100 ml/240 seconds). The volume of the IV

tubing between where the pentobarbital is injected into the IV tubing and the entry of the tubing

into the inmate is reported as 37 ml (the "dead space"). Thus, after the pentobarbital infusion

begins, it takes about 90 seconds before the first pentobarbital gets into the inmate (37

ml/0.41ml/sec = 90 seconds). It takes another 15-18 seconds for the "induction dose" to get into

the inmate (assuming 4.5mg/kg, a weight of 75 kg = 338 mg, and based on pentobarbital

concentration 50 mg/ml: 338 mg/ml/50mg/ml = 6.75 ml needs to be injected, which takes 16

seconds (6.75 ml/0.41 ml/second = 16 seconds). Once the induction dose is in, it takes another

20 to 30 seconds for unconsciousness to occur, so the total time between the initiation of

pentobarbital injection and when the inmate would start to become unconscious is about 125-135

seconds (90 sec + 16 sec + 20 to 30 sec).

<u>CONCLUSION</u>

37.     It is my opinion to a medical certainty that carbamazepine will not significantly affect the

actions of pentobarbital and that an inmate administered 5 grams of pentobabrital will become

rapidly unconscious and will not experience the sensation of any pulmonary edema that might

occur before death.

Date: September 11, 2020

_____

Joseph F. Antognini, M.D., M.B.A.

16

 References Cited

Acta Medica Scandinavica. Control Material. Acta Medica Scandinavica 1964; 176 (s418):29-40.

Baik JH et al. High-resolution CT findings of re-expansion pulmonary edema. Korean J Radiology 2010; 11:164-168

Bouzat P, et al. Time course of asymptomatic interstitial pulmonary oedema at high altitude. Resp Physiol Neurobiol 2013; 186:16-21

Brodie BB, Burns JJ, Mark LC, Lief PA, Bernstein E, Papper EM. The fate of pentobarbital in man and dog and a method for its estimation in biological material. J Pharmacol Rxp Ther 1953; 109:26-34

Chen HI, deJong J. Increased lung weights in drug-related fatalities. J Forensic Sciences 2017; 62:1632-4

Devine MD et al. Asymptomatic re-expansion pulmonary oedema with bilateral infiltrates. PostgradMed J 2014; 90:300-301

Drummond GB. Influence of thiopentone on upper airway muscles. Brit J Anaesth 1989; 63:12-21.

Durlacher SH, Banfield WG, Bergner AD. Post-mortem pulmonary edema. Yale J Biol Med 1950; 22:565-72.

Eadie MJ, Lander CM, Hooper WD, Tyrer JH. Factors influencing plasma phenobarbitone levels in epileptic patients. Brit J Clin Pharmacol 1977; 4:541-547

Ehrnebo M. Pharmacokinetics and distribution properties in humans following oral and intravenous administration. J Pharmaceutical Sciences 1974; 63:1114-18

Elliot SL, et al. The effect of hypoxia on propranolol clearance during antegrade and retrograde flow in the isolated perfused rat liver preparation. Biochemical Pharmacology 1993; 45:573-78

Enia G, et al. Asymptomatic pulmonary congestion and physical functioning in hemodialysis patients. Clin J American Soc Nephrology 2013; 8:1343-48

Homer TD, Stanski DR. The effect of increasing age on thiopental disposition and anesthetic requirement. Anesthesiology 1985; 62:714-24.

Ishida M, Gonoi W, Hagigawa K, et al. Fluid in the airway of nontraumatic death on postmortem computed tomography. Am J Forensic Med Path 2014; 35:113-17

Joachim H, Riede UN, Mittermayer C. The weight of human lungs as a diagnostic criterium. Path Res Pract 1978; 162:24-40

Kim DW, Joo JD, Kil HY. Can yawning be used as an indicator of induction of anesthesia? Korean J Anesthesiol 2000; 39:S1-S6.

Kim et al. New classification and clinical characteristics of reexpansion pulmonary edema after treatment of spontaneous pneumothorax. Am J Emerg Med 2009; 27:961-67

Mallamaci F et al. Detection of pulmonary congestion by chest ultrasound in dialysis patients. JACC: Cardiovascular Imaging 2010; 3:586-94

Manders WT, Vatner SF. Effects of sodium pentobarbital anesthesia on left ventricular function and distribution of cardiac output in dogs, with particular reference to the mechanism of tachycardia. Circulation Research 1976; 39:512-17

Marino F, et al. Subclinical pulmonary congestion is prevalent in nephrotic syndrome. Kidney International 2016; 89:421-28

Park GR. Molecular mechanisms of drug metabolism in the critically ill. British J Anaesthesia 1996; 77:32-49

Pasatolos PN, et al. The importance of drug interactions in epilepsy therapy. Epilepsia 2002; 43:365-85

Pattle RE. Properties, function and origin of the alveolar lining layer. Nature 1955; 175: 1125-26

Pelltier DE, Andrew TA. Common findings and predictive measures of opioid overdoses. Academic Forensic Pathology 2017; 7:91-98.

Segal L, Rendig SV. Sodium pentobarbital effects on cardiac function and response to dobutamine. J Cardiovasc Pharmacol 1986; 8:392-97

Shafer SL. Shock values. Anesthesiology 2004; 101:567-8.

Shiotani S, Kobayashi T, Hayakawa H, Kikuchi K, Kohno M. Postmortem pulmonary edema: A comparison between immediate and delayed postmortem computed tomography. Legal Medicine 2011; 13:151-55

Swann HE. The development of pulmonary edema during the agonal period of sudden asphyxia deaths. J Forensic Sciences 1964; 9:360-73

Wyant GM, Dobkin AB, Aasheim GM. Comparison of seven intravenous anaesthetic agents in man. Brit J Anaesthesia 1957; 29:194-209

# EXHIBIT A

FEDERAL LETHAL SUBSTANCE INJECTION CHECKLIST (TBD)                              PAGE 1 OF 2

DATE: _07/14/20_____          Inmate: _____559_____

IV (s) site: _Hand Brachial_ (Infiltrate) _____

Inserted and determined to be patent by: ___34_____          Time: _4:16 AM - infiltrate_ / _3:52 AM___

| Syringe # | Contents | Prepared by | Witness | Administered or disposed by | Time: | Witness |
|-----------|----------|-------------|---------|-----------------------------|-------|---------|
| 1 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 12 | 7:48 AM | 11 |
| 2 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 43 |  | 11 |
| 3 A | 60 mL saline flush | 11 | 44 | 35 | 7:53 AM | 11 |

X EXECUTION                    Γ EXECUTION PRACTICE

FEDERAL LETHAL SUBSTANCE INJECTION CHECKLIST (TBD)                    PAGE 1 OF 2

DATE: _07/16/20_____                    Inmate: _____560_____

IV (s) site: _Hand_____

Inserted and determined to be patent by: _____34_____        Time: _7:46 AM_____

| Syringe # | Contents | Prepared by | Witness | Administered or disposed by | Time: | Witness |
|-----------|----------|-------------|---------|-----------------------------|-------|---------|
| 1 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 43 | 7:58 AM | 11 |
| 2 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 34 |  | 11 |
| 3 A | 60 mL saline flush | 11 | 44 | 35 | 8:02 AM | 11 |

✗ EXECUTION                    Γ  EXECUTION PRACTICE

FEDERAL LETHAL SUBSTANCE INJECTION CHECKLIST (TBD)                    PAGE 1 OF 2

DATE: 7/17/20                          Inmate: 561

IV (s) site: Brachial

Inserted and determined to be patent by: 35                    Time: 3:44 PM

| Syringe # | Contents | Prepared by | Witness | Administered or disposed by | Time: | Witness |
|---|---|---|---|---|---|---|
| 1 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 34 | 4:06 PM | 11 |
| 2 A | 2.5 grams Pentobarbital Sodium in 50 mL diluent | 11 | 44 | 35 | ▓ | 11 |
| 3 A | 60 mL saline flush | 11 | 44 | 12 | 4:10 PM | 11 |

✗  EXECUTION                    Γ   EXECUTION PRACTICE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2020, I caused a true and correct copy of

foregoing to be served on all following counsel of record via the Court's CM/ECF system.

Joshua C. Toll (D.C. Bar No. 463073)
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 737-8616
jtoll@kslaw.com

Margaret O'Donnell
P.O. Box 4815
Frankfort, KY 40604
(502) 320-1837
mod@dcr.net

*Counsel for Plaintiff Anthony Battle*


Ginger D. Anders (D.C. Bar No. 494471)
Jonathan S. Meltzer (D.C. Bar No. 888166546)
Brendan Gants (D.C. Bar No. 1031419)
Munger, Tolles & Olson LLP
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
(202) 220-1100
ginger.anders@mto.com

*Counsel for Plaintiff Brandon Bernard*


Alex Kursman, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
alex_kursman@fd.org

*Counsel for Plaintiff Alfred Bourgeois*


Joseph Luby, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
 601 Walnut Street, Suite 545 West
Philadelphia, PA 19106

Telephone - 215-928-0520
Email – joseph_luby@fd.org

*Counsel for Plaintiff Chadrick Fulks*


Amy Lentz (DC Bar No. 990095)
Steptoe & Johnson, LLP
1300 Connecticut Avenue NW
Washington, DC 20036
202.429.1320
alentz@stepoe.com

*Counsel for Plaintiff Orlando Hall*


Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Higgs*

Scott W. Braden (Ark. Bar Number 2007123)
Assistant Federal Defender
Arkansas Federal Defender Office
Ark Bar Number 2007123
1401 West Capitol, Suite 490
Little Rock, Arkansas 72201
(501) 324-6114
Scott_Braden@fd.org

Jennifer Ying (DE #5550)
Andrew Moshos (DE #6685)
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market St.
P.O. Box 1347
Wilmington, Delaware 19801
(302) 658-9300
jying@mnat.com
amoshos@mnat.com


*Counsel for Plaintiff Norris G. Holder, Jr.*


Jon Jeffress
KaiserDillon PLLC

1099 14th Street NW
8th Floor West
Washington, DC 20005
(202) 640-2850
jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520
timothy_kane@fd.org
shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Lee Honken*

Donald P. Salzman (D.C. Bar No. 479775)
Charles F. Walker (D.C. Bar No. 427025)
Steven M. Albertson (D.C. Bar No. 496249)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Plaintiff Corey Johnson*

Gregory S. Smith
913 East Capital Street, SE
Washington, D.C. 20003
(202) 460-3381
(877) 809-9113 (fax)
gregsmithlaw@verizon.net

*Counsel for Plaintiff William Emmet LeCroy*

David S. Victorson
Hogan Lovells US LLP
Columbia Square
555 13th Street NW
Washington, DC  20004
(202) 637-5600
(202) 637-5910 (fax)
david.victorson@hoganlovells.com

Pieter Van Tol (admitted *pro hac vice*)
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

*Counsel for Plaintiff Daniel Lewis Lee*

Dale A. Baich (pro hac vice)
Jennifer M. Moreno
Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602-382-2816
602-889-3960 (fax)
dale_baich@fd.org
jennifer_moreno@fd.org

*Counsel for Plaintiff Keith Nelson*


Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
timothy_kane@fd.org
shawn_nolan@fd.org

Gary E. Proctor
Law Offices of Gary E. Proctor, LLC
8 East Mulberry Street
Baltimore, MD 21202
(410) 444-1500
(443) 836-9162 (fax)
garyeproctor@gmail.com

*Counsel for Plaintiff Jeffrey Paul*


Alan E. Schoenfeld (admitted *pro hac vice*)
Ryan M. Chabot (admitted *pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8880

Alan.Schoenfeld@WilmerHale.com
Ryan.Chabot@WilmerHale.com

Andres C. Salinas (DC Bar No. 156118)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6289
Andres.Salinas@WilmerHale.com

*Counsel for Wesley I. Purkey*

Paul F. Enzinna (D.C. Bar No. 421819)
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
(202)753-5553
penzinna@ellermanenzinna.com

*Counsel for Plaintiff James H. Roane, Jr.*

Amy Karlin, Interim Federal Public Defender
Celeste Bacchi
Jonathan C. Aminoff
Deputy Federal Public Defenders
321 E. Second Street
Los Angeles, CA 90012
(213) 894-2854
celeste_bacchi@fd.org

*Counsel for Plaintiff Julius O. Robinson*

Gerald W. King, Jr. (Ga. Bar No. 140981)
Jeffrey Lyn Ertel (Ga. Bar No. 249966)
Federal Defender Program, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
(404) 688-7530
(404) 688-0768 (fax)
Gerald_King@fd.org
Jeff_Ertel@fd.org

Brandon D. Almond
Troutman Sanders LLP
401 9th Street, NW
Suite 1000

Washington, D.C. 20004
(202) 274-2864
(202) 274-2994
brandon.almond@troutmansanders.com
*Counsel for Richard Tipton, III*

Michael F. Williams
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 389-5123
(202) 389-5200 (fax)
michael.williams@kirkland.com


*Counsel for Christopher Andre Vialva*


Evan Miller (DC Bar No. 219310)
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6605
(202) 478-1815 (fax)
emiller@velaw.com

*Counsel for Bruce Webster*


　　　　　 /s/Jean Lin
Attorney for Defendants