# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____<br><br>In the Matter of the<br>Federal Bureau of Prisons'<br>Execution Protocol Cases<br><br>LEAD CASE: _Roane et al. v. Barr_<br><br><br>THIS DOCUMENT<br>RELATES TO:<br><br>_Holder v. Barr, et al._, 19-cv-3520 (TSC) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.    19-mc-0145 (TSC) |

## PLAINTIFF NORRIS G. HOLDER, JR.'S SUPPLEMENT TO THE CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................II

I.      INTRODUCTION ............................................................................................1

II.     ARGUMENT ...................................................................................................2

        A.      Defendants confuse the applicable legal standard………… ......................2

        B.      Defendants' declarations fail to rebut Mr. Holder's showing
                of irreparable injury and lack credibility ......................................................3

        C.      If an evidentiary hearing is required, the Court should enjoin
                Defendants from scheduling Mr. Holder's execution until
                the issues are resolved................................................................................7

III.    CONCLUSION.................................................................................................9

## TABLE OF AUTHORITIES

Page

Cases

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ..............................................................................4, 8

*Ctr. for Biological Diversity v. Ross*,
  No. 18-112 (JEB), 2020 WL 4816458 (D.D.C. Aug. 19, 2020)................................2

*Doe v. Mattis*,
  928 F.3d 1 (D.C. Cir. 2019) ....................................................................................2

*In re: Ohio Execution Protocol Litig. (Henness) ('Henness I')*,
  2019 U.S. Dist. LEXIS 8200 (S.D. Ohio Jan. 14, 2019) (Merz, Mag. J.) ...............7

*In re: Ohio Execution Protocol Litig.*,
  No. 11-1016-EAS-MRM (S.D. Ohio Jan. 27, 2020) ...............................................7

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010).................................................................................................2

*Winter v. Nat. Resources Def. Council, Inc.*,
  555 U.S. 7 (2008).....................................................................................................7

**Other Authorities**

Shafer SL, *Shock Values* ..............................................................................................5

## I.      INTRODUCTION

Plaintiff Norris G. Holder, Jr. ("Mr. Holder") joins the consolidated Plaintiffs' reply in full, as it thoroughly addresses the issues common to all plaintiffs.   Mr. Holder submits this supplemental reply in regard to the particularized harm he is at risk of suffering as a result of Defendants' undisputed violation of the Food, Drug, and Cosmetics Act ("FDCA").

Defendants oppose Mr. Holder's assertion of irreparable injury, claiming that  the risks he identifies due to the potential adverse interaction between his prescribed anti-convulsant medication and  pentobarbital are "purely speculative."  Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and Permanent Injunction ("Opposition"), ECF No. 246 at 10.  The support for Defendants' argument rests on the declarations of two experts: Dr. Kendall Von Crowns ("Dr. Von Crowns") and Dr. Joseph Antognini ("Dr. Antognini").  Defendants' declarations, however, do not credibly rebut Mr. Holder's showing that Defendants' failure to comply with the FDCA's prescription requirement is likely to cause him irreparable injury.  *See* Additional Supplemental Report of Gail A. Van Norman, M.D., Ex. A.  Accordingly, Mr Holder respectfully requests that the Court enter summary judgment and a permanent injunction in his favor.

Arguably, by belatedly submitting expert declarations in opposition to the several expert declarations previously provided by Plaintiffs, including specifically by Mr. Holder (*see* ECF Nos. 94-1, 186-1), Defendants have attempted to create a "battle of the experts" situation.  But because, as discussed more fully below, Defendants' declarations fail to rebut Mr. Holder's showing of irreparable injury, this Court can and should permanently enjoin Defendants from executing Mr. Holder in violation of the FDCA.  Indeed, at a minimum, Defendants' declarations preclude resolution of this claim *against* Mr. Holder without an evidentiary hearing.  And to the extent this Court determines that a hearing is warranted, it should maintain the status quo by enjoining

Defendants from setting an execution date for Mr. Holder until such a hearing has been conducted and the issues have been resolved.

## II.     ARGUMENT

Again, Mr. Holder fully joins in the consolidated Plaintiffs' reply ("Consol. Rep.", ECF No. 248); he writes separately only to address Defendants' response to his particularized showing of irreparable injury.

### A.     Defendants confuse the applicable legal standard.

As the consolidated Plaintiffs explain in detail, Defendants improperly conflate the standard required for showing irreparable harm on a permanent  injunction with that needed to prevail on an Eighth Amendment claim. (Consol. Rep. at 2-3).  Under the applicable legal standard, Mr. Holder has established the requisite risk of irreparable injury to warrant a permanent injunction.

While the traditional recitation of the permanent injunction factors is in the past tense, irreparable harm may include future harm. *See Ctr. for Biological Diversity v. Ross*, No. 18-112 (JEB), 2020 WL 4816458, at *9 (D.D.C. Aug. 19, 2020); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010) (considering whether future irreparable harm will occur).  Both the Supreme Court and this district have recognized that the standard for showing future irreparable harm is a likelihood, and not a guarantee.  *See Monsanto*, 561 U.S. at 162 ("[A] permanent injunction is not now needed to guard against any present or imminent risk of *likely* irreparable harm.") (emphasis added); *Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019) (applying a "likely to suffer irreparable harm" standard to a permanent injunction).  Mr. Holder therefore need not definitively prove that he has suffered or will suffer irreparable harm, only that such harm is likely absent injunctive relief.  Mr. Holder has made this showing through the expert declarations of Drs. Grant and Van Norman, which establish that because of the metabolic interaction between

- 2 -

his prescribed medication and pentobarbital, he faces a risk of surviving an execution attempt under the 2019 Protocol while suffering brain damage, experiencing a prolonged execution under the 2019 Protocol, and/or suffering the excruciating pain and terror of flash pulmonary edema while sensate.

**B.     Defendants' declarations fail to rebut Mr. Holder's showing of irreparable injury and lack credibility.**

Further, Defendants fail to credibly rebut Mr. Holder's showing regarding that risk of irreparable injury.  Dating to his initial complaint challenging the 2019 Protocol, Mr. Holder has asserted that he faces a particularized risk of pain and suffering due to the metabolic interaction between his prescribed anti-convulsant medication and the pentobarbital Defendants plan to use to execute him.  He submitted the expert declarations of Dr. Arthur Grant and Dr. Gail Van Norman in support of his Supplemental Amended Complaint and his Supplemental Opposition to Defendants' Motion to Dismiss. (ECF Nos. 94-1, 186-1).  Defendants did not offer any expert testimony to counter these assertions in their responses to Mr. Holder's prior filings.  At this late date, however, Defendants now submit the declarations of Drs. Van Crowns and Antognini, neither of which rebuts Mr. Holder's assertions of harm.

Dr. Von Crowns does not indicate that he reviewed the declaration of Dr. Grant that supports Mr. Holder's allegations.  And Dr. Von Crowns' declaration does not address Mr. Holder's specific claims of harm; he simply opines on pentobarbital and pulmonary edema in general.  *See* ECF No. 246-1.  His declaration fails to consider and account for the details of Dr. Van Norman's August 9th declaration regarding the specific risk to Mr. Holder (ECF No. 186-1) and does not even mention Dr. Grant or his declaration (ECF No. 94-1).  And Dr. Von Crowns *agrees* with Dr. Van Norman – as he must, based on scientific fact – that pulmonary edema precedes death.  ECF No. 246-1 ¶ 4, Ex. A ¶ 13. Thus, Dr. Von Crowns's declaration does not

rebut the declarations and record evidence that support Mr. Holder's claims and establish the risk of irreparable injury to him from Defendants' FDCA violation.

Dr. Von Crowns' declaration is also not credible.  *See* Ex. A ¶¶ 10-19.  Dr. Von Crowns' statements concerning pentobarbital's action are misleading because the clinical action lasts minutes, not hours as Dr. Von Crowns' opines.  Ex. A ¶ 10.  His discussion of animal studies and euthanasia are irrelevant, because study of animal consciousness is impossible and the administration of substances for assisted suicide occurs under circumstances that cannot be analogized to that of lethal injection.  Ex. A ¶¶ 11-12.  Dr. Von Crowns also confounds unresponsiveness and unconsciousness, ignoring the evidence that persons injected with drugs similar to pentobarbital never lose consciousness to strong stimuli.  Ex. A ¶ 19.

Dr. Antognini, for his part, is simply not a credible witness.  The district court may disregard expert declarations at summary judgment that it finds are not reliable in consideration of the report itself and the record.  *Cf. Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (an injunction may be supported if the certifications are discredited).  Dr. Antognini's declaration is not credible because it relies on outdated studies and citations that do not accurately reflect the general scientific consensus today.  *See* Ex. A ¶¶ 20-39.  This Court therefore should not credit Dr. Antognini's declaration (ECF No. 246-2), especially as it relates to Mr. Holder's showing of irreparable injury.

Paragraphs 4-15 of Dr. Antognini's declaration address Mr. Holder's individual claim of harm due to the interaction of his prescribed anti-epileptic medication, carbamazepine, and pentobarbital.  The first substantive sentence of Dr. Antognini's declaration undermines his findings.  Dr. Antognini begins by discussing activity of pentobarbital at clinical doses (ECF No. 246-2 ¶4) rather than the dose in the 2019 Protocol.

Dr. Antognini does not support his assertions with citations to peer reviewed papers that reflect the current scientific understanding or the consensus among experts in the field.  Ex. A ¶¶ 28-32, 34-37.  Rather, he relies on outdated science.  For example, Dr. Antognini cites to Shafer, 2004 in support of his opinion that pentobarbital administration will be accompanied by a "cardiovascular depression" and decreased blood flow. ECF No. 246-2 ¶¶ 7-8.  Shafer 2004, however, is a one and a quarter page "editorial view," not a rigorous scientific publication.  *See* Shafer SL, *Shock Values*, Anesthesiology, 101:567-8 (2004).  As Dr. Van Norman explains, this brief article also fails to support Dr. Antognini's opinions.  Ex. A ¶¶ 28.

Shafer's 16-year-old piece is also the most current source on which Dr. Antognini relies to support his opinion.  His other cited authorities date back at least 24 years, and at most 67 years.  *See* ECF No. 246-2 ¶¶ 4-15 (citing Park 1996, Elliott 1993, Manders 1976, Segal 1986, Brodie 1953, Eadie 1977, and Ehrnebo 1974).   In contrast, Dr. Van Norman relies on far more recent studies that reflect the current understanding of the scientific community on these issues. *See* ECF No. 186-1 ¶¶ 9-17 nn.1-16 (identifying sources dating from 2002 to 2020).

In her supplemental declaration provided with this reply, Dr. Van Norman explains in detail, for each of Dr. Antognini's sources, precisely why it is outdated, irrelevant, or misleading.  Ex. A ¶¶ 28-32, 34-37.  For example, in support of his assertion that pulmonary edema is asymptomatic Dr. Antognini cites to studies in which the patients did not even have pulmonary edema (Ex. A ¶ 37).  Dr. Antognini's citations to studies of reduced metabolism during hypoxia and cardiac effects relate to observations in animals more than 25 years ago, and offer no support for his assertions.  *See* Ex. A ¶¶ 29-30.  Other studies on which he relies were never validated (Ex. A ¶ 31) or have since been "supplanted by many more modern studies that do show significant

interactions between barbiturates and [carbamazepine]" (Ex. A ¶ 32). Dr. Antognini also mischaracterizes the studies cited by Dr. Van Norman. Ex. A ¶ 33-34.

Dr. Antognini's claimed disagreement with Dr. Grant and Dr. Van Norman about the analgesic properties of pentobarbital has no basis in science. Dr. Antognini states, essentially without support, that pentobarbital has anesthetic effects (ECF No. 246-2 ¶12). He also opines that an individual given a dose of pentobarbital in the amount provided by the 2019 Protocol could not maintain awareness (ECF No. 246-2 ¶18) but does not cite any support for that statement. In contrast, Dr. Grant opines that "barbiturates, including pentobarbital, do not have analgesic properties and are not used for pain control." (ECF No. 94-1 ¶24). Similarly, Dr. Van Norman has explained the difference between consciousness and unresponsiveness. ECF No. 24 ¶15. Dr. Van Norman opines that Mr. Holder would likely retain consciousness, even if unresponsive, and experience pain from pulmonary edema if executed according to the 2019 Protocol ( ECF No. 186-1 ¶19). She explains that Dr. Antognini consistently makes the mistake of conflating "unresponsiveness" with "unconsciousness" (Ex. A ¶¶ 26).

Dr. Antognini's declaration is further not credible because he inaccurately describes the effects of pentobarbital and the role of metabolism in pentobarbital clearance. Ex. A ¶¶ 20-24. Dr. Antognini incorrectly opines that the injected pentobarbital goes straight to the brain and only to the liver after all of it has first traveled to the brain. Ex. A ¶ 22. He also misstates the time needed for pentobarbital clearance; in reality, in less than the time required to complete an execution, one-fifth of the drug will have been metabolized. Ex. A ¶¶ 23-24. Because he takes carbamazepine, Mr. Holder's induced enzymes would clear pentobarbital even faster, creating the risks of irreparable injury his experts have identified. Ex. A ¶ 25. Moreover, Dr. Antognini uses

the general term for shock, or cardiovascular collapse, in his declaration without evidentiary support. Ex. A ¶¶ 21, 27

Dr. Antognini's lack of scientific credibility has led courts in other litigation related to lethal injection challenges to disregard his opinions. *See In re: Ohio Execution Protocol Litig.*, No. 11-1016-EAS-MRM, ECF No. 2730, at 4 (S.D. Ohio Jan. 27, 2020) ("There is no indication that this Court or any other has been "distracted" by Dr. Antognini's opinions, as it has consistently given little or no weight to his reports or testimony in this consolidated litigation."), *id.* at 5 ("[T]his Court has repeatedly rejected Dr. Antognini's opinion."). Dr. Antognini's opinions have been characterized as "an outlier in the field of anesthesiology". *See, e.g., In re: Ohio Execution Protocol Litig. (Henness) ('Henness I'),* 2019 U.S. Dist. LEXIS 8200, at *224 (S.D. Ohio Jan. 14, 2019) (Merz, Mag. J.). Similarly here, the Court may consider the record evidence and discredit Dr. Antognini's opinions as unreliable outliers, insufficient to rebut Mr. Holder's evidence and claims.

Given the lack of credibility of Drs. Van Crowns and Antognini and their failure to rebut Mr. Holder's showing of irreparable injury, this Court should reject Defendants' late-stage attempt to create a factual dispute. Notwithstanding, should the Court be inclined to credit Defendants' new declarations, then Mr. Holder agrees with Defendants' new assertion that an evidentiary hearing is warranted.

## C.   If an evidentiary hearing is required, the Court should enjoin Defendants from scheduling Mr. Holder's execution until the issues are resolved.

As the consolidated Plaintiffs assert, this Court can and should still grant summary judgment on the FDCA claim. Any factual dispute generated by Defendants' response goes only to the issue of the appropriate remedy for that legal violation. The court's decision to grant or deny

injunctive relief is discretionary.  *Winter v. Nat. Resources Def. Council, Inc*., 555 U.S. 7, 32 (2008).

As explained above, this Court may credit Mr. Holder's experts at this stage after a finding that Defendants' experts are not reliable and may enter a permanent injunction on that basis.  *Cf. Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (an injunction may be supported if the certifications are discredited).  If the Court does conclude that a genuine issue of material fact exists as to whether the FDCA violation will irreparably harm Mr. Holder, then an evidentiary hearing is required.  *Id.*

In the event the Court decides that an evidentiary hearing is necessary to resolve the conflicting expert testimony, Mr. Holder respectfully requests the Court temporarily enjoin defendants from setting an execution date for him before such a hearing can be held and the issues resolved.  Mr. Holder originally advanced his claims of individualized harm in November 2019 (ECF No. 228 ¶¶ 7-8), and submitted his supporting expert declarations in June (ECF No. 94-1), and August 2020 (ECF No. 186-1).  The government did not provide any countervailing expert testimony together with either its motion to dismiss the consolidated Amended Complaint (in which it did not even mention Mr. Holder's claims) or its answer to Mr. Holder's specific allegations. Were the government to set an execution date for Mr. Holder, it would force the hasty adjudication of his claims under the heightened standard applicable to warrant-stage litigation, effectively enabling Defendants to evade review despite the substantial showing of irreparable injury Mr. Holder has made. It would not be in either the public interest or the interest of equity to allow Mr. Holder to be executed before the claims he has diligently asserted can be fully and fairly resolved.

### III.    CONCLUSION

For all of the reasons set forth above, in the consolidated Plaintiffs' Motion for Partial Summary Judgment (ECF No. 236), in Mr. Holder's Supplement Statement (ECF No. 237), and in the consolidated Plaintiffs' reply (ECF No. 248), this Court should grant summary judgment in his favor on Claim XI in the Consolidated Amended Complaint and should grant him a permanent injunction precluding his execution in violation of the FDCA.   In the alternative, Mr. Holder respectfully requests that the Court enjoin Defendants from setting an execution date for him until a hearing on the conflicting expert opinions regarding his risk of irreparable injury due to Defendants' FDCA violation can be held and the court has resolved the issue on the merits.

Dated:   September 15, 2020                    Respectfully submitted,

                                               */s/ Scott W. Braden*

                                               Scott W. Braden
                                               Assistant Federal Defender
                                               Arkansas Federal Defender Office
                                               Ark Bar Number 2007123
                                               1401 West Capitol, Suite 490
                                               Little Rock, Arkansas 72201
                                               (501) 324-6114
                                               Scott_Braden@fd.org

                                               Jennifer Ying (DE #5550)
                                               Andrew Moshos (DE #6685)
                                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                               1201 N. Market St.
                                               P.O. Box 1347
                                               Wilmington, Delaware 19801
                                               (302) 658-9300
                                               jying@mnat.com
                                               amoshos@mnat.com

                                               Counsel for Plaintiff Norris G. Holder, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system. Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record. The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of
Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of
Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Email: gerald_king@fd.org

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Email: john.beck@hoganlovells.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

Dated:  September 15, 2020

/s/ Scott W. Braden
Scott W. Braden
Assistant Federal Defender
Arkansas Federal Defender Office
Ark Bar Number 2007123
1401 West Capitol, Suite 490
Little Rock, Arkansas 72201
(501) 324-6114
Scott_Braden@fd.org

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |  |
|---|---|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases | ) ) ) ) | | |
| LEAD CASE: *Roane et al. v. Barr* | ) ) ) ) ) | Case No. | 19-mc-0145 (TSC) |
| THIS DOCUMENT RELATES TO: | ) ) ) | | |
| *Holder v. Barr, et al.*, 19-cv-3520 (TSC) | ) ) | | |

## <u>ADDITIONAL SUPPLEMENTAL REPORT OF GAIL A. VAN NORMAN, M.D.</u>

## INTRODUCTION

1.    On November 1, 2019, I provided Plaintiff's counsel with my opinions regarding the Federal Execution Protocol in a declaration that included detailed discussion and cited evidence.  On June 29, 2020 I provided a supplemental expert declaration addressing specific questions regarding flash pulmonary edema in prisoners executed by IV administration of 5 grams of pentobarbital.  I also provided a secondary supplemental declaration to the Court dated August 7, 2020 for the case of Nelson v. Barr, addressing findings of pulmonary edema following the execution of Wesley Purkey on July 16, 2020. Counsel have provided me now with the declaration of Kendall Von Crowns MD dated August 10, 2020 and a second supplemental report of Joseph F. Antognini MD dated September 11, 2020.

2.    Counsel asked me to comment on 1) the declarations of Kendall Von Crowns, MD and Joseph F. Antognini MD, 2) the question of possible effects of chronic administration of carbamazepine (CBZ), an anti-seizure medication on the pharmacological and clinical effects of pentobarbital, the drug designated by the Federal Protocol as a solo drug for judicial lethal injection, and 3) the significance of these interactions during judicial lethal injection as described by the Federal Execution Protocol and 4) my opinion regarding the role that various elements of the execution apparatus may play in the effects of pentobarbital during judicial lethal injection.

3.    In addition to the materials listed in my Expert Declaration dated November 1, 2019, and in my previous Supplemental Reports dated June 29, 2020 and August 7, 2020, I have further reviewed and relied upon the following materials:

- A file detailing the execution apparatus:  syringes, IV bags, IV tubing, IV ports, including measurements, and photographs.

- The Declaration of Kendall Von Crowns MD, dated August 10, 2020, and the materials cited therein.

- The Second Supplemental Declaration of Joseph F. Antognini MD, dated September 11, 2020, and the materials cited therein.

- Various authoritative textbooks, peer-reviewed articles, materials from government regulatory agencies such as the FDA, and other publications and materials as included in the references cited throughout this declaration

4.   As stated previously, if additional documents or materials are provided to me for specific review and analysis, or if I become aware of other scientific or clinical evidence that impacts my opinions, or if in attendance at any hearings or trials in this case I learn of relevant evidence, I may choose to modify these opinions accordingly.

5.   To aid counsel and the Court, I will summarize some of my previous conclusions in this declaration, in addition to addressing counsel's questions.  I will also review problematic aspects of the aforementioned reports of Drs. Von Crowns and Antognini.

**<u>SUMMARY OF OPINIONS FOR THE PURPOSE OF THIS REPORT</u>**

6.   At this time, autopsies of **all** prisoners executed by lethal injection with pentobarbital, including Wesley Purkey, in which the lungs were properly examined and documented, have demonstrated the presence of flash pulmonary edema, a well-known complication of barbiturate poisoning.

7.      There is no credible evidence that flash pulmonary edema occurs postmortem in persons who do not have fluid in the airways prior to death.  Pulmonary edema is a well-known complication of barbiturate poisoning, and the only reasonable theory about the causes of pulmonary edema  have for decades been a combination of any or all of the following:   1) drug mediated left ventricular heart failure, 2) caustic injury to capillaries in the lungs with leakage of fluid into the air cavities of the lungs, and 3) airway obstruction in the setting of continued respiratory efforts causing negative pressure in the chest cavity.

8.      Flash pulmonary edema, which develops within moments, even prior to peak barbiturate levels in the brain, is accompanied by excruciating symptoms of drowning:  shortness of breath, anxiety, terror, and panic.

9.      Mr. Norris Holder suffers from epilepsy, which has resulted in grand mal, generalized seizure activity.  He has been prescribed antiepilepsy drug (AED) therapy since 2017, and has been taking carbamazepine (CBZ) chronically for over six months. This medication has induced enzymes in his liver that will enhance metabolism of barbiturates within the timeframe of the "average" execution, resulting in lower brain levels of barbiturates, including pentobarbital, such that he will be at great risk for awareness and suffering, as well as prolonged death during judicial lethal injection.

**REVIEW AND REBUTTAL OF DR. VON CROWN'S REPORT**

10.     Dr. Von Crowns states in paragraph 3 of his report that pentobarbital has "effects that last up to 2 hours".  This statement is made without scientific support, and is misleading. Pentobarbital is a member of a class of 'short-acting' barbiturates, and has a duration of clinical action after single intravenous (IV) dose of **minutes**, not hours, as already

discussed.  Dr. Crowns may be confused by the fact that the drug does remain in the body for hours, but its clinical actions in the brain are terminated long before the drug leaves the body, due to rapid redistribution out of the brain to other tissues, such as muscle. Please refer to pages 9-12 of my November 1, 2019 Declaration for a discussion with references of clinical and pharmacological effects of pentobarbital, and thiopental, another barbiturate which is identical in all relevant characteristics to pentobarbital for the purpose of this discussion.

11.    Dr. Crowns' discussion in paragraph 3 of the use of the drug in euthanizing animals is entirely irrelevant to the discussion of judicial lethal injection in humans.  The question at issue with IV injection of pentobarbital is whether prisoners executed in this manner are *aware* during the process of dying and therefore experience excruciating pain and suffering during the execution process. There are no studies of animal consciousness during euthanasia. Indeed such studies would be impossible to perform at this time, since there is no way to ask an animal if they are awake and feeling pain or sensations of drowning. There is simply no way to tell if an *unresponsive* animal is *unconscious*.  In humans, on the other hand, hundreds of studies of consciousness after injection of anesthetic drugs have been performed using the "gold standard" for assessing awareness, the isolated forearm technique (IFT), that have demonstrated that awareness, as well as pain and suffering, both occur.  Please refer to my November 1, 2019 Declaration pages 12-23 for a discussion of awareness, the IFT, and clinical studies (including studies using thiopental) showing awareness after induction of anesthesia.

12.    Dr. Von Crowns' reference to the "pro-euthanasia groups" of Switzerland using misleading and emotionally evocative such as like "peaceful death" and "self-deliverance", is not only

entirely inappropriate, but it is also irrelevant.  His comments serve to demonstrate his ignorance with regard to the methods used.  As Dr. Von Crowns should know, the method of administration of any drug is absolutely critical in determining which, if any, of the drug's effects will occur, how quickly they will arise, and in what order.  I served as a scholar at the Brocher Foundation in Switzerland in 2011, during which time, the Swiss assisted suicide organizations EXIT and Dignitas constituted my specific area of study, undertaken with the cooperation of the presidents of both groups and the medical examiner at the University of Geneva who was responsible for autopsies on assisted-suicide patients. Barbiturates for assisted suicide are administered *orally,* not intravenously (IV).  They therefore and have a much longer onset of action (from 30 minutes to several hours), and death takes anywhere from an hour to, in rare cases, 1-2 days. Because there is no sudden massive bolus of caustic barbiturate into the bloodstream that is carried directly to the lungs, flash pulmonary edema has not been reported, although slower onset pulmonary edema certainly is well-known in cases of barbiturate overdose.  Since the timing and mechanisms of death in these cases are completely different from death due to IV injection of pentobarbital, this entire discussion is not relevant.  Please see my November 1, 2019 Declaration, pages 50-52 for a more complete discussion of assisted suicide versus judicial lethal injection.

13. In paragraph 4, Dr. Von Crowns *agrees and asserts* that pulmonary edema precedes death. He attributes the development of pulmonary edema to heart failure, but neglects to include the contribution of immediate caustic injury to the lungs from IV injection and the effects of airway obstruction in promoting pulmonary edema.  He does state that pentobarbital exacerbates sleep apnea and snoring, which is correct because pentobarbital-mediated

relaxation of the upper airway causes partial or total airway obstruction—for which snoring is the tell-tale sign.  The presence of respiratory efforts in the face of a partially or totally obstructed airway is sufficient in and of itself to cause flash pulmonary edema. Please see my November 1, 2019 Declaration, pages 31-33 for a more complete discussion of the mechanisms of flash pulmonary edema.

14.     In paragraph 5, his review of second-hand reports of 3 executions that were provided by a single employee of the Federal Bureau of Prisons and/or gleaned from the media, Dr. Von Crowns draws conclusions that are not warranted nor supported by the observations.  He declares that all prisoners were "asleep" within 2 minutes.  In this statement, he is making the common and uninformed error of confounding unresponsiveness with unconsciousness. Unconsciousness of the prisoners cannot be deduced from these second-hand reports, since even anesthesiologists who regularly anesthetize patients are not able to reliably determine who is aware and who is not.  Please see my November 1, 2019 declaration, pages 12-28 for a more complete discussion of consciousness, awareness, and unresponsiveness, together with scientific evidence that these are frequently disconnected in patients receiving anesthetic drugs, including barbiturates.

15.     In paragraph 6, apparently using prison log books kept by presumably the same witness referred to earlier, Dr. Von Crowns provides us with the observation that these executions were not quick.  In fact the average length of time was 24 minutes, during which sensations of suffocation and drowning would be agonizing.  Please see my November 1, 2019 report pages 33-34 for a more complete discussion of these sensations.

16.     In paragraphs 7 and 8, Dr. Von Crowns agrees that the autopsy of prisoner Wesley Purkey demonstrated the presence of pulmonary edema.   He states however, that it cannot be

determined from lung weights "when the pulmonary edema occurred."  While this statement is on its face true, it is not true that we cannot deduce from all of the information when the edema occurred.  We know that the prisoners did not have pulmonary edema before they were injected with pentobarbital.  We also know that it has been **scientifically proven** that pulmonary edema does not accumulate after death (please see my secondary supplemental report dated August 7, 2020 page 6 for a more complete discussion and references).  Therefore, the only time frame in which flash pulmonary edema could have occurred is in the minutes between the time of injection and the time of death.

17.   Dr. Von Crowns agrees that pulmonary edema is a common finding in barbiturate overdoses, supporting my previous assertions that this finding appears to be inevitable.  In paragraph 9, he gives numerous medical conditions that can cause pulmonary edema that is then found at autopsy.  However, none of these conditions were the cause of death in the prisoners who were executed, and no prisoner suffered from pulmonary edema until after the barbiturate was injected, making this entire discussion irrelevant.

18.   I note that in paragraph 10, Dr. Von Crowns concedes the basic mechanism of flash pulmonary edema, stating that it happens in "minutes", agreeing with my previous report. In fact, flash pulmonary edema has been observed to happen with seconds.  As I also stated in my report dated June 29, 2020 I have personally cared for a patient who developed flash pulmonary edema within one breath.  Please see my November 1, 2019 report page 33, and my report dated June 29, 2020 page 10.

19.   The remainder of Dr. Von Crowns' report continues to confound unresponsiveness and unconsciousness, and states (against all scientific evidence presented in my November 1, 2019 report), that prisoners have been and will be unconscious to flash pulmonary edema

when it occurs because they don't show outward signs of awareness.  He states without citing pharmacologic or clinical evidence that the pentobarbital will not be cleared from brain receptors in time to allow the prisoner to "regain consciousness", entirely ignoring the fact that scientific evidence shows that in many cases, persons injected with these drugs never lose consciousness to strong stimulation at all.  I refer you again to my November 1, 2019 report.

## REVIEW AND REBUTTAL OF DR. ANTOGNINI'S SECOND SUPPLEMENTAL DECLARATION

20.    In Paragraph 1, Dr. Antognini asserts in his report that the induction of enzymes that induce barbiturate  metabolism will have little effect in prisoners executed by the Federal Protocol, because after a dose of pentobarbital, there is no blood flow to the liver and when breathing ceases, tissue hypoxia occurs that will further interfere with liver metabolism of pentobarbital.  However, the cardiovascular effects of sudden IV injection of 5 gm of pentobarbital has never been studied in humans. Studies of cardiovascular effects of anesthetic doses of barbiturates indicate that while cardiac depression does occur, these affects are not generally dose related.[1] Please also see my November 1, 2019 Declaration for a discussion of the pharmacologic effects of pentobarbital. Furthermore, profound tissue hypoxia due to respiratory depression does not occur immediately following respiratory cessation except under extraordinary circumstances, such as when a patient is already hypoxic—for example due to pneumonia or lung disease.  Please see my November 1, 2019 Declaration, pages 33-34 for a discussion of the development of hypoxia after respiratory cessation.

21.  "Cardiovascular collapse", also known as "shock" is a general, not specific, term used to describe many states in which circulatory depression occurs.[2]  The term does not specifically indicate 1) how much blood flow in is decreased, 2) how much central blood flow (to the brain, heart and liver) is decreased when these events occur, or 3) over what time period these events occur.  The liver is part of the "central circulation", along with the brain and heart, and continues to receive blood flow and to function, even during periods of shock.

22.  In paragraph 1, Dr. Antognini also appears to imply that pentobarbital goes straight to the brain following IV injection, and only reaches the liver after it has traveled to the brain. This is incorrect.  In fact, about one-fifth of the injected drug continues to circulate in the blood and is subject to metabolism by the liver while brain levels are rising.[1]

23.  Dr. Antognini states that "metabolism of pentobarbital plays virtually no role in the decline of pentobarbital blood levels in the first 20 to 30 minutes after intravenous administration." This is a critical statement to examine, because it inaccurately describes the role of metabolism in pentobarbital clearance. According to Dr. Von Crowns' declaration, the average execution takes 24 minutes, and so it is important to review what happens under normal circumstances to barbiturate metabolism within that period of time, and to consider how that might be affected by carbamazepine (CBZ)-related induction of metabolizing enzymes.  According to the 2020 edition of Miller's Anesthesia,[1] the deployment of thiopental (which is equivalent to pentobarbital in all ways relevant to judicial lethal injection) following IV administration is as follows:

- 9 -

- At 1 minute, 30% of the barbiturate remains in the blood, 30% has entered the brain, 15% has already been redistributed to muscle, approximately 20% is in fat and other tissues, and less than 5% has been metabolized.

- At 3 minutes, about 20% of the drug remains in the bloodstream, about 25% remains in the brain, about 27% has entered the muscle, and about 7% of the drug has been metabolized.

- At around 6 minutes a little about 15% of the drug remains in the bloodstream, about 20% remains in the brain, about 30% is in muscle, and about 10% of the drug has been metabolized.

- At 10 minutes, less than halfway through the average execution, only 10% of the drug is in the bloodstream, 15% in the brain, 35% is in muscle, and 15% has been removed.

- At about 20 minutes, 5% of drug is in the bloodstream, 10% in the brain, and 20% of the drug has been metabolized.

24.     In other words, in less than the time course of the "average" execution, only 10% of the injected barbiturate remains in the brain, and with normal liver metabolism, about one-fifth of the drug has been metabolized by the liver, an amount termed by the authors to be "substantial".

25.     This number becomes more impressive when we consider that in patients in whom the enzymes that metabolize barbiturates have been "induced", for example by chronic carbamazepine (CBZ) administration for seizures, there is much more rapid clearance of the barbiturate by the liver. Please refer to my Secondary Supplemental Report dated August 7, 2020 for further discussion of pentobarbital clearance.

26.   In paragraph 3, Dr. Antognini once again conflates "unresponsiveness" with "unconsciousness", an error we see over and over again throughout this and other opinions he has submitted to the Court.

27.   In paragraph 6, Dr. Antognini states that profound cardiac depression follows administration of 5 gm of pentobarbital, preventing redistribution of pentobarbital in the body.  While he continues to assert this as though it is fact, he provides no scientific studies or other factual evidence that this is the case.  Indeed, there is no way for Dr. Antognini to provide this evidence, because IV administration of 5 gm of pentobarbital in adult humans has never been studied.  Studies of severe barbiturate overdoses also do not support this contention.  Even when drug levels approached those that have been seen in autopsies of lethal injection prisoners, the most common cardiovascular manifestation seen was pulmonary edema, not cardiovascular collapse.[3]  Please see my November 1, 2019 Declaration pages 31-33 for further discussion of pulmonary edema after barbiturate poisoning.

28.   Dr. Antognini states in paragraph 8 to assert that "there is little blood flow to the liver," for which he cites an article by Shafer[4] as proof that this process has "been well documented in models of shock."  However, the article he cites (which is an editorial and not a study) does not support his assertion.  It does not state that liver blood flow is low or absent, nor that pentobarbital clearance is altered in shock. In fact the article and the studies to which it refers do not test the clearance of pentobarbital or any drug clearance for that matter, in the setting of shock.  Rather, the article and the study to which it refers examined effects of 5 drugs on brainwaves in pigs (not human subjects) during shock.  Furthermore, there

was wide variation in how much drug actions were altered by shock, with one drug, etomidate, showing virtually no change at all. Pentobarbital was not studied.

29.    The 2 studies he cites regarding hypoxia are both problematic. The Park study[5] from 25 years ago does discuss the effect of hypoxia on liver enzyme action, indicating that it takes only **8 hours** of hypoxia in rabbits to cause changes in liver enzyme function.   Human hepatocytes in the laboratory were affected after **4 days** of hypoxia, although it is interesting to note that the CYP2E1 enzyme—one that is induced by CBZ and responsible for barbiturate metabolism was "less effected".   Given that the effects seen during judicial lethal injection do not have 8 hours, or 4 days to develop, and that when they do, they appear to have reduced implications for the enzymes involved in barbiturate metabolism, it is unlikely that a "hypoxia" effect on barbiturate metabolism is relevant during judicial lethal injection. The Elliot study[6], also from 30 years ago, examined metabolism of the nonanesthetic drug propranolol in a laboratory preparation of rat livers, and not during shock in an animal or human.  Even in that preparation, drug metabolism continued during periods of low oxygen levels.

30.    In asserting severe cardiac effects of pentobarbital, Dr. Antognini cites 2 studies: Manders[7] and Segal.[8]  However, Manders et al, who studied pentobarbital in dogs 45 years ago, found that while pentobarbital only resulted in a modest transient lowering of blood pressure, "slight reduction" in cardiac output.  They concluded that "pentobarbital affects systemic and regional hemodynamics only slightly." The Segal study from over 30 years ago demonstrated that pentobarbital did have cardiac depressant effects on the excised hearts of rats, a finding that is somewhat at odds with the Manders study in dogs, and with studies of barbiturate overdoses in humans, which are more applicable.

31.   Dr. Antognini cites a 67 year old study of pentobarbital drug levels in 2 humans and
concluded that larger doses lead to longer effects.[9]   However, the study subjects were not
subjected to any rigorous tests of awareness, nor were they stimulated to see if they were
anesthetized.   Nor has was the study apparently ever validated in a randomized trial. The
most interesting finding from this study is that pentobarbital metabolism in humans and
dogs is entirely different, suggesting that dogs studies are poor indicators of human
pharmacology or pharmacokinetics of pentobarbital.

32.   Many of the studies cited by Dr. Antognini regarding CYP enzymes predate modern
understanding of these enzyme systems by several decades.   The 43-year old Eadie study
looked at a total of 25 patients taking CBZ in addition to phenobarbitone, a severely
underpowered study, and found little difference in drug levels.   However, this study has
long since been supplanted by many more modern studies that do show significant
interactions between barbiturates and CBZ.   Please see my Second Supplementary Report
dated August 7, 2020 for full discussion and review articles on this important phenomenon.
The FDA website that Dr. Antognini cites clearly states that the tables are "examples and
not meant to be an exhaustive list" of inducers and inhibitors.   For more specific
information, a search of the literature more accurately reflects current research.   Please see
my Second Supplementary Report dated August 7, 2020 for citations and sources regarding
CBZ interactions with barbiturate-metabolizing enzymes.

33.   In paragraph 13, Dr. Antognini states that a paper I cited by Pastolos et al., discussing the
effects of CBZ therapy on phenobarbitone (PB) half-life demonstrated that liver enzyme
induction demonstrates that CBZ has no effect on PB, and implies that therefore CBZ
would not have an effect on pentobarbital.   He has failed to understand both why I cited

the article and the critical difference between PB and pentobarbital. The article demonstrates that PB (and therefore pentobarbital) are metabolized by several enzymes in the liver that are induced by CBZ. PB is the only barbiturate that has only minor metabolism in the liver (it is eliminated by the kidneys) and therefore its elimination will not be affected significantly by liver enzyme induction. Pentobarbital, on the other hand, is almost *exclusively* metabolized in the liver, and induction of those enzymes will dramatically increase its metabolism. Please see my Secondary Supplemental Report dated August 7, 2020 for full discussion and references.

34.   In paragraph 17, Dr. Antognini states that pulmonary edema is a "rare complication of clinical doses of barbiturates." Here and in paragraph 20 he clearly misunderstands why I mention the cases of pulmonary edema under anesthesia in my declaration. I am not asserting that at clinical doses, pulmonary edema is a common complication of barbiturates. I am asserting that it appears to be a universal complication of massive barbiturate overdose. I am also showing that when pulmonary edema has been witnessed developing after barbiturate injection, it occurred ***immediately,*** and in a timeframe that would precede maximum brain levels of barbiturate. In the Potts case I cited[11], while cardiovascular disease was present and probably a contributing factor, the patient had an extensive workup prior to surgery and did not suffer from pulmonary edema until after barbiturate was injected. The importance of the immediate onset in both of the cases can only be understood when we consider that ***100%*** of autopsied prisoners in which the lungs were examined demonstrated pulmonary edema. Thus far, the evidence indicates that ***everyone*** will develop it at this dose, not just some. Whether the complication is rare at lower doses is irrelevant, as is the Wyatt study (now over a half a century old).[12] Pulmonary

edema thus far is a *certainty* at lethal injection doses.  A major reason is that with such large doses, the amount of pentobarbital reaching the lungs is still very concentrated, and has not been diluted to the degree that lower doses are.  The caustic action of the more concentrated drug on the alveolar capillaries has a direct damaging effect not usually seen at lower doses. The 67 year old Brodie study used a dose that were somewhat larger than usual clinical doses, but that was still low compared to that given during judicial lethal injection. The Brodie study therefore does not in any way negate the fact that *all prisoners to date with the proper forensic examination have been demonstrated to have had it.*  Please see my November 1, 2019 Declaration (pages 32-33, paragraphs 66-67) and Supplemental Declaration (pages 7-10) for full references regarding barbiturates and pulmonary edema.

35.    In attempting to assert that pulmonary edema can happen after death, Dr. Antognini again presents an article that is 65 years old.  While it is quaint and historically interesting, a later study looked at whether the timing of autopsy in deaths that do not involve cardiovascular disease or chest trauma affects the weight of the lungs or findings of pulmonary edema and found that there is no association with delayed autopsy and "spurious" findings.   Dr. Antognini cites Durlacher et al.,[13] in stating that pulmonary edema can develop after death. Apart from the fact that this is also a very old study, a major problem is that this was a rabbit study and should not be used to determine what normal human autopsy findings would be:  chest wall mechanics, airway structure and lung structure of rabbits are significantly different than that of humans.  In addition, the rabbits were all killed in a variety of ways (including IV injection of pentobarbital), some of which are known to induce pulmonary edema and some do not.  The animals were separated in to 2 groups, the first to be autopsied immediately and the second to undergo delayed autopsy.  But the

- 15 -

groups included different manners of death and therefore cannot be compared properly. Dr. Antognini's statement about this study that "the animal data indicate that all of the pulmonary edema in inmates executed with pentobarbital can be generated post-mortem is simply nonsensical.

36.     The Shiotani study[14] that Dr. Antognini cites studying changes in the lungs on postmortem CT scans is also problematic:  all patients died of primary cardiac causes and underwent cardiopulmonary resuscitation with chest trauma of uncontrolled duration prior to declaration of death. There were also issues with the timing of the CT scans and delay of autopsy—complicating the correlation of CT findings with autopsy visualization.  The Ishidi study[15] cited in paragraph 31 does not examine whether pulmonary edema develops post mortem.  This is a study of in-hospital patients who had pulmonary pathology (pleural effusions, atelectasis, consolidation of the lung) *prior* to death. It that found that on CT scans performed after death at different intervals, fluid appeared in the airways (tracheal, bronchi) increasingly over time.  The authors postulate that the fluid *that was already present in the lungs before* death "migrated" into the airways *after* death.  This study did not look for the presence of pulmonary edema in the lungs and did not correlate CT findings with physical autopsy. Flash pulmonary edema is a rapid, dramatic, sudden-onset filling of the lung tissue with fluid, sometimes into the major airways.  It is *symptomatic* in people who do not have underlying significant health issues, as well as in many people with them.

37.     Dr. Antognini cites Mallamaci[16] as evidence that pulmonary edema is asymptomatic.  In the first place, the patients in the study had pulmonary congestion, not frank pulmonary edema—and they specifically did not suffer from *flash* pulmonary edema.  They were chronically ill, on hemodialysis due to renal failure, a situation that leads to fluid

imbalance—both too much and too little—through the cycle of dialysis treatments. The situation of fluid fluctuations in association with hemodialysis is simply not comparable to that of prisoners whose lungs suddenly fill up, sometimes all the way to the back of their throat, with fluid. The Marino study[17] was also of kidney failure patients with a syndrome called "nephrotic syndrome". In nephrotic syndrome "edema" (swelling in the arms, legs, face, etc) is common and asymptomatic pulmonary congestion can occur. But the authors are specific in pointing out that while "pulmonary congestion" (a much milder amount of fluid in the lung tissue) may be common "frank pulmonary edema is rare" and, presumably, symptomatic. They include several references to support this. Once again, none of these patients actually had pulmonary edema, and no one suffered from flash pulmonary edema. Bouzat et al.,[18] was a study of "interstitial pulmonary edema" characterized by ultrasound appearance of "lung comets" (a finding consistent with a small amount of fluid in intracellular spaces); essentially the same finding termed "pulmonary congestion" by the nephrologists in the prior 2 studies. The patients were not asymptomatic—a majority suffered from acute mountain sickness (nausea, headache, malaise) and so mild shortness of breath at altitude (about 13,000) feet might be missed or attributed to the altitude rather than pulmonary congestion. The authors specifically state that the subjects did NOT suffer from high altitude pulmonary edema, and the subjects certainly did not suffer from flash pulmonary edema. The Baik study[19] and the Devine case report[20] looked at patients with a form of pulmonary edema that has a different mechanistic origin than the others: re-expansion pulmonary edema that can occur when a lung has collapsed and is re-expanded by surgical insertion of a chest tube. The sudden re-inflation of the lung can lead to a form of "flash" pulmonary edema, in about 64% of patients, which Baik states is usually severely

symptomatic within one hour with cough, agitation, rapid heart rate, and rapid breathing. The Baik study is not specific about what "symptoms" the patients were suffering prior to lung expansion. Re-inflation pulmonary edema is not completely analogous to noncardiogenic pulmonary edema of other causes. or attributed to the altitude rather than pulmonary congestion. The authors specifically state that the subjects did NOT suffer from high altitude pulmonary edema, and the subjects certainly did not suffer from flash pulmonary edema. The Baik study and the Devine case report looked at patients with a form of pulmonary edema that has a different mechanistic origin than the others: re-expansion pulmonary edema that can occur when a lung has collapsed and is re-expanded by surgical insertion of a chest tube. The sudden re-inflation of the lung can lead to a form of "flash" pulmonary edema, in about 64% of patients, which Baik states is usually severely symptomatic within one hour with cough, agitation, rapid heart rate, and rapid breathing. The Baik study is not specific about what "symptoms" the patients were suffering prior to lung expansion. Re-inflation pulmonary edema is not completely analogous to noncardiogenic pulmonary edema of other causes.

38.     In the final paragraphs of his report, Dr. Antognini attempts to characterize the injection of pentobarbital during judicial lethal injection. The purpose of this exercise is not entirely clear to me, but there appears to be an error in his calculations. He says "it is stated that the dead space volume of the IV tubing from the point where the injection is made to the entry of the tubing into the inmate is 37 ml. Based on this deadspace measurement, the IV tubing to which he is referring is roughly twice the length of a standard Baxter IV tubing set (which has a deadspace of 17.5 ml), or roughly 18 feet. However, I reviewed photographs and measurements of the actual IV tubing used in the execution of Nelson,

which actually measures 24 feet, or 1.5 times that of the tubing specified by Dr. Antognini. This would indicate that the actual dead space is approximately 55.5 ml, and at the injection rate that Dr. Antognini specifies, (which assumes absolute accuracy of the injection log down to the second) the injection would take 271 seconds, plus about 5 seconds to swap out the second pentobarbital syringe.  Total injection would take 4.5 minutes.  However, at the time that the second pentobarbital syringe is beginning to be injected, only 44.5 ml of the first syringe of pentobarbital has actually reached the inmate (4.5 minutes into the execution). In order for the full dose to reach the inmate, injection of at least 56 ml of saline must occur.  Adding 5 sec for syringe swap and the same injection rate called for by Dr. Antognini, an additional 146 seconds would pass for a total time of 7 minutes for the full first dose of pentobarbital plus saline flush to be given (423 seconds). The slow injection time will cause the peak drug levels to be significantly lower in the bloodstream than in Dr. Antognini's scenario, and lower peak brain levels occur.  By the time the injection is complete, a significant part of the first injection has already passed out of the brain. Some of the drug has already been metabolized, and the execution still has 17 minutes to go.

39.    Recalling the calculations from Miller detailed near the beginning of this report, at around 6 more minutes only about 15% of that lower drug concentration remains in the bloodstream, about 20% remains in the brain, about 30% is in muscle, and about 10% of the drug has already been metabolized in a normal person.  In a person whose antiepileptic treatment has induced liver enzymes that metabolize pentobarbital, up to triple that amount of drug has been metabolized, lowering the blood levels further and "pulling" the drug levels in the brain lower.

## **CONCLUSION**

40.     In my previous Declaration and Supplemental Declaration, I concluded that every autopsy

report I reviewed from prisoners executed using pentobarbital where the lung tissues were

examined, demonstrated findings of pulmonary edema and that premortem flash

pulmonary edema is a virtual medical certainty in any execution in which pentobarbital is

used. I also concluded that prisoners executed by lethal injection in accordance with the

Federal Protocol remain sensate and able to experience the extreme pain and suffering

related to the occurrence of flash pulmonary edema.

41.     I reiterate those opinions here to a reasonable degree of medical certainty.

42.     Furthermore, I add that in the setting of the prolonged injection and with enhanced

metabolism of the pentobarbital due to chronic CBZ administration, it is my opinion to a

degree of medical certainty, that Norris Holder will be conscious during his execution and

experience excruciating pain and suffering from sensations of drowning due to

pentobarbital-induced flash pulmonary edema.

43.     I declare under penalty of perjury that the foregoing is true and correct.

Dated this 15th day of September, 2020.

_Gail A. Van Norman MD_

_____

Gail A. Van Norman, M.D.

**References:**

1. VuyckJ, Sitsen E, Reekers M. Intravenous anesthetics. In Miller's Anesthesia 9th Edition. Gropper MA, Ed.  Elsevier Inc.  Philadelphia PA, 2020. pp 638-79

2. Kilbaugh TJ, Zwass MS, Ross P.  Classification of shock. In Miller's Anesthesia 9th Edition.  Gropper MA, Ed.  Elsevier Inc.  Philadelphia PA, 2020. pp 2513-2584

3. Goodman JM, Bischel MD, Wagers PW, Barbour BH.  Barbiturate intoxication. Morbidity and mortality.  West J Med.  1975; 124:179-86

4. Shafer SL.  Shock values.  Anesthesiology 2004; 101:567-8

5. Park GR.  Molecular mechanisms of drug metabolism in the critically ill.  Brit J Aanesth 1996;  77:32-40

6. Elliot SL, et al.  The effect of hypoxia on propranolol clearance during antegrade

7. Manders WT, Vatner SF.  Effects of sodium pentobarbital anesthesia on left ventricular function and distribution of cardiac output in dogs, with particular reference to the mechanism of tachycardia.  Circ Res 1976; 39:512-17

8. Segal L, Rendig SV. Sodium pentobarbital effects on cardiac funcgtion and response to dobutamine.  J Cardiovasc Pharmacol 1986; 8:392-97

9. Brodie BB, Burns JJ, Mar LC et al.  The fate of pentobarbital in man and dog and a method for its estimation in biological material.  J Pharmacol Res Ther 1953; 109:26-34

10. Eadie MJ, Lander Cm, Hooper WE, Tyrer JH. Factors influencing plasma phenobarbitone levels in epileptic patients.  Brit J Clin Pharmacol 1977; 4:451-7

11. Potts MW, Smethurst PWR.  Plerual effusion complicating thiopentone administration. Brit J Anaesth 1967; 39:78

12. Wyatt GM, et al.  Comparison of seven intravenous anaesthetic agents in man. Brit J Anaesth 1957; 29:194-209

13. Durlacher SH, Banfield WG, Bergner Ad. Post mortem pulmonary edema.Yale J Biol Med 1950; 22: 565-72

14. Shiotani S, Kobayashi T, Hayakawa H, et al.  Postmorem pulmonary edema:  a comparison between immediate an delayed postmortem computed tomography.  Legal Med 2011; 13:151-55

15. Ishida M, Gonoi W, Hagigawa K, et al.  Fluid in the airway of nontraumatic death on postmortem computed tomography,  Am J Forensic Med path 2014; 335:113-7

16. Mallamaci F, et al.  Detection of pulmonary congestion by chest ultrasound in dialysis patienst.  JACC Carciovasc Imag. 2010; 3:586-94

17. Marino F, et al.  Subclinical pulmonary congestion is prevalent in nephrotic syndrome. Kidney Int 2016: 421-8

18. Bouzat P, et al. Time course of asymptomatic interstitial pulmonary oedema at high altitude.  Resp Physiol Neurobiol 2013; 186:16-2

19. Baik JH et al.  High-resolution CT findings of re-expansion pulmonary edema.  Jorean J Radiol 2010: 11:164-

20. Devine MD, et al.  Asymptomatic re-expansion pulmonary oedema with bilateral infiltrates.  Postgrad Med J 2014; 90:300-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases,<br><br>LEAD CASE: *Roane et al. v. Barr*<br><br>THIS DOCUMENT RELATES TO:<br><br>*Holder v. Barr, et al.*, Case # 19-cv-3520 (TSC) | Case No. 19-mc-0145 (TSC) |

## <u>DECLARATION OF JENNIFER M. MORENO</u>

I, Jennifer M. Moreno, do hereby declare and state as follows:

1.      I am an Assistant Federal Public Defender, Capital Habeas Unit, in the Office of the Federal Public Defender for the District of Arizona.  I represented Keith Nelson who was executed by the United States at the Federal Correctional Complex at Terra Haute on August 28, 2020.

2.      The statements made herein are based on my personal knowledge and, if called as a witness, could and would testify competently to the contents of this declaration.

3.      Prior to his execution, Keith Nelson was a plaintiff in this action.  On July 15, 2020, Mr. Nelson filed an Emergency Motion for Preservation of Evidence requesting the Court to order the federal Bureau of Prisons ("BOP") to preserve physical evidence related to the executions of Wesley Purkey and Dustin Honken, who were scheduled to be executed on July 15, 2020 and July 17, 2020. (ECF #160)

4.      On July 16, 2020, the Court issued an order directing the BOP to "preserve all IV tubing, syringes, and drug vials used in those Executions, except for any portion of the IV tubing

1

EXHIBIT B

and entry apparatus that must travel with the body to the coroner because they remain connected to the body of the inmate after execution." (ECF # 163)  The Preservation Order is attached as Appendix I.  The BOP executed Mr. Purkey and Mr. Honken on July 16, 2020 and July 17, 2020, respectively.

5.      On July 31, 2020, Michael Robles, an attorney with the law firm Crowell and Moring and co-counsel for Mr. Nelson, contacted Alan Burch, an Assistant United States Attorney representing the Defendants, and asked the government to produce the evidence subject to the Preservation Order. Michael Robles Emails with Defendants' Counsel, July 31, 2020 – August 11, 2020.  The emails arranging the inspection are attached as Attachment II. Defendants agreed to permit counsel for Mr. Nelson to inspect and photograph the IV tubing and syringes at FCC Terre Haute on August 13, 2020 at 11am. *Id*.

6.      On August 13, 2020, Dale Baich, with my office and co-counsel for Mr. Nelson, and I inspected and photographed the evidence preserved from the executions of Mr. Purkey and Mr. Honken.  We viewed the items in a training room with two BOP attorneys, Rob Schalburg and Katherine Siereveld, and one correctional officer present.  The items from each execution were contained in two large, red plastic bags set out on long folding tables covered in plastic bags.

7.      First, we inspected the evidence from the execution of Mr. Purkey.  We laid out all the items on the table and took a written inventory.  We photographed all the items together, then photographed each item separately, and then measured the tubing connected to the IV bags.  We also photographed the written inventory list.  We placed all the items back in the bag. We then repeated the same process for the evidence from the execution of Mr. Honken.

8.    After leaving FCC Terre Haute, the photographs were labeled and saved to the server at my office.  I typed and saved a copy of the written inventory list, which included the following items:

Purkey

- Phase I Syringe I, Pentobarbital 2.5g/50cc (green label)
- Phase I Syringe I, Pentobarbital 2.5g/50cc (green label)
- Phase I Syringe I, Pentobarbital 2.5g/50cc (green label)
- Phase I Syringe II, Pentobarbital 2.5g/50cc (yellow label)
- Phase I Syringe II, Pentobarbital 2.5g/50cc (yellow label)
- Phase I Syringe II, Pentobarbital 2.5g/50cc (yellow label)
- Phase II, Syringe Flush 60 cc (red label)
- Phase II, Syringe Flush 60 cc (red label)
- Partially full saline bag #1 connected to 285 inches (23' 9") of IV tubing
- Partially full saline bag # 2 connected to 289 inches (24' 1") of IV tubing and two clamps at the end
- Full saline bag, unnumbered
- Oxygen saturation monitor[1]
- 3 needles, retracted into plastic safety covering
- 1 empty syringe labeled lidocaine
- 1 syringe labeled flush, containing reddish pink liquid

Honken

- Phase I Syringe I, Pentobarbital 2.5g/50cc (green label)
- Phase I Syringe I, Pentobarbital 2.5g/50cc (green label)
- Phase I Syringe I, Pentobarbital 2.5g/50cc (green label)
- Phase I Syringe II, Pentobarbital 2.5g/50cc (yellow label)
- Phase I Syringe II, Pentobarbital 2.5g/50cc (yellow label)
- Phase I Syringe II, Pentobarbital 2.5g/50cc (yellow label)
- Phase II, Syringe Flush 60 cc (red label)
- Phase II, Syringe Flush 60 cc (red label)
- Partially full saline bag #1 connected to 285 inches (23' 9") of IV tubing and one clamp at the end
- Partially full saline bag # 2 connected to 289 inches (24' 1") of IV tubing and one clamp at the end
- Full saline bag, unnumbered
- Oxygen saturation monitor

---

[1] On the written inventories, I mistakenly list the oxygen saturation monitors as EEG, but corrected it in the typed copy, after reviewing the photos.

3

9.      On August 14, 2020, I provided true and correct digital copies of the photographs of the evidence and the inventory list as identified above to counsel for Mr. Holder and Gail Van Norman, M.D.  I provided a total of 105 digital photographs.

I declare under penalty of perjury that the foregoing is true and correct.

Signed in Austin, Texas on September 15, 2020.

Jennifer M. Moreno

4

# **APPENDIX I**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————
In the Matter of the
Federal Bureau of Prisons' Execution
Protocol Cases,

LEAD CASE: *Roane, et al. v. Barr*

THIS DOCUMENT RELATES TO:

*Nelson v. Barr, et al.*, 20-cv-557
———————————————————

)
)
)
)
)
)
)
)
)
)
)

Case No. 19-mc-145 (TSC)

## <u>ORDER</u>

Before the court is Plaintiff Keith Nelson's Emergency Motion for Preservation of

Evidence (The Motion). (ECF No. 160.) Having considered the Motion, the Motion is

GRANTED, and it is hereby ORDERED that, in the event the executions of WESLEY PURKEY

or DUSTIN HONKEN are carried out:

(1) the Bureau of Prisons shall preserve all IV tubing, syringes, and drug vials used in

those Executions, except for any portion of the IV tubing and entry apparatus that must travel

with the body to the coroner because they remain connected to the body of the inmate after

execution; and

(2) if an autopsy is or has been conducted of Wesley Purkey or Dustin Honken, then the

Coroner shall within 48 hours of their execution:

a) Collect evidence related to pulmonary edema and issues inserting Mr. Purkey's or Mr.

Honken's intravenous line, including that the Coroner or Medical Examiner: weigh the

lungs; perform a thorough examination and documentation of any fluid present in the

large or small airways, or mouth or nose; identify the IV site(s), note if the catheter was

1

placed intravascularly, and note any extravasation of fluid around the IV; and note any signs of multiple IV attempts; and

b) Preserve tissues from the brain, liver, and muscle from a location other than from the leg or arm where the IV was set.

Date: July 16, 2020

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge

# **APPENDIX II**

| | |
|---|---|
| **From:** | Kossak, Jonathan (CIV) |
| **To:** | Lin, Jean (CIV); M Robles; Burch, Alan (USADC) |
| **Cc:** | Harry Cohen; Clune, Kathryn L.; Jennifer Moreno; Dale Baich |
| **Subject:** | RE: BOP LI Litigation |
| **Date:** | Tuesday, August 11, 2020 10:27:19 AM |

Michael,

One additional logistical point.  Your colleagues should bring their bar cards with them to FCC Terre Haute.

- Jonathan

Jonathan D. Kossak
Trial Attorney
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 305-0612
jonathan.kossak@usdoj.gov

**From:** Lin, Jean (CIV) <JLin@civ.usdoj.gov>
**Sent:** Monday, August 10, 2020 10:19 AM
**To:** Robles, Michael <MRobles@crowell.com>; Burch, Alan (USADC) <ABurch1@usa.doj.gov>
**Cc:** Cohen, Harry <HCohen@crowell.com>; Clune, Kathryn L. <KClune@crowell.com>; Kossak, Jonathan (CIV) <jkossak@CIV.USDOJ.GOV>; Jennifer Moreno <Jennifer_Moreno@fd.org>; Dale Baich <Dale_Baich@fd.org>
**Subject:** RE: BOP LI Litigation

Michael:  Your colleagues should arrive at the FCI parking lot and call BOP Attorney Rob Schalburg, who will escort them from there. He is at 812-238-1531 Ext. 3556.  Rob and at least one other BOP staff member will be present at the inspection, but will not be able to answer questions or provide any substantive information.

Jean Lin
Special Litigation Counsel
U.S. Dep't of Justice, Civil Div.
Federal Programs Branch
jean.lin@usdoj.gov
(202) 514-3716

**From:** Robles, Michael <MRobles@crowell.com>
**Sent:** Friday, August 07, 2020 1:26 PM
**To:** Burch, Alan (USADC) <ABurch1@usa.doj.gov>
**Cc:** Cohen, Harry <HCohen@crowell.com>; Clune, Kathryn L. <KClune@crowell.com>; Lin, Jean (CIV) <JLin@civ.usdoj.gov>; Kossak, Jonathan (CIV) <jkossak@CIV.USDOJ.GOV>; Jennifer Moreno <Jennifer_Moreno@fd.org>; Dale Baich <Dale_Baich@fd.org>

**Subject:** RE: BOP LI Litigation

Alan,

Thanks for your e-mail.  Our colleagues Jen Moreno and Dale Baich (copied here) are available to inspect and photograph the items at 11 am on August 13 at FCC Terre Haute.  Please let us know who the contact person will be upon arrival.

Thanks,

Mike

Michael K. Robles
mrobles@crowell.com
Direct 1.212.803.4035 | Mobile: 1.646.641.5363

**Crowell & Moring LLP** | www.crowell.com
590 Madison Avenue
New York, NY 10022

**From:** Burch, Alan (USADC) <Alan.Burch@usdoj.gov>
**Sent:** Friday, August 7, 2020 10:51 AM
**To:** Robles, Michael <MRobles@crowell.com>
**Cc:** Cohen, Harry <HCohen@crowell.com>; Clune, Kathryn L. <KClune@crowell.com>; Lin, Jean (CIV) <Jean.Lin@usdoj.gov>; Kossak, Jonathan (CIV) <Jonathan.Kossak@usdoj.gov>
**Subject:** RE: BOP LI Litigation

External Email

Michael,

You may inspect and photograph the IV tubing and syringes at FCC Terre Haute. BOP suggests Aug. 12 after 1pm or Aug. 13 in the morning for that.  If those dates don't work, please send us several proposed alternative dates.  Note that the IV tubing is connected to IV bags (saline solution) that have the name of the medical supply company on them, and BOP has masked those names, consistent with the protective order.

With respect to the vials, we are providing photos of them in order to be able to effectively mask the confidential information as to source.  I will send those photos in separate emails due to their size.

I am attaching here the documents responsive to your request, with similar redactions.

Note that I will be unavailable Aug. 8-23, so you will need to contact Jean Lin or Jonathan Kossak, cc'd here, during that time.

Thanks,

Alan

---

**From:** Robles, Michael <MRobles@crowell.com>
**Sent:** Tuesday, August 4, 2020 12:08 PM
**To:** Burch, Alan (USADC) <ABurch1@usa.doj.gov>
**Cc:** Cohen, Harry <HCohen@crowell.com>; Clune, Kathryn L. <KClune@crowell.com>
**Subject:** RE: BOP LI Litigation

Thanks Alan, no apology necessary.  Please let us know when and where you will be able to make the IV and syringes available for inspection (and photographing), and we will let you know if that works for us.  In addition, we would appreciate it if you would produce the documents immediately.  We reserve all rights with respect to your proposed redactions.

Thanks,

Mike

Michael K. Robles
mrobles@crowell.com
Direct 1.212.803.4035 | Mobile: 1.646.641.5363

**Crowell & Moring LLP** | www.crowell.com
590 Madison Avenue
New York, NY 10022

---

**From:** Burch, Alan (USADC) <Alan.Burch@usdoj.gov>
**Sent:** Monday, August 3, 2020 3:39 PM
**To:** Robles, Michael <MRobles@crowell.com>
**Cc:** Cohen, Harry <HCohen@crowell.com>; Clune, Kathryn L. <KClune@crowell.com>
**Subject:** RE: BOP LI Litigation

External Email

Hello Mike,

Sorry about the late email.  We are willing to let you inspect the IV lines and syringes, and to produce redacted copies of the labels of the vials and of the logs.

Thanks,
Alan

---

**From:** Robles, Michael <MRobles@crowell.com>
**Sent:** Friday, July 31, 2020 5:42 PM
**To:** Burch, Alan (USADC) <ABurch1@usa.doj.gov>
**Cc:** Cohen, Harry <HCohen@crowell.com>; Clune, Kathryn L. <KClune@crowell.com>
**Subject:** BOP LI Litigation

Alan,

As you know, by Orders dated July 15 and 16 (Dist. Dkt. Nos. 158 and 163) Judge Chutkan ordered defendants to preserve evidence concerning the executions of Messrs. Lee, Purkey, and Honken (the "Preservation Orders").  Please confirm no later than 2:00 pm Monday (August 3) that defendants will produce no later than August 7, 2020: (a) all documents and other evidence subject to the Preservation Orders; and (b) the logs required by Chapter 2, section IV of the BOP Execution Protocol for the executions of Messrs. Lee, Purkey, and Honken.  If we do not receive that confirmation, we will seek emergency, expedited relief from Judge Chutkan.

Thanks,

Mike

Michael K. Robles
mrobles@crowell.com
Direct 1.212.803.4035 | Mobile: 1.646.641.5363

**Crowell & Moring LLP** | www.crowell.com
590 Madison Avenue
New York, NY 10022