# EXPERT DECLARATION OF DR. MICHAELA ALMGREN

## I. Background and Qualifications

1. My name is Michaela Almgren, Pharm.D., M.S. I am over the age of eighteen and competent to testify to the truth of the matters contained herein. The factual statements I make here are true and correct to the best of my knowledge.

2. I am a Clinical Assistant Professor in the Department of Clinical Pharmacy and Outcomes Sciences at the College of Pharmacy at University of South Carolina. I teach principles of sterile compounding per USP Chapters 797 and 800, aseptic technique and pharmacy regulations applicable in 503a and 503b compounding environments, as well as pharmacokinetics and biopharmaceutics courses. I specialize in sterile compounding, medication safety, and pharmacy regulations that relate to pharmacy compounding practices. I also provide continuing education courses for pharmacists in those topics. I received my Doctor of Pharmacy degree from the UofSC campus of the South Carolina College of Pharmacy in 2010. Additionally, I have a Master's Degree in Pharmaceutical Chemistry from University of Florida.

3. In conjunction with my academic appointment, I currently maintain a practice site at a 503b outsourcing pharmacy where I perform the duties of outsourcing pharmacist, clinical advisor and pharmacy student preceptor. I work with the new product development team to develop new formulations for the company's 503b compounding division, which includes review of analytical data as well as stability reports.

4. Previously, I worked in pharmacy operations in a local large teaching hospital as a pharmacist. I have over ten years of experience in sterile compounding and aseptic technique. Prior to joining the faculty at the University of South Carolina, I worked for several years in pharmaceutical manufacturing where I was involved in drug formulation, quality assurance, quality control and analytical method development. My professional qualifications are Doctor of Pharmacy and Master of Science in Pharmacy with a focus on Pharmaceutical Chemistry. A copy of my CV is attached.

5. I have been asked by attorneys in the Federal Community Defender Office, who represent death-sentenced prisoners Alfred Bourgeois, Chadrick Fulks, Dustin Higgs, and Jeffrey Paul,

to submit an expert medical and scientific opinions based on the information and documentation provided to me, about the risk of harm and unnecessary suffering that can be caused by lethal injection prepared by a 503b compounding pharmacy if the extended Beyond Use Date (BUD) was not properly assigned, as this can have an impact on potency and thus effectiveness of the drug.

II. **The Lack of Compounding Information Regarding the Preparation of the Pentobarbital Injection Raises Concerns Due to the Chemical and Physical Properties of Pentobarbital Sodium and the Stability of the Compound.**

6. Based on the information provided for my review, it appears that the Board of Prisons is using a 503b compounding pharmacy to prepare the pentobarbital injection, but is it not clear how the vials that are to be used for the execution were compounded. To my knowledge, the Board of Prisons has not made available records of the formulation recipe the 503b pharmacy is using to compound the injectable pentobarbital from pentobarbital API powder. Accordingly, it is not possible to confirm that the drug was compounded correctly.

7. I agree with the expert opinion of Dr. Swaan that the pentobarbital injection referenced in the article by Priest SM[1] appears to be stable. However, the stability of the drug will be impacted by the specific compounding recipe used, as well as the storage container, storage conditions and quality as well as quantity of reagents used. Thus, based on literature alone, and without having any information about any factors I mentioned, it is not possible to objectively compare and assume that the compounded lethal injection and the preparations mentioned in the literature are identical. There are multiple compounding recipes available, and their stability and thus their BUD will vary. This type of preparation is not just a simple reconstitution using single diluent, but rather a complex preparation that requires several different components and adjustments as may be necessary. Thus, the compounding recipe needs to be disclosed for review to assure that the drug is prepared correctly.

8. I also disagree with Dr. Swaan's application of the second article by Gupta[2] to the pentobarbital preparation in question here, as the article discusses a completely different drug scenario involving not only a different drug preparation (pentobarbital dilution using normal saline, not

the drug we are discussing), but also a completely different storage container, which is misleading. The container in which a compound is stored plays an extremely important role in the determination of expiry and Beyond Use Dating. It is also important to note that this study examined the quality of pentobarbital for only 31 days.

[1]Priest SM, Geisbuhler TP. Injectable sodium pentobarbital: Stability at room temperature. JPharmacol Toxicol Methods.2015; 76:38-42.
[2]Gupta VD. Stability of pentobarbital sodium after reconstitution in 0.9% sodium chloride injection and repackaging in glass and polypropylene syringes. Int. J Pharm Compd. 2001;5(6):482-4.

### III. Concerns About Improper Extension of BUD (Beyond Use Date) according to cGMP regulations as outlined in 21 CFR 210 and 211, ICH Q1A (R2) Stability testing and FDA's Guidance for Industry titled: Current Good Manufacturing Practice—Guidance for Human Drug Compounding Outsourcing Facilities Under Section 503B of the FD&C Act published January 2020.

9. From the records provided for my review, it appears that a contract independent laboratory has been hired to determine the stability of the injectable pentobarbital solution with intent to extend BUD of the compounded injectable preparation, as the laboratory protocols indicate (see AR pages 992-1015). This is a 365 Day study that was initiated 4/4/2019, when the test batch of injectable pentobarbital was initially compounded, and was to be completed on 4/4/2020.

10. To establish a tentative expiration (or to extend BUD), accelerated stability studies are performed as described in the protocol using elevated stress conditions such as temperature and humidity. This is a common practice in the pharmaceutical industry to examine the rate of kinetic degradation of drug products. In accelerated stability studies, drug preparation final containers are placed in a stability chamber and subjected to 40 degrees C and relative humidity of 75% as described in ICH Guidance (ICH Q1A (R2) Stability testing). This modelling of degradation helps with estimation of the degradation rate and predicts the expiration date. For example, it is assumed that if the drug maintains its quality attributes in the accelerated studies for 90 days, then it is very likely that the drug will maintain those same quality attributes within specifications for 180 days in long term stability conditions (which are defined as 25 degrees C and 60% relative humidity). At the same time, if the drug fails quality checks in accelerated studies at any time, this indicates instability of the preparation and the need for re-assessment

of the formulation, container, container closure or addition of a preservative. This is a widely used methodology supported by a great number of publications, as well as ICH and FDA guidance documents (ICH Q1A (R2) Stability testing and FDA's Guidance for Industry titled: Current Good Manufacturing Practice—Guidance for Human Drug Compounding Outsourcing Facilities Under Section 503B of the FD&C Act, published January 2020). The testing is usually performed in pre-specified time intervals such as 30 days, 60 days, 90 days, 180 days, 270 days, and 365 days.

11. I have reviewed the Certificate of Analysis (AR page 1142) that lists test results of accelerated studies performed on the injectable pentobarbital that was compounded by an unspecified 503B compounding pharmacy. The most important consideration for this preparation is, of course, the potency. The acceptable range specified by USP guidance for this specific product is 92.0 to 108.0% potency/purity. The report shows that the injectable pentobarbital potency was outside (lower than accepted low-end range) of acceptable range at 56 days, 92 days, 189 days, and again at 369 days. This indicates that this compounded injection is not stable, and BUD should not be extended. The findings of this study are confirmed by the real time study performed in long term stability conditions. The accelerated study also confirms that the storage conditions for this preparation must be monitored continuously.

12. I have also reviewed the Certificate of Analysis for the testing of stability samples maintained in room temperature (AR page 1140), also referred to as a real time stability study. There are two data points (92 days and 271 days) that were outside of the acceptable range. When potency falls outside of the acceptable range in drug stability studies, thorough investigations must be performed to determine the root cause of the failing result. Was it a lab error or a true product stability failure? It is assumed that if the report includes failing results, the root cause must be the failure of the stability data point, as it would be inappropriate to report data that were determined erroneously due to error by personnel or instrumentation that was not working correctly. It is also important to point out, again, that if at any time real time (room temperature) stability data falls outside of the acceptable range, the BUD must be reassessed and changes in formulation and packaging should be considered.

13. I disagree with Dr. Swaan's questioning of the accuracy of the data provided. The methodology that was used by the contract lab to analyse samples by High Precision Liquid Chromatography was validated and the validation report was provided (AR pages 984-987). When performing method validation, which is specified by USP guidelines, the accuracy, reproducibility, specificity, and reliability are examined. The purpose of method validation is to minimize the potential for inaccurate results. Additionally, the testing lab should have performed system suitability (and most likely did) as well as internal and external calibration processes in accordance with USP requirements, which also further minimize inaccuracy of the results. Also, Dr. Swaan interpreted incorrectly the conclusion of the study by Ermer, et al.,[3] which he used to justify why it is acceptable to have the results outside of the USP acceptable range. The article analysed stability studies with extended stability data only ranging from 12 to 60 months, which will typically have a much greater concentration of degradants that may be difficult to quantify, leading to greater potential for analytical error. This scenario is not applicable here. The study also examined how different dosage forms contribute to the inaccuracy of testing, and since the parenteral products were not examined in this study, Dr. Swaan's article reference is completely irrelevant. As a matter of fact, it is very important for the drug compounders and manufacturers to follow the USP guidelines exactly. If the FDA were to perform an audit and the stability data were found to be outside of the USP acceptable range, it would lead to drug recall, as this type of failure is never justifiable.

14. Lastly, I completely disagree with Dr. Swaan's analysis of the real time stability data trending analysis in Table 1 of his expert declaration. When the stability data is plotted, it becomes instantly very apparent that the stability data for the room temperature study do not follow a first order reaction. It is completely meaningless to perform linear regression and to determine the rate of degradation based on that. It is also erroneous to try to predict stability and the rate of degradation based on those calculations.

15. The results of both real time and accelerated stability studies here demonstrate that the expiry or BUD cannot be extended. The product must be reassessed as the quality of the product cannot be guaranteed to be within USP-acceptable specifications. It is impossible to predict

what the potency of the drug is at 365 days based on the outcomes of the stability studies discussed here.

[3]Ermer J, Arth C, De Raeve P, et al. Precision from drug stability studies. Investigation of reliable repeatability and intermediate precision of HPLC assay procedures. J Pharm Biomed Anal. 2005; 38 (4): 653-63.

## VI. Lack of transparency and failure of stability studies create the substantial risk that the drugs that the Board of Prisons intends to use in execution will not be of the appropriate quality and potency to cause death without significant suffering.

16. Due to lack of information provided, it is impossible to establish whether the drug is compounded correctly.

17. The potency of the drug cannot be guaranteed and most likely is outside of specified range as set by USP due to the failure of stability studies. This creates the risk that these drugs will not be sufficiently potent and effective to cause death without also causing significant suffering.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of September 2020.

*Michaela M. Almgren*
Michaela Almgren, PharmD, MS