```
                BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


   IN THE MATTER OF THE FEDERAL   .  Case Number 19-mc-145
   BUREAU OF PRISONS' EXECUTION   .  Washington, D.C.
   PROTOCOL CASES.                .  August 28, 2020
   - - - - - - - - - - - - - - -     1:50 p.m.


                TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
                  BEFORE THE HONORABLE TANYA S. CHUTKAN
                       UNITED STATES DISTRICT JUDGE


   APPEARANCES:

   For the Plaintiff:              JAMES K. STRONSKI, ESQ.
                                   Crowell & Moring LLP
                                   590 Madison Avenue
                                   New York, New York 10022


   For the Defendant:              JEAN LIN, ESQ.
                                   U.S. Department of Justice
                                   Civil Division
                                   Federal Programs Branch
                                   1100 L Street Northwest
                                   Room 11532
                                   Washington, D.C. 20005







   Official Court Reporter:        SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
                                   U.S. Courthouse, Room 4704-B
                                   Washington, D.C. 20001
                                   202-354-3284


   Proceedings recorded by stenotype shorthand.
   Transcript produced by computer-aided transcription.
```

```
                       P R O C E E D I N G S
            (All participants present telephonically.)
            THE COURT:  Good morning.  This is Judge Chutkan.
Thank you all for convening so quickly.  Obviously, time is of
the essence today, as we have an execution scheduled for 4:00.
     The reason I called is I think it's more efficient than
having pleadings getting blown back and forth, and I have
specific questions, particularly for counsel for plaintiff.
     I assume you have all given your names to Mr. Haley.  Who
will be speaking for plaintiff Nelson today?
            MR. STRONSKI:  Jim Stronski, Crowell & Moring, for
Mr. Nelson, Your Honor.
            THE COURT:  Thank you, Mr. Stronski.
     Okay.  So I've reviewed the -- in light of -- you all saw
the circuit's order.  And I have reviewed the plaintiffs'
request for proposed findings of fact and the government's
response to -- it's actually Mr. Nelson's request to clarify
and/or amend my order issuing the injunction.
     I have to be frank with you all that I'm a little -- I'm
not sure how the plaintiff is making out its irreparable injury
here.  I did not get -- I didn't find the plaintiffs' pleadings
to really hone in on that question.  And so I would -- well, let
me just pull it up.
     I mean, I'm trying to -- can you respond, Mr. Stronski, to
the -- the government responds -- cites the *Mitchell* case and
```

1   other cases that say that basically -- simply violating the
2   statutory provision of the FDCA does not in and of itself
3   establish irreparable harm in this case, and they do point to
4   the fact that the Supreme Court has allowed, at least recently,
5   four executions to take place, most recently being Mr. Mitchell
6   on, I believe it was, Wednesday, none of which took place with a
7   prisoner -- none of which occurred using pentobarbital that was
8   procured by means of a prescription.
9        And so I'm wondering if you can be more specific as to how
10  you establish irreparable injury as I must make a finding as
11  directed by the Circuit?
12            MR. STRONSKI:  Sure, Your Honor, and thank you for
13  making time on such short notice.
14            THE COURT:  Oh, of course.
15            MR. STRONSKI:  In the record, Your Honor, at docket
16  26-15, paragraph 12, is the declaration of Dr. Michaela Almgren,
17  an expert in compounding, who testifies by declaration that --
18  and it's in connection with the precipitation of pentobarbital
19  out of a compounded solution, that the precipitation of
20  pentobarbital out of the solution due to improper preparation or
21  storage is a major concern because subpotent pentobarbital
22  containing particulates can cause prolonged death in the
23  prisoner, to experience suffocation, drowning, or otherwise
24  severe respiratory --
25            THE COURT:  Isn't that really an Eighth Amendment

1  claim, which the Supreme Court has addressed?  I'm not sure how
2  that entitles you to relief in this case.
3           MR. STRONSKI:  The Supreme Court has vacated the
4  preliminary injunction relating to the Eighth Amendment, Your
5  Honor.
6     This, though, the irreparable harm is the harm of being
7  administered a fatal dose of a drug that lacks the scientific
8  studies to show that it is what they purport it to be.  And --
9           THE COURT:  Well, are you --
10          MR. STRONSKI:  And that's the problem.
11          THE COURT:  Dr. Almgren's statement, are you saying
12 that the Court should take that and from that make a finding of
13 fact?
14          MR. STRONSKI:  The Court can make a finding of fact
15 that Mr. Nelson will be subject to this irreparable harm arising
16 from a drug, the potency of which is not established because
17 there's been no 365-day stability study.
18          THE COURT:  And how do you square that argument with
19 the fact that the Supreme Court has now in the last six weeks
20 allowed four executions to take place using this form of
21 pentobarbital?
22          MR. STRONSKI:  So the Supreme Court has allowed those
23 to take place, but the Supreme Court hasn't had this issue and
24 these fact-findings before it, Your Honor.  The Supreme Court
25 has not had the issue of -- has not had before it the issue of

1  the fact that, in fact, the government is violating the Food,
2  Drug, and Cosmetic Act by the way it's procuring and the way
3  it's administering illegal substances that are unquestionably
4  defined in the FDCA as a drug.  It is clearly a drug because it
5  is in the USP.  That ends it there.  And so they simply didn't
6  have the legal issue and the fact-findings we are asking Your
7  Honor to make.
8         The Eighth Amendment also -- I'm sorry, Your Honor.
9              THE COURT:  No, go on.  Finish your point.
10             MR. STRONSKI:  My point is also, the Eighth Amendment
11 claim, a lot of the vacaturs here that we have seen deal with
12 the fact that there are other issues and obstacles to
13 establishing an Eighth Amendment claim.  And so the dismissal or
14 with the vacatur of preliminary injunction or permanent
15 injunction on the Eighth Amendment does not mean it would not be
16 appropriate to grant and uphold one on this APA claim.
17        It's undisputed that the government is violating the Food,
18 Drug, and Cosmetic Act.  The only issue is an alleged defect in
19 the order, and that can be corrected, because there is clear and
20 unmistakable irreparable harm to administer to --
21             THE COURT:  Well, that's the thing.  I don't think
22 it's clear, Mr. Stronski.  And that's what I'm having a hard
23 time with.  And I think the government drilled down on that in
24 their response, frankly.
25        Can you respond to their citation to *United States v.*

1  *Mitchell* in which the inmate argued that he would suffer an
2  irreparable harm due to the possibility that he could be
3  executed by means of an illegal protocol?
4      That argument was rejected, and --
5          MR. STRONSKI:  Right, Your Honor, but that argument
6  doesn't have our facts and our proposed fact-finding.  The
7  government has -- there is an administrative record here that we
8  are asking Your Honor to make factfindings based on that are not
9  a part of the *Mitchell* case, or at least those findings weren't
10 made in the *Mitchell* case.
11     Specifically with respect to the stability studies that
12 were and weren't done, as far as we can tell, Your Honor -- and
13 I can go through them -- if you look at what the government
14 cites here, that the BOP intends to have passed -- that the
15 drugs have passed quality assurance, none of that is a completed
16 stability study.  And in fact, in the first grouping of AR
17 there, 970 to 1015, I can go over what every page is, but the
18 point is some of it is simply just qualifying that what they're
19 putting in solution is actually the right chemical substance.
20 We don't dispute that.  We don't dispute a lot of this.
21     But the point is that they are making an unapproved drug,
22 mixing it up, and then it sits on a shelf under conditions that
23 are unspecified for up to a year.
24         THE COURT:  The government has asserted, and I have no
25 reason to doubt their assertion, that they're not using an

1    expired drug.
2         And moreover, I guess my question is really, is a technical
3    violation of the FDCA here sufficient to constitute irreparable
4    harm?
5              MR. STRONSKI:  It is; it is.  My point on *Mitchell*
6    simply was in addition to the lack of fact-finding, and the
7    fact-finding here being the drug being used, *Mitchell* was about
8    the protocol.  So there were different issues there factually.
9         But if I understand Your Honor's question -- and if I'm not
10   answering it, please interrupt me -- if you look at the
11   administrative record, if you look at the testing that was done,
12   the testing that they refer to is all being -- this work was
13   started in May of 2019, and they have testing in May of 2019,
14   and then they have testing in July and August of 2019.
15        And it's in our brief, but if you look at the testing in
16   July -- well, if you look first at AR 1009, that shows what
17   appears to be initial testing as part of a stability study.  And
18   stability studies have to test sterility, to make sure it's
19   not -- not sterile, particulate matter because don't want -- you
20   want it in solution.  You don't want it out of solution.  So
21   there are limits there, and that's important.  Potency is a key
22   issue as well and then whether there are endotoxins.  There was
23   an initial done, but there is no later testing in the record at
24   least on anything except for potency.
25        And then --

1           THE COURT:  But Mr. Stronski, what's your -- how do I
2   square these technical -- your argument about the insufficiency
3   of the study and the technical violation, the lack of
4   prescription, the compounding, how do I square those arguments
5   which all seem to go to technical violations of the statute --
6   and I'm not saying that those aren't serious, but they're
7   technical violations of the statute -- with the fact that the
8   Supreme Court has allowed to go forward four executions in the
9   last six weeks using the same version of the drug that the
10  government intends to use today?  How do you square those two,
11  your argument as to the violations with that fact, which I have
12  to consider?
13          MR. STRONSKI:  Right.  That fact, that the government
14  has allowed these to go forward --
15          THE COURT:  Not that the government has allowed; the
16  Supreme Court has allowed.  I understand your argument that the
17  Supreme Court addresses the claims before it.
18          MR. STRONSKI:  And that really is a key part of the
19  argument, because the Supreme Court didn't have these legal
20  claims and --
21          THE COURT:  And do you think you have a likelihood of
22  success on this argument before the Court?
23          MR. STRONSKI:  Absolutely, we do, because the
24  administration of a subpotent drug, if you look at the Almgren
25  declaration, will irreparably injure our client as he is put to

1  death.  And that's the finding; that's the necessary finding.
2       Additionally, the simple failure to get a prescription, the
3  failure to have any medical professional involved in
4  administering these drugs, the fact that you have a protocol
5  that administers the amount of drugs and the same drug to a
6  98-year-old 105-pound woman as it would a 28-year-old 450-pound
7  man doesn't -- it medically is wrong.  It doesn't make sense.
8  That's why a medical professional should be involved in this.
9  Number 1, this should be a prescription.  And number 2, it
10 should be a drug that has proper quality controls.  It should be
11 approved, or it should be shown to be as good as something
12 that's approved at a minimum to avoid harm.
13      But the approval here is a technical violation, Your Honor,
14 but the fact that the approval means something, the approval
15 means that it, among other things, has been established that if
16 it says it has a one-year stability, it means that they have put
17 drugs that they made under room temperature and elevated
18 temperature for a year, and they have tested it on a regular
19 basis.  And if it falls below the purity, the potency required,
20 which is at least 92 percent, it fails.  And a failing dosage
21 here irreparably harms our client.
22      And in the first test that they did at elevated
23 temperatures, it failed, in July of 2019.  In August of 2019,
24 even under room temperature, it had lost almost a percentage
25 point and was on the low end of 108 to 92 percent in terms of

1  the testing potency present.
2        And so they have not established that they have what they
3  say they have.  They have not established that they have a
4  potent drug, and administrating a drug that is subpotent
5  unquestionably as a matter of fact harms our client.
6        Those facts have not been a part of *Mitchell*; those facts
7  have not been a part of *Mitchell*.  Those facts have not been a
8  part of any of the other cases.  *Mitchell*, of course, also is
9  about protocol.
10       But Your Honor, those are the findings the Court can make
11 and we urge you to make and we think it appropriate to make
12 here.  And it's not been before -- this has not been before the
13 Circuit Court.  It has not been before the Supreme Court, Your
14 Honor, and we think it's appropriate and that irreparable harm
15 as a matter of fact does arise from the violation here of the
16 FDCA.
17            THE COURT:  Thank you, Mr. Stronski.
18       Who will be arguing for the government?
19            MS. LIN:  Your Honor, this is Jean Lin on behalf of
20 the government.
21            THE COURT:  I'm sorry.  Jean?
22            MS. LIN:  Jean Lin, L-i-n.
23            THE COURT:  Hi, Ms. Lin.  Sorry.  I didn't hear you.
24       All right.  Ms. Lin, let me ask you, why don't the
25 statements in the Almgren declaration regarding subpotent drugs,

1   why don't those reach the level of establishing irreparable harm
2   here?
3           MS. LIN:  Your Honor, those are just speculations
4   about what drug is going to be used to carry out any particular
5   execution.
6       I think the bottom line here is that the government has
7   standard guidelines now about testing and about making sure that
8   the drug is safe, has met all of the quality assurance standards
9   that Mr. Nelson's counsel just laid out.  And the government is
10  also making sure that all of the drugs that will be used for any
11  execution will not be expired.
12      So I think that is the bottom line, is that the government
13  should be presumed to be acting in good faith and particularly
14  given that we have various -- we have guidelines that also set
15  forth those requirements.  So as a general matter, there is just
16  no showing that in this particular case somehow we're going to
17  be deviating from those guidelines.
18      And I think what it seems to be at issue here are two
19  things:  One is that counsel seems to be arguing that just the
20  violation of FDCA itself is per se irreparable, and of course,
21  we disagree with that.  And the D.C. Circuit also disagreed with
22  that, given the D.C. Circuit's conclusion that the permanent
23  injunction issued by this Court was not supported by such a
24  finding.
25      And the idea that there is no prescription was also before

1   the Supreme Court the last time around when the Supreme Court
2   reviewed the preliminary injunction issued by this Court.
3           THE COURT:  Wait.  I'm sorry.  How -- I don't
4   understand.  What do you mean it was before the Supreme Court?
5           MS. LIN:  The fact that --
6           THE COURT:  Are you saying that they didn't address it
7   in their order, in their opinion?
8           MS. LIN:  Well, it was -- there was no opinion, but
9   there was also no noted dissent.  And the key there was that the
10  idea -- the claimed violation that there was no prescription was
11  before the Supreme Court, but the Supreme Court nevertheless
12  vacated the preliminary injunction issued by this Court.
13      But at a minimum, the D.C. Circuit yesterday made clear
14  that just the violation of the FDCA by itself would not be per
15  se irreparable --
16          THE COURT:  That's a little bit of a jump, Ms. Lin.
17  They simply said that the Court hadn't made sufficient findings,
18  you know, under the four-factor standard set forth in the *eBay*
19  case and the other case and hadn't made sufficient findings of
20  fact, among other things, with regard to irreparable injury.
21      So I think that's a leap to say that plaintiffs hadn't
22  established it.  Maybe the Court was saying this is a -- this
23  aspect is particularly troublesome.  But I don't know that
24  you -- I read the order to say that the order -- that my order
25  did not comply with the Rule 55 -- I can't remember if that's

1  the rule I'm citing correctly, but the rule that requires
2  certain findings of fact and conclusions of law.  But I'm not
3  sure that you can read into that what you're saying.
4          MS. LIN:  Well, Your Honor, if, in fact, a violation
5  of the FDCA itself establishes irreparable injury, there seems
6  no point for the D.C. Circuit to make a permanent injunction,
7  because Your Honor's finding was that there was a violation of
8  the FDCA, and that includes the violation of the prescription
9  requirement at issue here.
10         THE COURT:  But the circuit didn't reach whether I was
11 right or not.  It just simply said that my conclusion wasn't
12 supported by sufficient findings of fact.  They did not opine on
13 whether my conclusion was correct or not.
14         MR. STRONSKI:  Your Honor, Jim Stronski, if I may.
15     I read the order as simply saying the injunction portion of
16 your finding wasn't supported by findings, not the merits.
17         MS. LIN:  Your Honor, if I may respond.
18         THE COURT:  Yes.
19         MS. LIN:  So the question here is that in order to say
20 that the Court's permanent injunction was not supported,
21 currently before the D.C. Circuit was Your Honor's findings
22 about that there's a violation of FDCA.  So even though Your
23 Honor didn't put it in the proper bucket, the ruling is there
24 for the D.C. Circuit to see.
25     So we, therefore, disagree that we can read the D.C.

1  Circuit's ruling to say that, well, maybe there is irreparable
2  injury but we just --
3              THE COURT:  All I'm saying is I don't think we can
4  read it to say one way or the other.  I think we can -- I read
5  it to say there's -- you haven't presented sufficient basis in
6  the way that it's required for your finding, and therefore,
7  we're not reaching a finding.  I could be wrong.
8      I don't think either side can take -- they're going to see
9  what they want to see in it, but for the Court that has to
10 comply with it, I think what it is saying is that I need to --
11 before I can issue a permanent injunction, I need to make
12 certain findings in accordance with the Supreme Court's
13 guidelines.
14             MS. LIN:  If that's Your Honor's reading, then we
15 respectfully submit first that the mere violation of the FDCA
16 would not constitute per se irreparable harm.
17             THE COURT:  That's what I want to get to.
18             MS. LIN:  Yes.  And so we cited cases in our brief in
19 support of that proposition.
20     And so the second question is whether there is any specific
21 harm that's in the record upon which the Court could make a
22 factual finding.  And you know, our position is that the
23 administrative record is abundantly clear that there is -- that
24 what drugs the BOP is intending to use is going to be safe, it's
25 going to be -- I'm sorry, it's going to be unexpired, and it's

1  going to be tested for quality assurance, and that is the record
2  before this Court.
3       To the extent that there was discussion about a time study,
4  just to note that this issue was not before Your Honor the first
5  time when Mr. Nelson moved for summary judgment, and so the
6  government, obviously, didn't respond at that point.
7           THE COURT:  Yes.  So let me ask you, Ms. Lin, if based
8  on the record before me I find that the FDCA does require a
9  prescription for the use of pentobarbital and the government
10 concedes it's not going to get a prescription, then that
11 violation of the -- tell me how that violation of the FDCA
12 doesn't establish irreparable injury, given that in death
13 penalty cases irreparable injury is usually not the thing
14 everybody is -- you know, given that it's a death penalty case,
15 obviously, and obviously, if the plaintiff is executed, that's
16 final.
17          MS. LIN:  If I understand Your Honor's question, we
18 don't think that there is any way to establish that the lack of
19 prescription in the death penalty context can establish
20 irreparable injury for the very reason Your Honor just
21 identified, which is that the intent of the drug is to kill the
22 inmate, if that answers your question about that subject.
23          THE COURT:  I think so; I think so.
24          MS. LIN:  But on the factual question, if I could just
25 talk quickly about the time study test that was raised by

1   Mr. Nelson's counsel, I was just mentioning that that issue was
2   not raised before Your Honor the first time.  But the --
3           THE COURT:  You're right, it was not.
4           MS. LIN:  Right.  And the response to that first is
5   that we feel the BOP guidelines making sure that the drug is
6   tested and not expired meets the standard, and there is no
7   reason to question the government's representation to that
8   effect because the government is presumed to act in good faith.
9           But even on the time study itself, the administrative
10  record shows that the time study began in May and June of last
11  year.  So the 365 days naturally expired by June this year, and
12  then, therefore, the drug -- the testing is completed.
13          That last part is not in the administrative record, but the
14  point of the information in the administrative record at that
15  time when we compiled it last year showed that we are doing all
16  kinds of testing to ensure that the drug we use will be -- will
17  meet quality assurance.
18          And the compounding pharmacy also is a key factor here,
19  because it is the pharmacy that does meet several standards in
20  terms of when it compounds drugs, and part of that, again, is to
21  make sure the drug is tested for potency and all the other
22  factors that are required to be tested for such a drug.
23          So for that reason, the idea about there's going to be
24  unstable or some sort of subpotent drug we think is unwarranted
25  based on this record.  If the Court were to find so, then we

1  would think that procedurally that's improper to do that now
2  because we would then -- we would need to -- we would have a
3  right to contest such information.
4        THE COURT:  Okay.  Did you have any more points you
5  wanted to make, Ms. Lin?
6        MS. LIN:  Your Honor, we would just ask that the Court
7  let us know as soon as you can about your ruling on this,
8  because even though the execution is scheduled at 4:00, the
9  process actually begins quite a bit before that time, and so if
10 Your Honor intends to rule, to let us know immediately if you
11 can so we can seek appellate review and there is at least
12 opportunity.
13       THE COURT:  Absolutely.
14    Mr. Stronski?
15       MR. STRONSKI:  Your Honor, we have the administrative
16 record that we have, and it's the only administrative record
17 that exists, and that record demonstrates that the stability
18 study that they did, counsel admitted, started in May.  In July,
19 one of them failed at elevated temperature --
20       THE COURT:  None of this was raised in your motion for
21 summary judgment, Mr. Stronski.
22       MR. STRONSKI:  It was in the record, but the summary
23 judgment motion, it was not, Your Honor.  It's been raised,
24 though, in several motions on appeal, and the government has not
25 disputed it, has not identified any other testing that was done.

1       And the fact of the matter is that the administration of
2  this sentence in violation of the FDCA does irreparably harm our
3  client.  Our client will die when he's executed.  He will be
4  executed, but he should be executed in a way that doesn't
5  irreparably injure him, subject him to, among other things, a
6  dose the potency of which we don't know because it hasn't been
7  established.
8       When counsel says the government won't use anything beyond
9  its use date, what they're saying is they won't use anything
10 beyond a year, and I trust that's true.  But that's not the
11 issue at all.  The issue is whether scientifically this
12 unapproved drug that they've had a compounding pharmacy make is
13 stable and potent within the required range to be used in humans
14 when it's used.  And the record establishes that there's no
15 scientific basis for that, and absent that, our client is
16 irreparably harmed by the use of this drug now.
17      The fact that this is not -- the Supreme Court has not --
18 has allowed other executions to go forward is not dispositive of
19 this point, because this claim, legal claim and these facts have
20 not been before it in the record, Your Honor.
21           THE COURT:  All right.
22           MR. STRONSKI:  Lastly, I would just say that the FDCA
23 exists to protect humans to whom drugs are administered, and
24 allowing a drug that is a barbiturate to be administered without
25 a prescription and in a manner where it is not an approved drug

1   is irreparable harm, Your Honor, as well per se.
2       Thank you.
3           THE COURT:  All right.  Thank you, everyone, for your
4   time and attention in this.  I think we're all working very
5   hard, and obviously, we're up against some serious deadlines.
6       I will try to get a decision to you as quickly as possible,
7   and my clerks will notify you as soon as it's coming down, I'm
8   hoping within the next hour or so.  All right?
9           MR. STRONSKI:  Thank you, Your Honor.
10          MS. LIN:  Your Honor --
11          THE COURT:  Yes, Ms. Lin.
12          MS. LIN:  Your Honor, when you say your clerk will
13  notify us, is that going to be by e-mail or by telephone?
14          THE COURT:  What would -- would e-mail be preferable?
15  Would it be more efficient?  Because by phone means we have to
16  get you all together.
17          MS. LIN:  Correct.  So we would greatly appreciate an
18  e-mail notice as soon as Your Honor has her decision.
19  Obviously, we are proceeding with the execution today at 4:00.
20  We will begin at about 2:00.
21          THE COURT:  All right.  We will e-mail you.
22      Thank you, everyone.
23        (Proceedings adjourned at 12:21 p.m.)
24
25

```
 1                CERTIFICATE OF OFFICIAL COURT REPORTER
 2
 3          I, Sara A. Wick, certify that the foregoing is a
 4   correct transcript from the record of proceedings in the
 5   above-entitled matter.
 6
 7          Please Note:  This hearing occurred during the
 8   COVID-19 pandemic and is, therefore, subject to the
 9   technological limitations of court reporting remotely.
10
11
12   /s/ Sara A. Wick                    September 10, 2020
13   SIGNATURE OF COURT REPORTER         DATE
14
15
16
17
18
19
20
21
22
23
24
25
```