```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


     IN THE MATTER OF THE        .  MC No. 19-0145 (TSC)
     FEDERAL BUREAU OF PRISONS'  .  Washington, D.C.
     EXECUTION PROTOCOL CASES.   .  Friday, September 18, 2020
     . . . . . . . . . . . . . .  . 1:10 p.m.

                    TRANSCRIPT OF EVIDENTIARY HEARING
                        (VIA TELEPHONE CONFERENCE)
                   BEFORE THE HONORABLE TANYA S. CHUTKAN
                      UNITED STATES DISTRICT JUDGE


     APPEARANCES:

     For the Plaintiffs:      ALEXANDER L. KURSMAN, ESQ.
                              JOSEPH W. LUBY, ESQ.
                              Office of the Federal Community Defender
                              601 Walnut Street
                              Suite 545 West
                              Philadelphia, PA 19106
                              (215) 928-0520

                              SCOTT W. BRADEN, ESQ.
                              Federal Public Defender
                              1401 West Capitol Street
                              Suite 490
                              Little Rock, AR 72201
                              (501) 324-6114

                              GREGORY S. SMITH, ESQ.
                              Law Offices of Gregory S. Smith
                              913 East Capitol Street SE
                              Washington, DC 20003
                              (202) 460-3381

     For the Defendant:       JEAN LIN, ESQ.
                              SCOTT A.C. MEISLER, ESQ.
                              U.S. Department of Justice
                              1100 L Street NW
                              Room 11532
                              Washington, DC 20005
                              (202) 514-3716

     Court Reporter:          Bryan A. Wayne, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001
                              (202) 354-3186
```

C  O  N  T  E  N  T  S

TESTIMONY

WITNESS:

KENDALL VON CROWNS:    Cross-Examination...................... 12
                      Redirect Examination................... 29

JOSEPH ANTOGNINI:     Cross-Examination...................... 35
                      Redirect Examination................... 60

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Your Honor, we have miscellaneous

 3    action 19-145: In the Matter of Federal Bureau of Prisons

 4    Execution Protocol Cases.  I believe all counsel are available,

 5    are present, and we may go forward.

 6          THE COURT:  All right.  Thank you, everyone.  A couple

 7    of housekeeping matters before we begin.  One, I saw an email

 8    regarding the availability of a witness who wasn't available

 9    today, and it looks like the government is saying that -- hold

10    on one minute.  There's a witness who's not available today who

11    can testify tomorrow, and I think that's -- which witness is

12    that?  I'm trying to figure it out.

13          UNIDENTIFIED SPEAKER:  Almgren?

14          THE COURT:  Dr. Almgren.  All right.  But then there's

15    a response -- I wasn't understanding the government's response,

16    which states that the government's position is that if the Court

17    accepts Dr. Almgren's declaration, then they're okay having a

18    hearing on Saturday if Dr. Swaan's cross is put off until

19    Saturday.

20      I don't understand that, because yesterday when I asked

21    who the witness would be, there was no mention of a Dr. Swaan;

22    because I took notes and the government said Dr. Crown, I think

23    Dr. Antognini, and Dr. Yang were the three names that the

24    defendants mentioned.  I don't have any mention of a Dr. Swaan,

25    and I think that Dr. Swaan is the declarant whose report was
```

submitted in a surreply after I had closed off the filing of

new pleadings.  Is that correct?

MS. LIN:  Your Honor, this is Jean Lin on behalf

of the government.  So yesterday I actually -- I believed I

mentioned Dr. Swaan.  There is no Dr. Yang.  There's only three

experts on our side, and  --

THE COURT:  Oh.  Maybe I then -- is Dr. Swaan the

expert from Holder?

MS. LIN:  No, he's not.  So if I may explain, so

Dr. Swaan's declaration was filed a couple days ago because,

for the first time in the reply brief of the plaintiffs' motion,

they challenged the time study that was a report that were

produced prior to that time.  And so that was the -- so we

didn't have an opportunity to respond because plaintiff chose to

file their opening brief without mentioning the time setting

report.  They did it in the reply brief.  And because they did

it in the reply brief, we believe we're entitled to --

THE COURT:  Okay.

MS. LIN:  -- respond to that question.  So we

submitted Dr. Swaan's declaration to challenge the new argument

raised about the time study or the adequacy of it.  So that was

the purpose.  And then Dr. Almgren, I believe plaintiffs are

seeking to put on Dr. Almgren's declaration in response to

Dr. Swaan's declaration.  So they're kind of connected in that

way.

1          THE COURT:  Okay.  So it makes sense to have them

2     together.  Well, I'll tell you, I'm prepared to have a brief

3     hearing tomorrow for those witnesses, but I will then shorten

4     today's hearing since we're talking about two fewer witnesses

5     we had anticipated, because as you can all appreciate, I have a

6     full plate here all weekend, as do my staff.

7          So let me ask you first, Ms. Lin:  Will you be doing the

8     questioning for the government?

9          MS. LIN:  Yes.  But, Your Honor, to shorten your day

10     even further as to this hearing, if I could make a couple of

11     points?

12          THE COURT:  Sure.

13          MS. LIN:  And I think you'll be happy to hear that.

14     So, first of all, I think we want to first two initial points,

15     and the third is to explain how we would propose to proceed.

16          We prefer that -- we recognize that the government has

17     taken the position that an evidentiary hearing is required

18     before this court could credit the plaintiffs' evidence and

19     grant a permanent injunction.  But for the reasons we explained

20     in our briefs, one point that I made yesterday was that the

21     hearing today be relevant to any harm that would focus on the

22     alleged violation of FDCA.

23          The second objection we would like to make is that given

24     the extremely short notice and the time that the parties have

25     been given to prepare, we do not believe this type of extremely

abbreviated hearing is proper even in the capital context,
because that type of emergency hearing is the role of
preliminary injunction, which the plaintiffs had already gone
through the process, especially given the timing that has
preceded this.  So that is our second objection.

So in light of that and given the difficulties -- honestly,
yesterday we spent a lot of time tracking down our witnesses --
the government's not going to cross-examine the plaintiffs'
witnesses today, and we would like instead to reserve a time
that is allotted to us to redirect our witnesses if the Court
permits.

THE COURT:  You can -- sure.  Obviously, I'm the
fact-finder.  If I have questions, I'm going to -- I have to
make credibility determinations.  So if I have questions, I'll
ask them.  You can put on your evidence however you want to.  If
you want to waive cross-examination, you're certainly free to do
that and instead use the time for redirect examination.  Sure.

Do plaintiffs have any objection?  And your second
objection with regard to the hearing is also noted, Ms. Lin.

The plaintiffs have any -- and who will be speaking for
plaintiffs today?

MR. KURSMAN:  Good afternoon, Your Honor.  Alex
Kursman for Alfred Bourgeois.  I will be cross-examining Dr. Von
Crowns, and co-counsel Scott Braden who represents --

THE COURT:  Wait a second.  Van Crown or Van Norman?

1          MR. KURSMAN:  Von Crown.

2          THE COURT:  Von Crown.  Okay.  There's two Von

3    witnesses.  Okay.  You're examining Von Crown, and I'm sorry,

4    you were saying...

5          MR. KURSMAN:  And co-counsel Scott Braden, who

6    represents plaintiff Norris Holder, will be cross-examining

7    Dr. Antognini.

8          THE COURT:  Okay.  And, Mr. Kursman, you said you

9    represent Mr. Bourgeois.  Right?

10          MR. KURSMAN:  Yes, Your Honor.

11          THE COURT:  Now, as to the government's proposal

12    or the government's desire to forgo cross-examination and

13    to simply do redirect of their witnesses, do you have any

14    objections to that?

15          MR. KURSMAN:  Well, the only objection I would have,

16    Your Honor, is that our witness, especially Dr. Gail Van Norman,

17    then won't be able to testify.  So I would request that if we

18    have additional time, that is, the hearing right now is allotted

19    for four hours --

20          THE COURT:  Three hours.  Three hours.

21          MR. KURSMAN:  I apologize.  I'm not sure what you want

22    to lower it to based on the two witnesses testifying tomorrow,

23    but if Mr. Braden and I use less than our allotted time, I would

24    request to reserve the right to call Dr. Van Norman and put her

25    up for direct examination.

 1          THE COURT:  Why?  I have her declarations.  If the

 2   government doesn't want to cross-examine her, what would she

 3   testify to that wouldn't be cumulative of what she's already

 4   placed in her reports and declarations?

 5          MR. KURSMAN:  Right.  So the reason I would want

 6   to reserve that request is only if on redirect something is

 7   raised --

 8          THE COURT:  Okay.

 9          MR. KURSMAN:  -- from the expert testimony that they

10   did not raise in their report --

11          THE COURT:  Okay.  If the government's witnesses on

12   cross-examination raise something that was not addressed in

13   Dr. Van Norman's report, then she can testify as to those

14   points.  Beyond that, I don't see any need to have her testify

15   to repeat what's in her declaration and reports given that the

16   government does not seek to cross-examine her.  Okay?

17          MR. KURSMAN:  I'm sorry, Your Honor.  Just to

18   clarify --

19          MS. LIN:  Your Honor --

20          THE COURT:  Wait, wait.  Who's speaking?  One at a

21   time.  You gotta say who you are.

22          MR. KURSMAN:  I apologize, Your Honor.  This is Alex

23   Kursman again.  Just to clarify, our position is if the experts

24   raise new issues on redirect examination as well.

25          THE COURT:  Well, that would certainly be -- new

1   issues that weren't in their report, I guess if that happens,

2   yes.

3             MS. LIN:  Your Honor, may I be heard about that?

4             THE COURT:  Yes, Ms. Lin.

5             MS. LIN:  So we, of course, strongly object because

6   the point of today's experts testifying are the parties are

7   supposed to focus on the extent of the declarations already

8   submitted to the Court.  So we would obviously not try to --

9             THE COURT:  Well, okay.  What I'll do, I will need a

10  proffer before -- yesterday we agreed to hear from a certain

11  number of witnesses; and the dimensions of this hearing are

12  already being adjusted based on witness availability, and the

13  government has decided to proceed in a different fashion, which

14  is their right.

15      Now, beyond what I've said I'll allow, which is that

16  plaintiffs can go forward, cross-examine the government's

17  witnesses, the government can redirect its witnesses should they

18  need to, should they choose to.  After that is done, I will hear

19  proffers from the plaintiffs as to whether they wish to elicit

20  testimony from their own witnesses and on what points before

21  I'll allow it.  Okay?  I'm not giving advisory opinions.  That's

22  how I'm going to proceed.

23      Just like in a trial, before I allow re-cross, you know, or

24  additional questioning, I would want a proffer, and I'll want to

25  limit redirect to stuff that was brought up only on cross that

1    wasn't addressed on direct.  I'll apply those same principles,

2    but I will need a proffer before I allow it.  Okay?

3         MR. SMITH:  Your Honor, this is Greg Smith, and I

4    represent Mr. LeCroy.  And given his Tuesday date -- and this

5    is the first we've heard that the government is wanting

6    potentially redirect --

7         THE COURT:  Well, I mean certainly you should be

8    prepared to deal with the government's witnesses, Mr. Smith.

9         MR. SMITH:  No, we are.  My issue, Your Honor, has to

10   do with the fact that we have a few days, and what I would not

11   want to have happen is for them to reserve calling their

12   witnesses on redirect in a way that's going to slow down this

13   court's --

14        THE COURT:  Believe me, Mr. Smith, nobody is more

15   attuned to the need to be expeditious than I am, especially

16   around the fact that your client entered this litigation at

17   the last minute.  So I am moving as quickly as I can.

18        MR. SMITH:  No, and I appreciate what the Court is

19   doing.

20        THE COURT:  All right.

21        MR. SMITH:  But I just want to ensure that they're not

22   going to come back and say we need redirect in a manner that is

23   going to interfere with the Court's ability to rule on this

24   permanent injunction request prior to Tuesday.

25        THE COURT:  I assure you that is uppermost in my mind.

1     Let's begin.  Plaintiffs, you're the movants -- well, the

2     government's moved and plaintiffs have moved, but since the

3     government is not seeking to cross-examine the defense witnesses

4     -- I mean since the defendants are not seeking to cross-examine

5     the plaintiffs' witnesses, why don't we begin with the

6     plaintiffs' cross-examination of the government's witnesses.

7          Ms. Lin, was there an order you prefer to submit your

8     witnesses for cross-examination in?  Who do you have ready now?

9          MS. LIN:  Both doctors are standing by.  I just need

10    to email to let them know when to dial in.

11         THE COURT:  Okay.  Who's going to go first?

12         MS. LIN:  I think Dr. Antognini can go first.

13         THE COURT:  Okay.

14         MR. KURSMAN:  Your Honor, this is Alex Kursman again.

15    We would ask to cross-examine Dr. Von Crown first.

16         THE COURT:  Do you have Dr. Crown available, Ms. Lin?

17         MS. LIN:  Yes.  He just needs to --

18         THE COURT:  All right.  And who will be cross-examining

19    -- oh, that's Mr. Kursman.  Okay.

20         All right.  Let's begin with Dr. Crown.

21         MS. LIN:  My apologies, Your Honor.  We just need to

22    make sure he can dial in right now.

23         THE DEPUTY CLERK:  And, Judge, I thought you wanted me

24    to swear the witnesses.

25         THE COURT:  Yes, please.  Thank you.

1          (Witness joins call, is sworn.)

2                THE COURT:  All right.  Good afternoon, Dr. Crown.

3     This is Judge Tanya Chutkan.  Thank you for making time today on

4     such short notice.  You'll be questioned today by Mr. Kursman.

5          Mr. Kursman, you may proceed.

6          And, Dr. Von Crown, you just took an oath over the phone,

7     so you're under oath as you would be in an in-person hearing.

8                THE WITNESS:  I understand.  Thank you.

9          KENDALL VON CROWNS, WITNESS FOR THE GOVERNMENT, SWORN

10                         CROSS-EXAMINATION

11    BY MR. KURSMAN:

12    Q.   Good afternoon, Dr. Von Crown.

13    A.   Good afternoon.

14    Q.   I want to start by talking about pulmonary edema.  It's

15    your opinion that pulmonary edema will occur in each execution

16    under the federal protocol.  Right?

17    A.   Yes.  I feel pulmonary edema will occur in individuals that

18    are overdosed with pentobarbital, yes.

19    Q.   And that would include within every execution in the

20    federal protocol.  Right?

21    A.   I mean, I don't know if it would occur in every execution.

22    I'm sure everybody is different.  So it more likely than not

23    would occur, but I cannot say it is an absolute because

24    everybody's bodies react differently.  So I can't say that it's

25    a definitive thing, but more likely than not.

1    Q.    Okay.  Well, in paragraph 4 of your report, you discuss

2    pentobarbital and the effects that the pentobarbital injected in

3    these inmates will have.  And in that paragraph, four lines from

4    the top, you do say, right, "Due to these effects, there is

5    development of pulmonary edema and eventual cardiac collapse."

6    Am I right?

7    A.    That is correct.  Yes.

8    Q.    And you agree with me that this pulmonary edema, it doesn't

9    happen after death.  Right?

10   A.    Well, it depends.  So if we're talking about brain death,

11   yes, pulmonary edema can continue after brain death has

12   occurred.  If we're talking about cardiopulmonary death, then

13   no, it won't occur.  You'll get a settling of the fluids in the

14   body, but you won't get continued edema.  Edema is going to be a

15   result of a beating heart.  But if brain death occurs, you can

16   still get pulmonary edema.

17   Q.    But, essentially, the pulmonary edema occurs while the

18   inmate is still alive.  Right?

19   A.    Well, if they had brain death -- and, again, it just

20   depends on how we're defining death, because brain death

21   occurring can still have respiratory and cardiac function.

22   Even though your brain is completely gone, your heart and lungs

23   will continue to function until finally the brain shuts those

24   centers down.

25         If you're getting cardiopulmonary death, then if that

1    happens, everything kind of shuts down and you're not going to

2    see continued pumping of the heart.  So you're not going to see

3    continued formation of pulmonary edema.

4    Q.    But you're not aware of somebody being pronounced dead

5    until their heart stops beating.  Isn't that right?

6    A.    Well, in the hospital setting, people are often pronounced

7    brain dead before their heart stops beating because that's how

8    they do live organ transplantations; that they're declared brain

9    dead but their heart and lungs are still beating, and then they

10   acquire the organs that way.  So I am aware of people still

11   being declared dead but still having heart and lung function

12   going on.

13   Q.    Okay.  But you would agree with me that -- of course you'd

14   agree with me that pulmonary edema certainly occurs after the

15   pentobarbital is injected.  Right?

16   A.    Yes.  It would occur after the individual is injected with

17   pentobarbital unless they had an underlying health condition

18   that had them have pulmonary edema prior to.

19   Q.    And you haven't seen any evidence of that in the reports

20   that you have reviewed.  Right?

21   A.    I have not.

22   Q.    Okay.  So at some point after the pentobarbital is

23   injected, but before the inmate's heart stops beating, people

24   suffer pulmonary edema.  Right?

25   A.    They will have the formation of pulmonary edema.  Correct.

1    Q.   All right.  Now let's talk about consciousness.

2         Do you agree with me that consciousness is the subjective

3    experience of something?

4    A.   What are you defining as "subjective"?  That I don't

5    understand.

6    Q.   So how many times, Dr. Van Norman, have you testified

7    before?

8    Q.   Are you talking to someone else?  Because I'm Crowns.

9    A.   I apologize, Dr. Von Crown.

10        In your CV, you said you testified about 150 times.

11   Is that correct?

12   A.   Over 250 times.  That's correct.

13   Q.   So you know how this procedure works.  Right?

14   A.   Yes.

15   Q.   I ask the questions, and then you answer a question?

16   A.   I totally understand --

17            THE COURT:  Mr. Kursman.  Mr. Kursman.  This is not a

18   trial.  We don't me to score points here.  I don't see any need

19   for this.

20            MR. KURSMAN:  I apologize, Your Honor.

21            THE COURT:  Okay.

22   BY MR. KURSMAN:

23   Q.   So you agree with me that the term "consciousness" means

24   how somebody experiences something.  Is that how you define

25   "consciousness"?

1  A.   As how someone experiences -- yeah.  That can be a

2  definition of "consciousness."

3  Q.   And that is different from the term "responsiveness."  Right?

4  A.   And "responsiveness" is -- you're defining it as how

5  someone responds to painful stimuli?  Is that what you're

6  saying?  I mean consciousness is how you experience;

7  responsiveness is how you react.  If that's how we're defining

8  it, yes, that's how I would define it.

9  Q.   Okay.  So responsiveness to you -- and tell me if I'm

10  getting this right -- would be the ability to react to that

11  experience?

12  A.   Correct.  The body's ability to react to the experience.

13  Q.   Now, in paragraph 6 of your report, you note that the

14  inmates were asleep within two minutes.  Right?

15  A.   Yes.

16  Q.   Now, when you say "asleep," that may mean that the inmate

17  was unconscious.  Right?

18  A.   Yes.

19  Q.   But it could also mean that the inmate was unresponsive.

20  Right?

21  A.   That's a possibility, yes.

22  Q.   Right.  From the witness reports themselves, you can't

23  say one way or another.

24  A.   Whether they were conscious or unresponsive?

25  Q.   Right.

1   A.   So they were -- I feel unconscious because they were

2   asleep.  Responsiveness could mean their body's responsiveness

3   is there, have unlabored breathing that slowly stops, so if

4   they're not responding to a painful stimuli, in my opinion,

5   because they have unlabored breathing.

6   Q.   I'm just talking about at the first two minutes.  You say

7   you see they're asleep.  Right?  At that point, you can't tell

8   from the eyewitness reports whether they are unconscious or if

9   they're only unresponsive.  Right?

10  A.   I feel that being asleep is a lack of consciousness.  They

11  seem to be, based on witness reports, not to be responding or

12  conscious.  So, I mean, I feel it is loose information, but to

13  me it's like they are asleep.  Whether they're unresponsive or

14  not, again, you have unlabored breathing, so they're not

15  responding to anything as far as their breathing is concerned.

16  Q.   But we do know that the average execution, according to

17  your report, took 24 minutes from injection to death.

18  A.   Correct.

19  Q.   Is that right?  Okay.  And in paragraph 10 of your report,

20  you say there is no way to tell how quickly the pulmonary edema

21  occurred.  Right?

22  A.   Yes.  That is correct.

23  Q.   And then you say, even if there was flash pulmonary edema,

24  it would take minutes to occur.  Right?

25  A.   Yeah.  That is what my report says.

1   Q.   Now, are you aware that there are case studies showing

2   that flash pulmonary edema can happen in seconds or even

3   instantaneously?

4   A.   I don't know the one with instantaneously.  I know there's

5   a case report of an individual who developed flash pulmonary

6   edema, but he had underlying heart issues, specifically mitral

7   valve issues, as well as other heart problems.  So his heart was

8   already compromised when the flash pulmonary edema occurred.

9        So in his situation, his flash pulmonary edema was the

10  result of the fact that he already had a compromised heart which

11  then resulted in him developing edema more rapidly than normal.

12  So you have an individual that was already kind of critical when

13  this occurred.  But beyond that, I don't know of any other

14  statements with flash pulmonary edema where it doesn't always

15  say that it occurs.  The time frame seems to be minutes.

16  Q.   Now, in paragraph 5 of your report, you say that you

17  reviewed media reports of the execution?

18  A.   Yes.

19  Q.   And let me take you to paragraph 11.

20       You say, "From the eyewitness accounts of the three

21  executions, there is no evidence of distress that would be

22  seen in flash pulmonary edema."  Do you see that?

23  A.   Yes.  Correct.

24  Q.   And the three executions that you're referring to are

25  the executions of Mr. Lee, Mr. Honken, and Mr. Purkey.  Right?

1    A.    Honken, Purkey, and Lee.  Correct.

2    Q.    And then you say, "The breathing of all three individuals

3    was noted to be steady and unlabored."  Do you see that?

4    A.    And that's in paragraph 11?  Yes, I do see that.

5    Q.    And right after that you say, "This fact establishes that

6    the decedent experienced no physical response to pulmonary

7    edema."  Correct?

8    A.    Yes.  That is correct.

9    Q.    Are you aware that the Associated Press reported that

10   during Mr. Honken's execution, several minutes after officials

11   began administering the lethal drug, Mr. Honken's breathing

12   became, quote, "more labored"?

13           MS. LIN:  Objection.  This is outside the scope of his

14   declaration.

15           MR. KURSMAN:  Your Honor, Dr. Von Crown in his

16   declaration said he reviewed media reports.  So I am questioning

17   him as to what media reports he reviewed.

18           THE COURT:  All right.  I'll allow it on a limited basis.

19           THE WITNESS:  I did not see a media report about

20   labored breathing.

21   BY MR. KURSMAN:

22   Q.    Are you aware that Fox News reported that during Mr. Lee's

23   execution, Mr. Lee's, quote, "breathing appeared to become

24   labored"?

25   A.    No.  But what are we defining as "labored"?

1    Q.   I'm just asking if you are aware of that report from

2    Fox News.

3    A.   I am not.

4    Q.   Okay.  And are you aware of a report from the *Tribune-Star*

5    -- that's the paper where the executions take place -- reported

6    that during Mr. Purkey's execution he appeared to be, quote,

7    "gasping for breath"?

8    A.   No.  I did not see a report from a tribune that said he

9    gasped for breath.

10   Q.   Okay.  And are you also aware that the government executed

11   two additional inmates aside from the three we just talked

12   about?

13   A.   No.  I would not know their names.

14             THE COURT:  Do you know that they did?

15             THE WITNESS:  Well, no.  I did not know that they've

16   executed two more people past these three individuals more

17   recently.

18   BY MR. KURSMAN:

19   Q.   Well, would you have wanted to know the results of those

20   two executions?

21             MS. LIN:  Objection --

22             THE WITNESS:  Certainly, it would be --

23             MS. LIN:  -- this is again --

24             THE COURT:  Sorry.  Dr. Von Crown, if there's an

25   objection, you have to wait before you answer --

1           THE WITNESS:  I apologize.

2           THE COURT:  -- until I rule on the objection.

3     No problem; we're on the phone.

4           THE WITNESS:  Yes, I know.  It's a lot different than

5     being in court.

6           THE COURT:  It is very different, I assure you.

7     I'm finding it odd myself.

8        Ms. Lin, you have an objection?

9           MS. LIN:  Yes.  Objection again on the studies outside

10    the scope of Dr. Crowns' declaration.

11          THE COURT:  Okay.  Dr. Crown, Dr. Von Crown, has said

12    he hasn't -- he wasn't aware of the report.  So can you -- what

13    is your question, Mr. Kursman?  Can you ask it again?

14          MR. KURSMAN:  Well, sure.

15    BY MR. KURSMAN:

16    Q.   Would it have been helpful to your opinion to find out

17    about the media accounts of the other two executions that you

18    didn't review?

19          MS. LIN:  Objection again, Your Honor.  This is again

20    outside the scope of --

21          THE COURT:  Yeah.  You know, I'll overrule the

22    objection, Ms. Lin; but I have to say, Mr. Kursman, the answer

23    to that question is not particularly helpful to the Court.

24       But you can answer it if you can, Dr. Von Crown.

25          THE WITNESS:  More information is always helpful.

1          THE COURT:  Okay.  Move along, please, Mr. Kursman.

2   BY MR. KURSMAN:

3   Q.   Well, are you aware that CBS reported during Mr. Mitchell's

4   execution, his breathing became labored and his stomach area

5   began to throb?

6          MS. LIN:  Again, Your Honor, we're objecting because

7   Dr. Crowns has just testified he did not --

8          THE COURT:  Okay.

9          MS. LIN:  -- August 10th, and so the public --

10         THE COURT:  Yes.  Wait, wait.  Mr. Kursman --

11      Dr. Von Crown, have you reviewed any media reports of

12  executions that were performed since -- or are you aware of any

13  media reports of any executions that were performed since the

14  time you submitted your report?

15         THE WITNESS:  I am not, ma'am.

16         THE COURT:  Okay.

17      Mr. Kursman, you can ask one summary question.

18         MR. KURSMAN:  Okay.

19         THE COURT:  And I think Dr. Von Crown has already said

20  more information is always useful.

21         MR. KURSMAN:  Your Honor, I'm just trying to establish

22  the basis for his opinion and whether it's relevant to his

23  opinion.

24         THE COURT:  Well, as he said, more information would

25  always be helpful.  In weighing his opinion, I can factor in his

1    answer that he hasn't reviewed any media reports since then, and

2    I'll give that testimony the weight that I believe it deserves.

3           MR. KURSMAN:  So, Your Honor, may I ask one follow-up

4    question before I go on?

5           THE COURT:  Yes.

6           MR. KURSMAN:  Thank you, Your Honor.

7    BY MR. KURSMAN:

8    Q.  So you're not aware that the AP reported during

9    Mr. Nelson's execution, his chest and mid-section began to

10    heave and shudder involuntarily.  Right?

11    A.  I am not.  But do you know what time frame that would be?

12    Because that could just be agonal breathing.  But, no, I'm not

13    aware of that.

14           THE COURT:  Okay.  Let's move on.

15    BY MR. KURSMAN:

16    Q.  Let's move on to the drug that is used in the executions,

17    pentobarbital.  Okay?  You note in paragraph 3 of your report

18    that pentobarbital has an effect that lasts up to two hours.

19    Right?

20    A.  Correct.

21    Q.  Are you aware that pentobarbital is a short-acting

22    barbiturate?

23    A.  Yes.  That's stated in the first line of paragraph 3.

24    Q.  And as a short-acting barbiturate, you know that it has

25    a short duration of action.  Right?

1    A.    Correct.

2    Q.    And are you aware that textbooks in the field of

3    anesthesiology explain that most patients become responsive

4    again within three to five minutes after an IV dose of

5    pentobarbital?

6    A.    I am not aware of what the textbooks in anesthesiology say,

7    but I'm sure those are clinical doses of pentobarbital that are

8    being administered.

9    Q.    Now, in paragraph 3 of your report, you note that

10   pentobarbital is used to humanely execute animals.  Correct?

11   A.    That it can humanely euthanize animals, yes.

12   Q.    Yeah, I apologize.  But you agree with me that we have no

13   idea whether the animal is unconscious or just unresponsive

14   after they receive the pentobarbital.  Right?

15   A.    They go to sleep and they don't -- there's no reports of

16   the animals exhibiting pain or any suffering or I don't think

17   veterinarian medicine would use that drug for euthanizing

18   animals.  They think the backlash of the animal exhibiting

19   any pain would be too severe from the owners of those pets.

20   Q.    Well, are you aware of any studies on animals that

21   determined they are sensate to pain after they are injected

22   with pentobarbital?

23   A.    I don't do veterinarian medicine, so no.  I'm not aware

24   of that.

25   Q.    Okay.  But in humans, are you aware that we do have methods

1    to distinguish whether people are unconscious or merely

2    unresponsive?

3    A.    I guess they can do EEG studies and things of that nature.

4    Q.    Well, let me ask you:  Have you ever heard of the method

5    known as the isolated forearm technique?

6    A.    I know it's referenced in some of the statements that are

7    associated with this, but it is something that appears to be in

8    the anesthesiology literature that I would say is outside my

9    knowledge.

10   Q.    Okay.  So going back to paragraph 3, you also note that

11   pentobarbital is used by pro-euthanasia groups for humans.

12   Right?

13   A.    Yes.

14   Q.    Are you aware, though, that those procedures are done using

15   oral doses of barbiturates?

16   A.    So in the pro-euthanasia groups, they do use oral

17   barbiturates; but also with the veterinarian people, they will

18   obtain the injectable form and use that in suicides as well.

19   Q.    I'm sorry.  I don't understand your last answer.  Are you

20   saying that veterinarians --

21   A.    I am saying that individuals use both the oral form and

22   injectable form obtained illicitly from veterinarians.  I've

23   seen both used for suicides.

24   Q.    So you're saying that the injectable form may be used

25   illicitly for suicide?

A.    Correct.   I mean a veterinarian that's suicidal can obtain
the pentobarbital and use it on themselves.   I have seen that
happen.

Q.    Are you aware that in the United States euthanasia on
humans is required to be an oral dose?

A.    I believe that is correct.   Yes.

Q.    And if you administer pentobarbital orally rather than
through a massive bolus directly to the bloodstream, there
would not be a risk of flash pulmonary edema.   Right?

A.    If you're administering it orally, I think you would --
I mean you're going to still develop pulmonary edema from the
overdose no matter what, but I don't know of any information
that it could cause flash pulmonary edema or not, which I don't
think it does.

Q.    And a reason why it wouldn't cause flash pulmonary edema
as opposed to pulmonary edema is because the drug would be
processed by the body more slowly than in an injectable form.
Right?

      MS. LIN:   Objection, Your Honor.   This is outside of
Dr. Crowns' expert declaration.   He did not provide any opinion
as to distinctions between oral and injectable.

      THE COURT:   Tell me the question again, Mr. Kursman?

      MR. KURSMAN:   Sure, Your Honor.   The question is there
would not be flash pulmonary edema during an oral administration
of pentobarbital because it's processed by the body more slowly

1    and gradually.  And the reason this is relevant is because, in

2    paragraph 3 of his report, he notes that pentobarbital is humane

3    here because it's used by pro-euthanasia groups.  So all I want

4    to establish is pro-euthanasia groups are not using injectable

5    forms of pentobarbital; they're using oral forms, which have

6    different effects and side effects.

7              THE COURT:  Okay.  I'll overrule the objection.

8    You can answer the question, Dr. Von Crowns.

9              THE WITNESS:  Certainly.  So comparing oral versus

10   IV, oral can have a slower bioavailability.  But the thing about

11   IV is it acts more quickly in the brain, so it's going to shut

12   things down quicker.  So you're not going to even, I feel, have

13   less pulmonary edema in the individuals that are given it

14   intravenously than compared to those taking it orally.

15             THE COURT:  But for euthanasia in human beings, the

16   dosage is oral.  Is that correct?

17             THE WITNESS:  Yes, ma'am.  That is correct.  A lot

18   of what people are acquiring is the pills, although if they

19   have some sort of a connection with the veterinarian world, they

20   might get an injectable form.  But often what they are using are

21   pills.  I don't dispute that at all.

22             THE COURT:  Okay.  Mr. Kursman.

23   BY MR. KURSMAN:

24   Q.   And when it's administered orally, it doesn't reach the

25   lungs in the same concentration as an IV injection.  Right?

A.   Well, again, if you're taking a massive pill bolus, you're
going to get a large amount of drug in the system quickly, but
when you're injecting it into the veins, you're skipping that
digestion or that absorption factor and going directly into the
bloodstream.  So you get a much quicker response brainwise --
respiratory depression, cardiac depression -- than you would if
you're taking it in your stomach.  So you're taking more orally
with a pill to kind of the same effect as a smaller dose that
you're administering IV.

          THE COURT:  Okay.  Thank you.

BY MR. KURSMAN:

Q.   Dr. Von Crown, you explain in paragraph 12 that when
the procedures are followed by the federal execution protocol,
there wouldn't be enough time for the pentobarbital to clear
from the receptors of the brainstem for the inmate to regain
consciousness and experience pulmonary edema.  Right?

A.   To regain consciousness.  I feel that -- hold on -- that
they would not experience pain from pulmonary edema, yes.
They would still get pulmonary edema, but they wouldn't be
experiencing the pain from it.  That's what I'm saying.

Q.   Right.  Now, your report doesn't cite any literature
or case studies to support that conclusion.  Right?

A.   That's correct.  I didn't put any literature citations in.

          MR. KURSMAN:  I have no further questions, Your Honor.

          THE COURT:  All right.  Thank you, Mr. Kursman.

1      Ms. Lin, did you want to redirect?

2              MS. LIN:  Yes.  Just a couple of questions.

3                      REDIRECT EXAMINATION

4      BY MS. LIN:

5      Q.   So, Dr. Crown -- I believe that's how you are referred to,

6      correct?  Dr. Crown?

7      A.   Yes.  I'm sorry.  I'm always uncomfortable correcting a

8      judge, so --

9              THE COURT:  Oh, no.  Don't worry.  Nobody else is,

10     Dr. Crown.  I have a particular sensitivity to pronouncing

11     people's names correctly, as mine is so often not.  So I'm

12     sorry.  So it's Dr. Crown.  I'm sorry about that.

13             THE WITNESS:  No apologies, ma'am.  I just didn't want

14     to say anything.

15             THE COURT:  That's fine.

16     BY MS. LIN:

17     Q.   So a few minutes ago you were asked questions about media

18     reports of what was observed during the executions that you

19     didn't know about, that there were some references to increased

20     labored breath -- breathing by [indiscernible] and you asked the

21     question of it depends on whether that was agonal breath.

22          So can you explain to us what then are the symptoms and

23     whether that match with the media report that you were just

24     asked about and you didn't know --

25             THE COURT:  Hold on a second.  That's a pretty

1      complicated question, and Dr. Crown has said he's not aware of

2      the reports.  I think he was asked by Mr. Kursman about certain

3      information contained in the reports and asked to opine on what

4      that information might mean.  So I think he can answer questions

5      as to the information that Mr. Kursman asked him, so maybe you

6      can rephrase your question, Ms. Lin.

7      BY MS. LIN:

8      Q.   In Mr. Kursman's question, you asked whether what was

9      described to you was agonal breath.  And so my question to you

10     is whether that would be consistent -- whether what Mr. Kursman

11     described to you would be consistent with your understanding of

12     what you're supposed to see when someone is not experiencing

13     pulmonary edema or when someone is.

14               THE COURT:  Okay.

15               THE WITNESS:  All right.  So my question was -- he

16     described gasping, which the time frame was when you're in the

17     process of dying and your brain is already kind of gone and now

18     your brain is swelling and shutting down your respiratory

19     centers and your cardiac centers, it causes these last few

20     moments before you die of what people often perceive, which we

21     see all the time in investigative reports, as gasping, like

22     they're suddenly sucking for air.  The reality is is their brain

23     is long since gone, but this is the last few seconds before they

24     pass away.  And it has nothing to do with they're drowning in

25     their own fluids or they can't breathe; it's just basically the

1   life cycle.

2        So if you're seeing gasping going on before death, it's

3   agonal breathing.  It has nothing to do with the body trying

4   to survive.  It's just kind of this last gasp, so to say, before

5   you pass away, and it's not giving a sign that they're in pain

6   or anything like that; it's just kind of a physiological

7   function that has no meaning.

8   BY MS. LIN:

9   Q.   So is it consistent, then, with your opinion that you

10  made he was gasping toward the end is not suffering -- was not

11  suffering pulmonary edema in a sense that the inmate would

12  experience it?

13            THE COURT:  I'm sorry.  Is that Mr. Kursman?

14            MR. KURSMAN:  That is, Your Honor.  I believe Ms. Lin

15  is now leading the witness, and this is now redirect

16  examination.

17            THE COURT:  Well, I understand, but it's not a trial.

18  I'm going to give her some leeway.  I understand the point

19  you're making.  The objection is overruled.

20        You may answer the question.

21            THE WITNESS:  Could you ask the question again?

22  BY MS. LIN:

23  Q.   Dr. Crown, what you just described as the last few moments

24  before someone dies, the gasping, is that consistent with your

25  opinion that the inmate was not suffering pulmonary edema,

1   including the sensations of pulmonary edema?

2   A.   So he could have been suffering from pulmonary edema, but

3   that is irrelevant to the gasping, in my opinion.  So he is

4   dying, but not feeling pain or suffering from pulmonary edema.

5   It's just the gasping to me is agonal breathing that's occurring

6   at the moment before death.  So it has no relevance to pulmonary

7   edema whatsoever.

8   Q.   Thank you.  Dr. Crowns, you also were asked a question

9   that one of the media reports read to you that one of the

10  inmates was having labored breathing or increased labored

11  breathing.  Is it consistent with your view that the inmate

12  with the labored breathing is not suffering pulmonary edema?

13  A.   It's difficult to know how to interpret the labored

14  breathing, but I don't think that it's necessarily -- it's

15  difficult to say right offhand.  I'd to read it, what was

16  actually said, but the labored breathing is possibly associated

17  with pulmonary edema.  That I'm not a hundred percent sure of.

18  I'd really have to see that before I could make an educated

19  opinion on it.

20  Q.   Okay.  Thank you, Doctor.  So just one last question just

21  to clarify.  There was a little bit of discussion about using

22  injectable solutions for euthanasia versus the dosage form of

23  pentobarbital for euthanasia.  So is it your view, then, that --

24  just for my own clarification, is your view that the person

25  taking the pentobarbital is even less likely to suffer any kind

1    of pulmonary edema or pain through an injectable solution?

2              THE COURT:  You mean intravenous use?

3              MS. LIN:  Yes.

4              THE WITNESS:  That would be the preferred method of

5    killing yourself, would be to have intravenous use, because it

6    is so rapid that you'd get less problems from that.  So that

7    would be the preferred way to go if you can get ahold of it.

8    BY MS. LIN:

9    Q.   Okay.  Thank you.  And one last question.  I think you

10   testified a few minutes earlier that pulmonary edema can occur

11   prior to -- soon after pentobarbital injection.  Does it mean

12   that you may experience pain at that point?

13   A.   No.  Pulmonary edema, you have to look at it as a gradually

14   occurring, physiologic process, almost like you've got like this

15   big bucket and you're slowly filling it up with water.  So the

16   lungs have a tremendous reserve for you to not feel oxygen

17   hunger for quite a while.

18        So it's going to take a fair amount of filling up that

19   bucket before you start feeling air hunger and not being able to

20   breathe.  And it's my opinion that with the massive amount of

21   pentobarbital that's administered intravenously, the person

22   would be unconscious long before that would even be felt and,

23   I feel, probably dead.

24   Q.   Okay.  So I think -- okay.  I don't have any further

25   questions.  Thank you so much, Dr. Crown.

1          THE COURT:  All right.  Thank you, Dr. Crown.

2     I appreciate you making yourself available on a Friday afternoon

3     on such short notice.

4          THE WITNESS:  No problem.  You all have a good day.

5          THE COURT:  Thank you.

6     (Witness exits call.)

7          THE COURT:  All right.  Next witness.

8          MS. LIN:  I believe he's calling in right now.

9     (Witness joins call, is sworn.)

10          THE COURT:  Good afternoon, Dr. Antognini.

11    This Judge Chutkan.  How are you?

12          THE WITNESS:  Fine.  Thank you.

13          THE COURT:  I want to thank you very much for making

14    yourself available on such short notice, and I'm sure you have a

15    very, very busy schedule.  Although we're on the phone, the same

16    rules that would apply in live testimony apply here.  So if

17    there's an objection, pause a moment so I can rule on it before

18    answering.  All right?

19          THE WITNESS:  There was a break in the communication

20    there.

21          THE COURT:  Oh, sorry.  I was walking around, so

22    maybe --

23          THE WITNESS:  I lost you after "the same rules apply."

24          THE COURT:  Okay.  So the same rules apply as would if

25    you were giving live testimony, and so if there's an objection

1    lodged, if you could just pause in your answer so I can rule on

2    the objection, and I'll let you know if you can answer or not.

3    Okay.  Thank you.

4         All right.  Mr. Braden, are you ready?

5              MR. BRADEN:  Yes, ma'am.

6         JOSEPH ANTOGNINI, WITNESS FOR THE GOVERNMENT, SWORN

7                       CROSS-EXAMINATION

8    BY MR. BRADEN:

9    Q.   Dr. Antognini, I'm Scott Braden, and I'm going to skip

10   all the preliminaries and get right down to it.

11        So you are not a pathologist.  Correct?

12   A.   I am not.

13   Q.   And you're not a pharmacologist.  Correct?

14   A.   No.

15   Q.   And you're not currently practicing as an anesthesiologist,

16   are you?

17   A.   I am not.

18   Q.   So you haven't administered anesthesia in over four years.

19   Is that correct?

20   A.   That is not correct.  I have done some clinical work in

21   the last four years.  Not a lot, but occasionally I have.

22   Q.   So that work is minimal and not your main source of income

23   or support.  Right?

24   A.   That is correct.  It's minimal.

25   Q.   All right.  So you have discussed about some of the grants

1    you've been awarded to conduct studies, and all those grants

2    were research grants that you were rewarded over a decade ago,

3    at least before 2009.  Is that correct?

4    A.   Yes.

5         MS. LIN:  Objection, Your Honor.  There's nothing in

6    Dr. Antognini's declaration about grants.

7         THE COURT:  I'll overrule the objection, but I think,

8    Mr. Braden -- I'll allow a limited cross on this area, but I

9    really suggest you move on to the meat of your cross-examination.

10   BY MR. BRADEN:

11   Q.   Well, just to be clear, the research that you have done

12   in the past with these grants has all been done on animals.

13   Correct?

14   A.   Yes.  Well, if I may clarify, some of the research that I

15   have done, a little bit has been done in humans, but the bulk

16   of it's been animal work.

17   Q.   So in none of the studies you've done in the past have

18   dealt with injected anesthetics in humans.  Is that correct?

19   A.   I have to look at my CV.  There are a few studies that I

20   did where we injected anesthetics.  That wasn't the main reason

21   for the study, however.

22   Q.   All right.  So you weren't studying the effects

23   of anesthetics on humans in any of those.  Right?

24   A.   I don't think so, no.  I have looked at my CV, but I

25   don't think so.

1  Q.   In any of the your prior experience, your study, has

2  it been on the metabolism of pentobarbital in humans?

3  A.   No.  No.

4  Q.   And you've not received any grants for the purpose of

5  studying the metabolism of carbamazepine in humans.  Is that

6  correct?

7  A.   No, I have not.

8  Q.   And, obviously, you haven't studied or researched or been

9  given a grant for studying the interaction between pentobarbital

10 and carbamazepine.  Is that correct?

11 A.   No.  I've not.

12 Q.   So in your CV, on page 6 you list books, and you list one

13 book that was 18 years ago, published in 2002.  Is that correct?

14 A.   What's the name of the book?

15 Q.   Sorry.  Let me just look here...

16      Antognini J.F., *Neural Mechanisms of Anesthesia.*

17 A.   Yes.  That's correct.

18 Q.   And that's the most recent publication as far as a

19 book that you've done on this topic.  Is that correct?

20 A.   "Publication" meaning book?

21 Q.   Yes.

22 A.   I only -- I've written some chapters since then that relate

23 to anesthetic action.  There was a book that I was -- a chapter

24 in a book that was called -- I forget the exact name.  I have to

25 consult my CV, but like Neurophysiology of Anesthesia or

1    something like that.  I forget exactly.  So I have published

2    a book on anesthetic effects since then.

3    Q.   But it's not listed on your CV?

4    A.   I think it is.  If I'm allowed to pull up my CV, I can

5    show you where it is.

6         THE COURT:  You can do that, Dr. Antognini.

7         THE WITNESS:  Okay.  So in 2011, I, along with another

8    coauthor, wrote a chapter called "Anesthetic-Induced

9    Immobility."  That's in the *Neuroscientific Foundations of*

10   *Anesthesiology*.  So that was -- it's listed as No. 14 on my book

11   chapters, at least on the version of my CV that I'm looking at

12   now.

13   BY MR. BRADEN:

14   Q.   So did you discuss edema in that chapter?

15   A.   I'm sorry.  You broke up.  Ask the question again, please?

16   Q.   So did you discuss edema in that chapter?

17   A.   Edema?

18   Q.   Pulmonary edema.  Right.

19   A.   Pulmonary edema, no.  I don't think that I did.  I don't

20   believe I discussed it in that chapter.  I don't think I had

21   any reason to discuss it.

22   Q.   And I don't see a reference to pulmonary edema in your

23   2002 publication.  Is that correct?

24   A.   That is correct.  I don't think there would be anything

25   like that in that.

1    Q.   So, Doctor, your income now is your work as an adjunct

2    faculty member of a college.  Is that correct?

3    A.   Yes.  I guess -- well, I have personal investments and a

4    pension.  That's the main source of my income.  The other work

5    is just more for fun than for money.  That's my current position,

6    as an adjunct faculty, so I guess you could say I'm semiretired.

7    Q.   Right.  But you receive income from testifying in cases

8    like this.  Is that correct?

9    A.   Yes, I do.

10   Q.   So since 2016, when you left your practice or semiretired,

11   you have offered your opinion as an expert witness in a number

12   of lethal injection cases.  Is that correct?

13   A.   Yes.

14   Q.   And every time you've offered your opinion, you've always

15   been an expert for the state, is that correct, or the government?

16   A.   Yes.

17   Q.   So you provided expert reports or testimony as an expert

18   in lethal injection cases in Ohio, in Arkansas, Missouri, South

19   Dakota.  Is that correct?

20   A.   Yes.

21   Q.   As a matter of fact, Ohio's kind of been an ongoing

22   litigation.  You submitted multiple reports there at least

23   three times.  Is that correct?

24   A.   Yes.

25   Q.   All right.  And you testified twice in Arkansas.

1   Is that correct?

2   A.   I think that's correct.  I'm pretty sure it's twice in

3   Arkansas.

4   Q.   And each one of these states use different protocols,

5   at least in some form or another, different from what the

6   government is using here.  Is that correct?

7   A.   Yes, except for Missouri.  I think Missouri -- the cases

8   in Missouri was pentobarbital, the single drug.  That was the

9   Russell -- I forget his last name now, but the case in Missouri.

10   Q.   Most states have a different process, basically, and you

11   haven't found a problem with any of them.  Is that correct?

12   A.   Well, maybe you could clarify: I haven't had a problem with

13   any of them.

14   Q.   So you have found a problem with some of them?

15   A.   Well, if you mean have I said that there have been problems

16   basically with the way that the drugs are used or their intended

17   use and their intended effects, I guess in that regard I have

18   not had problems with those protocols.

19   Q.   So have you ever testified in a lethal injection case

20   such as this on behalf of the condemned inmate?

21   A.   Have I ever -- I have not testified on behalf of a

22   condemned inmate.

23   Q.   I'm sorry.  I missed your answer, if you don't mind

24   repeating it, please.

25   A.   Yes.  Could you repeat your question, because I wasn't sure

1    I got it exactly.

2    Q.   Sure.  So you have never testified on behalf of a condemned

3    inmate in a lethal injection case.   Correct?

4    A.   I have not.

5    Q.   All right.  Have you ever been asked by the counsel for

6    a condemned inmate to testify in a lethal injection case?

7    A.   I have.

8    Q.   All right.  Did you -- and you declined to participate.

9    Is that right?

10   A.   Yes.

11   Q.   Sorry?

12   A.   I said there was a reason I declined, but...

13   Q.   Well, did you review any of the records or any of the

14   documents in the case you declined before you made that

15   decision?

16   A.   I don't think we got that far.  I don't think I did

17   review...

18   Q.   So I want to talk just a little bit -- and I want to get

19   through this quickly -- about your testimony in Ohio, which has

20   been a lot.  So Judge Merz, who is the judge in the state lethal

21   injections in Ohio, has heard your testimony numerous times.

22   Is that correct?

23   A.   Yes.

24   Q.   All right.  And you've been subject to a *Daubert* motion up

25   there several times, is that correct, which is a pleading that

challenges your qualifications as an expert.  Is that correct?

A.   I don't know -- it's been at least one time that there was

an actual hearing.  I think there was another time where there

was a motion *in limine* I believe about that, but the judge

basically said -- denied the motion.  So I've only had one

hearing.

Q.   Right.  And in that, Judge Merz found that even though you

were qualified under the Federal Rules of Evidence, he stated

that much of -- I'm sorry.  Let me just read his quotation.

That you're "qualified under the Rule of Evidence 702.  However,

much of an outlier in opinions," meaning yours, "on the

midazolam may be," which is the drug used in Ohio.  Is that

correct?

          MS. LIN:  Objection, Your Honor.  This is going to a

different line of questioning of a separate trial.  So we would

object on the grounds that it's outside the scope of this

limited purpose of the cross-examination.

          THE COURT:  Well, I mean, you haven't brought a

*Daubert* challenge, Mr. Braden.  I see where you're going in this

line of questioning here, and you're entitled to challenge the

witness's credibility.  I'll take judicial notice of it if it's

cited somewhere.

          MR. BRADEN:  Yes, ma'am.  It is *In re Ohio Execution*

*Protocol Litigation* in the Southern District of Ohio.  The

opinion there is ECF document 2597 -- it's a really big case --

1    dated October 15, 2019.

2              THE COURT:  All right.  Thank you.

3    BY MR. BRADEN:

4    Q.   And in the same document, Doctor, Judge Merz says that he

5    accorded little weight to your testimony.  Is that correct?

6    A.   I don't remember exactly what he said, so I'd have to --

7    I don't have that document in front of me.

8    Q.   Well, I do.

9              MS. LIN:  I object to this line of questioning again

10   as Your Honor has noted it will take judicial notice of that

11   opinion.

12             THE COURT:  Okay.  We have a witness here who's on

13   the stand.  So I will allow you to argue briefly at the close

14   of the questioning, but why don't we just move on with the

15   questioning, Mr. Braden.  I understand the line you're pursuing,

16   but I hope at some point you get into the substance of the

17   witness's testimony as well of the witness's report.

18   BY MR. BRADEN:

19   Q.   So just like you've done here, when you testified in Ohio,

20   you also offered opinions about pharmacology and pathology when

21   you talked about pulmonary edema.  Is that correct?

22   A.   In Ohio or in this present case?

23   Q.   Yes.  I'm just saying -- yes, you're right.  In Ohio you

24   also offered opinions about pathology and pharmacology when

25   you talked about pulmonary edema in Ohio.  Is that right?

1    A.   Yes.

2         MS. LIN:  Objection.  Objection.  I don't want to --

3    again, this is talking about separate trial testimony in a

4    different trial.  This is outside the scope of the cross-

5    examination.

6         THE COURT:  All right.  Mr. Braden, that is a

7    different substance involved there.  If you could focus your

8    questions -- you know, there's no jury here, and I'm really

9    trying to get to the substance of this witness's testimony, if

10   you could be a little more focused and directed in your

11   questioning.

12        MR. BRADEN:  Your Honor, I agree that there's no jury

13   here, but we do have to make a record for further review.  And

14   I think Dr. Antognini's credibility is certainly an issue here,

15   but I will move on to other issues.

16   BY MR. BRADEN:

17   Q.   So I want to talk about some of the studies that you have

18   cited in your reports in this case.  So you offer a number of

19   opinions regarding the metabolism of pentobarbital.  Correct?

20   A.   Yes.

21   Q.   All right.  In your report, in paragraph 8 you cite to a

22   2000 report by Shafer.  I assume that's Dr. Shafer.  Is that

23   correct?

24   A.   Yes.

25   Q.   So are you aware that that's an editorial published in

1   the *Anesthesiology* journal?

2   A.   Yes.

3   Q.   So in the world of anesthesiology, is an editorial a

4   peer-reviewed article?

5   A.   It is peer reviewed, and it's a summary of person's

6   opinion, usually about an article that's been published in

7   that particular journal.  But editorials are peer reviewed.

8   Q.   So this editorial, though, did not consider the effects

9   of pentobarbital.  Right?

10  A.   No, it did not.

11  Q.   So isn't an editorial basically an opinion versus a fact?

12  A.   Yes.  For the most part, I'd say that's true.

13  Q.   All right.  In paragraph 17 you talk about a study cited by

14  a Brodie, I think Dr. Brodie, stating that -- and you state that

15  the study in the Brodie 1953 study received large pentobarbital

16  doses that did not apparently develop pulmonary edema.

17       Is that correct?  Do you recall that?

18  A.   Yes.  Yes, I do.

19  Q.   So that study is from 1953.  So it's almost as old as I

20  am at 67, right?

21  A.   Yes.

22  Q.   And that study was basically comparing the metabolism of

23  pentobarbital and thiopental in humans versus dogs.  Right?

24  A.   I have to review the study.  That's my recollection of

25  it, yes.  It was basically comparing the effects, or at least

1    looking at the effects of the drug --

2    Q.   And it wasn't -- I'm sorry.  I cut you off.

3    A.   I didn't have any more about that.

4    Q.   All right.  Thank you.  The purpose of the study, though,

5    was not to study pulmonary edema.  Is that correct?

6    A.   No.  It wasn't a -- [indiscernible] study.  Right.

7    Q.   And the study overall only dealt with two human subjects.

8    Is that correct?

9    A.   I don't remember the number of subjects.

10   Q.   Do you remember whether it was a lot?

11   A.   I don't remember.

12   Q.   I'm sure the study will speak for itself.  So in paragraph

13   10 of your report you state that, and I'm quoting here:

14        "As the pentobarbital is getting into the brain, it is also

15   getting into the heart and peripheral blood vessels, which leads

16   to rapid and profound cardiovascular depression."

17        Do you recall that?

18   A.   I do recall that, yes.

19   Q.   Right.  And so in support of that you cite two studies,

20   one by Manders and one by Segal.  Is that right?

21   A.   Right.

22   Q.   So those -- that study is 34 years old.  Is that right?

23   A.   The one -- yeah, one of them is from '86, so I'd make that

24   34.  Yes.

25   Q.   Yes.  All right.  And Manders is 44 years old, right,

1    because it's from 1976.  Is that correct?

2    A.    Yes.

3    Q.    So the Segal study was done on rats.  Right?

4    A.    Yes.  I think so.

5    Q.    All right.  And the Manders study dealt with a study of

6    dogs.  Is that correct?

7    A.    Yeah, to my recollection.

8    Q.    Right.  So the Manders study, as old as it is, only found

9    slight cardiac depression.  Is that right?

10    A.    I don't remember off the -- I'd have to review it.  I can't

11    answer that question yes or no.

12    Q.    All right.  So let me just read you a quote from that:

13        "The anesthetic produced an initial transient, peripheral

14    vasodilation, but the steady state effects 15-30 minutes later

15    were characterized by slight reductions in mesenteric flow and

16    cardiac output."  Do you remember that language?

17    A.    Yes.

18    Q.    So would you agree that that is talking about slight

19    cardiac depression or output?

20    A.    These effects are dose-dependent.  So in larger doses,

21    you're seeing more effects.

22    Q.    Right.  But the main of this study defined profound cardiac

23    depression.  Right?

24    A.    Again, I'd have to review the paper.  I don't remember

25    exactly what I found off the top of my head.

1    Q.   In paragraph 9 of your report --

2              MS. LIN:  Can counsel please identify which

3    declaration?  Because there are so many separate documents,

4    it would be helpful if the witness could go to the actual

5    document that you're referring to, please.

6              MR. BRADEN:  Yes, if you could just give me one moment

7    here.  I'm sorry; I'm talking from my notes.

8         So I'm talking about a document, 246-2, which is the second

9    supplemental declaration that was filed on September 14, 2020.

10   Sorry, I should have made that more clear when I began.  Thank

11   you for clarifying the record.

12             MS. LIN:  Which paragraph is that, or page?

13             MR. BRADEN:  I was talking about -- in the Manders

14   report, I was talking about paragraph 10.  Now I would like to

15   back up a bit and talk about paragraph 9.

16   BY MR. BRADEN:

17   Q.   Paragraph 9 you state that after just a few minutes after

18   the injection of pentobarbital, an inmate would experience

19   hypoxia that would stop the process of metabolizing pentobarbital

20   in the liver.  Is that right?

21   A.   Yes.  I did write that.

22   Q.   And in support of this statement, you cite two different

23   studies, one from Park in 1996 and one from Elliot in 1993.

24   Is that right?  And the Elliot study you talk about from 1993

25   was a study of rats.  Is that right?

1    A.   Yes.

2    Q.   All right.  And the Park study from 1996 specifically

3    studied the drug metabolism in critically ill patients.

4    Is that right?

5    A.   Yes.

6    Q.   So it didn't talk about the type of patients, I guess for

7    lack of a better term, that we have here.  Is that right?

8    A.   Well, of course we don't have patients there.  They're

9    inmates in the setting.  But we're talking about patients that

10   have low blood pressure at this point.  So, obviously, that

11   paper doesn't mention anything about lethal injection.  It had

12   to do with patients that had low blood pressure that affects

13   their drug metabolism.

14   Q.   Right.  So the Park study found that the time for hypoxia

15   to induce changes in metabolism is eight hours.  Is that right?

16   A.   I don't recall that.

17   Q.   So on page 37 of that article, it states, and I'm quoting

18   here, "The time taken for hypoxia to induce changes in drug

19   metabolizing enzymes appears to be short.  One study [35] found

20   that rabbits exposed to low $F_1O_2$ had changes in the ability of

21   their liver enzymes to metabolize theophylline within 8 hours."

22   Do you recall that?

23        MS. LIN:   Objection, Your Honor.  If counsel wishes to

24   question Dr. Antognini of specific studies, Dr. Antognini needs

25   to have the studies in front of him as opposed to testing him in

1    this manner.

2           THE COURT:  Do you have the study in front of you,

3    Dr. Antognini?

4           THE WITNESS:  I do.  I'll have to bring it up.

5           THE COURT:  All right.

6           THE WITNESS:  Which paper was it?  Which one?

7           MR. BRADEN:  So it's the Park study that you cited?

8           THE WITNESS:  All right.  I have it in front of me.

9    BY MR. BRADEN:

10   Q.   So on page 37, the right-hand column, middle of the page?

11   A.   Okay.  Hold on.

12   Q.   The third full paragraph down?

13   A.   Thirty-seven, third full paragraph down.  I see that.

14   Q.   So you agree with that.  Right?

15   A.   Well, you have apparently read that correctly, but that's

16   not what [indiscernible] studies suggest.  But go ahead.

17          THE COURT:  The question was do you agree with it,

18   Dr. Antognini.

19          THE WITNESS:  Yes.  I agree that he has read that

20   correctly.

21   BY MR. BRADEN:

22   Q.   So in the situation that we're dealing with here, though,

23   the inmates aren't expected to last eight hours.  Is that

24   correct?

25   A.   That is correct.

1   Q.   All right.  So you base your opinion of the effects of

2   carbamazepine therapy, pentobarbital metabolism in part on the

3   studies we just discussed.  Right?

4   A.   I have not -- no.  My opinion on the carbamazepine and

5   its effects on pentobarbital are not wholly based on the

6   [indiscernible] studies.  I would disagree with that assessment.

7   Q.   But they're formed on that.  Is that right?

8   A.   Well, the reason I brought those studies up -- to answer

9   your question about did they inform it, the reason I brought

10  those studies up is because the effect of pentobarbital will be

11  to decrease blood pressure, and because the inmate would be

12  hypoxic, that would affect the metabolism of pentobarbital.

13  But that's indirect, sort of a different issue compared to the

14  effects of carbamazepine on pentobarbital capsules.

15      I'm not sure if I explained that very well.

16  Q.   So in paragraph 30 of your report, which is document 246-2,

17  you say that -- and this is a quotation:  "More recent studies

18  in humans using postmortem computed tomography (PMCT) shows that

19  fluid accumulates in lungs over time in the postmortem period."

20  Correct?

21  A.   Yes.

22  Q.   All right.  And so in support of that statement, you cite

23  an article in 2011 from Shiotani.  And please correct me if I'm

24  mispronouncing that.

25  A.   Your guess is as good as mine, but I think that's right.

1    Q.   Okay.  Thank you.  You agree that that article, the

2    Shiotani article, focused on four patients.  Right?

3    A.   I'd have to pull it up, but that's my recollection.

4    I'm not sure how many patients were on that.  I'll have to

5    take your word for that.

6    Q.   All right.  And those four patients had undergone CPR.

7    Is that right?

8    A.   I don't recall that.  I don't remember.

9    Q.   So you don't recall whether they had had medical chest

10    trauma?  I'm sorry, mechanical chest trauma?

11    A.   I don't recall that, no.  I'd have to review that paper

12    again to see exactly what the conditions were.  Sorry.

13    Q.   All right.  So those four cases, assuming that that is

14    correct that the four persons in that study had had chest

15    trauma, that's not exactly comparable to -- well, I'm sorry.

16    I butchered that question.

17        So you agree that the purpose of the Shiotani article

18    was to investigate and study diagnostic methods that aid the

19    interpretation of postmortem in these findings.  Right?

20    A.   Yes.

21    Q.   All right.  And Shiotani concluded that no correlation

22    was possible.  Is that right?

23    A.   I don't remember all the details of that study, so I'm

24    sorry.  I'm not able to answer yes or no, I guess.  You're

25    asking about those studies, but I don't remember off the top

1  of my head.

2  Q.   Well, would you dispute if I said that the study does say

3  no correlation was possible?

4           MS. LIN:  Objection.  He says that he does not recall.

5           THE COURT:  Dr. Antognini, do you recall what the

6  study said specifically as relates to Mr. Braden's question?

7           THE WITNESS:  Well, my recollection of the study was

8  that they showed that there were changes after death, that the

9  lung -- I remember that study again; I had several studies that

10  I cited -- had a long accumulated fluid after death.

11           THE COURT:  Okay.  Mr. Braden, you can go ahead.

12  BY MR. BRADEN:

13  Q.   Thank you.  Do you recall that the study of the CT or

14  the PMCT studies here talk about here dealing with fluid

15  accumulation of the lungs was experimental in nature?

16  A.   You mean the postmortem CT was experimental in nature?

17  Q.   Yes.

18  A.   Like I suppose -- again, I don't know whether that was how

19  it was characterized or not.  It was a study, so most studies

20  that are published are experimental in nature in a way.

21  Q.   All right.  And so, Doctor, you filed this report, document

22  246-2, four days ago.  Right?

23  A.   Yes.  I submitted it to -- yes.

24  Q.   And in four days you're failing to recall many of the

25  details of the studies you relied on in forming your opinion?

1   A.   Well, yeah.  If you think about how many studies that I

2   cited here, to hold me to specific details, basically specific

3   sentences in each of these studies, I'd have to look to see

4   whether you've quoted those accurately and whether you quoted

5   them in correct context.  So, for example, for you to say

6   there's no correlation, I'd have to look at that sentence and

7   decide -- see what the context is to answer truthfully.

8   Q.   Right.  And did you review those reports before you cited

9   them in your brief of report filed four days ago?

10  A.   I reviewed them -- yes, I did review them.  I read through

11  those very carefully.  I read through those when I wrote the

12  different parts of that report.  I read them very carefully.

13  That report, parts were written well before I submitted it.

14  Q.   So, in other words, your report contains bits and pieces

15  of other reports that you prepared?

16          MS. LIN:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  Bits and pieces -- I mean, are you

19  asking me did I sort of copy and paste from one report and

20  put it in the current one?

21          THE COURT:  Let me ask you, Dr. Antognini: Did your

22  report include portions of other reports you prepared?

23          THE WITNESS:  Well, if you allow me to take a look at

24  it, I'd have to see --

25          THE COURT:  Sure.

 1          THE WITNESS:  Yeah.

 2      All right.  So, for example, the initial part where I

 3  say my name is Joseph Antognini, etc., some of this language

 4  is very similar to what I --

 5          THE COURT:  Yeah.  I'm talking more about the

 6  substantive portions of the report.

 7          THE WITNESS:  Yeah, the substantive portions of

 8  the report.  So, for example -- and I'm referring to my report

 9  that's the second supplemental declaration.  This is the one

10  that I think you're asking about, which I think was signed on

11  September 11.

12      So the second portion of it -- so, for example, the summary

13  of opinions, which goes from the bottom of page 1 basically to

14  the top of page 3, that's all new material as far as I can

15  recall.  There might be portions there when I talk about

16  cardiovascular collapse, things like that; I may have used that

17  language in a prior report, but I think it's all pretty new

18  stuff.

19      Certainly, the carbamazepine issue that comes up in

20  paragraphs 4 through -- basically 4 through 15, I'm certain

21  that's all new stuff because these issues -- obviously, this

22  carbamazepine issue is new.

23      Then the impact of pulmonary edema, I think most of that

24  is fairly new as well.  There might be things that I have copied

25  over from my prior reports in this particular case, but I'd have

1    to go over it word for word.  So I think most of this, if not

2    almost all of it, is substantively new stuff.

3    BY MR. BRADEN:

4    Q.   All right.  Are you prepared to defend these opinions today?

5    A.   Yes.  Absolutely.

6    Q.   So from paragraph 31, document 246-2, you state:

7         "Fluid accumulation in the airways increases during the

8    postmortem period."  Is that right?

9    A.   Yes.

10   Q.   All right.  And for that proposition, you cite a report

11   by Ishida, I-S-H-I-D-A, dated 2014.  Is that right?

12   A.   Yes.

13   Q.   And do you agree that the patients of that study all had

14   pathology that would cause pulmonary edema?

15   A.   Again, I don't remember that specific study off the top of

16   my head.  I'd have to review it.  But I wouldn't disagree with

17   that, I guess, if that's what it says there.

18   Q.   All right.  And this is a report you referred to for a

19   very important point here.  When is the last time you read that

20   report; do you recall?

21   A.   Probably when I submitted it.  As I'm sure the Court

22   realizes, I wasn't given much time to review any of this

23   based --

24              THE COURT:  I understand that.

25

1  BY MR. BRADEN:

2  Q.   Did you review all these reports that you cite?

3  A.   Reviewed them prior to my testimony right now?

4  Q.   No, I mean --

5         THE COURT:  Did you review them before you prepared

6  your report?

7         THE WITNESS:  Absolutely.  I want to make it perfectly

8  clear for the Court and everyone else, I looked at these studies

9  very closely and read through them very, very closely to make

10 sure that I chose reports that supported my opinion.  So I

11 absolutely stand 100 percent by my choice of these reports -- or

12 these citations to support my opinion.

13        THE COURT:  Okay.

14        MR. BRADEN:  So I just have a little bit more, Judge,

15 and I'll be done.

16 BY MR. BRADEN:

17 Q.   So it was likely, though, in this Ishida report, that all

18 the patients there had pulmonary edema before their death?

19 A.   Again, I'd have to look at the report to see exactly what

20 the pathology was in those patients.  I just don't recall.

21 Q.   Do you recall -- I'm sorry.  Go ahead.  I didn't mean to

22 cut you off.

23 A.   You said it was likely or not, and I don't know.  Again,

24 I'd have to look at the studies.

25 Q.   Do you agree that the autopsies performed that are the

1    basis of this report, the Ishida report, were performed

2    on patients not immediately, but at least one and a half days

3    later?  Or some of them, maybe not all of them, but some of

4    them occurred more than a day and a half later?

5    A.   I would not disagree with that.  That's very possible.

6    Q.   Would you disagree that serial scans were not performed

7    on the same body?

8    A.   For which study?

9    Q.   The Ishida study that we've been talking about.

10   A.   I don't know.  I can't remember.  I thought that there was

11   a -- I just don't remember.  Some of these studies, you know, I

12   can pull them up -- anyway.  Some of them they did a serial scan.

13   And two groups of studies I was focusing on, one is do people or

14   do corpses basically develop increased amounts of water in the

15   lungs, and then do they actually get fluid in their airways.

16        And at least one of those I believe has a scan done early

17   and a scan done late, but the ones with the fluid in the airways

18   may have just been done at one point in time.

19   Q.   So as it goes to the issue of pulmonary edema in these

20   subjects, the study states that there is a possibility that

21   these findings existed before death.  Is that correct?

22   A.   Are you referring to what they were saying in their

23   studies or what I wrote?

24   Q.   No, I'm sorry.  That was a confusing question on my part.

25   That is what Ishida and his colleagues stated in their report,

1    or their paper.

2    A.   That's certainly possible.  Some of these findings could

3    have been premortem, before death.

4    Q.   And the Ishida study found that these -- found, and I'll

5    quote here -- "these findings might be observed before death,

6    indicated by the lack of correlation with the lapse time from

7    death to scanning or to the serial scan."  Is that correct?

8    A.   If you've read that correctly, I'd have to say yes.

9    Q.   And so you relied on this report that we've just discussed

10   in forming your opinion on the impact of pulmonary edema.

11   Is that right?

12   A.   Yes.  I did rely upon that study.

13   Q.   All right.

14         MR. BRADEN:  Judge, may I have just a minute to go

15   through my notes before I pass the witness?

16         THE COURT:  Yes.

17         MR. BRADEN:  I'm sorry.  I had one... all right.

18   Judge, I appreciate your tolerance on this very difficult

19   subject.  I think that is all I have at this time.

20         THE COURT:  Thank you, Mr. Braden.  Those are the two

21   witnesses the government has today.  Is that right, Ms. Lin?

22         MS. LIN:  Yes, Your Honor.

23         THE COURT:  Dr. Antognini, you're free to go.

24   Thank you very much.

25         MS. LIN:  Your Honor, I would like an opportunity

1    to --

2               THE COURT:  Oh, redirect.  I'm sorry.  Yes, yes, yes.

3    Go ahead.

4               MS. LIN:  And I'll be very brief.

5               THE COURT:  Okay.

6                         REDIRECT EXAMINATION

7    BY MS. LIN:

8    Q.   So, Dr. Antognini, you testified earlier that you had

9    testified in all of those death penalty cases.  Right?

10   A.   Yes.  That's correct.

11   Q.   And you mentioned that you testified in a case in Missouri.

12   Was that case *Bucklew*?

13   A.   *Bucklew,* yes.

14   Q.   Okay.  So in *Bucklew* was the issue about -- and you also

15   testified that Missouri had a single-drug pentobarbital

16   protocol.  Correct?

17   A.   Yes.

18   Q.   So was your opinion in *Bucklew* about the usage of that

19   pentobarbital in lethal injections?

20   A.   Well, yes.  It was.  I mean that was the drug being used

21   in Missouri.  Part of the case related to that, yes.

22   Q.   And did the Supreme Court credit your opinion in *Bucklew*?

23   A.   Did the Supreme Court what?

24   Q.   Credit or cited your opinion in *Bucklew*?

25   A.   Yes, they did, although they -- for the record, they've

1   quoted my name as Dr. Michael Antognini.  I don't know how

2   they got that in there, but it's Joseph Antognini.

3   Q.   And so there was some questions posed to you about why you

4   rely on studies -- or that you relied on studies relating to

5   animals.  Can you explain why you cite studies on animals as

6   opposed to humans?

7   A.   Yes.  So we, "we" being the medical community and the

8   scientific community, build our consensus or our understanding

9   around certain -- you know, whatever we're studying, based on

10  accumulation of evidence both in humans and in animals.

11      The animal studies are useful in order to sort of inform

12  our understanding of mechanisms, and of course human studies are

13  important as well to understand how these drugs or whatever

14  we're studying work in humans and their effects in humans.

15      So, in general, you don't want to rely on just one single

16  study to form an opinion.  You look at a variety of different

17  studies, both in animals and in humans, that will inform your

18  understanding.  And so the animal studies are absolutely

19  important in terms of being able to look at the possible

20  mechanisms of what may be occurring and the time frame.

21  Q.   And, to your knowledge, in your report you said you

22  reviewed Dr. Van Norman's declaration that had been filed in

23  this case.  Right?

24  A.   Yes.  I did review her declarations.

25  Q.   And, to your knowledge, does she also rely on animal

1    studies?

2    A.    Yes.  She did cite at least one animal study, if not more.

3    Q.    And so there were a few questions about certain studies

4    being, you know, quite old or that some time had passed.  Can

5    you explain why you were relying on old studies relating to --

6    I believe it was about either thiopental or pentobarbital.

7    A.    Yes.

8    Q.    Okay.  Can you explain why you were relying on old studies?

9    A.    Yes.  Well, the drug pentobarbital is not being used very

10   much at all these days, and so it was used more often back in

11   the '40s '50s, and '60s.  So there are older studies during that

12   period where pentobarbital is used, number one.

13         Number two, some of these older studies -- many of the

14   older studies didn't have perhaps the ethical constraints that

15   we have now.  And those constraints are good; don't get me wrong

16   about that.  But, basically, you could do things to humans back

17   then that you can't really do to them now.

18         So, for example, in that Brodie study, these humans

19   received huge doses of pure barbital.  So they're very valuable

20   in that regard because you don't see studies -- more recent

21   studies like that.  And the actions of the pentobarbital in a

22   human are going to be the same in 2020 as they were in 19...

23   Q.    So there were no subsequent studies that contemplate the

24   premise of the studies that you cited from the '50s and '60s.

25   A.    No.  No.

1   Q.   Okay.  So just one last question.  Is it relevant to your

2   opinion, in your opinion -- well, let me rephrase the question.

3        Was it relevant to the question of pain and suffering or

4   whether the inmate experienced pain and suffering that pulmonary

5   edema occurred before or after death?

6   A.   I'm sorry.  Could you repeat that?  I'm not sure I followed

7   exactly.

8   Q.   I think you were posed question earlier -- maybe I'm not

9   getting this right.  Is it relevant to the question of whether

10  an inmate would experience pain and suffering by looking at

11  whether pulmonary edema occurred?

12  A.   Yes, and especially when the pulmonary edema occurs.

13  So if the pulmonary edema occurs after the inmate becomes

14  unconscious, or obviously after death as some of this is

15  occurring after death, then in my case it's -- I mean my

16  opinion, I should say, the pulmonary edema is irrelevant.

17       Once the inmate is unconscious, pulmonary edema is not

18  going to be enough to cause the inmate to achieve -- you know,

19  basically become conscious again.  I mean, pentobarbital, like

20  other drugs, it's an anesthetic.  So you can completely knock

21  out the brain, essentially, which at this dose pentobarbital

22  does, and it's just no [indiscernible] is going to make the

23  inmate become conscious again.

24            MS. LIN:  Thank you, Doctor.

25       I don't have any further questions, Your Honor.

1          THE COURT:  Okay.  Thank you, Dr. Antognini.

2     Now you are free to go.  Thank you very much.  Have a good

3     weekend, and I do appreciate you making yourself available on

4     such very short notice.

5          MR. BRADEN:  Judge, may I just add --

6          THE COURT:  Who is this speaking?

7          MR. BRADEN:  This is Scott Braden.  I'm sorry.

8          THE COURT:  Yes.

9          THE WITNESS:  May I be --

10         MR. BRADEN:  Yes.  It's fine with me as long as the

11    judge is fine with that.

12         THE COURT:  Yes.  Dr. Antognini, you can leave.

13         THE WITNESS:  Thank you.

14     (Witness exits call.)

15         MR. BRADEN:  Your Honor, the government here just

16    pointed -- or asked Dr. Antognini about courts giving him credit

17    for his opinions, and I just want to go back to my point about

18    you taking judicial notice of other courts that have not been

19    quite as favorable.

20     And I certainly want to point out to you the *In re Ohio*

21    *Execution Protocol Litigation* in the Southern District of Ohio,

22    case No. 11-1016, and if I could just quickly point to three

23    documents: ECF No. 2597; ECF 2730, and that decision was in

24    January of this year; and ECF 2513 from that court in September

25    of 2019, all go to Dr. Antognini and his opinions.  And I just

1    want to put that in the record and ask you to take judicial

2    notice of that.

3              THE COURT:  Okay.  Thank you.  Any objection from

4    the government?

5              MS. LIN:  Your Honor, without looking at them, it's

6    really hard to tell.  Obviously, they're judicial opinions.

7              THE COURT:  Right.  They're judicial opinions.  I can

8    take judicial notice of them, and I will.  Thank you.

9              MR. BRADEN:  That's all for me, Your Honor.

10             THE COURT:  All right.  Thank you, Mr. Braden.

11   Thank you, Ms. Lin.  So those are all the witnesses that the

12   government has available this afternoon.  Is that correct?

13             MS. LIN:  Yes, Your Honor.

14             THE COURT:  And Dr. Swaan and Dr. Almgren are both

15   available tomorrow, and they will be testifying regarding

16   compounding issues.  Is that correct?

17             MS. LIN:  They'll be testifying as to the -- yes.

18             THE COURT:  Dr. Almgren is for plaintiffs.  That's

19   right.  Okay.  And did we -- I just want to give you the most

20   complete record as I can, notwithstanding the defense objection

21   regarding the timing of this hearing.  Have you all conferred to

22   see what -- and, plaintiffs, is it true that you would want

23   Dr. Almgren to testify tomorrow if Dr. Swaan testifies tomorrow?

24             MR. LUBY:  Yes, Your Honor.  This is Joseph Luby for

25   the plaintiffs.  That's correct.

1          THE COURT:  Okay.  Have you conferred with Ms. Lin to

2    see what time works?  I have an hour.  I can give you an hour

3    tomorrow, maybe a little bit more, between about 11:30 and about

4    3:00/3:30.

5          MR. LUBY:  Your Honor, this is Mr. Luby again, and

6    I can confirm that Dr. Almgren would be available starting at

7    11:30.

8          THE COURT:  Ms. Lin, what about Dr. Swaan?

9          MS. LIN:  I'm trying to check.  I believe he's

10   available, but we would prefer it in the afternoon if possible.

11         THE COURT:  Okay.  Why don't you all confer and let

12   my law clerk, either Ms. Simmons or Mr. Boujaoude, know.  I can

13   make myself available anytime between 11:30 and about 3:30

14   tomorrow.

15      Okay.  Now, plaintiffs, are you still seeking to elicit

16   testimony from Dr. Van Norman?  If so, you need to proffer what

17   she would testify to that has not been in her reports or that

18   would need to address something that either Dr. Crown or

19   Dr. Antognini testified to.

20         MR. KURSMAN:  Your Honor, this is Alex Kursman.

21   May I have a minute to confer with --

22         THE COURT:  Absolutely.  Sure.  Go right ahead.

23         MR. KURSMAN:  Thank you.

24      (Counsel conferring.)

25         MR. SMITH:  Your Honor, this is Greg Smith

1    representing Plaintiff LeCroy.  I just want to mention, we also

2    do still have our challenge of the FDPA claims about whether

3    the federal government has failed to comply with binding Georgia

4    state execution requirements.  And so we are seeking a

5    preliminary injunction on that as a separate issue, and I did

6    want to just bring that to the Court's attention because we,

7    with a Tuesday execution date, will need a ruling on that as

8    well.

9              THE COURT:  Yes.  Thank you, Mr. Smith.

10             MR. KURSMAN:  I don't think that we will need to call

11   Dr. Van Norman.

12             THE COURT:  All right.  I will give you all a couple

13   of minutes to sum up if you want it.  Plaintiffs?

14             MR. KURSMAN:  This is Alex Kursman again, Your Honor.

15   If I could just let Mr. Braden speak a bit for Dr. Antognini.

16             THE COURT:  Okay.

17             MR. KURSMAN:  I just want to make clear that the

18   defendants here asked for a hearing, and that's at ECF 246 at

19   10 and 17.  Your Honor then granted them a hearing.  Last night

20   they then acquiesced to the parameters of the hearing.  Then

21   today, during the hearing, they objected to the parameters of

22   the hearing.

23             THE COURT:  I noticed.

24             MR. KURSMAN:  They decided not to cross any of

25   plaintiffs' experts.  Based on their failure to question

1    plaintiffs' experts, this Court should find plaintiffs' experts

2    credible and accurate.  And as for Dr. Von Crown --

3            THE COURT:  Well, I still have to make an independent

4    determination.  Are you saying I shouldn't make an independent

5    determination just because the defendants chose not to

6    cross-examine them?

7            MR. KURSMAN:  No.  You should, Your Honor, but

8    you should consider that when making your determination.

9            THE COURT:  I will.

10           MR. KURSMAN:  And as for Dr. Van Crown, he should

11   be found not credible, and I believe his opinion should be

12   disregarded for many reasons, but most importantly for this:

13       In paragraph 11 of his report, he says, "From the

14   eyewitness accounts of the three executions, there is no

15   evidence of distress that would be seen in flash pulmonary

16   edema."

17       And then he says, "The breathing of all three individuals"

18   -- and this is very important -- "was noted to be steady and

19   unlabored."  And he goes on to say, "This fact establishes that

20   the decedent experienced no physical response to the pulmonary

21   edema."

22       Dr. Von Crown, however, was not aware that the AP reported

23   during Mr. Honken's execution that several minutes after

24   officials began administering the lethal drug, Mr. Honken's

25   breathing became more labored.

1          THE COURT:  But hold on a second.  I don't have those

2     AP reports.  They're not evidence in the case.  I don't know who

3     witnessed it.  Those are second, perhaps third, fourth-hand

4     reports.  You can confront the witness with the witness's

5     knowledge of the reports with whether the witness has factored

6     those reports into their current conclusion.  The witness said

7     they weren't aware of the reports.  But I don't think you can

8     argue that the information contained in reports, which aren't

9     before me other than you did cite them, are true.

10          MR. KURSMAN:  Yes, Your Honor.  Right.  Two points

11     to that.  I believe that they are in evidence in the reports

12     that we entered with Dr.  --

13          THE COURT:  Yeah, you have cited them to me.  Yes.

14          MR. KURSMAN:  But even if not, it shows that he relies

15     on selective reports.  We know that he relied on a report from

16     a BOP official who noted that there was no labored breathing.

17     We also know, whether true or not, that there are these other

18     reports by major news companies, AP, Fox News --

19          THE COURT:  And are we saying that we always know

20     everything the media reports to be true?  I get your point.

21     I get your point.  And, again, it's a finding of credibility

22     here.  But I don't think I can take those reports as witness

23     evidence.  I didn't get any declaration.  I don't have

24     declarations, I don't believe, from people who were eyewitnesses

25     to the executions.  I have the autopsy report, and I think maybe

1   the government gave me a BOP official, but that's what I have

2   to take as evidence in this case.

3           MR. KURSMAN:  Right.  And I agree, Your Honor.  All

4   I'm saying is that Dr. Von Crown, that he based his opinion on

5   witness reports.

6           THE COURT:  Yes.

7           MR. KURSMAN:  At least whether one witness report is

8   right or the other witness report is right, he did not view what

9   we consider the entirety of the witness reports.  That much we

10  know is true.

11          THE COURT:  Okay.

12          MR. KURSMAN:  And for that reason, among all of the

13  others, Your Honor should find Dr. Von Crown not credible, and

14  then I will hand over the time to Mr. Braden.

15          THE COURT:  Thank you, Mr. Kursman.

16          MR. BRADEN:  Judge, I just want to talk for a minute

17  about Dr. Antognini.  You know, his studies do not support what

18  he says.  He submitted his report four days ago but yet still

19  doesn't recall most of the information that he says that relied

20  on and that he says that he reviewed.

21      Other federal courts have heard Dr. Antognini in the past,

22  multiple times, and have held that his opinions must be

23  supported by peer-reviewed studies, but yet he cites editorials

24  here.  And to the extent that he cites peer-reviewed studies,

25  they do not support his statements.  He is not a pulmonologist

or pathologist, and his opinions are far afield from the experts in the field of anesthesiology.

So I think this court should just adopt the same position as the court in Ohio and put no weight on his opinions in this matter.  Thank you.

THE COURT:  Thank you, Mr. Braden.

Ms. Lin?

MS. LIN:  Yes, Your Honor.  On the question of that we decided today to just cross-examine, just to be clear, the burden of proof of irreparable harm lies with the plaintiffs, and they have a very heavy burden to do so.  And so, yes, we previously indicated to the Court that a hearing would be appropriate if the Court's going to credit their witness and if we were going to -- if the Court's going to issue an injunction.

That by no means means to suggest that we would then have a process where we believe that we don't have adequate notice and to prepare.  That process should have occurred during the preliminary injunction phase.  That's what the emergency process was for.  This process is not that.  So that's my first point.

The second point is that, as today's testimony indicated, the cross-examination indicated, none of those had anything to do with the prescription requirement that is related to the FDA. And, again, as I emphasized yesterday, it is an alleged violation of FDCA that is the harm that stems from the violation of the FDCA that is the heart of this irreparable harm inquiry.

So, again, today the testimony had nothing to do with any of

that.

    And on the question of Dr. Crowns' opinion, I just want

to clarify, Dr. Crowns did not rely just on the witness

statements.  Dr. Crown relied on his medical expertise and the

fact that he had conducted thousands of autopsies and determined

the causes of death for all of those autopsies, and also, most

importantly, that pentobarbital was a direct and contributing

factor in the cause of death.

    And he's explained why it is not possible for the person

injected with an overdose of pentobarbital to experience pain.

That was the bulk of his opinion.  Then he found witness

accounts to be consistent with his opinion.  So his opinion is

entirely credible; and given his field in terms of forensic

pathology, he should be credited.

            THE COURT:  All right.

            MS. LIN:  And I think on the question of whether

Dr. Antognini remembered all of the studies that he cited

because he prepared -- because the government submitted his

report four days ago, that's neither here nor there, you know,

because you prepare a report over a period of time.  As he

stated, he studied all of the studies he cited carefully.  And

because this was over some period, I think that this --

obviously, I recognize this today's hearing was a little bit

unusual because we don't have the exhibits, we don't have the

studies in front of him, we didn't know what the subject matters

are going to be necessarily other than what's discussed in the

declarations themselves.

And most importantly, the Supreme Court credited his

opinion in *Bucklew.*  That was crucial to the Supreme Court's

determination that even an inmate with a unique medical

condition in that case was still not suffering unconstitutional

pain.

And so it is true that Dr. Antognini is not a pathologist,

but Dr. Crowns is.  And what I'd like to point out is that

Dr. Antognini's declaration is entirely consistent with

Dr. Crowns' declaration, and we've highlighted those where they

were consistent, where they corroborated one another, in our

briefs.  And that's all the points that I have.

THE COURT:  Okay.  All right.  Thank you all.  I know

I gave you very little to no time.  Are you finished, Ms. Lin?

MS. LIN:  I am, Your Honor.

MR. SMITH:  Your Honor, this is Greg Smith.  I didn't

know if the Court would give me just one minute and a half to

make a quick --

THE COURT:  Sure.  Yes.  Go ahead, Mr. Smith.

MR. SMITH:  Thank you.  We seek a preliminary

injunction to bar the defendants from proceeding with

Mr. LeCroy's execution unless and until they comply with the

requirements of binding, incorporated Georgia state law as the

1    FDPA requires.  In other words, unless and until three things

2    occur that the D.C. Circuit's binding law, as set forth by Judge

3    Rao, happens.  In other words, unless, No. 1, the government has

4    two physicians present who will be determining when death --

5              THE COURT:  But, Mr. Smith, the government filed

6    their notice indicating that that's what they intended to do.

7              MR. SMITH:  Your Honor, please, please look at our

8    reply brief.  All they have said is that they have made

9    arrangements for a second doctor to come, and they don't say

10   that those people will be determining when death supervenes.

11   They also have suggested that they feel perfectly free to

12   proceed under the law even if he doesn't show up.

13             THE COURT:  Okay.

14             MR. SMITH:  We believe that that is necessary.

15   Please read our reply brief on that carefully.

16       Number two, unless and until they comply with the notice

17   of execution requirements of Georgia law which included the

18   expiration limits on such notices that limits 20 days of time

19   that any such notice is effective.  In other words, their

20   current notice is not effective under Georgia law.  It is

21   expired and should not be allowed to be enforced.

22       And finally, number three, the government requires a

23   prescription -- I'm sorry, the number three, that they not be

24   allowed to proceed unless and until the government requires a

25   prescription as required by Georgia law, consistent with Georgia

law in practice.  Because even if it's not required under the

FDCA, it is required under Georgia law.  And as you've heard in

the argument, it in fact is happening as a matter of custom

under Georgia law for all executions in Georgia that the

execution drug is prescribed.  So we ask that you give --

THE COURT:  Wait, wait.  Mr. Smith, are you saying

that Georgia law requires a prescription --

MR. SMITH:  We are.

THE COURT:  -- or simply -- okay.  Okay.

MR. SMITH:  And it separately requires a prescription

even if the FDCA does not, for the reasons set forth in our

reply brief.  I understand the government is claiming it does

not, but please read our reply brief which we believe sets forth

including in a citation to a Georgia case that it is required.

So for those reasons, we do ask that you give very close

attention to our FDPA claim which we think is very important and

required as a stay under Judge Rao's opinion and binding D.C.

Circuit law.

THE COURT:  Okay.  Thank you.

MS. LIN:  Your Honor, may I be heard?

THE COURT:  Yes.

MS. LIN:  May I respond to these questions?  And also

Scott Meisler from the Department of Justice who handled the

court filing would like to be heard.  But for a particular

matter, I understand Your Honor has already denied Mr. LeCroy's

1    motion for preliminary injunction, and so there's no more

2    question about the issue of preliminary injunction.  If I'm

3    wrong about that --

4              THE COURT:  I have to look.  Hold on.  I have issued

5    so many orders, I'd have to look back at my docket, which I

6    don't have in front of me right here.

7              MS. LIN:  I believe that Scott Meisler has just

8    joined, so he can speak directly about this.

9              THE COURT:  Okay.  Mr. Meisler?

10             MR. MEISLER:  Good afternoon, Your Honor.  Scott

11   Meisler from DOJ's Criminal Division.  I may have missed part

12   of that in transferring from the public line to the participant

13   line.  So I heard part of Mr. Smith's presentation, and I was

14   just going to direct the Court to ECF 242, which is the

15   government's response.

16        I know he's referred to his reply brief, but I believe

17   we've addressed all the issues there.  As Your Honor noted, the

18   BOP declaration on the issue of the two-physician requirement in

19   Georgia law, the Ninth Circuit in the *Mitchell* case credited and

20   followed a similar BOP declaration denying injunctive relief to

21   an inmate raising a claim under the FDPA.

22        The second issue under Georgia law, which I believe we

23   thoroughly addressed at ECF 242, which is the notice and

24   resetting of execution dates, and we've argued both that the

25   Georgia provision is not incorporated into the scope of Section

3596(a) under the D.C. Circuit decision and under persuasive

authority from the Seventh and Ninth Circuits, and then as well

as being inapplicable by its terms under Georgia law.

And then the third issue, Your Honor, is the Georgia

prescription requirement.  And I would just note there again

I think we've thoroughly addressed that, and Ms. Lin also

addressed that in yesterday's hearing; but I would note again

that the State of Georgia has also argued in its court in the

Eleventh Circuit that state law does not require a prescription

requirement in this situation, and I think Mr. Smith has noted

in his brief that Georgia, as a matter of practice, does obtain

a prescription.  But, again, it has argued to the court --

THE COURT:  That it is not required to do so.

MR. MEISLER:  Exactly.  And so I'm not aware of any

Georgia authority that has resolved that issue, but I think it's

important to note they have taken the same consistent position

on that for many years.  And I think that's consistent with all

the various provisions of Georgia law, including the provision

Ms. Lin discussed yesterday.  I think it's 17-10-38(c) of the

Georgia Code Annotated.

We also made arguments about irreparable harm under those

statutes that I think help settle some of the ones Ms. Lin has

been discussing today and yesterday as well.

THE COURT:  All right.  Thank you, Mr. --

MS. LIN:  Your Honor, I'm so sorry.  Mr. Meisler may

1    not have heard this when he was transferring, so I was making --

2    I indicated that the Court has already denied the preliminary

3    injunction motion that Mr. LeCroy's counsel was just arguing.

4            THE COURT:  I have to check my docket.

5            MR. SMITH:  That is not correct.  We filed a second

6    preliminary injunction if we needed it on the FDCA claim.  In

7    other words, if the Court didn't decide the FDCA claim in time,

8    we may need preliminary injunction on that as well.

9            THE COURT:  Well, I'm hoping to decide all remaining

10   claims in time, and I appreciate everybody's getting on this

11   call and participating and producing your witnesses for this

12   evidentiary hearing; and we are all working very hard, and we

13   are all aware of the pending execution dates.

14       And I'm again reminding the parties that nothing further

15   need to be filed, that it is the Court's intention to rule on

16   all pending claims before the execution dates and in time to

17   give whichever party does not receive the relief they seek the

18   chance to file an appeal.  But I cannot do that if I'm forced to

19   turn to emergency pleadings that are filed after this.

20       So there should be no further filings.  You can, of course,

21   seek leave of court to file something that is truly an

22   emergency, but I warn you that every time you do that, it means

23   that my staff and I have to stop what we're doing and turn to

24   whatever pleading has come in and deal with that because of the

25   exigency involved here.  So I thank you all.  Ms. Lin?

1          MS. LIN:  I'm so sorry, Your Honor.  This is just a

2    housekeeping question.  The government currently has not yet

3    responded to the motion to amend the Eighth Amendment decision

4    that Your Honor -- the final judgment entered.  So our time is

5    not up, and we were intending to respond and oppose the motion.

6    Do we seek leave to do that, or do you think we --

7          THE COURT:  When can you get that to me, Ms. Lin?

8          MS. LIN:  I can get that to Your Honor early next

9    week.  Monday?  Tuesday?

10         THE COURT:  No.  I'm not having any more filings.

11   I realize you have time, but no.  My plan is not to be

12   responding to filings on the day of an execution.  You know,

13   I've had to do that a number of times.  Believe it or not, that

14   is not how I prefer to rule.  Can you get that to me sooner?

15         MS. LIN:  Yes.  We will.  If we file something on

16   Sunday?  Again, we're not moving --

17         THE COURT:  I understand.  As early as possible on

18   Sunday, please.

19         MS. LIN:  Yes, Your Honor.

20         THE COURT:  Thank you.  All right.  Can the parties

21   confer with each other and let my clerk know about tomorrow and

22   what time?  As I said, I can give you an hour, hour and a half,

23   but obviously we're all very busy here.

24         MS. LIN:  Your Honor, we would propose 1:30.

25         THE COURT:  1:30 is fine what me.  Yes.  Let's set

1   it for 1:30.

2           MR. LUBY:  Your Honor, this is Joseph Luby for the

3   plaintiffs.  I'm not certain that Dr. Almgren is available at

4   1:30, but I will confirm that and confer.

5           THE COURT:  Please do that and let my staff know as

6   soon as possible because we have to ensure that we can prepare

7   logistically for that, make sure we have a court reporter and

8   so on.

9           MR. LUBY:  Certainly, Your Honor.

10          THE COURT:  All right.

11      Thank you, everyone.  We're adjourned.

12      (Proceedings adjourned at 3:27 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE *

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE

* PLEASE NOTE:

This hearing was taken via telephone conference in compliance
with U.S. District Court Standing Order 20-19 during the
COVID-19 pandemic.  Transcript accuracy may be affected by
limitations associated with the use telephonic technology,
including but not limited to sound distortions, weak signal
strength, or other types of audio interference.