UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


IN THE MATTER OF THE          .  MC No. 19-0145 (TSC)
FEDERAL BUREAU OF PRISONS'    .  Washington, D.C.
EXECUTION PROTOCOL CASES.     .  Saturday, September 19, 2020
. . . . . . . . . . . . . . . .  1:30 p.m.


TRANSCRIPT OF EVIDENTIARY HEARING
(VIA TELEPHONE CONFERENCE)
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiffs:      JOSEPH W. LUBY, ESQ.
                         MEGAN MCCRACKEN, ESQ.
                         Office of the Federal Community Defender
                         601 Walnut Street
                         Suite 545 West
                         Philadelphia, PA 19106
                         (215) 928-0520

                         GREGORY S. SMITH, ESQ.
                         Law Offices of Gregory S. Smith
                         913 East Capitol Street SE
                         Washington, DC 20003
                         (202) 460-3381


For the Defendants:      JEAN LIN, ESQ.
                         JONATHAN D. KOSSAK, ESQ.
                         U.S. Department of Justice
                         1100 L Street NW
                         Room 11532
                         Washington, DC 20005
                         (202) 514-3716


Court Reporter:          Bryan A. Wayne, RPR, CRR
                         U.S. Courthouse, Room 4704-A
                         333 Constitution Avenue NW
                         Washington, DC 20001
                         (202) 354-3186

C O N T E N T S

TESTIMONY

WITNESSES:

PETER SWAAN:            Cross-Examination...................... 6
                       Redirect Examination................... 20

MICHAELA ALMGREN:      Cross-Examination...................... 26
                       Redirect Examination................... 42

                        P R O C E E D I N G S

          THE DEPUTY CLERK:  Your Honor, we have miscellaneous

action 19-145: In the Matter of the Federal Bureau of Prisons

Execution Protocol Cases.  All counsel have checked in, and we

have one of the witnesses on the line, just so you know,

Mr. Peter Swaan.

          THE COURT:  Okay.  Dr. Swaan.  Okay.  Thank you,

everyone, once again.  This is a Saturday.  I understand

everyone is working very hard, so thank you all for being on

the call.  I do have a preliminary question before we get to

Dr. Swaan's testimony.

     Dr. Swaan, you don't have to get off.  You can stay on

the line.

          THE WITNESS:  Okay.

          THE COURT:  Is it Mr. Smith, counsel for Mr. LeCroy?

          MR. SMITH:  Yes, Your Honor.  Greg Smith.

          THE COURT:  Where on the docket is it indicated that

you agreed to join the plaintiffs' motion for summary judgment?

Because you filed an opposition notice indicating you did not

want to convert for motion for preliminary injunction to one for

summary judgment.

          MR. SMITH:  Your Honor, we have two preliminary

injunction motions and perhaps -- the first one we indicated

that we saw so need to convert it.

          THE COURT:  Right.  And then the second one is sort of

1    in the event that I don't rule before the execution date.

2            MR. SMITH:  On the other claim, which is the FDCA, the

3    Food, Drug, and Cosmetic Act one --

4            THE COURT:  Right.  Did you agree?  I thought you had

5    agreed also to join the plaintiffs' motion for summary judgment.

6            THE COURT:  That is on the FDCA claim, the Food, Drug,

7    and Cosmetic Act claim.  They filed theirs --

8            THE COURT:  Is that in writing?

9            MR. SMITH:  I believe that their original motion

10   indicates that we are joining the motion, and they drop a

11   footnote saying Plaintiff LeCroy plans to file --

12           THE COURT:  Okay.  We'll take a look.  All right.

13   I assume we're going first with Dr. Swaan?  Ms. Lin?

14           MS. LIN:  Yes.  This is Jean Lin.

15           THE COURT:  Okay.  Thank you.  And are you doing

16   the -- and Dr. Almgren will be testifying for plaintiff.  And

17   Ms. Lin, are you using the same procedure from yesterday, that

18   is that you're waiving -- are you going to waive cross and then

19   after redirect Dr. Swaan?

20           MS. LIN:  No, Your Honor.  The parties have conferred,

21   so hopefully the questioning won't be very long for either

22   witness.

23           THE COURT:  Okay.

24           MS. LIN:  We are crossing -- we're going to do

25   cross-examination of Dr. Almgren, and Jonathan Kossak on my

1    team will be doing that, but I'll be defending Dr. Swaan's

2    cross-examination.

3                THE COURT:  Okay.

4                MS. LIN:  And also the parties have discussed this,

5    that hopefully we would both like to have an opportunity to have

6    a couple of redirect.

7                THE COURT:  That's fine.  So far, no one's abused the

8    time and the rules.  So that's okay.  So who will be testifying?

9                MS. MCCRACKEN:  Good morning, Your Honor.  This is

10   Megan McCracken.  I will be questioning Dr. Swaan.

11               THE COURT:  And you represent who?

12               MS. MCCRACKEN:  Bruce Webster.

13               THE COURT:  Mr. Bradley, has Dr. Swaan been sworn in?

14               THE DEPUTY CLERK:  No, Your Honor.  I'm sorry.

15          (Witness is sworn.)

16               THE COURT:  All right.  Dr. Swaan, this is Judge

17   Chutkan.  You are under oath as you would be in any normal

18   proceeding.  Obviously, nothing about this is normal because

19   we're all on the phone and no one's in court, but if at any

20   point there is an objection raised to a question, if you could

21   just pause for a moment while I rule on the objection before I

22   instruct you whether to answer.  All right?

23               THE WITNESS:  Thank you.

24               THE COURT:  With that being said, Ms. McCracken, you

25   may proceed.

1          MS. MCCRACKEN:  Than you, Your Honor.

2          PETER SWAAN, WITNESS FOR THE GOVERNMENT, SWORN

3                    CROSS-EXAMINATION

4    BY MS. MCCRACKEN:

5    Q.   Good morning, Mr. Swaan.  My name is Megan McCracken.

6    I'll be questioning you.  Please let me know if you can't hear

7    me at any time.

8          I'd like you to start with your declaration dated

9    September 16, and I'd like to direct you to paragraph 9 of that

10   declaration.  Since you wrote this declaration dated September

11   16, have you reviewed any additional materials that are not

12   listed here in paragraph 9?

13   A.   Yes.  I have reviewed the response of Dr. Almgren that was

14   submitted to me, I believe, on the 18th.

15   Q.   Okay.  Thank you.  And any additional materials that are

16   not listed in paragraph 9?

17   A.   No other materials.  No.

18   Q.   Okay.  You state in this declaration that the drug

19   pentobarbital generally is a very stable drug.  Is that correct?

20   A.   That is correct.  It's been well studied, and it's very

21   stable.

22   Q.   Do you know how the specific pentobarbital that will be

23   used by the Bureau of Prisons for execution is compounded?

24   A.   I have no information.  That was not provided to me.

25   Q.   Okay.  I'm looking at paragraph 12 of your declaration.

1    You say that the pentobarbital compounded for lethal injections

2    is nearly identical to the one studied in the 2015 article by

3    Priest and other authors.  Is that correct?

4    A.    Again, that's -- I do not have the exact formulation that

5    is being used here, and I assume, just as Dr. Almgren did, that

6    they are following the formulation of Nembutal, which is

7    identical to the one --

8    Q.    Of what?

9    A.    Nembutal.

10   Q.    Nembutal.  Okay.  So you have not seen any records of the

11   formulation recipes for the Bureau of Prisons' pentobarbital.

12   Correct?

13   A.    I have not.  I have only seen the analyses by the

14   independent laboratory that were provided to me.

15   Q.    Okay.  So you can't say that it is identical to the

16   pentobarbital referred to in the Priest article.

17   A.    I can't.  That's an assumption.

18   Q.    Okay.  And do you know how the pentobarbital slated

19   for use in executions by the Bureau of Prisons is stored?

20   A.    From -- I did not get -- I was not provided the information

21   on the storage conditions of Nembutal.

22   Q.    So you don't know what kind of vessel it's stored in?

23   A.    I do not know this, and I believe -- no.  I have not been

24   provided information on this.  No.

25   Q.    Okay.  Isn't it true that without knowing the formulation

1   recipe, you cannot say the drug was compounded correctly?

2   A.   You cannot -- I mean, can you repeat the question, please?

3   Q.   Sure.  Without knowing the formulation recipe used to

4   compound the pentobarbital, you cannot say that the drug was

5   compounded correctly.  Is that right?

6   A.   I don't think you can not say that, because what you're

7   doing is you're relying on the independent analyses from the

8   laboratory that were provided to me, and if the concentration

9   in there or the potency in there is the correct potency, that's

10  what your -- that's the information that you receive.

11  Q.   Okay.  So you're looking specifically at the potency in

12  the --

13  A.   I'm looking specifically, yes, at the potency and at

14  the stability of the solution.  Yeah.

15  Q.   Is it true that the stability of the drug, and of any drug,

16  will be impacted by the specific compounding recipe used?

17  A.   It can be impacted by the recipe and the storage

18  conditions, but for Nembutal, which has been very well

19  characterized -- this drug has been around for over a hundred

20  years.  The last change was made in 1979.  So for the last 40

21  years or so, it's been well known on how to formulate it and

22  how to store it.  And given the fact that this was carried out

23  by a 503B pharmacy that uses CGMP protocols for quality

24  assurance, I therefore assume that its formulation was adhered

25  to to the United States Pharmacopeia guidelines.

1   Q.   All right.  But the Bureau of Prisons is not using

2   Nembutal.  Correct?

3   A.   I don't know that, but I believe they don't.  No.

4   Q.   Okay.  And I believe you just said that the stability of

5   the drug, one of the factors that can impact the stability of

6   the drug is the storage container used and -- I'm sorry.  I'll

7   stop there.  The storage container used.

8   A.   It could.  It could.  But like I said, this has been

9   well prescribed for pentobarbital over a history of nearly a

10  century.  So the storage conditions are very well known, and

11  knowing that this was prepared in a 503B pharmacy that would

12  have used the correct container and storage conditions and

13  formulation recipe, yes.

14  Q.   Okay.  But my question is does the storage container impact

15  the stability of the drug.

16  A.   It could.

17  Q.   Can the storage condition impact the stability of the drug?

18  A.   It could, in general.  For any drug, yes.

19  Q.   I am still looking at paragraph 12 of your declaration.

20  You refer to an article by an author, Gupta.  Is it correct that

21  in that study the pentobarbital at issue was diluted with normal

22  saline?

23  A.   Yes.  That's correct.  But I need to expand on that,

24  because that Gupta study was merely used by me in my declaration

25  to illustrate that pentobarbital is extremely stable even under

1    extreme conditions.  So these extreme conditions do not
2    reflect what would happen with the drug storage under normal
3    circumstances in a pharmacy.
4        So this was merely an illustration.  It's a different, what
5    do you call it, formulation.  But they boiled this for hours and
6    only found about 6-1/2 percent degradation.  So this led me to
7    conclude that this is a very stable drug, and a lot of people
8    agree with that.
9    Q.   And that, however, goes back to the first point we
10   addressed, that when you're discussing pentobarbital generally,
11   pentobarbital as a drug in general, is very stable.  Correct?
12   A.   Yes.
13   Q.   And as you point out in the Gupta study, they were
14   monitoring its stability, the pentobarbital stability, after
15   repackaging it in syringe.  Right?
16   A.   Yes.  They did.
17   Q.   And you have not been told how the BOP's compounded
18   pentobarbital is stored.  Is that correct?
19   A.   I do not have that information, no.  So I don't know if
20   they would repackage it in syringes and boil it, but I assume
21   they won't.
22   Q.   Okay.  Let's move to the 365-day study that was conducted
23   by an independent laboratory and that you reviewed for your
24   declaration.  You did review that.  Correct?
25   A.   Yes.  Of course.  Yes, I did.

1   Q.   And that study began on April 4, 2019.  Is that right?

2   A.   That is correct.

3   Q.   Okay.  And is it correct that the 365-day stability

4   study at issue here was done pursuant to the United States

5   Pharmacopeia to their specifications?

6   A.   It was performed by an independent lab according to

7   specifications, yes.

8   Q.   For everyone's ease, including the court reporter, I will

9   be referring to the United States Pharmacopeia as "USP."  Okay?

10  A.   Yes.  So the study was performed at room temperature and

11  at elevated temperature to accelerate degradation.

12  Q.   Right.  We'll get there.

13  A.   Sorry.

14  Q.   No problem.  Would you agree that the acceptable range for

15  potency specified by the USP for this specific pentobarbital

16  product is between 92 and 108 percent potency/purity?

17  A.   That guideline by USP is generally acceptable or accepted

18  for formulations -- for potency of formulations, correct.  Yes.

19  But I would like to point out here that during the stability

20  study, that was not the batch being used for lethal injections.

21  That batch was merely used to do a stability study.

22  Q.   Of course.  I'd like to direct your attention to Bates-

23  stamped page 1142.

24          MS. LIN:  Counsel, can you identify what page that is,

25  because I don't think the doctor has the Bates-stamped one in

1    front of him.

2              THE WITNESS:  No.

3              MS. MCCRACKEN:  I see.  Okay.

4         This is the certificate of analysis for the stability study

5    conducted at elevated temperature.

6              THE WITNESS:  Okay.

7    BY MS. MCCRACKEN:

8    Q.   Okay.  So this lab report is for the stability study at

9    elevated temperature, and it shows four different points at

10   which the pentobarbital was subpotent.  Correct?

11   A.   It shows four points that if you'd look at the starting

12   conditions, the starting potency, that over the course of a year

13   there was degradation of about 4 percent.

14   Q.   Dr. Swaan, I'm quoting from your report at paragraph 16,

15   and at the bottom of that paragraph, I actually quoted directly

16   from it, you say that it documents four different points at

17   which the drug was subpotent: days 56, 92, 189, and 369.

18   Is that correct?

19   A.   That's correct, and I follow that by saying that that

20   is to be expected and not indicative of reduced potency of

21   the formulation storage at room temperature or below.

22   Q.   That's fine.

23   A.   Correct.

24   Q.   Now I'd like you to look at -- you don't have Bates-stamped

25   pages, so for the Court its Bates-stamped 1140.  This is the

1   certificate of analysis for the study conducted at room

2   temperature.  Now, I'm just asking you what is on the piece

3   of paper.

4   A.   Okay.

5   Q.   This certificate of analysis shows two points where the

6   pentobarbital was subpotent at days 92 and 271.  Is that right?

7   A.   I'd like to again point out that this is a stability study

8   that has a certain starting point.  That starting point was 93

9   percent, and over the course of the year, the degradation is

10   only 1 percent.

11        So if we speak about subpotent, it would have started at

12   100 percent; we would have been left at 99 percent, right?  So

13   I think looking at the stability data that were done for a

14   specific purpose, we should not judge whether these are potent

15   or subpotent, because they were not actually used in executions.

16   Q.   We understand that these were the drugs that were used for

17   the sole purpose of testing.

18   A.   Yes.

19   Q.   However, at paragraph 14 of your declaration, you say

20   the intrinsic accuracy of the assay method can account for

21   the fluctuations in the certificate of analysis.

22        So when the pentobarbital at elevated temperature -- so

23   below the acceptable range of potency according to the USP,

24   you described that as documenting subpotency.  So when the

25   pentobarbital at room temperature fell below the same acceptable

1   range of potency, you did not describe that as documentation

2   of subpotency.  Is that correct?

3   A.   Are you referring here to the measured potency or the

4   actual potency?  Because that's intrinsic with the assay

5   accuracy.

6   Q.   I'm referring to the results on the certificate of analysis

7   for room temperature and elevated temperature and how you

8   described what these certificates of analysis document

9   differently.

10  A.   Right.  I'd like to point out that the analysis of day 92

11  was considered to be a prep error by the laboratory carrying

12  these out, and they reprepped after six days and listed that

13  value.

14  Q.   Right.  And the sole note that I see regarding that reprep

15  is the word "reprep."  Do you see any additional note about that?

16  A.   I do not.

17  Q.   And did you receive any additional information about that?

18  A.   I did not.

19  Q.   Okay.  In paragraphs 14 and 16 of your declaration, you

20  say that the readings from the room temperature certificate

21  of analysis are in error due to what you describe as inherent

22  limitations/inaccuracies of assay readings, i.e., lab errors.

23  But you do not cite a basis for saying that.  Is that correct?

24  A.   I did cite -- that is not correct.  I cited that the

25  acceptable or general accuracy of any assay methods, and as

referred to me before in paragraph 14, I believe, that the
accuracy of any assay has a limitation that there's an error.
That error is not reported for this specific assay by the lab.
It can only be established when you do a time course study like
this.

Q.   I see.  So I think you were referring to the bottom, the
last two lines of paragraph 13?  There you cite an article for
the assertion that the accuracy of potency assays of drugs --

A.   That's correct.

Q.   -- in solution may have errors up to 2.2 percent.

A.   2.2 percent.  Yes.

Q.   So that, in essence, is the expected and allowable degree
of inaccuracy.  Is that correct?

A.   For this assay, without this knowledge, this would be
2.2 percent considering that that is a baseline.  But over the
course of this stability study, if you actually calculate the
variability in those data, and I've done that in the appendix
in Table 1, you see there a measured potency and a predicted
potency which would give you the actual potency of the solution.
And there you find that there's about a maximum of 2-1/2 percent
variability.  The average variability is 1.5 percent.  So the
accuracy is actually better than the reported values.

Q.   Okay.  Let's focus on the assay for now.  Isn't it true
that the USP does not accept assay accuracy errors in the range
of 10 to 15 percent?

1    A.    That is correct.  I was merely --

2    Q.     -- some analytical chemist might accept?

3    A.    Some analytical chemists might accept that, but that would

4    not be under drug standards, no.

5    Q.    Right.  Okay.  But essentially you are assuming that the

6    reading from this stability study are based on assay errors.

7    Is that correct?

8    A.    Yes.  As you can see in the graph, there's variability in

9    the numbers.

10   Q.    And putting aside for a moment, just for the moment, your

11   opinion regarding assay error, if those room temperature

12   readings are accurate, then the pentobarbital fell below the

13   allowable potency range.  Correct?

14   A.    The measured potency, but not the actual potency, no.

15   But I again want to point out that these were not used for

16   lethal injections.  This was merely a batch that was used for

17   stability testing, and the starting potency --

18   Q.    Right.  And the reason this batch was used for potency

19   testing was because presumably it was compounded by the same

20   pharmacy, the same 503B facility that will compound the drugs

21   that will be used.

22   A.    I don't have that information.

23   Q.    And do you have the information of whether the drugs that

24   will be used will be compounded in the same way as the drugs

25   that were tested?

1    A.    I was not given that information.  I can only assume.

2    Q.    Okay.  Isn't it true that the methodology used by this

3    independent lab to do the stability study was validated?

4    A.    I was -- are you asking for my opinion whether I assume

5    it was validated or whether I acknowledge --

6    Q.    No, I'm sorry.  I'm sorry.  Let me rephrase.

7    A.    Okay.

8    Q.    Let me back up.  Have you been shown a validation

9    report from the laboratory that did the stability study?

10   A.    I have not been shown the validation report, no.

11   Q.    Are you aware that a validation report exists?

12   A.    I have not been given information about that, no.

13   Q.    So it was not provided to you.

14   A.    Not provided to me.  Correct.

15   Q.    Okay.  If a validation report existed, and I will represent

16   to you that one does, isn't it true that the purpose of method

17   validation is to minimize the potential for inaccurate results?

18   A.    So are you asking me, if the accuracy report was available,

19   that that's for the purpose of finding the error?  I'm not sure

20   I understand the question.

21   Q.    Okay.  Let's make it general.

22   A.    Sure.

23   Q.    I'm asking you the purpose of a validation report

24   generally.  Does that minimize the potential for inaccurate

25   results?

1    A.   A validation report was provided in general to demonstrate

2    the variability or accuracy of the methods.  So in other words,

3    it would provide that standard error that every value that would

4    be reported would intrinsically have.  So as an example, if the

5    accuracy is 2.2 percent, then every value that they report would

6    have that margin of error.

7    Q.   And if a validation report existed for this stability

8    study, would you want to see it?

9    A.   I haven't seen it, but yes, I would like to see it.  Sure.

10   Q.   Okay.  Let's turn to the second appendix to your

11   declaration.  Am I correct that you created the graphs that are

12   appended to your declaration?

13   A.   I did indeed.  Yes.

14   Q.   And these are linear regression models.  Is that correct?

15   A.   That is correct.

16   Q.   Okay.  So in a linear regression model, there is one

17   independent variable.  In this case, is it correct that the

18   independent variable is the number of days that had passed?

19   A.   Yes.

20   Q.   And there's one dependent variable, and in this case

21   that dependent variable is the potency of the pentobarbital?

22   A.   Correct.

23   Q.   Okay.  So the data point on these graphs map the potency

24   of specific dates.  Correct?

25   A.   Yeah.

1   Q.   And then the line that you draw through those data points

2   is a linear representation of the average of the downward trend

3   over time.  Is that correct?

4   A.   That is correct.

5   Q.   Okay.  Do you know if USP guidelines accept a linear

6   regression model rather than actual plotting of stability data

7   to determine the rate of degradation?

8   A.   The reason that I plot a linear regression here is because

9   it is well known that pentobarbital stability or degradation is

10   a first order process, which is a linear process, and therefore

11   you can follow a linear regression curve through these data.

12   Q.   But the USP does not accept linear regression models to

13   determine the rate of degradation.  Correct?

14   A.   I don't believe that's correct.

15   Q.   And is it correct that your linear regression model is

16   not predictive of the actual potency on any given day?

17   A.   I believe it is predictable.  It merely shows the deviation

18   taking into consideration the accuracy of the assay.

19   Q.   Do you construct a linear regression model regardless of

20   the data point?

21   A.   Can I construct linear regression regardless of the data

22   points?  Well, if I know that the potency, the degradation,

23   follows a first order process kinetically, then I can fit a

24   regression line through those data points, yes.

25   Q.   And that's the reason why a linear regression model would

1    not be acceptable to the United States Pharmacopeia.   Correct?

2    A.   I did not say that was not acceptable to the USP.

3         MS. MCCRACKEN:   Your Honor, could I just take one

4    minute to go through my notes to see if I have any additional

5    questions?

6         THE COURT:   Sure.

7         MS. MCCRACKEN:   Okay.   That's all I have, Your Honor.

8         THE COURT:   Okay.   Thank you.

9    Ms. Lin?

10        MS. LIN:   Yes.   I just have a few questions, some

11   redirect questions, if I may.

12                       REDIRECT EXAMINATION

13   BY MS. LIN:

14   Q.   Dr. Swaan, I just wanted to clarify a couple of factual

15   points just for purposes of the record.   I think you earlier

16   were asked the question of whether the time study started on

17   April 4, and your answer to that is yes.

18        Did you get that from the certificate of analysis?   Because

19   I want to point you to the certificate of analysis, and if you

20   could tell me what the testing starting date was for both the

21   room temperature and the elevated room temperature, I just don't

22   want there to be any factual errors.

23   A.   I would have to honestly go through my notes to see when

24   this exactly started.   I have a lot of certificates of analysis

25   here that it would take me some time to find the actual start

1    date.

2    Q.   Okay.  So you don't know if it's April 4th, right,

3    because --

4    A.   No, I don't know the exact date.  No.

5    Q.   Okay.  So the two documents that counsel was just asking

6    you about, the two certificates of analysis of the time studies,

7    the first date on the certificate of analysis itself, if you

8    could just look at that and see what the first date is just so

9    that the record is clear.

10   A.   I don't have that data in front of me right now.

11   I'm sorry.

12   Q.   Okay.  So that's fine.  If I may, I'll just reflect for the

13   record, given that this document is in front of counsel and that

14   was asked of the starting date there was reflected as May 17,

15   2019.

16        And one other point that you were asked about, whether

17   you were provided data for the batches that BOP is using for

18   executions, and you said that you were not provided that data.

19   I just want to make sure that you appreciated that question,

20   because I didn't -- weren't you given the laboratory report

21   about the pentobarbital that is intended to be used for

22   executions?

23   A.   I was.  I must have misspoken there.  I have those

24   certificates of analyses, yes, the 97.6 percent and 100 percent

25   potency.

Q.    Okay.  And so you did review those data in formulating your
conclusion in your report.  Right?

A.    I did review those data in my opinion notes.

Q.    Okay.  And then -- so can you tell us, because I think you
were trying to explain to counsel the purpose of a time study
and the range that was described in the certificate of analysis
being 92 to 108, and you mentioned actual versus measured.

      Can you tell us the purpose of the time study and explain
what you were trying to say which I believe you were not able to
fully complete your response?

A.    Okay.  Yeah.  So the purpose of the time study is that it's
a degradation test, not a potency test.  So we cannot glean
potency numbers from this test.  We have to look at the relative
degradation.  And since the degradation started at a potency of
93 percent, we have to use those numbers.

      Now, normally I would say in scientific terms you should
have started out at 100 percent with that starting concentration,
but I don't really want to go there.  But I think what is
important here to state is that this is a relative amount of
drug which you follow its degradation over time, over a year.
And so, again, these were not the batches used for lethal
injection, and so this was a degradation test and not a potency
test.

Q.    So what are you trying to determine in degradation tests,
just to make sure that I understand that?

1  A.   That would be the stability, the stability of the drug

2  formulation and its shelf life and expiration date.  So in this

3  case I determined from the stability studies that the drug

4  formulation was stable beyond -- it was stable beyond a year.

5  Because in the case of the 100 percent potency drug, after one

6  year, only 1 percent would have been degraded, which would then

7  be 99 percent.

8       So, technically, you could store this formulation perhaps

9  for as long as eight years, which we probably wouldn't want to

10  do, but the potency of the lethal injection use of batches would

11  degrade only 1 percent over a year.

12  Q.   Okay.  Thank you.  And one question that you were posed was

13  that this is the same compounding drug that was produced by the

14  pharmacy.  Does this degradation rate cause any concern for you

15  as a pharmacist?

16  A.   No.  This degradation rate is not a concern.  This is a

17  highly stable drug and one which its formulation has been well

18  documented in the literature, and there's even a USP monograph

19  on its formulation.  So I have no concerns about this

20  formulation and its stability.

21  Q.   Okay.  One last question.  Just to clarify your point

22  earlier, you said that the differential or the potency rates

23  change during the degradation studies, and that could be

24  prepping area; that can be study error.  And so if you can look

25  at certificate of analysis that counsel was just asking you

1    about as to the room temperature.  So in -- do you have it?

2    A.   I have the data in front of me, yes.

3    Q.   Okay.  And you were asked about the 271-day measures

4    potency results, and then as you can see, there's also a 369-day

5    result and there was an increase of 3 percent percentage points?

6    Is it possible for actual potency to change from 271 days to 369

7    days in a 3 percentage change for actual potency?

8    A.   No.  This would be creation of matter, and that's

9    thermodynamically not feasible.  So the only way to explain this

10   is that the accuracy of the assay impacts the readout of the

11   potency.

12   Q.   Is that also true for the change from 92 days, which is at

13   90.6 percent, and then six days later -- at day 98 it changed to

14   94.6 percent, so there was a 4 percentage change in six days.

15   Can you explain that differential?

16   A.   No.  That can only be explained by variability in the

17   assay.  And as the lab explained, this was likely a prep error,

18   and that's what a reprep is.  Their quality assurance -- and I'm

19   speculating, but their quality assurance probably flagged this

20   as a faulty readout or a prep error.  They then investigated and

21   reran the sample six days later.

22   Q.   Okay.  Thank you.  I have no more questions, Dr. Swaan.

23   A.   Thank you.

24        MS. MCCRACKEN:  Your Honor, this is Megan McCracken.

25   I wanted to clarify something on the record.

1           THE COURT:  Yes.

2           MS. MCCRACKEN:  When I referred to the method

3     validation, I was not referring to the testing at the end of

4     last year on the drugs compounded at the end of last year.

5     I was referring to the method validation report in the

6     administrative record which begins at page 984 and which is not

7     the lab testing but which is the method validation report from

8     the lab that was doing the 365-day stability test.

9           THE COURT:  Okay.  Thank you.

10        All right.  Dr. Swaan, thank you very much for taking time

11    out of your Saturday, and you are free to leave.

12          THE WITNESS:  You're welcome, Your Honor.

13          THE COURT:  Or I should say hang up.  Thank you

14    very much.

15          THE WITNESS:  Thank you.

16        (Witness exits call.)

17          THE COURT:  Okay.  The next witness, I believe, is

18    Dr. Almgren.  Who will be questioning Dr. Almgren?

19          MR. KOSSAK:  Your Honor, this is Jonathan Kossak for

20    the government.  Dr. Almgren is not yet on the phone, but she is

21    being notified that Dr. Swaan has just completed his testimony.

22          THE COURT:  Okay.  Just let me know when she gets on

23    the phone.

24          THE DEPUTY CLERK:  And, counsel, if you're not

25    speaking, please mute your phone.  Thank you very much.

1          (Witness joins call, is sworn.)

2              THE COURT:  All right.  Good afternoon, Dr. Almgren.

3     This is Judge Chutkan.  Thank you very much for taking time out

4     of your schedule and your weekend to be here.  I appreciate it,

5     and I know the parties do appreciate you making yourself

6     available.

7          You are under oath, as you would be in any proceeding.

8     There's a court reporter who's transcribing the testimony, and

9     although it is unusual for us all to be on the phone in this

10    way, if at any point the audio fades or you can't hear, can you

11    just indicate that.  And so I believe you will be questioned by

12    Mr. Kossak.  You may proceed.

13             MR. KOSSAK:  Thank you, Your Honor.

14         MICHAELA ALMGREN, WITNESS FOR THE DEFENDANTS, SWORN

15                        CROSS-EXAMINATION

16    BY MR. KOSSAK:

17    Q.   Good morning.

18    A.   Good morning.

19    Q.   I'm counsel on behalf of the government.  I'll be

20    questioning you here today.  If you can't hear me or you can't

21    understand my question, please let me know.  Okay?

22    A.   Okay.

23    Q.   All right.  Thank you.  And the Court has mentioned this

24    previously, but I'm not sure if you heard it:  If there's an

25    objection to a question of mine, you know, please allow the

1    Court to weigh in before you answer, and that way we can all

2    sort of get a clean record and not talk over each other.  Okay?

3    A.    Okay.

4    Q.    All right.  Great.

5          Dr. Almgren, I'm correct that you've submitted two

6    declarations in this case.  Right?

7    A.    Yes.

8    Q.    And the first is dated October 31, 2019.  Correct?

9    A.    Yes.  That's correct.

10   Q.    And the second is dated yesterday, September 18, 2020.

11   Correct?

12   A.    Yes.  That's correct.

13   Q.    And do you have both of those declarations in front of

14   you today?

15   A.    I do.

16   Q.    Okay.  In paragraph 2 of your second declaration -- and

17   for the record, that at docket 257-1.  At paragraph 2 you state

18   that you are a clinical assistant professor at the University of

19   South Carolina's College of Pharmacy.  Correct?

20   A.    Yes.

21   Q.    And of the several subjects that you teach, one includes

22   pharmacy regulations applicable in 503A and 503B compounding

23   environments.  Correct?

24   A.    Yes.  That's correct.

25   Q.    And in paragraph 3 of your second declaration, you state

1    that you maintain a practice site at a 503B outsourcing

2    pharmacy.  Is that correct?

3    A.   Yes.  That's correct.

4    Q.   Is that true today?

5    A.   Yes.

6    Q.   So am I correct in assuming that you are familiar with

7    pharmacy regulations applicable in both 503A and 503B

8    compounding environments?

9    A.   Yes.

10   Q.   And I'm correct, aren't I, that a 503B pharmacy is held to

11   a higher manufacturing standard than a 503A pharmacy?  Right?

12   A.   Yes.  That's correct.

13   Q.   In fact, 503B pharmacies must comply with what is known

14   as Current Good Manufacturing Practices, or CGMP regulations.

15   Right?

16   A.   Yes.  That's correct.

17   Q.   And isn't it the case that 503A pharmacies do not have

18   to comply with CGMP requirements?

19   A.   Right.  They follow USP guidelines.  If they do sterile

20   compounding, they will follow USP guidelines for USP 797 and

21   USP 800.  If they are performing nonsterile compounding, they

22   follow USP 795 guidelines.

23   Q.   Okay.  I just want to make sure I got my question answered,

24   though.  The 503A pharmacies do not have to comply with CGMP

25   requirements.  Correct?

1    A.    No, because they're more stringent than they are for

2    manufacturing and making larger batches.

3    Q.    Okay.  Thank you.  Can you summarize the manufacturing

4    standards that 503B pharmacies are required to abide by under

5    CGMP regs?

6    A.    That is a very wide question.

7    Q.    It is a wide -- I agree.  I apologize.  That's too broad,

8    but I'm wondering if you can sort of -- if there are a few key

9    manufacturing standards that 503B pharmacies are required to

10    abide by under CGMP regulation.

11    A.    I mean you need to -- once again, that is not really a good

12    question because you are asking how to summarize guidelines for

13    the industry, because CGMP basically also applies to pharmaceutical

14    industry.  So you're asking me to summarize for you guideline by

15    which pharmacies and industry follow.  I mean it's just a very,

16    very wide question.  I mean there are different aspects of CGMP

17    that we can discuss, but I cannot summarize for you the entire

18    guidelines.

19    Q.    Okay.  I appreciate that, and perhaps in the interest of

20    time we'll just move on.  I understand that you testified that

21    CGMP requirements are more stringent than normal.  Isn't that

22    correct?

23    A.    Exactly.  Yes.

24    Q.    Okay.  All right.  I'd like to turn to your second

25    declaration, still at paragraph 6.  You state: "Based on the

1    information provided for my review, it appears that the Board

2    of Prisons is using a 503B compounding pharmacy to prepare the

3    pentobarbital injection."  Correct?

4    A.   Yes.

5    Q.   You have not reviewed anything to indicate that BOP

6    is not using a 503B pharmacy.  Right?

7    A.   I'm not sure I understand what you're asking.  I mean,

8    what else could I review?  Can you please clarify?

9    Q.   Well, sure.  You state that "it appears."

10   A.   Oh, you're questioning my language in your question.

11   Q.   Yes.

12   A.   Okay, yes.  Well, yes.  I absolutely would.  I had the

13   administrative record, and that is what I reviewed.  So that

14   is all that I was provided.  Yes.

15   Q.   Right.  And nothing that you were provided indicates that

16   BOP is not using a 503B compounding pharmacy.  Right?

17   A.   I'm sorry.  Maybe I'm not following the line, but from what

18   I read it appears there was somewhere a statement, I believe,

19   that said that they were going to have 503B pharmacy compounding.

20   So there was nothing else mentioned about 503A or anything like

21   that.  So I guess from that perspective, that's correct.

22   Q.   Okay.  Thank you.  Moving on to paragraph 9 of your second

23   declaration, you refer to a 365-day study --

24   A.   I'm sorry.  I'm sorry.  Can I go back for a second, because

25   I thought about what I just said and I want to clarify?  Can I

1      clarify, please, what I just said a minute ago?

2                  THE COURT:  Yes, you may.

3                  THE WITNESS:  Thank you.  Thank you.

4          What I meant is -- so you're asking about my status today.

5      So those statements that you are talking about is the one we

6      submitted yesterday.  So at this point of time, yes, that is

7      correct; I'm aware that it was a 503B pharmacy that is preparing

8      these drugs.

9              However, when I have initially prepared my statement, so

10     we're talking about 2019, October of 2019, so we have to look

11     a year back.  At one point of time I was unaware that 503B

12     pharmacy was actually used.  I really want to clarify it because

13     I am aware of my previous statement; and that point of time I

14     was unaware that a 503B was in play, and I was under the

15     impression that they were using just a compounding pharmacy,

16     a regular 503A type of pharmacy.  I'm sorry.

17                 MR. KOSSAK:  No, I appreciate that clarification.

18     Thank you.

19     BY MR. KOSSAK:

20     Q.    Okay.  So moving on to paragraph 9 of your declaration,

21     you refer to a 365-day time study that was conducted by an

22     independent laboratory.  Correct?

23     A.    Yes.

24     Q.    Would you agree with me that the point of the time study

25     is to determine the rate of degradation of a drug?

1    A.    Well, the purpose of the time study truly is, in

2    pharmaceutical setting, to determined the expiry.  So we're

3    not looking just at degradation; we're looking at the overall

4    product.  We are examining the storage conditions and the

5    packaging as well.

6    Q.    Okay.  But is one aspect of the time study -- one purpose

7    of the time study to determine the rate of degradation of a

8    drug?

9    A.    One of many aspects, yes.

10   Q.    Okay.  And forgive me; I may be butchering this in my lay

11   understanding of what's happening here, but my understanding is

12   that you determine the rate of degradation by starting with a

13   certain concentration of a drug and measuring how that

14   concentration changes over various points in time.  Is that

15   correct?

16   A.    Well, so yes, in a sense.  I agree in a sense that, yes,

17   you prepare the drug.  Obviously, you are to dispense it, and

18   then you basically measure degradation over time and you're

19   hoping -- of course, I'm looking as some business perspective --

20   that it does not degrade significantly.  So you are able to

21   maintain the potency of the drug, and so the degradation will

22   be so insignificant that even a year from now or six months from

23   now the degradation of the drug is still within certification

24   so you can sell it to the date of expiry.

25   Q.    In paragraph 9 you refer to a 365-day study initiated on

 1   April 4, 2019.  Is that correct?

 2   A.   Yes.

 3   Q.   Okay.  And you state that it was to be completed by

 4   April 4, 2020.  Correct?

 5   A.   Yes.

 6   Q.   Okay.  And in your first declaration --

 7   A.   That's correct.  Yes.

 8   Q.   Okay.  And in your first declaration, I'm looking at

 9   paragraph 19 --

10   A.   And I'll tell you where I got these dates from in case

11   the dates are in question.  These came from the actual protocol

12   that was submitted, and it was available in the administrative

13   record.  That's where those dates came from.  That was the

14   initial proposal for the study.  And go ahead.  Sorry.

15   Q.   No, I appreciate that.  I'm actually not trying to verify

16   the dates.  I'm just trying to verify that you are aware of the

17   study, its general time period, and that it's the same study

18   that you refer to in paragraph 19 of your first declaration.

19   A.   Well, let me look because I'm not sure if that's the case.

20   Hold on.  Is that your next question?  I'm sorry.

21   Q.   Yes.

22   A.   Yes.  It's the same administrative record page numbers.

23   Q.   And I'm correct that you have reviewed the completed

24   results of that same study.  Correct?

25   A.   Yes.  I have the other pages in front of me, administrative

record pages 1142, that I'm looking at that is the certificate

of analysis, and that is I believe the completed report.

There's a page 1144 on administrative record that talks about

the elevated temperatures, and then there's a page 1140 that is

the certificate of analysis.  Again, that's the page number in

the administrative record, and that one shows the data from the

room temperature study.

Q.    Okay.  And I direct your attention to AR 1140.

A.    Okay.

Q.    The first test date, day 2, is May 17, 2019.  Correct?

A.    Yes.

Q.    And the last test date at day 369 is May 18, 2020.  Correct?

A.    Yes.

Q.    When was the first time you reviewed the completed test

study results?

A.    A couple of days ago.  I think it was -- I had received

this report, I want to say, on Wednesday or Tuesday of this week.

Q.    Okay.  I'd like you now to -- we're still on paragraph 9 of

your second declaration.  You refer to laboratory protocols for

the study.  Correct?

A.    Yes.

Q.    Okay.  And in paragraph 10 you state that accelerated

stability studies are performed as described in the protocol.

Right?

A.    Well, what I stated was that it was proposed.  The protocol

1    actually -- honestly, it is not very well written protocol

2    because it does not address a lot of issues that may come up.

3    Typically, a federal protocol will be a substantial document

4    that will address what happens if you have an analytical

5    failure, what happens if you have failure of the products,

6    and this product is extremely simple.  I'm really surprised

7    to see the way --

8    Q.   That is not the question I asked.

9    A.   Sorry.  Please ask again.  I'm sorry.

10   Q.   You said in paragraph 10 that accelerated stability studies

11   are performed as described in the protocols that you reference

12   in paragraph 9.  Correct?

13   A.   Yes.  That's correct.

14   Q.   Okay.  You state in the next sentence that "this is a

15   common practice in the pharmaceutical industry to examine the

16   rate of kinetic degradation of drug products."  Isn't that

17   correct?

18   A.   Yes.  That's correct.

19   Q.   In paragraph 11 of your second declaration, you say that

20   you have reviewed the certificate of analysis at AR 1142.

21   Correct?

22   A.   Yes.

23   Q.   And you have that page in front of you.  Correct?

24   A.   I do.

25   Q.   And that shows the result of the 365-day study at elevated

1    temperatures.  Right?

2    A.   Yes.  That's correct.  It is really --

3    Q.   And the starting value -- excuse me.  Excuse me.

4    A.   I'm sorry.

5          THE COURT:  Wait.  This is Judge Chutkan.  We

6    can't speak over each other.  It has to be one at a time.

7       Dr. Almgren, the question may be confusing, but if you

8    could wait till you get to the end of his question and then

9    clarify or answer or whatever, but we have to speak one at a

10   time here.

11        THE WITNESS:  Sure, absolutely.  I'm sorry.

12   BY MR. KOSSAK:

13   Q.   Okay.  So you have that page in front of you.  Correct?

14   A.   Yes, I do.

15   Q.   And it shows the results of the 365-day stability study at

16   elevated temperatures.  Correct?

17   A.   Yes.

18   Q.   Okay.  And the starting value on day 2 of that test result

19   was 93.1 percent.  Correct?

20   A.   Yes.  That's correct.

21   Q.   And the final value at day 369 was 88.8 percent.  Correct?

22   A.   We are looking at -- let me double-check.  So this is page

23   11 -- you say 1142, right?  I'm looking at the right page.  Yes.

24   1142 would be the last data point at 369 days was 88.8 percent.

25   You are correct.  That's the elevated temperature.

1   Q.   And so that's a degradation, if my simple math is accurate

2   here, is a degradation of 4.3 percent.  Correct?

3   A.   Sure.

4   Q.   And that's at elevated temperatures.  Right?

5   A.   Yes.

6   Q.   Okay.  So the results at issue here on this page are

7   the results of a 365-day study of a batch of pentobarbital

8   compounded sometime prior to May 17, 2019, and stored at

9   elevated temperatures.  Correct?

10  A.   Yes.

11  Q.   Okay.  And have you reviewed the potency test results of

12  the pentobarbital compounded for BOP's use for lethal injection

13  that was compounded in November and December of 2019?

14  A.   November and December.

15  Q.   I'll refer you to -- I'm sorry.  I shouldn't have stepped

16  over you.  Go ahead.

17  A.   No, please.  Please refer me to a specific page, because

18  I cannot recall.

19  Q.   Sure.  It's AR 1075 to 1078.

20  A.   I will look at it right now.  I'm sorry.  Hold on.

21       1075 and 1078, right?

22  Q.   That's correct.

23  A.   I'm looking for it right now in this stack.  I don't see...

24       I'm not sure I can find it right now.  Can you tell me what

25  the data points are?

1    Q.   Let me ask you a different question:  Are you aware that

2    the compounded pentobarbital used for the lethal injections

3    carried out -- the executions carried out in July and August of

4    this year was not the pentobarbital compounded prior to May 17,

5    2019?

6    A.   I'm unaware of that.  I do not know what lot or what

7    product was used.

8    Q.   You do not know what the starting potencies of those -- of

9    the compounded pentobarbital from November and December of 2019

10   are?

11   A.   No, I do not.  No.  I do not have that data right now.

12   Q.   So let's move on to paragraph 14 of your second declaration.

13   A.   Okay.  I have it in front of me.

14   Q.   Okay.  Do you identify -- I'm sorry.  Let me start this

15   from the beginning.  In paragraph 14 you state that you disagree

16   with Dr. Swaan's analysis of the real time stability data

17   trending analysis in Table 1 of his expert declaration.

18   Correct?

19   A.   Hold on.  Let me find it.  This is 14, not from last year.

20   This is my second declaration.  I'm sorry.

21   A.   Yes.

22   Q.   No problem.

23   A.   Okay, yes.  I did.  Yes.  That's correct.

24   Q.   And you say that "when the stability data is plotted, it

25   becomes instantly very apparent that the stability data for the

1   room temperature study do not follow a first order reaction."

2   Is that correct?

3   A.   Yes.   Actually, let me ask you something.   When you are

4   referring to the data from November of 2019, I see it now.

5   You were referring to a specific page of 1072 in administrative

6   record, and I don't have that.   However, I do have the data in

7   the -- on the page 1142.   Is that the same data you were

8   referring to earlier?

9   Q.   No, it's not.

10   A.   Okay.

11   Q.   Let me return you to paragraph 14, and I just sort of

12   reiterated your statement that it becomes apparent that the

13   stability data for the room temperature do not follow first

14   order reaction.

15   A.   Yes.

16   Q.   You do not cite any studies to support that --

17   A.   Oh, I'll be happy to -- let me explain this.   I will be

18   more than happy --

19   Q.   No, no, no, no.   Please.   I'd like you to answer my

20   question, which is you don't cite any studies to support --

21   A.   Well, I have to ex -- listen.   Sir.   I'm sorry.   I have

22   to explain why there are no cites, okay?   I have to explain.

23   So I do have to -- this is not a yes-or-no question.   I'm sorry.

24        The reason that I don't mention any studies is because what

25   I have done is I looked at Dr. Swaan's integration.   So what he

has done in his Exhibit 2, I believe, it could be one in

statement in his CV, he had shown -- it's a graph, if you look

at it.  It's from page 45.  It's Table 1.

     So if you look at Table 1 that he has included as a part

of his report, you will see there are data points and there is

an integration.  He actually is the one that was trying to show

that there were linearity.  So what I'm referring to in my

statement is basically his chart.  What I have done is I have

plotted myself, and I was examining the linearity, the plot

myself --

Q.   Dr. Almgren --

A.   -- is not based on the study.  The first order reaction

that I'm referring to here --

Q.   Dr. Almgren, have you included the analysis that you did

in your second declaration?

A.   Well, no, because I mean I'm summarizing --

Q.   Okay.  Thank you.  Thank you very much.

A.   -- using his.  I'm sorry.  I'm using his --

          THE COURT:  Dr. Almgren.  Dr. Almgren.  This is

Judge Chutkan.  You will be given an opportunity to explain your

answers.  So all I'm saying is can you just direct your answer

to the question that you're being asked, and can you both try

not to interrupt each other.  It's making it --

          THE WITNESS:  I'm sorry.

          THE COURT:  -- very difficult for my court reporter.

1    Like just now.  You have to wait till I'm finished speaking.

2    Thank you.

3              MR. KOSSAK:  I'm sorry, Your Honor.  I'll just ask

4    the question just so it's clear for the record.

5    BY MR. KOSSAK:

6    Q.   You did not include your analysis that you just referenced

7    in your second declaration.  Isn't that correct?

8    A.   No, because I used his.

9    Q.   I'm sorry?  What was the last one?

10   A.   No, because I used his analysis.  I didn't need to replot

11   the same graphic that he did.  He did an integration, and I

12   came up at exactly the same result.  It's really unfortunate

13   that he did not --

14             MR. KOSSAK:  No further questions, Your Honor.

15             THE COURT:  Mr. Kossak, you just did what I asked

16   you all not to do.  You didn't let the witness finish speaking.

17   Apart from the fact that it's making it very difficult for my

18   court reporter, it's also rude.  And so this is the last time

19   I'm going to tell everybody to let the other person -- unless

20   there's an objection, to let the witness or the questioner

21   finish speaking.  Okay.

22             MR. KOSSAK:  I apologize, Your Honor.  I have no

23   further questions.

24             THE COURT:  I'm sorry?

25             MR. KOSSAK:  I said I apologize.  I have no further

1    questions.

2              THE COURT:  All right.  Was there going to be brief

3    redirect of this witness?

4              MR. LUBY:  This is Joseph Luby.  And, yes, Your Honor,

5    there will be, if I may.

6              THE COURT:  And please keep it to any material raised

7    on cross-examination that's not covered in the submissions.

8    Thank you.

9              MR. LUBY:  I will do so, Your Honor.  Thank you.

10                        REDIRECT EXAMINATION

11   BY MR. LUBY:

12   Q.   Dr. Almgren, if we could return, please, to the last matter

13   you were being questioned about, specifically paragraph 14 of

14   your most recent declaration, can you explain for the Court what

15   you were trying to explain in your last response before you were

16   cut off in terms of why the basis of your conclusion here isn't

17   spelled out in the report itself?

18   A.   Sure.  Thank you.  So what I have done is I basically

19   examined the data that also Dr. Swaan had reported and he

20   integrated and he came up with a chart.  Unfortunately, he did

21   not submit an actual visual chart so you could see how much of a

22   scatter plot this really was.  And so when I examined it myself,

23   I plotted it myself just to make sure that I understand why he

24   was integrating this.

25        I realized that for this particular product, for this

1   particular compounded product, the first order reaction is not

2   applicable.  So you cannot perform linearity calculations on

3   this.  The plot is just too scattered.  So, obviously, most

4   likely the degradation of this particular product does not

5   follow the first order reaction, and so you cannot just do a

6   linear regression.

7        As a matter of fact, when you do perform linear regression,

8   you will end up with a very low correlation factor that just

9   shows you that there really is no linear correlation between the

10   points.

11   Q.   And when you say that there's no linear relationship and

12   you cannot do a linear regression, is there some standard that

13   underlies that statement?

14   A.   So what that really means is that on the big scale of

15   things in terms of predicting stability of the product, that you

16   can't just assume a pattern of a first order reaction that it

17   will follow.  You can't do a linearity regression and then say,

18   okay, the next data point even without testing will be this

19   value or that value.  You cannot do that using this linearity

20   regression.

21   Q.   Are there USP standards that address the use of regression

22   in this respect?

23   A.   Well, there's several in terms of how you perform the

24   analysis of the data.

25   Q.   And --

1   A.   I think the -- I'm sorry.

2   Q.   No, please.  If you would please continue.

3   A.   I think the key takeaway here is that because of the

4   pattern that we are seeing in this data, it obviously shows that

5   the degradation is unpredictable, so we do not know where the

6   next point will be.  As a matter of fact, we can't even predict

7   where the data points are before the 365 days because of the

8   scatter plot.  And so I think that is the key takeaway here,

9   that basically the product is not stable.

10       In my experience as a pharmacist in a 503B pharmacy, we

11  would never use a product with this type of -- we would never

12  extend expiry of beyond-use date based on this data.  It would

13  completely fail.

14  Q.   Under what standards would it fail?  Are there specific USP

15  standards that would --

16  A.   Yes.  So, of course, the USP Compendium specifically

17  addresses your quality standard for pentobarbital injection,

18  and so you have to be within the specified range.  You cannot

19  be outside.  So it really doesn't matter if the initial data

20  point versus the data point at the end are all 5.2 percent or

21  3 percent.  It's not relevant.

22       What's relevant is that all of the data points when you are

23  performing a stability testing must stay within that specified

24  range.  So in this particular case, they should never drop below

25  92 percent.  That is the potency of the drug.

1    Q.   And when a result does fall below 92 percent, what
2    procedure is required?
3              MR. KOSSAK:  Your Honor, I object.  This is beyond
4    the scope of my cross.
5              THE COURT:  This wasn't raised on cross-examination,
6    was it, Mr. Luby?
7              MR. LUBY:  It was raised to a point opposing counsel's
8    making, but I will move on, Your Honor.
9              THE COURT:  All right.
10   BY MR. LUBY:
11   Q.   Dr. Almgren, do you recall counsel asking you questions
12   about the differences between 503A pharmacies and 503B pharmacies?
13   A.   Yes.
14   Q.   And I believe one of your responses was that even though
15   503B pharmacies are not subject to CGMP, did you testify they
16   do follow USP standards?
17   A.   Yes.  Yes.  Absolutely.  The USP, the Compendium itself is
18   really guidance for all.  And even when we have CGMP guidelines,
19   a lot of times the base of those is truly in USP Compendium
20   guide for all of the industry, all of the pharma industry, not
21   just pharmacy, And so we basically follow those guidelines.
22   And typically the CGMP just has like a more stringent spin on
23   all of those, to put it simply.
24   Q.   And do I understand correctly that it's through the
25   application of USP standards in your last report that you

1   concluded that the beyond-use date of the sample of

2   pentobarbital cannot be soundly extended?

3              MR. KOSSAK:  Objection.  Beyond the scope of cross.

4              THE COURT:  Mr. Luby?

5              MR. LUBY:  Your Honor, I think it answers the

6   implication that opposing counsel was making in suggesting that

7   503B pharmacies are subject to heightened restrictions above

8   503A, and this is my last question, Your Honor.

9              THE COURT:  Okay.  All right.  Then the objection

10  is overruled if that's the last question.  Is that correct?

11             MR. KOSSAK:  I do understand, but I think it's beyond

12  the scope and I respectfully object.

13             THE COURT:  Okay.  Your objection is overruled.

14        You can answer, Dr. Almgren.

15             THE WITNESS:  I'm sorry.  Can you repeat the question?

16  BY MR. LUBY:

17  Q.   The question is whether is it through the use of USP

18  standards that you have concluded that the beyond-use date,

19  based on a 365-day stability sample, cannot be extended in the

20  sense that --

21             MR. KOSSAK:  Same objection.

22             THE WITNESS:  They cannot be.

23             THE COURT:  The objection's overruled.

24        All right.  Thank you, Dr. Almgren.  You are free to depart

25  the hearing.  I appreciate you making yourself available and

```
 1   taking the time out of your schedule and your weekend.

 2               THE WITNESS:  Thank you.  Have a good day.

 3               THE COURT:  Thank you.  You, too.

 4         (Witness exits call.)

 5               THE COURT:  All right, counsel.  It's almost now three

 6   o'clock, so we're on time.  Is there anything else we need to

 7   deal with?

 8               MS. LIN:  Your Honor, are we allowed to sum up?

 9               THE COURT:  I mean -- yeah.  You can take a few

10   minutes.  Sure.

11               MS. LIN:  Do plaintiffs --

12               THE COURT:  Yeah.  Mr. Luby, do you want to sum up?

13   Or Ms. McCracken?  Who would like to sum up from the plaintiffs'

14   side?  Or you can divide it up.  Do you want to take a minute to

15   confer?

16               MS. MCCRACKEN:  A minute would be great.  Thank you.

17               THE COURT:  Yes.  Go ahead.

18         (Counsel conferring.)

19               MS. MCCRACKEN:  Your Honor, this is Megan McCracken.

20   I'm sorry for the delay.

21               THE COURT:  That's fine.

22               MS. MCCRACKEN:  I think Mr. Luby's going to go ahead.

23               THE COURT:  Okay.  Go ahead, Mr. Luby.

24               MR. LUBY:  Thank you, Your Honor.  And, again,

25   I apologize for the delay.
```

1          At least concerning the testimony today, Your Honor,

2    I think the difference between these two witnesses is that

3    Dr. Almgren is a specialist in drug compounding and USP

4    standards; the government's expert, Dr. Swaan, is in the line

5    of pharmacological chemistry; and we're looking at different

6    pursuits in the application of different standards.

7          Under Dr. Almgren's analysis, the beyond-use date cannot

8    be extended based on the date that's been provided, and

9    effectively what that means is that the defendants plan to

10   administer an expired drug.

11         And so that certainly is when we're talking about, well,

12   what's the harm, is there any irreparable harm here, I do not

13   know of any lethal-injection state in the country that knowingly

14   administers expired drugs.  So that certainly is something there

15   to not only be concerned with, but that demonstrates the

16   difficulty, the harm that we've been litigating about.

17         There are three quick points I'd like to make on that.

18         THE COURT:  Mr. Luby, let me interrupt you for a

19   second.  Tell me again how you come to the conclusion that the

20   government's going to be using an expired drug.  Is it an

21   inference?  Are you inferring that they're going to use an

22   expired drug based on the testimony here?

23         MR. LUBY:  No.  It's a fact.  Unless the expiration

24   date is extended, as they announced the extension in the recent

25   edition of the administrative record, the drug's shelf life has

1    expired.  So without that extension that was recently added,

2    the drugs that they would be administering in the forthcoming

3    execution would be beyond the beyond-use date.

4            THE COURT:  And given that there have already been

5    five executions using this drug, presumably all of the drugs

6    that they've used have been similarly expired, where's the

7    irreparable harm?

8            MR. LUBY:  Well, again, I would point the Court to the

9    testimony of the other witnesses who've testified as well as the

10   expert reports.  There is certainly evidence that there was

11   suffering.

12           THE COURT:  Do you have any -- do you have any

13   evidence or testimony or anything to suggest that to the extent

14   there was suffering -- and let's say for the purpose of argument

15   there's pulmonary edema.  There's a disagreement, obviously,

16   whether that pulmonary edema happens after the inmate is

17   rendered insensate or before, but do you have any evidence that

18   that pulmonary edema is linked to the fact that the drug is

19   expired or just because it's pentobarbital?

20           MR. LUBY:  Well, what we have, Your Honor, is

21   Dr. Almgren's question in her report that administering a drug

22   beyond the approved beyond-use date poses a danger of --

23           THE COURT:  But is that anything more than

24   speculative?  Here's what I have on the record:  Other states

25   have used pentobarbital.  The evidence appears to be that

1   pulmonary edema -- and you just said there's no indication that

2   any of the states that have used pentobarbital have used expired

3   versions of pentobarbital.  If they've used unexpired

4   pentobarbital and there has been pulmonary edema, then it would

5   seem to me that there's no evidence that I can find that using

6   -- if I do find that it is expired, that it causes the pulmonary

7   edema.  What's the irreparable harm here, and is it more than

8   just speculative?

9           MR. LUBY:  The danger of the use of expired drugs, as

10  explained by Dr. Almgren, is that the drug would have a slower

11  onset and the prisoner would suffer a more longer, labored death

12  as a result of that.  So I don't think that there's the

13  necessary nexus there that the Court is discussing in terms of

14  the pulmonary edema being a factor in the use of the expired

15  drug.  It's more of a subpotent drug that would --

16          THE COURT:  Could.  But you don't have any evidence

17  that that has happened in the five executions that have been

18  conducted thus far.

19          MR. LUBY:  Well, I am unable to prove that,

20  Your Honor, but that is why we have pharmacological standards in

21  order to prevent harms like that, so we don't give patients

22  expired drugs and certainly no -- going back to the other day,

23  no physician would prescribe an expired drug.

24          THE COURT:  All right.  Okay.

25          MR. LUBY:  And we don't even give animals expired

1    drugs.  So I don't believe that any harm beyond that described

2    is necessary to establish the level of harm required or an

3    irreparable harm showing under an APA claim as opposed to an

4    Eighth Amendment claim.

5        And I would add on the same point, Your Honor, that this

6    issue of the drug being expired was not before the Supreme Court

7    and has not been addressed by the higher courts in this

8    particular case, but certainly beyond the record this plaintiff

9    now was able to make because the documents that we're analyzing

10   now were made available to them.

11       And so certainly this is a new issue, and I think a

12   troubling one.  If we don't administer expired drugs in any

13   other contexts, there's no reason that they ought to be

14   administered here.

15               THE COURT:  Okay.  All right.  Did I interrupt you,

16   Mr. Luby?  Are you finished?

17               MR. LUBY:  I am, Your Honor.  Thank you.

18               THE COURT:  All right.  Who will be summarizing for

19   the government?

20               MS. LIN:  I will.  This is Jean Lin, Your Honor.

21               THE COURT:  Yes, Ms. Lin.

22               MS. LIN:  Just a couple of quick points, and I think

23   that Your Honor really highlighted the issue here.  It is

24   entirely speculative that the government's going to be using

25   expired drugs, and we refer Your Honor to AR 1148, 1149.  That

1    is the memoranda from the pharmacist extending the beyond-use

2    date indicating that the batches that the government intends to

3    use for executions have been extended to November 25, 2020, and

4    December 3, 2020.

5         And this is the 503B facility which the plaintiffs' expert

6    agree that they are held to higher standards, and this is the

7    pharmacist's judgment at the 503B facility.  So any idea that

8    there's going to be expired drug used in the execution is

9    entirely unfounded based on the record before Your Honor.

10        And I would also add that plaintiffs' experts did not know

11   whether the drug being used for the execution is the same drug

12   that was used in this time study.  In fact, as we have

13   established, this was not the same pentobarbital batch that's --

14   I'm sorry -- 503B high standards should be considered by this

15   court.

16        So my second point is today's testimony again illustrates

17   that there's no injury formed directly from any alleged

18   violation of FDCA.  So, again, any irreparable injury is just

19   not tied to any kind of violation, and so plaintiffs again fail

20   to meet the very high burden, as Your Honor has recognized

21   before.

22        So my final point is only just to urge the Court again to

23   consider that in the Eighth Amendment context, the Supreme Court

24   said the Court should not operate as a board of inquiry.  And so

25   the kind of details that we're going into today is precisely

what a board of inquiry might be doing which the Supreme Court
said that courts shouldn't be doing in the capital punishment
context.  I know that that's the Eighth Amendment legal
standard, but the broad concept should apply here that to enjoin
the execution on the idea that a lethal-injection drug might be
subpotent is certainly fundamental to the teaching from the
Supreme Court.

And, again, as Your Honor has recognized before, the
government can use compounded drugs.  So there is no basis in
our view that justify any irreparable injury finding for
purposes of a permanent injunction.

THE COURT:  All right.  Thank you, everyone.  I will
-- we're all going to be working, and so I will obviously render
a decision as soon as I can get it out.

MS. LIN:  Your Honor, this is Jean Lin.  Very quick
two housekeeping questions?

THE COURT:  Yes.

MS. LIN:  So Your Honor issued an order today
about not filing any more documents.  I just want to get a
clarification.  Yesterday you gave me permission to respond to
the Eighth Amendment motion, and we're ready to file that after
the hearing today, so if I may --

THE COURT:  Great, yes.  Yes, you can file that.  Yes.

MS. LIN:  And the second housekeeping question is that
there are two recent appellate decisions that were just issued,

1   and we would like to alert the Court.  Should we email those

2   decisions to the Court or provide citations?

3            THE COURT:  If you could email the citations to my

4   clerk, Mr. Boujaoude, and obviously copy opposing counsel.

5            MS. LIN:  Thank you, Your Honor.

6            THE COURT:  Actually, you know what, since we're

7   on the record, why don't you tell the names of the cases.

8            MS. LIN:  These were all LeCroy.  I don't have the

9   exact citations on me.  I'm sorry.  You know what, I don't know

10  if my clerk is on the phone.  Do you have the citations?

11           UNIDENTIFIED:  Yes.  I have the case numbers.  They're

12  very recent, so they don't have an F.3d position, but they're

13  both present --

14           THE COURT:  If you just give the names and then email

15  the cites so the names are on the record.

16           UNIDENTIFIED:  Yes, Your Honor.  We're talking about

17  *LeCroy v. United States*, Eleventh Circuit, September 16; and

18  last night *Vialva v. United States*, Fifth Circuit decision

19  issued on September 18, 2020.

20           THE COURT:  All right.  Thank you.

21        Thank you, everyone.  Thank you for bringing those to

22  my attention.  Have a good evening.

23        (Proceedings adjourned at 3:04 p.m.)

24

25

                        CERTIFICATE *

        I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.




                   _____
                   BRYAN A. WAYNE












* PLEASE NOTE:

This hearing was taken via telephone conference in compliance
with U.S. District Court Standing Order 20-19 during the
COVID-19 pandemic.  Transcript accuracy may be affected by
limitations associated with use of electronic technology,
including but not limited to any sound distortions and/or
audio interferences.