UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


IN THE MATTER OF THE          .  MC No. 19-0145 (TSC)
FEDERAL BUREAU OF PRISONS'    .  Washington, D.C.
EXECUTION PROTOCOL CASES.     .  Thursday, September 17, 2020
. . . . . . . . . . . . . . .    5:00 p.m.


TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiffs:          JOSEPH W. LUBY, ESQ.
                             Office of the Federal Community Defender
                             601 Walnut Street
                             Suite 545 West
                             Philadelphia, PA 19106
                             (215) 928-0520

                             GREGORY S. SMITH, ESQ.
                             Law Offices of Gregory S. Smith
                             913 East Capitol Street SE
                             Washington, DC 20003
                             (202) 460-3381

                             GERALD W. KING, JR., ESQ.
                             Federal Defender Program, INC.
                             101 Marietta Street, NW
                             Suite 1500
                             Atlanta, GA 30303
                             (404) 688-7530

                             JENNIFER YING, ESQ.
                             Morris Nichols Arsht & Tunnell LLP
                             1201 North Market Street,
                             P.O. Box 1347
                             Wilmington, DE 19899-1347
                             (302) 351-9243

```
For the Defendants:          JEAN LIN, ESQ.
                             SCOTT A.C. MEISLER, ESQ.
                             U.S. Department of Justice
                             1100 L Street NW
                             Room 11532
                             Washington, DC 20005
                             (202) 514-3716


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

<pre>
1                        P R O C E E D I N G S
</pre>

2          THE DEPUTY CLERK:  Your Honor, we have miscellaneous

3   action 19-145: In the matter of Federal Bureau of Prisons'

4   Execution Protocol Cases.  Most of counsel have identified

5   themselves.  I believe they're all here.

6          THE COURT:  Okay.

7          THE DEPUTY CLERK:  Counsel, once again, when you

8   speak, plea state your name for the record so the court reporter

9   knows exactly who's talking at all times.  Thank you.

10          THE COURT:  Yes.  Please say your name and which

11   plaintiff you represent when you speak.  That would be very

12   helpful because we have many, many cases that have been

13   consolidated here.

14      So I asked you all here because time is, once again, of the

15   essence, and rather than asking you all to put your positions in

16   writing, I thought it might make sense to just have you here to

17   make your representations on the record.  Can everyone hear me?

18   I guess if you can't, you can't answer.  But if you can't, just

19   email Mr. Bradley or something.

20      So we're here primarily to discuss a possibility of holding

21   an evidentiary hearing and what that would look like.  Right

22   now, let me tell you the pleadings I have in front of me that

23   are still active:

24      I have the defendants' motion to dismiss and for summary

25   judgment, which are ECF Nos. and 169 and 170;

 1          Defendants' motion to vacate the preliminary injunction

 2     barring the executions of plaintiffs Roane, Tipton, Johnson,

 3     Hall, Webster, Battle, and Paul.  That's ECF No. 173;

 4          Plaintiff William LeCroy's emergency motion for a

 5     preliminary injunction and for a hearing.  That's ECF Nos. 233

 6     and 234;

 7          Plaintiffs' motion for partial summary judgment on the

 8     FDCA claims in Count 11, ECF No. 236.

 9          And let me ask, at this juncture, does Plaintiff William

10     LeCroy join this motion?

11               MR. SMITH:  Yes, Your Honor.  In fact --

12               THE COURT:  Who is this, please?

13               MR. SMITH:  I'm sorry.  My apologies.  This is

14     Greg Smith representing William LeCroy.

15               THE COURT:  Okay.

16               MR. SMITH:  And we are actually one of the plaintiffs

17     on the original motion, and it noted that we would be amending

18     our complaint to include a claim under the FDCA, which we then

19     did.  So we are actually a part of the original motion that was

20     filed.

21               THE COURT:  Okay.  So you're joining the motion.

22          So I also have before me plaintiffs' motion to alter

23     judgment, which is ECF No. 238.

24          And notwithstanding my order that said that I was inundated

25     with filings and motions and that I was in a position to address

1    all remaining motions on the docket, I have still received

2    various motions for leave to file various motions.  You can

3    imagine, counsel, that obviously, given the nature of this

4    litigation, there are going to be last-minute motions.  But I

5    have been trying mightily to resolve things expeditiously, and

6    it is very difficult when I get matters in the last few days

7    before a scheduled execution.

8        Obviously, that's the nature of this kind of litigation,

9    but I am drinking from a firehose here with regard to all these

10   pending motions and requests to file.  So there's a reason I

11   asked -- I ordered that nothing further be filed without leave

12   of court.

13       Right now I want to address defendants' motion for summary

14   judgment, which is ECF No. 170, and plaintiffs' motion for

15   partial summary judgment, ECF No. 236.  It is my understanding

16   that plaintiffs seek summary judgment on the APA claims in

17   Count 11 of the amended complaint and injunctive relief.

18       Is that right?

19           MR. LUBY:  Your Honor, this is Joseph Luby

20   representing plaintiffs Fulks, Bourgeois, Paul, and Higgs.

21   The Court's understanding is correct that plaintiffs seek both

22   summary judgment on Count 11 as well as a permanent injunction.

23           THE COURT:  Okay.  Now, assuming I grant plaintiffs'

24   motion and finding there's a violation of the FDCA, and it's

25   assuming for purposes of this discussion, plaintiffs would still

1    have to demonstrate irreparable harm, and it appears that the

2    factual dispute is limited to that inquiry.

3         Does any side dispute that characterization?  All right.

4              MR. LUBY:  I think that's correct, Your Honor.

5    This again is Mr. Luby.

6              MR. SMITH:  Your Honor, Greg Smith.  The only issue

7    I would raise is, at least as to Mr. LeCroy, since it was

8    mentioned that it was Count 11, it would be Count 4 as to

9    Mr. LeCroy's amended complaint.

10             THE COURT:  Okay.  And who's here for the government?

11   I'm sorry.

12             MS. LIN:  Your Honor, this is Jean Lin on behalf of

13   the government, and also Scott Meisler is also here.  It's an

14   issue specific to Mr. LeCroy.

15             THE COURT:  All right.  And, I'm sorry, who was that

16   you said?  I didn't catch the name.

17             MS. LIN:  Mr. Scott Meisler.

18             THE COURT:  Scott Meisler.  Okay.  Thank you.

19        Okay.  And, Ms. Lin, do you dispute my summation of where

20   we are, of my characterization of the posture that if I grant

21   plaintiffs' motion and find there's a violation of the FDCA,

22   they still have to demonstrate irreparable harm, and the factual

23   dispute is limited to that inquiry?  Do you agree, obviously,

24   for the purposes of argument?

25             MS. LIN:  Your Honor, we agree, except that there

are also other factors given the showing that's required for a
permanent injunction.  So as the D.C. Circuit has noted, it's
not just irreparable injury.

THE COURT:  Right.  Right.  But without irreparable
harm, they don't really get to those, do they?

MS. LIN:  They don't.  You're right, Your Honor.

THE COURT:  Okay.  So the briefings on these
motions has presented new evidence from both sides.  It's my
understanding that both sides agree that a hearing is needed
for me to rule in the other side's favor, and that's based on
my reading of ECF No. 246, which is defendants' response to
plaintiffs' motion for partial summary judgment in which they
say at page 3, "At a minimum, the Court should not simply credit
plaintiffs' evidence regarding the alleged effects of
pentobarbital, and indeed cannot credit them absent an
evidentiary hearing."

As to the plaintiffs in ECF No. 248, which is plaintiffs'
reply in support of their motion for partial summary judgment,
at pages 6 to 7, plaintiffs say that they do not believe a
hearing is necessary, but the Court cannot deny injunctive
relief to plaintiffs without an evidentiary hearing.

Therefore, it appears that both sides contend that a
hearing is needed for me to reach a decision against them.
Does anybody dispute that characterization?

MS. LIN:  This is Jean Lin on behalf of the

government.  We dispute that characterization to the extent
that the Court is suggesting that in order to deny a request
for a permanent injunction, the Court needs to hold --

THE COURT:  No, no.  I think what you're saying is --
how I'm reading your response to plaintiffs' motion for partial
summary judgment is that I cannot rule in favor of plaintiffs
without an evidentiary hearing.  Is that your position?

MS. LIN:  Yes.  That's our position, Your Honor.

THE COURT:  And what I'm saying is plaintiffs appear
to take the same position, in other words, that I can't deny
their motion without an evidentiary hearing.  So what you both
appear to be saying is if I rule for the other one, if you're
going to lose, you want a hearing.

In other words, what defendants are saying is if I'm going
to rule for the plaintiffs, I have to have a hearing first; and
plaintiffs are saying if I'm going to deny their motion, I have
to have a hearing first.  Right?

MR. LUBY:  Yes, Your Honor.  This is Joe Luby again,
and again the Court is correct in its understanding of the
parties' positions, I think.

THE COURT:  All right.  So we have two executions
scheduled for next week, and whatever decision I reach is highly
likely to be appealed by one side or the other.  Mindful of
this, I want to understand -- and I'm not saying I am going to
grant a hearing, but mindful of this and mindful that clearly an

1    inmate facing a death sentence is entitled to full due process,

2    I want to understand exactly what a hearing would look like

3    because I've received, obviously, a lot of evidence by

4    way of submission.  It appears to me that the disputed issue is

5    whether pentobarbital causes flash pulmonary edema before an

6    inmate is rendered insensate.

7           Mr. Luby or Mr. Smith, am I correct, or any other counsel

8    who wants to weigh in?

9                MR. LUBY:  Yes, Your Honor, with one clarification.

10               THE COURT:  Who's speaking?

11               MR. LUBY:  I'm sorry.  This is Joe Luby again.

12   I agree with the Court's characterization, with one

13   clarification, and that is that it would suffice for purposes

14   of showing irreparable harm that the evidence would show a

15   nontrivial risk of flash pulmonary edema.

16               THE COURT:  Well, you know, we've been there,

17   Mr. Luby.  Been there.  And the Supreme Court disagreed in

18   the earlier case.

19         Okay.  Ms. Lin, do you agree with that characterization

20   of the disputed issue here?

21               MS. LIN:  Yes, Your Honor.  Our position is that this

22   dispute of factual questions is actually not relevant to the

23   legal question that the Court must address in the first instance,

24   which is that any violation of FDCA would cause the alleged

25   irreparable injury.  And our position is that having a

1    prescription is not going to change whether pentobarbital

2    allegedly would cause pulmonary edema, so the factual questions

3    don't even need to be addressed in the first instance.

4         And I also want to remind the Court that this issue has

5    gone to the Supreme Court, and I recognize the Court last time

6    said that you weren't going to credit -- you weren't going to

7    credit the Supreme Court's in full vacatur of the preliminary

8    injunction based on the FDCA because there was no notice of

9    dissent and you weren't going to credit what the Supreme Court

10   was necessarily doing, but --

11        THE COURT:  Well, I didn't put it quite that way,

12   Ms. Lin.  I just said that I didn't believe that the Court had

13   addressed the issue.

14        MS. LIN:  Right.  So if I may, you know, it was either

15   the Supreme Court disagreed with Your Honor's merits discussion

16   or that it was the equitable factors that caused the Supreme

17   Court to vacate the preliminary injunction, and neither of those

18   things have changed.  But, importantly, it was also not a

19   question of a last-minute nature because, as the Court has now

20   recognized, that Nelson's execution was quite some time away.

21        So for all of those reasons, this is not the time also to

22   go to the issue of pulmonary edema which is before the Supreme

23   Court when the Supreme Court vacated --

24        THE COURT:  Right.  Exactly.  And I am -- I do have

25   before me the Supreme Court's statement in *Barr v. Lee* with

1    regard to its assessment of the evidence.

2        Let me ask you, counsel for plaintiffs, is the evidence

3    you would be submitting, if we had a hearing, cumulative of the

4    evidence the Supreme Court already weighed in *Barr v. Lee*?

5    Is there something new?

6        I mean I'm really trying to get an idea of the contours of

7    what a hearing would be.  I've received a lot of submissions.

8    Are you anticipating live witnesses, and what is your proffer

9    with regard to what they would testify to?  Is it something that

10    I haven't already gotten?

11        MR. LUBY:  Depending on the scheduling of the hearing,

12    Your Honor, and how much time we have to get things together, I

13    would anticipate that the hearing would largely be consistent

14    with a declarations that we've already submitted to the Court,

15    and so I anticipate that, for example --

16        THE COURT:  Wait, wait, wait.  Stop.  Hold on a

17    second.  You said consistent, and this is what I'm concerned

18    about.  When you say consistent, is it the same, or are we

19    talking about new evidence?

20        MR. LUBY:  There may be a little bit of new evidence,

21    Your Honor, on the drug-testing issue, simply because it was

22    only yesterday that the defendants -- or perhaps I'm losing

23    track of my days, but I believe it was yesterday that the

24    defendants presented a brand-new expert report, or maybe the day

25    before yesterday, and we're working with our experts on a

1    response to that.

2            THE COURT:  What claim does that go to?  Does that go

3    to claim 11?

4            MR. LUBY:  That doesn't go to the claim as much as the

5    showing of irreparable harm.  You may notice there's a dispute

6    as to whether harm is shown by virtue of the compounding drug

7    violations that are part of the FDCA count.

8            THE COURT:  Right.

9            MR. LUBY:  And the government is taking the position

10   that no such harm is shown based on the test results and --

11           THE COURT:  So what I'm really trying to get -- sorry.

12   Please finish.

13           MR. LUBY:  Oh, no.  I would just say that was offered

14   in the briefing, and I anticipate the parties would present

15   conflicting evidence in that regard as well.

16           THE COURT:  Well, and so this is what I'm -- I'm

17   trying to get a sense of what I'm hearing.  Obviously, you know,

18   plaintiffs are entitled to the full panoply of rights, and if

19   there's evidence that has not been presented to me, then they

20   should have an opportunity to present that evidence to me.  But

21   if it's simply repeating the evidence by a different witness,

22   perhaps, or in a different form orally as opposed to in writing

23   that has already been presented to me, I need to know that as

24   well.

25       I mean, who would you call as your witnesses?  How long

would the testimony take?  Can you proffer the subject matter
of the testimony?  I'm trying to get an understanding as to not
only whether we need a hearing, but what that hearing would
entail.

MR. LUBY:  Well, at this point I anticipate,
Your Honor, that our primary witness would be Dr. Van Norman.
I think that we could probably finish her testimony and have
her cross-examined in the course of perhaps three hours.

Beyond that, I would hope that we could also call
Dr. Edgar, who's the pathologist that we've cited in our
briefing.  I'm not certain he's available.  I think his
testimony would be shorter, something in the neighborhood of
an hour to an hour and a half.

Finally, I hope that we may be able to call Dr. Almgren,
who's the pharmacologist whose reports have been submitted, and
I anticipate that her testimony would be something in the nature
of a couple of hours.

THE COURT:  But if you've submitted reports from all
these people, what would their live testimony add to the Court's
understanding of the evidence here?

MR. LUBY:  That's largely for the Court to determine.
In order for the Court to make factual findings, the law
generally favors that a judge undertake live testimony, that
the judge have the opportunity to ask questions of the
witnesses, at least in a court-tried manner, and usually

1    credibility determinations and decisions about which witnesses

2    to believe.  The law generally favors that that would be done

3    after a live hearing instead of on the papers.

4        So certainly we would anticipate a substantial overlap

5    of what we would present in a hearing and what's been presented

6    on paper, but the difference is that the Court would actually

7    make factual findings and make a determination as to which

8    witnesses it believes or which part of which witness's testimony

9    it believes.

10                THE COURT:  Well, I have to tell you --

11                MS. LIN:  May I speak?

12                THE COURT:  Yes.

13                MS. LIN:  Your Honor, may I address -- I didn't mean

14   to cut you off.  First of all, I want to make sure you can hear

15   me well because --

16                THE COURT:  I can.

17                MS. LIN:  Okay, great.  So if I may address the

18   question of whether this is going to be cumulative information,

19   or should I address that later or --

20                THE COURT:  Go ahead.

21                MS. LIN:  Okay.  So on the question of what

22   Dr. Van Norman and Dr. Edgar and Dr. Almgren are going to say,

23   the declarations were all before the Supreme Court last time.

24   And especially about a cumulative nature, Dr. Van Norman had

25   already said she reviewed the autopsy reports of 27 inmates

whose executions were performed using barbiturates, I believe,
and Dr. Edgar said the same thing.  So all the information was
before the Supreme Court when the Supreme Court did what it did.

And then secondly, to the extent that the new evidence that
the plaintiffs have pointed out, which is the autopsy report of
Mr. Purkey, it's entirely cumulative because, again, it's saying
that the autopsy report shows pulmonary edema.

THE COURT:  Right.  But let me ask you, Ms. Lin, the
autopsy report with regard to Mr. Purkey's execution is new.
Correct?  In other words, that was produced after the Supreme
Court's decision.  Right?

MS. LIN:  I don't remember the exact timing.  It was
submitted -- I believe so.  It was submitted in connection with
a motion --

THE COURT:  And the autopsy reports that Dr. Van
Norman based her report on, the 20 or so autopsy reports of
executions that you talked about in her report, those were not
done using the same dose and same method of execution as the
2019 protocol.  Is that right?

MS. LIN:  I don't believe that's right.  I mean
Dr. Van Norman was opining on Purkey's autopsy, which is using
the 2019 protocols for his execution.

THE COURT:  Right.  Okay.

MS. LIN:  So it is the same --

THE COURT:  Right.  So she had Mr. Purkey's -- okay.

1          MS. LIN:  She did have the autopsy report, and her

2    opinion is this is consistent with all the autopsy reports

3    that she reviewed before, which is that there was evidence

4    of pulmonary edema.

5          THE COURT:  Mr. Luby, Ms. Lin raises a very compelling

6    point, which is what is new?  What would Dr. Van Norman testify

7    to that I haven't already received in her reports and her

8    declarations?

9          MR. LUBY:  Well, Your Honor, there isn't much new for

10   that reason, and I don't disagree with the Court's assessment of

11   that.  But the Court --

12         THE COURT:  So what purpose would an evidentiary

13   hearing serve?  I can make findings based on the declarations

14   and the materials I've received if I have to.  Right?

15         MR. LUBY:  If the Court wishes to, it can.  Normally,

16   when the parties present conflicting evidence, the Court hears

17   live testimony and decides which evidence it believes.

18   Obviously, I wouldn't -- the plaintiffs aren't insisting that

19   the Court do that, only that we're willing to engage in a

20   hearing if the Court finds it necessary.

21      If I might address Ms. Lin's larger point that the Supreme

22   Court has already heard of this before, I think that's really

23   mixing legal apples and oranges, because what the Supreme Court

24   considered was all of this evidence within the context of an

25   Eighth Amendment claim, which requires a heightened standard of

1    harm that is not applicable to what we have to prove in order

2    to show irreparable harm for purposes of a statutory violation

3    that's connected to an APA claim.  So there's no law that's been

4    cited --

5            THE COURT:  Except that, Mr. Luby, I understand we're

6    not dealing with an Eighth Amendment claim, but the Supreme

7    Court's holding is instructive as it relates to irreparable

8    harm.  I mean, I think that's partially what Ms. Lin is talking

9    about.

10           MR. LUBY:  Well, that isn't how I read the Supreme --

11   well, respectfully, it's not how I read the Supreme Court's

12   opinion in the *Lee* case.  It really is talking about an Eighth

13   Amendment harm, the amount of a hazard that has to be shown, and

14   I don't see anything in that particular opinion that's talking

15   about the amount of the irreparable harm that must generally be

16   shown in order to entitlement to a permanent injunction.

17           THE COURT:  Okay.

18           MS. LIN:  Your Honor, may I respond?

19           THE COURT:  Yes.

20           MS. LIN:  So I just said, you know, certainly the

21   Eighth Amendment does have a high standard, but as Your Honor

22   pointed out, this is talking about irreparable injury.  Had the

23   violation of the FDCA -- had that been an issue in terms of

24   irreparable injury, I think the Supreme Court would have acted

25   differently.

1          And the same thing, just to remind the Court, that the

2     Court has already said in the Eighth Amendment context that the

3     additional autopsy report of Mr. Purkey is cumulative.  So I

4     think that just to listen to the experts repeat their opinions

5     doesn't seem to serve the typical purpose of when Your Honor's

6     trying to assess the credibility of fact witnesses where the

7     credibility --

8          THE COURT:  Right.  And that's what I'm trying to --

9     I mean, I am perfectly willing to do an emergency hearing and

10    to do what needs to be done to have a hearing if I feel that a

11    hearing is necessary for me to make the findings I need to make.

12    And clearly I think, with this just sort of factual testimony,

13    that would be necessary.  But this is expert testimony, and I'm

14    not sure what a live hearing would give me.

15         I mean, nobody's saying these experts are lying or that

16    they don't have a sense of recollection or -- you know, the

17    normal factors that would go into a credibility hearing with a

18    fact witness.  This entails me weighing their evidence of --

19    their medical evidence, the scientific evidence report.

20         So I'm not sure -- I guess if I had questions about those

21    reports and declarations I could have a hearing to have those

22    questions answered, but I think this is one of these situations

23    where, you know, both experts take fundamentally different --

24    irreconcilable different positions.

25         Mr. Luby, did you finish?  Yes.

1         Hello?

2              MR. LUBY:  Your Honor, Joe Luby.  I think that was

3    someone else.

4              MR. KING:  My apologies.  This is Gerald King for

5    Plaintiff Tipton, and I wondered if I could speak briefly to

6    the question that Your Honor's --

7              THE COURT:  Yes, you may, Mr. King.

8              MR. KING:  Your Honor, we have a situation where, as

9    you said, we have expert declarations that are taking positions

10   that are somewhat irreconcilable, but one thing that has emerged

11   in the declarations is our experts in particular are critiquing

12   the adequacy of the government's experts' knowledge base and

13   experience with the substances and methods that are the subject

14   of this dispute.

15        And those are matters that can really only be explored,

16   I would argue, through cross-examination and the opportunity

17   to address whether the experts can speak conclusively as to

18   the position that they're taking, and I don't think that the

19   benefit of cross-examination should be minimized as to the

20   expert testimony here.  We know that the -- oh, I'm sorry.  Yes?

21             THE COURT:  I haven't said anything.  I'm listening.

22             MR. KING:  I apologize.  I thought I was talking over

23   you.

24             THE COURT:  No, no.

25             MR. KING:  But it's probably a good place for me to

1    stop anyway.

2           THE COURT:  So are you talking about cross-examination

3    of the government's witnesses, your cross-examination of the

4    government's witnesses?

5       Ms. Lin, if I decided to have a hearing, what would the

6    government's evidence consist of if they were putting on any?

7           MS. LIN:  I guess depending on what it is that they're

8    putting on, if they are putting on --

9           THE COURT:  Assume these three witnesses are allowed

10   to testify.  And I can tell you that if all we're talking about

11   is a reiteration of the reports and declarations already

12   submitted to me, I don't even know why I would need direct

13   examination.  We would probably go straight into cross-

14   examination.  But, yes, assuming I allowed those three witnesses

15   to testify, what would the government's evidentiary submission

16   look like?

17          MS. LIN:  Your Honor, I mean, this is somewhat

18   difficult.  With respect to Dr. Van Norman, if she was going

19   to be testifying about the autopsy report, I guess we would

20   say that she's not a pathologist, and we would put on our

21   pathologist witness who has conducted thousands of autopsies.

22          THE COURT:  So you would put on a pathologist.

23          MS. LIN:  Correct.  We have a pathologist who's used

24   an expert report explaining why Dr. Van Norman's reliance on

25   the lone weight of Mr. Purkey's autopsy, they cannot possibly

determine when pulmonary edema occurred.  And so we would put on

Dr. Crowns.  That's our expert who is a pathologist in the field

of forensic pathology.  And we would also put on his testimony,

which consistent with this forensic pathology analysis, that he

looked at the witness account of the executions in July and to

determine from the witness accounts that there was no indication

of any kind of pulmonary edema.  So that's one kind of witness

we would put on.

        We would additionally put on Dr. Antognini, who corroborates

in every respect what Dr. Crown has said about the autopsy and

about pulmonary edema in general, as to when it could occur and

whether the inmate would suffer excruciating pain.

        And then, in addition, we would put on the expert that

we -- expert declaration that we could use from an expert in

the field of pharmacology to show that the government's

pentobarbital that is intended to be used for next week's

execution --

                THE COURT:  Wait.  You're saying you would put this

report in, or you'd put this witness on live?

                MS. LIN:  We have already put in a declaration

yesterday, but Your Honor's asking me if I was going to be

putting on any witnesses.  That's one of the experts --

                THE COURT:  Okay.  Okay.

                MS. LIN:  It all depends on their availability, of

course, given the short notice.  But the expert declaration

1   yesterday would discuss why the government's drug is potent, and

2   again as evidenced by the fact that the executions so far have

3   been performed without incident.

4           THE COURT:  Okay.  Counsel for Mr. LeCroy, that is

5   Mr. Smith, the evidence presented at a hearing would also apply

6   to Mr. LeCroy.  Is that correct?

7           MR. SMITH:  Yes, Your Honor, because of Count 4 of the

8   amended complaint and Count 11 of the plaintiffs' amended

9   complaint.

10          THE COURT:  So you're not arguing that you need a

11  separate hearing.

12          MR. SMITH:  Correct.

13          THE COURT:  Okay.

14          MR. SMITH:  I think the plaintiffs noted that a

15  preliminary injunction may be necessary until the hearing is

16  held if it is not held before Tuesday and decided before

17  Tuesday.  The only thing we asked for leave to file was, in

18  the event that we need a preliminary injunction, we felt like

19  we needed to get a motion on file --

20          THE COURT:  I understand.  All right.  Ms. -- yes.

21          MS. YING:  This is Jennifer Ying on behalf of

22  Mr. Norris Holder, and I just wanted to confirm with the Court,

23  I think the Court listed a bunch of ECF documents, and

24  Mr. Holder submitted separate statements regarding his unique

25  situation.

1          THE COURT:  Right.  He has an as-applied challenge.

2          MS. YING:  Correct.  And we also submitted additional

3    briefing regarding the irreparable harm factor at docket

4    Nos. 237 and 249.

5          THE COURT:  Has Mr. Holder's execution been scheduled?

6          MS. YING:  It has not, Your Honor.  And so I think to

7    the extent that the Court would like to handle Mr. Holder and

8    his unique situation on a separate track, we don't have any

9    objection to that.

10         THE COURT:  Well, clearly I don't want to have these

11   experts being hauled in for evidentiary hearings repeatedly.

12   So I would, you know, allow some questioning with regard to Mr.

13   -- if you anticipate using these same witnesses for Mr. Holder's

14   case, I would probably allow you some leeway there, depending on

15   how long we're talking about.

16         MS. YING:  Your Honor, my only point there is that

17   there are some slightly different experts that Mr. Holder had

18   relied upon, and I don't know what their availability would be.

19         THE COURT:  Okay.  To the extent that there are

20   witnesses or experts that aren't Dr. Van Norman or Dr. Edgar or

21   Dr. Almgren, then no, we're not trying to make this longer than

22   it needs to be given when the currently scheduled executions are

23   to go by.

24         So if we had one, would the parties want to do this by

25   phone or by video conference?  I can do a video conference from

 1   my courtroom or my home, you know.  I can do it by video, but

 2   I'm not sure -- I don't have a preference.  Again, this is not

 3   an evidentiary hearing where I have to look at the witness's

 4   demeanor and whether they're, you know, shifty-eyed or

 5   something.  This is expert evidence.

 6        MS. LIN:  Your Honor, this is Jean Lin.  So I don't

 7   know what our experts' technology capabilities are, so it's a

 8   little bit harder.  So I think by telephone, certainly, would

 9   work.  I don't know about video conferencing, only because of

10   the potential challenges that our experts might have.

11        THE COURT:  Right.  Also, Mr. Luby, you talked about

12   you gave me estimations for time, and I can tell you that those

13   estimations are way beyond what I consider necessary given that

14   you basically said that the experts would not be testifying to

15   anything -- maybe a small amount of information or testimony

16   that has not been previously submitted to me.  So my preference

17   would be to just go straight into cross-examination.

18        Now, does either side have an -- if I decided hold a

19   hearing, does either side have an objection to doing that?

20        MR. LUBY:  This is Joe Luby.  No, plaintiffs don't

21   have an objection to that, and obviously my estimation of how

22   long the witnesses would be testifying were predicated on the

23   assumption that there was a full-board hearing and that the

24   Court wanted live testimony on all relevant facts as opposed

25   to accepting and considering what's in the declarations.  So we

 1   would not have any objection.

 2           THE COURT:  Okay.  I'm going to -- all right.

 3   Again, assuming that --

 4           MS. LIN:  Judge?

 5           THE COURT:  Yes.  Ms. Lin?

 6           MS. LIN:  Your Honor, the government has no objection

 7   to going straight to cross-examination.

 8           THE COURT:  Okay.

 9           MS. LIN:  But if you're concluding the point, if I

10   may just broach to the Court two additional points just to make

11   sure that I understand, I mean Your Honor has not decided that

12   it's necessarily going to be an evidentiary hearing, but I want

13   to --

14           THE COURT:  I have not.

15           MS. LIN:  I want to urge the Court to consider the

16   key factor here is that if the Court is planning to rule on the

17   FDCA, the irreparable injury has to flow from violation of the

18   FDCA.

19           THE COURT:  Yes.

20           MS. LIN:  Because, without that, I think the Court

21   doesn't need to go to any evidentiary point.  And the second

22   point is again the point that the Supreme Court has now

23   emphasized repeatedly that if the Court were to issue a

24   permanent injunction at this late stage, that is something that

25   requires exceptional circumstances, and we do not believe that

1   such exceptional circumstances are present here given all the

2   litigation that has been ongoing.  And the Court has reviewed

3   the FDCA question multiple times as of now, and both Supreme

4   Court, D.C. Circuit, and this Court have allowed five executions

5   to take place so far.

6           THE COURT:  Thank you, Ms. Lin.

7       Plaintiffs' counsel, can you respond to Ms. Lin's first

8   point?

9           MR. LUBY:  Yes, of course.  And that point,

10  Your Honor, is brief.

11          THE COURT:  And this is Mr. Luby?

12          MR. LUBY:  Oh, yes.  I apologize.  This is Mr. Luby.

13      As is argued in our motion and especially in our reply

14  brief, Your Honor, the violation here is the absence of a

15  prescription.  And the reason why harm is connected to that

16  violation is because the absence of a prescription means that

17  there's no clinical and medical oversight in the decision of how

18  to dispense this drug and what drug to dispense at all.

19      And certainly, if a medical practitioner had to be brought

20  into the process, our contention is, as we've explained, that

21  the practitioner would require the administration of some other

22  drug in order to diminish the risk of harm from the

23  pentobarbital.  So that's the plaintiffs' chief claim here

24  as it's already been found by the Court with respect to the

25  Eight Amendment  --

1          THE COURT:  So if that's the chief claim -- say I

2     agree with you.  Say I agree that a prescription is required.

3     What's the irreparable injury?  The plaintiff will be executed.

4     Right.  So the injury you're talking about is the pain or is the

5     harm from being executed in a manner -- by being executed using

6     a drug with no prescription?

7          Because a prescription -- if I were to rule that defendants

8     must dispense pentobarbital that has been prescribed, then

9     regulations would insist that a physician supervise it,

10    supervise the process?  Or is it that a physician insists that

11    a sedative be given prior to the administration?

12          MR. LUBY:  Well, the physician would have to exercise

13    clinical judgment in order to decide what all would be

14    prescribed.  And so the absence of a prescription here is what

15    allows the government to administer a drug that carries a great

16    risk of pain, whereas if that consultation were to take place,

17    the physician would recommend what's clinically appropriate,

18    which is the administration of another drug before the drug that

19    causes pain so that it doesn't do so.

20          THE COURT:  And I know it was made in an Eighth

21    Amendment context, Mr. Luby, but I think that is a very, very,

22    very heavy lift given what the Supreme Court has said in these

23    cases.  A very heavy lift.  But I understand your point.

24          All right.

25          MS. LIN:  May I respond to that?

1          THE COURT:  Yes, Ms. Lin.

2          MS. LIN:  So I think that the argument here is that

3  the physician has to have a relationship, a practitioner-

4  patient relationship with the inmate, and then prescribe what

5  the physician thinks is necessary.  And in this case, I think

6  the plaintiffs' position, if I understand it correctly, they

7  think that no physician will prescribe pentobarbital because

8  it's necessarily going to cause suffering.  So the prescription

9  here would not make a difference --

10         THE COURT:  Well, hold on.  I think theoretically --

11  and Mr. Luby can correct me -- is that what they're saying is --

12  I don't think they're going so far as to say that it has to be

13  the inmate's own doctor, although I don't know any medical

14  professional who would prescribe something for somebody that

15  they did not know or had not examined.

16      It's sort of an abstract argument that, you know, you tell

17  a doctor we want to give this much pentobarbital to execute

18  somebody, and they'd say, well, to do that safely you'd have to

19  give them a sedative first so that they don't suffer

20  excruciating pain.  The reality, what you're arguing, is that

21  there's no medical professional who would prescribe a drug to be

22  used to cause death.  Is that right?

23         MS. LIN:  Well, a slightly different point too.

24  I'm simply stating what I believe that plaintiffs' position is,

25  which is that a prescription somehow would defuse the alleged

suffering.  So a prescription wouldn't make any difference,

because it's the plaintiffs' position that it's going to cause

suffering anyway.  And the idea that there could be a separate

drug that could be prescribed in addition to pentobarbital is

not the question here, because that is not what the FDCA

prescription requirement is about.

THE COURT:  Precisely.  And actually, that was --

I addressed that in one of my previous opinions.  It did not

go anywhere.

MR. LUBY:  And, Your Honor --

THE COURT:  Wait, wait.  Let Ms. Lin finish, and then

I'll hear from you, Mr. Luby.

MS. LIN:  So then my point is simply that the drug in

question is pentobarbital.  So this court must evaluate whether

the lack of a prescription for that drug causes the kind of harm

that they allege.  And so it's irrelevant for purposes of FDCA

whether any harm could result from that statute if BOP could use

a different drug or different protocol for executing an inmate,

that that is not something that flows from the violation of

FDCA.  That's an Eighth Amendment point, as Your Honor

recognized just now.

THE COURT:  Thank you, Ms. Lin.

Mr. Luby?

MR. LUBY:  Yeah.  And actually, to the contrary, it

flows directly from the violation, and it's the same way that

1   the FDCA regulates any other potentially dangerous drug that's

2   available only by prescription.  So, for example, as we argued

3   in the reply brief, if a woman is given estrogen replacement

4   therapy, that carries the risk of endometrial cancer unless it's

5   also accompanied by progesterone.  And no physician who is

6   attuned to current medical standards would prescribe estrogen

7   alone, because it's dangerous --

8           THE COURT:  Well, Mr. Luby, let's not be disingenuous

9   here.  Are you really saying that you believe there's a

10  practicing physician who would prescribe a lethal dose of

11  pentobarbital, in conjunction with whatever, for an inmate,

12  especially one who is not his patient?

13      I mean, let's talk about the practicalities here.  Is it

14  disingenuous for you to claim that that's an actual remedy when

15  you know it's not -- it doesn't appear to be.  It appears to be

16  a way to permanently stop an execution because the government's

17  not going to be able to find a physician to do that.

18          MR. LUBY:  And I don't know that that's the case,

19  Your Honor.  It says in the administrative record that -- the

20  administrative record itself documents that the State of

21  Missouri uses medical prescriptions for pentobarbital.  Now,

22  those are different from the kinds of prescriptions I'm talking

23  about, but at least there, that's a prescription that some

24  medical physician is ethically willing to issue.

25      So I wouldn't say that it's just impossible to go out --

1    that it would be impossible for the government to try to find a

2    physician --

3          THE COURT:  And is it your position, Mr. Luby, that

4    inmates executed in Missouri with a prescription that you

5    describe are not suffering the pulmonary edema that you allege

6    is a danger here?

7          MR. LUBY:  No.  In Missouri the prescriptions are

8    issued by someone who doesn't even know who this prisoner is

9    or examined them.  They just issue a prescription, they write a

10   piece of paper, and they get something like 500 --

11         THE COURT:  So my question is, is that preventing

12   the pulmonary edema that you are arguing is a danger here?

13   Does that procedure --

14         MR. LUBY:  In that case, no, because there's no

15   physician who actually exercises clinical judgment.

16         THE COURT:  Exactly.  So there you have it.  There

17   is a prescription, and it doesn't seem to alleviate the harm

18   you're talking about here.  So what you're really asking for

19   is a doctor-patient relationship, which is something that

20   doesn't exist here with these inmates.

21         MR. LUBY:  What I'm asking for is that they bring

22   medical science to bear and have a clinical judgment made.

23   If they cannot do that, that's because --

24         THE COURT:  Can you point me to a -- wait.  Stop.

25   Can you point me to a case that says they're required to do

1      that?

2                MR. LUBY:  They are required to --

3                THE COURT:  Yeah.  You're saying they need a

4      prescription.  Your claim is grounded in the fact that there's

5      no -- one of the arguments is that there's no prescription.  But

6      it seems to me that what you're saying is even further; there

7      needs to be a clinical relationship between the prescriber and

8      the patient, or the inmate, because it sounds to me like in

9      Missouri where there is a prescription, which just happens to be

10     a piece of paper, that's not alleviating the harm that you have

11     described would be present here if an inmate were executed

12     without a prescription.

13         So it's not the prescription that you seem to me to be

14     really arguing is the problem; it's the lack of a patient-

15     clinician relationship here.  Right?

16               MR. LUBY:  Well, a valid prescription requires a

17     clinical judgment, Your Honor.

18               THE COURT:  So the prescription that you're talking

19     about in Missouri is not a valid prescription?

20               MR. LUBY:  Correct.

21               THE COURT:  Okay.

22               MR. KING:  Your Honor, this is Gerald King on behalf

23     of Richard Tipton.  Could I speak to a couple of concerns that

24     were raised?

25               THE COURT:  Yes, Mr. King.

1    MR. KING:  And part of my motivation is that I am in

2    the State of Georgia where a physician is hired at the rate of

3    $5,000 a year to write a prescription in the event of lethal

4    injection.  And I don't know whether the -- there is also a

5    sedative that is offered as a part of the Georgia execution.

6    I think the point that we've been making here is that the

7    presence of medical -- medical involvement in the dispensation

8    of these potentially dangerous substances shouldn't be conflated

9    with the individual patient-physician relationship which you're

10   discussing.  What we're saying is these are drugs that are

11   controlled, and the dispensation of them is controlled for a

12   reason, because they are dangerous, because they can be

13   injurious.  And we --

14   THE COURT:  Well, let me stop you, Mr. King.  That's

15   exactly what the government is using them here for.  They're

16   using them to kill someone.  So the inherently dangerous nature

17   of the drug as a basis for requiring a prescription is not

18   really a factor here because, in fact, that is what the

19   government is using it for.  They're using it to cause death.

20   So I agree with you that normally a prescription

21   requirement exists to make sure that the drug is not used in a

22   way that could harm a person.  That is totally upside down here,

23   because the drug is being used to cause death.  So this is the

24   issue.  Even if a prescription -- as you say, somebody's paid

25   $5,000 a year in the state of Georgia to write a prescription,

1    that's a technical compliance with the prescription rule.

2    Right?

3                MR. KING:  Your Honor, I don't believe that it is a

4    technical requirement.  It is something that brings in medical

5    supervision over the dispensation of dangerous drugs.  And, yes,

6    the drugs are used to kill, but they still cannot be used to

7    cause unconstitutional suffering.  And the way that the drug

8    is --

9                THE COURT:  But let me stop you.  Let me stop you

10   there, because you're saying "unconstitutional suffering."  The

11   Supreme Court has said the suffering is not unconstitutional; it

12   does not violate Eighth Amendment.  So you can't hang your hat

13   on that one.

14               MR. KING:  Your Honor, I don't think -- yes.

15   I'm sorry.  I'm talking over someone?

16               THE COURT:  No.  Go ahead, Mr. King.

17               MR. KING:  Your Honor, I don't think that that is the

18   implication of *Barr v. Lee*, which is actually the subject of one

19   of the other motions that we put forward where we don't think

20   that that is an endorsement of the use of pentobarbital in all

21   circumstance, particularly with the evidence that's before the

22   Court.  And we are before the Court in this motion requesting a

23   permanent injunction, and we're no longer in the area of

24   preliminary injunction.

25          We're not talking about a likelihood of success; we're

1  talking about the ultimate merits of the claim, which is yet

2  another reason why we believe that a hearing is necessary and

3  why we actually need to cross-examine the government's experts

4  about the positions they are taking on precisely the subjects

5  Your Honor is raising: Just what do these drugs do?

6       Yes, they're being used for a purpose.  Is there an

7  unconstitutional effect of the way these drugs are being used

8  by the government here?  So I don't believe that the

9  constitutionality of these drugs is a permanently settled

10  question.  I think that that --

11            THE COURT:  Well, I -- you know.  I suspect, I

12  strongly suspect, the Supreme Court would take a different view.

13            MS. LIN:  Your Honor, this is Jean Lin.  May I be

14  heard about the Georgia question?

15            THE COURT:  Yes, Ms. Lin, and then I'll go back to

16  Mr. Luby.  Yes.

17            MS. LIN:  About the Georgia -- the representations

18  that Mr. King has about the fact that they may have gotten a

19  prescription, remember the Georgia statute itself says that this

20  type of prescription, in the context of lethal injection, is not

21  part of the physician's medical practice.  It is not doing the

22  type of thing that the plaintiffs here are urging that a

23  physician should be doing.

24       So the Georgia statute itself directly says that the

25  physician participation does not constitute medical malpractice.

1    And that underscores our key point here, is that when a drug is

2    intended to kill, there is not the kind of safety issue that a

3    prescription is going to be able to make any difference, in the

4    sense that it is intended to kill.

5        And Your Honor pinpointed the idea that, you know, to

6    the extent that the argument about this is some sort of

7    unconstitutional pain, of course the Supreme Court definitely

8    has addressed that, but we also urge the Court to consider the

9    fact that pentobarbital is commonly used in the euthanasia

10   context for people who are seeking death with dignity.

11       So the idea that somehow we should revamp everything

12   about whether pentobarbital is going do its intended purpose

13   of killing the inmate is somewhat too late in the stage of all

14   this litigation that has gone on.

15           THE COURT:  All right.  Thank you, Ms. Lin.

16       Mr. King, you've spoken.  Mr. Luby?

17           MR. LUBY:  Thank you, Your Honor.  A few points, if

18   I may.  I'll try to make this brief.  The intended purpose of

19   pentobarbital isn't simply to kill.  The defendants' express

20   purpose for using pentobarbital is so that it would kill without

21   suffering.  And the Court itself has held in its previous order

22   that the government argued that a lethal injunction drug is

23   legally and constitutionally permissible because it will ensure

24   a humane death.  This court -- [indiscernible] --

25           THE COURT:  Okay.  But, Mr. Luby, let me ask you this.

1    I know this is not an Eighth Amendment claim, but if the Supreme

2    Court has held that the use of pentobarbital does not violate

3    the Eighth Amendment -- I realize this is a claim brought under

4    a different statute, but if the argument is that the use of

5    pentobarbital without a prescription or in violation of the

6    statute gives rise to an extreme risk of pain, mustn't I take

7    into consideration that, while that may be true, the Supreme

8    Court has found that it doesn't violate the Eighth Amendment and

9    that it has also said in its holding that pentobarbital has been

10   used repeatedly in many, many executions, and they don't have a

11   problem with that?  I mean, obviously I'm paraphrasing here,

12   and I don't mean to do it in a flip way, but I mean I have to

13   take that into account, do I not?

14         MR. LUBY:  Yes, Your Honor, but the problem the Court

15   doesn't have is an Eighth Amendment problem with it.  There's no

16   holding that pentobarbital doesn't cause pain, merely that the

17   amount of pain that may be involved doesn't violate the Eighth

18   Amendment and isn't cruel and unusual.

19         THE COURT:  I mean, I've said, Mr. Luby, in my

20   previous opinions that the use of pentobarbital in this

21   manner -- you know, I found that it poses a risk of pulmonary

22   edema and so on, and it didn't go anywhere.  I mean, if I make

23   the same finding, what difference does it make?

24         MR. LUBY:  Because a different legal standard governs

25   that finding and a different quantum of harm is necessary.  It's

1   a difference between a probability of irreparable harm, which

2   could be just about any harm, as opposed to a certainty

3   of cruel and unusual punishment.  There are all kinds of cases

4   out there granting injunctive relief on irreparable harm that's

5   based on harms that are much less serious than the ones that are

6   at issue here whether or not they amount to an Eighth Amendment

7   violation.

8             THE COURT:  Okay.

9             MR. LUBY:  And we've cited those in our brief.

10            THE COURT:  Yes.  All right.

11            MR. SMITH:  Your Honor, this is Greg Smith for

12   Mr. LeCroy.  And since the Georgia statute has been mentioned,

13   if the Court will indulge me, I wanted to briefly touch on the

14   prescription under the law.

15            THE COURT:  Sure.

16            MR. SMITH:  Ms. Lin said that the Georgia statute

17   does not require a prescription.  And in our reply brief on the

18   preliminary injunction issue, we did address that, and we don't

19   think that that's accurate at all.  It is a protection statute

20   against lawsuits.  It is not at all a statutory -- a limit on

21   the statute's requiring a prescription.  And I think, as

22   Mr. King said, Georgia does in fact use a prescription for its

23   pentobarbital.

24        The other issue I guess I wanted to address was I take the

25   Court's point and the comment that it may be -- the Court may

1 think it's a heavy lift to distinguish this from the Eighth

2 Amendment issue, but really their Eighth Amendment question is

3 whether they could do this if there had never been an FDCA

4 passed.  That's the Eighth Amendment question.  The standard

5 there is very high:  Is it a constitutional violation that

6 causes unconstitutional suffering?

7        The question before the Court now is, now that Congress has

8 adopted the FDCA and established a standard of a prescription

9 requirement, what is the expectation that Congress had in terms

10 of the harms and what it would allow?

11           THE COURT:  I understand.  But you have to consider

12 the purpose of the statute.  And I know the D.C. Circuit law

13 that talks about drugs being subject to -- even drugs that are

14 used in executions are subject to statute, but we have to look

15 at these arguments viewed against the backdrop of the recent

16 Supreme Court rulings.  And, yes, they're an Eighth Amendment.

17        But when I say it's a heavy lift and I -- you know,

18 this is not my personal opinion.  But I'm bound by Supreme Court

19 precedent; I'm bound by D.C. Circuit precedent.  And even though

20 the Supreme Court's holdings are in the Eighth Amendment

21 context, I'm just not sure how I issue an injunction under a

22 statute that is designed to ensure the safety of drugs when

23 the Supreme Court has said that the use of pentobarbital in

24 executions is fine.  Well, they didn't say "fine."  Appropriate.

25 Granted, it's an Eighth Amendment context, but this is the heavy

1    lift I'm talking about.

2           MR. SMITH:  No, I understand.  But all they held was

3    that it was appropriate under the Eighth Amendment.

4           THE COURT:  That's all they had then.

5           MR. SMITH:  That's all they had before them.  And the

6    issue before the Court now is, is it also appropriate under the

7    FDCA, and that is not an issue that --

8           THE COURT:  But I'm not making my rulings in a vacuum.

9    I'm making my rulings knowing full well that they're going to be

10   challenged and they're going to be viewed on appeal in light of

11   all the appellate rulings in this litigation, and so there's no

12   point in me issuing anything that's going to be reversed.

13          MR. SMITH:  We're certainly not trying to lead you

14   into error at all.

15          THE COURT:  I can do that myself.

16      (Laughter.)

17          MR. SMITH:  What we're --

18          MS. LIN:  Your Honor --

19          MR. SMITH:  -- but I do think that how the court or

20   how that court or this court may deem harm to be analyzed under

21   the Eighth Amendment, if there had never been an FDCA passed

22   really doesn't answer the question of what Congress expected

23   after adopting the FDCA.

24      And in this context I think what we've conveyed, or

25   attempted to, is if in Georgia, when you have a medical overlay,

1    as Mr. King said, you bring medical judgment to the table, you

2    don't just have a prescription for the pentobarbital; you also

3    have a sedative offer.  And that is not being done here, and

4    that is what we are basically saying would happen, and it would

5    prevent unnecessary pain.

6         Now, is it unconstitutional pain?  You make the point that

7    it's not, and I fully understand the Court's point.  But is it

8    unnecessary pain under the statute that Congress didn't want to

9    happen?  And isn't that in fact why the FDCA, the D.C. Circuit

10   said, applies to this situation, was passed and what it expects?

11   And so the question is not, as was before the Supreme Court, is

12   does the constitution expect it; the question -- and really the

13   only relevant question is what does Congress expect.

14        (Multiple speakers.)

15        THE COURT:  All right.  Wait, wait, wait.  Hold on,

16   Ms. Lin.  I'm going to let you respond, but hold on.  Are you

17   finished -- is that Mr. Luby or Mr. Smith?

18        MR. SMITH:  I think Congress, like Georgia, expected

19   that we're not going to have unnecessary suffering.  That's why

20   Georgia, when they do prescriptions, they apply a sedative as

21   well.  And I think that if the FDCA is properly applied, as is

22   pointed out in the reply brief in the summary judgment, just

23   like with other drugs that may have benefits or may have

24   detriments, the natural medical response in that situation is

25   to try to minimize the pain as much as possible.  Even if it's

1    not pain of an unconstitutional level, the goal is to minimize

2    suffering, and that's what a prescription accomplishes.  It

3    ensures that the drug is safe and --

4              MR. KING:  And, Your Honor --

5              THE COURT:  Okay.  Hold on.  Hold on.  Who's just --

6    is that Mr. King?

7              MR. KING:  Your Honor, it is Mr. King, and I

8    apologize.  I did want to speak to a related point that has

9    not been discussed, but I of course don't want to queue-jump

10   Ms. Lin.

11             THE COURT:  No.  Well, you go ahead, and then I'll

12   hear from Ms. Lin, and then we'll close out.

13             MR. KING:  We should not assume that the drug referred

14   to as pentobarbital is fungible across every protocol that gives

15   it that name, especially when we are dealing with compound

16   drugs.  And you don't know what a drug is unless you know how

17   it is made, with what, and how it has been tested.

18        And there is new evidence that has come to light in the

19   last few days about the government's testing of its compounded

20   drugs, and that is an extremely relevant issue for the Eighth

21   Amendment questions before the Court, but also for the question

22   before the Court as to harm with FDCA.

23        And that is new evidence that we would like the opportunity

24   to address.  It was only recently disclosed, and we think that

25   that's something that we should be able to get into.  And it

1    relates to that question:  When we are talking about

2    pentobarbital, what is being called pentobarbital here?  How

3    does it operate?  Is it potent?  Is it stable?  And is it even

4    operating within the parameters of what we would expect

5    pentobarbital, FDA-approved pentobarbital, to do?  And I think

6    that that's a relevant point for the Court's analysis as well

7    and one that we'd like to address in a hearing.

8              THE COURT:  Okay.

9         All right.  Ms. Lin?

10             MS. LIN:  Yes, Your Honor.  So just very briefly on

11   the Georgia question, and I won't be belabor it.  The point

12   I was making earlier is the Georgia statute itself does not

13   recognize lethal injection in execution as medical treatment.

14   The condemned inmate is not a patient.  And the statute

15   specifically says that a lethal injunction does not involve,

16   I quote, "the diagnosis, treatment, or prevention of injury,

17   illness, or disease of a patient or other individual."

18        So that was the point I was making, was that what

19   the plaintiffs referred that to take place is the precise

20   relationship that is not going to change with a prescription

21   here, because again the prescription is -- again, the drug is

22   intended to kill.

23        On this question about what Congress intended when enacting

24   the FDCA in 1938, just to be clear, since 1938 there's been

25   thousands of executions that took place.  So FDA has not

1    regulated the articles that are being used in lethal injections.

2    Well, precisely the point that these articles cannot be made

3    safer.  The therapeutic benefits are never going to outweigh

4    the risk because, again, the purpose is to kill.

5         So to say what Congress intended with FDCA to govern this

6    situation, and particularly when determining the question of

7    irreparable harm I think is inapt, particularly given especially

8    what the Supreme Court had found.

9         And this court recognizes that if you were to find that

10   somehow, even though pentobarbital does not cause Eighth

11   Amendment violation, but nevertheless an injunction at this late

12   stage should still be issued because it's going to cause pain

13   that is irreparable injury, I think that is fundamentally at

14   odds with what the Supreme Court has said.

15        And I think I want to remind again that the FDCA injunction

16   that the Supreme Court vacated, again it's got to be either on

17   the merits or on the irreparable injuries.  And on either of

18   those factors, nothing has changed.  So the Supreme Court

19   vacated without noting dissent.  So that has to have -- that's

20   got to be either/or or both.  But in no situation would it

21   suggest that somehow a permanent injunction at this point is

22   appropriate.

23        And so finally, the point about Mr. King's point about

24   compounded drugs, whether this was potent, we have been through

25   all of this in the Eighth Amendment context, and this court

1    itself fully recognized the court of appeals repeatedly has

2    found that compounded lethal-injunction drugs are appropriate

3    under the Eighth Amendment.  And so, again, that is just kind

4    of repeat the same argument the Court has previously already

5    addressed, and the Supreme Court was well aware both times when

6    it vacated the Court's injunction.

7            THE COURT:  All right.  Thank you, everyone.  We've

8    been going an hour now, and I think I have heard enough.  I

9    realize that we are operating on a very tight time frame, and

10   I'm hoping that my law clerk will let you know tonight whether

11   we're going to have a hearing.  And if we do, I'm hoping we can

12   do it tomorrow.

13       So if I were you, I would start to see what witnesses would

14   be available by phone tomorrow.  I mean, I'm willing to do it on

15   a Saturday if necessary.  You know, of course, we're in unusual

16   circumstances here, but I will let you know tonight whether I

17   think a hearing is necessary in this case.

18           MS. LIN:  Your Honor, a housekeeping question,

19   Your Honor?

20           THE COURT:  Yes.

21           MS. LIN:  So it looks to us that the ECF is going to

22   maintenance this Sunday from 6 a.m. to 4 p.m., and we know that

23   there could be spotty issues and possible glitches.  So is there

24   an alternative way if the parties --

25           THE COURT:  Oh, boy.  Yes.  Make sure that

1    Mr. Boujaoude gets all of your email addresses and phone

2    numbers, please.

3              MS. LIN:  All right.

4              THE COURT:  All right?  And thank you for reminding

5    me of that.  This is particularly bad timing.

6         Did someone else have something?

7              LAW CLERK:  Judge, this is Delores.  We have an email

8    currently circulating that I believe has all the email

9    addresses, and when I sent it out today, I asked all the parties

10   if there were any more that needed to be added.  But I think at

11   this point we're good with that.

12             THE COURT:  Okay.  Make sure all counsel have

13   Mr. Boujaoude's cell phone number and email address as well

14   if you need to communicate with the Court.

15        Okay?  Thank you, everyone.  Appreciate it.  I will let you

16   know as soon as possible.

17        (Proceedings adjourned at 6:10 p.m.)

CERTIFICATE *

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE


* PLEASE NOTE:

This hearing was taken via telephone conference in compliance with U.S. District Court Standing Order 20-19 during the COVID-19 pandemic.  Transcript accuracy may be affected by limitations associated with use of electronic technology, including but not limited to any sound distortions and/or audio interferences.