# SUPPLEMENTAL EXPERT DECLARATION OF MARK A. EDGAR, M.D.

1.  My name is Mark A. Edgar, M.D. I am a practicing and board-certified anatomic pathologist and neuropathologist, and I am employed at the Mayo Clinic in Jacksonville, Fla. On October 24, 2019, I provided a sworn declaration describing the risk that executions involving the injection of pentobarbital will cause the prisoner to suffer flash pulmonary edema. This declaration supplements my previous declaration and assumes the reader's familiarity with it. The statements and conclusions I make in this declaration are true and correct to the best of my knowledge and experience and to a reasonable degree of medical certainty.

2.  An eyewitness to the September 22, 2020, execution of William LeCroy (Jordan Kudisch from WTHI-TV) described LeCroy as very calm at first, but as the execution began, "His stomach was going up and down. It was very intense. He was grasping for air." This description indicates respiratory distress, and the inmate's stomach "going up and down" is in keeping with increased work of breathing with the diaphragm forcefully contracting in an effort to draw air into edematous lungs and forcing the abdominal wall outward in the process. Kudisch continues: "The next thing I saw was the mouth drop and his eyes close". That LeCroy's eyes were described as closing after the onset of respiratory distress is strong evidence that he was awake during the onset of flash pulmonary edema.

3.  Unlike autopsy reports which are produced by observers with years of training and experience, eyewitness reports are provided largely by people with no medical expertise and who cannot be expected to identify unexpected findings that would indicate respiratory distress. It is therefore not surprising that a minority of eyewitnesses descriptions contain sufficient detail to infer the presence, let alone the time of onset of respiratory compromise. It is therefore significant that in seven eyewitness reports referenced in my previous declaration (Anthony

Shore, Scotty Morrow, Michael Yowell, Vaughn Ross, Erick Davila, Elroy Chester, and Danny Bible) the description indicates abnormalities of breathing prior to loss of consciousness.

4. Agonal breathing is, as the name implies, a pattern of abnormal respiration immediately preceding death. This type of breathing may be due, in part, to the effects of pulmonary edema in patients with lungs that fill with fluid due to heart failure immediately prior to death. But agonal breathing immediately precedes death, and lethal injection executions last, on average, about 20 minutes. Agonal breathing would be expected later in the execution if it occurred, and certainly not while the inmate was still awake.

5. Dr. Antognini's suggestion that pulmonary edema seen in autopsies of inmates executed with overdoses of pentobarbital could arise postmortem is at odds with decades of experience by pathologists and defies common sense. If pulmonary edema arose as a postmortem artifact, then it would not be noted in autopsy reports (such as that of inmate Purkey), we would not seek evidence of its presence at the time of autopsy, and we would not teach pathology residents how to examine the lungs to detect it. Purkey's autopsy showed "frothy pulmonary edema in trachea and mainstem bronchi." As explained in my previous declaration, the presence of foam or froth in the airways shows the active mixing of fluid and air, which can only occur when the person is still breathing. Froth indicates that the person continued breathing for a significant period of time after the onset of pulmonary edema, which itself stems from the corrosive effect of the highly alkaline pentobarbital solution on the lung capillaries and tissues (which, if injected into a peripheral vein, the drug reaches before it reaches the brain). Reports of respiratory distress before the loss of consciousness suggest that the onset begins soon after the drug is administered.

6. Dr. Crowns's field of expertise is forensic pathology. He is neither a pharmacologist nor an anesthesiologist, and he does not practice clinical medicine. Yet he testifies that inmates executed using

pentobarbital would not experience pain from pulmonary edema because of the time needed for pentobarbital "...to clear from the respiratory and cardiac receptors of the brain stem." As a pathologist, Dr. Crowns is not qualified to offer this opinion concerning the pharmacological effects of pentobarbital on the brain, and he offers no support for his opinion.

7.  In summary, I believe that opinions provided by experts for the government are, at turns, incorrect, misleading, and selectively disregard inconvenient data that directly contradicts their testimony.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this, the 28th day of September, 2020.

_____
Mark A. Edgar, M.D.