## Supplemental Expert Declaration
## of Gail A. Van Norman, M.D.

**Introduction**

1. On November 1, 2019, I provided Plaintiffs' counsel with my opinions regarding the Federal Execution Protocol in a declaration that included detailed discussion and cited evidence. On June 29, 2020 I provided a Supplemental Expert Declaration addressing specific questions regarding flash pulmonary edema in prisoners executed by IV administration of 5 grams of pentobarbital. I also provided a Secondary Supplemental Declaration to the Court dated August 7, 2020 for Plaintiff Keith Nelson, addressing findings of pulmonary edema following the execution of Wesley Purkey on July 16, 2020. On September 15, 2020, I wrote an Additional Supplemental Report to the Court, providing rebuttal to the declarations of Dr. Kendall Von Crowns (August 10, 2020) and Dr. Joseph Antognini (September 11, 2020).

2. Counsel have now provided me with eyewitness accounts of the execution of William LeCroy on September 22, 2020, as well as autopsy reports of 307 prisoners executed by judicial lethal injection involving various drugs, most of which were cited by in a story published by NPR on September 21, 2020.[1]

3. Counsel asked me to comment on several topics: (1) the occurrence of flash pulmonary edema as a result of a massive barbiturate overdose; (2) the time course of flash pulmonary edema; (3) whether the observations made by the eyewitnesses, including media eyewitnesses to Mr. LeCroy's execution, are consistent with the occurrence of flash pulmonary edema or agonal breathing; (4) the significance of autopsy findings now provided to me from additional sources.

4. In addition to the materials listed in my Expert Declaration dated November 1, 2019, and in my previous Supplemental Reports dated June 29, August 7, and September 15, 2020, I have further reviewed and relied upon the following materials:

- Eyewitness accounts of the execution of William LeCroy, as detailed by reporters George Hale (NPR) and Michael Tarm (AP);
- Autopsy reports from multiple judicial lethal injections (as cited above); and
- Testimony of Dr. Kendall Von Crowns and Dr. Joseph Antognini from a Judicial Hearing dated September 18, 2020.

5. If additional documents or materials are provided to me for specific review and analysis, or if I become aware of other scientific or clinical evidence that impacts my opinions, or if in attendance at any hearings or trials in this case I learn of relevant evidence, I may choose to modify these opinions accordingly.

---

[1] Caldwell N., Chang A., Myers J. Gasping for air: autopsies reveal troubling effects of lethal injection. NPR. Sept 21, 2020. Available at: https://www.npr.org/2020/09/21/793177589/gasping-for-air-autopsies-reveal-troubling-effects-of-lethal-injection. Accessed Sept 21, 2020

**Summary of Opinions**

6. To aid Counsel and the Court, I will summarize some of my previous conclusions that are relevant to this declaration, in addition to my new conclusions that address Counsel's questions. Each opinion is discussed at length in this declaration.

- Flash pulmonary edema is a well-known complication of barbiturate overdose. It occurs during judicial lethal injection through several mechanisms, including (1) direct caustic injury to the lungs by the barbiturate, (2) negative pressure pulmonary edema as the prisoner struggles to breathe against an obstructed airway, and (3) diminished power of contraction by the heart. Please refer to my Expert Declaration, pages 32-33, for a discussion of pulmonary edema in barbiturate overdose and references.

- Flash pulmonary edema occurs extremely rapidly. Two mechanisms of flash pulmonary edema occur during judicial lethal injection: lung injury flash pulmonary edema and negative pressure pulmonary edema. Administration of a large dose of barbiturate causes lung injury, which in turn causes flash pulmonary edema, sometimes within a few seconds. Negative pressure pulmonary edema due to airway obstruction is well-known and also has been observed to occur within moments, or "immediately."

- Flash pulmonary edema is accompanied by excruciating symptoms of drowning: shortness of breath, anxiety, terror, and panic. Please refer to my Expert Declaration dated November 1, 2019, pages 33-34, detailing sensations of drowning and suffocation.

- Autopsies of 61 prisoners executed by lethal injection with pentobarbital, including Wesley Purkey, for whom the lungs were properly examined and documented, 100% have demonstrated findings of flash pulmonary edema, a well-known complication of barbiturate poisoning.

- Flash pulmonary edema does not and cannot occur "post mortem," as it requires a beating heart to push large amounts of fluid into the lungs. The time that passes between sudden death and autopsy is not associated with increased fluid or pulmonary edema in the lungs.

- The strenuous respiratory efforts witnessed during Mr. LeCroy's execution were not agonal respirations. Rather, they are consistent with continued, strenuous efforts by the prisoner to breathe as his airway become obstructed and his lungs filled with fluid.

- Agonal respirations are not associated with "brain death," as brain death both requires *a complete absence of respiratory activity of any kind.*

- Witnesses descriptions of Mr. LeCroy holding his eyes open during execution as he struggled to breathe, then closing his eyes demonstrate both volition and responsiveness. In other words, he was aware.

**At Least 3 Mechanisms of Flash Pulmonary Edema Occur in Judicial Lethal Injection**

7.  Immediate, or "flash" pulmonary edema occurs with massive intravenous (IV) barbiturate overdose because of several well-described mechanisms that, alone or in-combination, occur immediately upon injection of the drug. This is a well-established and indisputable fact. (Please refer to my Expert Declaration dated November 1, 2019, pages 32-33, regarding pulmonary edema and barbiturate overdose.) All of these mechanisms have been proven to occur after IV barbiturate administration in humans and also are supported by animal studies across species, including primates.

1.  **Pulmonary Edema Due to Caustic Injury to Lung Tissue by High Dose/Concentration Pentobarbital.**

8.  Experts who have studied barbiturate overdoses agree that immediate caustic injury is one of three mechanisms that sets off the sequence of flash pulmonary edema. (Please refer to my Expert Declaration dated November 1, 2019 for discussion and references.) When the drug comes into contact with the delicate membranes separating the blood in the capillaries from the air-containing spaces in the lung, this causes immediate destruction of the membranes and sudden, massive leakage of plasma from the blood and inflammatory fluid into the alveoli, "drowning" the lungs. This flooding of plasma and inflammatory fluid into the lungs causes severe damage, including congestion, edema, and hemorrhage and has been shown to occur in animals including rats, mice, guinea pigs, sheep, dogs, and cats.[2, 3]

9.  Lung injury flash pulmonary edema occurs in close relatives of the human species as well. Grieves et al.,[2] examined the effects of pentobarbital euthanasia solutions on the lung tissues of over 100 non-human primates that were euthanized with massive barbiturate overdoses. Necropsies were carried out very rapidly, in most cases under two hours. The study found that most animals exhibited architectural lung damage, in addition to swelling and pulmonary edema. Furthermore, they found that the severity of the lung damage *was directly proportional to the dose of drug given*. The higher the dose, the more destruction occurred. At execution doses, we can expect virtually everyone to experience immediate lung damage. The autopsies of prisoners illustrate this conclusion (see discussion of autopsies, below).

10. In clinical practice, where doses of barbiturates are much lower, and the drug is administered much slower, flash pulmonary edema without airway obstruction has been seen

---

[2] Grieves JL, Dick EJ Jr, Schlabritz-Loutsevich NE, et al. Barbiturate euthanasia solution-induced tissue artifact in nonhuman primates. J Med Primatol 2008; 37:154-61
[3] Port CD, Garvin PJ, Ganote CE, Sawyer DC. Pathologic changes induced by a euthanasia agent. Lab Anim Sci. 2978; 28:4481

practice, but it is rare.  (Please see my report dated November 1, 2019, page 33.)[4]  The significance of this rare clinical event is that, when it has occurred, it happened just moments after injection, even within a single breath, and well within the timeframe of an "average" judicial execution as described by Dr. Crowns.  (Please see report of Dr. Kendall Von Crowns, dated August 10, 2020, page 3.)

11. Dr. Antognini cites a single study in which 1000 mg of barbiturate (about one-fifth of the dose administered in judicial lethal injection) was administered to study subjects and did not cause pulmonary edema.  While the point of referring to this study presumably was to show that barbiturate-induced pulmonary edema does not occur, the study in no way demonstrates what would happen with a five-gram dose of pentobarbital that is *18 to 25 times the normal clinical dose*. However, in the animal euthanasia study cited above, doses similar to judicial lethal injection were given, and severe lung damage was clearly shown.

**2.     Pulmonary Edema due to Breathing with Airway Obstruction.**

Barbiturates induce relaxation of the muscles of the upper airway, causing collapse of the upper airway and obstruction of the airway. Continued efforts to breathe then cause buildup of negative pressure in the chest.  This negative pressure draws fluid into the blood vessels of the chest, raising blood volume and pressure in the pulmonary capillaries, which in turn presses fluid into the alveoli through the damaged capillary-alveolar membrane.

12. In contrast to the rare occurrence of caustic lung injury by clinical doses of barbiturates, flash pulmonary edema associated with airway obstruction has been well documented by many reports and studies, even with low clinical doses of sedatives, including barbiturates.  Those reports also show that the negative pressure pulmonary edema can occur in moments—including within a single breath or two, or "immediately,"[5,6] and well within the time of an "average" lethal injection execution of 24 minutes.  (Please see report of Dr. Kendall Von Crowns, dated August 10, 2020, page 3.)

**3.     Reduction in the Strength of Cardiac Contractions**

13. Finally, large doses of barbiturates can cause a decrease in the strength of contractions of the heart.  Dr. Antognini has stated the same in his reports.  When left heart contraction decreases, fluid "backs up" into the lungs, resulting in increased pressure in the capillary beds.  This is precisely the same mechanism that happens in myocardial infarction ("heart attacks"), when the heart cannot beat efficiently.  It is also a well-known response to oral barbiturate overdose.  (Please see my Expert Declaration November 1, 2019 page 9 for pentobarbital clinical effects and references.)

---

[4] Potts MW, Smerthurst PW.  Pleural effusion complicating thiopentone administration: a case report.  Br J Anaesth 1967; 39:78-9
[5] Udeshi A, Cantie SM, Pierre E.  Postobstructive pulmonary edema.  J Crit Care. 2010; 25:508.e1-5
[6] Deepika K, Kenaan CA, Baroocas AM, Fonseca JJ, Bikazi GB.  Negative pressure pulmonary edema after acute upper airway obstruction.  J Clin Anesth 1997; 9:403-8

**Barbiturate-Induced Lung Damage Plus Obstructed Breathing Both Occur During Lethal Injection**

14.     Damage caused to the lungs by massive barbiturate injection is sufficient *by itself* to cause flash pulmonary edema and respiratory distress. (Please see discussion in my report of November 1, 2019). However, when *combined* with continued respiratory efforts and airway obstruction, as occurs during lethal injection with pentobarbital, it is easy to see why immediate, massive fluid movement, or "flash" pulmonary edema, occurs in virtually all prisoners being executed with barbiturates. The injected barbiturate "burns" through the pulmonary membranes, and then the continued respiratory efforts in the presence of airway obstruction immediately "suck" fluid across the damaged membranes into the air containing spaces.

**Autopsy Evidence of Flash Pulmonary Edema in Executed Prisoners**

15.     Counsel have supplied me with the post mortem reports of 308 prisoners executed by judicial lethal injection. Ninety-four of these reports consisted of toxicology reports plus external examination only and, therefore, cannot be used to draw conclusions about pulmonary edema. Of the remaining 214 reports, no lung sections appeared to have been taken in four. Those autopsies were all performed by a single pathologist in Arizona.

16.     Of the 210 autopsies remaining, sixty-one were conducted on prisoners executed using pentobarbital, and 120 involved use of an alternative barbiturate, thiopental (also known as pentothal).

17.     Of the sixty-one prisoners executed with pentobarbital, fifty-five were deemed to have lung congestion/edema by the pathologist. These fifty-five autopsies clearly demonstrated lung weights markedly increased from average weights[7] (in some cases *by over 300%*) and frothy foam in the lungs and airways. In the remaining six autopsies, where lung sections were not done, all prisoners had drastically increased lung weights (increase of around 200%) that are also evidence of pulmonary congestion and edema. In other words, all sixty-one prisoners (100%) had evidence of pulmonary edema.

18.     Of the 120 autopsies conducted following thiopental executions, no lung sections were taken in one, but the weights of the lungs in that prisoner were markedly elevated and indicated pulmonary edema. In an additional three autopsies, pulmonary edema was not mentioned, but lung weights were markedly elevated, consistent with pulmonary edema. In five autopsies, neither lung weight, nor lung sections were mentioned, therefore no information

---

[7]Standard pathology textbooks list the "normal" weights of human lungs at autopsy as 445 gm for the R lung, and 395 gm for the left lung. It should be noted, however, that these weights were based on studies that did not control for method of death. In a controlled study that excluded preexisting cardiac disease and/or chest trauma affecting the lungs, Joachim et al., found that actual lung weights are considerably lower at 234 gm. For the purpose of this discussion I will assume the standard weights, but the reader should be aware that this may *underestimate* the magnitude of the increased in lung weight in executed prisoners.

relevant to pulmonary edema was provided. Thus over 96% of all prisoners executed using thiopental showed evidence of pulmonary edema at autopsy. Overall in barbiturate executions, based on the autopsies I have seen, 97% of prisoners showed findings of pulmonary edema, with the percentage being highest in those executed using pentobarbital (100%).

19. These autopsies prove my assertion that judicial executions using barbiturate lethal injection cause flash pulmonary edema to a virtual medical certainty.

**Flash Pulmonary Edema Does Not Occur Post-Mortem**

20. The formation of flash pulmonary edema requires a beating heart to provide pressure in the blood vessels of the lungs, which then pushes fluid from inside the capillaries, through the damaged membranes into the air spaces. Dr. Crowns testified to this point in the September 18 hearing, answering the question whether pulmonary edema happens after death:

> If we're talking about cardiopulmonary death, then no, it won't occur. You'll get settling of the fluids in the body, but you won't get continued edema. Edema is going to be the result of a beating heart.[8]

Although Dr. Antognini has asserted that the pulmonary edema seen in prisoners happened post mortem, he does not provide evidence that this is true. Rather, he cites two studies using CT scans that do not support his contention that flash pulmonary edema occurs after death.[9] The first study he cites by Shiotani[10] included patients who had died due to chronic cardiopulmonary disease, all of whom had undergone CPR.[11] In the second study,[12] the authors were not studying pulmonary edema, but pooled secretions in the airway that are present in nearly everyone.[13] The authors of the study state explicitly that it is not possible to draw the conclusion the fluid was not in the airway prior to death. Furthermore, they state, "it is difficult to endorse fully the conclusion of a correlation between the presence of [fluid in the airway] and the postmortem delay." In other words, they did not feel that the presence of fluid could be related to the time delay between death and autopsy. In fact, *the only human study examining whether pulmonary*

---

[8] Transcript of evidentiary hearing before the Honorable Tanya S. Chutkan, United States District Court Judge, September 18, 2020: Page 13, line 12.
[9] It is worth noting that CT scans have never been validated as a method of accurately quantifying pulmonary edema, pre or post mortem.
[10] Shiotani S, Kobayashi T, Hayakawa H, Kikuchi K, Kohno M. Postmortem pulmonary edema: a comparison between immediate and delayed postmortem computed tomography. Legal Med 2011; 13:151-5
[11] CPR is known to cause intrapulmonary contusion and bleeding. This type of hemorrhaging is physiologically very different than edema in the tissues. Pooling of trauma-induced hemorrhage can occur after death but is entirely different than tissue swelling (edema) in the lungs.
[12] Ishida M, Gonoi W, Hagigawa K, et al. Fluid in the airway of nontraumatic death on postmortem computed tomography. Am J Forensic Med Path 2014; 335:113-7
[13] Ishida et. al. used CT scans to determine if fluid that is already present in the trachea prior to death then drains into the main airways after death, e.g. by gravity. This study does not examine swelling within the tissues.

*edema accumulates post mortem* (by comparing the amount pulmonary edema with the time between death and autopsy) *concluded that it did not*.[14]

21.     Moreover, asserting that the pulmonary edema seen in all prisoners after judicial execution with pentobarbital is simply a normal post mortem finding defies the very definition of "normal." Pulmonary edema is *never* a normal post mortem finding. If it were, then the "normal" weight of lungs at autopsy would be as high as the weights of the prisoners' lungs after execution—but then most "normal" patients would show severely "underweight" lungs at autopsy, an oxymoron.

**Mr. LeCroy's Respiratory Movements Indicated Airway Obstruction, Not Brain Death.**

22.     Continued and strenuous respiratory efforts have been well-documented during judicial executions. In recent testimony on September 18, 2020, Dr. Kendall Von Crowns asserted that these were "agonal respirations" and demonstrated that the "brain was gone."[15] He stated: "brain death occurring can still have respiratory and cardiac function."[16] This is *absolutely false*, and *contradicts both medical and legal definitions and standards for brain death*.[17,18]

23.     Agonal respiration is a type of breathing that continues during cardiac arrest, after the heart stops beating. Agonal respiration is absolutely NOT a sign of "brain death," as stated by Dr. Crowns in his testimony on September 18, 2020. In fact, the diagnosis of brain death *both medically and legally* requires all of the following: (1) there can be *no voluntary muscular movements of any kind* in a person who has been given no paralytic agents or toxins that would prevent them from moving; (2) there can be *no specific reflexes present* called "cranial reflexes," which include certain types of eye movements, gagging, swallowing, coughing, grimacing; and (3) *there can be no breathing movements of any kind*, volitional or otherwise. All respiratory efforts must be irreversibly *absent*, not merely ineffective.[19,20] Declaration of the presence of

---

[14] Joachim H, Riede UN, Mittermayer CH. The weight of human lungs as a diagnostic criterium. Path Res Prac 1978; 162:24-40

[15] Transcript of evidentiary hearing before the Honorable Tanya S. Chutkan, United States District Court Judge, September 18, 2020: Page 30, line 23

[16] Transcript of evidentiary hearing before the Honorable Tanya S. Chutkan, United States District Court Judge, September 18, 2020: Page 13, line 20

[17] Uniform Determination of Death Act. National Conference of Commissioners on Uniform State Laws. 1980. Available at: http://www.lchc.ucsd.edu/cogn_150/Readings/death_act.pdf Accessed Sept 24, 2020. (Note that this legislation has been enacted by all 50 states, and approved by the American Medical Association and the American Bar Association).

[18] Van Norman G. A matter of life and death: what every anesthesiologist should know about the medical, legal and ethical aspects of declaring brain death. Anesthesiology 1999; 91:275-87

[19] Uniform Determination of Death Act. National Conference of Commissioners on Uniform State Laws. 1980. Available at: http://www.lchc.ucsd.edu/cogn_150/Readings/death_act.pdf Accessed Sept 24, 2020.

[20] Van Norman G. A matter of life and death: what every anesthesiologist should know about the medical, legal and ethical aspects of declaring brain death. Anesthesiology 1999; 91:275-87

brain death requires specific medical studies, including an "apnea test" that must demonstrate that the patient (who cannot have been given any substances to suppress breathing) does not make any kind of respiratory efforts if breathing support (such as a ventilator) are removed.[21] All brain dead bodies require artificial ventilation, because they cannot breathe or make efforts to breathe on their own.  Diagnosing brain death in the presence of respiratory movements would be not only a violation of international medical standards, *but also a significant breach of the law in all 50 states*.

24. The presence of agonal respiration actually *rules out* the possibility that brain death has occurred, and furthermore it does not even predict that death *will* occur.  A patient who is experiencing this pattern of breathing may die if not assisted in their breathing.  But patients are frequently resuscitated to consciousness if ventilatory assistance is provided during agonal breathing, further showing that they are not brain dead.

25. Moreover, the respiratory efforts reported by eyewitnesses during the execution of Mr. LeCroy *were not agonal respirations*.  What the eyewitnesses report is a classic description of attempts to breathe against an obstructed airway.

26. Agonal respiration is a breathing pattern believed to be triggered in the respiratory center in the medulla of the brain, which begins to fire in response to decreased oxygen, causing slow, infrequent contraction of the diaphragm and erratic slow, periodic deep breaths through an open mouth. There is no heaving motion of the chest, alone or together with the abdomen.  In a program to train student doctors how to recognize agonal breathing in order to aid decisions about resuscitation, Perkins et al., developed a simulation of agonal breathing, which is described as "Slow (< 6/min), deep sighing breaths."[22] These investigators also validated the accuracy of their simulation by testing it with a physician who had experience with patients with agonal breathing to assure that it was a proper simulation of agonal respiration, and that it could be distinguished from other abnormal breathing patterns.

27. Respiratory efforts with an obstructed airway, in contrast to agonal respirations, are characterized by forceful efforts to breathe with minimal or no air passage (because the upper airway is obstructed).  This results in something called "chest-abdominal paradox,"[23] a phenomenon well-recognized by anesthesiologists and sleep medicine specialists as a physical sign that the airway is blocked.

28. In normal, unobstructed respiration while laying supine (on one's back) during inspiration, the diaphragm contracts downward into the abdomen.  The abdomen rises, because the diaphragm pushes the abdominal contents upward.  At the same time, the movement of the diaphragm creates a vacuum in the chest, and under normal circumstances air rushes in through

---

[21] Van Norman G. A matter of life and death; what every anesthesiologist should know about the medical, legal and ethical aspects of declaring brain death. Anesthesiology 1999; 91:275-87
[22] Perkins GD, Walker G, Christensen K, Hulme J, Monsieurs KG.  Teaching recognition of agonal breathing improves accuracy of diagnosing cardiac arrest. Resuscitation.  2006; 70:432-7
[23] Berry R.  Monitoring respiration—event definition and examples.  In: Fundamentals of Sleep Medicine. Saunders/Elsevier Inc.  Philadelphia PA.  2012.  pp 119-140

the trachea to fill the extra space created in the chest when the diaphragm contracts.  Thus, the chest rises together with the abdomen as the chest expands with the inrushing air.

29.     In chest-abdominal paradox, however, the movements of the chest and abdomen become disconnected.  The diaphragm contracts, moving into the abdomen and pushing the abdominal organs upward, causing the abdomen to rise.  But the upper airway is obstructed, and no air enters the chest.  As the diaphragm pulls down into the abdomen, it sucks the chest wall down with it.  In this sequence the chest collapses inward while the abdomen is rising—giving the appearance of the chest and abdomen rocking opposite of one another, or a heaving abdomen.  If the sequence continues, recruitment of chest wall muscles to breathe more forcefully and pull air into the chest causes the chest to rise, but again no air is entering the chest because the upper airway is obstructed.  This motion causes the vacuum in the chest to increase, overcoming the pull of the diaphragm downward.  The diaphragm is then "sucked" back toward the chest to fill the space where air should go, and the abdominal organs fall inward and are sucked upward toward the chest as well.  The chest rises, but at the same time the abdomen collapses inward, and rocking in the opposite direction occurs.  The sequence repeats, often with increasing recruitment of accessory muscles, and deepening of the heaving, until either the airway opens, or the muscles lose strength and then cease to move altogether.

30.     I have read descriptions of Mr. LeCroy's execution by media eyewitness George Hale.  Hale described continued *forceful efforts to breathe* during the execution of LeCroy.  He stated that "LeCroy's torso jerked and contracted uncontrollably for about a minute" after the pentobarbital was administered.[24]  After this period of jerking and contracting, Mr. LeCroy's eyes closed, and "[a]side from shallow breaths, he barely moved again."[25]  Mr. Hale's Twitter feed recounts very similar observations, including that "[a]lmost immediately" upon start of the execution, Mr. LeCroy's "torso began to jerk and contract uncontrollably."[26]  The jerking and contracting lasted for "a minute or a bit longer," during which time Mr. LeCroy's eyes were "open and looking upward."[27]  Thereafter, Mr. LeCroy "remained almost entirely still for the next 12 minutes or so" with only "very faint signs of breathing."[28]  In other words, respiratory efforts continued until the time of death.

31.     Another media eyewitness, Michael Tarm, reported similar observations: "LeCroy kept his eyes open as someone out of his view in an adjacent room began administering the lethal injection of pentobarbital. His eyelids grew heavy while his midsection began to heave

---

[24] Adam Pinsker and George Hale, *Federal government execute inmate for murder, rape of Georgia woman*, Indiana Public Media (Sept. 22, 2020), https://indianapublicmedia.org/news/federal-government-executes-man-for-murder-and-rape-of-georgia-woman.php (last visited Sept. 28, 2020).
[25] *Id.*
[26] George Hale (@georgehale), Twitter (Sep. 24, 2020), https://twitter.com/georgehale/status/1309010208539185154?s=20.
[27] *Id.*
[28] *Id.*

uncontrollably."[29]  Mr. Tarm also reaffirmed these observations in his Twitter feed, stating that, Mr. LeCroy "kept his eyes open as the lethal injection was administered," later closing them "as his midsection quickly started to heave."[30]

32. A third eyewitness to Mr. LeCroy's execution also explicitly confirms both obstructed breathing, and that Mr. LeCroy's eyes were open while he was fighting for breath, and closed only later.  Jordan Kudisch, a media reporter, stated that "he started very calm.  The next thing I noticed was that his stomach started moving.  His stomach was going up and down.  It was very intense.  He was grasping for air.  I mean, he was literally grasping for the rest of his life, the last breath.  The next thing that happened was I saw his mouth drop and the eyes close."[31]

33. A critical observation was made by all three witnesses: Mr. LeCroy's eyes were open when the jerking movements began, *and then he closed them after struggling for breath.*  This demonstrates that Mr. LeCroy *was still responsive when his airway obstructed and his lungs were filling with fluid.*

34. These accounts clearly do NOT describe the slow, periodic, deep agonal respiration of cardiac arrest.  Chest-abdominal paradox does not occur during agonal respiration.  At the time that the respiratory efforts were witnessed, cardiac arrest had not occurred—at that time, Mr. LeCroy's heart was still beating, and continued to beat for at least 12 more minutes. Rapid and strenuous, heaving efforts to breathe are NOT agonal respirations by definition, nor by validated medical observation tools. Rather the observations by three independent eyewitnesses clearly describe the classic motion of chest-abdomen paradox, a characteristic indicator of breathing attempts in the presence of an obstructed airway, while Mr. LeCroy was still aware and experiencing flash pulmonary edema.

**Awareness During the Execution and Sensations of Drowning**

35. Dr. Crowns stated in his Declaration dated August 10, 2020 that prisoners do not feel the sensations of drowning caused by flash pulmonary edema because of the amount of time needed for the pentobarbital "to clear from the respiratory and cardiac receptors of the brain stem."  This statement demonstrates that he has not reviewed the data on awareness after administration of anesthetic agents, and that he does not understand the difference between responsiveness and awareness.  (Please refer to my Expert Declaration dated November 1, 2019, pages 12-29, for a discussion of the brain effects of anesthetic drugs, including barbiturates, and consciousness vs. unresponsiveness).  As a pathologist, Dr. Crowns does not have experience

---

[29] Michael Tarm, *US government executes killer obsessed with witchcraft*, AP News (Sept. 21, 2020), https://apnews.com/article/donald-trump-indiana-terre-haute-archive-executions-ad069e143126b4abb8ac65a1482cb13a (last visited Sept. 28, 2020).

[30] Michael Tarm (@mtarm), Twitter, (Sep. 22, 2020), https://twitter.com/mtarm/status/1308583364195225600?s=20.

[31] *News 10's Jordan Kudisch describes William LeCroy's final moments*, WTHI-TV (Sept. 22, 2020), https://www.wthitv.com/content/video/572499751.html (last visited Sept. 29, 2020).

administering these drugs, and is not sufficiently knowledgeable about the way they work clinically.

      36.    As I have discussed in previous reports, studies using the gold standard for testing awareness—the isolated forearm technique (IFT)—have demonstrated that even though subjects are unresponsive, they can retain awareness during anesthesia. (Please refer to my November 1, 2019 reports, pages 19-29, for a more complete discussion of responsiveness and awareness, and for a discussion of clinical studies using the IFT that demonstrate and patients remain aware after administration of anesthetic drugs.)

      37.    As noted above, it is a critical observation that Mr. LeCroy held his eyes open when struggling respiratory movements began, *and then afterward he closed them*. This demonstrates that Mr. LeCroy *was still responsive* when his airway was obstructed and pulmonary edema fluid was filling his lungs. Even if Mr. LeCroy had not held his eyes open, it should be noted that a lack of movement, or responsiveness, does not correlate with a lack of awareness. If we see responsiveness, it is useful, but not determinative in diagnosing awareness—clinical studies clearly prove that awareness is present even when there is no responsiveness. (Please see my report dated November 1, 2019, pages 12-29.)

I declare under penalty of perjury that the foregoing is true and correct to a reasonable degree of medical certainty.

Signed: *Gail A. Van Norman, MD*

Dated: Sept 29, 2020