# DECLARATION OF KENDALL VON CROWNS, M.D.

I, KENDALL VON CROWNS, under the penalty of perjury, declare the following to be true and correct:

1. My name is Kendall Von Crowns, MD. I am board-certified by the American Board of Pathology in Anatomic Pathology with subspecialty certification in Forensic Pathology. I practice forensic pathology full time in the State of Texas. I am also the Deputy Chief Medical Examiner of the Travis County Medical Examiner's Office in Austin, Texas. In addition, I am an Assistant Professor of Practice and Director of the Forensic Fellowship Program at the Travis County Medical Examiner's Office, Clinical Assistant Professor at the University of Texas Medical Branch, and Adjunct Assistant Professor at the Texas A & M Health Science Center. I have determined cause and manner of death in thousands of autopsies including cases of suicides in which an intentional overdose of pentobarbital was a direct or contributing factor in the cause of death.

2. The eyewitness accounts of the execution of William LeCroy from the media were varied in their exact description of the symptoms exhibited at the time of the execution. The one consistent reported finding from all the reports was that the execution took 20 minutes from start to finish. In some of the reports Mr. LeCroy was noted to blink, slowly close his eyes, and begin breathing through his mouth until his breathing slowed and eventually his heart stopped. In the reports attached as exhibits to the plaintiffs' filing on September 29, 2020, it was reported that his mid-section began to "heave uncontrollably" as his eyes began to close. Only reporter George Hale gives a possible timeline for this event. He describes that "almost immediately' upon the pentobarbital being injected that Mr. LeCroy "torso began to jerk and contract uncontrollably" for a minute or a bit longer.

3. From this description, it is not established that Mr. LeCroy's immediate physical reaction was caused by acute (flash) pulmonary edema or respiratory efforts due to an obstructed airway. As I have stated in my previous declaration the symptoms observed with pulmonary edema would be shortness of breath (dyspnea), increased respiration (tachypnea) wheezing, gasping, coughing, and noisy labored breathing. Particularly in the case of an acute upper airway obstruction, there would also be sudden violent coughing, gagging, vomiting, noisy breathing and struggling to breathe. Any of these symptoms if they existed would continue to persist after the loss of consciousness until respiratory depression caused the individual to stop breathing. The symptoms would not begin and then subside.

4. Neither Mr. Hale nor his other reporter colleagues describe Mr. LeCroy as wheezing, coughing, gagging, vomiting, exhibiting noisy breathing. It is highly unlikely that anyone suffering from flash pulmonary edema would exhibit uncontrollable heaving of their torso without one or more of these other effects.

5. Assuming that Mr. Hale and the media accounts supplied by Plaintiffs offer a more accurate description of LeCroy's behavior than the accounts by others in the media and by the Bureau of Prisons, a more likely explanation for what was described in those accounts would be hyperventilation (rapid irregular breathing) due to anxiety. Mr. LeCroy would naturally have anxiety to his impending death. The symptoms associated with anxiety include hyperventilation, sweating, headache, shaking, trembling, shortness of breath (dyspnea), muscle twitches/spasms, chest pain, and heart palpitations. Any of these symptoms could be misinterpreted as being related to the pentobarbital but they would exist prior to the onset of the effects of the drug. From Mr. Hale's description the uncontrolled heaving gave way to Mr. LeCroy exhibiting faint signs of breathing and Mr. LeCroy laid entirely still for several minutes. From this description it is more likely that Mr. LeCroy was experiencing hyperventilation due to the anxiety associated with his impending death that was overcome by the sedative effects of the pentobarbital that eventually resulted in his death.

6. The declaration of Eric Williams in regard to the execution of Mr. LeCroy states that Mr. LeCroy took a deep breath shortly after the lethal injection substances were administered and subsequently began to snore loudly one time. He notes that he could continue to see Mr. LeCroy's chest rise and fall. He does not state that there was any irregular or uncontrolled heaving. He also states that after the moment of snoring that Mr. LeCroy appeared to be in a deep comfortable sleep with his eyes closed. This description is different than some of the reporter's descriptions and is more in line with previous descriptions of the executions of inmates Purkey, Honken and Lee

7. Mr. LeCroy was noted to be obese with a pronounced abdominal area. His height was 6 foot 5 inches, and his weight was reported to be 288 pounds. His body mass index (BMI) would equal 34.1 which is considered obese. He was noted to have a pronounced abdominal area that protruded under the sheet and the rise and fall of his abdomen was very apparent. When an obese individual is laid flat on their back their protuberant abdomen (panniculus) will be more prominent than a non-obese individual. The fact that their abdomen would be so readily observed would make any movement more exaggerated/notable when compared to a person of normal weight and could result in misinterpretation of possible distress.

8. Finally, due to Mr. LeCroy's obesity, being laid flat on his back could make it more difficult for him to breathe due to the compressive effects of the panniculus compressing the abdomen and restricting the diaphragm causing the lungs not to fully expand. This can cause shortness of breath (dyspnea) or labored breathing.

9. My opinions are reached to a reasonable degree of medical certainty and I reserve the right to change my opinions should more or different information become available.

Date: 10/8/20

Kendall Von Crowns, MD