**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,** ) ) ) ) | |
| **Lead case:** *Roane et al. v. Barr et al.* ) ) ) ) | **Case No. 19-mc-00145-TSC** |
| **THIS DOCUMENT RELATES TO:** ) ) ) | |
| *Roane, et al. v. Barr, et al.,* No. 05-2337 ) | |

<u>**MOTION TO INTERVENE BY LISA MARIE MONTGOMERY
AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**</u>

Federally death-sentenced prisoner Lisa Marie Montgomery hereby moves, pursuant to

Fed. R. Civ. P. 24(a) and (b), to intervene in the case of *Roane v. Barr et al.*, No. 05-2337.

Plaintiff-Intervenor Montgomery states as follows in support of this motion:

1.      Plaintiff-Intervenor Montgomery is under a sentence of death. On October 16,

2020, the United States announced that it intends to execute Mrs. Montgomery on December 8,

2020.  On October 19, 2020, counsel for the Bureau of Prisons informed Mrs. Montgomery that

they would execute her at the men's prison, USP Terre Haute.

2.      It appears that the Defendants intend to employ the same lethal injection

execution protocol, and the same method of execution, that is the subject of the suit brought by

Plaintiff Roane and the other consolidated Plaintiffs.

3.      Pursuant to Fed. R. Civ. P. 24(c) as well as Local Civil Rule 7(j), Mrs.

Montgomery's proposed complaint is attached to this motion as Exhibit 1. The complaint itself

includes Exhibits A through F.

4.      Under Rule 24(a), a party is entitled to intervention as of right when that party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Mrs. Montgomery's motion satisfies those standards. She has an interest in the "transaction" that is the subject of Mr. Roane's lawsuit, i.e., the federal government's development, implementation and exercise of a new execution protocol.

5.      Without participating in the litigation of claims that she shares or substantially shares with Mr. Roane, the separate interests that Mrs. Montgomery has may be impaired by the Court's determination of the legal issues brought by Mr. Roane and the Defendants, as well as any determinations that might be reached by higher courts.

6.      Permissive intervention under Rule 25(b) is similarly appropriate. Such intervention lies when, among other circumstances, the party "has a claim or defense that shares with the main action a common question of law or fact." In this instance, Mrs. Montgomery brings four claims against the Defendants' 2019 Protocol, including three that parallel or substantially overlap Mr. Roane's claims. *Compare* Ex. 1 (attached), *with Roane* ECF Doc. 92 (amended complaint).

7.      Intervention is also justified as a matter of convenience to the parties and the Court. Logistically it is simpler for Mrs. Montgomery to intervene in Mr. Roane's suit rather than filing her own suit against the same defendants. Her complaint is supported by five expert declarations that this Court has already reviewed, and by a sixth, newly prepared declaration from an expert, Dr. Gail Van Norman, with whom the Court is already familiar.  If Mrs. Montgomery were to file a separate suit, the Court would likely consolidate it with Mr. Roane's

suit, as well as with the other federal lethal injection cases that are before it. Little purpose would be served by the expense and trouble of a separate lawsuit.

8.      Undersigned counsel has contacted counsel for the Defendants, Johnny Walker, III, who states that the Defendants take no position on this motion, but they reserve the right to argue, upon seeing any new arguments or claims, that any injunctive relief sought is inappropriate in light of Ms. Montgomery's delay in joining the litigation.  Undersigned has also consulted with counsel for the consolidated plaintiffs and they collectively take no position on this motion.

9.      This motion to intervene has been made as soon as reasonably possible after the surprising news that Mrs. Montgomery's execution would proceed on an expedited basis.  Mrs. Montgomery finished her standard appellate process on August 3, 2020, when the United States Supreme Court denied rehearing on the denial of her petition for certiorari.  She was given notice on the late afternoon of Friday, October 16, 2020 that her execution had been scheduled for December 8, 2020.  She was informed on Monday, October 19, 2020, that she would be executed at the men's prison in Terre Haute, Indiana (as opposed to at a women's prison in Texas where she has been housed, or a prison in her State of conviction, Missouri).  Approximately, 34 of the 55 federal death row inmates received their death sentences prior to Mrs. Montgomery; some were sentenced decades before her.  Thus, until the recent notices, she and her counsel were unaware that (a) the Federal Government intended to execute her, or any female inmates, at the men's prison in Terre Haute, Indiana, (b) that the new lethal injection protocol would be used for the execution of women prisoner's such as herself, and (c) that the defendants wished to expedite her execution *vis a vis* other federal death row inmates.

WHEREFORE, for all the foregoing reasons, Plaintiff-Intervenor, Lisa Marie Montgomery, respectfully requests, pursuant to Fed. R. Civ. P. 24(a) and 24(b), that she be granted leave to intervene in the case of *Roane v. Barr et al.*, No. No. 05-2537; that the Court file the proposed intervenor-complaint that is attached to this motion; and that the Court grant such other and further relief as may be fair, just, and equitable under the circumstances.

Dated:   October 28, 2020                     Respectfully submitted,

                                              KELLEY J. HENRY
                                              Chief, Capital Habeas Unit
                                              AMY D. HARWELL
                                              Asst. Chief, Capital Habeas Unit
                                              RICHARD LEWIS TENNENT
                                              Asst. Federal Public Defender
                                              Office of the Federal Public Defender
                                              810 Broadway, Suite 200
                                              Nashville, TN 37203
                                              (615) 736-5047
                                              Kelley_Henry@fd.org


                                   BY:    */s/ Kelley J. Henry*
                                              Counsel for Lisa Montgomery


## CERTIFICATE OF SERVICE

I certify that on October 28, 2020, a copy of the foregoing Motion to Intervene, was filed using the CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record. The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Johnny Hillary Walker, III
U.S. Attorney's Office for the District of Columbia
(202) 815-8708
Email: johnny.walker@usdoj.gov

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov
Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org
Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of
Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com
Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com
Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

/s/ *Kelley J. Henry*
KELLEY J. HENRY
Supervisory Assistant Federal Public Defender
Office of the Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203
(615) 736-5047
Kelley_Henry@fd.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES, | ) ) ) | |
| | ) | |
| Lead case:   *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | Case No. 19-mc-00145-TSC |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Roane, et al. v. Barr, et al.,* No. 05-2337 | ) | |

<u>COMPLAINT BY PLAINTIFF LISA MARIE MONTGOMERY</u>

### I. NATURE OF ACTION

1.     This is a civil action for declaratory and injunctive relief brought by Plaintiff Lisa Marie Montgomery for (i) violations and threatened violations of her right to be free from cruel and unusual punishment under the Eighth Amendment to the Constitution; and (ii) violations and threatened violations of her rights pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), the Food, Drug, and Cosmetic Act 21, U.S.C. § 301 *et seq.* ("FDCA"), and the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA").

2.     Mrs. Montgomery is a female prisoner, presently incarcerated at Federal Medical Center Carswell ("FMC Carswell") who has been sentenced to death under federal law.  Her standard appeals were final, as of August 3, 2020.  Defendants are the individuals charged by the federal government with carrying out the death sentences of Plaintiff and similarly situated federal prisoners. On October 16, 2020, Defendants scheduled Plaintiff's execution for December 8, 2020.  On October 19,

2020, Defendants notified Plaintiff she would be executed at the men's maximum security prison, United States Penitentiary Terre Haute. ("USP Terre Haute").

3.      On July 25, 2019, the United States Department of Justice ("DOJ") issued an addendum to the BOP Execution Protocol (the "2019 Addendum"). The 2019 Addendum provides that, except to the extent necessary to "comply with specific judicial orders," or in the discretion of the Director of the Bureau of Prisons, all federal executions will be conducted via a uniform procedure utilizing intravenous injection of five grams of Pentobarbital Sodium ("pentobarbital"), a controlled substance under the CSA. On November 13, 2019, the DOJ publicly filed the Administrative Record (R. 39-1), which included a revised BOP Execution Protocol that replaced the prior version. (The new BOP Execution Protocol announced by the DOJ and the 2019 Addendum are sometimes referred to herein collectively as the "2019 Protocol.")

4.      It appears that Defendants intend to carry out the execution of Mrs. Montgomery pursuant to the 2019 Protocol, as no notice has been provided to Plaintiff that some other protocol, applicable to women, or to inmates at FMC Carswell will be applied.  Per e-mail sent to counsel for Plaintiff on October 19, 2020, Plaintiff has been informed that she will be moved to USP Terre Haute at some date, and will be executed at that location on December 8, 2020.

5.      The 2019 Protocol presents a "substantial risk of serious harm" and therefore violates the Eighth Amendment. *Baze v. Rees*, 553 U.S. 35, 50 (2008); *see also Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion) (holding that the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain").

2

Plaintiff, by and through counsel, has alleged below several alternatives to the 2019 Protocol, all of which are feasible, available, and significantly reduce the substantial risk of harm presented by the 2019 Protocol.

6. The 2019 Protocol, as applied against Mrs. Montgomery, presents additional substantial risks of harm in light of her serious health conditions, which include, but are not limited to Prinzmetal angina, cardiac dysthymia, idiopathic peripheral neuropathy, asthma, sleep apnea, hyperthyroidism, brain damage likely secondary to fetal alcohol exposure and childhood head trauma, leading to complex partial seizures, and complex post-traumatic stress disorder from repeated childhood rapes and other sexual trauma (including sex trafficking of the Plaintiff as a young child by her parents), physical abuse and extreme neglect, with associated mental health disorders, including bipolar disorder with psychotic features.

7. The 2019 Protocol violates the APA because it contravenes the CSA and the FDCA, which forbid the dispensing of prescription-only drugs – including the Schedule II controlled substance pentobarbital – without the issuance of a valid prescription issued for a legitimate medical purpose, as well as the unprescribed compounding of a drug that is essentially a copy of a commercially available drug that is approved by the Food and Drug Administration ("FDA"). These violations require that the 2019 Protocol be vacated under the APA because it is "not in accordance with law," is "in excess of statutory jurisdiction, authority or limitations," is "short of statutory right" and is "arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. § 706(2). The 2019 Protocol constitutes an "arbitrary and capricious" agency action

3

under the APA because Defendants have ignored and otherwise violated their duties to comply with federal drug-related statutes aimed at making a regulated drug such as pentobarbital safe and effective for the pain-minimizing purpose that Defendants claim as their motivation for selecting that drug for executions.

8.      The claims in this complaint are cognizable under the constitutional and statutory grounds identified above and described in more detail below. This action is not, and should not be treated as, a successive habeas corpus petition. Plaintiff does not challenge the validity of her conviction or death sentence through this action. Rather, she claims that the 2019 Protocol by which her scheduled execution is to be implemented violates the APA, other applicable laws, and the United States Constitution.

9.      Accordingly, Mrs. Montgomery seeks the following relief in this action: (a) a preliminary and permanent injunction preventing the Defendants from executing her pursuant to the 2019 Protocol; (b) an order declaring that the implementation or use of the 2019 Protocol violates Plaintiff's rights under the Eighth Amendment of the United States Constitution; (c) an order declaring that the adoption and use of the 2019 Protocol violates the APA, the FDCA, and the CSA; and (d) any such other equitable relief as this Court deems just and proper.

## II. PARTIES

10.      Plaintiff, Lisa Marie Montgomery, is a United States citizen, a woman, and a prisoner in the custody of Defendants and under the control and supervision of the BOP, which is a department of the DOJ. In April 2008, in the United States District Court for the Western District of Missouri, Mrs. Montgomery was sentenced

4

to death, following her conviction for kidnapping resulting in death. She is currently incarcerated at the Carswell Federal Medical Center in Fort Worth, Texas ("FMC Carswell"). On October 16, 2020, Defendants scheduled her execution for December 8, 2020.  On October 19, 2020, by email, Mrs. Montgomery was informed that her execution would be conducted at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute").

11.     Defendant William P. Barr is the Attorney General of the United States. Plaintiff was remanded into the Attorney General's custody upon her conviction and death sentence. To the extent authorized by Congress, the Attorney General prescribes the means for implementing federal judicial death sentences. He is the final executive authority responsible for carrying out sentences of death against federal prisoners. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

12.     Defendant Michael Carvajal is the Director of the United States Bureau of Prisons. As such, he is charged with prescribing and directing the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and, under the 2019 Protocol, execution procedures. Mr. Carvajal is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.  Pursuant to 28 C.F.R. § 26.03(a) he is vested with the sole authority to designate the date, time and location for a prisoner's execution.

13.     Defendant Jeffrey E. Krueger is the Regional Director of the North Central Region of the BOP. Mr. Krueger is responsible for operations at USP Terre

Haute, and plays a role in the promulgation of rules and regulations for USP Terre Haute, including rules and regulations for the conduct of prison operations and executions. Mr. Krueger is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

14.     Defendant Donald W. Washington is the Director of the U.S. Marshals Service ("USMS") and is responsible for all agency operations. Under Section 3596 of the Federal Death Penalty Act, a U.S. Marshal "shall supervise implementation" of Plaintiffs' death sentences "in the manner prescribed by the law of the State in which the sentence is imposed." Mr. Washington is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

15.     Defendant Nicole C. English is the Acting Assistant Director, Health Services Division, of the BOP. Ms. English is responsible for overseeing the provision of medical care to prisoners at all BOP facilities, including FMC Carswell and USP Terre Haute, and for promulgating and implementing BOP policies with respect to medical care provided by the BOP. Ms. English is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

16.     Defendant T.J. Watson is the Complex Warden of Federal Correctional Complex Terre Haute, which includes USP Terre Haute. Mr. Watson is responsible for the management, oversight and operations at USP Terre Haute, including the oversight and implementation of executions. Mr. Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

17.     Defendant William Wilson, M.D., is the Clinical Director at USP Terre Haute. In that position, he is responsible for overseeing the provision of medical care to prisoners at that facility. Dr. Wilson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

18.     Defendants John Does I-X (the "John Doe Defendants") are employed by, or have contracted with, the BOP and/or USMS to provide consultations for, prepare for, and/or carry out the Plaintiff's execution. Plaintiff does not know, and the Defendants have refused to reveal, the identities or positions of the John Doe Defendants. To the extent the John Doe Defendants are federal government employees, they are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

19.     Upon information and belief, unless preliminarily and permanently enjoined, the Defendants will act in their respective official capacities and under the authority of federal law in executing Mrs. Montgomery, in violation of Plaintiff's constitutional and statutory rights.

### III. JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this action arises and seeks relief under the laws and Constitution of the United States, specifically, the Eighth Amendment of the U.S. Constitution, the APA, 5 U.S.C. §§ 702-706, 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

21.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the BOP headquarters is in this District and a substantial part of the events giving rise to the

claims made herein by Plaintiffs, including the formulation and authorization of the 2019 Protocol, took place and continue to take place in this District.

## IV. TIMELINESS

22.     Mrs. Montgomery was sentenced to death on April 4, 2008, however, the District Court stayed execution "[i]f an appeal is taken."  Appeal was filed on April 5, 2008.  Pursuant to the District Court's judgment and stay order, no execution date was set by the Director of the Bureau of Prisons.

23.     On June 22, 2011, the Eighth Circuit Court of Appeals, having denied appellate relief, issued the mandate.  On March 19, 2012, the United States Supreme Court denied Mrs. Montgomery's Petition for Certiorari.  The District Court did not dissolve the previously issued stay, and no execution date was set by the Director of the Bureau of Prisons.

24.      On March 19, 2013 a Motion to Vacate pursuant to 28 U.S.C. § 2255 was filed by Mrs. Montgomery.  This Motion was denied by the District Court on March 3, 2017.  Appeal was taken, and denied by the Eight Circuit Court of Appeals on January 25, 2019.  On April 19, 2019 the Mandate issued.  On May 26, 2020, the United States Supreme Court denied Plaintiff's Petition for Certiorari, and on August 3, 2020 the Court denied Plaintiff's Petition for Rehearing.

25.     Since, the denial of rehearing on August 3, 2020, no orders have been issued by the District Court, and the preexisting stay has not been lifted.  Rather, on the late afternoon of Friday, October 16, 2020, the United State Attorney filed notice with the court that the Director had scheduled the date of Mrs. Montgomery's execution, pursuant to 28 C.F.R. Part 26, for December 8, 2020.  Accompanying this

8

Notice was a letter to Plaintiff, from the Warden for FCC Terre Haute, providing "official notification that pursuant to Title 28, Code of Federal Regulations, Section 26.3(a)(1) the Director of the Federal Bureau of Prisons has set December 8, 2020, as the date for your execution by lethal injection."  Neither the formal Notice, nor the letter informed Plaintiff where she was to be executed.

26.    On October 19, 2020, by email to counsel, Mrs. Montgomery was informed that the Bureau of Prisons intends to transfer her to the all-male prison, USP Terre Haute, for execution.

27.    This Complaint is filed within 12 days of Mrs. Montgomery receiving notice of her scheduled execution, and within 9 days of being informed she would be executed at USP Terre Haute.[1]  This Complaint is filed 41 days prior to her scheduled execution.

28.    Mrs. Montgomery would observe that Notice of Execution was unexpected.  There are 55 prisoners awaiting execution in the U.S. Bureau of Prisons. At least 34 of those prisoners were sentenced to death prior to Plaintiff.  9 were sentenced to death in the 1990s and have been awaiting execution for over two decades.

---

[1] But for technical filing difficulties, this Complaint would have been filed on October 27, 2020, within one-day of receiving Dr. Van Norman's case-specific declaration.

9

## V. FACTS

### A.   The History of the Federal Lethal Injection Protocol

29.   Beginning in 1937, Congress required federal executions to be conducted in the manner prescribed by the state of conviction. *See* 50 Stat. 304 (formerly 18 U.S.C. § 542 (1937)), recodified as 62 Stat. 837 (formerly 18 U.S.C. § 3566) (the "1937 Act").

30.   The death penalty was briefly held unconstitutional. *See Furman v. Georgia*, 408 U.S. 238 (1972). The Supreme Court's decision in *Gregg v. Georgia*, 428 U.S. 153 (1976), readopted the constitutionality of the death penalty.

31.   In 1984, Congress repealed the 1937 Act, leaving the federal government without a mechanism for carrying out executions. In 1988, Congress passed the Anti-Drug Abuse Act, which reinstated the death penalty for certain federal crimes but did not specify a procedure for implementation.

32.   On November 30, 1992, the DOJ published a proposed rule seeking to "establish[] procedures" for carrying out federal death-penalty sentences. Implementation of Death Sentences in Federal Cases, 57 Fed. Reg. 56,536 (Nov. 30, 1992) (to be codified at 28 C.F.R. pt. 26). The DOJ received and considered comments from (among others) medical associations, physicians, criminal defense attorneys, and advocates for prisoners' rights.

33.   On February 18, 1993, the DOJ issued a set of regulations, referred to as the "Final Rule," that purported to establish a protocol for carrying out the executions of prisoners "sentenced to death for commission of an offense described in any federal statute." 28 C.F.R. § 26.1. The Final Rule provided that executions would

10

take place at a federal prison by "intravenous injection of a lethal substance." *Id.* § 26.3(a)(4). The Final Rule provided little detail about the manner of execution and did not identify the drug or drugs to be used in executions.

34.    In 1994, Congress enacted the Federal Death Penalty Act ("FDPA"), establishing that federal death sentences shall be implemented as follows:

> When the [death] sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.

18 U.S.C. § 3596(a). The FDPA superseded the Final Rule and once again assigned to the USMS sole responsibility and authority to supervise the implementation of federal death sentences.

35.    In 2004, the DOJ adopted a new BOP Execution Protocol for carrying out federal death penalty sentences (the "2004 Protocol"). The 2004 Protocol included additional detail about how executions would be administered, but was silent about the drug or drugs to be used in executions.

36.    In December 2005, several condemned prisoners initiated this action by challenging the 2004 Protocol as violating the APA, the CSA, and their rights pursuant to the Fifth and Eighth Amendments of the U.S. Constitution. This Court issued preliminary injunctions preventing the executions of those prisoners during the pendency of the litigation.

37.    While this litigation was pending, the BOP updated the 2004 Protocol by issuing addenda in 2007 and 2008 (the "2008 Addendum"). The 2008 Addendum specified that executions would be carried out using three drugs: sodium pentothal,

11

pancuronium bromide, and potassium chloride. (The 2004 Protocol and 2008 Addendum will collectively be referred to as the "2008 Protocol.")

38.     In May 2011, the BOP announced that it did not have the drugs necessary to implement the 2008 Protocol and was considering revisions to the execution protocol. After the announcement, the ongoing proceedings were stayed. For the next eight years, the DOJ submitted quarterly status reports indicating that protocol revisions were ongoing.

39.     On July 25, 2019, the DOJ issued a press release announcing the scheduling of five executions: three in December 2019 and two in January 2020, all to be carried out at USP Terre Haute.

40.     On the same day, the DOJ announced that, at the direction of Defendant Barr, the BOP had adopted the 2019 Addendum. The 2019 Addendum replaced the previous three-drug procedure with a procedure using a five-gram dose of pentobarbital.

41.     On November 13, 2019, the BOP publicly filed the Administrative Record, including a revised execution protocol (the 2019 Protocol), which replaced the 2008 Protocol.  (The Administrative Record was supplemented twice thereafter.) The 2019 Protocol included the 2019 Addendum and also removed key provisions that had been included in the 2008 Protocol, including a detailed plan for responding to unexpected occurrences during executions.

42.     On July 31, 2020, BOP revised its execution protocol to shorten the number of days' notice that death-sentenced prisoners would be given in advance of an execution date. *Roane v. Barr*, No. 19-mc-145-TSC, ECF No. 171 at 1-2.

43.     The 2019 Protocol, including the 2019 Addendum, constitute DOJ/BOP "statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). They are therefore "rule[s]," as defined by the APA. *Id.*

B.     **The 2019 Protocol**

1.     **The 2019 Protocol violates applicable law.**

a.     **The CSA**

44.     The CSA makes it unlawful to "dispense" any "controlled substance" except pursuant to a valid prescription issued by a practitioner who is registered pursuant to the statute and is "acting in the usual course of his professional practice." 21 U.S.C. §§ 822, 829, 841(a)(1); 21 C.F.R. § 1306.04(a). In addition, regulations promulgated by the DEA provide that every person who "dispenses" a "controlled substance" is required to obtain a registration, and that the DEA Administrator "shall deny" an application for registration unless the issuance of a registration is "required" under the CSA. 21 C.F.R. § 1301.35.

45.     Defendants have confirmed that they do not intend to obtain a prescription for the pentobarbital they intend to use to execute Mrs. Montgomery. *See* Miller Dep. at 29:18-21.

46.     The 2019 Protocol violates the CSA because it requires the dispensing and administration of pentobarbital, a Schedule II controlled substance, without a valid prescription, by persons who are not acting in the course of professional practice and/or who lack a valid registration, and by not requiring the persons who will dispense the pentobarbital to apply for a registration.

### b.     The FDCA

47.     The FDCA applies to drugs used in lethal injection executions and conditions the dispensing of FDA-approved drugs such as pentobarbital upon either (a) "a written prescription of a practitioner licensed by law to administer such drug," or (b) "an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist."  21 U.S.C. § 353(b)(1)(B).

48.     A prescription must be a "bona fide order" reflecting a genuine practitioner-patient relationship. *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002). It directs "the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination or consultation by a licensed doctor—and does not include pieces of paper by which physicians are directing the issuance of a medicine, remedy, or drug to patients who do not need it, persons they have never met, or individuals who do not exist." *Id.*

49.     The 2019 Protocol violates the FDCA because it requires the dispensing and administration of pentobarbital and/or compounded pentobarbital without a valid medical prescription. Medical prescriptions are available for pentobarbital and/or compounded pentobarbital as evidenced by the fact that two of the five states

14

whose methods Defendants relied on in crafting the 2019 Protocol utilize such prescriptions.

50.     The FDCA also prohibits compounding of a drug that is "essentially a copy of one or more approved drugs." 21 U.S.C. § 353b(a)(5). The compounded pentobarbital Defendants intend to use to execute Plaintiff is "essentially a copy" of, is "identical or nearly identical to," and contains a "bulk drug substance" contained in FDA-approved pentobarbital, including Nembutal and generic products. 21 U.S.C. § 353b(d)(2)(A)-(B). The 2019 Protocol violates the FDCA because FDA-approved pentobarbital, including Nembutal and generic products, are marketed and commercially available drug products under the FDCA.

51.     In addition, Defendants procured the pentobarbital from an "outsourcing facility," AR1084, but their non-compliance with important limitations on outsourcing facilities independently violates the FDCA.

52.     Any API that an outsourcing facility uses to make compounded drugs *must* appear either (1) on the FDA's "503B Bulks list" based on the agency's determination of "clinical need," or (2) on the FDA's list of drug shortages – two designations that would justify the use of a comparatively risky compounded drug rather than the more thoroughly regulated FDA-approved version. *See* 21 U.S.C. § 353b(a)(2)(A). Because the FDA has neither placed pentobarbital API on the "503B Bulks list," nor identified it on its list of drug shortages, production of pentobarbital by an outsourcing facility is unlawful.

53.     Under the APA, any agency action that is "not in accordance with [the] law," "in excess of statutory jurisdiction, authority, or limitations," "contrary to constitutional right, power, privilege, or immunity," or taken "without observance of procedure required by law" must be set aside. 5 U.S.C. § 706(2)(A)-(D). The 2019 Protocol violates the CSA and the FDCA, is thus "not in accordance with [the] law," and under the APA must be set aside.

## 2.     Pentobarbital and Flash Pulmonary Edema

54.     The 2019 Protocol provides that "[t]he lethal substances to be utilized in federal lethal injections shall be Pentobarbital Sodium." 2019 Addendum ¶ C. The 2019 Protocol further provides that executions will be administered using two syringes each containing "2.5 grams of Pentobarbital Sodium in 50 mL of diluent," and a third syringe containing "60 mL of saline flush." *Id.* ¶ H.

55.     Pentobarbital is a barbiturate that affects the activity of the brain and nervous system. It is clinically indicated for use as a pre-anesthetic, a sedative, and for treatment of brain-swelling, seizures, and insomnia.

56.     Barbiturates such as pentobarbital "do not guarantee lack of consciousness." Decl. of Gail Van Norman, M.D. ("Van Norman Decl."), at 7 (Nov. 1, 2019), Exhibit A. Pentobarbital produces only unresponsiveness, not unconsciousness or lack of awareness, so prisoners given a five-gram dose of pentobarbital will remain sensate and feel the effects of the execution. "[E]ven when the patients appear to be unconscious by all clinical measures and are unresponsive, . . . consciousness will permit extreme pain and suffering during the execution process." *Id.*

16

57.     Pentobarbital has a high alkaline pH of approximately 9.5, significantly higher than normal blood pH. Defendants' supplies of pentobarbital, to the extent they have been analyzed and disclosed, show even higher pH readings, specifically, 9.91, 10.0, 10.03, 10.3, and 10.12. Decl. of Mark A. Edgar, M.D. ("Edgar Decl."), at 19 (Oct. 24, 2019), Exhibit B.

58.     As a result of pentobarbital's high pH level, injection of a high dose of pentobarbital (including five grams as required by the 2019 Protocol) will cause "virtually instantaneous" non-cardiogenic or "flash" pulmonary edema. Ex. A, Van Norman Decl. at 33. Flash pulmonary edema results from the "direct toxic/caustic damage to the lung capillaries as extremely high concentrations of barbiturates (which are highly alkaline and caustic) make physical contact with the lung and capillary surfaces, causing immediate leakage of fluid through the damaged capillaries into the lungs." *Id.* at 32; *see also* Ex. B, Edgar Decl. at 19-20. Flash or non-cardiogenic pulmonary edema is distinguished from cardiogenic pulmonary edema, which occurs much more gradually when fluid backs up in the lungs as a result of heart failure. *Id.* at 20.

59.     Flash pulmonary edema will produce "foam or froth in the small/lower or large/upper airways (bronchi and trachea) resulting from the mixture of air, edema fluid, and pulmonary surfactant (a detergent-like secretion normally present in the airspaces)." *Id.* at 4. As a result, flash pulmonary edema causes "obstruction or partial obstruction of the upper airway due to effects of barbiturates on respiratory centers in the brain, or due to laryngospasm (a spasmodic, involuntary closure of the larynx)

17

while respiratory efforts continue against the obstruction or partial obstruction, 'sucking' fluids from the capillaries into the lung air spaces" – a mechanism known as "negative pressure pulmonary edema." Ex. A, Van Norman Decl. at 32. Pulmonary edema may also result from "acute left heart failure due to direct toxic effects of barbiturates on the heart, leading to 'backing up' of blood into the lungs." *Id.*

60.     The experience of acute pulmonary edema prior to the loss of consciousness "produces sensations of drowning and asphyxia," and therefore, "the experience of this condition in an inmate who was still sensate would result in extreme pain, terror and panic," Edgar Decl. at 21, feelings made "more frightening by being positioned lying flat in restraints," "which aggravates the noxious sensations of pulmonary edema." *Id.* at 22. Pulmonary edema causes an "excruciating" experience comparable to death by drowning:

> Not being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man. It is nearly impossible for most untrained human beings to hold their breath voluntarily for more than 1 minute. In less than 60 seconds, sensations of asphyxia and compulsion to breathe appear and rapidly overwhelm the brain. Panic and terror, and the attempt to fight take over. Even human beings who are underwater will reach such a level of agony that they will be compelled to take a "breath" within about 1 minute. This is the sensation that is deliberately elicited in "the enhanced interrogation technique" called waterboarding, which is defined by the European Court of Human Rights as a form of torture.

Ex. A, Van Norman Decl. at 34 (emphasis omitted).

61.     "Flash" or "acute" pulmonary edema occurs in the "vast majority, if not all" of pentobarbital executions. *Id.* at 31.

62.     Flash pulmonary edema occurs "virtually immediately during and after high-dose barbiturate injection," and well within the time frame for pentobarbital to

18

carry out its peak effects on the brain. *Id.* at 36. It is therefore "extremely likely" that prisoners executed with pentobarbital will experience sensations of drowning and suffocation when they die. *Id.* It is likewise "extremely likely" that prisoners who are injected with five grams of pentobarbital under the 2019 Protocol will remain "capable of feeling pain, terror, and suffocation." *Id.* at 7. And it is a "virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of [the] effect of IV injection of 5 grams of pentobarbital." *Id.*

63.     A review of over two dozen autopsy reports confirms that it is a "virtual medical certainty" that most, if not all, prisoners executed with a single dose of pentobarbital, as under the 2019 Protocol, experienced "immediate, flash pulmonary edema." *Id.* at 36. Prisoners' autopsy reports also confirmed the presence of moderate to severe pulmonary edema, "many with fluid filling their major airways." *Id.* at 35. The presence of froth, foam or fluid in the airways indicated the onset of flash, non-cardiogenic pulmonary edema (not cardiogenic pulmonary edema) caused by "immediate toxic damage to the pulmonary capillaries by the" pentobarbital, *id.* at 35-36, and further indicated that the prisoners continued to breathe after the onset of the edema—as  demonstrated by the mixing of edema-fluid and air. *Id.* at 36; *see also* Ex. B, Edgar Decl. at 18, 20.

64.     Autopsy findings from the July 16, 2020 execution of Wesley Purkey are consistent with these prior reports. "Notable in [Mr. Purkey's] autopsy report was the finding of heavy congestion in both lungs caused by pulmonary edema." Decl. of Joel

B. Zivot ("Zivot Decl.") at 3 (Aug. 31, 2020), Exhibit C. Each lung weighed approximately 3 times the weight of a normal lung, and "[f]rothy pulmonary edema fluid was also seen" in the airways. *Id.* "[T]his choking fluid accumulation could only have occurred while Wesley Purkey was still alive." *Id.*

65.     Witness reports of executions also confirm that prisoners who were executed with a single dose of pentobarbital were sensate and continued to breathe after the onset of the edema, and, before losing consciousness, experienced acute symptoms of pulmonary edema, including burning sensations, labored breathing, gasping, and other signs of severe pain and respiratory distress. *See* Ex. B, Edgar Decl. at 19-21.

66.     Based on the foregoing, there is "an extremely high risk" that the 2019 Protocol will "caus[e] prisoners severe pain, and is virtually certain to cause prisoners excruciating suffering through their awareness of the sensations of suffocation and drowning caused by pulmonary edema." Ex. A, Van Norman Decl. at 6-8.

67.     The 2019 Protocol lacks sufficient detail and important requirements and safeguards to ensure that the pentobarbital Defendants obtain for use in executions will meet minimum standards of purity and potency and function as intended. The problems attendant to the use of pentobarbital in executions are made significantly worse if the drug is contaminated, impure, sub-potent, or otherwise does not meet minimum standards of purity and potency, including pentobarbital that has expired, is past its "beyond use date," or has failed established quality control measures.

68.   Under those conditions, the pentobarbital "would not have the pharmacological effect as expected, potentially leading to the prisoner's prolonged suffering as a result." Decl. of Michaela Almgren, Pharm.D., M.S. ("Almgren Decl.") at 8 (Oct. 31, 2019), Exhibit D. Accordingly, the lack of requirements and safeguards in the 2019 Protocol materially and foreseeably increase the likelihood that prisoners will suffer severe pain and serious harm during executions.

a.    The 2019 Protocol contains no provisions, requirements, criteria, or safeguards regarding the methods for obtaining, storing, mixing, and appropriately labeling the pentobarbital; the chain of custody for the pentobarbital; or the minimum qualifications and expertise required for the person who will be determining the concentration, dosage, and rate of infusion to give. As to those crucial points, the protocol instead provides unfettered discretion without any criteria to guide the exercise of that discretion.

b.    The 2019 Protocol does not require or allow for the consideration of the prisoner's unique physical health and medical conditions and history as part of the determination of the appropriate dosage to be used. Rather, the 2019 Protocol fixes the same dosage to be used in every execution. *See* 2019 Addendum, ¶ H. In particular, the protocol does not take into account Mrs. Montgomery's serious health conditions including her cardiac and respiratory infirmities, and mental health conditions, all of which are discussed further, below.

21

c.      The 2019 Protocol contains no provisions, requirements, criteria, or safeguards regarding the form and provenance of the pentobarbital to be used (manufactured, FDA-approved, compounded, imported, etc.).

d.      The 2019 Protocol contains no provisions, requirements, criteria, or safeguards regarding testing of the pentobarbital to be used in executions to ensure, at a minimum, its identity, purity, and potency. Nor does the 2019 Protocol contain any requirements or safeguards to ensure that pentobarbital that fails any quality assurance testing will not be used in any execution.

e.      The 2019 Protocol lacks any requirement that the results of any testing the BOP elects to undertake are communicated promptly and prior to the execution to condemned prisoners facing execution and their counsel. These are not abstract concerns. The pentobarbital prepared for use in the executions scheduled for December 2019 failed quality assurance testing on or around December 3, 2019, but Defendants did not inform this (or any other) Court of that failure, despite ongoing litigation over whether those executions would be enjoined. The failed test was revealed on January 29, 2020 during the OAG 30(b)(6) deposition of Mr. Weinsheimer. Defendants have further revealed that none of their lethal injection drugs had passed quality assurance testing at the time of the first scheduled execution, but that they intended to proceed regardless, had the injunction been lifted. May 2020 Winter Dep. at 56:3-60:2.

69.     For the foregoing reasons, the 2019 Protocol "will subject executed prisoners to severe pain and suffering, when they remain conscious and aware prior to their deaths." Ex. A, Van Norman Decl. at 6-7.

### 3.     Issues with compounding of pentobarbital

70.     The BOP has obtained pentobarbital active pharmaceutical ingredient ("API") from a domestic manufacturer, has identified a compounding pharmacy to store the API and compound an injectable form of the drug, and currently uses compounded pentobarbital to administer executions. *See* AR 872. The 2019 Protocol lacks sufficient detail and important requirements and safeguards to ensure that compounded pentobarbital used in executions meets minimum standards of purity and potency. Use of contaminated, impure, or sub-potent compounded pentobarbital materially and foreseeably increases the likelihood that prisoners will suffer severe pain and serious harm during executions. *See* Ex. D, Almgren Decl. at 7-8.

71.     Compounded drugs are not FDA-approved and are subject to less rigorous regulation and oversight relating to the identity, purity, and potency of the drug. For these reasons, there is a substantial risk that compounded drugs will be contaminated, handled improperly or suffer from quality issues, the most common and concerning of which is lack of potency.

72.     The BOP has stated that the compounding facility that will produce pentobarbital for federal executions is a registered outsourcing facility pursuant to section 503B of the FDCA, 21 U.S.C. § 353b (*see* Nov. 2019 Winter Dep. at 291:10, 307:2-4; Decl. of Raul Campos at 1-2 (Nov. 12, 2019), ECF No. 36-1)), but the DEA

has advised that the facility is not a compounding pharmacy, but rather a dosage manufacturer. *See* Miller Dep. at 78:6-17. This confusion is made worse by the fact that the 2019 Protocol contains no provisions, requirements, criteria, or safeguards to ensure verification that the API supplier and compounding pharmacy are qualified, experienced, properly licensed, and have a satisfactory regulatory track record.

73.     The Office of the Attorney General has indicated that the chosen compounding facility had no previous experience compounding pentobarbital, Weinsheimer Dep. at 217:2-5, raising quality concerns given the technical complexity of compounding the drug properly. *See* Ex. D, Almgren Decl. at 2-4. But Defendants have provided no additional information about the process and criteria for vetting and selecting the supplier of the API or the compounding pharmacy, including sufficient information to verify they are qualified, experienced, properly licensed, adhere to appropriate standards and practices, and have a satisfactory regulatory record.

74.     Compounding of pentobarbital is a complex and highly specialized process that requires specialized equipment, numerous pharmaceutical-grade ingredients, chemical adjustments during the process, and the appropriate experience and credentials in aseptic compounding technique. *See id.* at 2-3. Even minor deviations from the complex procedures for compounding pentobarbital can result in a sub-potent drug. *See id.* at 4. The use of a sub-potent drug increases the risk of severe pain and harm because it "would not have the pharmacological effect

as expected, potentially leading to the prisoner's prolonged suffering as a result." *Id.* at 7-8.

75.     The 2019 Protocol lacks information explaining how the pentobarbital Defendants intend to use for executions has been compounded or will be compounded. In particular, the 2019 Protocol lacks detail and contains no requirements to ensure that the pentobarbital is properly compounded in accordance with applicable standards and best practices. It omits any discussion of: the quality of the API; an appropriate formulation recipe; the procedures by which the drug has been or will be compounded; the ingredients and their concentrations; the equipment used and how that equipment is maintained and calibrated; or the contents of "compounding logs" that include the criteria to determine the beyond use date, a master work sheet containing storage requirements, and documentation of performance of quality control procedures. *See id.* at 4. Without that information, it is impossible to determine that the pentobarbital to be used in executions has been properly compounded and is "safe to be used without causing unnecessary suffering to the prisoner." *Id.*; *see also* Ex. A, Van Norman Decl. at 8, 41.

76.     Proper compounding also involves standards for proper storage of drugs including temperature, humidity, and sterile conditions. Storage conditions must be continually monitored and documented. Improper storage, such as excessive temperature, excessive humidity, or unsterile conditions, will cause drugs—the API powder or the compounded form—to be degraded, contaminated, or damaged. This increases the "risk that the drugs could lose potency and thus the drugs would not

have the pharmacological effect as expected, potentially leading to the prisoner's prolonged suffering as a result." Ex. D, Almgren Decl. at 7-8. The 2019 Protocol lacks detail and contains no requirements to ensure that these critical storage requirements are satisfied and that sub-potent and/or expired drugs are not used in executions.

77.     Compounded drugs, including pentobarbital, are subject to standards for shelf-life or "use by" dates, and the allowable length of time between compounding and administration. *See id.* at 5. If administered after the "beyond use date," the drug may be unstable or unsterile and thus lose potency. The 2019 Protocol lacks detail and contains no requirements to ensure that drugs past their "beyond use date" are not used in executions.

78.     If Defendants carry out executions using compounded pentobarbital, there is a substantial and foreseeable risk that the drugs will be handled improperly, contaminated, expired, and sub-potent, and thus a substantial and foreseeable risk that Plaintiff will suffer severe pain and substantial harm during execution.

### 4.     Issues with intravenous ("IV") administration of pentobarbital

79.     The 2019 Protocol provides that "[l]ethal substances shall be administered intravenously." 2019 Addendum, ¶ H. Setting an intravenous line is a delicate, complicated, and invasive procedure that requires appropriate and extensive skill, experience, and training. Ensuring that intravenous access is properly established, functioning, maintained, and monitored is essential to ensure that lethal injection will effectively bring about death in a humane and constitutional manner.

26

80.     Improper IV insertion may lead to infiltration (in which the drug is injected or bursts into the surrounding tissue instead of the prisoner's vein) or extravasation (leakage of the drug into the surrounding tissue). *See* Ex. A, Van Norman Decl. at 36-37. Extravasation and infiltration often cause "significant, excruciating pain for prisoners," including "instant, excruciating pain that patients liken to being set on fire." *Id.* at 8, 36. Injection of pentobarbital into an artery instead of a vein may result in "instant arterial spasm, pain, excruciating local tissue destruction, and also immediate ischemia (i.e., lack of oxygen, tissue damage and necrosis) in the area of the body supplied by the artery." *Id.* at 36. Infiltration, extravasation, and arterial injection "can result in slow suffocation if only partial injection is achieved, and a lingering and extremely painful death, and/or failure of the execution altogether." *Id.* at 41.

81.     The 2019 Protocol lacks sufficient detail and safeguards to ensure that intravenous access is properly established and maintained throughout the execution. The 2019 Protocol contains no criteria or requirements regarding the manner in which the IV catheters shall be inserted into the prisoner (for example, whether to establish central line access or perform a cut-down); whether there is an order of preferred access sites; whether there is a time limit for establishing IV access; whether there is a limit on the number of times the team can attempt IV access; and how disagreements among execution team members are to be resolved. *See* Nov. 2019 Winter Dep. at 225:13-227:12.

82.     The 2019 Protocol contains no requirements regarding the minimum training, experience, or qualifications required for the person setting the IV.

83.     The 2019 Protocol contains no requirements regarding the minimum training, experience, or qualifications required for the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned in favor of some other procedure, or the manner in which the condition of the prisoner will be monitored to confirm that the IV lines are not inflicting severe and unnecessary pain.

84.     The 2019 Protocol contains no criteria or requirements regarding the manner in which the prisoner will be monitored to ensure that he or she is anesthetized and insensate during the entire execution process, or the qualifications and expertise required for the person who will be responsible for such monitoring.

85.     The 2019 Protocol contains no criteria or requirements regarding the manner in which the IV tubing, three-way valve, saline solution, or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion.

86.     The 2019 Protocol allows the training and experience of the execution team member placing the IVs to change from one execution to the next, and contains no requirements to ensure that the team member responsible for the critical task of determining the method of venous access has sufficient and appropriate training,

28

experience, and qualifications to undertake the task or make that determination. *See* Nov. 2019 Winter Dep. at 162:20-163:4.

87.     The 2019 Protocol does not require that the prisoner's unique physical, health, and medical conditions, including the viability or sufficiency of his or her veins, be taken into consideration as part of the determination of the appropriate method of venous access.  There are no provisions for a prisoner, such as Lisa Montgomery, who may be actively psychotic, delusional, and/or suffering from extreme panic, at the time of IV placement.

88.     The 2019 Protocol also delegates critical decisions to personnel who lack and/or are not required to have appropriate background, experience, and training. The 2019 Protocol delegates to the BOP Director authority to determine the method of venous access for an execution with no requirement that he or she have adequate medical knowledge, experience, background, and training to make that critical medical decision. Although the 2019 Protocol allows the BOP Director to designate another person to determine the method of venous access, such designee is likewise not required to have adequate medical knowledge, experience, background, and training to make that critical decision.

89.     Finally, the 2019 Protocol indicates that the determination of the method of venous access will be "(1) based on the training and experience of [the] personnel establishing the intravenous access; (2) to comply with specific orders of federal courts; or (3) based upon a recommendation from qualified personnel." 2019 Addendum, ¶ H. However, the 2019 Protocol does not require the personnel

29

establishing the IV to have any minimum or particular "training [or] experience," and contains no limitation on who might be deemed to be "qualified personnel." Given that the 2019 Protocol does not require that qualified medical personnel perform IV placement, there is no guarantee that any medical professionals will in fact be present to perform this function at an execution.

90.     That inadequate intravenous access presents a serious and avoidable risk of severe pain and suffering is confirmed by the fact that lethal-injection executions have frequently been plagued by difficulties with setting IVs that have caused serious harm to prisoners. The complaints in two other actions pending in this district, *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C. filed Dec. 6, 2005) (*Roane* Compl.), and *Bourgeois v. United States Dep't of Justice*, No. 1:12-cv-00782-TSC (D.D.C. filed May 15, 2012) (*Bourgeois* Compl.), provide details on the issues that have arisen. For example, kinked tubing and an improperly inserted IV needle caused one prisoner "excruciating pain" and delayed his execution, *Roane* Compl. ¶ 45(c), while another prisoner suffered a prolonged execution due to a clogged IV tube that could have been prevented by "proper procedures taught in 'IV 101,'" *id.* ¶ 45(f), and yet another prisoner "grimace[ed]," "tried to mouth words," and was not declared dead for 34 minutes as a result of a needle that improperly injected chemicals into his soft tissue, rather than into his vein, *Bourgeois* Compl. ¶ 59(k). Furthermore, difficulties in locating veins suitable for lethal injection have resulted in significant delays and torment for prisoners awaiting execution. *See Roane* Compl. ¶ 46; *Bourgeois* Compl. ¶ 60.

91.     There have been several recent, significant examples of IV problems in lethal injections. For example, at the Clayton Lockett execution in 2014, the femoral line was not placed correctly and Mr. Lockett regained consciousness before dying. In addition, in Ohio (2017) and Alabama (2018), the execution teams tried unsuccessfully for extended periods of time to set IVs in two very ill prisoners, Alva Campbell and Doyle Lee Hamm. Those two executions were called off as a result.

92.     The 2019 Protocol lacks detail and requirements to ensure intravenous access is properly established, functioning, maintained, and monitored throughout the entire execution process. Without those protections, the 2019 Protocol cannot be relied on to guarantee that executions using lethal injection will effectively bring about death in a humane and constitutional manner.

### 5.     The 2019 protocol is materially incomplete.

93.     As explained in detail above, although the 2019 Protocol provides some vague and high-level information, it lacks sufficient detail regarding the planned implementation of executions, including numerous factors that are necessary to ensure compliance with constitutional requirements.

94.     In addition to the deficiencies detailed above, the 2019 Protocol lacks sufficient detail and important requirements and safeguards regarding numerous other factors that are necessary to ensure lethal injection will effectively bring about death in a humane and constitutional manner, including, but not limited to, the following:

31

95.     The 2019 Protocol does not require the presence of a doctor or anyone with a medical license to be present at or oversee the executions.

96.     The 2019 Protocol contains no criteria or requirements regarding the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering, and the criteria to be used in exercising this discretion.

97.     The 2019 Protocol contains no criteria or requirements regarding the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the execution, and the criteria that shall be used in exercising this discretion.

98.     The 2019 Protocol expressly blocks access to information about the qualifications of personnel, stating that "any documentation establishing [the] qualifications" of the personnel involved in the executions "shall be protected from disclosure to the fullest extent permitted by law." 2019 Addendum, ¶ B.

99.     Moreover, the Government has taken the position that the entire 2019 Protocol—and not just the "addendum" that describes the execution drug and its administration—is "nonbinding." *Roane v. Barr*, No. 19-mc-145-TSC, ECF No. 109 at 2-3.

100.    Further, the 2019 Protocol provides that its "procedures should be observed and followed as written unless deviation or adjustment is required, as

32

determined by the Director of the BOP or the Warden." AR 1019. The 2019 Addendum similarly provides as follows:

> The procedures utilized by the BOP to implement federal death sentences shall be as follows unless modified at the discretion of the Director or his/her designee, as necessary to (1) comply with specific judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) as may be required by other circumstances.

2019 Addendum, ¶ A. However, the 2019 Addendum does not contain any detail or requirements concerning the "other circumstances" which allow for deviation from the stated execution procedures.

101.   The 2019 Protocol is materially incomplete and lacks sufficient detail, requirements, and safeguards regarding the implementation of executions. Without those protections, the 2019 Protocol cannot be relied on to guarantee that executions using lethal injection will effectively bring about death in a humane and constitutional manner.

### 6.   Unique Risks of Executing Mrs. Montgomery under the 2019 Protocol

102.   Plaintiff, Lisa Montgomery, is a survivor of prolonged, systemic, childhood torture, neglect, deprivation and abuse, most hideously involving her parents' sexual trafficking of her to a variety of older men beginning when she was a young child; as a result of this torture she has Complex Post-Traumatic Stress Disorder ("CPTSD"). She is also diagnosed with bipolar disorder. Ex. F, Dr. Gail Van Norman Declaration October 26, 2020, p. 8. These mental conditions are treated with

a variety of psychotropic drugs, including mirtazapine (trade name, Remeron). *Id.* at

8.[2]  Mirtazapine is commonly used to treat major depression.

103.   Mrs. Montgomery has a variety of significant cardiac and respiratory

issues, including Prinzmetal's angina (treated with a variety of medications),

obstructive sleep apnea (treated with CPAP machine), and asthma (for which she is

prescribed two different inhalers). *Id.* at 9.

104.   Mirtazapine "upregulates" one of the three enzymes known to enhance

the metabolism of barbiturates. *Id.* at 8.  Because of her use of this medication, she is

"at enhanced risk for 1) immediate (at the time of initial injection) reduction in

pentobarbital levels in the brain due to dramatically increased local enzymatic

breakdown of pentobarbital in the brain itself, and 2) more rapid redistribution of

pentobarbital out of the brain by induced CYP2E1 activity in the liver that

dramatically increases clearance from the bloodstream." *Id.* at 9.  Due to mirtazapine,

she may experience an "8-fold increase in drug clearance." *Id.*

105.   Mrs. Montgomery's regular prescribed use of mirtazapine "puts her

especially at risk for awareness, and her medical conditions contribute to the

significant likelihood that she will suffer pain and sensations of suffocation and

drowning during judicial lethal injection." *Id.*

---

[2] Mrs. Montgomery reports that she is being provided four psychotropic medications
at present: Prozac, Elavil, Risperdol and Remerdon (mirtazapine).  Her levels of
Remerdon were recently adjusted by the BOP.  Counsel has submitted a request for
current psychological records, but, traditionally, such requests take many months
before records will be provided by the BOP.

106.   Ending Mrs. Montgomery's use of mirtazapine prior to the scheduled December 8, 2020 execution, would not reduce the extreme risk of awareness. "[E]nzyme activity takes a significant amount of time to return to normal, usually measured in weeks or months." *Id.* at 7.   Moreover, as execution becomes imminent, Mrs. Montgomery will be ever more reliant on psychotropic medications to maintain a semblance of mental stability.[3] *Id.*

107.   Asthma and sleep apnea are both disorders of the respiratory system. *Id.*   These conditions "virtually guarantee that airway obstruction will occur even more rapidly…during lethal injection, meaning that flash pulmonary edema will occur earlier." *Id.* at 10.   That is, Mrs. Montgomery will not only be aware earlier and to a greater extent than a typical inmate, she will experience more significant and faster onset of flash pulmonary edema and associated drowning than a typical inmate.

108.   Prinzmetal's angina is a painful cardiac condition, which occurs in atypical patterns—often when the patient is at physical rest. *Id.* at 10.   The pain of Prinzmetal's angina is "typically more severe than regular angina" and it is described as "like an elephant sitting on the chest."   *Id.*   The pain is often accompanied by a decrease in the heart's ability to pump blood, "another factor known to be a

---

[3] Whether Mrs. Montgomery is psychiatrically competent to be executed is not at issue in this suit, but will be addressed in an appropriate forum pursuant to *Madison v. Alabama*, 139 S.Ct. 718 (2019).   Should the defendants chose to take Mrs. Montgomery off of psychotropic medications, her competency would be even more imperiled.

contributor to flash pulmonary edema." *Id.* at 10-11.   Prinzmetal's angina is precipitated by mental and physical stress…which can be expected to occur in the minutes and hours prior to judicial execution." *Id.*   That is, this unique cardiac condition means that Mrs. Montgomery is at greater risk of flash pulmonary edema during execution, and at greater risk of physical suffering and pain prior to death.

109.   Mrs. Montgomery's extreme PTSD creates an additional host of problems, and renders her execution in a men's prison under the 2019 protocol extraordinarily cruel.   As the victim of significant sexual trauma inflicted by men, Mrs. Montgomery's transfer away from FMC Carswell, to the men's prison at USP Terre Haute will be extraordinarily upsetting and destabilizing.   What limited emotional resources she has available, will be taxed to the extreme by this change to an all-male prison.   Additionally, as a victim of repeated gang rape and other sexual degradation, Mrs. Montgomery's physiologically hard-wired responses to perceived threat are heightened: transfer of a woman to a male facility inherently poses a threat which will, inevitably, create a cascade of stress hormones and neurobiological reactions more fully severing her contact with reality.

110.   Anesthesiologists recognize that patients with PTSD "often have extreme anxiety, and develop fast heart rates, high blood pressure and shortness of breath.[4]   They also often present difficulties in placement of IV catheters for

---

[4] Mrs. Montgomery has been diagnosed with complex post-traumatic stress disorder (CPTSD) which differs in severity and etiology from PTSD sufficiently to be recognized by many as a separate disorder. World Health Organization (2018). International Classification of Diseases, 11th edition (ICD-11). Geneva, Switzerland: WHO. Despite the distinctions, that which occurs with PTSD (which may result from

administration of IV drugs, due to profound fear and anxiety and sympathetic nervous system responses." *Id.* at 11.  "PTSD predisposes her to severe anxiety and terror, and to present difficulties with the placement of intravenous catheters." *Id.* at 2-3.  PTSD also places Mrs. Montgomery at greater risk of angina and asthmatic episodes. *Id.* at 11. That is, a typical PTSD patient, who is undergoing life-saving surgery, presents significant challenges to an experienced anesthesiologist, due to their extreme emotional response to surgery.  In Mrs. Montgomery's case, she will be suffering the impact of CPTSD, as well as bipolar disorder with psychotic features while subjected to a medical procedure intended to end her life.

111.    Dr. Van Norman has concluded that:

> Enhancement of [Mrs. Montgomery's] CYP enzyme system by mirtazapine further increases the risk of awareness during judicial lethal injection—and the probability that she will experience excruciating feelings of drowning, suffocation, shortness of breath, and terror.  Her asthma and OSA likely will lead her to experience sensations of shortness of breath earlier in the injection process than other prisoners without this condition, thus prolonging these experiences.  Because of her Prinzmetal's angina, she is at risk of additional suffering through cardiac ischemia due to her anxiety and stress during the execution, that causes severe chest pain, shortness of breath, and terror.  PTSD will amplify all of these conditions, as well as increase the probability that placement of intravenous catheters will be difficult.

*Id.* at 12.

## C.    Alternatives Relating to Eighth Amendment Issues

---

a single traumatic event) is more likely to occur and at a greater intensity with CPTSD.

112.    The United States Supreme Court has held that in order to establish an Eighth Amendment violation, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).

113.    Based on statutory authority and current and historical practices, and upon undersigned counsel's information and belief, the following alternative methods of execution are feasible and readily implemented and available and would significantly reduce a substantial risk of severe pain, but Defendants have refused to adopt such methods without a legitimate penological reason.

114.    Alternative One: Execution by a single dose of FDA-approved pentobarbital, including implementing the remedial measures and safeguards detailed below and adding a pre-dose of a pain-relieving, anesthetic drug in a sufficiently large clinical dose. There are a wide variety of well-known, accessible, and easily administered pain-relieving medications used in anesthetic procedures. *See* Ex. A, Van Norman Decl. Nov. 1, 2019,  at 7, 18-19, 29-30; Decl. of Craig W. Stevens, Ph.D. at 2-7 (Nov. 1, 2019), Exhibit E. The opioid fentanyl is one option for a drug that would substantially reduce the risk that the prisoner would remain sensate to experience pain, including the pain and suffering caused by pulmonary edema. The BOP has asserted that "numerous companies manufacture" fentanyl and that brand-name and generic products are sold in the United States. AR 862-63. The BOP also has confirmed that it has located a lawfully licensed compounding

pharmacy in the United States that is able and willing to "lawfully provide [BOP] with commercially manufactured medications as they are available," and to compound fentanyl as needed. *Id.* at 864. The necessary remedial measures and safeguards are as follows:

      i.     the selection of qualified, competent and vetted team members, whose qualifications are disclosed;

      ii.     establishment of two patent, functioning peripheral IV lines and assurance (a) that no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional, and (b) central lines will be set only by qualified and competent medical professionals; and

      iii.     the administration of pentobarbital in close proximity to the prisoner, rather than remotely. Eliminating the need for extension sets of IV tubing can significantly reduce the risks of leakage or pinching of the tubing. Proximate administration would also ensure adequate surveillance and monitoring of the IV, the catheter site, and the prisoner. By eliminating the need for lengthy IV tubing, proximate administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing. Any concern about revealing the identity of personnel participating in the execution process could be satisfactorily addressed by using a privacy screen.

39

115.    Alternative Two: Execution by a single dose of compounded pentobarbital that complies with all state and federal compounding requirements, and has been tested for purity and potency, with records of testing, chain of custody, and compounding formula disclosed to prisoners and their counsel, including a pre-dose of a pain-relieving, anesthetic drug in a sufficiently large clinical dose, and implementing the remedial measures and safeguards set forth in the above paragraph.

116.    Alternative Three: Execution by firing squad. Execution by firing squad is a method of execution currently authorized by the laws of three states (Utah, Oklahoma, Mississippi), which Defendants have the means and ability to administer. Execution by firing squad eliminates entirely the risk of pain and suffering inherent in executions using pentobarbital and the procedures set forth in the 2019 Protocol, including risks associated with establishing IV access and addressing prisoner's unique physical, health, and medical conditions. Execution by firing squad causes a faster and less painful death than execution by lethal injection. *See Arthur v. Dunn*, 137 S. Ct. 725, 733-34 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution); *see also Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative). Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip v. Gross*, 135 S. Ct. 2726, 2796 (2015) (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad is statistically much

less likely to result in "botched" executions than lethal injection. *See* Austin Sarat, Gruesome Spectacles: Botched Executions and America's Death Penalty 120, App. A (2014) (analysis of contemporaneous news reports of all executions in the United States from 1900 to 2010 found that 7.12% of the 1,054 executions by lethal injection were "botched" and none, 0%, of the 34 executions by firing squad were "botched").

## V.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

117.   Plaintiff believes exhaustion is not necessary under the Prison Litigation Reform Act, 42 U.S.C. § 1997e, because this suit does not challenge prison conditions, and because there are no available administrative remedies that could address the challenged constitutional violations.

## VI.   CLAIMS FOR RELIEF

### Count I
(Count II of the Amended Complaint in the Consolidated Action)
### Eighth Amendment Violation

118.   Plaintiff, Lisa Marie Montgomery, realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full here.

119.   The Eighth Amendment of the U.S. Constitution forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *See In re Kemmler*, 136 U.S. 436, 447

41

(1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id.; see also Baze v. Rees*, 553 U.S. 35, 50 (2008) (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

120.    Defendants, acting under color of federal law and pursuant to the 2019 Protocol, intend to execute Mrs. Montgomery in a manner that is arbitrary, cruel, and/or unreliable, and which will inflict excruciating pain on Plaintiff, or has a foreseeable and significant but completely avoidable and unnecessary risk of causing such pain.

121.    There are alternative methods of execution, as described above, that are "feasible, readily implemented, and in fact [would] significantly reduce the substantial risk of severe pain." *Baze*, 553 U.S. at 52.

122.    Because the 2019 Protocol poses a substantial risk of serious harm to Plaintiff, it violates Plaintiff's constitutional right guaranteed by the Eighth Amendment of the U.S. Constitution to be free from arbitrary, capricious, cruel, and unusual punishment.

## <u>Count II</u>
### <u>Eighth Amendment Violation as applied to Mrs. Montgomery</u>

123.    Plaintiff, Lisa Marie Montgomery, realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

124.    The Eighth Amendment provides prisoners with the right to be free from cruel and unusual punishments. In carrying out a sentence of death, the Government

violates the Eighth Amendment if the planned manner of execution presents a "substantial risk of serious harm" to the prisoner. *Baze v. Rees*, 553 U.S. 35, 50 (2008).

125.   Executing Mrs. Montgomery under the 2019 Protocol poses a substantial risk of serious harm to Mrs. Montgomery, given her significant cardiac and respiratory infirmities, and in light of her extremely fragile mental health condition.  Mrs. Montgomery, as a survivor of extreme childhood trauma, must take psychotropic medications, including mirtazapine.  Mirtazapine will cause her to regain awareness very rapidly following pentobarbital injection, if she loses awareness at all. She will then be aware and fully experience the horror of pulmonary edema and drowning during her execution.  Mrs. Montgomery also suffers cardiac and respiratory disorders that will cause flash pulmonary edema to begin even more rapidly than in a typical inmate.  Throughout the entire process she will be at high risk of suffering the extreme pain from Prinzmetal's angina.  Psychosis, panic and mental anguish are all highly likely to overcome her in the days and hours before execution.  Competent professional anesthesiologists, dealing with a mentally fragile patient—whose life they are trying to save—are well aware of the difficulties in finding a vein, and inserting a catheter, in a mentally unstable PTSD survivor.  The challenges for an inadequately trained executioner to properly insert an IV-catheter into Mrs. Montgomery should she become psychotic or delusional will be extreme.

126.   The 2019 protocol does not take into account the possibility of any one of Mrs. Montgomery's infirmities, let alone the catastrophic impact of all of these infirmities being suffered by a single condemned inmate.  Indeed, the 2019 protocol

is simply incapable of providing Mrs. Montgomery anything other than a barbaric and constitutionally cruel and unusual death.

127.   The defendants' intent to uproot Mrs. Montgomery from the women's prison where she has lived for the past dozen years, and to send her (at a date unknown) to USP Terre Haute, to be the sole female inmate in a men's prison, yet further exacerbates the harm inflicted.   Mrs. Montgomery is at high risk for decompensating and becoming actively psychotic prior to execution. The unnecessary transfer of Mrs. Montgomery to a men's prison only increases this exceptional risk.

128.   The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment when he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

129.   BOP knows of Mrs. Montgomery's medical and psychiatric issues, all are well documented in the medical and psychiatric records kept by the BOP and/or in legal filings on the record in federal court.

130.   There is substantial and unjustifiable risk that the Defendants will cause serious harm to Mrs. Montgomery by executing her pursuant to the 2019 Protocol.   The risk that Mrs. Montgomery faces is significantly greater than the risk faced by a "typical" inmate, and the torture, and unnecessary pain and suffering she will experience will be significantly greater.   Her as-applied challenge is one unique to her, and is based on her particular mental health and physical conditions.

## Count III

(Count IX of the Amended Complaint in the Consolidated
Action)

### Violation of the APA – Arbitrary and Capricious Agency Action

131.   Plaintiff, Lisa Marie Montgomery, realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full here.

132.   The APA requires a reviewing court to set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

133.   Agency action that is not the product of reasoned decision-making is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy the requirement of reasoned decision-making, an agency must "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48.

134.   An agency's rule is also arbitrary and capricious when, among other circumstances, the agency has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

135.   Neither the DOJ nor the BOP provided any explanation for the basis or reasons for the decision to adopt the 2019 Protocol or the procedures contained therein. In particular, neither the DOJ nor the BOP has adequately considered or provided an explanation or justification for their planned use of pentobarbital as an execution drug, their failure to comply with applicable laws, including the CSA and FDCA, or the absence of necessary safeguards to protect against the significant risk

of pain and suffering that the use of pentobarbital will cause to Plaintiff, including the risk of acute pulmonary edema and the harm caused by the use of sub-potent or improperly compounded drugs.

136.   The adoption of the 2019 Protocol was not the product of reasoned decision-making and entirely failed to consider important aspects of the problem, and is thus arbitrary and capricious, in violation of the APA.

137.   The DOJ's and the BOP's violation of the APA caused harm to Plaintiff by depriving her of the right and opportunity to consider and address issues and concerns with the 2019 Protocol, including, but not limited to, the risk of an unavoidably painful execution, including the risk of cruel and unusual punishment under the Eighth Amendment on account of the properties of pentobarbital and Plaintiff's unique health conditions, the undefined and unrestricted procedures to be used in executions, and/or the absence of sufficient safeguards.

138.   Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## Count IV
(Count XI of the Amended Complaint in the Consolidated Action)
### Violation of the APA – Agency Action that is Contrary to Law Because it Violates the FDCA and CSA

139.   Plaintiff, Lisa Marie Montgomery, realleges and incorporates herein by reference all of the preceding paragraphs of this Complaint as if set forth in full here.

140.    Under the APA, a reviewing court must set aside any agency action that is "not in accordance with [the] law," or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) and (C).

141.    As explained above, the 2019 Protocol violates both the CSA and the FDCA.

142.    The APA provides a private right of action when, as here, an agency's action is "not in accordance with [the] law," 5 U.S.C. § 706(2)(A), and regardless of whether those two underlying statutes provide a right of action by themselves. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979).

143.    Defendants' violations of the federal drug laws will cause injury to Plaintiff by circumventing the statutory purposes of the CSA and FDCA to ensure that all drugs, including those used to carry out an execution, are safe and effective, and dispensed and administered properly. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "[I]gnoring those safeguards, as Plaintiffs allege Defendants intend to do, places Plaintiffs at risk." *Ringo v. Lombardi*, 706 F. Supp. 2d 952, 958 (W.D. Mo. 2010); *see also Beaty v. FDA*, 853 F. Supp. 2d 30, 42-43 (D.D.C. 2012) (explaining that importation of a misbranded execution drug implicates the FDCA's statutory purposes, including the need to ensure that a drug is safe and effective: "Even when in the correct hands, prisoners on death row have an unnecessary risk that they will not be anesthetized properly prior to execution."), *aff'd in part, vacated in part sub nom. Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013).

47

144.   Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## VII. PRAYER FOR RELIEF

WHEREFORE, in order to prevent the violations of Plaintiff's rights under the Eighth Amendment of the United States Constitution, and the violations of the APA, the FDCA, and the CSA as alleged above, Plaintiff respectfully requests that the Court enter a judgment:

a.   declaring that the Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding executions, and specifically the 2019 Protocol, are illegal and violate the Eighth Amendment of the United States Constitution, the APA, the FDCA, and the CSA;

b.   declaring that the use of the 2019 Protocol to execute Plaintiff is illegal and unconstitutional as applied to her, in light of her specific medical and mental health conditions;

c.   vacating the 2019 Protocol and enjoining Defendants and all persons acting on their behalf from using the 2019 Protocol, or any revised protocol that violates Plaintiff's rights and the law, for the same reasons challenged above; and

d.   granting such further relief as the Court deems just and proper.

48

Dated:   October 28, 2020                    Respectfully submitted,


                                             KELLEY J. HENRY
                                             Chief, Capital Habeas Unit
                                             AMY D. HARWELL
                                             Asst. Chief, Capital Habeas Unit
                                             RICHARD LEWIS TENNENT
                                             Asst. Federal Public Defender
                                             Office of the Federal Public Defender
                                             810 Broadway, Suite 200
                                             Nashville, TN 37203
                                             (615) 736-5047
                                             Kelley_Henry@fd.org


                                     BY:     */s/ Kelley J. Henry*
                                             Counsel for Lisa Montgomery

## CERTIFICATE OF SERVICE

I certify that on October 28, 2020, a copy of the foregoing Complaint with

Attached Exhibits, was filed using the CM/ECF system.  Pursuant to this Court's

August 20, 2019 Order, below is a list of all counsel of record. The names marked

with an asterisk (*) have no email provided on the docket and are no longer with the

identified firms.

Johnny Hillary Walker, III
U.S. Attorney's Office for the District of
Columbia
(202) 815-8708
Email: johnny.walker@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of
Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of
Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM,
INC.
(404) 688-7530
Email: gerald_king@fd.org
Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
(212) 735-2129
Email:
Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC
DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF
CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email:
brandon.almond@troutmansanders.com

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL
COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com
Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E.
PROCTOR, LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com
Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION
CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email:
David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com
Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com
Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT &
TUNNELL LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING
HALE & DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT &
TUNNELL LLP
(302) 351-9197
Email: Amoshos@mnat.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com
Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Ryan M. Chabot
WILMER CUTLER PICKERING
HALE & DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

/s/ *Kelley J. Henry*
KELLEY J. HENRY
Chief Capital Habeas Unit
Office of the Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203
(615) 736-5047
Kelley_Henry@fd.org

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) |  |
| In the Matter of the | ) |  |
| Federal Bureau of Prisons' Execution | ) |  |
| Protocol Cases, | ) |  |
|  | ) |  |
| LEAD CASE: *Roane et al. v. Barr* | ) | Case No.  19-mc-0145 (TSC) |
|  | ) |  |
|  | ) |  |
| THIS DOCUMENT RELATES TO: | ) |  |
|  | ) |  |
| *Lee v. Barr*, 19-cv-2559 | ) |  |
|  | ) |  |
| _____ | ) |  |

## EXPERT DECLARATION OF GAIL A. VAN NORMAN, M.D.

Pursuant to 28 U.S.C. § 1746, Gail Van Norman, M.D. declares as follows

## I.   BACKGROUND AND EXPERT QUALIFICATIONS

1.   I attended the University of Washington School of Medicine in Seattle, Washington from 1977 to 1981, graduating with an M.D. with honors.  During medical school training, I received the following honors:  Medical-Scientist Traineeship Grant 1978, invitation to Alpha Omega Alpha, the medical school honor society in 1980, the Merck Manual Medicine Award in 1981 and the John J. Bonica Anesthesiology Award in 1981.

2.   My postgraduate medical training consisted first of internal medicine residency training at Virginia Mason Medical Center in Seattle, Washington, and board certification from the American Board of Internal Medicine (ABIM) in 1984.  I practiced internal medicine from 1984 to late 1986, including experience in intensive care medicine.  I underwent residency training in anesthesiology from 1986 to 1988 at the University of Washington, obtaining board certification in 1990.  I completed cardiothoracic anesthesia fellowship training in 1989, after

which I achieved testamur status in perioperative echocardiography. After 5 years in private practice, I returned as faculty to the University of Washington, where I served as the acting Chief of Cardiothoracic Anesthesiology and Associate Medical Director of the PreAnesthesia Clinic. I became certified in clinical ethics, and also served as the co-chair of the University of Washington Medical Center Committee on Ethics. In 2000, I was recruited to join a private practice anesthesia group, Pacific Anesthesia, in Tacoma, Washington, where I served as the Clinical Director, Director of Perioperative Echocardiography, and as Vice-President of Pacific Anesthesia, but I returned to the University of Washington Medical Center to serve as Director of the PreAnesthesia Clinic and the Compliance Officer for the Department of Anesthesiology and Pain Medicine. I currently hold positions as Professor of Anesthesiology and Pain Medicine and Adjunct Professor of Bioethics at the University of Washington. I maintain an active clinical practice.

3. As an internist and anesthesiologist, following graduation from residency training, I received honors from the Spokane Urban Indian Health Service, the President's Award from Pacific Anesthesia, and the Mary Jane Kugel Award from the Juvenile Diabetes Research Foundation.

4. I was recruited in 1992 to serve on the Committee on Ethics for the American Society of Anesthesiology, the national professional organization for the specialty of Anesthesiology. I served for 22 years on the committee, and served as the Chair of the ASA Committee on Ethics for three years. I attended the Brocher Foundation in Geneva, Switzerland, as an ethics scholar-in-residence in 2011.

5. I have over 120 publications in peer-reviewed journals, textbooks, and other venues that include topics of cardiac anesthesia research, ethics, geriatric medicine, perioperative

2

medicine and intensive care. I have also served as a journal reviewer for journals such as *Anesthesia and Analgesia, Anesthesiology, Journal of Obstetrics and Gynecology, Mayo Clinic Proceedings, Journal of Philosophy, Ethics and Humanities, and European Journal of Anaesthesiology.* I was Consulting Editor for the ASA Syllabus on Ethics from 1997-2003, and an Associate Editor for the Journal of Bioethical Inquiry, an international journal, from 2012 to 2017. I published a textbook entitled "The Cambridge Textbook of Clinical Ethics for Anesthesiologists", with Cambridge University Press in 2011, and I have focused expertise and publications in end-of-life issues, including physician assisted suicide, euthanasia and lethal injection.

6.     As an expert in cardiovascular and perioperative issues, I have served internationally and nationally as an invited speaker at such venues as the American Society of Anesthesiologists, American Society of Interventional Pain Physicians, Harvard Medical School, American Society of Bioethics and Humanities, World Congress of Anesthesiologists (Santiago, Chile) and many others. As an expert in ethical issues in anesthesia care, I have been an internationally-invited speaker in London, Rome, Vienna, Prague, Hong Kong, Geneva and throughout the United States. Full details of my publications and invitational lectures can be found in the *curriculum vitae* attached as **Appendix I**.

7.     A majority of my clinical experience has been based in cardiac and general anesthesiology, as well as perioperative care of the anesthesia patient; because I trained in the 1980s, I have extensive personal experience with intravenous barbiturate administration.

8.     Over the course of my career I have been an expert consultant/witness in approximately 13 medical malpractice cases, both as a defense and as a plaintiff's expert in approximately equal numbers, and both as a paid and as a *pro bono* expert. In 3 of these cases, I

was consulted as an expert in bioethics: i.e. regarding informed consent and end-of-life issues. In the remainder, I was consulted as an expert in the anesthesia care of a patient. In the last 4 years, I have provided testimony at trial or by deposition in 4 cases; **the list is included in Appendix II following this declaration.** I am not now, nor ever have been, regularly employed by any legal firm or entity, nor do I derive a significant portion of my income from medico-legal expert witness activities. In this case I'm being compensated $350 per hour for consultation and preparation of this declaration and $400 per hour for testimony.

## II.   MATERIALS REVIEWED

9.    I have reviewed and relied upon the following materials in connection with this declaration:

- Case 1:05-cv-02337-TSC-DAR, *Roane v. Gonzales* (and others), Document 385-1, filed 7/25/19: ADDENDUM TO BOP EXECUTION PROTOCOL FEDERAL DEATH SENTENCE IMPLEMENTATION PROCEDURES EFFECTIVE JULY 25, 2019

- Case 1:19-cv-02559-TSC-DAR, *Lee v. Barr* (and others), Document 1, filed 8/23/19: COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE FIRST, FIFTH, SIXTH AND EIGHT AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 551 et seq.

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 13, filed 9/27/19: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION BARRING THE IMPLEMENTATION OF THE NEWLY ANNOUNCED FEDERAL LETHAL INJECTION PROTOCOL

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 13-1, filed 9/27/19: PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION BARRING THE IMPLEMENTATION OF THE NEWLY ANNOUNCED FEDERAL LETHAL INJECTION PROTOCOL

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 13-4, filed 9/27/19: PROPOSED PRELIMINARY INJUCTION ORDER

- Case 1:19-mc-00145-TSC-DAR, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Document 16, filed 10/18/19: DEFENDANTS' OPPOSITION TO PLAINTIFF DANIEL LEWIS LEE'S MOTION FOR A PRELIMINARY INJUNCTION

- EXPERT DELARATION OF MARK A. EDGAR, MD, signed October 24, 2019

- Autopsy reports as listed in **Appendix III** of this declaration

- Various authoritative textbooks, peer-reviewed articles, materials from government regulatory agencies such as the FDA, and other publications and materials as included in the references cited and footnoted throughout this declaration.

## III. THE FEDERAL EXECUTION PROTOCOL

10.     I will refer to the document provided to me, described as Case 1:05-cv-02337-TSC-DAR, Document 385-1 filed 7/25/19, ADDENDUM TO BOP EXECUTION PROTOCOL FEDERAL DEATH SENTENCE IMPLEMENTATION PROCEDURES EFFECTIVE JULY 25, 2019, as the "Federal Protocol" or the "Addendum."

11.     This protocol is briefly described here as a "single-drug" protocol, calling for the intravenous injection of 3 syringes in consecutive series:   #1 containing 2.5 grams of Pentobarbital Sodium in 50 ml of diluent, #2 containing 2.5 grams of Pentobarbital Sodium in 50 ml of diluent, and #3 containing 60 ml of saline flush.

## IV. EXPERT OPINION QUESTIONS

12.     I have been asked to address the following questions:

- What are the effects of intravenous (IV) barbiturates on consciousness, awareness, and responsiveness?

- What are the potential complications of the intravenous bolus injection of a 5 gm dose of pentobarbital?

- Will administration of 5 grams of pentobarbital assure unconsciousness of the prisoner during parts of the execution that cause the most pain or suffering?

- What is the significance of the autopsy findings of pulmonary edema in prisoners executed by similar protocols involving an intravenous injection of a high dose of barbiturates?

- What are the foreseeable complications of IV line placement?

- What are the risks of using compounded drugs for judicial lethal injection?

- What is known about the complications of physician-assisted suicide and legal euthanasia?

- In my medical opinion, do prisoners executed in accordance with the procedures outlined in the Federal Protocol face a substantial risk of pain and suffering?

13.    In order to answer these questions, this declaration addresses 1) known clinical effects of IV barbiturates with regard to pain relief, consciousness, awareness, recall, responsiveness and other relevant issues; 2) known complications of barbiturate overdose, either accidental or for the purpose of suicide; 3) known effects of extravasation or inadvertent arterial injection of IV barbiturates; 4) complications of injections of high-dose IV barbiturates; and 5) relevant autopsy findings in prisoners executed using high-dose barbiturate protocols.   In preparing this declaration, I have relied on my own clinical experience with intravenous barbiturates during induction of general anesthesia, as well as various authoritative textbooks, peer-reviewed articles, materials from government regulatory agencies such as the FDA, and other publications and materials as included in the references cited and footnoted throughout this report.   I reserve the right to revise my opinion should further relevant information come to my attention that clarifies, strengthens, or changes my opinion in the course of continued review.

## V.    SUMMARY OF FINDINGS

14.    As explained thoroughly below, the Federal Protocol will subject executed prisoners to severe pain and suffering, when they remain conscious and aware prior to their

deaths. All of the opinions I express in this section and throughout the declaration are expressed to a reasonable degree of medical certainty.

15. Consciousness and unresponsiveness are distinct and should not be confused. Barbiturates do not guarantee lack of consciousness, even when the patients appear to be unconscious by all clinical measures and are unresponsive, and consciousness will permit extreme pain and suffering during the execution process. The effect of IV short-acting barbiturates is unresponsiveness, and it is extremely likely that prisoners given even high doses of barbiturates retain consciousness long enough to experience pain and suffering during the execution process using single-drug pentobarbital.

16. General anesthesia for surgery and other noxious stimuli differs greatly from administration of drugs for judicial lethal injection. During general anesthesia, both pain and awareness are reduced by the administration of multiple, different classes of potent anesthetic drugs. This will not be the case in judicial lethal injection with solo pentobarbital.

17. Barbiturate administration does not prevent pain from being felt during periods of awareness. It is a virtual medical certainty that prisoners who remain aware after high-dose administration of an IV barbiturate such as pentobarbital are capable of feeling pain, terror, and suffocation.

18. IV injection of high-dose barbiturates, including pentobarbital, has been shown to be associated with "flash" pulmonary edema in both animals and humans. It is a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of this effect of IV injection of 5 grams of pentobarbital.

19.     Pentobarbital can cause excruciating pain if injected rapidly into veins, particularly if extravasation or infiltration of the peripheral IV catheter occurs, or if inadvertent intra-arterial injection occurs. It is common for IV problems to result in extravasation or infiltration that would cause significant, excruciating pain for prisoners undergoing judicial lethal injection with IV barbiturates.

20.     It is likely that adherence to the Federal Protocol will lead to protracted efforts and multiple attempts to establish IV access and to faulty IVs. It is therefore likely that a prisoner will experience either significant pain from protracted IV access attempts, severe or excruciating pain from injection of barbiturate into tissues other than veins, and/or prolongation of the execution process due to incomplete delivery of drug into the vein.

21.     Drugs obtained from compounding pharmacies are very likely to suffer from quality issues, the most common of which is lack of potency, and this risk is pervasive, even among more tightly regulated outsourcing facilities.  It is therefore extremely likely that prisoners will be subjected to injection of an inferior, subpotent drug that vastly increases the risk that execution will be prolonged and the prisoner will suffer prolonged feelings of pain and suffocation.

22.     The Federal Protocol is vague, and does not supply sufficient detail to assure the minimization of the risks detailed in this declaration. Additionally, there are obvious deficiencies in the process, personnel, and management of risks to the prisoners that significantly increase the already substantial risks of a protracted execution.  The Federal Protocol has an extremely high risk of causing prisoners severe pain, and is virtually certain to cause prisoners excruciating suffering through their awareness of the sensations of suffocation and drowning caused by pulmonary edema.

8

## VI.   PENTOBARBITAL:  CLINICAL EFFECTS AND CONSCIOUSNESS

23.     Pentobarbital (aka Nembutal, pentobarbitone) and thiopental (aka thiopentone) are both members of a class of drugs called barbiturates. Pentobarbital is classified as a short-acting barbiturate, and thiopental is classified as ultra-short acting.  These drugs differ only slightly; thiopental contains a sulfur molecule, while pentobarbital does not.  For the purposes of judicial lethal injection, only the short-acting barbiturates (short and ultra-short) are relevant. Pentobarbital and thiopental are essentially equivalent in all pharmacological characteristics relevant to my discussion of the federal government's pentobarbital-only execution protocol. For these purposes, data regarding thiopental is also informative of how pentobarbital will act.

### a.   Clinical Effects

24.     The short-acting barbiturate thiopental was introduced in the 1930s as an anesthetic "induction" agent, meaning a drug that starts the administration of general anesthesia,[1] because of its perceived "hypnotic" or sedative effects.  Barbiturates do not have "analgesic," (i.e. pain-relieving), properties and in lower doses actually are "antalgesic," meaning they augment feelings of pain.[2]

25.     Barbiturates have generally not been used much in clinical anesthesia practice in the United States since the late 1980's, due in large part to the more favorable clinical properties of propofol when it became available after about 1987.  Pentobarbital itself was never widely used in humans in the United States for anesthesia because of adverse effects on the cardiovascular system; it has been employed in humans as a sedative, in the treatment of epilepsy, and as a drug to reduce brain swelling in patients with high intracranial pressure

---

[1] Vuyk J, Sitsen E, Reekers M.  Intravenous anesthetics.  In:  Miller's Anesthesia 9th edition.  Gropper MA, Editor-in-Chief.  Elsevier Saunders Publications, Philadelphia PA.  2019. pp 648-53
[2] Sanders RD, Tononi G, Laureys G, Sleigh JW.  Unresponsiveness ≠ unconsciousness.  Anesthesiology 2012; 116:946-9

9

(pressure on the brain) due to trauma, tumors or other causes.[3]  Its most common use in the United States is as an agent in veterinary medicine for euthanasia of animals.

26.     The intended and unintended effects of all barbiturates are highly dependent on factors related to the **pharmacokinetic** characteristics of the drug, e.g. how quickly it is redistributed to places in the body, such as muscle, where it will have no **pharmacologic** (clinical) effects; the method of administration of the drug; the individual to whom it is administered; and the nature of the surgical or other stimulus applied after the drug is administered.

27.     Like all barbiturates, the dose of pentobarbital required to produce its physiologic effects is dependent on the size, sex, and age of the recipient.  Prior or concomitant use of prescription medications can amplify or mute the onset of the clinical actions of barbiturates and shorten or augment their clinical effects and duration of action.  Prior or concomitant illicit drug use by the recipient can both reduce the effects of pentobarbital (thus requiring markedly higher than expected doses to produce a desired effect), or alternatively can augment the effects of the drug through **synergistic** action.[4] The effects of an overdose of all of the short-acting barbiturates, including pentobarbital, are effects on breathing: either inadequate breathing or interruption of breathing that results in subsequent suffocation, obstruction of breathing, or the filling of the air passages with fluid due to pulmonary edema, or with gastric contents due to vomiting.  Barbiturate overdose can cause interference with the brain's regulation of breathing.  For example, barbiturate-induced sedation can lead to mechanical airway obstruction due to the collapse of the tissues into the airway because of reduced muscle tone in the throat.

---

[3] Lopez-Munoz F, Ucha-Udabe R, Alamo C.  The history of barbiturates a century after their clinical introduction. Neuropsych Dis Treat 2005; 1:329-43
[4] **Synergism** between drugs means that the total effect of 2 or more drugs administered together is greater than the effect that would be expected by simply adding them together:  they interact in such a way that 2 + 2 does not equal 4, but rather results in 8, for example).  Each drug is said to enhance, or *potentiate* the effects of the other(s).

28.     Pentobarbital and other short-acting barbiturates owe their short duration of action to "redistribution" within body tissues, rather than to "clearance," or removal, of the drug from the body.  This means that after the drug enters the bloodstream and flows to the brain, where it has its effects, it then immediately begins to leave the brain and bloodstream as it is "soaked up" by muscle and fat.  This latter process occurs so rapidly in fact that the drug levels in the brain are already falling (and the sedative properties of the drug are decreasing) in less time than it would generally take to inject the total volume of drug called for in the Federal Protocol (160 cc via manual IV "push" through a standard IV line).[5]  The drug is later removed from the body by the kidneys and liver, long after the action of the drugs has ended.  The onset and duration of the clinical actions of short acting barbiturates like pentobarbital are also strongly affected by the dose and how quickly the drug is injected: the larger the dose, the quicker the onset.  The more rapid the injection the quicker the onset, but the faster the drug is redistributed, and the shorter the duration of action for a given dose.

29.     Short acting barbiturates such as pentobarbital have an initial onset of action within a few seconds, and cause unresponsiveness within about 1.5 minutes of injection.  Redistribution of the drug out of the brain begins immediately, and drug levels in the brain begin to fall 1.5 to 2 minutes after injection, as the drug is "soaked up" into other tissues.[6]  Most patients become responsive again within 3 to 5 minutes of a 2.5 mg/kg dose of thiopental.  Barbiturates cause a dose-dependent depression of respiratory function with maximum depression after 1 to 1.5 minutes after a 3.5 mg/kg injection.  Additional effects are depression of

---

[5] In my personal experience, IV injection of 150 cc of fluid (as designated in the Federal Protocol) into a peripheral vein, even given as rapidly as possible via the syringe method described, takes several minutes.  Faster injection of any fluid through a peripheral IV, aside from being very difficult to accomplish, predisposes to infiltration and extravasation, loss of drug, excruciating pain, and other issues.  Central IV lines (e.g. femoral, jugular and subclavian vein catheters) have a much greater length than peripheral IV catheters, exhibit much higher resistance to injection, and will require slower injections that peripheral lines.

[6] Vuyk J, Sitsen E, Reekers M.  Intravenous anesthetics.  In:  Miller's Anesthesia 9th edition.  Gropper MA, Editor-in-Chief.  Elsevier Saunders Publications, Philadlephia PA.  2019. pp 648-53.  See Figure 23.7, page 651.

the strength of contraction of the heart, dilation of peripheral veins causing low blood pressure ("hypotension") and a reflex rise in heart rate. The degree of these latter actions appears largely unrelated to dose in higher dosing ranges.[7]

### b. Brain Effects of Pentobarbital

30. "Neurotransmitters" are the chemicals largely responsible for transmitting information in the brain and peripheral nervous system. They are manufactured and stored by nerve cells, and released in response to various conditions in the cell's environment. These chemicals can be excitatory (causing increased metabolic, electrical and chemical activity in the cells they reach) or inhibitory (reducing the metabolic, electrical and chemical activity in the cells they reach). A balance of excitatory and inhibitory influences governs how the brain, spinal cord and nerves will react to a given stimulus. The mechanisms of action of barbiturates are grouped into 2 categories: 1) enhancement of the actions of inhibitory neurotransmitters and 2) blockade of the actions of excitatory neurotransmitters. The mechanisms of action of barbiturates are largely unknown, except for their actions at the "GABA" receptor.

31. GABA (gamma aminobutyric acid) is the primary *inhibitory* neurotransmitter in the mammalian central nervous system (i.e. brain and spinal cord). One receptor for GABA, the GABA$_A$ receptor, is the only proven site of action of the barbiturates in producing unresponsiveness. Barbiturates bind a site on the GABA$_A$ receptor and are able to 1) enhance the effects of the brain's intrinsic GABA at its receptor site, as well as 2) mimic GABA itself with a direct action on the receptor without using GABA.

### c. Consciousness, Unconsciousness, Awareness, Responsiveness, and Recall

---

[7] Vuyk J, Sitsen E, Reekers M. Intravenous anesthetics. In: Miller's Anesthesia 9th edition. Gropper MA, Editor-in-Chief. Elsevier Saunders Publications, Philadlephia PA. 2019. pp 648-53

32. "Pain" and "suffering" are terms that refer to subjective experiences of physical sensations. In order to feel either pain or suffering, awareness or consciousness of the sensation is necessary. So an important question regarding judicial lethal injection with pentobarbital is the effects it is likely to have on consciousness.

33. The medical study of "consciousness" and drugs that affect it is plagued by the indiscriminate and inaccurate use and interchange of the terms "consciousness" and "recall," which are two entirely different things. This misuse has led to confusion and false claims about how anesthesia itself affects consciousness. In order to understand these issues and how they impact a prisoner's experience of pain and suffering during judicial lethal injection, it is important to understand the concepts of **consciousness, awareness, responsiveness** and **recall**. Although traditional textbooks and authors report that the inhibitory effects of barbiturates cause "unconsciousness," authoritative publications now describe barbiturates as producing "unresponsiveness," since how, and even whether, they affect consciousness is under serious question.

34. The term "**consciousness**" describes a state of having a subjective experience of something. Consciousness can be "connected" or "disconnected". **Connected consciousness—** also called **awareness—**is the subjective experience of an event related to the "real" environment in a physical, emotional or psychological way. Awareness is present, for example, when an awake person savors a meal. They are having a subjective experience that is directly related to a "real world" occurrence. **Disconnected consciousness** usually occurs when we are dreaming, for example and are unaware of our "real world" environment.[8] Dreams are also

---

[8] The special case of "lucid" dreaming is a state in which a person is dreaming, but probably does have connected consciousness. They are aware they are dreaming, and can communicate to the external world. It is not known if they will take commands and much more research is needed to fully define this state of consciousness as either connected or unconnected.

subjective experiences—we might remember them when we wake, may have intense emotional reactions to them, and may even respond physically to them by moving and vocalizing in our sleep—but the dreamer is not usually reacting to what is happening to them in the physical world. When the physical world intrudes, and the dreamer "awakes," they move from disconnected consciousness to connected consciousness—aware of and responding to their environment once again.

35. Unfortunately, **consciousness** is often confused—even in the medical literature—with **responsiveness**, although these terms refer to entirely different things. While consciousness is the subjective experience of something, responsiveness is the ability to react physically to that experience. Consciousness and responsiveness do not go hand in hand. A person can respond to a stimulus but not have connected consciousness of it, and, conversely, a person can have connected consciousness, and yet be unable to respond and demonstrate that they are conscious. Sleepwalking is an example of a state in which a person is responsive (e.g. can navigate walking around their physical environment), but does not have connected consciousness (is not aware of the environment) and does not take commands.[9] There are many examples where people have connected consciousness and are aware and experiencing their environment, but are unable to respond to it. Unresponsiveness can occur due to physical impediments, e.g. a person may be given a drug that paralyzes their muscles so that they relax enough that the surgeon can work within the belly, and yet remain fully awake; by nonphysical impediments, e.g. being "frozen" by terror; and by physiological problems within the brain itself, e.g. strokes, and drug effects that prevent purposeful movement even though muscles are not paralyzed.

---

[9] Sanders RD, Tononi G, Laureys S, Sleigh JW. Unresponsivenes ≠ unconsciousness. Anesthesiology 2012; 116:946-59

36.     In considering the actions of a barbiturate such as pentobarbital on the brain during judicial lethal injection, we are concerned primarily with connected consciousness—the subjective experiences of the prisoner in his/her physical environment—such as whether they are able to experience pain or sensations including suffocation, despite being unresponsive.  A lack of responsiveness is not a reliable, nor even a good, indicator of connected consciousness, as a vast amount of research in anesthesia demonstrates.

37.     As it relates to a lethal injection protocol, it is absolutely critical to understand that **awareness** (another term for connected consciousness) and **recall** are distinctly different, and that lack of recall in no way equates to a lack of consciousness.  Research into awareness under anesthesia, and other conditions such as strokes, is fraught with the misuse of terms regarding awareness, and a lack of understanding of how awareness is determined.  Many clinicians and researchers, and even experienced and expert anesthesiologists, erroneously use the terms awareness and recall interchangeably, and rely on data regarding *recall* to comment on the incidence of *awareness*.[10],[11]  The vast majority of our conscious experiences will all be forgotten and never recalled.  But the failure to remember an event is not an indication that it did not occur, nor that it did not result in terrible suffering.  Who among us has not had the experience of driving home from work after a long day, and realizing once we arrived that we had no memory of parts of the drive?  But we clearly were not unconscious on the drive:  we were able to negotiate complex streets, read and respond to traffic signs and lights, and put on the brakes to avoid colliding with the car stopping ahead of us. This is especially true of

---

[10] Absalom A, Nagels W.  Fentanyl and midazolam anaesthesia for coronary artery bypass surgery. [letter to the editor].  Br J Anaesth 2000; 85:940-1
[11] Russel IF. Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993; 70:42-6

physically, emotionally or psychologically traumatic events, which are known to be associated with significant *lapses* in memory.

38.     Unfortunately, it is common for physicians and laypersons to mistakenly believe that patients who do not *recall* intraoperative events were not therefore conscious or aware of them at the time they occurred. Quite the opposite has been clearly shown in multiple clinical studies to be true.[12,13,14,15,16,17] Reports regarding these studies in humans demonstrate that a disturbing number of patients retain some awareness of what is happening to them during surgery, but simply cannot recall it later. One reason is that drugs such as barbiturates are adept at causing *amnesia* (or memory loss), even when they don't produce unconsciousness.

39.     Many studies purporting to be of *awareness* during anesthesia are in fact studies of *recall*, and because even accomplished authors have misused these terms, studies involving "awareness" must be read and interpreted very carefully. *Recall* is estimated to happen in less than 0.5% of anesthesia cases, but current research shows that *awareness* is disturbingly common. Obviously in the case of lethal injection, recall is irrelevant. However, *awareness*, which can permit extreme pain and suffering during the execution process, is extremely relevant.

40.     Further complicating the study and understanding of awareness during general anesthesia and other uses of "anesthetic" drugs, such as barbiturates, is the fact that connected consciousness is also related to the level of stimulus that the subject receives. A sleeping person

---

[12] Mainzer J. Awareness during fentanyl anesthesia. Anesthesiology 1982; 56:331-2
[13] Mark JB, Greenberg LM. Intraoperative awareness and hypertensive crisis during high-dose fentanyl-diazepam-oxygen anesthesia. Anesth Analg 1983; 62:698-700
[14] Hilgenberg JC. Intraoperative awareness during high-dose fentanyl-oxygen-anesthesia. Anesthesiology 1981; 54:341-3;
[15] Mummaneni N, Rao T, Montoya A. Awareness and recall with high-dose fentanyl-oxygen anesthesia. Anesth Analg 1980; 59:948-9
[16] Mainzer J. Awareness during fentanyl anesthesia. Anesthesiology 1982; 56:331-2
[17] Andrade J, Stapleton CL, Harper C, Englert L, Edwards ND. The contribution of surgery to learning and memory in anaesthesia. In: Memory and Awareness in Anaesthesia IV. Jordan C, Vaughan DJA, Newton DEF, eds. Imperial College Press, London UK. 2000. Pp 141-63

without connected consciousness may not respond to softly spoken words in their physical environment because the stimulus is too little to rouse them to connected consciousness, but will awaken if the same words are shouted. The level of stimulus bears little relationship to whether recall is reported later. However, as the level of stimulus increases—louder sounds, greater pain, growing air hunger—so does the probability that connected consciousness (awareness) will occur. It is common for an anesthesiologist to induce unresponsiveness in a non-paralyzed patient, observe them "sleeping" quietly while their body is prepped and draped for surgery, only to have them move, groan and even try to reach or sit up when the surgery begins. Additional anesthetic drugs have to be administered by the time the surgery starts (this is called "deepening the anesthetic") to adjust the level of drugs to meet the stimulus that is now occurring. For example, during lethal injection, as the prisoner begins to experience suffocation and the sensations of drowning with flash pulmonary edema (discussed later in this report), they will become progressively more aware.

41. Multiple case reports and clinical studies in the literature have demonstrated that even "massive" doses of non-barbiturate drugs or simple combinations of one or two classes of non-barbiturate drugs that supposedly produce "unconsciousness" actually do not guarantee that a surgical patient is unconscious. These studies are important and relevant here, even when they do not involve short-acting barbiturates, because they illustrate past misperceptions about anesthetic drugs and show that hypnotic (sleep) drugs do not apparently ablate (i.e. remove) awareness, *regardless of the class of drug.*

42. A spate of publications in the 1980s showed that high-dose diazepam or another benzodiazepine, usually in combination with fentanyl (which enhances the benzodiazepine

effects), failed to prevent intraoperative awareness.[18,19,20,21] In 1987, investigators demonstrated significant levels of perioperative awareness in patients who received a combination of high doses of the drugs lorazepam (another potent benzodiazepine) and fentanyl (a narcotic) for induction of anesthesia. Two patients had recall during their surgery that was specific enough to report details of conversations in the operating room.[22] Similarly, in a study reported in 2011, in patients who received high doses of lorazepam plus temazepam plus midazolam (all members of the same class of drugs, benzodiazepines), a significant number were found to have awareness after induction, some with recall specific enough to report noises and conversations in the operating room.[23] Is this also the case with short-acting barbiturates like pentobarbital? A few studies using a special technique to determine awareness, rather than recall, show that it is indeed true of them as well (see below).

43.     The normal conduct of a general anesthetic involves several stages: induction, maintenance and emergence. Induction is the phase in which hypnotic ("sleep") drugs, sometimes accompanied by narcotic analgesic (pain relieving) drugs are given in sufficient doses to allow the patient to tolerate procedures that precede the actual surgery and that would generally be intolerable without medication, such as placement of a breathing tube into the trachea. During this time, other things are also happening, such as positioning of the patient, sterile prep of the surgical field, possible placement of additional peripheral or central

---

[18] Mainzer J. Awareness during fentanyl anesthesia. Anesthesiology 1982; 56:331-2

[19] Mark JB, Grreenberg LM. Intraoperative awareness and hypertensive crisis during high-dose fentanyl-diazepam-oxygen anesthesia. Anesth Analg 1983; 62:698-700

[20] Hilgenberg JC. Intraoperative awareness during high-dose fentanyl-oxygen-anesthesia. Anesthesiology 1981; 54:341-3;

[21] Mummaneni N, Rao T, Montoya A. Awareness and recall with high-dose fentanyl-oxygen anesthesia. Anesth Analg 1980; 59:948-9

[22] Robinson JF, Boright WA, Ligier B, Mclivena K, Metcalf LR, Truong DT. The incidence of awareness, and amnesia for perioperative events, after cardiac surgery with lorazepam and fentanyl anesthesia. J Cardiothor Anesth 1987; 1:524-30

[23] Lala HM, Lala MP, Kibblewhite DP, Chan BO, Barnard JPM. Awareness during cardiac surgery—a single centre prospective clinical audit of 1060 patients. Anaesth Intensive Care 2011; 39:973-4

intravenous lines, etc. Immediately following tracheal intubation while these events take place, the anesthesiologist begins to "deepen" the anesthetic by administering additional drugs. This can include administering more of the drugs that were given during induction, but also includes different drugs, such as inhaled anesthetic gases (e.g. sevoflurane or others), nitrous oxide, and possibly intravenous drugs of different classes. When anesthetic gases are given, unlike IV administration of medications, the rise in concentration of these agents in the patient does not occur instantaneously, but takes a variable amount of time—from 5 to 10 minutes. The amount of these additional drugs and repeat boluses of drugs that can be given before surgical incision is somewhat limited, because they can cause potentially deleterious effects on blood pressure, heart rate, and other vital organ functions of patients, that will be offset by a rise in blood pressure and heart rate once surgical incision is made. After incision, additional drugs can generally be given.

44.     The phase from just prior to incision, through to the end of surgery, is the "maintenance" phase of anesthesia. "Emergence" is the phase in which surgery is ending, the anesthetic drugs are wearing off and/or being discontinued, and the awakening of the patient begins. The period from first administration of induction drugs to incision is highly variable, but in most studies of awareness using a special technique called the isolated forearm technique (see below), when this length of time was recorded, it was between 9 and 10 minutes in length.[24] Studies of awareness during this period of anesthesia—from the administration of induction drugs to the point of stimulation by surgical incision—are the most informative about how consciousness, pain and suffering occurs during judicial lethal injection.

45.     Because many anesthetic techniques require administration of a drug to paralyze the muscles (in order to place a breathing tube, or so that they are sufficiently relaxed for the

---

[24] Russell IF, Wang M.  Absence of memory for intraoperative information during surgery under adequate general anaesthesia.  Br J Anaesth 1997; 78:3-9

surgeon to work within body cavities such as the abdomen), researchers realized that movement and other potential signals of awareness and pain would be impossible to detect. A special technique, called the "isolated forearm technique" (IFT), was developed to study true awareness under these conditions. It is now considered the "gold standard" in researching awareness during anesthesia. With the IFT technique, prior to administration of the paralytic drug, one forearm is isolated from the circulation to prevent the arm from being paralyzed and allow the patient to move that arm in response to commands if they are aware. This is done by placing a tourniquet on the forearm and inflating it to prevent blood from entering the forearm while the paralytic drug is being given. Following a specific command (such as "move your right arm" or "raise your right hand") *requires awareness:* the patient must hear the instruction, realize what they are being told to do, and carry out the action in the instruction.

46. In one study of high dose IV anesthetic agents using the IFT technique *72%* of patients—all of whom the anesthesiologists assessed to be "asleep" after administration of a combination of 2 non-barbiturate induction drugs for general anesthesia was given — responded to explicit commands, causing the author to question whether a combination of these drugs was actually an anesthetic at all.[25] The same author found that other anesthetic inductions using midazolam and fentanyl were also associated with a 44% rate of response to commands with this technique, indicating awareness.[26] Other studies have shown awareness in 73% of patients undergoing major gynecologic surgery with anesthesia involving induction with one drug.[27]

---

[25] Russell IF. Midazolam-alfentanil: an anaesthetic? An investigation using the isolated forearm technique. Br J Anaesth 1993;70:42-6

[26] Russell IF. Comparison of wakefulness with two anaesthetic regimens. Total i.v. balanced anaesthesia. Br J Anaesth 1986; 58:965-8

[27] Russell IF. The ability of bispectral index to detect intraoperative wakefulness during total intravenous anaesthesia compared with the isolated forearm technique. Anaesthesia 2013; 68:502-11

47.    Studies using the IFT technique, and others have demonstrated that no clinical parameters (i.e. changes in heart rate, blood pressure, loss of eyelash reflex, response to moderately painful stimuli, tearing or sweating) reliably identify whether a patient is aware[28,29,30,31,32,33,34] and *no reliable technical monitor for detecting connected consciousness in anesthetized patients has ever been found*.  IFT studies have shown that physical maneuvers, such as calling the patient's name, testing for eyelash reflex, or providing a mild to moderately painful stimulus such as pinch or sternal rub do not predict whether a patient is aware, nor whether they will have recall.[26-30]  Research also has proven that ("brain wave") monitors (e.g. EEG, BIS, Lifescan and other processed EEG methodologies) cannot reliably detect consciousness.[35,36,37,38,39]  Vice President and Medical Director of Aspect Corporation, the company that made and marketed the BIS monitor, Scott Kelley in fact himself stated that there is no assurance that "BIS monitoring alone would prevent an inmate from suffering" during

---

[28] Baker AB.  Induction of anesthesia with diazepam.  Anaesth 1969; 24:388-92
[29] Blackmon BB, Mahaffey JE, Baker JD.  Clinical comparison of midazolam hydrochloride and midazolam maleate for anesthesia induction.  Anesth Analg 1984; 63: 1116-20
[30] Gamble JAS, Kawar P, Dundee JW, Moore J, Briggs LP.  Evaluation of midazolam as an intravenous induction agent.  Anaesthesia 1981; 36:868-73
[31] Russell IF.  Comparison of wakefulness with two anaesthetic regimens.  Br J Anaesth 1986; 965-8
[32] Russell IF.  Midazolam-alfentanil: an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6
[33] Russell IF.  Midazolam-alfentanil: an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6
[34] Russell IF.  Comparison of wakefulness with two anaesthetic regimens.  Total i.v. balanced anaesthesia.  Br J Anaesth 1986; 58:965-8
[35] Russell IF.  The Narcotrend 'depth of anaesthesia' monitor cannot reliably detect consciousness during general anaesthesia: an investigation using the isolated forearm technique.  Br J Aanesth 2006; 96:346-52
[36] Schneider G, Wagner K, Reeker W, Hanel F, Werner C, Cochs E.  Bispectral index (BIS) may not predict awareness reaction to intubation in surgical patients.  J Neurosurg Anesthesiol 2002; 14:7-11
[37] Kerssens C, Gaither JR, Sebel PS.  Preserved memory function during bispectral index-guided anesthesia with sevoflurane for major orthopedic surgery.  Anesthesiology 2009; 111:18-24
[38] Avidan MS, Zhang L, Burnside BA, et al.  Anesthesia awareness and the bispectral index.  N Eng J Med 2008; 358: 1097-108
[39] Gaskell AL, Hight DF, Winders J, et al. Frontal alphas-delta EEG does not preclude volitional response during anaesthesia: prospective cohort study of the isolated forearm technique.  Br J Anaesth 2017; 119:664-73

Case 1:19-mc-00145-TSC Document 302-2 Filed 10/29/20 Page 23 of 89

lethal injection.[40]   Processed brainwave monitors in the OR have long since been proven to unreliable in detecting awareness, even in patients in whom the IFT shows awareness is present.[41,42]   Studies using the BIS and other brain wave monitors as evidence of lack of awareness must therefore be disregarded.

48.      Because the barbiturates stopped being widely used in clinical anesthesia practice about 40 years ago, only a few studies of awareness using the IFT have specifically involved pentobarbital or other short-acting barbiturates, such as thiopental.   But those studies have indicated that barbiturates do not guarantee unconsciousness, even when the patients appear to be unconscious by all clinical measures, including EEG monitoring.

49.      In 1993, King et al. demonstrated recall in patients undergoing C-section after induction with thiopental as a solo agent. Following thiopental administration, and after disappearance of the eyelash reflex, patients received taped instructions to flex their fingers to indicate if they could hear, make a fist or squeeze the researcher's hand if they felt pain, and to respond with various physical cues during interviews after the anesthetic.   They also were given 6 target words to remember.   Over 96% of patients (who were assessed by traditional measures as being "asleep") responded and indicated awareness at one minute after induction.   Twenty percent indicated persistent awareness for an additional 2 minutes.   It should be noted that EEG monitoring (via Lifescan®) showed *no activity* during intubation, a very noxious stimulus, even while 1/3 of patients indicated that they were awake.   *None* of the patients had later recall of the

---

[40] Steinbrook R.  New technology, old dilemma—monitoring EEG activity during executions.  New Eng J Med 2006; 354:2525-27
[41] Russell IF.  The ability of bispectral index to detect intraoperative wakefulness during total intravenous anaesthesia compared with the isolated forearm technique.  Anaesthesia 2013; 68:502-11
[42] Russell IF. The ability of bispectral index to detect intra-operative wakefulness during isoflurance/air anaesthesia, compared with the isolated forearm technique.  Anaesthesia 2013; 68:1010-20

events.[43]   Gaitini et al. found that over half of women undergoing C-section after thiopentone induction moved their hands in response to commands, although none recalled the operation later.[44]  In 1997, Russell and Wang, using the IFT and similar instructions and commands following induction of anesthesia with thiopentone in 68 women, found that even though none of their patients followed commands after induction, five women later showed evidence of explicit recall of intraoperative events, including hearing voices and conversation, and being aware of incision.[45]   Slavov et al. demonstrated movement in response to intubation (placement of an endotracheal tube) despite no apparent change in the EEG monitoring (BIS® monitor) in 24% of patients who were induced with fentanyl plus thiopental.  No patient had recall of events later.[46]  In 1989, Tunstall and Shiek found using the IFT that 42% of women were responsive to command 2 minutes after the beginning of the injection of thiopentone for induction of general anesthesia—at the time in which the clinical effects of the drug would be at their peak.  None of the women had recall of the events.

50.    Overall, awareness has been reported to occur in up to 71% of patients studied who received IV anesthesia induction,[47] and furthermore appears to be more common with IV anesthetic induction compared to inhalational anesthetic drugs.  Are the other 29% of patients who did not respond under IFT "unaware"?  Not necessarily.  Even the IFT itself almost certainly underestimates awareness: for the technique to work the patient must not only be

---

[43] King H, Ashley S, Brathwaite D, Decayette J, Wooten D.  Adequacy of general anesthesia for cesarean section.  Anesth Analg 1993; 77:84-8
[44] Gaitini L, Vaida S, Collins G, Somri M, Sabo E.  Awareness detection during Caesarean section under general anaesthesia using EEG spectrum analysis.  Can J Anaesthesia 1995; 42:377-81
[45] Russell IF, Wang M.  Absence of memory for intraoperative information during surgery under adequate general anaesthesia.  Br J Anaesth 1997; 78:3-9
[46] Slavov, v, Motamed C, Massou N, Rebufat Y, Duvaldestin P.  Systolic blood pressure, not BIS, is associated with movement during laryngoscopy and intubation.  Can J Anaesth. 2002; 49:918-21
[47] Russell IF.  Comparison of wakefulness with two anaesthetic regimens.  Total i.v. balanced anaesthesia.  Br J Anaesth 1986; 58:965-8

aware, but be capable of understanding the command, capable of perceiving that movement is required, and physically capable of producing that movement.  Terror and pain are known to impair the ability of persons to understand, and carry out complex tasks during traumatic events, "freezing" them from being able to respond even when they are conscious and not under the influence of drugs. Recent research regarding how the brain processes and responds to information offers a more fundamental explanation for involuntary unresponsiveness during awareness, and scientific evidence suggests that the very drugs we often rely upon to produce unconsciousness may actually produce unresponsiveness that mimics unconsciousness, even as a person retains awareness.

51.     While the "cortex" of the brain (the so-called "gray matter" that makes up a large part of the brain and gives the brain its traditional shape) is traditionally thought of as ruling thought, consciousness, and responsiveness, it turns out that much deeper core brain structures and their interactions with the cortex are even more critical to consciousness, recall, and responsiveness. Much of the current research regarding mechanisms of consciousness focuses on the thalamus and other structures, such as the amygdala.

52.     The thalamus lies buried deep within the core of the brain, and it is responsible for receiving and selecting among the billions of bits of data and sensory input received by the nervous system every moment.  It processes data and sensory input by selecting some and rejecting others, and then connects with the cortex as well as arousal centers deeper in the brain to integrate consciousness of and responsiveness to those inputs. The thalamus thus behaves much like a giant, multimodal switching center in a hugely complex railyard of electrical signals and inputs, sending millions of signals at nearly the speed of light along some tracks to the cortex and others along different tracks to arousal centers or other areas of the midbrain for processing,

24

and sometimes simply allowing some signals to be extinguished. Along the way, the signals that travel the tracks are amplified or dampened by additional signaling and chemicals in the brain.

53.     Experiments have shown that during deep, dreamless sleep, connections and relays between the thalamus and the cortex break down.  In dreaming sleep (so-called REM sleep for the Rapid Eye Movements seen in dreaming subjects) cortico-thalamic connectedness looks essentially the same as the connections during full wakefulness.[48]  In other words, intact cortico-thalamic connectedness, for all intents and purposes, indicates consciousness, either connected or disconnected. Experiments have shown that cortical connectivity (and therefore connected consciousness or awareness) changes *independently* from responsiveness:  one can be suppressed while the other is intact.  In other words, unresponsiveness does not equal unconsciousness, even when nothing is physically preventing the subject from responding. To produce unconsciousness, a drug must therefore reduce cortical-thalamic connectivity, and not merely suppress responsiveness.

54.     An important chemical in maintaining cortico-thalamic connectivity and consciousness is norepinephrine.  Norepinephrine suppression reduces the brain's attention to external stimuli, even while still allowing sensory information to occur.  Experiments have shown that during administration of individual anesthetic drugs (as opposed to administration of multiple anesthetic drugs together, as is done in the practice of anesthesia, see below), connectivity of attention-rousing areas of the brain to the corticothalamic network are not suppressed, and norepinephrine signaling continues.  Rises in levels of another adrenergic

---

[48] Sanders RD, Tononi G, Laureys S, Sleigh JW.  Unresponsiveness ≠ unconsciousness.  Anesthesiology 2012; 116:946-59

chemical, adrenalin, have been shown in rats subjected to pentobarbital and chloral hydrate anesthesia, to enhance learning and awareness.[49,50]

55.    *GABAergic anesthetic drugs such as barbiturates— including pentobarbital—*are known to be poor at suppressing norepinephrine signaling in the human brain, and it is felt that this may explain why patients who receive anesthetic drugs and who are aware may still not move— will appear to be asleep— even when connected consciousness is present.  The thalamus receives major input via norepinephrine.   And GABAergic drugs are poor at suppressing thalamic activity at doses that are known to prevent spontaneous responsiveness.[51]   The continued actions of norepinephrine during GABAergic drug administration leave the brain able to perceive sensory input, even while it is unable to respond.

56.    Additionally, other areas of the brain, such as the amygdala, appear to play a role in selecting a response out of the infinite number of responses that the brain could make when a stimulus is received.  Connectivity of these areas to the cortex can determine whether an "aware" brain is able to select and perform any response.  It has been shown that in various states of consciousness, damage to this area (or drug effects on this area) can prevent spontaneous responses to events, while leaving the brain's ability to follow direction (so-called "goal-directed" responses) intact.  This may explain why some patients who are aware and report recall after an anesthetic, do not move during the anesthetic in response to pain or noxious stimuli (or even during IFT when given commands) even though they are not paralyzed. [52] It is generally

---

[49] Gold PE, Weinberger NM, Sternberg DB.  Epinephrine-induced learning under general anesthesia:  retention performance at several training-testing intervals.  Behav Neurosci 1985; 99:1019-22
[50] Weinbergerger NM, Gold PE, Sternberg DB.  Epinephrine enables Pavlovian fear conditioning under general anesthesia.  Science 1984;233:605-7
[51] Mashour GA, Pryor KO.  Consciousness, Memory and Anesthesia.  IN:  Miller's Anesthesiology 9th Ed.  Gropper MA, Ed.  Elsevier , Inc. Philadelphia PA.  2002.  Pp 260-66
[52] Sanders RD, Tononi G, Laureys S, Sleigh JW.  Unresponsiveness ≠ unconsciousness.  Anesthesiology 2012; 116:946-59

recognized, that although IFT is a "gold standard" in detecting awareness, even it does not detect *all* cases of awareness.

57.     Since connected consciousness, unresponsiveness and recall have been reported together in general anesthesia only on exceedingly rare occasions (< 0.5%), it is difficult to ask people what it feels like under those circumstances.  However, conditions involving the failure of cortico-thalamic connections that leave a conscious person unable to move despite not being paralyzed are well-described and are called "locked-in syndromes."  They can give us an idea of what patients who have awareness under general anesthesia might be experiencing.  Some forms of locked-in syndrome are produced by certain neurological diseases, particularly a special type of stroke affecting the deep brain. In about 1% of strokes, despite having intact nerves and muscles, intact sensation, and full consciousness, patients are partially or wholly unable to move.[53]  Survivors, which are uncommon, frequently report terror, loneliness, and desperation. One patient reported being able to hear every word and understand everything around him, including the doctors telling his wife that he had a less than 2% chance of survival, but was unable to tell them he was alive, "…in my mind I was screaming 'No!'"[54]

58.     Locked-in syndrome has also been reported as an occasional complication after the administration of a certain class of drugs used in both anesthesia and psychiatric treatment, the butyrophenones (haldol and droperidol).  The condition consists of being awake and aware, yet unable or minimally able to initiate movement despite not being physically paralyzed. Patients and anesthesiologists described the condition as "outward calm, but inner panic."  The anesthetic technique using butyrophenones has been all but abandoned due in large part because

---

[53] Patterson JR, Crabois M.  Locked-in syndrome: a review of 139 cases.  Stroke 1986; 17:758-64
[54] Locked-in syndrome: rare survivor Richard March recounts his ordeal.  The Guardian.  Aug 7 2012

so many patients reported terrible nightmares, panic, and feelings of "being locked in" during induction of anesthesia.[55,56,57,58]

### d. Many Patients Who Are Aware By IFT Report Pain and Other Distress

59.     Studies using the IFT not only demonstrate that patients are aware in a significant portion of cases, but also that they can and do experience pain, panic and other distress during that awareness. Studies of awareness that occurs between the time of the administration of induction drugs to the point of stimulation by surgical incision and shortly thereafter are the most informative about how pain is affected during the administration of solo drugs, simple combinations and then under full general anesthesia when multiple classes of drugs are being administered.

60.     Gaitini found that over half of patients given thiopental for induction were aware for more than 12 minutes after induction, and that awareness began to fall as halothane and nitrous oxide, two different inhaled anesthetic gases, began to reach their effective levels. Furthermore, during this critical period of time, not only was awareness found in both of these studies, but 63% of patients in the King study indicated they felt pain. Pain with awareness has been confirmed in other studies using the IFT—in one study pain was demonstrated in 42% of patients who were aware, and "pain and distress" in 75%—but both decreased awareness and decreased pain occurred when volatile anesthetic gases were added.[59]   Thus, awareness occurs in

---

[55] Rennemo F, Larsen R, Breivik H.  Avoiding psychic adverse effects during induction of neurolept anaesthesia with levomepromazine.  A double-blind study of levomepromazine and droperidol.  Acta Anaestheesiol Scan. 1982; 26:108-11

[56] Anesthesia Basics.  University of Sidney.  Sydney, AU.  Available at: http://www.anaesthesia.med.usyd.edu.au/resources/lectures/anaesthesia_basics.html  Accessed Oct 27, 2019

[57] Brown E, Purdon PL, Van Dort CJ.  General anesthesia and altered states of arousal:  a systems neuroscience analysis.  Ann Rev Neurosci 2011; 34:601-28

[58] Russell IF.  Balanced anaesthesia:  does it anesthetize?  Anesth Analg 1985:64:941-2

[59] Sander RD, Gaskell A, Rax A, et al.  Incidence of connected consciousness after tracheal intubation.  A prospecgive, international, multicenter cohort study of the isolated forearm technique.  Anesthesiology 2017; 126:214-22

many patients during the induction and early maintenance phases of general anesthesia, and pain is reported with awareness in a significant number of them. Both pain and awareness are reduced during the general anesthesia after the further administration of additional, different classes of potent anesthetic drugs. This will not be the case in judicial lethal injection with solo pentobarbital.

## VII. GENERAL ANESTHESIA PRACTICE AND JUDICIAL LETHAL INJECTION: RELEVANT CRITICAL DIFFERENCES

61.     It should be emphasized that the administration of general anesthesia is critically different from administration of drugs for judicial lethal injection, even though they may involve some of the same drugs. General anesthesia for severely noxious stimuli, such as the procedures performed during surgery, virtually *never* consists of giving only one drug or one class of drug. While single "brain chemicals" can be administered as "anesthesia" for techniques involving minor amounts of pain or discomfort, or that are extremely brief in duration, today it is very uncommon to do so because our understanding of the deficiencies of such techniques has evolved. Solo anesthetic drugs are never sufficient to produce appropriate anesthesia for significant procedures that involve significant pain. Multiple drugs are given during anesthesia to target multiple areas in the brain with the intent of diminishing pain and awareness, both of which occur when only one or even a couple of drugs are given.

62.     Even a very simple, balanced anesthesia technique requires administration of multiple chemicals targeting different areas of the brain and different neurotransmitter systems, and some primarily targeting the musculoskeletal system. General anesthesia combines entirely different classes of drugs to produce its multiple effects in the brain.[60] The administration of a

---

[60] Examples include 1) propofol, etomidate, barbiturates, and benzodiazepines that affect the $GABA_A$ receptor and GABA itself; 2) inhaled anesthetics such as isoflurane and sevoflurane that have multiple effects throughout the

single drug that acts at very narrowly defined areas in the brain can in no way be equated to, nor act in even similar ways to, general anesthesia, which aims to produce unconsciousness, immobility, analgesia and amnesia.

63.     In studies of patients undergoing anesthesia, awareness as measured by IFT was highest when only one or two IV drugs have been administered, and fell as the actions of multiple drugs that affect different types of receptors in the brain were rising to effective levels in the body.  In the studies of awareness in which thiopental was the solo induction agent or was used in combination with just one other drug (usually a narcotic), awareness was most pronounced during the first 10 to 12 minutes of the anesthetic, or from the period immediately following injection of the barbiturate, to several minutes following incision, when the additional drugs—often an anesthetic gas plus nitrous oxide[61]—could be expected to have reached their effective doses.   Russell found that awareness following administration of thiopental as measured by IFT was highest for several minutes, until nitrous oxide and other drugs were given.[62]  King found that after thiopental induction, in 30 patients, 76% demonstrated awareness on IFT at surgical incision, and that IFT responses began to fall thereafter at the time when the halothane and nitrous oxide (that had been started after induction) would finally have reached their effective levels.[63]

brain and spinal cord that are independent of GABA and the GABA$_A$ receptor but that affect other sites, such as potassium channels and direct effects on the spinal cord; 3) the inhaled analgesic nitrous oxide that relies on N-methyl-D-aspartate (NMDA) receptors and potassium channel activation; 4) ketamine that relies on NMDA receptor effects; dexmedetomidine that promotes alpha adrenergic neurotransmitter effects; 5) droperidol that acts on sites affected by the neurotransmitters norepinephrine, dopamine, and serotonin; 6) scopolamine or other anticholinergic agents that act on cholinergic receptors; and 7) opioids such as fentanyl, sufentanil, alfentanil, remifentanil, morphine, demerol and other that act on specific opioid binding sites in the brain and spinal cord; as well as many others.

[61] Nitrous oxide is not an "anesthetic" gas, since at its maximum dose it does not as a solo drug prevent response to surgical incision. It does, however, reduce pain and is termed an "analgesic".

[62] Russell IF.  Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6

[63] Russell IF.  Midazolam-alfentanil:  an anaesthetic?  An investigation using the isolated forearm technique.  Br J Anaesth 1993;70:42-6

## VIII.   COMPLICATIONS OF BARBITURATES IN JUDICIAL LETHAL INJECTION

64.     The high incidence of awareness, and the finding that painful stimuli and other distress happens after intravenous administration of single and double "anesthetic" agents, is one reason why anesthesia for significantly painful or prolonged procedures does not rely on a single barbiturate, but rather on multiple drugs that target multiple areas in the brain.  In the context of judicial lethal injection, it is critical to understand that a single dose of barbiturate is insufficient to ablate awareness, including the sensations of pain and the extreme suffering of suffocation and asphyxiation that will occur during the barbiturate IV injection that is proposed in the Federal Protocol.

### a.     Flash Pulmonary Edema

65.     Flash pulmonary edema is an excruciating complication that occurs in the vast majority, if not all, judicial lethal injections using pentobarbital or thiopental. Acute pulmonary edema (or fluid in the lungs) is a process in which fluid from the bloodstream floods the lungs, causing failure of the lungs to transfer sufficient oxygen into the bloodstream.  In addition, the lungs become stiff from increased fluid, and it becomes harder physically for the victim to draw breath.  Actual spasm of the airways (bronchospasm) occurs as the swelling ("edema") of airway passages makes breathing increasingly difficult as the airways themselves swell shut.  The victim has to work harder and harder to breath, and suffers sensations of shortness of breath and excruciating air hunger, similar to the sensations experienced in drowning and near-drowning victims (see below: Drowning/Suffocation).  "Flash" pulmonary edema or "acute" pulmonary edema refers to a phenomenon in which this entire process happens rapidly, e.g. over seconds to minutes, rather than over the course of hours or days.  Symptoms of flash pulmonary edema in patients include cough, shortness of breath, air hunger rapid breathing, sweating, falling levels of

oxygen in the bloodstream, frothy sputum (sometimes pink or red due to blood) or fluid in the airway, and acute excruciating sensations of doom and/or drowning.[64,65]

66.     Pulmonary edema is a well-known complication of barbiturate overdoses in humans and nonhuman animals.[66,67,68,69,70]  Its occurrence involves several mechanisms relevant to lethal injection: 1)  acute left heart failure due to direct toxic effects of barbiturates on the heart, leading to "backing up" of blood into the lungs, 2) direct toxic/caustic damage to the lung capillaries as extremely high concentrations of barbiturates (which are highly alkaline and caustic) make physical contact with the lung and capillary surfaces, causing immediate leakage of fluid through the damaged capillaries into the lungs (non-cardiogenic pulmonary edema), and 3) obstruction or partial obstruction of the upper airway due to effects of barbiturates on respiratory centers in the brain, or due to laryngospasm (a spasmodic, involuntary closure of the larynx) while respiratory efforts continue against the obstruction or partial obstruction, "sucking" fluids from the capillaries into the lung air spaces ("negative pressure" pulmonary edema).  It should be noted that laryngospasm is also an independent complication of very high-dose barbiturate administration.[71]  Non-cardiogenic pulmonary edema is facilitated by catecholamine

---

[64] Wedro B.  Pulmonary edema.  Emedicinehealth.  Updated 2/1/19.  Available at: http://emedicinehealth.com/pulmonary_edema/article_em.htm#what_are_the_symptoms_of_pulmonary_edema. Accessed October 18, 2019

[65] Gagne D.  Acute pulmonary edema.  CathLabDigest September 5, 2012. Volume 20.  Available at: https://cathlabdigest.com/Acute-Pulmonary-Edema  Accessed Oct 18, 2019

[66] Nilsson E.  Care of respiration and air passages in connections with barbiturate poisoning.  Int Anaesthesiol Clin. 1966; 4:309-22

[67] Goodman JM, Bischel MD, Wagers PW, Barbour BH.  Barbiturate intoxication:  morbidity and mortality.  West J Med 1976; 124:179-86

[68] Lee WJ, Rie EU. OH DR, et al.  A patient with pulmonary edema and cardiac arrest after phenobarbital overdose. J Korean Soc Emerg Med 1999; 10:294-300

[69] Suddock J, Cain M.  Barbiturate toxicity.  StatPearls.  A service of the national library of medicine.  Updated Nov 15, 2018.  Stat Pearls publishing, January 2019.  Available at:  https://www.ncbi.nlm.nih.gov/books/NBK499875/ Accessed Oct 21, 2019

[70] Schoenfeld MR.  Acute pulmonary edema caused by barbiturate poisoning: a consideration of its genesis and therapy.  Angiology 1964; 15:445-53

[71] Barron DW, Dundee JW.  Clinical studies of induction agents.  XVII: relationship between dosage and side effects of intravenous barbiturates.  Brit J Anaesth 2967; 39:24-30

(adrenalin) release into the bloodstream in combination with known precipitating drugs.[72,73] Excitement, fear, and anxiety release large amounts of adrenalin into the bloodstream, and all set up conditions for non-cardiogenic pulmonary edema.

67.     Onset of pulmonary edema following IV barbiturate injection can be *virtually instantaneous*.  Potts, for example, reported a case in which hypoxia, pulmonary edema, and pleural effusions developed in a patient *immediately* following IV administration of just 325 mg of sodium thiopentone.[74] Since the patient was intubated (i.e. had an endotracheal tube in place), the mechanism that triggered pulmonary edema in that particular case was most likely a combination of rising pulmonary venous pressure as the left ventricle of the heart suddenly failed from barbiturate poisoning, and direct damage by the barbiturate when it came into contact with the lung capillaries, causing fluid that was under increased pressure from the heart to pour from the capillaries into the lungs.[75]

### b.     The Drowning/Suffocation Sensation

68.     Respiration involves two primary functions:  maintenance of viable oxygen levels in the bloodstream and extraction of (toxic) carbon dioxide ($CO_2$) that is constantly accumulating as the "waste" of living cells.  To accomplish these functions, air is pulled into the lungs when the diaphragm actively contracts, and oxygen passively crosses from the air in the lungs into the bloodstream while $CO_2$ simultaneously passes from the bloodstream into the air in the lungs.  The diaphragm passively relaxes, and the air flows passively out of the body. The normal percentage saturation of oxygen in the blood of the average person breathing room air at

---

[72] Pate P.  The shocking truth about non-cardiogenic pulmonary edema.  Vetbloom.  July 26, 2016.  Available at: http://blog.vetbloom.com/ecc/non-cardiogenic-pulmonary edema.  Accessed Oct 21, 2019
[73] Stone CA, Loew ER.  Effect of various drus on epinephrine-induced pulmonary edema in rabbits.  Proc Soc Exp Biol Med  1949; 71:122-6
[74] Potts MW, Smethurst PW.  Pleural effusion complicating thiopentone administration.  A case report.  Br J Anaesth 1967;39:78-8
[75] Nilsson E.  Care of respiration and air passages in connections with barbiturate poisoning.  Int Anaesthesiol Clin. 1966; 4:309-22

sea level is around 97%. There is enough oxygen in the lungs after a normal breath of room air to maintain oxygen at levels in the bloodstream above 92% for about 3 to 4 minutes, even if the person is not breathing, after which the oxygen levels start to fall. After another 1 to 2 minutes, oxygen levels in the bloodstream will be dangerously low.   Unconsciousness due to hypoxia appears to occur in most people 30 seconds to a minute after that, when oxygen saturation is below 40%.   Timing is affected by patient size, obesity, increased or decreased metabolism, smoking history and other patient-specific factors.

69.     Not being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man.  It is nearly impossible for most untrained human beings to hold their breath voluntarily for more than 1 minute.   In less than 60 seconds, sensations of asphyxia and compulsion to breathe appear and rapidly overwhelm the brain. Panic and terror, and the attempt to fight take over.  *Even human beings who are underwater will reach such a level of agony that they will be compelled to take a "breath" within about 1 minute.*[76] This is the sensation that is deliberately elicited in " the enhanced interrogation technique" called waterboarding, which is defined by the European Court of Human Rights as a form of torture.[77] These sensations occur whether or not the victim is able to take that breath.  They may be physically unable (for example paralyzed by a paralytic drug), or physiologically impaired, for example by drugs that "lock in" the brain and make it impossible for the brain to act on these sensations.  A lack of visible breathing effort therefore does not indicate that these sensations are absent.

---

[76] Parkes MJ.  The limits of breath holding.  Scientific American.  April 2012; pp74-9

[77] European Court of Human Rights  Former fourth section: case of Husayn (Abu Zubaydah) v Poland. (Application no. 7511/13) judgement. Strasbourg 24 July 2014. FINAL 16/02/2015. Treatment to which the applicant was subjected at the relevant time. Paragraph 511.  http://hudoc.echr.coe.int/eng?i=001-146047  Accessed October 18, 2019

### c. Autopsy Evidence Regarding Flash Pulmonary Edema and Lethal Injection Protocols with Barbiturates.

70.    As part of this report I have reviewed autopsy findings in 27 prisoners who were executed in Florida, Arizona, Georgia, and Oklahoma between 2001 and 2018 by judicial lethal injection of barbiturates alone or in combination with other drugs (see **Appendix III**).  Of the 27 autopsies, the pathologist failed to comment on the presence or absence of pulmonary edema and/or failed to report taking sections of lung tissue dissection in 7 cases.[78] Of the 20 cases in which any commentary was made on the lungs, ***100% demonstrated pulmonary congestion and pulmonary edema***, which are not normal autopsy findings.  In 40% of the cases (n = 8), edema was rated as moderate, and in 50% of cases (n = 10) edema was rated as severe, abundant, intense, and/or was associated with fluid in the main airways, (indicating severe pulmonary edema).  In 2 cases, edema was present, but not characterized.  Three-quarters of severe cases (n = 6) demonstrated *fluid filling the main airways and tracheobronchial tree*—in one case filling the airways all the way up to the back of the throat (larynx).    Thus at least 90% of the cases of pulmonary edema were moderate to severe, many with fluid filling their major airways

71.    Because this finding had to develop while the prisoner was still alive during the execution protocol, (i.e. not over hours or days), they all represent flash pulmonary edema.  In addition, pulmonary edema was found in a woman as well as men, across a wide age range, and in individuals who had no signs of heart disease on autopsy, indicating that this was not due to heart failure, and is rather due to immediate toxic damage to the pulmonary capillaries by the barbiturate, possibly combined with negative pressure pulmonary edema due to upper airway

---

[78] Three of these cases took place in Arizona and were autopsied by the same examiner, so this may represent a local practice, and two more were performed by the same pediatric pathologist, and represent personal practice, or pediatric practice rather than routine adult practice.

edema and other causes of airway obstruction, including barbiturate-triggered laryngospasm and bronchospasm.

72.     Experience in humans and animal models indicate that flash pulmonary edema occurs virtually immediately during and after high-dose barbiturate injection, and well within a time frame before peak drug effects on the brain have occurred.  In my opinion, it is a virtual medical certainty that immediate, flash pulmonary edema occurred in the prisoners whose autopsies I reviewed, and it is extremely likely that they were aware and experienced sensations of drowning and suffocation as they died.

**d.      Problems With IV Access: Extravasation, Infiltration, and Inadvertent Intra-arterial Injection of Barbiturates; and Complications of Central Line Access**

73.     Barbiturates are strongly alkaline, and cause immediate caustic destruction of tissues when direct contact occurs (akin to lye).[79]  With dilution in IV fluid and further dilution in blood, the drug is reasonably well tolerated in small doses with IV injection, but infiltration or extravasation of even small amounts of the drug causes instant, excruciating pain that patients liken to being set on fire, and requires emergency intervention to reduce extensive tissue damage. Often, gangrene of the arm and hand results.[80]  Inadvertent arterial injection (the catheter has been unintentionally placed in an artery rather than a vein) causes instant arterial spasm, pain, excruciating local tissue destruction, and also immediate ischemia (i.e. lack of oxygen, tissue damage and necrosis) in the area of the body supplied by the artery—e.g. infiltration of pentobarbital in an IV at the elbow (antecubital or AC location) can cause the entire arm from the IV site down to the hand to immediately turn white and generate excruciating pain.

---

[79] Shibata Y, Yokooji T, Itamura R, et al.  Injury due to extravasation of thiopental and propofol:  risks/effects of local cooling/warming in rats. Biochem Biophys Rep 2016; 8:207-11
[80] Davies DD.  Local complications of thiopentone injection.  Br J Anaesth 1966; 38:530-2

74.　In reviewing 27 autopsies of patients executed with pentobarbital or thiopental single or multiple-drug protocols (see **Appendix III**), complications of peripheral line placement was common: only 44% of cases in which IV lines were described appeared to be uncomplicated. Problems included multiple attempts in 32%, evidence of apparent extravasation in 12%, and necessity of central line placement in 24% of cases. Some lines were associated with multiple problems.

75.　Central venous access catheters (CV lines) are, in the words of one author "relatively dangerous, problem-prone devices" for which mechanical complications during placement remain "a significant cause of morbidity and mortality".[81] The majority of mechanical complications are vascular injuries,[82] and several complications are relevant to judicial lethal injection, because they are either extremely painful in and of themselves; would lead to extravasation, infiltration or intra-arterial injection of the pentobarbital, which would be excruciating; or lead to failure of delivery of the intended dose of pentobarbital, potentially prolonging death while excruciating suffocation occurs. The overall rate of vascular complications during placement ranges as high as almost 1 in 5.[83] All complications are significantly affected by the experience of the person placing the line, with rates of complications in hospitals from relatively inexperienced providers (e.g. interns) nearly double that of more senior house staff.[84]

76.　Intra-arterial puncture occurs in almost 1 in 10 cases in experienced hands, and a small number (about 1% of all CV lines) result in intra-arterial placement of the entire line.

---

[81] Bowdle A. Vascular complication of central venous catheter placement: evidence-based methods for prevention and treatment. J Cardiothor Vasc Anesth 2014; 28:358-68
[82] Domino KB, Bowdle TA, Posner KL, et al. Injuries and liability related to central vascular catheters: a closed claims analysis. Anesthesiology 2004; 100:1411-8
[83] Kusminsky RE. Complications of central venous catheterization. J Am Coll Surg 2007; 204:681-96
[84] Eisenhauer ED, Derveloy RJ, Hastins PR. Prospecitve evaluation of central venous pressure (CVP) catheters in a large city-county hospital. Ann Surge 1982; 196:560-4

This can result in rapid loss of large amounts of blood, or intra-arterial injection of pentobarbital in the neck, chest wall, or groin, depending on the location of the line. Both are both gruesome and excruciating injuries, the latter leading to both excruciating pain and prolongation of the execution due to failure to deliver drug into the bloodstream. This injury is most common with femoral line placement,[85] which appears to be common in judicial executions: 24% of autopsies I reviewed in which venous access was documented included a triple lumen femoral line.

77.        Through-and-through injuries of the vein also occur. This increases the risk that pentobarbital will be injected into soft tissue surrounding the vein in the neck, groin, or chest, also causing excruciating pain due to the caustic effects of the drug on soft tissues, and potentially also prolonging the execution by failing to deliver all or part of the drug to the bloodstream.

78.        Injury to large nerves in the neck (the brachial plexus, a bundle of all of the nerves running to the arm) or groin (femoral nerve supplying sensation and muscle movement and strength to the leg) during placement is not rare, leading to immediate piercing pain when the needle damages the nerves.

79.        To summarize, placement of a central line for venous access during judicial lethal injection is common, is fraught with potential mechanical complications, and requires personnel experienced and adept in their placement. While many complications of central line placement occur, the most relevant to lethal injection are mechanical complications of line placement that cause vascular injury and inadvertent injection of pentobarbital into surrounding tissues, and failure to deliver all or part of the pentobarbital into the blood stream, leading to prolongation of the execution and excruciating pain.

---

[85] Dornbau C, Lee KC, Hughes GD, Firstenberg MS. Central line complications. Int J Illn Inj Sci. 2015; 5:170-8

IX.    **RISKS AND DEFICIENCIES OF THE FEDERAL EXECUTION PROTOCOL PROCESSES**

80.    The Federal Protocol is inherently vague, and lacks sufficient detail to provide assurance that "qualified" personnel will be in charge of and carry out the execution. It also does not provide sufficiently explicit instruction on the procedure of the execution itself to assure either a lack of severe pain and/or suffering, or the efficiency of the execution.  The lack of detail in the Addendum furthermore obscures important aspects of the Bureau of Prisons' (BOP's) intended preparation for and implementation of the execution itself. By obscuring these critical details, the Addendum poses a significant impediment to expert review.  Indeed, the only explicit element in the Addendum is that the protocol is a single-drug protocol relying on the intravenous injection of 2 doses of 2.5 gm of pentobarbital sodium, each in 50 ml of solution, followed by a 60 ml saline flush.

a.    **Information That Is Missing or Deficient**

81.    The Federal Protocol states no explicit requirement regarding the expertise, experience and psychology of the personnel who will be directly involved in the execution process—a process that spans the medical treatment of the prisoner prior to the execution (e.g. management of medications that might interfere with or cause complications to the execution, administration of sedatives, if any, etc.) to the declaration of death at the end of the execution.

b.    **Paragraph D:  definition of qualified personnel**

82.    Broad categories of personnel are designated as "qualified," e.g. physician, nurses, EMTs, paramedics, etc.  But such persons, even if licensed, are only qualified to perform certain tasks necessary to the execution, and none are qualified for all of the tasks.  Expertise required for specific tasks are not detailed.  For example, a "phlebotomist" (a person who draws blood at a laboratory) is listed as a "qualified person," but the task assigned to the phlebotomist

is not defined. Phlebotomists are not professionally trained, nor necessarily expert in medication management, intravenous line placement, or administration of medications. Indeed, a phlebotomist might not be qualified to carry out any of the tasks associated with executions.

83. The Addendum specifies that the qualified person must have 1 year of professional experience, but, again, does not designate the tasks that experience must include. The Addendum states only that it must be "a specific execution related function," but does not state anywhere what those execution-related functions are. Without that information, it is impossible to determine if the persons assigned to execution "functions" will be qualified for the tasks to which they are assigned. What would constitute a professional disqualification? Under the terms of the Addendum, licensed physicians, nurses and others who had committed proven professional malpractice, or been subject to professional disciplinary action would be considered "qualified."

### c. What skills are required of each "qualified" person?

84. The Addendum also does not specify what skills and experience are required of each "qualified" person. In order to select and assign properly qualified personnel, the Addendum must state the skills, training and experience necessary for personnel who obtain intravenous (IV) access, monitor intravenous line function, recognize and interrupt the execution process if in the course of execution the IV line malfunctions, infiltrates, or becomes occluded, and obtain alternate venous access if necessary, including central venous access via the jugular vein, femoral vein cut-down or other procedures.

85. Whether central IV access is successful is significantly affected by the number of lines and the frequency with which the provider places them. The incidences of line infiltration and inadvertent placement into an artery instead of a vein are high in personnel without significant, ongoing and routine practice of those lines, even if they have the technical expertise

to know how to do them. Repeat attempts to establish peripheral or central venous access, line infiltration and/or inadvertent intra-arterial injection of pentobarbital sodium are excruciating events and can result in slow suffocation if only partial injection is achieved, and a lingering and extremely painful death and/or failure of the execution altogether.

86.     There is no explicit instruction regarding the implementation of the protocol from the day prior to the execution to the declaration of death. Details that are missing and may significantly affect the course of the execution include:

87.     **How will the prisoner's medical issues and medications be managed from the day prior to the execution going forward, and who will provide that management?** Sodium pentobarbital is associated with severe bronchospasm in asthmatics, for example. Will measures be taken to prevent this?

88.     **What form of Pentobarbital Sodium will be used and how will it be handled prior to, and on the day of execution?** No details are provided about the source of the drug, and there are indications that this will be obtained from a compounding pharmacy, which presents significant risks of improper drug management (see section below on compounding pharmacies). How long prior to execution will the drug be obtained? Will the drug be supplied in solution or as a powder to be reconstituted on the day of execution? If it requires reconstitution, who will do that, since it requires the experience of a person who is professionally qualified, in order to be sure the drug is reconstituted in the right solution, in the right dilution, and then stored/refrigerated properly. Pentobarbital sodium is loses potency over time. How with the drugs be labeled? What happens if the execution is delayed and the drug is in solution an hour longer than permitted? Who will examine the reconstituted drug to be sure it is of the proper color and not degraded prior to injection?

89.     **What equipment will be used?  What size of IV will be required?**  Infiltration and extravasation increase with small IV size and shorter IV catheter length and can lead to an excruciating death.  The length of tubing permitted from the injection port for the drug and the prisoner's vein is important—the longer the tubing the higher the resistance and pressure in the IV line, leading to increased risk of infiltration and extravasation, and to insufficiently rapid injection to ablate awareness.

90.     **What fallback measures will be undertaken if venous access cannot be obtained?** There are no explicit instructions regarding contingency plans in the event the executioners struggle to obtain or cannot obtain IV access.  In fact, the Addendum does not specify the number of lines, if a backup line is necessary, how many attempts are allowed, how much time will be permitted, nor specific access sites that will be used, and the order in which they will be attempted.  Will more than an hour of attempts, or hundreds of punctures be permissible?  What will be the procedure if extravasation or infiltration is recognized?  Will pain be treated while another IV site is sought?

91.     **How will the executioners manage severe complications that arise during the execution?**  How will personnel manage bronchospasm and/or laryngospasm, both well-known side effects of IV barbiturate administration, if they occur? Will the prisoner be given treatment or simply allowed to suffocate as the execution proceeds? There is no anticipation of these likely developments and no instruction, much less detailed instruction, of how the personnel should respond.

92.     **How exactly will the drug be given?**  The effects of pentobarbital sodium are absolutely dependent not only on dose, but also on rate of administration. Fast redistribution of the drug can cause significant awareness to linger while the prisoner experiences suffocation (see

42

below), and rapid administration can cause pulmonary edema within seconds, with associated sensations of drowning. Rapid administration is also associated with increased probability of extravasation and infiltration.

93.     **What is the protocol for mishaps that happen during the execution?** The addendum merely states that mishaps must be "reported to the Director," but there is no instruction of what should actually be done to assure the prisoner does not experience a lingering and excruciating death due to a mishap.

## X.     RISKS OF DRUGS OBTAINED FROM COMPOUNDING PHARMACIES

94.     The Federal Protocol states that pentobarbital will be acquired from a compounding pharmacy. It is important to understand the significant safety issues associated with drugs that come from these facilities.

95.     The FDA regulates virtually all commercial pharmaceutical manufacturing to assure safety, consistency and quality. FDA-approved drugs are made and tested under Good Manufacturing Practice regulations ("GMPs"). However, states generally regulate pharmacies, including compounding pharmacies. State regulations include matters of storage, record keeping, labeling, and safety regulations related to drug origins, authenticity, chain of custody, product expiration dates, purity, sterility.[86] The states also grant authority to "compound" or mix pharmaceuticals into a patient-ready product. The classic role of a compounding pharmacy in general is to produce a formulation of a drug which fits a single patient's specialized needs: for example, the manufacturer's formulation contains a preservative to which a patient is allergic, and a single version of the drug in a different preservative is needed by the patient.

96.     Regulatory oversight of compounding pharmacies is much less rigorous than for FDA-approved drugs. Compounding pharmacies, for example, are exempt from GMPs. GMPs

---

[86] Gudeman J, Jozwiakowski M, Chollet J, Randell M. Potential risks of compounding. Drugs R D; 2013; 13:1-8

include regulation of the facilities and equipment used in manufacturing a drug, training of personnel, calibration and cleaning of processing equipment, and ensuring that validated analytical test procedures are used to guarantee potency, purity, sterility and other characteristics. GMPs require that all ingredients and components coming in to the manufacturer be tested upon receipt; that an independent quality control unit oversee the manufacturing, packaging, and testing process; that substandard batches be rejected; and that stability studies are done to support expiration dates.[87] It should be noted that "compounded drugs" are different from "generic drugs." Generic drug manufacturers are regulated by the FDA and do have to meet GMP regulations, and their generic drugs must meet FDA regulatory standards.

97.     It is not required that pharmaceuticals from compounding pharmacies be tested to assure product quality and consistency, and generally they are not tested, and not evaluated for safety or for efficacy.  They do not have the same product labeling or prescribing information to instruct safe usage.  Compounding pharmacies are not required to report adverse events to the FDA.  Thus, the FDA's knowledge of adverse events from these chemicals comes from voluntary reporting, direct patient reporting, reports of caregivers, and sometimes whistleblowers.  The compounding industry often uses the low reported rate of adverse events as evidence of safety of compounded pharmaceuticals, which is a stark misrepresentation.[88]

98.     Pharmaceutical preparation errors are much more common among compounding pharmacies than commercial manufacturers:  independent testing of compounding pharmacies by the FDA and state agencies consistently shows that compounded drugs fail to meet specifications at a much higher rate than FDA-approved drugs.[89]  Problems associated with drug compounding

---

[87] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[88] Dohm J, Kim J, Woodcock J.  Improving adverse event reporting for compounded drugs.  JAMA Intern Med 2019;  Sept 9, 2019.  Available at".  https://jamanetwork.com  Accessed Oct 23, 2019
[89] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8

include several types of risk: subpotency (the compound contains less drug than labelled); superpotency (the compound contains more drug than labelled); contamination; overmedication (too much drug is prescribed by the physician of the compounded drug), and medication-replacement. Contamination and overmedication are not the main issue concerning judicial lethal injection, although they speak to a pharmacy's ability to accurately and safely carry out compounding activities. Sub- and super potencies, however, are important issues to examine. **Subpotency** appears to be the most common type of compounding error, occurring in around one-third of compounded drug samples tested, as noted above. Over half of subpotent drugs in one survey had < 70% of the labeled value.[90] **Superpotency** also occurs, with cases in which the compounded drug contained 1000% of the labeled value.[91] **Medication replacement** occurs when a compounding pharmacy substitutes an untested compound for a commercially available, FDA-screened compound—and thus does not guarantee similar clinical effectiveness.

99. More recently, compounding pharmacies have departed from their traditional role in meeting single-patient, specified needs, and have entered large-scale production of compounded medications without single patient prescriptions, effectively manufacturing drugs without FDA approval that are merely copies of FDA-approved drugs. Thus, large-scale release has occurred at times of medications that have never been FDA approved, or alternatively, were removed from use by the FDA for safety reasons, skirting FDA safety oversight.[92]

---

[90] Boodoo JM. Compounding problems and compounding confusion: federal regulation of compounded drug products and the FDAMA circuit split. Am J Law Med 2010; 36:220-47
[91] Schwam E. Severe accidental overdose of 4-aminopyridine due to a compounding pharmacy error. J Emerg Med 2011; 41:51-4
[92] For example, domperidone, which led the FDA to issue warning letters to compounding pharmacies that had obtained the drug from foreign source. The drug was being touted to assist lactation, but had been shown to cause sudden cardiac arrest and death. See U.S. Food and Drug Administration. FDA Talk paper: FDA warns against women using unapproved drug, domperidone, to increase mild production. 4/18/2016. Available at: https://www.fda.gov/drugs/information-drug-class/fda-talk-paper-fda-warns-against-women-using-unapproved-drug-domperidone-increase-milk-production Accessed Oct 24, 2019

100.    The FDA undertook a limited survey in 2001 of 29 compounded drugs from 12 compounding pharmacies.  They tested 8 drugs against established quality standards.  Ten of the 29 (34%) failed quality testing, most for substandard potency—the drugs that failed ranged from 59 to 89% of the labeled dose.  This compares to a less than 2% failure rate among over 3000 FDA-approved drugs tested from a similar time period.[93]  A follow-up survey in 2006 found no improvement in these discrepancies:  33% of 36 compounded products failed quality testing and potency, with the products containing from about *0.68 to over 2.5 times* the amount of drug on the labeled dose.[94]  Failure rates in drugs tested between 2005 and 2009 were between 11.6% and 25.2%, with potency ranging from *0 (meaning none of the expected drug is present) to 4.5 times the labeled drug dose.*[95]  In Ohio in 2007, potency results ranged from 27% to 87% of the labeled dose, and over 1300 doses of products were found that were contaminated with fungus.  Three out of five formulations of one set of drugs included drug combinations that were not approved by the FDA.[96]  In Texas from 2008 to 2010, 23% of compounded drugs tested by the state compounding pharmacy board failed potency testing.[97]  In other studies, almost half of compounded nitroglycerin ointments for heart patients (84,000 prescriptions for compounding in 2004) failed in potency and content[98], and diaminopyridine products (for myasthenia gravis

[93] U.S. Food and Drug Administration.  Limited FDA Survey of Compounded Drug Products, 2001.  Available at: https://www.fda.gov/drugs/human-drug-compounding/report-limited-fda-survey-compounded-drug-products Accessed Oct 23, 2019
[94] US Food and Drug Administration.  Pharmacy compounding.  2006 limited survey of compounded drug products. 2012.  Cited in Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[95] Missouri Board of Pharmacy Compounding Report.  FY2006-2009.  Each of the annual reports available at: https://pr.mo.gov/pharmacists-compounding.asp  Accessed Oct 23, 2019
[96] Sasich LD, Sukkari SR. Unknown risks of pharmacy-com-pounded drugs. J Am Osteopath Assoc. 2008;108(2):86.
[97] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[98] Azarnoff DL, Lee JC, Lee C, et al.  Qualityof extemporaneously ompounded nitroglycerin ointment.  Dis Colon Rectum 2007;  50:509-16

patients) varied in potency from 22% to 125% of the labeled dosage.[99]   In the case of one agent, sodium tetradecyl sulfate, used to sclerose (i.e. close) veins, compounding pharmacies were found to have used a low-quality starting ingredient that cause the drug to contain toxic levels of a contaminant, carbitol—a solvent used in staining wood.

101.    After a deadly outbreak of fungal meningitis (a brain infection) due to contaminated drugs compounded at New England Compounding Center in Massachusetts, (NECC), a follow-up inspection by the FDA found that no corrective action to decontaminate the facility had been undertaken, and there was no evidence that NECC sterilization processes were effective.[100,101] FDA inspectors who performed follow-up inspections in 30 other compounding pharmacies after the NECC disaster found spiders, rust and mold in "clean rooms" and technicians wearing gloves with tears in the them who were compounding "sterile" injectable drugs. Five of the pharmacies tried to deny the FDA access to their facilities and records, and the agency had in at least one case to obtain a court-ordered inspection warrant.   Another 12 facilities underwent lower priority inspection:  in New Jersey, a company recalled 83 of its compounded products when a nurse found mold floating in medicine bags, and in Georgia, a compounding company recalled 60 products after patients reported eye infections.

102.    All in all, from 2002 to 2012, the FDA did 197 inspections of compounding pharmacies and found "objectionable" safety issues in one-third of them.   In the following 2 years, the FDA carried out 148 inspections at compounding sites, and found safety problems in *9*

---

[99] Green DM, Jones AC, Grain KR.  Content variability of active drug substance in compounded oral 3,4-diaminopyridine products.  J Clin Pharm Ther 2012;37:53-7
[100] Gudeman J, Jozwiakowski M, Chollet J, Randell M.  Potential risks of compounding.  Drugs R D; 2013; 13:1-8
[101] Food and Drug Administration Inspectional Observations (Form 483) New England Compounding Center issued October 26th, 2012. 2012.   Available at:  http://www.fda.gov/downloads/AboutFDA/Centers Offices/OfficeofGlobalRegulatoryOperationsandPolicy/ORA/ ORAElectronicReadingRoom/UCM325980.pdf. Accessed Nov 2012

*out of 10 of them.*[102] Far from cooperating with improvements in the safety of compounded drugs, a number of compounding pharmacies fight back. NuVision Pharmacy in Dallas refused to recall products the FDA identified as potentially dangerous that were also associated with patient reactions, despite two warnings.[103] As of 2019, only four states had enacted laws to tighten regulation of compounding pharmacies.[104] Only twenty-eight states reported in 2016 that they even had expectations or requirements for special training in sterile compounding. Hospitals, in contrast, are responding to concerns about the safety of compounded drugs. In 2013, the Department of Health and Human Services reported that over half of 298 acute-care hospitals they surveyed are discontinuing use of compounding pharmacies for sterile IV injection drugs due to safety reasons.[105]

103. In 2013, Congress passed the Drug Quality and Security Act (DQSA) in response to problems with contamination at compounding pharmacies. It established a new voluntary category of compounding pharmacies, called "outsourcing facilities." Outsourcing facilities are subject to GMP requirements, and may distribute compounded drugs either in response to a patient-specific need, or in response to an order from a health care provider (a hospital or health care facility) that is not for an individual patient. They are inspected by the FDA according to a "risk-based" schedule and must report to the FDA adverse events and details about products they

---

[102] Eisler P, Schnaars C. Safety, sanitary problems prompt scores of drug recalls. USA Today. Oct 2, 2014. Available at: https://www.usatoday.com/story/news/nation/2014/10/07/compounding-pharmacy-recalls-inspections-contamination/16472741/ Accessed Oct 23, 2019
[103] Ibid.
[104] Compounding pharmacies. National Conference of State Legislatures. Available at: http://www.ncsl.org/research/health/compounding-pharmacies-and-states.aspx Accessed Oct 24, 2019
[105] Sun LH. FDA finds widespread safety issues at compounding pharmacies. The Washington Post. April 11 2013. Available at: https://www.washingtonpost.com/national/health-science/fda-finds-widespread-safety-issues-at-compounding-pharmacies/2013/04/11/5321e17a-a20d-11e2-be47-b44febada3a8_story.html Accessed Oct 23, 2019

compound.[106]  As of this month, only about 1% of all compounding pharmacies were registered

as outsourcing facilities—75[107] of the more than 7500[108] compounding pharmacies believed to

exist.[109,110]  Of the 75 outsourcing facilities currently registered with the FDA, 13 (17%) have not

yet been inspected, and of the 62 that have been inspected, *92%* have received warning letters or

other disciplinary actions as of 10/11/19, most in the last 2 years.[111]  Also, as of the last FDA

report from summer of 2019, which lists all of the drugs that these facilities compound,

pentobarbital is not listed as being compounded at any of the registered pharmacies,[112]

suggesting that this drug is probably being produced by a non-registered compounder.

104.    As of 10/11/2019, the FDA lists over 595 compounding facilities total as having

received inspections, warnings, recalls or other regulatory actions.[113]  There is no data at this time

that demonstrates that regulatory action decreases problems with compounded drugs in these

facilities, only a hope that it will do so.  However, if the current recall, regulatory action list at

the FDA is any indicator, this does not seem to be a realistic hope at this time, as many if not

most of the disciplined pharmacies are the subject of repeat actions over years.  Moreover, as

---

[106] U.S. Food and Drug Administration.  Compounding Laws and Policies.  Updated 7/23/18.  Available at: https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies  Accessed 10/25/2019
[107] U.S. Food and Drug Administration.  Registered Outsourcing Facilities.  Updated 10/22/19.  Available at: https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities  Accessed Oct 24, 2019
[108] Peters K.  Those involved in compound pharmaceuticals beware:  law enforcement is focused on you.  Food and Drug Law Institute. Nov/Dec 2017.  Available at: https://www.fdli.org/2017/12/involved-compound-pharmaceuticals-beware-law-enforcement-focused/  Accessed Oct 24, 2019
[109] Gulfo J.  Pharmaceutical compounding:  the FDA is not the problem.  Forbes.  August 29, 2016.  Available at: https://www.forbes.com/sites/realspin/2016/08/29/pharmaceutical-compounding-the-fda-is-not-the-problem/#725ada4778df  Accessed Oct 23, 2019
[110] Wilson LE< Blythe D, Sharfstein JM.  Fungal meningitis form injection of contaminated steroids:  a compounding problem.  JAMA 2012; 308:2461-2
[111] U.S. Food and Drug Administration.  Compounding: inspections, recalls and other actions,  Updated 10/11/2019.  Available at: https://www.fda.gov/drugs/human-drug-compounding/compounding-inspections-recalls-and-other-actions  Accessed Oct 24, 2019
[112] U.S. Food and Drug Administration.  Information for Outsourcing Facilities.  Updated 9/4/19.  Available at: https://www.fda.gov/drugs/human-drug-compounding/information-outsourcing-facilities/#reporting%20information  Accessed Oct 24, 2019
[113] U.S. Food and Drug Administration.  Compounding: inspections, recalls and other actions,  Updated 10/11/2019.  Available at: https://www.fda.gov/drugs/human-drug-compounding/compounding-inspections-recalls-and-other-actions  Accessed Oct 24, 2019

noted above, even after repeat inspections, some compounding pharmacies failed to show any signs of improved facilities, personnel training or product handling.

105.   The use of compounded chemicals in lethal injection introduces potentially critical errors in judicial executions:

- Compounding pharmacies have a much higher rate of serious errors in drug preparation than FDA regulated manufacturers.
- Assertions that compounded pharmaceuticals are "as safe" or "safer" than FDA-regulated drugs are patently false; this is a misrepresentation of the fact that most compounding pharmacies do not even report or keep records of adverse events, rather than a reflection of fewer adverse events.
- The most common compounding error is that of potency: compounded drugs are *very likely* to be less potent than the label indicates, and *very likely* to *not* be within 30% of their labeled potency, compared to less than 2% of FDA-regulated compounds.
- Compounded drugs do not have to be subjected to the FDA-required stability studies guaranteeing their stability in solution once compounded, and this is a particular problem when the drug has a relatively short recommended time-to-utilization (i.e. 24 hours) as in the case of short-acting barbiturates; compounded barbiturates *pose a risk of poor potency, instability and accelerated degradation of drug*.
- There is no guarantee that an outsourcing facility will be used for drug compounding. Even if one is used, these facilities are also fraught with errors, with more than *92%* of all inspected registered facilities to date having received FDA warning letters and regulatory actions, most in the last 2 years.

## XI.   COMPARISON OF JUCIDIAL LETHAL INJECTION AND PHYSICIAN-ASSISTED SUICIDE AND LEGAL EUTHANASIA

106.   **Physician-assisted suicide ("PAS")** is a procedure where a patient, following approval, chooses to end his or her life and receives a prescription for oral medications to take to commit suicide. In the United States, PAS requires that patients take the drugs unassisted and orally.  Two barbiturates have predominantly been used in PAS: seconal (secobarbital), a short-acting barbiturate similar to pentobarbital that was developed for treatment of seizures and insomnia, in a 9gm oral dose, and phenobarbital, an ultra slow-acting barbiturate originally used for treating epilepsy.  The practice is legal in only 10 jurisdictions in the United States (legalized

in 8 states and the District of Columbia, and "permissible" in Montana).[114] It is therefore not a common, nor even widely accepted, medical practice at this time, and there remain grave concerns about whether the drug protocols themselves cause a "cruel" and "inhumane" form of death that "results from asphyxia due to cardiorespiratory depression"[115] and that may well be accompanied by awareness.

107.     PAS and euthanasia are frequently confused in both the lay and medical literature. PAS differs significantly from euthanasia, in that with euthanasia, someone other than the patient administers the drugs to cause death, sometimes without the patient's knowledge or agreement and almost always via IV injection of the drugs.[116,117]

### a.     Oral Versus IV Administration of Barbiturates

108.     Drugs behave differently when given orally versus intravenously, and therefore equating barbiturate use in PAS (which is oral administration) to its IV use and effects is inappropriate and not supportable. Differences in action for the same drug between or and IV administration include different onset and peak of action (much longer with oral administration), and clearance of the drug from the bloodstream, brain, and body.  In addition, after oral administration, a large dose of barbiturate will remain in the stomach and continue to be slowly absorbed.  The stomach acts as a reservoir of drug, allowing it to continue to enter the bloodstream for hours after oral dosing, and thus keeps drug levels from falling in the bloodstream and brain over a longer period of time than IV injection.  These characteristics have a strong influence on the drugs' clinical effects, and rates and types of complications.

---

[114] Assisted Suicide in the States.  Charlotte Lozier Institute.  June 12, 2019.  Available at: https://lozierinstitute.org/map-assisted-suicide-in-the-states/  Accessed Oct 26, 2019

[115] Sinmyee S, Pandit VJ, Pascual JM, et al.  Legal and ethical implications of defining an optimum means of achieving unconsciousness in assisted dying. Anaesthesia 2019; 74:630-7

[116] McKenney J.  Informed consent and euthanasia:  an international human rights perspective. Internat Comp Law Rev 2018; 18: 118-33

[117] Pereira J.  Legalizing euthanasia or assisted suicide: the illusion of safeguards and controls.  Curr Oncol. 2011; 18:e38-e45

109.    There are also important differences in the way a barbiturate acts when used as a *solo* drug for judicial lethal injection, versus in PAS, where it is both administered orally and combined with other drugs (referring to the practice in the United States). Many references in studies and textbooks allude to "unconsciousness" following oral barbiturate overdose, however this again is a misuse of the term "unconsciousness," and the authors are invariably referring to "unresponsiveness." Actual studies of awareness have never been done on unresponsive patients after oral barbiturate administration. As explained earlier in this report, the recall of such patients if they survive is severely impaired, no matter what the experience of awareness at the time might have been.

110.    Pulmonary edema is a well-known complication of oral barbiturate overdose,[118] but the time course of this complication is almost entirely unknown, since patients are seldom in the presence of physicians or other medical professionals who would be able to watch for and recognize the onset of this complication when the overdose is taken. Equally important, the prevalence of pulmonary edema in PAS patients has never been studied and is unknown. In contrast, pulmonary edema appears to be almost immediate following a large IV overdose, as demonstrated in both humans and animals (see previous Pulmonary Edema section), and appears to occur in virtually 100% of prisoners when pentobarbital or thiopental is used in their executions, as evidenced in autopsy reports. It is possible, for example, that in PAS patients, pulmonary edema is rare, slower in onset, and less potentially symptomatic than when it occurs during lethal injection. It is equally possible that it is no different, or that onset is more prolonged, and that the experience is even worse.

---

[118] Goodman JM, Bischel MD, Wagers PW, Barbour BH. Barbiturate intoxication: morbidity and mortality. West J Med 1976; 124:179-86

## XII.  CONCLUSIONS

111.    For all of the reasons laid out above, it is my conclusion, to a reasonable degree of medical certainty, that prisoners executed by lethal injection in accordance with the Federal Protocol will remain conscious and able to experience extreme pain and suffering related to the caustic effects of pentobarbital and occurrence of flash pulmonary edema. I also conclude that the Federal Protocol creates additional risks of pain and suffering that are likely to occur, including (1) that the compounded pentobarbital will be defective, most likely subpotent; (2) that the personnel selected to be on the execution team will not be qualified to perform their assigned tasks and therefore will not be able to perform them correctly; and (3) that complications of faulty IV line placement will lead to delivery of the pentobarbital outside the vein or into an artery, both of which would cause extreme pain and suffering, as well as prolong the execution process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Seattle, Washington on November 1, 2019.

Gail A.Van Norman, M.D.

Case 1:19-mc-00145-TSC Document 302-2 Filed 10/29/20 Page 55 of 189

# APPENDIX I

CURRICULUM VITAE
**Gail A. Van Norman, M.D.**

## Education:

| | | |
|---|---|---|
| 1973-1977 | University of Washington, Seattle, Washington | Honors B.S, Microbiology |
| 1977-1981 | University of Washington School of Medicine, Seattle, Washington | M.D. with Honors |

## Postgraduate Training:

| | | | |
|---|---|---|---|
| 1981-1982 | Virginia Mason Hospital, Seattle Washington | Internship | Internal Medicine |
| 1982-1984 | Virginia Mason Hospital, Seattle, Washington | Residency | Internal Medicine |
| 1986-1988 | University of Washington, Seattle, Washington | Residency | Anesthesiology |
| 1988-1989 | University of Washington, Seattle, Washington | Fellowship | Cardiothoracic Anesthesiology |
| 1992-1993 | University of Washington, Seattle, Washington, Department of Biomedical Ethics | Certification | Health Care Ethics |
| 2001 | Perioperative Transesophageal Echocardiography Examination | Testamur | |
| 2011 | ASA Business Management Certification | Certification | |

## Faculty Positions Held:

| | |
|---|---|
| 1989-1994 | Clinical Acting Instructor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1994-1995 | Acting Instructor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1995-1997 | Acting Assistant Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1997-2000 | Assistant Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 1997-2000 | Adjunct Assistant Professor, Department of Internal Medicine, University of Washington, Seattle, Washington |
| 2000-2001 | Clinical Assistant Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 2001 -2008 | Clinical Associate Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 2008- | Professor, Department of Anesthesiology, University of Washington, Seattle, Washington |
| 2008- | Adjunct Professor, Department of Biomedical History and Ethics, University of Washington, Seattle, Washington |

1

**Hospital Positions Held:**

| | |
|---|---|
| 1984-1985 | Attending Internist, Jefferson Memorial Hospital, Port Townsend, Washington |
| 1985-1986 | Attending Internist, Highline Community Hospital, Burien, Washington |
| | |
| 1989-1992 | Staff Anesthesiologist, Northwest Hospital, Seattle, Washington |
| 1992-1994 | Staff Anesthesiologist, Swedish Hospital, Seattle, Washington |
| 2000 – 2008 | Staff Anesthesiologist, St. Joseph Medical Center, Tacoma, Washington |
| 2000 – 2006 | Director, Transesophageal Echocardiography Education, Department of Anesthesiology, St. Joseph Medical Center, Tacoma, Washington |
| 2003-2004 | Clinical Director, Department of Anesthesiology, St. Joseph Medical Center, Tacoma, Washington |
| 2008-2013 | Medical Director, PreAnesthesia Clinic, University of Washington Medical Center, Seattle, Washington |
| 2010- | Physician Champion, Compliance Officer, Dept of Anesthesiology and Pain Medicine, University of Washington, Seattle WA |

**Non-Hospital Positions Held:**

| | |
|---|---|
| 1984-1985 | Consulting Internist, Spokane Urban Indian Health Center, Spokane, Washington |
| 1985-1986 | Consulting Internist, Seattle Community Health Clinics serving economically disadvantaged patients; for Group Health Cooperative of Puget Sound, Seattle, Washington |
| 2005-2006 | Chair CQI Process, Pacific Anesthesia, Inc., Tacoma, Washington |
| 2006 -2008 | Board of Directors, Pacific Anesthesia, Inc., Tacoma, Washington |
| 2007-2008 | Vice President, Pacific Anesthesia, Inc., Bellevue, Washington |

**Honors:**

| | |
|---|---|
| 1978 | Medical-Scientist Traineeship Grant, University of Washington, Seattle, Washington |
| 1980 | Alpha Omega Alpha |
| 1981 | Merck Manual Medicine Award |
| 1981 | John J. Bonica Anesthesiology Award, Department of Anesthesiology, University of Washington |
| 1985 | Award of Merit for Service to the Health Care Needs of Native Americans, Spokane Urban Indian Health Service |
| 2000 | President's Award, Pacific Anesthesia, Inc. Tacoma, Washington |
| 2008 | Mary Jane Kugel Award, Medical Science Review Committee, Juvenile Diabetes Research Foundation International |
| 2011 | Brocher Foundation Residency in Ethics |

**Board Certification:**

| | |
|---|---|
| 1984 | American Board of Internal Medicine |
| 1990 | American Board of Anesthesiology |

**License to Practice:**

| | |
|---|---|
| 1981- | Washington State |
| 1991-2003 | Wisconsin |

2

**Professional Organizations:**

| | |
|---|---|
| 1984-1987 | American Society of Internal Medicine |
| 1989-2000 | King County Medical Society |
| 1989-2000 | Washington State Society of Anesthesiologists;  Co-chair, Medical Education Committee, 1994-1997 |
| 1989-2013 | American Society of Anesthesiologists;  Committee on Ethics, 1992-2013 |
| 2003-2007 | Society of Cardiovascular Anesthesiologists; Committee on Ethics; 2003-2007 |
| 2008-2013 | American Society of Bioethics and Humanities |
| 2015-present | International Academy of Law and Mental Health |
| 2015-present | Overseas Fellow, Royal Society of Medicine |

**Teaching Responsibilities:**

**Lectures:**

**Undergraduate Student Lectures:**

| | |
|---|---|
| 1999-2008 | University of Washington, Undergraduate Introduction to Bioethics Course (MHE 411) "Informed Consent" |
| 2001 | University of Washington, Seattle Biomedical Ethics for Medical Students Lecture Series, "Informed Consent" |
| 2008 | University of Washington Dept. of Biomedical History and Ethics: MHE 597C, Informed Consent in Clinical Practice |
| 2009-2017 | University of Washington Dept. of Biomedical History and Ethics: MHE 597C, Informed Consent |

**Resident Lectures:**

| | |
|---|---|
| 1992-1994 | University of Washington, Department of Anesthesiology, "Clinical Ethical Issues in Anesthesia Practice" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture series, "Perioperative Diabetes Management" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series "Anesthetic Implications of Neuromuscular Disease" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Pathophysiology of Ischemic Heart Disease" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Intraoperative Management of the Patient with Ischemic Heart Disease" |
| 1994-2000 | University of Washington, Department of Anesthesiology Resident Core Lecture Series, "Preoperative Evaluation of the Patient for Anesthesia and Surgery" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "CQI: Quality Improvement in Practice" |
| 1994-2000 | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Post Operative Cognitive Dysfunction" |
| 1994- | University of Washington, Department of Anesthesiology, Resident Core Lecture Series, "Clinical Ethical Issues in the Practice of Anesthesiology," |
| 1994- | University of Washington, Department of Anesthesiology R2 Core Lecture series, "Ethical Issues of Informed Consent" |
| 1994- | University of Washington, Department of Anesthesiology R2 Core Lecture series, "Do Not Resuscitate Orders in the Operating Room" |
| 1994- | University of Washington, Department of Anesthesiology R3 Core Lecture series, "Ethics of Surrogate Consent" |

3

| | |
|---|---|
| 1994- | University of Washington, Department of Anesthesiology R3 Core Lecture series, "Ethical Issues in Organ Transplantation" |
| 1994- | University of Washington, Department of Anesthesiology R4 Core Lecture series, R4 Seminar: "Allocation of Scarce Resources in a Managed Care Environment" |
| 1995 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology, "Informed Consent and Surrogate Consent: Who Speaks for the Patient?" |
| 1995 | University of Washington, Department of History and Ethics, Ethics Brown Bag Lecture Series, "Ethical Dilemmas in the Operating Room" |
| 1995, 1997 | University of Washington Department of Anesthesiology, Evening Resident Special Workshop, " Fiberoptic Intubation and Management of the Difficult Airway" |
| 1996 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology, "Ethical Issues in Organ Transplantation, and The Impaired Practitioner" |
| 1997 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology, "Physician-Assisted Suicide, and the Impaired Physician," |
| 1997 | University of Washington, Department of History and Ethics; Ethics Brown Bag Lecture Series "DNR in the Operating Room: Should Different Rules Apply?" |
| 1997 | University of Washington, Department of History and Ethics, Ethics Brown Bag Lecture Series "Ethical Pain Management in the Addicted Patient Undergoing Surgery--Is There A Duty to Rescue?" |
| 1999 | University of Washington, Department of Biomedical Ethics and History, Master's Course in Biomedical Ethics, "Informed Consent." |
| 1999 | University of Washington, Department of Biomedical Ethics and History Ethics, Brown Bag Lecture Series, "Who is Captain of the Ship on the Multidisciplinary Team: Lessons from the Operating Room" |
| 2004 | University of Washington, Department of Anesthesiology, Resident Special Evening Lecture Series: Forum on Ethical Issues in Anesthesiology "Ethics of Organ Transplantation" |
| 2008- | University of Washington, R2 Core lecture "Introduction to Preoperative Evaluation." |
| 2008-present | University of Washington CA1 PAC lecture series: "informed Consent/Informed Refusal" |
| 2010-present | University of Washington Resident Introductory Lecture series: "EHR Integrity" |
| 2010-present | University of Washington R2 and R3 Core Lectures: "Coding and Documentation" |

## GRAND ROUNDS LECTURES

| | |
|---|---|
| 1994-1996 | New England Deaconess Hospital, Boston, Massachusetts: "Ethical Issues in Anesthesia Practice" |
| 1994 | University of Washington, Ethics Grand Rounds, "DNAR in the Operating Room" |
| 1996 | University of Washington, Hematology Grand Rounds, "Antifibrinolytics, Use, Clinical Efficacy, and Cost Effectiveness" |
| 1998 | Providence Medical Center, Department of Surgery, Surgery Grand Rounds "Ethical Issues in Surgical Care: A Panel Discussion" |
| 1998 | University of Washington School of Medicine: Combined Cardiothoracic Surgery/Cardiology Grand Rounds, "Brain Death and Organ Donation" |
| 2001 | Rush-Presbyterian-St. Luke's Medical Center, Anesthesia Grand Rounds, Department of Anesthesiology Chicago, Illinois, "Historical Perspectives on the Ethics of Clinical Research" |

| 2002 | University of Pittsburgh Medical Center, Pittsburgh, Pennsylvania, Department of Anesthesiology, Anesthesia Grand Rounds, "Ethical Issues in Brain Death" |
|------|------|
| 2008 | University of Washington Anesthesiology Grand Rounds: "Perioperative Management of Pacers and AICDs" |
| 2009 | University of Washington Medical Center Combined Anesthesiology and Surgery Grand Rounds "Preoperative Evaluation: Where Have We Been, Where are We Going?" |
| 2009 | University of Oklahoma Anesthesiology Grand Rounds, "Is a Free Pen Just a Free Pen? Conflicts of Interest in Clinical Practice, Research and Industry." February, 2009. |
| 2009 | University of Washington Department of Anesthesiology; DNR in the Operating Room April, 2009 |
| 2010 | University of Washington Department of Orthopedics; Preoperative Testing: Should Your Patient have a Preoperative Chest XRay? April, 2010. |
| 2010 | University of Washington Department of Obstetrics and Gynecology: Preoperative Testing: Less is More. May, 2010 |
| 2011 | MD Anderson Cancer Center; Houston Texas. Dept of Anesthesiology. Fraud and Plagiarism in Medical Research. February 14, 2011 |
| 2012 | MD Anderson Cancer Center: Houston Texas. Dept of Anesthesiology. Physician Assisted Suicide and Euthanasia. April 18, 2012 |
| 2012 | MD Anderson Cancer Center, Houston Texas. Risk Management Department. Fraud and Plagiarism in Medical Research. April 18 2012 |
| 2012 | Overlake Medical Center Department of Anesthesiology: Lifeboat Ethics. April, 2012 Bellevue, WA |
| 2018 | University of Washington "Respecting Patient Privacy". Feb 28, 2018 |

**Resident Journal Club:**

| 1995 | University of Washington, Department of Anesthesiology "Use of Magnesium for Cardiac Surgery Patients" |
|------|------|
| 1996 | University of Washington, Department of Anesthesiology; "Anesthesia for IVF, Teratogenicity of Anesthetics, and Anesthesia and the Breast-Feeding Patient" |
| 1996 | University of Washington, Department of Anesthesiology, "N2O: Friend or Foe?" |

**Faculty Lectures:**

| 1995 | University of Washington, Department of Anesthesiology, CME lecture, "Ethics and the Examiners" |
|------|------|

**Workshops:**

| 1994-1996 | University of Washington, Department of Anesthesiology, CME Workshop, "Difficult Airway" |
|------|------|
| 1996 | University of Washington School of Medicine CME Workshop, "Aprotinin and Other Antifibrinolytics," Blood Therapy: Applications and Alternatives" |

**Nursing Lectures:**

| 1996-1997 | University of Washington Medical Center, Pre-Surgical Clinic Nursing Lecture Series; "Preoperative Assessment of the Patient for Anesthesia" |
|------|------|
| 1999 | University of Washington Medical Center Operating Room, Nurses Weekly Conference, "Informed Consent in the Operating Room." |

| 1999 | University of Washington, Association of Operating Room Nurses, Perioperative Nursing Internship Program "Informed Consent in the Operating Room" |
| 2000 | University of Washington, Department of Radiology Nursing Staff Lectures, "Sedation of the Patient with Severe Liver Disease for TIPS Procedure" |
| 2008 | University of Washington Medical Center Operating Room Nursing Conference, "Informed Consent in the Operating Room." |
| 2011 | Overlake Medical Center, Bellevue WA. Perioperative Nursing Education. DNR in the OR. |

## Editorial Responsibilities:

| 1997-2003 | Consulting Editor, ASA Syllabus on Ethics, American Society of Anesthesiologists, Park Ridge, Illinois |
| 2004- | Editor, ASA Syllabus on Ethics, American Society of Anesthesiologists, Park Ridge, Illinois. |
| 2009 | Editor-in-Chief, *Clinical Ethics for Anesthesiologists, a Cambridge University Press Case-Based Textbook.* |
| 2012-2017 | Associated Editor, North America Clinical Ethics, Journal of Bioethical Inquiry. |

## Special National Responsibilities:

| 1992-2014 | Committee on Ethics, American Society of Anesthesiologists, Park Ridge, Illinois |
| 1994 | Panelist, American Society of Anesthesiologists Annual Meeting, Panel on Ethics:  Ethical Issues in Anesthesiology |
| 1995 | Moderator Ethics Panel, American Society of Anesthesiologists, Annual Meeting, "Is There a Role for the Anesthesiologist in Physician-Assisted Suicide?" |
| 1996-2006 | Moderator Clinical Forum, American Society of Anesthesiologists, Annual Meeting, "Ethics/Geriatrics" |
| 1996-1999 | Moderator Problem-Based Learning Discussion, American Society of Anesthesiologists Annual Meeting, Ethics cases |
| 1997 | Panelist, American Society of Anesthesiologists Annual Meeting Panel on Education, "Can Ethics be Taught?" |
| 1998 | Workshop Organizer and Lecturer,  American Society of Anesthesiologists, "Teaching Clinical Ethics in Anesthesia Residency" |
| 1999 | Invited Participant, Duke University, Durham, North Carolina, Second Duke Conference on Surgery and the Elderly |
| 2001 | Panelist, American Society of Anesthesiologists Annual Meeting Panel on Professionalism, "Defining and Demanding Excellence in Anesthesia Job Performance" |
| 2004 | Panelist International Liver Transplantation Society Annual Meeting, "Ethics of Liver Transplantation, NHB/DCD Donors: Perioperative Issues in Liver Transplantation" |
| 2005 | Representative for the American Society of Anesthesiologists (one of four), First National (UNOS) Conference on Donation After Cardiac Death, Philadelphia [please see Bernat J.L. et al.  Report of a National Conference on Donation After Cardiac Death.  Am J Transpl 6: 281-91, 2006.] |
| 2005- | Ethics Reviewer, Research and Funding Department, Juvenile Diabetes Research Foundation, New York |
| 2006 | Panelist, American Society of Anesthesiologists Annual Meeting, Panel on Professionalism, "Role of the Anesthesiologist in End-of-Life Care –Do physicians have conflicts of interest?" |

6

| | |
|---|---|
| 2006 | Panel Moderator, American Society of Anesthesiologists Annual Meeting, Panel on Professionalism, "Working Hard—or Sleeping at the Wheel. Should the ASA adopt aviation-style standards for work hours for anesthesiologists?" |
| 2006 | Panel Moderator, American Society of Anesthesiologists Annual Meeting: Panel on Ethics, "Should Anesthesiologists Participate in Executions?" |
| 2007 | Panelist, ASA Panel on Ethical Issues in Perioperative Medicine |
| 2007 | Panelist, ASA Panel on Professionalism in Multidisciplinary Teams: Palliative Care and Multidisciplinary Pain Management |
| 2007 | Panelist, ASA Panel "What is Professionalism? Do I Need it? Do I Have it?" |
| 2007 | ASA Clinical Forum: Special Topics in Bioethics |
| 2008-2011 | Chair, American Society of Anesthesiologists Committee on Ethics |
| 2008 | Panelist, ASA Panel "Lethal Injection." |
| 2008 | Panelist, ASA Panel "DCD—do we need it? Con." |
| 2008 | Moderator, ASBH panel "Opioid Pain Medication for Chronic Nonmalignant Pain: A Right or a Wrong?" American Society of Bioethics and Humanities |
| 2008 | Invited lecturer: 37th Annual Advances in Family Practice and Primary Care, August. Seattle WA: "DNR and Other Advance Directives in the OR" |
| 2008 | Invited Lecturer: AANA. "Preoperative Testing" and "Perioperative beta blockade." September. Spokane, WA |
| 2009 | Refresher Course Lecture: Ethics for Anesthesiologists in the 21st Century. New Orleans LA. |
| 2010 | Refresher Course Lecture: Protecting Vulnerable Subjects in Research: Ethical Obligations to Human and Animal Research Subjects. San Diego, CA |
| 2010 | Panelist, ASA Panel "Health Care Reform." ASA Annual Meeting, San Diego, CA. |
| 2011 | Invited lecturer: "DNR Orders in the Perioperative Period." Overlake Medical Center, Bellevue Washington. |
| 2011 | Should Anesthesiologists Participate in Physician-Assisted Suicide? Pro and Con. American Society of Anesthesiologists Annual Meeting. Chicago, Il. 2011 |
| 2012 | Invited Lecturer: Informed Consent and Informed Refusal in the OR. Puget Sound Multi-Chapter AORN Coalition. Kent, WA Jan 2012 |
| 2012 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Fraud in Anesthesia Research, and Ethics of Interventional Pain Management. April 2012 Phoenix, AZ |
| 2012 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Fraud in Anesthesia Research, and Ethics of Interventional Pain Management. August 2012 San Francisco, AZ |
| 2012 | Invited Lecturer: 41st Annual Refresher Course for Nurse Anesthetists. Ethics of Informed Consent; Ethics of Informed Refusal; Ethical Issues in Preoperative Testing. Nov 2012 Orlando, FL. |
| 2012 | Invited Lecturer: Idaho State Society of Anesthesiologists: The Ethics of Preoperative Testing. Boise, Idaho, Spring 2012. |
| 2013 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Ethics of Interventional Pain Management. February 2012 Phoenix, AZ |
| 2013 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Ethics of Interventional Pain Management. October 2013 Denver, CO |
| 2013 | Panelist: Controversial Cases in Organ Donation and End-of-Life Care, American Society of Anesthesiologists Annual Meeting, San Francisco CA. |
| 2014 | Panelist: Controversies in Organ Transplantation, American Society of Anesthesiologists Annual Meeting, New Orleans LA |
| 2014 | Ethical Issues Regarding Open Access Journals, American Society of Bioethics and Humanities Annual Meeting, San Diego CA. |

| 2015 | Harvard Anesthesia Update 2015. Point/Counterpoint. Physician Involvement in Lethal Injection. May 2015 |
| 2015 | Invited lecturer, American Society of Interventional Pain Physicians Refresher Course and Review. Ethics of Interventional Pain Management. Chicago Il, July 2015 |
| 2015 | Faculty, Moya Annual CRNA Refresher Course. Orlando, FA. Nov 2015 |

## Special Regional Responsibilities:

| 1991-1993 | Member, Medical Ethics and Practice Committee, King County Medical Society, Seattle, Washington |
| 1992-1994 | Member, Professional Liability Panel, King County Medical Society, Seattle, Washington |
| 1992-1996 | Co-chair, Committee on Education, Washington State Society of Anesthesiologists, Seattle, Washington |
| 1995 | Program Chair, Washington State Society of Anesthesiologists Spring Meeting, "Controlling Our Destiny: Leadership Opportunities Beyond the Operating Room" |
| 1995 | Program Chair, Washington State Society of Anesthesiologists Fall Meeting, "The Difficult Airway: Clinical Approaches and Risk Management" |
| 1996 | Program Co-Chair, Washington State Society of Anesthesiologists Spring Meeting, "Preoperative Issues for the Surgical Patient" |
| 1996 | Representative, Washington State Society of Anesthesiologists, ASA Legislative Session, Washington, DC |

## Special Local Responsibilities:

| 1991-1993 | Ethics Committee, Swedish Hospital, Seattle, Washington |
| 1995-2000 | Associate Medical Director, Pre-surgery Clinic, University of Washington Medical Center, Seattle, Washington |
| 1996-1997 | Member, Advisory Committee on Ethics, University of Washington Medical Center, Seattle, Washington |
| 1998-2000 | Chair, Continual Quality Improvement University of Washington Medical Center, Department of Anesthesiology |
| 1997-2000 | Co-chair, Advisory Committee on Ethics, University of Washington Medical Center, Seattle, Washington |
| 1999-2000 | Acting Chief, Cardiothoracic Anesthesia, University of Washington Department of Anesthesiology |
| 2006 - | Regional Ethics Committee member, Franciscan Health Care Systems, Tacoma, Washington |
| 2006-2008 | Member, Regional Committee on Organ Transplantation, Franciscan Health Care System, Tacoma, Washington |
| 2008-2009 | Member, Joint Transfusion Committee, HMC and UWMC |
| 2009-2010 | Member, Standards and Finance Committee, University of Washington Department of Anesthesiology and Pain Medicine |
| 2010-2016 | Member, Business Excellence Committee, University of Washington Physicians |
| 2010- | Chair/co-chair Standards and Finance Committee, University of Washington Department of Anesthesiology and Pain Medicine |
| 2010-present | Compliance Officer, Department of Anesthesiology and Pain Medicine, University of Washington, Seattle WA. |
| 2014-present | Member, Dept of Anesthesiology and Pain Medicine Promotions Committee |

8

**Research Funding:**

University of Washington Department of Anesthesiology; "The Effects of PTCA vs. CABG in
Reducing Postoperative Cardiac Morbidity in Patients Undergoing Noncardiac
Surgery"; 1995; $500 [Investigators: Chan V, Van Norman G, Posner K]

Washington State Society of Anesthesiologists;  The Effects of PTCA vs. CABG in Reducing
Postoperative Cardiac Morbidity in Patients Undergoing Noncardiac Surgery; 1995;
$2000; [Investigators: Chan V, Van Norman G, Posner K]

Washington State Society of Anesthesiologists:  Echocardiography Screening in the
PreAnesthesia Clinic.  2010.  $5000 [Investigators:  Wako E, Van Norman GA, Rooke
A, Otto C.]

**BIBLIOGRAPHY**

**Publications in Refereed Journals:**

1. Van Norman G., Groman N..  A Method of Quantitating Sensitivity to a Staphylococcal Bacteriocin.  Infection and Immunity 26(2): 787-789, 1979.

2. Dreis D., Winterbauer R., Van Norman G, Sullivan S., Hammer S.  Cephalosporin-Induced Interstitial Pneumonitis.  Chest 86(1): 138-140, 1984.

3. Winterbauer R., Hammer S., Van Norman G.  Histiocytosis X, Case Report and Discussion.  J Resp Dis February 1985.

4. Van Norman G, Pavlin E, Eddy C, Pavlin J.  Hemodynamic and Metabolic Effects of Aortic Unclamping Following Emergency Surgery for Traumatic Thoracic Aortic Tear in Shunted and Unshunted Patients.  J Trauma 31(7): 1007-1016, 1991.

5. Van Norman, G.  Diabetes in the Operating Room:  Metabolic Challenges for the Anesthesiologist.  Seminars Anesth 14(3): 210-220,1995

6. Van Norman, G. Preoperative Assessment of Common Diseases in the Outpatient Setting.  Anesthesiology Clinics of North America. 14(4): 631-654,1996.

7. Van Norman G.  Preoperative Management of Common Minor Medical Issues in the Outpatient Setting. Anesthesiology Clinics of North America. 14(4): 655-678, 1996.

8. Aziz S, Haigh W, Van Norman G, Kenney R, Kenney M.  Blood Ionized Magnesium Concentration During Cardiopulmonary Bypass and Their Correlation with Other Circulating Cations.  J Card Surg Sep-Oct 11(5): 341-7, 1996.

9. Van Norman G, Gernsheimer T, Chandler W, Cochran P, and Spiess B.  Indicators of Fibrinolysis During Cardiopulmonary Bypass After Exogenous Antithrombin III Administration for Acquired Antithrombin III Deficiency. J. Cardiothoracic Vasc Anesth 11(6): 760-763, 1997.

10. Jackson S, Palmer S, Van Norman G, et al.  Ethical Issues in Anesthesia.  Adv Anesth 14:227-260, 1997.

11. Van Norman G. A Matter of Life and Death:  What every anesthesiologist should know about the medical, legal, and ethical aspects of declaring brain death.  Anesthesiology 91(1): 275-287, 1999.

12. Posner K, Van Norman G, Chan V.  Adverse Cardiac Events Following Noncardiac Surgery in Patients with Coronary Artery Disease Undergoing Prophylactic PTCA. Anesth Analg  89: 553-60, 1999.

13. Reilly DF, McNeely JM, Doerner D, Greenberg DL, Staiger TO, Geist MJ, Vedovatti PA, Coffey JE, Mora MW, Johnson TR, Guray Ed, Van Norman GA, Fihn S.  Self-Reported Exercise Tolerance and the Risk of Serious Perioperative Complications.  Arch Int Med 159: 2185-92,1999.

14. Van Norman G.  Ethics and The Elderly Patient.  Current Anesth Rep 1:13-17, 1999.

15. Pavlin DJ, Arends RH, Gunn H, Van Norman G, Keorschgen M, Shen D.  Optimal Propofol-Alfentanil Combinations for Supplementing Nitrous Oxide for Outpatient Surgery.  Anesthesiology 91(1): 97-108, 1999.

16. Jackson S, <u>Van Norman, G</u>. Goals and Values Directed Approach to Informed Consent in the "DNR" Patient Presenting for Surgery--More Demanding of the Anesthesiologist? Editorial. Anesthesiology 90:3-6, 1999.

17. Pavlin JD, Colley PS, Weymuller EA, <u>Van Norman GA</u>, Gunn HC and Koerschgen M. Propofol Versus Isoflurane For Endoscopic Sinus Surgery. Am J Otolaryn; 10: 96-101, 1999.

18. <u>Van Norman, G</u>. Angioplasty and Noncardiac Surgery: Risks of Myocardial Infarction. Current Opinion in Anesthesiology, 12(1):15-20, 1999.

19. <u>Van Norman, G</u>. Response: Re: Can Brain Death Testing Be Perfect? Anesthesiology. 92(4): 1204-5, 2000.

20. <u>Van Norman G</u>, Patel MA, Robledo J, Chandler W, and Vocelka C. Effect of Hemofiltration on Serum Aprotinin Levels in Patients Undergoing Cardiopulmonary Bypass. J. Cardiothor Vasc Anesth 14(3): 253-256, 2000.

21. <u>Van Norman G</u>, Palmer S. Coercion and Restraint in Anesthesia Practice. International Clinics of Anesthesiology. Medical Ethics 39(3): 131-143, 2001.

22. <u>Van Norman, G</u>. Ethical Issues and the Role of Anesthesiologists in Non-Heart-Beating Organ Donation. Current Opinion Anesthesiology 16(2): 215-9, 2003

23. <u>Van Norman G</u>. Another Matter of Life and Death; What Every Anesthesiologist Should Know About the Ethical, Legal and Policy Implications of the Non-Heart-Beating Organ Donor. Anesthesiology 2003. 98(3):763-73.

24. <u>Van Norman G</u>, Jackson S, Waisel D. Ethical Issues in Informed Consent. Current Opinions in Anesthesiology 17(2): 177-81, 2004.

25. <u>Van Norman GA</u>. Ethical Issues of Importance to Anesthesiologists Regarding Organ Donation After Cardiac Death. Current Opinion Organ Transplant 10(2): 105-109, 2005.

26. <u>Van Norman GA</u>. Controversies in Organ Donation: Donation After Cardiac Death. Periop Nurs Clin, 3(3):233-240, 2008

27. <u>Van Norman GA</u>. Ethical Issues in Informed Consent. Periop Nurs Clin 3(3):213-222, 2008

28. Ivashkov Y, <u>Van Norman GA</u>. Informed Consent and Ethical Management of the Elderly Patient. Anesthesiology Clinics 2009; 27(3):569-80

29. Souter M, <u>Van Norman GA</u>. Ethical Controversies at End-of-Life After Traumatic Brain Injury: Defining Death and Organ Donation. Critical Care Medicine. Accepted for publication, anticipated Fall 2010.

30. Souter M, <u>Van Norman GA</u>. [Letter to the Editor] Reply to: Concerns regarding definition of brain death. Critical care medicine 2011;39(3):606-7

31. Sara Kim, PhD; Sinan Jabori, BS; Jessica O'Connell, MD, FACS; Shanna Freeman, APRN; Cha Chi Fung, PhD; Sahrish Ekram, BA; Amruta Unawame, MD; <u>Gail Van Norman, MD</u>. Current Trends of Research Methodologies in Informed Consent Studies: Time to Re-examine? Patient Educ Couns 2013; 93:559-66

32. <u>Van Norman G</u>. Physician Aid-in-Dying: Cautionary Words. Curr Opinion Anesthesiol 2014; 27:177-82

33. <u>Van Norman GA</u>. Five Days at Memorial: Life and Death in a Storm-Ravaged Hospital. Book Review. Anesth Analg 2014; 199:494

34. <u>Van Norman GA</u>. Abusive and Disruptive Behavior in the Surgical Team. *AMA Journal of Ethics*. 2015; 17:215-220. . http://journalofethics.ama-assn.org/2015/03/ecas3-1503.html. Accessed March 3, 2015.

35. <u>Van Norman GA</u>. A Matter of Mice and Men: Ethical Controversies in Animal Experimentation. Int Anesthesiol Clin. 2015; 53:63-78.

36. Rooke GA, Lombaard SA, Dziersk J, Natrajan KM, <u>Van Norman G</u>, Larson LW, Poole JE. Initial experience of an anesthesiology-based service for perioperative management of pacemakers and implantable cardioverter defibrillators. Anesthesiology 2015; 123:1024-32.

37. Nair BG, Grunzweig K, Peterson GN, Horibe M, Nerdilek MB, Newman SF, <u>Van Norman G,</u> et al. Intraoperative blood glucose management: impact of a real-time decision support system on adherence to institutional protocol. J Clin Monitor Comput June 12, 2015; epub ahead of print

38. Grunzweig K, Nair BG, Peterson GN, Horibe M, Neirdilek MB, Newman SF, <u>Van Norman G</u>, et al. Decisional practices and patterns of intraoperative glucose management in an academic medical center. 2016; 32:214-23

39. <u>Van Norman G</u>. Drugs, devices and the FDA: an overview of the approval processes: Part 1 Approval of drugs. JACC Basic Translation Sci 2016; 1: 170-9

40. <u>Van Norman G</u>. Drugs, devices and the FDA: an overview of the approval processes: Part 2 Approval of medical devices. JACC Basic Translation Sci 2016; 1:277-87

41. <u>Van Norman G</u>. Drugs and Devices Part 3: a Comparison of U.S. and European Processes. JACC Basic Translation Sci 2016; 1:399-412

42. <u>Van Norman GA</u>. Decisions regarding foregoing life-sustaining treatments. Curr Opin Anesth 2016; Nov 30 [epub ahead of print].

43. <u>Van Norman GA</u>, Eisenkott R. Technology Transfer: From the Research Bench to Commercialization. Part 1. Intellectual Property Rights-Basics of Patents and Copyrights. JACC Basic Translation Sci 2017; 2:85-97

44. <u>Van Norman GA</u>, Eisenkott R. Technology Transfer. Part 2. The Commercialization Process. JACC Basic Translation Sci 2017; 2:197-208

45. <u>Van Norman GA</u>. Overcoming the declining trends in innovation and investment in cardiovascular therapeutics: beyond EROOM's law. JACC Basic Translational Sci 2017; 2:613-25

46. <u>Van Norman GA</u>. Expanding Patient Access to Investigational Drugs: Single Patient INDs and "Right to Try". JACC Basic Translational Sci 2018; 3:280-91

47. <u>Van Norman GA</u>. Expanding Patient Access to Investigational Drugs: Overview of Intermediate and Widespread Treatment INDs, and Emergency Authorization in Public Health Emergencies. JACC Basic Translational Sci 2018; 3:403-14

48. <u>Van Norman GA</u>. Expanded patient access to investigational new devices: review of emergency and non-emergency expanded use, custom and 3D printed devices. JACC Basic Translational Sci. 2018; 3:533-44

49. Shah AC, Ma K, Faraoni D, Oh D, Rooke A, <u>Van Norman GA</u>. Self-reported functional status predicts post-operative outcomes I noncardiac surgery patients with pulmonary hypertension. PLOS ONE. Aug 16, 2018. https://doi.org/10.1371/journal.pone.0201914

50. <u>Van Norman GA</u>. The problem of Phase II clinical trials: reducing costs and predicting success. JACC Basic Translational Sci 2019; 4:428-37

51. Suhr W, <u>Van Norman GA</u>. Ethical issues in organ transplantation at end of life: defining death. Anesthesiology Clinics: Anesthesia at the Edge of Life. Elsevier. Accepted, anticipate publication Winter 2020.

52. <u>Van Norman GA</u>. Limitations of animal studies for predicting toxicity in clinical trials: part 1: is it time to rethink our current approach? JACC Basic Transl Sci. Accepted, publication anticipated Winter 2020


**Books:**

Cambridge Textbook of Clinical Ethics for Anesthesiologists. Van Norman G, Ed. Palmer S, Jackson S, Rosenbaum S co-ed. Cambridge University Press, 2011. London, UK.


**Book Chapters:**

1. <u>Van Norman, G</u>. Jehovah's Witnesses, in Atlee, J. (ed): *Complications in Anesthesiology*. WB Saunders, Philadelphia., 1999, pp. 937-939.

2. <u>Van Norman, G</u>. Patient Confidentiality, in Atlee, J. (ed): *Complications in Anesthesiology*. WB Saunders, Philadelphia, 1999. Pp. 931-933.

3. <u>Van Norman, G</u>. DNR in the Operating Room, in Atlee, J (ed): *Complications in Anesthesiology*. WB Saunders, Philadelphia, 1999, pp. 934-936.

4. <u>Van Norman G</u>. Ethical Considerations: Informed Consent, Advanced Directives, DNR Orders. In Hanson, E.(ed): *Medical Clerkship Companion 2*. Harcourt Brace, Chestnut Hill, MA, 2003.

5. <u>Van Norman G</u>. Ethical Decisions/End-of-Life Care in Patients with Vascular Disease. In Kaplan, J. (ed): *Vascular Anesthesia, 2nd Edition*. Churchill Livingstone, Philadelphia, PA, 2004, pp. 387-406.

6. <u>Van Norman, G</u>. DNR in the Operating Room. In Atlee, J. (ed): *Complications in Anesthesiology, 2nd Edition*. WB Saunders, Philadelphia. 2005.

7. <u>Van Norman, G</u>. Jehovah's Witnesses. In Atlee, J. (ed): *Complications in Anesthesiology, 2nd Edition*. WB Saunders, Philadelphia, 2005.

8. <u>Van Norman, G</u>. Patient Confidentiality. In Atlee, J. (ed): *Complications in Anesthesiology, 2nd Edition*. WB Saunders, Philadelphia, 2005.

9. <u>Van Norman GA</u>. Anesthesiology Ethics. *IN* Singer P, Viens A (eds): *The Cambridge Textbook of Clinical Ethics*. 2008. Cambridge University Press, London.

10. <u>Van Norman GA</u>, Rosenbaum S.  Ethical Issues in Anesthesia Care.  *IN* Miller R, Ed. *Miller's Anesthesia, 7th Ed.*  Elsevier Publications, Philadelphia PA. 2009

11. <u>Van Norman GA.</u> Informed Consent:  Respecting Patient Autonomy.  *IN* Van Norman GA, Ed. *Cambridge Textbook of Ethics for Anesthesiologists.*  2011 Cambridge University Press, London, UK.

12. <u>Van Norman, GA.</u> Informed Consent for Preoperative Testing:  Pregnancy Testing and Other Tests Involving Sensitive Patient Issues. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

13. <u>Van Norman GA.</u>  Revising the Anatomical Gift Act—the Role of Physicians in Shaping Legislation. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

14. <u>Van Norman GA.</u>  Animal Subjects Research Part II:  Ethics of Animal Experimentation. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

15. <u>Van Norman GA.</u>  Publication Ethics:  Obligations of Authors, Peer-Reviewers and Editors. *IN* Van Norman GA, Ed.  2011*Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

16. <u>Van Norman GA.</u> Sexual Harassment, Discrimination, and Faculty-Student Intimate Relationships in Anesthesia Practice. *IN* Van Norman GA, Ed.  2011*Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK..

17. <u>Van Norman GA.</u>  Physician Participation in Executions. *IN* Van Norman GA, Ed.  2011 *Cambridge Textbook of Ethics for Anesthesiologists.*  Cambridge University Press, London, UK.

18.  Wako E, <u>Van Norman GA.</u> Laboratory Testing in Spine Disease.  *IN* Chapman JR, Dettori JR, Norvell, DC (2011) *Measurements in Spine Care.* 1st ed. Stuttgart New York: Thieme.

19. <u>Van Norman GA.</u>  Ethical Standards in Medical Practice.  *IN* Manchikanti L, Christo P, Trescot A, Falco FJE (eds). *Foundations of Pain Medicine and Interventional Pain Management Board Review.* 2011 ASIPP Publishing, Paducah, KY 42001

20. <u>Van Norman GA.</u>  Ethics of Research in Pain Management.  *IN* Manchikanti L, Christo P, Trescot A, Falco FJE (eds). 2011 *Foundations of Pain Medicine and Interventional Pain Management Board Review.* ASIPP Publishing, Paducah, KY 4200

21. <u>Van Norman GA.</u>  Ethics in Anesthesiology.  *IN* Miller R, Ed. *Miller's Anesthesia, 8th Ed.* Elsevier Publications, Philadelphia PA, 2015.

22. <u>Van Norman GA.</u>  Anesthesia Pearls.  *IN*  Wong C, Hamlin N Eds.  *The Medicine Consult Handbook.*  Springer Science and Business Media Inc.  New York, NY.  2012

23. <u>Van Norman GA.</u>  Organ Transplantation.  *IN* Brennan. Michael (ed.). The A-Z of Death and Dying: Social, Medical and Cultural Aspects. Santa Barbara, CA: ABC-Clio. 2013

24. <u>Van Norman GA.</u>  Life Support Systems.  *IN*: Brennan. Michael (ed.). The A-Z of Death and Dying: Social, Medical and Cultural Aspects. Santa Barbara, CA: ABC-Clio. 2013

25. Jackson S, <u>Van Norman GA</u>. Anesthesia, Anesthesiologists and Modern Medical Ethics. *IN* The Wondrous Story of Anesthesiology, Eger EI II, Saidman L, Westhorpe RN Eds. Springer, NY.  2014 pp205-218

26. <u>Van Norman G</u>, Rosen J.  Michael Jackson:  Medical Ethics and What Went Wrong. In; Pediatric Sedation Outside of the Operating Room: a Multispecialty International Collaboration,  Second Edition.  Mason KP Ed.  Springer, NY  2015 pp685-698

27. <u>Van Norman, GA</u>.   Ethics and clinical aspects of palliative sedation in the terminally ill child. In;  Pediatric Sedation Outside of the Operating Room: a Multispecialty International Collaboration,  Second Edition.  Mason KP Ed.  Springer, NY  2015 pp699-710

28. <u>Van Norman G.</u>  Anesthesia Pearls.  *In* The Perioperative Medicine Consult Handbook, Jackson M, ed.  Springer, 2015.

29. <u>Van Norman GA</u>.  Preoperative Testing:  Ethical Challenges, Evidence-Based Medicine and Informed Consent.  In:  Ethical Issues in Anesthesiology and Surgery.  Springer publications. Jericho B, Ed.  Springer, New York, 2016.

30. <u>Van Norman GA</u>. Ethics and Evidence Regarding Animal Subjects Research:  Splitting Hares--or Swallowing Camels? In:  Ethical Issues in Anesthesiology and Surgery.  Jericho B, ed. Springer, New York, 2016.

31. Jackson S, <u>Van Norman GA</u>.  Ethics in Research and Publication.  In:  Ethical Issues in Anesthesiology and Surgery.  Jericho B, Ed. Springer, New York.  2016.

32. <u>Van Norman GA</u>.  Ethical Issues in Elderly Patients:  Informed Consent.  In:  Barnett S, ed. Perioperative Care of the Elderly Patient.  Cambridge University Press, Cambridge UK.  2017

33. <u>Van Norman GA</u>.  Ethical Issues: Withdrawing, Withholding and Futility.  In Principles of Geriatric Critical Care.  Akhtar S, Rosenbaum S, Eds.  Cambridge University Press, UK.  Dec 6, 2018.

34. <u>Van Norman GA</u>, Rosenbaum S.  Ethics in Anesthesiology.  Miller's Anesthesia 9th Ed. Elsevier.  Accepted 2018, anticipated publication Autumn 2019

**Other Publications:**

**Print Publications**

1. <u>Van Norman, G.</u> Cheney F.  Falsely Elevated Oximeter Reading Dangerous on One Lung.  APSF Newsletter (letter to the editor) Issue 23. June, 1989.

2. <u>Van Norman G</u>.  Ethics of Informed Consent.  ASA Newsletter 58(8): 15-17, 1994

3. <u>Van Norman, G.</u>  Special Paper:  Implementation of an Ethics Curriculum:  Getting Started. In Waisel D, Van Norman G (eds):  *ASA Syllabus on Ethics:  Informed Consent.*  ASA publications, Park Ridge, Illinois. 1997, pp. 1-6.

4. Jackson S, Fine P, Palmer S, Rosebaum S, Truog R, <u>Van Norman G</u>.  Letter to Editor, Comment on Bastron, D.  Response to:  Ethical Concerns in Anesthetic Care for Patients with Do-Not-Resuscitate Orders.  Anesthesiology 87(1): 176-177, 1997.

5. <u>Van Norman, G</u>. Who Speaks for the Patient? Ethical Principles in Assessing Patient Competence and Appropriate Use of Proxy Decision-Makers in the Practice of Anesthesiology. In Waisel D, Van Norman G (eds*): ASA Syllabus on Ethics: Informed Consent.* ASA publications, Park Ridge, Illinois. 1997, pp. B2-B34.

6. Waisel D, <u>Van Norman G</u>, Fine P. Special Article, Hospice Care: Live All the Days of Your Life. An Interview with Perry G. Fine. In Waisel D, Van Norman G (eds). *ASA Syllabus on Ethics: Informed Consent.* ASA publications, Park Ridge, Illinois. 1997, pp. 1-9.

7. <u>Van Norman G</u>. Redefining Death. Ethical, Legal and Medical Implications of Brain Death Determination in Anesthesia Practice. In Waisel D., Van Norman G. (eds): *ASA Syllabus on Ethics: End of Life Issues.* ASA publications, Park ridge, Illinois. 1999, pp. G1-G7.

8. <u>Van Norman G</u>. Chapter 17: Misinformed Consent--A Problem in the OR? In*: ASA Refresher Courses in Anesthesiology.* ASA Publications, Chicago Ill. 1999, pp.215-223.

9. <u>Van Norman G</u>, and Posner K. Coronary Stenting or Percutaneous Transluminal Coronary Angioplasty Prior to Noncardiac Surgery Increases Adverse Perioperative Cardiac Events; the Evidence is Mounting. (letter to the editor). J Amer Coll Cardiol 36(7): 2351, 2000.

10. <u>Van Norman, G</u>, Palmer S. When Should Anesthesiologists Restrain Uncooperative Patients? ASA Newsletter 65(3), 2001.

11. <u>Van Norman G</u>. The Student-Teacher Relationship in Medicine: Are Intimate Relationships Between Faculty and Medical Trainees Ethical? In Van Norman G, Waisel D. (eds): *ASA Syllabus on Ethics: Ethics of Professional and Personal Relationships in Anesthesiology Training and Practice.* ASA, Park Ridge, Illinois. 2004.

12. <u>Van Norman G</u>. Non-Heart-Beating Cadaver Organ Donation: Ethical Issues for Anesthesiologists. ASA Newsletter 67(11), 2003.

13. <u>Van Norman GA</u>, Palmer SK, Jackson SH. The Ethical Role of Medical Journal Editors. [Letter} Anesth Analg 100:603-4, 2005.

14. Brown S, <u>Van Norman G</u>. Compassion and Choice in End-of-Life Decisions. Editorials and Opinions, *The Seattle Times,* April 1, 2005

15. <u>Van Norman GA</u>. Practical Ethical Concerns Regarding Intimate Relationships in the Operating Room. ASA Newsletter 2007, 71(5).

16. <u>Van Norman G, Brown S</u>. Organ Donation a Personal Decision. Opinion, *The Seattle Post Intelligencer,* March 20, 2007.

17. <u>Van Norman GA.</u> Contributing Writer: *Handbook of Anesthesia and Co-Existing Disease.* Elsevier publications, Philadelphia PA. 2009.

18. Sweitzer BJ, Vidoga M, Milokjic, et al. Resident's knowledge of ACC/AHA Guidelines for Preoperative Cardiac Evaluation is Limited. Cleveland Clinic J Med 2010; 77(ESuppl):eS11-eS12.

19. <u>Palmer SK, Van Norman GA, Jackson SL.</u> Letter to the editor. Routine pregnancy testing before elective anesthesia is not an American Society of Anesthesiologists standard. Anesth Analg. 2009; 208(5):1715-6.

20. <u>Van Norman GA</u>, Jackson SL. Back to our roots: the importance of enforcing professionalism at the ASA. ASA Newsletter. May, 2011. 75(5):10-12

21. Jackson SL, <u>Van Norman GA.</u> Ethical issues in the publication of medical research. ASA Newsletter. May 2011.  75(5):14-15

22. <u>Van Norman GA</u>.  Misinformed Consent:  A problem in the Operating Room?  Ethical principles of informed consent and their application for the anesthesiologist.  Refresher Courses Anesth  2011; 39(1):215-223

23. <u>Van Norman GA</u>.  Ethics of Ending Life; Physician-Assisted Suicide and Euthanasia, Part 1.  California Society of Anesthesiologists Bulletin, CA.  Winter 2012.

24. <u>Van Norman GA</u>.  Physician Assisted Suicide.  ASA Newsletter. Spring 2012.

25. <u>Van Norman GA</u>.  Ethics of Ending Life; Physician-Assisted Suicide and Euthanasia, Part 2.  California Society of Anesthesiologists Bulletin, CA.  Summer 2012.

26. <u>Van Norman GA</u>.  Ethical Challenges of Routine Preoperative Tests.  ASA Newsletter, Nov. 2012

27. Rooke A, Natrajan K, Lombaard S, Dziersk J, <u>Van Norman GA</u>, Poole J.  Letter to the Editor In Reply: Initial experience of an anesthesiology based service for perioperative management of pacemakers and implantable cardioverter defibrillators.  Anesthesiology 2016; 124: 1195


**Web publications**

1. Update Author, *Sleisinger and Fordtran's Gastrointestinal and Liver Disease, 7th Edition,* on-line version.  Mark Feldman MD, Editor.  Elsevier Scientific Publications, Philadelphia *[www.sfgastro.com],* 2003 to 2006.

2. Update Author, *Anesthesia, 6th Edition,* on-line version.  Ron Miller MD, Editor.  Elsevier Scientific Publications, Philadelphia. *[www.anesthesiatext.com]* 2004 to present.

3. Update Author, *Diseases of the Heart, 6th Edition,* on-line version.  Eugene Braunwald MD, Editor.  Elsevier Scientific Publications, Philadelphia [*www.branwalds.com],* 2004 to present.

4. Update Author, *Murry and Nadel's Textbook of Respiratory Medicine,* on-line version. Robert J. Mason MD, John F. Murray MD, V. Courtney Broaddus MD, and Jay A Nadel MD, editors.  Elsevier Scientific Publications, Philadelphia *[www.respmedtext.com],* 2005-2006.

5. Update Author, *Drugs for the Heart,* on-line version.  Lionel H Opie MD and Bernard J Gersh MD, editors.  Elsevier Scientific Publications, Philadelphia *[www.opiedrugs.com],*, 2005 to 2008

6. Update Author, *Clinical Gastroenterology and Hepatology,* on-line version, Wilfred M Weinstein MD, C J Hawkey MD, J Bosch MD, editors.  Elsevier Scientific Publications, Philadelphia *[www.clingastrotext.com],* 2005-2006.

7. Medifile author for *FirstConsult*,  Medical website for primary care physicians.  Elsevier Scientific Publications, London UK  *[www.firstconsult.com],* 1998 to 2008.

8. Topic Editor, *First Consult.*  Medical website for primary care physicians.  Elsevier Scientific Publications, London UK, *[www.firstconsult.com],* 1998 to 2008

9. Medical writer, Clinical Procedures website, Elsevier Scientific Publications, Philadelphia, 2008 to present

**Abstracts:**

1.  Van Norman G, Pavlin E, Eddy C, and Pavlin J.  Hemodynamic and Metabolic Effects of Aortic Unclamping Following Emergency Surgery for Traumatic Thoracic Aortic Tear in Shunted and Unshunted Patients.  Presented to the 50th Annual Meeting of the American Association for the Surgery for Trauma, 1989.

2.  Van Norman G, Pavlin E, Eddy C, and Pavlin J.  Hemodynamic and Metabolic Effects of Aortic Unclamping Following Emergency Surgery for Traumatic Thoracic Aortic Tear in Shunted and Unshunted Patients.  Presented to the American Society of Anesthesiologists Annual Meeting, 1989.

3.  Van Norman G, Spiess B, Lu J, et al.  Aprotinin Versus Aminocaproic Acid in Moderate-to-High-Risk Cardiac Surgery:  Relative Efficacy and Costs of Transfusion.  Anes Anal Supplement,  March 1995.

4.  Kenney M, Van Norman G, Hague G, et al.  Variations in Ionized Magnesium During Cardiopulmonary Bypass.  Presented to the Cardiopulmonary Bypass Meeting, San Diego, California, 1995.

5.  Pavlin J, Gunn H, Van Norman G, et al.  Optimal Propfol/Alfentanil Combinations for Supplementing N20 For Outpatient Surgery.  Presented to the Annual Meeting of the American Society of Anesthesiologists, 1997. Anesthesiology  87(3S) Supplement 308A, 1997.

6.  Van Norman G, Posner K, Wright I, et al.  Adverse Cardiac Events Following Noncardiac Surgery in Patients with Prior PTCA versus Normal Patients, and Patients with Nonrevascularized CAD.  Presented to the Scientific Sessions of the American Heart Association, Orlando, Florida, 1997, published in supplement to Circulation, October 1997.

7.  Simmons E, Van Norman G, Robledo J, et al.  Effect of Hemofiltration on Aprotinin Activity in Patients Undergoing Cardiopulmonary Bypass.  Presented to  WARC (Western Anesthesia Residents Conference,  1998.

8.  Lee J, Karjeker S, Van Norman GA et al.  Advance Directives in the Perioperative Period. Presented to WARC (Western Anesthesia Residents Conference), 2009

9.  Karjeker S, Van Norman G, et al.  Advance Directives in the PreAnesthesia Clinic.  Presented at the American Society of Anesthesiologists' Annual Meeting, New Orleans, LA.  2009

10. Rooke, G.A., Natrajan, K., Lombaard, S., Dziersk, J., Van Norman, G., Poole, J.:  Initial experience of an anesthesia-based service for perioperative management of CIEDs.  Anesthesiology 117:A835, 2012.

11. Shah A, Ma K, Rooke GA, Van Norman G.  Pulmonary HTN in the perioperative patient. (working title).  Accepted to IARS Annual Meeting, Honolulu HI.  March 2015.

12. Rooke A, Natrajan K, Lombaard S, Dziersk J, Van Norman G, Poole J.  Poster:  Initial experience of an anesthesia-based service for perioperative management of CIEDs.  ASA American Society of Anesthesiologists Annual Meeting, Washington DC, 2012

**OTHER**

**International and National Invitational Lectures:**

1. "DNR in the OR: Am I a Bad Doctor if I Let My Patient Die?" American Society of Anesthesiologists, Refresher Course, San Francisco, CA, June 29, 1996.

2. "Misinformed Consent: Is This a Problem in the Operating Room?" American Society of Anesthesiologists Refresher Course, San Francisco, CA, June 29, 1996.

3. "Ethics: A New Hot Topic in Resident Education," The Society for Education in Anesthesia Fall Meeting: Educational Strategies for the 21st Century, New Orleans, 1996.

4. "Ethics: A New Hot Topic in Resident Education," The Society for Education in Anesthesia Fall Meeting: Educational Strategies for the 21st Century, San Diego, CA, October 1997.

5. "Misinformed Consent: A Problem in the Operating Room?" American Society of Anesthesiologists Workshop in Practical Bioethics for the Anesthesiologist, Boston, MA, 1997.

6. "Brain Dead, or Only Mostly Dead? What's the Difference, I'm Just the Anesthesiologist!" American Society of Anesthesiologists Workshop in Practical Bioethics for the Anesthesiologist, Boston, MA, 1997.

7. "PTCA prior to Noncardiac Surgery." World Congress of Cardiovascular Anesthesiologists, Santiago, Chile, 1998.

8. "Ethics Case Discussion: Assessing Cardiac Risks for Patients with Coronary Artery Disease Undergoing Noncardiac Surgery" and "Ethics Case Discussion: Assessing Brain Death" Rush-Presbyterian-St. Luke's Medical Center, Chicago Illinois, Visiting Professorship, 1998

9. "Brain Death: What Every Anesthesiologist Should Know" Midwest Anesthesia Conference and Peri-Anesthesia Care Symposium, Chicago, Il, 1999.

10. "Ethical Issues in the Operating Room," American Society of Anesthesia Technologists and Technicians, Seattle, WA, 2000.

11. "Ethical Issues in the Operating Room," American Society of Extracorporeal Technologists, Seattle, WA, 2000.

12. "Ethical Boundaries of Persuasion: Coercion and Restraint in Pediatric Anesthesia Practice," Mid-Year SAMBA meeting, New Orleans, LA, 2001.

13. "Ethics: Brain Death and Organ Donation" Rush-Presbyterian-St. Luke's Medical Center and Rush University, Chicago, Illinois Department of Anesthesiology and Undergraduate Medical School; Inaugural Speaker, Katalin Selemczi MD Memorial Lecture Series in 2001

14. "Donation After Cardiac Death—Stretching the Definitions of Death Too Far?" Invited lecturer; European Society of Anesthesiology, Copenhagen Denmark, May 2008.

15. "Conflicts of Interest:  Industry Reps."  February 2009;  Visiting Professor, University of Oklahoma Department of Anesthesiology.  Oklahoma City, OK

16. "DNR in the Patient Undergoing Surgery and Anesthesia." Sept 2009  Primary Care Medicine.  Seattle, WA

17. Perioperative Beta Blockers."  National Association of Nurse Practitioners.  Aug 2010. Seattle, WA

18. Ghosts of OR Cancellations Past and Present."   Combined WSSA, BCAA international meeting.  Dec 2010  (Elizabeth Wako MD and Gail Van Norman MD speakers)

19. Ethics of Organ Donation After Cardiac Death.  Society for Cardiovascular Anesthesiologist.  Annual Meeting, April 2011.  Savannah, Georgia.

20. Ethics of Organ Donation After Cardiac Death.  Dept of Anaesthesiology and Intensive Care, St. Mary's Hospital.  London, UK.  August 2011.

21. Physician-assisted Suicide and Euthanasia.  Brocher Foundation.  Hermance, Switzerland, August 2011.

22. Fraud in Publication and Medical Research.  Dept of Anaesthesiology and Intensive Care Medicine, University of Geneva.  Geneva, Switzerland.  Sept 2011.

23. Informed Consent and Informed Refusal in the Operating Room.  AORN annual meeting, Seattle, WA Jan. 2012

24. Fraud and Plagiarism in Research.  Risk Management Division, MD Anderson Medical Center, Houston TX, April 18, 2012

25. Physician-Assisted Suicide and Euthanasia, Department of Anesthesiology, MD Anderson Medical Center, Houston TX, April 18, 2012

26. Ethics in Anesthesiology.  Annual Review Course for Certified Nurse Anesthetists. Orlando Florida, November 2012

27. Invited Lecturer:  Ethics of Interventional Pain Management.  ASIPP.  Phoenix, AZ.  Feb 2012

28. Invited Lecturer:  Ethics of Interventional Pain Management.  ASIPP.  San Francisco CA Aug 2012.

29. Invited Lecturer:  Ethics of Interventional Pain Management.  ASIPP.  Phoenix, AZ.  July 2013

30. Invited Lecturer:  Ethics of Interventional Pain Management.  ASIPP.  Denver CO;  Oct 2013

31. Invited Lecturer; Controversial Cases in Organ Transplantation: clinical forum.  American Society of Anesthesiologists Annual Meeting.  San Francisco CA.  Oct 2013

32. Invited Lecture:  Ethics of DCD Organ Donation.  St. Mary's Hospital Dept of Anesthesiology and Critical Care, London UK.  Dec 2014

33. Invited Lecture: DNR in the OR.  London Soc Anesthesiology, UK.  Dec 2014

34. International Academy of Law and Mental Health. Moderator: Brain Death, Personhood, Body Integrity: Ethical and Legal Considerations in Vital Organ Transplantation. Vienna Austria July 2015

35. Invited Lecturer: Harvard Anesthesia Update Spring 2015. Pro/Con Debate: Should Physicians Participate in Lethal Injection.

36. Invited Lecturer: Ethics of Interventional Pain Management. ASIPP, Chicago Il. July, 2015

37. Keynote Speaker: Terminal Sedation in Pediatric Sedation: Suffering, Palliation and Transcendance (working title). Conference for Pediatric Sedation Outside of the Operating Room. Cancun, Mexico Sept 2015

38. Invited Ethics Lecturer: Moya Review Course for Nurse Anesthetists. Orlando Fl, November 2015

39. Invited Participant; 2015 Alumni Meeting of the Scholars of the Brocher Foundation, Geneva Switzerland, June 16-18, 2015.

40. Invited Speaker: 2016 World Congress of Anesthesiologists. Ethics Section. Hong Kong, Aug 27-Sept 1, 2016

41. Invited Lecturer; Medical Professionalism. St. Mary's Hospital Department of Anesthesiology and Critical Care. London, UK. July 2016

42. 2017 International Academy of Law and Mental Health. Invited panelist, moderator. Ethics of Psychosurgery. Prague, Czech Republic, July 2017

43. 2017 Mazama Spine Summit, Mazama WA. Invited Speaker: What is Professionalism and the Practice of Medicine? Lessons from the Michael Jackson Case.

44. 2019 International Academy of Law and Mental Health. Invited panelist, moderator. Physician Assisted Suicide in the United States: Current Status. Rome, Italy. July 2019.

45. Brocher Foundation Reunion of Scholars, 2019. Lethal Injection in the United States: personal experience as an expert witness for the prisoner. Geneva, Switzerland. June 2019


**Regional Invitational Lectures:**


1. "Treatment of Intraoperative Emergencies: Wheezing; Inability to Ventilate" CME Lecture, Washington State Society of Anesthesiologists, Seattle, WA, 1991.

2. "Ethical Issues in Anesthesiology," Washington State Society of Anesthesiologists, Moderator and CME Lecturer, Seattle, WA, 1993.

3. Washington State Association of Nurse Anesthetists, Tukwila, Washington "Ethical Issues in Anesthesia Practice", 1995.

4. Washington State Association of Nurse Anesthetists "Ethical Issues in Anesthesia Practice" Seattle, WA, 1998.

5. "Management Issues In the Preoperative Clinic." Society for Ambulatory Anesthesia (SAMBA), Seattle, Washington, 1999.

6. "Physiology of Perioperative Myocardial Blood Flow." Washington State Society of Nurse Anesthetists, Seattle, WA, 1999.

7. "Ethical Issues in the Operating Room." American Society of Anesthesiology Technologists, Seattle, WA, 2000.

8. "DNR orders in the Operating Room," Combined Anesthesia and Surgery Grand Rounds, Southwest Washington Medical Center, Vancouver, WA, 2001.

9. "Medical Ethics: Balancing Patient Advocacy and Managed Care." Western Pension and Benefits Conference, Seattle, WA, 2003.

10. "Conscious Sedation for Radiological Procedures in the Outpatient," Northwest Hospital Radiology Department, Seattle, WA, 1991.

11. Instructor, Certified Post Anesthesia Nurse (CPAN) Certification Course, Northwest Hospital, Seattle, WA, 1991.

12. Conflicts of Interest with Industry.  AORN winter meeting, Kent WA, 2009

13. "Preoperative Testing."  Wash. State Nurse Anesthetists.  Sept 2009, Spokane, WA

13. "Implementing Intra-Operative Glucose Control:  What Does it Take?"  Washington State Hospital Association.  April 2014, Seattle, WA

14. "Who's Doing Your Surgery and Anesthesia?  Ethical Issues in Informed Consent in Medical Direction and Overlapping Surgeries."  Washington Ambulatory Surgery Association 2018 Conference.  November 2018, Seattle WA.

15. The MAD physician and why he is a constant danger to your patients and your institution. Ethical management of the abusive physician in the operating room.  Washington Ambulatory Surgery Association 2019 Conference.  November 2019, Everett WA.


**Invited Journal Reviews:**


1. Invited Journal Reviewer, cardiovascular anesthesia, *Anesthesia and Analgesia,* 1998 to present.
2. Invited Journal Reviewer, medical ethics, *Anesthesiology*, 1998 to present.
3. Invited Journal Reviewer, medical ethics, *Journal of Obstetrics and Gynecology*, 1998.
4. Clinical Reviewer, *FirstConsult*. Medical website for primary care physicians, Elsevier publications, London UK. *[www.firstconsult.com]* ,1998 to present.
5. Invited Journal Reviewer, medical ethics, *Mayo Clinic Proceedings,* 2006-2009.
6. Invited Journal Reviewer, *Journal of Philosophy, Ethics, and Humanities*, 2007.
7. Invited Journal Reviewer, *European Journal of Anaesthesiology,* 2013

**Web Authorships**

1. Update Author, *Anesthesia, 6th Edition,* on-line version.  Ron Miller MD, Editor.  Elsevier Scientific Publications, Philadelphia. *[www.anesthesiatext.com]* 2004 to present.

2. Update Author, *Sleisinger and Fordtran's Gastrointestinal and Liver Disease, 7th Edition,* on-line version.  Mark Feldman MD, Editor.  Elsevier Scientific Publications, Philadelphia *[www.sfgastro.com],* 2003 to 2006.

22

Case 1:19-mc-00145-TSC Document 303-2 Filed 10/29/20 Page 78 of 189

3. Update Author, *Diseases of the Heart, 6th Edition,* on-line version. Eugene Braunwald MD, Editor. Elsevier Publications, Philadelphia [*www.branwalds.com],* 2004 to present.

4. Update Author, *Murray and Nadel's Textbook of Respiratory Medicine,* on-line version. Robert J. Mason MD, John F. Murray MD, V. Courtney Broaddus MD, and Jay A Nadel MD, editors. Elsevier publications, Philadelphia *[www.respmedtext.com],* 2005-2006.

5. Update Author, *Drugs for the Heart,* on-line version. Lionel H Opie MD and Bernard J Gersh MD, editors. Elsevier publications, Philadelphia *[www.opiedurgs.com],* 2005 to present.

6. Update Author, *Clinical Gastroenterology and Hepatology,* on-line version, Wilfred M Weinstein MD, C J Hawkey MD, J Bosch MD, editors. Elsevier publications, Philadelphia *[www.clingastrotext.com],* 2005-2006

7. Medifile Author for *FirstConsult,* Medical website for primary care physicians. Elsevier publications, London UK *[www.firstconsult.com],* 1998 to 2006

8. Medical Writer, *Procedures Consult,* Anesthesia Procedures. Elsevier publications, Philadelphia, PA. 2007-2008

**Miscellaneous:**

Consulting Anesthesiologist, Woodland Park Zoological Society, 1992-2002.
Medical writer Handbook for Stoelting's Anesthesia and Co-Existing Disease, 3rd Edition 2009
Content/formatting editor, Journal of American College of Cardiology 2015-present
Medical Writer, Journal of American College of Cardiology 2016-present

Updated, September 2019

gvn

Case 1:19-mc-00145-TSC Document 302-2 Filed 10/29/20 Page 79 of 89

# **APPENDIX II**

**Gail Van Norman MD Depositions and Court Testimony in the Last 4 Years**

2019  McGehee Et al V Governor Asa Hutchinson.  No 4:17-CV-00179-KGB. (for Federal Public Defender)

2018  (for plaintiff). Goff v. State of Washington

2017  (for defendant) Rodecap v. Multicare (Washington)

2014  (for plaintiff) Duke v. Valley Endoscopy Center (Ohio)

# APPENDIX III

**Relevant Autopsy Findings Regarding Pulmonary Edema and Vascular Access During Executions involving pentobarbital or thiopental as the solo drug or in combination with other drugs**.

1) Daniel Wayne Cook.  Execution: August 8, 2012, Arizona
   1-drug pentobarbital protocol, 5 grams
   a) IV catheters and punctures:  5 peripheral attempts
   b) Weight of lungs:  R 940 gm, L 395 gm
   c) Pulmonary edema not mentions, although lungs are "heavy".  No apparent lung sections taken.

2) Thomas Arnold Kemp
   Execution: April 25, 2012, Arizona
   1-drug pentobarbital protocol, 5 grams
   a) 1 peripheral IV, 1 central line ("triple lumen) in groin
   b) Weight of lungs:  R 1070 gm, L 980 gm
   c) Pulmonary edema not mentioned, lungs are very heavy.  Apparently no sections taken

3) Samuel Villegas Lopez
   Execution: June 27, 2012, Arizona
   1-drug pentobarbital protocol, 5 grams
   a) 2 peripheral IVs
   b) Weight of lungs:  R 970 gm, L 720 gm
   c) Pulmonary edema:  yes, severe.  Cut surfaces of lungs "exude abundant blood and frothy fluid

4) Robert Henry Moorman
   Execution: February 29, 2012, Arizona
   1-drug pentobarbital protocol, 5 grams
   a) 2 peripheral IVs
   b) Weight of lungs:  R 560 gm, L 170 gm
   c) Pulmonary edema: yes. Moderate.  Moderate amounts of blood and frothy fluid.

5) Robert Charles Towry
   Execution: March 8, 2012, Arizona
   1-drug pentobarbital protocol, 5 grams
   a) 1 peripheral line, R groin central line "triple lumen"
   b) Weight of lungs:  R 740 gm, L 690 gm
   c) Pulmonary edema:  apparently no lung sections taken and no mention

6) Thomas Paul West
   Execution: July 19, 2011, Arizona
   3-drug protocol with pentobarbital, 5 grams
   a) 1 peripheral line, 1 peripheral puncture, 1 central line "triple lumen" R groin
   b) Weight of lungs:  R 920 gm, L 740 gm

    c)  Pulmonary edema:  yes, moderate.  "moderate amounts of pink frothy fluid from cut surfaces"

7)  Donald Edward Beaty.
    Execution:  May 25, 2011, Arizona
    3-drug thiopental protocol, 5 grams
    a)  Single "triple lumen" in R groin with 2 hubs labeled A and B.  No backup line.
    b)  Weight of lungs:  R 960 gm, L 830 gm
    c)  Pulmonary edema:  yes, severe.  "intense dependent congestion, cut surfaces exude abundant frothy fluid

8)  Richard Lynn Bible
    Execution: June 30, 2011, Arizona
    3-drug thiopental protocol, 5 grams
    a)  Single triple lumen line R groin, no back up
    b)  Weight of lungs:  R 840 gm, L 1000 gm
    c)  Pulmonary edema:  yes, severe.  "severe congestion and edema"

9)  Marshall Gore
    Execution: October 1, 2013, Florida
    3-drug pentobarbital protocol, 5 grams
    a)  2 peripheral lines
    b)  Weight of lungs:  R 945 gm, L 715 gm
    c)  Pulmonary edema:  Yes, at least moderate.  "oozing bloody froth"

10) Joshua Daniel Bishop
    Execution: March 31, 2016, Georgia
    1-drug pentobarbital protocol, 5 grams
    a)  2 peripheral lines, 1 puncture hand.
    b)  Weight of lungs:  R 760 gm, L 620 gm
    c)  Pulmonary edema:  not mentioned, apparently no lung sections done.

11) Robert Earl Butts Jr.
    Execution: May 4, 2018, Georgia
    1-drug pentobarbital protocol, 5 grams
    a)  2 peripheral lines
    b)  Weight of lungs:  R 780 gm, L 680 gm
    c)  Pulmonary edema:  yes, moderate. "moderate amount of bloody foam, moderate amount of white froth in airways.

12) Roy W. Blankenship
    Execution: June 23, 2011, Georgia
    1-drug pentobarbital protocol, 5 grams
    a)  2 peripheral IVs, one appears infiltrated.
    b)  Weight of Lungs:  R 860 gm, L 720 gm
    c)  Pulmonary edema: yes, moderate.  "moderately edematous"

13) Andrew Howard Brannan
   Execution: January 1m 2015, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral lines
      b) Weight of Lungs:  R 820 gm, L 720 gm
      c) Pulmonary edema: yes, severe.  "parenchyma edematous, frothy fluid in lower
         airways"

14) John Conner
   Execution: July 15, 2016, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral lines
      b) Weight of Lungs:  R 860 gm, L 820 gm
      c) Pulmonary edema:  not mentioned, and no lung slices taken.

15) Andrew Cook
   Execution: February 21, 2013, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral lines
      b) Weight of lungs:  R 720 gm, L 640 gm
      c) Pulmonary edema:  yes, severe.  "frothy fluids in tracheobronchial tree and larynx"

16) Kenneth E. Fults
   Execution: April 12, 2016, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral lines
      b) Weights of Lungs:  R 560 gm, L 460 gm
      c) Pulmonary edema:  yes, severe.  "moderate congested and edematous, and moderate
         amount of fluid in the major airways.

17) Kelly Renee Gissendaner.
   Execution: September 20, 2015, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral lines
      b) Weight of Lungs:  R 620 gm, L 530 gm
      c) Pulmonary edema:  yes, severe.  "Moderate amount of white foam" in upper airway,
         "parenchyma exudes moderate amounts of blood tinged foamy fluid".

18) Warren Lee Hill Jr.
   Execution: January 27, 2015, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 4 peripheral IVs, additional areas suggesting 5th puncture.
      b) Weight of Lungs:  R 760 gm, L 700 gm
      c) Pulmonary edema:  yes, moderate.  "blood and frothy fluid in cross sections"

19) Travis Hitson
   Execution: February 17, 2016, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral IVs
      b) Weight of Lungs:  R 580 gm, L 580 gm
      c) Pulmonary edema:  yes, mild-mod.  "pulmonary parenchyma edematous"

20) Robert Wayne Holsey
   Execution: December 9, 2014, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 3 peripheral lines.
      b) Weight of lungs:  R 740 gm, L 580 gm
      c) Pulmonary edema:  yes, moderate.  "moderate congestion"

21) Marcus Ray Johnson
   Execution: November 19, 2015, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral lines, 1 with extravasation
      b) Weight of lungs:  R 760 gm, L 640 gm
      c) Pulmonary edema:  Yes, moderate.  "parenchyma congested and edematous"

22) Brandon A Jones
   Execution: February 3, 2016, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 3 peripheral IVs, 2 of which appear to have extravagated.  1 central line, triple lumen in R groin, with hemorrhage
      b) Weight of Lungs:  R 720 gm, L 600 gm
      c) Pulmonary edema:  not mentioned, and apparently no lung slices taken.

23) Daniel Anthony Lucas.
   Execution: April 27, 2016, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral lines
      b) Weight of lungs:  R 520 gm, L 540 gm
      c) Pulmonary edema:  Yes, severe.  "prominent amount of white frothy fluid in tracheobronchial tree"

24) Bryan Terrell
   Execution: December 19, 2015, Georgia
   1-drug pentobarbital protocol, 5 grams
      a) 2 peripheral IVs, 2 additional punctures.
      b) Weight of lungs:  R 800 gm, L 640 gm
      c) Pulmonary edema:  Yes, severe. "frothy material in mainstem bronchi and into the smaller airways.

25) Marcus Wellons
    Execution: June 17, 2014, Georgia
    1-drug pentobarbital protocol, 5 grams
        a) 3 peripheral IVs.
        b) Weight of lungs: R 860 gm, L 720 gm
        c) Pulmonary edema: yes, moderate. "moderately congested"

26) Michael Wilson
    Execution: January 9, 2014, Oklahoma
    3-drug pentobarbital protocol, 5 grams
        a) No exam included in file and no mention about lungs.

27) Lloyd Lafevers
    Execution: January 30, 2001, Oklahoma
    3-drug thiopental protocol, 5 grams
        a) No info on IVs.
        b) Weight of lungs: R 800 gm, L 700 gm
        c) Pulmonary edema: yes, "edema and congestion" not further characterized.

**Summary of my review:**

I.     Note that normal lung weights are approximately R 445 gm, L 395 gm. Moorman L lung was noted at 170 gm, which may be an error. With that exception all lungs were significantly heavier than normal.

II.     Pulmonary edema was present in at least 20 of the 27 autopsies (77%). In the remaining 7 there was no comment, and/or lung slices were not taken.

III.     In the 20 cases of pulmonary edema, autopsy findings suggest severe pulmonary edema in 8 (40%) and moderate pulmonary edema in 10 (50%). Edema was not characterized in 2 cases.

IV.     For autopsies in which lung examination was documented, 100% demonstrated pulmonary edema, which was moderate to severe in 90% of the cases. In the remaining cases, severity was not characterized.

V.     Of 27 autopsies, 2 did not comment on IV access. Of those in which there is a description, 8 cases (32%) had multiple attempts, 6 (24%) had femoral central lines placed, 3 (12%) had signs of extravasation or infiltration, only 11 (44%) appear uncomplicated.

## CERTIFICATE OF SERVICE

I hereby certify that, on November 1, 2019, this Expert Declaration of Gail A. Van Norman, M.D. was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties that are registered users. The below parties may access this filing through the Court's CM/ECF System.

**Joshua Christopher Toll**
KING & SPALDING, LLP
(202) 737-8616
Email: jtoll@kslaw.com

**Paul F. Enzinna**
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

**Charles Anthony Zdebski**
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

**Brandon David Almond**
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

**Gerald Wesley King , Jr.**
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

**Celeste Bacchi**
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

**Craig Anthony Harbaugh**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

**Donald P. Salzman**
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

**Jonathan Charles Aminoff**
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

**Alexander Louis Kursman**
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: alex_kursman@fd.org

**Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: billy_nolas@fd.org

**Kathryn B. Codd**
VINSON & ELKINS, L.L.P.
(202) 639-6536
Email: kcodd@velaw.com

**Jeanne Vosberg Sourgens**
VINSON & ELKINS L.L.P
(202) 639-6633

**William E. Lawler , III**
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

**Margaret O'Donnell**
(502) 320-1837
Email: mod@dcr.net

**William E. Hoffmann , Jr.**
KING & SPALDING, LLP
(404) 572-3383

**Matthew John Herrington**
STEPTOE & JOHNSON, LLP
(202) 429-8164
Email: mherrington@steptoe.com

**Denise M. Clark**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
(202) 252-6605
Email: denise.clark@usdoj.gov

**Jean Lin**
U.S. DEPARTMENT OF JUSTICE, CIVIL
DIVISION
FEDERAL PROGRAMS BRANCH
(202) 514-3716
Email: jean.lin@usdoj.gov

**Amy Gershenfeld Donnella**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

**Robert E. Waters**
KING & SPALDING, LLP
(202) 737-0500
Email: rwaters@velaw.com

**Yousri H. Omar**
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

**Abigail Bortnick**
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

**Mark Joseph Hulkower**
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

**Robert A. Ayers**
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

**Peter S. Smith**
UNITED STATES ATTORNEY'S OFFICE
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

**Robert J. Erickson**
U. S. DEPARTMENT OF JUSTICE
(202) 514-2841
Email: robert.erickson@usdoj.gov

**Joseph William Luby**
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

2

**Gary E. Proctor**
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

**Shawn Nolan**
FEDERAL COMMUNITY DEFENDER
OFFICE, EASTERN DISTRICT OF PENN
(215) 928-0528
Email: shawn.nolan@fd.org

**Robert L. McGlasson**
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

**Sean D. O'Brien**
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Date:   November 1, 2019

*/s/ Pieter Van Tol*

Pieter Van Tol (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY  10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

and

Elizabeth M. Hagerty (Bar No. 1022774)
David S. Victorson (Bar No. 1027025)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
elizabeth.hagerty@hoganlovells.com
david.victorson@hoganlovells.com

*Attorneys for Plaintiff Daniel Lewis Lee*

3

# Exhibit B

# EXPERT DECLARATION OF MARK A. EDGAR, M.D.

I, Mark Edgar, under the penalty of perjury, declare the following to be true:

1. My name is Mark A. Edgar, M.D. I am an Associate Professor of Pathology at Emory University School of Medicine, in Atlanta, Georgia. I am a practicing, Board-certified anatomic pathologist and neuropathologist, and I am involved in resident training in anatomic pathology.

2. The factual statements and conclusions I make in this declaration are true and correct to the best of my knowledge and experience and to a reasonable degree of medical certainty.

3. I have been asked by counsel representing inmates Alfred Bourgeois, Dustin Honken, Chadrick Fulks, and Jeffrey Paul to provide opinions related to the lethal injection execution protocol employed by the Federal Government.

4. In preparing this report and reaching the expert opinions contained herein, I have reviewed, among other materials, autopsy reports of inmates executed using lethal injection protocols employing pentobarbital, including reports for the following inmates executed in the state of Georgia: John Conner, Andrew Cook, Marcus Wellons, Robert Holsey, Andrew Brannan, Warren Hill, Jr., Kelly Gissendaner, Marcus Johnson, Bryan Terrell, Brandon Jones, Travis Hittson, Kenneth Fults, Daniel Lucas, Joshua Bishop, and Robert Earl Butts. I have also reviewed media

reports of witness observations from lethal injection executions employing pentobarbital protocols including those from Texas (John Battaglia, Danny Bible, Carl Blue, Lester Bower, Alvin Braziel, Juan Castillo, Elroy Chester, Troy Clark, Billie Coble, Billy Crutsinger, Erick Davila, Arturo Diaz, Gustavo Garcia, Robert Garza, Robert Ladd, Rickey Lewis, Daniel Lopez, Kimberly McCarthy, Jamie McCoskey, Carroll Parr, TaiChin Preyor, Arnold Prieto, Roberto Ramos, Vaughn Ross, Ronaldo Ruiz, Mark Soliz, Robert Sparks, Kent Sprouse, Larry Swearingen, Ronnie Threadgill, Manuel Vasquez, Jose Villegas, Christopher Young, and Michael Yowell), Georgia (Robert Butts, Jr., Andrew Cook, Carlton Gray, Travis Hittson, Gregory Lawler, J. W. Ledford, Scotty Morrow, William Sallie, Steven Spears, Marion Wilson, Jr., and Marcus Wellons), Missouri (Jeffrey Ferguson, Joseph Franklin, Allen Nicklasson, and Michael Worthington), and South Dakota (Rodney Berget, Donald Moeller, and Eric Robert).  I have reviewed affidavits of Niski Paredes and K. Knox Nunnally (witnesses to the execution of Anthony Shore) and affidavits of Danielle Allen and Liliane Sticher (witnesses to the execution of William Rayford). I have reviewed the 8/23/2019 Complaint for Injunctive and Declaratory Relief of Daniel Lewis Lee.  I have reviewed the State of Georgia lethal injection protocol.  I have read sections of the Administrative Record regarding the revised BOP Federal Execution Protocol including: Administrative Record Summary (Bates Stamped pages 1-6), Lindley letter/report (p. 525-26), Memorandum for the Attorney General (p. 855-59), Memorandum for the Attorney General (p. 869-73), Current pentobarbital protocol (labeled an "addendum") (p. 874-75), and

Administrative Record Summary (p. 929-34).  I have reviewed the package insert for pentobarbital (Leucadia Pharmaceuticals, Revised October 2017). I reviewed an article on acute pulmonary edema (*NEJM* 2005; 353: 2788- 2796). I have reviewed a paper that describes findings in an experimental model of pulmonary edema in the dog (*Journal of Clinical Investigation* 44(3), 1965).

5. Pulmonary edema is the movement of fluid from small blood vessels in the lung (alveolar capillaries) into the air spaces (Ware et al). It can be caused by increased hydrostatic pressure and congestion in capillaries as the result of fluid back-up in the lungs resulting from a failing heart (cardiogenic pulmonary edema) or it can be the result of a variety of chemical, infectious, or physical insults to the lung such as inhaled toxic gas or reaction to intravenous contrast media used by radiologists. Pulmonary edema has a variety of effects on the body.  First, the presence of fluid in airspaces (alveolar sacs) interferes with normal gas exchange which reduces the amount of oxygen in the blood.  It also increases the work of breathing; in mild cases, this causes shortness of breath, sometimes coughing or wheezing, and increase in the rate of breathing, but with increasing severity it greatly increases the work of breathing such that the chest muscles and diaphragm strain as they expend greater effort to move air into the lungs. This also produces sensations similar to drowning or asphyxiation as fluid occupies a greater volume of the air spaces. Severe pulmonary edema is an intolerable state that produces panic and terror. These sensations are increased when subjects lay flat.

6. Normal adult lungs weigh about 350-400 grams and these lung weights are seen in people who die very suddenly as from a ruptured aneurysm in the brain or from sudden trauma. Most deaths are not instantaneous, however, but are a more gradual process in which multiple organs gradually fail together. This results in heavy lungs and, in patients with heart failure, pulmonary edema can be seen.

7. Significant degrees of pulmonary edema are evident to the naked eye. Lungs are typically heavy and wet, with cut sections leaking fluid and resembling a wet sponge as fluid pours from the tissue when it is squeezed. Blood is often present in the fluid, giving it a red color described as serosanguineous. Pulmonary edema may arise suddenly, over the course of minutes and when sudden and severe in onset (fulminant) it may result in the presence of foam or froth in the small/lower or large/upper airways (bronchi and trachea) resulting from the mixture of air, edema fluid, and pulmonary surfactant (a detergent-like secretion normally present in the airspaces).  Minor degrees of pulmonary edema may result in heavy lungs that do not appear wet, but edema fluid may be evident in lung tissue examined under the microscope. Pulmonary congestion (increase in the volume of blood within blood vessels) commonly precedes or accompanies pulmonary edema, but it is not clinically or pathologically equivalent to pulmonary edema.

**AUTOPSY REPORTS (AND WITNESS OBSERVATIONS)
OF GEORGIA INMATES EXECUTED USING
PENTOBARBITAL PROTOCOL**

8. **John Conner (7/15/2016).** The autopsy report indicates that right and left lungs weighed 860 and 820 grams, respectively.  No other note was made of abnormalities in the lungs.

9. **Andrew Cook (2/21/2013).** Media reports of witness accounts state that after the execution began Cook blinked his eyes a few times and his eyes soon got heavy. His chest was heaving for about two to three minutes as his eyes closed. The autopsy report states that right and left lungs weighed 720 and 640 grams, respectively. Note was made of frothy fluid in the tracheobronchial tree. This finding confirms that Cook developed acute pulmonary edema during the execution.

10. **Marcus Wellons (6/17/2014).** Media reports of witness observations state that a few minutes after the execution began, Wellons took a couple of heavy breaths and blew air out through his lips as if snoring. The autopsy report states that right and left lungs weighed 860 and 720 grams, respectively. Lungs are described as congested.

11. **Robert Holsey (12/9/2014).** The autopsy report indicates that right and left lungs weighed 740 and 580 grams, respectively.  Lungs were described as moderately congested.

12.    **Andrew Brannan (1/13/2015).** The autopsy report indicates that right and left lungs weighed 820 and 720 grams, respectively. There was a mild degree of frothy fluid in the lower airways. This finding confirms that Brannan developed pulmonary edema during the execution.

13.    **Warren Hill, Jr. (1/27/2015).** The autopsy report indicates that right and left lungs weighed 760 and 700 grams, respectively. The cut surfaces of lungs exuded minimal frothy fluid. This finding confirms that Hill developed pulmonary edema during the execution.

14.    **Kelly Gissendaner (9/30/2015).** The autopsy report indicates that right and left lungs weighed 620 and 520 grams, respectively. There was a moderate amount of white foam in the upper airway. Pulmonary parenchyma exuded a moderate amount of blood-tinged foamy fluid.  These findings confirm that Gissendaner developed pulmonary edema during the execution.

15.    **Marcus Johnson (11/19/2015).** The autopsy report indicates that right and left lungs weighed 760 and 640 grams, respectively. Cut sections of lungs showed congestion and edema.  This finding confirms that Johnson developed pulmonary edema during the execution.

16.    **Bryan Terrell (12/9/2015).** The autopsy report indicates that right and left lungs weighed 800 and 640 grams, respectively. Frothy material was noted in main bronchi and smaller airways.  This finding

confirms that Terrell developed pulmonary edema during the execution.

17.   **Brandon Jones (2/3/2016).** The autopsy report indicates that right and left lungs weighed 720 and 600 grams, respectively. Lungs were described as congested.

18.   **Travis Hittson (2/17/2016).** Media reports of witness accounts state that Hittson appeared to take several deep breaths before becoming still about four minutes after the warden left the execution chamber. The autopsy report indicates that right and left lungs each weighed 580 grams. Pulmonary parenchyma was described as edematous. This finding indicates that Hittson developed pulmonary edema during the execution.

19.   **Kenneth Fults (4/12/2016).** The autopsy report indicates that right and left lungs weighed 560 and 460 grams, respectively. Cut sections of lung showed edema with edematous fluid in major airways. Lung parenchyma was moderately congested and edematous.  These findings confirm that Fults developed pulmonary edema during the execution.

20.   **Daniel Lucas (4/27/2016).** The autopsy report indicates that right and left lungs weighed 520 and 540 grams, respectively. White frothy fluid was noted in the tracheobronchial tree.  This finding confirms that Lucas developed pulmonary edema during the execution.

21.    **Joshua Bishop (3/31/2016).** The autopsy report indicates that right and left lungs weighed 760 and 620 grams, respectively. No other note was made of abnormalities in the lungs.

22.    **Robert Butts (5/4/2018).** Media reports of witness accounts state that Butts twitched briefly as the lethal injection flowed into his body and he groaned, "It burns, man". His chest rose high as his back arched. He took about nine deep breaths; after that he lay still.  The autopsy report indicates that right and left lungs weighed 780 and 680 grams, respectively. The pulmonary parenchyma was purple, exuding moderate amounts of bloody fluid. Upper airways contained a moderate amount of foam. These findings confirm that Butts developed pulmonary edema during the execution.

## ADDITIONAL WITNESS OBSERVATIONS OF INMATES EXECUTED USING PENTOBARBITAL PROTOCOLS

23.    **John Battaglia (2/1/2018, TX).** Media reports of witness accounts state that during the execution the inmate gasped twice and started to snore. Within a few more seconds all movement had stopped.

24.    **Danny Bible (6/27/2018, TX).** Media reports of witness accounts state that after the execution began the inmate started breathing heavily before saying "it burned".  He stopped moving three minutes later.

25.    **Carl Blue (2/21/2013, TX).** Media reports of witness accounts state that during the execution the

inmate took about a dozen breaths, said he could "feel it", then slipped into unconsciousness.

26.     **Lester Bower (6/3/2015, TX).** Media reports of witness accounts state that during the execution the inmate closed his eyes and could be heard taking deep breaths.  After several minutes he made some grunting, snore-like sounds. His mouth opened and he lay still.

27.     **Alvin Braziel (12/11/2018, TX).** Media reports of witness accounts state that during the execution the inmate took a couple breaths, gasped, then snored loudly three times.  The fourth snore was noticeably less pronounced and then all movement stopped.

28.     **Juan Castillo (5/16/2018, TX).** Media reports of witness accounts state that during the execution the inmate struggled to lift his head and look down at his feet.  "I can taste this s---", he added.  "S--- does burn".  He began breathing heavily then stopped a minute later.

29.     **Elroy Chester (6/12/2013, TX).** Media reports of witness accounts state that during the execution the inmate began breathing heavily and yawned before losing consciousness.

30.     **Troy Clark (9/26/2018, TX).** Media reports of witness accounts state that during the execution the inmate remarked that the drug "burned going in".  "I feel it", he said. Then he grunted, gasped, and began to snore. Seconds later all movement stopped.

31.     **Billie Coble (2/28/2019, TX).** Media reports of witness accounts state that during the execution the inmate gasped several times and began snoring.

32.     **Billy Crutsinger (9/4/2019, TX).** Media reports of witness accounts state that during the execution the inmate said he could feel it "in my left arm. It's kind of burning". Crutsinger then began coughing and breathing heavily and then made snoring noises at least 29 times before he stopped moving.

33.     **Erick Davila (4/25/2018, TX).** Media reports of witness accounts state that during the execution the inmate tried to mumble a few words and started breathing heavily. Moments later Davila lost consciousness.

34.     **Arturo Diaz (9/26/2013, TX).** Media reports of witness accounts state that during the execution the inmate took several deep breaths, began snoring and ceased movement in less than a minute.

35.     **Gustavo Garcia (2/16/2016, TX).** Media reports of witness accounts state that during the execution the inmate yawned, gurgled, exhaled and started to snore quietly. Within 30 seconds all movement stopped.

36.     **Robert Garza (9/19/2013, TX).** Media reports of witness accounts state that during the execution the inmate took several deep breaths then began snoring. All movement stopped within less than one minute.

37.     **Robert Ladd (1/29/2015, TX).** Media reports of witness accounts state that during the execution the

inmate said, "Stings my arm, man!" He began taking deep breaths then started snoring. His snores became breaths, each one becoming less pronounced, before he stopped all movement.

38.     **Rickey Lewis (4/9/2013, TX).** Media reports of witness accounts state that during the execution the inmate said, "I feel it in my throat. I'm getting dizzy", before he started to snore and, seconds later, lost consciousness. As the drug began taking effect he said he could feel it "burning my arm".

39.     **Daniel Lopez (8/12/2015, TX).** Media reports of witness accounts state that during the execution the inmate took two deep breaths, then two shallower breaths. Then all movement stopped.

40.     **Kimberly McCarthy (6/26/2013, TX).** Media reports of witness accounts state that during the execution the inmate took hard, raspy, loud breaths for several seconds before becoming quiet. Then, her chest moved up and down for another minute before she stopped breathing.

41.     **Jamie McCoskey (11/12/2013, TX).** Media reports of witness accounts state that during the execution the inmate let out a loud laugh then began taking deep breaths that became several snores.

42.     **Carroll Parr (5/7/2013, TX).** Media reports of witness accounts state that during the execution the inmate yawned and made several deep breathing sounds before falling silent.

43.      **TaiChin Preyor (7/27/2017, TX).** Media reports of witness accounts state that during the execution the inmate took several deep breaths, then began snoring, each sound decreasing in volume. Within a minute all movement stopped.

44.      **Arnold Prieto (1/21/2015, TX).** Media reports of witness accounts state that during the execution the inmate screamed, "I can smell it… whoa".

45.      **Roberto Ramos (11/14/2018, TX).** Media reports of witness accounts state that during the execution the inmate took a couple of deep breaths, sputtered once and began snoring. Within seconds all movement stopped.

46.      **Vaughn Ross (7/18/2013, TX).** Media reports of witness accounts state that during the execution the inmate's breathing quickly became labored and he seemed to briefly strain against the leather restraints. His eyes slowly closed and he snored several times.

47.      **Rolando Ruiz (3/7/2017, TX).** Media reports of witness accounts state that during the execution the inmate took several deep breaths, then began snoring quietly. All movement stopped within about 30 seconds.

48.      **Mark Soliz (9/10/2019, TX).** Media reports of witness accounts state that during the execution the inmate gasped, snorted, and appeared to go to sleep.

49.      **Robert Sparks (9/25/2019, TX).** Media reports of witness accounts state that during the execution the

inmate said, "I feel it". He took two deep breaths almost immediately, snored three times and then all movement ceased.

50.   **Kent Sprouse (4/9/2015, TX).** Media reports of witness accounts state that during the execution the inmate took several deep breaths then began snoring. Within a minute all movement stopped.

51.   **Larry Swearingen (8/21/2019, TX).** Media reports of witness accounts state that during the execution the inmate said he could "hear it" going into a vein in his arm and he could taste it. "It's actually burning in my right arm.  I don't feel anything in the left arm". Almost immediately he took a short breath, then started to snore quietly.

52.   **Ronnie Threadgill (4/16/2013, TX).** Media reports of witness accounts state that during the execution the inmate took several deep breaths, then began snoring loudly. Within a few seconds the sounds stopped.

53.   **Manuel Vasquez (3/11/2015, TX).** Media reports of witness accounts state that during the execution the inmate took three deep breaths then began snoring loudly. The snores became progressively quiet and all movement stopped in less than a minute.

54.   **Jose Villegas (4/16/2014, TX).** Media reports of witness accounts state that during the execution the inmate said, "It does kind of burn. Goodbye". He gasped several times then started to breathe quietly. Within less than a minute all movement had stopped.

55.    **Christopher Young (7/17/2018, TX).** Media reports of witness accounts state that during the execution the inmate said, "I taste it in my throat" He cursed twice and said that the drug burned his throat. Then he slipped into unconsciousness, saying something incomprehensible. He started taking shallow breaths. Within about 30 seconds he stopped moving.

56.    **Michael Yowell (10/9/2013, TX).** Media reports of witness accounts state that during the execution the inmate appeared to struggle for breath several times before settling into sleep, inhaling and snoring eight times before his audible breathing stopped.

57.    **Carlton Gary (3/15/2018, GA).** Media reports of witness accounts state that during the execution the inmate took several quick breaths within a few minutes of the warden exiting and then yawned before becoming still.

58.    **Gregory Lawler (10/19/2016, GA).** Media reports of witness accounts state that during the execution the inmate took several deep breaths before yawning and becoming still.

59.    **J.W. Ledford (5/17/2017, GA).** Media reports of witness accounts state that during the execution the inmate raised his head to look at his right arm. He appeared to take several deep breaths before falling still within two to three minutes of the warden leaving.

60.     **Scotty Morrow (5/2/2019, GA).** Media reports of witness accounts state that during the execution the inmate's chest heaved, he tilted his head to the right, and one minute later he yawned. Then he was still.

61.     **William Sallie (12/6/2016, GA).** Media reports of witness accounts state that during the execution the inmate's shoulders twitched four or five times, but his eyes remained closed.  Then he was still.

62.     **Steven Spears (11/16/2016, GA).** Media reports of witness accounts state that during the execution the inmate took several deep breaths and swallowed a few times before becoming still.

63.     **Marion Wilson, Jr. (6/20/2019, GA).** Media reports of witness accounts state that during the execution the inmate breathed deeply about ten times, yawned and took several more deep breaths before becoming still.

64.     **Jeffrey Ferguson (3/26/2014, MO).** Media reports of witness accounts state that during the execution the inmate took a few deep breaths before becoming still.

65.     **Joseph Franklin (11/20/2013, MO).** Media reports of witness accounts state that during the execution the inmate breathed heavily a few times and swallowed hard. The heaving of his chest slowed and finally stopped.

66.     **Allen Nicklasson (11/20/2013, MO).** Media reports of witness accounts state that during the

execution the inmate briefly breathed heavily about two minutes into the process.

67. **Michael Worthington (8/6/2014, MO).** Media reports of witness accounts state that during the execution the inmate appeared to breathe deeply for about 15 seconds before closing his eyes.

68. **Rodney Berget (10/29/2018, SD).** Media reports of witness accounts state that during the execution the inmate said, "Is it supposed to feel like that?", groaned, pushed out his chest, said, "ahh", began breathing heavily and snored.

69. **Donald Moeller (10/30/2012, SD).** Media reports of witness accounts state that during the execution the inmate took about eight heavy breaths before the breathing stopped.

70. **Eric Robert (10/15/2012, SD).** Media reports of witness accounts state that during the execution the inmate appeared to be clearing his throat and then began to make heavy gasps. He started snoring for about 30 seconds.

71. **William Rayford (1/30/2018, TX).** Sworn affidavit of Danielle Allen (witness to the execution) describes Rayford jerking his head and his face twisting into a grimace after the execution began. Allen further states, "His eyes were squinted, and his face was tensed. It's hard to describe, but Mr. Rayford was clearly in severe pain". She describes Rayford breathing heavily and unevenly for a while until his breathing became inaudible. Sworn affidavit of Liliane

Sticher (witness to the execution) describes Rayford raising the upper part of his body to about 30 degrees after the execution began. He was shaking and appeared to be in distress. Rayford's breathing was intermittently heavy and his body was shaking more than once.

72.   **Anthony Shore (1/18/2018, TX).** Sworn affidavit of Niski Paredes (witness to the execution and spiritual adviser to Shore) states that about two minutes after he said his final words, Mr. Shore's body started to tremble. He then said in a stressed voice, "Ohh weeee, I can feel that it does burn. Burning!" Paredes further states that as he said this his voice became progressively louder and more agitated. After that he shut his eyes and had a desperate look on his face. Mr. Shore appeared to be struggling to breathe. Sworn affidavit of K. Knox Nunnally (witness to the execution and Shore's legal counsel) also describes Shore saying, in a stressed voice, "Ohh weee, I can feel that it does burn. Burning!"

73.   **Roy Blankenship (6/23/2011, GA).** Media reports of witness accounts state that during the execution the inmate jerked his head toward his left arm and made a startled face while blinking rapidly. He soon lurched to his right arm, lunging with his mouth agape twice. One eyewitness reported, "Blankenship was apparently much more aware of his surroundings at a time when he shouldn't have been".

## EVALUATION OF AUTOPSY FINDINGS AND WITNESS OBSERVATIONS IN LETHAL INJECTION EXECUTIONS USING PENTOBARBITAL

74.     Ten of 15 autopsy reports show evidence of pulmonary edema with eight of these demonstrating fulminant (acute and severe) pulmonary edema with foam or froth in airways. Microscopic examination was not reported in any of these autopsies; this might have shown evidence of pulmonary edema in cases where it was not appreciated grossly.  Furthermore, some of the autopsy reports make reference to airway froth, but do not note evidence of fluid in the lungs (i.e. gross pulmonary edema), despite the fact that such cases would have been expected to show edema fluid in the airspaces. This suggests that pulmonary edema may have actually been present in some cases where it was not described, and the number of cases affected by pulmonary edema may be understated in this series. Therefore, at least two-thirds of autopsies showed findings consistent with development of acute pulmonary edema during execution by lethal injection with pentobarbital.

75.     Witness observations describe heavy breathing in 29 reports that I have reviewed, with evidence of respiratory distress (gasping, "struggling to breathe", chest heaving) in an additional 15 cases. In seven of these reports (Anthony Shore, Scotty Morrow, Michael Yowell, Vaughn Ross, Erick Davila, Elroy Chester, and Danny Bible), witnesses describe the onset of respiratory distress prior to loss of consciousness. Eleven reports state that the inmate complained of burning after the execution began, most often at the

site of injection in the arm but also in the throat (in one case).

76.     Pentobarbital solution is highly alkaline with a pH of about 9.5 (normal blood pH is 7.4). Review of the Administrative record shows even more alkaline pH measurements on samples submitted for analysis with values of 9.91, 10.0, 10.03, 10.3, and 10.12. Inadvertent injection into an artery can cause severe tissue injury and gangrene, indicating that high concentrations of the drug are directly toxic to tissue and/or the lining of blood vessels. Reports of inmates complaining of burning as the execution begins are additional evidence of pentobarbital's injurious, caustic effect on blood vessels when injected in high doses, possibly the result of highly alkaline pH.

77.     Overdose of oral pentobarbital (and other barbiturates) causes death from respiratory depression due to effects exerted on the brain stem centers responsible for control of breathing (Goodman and Gilman, *The Pharmacological Basis of Therapeutics*, 12e, chapter 17).  This produces decreased oxygen concentration in the blood and leads to cardiac arrest. Cardiogenic pulmonary edema may develop as a consequence of heart failure induced by decreasing blood oxygen levels.

78.     Pentobarbital may also be producing non-cardiogenic pulmonary edema during lethal injection executions as the result of injection of a high volume of alkaline solution which travels from a peripheral vein, then to the right side of the heart, and then directly to the lungs.  Witness observations of

respiratory distress support this idea as breathing is frequently described as labored before it becomes shallow and stops. Furthermore, in seven cases, witnesses describe the onset of respiratory distress before loss of consciousness, making it extremely unlikely that the respiratory distress was due to cardiogenic pulmonary edema, as the drug had not yet acted on the brain to produce deep sedation (and therefore would not be expected to produce respiratory depression through an effect on the brain). If pentobarbital caused *only* respiratory depression and arrest, inmates would be expected to demonstrate *only* decreased movements of breathing, without gasping and evidence of labored or heavy breathing.

79.    The presence of fulminant pulmonary edema in more than half of the autopsies also raises concern for the occurrence of acute, non-cardiogenic pulmonary edema as a direct toxic effect of alkaline pentobarbital solution on the lung capillaries. If the only effect pentobarbital produced on the respiratory system was to depress and stop breathing, edema fluid would be expected in the airspaces of the lung as the result of heart failure due to low oxygen tension in the blood; this would occur whether the lungs were actively inflating/deflating or not. The presence of foam or froth in the airways indicates the active mixing of edema fluid with air, a process that could only occur while the inmate was still breathing (that is, before the drug had acted on the brain to stop breathing).  Put another way, the presence of froth in the airways indicates that there was continued breathing for a significant period of time after pulmonary edema had commenced, and witness reports of respiratory

distress in some of the inmates before loss of consciousness suggest this can occur soon after administration of the drug.

80.    Because pulmonary edema produces sensations of drowning and asphyxia, the experience of this condition in an inmate who was still sensate would result in extreme pain, terror and panic.

## CONCLUSIONS

81.    Pulmonary edema (and fulminant pulmonary edema) is described in more than half of available autopsy reports from inmates executed by lethal injection protocols using pentobarbital.

82.    Witness observations report respiratory distress in a significant number of lethal injection executions employing pentobarbital, including examples in which the onset of labored breathing precedes loss of consciousness.

83.    The presence of fulminant pulmonary edema at autopsy is evidence that inmates are continuing to breathe while fluid leaks into their lungs, a finding which would not be expected if pentobarbital rapidly produced respiratory arrest. This fact, combined with the witness observations noted above, the highly alkaline pH of pentobarbital, its known capacity to produce tissue damage in high concentrations, and evidence of burning at the time of injection in lethal injection executions, raises concern that inmates are rapidly developing acute non-cardiogenic pulmonary

edema following injection of high volumes of caustic pentobarbital solution.

84.    Acute pulmonary edema is a terrifying and painful condition which would be made more frightening by being positioned lying flat in restraints (a position which aggravates the noxious sensations of pulmonary edema).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this, the 24th day of October, 2019.

_____
Mark A. Edgar, M.D.

# <u>Exhibit C</u>

**DECLARATION OF DR. JOEL ZIVOT**

**PURSUANT TO 28 U.S.C. § 1746**

I, Joel Zivot, being of sound mind and lawful age, hereby state under penalty of perjury as follows:

1.      I am an associate professor and senior member of the Departments of Anesthesiology and Surgery, Emory University School of Medicine, in Atlanta, Georgia. I am the former Medical Director of the Cardiothoracic Intensive Care Unit at Emory University Hospital and the former fellowship director for training in Critical Care Medicine. I hold board certification in Anesthesiology from the Royal College of Physicians and Surgeons of Canada and The American Board of Anesthesiology. I am board certified in Critical Care Medicine from the American Board of Anesthesiology. I am an adjunct professor of law and of the School of Liberal Arts at Emory University.  A copy of my curriculum vitae is attached as Exhibit 1.

2.      I have practiced anesthesiology and critical care medicine for 25 years and in that capacity, I have personally performed or supervised the care of over 47,000 patients.

3.      I hold a medical license from the state of Georgia, and have held unrestricted medical licenses in Ohio, the District of Columbia, Michigan, and the Canadian provinces of Ontario and Manitoba. I hold a license to prescribe narcotics and other controlled substances from the U.S. Drug Enforcement Administration (DEA).

4.      I have been asked by the Federal Community Defender Office for the Eastern District of Pennsylvania to review medical records pertaining to Mr. Dustin Higgs, an inmate at USP Terre Haute who is facing death by lethal injection.

5.      By way of background for components of this document, I reviewed a file containing medical records for Dustin Higgs; the Federal Bureau of Prisons Lethal Injection

1

Protocol and the 2019 Addendum to the federal government's lethal injection protocol; preliminary autopsy findings for Wesley Purkey; and the declarations of Dr. Mark Edgar, Dr. Gail Van Norman, and Dr. Joseph Antognini.

6.     The declaration for Dr. Edgar reviews the autopsy findings and eye witness reports of a list of individuals executed with pentobarbital. I concur with the opinion of Dr. Edgar. In the case of the execution of Marcus Wellons, I can personally corroborate the observed respiratory findings as I was invited by Marcus Wellons to be a witness to his execution. The declaration of Dr. Van Norman describes how pentobarbital injection can result in a state of awareness for a duration of time long enough to experience intense noxious sensation prior to death. As a practicing anesthesiologist, I have often observed deeply anesthetized patients react to noxious stimuli. These events may later not be recalled after the anesthetic effects have abated. In execution, recalled events are clearly moot. All that matters is the experience in the moment.  Dr Antognini dismisses awareness under pentobarbital and claims it does not exist. A search in Pubmed.gov with the term "awareness under anesthesia" reveals 980 separate citations. As a practicing anesthesiologist, Dr. Antognini should be knowledgeable on the subject of anesthesia awareness and his refutation of this well-known concern is highly unusual.

7.     As a practicing anesthesiologist and critical care doctor, I am familiar with the pharmacokinetics and pharmacodynamics of the class of drugs known as barbiturates, including pentobarbital. I have reviewed the unredacted portions of the Federal Bureau of Prisons lethal injection protocol and understand it involves the use of pentobarbital for the purpose of causing death.

8.     The injection of strong chemical bases like pentobarbital directly into the blood stream likely causes severe toxicity to the pulmonary (lung) endothelial cells. The injury manifests

by escape of edema fluid into normally air-filled lungs, resulting in pulmonary edema. When pulmonary edema occurs, the lungs fill with watery fluid. This makes it much more difficult for an individual to breathe. In mild cases of pulmonary edema, a person typically experiences shortness of breath, an increased rate of respiration, and wheezing or coughing. In severe cases, as would be expected with the injection of a large dose of pentobarbital, a person may strain and labor to breathe as the diaphragm works harder to try to push air into the lungs.   Severe pulmonary edema creates the sensation of drowning. Pulmonary edema and congestion are common findings in hospital autopsies where death is usually a gradual process, often as a result of progressive cardiac failure or overwhelming infection, but it is not ordinarily seen in cases of sudden death. (Molina DK, DiMaio VJ. Normal organ weights in men: part II – the brain, lungs, liver, spleen, and kidneys. *Am J Forensic Med Pathol*. 2012, 33(4):368-72.)

9.     I reviewed the preliminary autopsy findings report from forensic pathologist, Dr. Joyce L. deJong from the Medical Examiners and Forensic Services of the Western Michigan University School of Medicine for Wesley Purkey, executed on July 16, 2020 via the Federal Bureau of Prisons lethal injection protocol that utilizes pentobarbital. Notable in this autopsy report was the finding of heavy congestion in both lungs caused by pulmonary edema. The weight of each individual lung was approximately 3 times the weight of a normal lung. Frothy pulmonary edema fluid was also seen in the traches and right and left mainstem bronchi and this choking fluid accumulation could only have occurred while Wesley Purkey was still alive.  It is not noted if Wesley Purkey suffered from COVID-19.

10.     COVID-19 is a highly contagious respiratory illness caused by a novel coronavirus (SARS-CoV-2). As a practicing anesthesiologist and critical care physician, I have cared for many hundreds of critically ill patients suffering from COVID-19, including the very first critically ill

patient at Emory University in Atlanta, Georgia. I consider myself expert in the care of these patients and continually update my knowledge through reviewing the medical literature, participating in continuing medical education seminars through the Centers for Disease Control and Prevention, and participating in ongoing research investigating novel treatment options.

11.     COVID-19 spreads very rapidly. SARS-CoV-2 originated in China and early reports indicate that the number of infected people can double every 6-7 days. (Steven Sanche et al., *High Contagiousness and Rapid Spread of Severe Acute Respiratory Syndrome Coronavirus 2*, 26 Emerging Infectious Diseases 1470, 1470 (2020)). Although medical knowledge about the novel coronavirus is still developing, researchers know that a significant portion of those infected with COVID-19 do not exhibit obvious symptoms.

12.     SARS-CoV-2 spreads via the respiratory route and as such, targets the lungs. The need for hospital admission is almost always as a consequence of severe respiratory distress necessitating the need for supplemental oxygen. In the most severe cases, a need exists for intubation and mechanical ventilation or attachment to a heart-lung support machine that bypasses severely damaged lungs and instead adds oxygen and removes carbon dioxide directly from the blood stream via extra-corporeal membrane oxygenation.

13.     A lack of outward symptoms does not exclude a diagnosis of COVID-19. Lung damage may be present and unnoticed by the infected individual. In a recent study, researchers found that over half of asymptomatic people infected with COVID-19 showed abnormalities on a CT scan of the lungs. (Quan-Xin Long et al., *Clinical and Immunological Assessment of Asymptomatic SARS-CoV-2 Infections*, 26 Nature Medicine 1200, 1201 (2020).)

14.     COVID-19 primarily affects the respiratory system. The illness frequently causes shortness of breath and can cause segmental lung collapse and a buildup of fluid in the lungs.

COVID-19 disease can also lead to long lasting lung damage and permanent lung scars that remain even after the patient has apparently recovered.

15.     The risk of transmission of COVID-19 in correctional settings is particularly high. Shared facilities such as bathrooms and cafeterias, densely packed indoor spaces, and the difficulty of maintaining social distancing facilitates rapid transmission of this airborne illness.

16.     As of August 31, 2020, 12,382 inmates in BOP custody had tested positive for COVID-19 across the country. (COVID-19, *Bureau of Prisons*, https://www.bop.gov/coronavirus/ (last visited Aug. 31, 2020).) BOP houses a total of 127,242 federal inmates. (Population Statistics, *Bureau of Prisons*, https://www.bop.gov/mobile/about/population_statistics.jsp (last visited Aug. 31, 2020).) As of August 31, 2020, there were 57 inmates with confirmed cases of COVID-19 housed at USP Terre Haute, and all visiting has been suspended. What is particularly noteworthy and concerning is that the number of COVID-19 cases at USP Terre Haute almost doubled in the last 6 days.  The true number of inmates infected with COVID-19 cannot be known as the majority of inmates housed at Terre Haute have never been tested for COVID-19. *See* COVID-19, *supra*; see also Population Statistics, *supra*.

17.     Upon review of the medical records for Dustin Higgs, I note he suffers from life-long asthma. Asthma is a respiratory condition characterized by reversible airway swelling. Severe asthma may cause death by respiratory failure, even in the setting of self-treatment. Dustin Higgs requires the use of three times daily inhaled albuterol to manage his asthma under normal conditions. People with underlying respiratory conditions, including asthma, may be more susceptible to severe illness from COVID-19.

18.     In an inmate who has been exposed to COVID-19, injection with pentobarbital is particularly likely to cause extreme suffering. Because COVID-19 can cause lasting lung damage,

a person injected with pentobarbital would experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19. For Mr. Higgs, the sensation of suffocation or drowning would be further exacerbated by his asthma, which produces shortness of breath even without the presence of respiratory illness or barbiturates.

19.    Injecting Mr. Higgs—a person with a serious underlying respiratory condition who has likely been exposed to COVID-19 in BOP custody—with pentobarbital is virtually certain to cause extreme pain and suffering.

20.    I hold the opinions stated in this Declaration to a reasonable degree of medical certainty.  Should additional information become available at a later date, I reserve the opportunity to update or add to the opinions stated herein.

21.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. § 1746.

Joel B. Zivot, M.D.

Dated:    August 31, 2020

# **EXHIBIT 1**

**EMORY UNIVERSITY SCHOOL OF MEDICINE**
**CURRICULUM VITAE**

Revised: June 2020

1.  Name and current position:

    *Joel B. Zivot, MD, FRCP(C), MA (Bioethics)*
    *Director of Medical Humanities, Department of Anesthesiology*
    *Emory University School of Medicine*
    *Associate Professor of Anesthesiology and Surgery*
    *Adjunct Professor of Liberal Arts and the School of Law, Emory University*

*2.*  Office Address:,
    *1364 Clifton Road, Atlanta, GA 30322*
    *Telephone: (404) 686-4411*

3.  E-mail Address: *Jzivot@emory.edu*

4.  Citizenship:
    *American, Canadian*

5.  Current Titles and Affiliations:

    a.  Academic Appointments:

        1.  Primary Appointments:
            *Associate Professor, Department of Anesthesiology*

        2.  Joint and Secondary Appointments:
            *Associate  Professor, Department of Surgery*

        3.  Other academic appointments
            *Adjunct Professor, Emory School of Law*
            *Adjunct Professor, Emory Institute of Liberal Arts and Interdisciplinary Studies*

    b.  Other Administrative Appointments:

        *Director of Medical Humanities, Department of Anesthesiology, Emory University School of Medicine*

        *Medical Advisor, Southern Center for Human Rights, Atlanta, Georgia*

6.  Previous Academic and Professional Appointments:

    *-Fellowship Director, Critical Care Medicine, Department of Anesthesiology, Emory University School of Medicine, Jan 2013-January 2016*
    *- Medical Director, 4A/5A, EUH (February 2013 –June 2015)*
    *- Medical Director, 11S, EUHM (June 2010-February 2013)*
    *- Associate Professor, Department of Anesthesiology, University of Manitoba, Winnipeg, Manitoba,*

*Canada, 2007-2010*
*- Member, Academic Promotions Committee, University of Manitoba, Faculty of Medicine, Winnipeg, Manitoba, Canada, 2009*
*-Member of selection committee, Physician Assistant Program, The University of Manitoba, Winnipeg, Manitoba, Canada, 2008*
*- Member, Accreditation Review Committee-Anesthesiologist Assistants, Commission on Accreditation of Allied Health Education Programs (ARC-AA), 2008*
*- Assistant Professor, Department of Anesthesiology and Critical Care Medicine, George Washington University Hospital, District of Columbia, USA, 2005-2007*
*-Program Medical Director, Master of Science in Anesthesia, Case Western Reserve University School of Graduate Studies, Cleveland, Ohio, USA, 2000-2005*
*- Assistant Professor of Anesthesia, Surgery, and Intensive Care, University Hospitals of Cleveland, Case Western Reserve University School of Medicine, Cleveland, Ohio, USA, 1998-2005*
*- Director Critical Care Medicine Fellowship, Department of Anesthesiology, University of Michigan Medical Center, Ann Arbor, Michigan, USA, 1996-1998*
*- Assistant Professor, Department of Anesthesiology and Critical Care Medicine, University of Michigan Medical Center, 1995-1998*

7. Previous Administrative and/or Clinical Appointments:

*-Medical Director, Cardio-thoracic ICU, Intensive Care Cardiac Sciences Program, Winnipeg Regional Health Authority, Winnipeg, Manitoba, Canada, 2007-2010*
*-Medical Director, CTICU, George Washington University Hospital, Washington, DC, 2005-2007*
*-Co-Medical Director, Surgical Intensive Care Unit, University Hospitals of Cleveland, Case Western Reserve University, Cleveland, Ohio, USA, 2002-2005*
*-Director, Post Anesthesia Care Unit, Department of Anesthesiology, University of Michigan Medical Center, Ann Arbor, MI, 1995-1998*

8. Licensures / Boards:

*-Licentiate, Medical Council of Canada, 1989-present*
*-License, Controlled Substance, Drug Enforcement Agency, 1995-present*
*-License, Michigan State Medical Board, 1995-2000*
*-License, Ohio State Medical Board, 1998-2012*
*-Fellow, American College of Chest Physicians, 2000-2010*
*-License, District of Columbia Medical Board, 2005-2011*
*-License, College of Physicians and Surgeons of Manitoba, 2007-2011*
*-License, Georgia Composite Medical Board, 2010-present*

9. Specialty Boards:

*-Fellow, Royal College of Physicians of Canada, 1993-present*
*-Diplomat, Anesthesiology, American Board of Anesthesiology, 1995-present*
*-Diplomat, Critical Care Medicine, American Board of Anesthesiology, 1995-present*
*-Fellow, American College of Chest Physicians, 2000-2010*
*-Testamur in basic peri-operative trans-esophageal echocardiography, National Board of Echocardiography, 2010-present*

10. Education:

*-University of Manitoba, Winnipeg, Manitoba, Canada, 1980-1983*
*-University of Toronto, Toronto, Ontario, Canada, 1984*
*-Doctor of Medicine, University of Manitoba, Winnipeg, Manitoba, Canada, 1988*

11. Postgraduate Training:

*-Rotating Internship, Mount Sinai Hospital, University of Toronto, Department of Post Graduate Medical Education, Toronto, Canada, 1988-1989*
*-Residency, Anesthesiology, University of Toronto, Department of Anesthesiology, Dr. David McKnight, Toronto, Canada, 1989-1993*
*-Residency, Anesthesiology, Cleveland Clinic Foundation, Department of Anesthesiology, Dr. Armin Schubert, Cleveland, Ohio, United States, 1993-1994*
*-Fellowship, Critical Care Medicine, Cleveland Clinic Foundation, Department of Anesthesiology, Dr. Marc Popovich, Cleveland, Ohio, United States, 1994-1995*
*-Masters of Arts in Bioethics, Emory Center for Ethics, Dr. Toby Schonfeld, program director, 2012-2017*
*-Emory Public Scholars Institute, Fall 2018*
*-Emory School of Law, Jurist Master's Program candidate. Expected graduation Fall 2022*

12. Committee Memberships:

    a. National and International:

    *-American Society of Anesthesiology, Committee on Ethics, 2011-present*
    *-American Society of Anesthesiology, Care Team Committee, 2007-2009*
    *-Society of Critical Care Medicine, Committee on Ethics, 2011-present*
    *-Society of Critical Care Medicine, Patient and Family Satisfaction Committee, 2013-present*
    *-Society of Cardiovascular Anesthesiology, Committee on Ethics, 2012-2013*
    *-Society of Critical Care Anesthesiologists, Graduate Education Committee 2013-present*

    b. Regional and State:

    *-President, Cleveland Society of Anesthesiology, 2001-2002*
    *-President Elect, DC Society of Anesthesiology, 2006-2007*

    c. Institutional:

    *-EUHM Committee on Ethics, 2011-present*
    *-EUHM Pharmacy and Therapeutics Committee 2011-present*
    *-EUHM Executive Critical Care Committee 2010-2015*
    *-EUHM CAUTI and CLABSI prevention committee 2010-2015*
    *-EUH Executive Pharmacy Committee 2012-present*
    *-EUH Antibiotic Utilization Subcommittee 2012-present*
    *-EUH Resuscitation Committee 2013-2016*
    *-EUH Difficult Airway ad-hoc group 2013-2014*
    *-EUH Executive Critical Care Committee 2013-2015*
    *-Department of Anesthesiology Residency Review Committee2013-present*
    *-EUH/EUHM CTS Quality Committee, 2012-2015*

13. Peer Review Activities:

    a. Manuscripts:

    *-Canadian Journal of Anesthesiology, (manuscript reviewer), 2013-*

    *-Critical Care Medicine, (manuscript reviewer), 2014-*

    *-Mayo Clinic Proceedings, (manuscript reviewer), 2015-*

    b. Grant reviewer

*- Reviewed grant applications for The Emory Georgia Tech Healthcare Innovation Program (HIP), (HIP-ACTSI-GSU) Seed grant 2016, 2017, 2018*

    c.   Conference Abstracts:

        i.   National and International:

           *-American Society of Anesthesiology, 2012*
           *Abstract Review Committee and poster session moderator*

        ii.   Regional:

           *-Midwestern Anesthesia Resident Conference, 2001-2003*
           *Abstract reviewer*

    d.   American Society of Anesthesiology Committee on Ethics Syllabus

        i.   CME questions; "Ethics of Drug Shortages"

14.  Consultant positions:

    *-Merck Pharmaceuticals, physician advisory board, 2005-2007*
    *-Consultant for Wireless EKG Monitor, 2004-2005*
    *-Masimo Corporation, product design and physician advisory board, 2013-present*
    *-Doximity, physician advisory committee, 2014-present*

*15.* Honors and Awards:
    *-Robert B. Sweet Clinical Instructor of the Year, University of Michigan, Department of Anesthesiology, 1997*

    *-Outstanding Clinical Instructor of the Year, Case Western Reserve University, Master of Science in Anesthesiology Program, 1999*

    *-Clinical Instructor of the Year, University Hospitals of Cleveland, Department of Anesthesiology, 2000*

    *-Outstanding Clinical Instructor of the Year, Case Western Reserve University, Master of Science in Anesthesiology Program, 2001*

    *-Meritorious Service Award, American Academy of Anesthesiologist Assistants, 2003*

        *This award was given to me for academic work as the medical director of the Masters in Science of Anesthesiology at Case Western Reserve University and also advocacy for scope of practice, and committee work to improve the relationship between the American Society of Anesthesiology and American Academy of Anesthesiologist Assistants.*

    *-Quality and Patient Safety Award, University Health Systems Consortium, 2002*

        *This award was given by University Health System Consortium for various quality benchmark projects when I was the co-medical director of the Cardio-thoracic Intensive Care Unit at University Hospitals of Cleveland.*

*-Distinguished service by a Physician Award, American Academy of Anesthesiologist Assistants, 2005*

> *This award was given to me for work with the American Academy of Anesthesiology Assistants annual meetings where I served as a speaker on multiple locations and also developed and hosted an annual Jeopardy game competition between all of the Masters of Science in Anesthesiology schools around the country.*

*-District of Columbia Annual Patient Safety Award, District of Columbia Department of Health, 2006*

> *This award was given by the District of Columbia Department of Health for quality improvement work done when I was the medical director of the cardio-thoracic intensive care unit at George Washington University Hospital. I developed several collaborative quality projects between cardio-thoracic surgery and critical care medicine.*

*-Presidential Citation, Society of Critical Care Medicine, 2013*

> *This award was given to me for work done within the Society of Critical Care Medicine that included writing a book chapter, service on 2 society committees, and moderating an on-line debate about the topic of end of life decisions in patients with implanted mechanical cardiac support devices.*

*-Excellence in Patient and Family Centered Care, Emory Center for Critical Care, 2018*

16. Society Memberships:

*-American Academy of Anesthesiologist Assistant, 2005-present*
*-American College of Chest Physicians, 2000-2007*
*-American Medical Association, 1995-2000*
*-American Medical Association (reactivated), 2010-present*
*-Society of Critical Care Anesthesiologists, 1995-present*
*-American Society of Anesthesiologists, 1993-present*
*-Canadian Anesthesiologist Society, 2007-present*
*-District of Columbia Society of Anesthesiologists, 2006-2007*
*-International Anesthesia Research Society, 1996-2000*
*-International Extra-Corporeal Life Support Organization, 1997-2005*
*-Ohio Society of Anesthesiologists, 1993-2005*
*-Society of Critical Care Medicine, 1995-present*
*-Manitoba Medical Society, 2007-2010*
*-Canadian Medical Association, 2008-2012*
*-Georgia Society of Anesthesiologists, 2010-present*
*-Society of Cardiovascular Anesthesiologists, 2010-present*
*-Society of Academic Anesthesiology Associations, 2013-present*
*-Medical Association of Georgia, 2016-*

17. Organization of National or International Conferences:

*"On the Ethics of Drug Shortages" June 2012, Jointly with the American Society of Anesthesiology and the Emory Center for Ethics*

a. Administrative Positions: *Director, Meeting Planning Committee*

b. Sessions as chair: *Overall conference chair*

18. *Research Focus:*

*Medicine, moral theory, rhetoric, semantics, end of life, physicians and vulnerable populations. Physician participation in lethal injection. Ethogram to study conflict in the operating room. Human factors in critical care decision-making and biological variability. Developed economic model explaining the national generic drug shortages. Studied Propofol wastage in the operating room.*

*Ongoing Research Projects:*

**"Do Tibetan Monks get depressed?"**

This project is an IRB approved study involving the administration of the PHQ-9, a validate depression screening tool, translated into the Tibetan language and administered to a cohort of 400 monks and nuns to screen for depression symptoms. This project was conducted jointly with Professor Jennifer Mascaro in the Emory School of Public Health and Professor Arri Eisen in the Emory Department of Biology.

**"Autopsy Findings in Prisoners executed by Lethal Injection"**

This project is a review of autopsies performed on 43 prisoners after death by Lethal Injection in order to determine the histologic effects on organ systems as a consequence of exposure to extremely high doses of barbiturates, benzodiazepines and Potassium Chloride. This is a joint project with Dr. Mark Edgar, Department of Pathology, Emory University School of Medicine.

19. Grant Support:

    a. Previous Support:

        1. Other: *Team Based Science (TBS) grant from the Department of Anesthesiology for Evaluation of conflict in the operating room, $20,000.00*
        2. *The Emory Georgia Tech Healthcare Innovation Program (HIP), (HIP-ACTSI-GSU) Seed grant, $25,000.00, for "Managing Conflict and Error in the Operating Room". Awarded July 2014.*
        3. *$20,000.00 from the American Society of Anesthesiology to plan the meeting "On the Ethics of Drug Shortages". June 2012*

20. Clinical Service Contributions

    -Medical director of 11S ICU (EUHM) and 4A/5A ICU (EUH),

    *I created and chaired a joint protocol development group with Critical Care Medicine, Surgery, Nursing, and Respiratory Therapy with the purpose of improving quality metrics in critical care medicine. This group accomplished several things including a blood conservation strategy for post-operative cardiac surgery patients, intra-aortic balloon pump removal, DVT and GI prophylaxis and the beginning of an atrial fibrillation management protocol. I also wrote and helped implement a rapid extubation protocol for EUH and EUHM cardiac surgery patients.*

    -Hospital Committee involvement

    *I was involved in several Emory committees that addressed a broad range of issues, (see 12 c)*

    -GME involvement, Fellowship Director, Critical Care Medicine, Department of Anesthesiology

    *I served as the fellowship director for critical care medicine in the Department of Anesthesiology. I developed the first joint Anesthesiology-Emergency Medicine critical care medicine fellowship at Emory and I am expanding the number of fellows who will also be trained to assist in providing*

*overnight coverage for airway management at EUH. Overnight airway coverage has been a project of the EUH emergency airway committee on which I am a member. My conflict project was embraced by Emory Healthcare Office of Quality and they contributed to the funding and management of the project on an ongoing basis.*

21. Community Outreach:

Community Service

International:
-*St. Petersburg, Russia, 2002, 2004*
*Home visits to community members who were unable to travel to see a physician*
-*The Global Surgical and Medical Support Group, (GSMSG) 2018-*

Regional:
-*Hurricane Katrina Medical Response Team, 2005*
-*Emory 500 Atlanta Motor Speedway Health Tent Volunteer, 2010*

Media

***Op-Ed***:

-*"Baby's status as human is on trial" Op-Ed, Feb. 19, 2010, Winnipeg Free Press*

-*"Why I am for a moratorium on lethal injections" Op-Ed, Dec 15, 2013, USA Today*

-*"The Slippery Slope from Medicine to Lethal Injection" Op-Ed, May 2, 2014 TIME*

-*"The White Coat: A Veil for State Killing", MedPage Today August 2014*

-*"Executions put physicians in unfair dilemma" January 2017, CNN*

-*"Gorsuch grapples with death: a physician's viewpoint" February 2017, CNN*

-*"Neil Gorsuch and Assisted Suicide" February 2017, MedPage Today*

-*"Don't thank me, it's my job" May 2018, MedPage Today*

-*"Inmates as test subjects: can clinical trials in prisons ever be ethical?" Medpage Today, September 2018"*

-*"Lethal injection: Burning as they die" MedPage Today, December 2018*

-*"Lethal injections are medicine not poison" Houston Chronicle, December 2018*

-*"In Defense of Telling Patients They're Dying via Robot" Slate, March 2019*

-*"What Kim Kardashian Can Teach Us About Drug Pricing" MedPage Today, March 2019*

-*"Patients love a miracle, but doctors can't be afraid to deliver bad news (even via robot)" USA Today, March 2019*

-*"Buddhist Wisdom and Human Poop" MedPage Today, March 2019*

-*"What if Airlines Worked Like Healthcare?" MedPage Today, April 2019*

-"Abortion: No Middle Ground on Fetal Heartbeat" MedPage Today, May 2019

-"Kobe Bryant's Death: What Were the Chances?" MedPage Today. Jan 30, 2020

-"Could U.S. ICUs Handle 45,000-Bed Corona Virus Load?" MedPage Today, February 12, 2020

-"Doctors Volunteer for Covid-19 Duty: Who has Their Backs?" Medpage Today, March 3, 2020

-"Rationing Ventilators by Age Is Wrong" MedPage Today, April 8, 2020

**_Interviews:_**

Anesthesiology News,2002
                        -Anesthesiologist Assistants

The Medical Post, 2009
                        -Waiting for Cardiac Surgery

The Health Report, CJOB 68 AM, Winnipeg, Canada, 2010
                        -Cardiac Critical Care
                        -End of Life in the ICU
                        -VIP syndrome

Inside the Black Box, WREK 91.1 FM, Atlanta, Georgia, 2011
                        -Biting the Bullet: The Technology of Anesthesia

National Public Radio WABE 90.1 FM Atlanta, Georgia, 2011
                        -Physicians and the death penalty
                        -Drug shortages

Georgia Public Broadcasting, Atlanta GA, 2012
                        -Drug shortages reaching critical levels

MedPage Today, 2013
                        -No Advantage for Fresh Blood in ICU Transfusions
                        -Meningitis Outbreak: Suspicion needed for nausea complaints
                        -Drug Shortages spark use of compounders

Medscape Medical News, 2013
                        -GPOs to Blame for Drug Shortages, Says Physicians Group

MedPage Today, 2014
                        -Cruel and Unusual Punishment
                        -Lethal Injection: a cruel, painful, terrifying execution

Miami Herald, 2014
                        **-**Doctor speaks out on use of untested drugs in capital punishment

The New York Times, 2014
                        -Timeline describes frantic scene at Oklahoma execution

The Washington Post, 2014
                        -Florida's Gruesome Execution Theater
                        -Another execution gone awry. Now what?

CNN with Sanjay Gupta, 2014
                    -Dr. Zivot: Lethal injection not humane

Amicus on Slate with Dahlia Lithwick, 2015
                    -Botched protocols

Huffington Post, 2015
                    -Oklahoma wants to reinstate the gas chamber and experts say it's a bad
                    idea
Time, 2015
                    -The harsh reality of execution by firing squad

BBC World News, 2017
                    -Lethal injection in Arkansas

BBC Radio Science Unit 2017
                    -Pain in execution by lethal injection

CNBC, 2017
                    -Silicon Valley is trumpeting A.I. as the cure for the medical industry, but
                    doctors are skeptical

AXIOS, 2017
                    - The Human Diagnosis Project: a skeptical look at new AI initiatives,

Washington Post, 2017
                    -States to try new ways to execute prisoners

BBC Three, 2018
                    -    Life and Death Row: How the Lethal Injection Kills

Mother Jones, 2018
                    -    Veterinarians Won't use This Gas to Kill Animals but 3 states want to use
                    it on prisoners

Eye for Pharma, 2018
                    -    Artificial Intelligence: The Counter-Argument

National Public Radio, 2018
                    -    All Things Considered, Lethal Injection

Newsweek, 2018
                    Nebraska's first lethal injection execution will use new cocktail of drug,
                    including fentanyl

Good Law/ Bad Law Podcast, October 2018
                    Is Lethal Injection Fatally Flawed on Moral and Constitutional Grounds?

Anamnesis: Medical Storytellers from MedPage Today, Podcast July 24, 2019
                    Higher Power: All I could do

New York Times, February 19, 2020
                    "Why This Inmate Chose the Electric Chair Over Lethal Injection"

22.  Formal Teaching:

a. Medical Student Teaching:
    i. *Discovery Project: "Propofol wastage in the ICU" Medical student Mina Tran, 2012-2013, contact hours 4 hrs/week*
    ii. *Serve as teacher and mentor for medical students in anesthesiology and critical care medicine. 2010-present, contact hours: 3 hrs/week*
    iii. *Instructor for Fundamental Critical Care Support (FCCS) training course for medical students, 2012-present, contact hours: 1 hr/week*
    iv. *Forge Medical Student Innovation Group, Mentor, contact hours: 0.5 hrs/week*

b. Undergraduate/Graduate Programs:

    1. Training Programs:
        *Instructor in the Masters of Science in Anesthesiology program. I developed the first critical care medicine rotation for all of the students and also a series of didactic lectures on the topic of critical care medicine the included "Critical Care Medicine", "Heart Failure", and "Acid-Base Disorders"*

    2. Emory School of Law:
        *Co-chief instructor of **LAW 819-002, "Law, Medicine and Human Rights",** a 2 credit hour seminar taught in the fall 2016 semester in the Emory School of Law*

    3. Emory Institute of Liberal Arts: School of Interdisciplinary Studies:
        *Chief Instructor, **IDS 385-5, "When medicine and the state collide: bioethics and the due process of cruelty"** Emory University, Institute of Liberal Arts, 3.0 credit hours, Fall, 2017*

        *Chief Instructor, **IDS-385-4 "The Science, Medicine, and Ethics of Killing"** Emory University, Institute of Liberal Arts, 3.0 Credit hours, Spring 2018*

        *Chief Instructor, **IDS-385-4 "Medicine, the Law and the Ethics of Punishment and Killing"** Emory University, Institute of Liberal Arts, 3.0 Credit hours, Fall 2018*

        *Chief Instructor, **IDS-385 "Medicine, the Law and Bioethics"** Emory University, Institute of Liberal Arts, 3.0 Credit hours Spring 2019*

        *Co-Instructor, **IDS-290 "Medicine, Literature, Law, Crime, Punishment, Death"** Emory University, Institute of Liberal Arts, 1.0 Credit Hour, Spring 2019*

        *Chief Instructor, **IDS-385 "Medicine, the Law and Bioethics"** Emory University, Institute of Liber Arts, 3.0 Credit Hours, Fall 2019*

    4. Emory Center of Bioethics
        *Chief Instructor, **Bioethics 506-1(5935) "Independent Study in Bioethics: Public Scholarship",** 3.0 Credit Hours, Fall 2019*

    5. Emory Scholars Program
        ***Emory Scholars Retreat,** Hilton Head, South Carolina, January 2019 **"Lethal Injection and Capital Punishment"***

    6. Emory University **Ethically Engaged Leaders Program** (EEGL)
        *Mentor for undergraduate student, Shreeja Patel, 2019*

    7. Emory Neuroscience and Behavioral Biology Program

*Supervising Faculty **NBB Honors 495A, Samuel John, "Needle Exchange Programs and their Role in Alleviating the Opioid Crisis and Addiction"** 4.0 Credit hours, Spring 2019-Spring 2020*

8. Residency Programs:

   *Served as instructor for residents in anesthesiology, emergency medicine, and surgery in the area of critical care medicine. I also sit on the residency review committee for the Department of Anesthesiology. Lecture topics "Septic shock", "Thyroid disease in critical care", "Mechanical heart support", "Pulmonary artery catheters" "Heuristics and biases in clinical reasoning", "delirium and agitation in critical illness", "biological variability".*

c. Other Categories

   *I give regular lectures on a variety of critical care topics for respiratory therapy including "capnography" and "paralytics". I lecture students in the Emory critical care NP/PA program and also regular critical care lectures to the NP/PA practitioners in critical care. I teach those students how to read chest X-rays. I am invited to lecture in the Emory School of Law on the topic "Physician Assisted Suicide".*

   ***Emory Tibet Science Initiative:***

   *I taught biology to Buddhist monks at Drepung Loseling Monastery in Southern India in June 2015, June 2017, June 2018 and June 2019. This initiative is a result of an invitation from His Holiness, The Dalai Lama, to bring science education to the curriculum of the monks and represents the first time in 700 years that the curriculum has changed. I spent 2 weeks at the monastery on each occasion teaching for 6 hours per day including microscopy lab teaching. I worked with a series of translators.*

   **Emory-Addis Ababa Education Innovation Community of Practice Program:**

   *Instructor: Distance Learning, September 2019*

23. Supervisory Teaching:

a. Residency Program:
   *Fellowship director, Critical Care Medicine, Department of Anesthesiology 2013-present. I am chiefly responsible for the education and training of the critical care fellows in the Department of Anesthesiology. In addition to a multitude of critical care topics, I assist the fellows in abstract writing for a national critical care meeting, grand rounds for the Department of Anesthesiology and a quality improvement project for Graduate Medical Education Day that occurs annually in June.*

b. Other:
   *I completed a summer internship at the Southern Center for Human Rights and also teach law students on the topic of lethal injection.*

24. Lectureships, Seminar Invitations, and Visiting Professorships:

*"The Case of Samuel Golubchuk: Lessons about end-of-life decision-making?"*
*A debate between Doctors Joel Zivot and Adrian Fine*
*Wednesday, 18 March, 2009, 12h30-13h30. The Centre for Professional and Applied Ethics, The University of Manitoba, Winnipeg, Manitoba*

*"Cardiac output after the Pulmonary Artery Catheter" American Academy of Anesthesiologist Assistants Annual Meeting. Clearwater, Florida, April 2009*

"End of Life in the ICU", Canadian Hospice Palliative Care Conference Annual Meeting, Winnipeg, Manitoba, Canada. October 2009

"Reductions in wait times for cardiac surgery may be harmful", poster presentation, Canadian Cardiovascular Society Annual Meeting, Edmonton, Alberta, Canada, October 2009

"Biological Variability" American Society of Anesthesiology, 2009-(I formed a panel to discuss biological variability. My panel consisted of an anesthesiologist, a mathematician, and a physicist.)

"End of life in the ICU: When the patient and doctor disagree…" Province wide health care ethics grand rounds, St. Boniface Research Centre, Winnipeg, Manitoba, Canada. January 2010

"Mostly dead is slightly alive, the problem with the dying process" Center for Ethics, Emory University, 2011.

"Anesthesiology Jeopardy!" American Academy of Anesthesiologist Assistants Annual Meeting, 2006, 2007, 2008, 2009, 2010, 2011

"Queuing Theory: Applications for Anesthesiology" American Academy of Anesthesiologist Assistants Annual Meeting, Destin, Florida, 2011

"Cardiac Anesthesia: Mostly we have it wrong" American Academy of Anesthesiologist Assistants Annual Meeting, Destin, Florida, 2011

"End of life in the ICU: When the patient and doctor disagree" American Academy of Anesthesiologist Assistants Annual Meeting, Destin, Florida, 2011

"Sedating the difficult patient" 5th Annual Southeastern Critical Care Summit. Emory University, Atlanta, GA, March 2012

"End of Life Care" IMPACT 2012 American Academy of Physician Assistants Annual Meeting, Toronto, Canada, June 2012

"Biosimilars, where do we stand?" Georgia Bio and the Georgia Association of Healthcare Executives. September 2012, Atlanta, Georgia

"Drug Shortages" Visiting Professor, Rutgers Business School, Newark, New Jersey, November 2012.

"Deactivating a permanent cardiac device is not physician assisted death", Pro-con debate Webinar, Society of Critical Care Medicine, November 2012.

"Drug shortages: The invisible hand of the Market" New Horizons in Anesthesiology, Vail, Colorado, February 2013

"Hey Anesthesia is a compliment, not an insult: the case for protocols" New Horizons in Anesthesiology, Vail, Colorado, February 2013

"Pro/Con: Death Panels in End of Life Care" New Horizons in Anesthesiology, Vail, Colorado, February 2013

"Hockey Violence and Killer Apes: Conflict Management in the Operating Room" New Horizons in Anesthesiology, Vail, Colorado, February 2013

"Drug Shortages, a failed market" American Society of Anesthesiology Legislative Conference Annual Meeting, April 2013, Washington, DC

"Lethal injection in the death penalty", Georgia Law Society and the Southern Center for Human Rights, Atlanta, Georgia, July 2014

"Identifying and managing futile care in the ICU", 10th Annual South Easter Critical care Summit, May 2016, Atlanta, Georgia

"Capital Punishment and Lethal Injection", Georgia State School of Law, Atlanta, Georgia, September 2016

"The Ethics of Drug Pricing", GEM annual meeting, Georgia Society of Ophthalmology, January 2017

*"Medical Assistance in Dying: Not as Easy as it Looks" Institute of Liberal Arts and Interdisciplinary Studies, Emory University, October 2017*

*"Medical Assistance in Dying: Not as easy as it looks" TEDx Emory, February 2018*

*"Emotive Arts Series Panel Discussion: The Opioid Epidemic" Carlos Museum, Emory University, February 2018*

*"Fast Track Cardiac ICU in Canada" 37th annual APACVS meeting, Miami, Florida, April 2018*

*"On the Ethics of Drug Pricing" Grand Rounds, Department of Anesthesiology, Case Western Reserve University, May 2018*

*"Building Transdisciplinary Capacity for Tibetan Medical Research: Methods, Translation and Efficacy Evaluation" Translation needs for Tibetan Medical Research, Emory University, School of Medicine and School of Anthropology, October 2018*

*"Medicine, AI, and the Human Touch" Contemporary Challenges of AI in Healthcare: Verification, Big Data, and Investment. Emory Center for Ethics, Emory University, December 2018*

*25th Annual Conference of the Healthcare Ethics Consortium: Panelist, Emory Conference Center, Atlanta, Georgia, March 2019, "remote technologies, telemedicine, artificial intelligence & keeping care for the patient".*

25.   Invitations to National or International Conferences:

*University of Richmond Law Review, Allen Chair Symposium, 2014,*
*"The Death Penalty in the United States".*

*Yale Law School, March 2015*
*"Lethal injection"*

*The Fordham Law Review, Fordham Law School, February 2016*
*"Criminal Behavior and the Brain: When Law and Neuroscience Collide"*

*American College of Correctional Physicians*
*Fall Educational Conference*
*October 2016*
*Las Vegas, Nevada*
*"Physician participation in executions: A discussion of the Ethical Challenges and the Pros and Cons, a pro-con debate between Dr. Carlo Muso and Dr. Joel Zivot*

*"Prescribing Price: The Ethics, Science, and Business of Drug Development and Pricing"*
*Panelist*
*Emory Conference Center, November 2016*
*Atlanta, Georgia*
*Emory Center for Ethics*

*"The First International Emory Tibet Symposium: Bridging Buddhism & Science*
*December 2016*
*Drepung Loseling Monastery*
*Karnataka State, India"*
*Panelist:  What is life and what are its origins?*

26.   Bibliography:

Joel B Zivot, MD, FRCP(C), MA (Bioethics)
June 2020                                                                    13

a.   Published and Accepted Research Articles (clinical, basic science, other) in Refereed Journals

*Perera ER, Vidic DM,* **Zivot J**. *"Carinal resection with two high frequency jet ventilation delivery systems". Canadian Journal of Anesthesia. Jan 1993: 40(1):59-63. PMID: 8425245*

**Zivot JB,** *Hoffman WD. "Pathological effects of endotoxin". New Horizons. May 1995; 3(2):267-75. PMID:7583168*

*Popovich MJ, Lockrem JD,* **Zivot JB**. *"Nasal bridle revisited: an improvement in the technique to prevent unintentional removal of small-bore naso-enteric feeding tubes". Critical Care Medicine. March 1996; 24(3):429-31. PMID: 8625630*

*Kumar K, Zarychanski R, Bell DD, Manji R,* **Zivot J**, *Menkis AH, Arora RC; Cardiovascular Health Research in Manitoba Investigator Group. "Impact of 24-hour in-house intensivist on a dedicated cardiac surgery intensive care unit". Ann Thorac Surg. 2009 Oct;88(4):1153-61.doi: 10.1016/j.athoracsur. 2009.04.070*

**Zivot JB**. *"The Case of Samuel Golubchuk", AJOB Volume* 10, *Issue* 3 *March 2010, pages 56 – 57 doi: 10.1080/15265160903681890.*

*AbdulRazaq A. H. Sokoro, PhD.,* **Joel B. Zivot**, *, MD, FRCPC, Robert E. Ariano, PharmD, FCCM "Neuroleptic malignant syndrome versus Serotonin syndrome: the search for a diagnostic tool?" Ann Pharmacother. 2011 Sep;45(9):e50.doi: 10.1345/aph. 1P787. Epub 2011 Aug 30.*

*When patient and doctor disagree.* **Zivot JB**, *CMAJ 2012,Jan 10;184(1):76-6. doi: 10.1503/cmaj. 112-2008*

**Zivot JB**, *"Anesthesia does not reduce suffering at the end of life", Crit Care Med. 2012 Jul; 40(7):2268-9. doi: 10.1097/CCM.0b013e31824fc12b.*

**Zivot JB,** *"The absence of cruelty is not the presence of humanness: physicians and the death penalty in the United States". Philos Ethics Humanit Med. 2012 Dec 3;7(1):13. doi: 10.1186/1747-5341-7-13.*

*Mazzeffi, M,* **Zivot J**, *Buchman T, Halkos M, "In hospital mortality after cardiac surgery: patient characteristics, timing, and association with postoperative length of intensive care unit and hospital stay". Ann Thorac Surg. 2014 Apr;97(4):1220-5. doi: 10.1010/j.athoracsur.2013. 10.040. Epub 2013 Dec 21.*

**Zivot JB**, *"The withdrawal of treatment is still treatment". Can J Anesth 2014; Oct;61(10):895-8*

**Zivot J**, *"Lethal injection: the states medicalize execution" 49 U. Rich. L. Rev. 711 (2015)*

**Zivot J**, *"Elder care in the ICU: Spin bravely?" Crit Care Med 2015 July;43(7):1526-7\*

*Jones LK, Jennings BM, Goetz RM, Haythorn KW,* **Zivot JB**, *de Waal FB "An Ethogram to Quantify Operating Room Behavior" Ann Behav Med. 2016 Jan 26. [Epub ahead of print]*

**Zivot J**, *Arenson K, "Lessons learned from physician participation in lethal injection: Is Carter v. Canada a death knell for medical self-regulation?" Can J Anaesth 2016 March;63(3):246-251*

**Zivot JB**, *"Elderly patients in the ICU: Worth it, or not?" Crit Care Med 2016 April;44(4):842-3*

*Moll V, Ward CT,* **Zivot JB**, *"Antipsychotic-Induced Neuroleptic Malignant Syndrome after Cardiac Surgery" AA Case Rep. 2016 July 1; 7 (1); 5-8*

**Zivot J**, *"Too Sick to be Executed: Shocking Punishment and the Brain" November 2016 Vol 85, pp 697-703, Fordham Law Review*

*Zivot J*, *"Useful ethics committees: no mandate required" Crit Care Med. 2020 Jun;48(6):928-929. doi: 10.1097/CCM.0000000000004357.*

*Zivot J*, *"Coronavirus Disease 2019 Triage Teams: Death by Numbers" Crit Care Med 2020 May 15. doi: 10.1097/CCM.0000000000004435. Online ahead of print.*

b.   Examination Activities:

   *Committee Member, 2005, National Anesthesiologist Assistant Certification Examination Development Committee*

   *Question writer, 2005,  Critical Care Medicine, National Board of Medical Examiners*

   *Question reviewer, 2015, American Board of Anesthesiology-Maintenance of Certification in Anesthesiology (MOCA), Critical Care Medicine*

c.   Book Chapters:

   *Bojan Paunovic MD, FRCPC[1],  Rizwan Manji MD, PhD, FRCSC[2], Rakesh Arora MD, PhD, FRCSC[2], Johan Strumpher MD, FRCPC[3], Rohit Singhal MD, FRCSC[2],* **Joel Zivot MD, FRCPC[4]**, *and Eric Jacobsohn MBChB, MHPE, FRCPC[5] "Diagnosis and Management of Sepsis and Septic Shock in the Cardiac Surgical Patient". Society of Cardiovascular Anesthesiology Monograph, March 2010*

   ***Zivot, JB***, *"What Are Advance Directives?" Critical Care Ethics: A Practice Guide, Third Ed. Copyright 2014 Society of Critical Care Medicine.*

d.   Other Publications:

   *Zivot J, Hoffman W, Lockrem J, Esfandiari S, Bedocs N, Vignali C, Popovich M. "Changes in gastric intramucosal pH are not predicted by therapeutic changes in conventional hemodynamic variables for septic surgical patients". Critical Care Medicine. 23(1) Supplement A:107, Jan 1995*

   *Webster J, Thomson V, Zivot J. "Excessive endotracheal tube cuff pressures are common but are not clinically significant". Anesthesiology 87(3 Suppl) A984, 1997*

   *Bloch, MG, Zivot JB. "Successful transplantation of liver and kidney allografts from a donor maintained on veno-arterial extracorporeal membrane oxygenation". Anesthesia and Analgesia, 94(25 Supplement) S104, Feb 2002*

   *Zivot J, Polemenakas A, Aggarwall S, Rowbottom J. "Differential lung capnography after single lung transplant". Critical Care Medicine 30(12) Supplement: A90 December 2002*

   *Voltz D, Zivot J, "Changes in the Bispectral Index during Deep Hypothermic Circulatory Arrest." Society of Critical Care Medicine Annual Meeting, San Francisco, California, January 2003*

   *Ravas R, Zivot J, "Blood conservation; Designing a better blood bag", Department of Anesthesiology, University Hospitals of Cleveland, Case Western Reserve University, Cleveland, Ohio, Midwestern Anesthesia Resident Conference (MARC), Chicago, Illinois, March 2003*

   *Hacker L, Zivot J "Local anesthetic spread for skin infiltration", Department of Anesthesiology, University Hospitals of Cleveland, Case Western Reserve University, Cleveland, Ohio, Midwestern Anesthesia Residents Conference, Chicago, Illinois, March 2003*

Falk S, **Zivot J**, *"Post-operative Sidenafil for pulmonary hypertension following mitral valve repair"* 17th Asia Pacific Conference on Diseases of the Chest, Istanbul, Turkey, August 2003

Aggarwal S, **Zivot J**, *"New onset anterior spinal artery syndrome after lumbar drain removal"* Department of Anesthesiology, University Hospitals of Cleveland, Case Western Reserve University, Cleveland, Ohio, Midwestern Anesthesia Residents Conference, Rochester, Minnesota, March 2004

Stetz J, **Zivot J**, *"Dextromethorphan masquerading as phencyclidine"* Department of Anesthesiology, University Hospitals of Cleveland, Case Western Reserve University, Cleveland, Ohio, Midwestern Anesthesia Residents Conference, Rochester, Minnesota, March 2004

Petelenz K, **Zivot J**, *"Bilateral BIS monitoring in unilateral brain injury"*, Department of Anesthesiology, University Hospitals of Cleveland, Case Western Reserve University, Cleveland, Ohio, Midwestern Anesthesia Residents Conference, Chicago, Illinois, March 2005

Arora RC, Zarychynski R, Bell D, **Zivot J**, Lee J, Kumar K, Zhang L, Menkis A *"The Manitoba Model of Post-Operative Cardiac Surgery Intensive Care"* The Cardiac Sciences Program, St. Boniface Hospital and the University of Manitoba, Winnipeg, Canada. Toronto Critical Care Meeting, October 2007

K Kumar, R Zarychanski, DD Bell, **J Zivot**, J Lee, R Manji, A Menkis, RC Aurora, *"The Impact of the Manitoba Model of 24 hour in-house intensivist on a dedicated cardiac surgery ICU"* Canadian Cardiovascular Society Annual Meeting, Toronto, Ontario, Canada, October 2008

Fergusson DA, Hébert PC, Mazer CD, Fremes S, MacAdams C, Murkin JM, Teoh K, Duke PC, Arellano R, Blajchman MA, Bussières JS, Côté D, Karski J, Martineau R, Robblee JA, Rodger M, Wells G, Clinch J, Pretorius R; BART Investigators. *"A comparison of aprotinin and lysine analogues in high-risk cardiac surgery"*. N Engl J Med. 2008 May 29;358(22):2319-31. Epub 2008 May 14. Erratum in: N Engl J Med. 2010 Sep 23;363(13):1290

M Rivet, S Chartrand, G Henry, ICCS Nurses, RC Aurora, DD Bell, A Menkis, **J Zivot**, RA Manji, on the GRACE, GRACE2 Investigators, *"Bunk Beds in the ICU - Can Two Cardiac Surgery Patients Occupy One ICU Bed?"* Canadian Cardiovascular Society Annual Meeting, Toronto, Ontario, Canada, October 2008

RA Manji, E Jacobsohn, D Bell, RK Singal, **J Zivot**, A Menkis *" Delirium and bed management in the cardiac surgery ICU"* Canadian Cardiovascular Society Annual Meeting, Edmonton, Alberta, Canada, October 2009

RA Manji, D Bell, C Shaw, C Moltzan, P Nickerson, AH Menkis, **J Zivot**, E Jacobsohn, Management Suggestions for Cardiac Surgery Patients with a Positive Heparin Induced Thrombocytopenia (HIT) ELISA, Canadian Cardiovascular Society Annual Meeting, Edmonton, Alberta, Canada, October 2009

RA Manji, E Jacobsohn, **J Zivot**, H Grocott, Alan Menkis, Prolonged in-hospital wait times does not affect outcomes for urgent coronary artery bypass surgery, Canadian Cardiovascular Society Annual Meeting, Edmonton, Alberta, Canada, October 2009

**J Zivot**, RA Manji, E Jacobsohn, H Grocott, A Menkis, Reductions in wait times for cardiac surgery may be harmful, Canadian Cardiovascular Society Annual Meeting, Edmonton, Alberta, Canada, October 2009

RA Manji MD PhD FRCSC MBA, E Jacobsohn MBChB FRCPC, H Grocott MD FRCPC, **J Zivot** MD FRCPC, AH Menkis DDS MD FRCSC, Longer in-hospital wait times does not affect outcomes for urgent coronary artery bypass grafting surgery, American Heart Association Annual Meeting, Orlando, Florida, November 2009

**Zivot, JB**, *"When the patient and the doctor disagree: end of life in the ICU"* (poster presentation) American Society of Anesthesiology Annual Meeting, San Diego, California, October 2010

**Joel Zivot, MD,** "*A cure in search of a disease, comments on: From an Ethics of Rationing to an Ethics of Waste Avoidance", N Engl J Med. 2012; 366:1949-1951, May 24 2012*

*Mazzeffi, Halkos,* **Zivot** *"Timing and characterization of post-cardiac surgery in-hospital mortality" Society of Critical Care Annual Meeting Society of Critical Care Annual Meeting, Jan 2013.*

*Neamu, Halkos,* **Zivot** *"Right Ventricular Laceration During Closed Chest Compression in a Cardiac Surgical Patient" Society of Critical Care Annual Meeting:  Jan 2013*

*Caridi-Scheible,* **Zivot**, *Paciullo, Connor "Successful treatment of pulmonary-renal syndrome secondary to p-ANCA vasculitis using ECMO with Argatroban", Society of Critical Care Medicine Annual Meeting, San Francisco, CA, Jan 2014*

*Lin, Stacey,* **Zivot J**, *"The Interaction between Opioids and SSRI leading to Serotonin Syndrome" American Society of Anesthesiology Annual Meeting, Boston MA, October 2017*

*Wiepking, Mathew,* **Zivot J**, *"Eastern Equine Encephalitis: A Dangerous Dark Horse in Organ Transplantation" IARS annual meeting, Chicago, IL, April 2018*

# **Exhibit D**

## EXPERT DECLARATION OF DR. MICHAELA ALMGREN

### I. Background and Qualifications

1.  My name is Michaela Almgren, Pharm.D., M.S. I am over the age of eighteen and competent to testify to the truth of the matters contained herein. The factual statements I make here are true and correct to the best of my knowledge.

2.  I am a Clinical Assistant Professor in the Department of Clinical Pharmacy and Outcomes Sciences at the College of Pharmacy at University of South Carolina. I teach principles of sterile compounding per USP Chapters 797 and 800, aseptic technique and pharmacy regulations applicable in 503b compounding environment, as well as pharmacokinetics and biopharmaceutics courses. I specialize in sterile compounding, medication safety and pharmacy regulations that relate to pharmacy compounding practices. I also provide continuing education courses for pharmacists in those topics. I received my Doctor of Pharmacy degree from the USC campus of the South Carolina College of Pharmacy in 2010. Additionally, I have a Master's Degree in Pharmaceutical Chemistry from University of Florida.

3.  In conjunction with my academic appointment, I currently maintain a practice site at a 503b outsourcing pharmacy where I perform duties of outsourcing pharmacist, clinical advisor and pharmacy student preceptor.  Previously I worked in pharmacy operations in a local large teaching hospital as a pharmacist.  I have over ten years of experience in sterile compounding and aseptic technique.  Prior to joining the faculty at the University of South Carolina I worked for several years in pharmaceutical manufacturing where I was involved in drug formulation, quality assurance, quality control and analytical method development. My professional qualifications are Doctor of Pharmacy and Master of Science in Pharmacy with focus on Pharmaceutical Chemistry.  A copy of my CV is attached.

4.  I have been asked by the attorneys of the Office of Federal Defenders who represent death-sentenced prisoners Alfred Bourgeois, Dustin Honken, Chadrick Fulks, and Jeffrey Paul to submit an expert medical and scientific opinion based on the information and documentation provided to me, about whether there is a risk of harm and unnecessary suffering that can be caused by the use of compounded pentobarbital in lethal injection.

II. **The Lack of Compounding Information Regarding the Preparation of the Pentobarbital Injection Raises Concerns Due to the Chemical and Physical Properties of Pentobarbital Sodium and the Complexity of the Compounding Procedure of Pentobarbital Injection.**

5. Based on the information provided for my review, it appears that the Board of Prisons is using a compounding pharmacy to prepare the pentobarbital injection but is it not clear how the vials that are to be used for the execution will be compounded. It appears that the Board of Prisons has not made available records of the formulation recipe used to compound the injectable pentobarbital from pentobarbital API powder to be used to execute the prisoners. Accordingly, it is not possible to confirm that the drug was or will be properly compounded.

6. The process for compounding pentobarbital is complex. It is typically performed in one of two ways, though other compounding recipes may be available. A pharmacy preparing this type of compound should have an extensive parenteral compounding experience in order to be able to prepare this drug correctly. Again, it is important that the compounding pharmacy logs and records should be available for review to assure that the pharmacy compounding this preparation has the expertise as well as the equipment necessary to prepare this drug.

7. In the first version of the compounding procedure, pursuant to the drug monograph listed in ASHP's Handbook of Injectable Drugs, a commercially prepared injection of pentobarbital 50 mg/mL (trade name Nembutal, AHFS classification 28:24.04) is prepared as a mixture containing pentobarbital sodium, propylene glycol 40% v/v, and alcohol 10%[1]. Additional ingredients, such as sodium hydroxide and hydrochloric acid may be used to stabilize the solution and to produce the final pH of 9.5.

8. There are many considerations when preparing sodium pentobarbital injection in a compounding pharmacy setting per USP <797> under 503a regulations, applicable to traditional compounding pharmacies as opposed to "outsourcing facilities." Pentobarbital sodium powder Active Pharmaceutical Ingredient (API) is not water soluble. Additionally, aqueous solutions of pentobarbital sodium are also not stable per AHFS reference. According to a formulation recipe listed in literature, the API has to be dissolved in water, but the solution must be alkalinized using sodium hydroxide pellets to bring the pH to 12. Otherwise the drug

will produce a suspension rather than a solution, meaning that some of the particles will settle out of the mixture. A suspension is not suitable for parenteral use, so it cannot be safely injected, as this could cause extreme pain and suffering to the prisoner. Hydrochloric acid is then added to the solution to bring the pH back down to around 9.8 (until pentobarbital just barely stays in solution). Propylene glycol needs to be added (40% v/v) and alcohol is then also added.  The drug is then filtered using a 0.22 micron filter to assure sterility. To assure filter integrity a quality assurance report should be issued documenting that the filter had undergone and passed pressure testing. Any changes in pH can cause precipitation out of the solution, formation of suspension and a change in the potency of this drug solution. This preparation closely mimics the commercial formulation of the drug.

9.   In the alternative, pentobarbital may be compounded by dissolving the bulk powder in alcohol initially, and then adding polypropylene glycol and water while adjusting the pH, in order to keep the drug in solution without precipitation.[1]

10.   As the two common examples of formulation recipes for pentobarbital injection described above illustrate, the preparation of this compounded sterile product is complex, and involves a number of ingredients and chemical adjustments. It is important to make sure that all the ingredients that are used for compounding are of pharmaceutical grade, with expiration dates past the BUD of the compounded product.  No information regarding the process used to compound the pentobarbital injection for BOP has been made available, making it impossible to confirm the adequacy of the compounding procedure used, the suitability of the inactive ingredients and their expiration dates, the ingredients and amounts/concentrations used, and whether any adjustments that were made to assure that the medication was prepared correctly and thus will produce desired effect.   Only pharmacies with extensive experience in compounding and aseptic technique should prepare this type of preparation, as special equipment, such as pH meter, filter integrity pressure gage, and stirring apparatus need to be

---

[1] https://www.medschool.umaryland.edu/media/SOM/Offices-of-the-Dean/OAWA/docs/non-usp-grade-pentobarbital-policy.pdf

on hand, and calibrated, with usage logs and procedures describing maintenance, cleaning and calibration of each equipment used.

11. Deviations from the appropriate procedure can significantly impact the efficacy and safety of pentobarbital injection.  For example, if there is a shift in concentration of one of the ingredients (perhaps due to the improper storage conditions), this can lead to the formation of precipitant and oxidation of the product often indicated by a colour change of the solution, which will also impact potency of the drug and its pharmacological effects. A change in pH of the drug due to improper storage can lead to extreme pain during the injection stage of the execution and suffering of the prisoner.

12. The possibility of precipitation of pentobarbital out of solution due to improper preparation or storage is in particular extremely concerning. Injection of a solution containing particles may lead to directly causing severe tissue injury and occlusion of the affected vasculature can result in thromboembolism which can be extremely painful.  Furthermore, if the drug has precipitated out of solution, the potency of the injection will be lower leading potentially to slow and excruciatingly painful death. More generally, subpotent pentobarbital containing particulate matter can produce unpredictable pharmacokinetic and pharmacodynamic effects causing potentially prolonged death in which the prisoner may suffer the experience of suffocation, drowning, or otherwise severe respiratory distress.

13. In general, compounding logs must be maintained by the compounding pharmacy and all the details listed above must be recorded to assure the traceability and quality of the compounded product. Such logs must also include the criteria used to determine the beyond use date, a master work sheet containing amounts used for each ingredient, storage requirements, quality certificates of all ingredients used, any adjustments/deviations from the procedure performed, calibration reports, and documentation of performance of quality control procedures. Without access to these logs, it is not possible to verify that the pentobarbital injection for BOP was properly prepared and is safe to be used without causing unnecessary suffering to the prisoner.

III. **Concerns About Compliance With USP Standards Pertaining to the Sterile Compounding of the Pentobarbital Injection.**

14. It is my understanding that the Board of Prisons intends to execute prisoners by an intravenous injection of compounded pentobarbital sodium. For each execution the Board of Prisons plans to use compounded pentobarbital preparation prepared by an undisclosed compounding pharmacy.

15. According to USP Chapter <797>, the set of regulations which provides guidelines (enforceable by FDA and Boards of Pharmacy) for sterile compounding in 503a pharmacy environment, sterile medications that are prepared from initially non-sterile components, such as APIs, or using a methodology that causes the preparation potentially to lose sterility, are considered high-risk sterile compounds. The preparation then must be terminally sterilized if it is to be used for parenteral (i.e. non-oral) application.

   a. **The compounded pentobarbital injection will be expired by the time it is intended to be used.**

16. If the compounded drug intended for use in upcoming BOP executions has already been prepared, it is now considered to be expired, as it is far beyond the USP specified Beyond Use Date (BUD).

17. A Beyond Use Date is defined in USP Chapter <797> as "the date or time after which a compounded sterile product (CSP) shall not be stored or transported." The BUD is determined from the date and time the preparation was compounded. A compounded product's beyond-use date shall be determined as outlined in USP Chapter <797>, Pharmacy Compounding--Sterile Preparations of the USP/NF. The maximum Beyond Use Date for high-risk compounded sterile preparations such as compounded pentobarbital are:

   - 24 hours, if stored at room temperature;

   - 72 hours, if kept refrigerated, or

   - 45 days, if kept in a solid, frozen state.[2]

---

[2] Chapter 797, Pharmacy Compounding--Sterile Preparations of the USP/NF.

18. A drug that has surpassed its Beyond Use Date is at risk of stability and sterility failings and may not retain sufficient potency.

19. From the records provided for my review it appears that the contract independent laboratory has been studying stability of the injectable solution, most likely with intent to extend BUD of the compounded injectable preparation, as the laboratory reports indicate (see AR pages 992-1015). This is a 365 Day study that was initiated 4/4/2019, when the test batch of injectable pentobarbital was initially compounded and will be completed on 4/4/2020. There is also an accelerated arm of the study initiated using higher temperature and humidity, as specified in the protocol on page 996 of AR.

20. It is not clear from the protocol whether an "In Vial Sample Stability" study has been initiated to confirm that container closure and the storage container itself are appropriate for this long term storage, but that would be the prevailing industry standard in order to completely validate the intent of the study to verify that the compounded medication can be stored properly in a specified container over a prolonged period of time without the vial or container closure negatively impacting the quality and potency of the stored drug solution.

21. Additionally, it appears that one of the stability test points in the accelerated study has failed and is outside of the range as specified and acceptable per testing protocol (Page 1013 of AR). This indicates that the compounded injectable pentobarbital preparation may have shorter shelf life than predicted. It may also indicate that improper storage conditions (for example higher temperature than 25 degrees C and/or higher humidity than 60% RH) can severely negatively impact the quality of this preparation reducing its potency, and thus decreasing its effectiveness leading to the prisoner's unnecessary suffering due to lesser efficacy of the drug.

**b. Unknown Storage Conditions (Temperature and Humidity)**

22. Per the records provided to me, the BOP states that is has confirmed with the DEA that the BOP facility in Terre Haute, Indiana meets the regulatory requirements for storage and handling of pentobarbital sodium. These requirements, as set by DEA, relate to controlled substance storage conditions that describe security and tracking measures to be taken by the facility

Page 6

storing the controlled substances.  This is important in order to minimized drug diversion for unauthorized use.

23. However, the records provided for my review do not state anything about the actual physical conditions of the storage facility where API and the prepared drug vials are stored.  When it comes to storing medications in pharmacies and healthcare facilities, proper procedure typically requires pharmacists to maintain records of storage conditions for each compounded sterile product.  Storage conditions must be continuously monitored and recorded on a regular basis (for example daily) until the product is used. Poor physical storage conditions such as high humidity and temperature frequently cause degradation and contamination of drug products. Pentobarbital and other compounded sterile products need to be kept in proper storage conditions (as defined by the manufacturer, or USP) or they can become damaged, unusable, and unsafe as the temperature and humidity may vary greatly in unmonitored spaces throughout the year. The same is true for pentobarbital's active pharmaceutical ingredient powder, which is used to prepare the injectable product. Typically in the pharmacy, a temperature log is maintained to show compliance with storage temperature requirements. Temperature is checked daily or as required based on products stored to assure compliance.  Any excursions outside of the required temperature range are recorded and must be explained. An assessment is then performed on products that were exposed to suboptimal storage conditions to determine whether they should be used or discarded.

24. Due to the lack of records documenting current storage conditions of the API and compounded product provided for my review, the storage conditions for the compounded pentobarbital injections intended to be used for execution do not appear to have been monitored or recorded, as those records are not available and cannot be verified. It is also unknown how the drugs and active ingredients were transferred to the BOP, and whether such transfer took place with appropriate handling and under the appropriate temperature and humidity-controlled conditions.

25. Because the records provided for my review do not confirm that compounded pentobarbital will be stored at the appropriate temperature and humidity levels, there is a risk that the drugs

could lose potency and thus the drugs would not have the pharmacological effect as expected, potentially leading to the prisoner's prolonged suffering as a result. That danger is all the more pronounced in light of the test results that demonstrate inadequate stability and potency of the compounded drug at elevated temperature. (AR at 1013).

**IV. The compounding pharmacy is not complying with the Food, Drug, and Cosmetic Act, including section 127 of the Food and Drug Administration Modernization Act of 1997.**

26. Per the administrative record provided to me for review, the BOP has secured a compounding pharmacy that is properly registered according to the BOP statement. However, the pharmacy appears to be clearly violating section 127 of the Food and Drug Administration Modernization Act of 1997, as explained below. The pharmacy is not following the proper regulations as outlined by the FDA, and its good standing with state board of pharmacy in which this pharmacy is registered and permitted should be questioned. Furthermore, the pharmacy license should be provided for review to assure that it is in good standing in the state in which it is registered to assure that it has no violations and quality issues on its record.

27. Per the Food and Drug Administration Modernization Act of 1997, section 127, the compounding pharmacy is required to compound a drug for specific patient according to a prescription from a physician or an authorized licensed prescriber. It does not appear that a prescription was issued prior to compounding the pentobarbital injection. If so, it was not provided for my review.

28. Moreover, under section 127, per section iii (D) of the section 503A of the Food and Drug Administration Modernization Act of 1997, a pharmacy is not allowed to compound a product that is an essential copy of a commercially available product available in the United States. To further define the copy of the commercial product: "for purposes of paragraph (1)(D), the term 'essentially a copy of a commercially available drug product' does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product".

29. To my knowledge based on the information provided, the compounded pentobarbital is most likely a copy of a commercially available medication sold under the brand name Nembutal.

**V. Concerns about the Lack of Information about the Source of the Active Pharmaceutical Ingredient (API) that is to be Used in the Compounding of the Pentobarbital Sodium Injection.**

30. The manufacturer of the API will typically provide a Certificate of Analysis, but every lot of pentobarbital powder must still undergo independent quality testing prior to use since the source of API is not disclosed for review to assure that it meets all requirements for quality, as described in the USP monograph for pentobarbital sudium. The testing must be performed on every lot of API and reviewed prior to compounding of pentobarbital powder to the injectable form. This is requirement is specified by the Food and Drug Administration Modernization Act of 1997, section 127, section 503A.

31. I have reviewed the Certificate of Analysis that was provided to me by the Office of Federal Defenders. This analytical report was prepared and submitted on 12/06/18 (page 977 of AR) to BOP. The analysis was performed to test the quality of the API pentobarbital per USP monograph and the results reflect that the USP quality standards for pentobarbital sodium have not been met. The above-mentioned lot of pentobarbital that was tested on 11/06/18 failed one of the specifications. Additionally, a number of unidentified impurities were noted in the report. Unfortunately, due to limited information on the analytical certificate provided, it is difficult to determine which lot(s) was/were tested that failed to meet the USP monograph standards. It would also be helpful to review the original API Certificate of Analysis that was provided by the original manufacturer to determine why there is a discrepancy, but unfortunately it was not available for my review. The BOP Execution Protocol does not address any of these potential problems and how to properly resolve them.

32. The failing result of the analysis brings up further concerns: what happened to this lot? Was it still used for drug preparation, or was it destroyed? No further information was provided regarding the disposition of this lot. The number of impurities in this API is certainly concerning. API quality can often be compromised by the presence of chemical impurities arising from toxic solvents and unapproved reagents used in API synthesis. Moreover, some

APIs may exhibit undesired physical and chemical properties, such as uncharacterized polymorphic structures and impurities that can make the resulting drug have undesirable quality attributes that prevent adequate uptake of APIs and reduce the intended effect of the drug.

## VI.  Concerns about BOP Execution Protocol and Use of Compounded Pentobarbital Sodium Injection.

33.  While the BOP Execution Protocol Manual addresses many important issues, it completely fails to address any concerns in regard to the quality, origin, review and handling of the compounded drug that is to be used for execution.  The Manual lacks guidance on how is the quality of the API going to be monitored, when is it to be tested, who will test it, what happens if the reports show that the quality of API is outside of acceptable range, who reviews the pharmacy compounding records, who determines that the pharmacy selected to perform the compounding has the expertise to perform the compounding, who reviews the analytical records from the outside laboratory performing testing of the prepared drug, how to address any quality issues, storage conditions log, compounding pharmacy log, etc. By not addressing these issues many concerns arise about the quality of the preparation, and whether the drug will work or cause suffering to the prisoner.

34.  Poor pharmacy practices and a lack of transparency create the substantial risk that the drugs that the Board of Prisons intends to use in execution will not be of the appropriate quality and potency to cause death without significant suffering.

35.  The potency of a drug is contingent on a number of factors, including the quality of the active pharmaceutical ingredient, conditions, practices, and regulatory records of the compounding pharmacy, conditions of the testing laboratory, conditions and manner of storage and handling, and the time between compounding and use. No policies are in place to review, monitor and address these factors.

36.  Here, knowledge gaps and potential improper pharmacy practices create the risk that these drugs will not be sufficiently potent and effective. The quality and origin of the active ingredients used to compound these drugs are unknown.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 31st day of October 2019.

Michaela Almgren, PharmD, MS

# **Exhibit E**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| In the Matter of the | ) |
| Federal Bureau of Prisons' Execution | ) |
| Protocol Cases, | ) |
|  | ) |
| LEAD CASE: _Roane et al. v. Barr_ | )    Case No.  19-mc-0145 (TSC) |
|  | ) |
|  | ) |
| THIS DOCUMENT RELATES TO: | ) |
|  | ) |
| _Lee v. Barr_, 19-cv-2559 | ) |
|  | ) |
_____ )

### EXPERT DECLARATION OF CRAIG W. STEVENS, PH.D.

Pursuant to 28 U.S.C. § 1746, Craig W. Stevens, Ph.D. declares as follows

### I.      BACKGROUND AND EXPERT QUALIFICATIONS

1.      I am a Professor Pharmacology and a full-time faculty member in the department of Pharmacology and Physiology at the College of Osteopathic Medicine, a unit of Oklahoma State University, Center for Health Sciences campus in Tulsa, Oklahoma.  After receiving my Ph.D. in Pharmacology from the Mayo Clinic, in Rochester, Minnesota, I completed a 2-year postdoctoral fellowship at the University of Minnesota Medical School in Minneapolis, Minnesota, and secured a position as an Assistant Professor of Pharmacology with my present employer in 1990.  I advanced through the academic ranks to Associate Professor of Pharmacology in 1993, and Professor of Pharmacology in 2000.

2.      Besides my regular duties of teaching medical students, pursuing research and scholarly activities, and serving on college committees, I work part-time as a litigation consultant/expert witness on cases involving pharmacological issues.  I have consulted in both civil and criminal cases, working with both the prosecution or plaintiff and the defendant.  With regard to the pharmacological issues in lethal injection, I have worked as a consultant for the state as well as with attorneys representing condemned prisoners. I am compensated at the rate of $250 per hour

for research, document review, and reports, and $400 per hour for testimony at a deposition or trial. Appended to this declaration is a current curriculum vitae and a listing of cases in which I have testified in the past four years.

3.      I have been retained by counsel for Daniel Lewis Lee.  Counsel have asked me to provide the Court with an opinion of an alternative protocol for Federal lethal drug execution where an analgesic agent is given to the prisoner before the injection of pentobarbital.

4.      I have reviewed the following materials in preparing this declaration: Declaration of Dr. Gail Van Norman, Declaration of Dr. Mark Edgar, and Addendum to BOP Execution Protocol Federal Death Sentence Implementation Procedures, Effective July 25, 2019. Additionally, a thorough search of professional medical and pharmacological journals was done to obtain current and past peer-reviewed articles and reviews on the pertinent medical and pharmacological topics. Full reference information to articles used in this declaration are given in footnotes where cited. This information, along with over 30 years of experience as a Pharmacologist, formed the basis for the background information and the expert opinion given below.

## II.      THE NEED FOR AN OPIOID ANALGESIC DRUG

5.      The declaration and report of Drs. Van Norman and Edgar were provided to me by Counsel and convincingly demonstrate that the IV injection of high-dose pentobarbital produces pulmonary edema resulting in pain and suffering in the prisoner. To prevent the pain induced by a lethal 5 gram dose of pentobarbital, an analgesic drug should be given before the pentobarbital injection. This pain-killing or analgesic drug is not part of the lethal drug protocol *per se* but is a necessary intervention for a humane execution process. Unlike all other drugs used in lethal drug protocols that are given at high *supra*-clinical doses, the first or *pretreatment* drug is given at a clinical dose to exert a clinical effect of analgesia. This pretreatment drug is administered after the primary and backup IVs are set and last words, if any, are spoken by the prisoner.

6.        There are a number of classes of analgesic agents (e.g. aspirin-like analgesics, opioid analgesics) and a number of routes of administration (e.g. oral, subdermal, intramuscular, and intravenous). An ideal analgesic drug would be a drug that acts quickly (fast onset time) and that is easy to administer by the execution personnel (by IV administration). An opioid analgesic given by the IV route of administration is both fast-acting and easily administered through an IV bolus injection. Both morphine and fentanyl given by the IV injection are used for acute pain management.[1] Use of either morphine or fentanyl at clinical doses before the administration of pentobarbital would provide sufficient analgesia.

## III.        BACKGROUND ON OPIOID ANALGESIC DRUGS

7.        Opioid pain medications, called *opioid analgesics*, are among the most powerful drugs used in the clinic and prescribed to patients. Morphine is the gold standard of opioid analgesics, given for the treatment of moderate to severe pain.[2] Besides morphine, the class of other well-known opioid analgesics includes as codeine, oxycodone (OxyContin®), meperidine (Demerol®), and hydromorphone (Dilaudid®). Heroin (diamorphine) is also an opioid analgesic drug but is illegal in the USA; however, it is a legal opioid analgesic in the UK and other countries.

8.        There are also a number of combination opioid products with the most prescribed opioid analgesic, hydrocodone. A popular combination is hydrocodone and acetaminophen (Norco®, Lortab®, Vicodin®) and many others similar formulations with aspirin instead of acetaminophen.  Morphine, and all opioid analgesics, work by binding to opioid receptors on pain neurons (brain cells) and in this way inhibit the activity of the pain neurons. The inhibition of pain neurons produces the analgesia, or relief of pain, that characterizes the therapeutic action of morphine and other opioid analgesics.[3]

---

[1]  Farahmand S et al. (2014) Nebulized fentanyl vs intravenous morphine for ED patients with acute limb pain: a randomized clinical trial. Am J Emerg Med. 32:1011-1015.
[2]  Hoskin PJ, Hanks GW (1990) Morphine: pharmacokinetics and clinical practice. Br J Cancer 62:705-707.
[3]  Brenner GM, Stevens CW (2018) *Brenner and Stevens' Pharmacology, 5th Edition*, Elsevier, Philadelphia, PA

9.      While opioid analgesics are presently the best agents to treat pain and do so quite

effectively, they are also a dangerous class of drugs that are responsible for the epidemic of

opioid deaths due to fatal respiratory depression.[4] Opioid drugs, like the licit morphine and the

illicit heroin, work by inhibiting pain transmission in the CNS[5] and do so by binding to opioid

receptors on pain neurons. The targets of opioid drugs, the opioid receptors, are also found on

non-pain neurons unfortunately. The presence of opioid receptors on neurons that control the GI

tract lead to opioid-induced constipation, a common problem among chronic pain patients treated

with opioids. A more deadly problem is that opioids also bind to opioid receptors on brain

neurons that control breathing and high doses of opioids produce respiratory depression.[6]

## IV.    MORPHINE

10.     Morphine injection given by the IV route is used widely in hospitals and clinics for the

treatment of acute and chronic pain.[7] IV morphine is also used for the control of breakthrough

pain in chronically treated cancer patients.[8] Morphine and fentanyl are also given by IV injection

as a premedication used as part of the overall anesthetic plan.[9] Due to the euphoric effect

sometimes seen with opioids, use of morphine and fentanyl as premedications also reduce

patient's preoperative anxiety. Sedation also occurs during IV administration of morphine in

about 60% of post-operative patients being treated for pain.[10] Both morphine and fentanyl given

by the IV route also reduce airway irritation during induction with the general anesthetic

---

[4]  Bohnert AS et al. (2011) Association between opioid prescribing patterns and opioid overdose-related deaths. J. American Med Assoc 305:1315-1321.

[5]  CNS is the central nervous system; i.e. the brain and spinal cord.

[6]  White JM, Irvine RJ (1999) Mechanisms of fatal opioid overdose. Addiction 94:961-972; Dolinak D (2017) Opioid Toxicity. Acad Forensic Pathol. 7:19-35.

[7]  Ackerman AL et al. (2018) Association of an opioid standard of practice intervention with intravenous opioid exposure in hospitalized patients. JAMA Intern Med. 178:759-763.

[8]  Mercadante S et al. (2004) Safety and effectiveness of intravenous morphine for episodic (breakthrough) pain using a fixed ratio with the oral daily morphine dose. J Pain Symptom Manage. 27:352-359.

[9]  Pandit SK, Kothary SP (1989) Intravenous narcotics for premedication in outpatient anaesthesia. Acta Anaesthesiol Scand. 33:353-358.

[10]  Paqueron X et al. (2002) Is morphine-induced sedation synonymous with analgesia during intravenous morphine titration? Br J Anaesth. 89:697-701.

desflurane.[11] A randomized clinical trial using emergency department patients with acute limb pain found that significant analgesia occurred within 5 minutes following IV administration of 0.1 mg/kg morphine.[12] Another clinical study of acute pain management in trauma patients found that the onset of IV injected morphine's analgesic effect is approximately 6 minutes.[13] In an experimental pain model using healthy volunteers, a significant analgesic effect was noted an average of about 1 minute after IV bolus injection of 8 mg morphine.[14] To prevent the pain and suffering induced by a lethal dose of pentobarbital, morphine should be given in an IV bolus dose in the range of 2 mg to 10 mg/70 kg of body weight[15] at least 10 minutes before the injection of pentobarbital.

11.     Morphine is marketed by the brand name of Duramorph and many generic formulations. Morphine for injection is available in ampoules containing morphine sulfate at numerous concentrations ranging from 0.5 mg/mL to 25 mg/mL. All of these formulations of morphine for injection are commercially available (see Table below).

## V.     FENTANYL

12.     Fentanyl is a synthetic opioid analgesic that is about 100 times more potent than morphine.[16] Fentanyl is a highly lipophilic, or fat-loving, drug molecule that can rapidly cross from the bloodstream into the brain. According to a recent review, fentanyl exerts its pharmacological effects almost immediately after IV administration.[17] A clinical study of acute pain management in trauma patients found that the onset of IV injected fentanyl's analgesic

---

[11] Kong CF et al. (2000) Intravenous opioids reduce airway irritation during induction of anaesthesia with desflurane in adults. Br J Anaesth. 85:364-367.

[12] Farahmand S et al. (2014) Nebulized fentanyl vs intravenous morphine for ED patients with acute limb pain: a randomized clinical trial. Am J Emerg Med. 32:1011-1015.

[13] MacKenzie M et al. (2016) Opioid pharmacokinetics-pharmacodynamics: clinical implications in acute pain management in trauma. Ann Pharmacother. 50:209-218.

[14] Morrison LM et al. (1991) Comparison of speed of onset of analgesic effect of diamorphine and morphine. Br J Anaesth. 66:656-659.

[15] Morphine sulfate for injection, USP, FDA full prescribing information.

[16] Grond S et al. (2000) Clinical pharmacokinetics of transdermal opioids: focus on transdermal fentanyl. Clin Pharmacokinet. 38:59-89.

[17] Vardanyan RS, Hruby VJ (2014) Fentanyl-related compounds and derivatives: current status and future prospects for pharmaceutical applications. Future Med Chem. 6:385-412.

effect is approximately 2 minutes.[18] Clinical studies using experimental pain methods in healthy human volunteers demonstrate that fentanyl IV at a dose of 0.1 mg to 0.2 mg (100 to 200 mcg) produced a significant analgesic effect at the first post-injection test time of 5 minutes.[19] Another experimental study examining EEG changes after fentanyl IV infusion found that depression of brain activity occurred in 3-5 minutes.[20] Half of peak brain concentrations of fentanyl are reached within 35 seconds following IV injection of fentanyl (100 mcg) and peak brain concentrations at 6 minutes.[21] Another clinical study found that more than 80% of an IV fentanyl dose can distribute from the blood to the brain in less than 5 minutes.[22] To prevent the pain and suffering induced by a lethal dose of pentobarbital, fentanyl should be given in an IV bolus dose of 2 mcg/kg to 20 mcg/kg (0.002 mg/kg to 0.02 mg/kg)[23] at least 5 minutes before the injection of pentobarbital.

13.     Fentanyl is marketed by the brand name of Sublimaze® and many generic formulations. Fentanyl for injection is available in ampoules containing fentanyl citrate at a concentration of 50 mcg/mL (micrograms per milliliter) for IV or IM injection.[24] All of these formulations of fentanyl for injection are commercially available (see below).

## VI.     SUMMARY AND CONCLUSIONS

14.     Both morphine and fentanyl are commercially available and obtainable as these drugs would be used for medical purposes, like other medications ordered and used by the prison medical staff. The Table below (next page) lists the dose formulations and manufacturers of morphine and fentanyl for IV injections that are commercially available.

---

[18] MacKenzie M et al. (2016) Opioid pharmacokinetics-pharmacodynamics: clinical implications in acute pain management in trauma. Ann Pharmacother. 50:209-218.
[19] Zacny JP et al. (1996) Midazolam does not influence intravenous fentanyl-induced analgesia in healthy volunteers. Pharmacol Biochem Behav. 55:275-280.
[20] Scott JC et al. (1985) EEG quantitation of narcotic effect: the comparative pharmacodynamics of fentanyl and alfentanil. Anesthesiology 62:234-241.
[21] Metz C et al. (2000) Pharmacokinetics of human cerebral opioid extraction: a comparative study on sufentanil, fentanyl, and alfentanil in a patient after severe head injury. Anesthesiology 92:1559-1567.
[22] Hartmann FV et al. (2017) Femoral nerve block versus intravenous fentanyl in adult patients with hip fractures - a systematic review. Braz J Anesthesiol. 67:67-71.
[23] Fentanyl for injection, USP, FDA full prescribing information
[24] Fentanyl for injection, USP, FDA full prescribing information.

**Availability of Opioid Analgesic Drugs for IV Injection and Manufacturer Information[a]**

| Class/Drug | Brand name | Manufacturer | Dose Formulations |
|---|---|---|---|
| MORPHINE FOR IV INJECTION | | | |
| Morphine sulfate | Duramorph PF | WEST-WARD | 0.5 mg/mL, 1.0 mg/mL, 10 mg/mL, 25 mg/mL |
| Morphine sulfate | Mitigo | PIRAMAL | 10 mg/mL, 25 mg/mL |
| Morphine sulfate | *generic* | HOSPIRA | 0.5 mg/mL, 1.0 mg/mL, 2.0 mg/mL, 4.0 mg/mL, 8.0 mg/mL, 10 mg/mL, 25 mg/mL |
| Morphine sulfate | *generic* | EUROHEALTH | 4.0 mg/mL, 8.0 mg/mL, 10 mg/mL |
| Morphine sulfate | *generic* | FRESENIUS | 2.0 mg/mL, 4.0 mg/mL, 5.0 mg/mL, 8.0 mg/mL, 10 mg/mL |
| FENTANYL FOR IV INJECTION | | | |
| Fentanyl citrate | Sublimaze | AKORN | 0.05 mg/mL (50 mcg/mL) |
| Fentanyl citrate | *generic* | HOSPIRA | 0.05 mg/mL (50 mcg/mL) |
| Fentanyl citrate | *generic* | FRESENIUS KABI | 0.05 mg/mL (50 mcg/mL) |
| Fentanyl citrate | *generic* | WEST-WARD | 0.05 mg/mL (50 mcg/mL) |

[a] Data from the list of FDA-approved available drugs at *FDA Orange Book* online: *www.accessdata.fda.gov/scripts/cder/ob/index.cfm*.

15.     The use of an opioid as the first analgesic drug also has the important safeguard of an effective and common antidote should the execution procedure need to be stopped. This antidote is naloxone (Narcan) which is widely available for the treatment of opioid overdose and is a competitive antagonist (blocker) at the opioid receptor. Both morphine and fentanyl effects could be easily reversed with naloxone.

16.     In conclusion, the use of morphine or fentanyl as a premedication or the first drug in the lethal execution protocol would provide analgesia to prevent the pain and suffering from the lethal dose of pentobarbital.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury.

_____          _____
Craig W. Stevens, Ph.D.                              11/01/2019

Case 1:19-mc-00145-TSC Document 28-6 Filed 10/28/20 Page 8 of 23
Case 1:19-mc-00145-TSC Document 25 Filed 11/01/19 Page 8 of 25
MARCH, 2019

## CURRICULUM VITAE

**Craig W. Stevens, Ph.D.**

Professor of Pharmacology
Department of Pharmacology & Physiology
OSU-Center for Health Sciences, College of Osteopathic Medicine
1111 W. 17th Street
Tulsa, OK 74107-1898     Ph. 918.561.8234     email: cw.stevens@okstate.edu

### PROFESSIONAL APPOINTMENTS

| | |
|---|---|
| 2000-present | **Professor of Pharmacology**, OSU-College of Osteopathic Med.,CHS, Tulsa, OK |
| 2012-2018 | **Chair,** Coalition Against Prescription and Substance Abuse of Tulsa (CAPSAT) |
| 2007-2009 | **Chair,** Dept. of Pharmacology/Physiology, OSU-CHS, Tulsa, OK |
| 1993-2000 | **Associate Professor of Pharmacology**, Dept. of Pharmacology/Physiology, OSU-CHS, Tulsa, OK |
| 1990-1993 | **Assistant Professor of Pharmacology**, Dept. of Pharmacology/Physiology, OSU-CHS, Tulsa, OK |
| 1989-1990 | **Development Manager**, Minnesota Academy of Science, St. Paul, MN |
| 1984-1986 | **President** (*founding*), Mayo Graduate Students Association, Mayo Grad. Schl Med., Rochester MN |

### EDUCATION AND TRAINING

| | |
|---|---|
| 2005 | **Molecular Biology and PCR Course,** Smith College/New England Biolabs, Northampton, Massachusetts |
| 1988-1990 | **Postdoctoral Research Fellow**, Dept. of Cell Biology and Neuroanatomy, Univ. of Minnesota, Minneapolis, MN. Supervisor: *Dr. Virginia Seybold* |
| 1984-1988 | Mayo Graduate School of Medicine, Rochester, MN, **Ph.D. in Pharmacology**. Thesis: *Behavioral and Biochemical Characteristics of Opioid Tolerance in Rat Spinal Cord.* Supervisor: *Dr. Tony L. Yaksh* |
| 1981-1984 | University of Illinois, Chicago, IL; **M.S. in Biological Sciences**. Thesis: *Endogenous Opioid Systems in Amphibians.* Supervisor: *Dr. Paul D. Pezalla* |
| 1978-1981 | **American Peace Corps in Nepal**; Science/Math Instructor, *Katmandu, NEPAL* |
| 1974-1978 | Augustana College, Rock Is., IL; **B.A. in Biology, *cum laude*** |

### EXTRAMURAL FUNDING

| | |
|---|---|
| 2010-2014 | *"Novel Opioid Action at Toll-Like Receptors"*, Oklahoma Center for the Advancement of Science and Technology (**OCAST**) C.W. Stevens, (PI), $126,090 (direct costs) |
| 2007-2011 | *"Functional Evolution of Opioid Receptors"*, **NIH NIDA AREA Grant**, R15DA12448, C.W. Stevens (PI), $150,000 (direct costs) (no-cost extension for 2011) |
| 2004-2007 | *"Functional Evolution of Opioid Receptors"*, **NIH NIDA AREA Grant**, R15DA12448, C.W. Stevens (PI), $100,000 (direct costs) |
| 2002-2004 | *"Sequence and Pharmacology of Novel Opioid Receptors"*, Oklahoma Center for the Advancement of Science and Technology (**OCAST**) C.W. Stevens, (PI), $68,264 (direct costs) |
| 2001-2003 | *"Functional Evolution of Opioid Receptors"*, **NIH NIDA AREA** (Academic Research Enhancement Award) Grant, R15DA12448, C.W. Stevens (PI), $100,000 (direct costs) |
| 1999-2001 | *"Functional Evolution of Opioid Receptors"*, **NIH NIDA AREA** (Academic Research Enhancement Award) Grant, R15DA12448, C.W. Stevens (PI), $69,605 (direct costs) |
| 1998-1999 | *"Testing and Comparison of Analgesic Agents"*, American College of Laboratory Animal Medicine (**ACLAM**), C.W. Stevens (PI), $11,555 (direct costs) |
| 1995-1997 | *"Graduate Student Research"*, **Gardner Spring, Co.**, Tulsa, OK ($4,000) |
| 1994-1996 | **NRSA postdoctoral grant** for Dr. Stan Willenbring, C.W. Stevens (sponsor). |
| 1992-1998 | *"Studies of Opioid Analgesia in Amphibians"*, **NIH-NIDA First Award** (DA07326), C.W. Stevens, Principal Investigator (PI), $418,000. (direct costs) (no-cost extension for 1998) |
| 1992-1995 | *"Spinal Sites of Endogenous Opioid Action in Amphibians"*, Research Grant, **Whitehall Foundation**, C.W. Stevens, PI, $70, 785. |
| 1991-1992 | *"Nociceptive Processing in the Amphibian Spinal Cord"*, Grants-In-Aid, **Whitehall Foundation**, C. W. Stevens, PI, $10,375. |
| 1988-1990 | **NIDA Neuroscience Training Grant**, Postdoctoral position, Dept. of Cell Biology and Neuroanatomy, University of Minnesota Medical School, Minneapolis, MN |
| 1987-1988 | *"Issues related to tolerance development and tissue toxicology of chronically administered 4-anilinopiperidines"*, T.L. Yaksh (PI) and C.W. Stevens (Co-I). **Janssen Pharm.**, $46,000. |
| 1985-1986 | *"Effects of capsaicinoid agents on peptide levels and behavioral function"*, T.L. Yaksh (PI) and C.W. Stevens (Co-I). **Procter and Gamble Co.**, $25,000. |
| 1985-1986 | *"Effects of drugs on the shock titration threshold in the primate"*, T.L. Yaksh (PI) and C.W. Stevens (Co-I). $10,000, **Sterling Winthrop Pharmaceuticals**. |

## TEACHING EXPERIENCE

| | |
|---|---|
| 1990-2014 | Lecturer, *Medical Pharmacology I-II*, (Course-Coordinator 1997-2007) OSU-CHS, COM, Tulsa, OK |
| 2009-2013 | Instructor, *Receptors II* (graduate course, alternate years) OSU-CHS, COM, Tulsa, OK |
| 1997-2009 | Instructor, *Neuropharmacology* (graduate course, alternate years) OSU-CHS, COM, Tulsa, OK |
| 1991-2009 | Facilitator, *Medical Information Systems Course*, OSU-CHS, COM, Tulsa, OK |
| 2000-2004 | Visiting Professor, Neuroscience Lab Course, U of MN Medical School, Minneapolis, MN |
| 1998-2001 | Adjunct Professor of Pharmacology, University of Tulsa Nursing School, Tulsa, OK |
| 1989-1990 | Lecturer, *Pharmacology for Nurse Anesthetists*, University of Minnesota, Minneapolis, MN |
| 1989-1990 | Lecturer, *Neuropharmacology Course*, Dept. of Neurology, Univ. of MN, Minneapolis, MN |
| 1984-1987 | Community Education, *Juggling Instructor*, Rochester, MN |
| 1984-1987 | IBM-PC Instructor, *Microcomputer Education Cntr.*, Mayo Clinic, Rochester, MN |
| 1981-1983 | Teaching Assistant; *Dept. of Biological Sciences*, University of IL at Chicago, IL |

## ACADEMIC COMMITTEES

| | |
|---|---|
| 2011 | *Member,* Honorary Degree Committee, OSU-Stillwater |
| 2010-2012 | *Secretary,* Group 6 of the Graduate College, OSU-Stillwater |
| 2004 | *Member,* Research and Creative Activities Task Force, OSU-System, appt. by OSU President Schmidly |
| 2003 | *Member,* Search Committee for VP Health Affairs OSU/Dean OSU-COM |
| 2002-2003 | *President,* Faculty Senate |
| 2002-2003 | *Member,* Board of Directors for Academic Health Center, joint affiliation of TRMC and OSU-CHS |
| 2001-2002 | *Vice-President* Faculty Senate |
| 1994-2001 | *Founding Member & Chair (2000-2001)*, Biomedical Sciences Graduate Committee |
| 1996-2001 | *Chair,* Hazardous Materials and Equipment |
| 1994-98, 2000-16 | *Member, Chair (2001-2004; 2006-2007;2010-2013)* OSU-CHS Promotion and Tenure Committee |
| 1996-1998, 2009 | *Senator,* Faculty Senate |
| 1991-2000, 2006 | *Member, (Chair, 2006)* Research Committee |
| 1991-92, 2002-04 | *Member, (Chair, 2002-2004)* Academic Appeals Board |
| 1991-1992 | *Member,* Learning Resources Committee |
| 1990-1999 | *Chair (1990-1993)*, *Member (1994-1999)*, Animal Use Committee (IACUC) |

## PROFESSIONAL SOCIETY MEMBERSHIPS

International Narcotics Research Conference (INRC, member of Executive Committee)
American Society for Pharmacology and Experimental Therapeutics (ASPET)
Society for Neuroscience (SFN), American Association for the Advancement of Science (AAAS)
Committee on Problems of Drug Dependence (CPDD)

## HONORS AND AWARDS

| | |
|---|---|
| 2006 | Regents Research Award, Inaugural awardee for OSU-Center for Health Sciences |
| 1992 | Young Investigator Travel Award, American Pain Society, San Diego, CA |
| 1992 | NIDA Travel Award, International Narcotics Res. Comm. (INRC), Keystone, CO |
| 1991 | Young Investigator Travel Award, American Pain Society, New Orleans, LA |
| 1991 | Young Scientist Travel Award, ASPET Annual Meeting, San Diego, CA |
| 1990 | Fulbright Scholarship for Research & Teaching in India *(declined to accept faculty position)* |
| 1990 | CPDD Travel Award, CPDD Annual Meeting, Keystone, CO |
| 1989 | NIDA Travel Award, CPDD Annual Meeting, Keystone, CO |
| 1987 | Upjohn Travel Award, ASPET Annual Meeting, Honolulu, HA |
| 1987 | NIDA Training Grant, Gordon Research Conference, *"Mode of Action of Opiates"*, CA |
| 1983 | UIC Research Assistantship, University of Illinois, Chicago, IL |
| 1983 | NIH Training Grant,*"Neural Systems & Behavior"*, MBL Summer course, Woods Hole, MA |
| 1982 | UIC Research Board Travel Grant, *"Strategies for studying the role of peptides in neuronal function"*, Society for Neuroscience Short Course, Minneapolis, MN |

## GRADUATE TRAINING ACTIVITIES

| | |
|---|---|
| 1997-2000 | Chair/Major Advisor to Leslie C. Newman (Ph.D. student, completed 8/2000 with university-wide honors). |
| 1998-2005 | Member, Advisory Committee for John Paulson (Ph.D. student, completed 8/2005) |
| 2001-2005 | Chair, Advisory Committee for Eva Garringer (Ph.D. student, completed 5/2005) |
| 2002-2004 | Member, Advisory Committee for Randy Benton (M.S. student; completed 5/2004) |
| 2002-2004 | Member, Advisory Committee for Raju N. Kacham (M.S. student at OSU-CVHS, Stillwater; completed 5/2004) |
| 2001-2007 | Chair/Major Advisor to Kristin K. Martin (M.S. student; completed 5/2007) |

GRADUATE TRAINING ACTIVITIES (CONT.)

2003-2008    Chair/Major Advisor to Christopher M. Brasel (Ph.D. student, completed 5/2008)
2004-2008    Chair/Major Advisor to Shekher Mohan (Ph.D. student, completed 12/2008)
2005-2008    Chair/Major Advisor to Julie Duffey (M.S. student, completed M.S. degree 5/2008)
2007-2009    Member, Advisory Committee for Danielle Armstrong (M.S. student, completed M.S. 7/2009)
2006-2011    Member, Advisory Committee for Neda Saffarian-Toussi (Ph.D. student, Ph.D. awarded May, 2011)
2007-2011    Member, Advisory Committee for Arunkumar Thangaraju (Ph.D. student, Ph.D. awarded Dec., 2011)
2008-2011    Chair/Major Advisor to Shruthi Aravind (M.S. student, M.S. awarded May 2011)
2010-2013    Chair/Major Advisor to Larry Johnston (D.O./M.S. student)
2009-2013    Chair/Major Advisor to John Knox (D.O./M.S. student)
2011-2015    Chair/Major Advisor to Summer Dodson (Ph.D. degree awarded Summer, 2015)
2011-       Member, Advisory Committee for Leandra Figueroa (Ph.D. student)

GRANT STUDY SECTIONS

Reviewer for NIH grants, Special Emphasis Pain Study Sections (1998-present)
Grant consultant for the AAAS, Univ of Michigan, Centers of Research Excellence project (2003)
Grant Reviewer for National Science Foundation (1996-2002)
Grant Reviewer for the Veterans Administration (1995- present)
Chair (1999), Member (1997) Biological Sciences Panel, Texas State Granting Program-Advanced Research Proposals
Grant Reviewer (2008) for Neuroscience and Mental Health Grants, The Wellcome Trust

EDITORIAL & ADVISORY BOARDS/PEER-REVIEWER FOR THE FOLLOWING SCIENTIFIC JOURNALS

Peer-Reviewer for: *J. Pharmacol. Exp. Ther., Brain Research, Life Sciences, Neuroscience Letters, Eur. J. Pharmacology, J. Neuroscience, Pain, American Journal of Physiology, Journal of Pain, Laboratory Animals*
Editorial Advisory Board, *Pharmacology Online* (Italy), Editor: Anna Capasso.
Editorial Advisory Board, *Computational Biology and Chemistry: Advances and Applications*, Editor: Bruno Villoutreix
Advisory Board Member, Tobacco-Free Zone, Tulsa, OK
Consultant, Reuters News Service, Insight Service

COMPUTER CONSULTING

SigmaPlot for Windows, $\beta$-tester, Jandel Scientific, CA, 1992-1999.
Reference Manager for Windows, $\beta$-tester, Research Information Systems, Inc., CA, 1993-1999.
Institute for Scientific Information (ISI), focus group meeting, San Francisco, CA, April, 1998.
Knowledge Acquisition Consultant for Ingenuity.com (2001).
$\beta$-tester for JPET Online Review and Submission website (2001).

COMMUNITY SCIENCE INITIATIVES

Science Fair Judge at School (Carver and Elliot) and Regional (Tulsa County) Level, 1990-2010.
Institutional Representative for the Tulsa Biological and Clinical Research Alliance (TBCRA), 1998-2001
Science Enrichment for University of Tulsa- Gifted School, 1998-present, also at Trinity Episcopalian Day School.
Faculty Participant in High School Ambassador Program at OSU-CHS, 1994-2000
Workshop participant in "Speaking out for Science", sponsored by AAAS, March 28, 2009.
Member, Oklahomans for Excellence in Science Education.

VISITING SCIENTIST/RESEARCH CONSULTANT/OUTSIDE COLLABORATION

1994 Laboratory of Tony L. Yaksh, Ph.D., Vice Chair for Research, Dept. of Anesthesiology, UCSD, La Jolla, CA. Project entailed characterization of met-enkephalin extended sequences in *Rana pipiens* and presentation to research group.
1996 Laboratory of George Wilcox, Ph.D., Professor of Pharmacology, University of Minnesota Medical School, Minneapolis, MN. Training of intrathecal catheterization to research group and general lab QC.
1999 Laboratory of Howard Gutstein, M.D./Ph.D., Director of Research, Dept. of Anesthesiology, MD Anderson Cancer Center, Houston, TX. Training of intrathecal catheterization and analgesic modeling techniques to research group.
2000 Research consultant for Ligand Pharmaceuticals, San Diego, CA.
2000 Laboratory of Dr. Sandra Roerig, Professor of Pharmacology/Associate Dean for Research, LSU Medical Center, Shreveport, LA. Training of intrathecal catheterization and analgesic modeling techniques to research group.
2000 Laboratory of Dr. James Zadina, Professor of Pharmacology/ Director of Neurosciences Program, Tulane University School of Medicine, New Orleans, LA. Training of intrathecal catheterization to research group.
2001 Visiting Professor, Neuroscience Lab Course, Dr. George Wilcox, co-director, University of Minnesota Neuroscience Program. Amphibian model for testing analgesics used in a live laboratory course (also subsequent years).
2001 Laboratory of Ken McCarson, Ph.D., Associate Professor of Pharmacology, University of Kansas Medical Center, Kansas City, KS. Training and collaboration on vanilloid-like receptor function in *Rana pipiens*.
2002 Laboratory of Paul Prather, Ph.D., Associate Professor of Pharmacology. University of Arkansas for Medical Sciences, Little Rock, AR. Collaboration on transfection of frog opioid receptors in cell lines.
2002 Visiting Professor, Dept. of Neuroscience, University of Minnesota Medical School, March 12-14, 2002.
2003 Visiting Professor, Dept. of Neuroscience, University of Minnesota Medical School, April 8 to 10, 2003.
2003 Visiting Professor, Dept. of Medicinal Chemistry, University of Mississippi, Oxford. MI, May 7-9, 2003.
2004 Visiting Professor, Dept. of Neuroscience, University of Minnesota Medical School, April 12-15, 2004.
2005 Visiting Professor, Dept. of Neuroscience, University of Minnesota Medical School, April 11-13, 2005.

3

**INVITED TALKS/SEMINARS/KEYNOTE PRESENTATIONS**

1. *"Opioid antinociception in amphibians"*, Satellite Symposium: Behavioral Biology of Nociception: Comparative, Developmental, and Sexual Aspect, Society for Neuroscience, New Orleans, LA, November, 1987.

2. *"An amphibian model for the assessment of opioid action"*, Annual Meeting of the College on Problems in Drug Dependence (CPDD), Richmond, VA, June, 1989.

3. *"Alternatives to the use of mammals for pain research"*, OSU College of Veterinary Sciences, Annual Research Symposium, Stillwater OK, May 1991.

4. *"An amphibian model for pain research"*, Northeastern State University, Science and Technology Seminar Series, Tahlequah OK, October, 1991.

5. *"An amphibian model for pain research"*, Children's Medical Center, Chapman Research Institute Seminar Series, Tulsa OK, November, 1991.

6. *"An amphibian model for pain research"*, Oklahoma State University, Dept. of Zoology Seminar Series, Stillwater OK, January, 1992.

7. *"Alternatives to the use of mammals for opioid research"*, OSU College of Veterinary Sciences, Annual Research Symposium, Stillwater OK, May 1992.

8. *"An amphibian pain model for opioid research"*, University of Tulsa Biology Department Colloquium, Tulsa, OK, September 1992.

9. *"An amphibian pain model for opioid research"*, University of Oklahoma Health Sciences Center, Dept. of Anatomy, Oklahoma City, OK, October, 1992.

10. *"Studies of opioid tolerance in an amphibian pain model"*, 1st Annual Young Investigators Symposium, College on Problems in Drug Dependence (CPDD), Toronto, June, 1993.

11. *"Relative analgesic potency of mu and kappa opioids in amphibians: a unique assay for kappa opioid action?"*, College on Problems of Drug Dependence (CPDD), Palm Beach, FL, 1994.

12. *"An amphibian pain model for opioid research"*, UCSD, Anesthesiology Research Lab Group, April, 1994.

13. *"An amphibian model for pain research"*, Pharmacology Dept., LSU Med Center, New Orleans, 9/27/94.

14. *"Alternatives to the use of mammals for pain research"*, NIH/OPPR/LSU sponsored workshop, New Orleans, September 29-30, 1994.

15. *"Alternatives to the use of mammals for pain research: an amphibian model"*, SCAW/CCAC Conference, Toronto, Canada, September 28, 1995.

16. *"An amphibian model for studies of opioid action"*, University of Minnesota Medical School, Dept. of Pharmacology Seminar Series, Minneapolis, MN, January 19, 1996.

17. *"An alternative model for testing of opioid analgesics and pain research using amphibians"*, 2nd World Congress on Alternatives and Animal Use in the Life Sciences, Utrecht, Netherlands, October 21, 1996.

18. *"From Pond to Pain: An Amphibian Model for Opioid Analgesia"*, Anatomy/Physiology Seminar Series, University of Oklahoma Health Sciences Center, Oklahoma City OK, May 20, 1997.

19. *"From Pond to Pain: An Amphibian Model for Opioid Analgesia"*, invited Symposium speaker, Annual Meeting of the Midwest Pain Interest Group (PIG), Medical College of Wisconsin, Milwaukee, WI, June 6, 1997.

20. *"Studies of selective mu opioid antagonism after spinal administration of beta-FNA in amphibians"*, invited Symposium speaker, College on Drug Dependence (CPDD) Annual Meeting, Nashville, TN, June 16, 1997.

21. *"The unireceptor hypothesis of opioid antinociception in amphibians: implications for the evolution of opioid receptors"*, invited Symposium speaker, International Narcotics Research Conference (INRC), Munich, Germany, July 20-25, 1998.

22. *"An Amphibian Whole-Animal Alternative for the Study of Pain"*, invited participant for symposium, All Creatures Weird and Wonderful: Revolutionary Approaches to Medical Discovery, AAAS Meeting, Anaheim, CA, Jan, 23, 1999.

23. *"Perspectives on Opioid Tolerance from Basic Research"*, MD Anderson- University of Texas Medical Center, Dept. of Anesthesiology and Critical Care, Houston, TX, November 18, 1999.

24. *"An Alternative Model for Pain and Analgesia Research Using Amphibians"*, invited Symposium speaker, Scientists Center for Animal Welfare (SCAW), Spring Meeting, Baltimore, MD, May 19, 2000.

25. *"From Pond to Pain: Investigating Mechanisms of Opioid Analgesia Using Amphibians"*, OSU, Zoology, Stillwater, OK, 9/22/00.

26. *"Investigating Mechanisms of Opioid Analgesia in Amphibians"*, LSU-Medical Center, Dept. of Pharmacology, Shreveport, LA, December 5, 2000.

27. *"An Amphibian Model for the Study of Opioid Analgesics"*, University of Kansas Medical Center, Dept. of Pharmacology, Toxicology and Therapeutics, Kansas City, KS, September 11, 2001 (re-scheduled and presented on December 11, 2001).

28. *"An Amphibian Model for Analgesia Testing"*, Univ. of Oklahoma Dental School, Student Research Society Annual Banquet, Myriad Convention Center, Oklahoma City, OK, April 12, 2002.

29. *"Mechanisms of Opioid Analgesia in Amphibians"*, Dept. of Neuroscience, Univ. of MN, Minneapolis, MN, April 16, 2002.

30. *"An Amphibian Model for Investigation of Opioid Analgesia and Pain-processing"*, at the Cross-Species Approach to Pain and Analgesia conference, sponsor: Mayday Fund, Airlie Conference Center, Warenton, VA, Sept. 19, 2002.

31. *"An Amphibian Model for Opioid Research"*, Dept. of Pharmacology and Toxicology, University of Arkansas for Medical Sciences, Little Rock, AR, October 16, 2002.

32. *"Opioid research using amphibians and the evolution of opioid receptors"*, Dept. of Medicinal Chemistry, University of Mississippi, Oxford. MI, May 8, 2003.

33. *"Opioid research using amphibians and the evolution of opioid receptors"*, invited Symposium speaker, British Society for Experimental Biology, Edinburgh, Scotland, April 2, 2004.

34. *"Opioid research using amphibians and the evolution of opioid receptors"*, invited Symposium speaker, European Opioid Conference, Budapest, Hungary, April 8, 2004.

35. *"Opioid research using amphibians: a unique perspective on the evolution of vertebrate opioid receptors"*, Seminar for the Center for Pain Research, University of Minnesota, Minneapolis, MN, April 15, 2004.
36. "*An Evolutionary Approach to Understanding Vertebrate Opioid Receptors*", Veterinary Biomedical Sciences Seminar Series, OSU-College of Veterinary Medicine, Stillwater, OK, January 27, 2005.
37. *"Opioid research using amphibians: An Evolutionary Approach to Understanding Vertebrate Opioid Receptors"*, Seminar for the Department of Neuroscience, University of Minnesota Medical School, Minneapolis, MN, April 12, 2005.
38. *"Opioid analgesia research in amphibians: from behavioral assay to cloning opioid receptor genes"*, Keynote speaker, Annual meeting of the Association of Reptile and Amphibian Veterinarians, Baltimore, MD, April 23-26, 2006.
39. *"Insights on the Molecular Evolution of Vertebrate Opioid Receptors: From Frog to Man"*, Physiology Seminar Series, University of Oklahoma Health Sciences Center, Oklahoma City, OK, January 25, 2007.
40. *"Evolution of opioid receptors: why the mu opioid receptor would make Darwin proud"* INRC Annual Meeting, Charleston, SC, USA, July 15, 2008.
41. *"Evolution of Opioid Receptors: Why the Mu Opioid Receptor Would Make Darwin Proud"*, Veterinary Biomedical Sciences Seminar Series, OSU-Center for Veterinary Medical Sciences, OSU-Stillwater, Stillwater, OK, March 5, 2009.
42. *"Evolution of Opioid Receptors"*, AAAS-SWARM Meeting, Tulsa, OK, March 30, 2009.
43. *"Molecular Evolution of Vertebrate Opioid Receptors"*, Invited speaker, Genetics Group, St. Francis Hospital, March 15, 2012.
44. *"Molecular Evolution of Opioid Receptors"*, Seminar Speaker, Human Anatomy and Physiology Society (HAPS) Annual Meeting, University of Tulsa, May 28, 2012.
45. *"Ethical Issues of an Amphibian Pain Model"*, La souffrance animale: de la science au droit (Animal suffering: the science and the law) World Organization for Animal Health (OIE) Paris, France, October 18-19, 2012.
46. *"Pharmacological Exculpation or Mitigation: Effects of Drugs on Brain and Behavior"* Oklahoma Criminal Defense Institute, Hard Rock Casino, Tulsa, OK, June 23, 2016.

## SCIENTIFIC PRESS

1. Stevens, C.W., *"No Pain, Some Gain: A New Model for Neuropathic Pain"*, Journal of NIH Research, May, 1990, p.33-35.
2. Stevens, C.W., *"Funding for Young Investigators"*, Letters to the Editor, Science, Vol. 255, p. 142, 1992.
3. Stevens, C.W., Response to *"Letters from the Editor"*, Lab Animal, Vol. 25, p. 42, 1996.
4. Stevens, C.W.; Response to *Protocol Review Column*, Lab Animal, Vol. 26, p 23-24, October, 1997.
5. Stevens, C.W., *"Evolution and Faith: Empathy Is Misplaced"*, Letters to the Editor, Science, Vol. 320, p. 745, 9 May 2008.

## MEDIA ARTICLES/INTERVIEWS/PRESS CONFERENCES

1. *"Northern grass frog helps Tulsan gig research grants"*, Tulsa World Newspaper, August 21, 1992.
2. *"Research Grants"*, op-ed page, Tulsa World Newspaper, September 7, 1992 (*Animal rights response*).
3. *"Get Priorities Straight"*, op-ed page, Tulsa World Newspaper, September 20, 1992. (*support of research*)
4. *"Animal Research Needed"*, op-ed page, Tulsa World Newspaper, September 20, 1992. (*support*)
5. *"Who Suffers? Children or the Frogs?"*, op-ed page, Tulsa World Newspaper, September 27, 1992. (*support*)
6. *"The Frogman"*, Tulsa People Magazine, March, 1994. (*profile*)
7. *"Success by Six"* Interview on brain activity in children, KGRH, Tulsa 6pm Evening News, August 10, 1996
8. *"State's Share of Funds Short, Researchers Say"*, interviewed & (mis)quoted, The Daily Oklahoman, January 11, 1999.
9. *"State's Research Fund Malnourished"*, interviewed & (mis)quoted, Tulsa World, Jan. 15, 1999, p A10
10. *"All Creatures Weird and Wonderful: Revolutionary Approaches to Medical Discovery"*, Press Conference, American Association for the Advancement of Sciences (AAAS) Anaheim, CA, Jan 23, 1999.
11. *"Research Report"*, radio interview for Radio Netherlands, Jan 23, 1999.
12. *"Animals Hold Key to Cures: Medical Science Plumbs Secrets of Scorpions, Fish, Frogs"* SF Examiner, Jan. 25, 1999.
13. *"What will ease the pain? Ask a frog"*, Science News, Vol. 155, p. 91, February 6, 1999.
14. *"Painful Choices"*, New Scientist Online Conference Reports, Feb. 6, 1999.
15. *"Notebook: Frog Simplicity"*, The Scientist, Vol. 13 (4), p. 32, February 15, 1999.
16. *"Suffer the little amphibians"*, The London Times- Higher Education Supplement, Issue 1379, pp. 22-23, April 9, 1999.
17. *"Heat, Some Medicines Don't Mix"*, Tulsa World Newspaper, p A-9, August 4, 1999.
18. *"OSU grant allows pain medicine study"*, The Daily Oklahoman, p. 3-B, August 27, 2001
19. *"Research frogs may lead to medical leaps and bounds"*, The Tulsa World, Sept. 5, 2001.
20. *"OSU researchers to study pain relief"*, The Tulsa World, p. D-7, Aug. 22, 2002.
21. *"Of Frogs and Pain – Weird Lab Recognized"*, Tulsa Business Journal, Vol 12 (#36), p. 10, Sept 6-12, 2002.
22. *"Oklahoma Innovations Radio Show"*, invited guest to talk about OSU-CHS and OCAST-funded research, 3/4/03.
23. *"Oklahoma Scientists and the Human Genome"*, article about Dr. Stevens' lab, Oklahoma Magazine, Oct. , 2003.
24. *"OSU Professor Receives Grant"*, The Daily O'Collegian, OSU Newspaper, September 8, 2004.
25. *"The Other O.C. (Oxycontin)"*, The Tulsa World Newspaper, Feb, 17, 2005, D-1 (cont. D-6). CWS is the *"voice of reason"*.
26. *"Do Boiling Lobsters Feel Pain?"* interviewed for ABC news special series on pain, May 10, 2005. http://abcnews.go.com
27. *"Tough times add to panic, anxiety disorders"*, Tulsa World Newspaper interview, D-3, April 2, 2009.
28. *"Take pains to excercise"*, Tulsa World Newspaper interview, D-3, July 18, 2009.

Case 1:19-mc-00145-TSC Document 306 Filed 10/29/20 Page 14 of 23

MEDIA ARTICLES/INTERVIEWS/PRESS CONFERENCES (CONT.)

29. *"OSU medical students say juggling is great for the brain"*, Dr. Stevens' Med School juggling club and video interview by Rick Wells from Newson6.com, August 25, 2010 (video at: http://www.youtube.com/watch?v=BCFqa0D8BY8)

30. *"OSU Jugglers: Fox 23 Daybreak Show"*, Kristin Talent interview and juggling by Dr. Stevens, Feb. 11, 2011 (video at: http://clipsyndicate.com/video/playlist/0/2208385?wpid=9601)

31. *"Juggle Heads: Keeping both sides of brain active is key to a healthy mind"*, Tulsa World article by Kim Brown featuring interview and photos of Dr. Stevens and the Med School Chapter of the T-Town Juggling Club. Jan. 27, 2011.

32. *"Innovations Radio Show"*, interview with Dr. Stevens about his research on opioids. Oklahoma City, OK. April 6, 2011.

33. *"Letters to the Editor: Research Supported"*, The Tulsa World Newspaper, Aug. 28, 2011.

34. *"Turning to Frogs for Illegal Aid in Horse Races"*, The New York Times Newspaper – Front Page, June 20, 2012.

35. *"Secrets still shroud Clayton Lockett's execution"*, The Tulsa World Newspaper, May 11, 2014.

36. *"Questions, inconsistencies about Clayton Lockett execution remain unanswered"*, The Tulsa World, August 31, 2014.

37. *"Federal nursing home comparison website receives updates"*, The Tulsa World Newspaper, February 21, 2015.

38. *"Scientists in Tulsa conducting ground-breaking research to eliminate addiction"*, KOCO News at 6, Feb. 6, 2016.

PEER-REVIEWED PRIMARY PUBLICATIONS

1. Stevens, C.W. and Pezalla, P.D., A spinal site mediates opiate analgesia in frogs. Life Sci. 33: 2097-2013, 1983.

2. Stevens, C.W. and Pezalla, P.D., Naloxone blocks the analgesic action of levorphanol but not dextrorphan in the leopard frog. Brain Research 301: 171-174, 1984.

3. Pezalla, P.D., and Stevens, C.W., Behavioral effects of morphine, levorphanol, dextrorphan, and naloxone in *Rana pipiens*. Pharm. Biochem. Behavior 21: 213-217, 1984.

4. Yaksh, T.L., and Stevens, C.W., Simple catheter preparation permitting bolus intrathecal administration during chronic intrathecal infusion. Pharmacology, Biochemistry and Behavior, 25: 483-485, 1986.

5. Stevens, C.W. and Yaksh, T.L., Spinal action of dermorphin an extremely potent opioid peptide from frog skin, Brain Research, 385: 300-304, 1986.

6. Stevens, C.W. and Yaksh, T.L., Dynorphin A and related peptides administered intrathecally in the rat: A search for putative *kappa* opiate receptor activity. J. Pharmacol. Exp. Ther., 238: 833-838, 1986.

7. Stevens, C.W. Pezalla, P.D., and Yaksh, T.L., Spinal antinociceptive action of three representative opioids in frogs. Brain Research, 402: 201-203, 1987.

8. Stevens, C.W., Weinger, M.B. and Yaksh, T.L., Intrathecal dynorphins suppress hindlimb electromyographic activity in rats. Eur. J. Pharmacol., 138: 299-302, 1987.

9. Stevens, C.W. and Yaksh, T.L., Chronic antagonist infusion does not increase morphine antinociception in rat spinal cord. Brain Research, 425: 388-390, 1987.

10. Stevens, C.W., Monasky M.S. and Yaksh, T.L., Spinal infusion of opiate and alpha-2 agonists in rats: Tolerance and cross-tolerance studies, J. Pharmacol. Exp. Ther. 244: 63-70, 1988.

11. Schick, R.R., Stevens, C.W., Yaksh, T.L. and Go, V.L.W., Chronic intraventricular administration of CCK octapeptide suppresses feeding in rats. Brain Research, 448:294-298, 1988.

12. Stevens, C.W., and Yaksh, T.L., Potency of infused spinal antinociceptive agents is inversely related to magnitude of tolerance after continuous infusion. J. Pharmacol. Exp. Ther. 250: 1-8, 1989.

13. Sosnowski, M., Stevens, C.W., and Yaksh, T.L., Assessment of the role of A1/A2 adenosine receptors mediating the purine antinociceptive, motor, and autonomic function in rat spinal cord. J. Pharmacol. Exp. Ther. 250: 915-922, 1989.

14. Stevens, C.W., and Yaksh, T.L., Time course characteristics of tolerance development to continuously infused antinociceptive agents in rat spinal cord. J. Pharmacol. Exp. Ther. 251: 216-233, 1989.

15. Stevens, C.W., and Yaksh, T.L., Magnitude of opioid dependence after continuous intrathecal infusion of *mu* and *delta* opioids in the rat. Eur. J. Pharmacol. 166: 467-472, 1989.

16. Morón, M.A., Stevens, C.W., and Yaksh, T.L., Diltiazem enhances and flunarizine inhibits nimodipine's antiseizure effects. Eur. J. Pharmacol. 163: 299-307, 1989.

17. Stevens, C.W. and Pezalla, P.D., Endogenous opioid system down-regulation during hibernation in amphibians. Brain Research, 494: 227-231, 1989.

18. Yanez, A., Sabbe, M.B., Stevens, C.W., and Yaksh, T.L., Interaction of midazolam and morphine in the rat spinal cord. Neuropharmacology 29: 359-364, 1990.

19. Morón, M.A., Stevens, C.W., and Yaksh, T.L., The antiseizure activity of dihydropyridine calcium channel antagonists in the conscious rat. J. Pharmacol. Exp. Ther. 252: 1150-1155, 1990.

20. Monasky, M., Zinsmeister, A., Stevens, C.W., and Yaksh, T.L., The interaction of intrathecal morphine and ST-91 on antinociception in the rat. J. Pharmacol. Exp. Ther. 254: 383-392, 1990.

21. Stevens, C.W., Lacey, C.B., Miller, K.E., Elde, R.P., and Seybold, V.S., Biochemical characterization and regional quantification of *mu*, *delta*, and *kappa* opioid binding sites in rat spinal cord. Brain Research 550: 77-85, 1991.

22. Stevens, C.W., Kajander, K.C., Bennett, G.J., and Seybold, V.S., Bilateral and differential changes in spinal *mu*, *delta* and *kappa* opioid binding in rats with a painful, unilateral neuropathy. Pain 46: 315-326, 1991.

23. Stevens, C.W. and Yaksh, T.L., Studies of morphine and DADLE cross-tolerance after continuous intrathecal infusion in the rat. Anesthesiology 76: 596-603, 1992.

6

24. Stevens, C.W. and Kirkendall, K., Time course and magnitude of tolerance to the analgesic effects of systemic morphine in amphibians, Life Sciences 52: PL111-116, 1993.

25. Stevens, C.W., Alan J. Klopp, and J. Anthony Facello, Analgesic potency of *mu* and *kappa* opioids after systemic administration in amphibians. J. Pharmacol. Exp. Ther. 269: 1086-1093, 1994.

26. Brenner, G.M., Deason, L. L, Klopp, A.J., and Stevens, C.W, Analgesic potency of alpha-adrenergic agents after systemic administration in amphibians J. Pharmacol. Exp. Ther. 270: 540-545, 1994.

27. Stevens, C.W., Sangha S. and Ogg, B., Analgesia produced by immobilization stress and an enkephalinase-inhibitor in amphibians. Pharm. Biochem. Behav. 50: 675-680, 1995.

28. Stevens, C.W. and Seybold, V.S., Changes of opioid binding density in the rat spinal cord following unilateral dorsal rhizotomy, Brain Research 687: 53-62, 1995.

29. Willenbring, B. and Stevens, C.W., Thermal, mechanical, and chemical peripheral sensation in amphibians: opioid and adrenergic effects. Life Sciences 58: 125-133, 1996.

30. Stevens, C.W. Relative analgesic potency of *mu, delta,* and *kappa* opioids after spinal administration in amphibians. J. Pharmacol. Exp. Ther. 276: 440-448, 1996.

31. Stevens, C.W. and Brenner, G.M., Spinal administration of adrenergic agents produces analgesia in amphibians, Eur. J. Pharmacol., 316: 205-210, 1996.

32. Stevens, C.W., and Rothe, K.S., Supraspinal administration of opioids with selectivity for μ-, δ- and κ-opioid receptors produces analgesia in amphibians, European Journal of Pharmacology, 331: 15-21, 1997.

33. Willenbring, B. and Stevens, C.W., Spinal *mu, delta,* and *kappa* opioids alter chemical, mechanical and thermal sensitivities in amphibians Life Sciences 61: 2167-2176, 1997.

34. Stevens, C.W., and Newman, L.C., Spinal administration of selective opioid antagonists in amphibians: evidence for an opioid unireceptor. Life Sciences-Pharmacology Letters 64: PL125-130, 1999

35. Newman, L. C., Wallace D.R. and Stevens, C.W., Characterization of [³H]-diprenorphine binding in *Rana pipiens*: observations of filter binding enhanced by naltrexone. J. Pharmacol. Toxicol. Meth. 41: 43-48, 1999.

36. Newman, L. C., Wallace D.R. and Stevens, C.W., Selective opioid agonist and antagonists displacement of [3H]-naloxone binding in amphibian brain, European Journal of Pharmacology, 397: 255-262, 2000.

37. Newman, L. C., Wallace D.R. and Stevens, C.W., Selective opioid agonist and antagonists competition for [3H]-naloxone binding in amphibian spinal cord, Brain Research, 884: 184-191, 2000.

38. Stevens, C.W., MacIver, D. N., Newman, L.C., Testing and comparison of non-opioid analgesics in amphibians, Cont. Topics in Lab. Animal Sciences 40: 47-51, 2001.

39. Newman, L. C., Sands, S.S., Wallace D.R. and Stevens, C.W., Characterization of selective μ, κ, and δ opioid radioligand binding in amphibian brain. Journal of Pharmacology and Experimental Therapeutics 301:364–370, 2002.

40. Mohan, S. and Stevens, C.W., Systemic and spinal administration of the *mu* opioid, remifentanil, produces antinociception in amphibians, European Journal of Pharmacology, 534: 89-94, 2006.

41. Stevens, C.W., Toth G., Borsodi A., Benyhe S., Xendorphin B1, a novel opioid-like peptide determined from a *Xenopus laevis* brain cDNA library, produces opioid antinociception after spinal administration in amphibians. Brain Res Bulletin., 71:628-632, 2007.

42. Stevens, C.W., Brasel, C.M. and Mohan, S.K., Cloning and bioinformatics of amphibian *mu, delta, kappa,* and nociceptin opioid receptors expressed in brain tissue: evidence for opioid receptor divergence in mammals. Neuroscience Letters, 419: 189-194, 2007

43. Davis, R.L., Buck, D.J., Saffarian, N. and Stevens, C.W., The opioid antagonist, β-funaltrexamine, inhibits chemokine expression in human astroglial cells. Journal of Neuroimmuunology 186: 141-149, 2007.

44. Davis, R.L., Buck, D.J., Saffarian, N., Mohan, S.K., Desilva, U., Fernando, S.C., Stevens, C.W., β-funaltrexamine inhibits inducible nitric-oxide synthase expression in human astroglial cells. J. Neuroimmune Pharm. 3: 150-153, 2008.

45. Brasel, C.M., Sawyer, G.W. and Stevens, C.W., A pharmacological comparison of the cloned frog and human *mu* opioid receptors reveals differences in affinity and function. Eur J Pharmacol 599:36-43, 2008.

46. Stevens, C.W., Martin, K.K. and Stahlheber, B.W., Nociceptin produces antinociception after spinal administration in amphibians. Pharm Biochem Behav 91:436-440, 2009.

47. Mohan S.K., Davis R.L., Desilva U. and Stevens C.W., Dual regulation of *mu* opioid receptors in SK-N-SH neuroblastoma cells by morphine and interleukin-1*beta*: Evidence for opioid-immune crosstalk. J Neuroimmunology 227:26-34, 2010.

48. Stevens, C.W., Aravind S., Das S., and Davis R.L., Pharmacological characterization of LPS and opioid interactions at the toll-like receptor 4. Br J Pharmacol. 168:1421-1429, 2013.

49. Davis R.L., Das S., Buck, D.J., and Stevens, C.W., β-funaltrexamine inhibits chemokine (CXCL10) expression in normal human astrocytes. Neurochem. Int. 62:478-485, 2013.

50. Stevens, C.W., New pathways for an old molecule: the role of the Na⁺-K⁺ ATPase pump in peripheral neuropathy. J Neurol Sci. 340:3-4, 2014.

51. Davis, R.L., Das, S., Curtis, J.T., Stevens, C.W.,The opioid antagonist, β-funaltrexamine, inhibits NF-κB signaling and chemokine expression in human astrocytes and in mice. Eur J Pharmacol 762:193-201, 2015.

PEER-REVIEWED PRIMARY PUBLICATIONS (CONT.)

52. Vardy E, Sassano MF, Rennekamp AJ, Kroeze WK, Mosier PD, Westkaemper RB, Stevens CW, Katritch V, Stevens RC, Peterson RT, Roth BL. Single amino acid variation underlies species-specific sensitivity to amphibian skin-derived opioid-like peptides. Chem Biol. 22:764-75, 2015.

53. Davis RL, Stevens CW, Thomas Curtis J.The opioid antagonist, β-funaltrexamine, inhibits lipopolysaccharide-induced neuroinflammation and reduces sickness behavior in mice. Physiol Behav. 173:52-60, 2017.

## BOOKS, BOOK CHAPTERS, REVIEWS & CONFERENCE PROCEEDINGS

1. Yaksh, T.L., Durant, P., Onofrio, B. and Stevens, C.W., The effect of spinally administered agents on pain transmission in man and animals. In: *Spinal Opioids and the Relief of Pain*, J.M. Besson and J. Lazorthes (Eds.), INSERM 127: 317-332, 1984.

2. Yaksh, T.L., Durant, P.A.C., Gaumann, D.M., Stevens, C.W. and Mjanger, E., The use of receptor-selective agents as analgesics in the spinal cord: Trends and possibilities. J. Pain Sympt. Manag. 2: 129-138, 1987.

3. Stevens, C.W. and Yaksh, T.L., Opioid and adrenergic spinal receptor systems and pain control, In: *Problems of Drug Dependence 1987*, Harris, L.S. (Ed.), NIDA Research Monograph, 81: 343-352, 1988.

4. Yaksh, T.L, Durant, P.A.C., Monasky, M.S., Stevens, C.W. and Schick, R.R., Spinal pharmacology of agents which alter pain transmission and muscle tone. In: *Local-Spinal Therapy of Spasticity*, H. Müller, J. Zierski, R.D. Penn, (Eds.), Springer-Verlag, Berlin, pp. 19-36, 1988

5. Yaksh, T.L., Stevens, C.W., Gaumann, D.M., and Mjanger, E., Receptors in the dorsal horn and intrathecal drug administration. In: *Neurological applications of implanted drug pumps*, Ann. NY Acad. Science 531: 90-107, 1988.

6. Yaksh, T.L. and Stevens, C.W., Properties of the modulation by receptor-selective agents of spinal nociceptive processing. In: *Proceedings of the 5th World Congress of Pain*, R. Dubner, G.F. Gebhart, M.R. Bond (Eds.), Elsevier Science Publishers, Amsterdam, pp. 417-435, 1988.

7. Yaksh, T.L., Mjanger, E., and Stevens, C.W., Pharmacology of the analgesic effects of opioid and non-opioid receptor selective agents in the spinal cord. J. Anest. Reanim. pp. 221-242, 1988.

8. Stevens, C.W., Opioid antinociception in amphibians, Brain Research Bulletin, 21: 959-962, 1988.

9. Stevens, C.W. and Yaksh, T.L., Opioid dependence after continuous intrathecal infusion of *mu* and *delta* opioids in the rat. In: *Problems of Drug Depend. '88*, Harris, L.S., (Ed.), NIDA Res. Mongr. 95:544-545, 1989.

10. Stevens, C.W., Kajander, K.C., Bennett, G.J., and Seybold, V.S., Differential regulation of opioid binding sites in an experimental model of chronic pain. In: *Proceedings of the 6th World Congress of Pain*, M.R. Bond, J.E. Charlton, C.J. Woolf (Eds.), Elsevier Science Publishers, Amsterdam, 283-289, 1991.

11. Stevens, C.W., Intraspinal opioids in frogs: a new behavioral model for the assessment of opioid action. In: *Problems of Drug Dependence 1990*, Harris, L.S., (Ed.), NIDA Research Monograph 105: 561-562, 1991.

12. Stevens, C.W., Alternatives to the use of mammals for pain research. Life Sciences 50: 901-912, 1992.

13. Adams, J.U., Izenwasser, S., Kramer, T.H., Stevens, C.W., Tiseo, P.J., and Unterwald, E.M., Tolerance and sensitization to opioids and cocaine. In: *Problems of Drug Dependence 1993*, Harris, L.S., (Ed.), NIDA Research Monograph 140: 69-73, 1994.

14. Stevens, C.W., Environmental factors influencing pain physiology in amphibians. In: *Environment and Physiology: 38th Annual Conference of the Association of Physiologists and Pharmacologists of India*, Mallick, B.N. and Singh, R. (Eds.), Narosa Publishing House, New Delhi, pp. 54-61, 1994.

15. Stevens, C.W., Perspectives on opioid tolerance from basic research: behavioral studies after spinal administration in rodents. In: *Cancer Surveys: Palliative Medicine Volume 21*, Banks, G.W. (Ed.),Cold Spring Harbour Laboratory Press, London, pps. 25-47, 1994.

16. Stevens, C.W. Relative analgesic potency of *mu* and *kappa* opioids in amphibians: a unique assay for *kappa* opioid action? In: *Problems of Drug Dependence 1994*, Harris, L.S., (Ed.), NIDA Research Monograph 152: 446, 1995.

17. Stevens, C.W., An amphibian model for pain research, *Lab Animal*: 24: 32-36, 1995.

18. Stevens, C.W. An amphibian model for the assessment of opioid analgesia: systemic and spinal studies. Proc. International Narcotics Research Conference, *Analgesia* 1: 766-769, 1995.

19. Rothe-Skinner, K.S. and Stevens, C.W., Distribution of opioid-expressing neurons in the frog: an *in situ* hybridization study. Proc. International Narcotics Research Conference, *Analgesia* 1: 683-686, 1995.

20. Stevens, C.W. and Paul, D.J. Opioid analgesia after spinal administration in amphibians: binding and behavioral studies, In: *Problems of Drug Dependence 1995*, Harris, L.S., (Ed.), NIDA Research Mon., 162: p 222, 1996.

21. Stevens, C.W. An alternative model for testing opioid analgesics and pain research using amphibians, In: van Zutphen, L.F.M., and Balls, M. (eds) *Animal Alternatives, Welfare and Ethics*, Elsevier Science Publishers, Amsterdam, pp. 247-251, 1997

22. Stevens, C.W. and Willenbring, S., Pain sensation and analgesia in amphibians and reptiles, In: *The Biology, Husbandry and Health Care of Reptiles and Amphibians Vols. I,II,III*. Ackerman, L. (Ed.), T.F.H. Publications, Neptune City, New Jersey, pp. 309-324, 1997.

23. Stevens, C.W., A whole-animal, alternative model for pain research. Animal Welfare Information Center (AWIC) Newsletter, Volume 8: 3-5, 1998.

24. Stevens, C.W., An amphibian model for investigation of opioid analgesia and pain-processing. In: Proceedings of the Mayday Conference: A Cross-Species Approach to Pain and Analgesia - 2002, Ludders J.W., et al. (Eds.). International Veterinary Information Service, Ithaca NY (www.ivis.org), 2002; P0512.1202.

**BOOKS, BOOK CHAPTERS, REVIEWS & CONFERENCE PROCEEDINGS (CONT.)**

25. Stevens, C.W., Opioid research in amphibians: a unique perspective on mechanisms of opioid analgesia and the evolution of opioid receptors. *Reviews in Analgesia* 7: 69-82, 2003.

26. Stevens, C.W., Opioid research in amphibians: an alternative pain model yielding insights on the evolution of opioid receptors. *Brain Res Brain Res Rev*. 46:204-15, 2004.

27. Stevens, C.W., Molecular evolution of vertebrate opioid receptor proteins: a preview. In: *Recent Developments in Pain Research, 2005*, pps. 13-29, Ed. Capasso, A., Research Signpost, Kerala, India, 2005.

28. Brenner, G.M. and Stevens, C.W., *Pharmacology*, 2/e. Pharmacology textbook for medical and health professional students, Saunders/Elsevier, Philadelphia/London, March, 2006.

29. Stevens, C.W. Opioid analgesia research in amphibians: from behavioral assay to cloning opioid receptor genes. *Proceedings of the Annual Conference of the Association of Reptilian and Amphibian Veterinarians* 13: 9-15, 2006.

30. Stevens, C.W., Non-Mammalian Models for the Study of Pain, in *Sourcebook of Models for Biomedical Research*, Ed. Conn, M, Humana Press, Towata, NJ, USA, pp. 341-352, 2008.

31. Stevens, C.W., The evolution of vertebrate opioid receptors, *Frontiers in Bioscience*, 14: 1247-1269, 2009.

32. Brenner, G.M. and Stevens, C.W., *Pharmacology*, 3/e. Pharmacology textbook for medical and health professional students, Saunders/Elsevier, Philadelphia/London, February, 2009.

33. Stevens, C.W. Alternative Models for Pain Research: A Translational, Non-Mammalian Model with an Ethical Advantage, in *Translational Neuroscience and its Advancement of Animal Research Ethics*, pp. 3-27, Eds. Warnick, J.E. and Kalueff, A.V., Nova Science Publishers, New York, NY, USA, 2010.

34. Stevens, C.W. Analgesia in Amphibians: Preclinical Studies and Clinical Applications, Veterinary Clinics of North America: Exotic Animal Practice, 14:33-44, 2011.

35. Stevens, C.W. (Editor) *Methods for the Discovery and Characterization of G Protein-Coupled Receptors*, Neuromethods vol. 60, Humana Press, Springer Science+Business Media, LLC, New York, NY, 2011.

36. Stevens, C.W., Deciphering the molecular evolution of vertebrate G protein-coupled receptors. In Stevens, C.W. (Ed.) *Methods for the Discovery and Characterization of G Protein-Coupled Receptors*, Neuromethods vol. 60, Humana Press, Springer Science+Business Media, LLC, New York, NY, 2011.

37. Brenner, G.M. and Stevens, C.W., *Pharmacology*, *4th edition*. Pharmacology textbook for medical and health professional students, Saunders/Elsevier, Philadelphia/London, 2013.

38. Stevens, C.W. (Editor) *G Protein-Coupled Receptor Genetics: Research and Methods in the Post-Genomic Era*, Springer Science+Business Media, LLC, New York, NY, 2014.

39. Stevens, C.W., G Protein-Coupled Receptor Genetics: Research and Methods in the Post-Genomic Era. In Stevens, C.W. (Ed.) *G Protein-Coupled Receptor Genetics: Research and Methods in the Post-Genomic Era*, Springer, New York, NY, 2014.

39. Vardy, E., Roth, B.L., Stevens, C.W., The functional evolution of opioid family G protein-coupled receptors. In Stevens, C.W. (Ed.) *G Protein-Coupled Receptor Genetics: Research and Methods in the Post-Genomic Era*, Springer, New York, NY, 2014.

40. Stevens, C.W., Bioinformatics and evolution of vertebrate nociceptin and opioid receptors. In Litwack, G. (Ed.) *Vitamins and Hormones Volume 97*, Burlington: Academic Press, 2015.

41. Brenner, G.M. and Stevens, C.W., *Brenner and Stevens' Pharmacology, 5th edition*. Pharmacology textbook for medical and health professional students, Saunders/Elsevier, Philadelphia/London, 2018.

42. Stevens, C.W., The Discovery of a Spinal Portal for Pain and Analgesia. In: Farquhar-Smith et al. (Eds.) Landmark Papers in Pain, Oxford University Press, Oxford, UK, 2018.

43. Stevens C.W., Foreword, In: Soysa NS, Basics in Pharmacology, S. Godage and Brothers, Colombo, Sri Lanka, 2018.

44. Stevens, C.W., The Drug Expert: A Practical Guide to the Impact of Drug Use in Legal Proceedings. Academic Press/Elsevier, Philadelphia/London, 2019 (in preparation).

**CONFERENCE ABSTRACTS**

1. Stevens, C.W. and Pezalla, P.D., Antinociceptive activity of intraspinal morphine and naloxone attenuation in *Rana pipiens*, Chicago Chapter Soc. Neuroscience, 1983.

2. Stevens, C.W. and Pezalla, P.D., Dextrorphan analgesia in *Rana pipiens*, Committee on Neuroscience, University of Illinois, 1984.

3. Pezalla, P.D., Stevens, C.W. and Dicig, M., Opioid and non-opioid pain control systems in an amphibian, Chicago Chapter Society for Neuroscience (SFN), 1984.

4. Stevens, C.W. and Yaksh, T.L., Is intrathecal dynorphin A a *kappa* ligand in rats? Society for Neuroscience (SFN) Dallas, Texas, Oct. 20-25, 1985.

5. Stevens, C.W. and Yaksh, T.L., Studies of opiate tolerance in spinal catheterized rats, Society for Neuroscience (SFN) Washington, DC, Nov. 9-14, 1986.

6. Stevens, C.W. and Yaksh, T.L., Time course of tolerance development in rat spinal cord, American Society of Pharmacology and Experimental Therapeutics (ASPET), Honolulu, HA, 1987.

7. Stevens, C.W. and Yaksh, T.L., Time course of tolerance development to antinociceptive agents in rat spinal cord, Society for Neuroscience (SFN), New Orleans, Louisiana, Nov. 16-21, 1987.

8. Morón, M.A., Yaksh, T.L., and Stevens, C.W., Further studies on the anticonvulsant activity of nimodipine. Workshop: Pre-clinical Studies with Nimodipine. Miles Pharmaceutical, 1988.

9. Morón, M.A., Yaksh, T.L., and Stevens, C.W. The anti-epileptic activity of eight dihydropyridine calcium channel antagonists: mechanism of action. American Society of Pharmacology and Experimental Therapeutics (ASPET) 1988.

**CONFERENCE ABSTRACTS (CONT.)**

10. Morón, M.A., Yaksh, T.L., and Stevens, C.W., Diltiazem enhances and flunarizine suppresses nimodipine's anti-epileptic actions: a reflection of allosteric binding interactions at the dihydropyridine binding site?, Society for Neuroscience (SFN) Toronto, Canada, Nov. 13-18, 1988.

11. Sabbe, M., Yanez-Gonzalez, A., Stevens, C.W., and Yaksh, T.L., Society for Neuroscience (SFN) Toronto, Canada, Nov. 13-18, 1988.

12. Sosnowski, M., Stevens, C.W., and Yaksh, T.L., Effects of intrathecal adenosine receptor agonists on the nociceptive, motor, and bladder function in the rat, Society for Neuroscience (SFN) Toronto, Canada, Nov. 13-18, 1988.

13. Stevens, C.W., and Yaksh, T.L., Infusion potency is inversely related to the magnitude of spinal antinociceptive tolerance, Society for Neuroscience (SFN) Toronto, Canada, Nov. 13-18, 1988.

14. Stevens, C.W., and Yaksh, T.L., Opioid dependence after continuous intrathecal infusion of *mu* and *delta* opioids in the rat. College on Problems of Drug Dependence (CPDD) 1989, Keystone, CO, USA, June 19-22, 1989.

15. Stevens, C.W., Kajander, K.C., Bennett, G.J., and Seybold, V.S., Analysis of *mu*, *delta*, and *kappa* opioid binding sites in the spinal cord of rats in a model of neuropathic pain. Society for Neuroscience (SFN) Phoenix, Arizona, Oct. 29-Nov. 3, 1989.

16. Stevens, C.W., Kajander, K.C., Bennett, G.J., and Seybold, V.S., Differential regulation of opioid binding sites in the spinal cord of rats in an experimental model of chronic pain. International Association for the Study of Pain (IASP) 1990.

17. Stevens, C.W. and Seybold, V.S., Distribution of *mu*, *delta*, and *kappa* opioid receptors in rat spinal cord after unilateral dorsal rhizotomy. Society for Neuroscience (SFN) St. Louis, Missouri, Oct. 28-Nov. 2, 1990.

18. Stevens, C.W., Spinal analgesia in frogs: studies with highly-selective opioid agents. American Society of Pharmacology and Experimental Therapeutics (ASPET), Atlanta, GA, USA, April 21-25, 1991.

19. Kirkendall, K. and Stevens, C.W., Studies of morphine tolerance in amphibians, Oklahoma Academy of Science Annual Meeting, Durant, OK, 1991.

20. Stevens, C.W., Spinal analgesia in frogs: studies with highly-selective opioid agents. Society for Neuroscience (SFN) New Orleans, Louisiana, Nov. 10-15, 1991.

21. Stevens, C.W., Relative potency of systemic opioids and morphine tolerance in an amphibian pain model. Joint meeting of International Narcotics Res. Comm. (INRC) and College on Problems of Drug Dependence (CPDD), Keystone, CO, 1992.

22. Stevens, C.W., and Klopp, A.J., Opioid analgesia after systemic administration of eight opioid agents in amphibians, Society for Neuroscience (SFN) Anaheim, California, Oct. 25-30, 1992.

23. Mitchell, M.A., Stevens, C.W., and Klopp, A.J., Sedative-induced analgesia in a non-mammalian vertebrate pain model, American Osteopathic Association Meeting, San Diego, CA, 1992.

24. Stevens, C.W., Brenner, G.M., Deason, L.L., and Klopp, A.J., Studies of opioid and alpha-2 analgesia and morphine tolerance in amphibians. Inaugural Symposium of the Oklahoma Center for Neuroscience, Oklahoma City, OK, 1992.

25. Stevens, C.W., Studies of morphine tolerance in an amphibian pain model. College on Problems of Drug Dependence (CPDD), Toronto, Canada, 1993.

26. Stevens, C.W., Opioid analgesia after systemic administration of eight opioid agents in amphibians, 7th World Congress, International Association for the Study of Pain (IASP), Paris, France, 1993.

27. Deason, L.L., Brenner, G.M., and Stevens, C.W., Alpha$_2$-analgesia after systemic administration of adrenergic agents in amphibians, Society for Neuroscience (SFN) Washington, DC, Nov. 7-12, 1993.

28. Stevens, C.W., Deason, L.L., and Brenner, G.M., Analgesic action of intraspinal adrenergic agents in amphibians, Society for Neuroscience (SFN) Washington, DC, Nov. 7-12, 1993.

29. Stevens, C.W., Brenner, G.M., Analgesic action of opioid and adrenergic agents in amphibians. American Society of Pharmacology and Experimental Therapeutics (ASPET), 1994.

30. Stevens, C.W., Relative analgesic potency of *mu* and *kappa* opioids in amphibians: a unique assay for *kappa* opioid action?, College on Problems of Drug Dependence (CPDD), Palm Beach, FL, 1994.

31. Stevens, C.W., Studies of dynorphin and *kappa* opioid agents after spinal administration in amphibians, Society for Neuroscience (SFN) Miami Beach, Florida, Nov. 13-18, 1994.

32. Rothe-Skinner, K. S. and Stevens, C.W., Dynorphin expression in amphibian brain and spinal cord: *in situ* hybridization studies, Society for Neuroscience (SFN) Miami Beach, Florida, Nov. 13-18, 1994.

33. Stevens, C.W., Analgesic action of spinal *mu*, *delta*, and *kappa* opioids in amphibians. American Society of Pharmacology and Experimental Therapeutics (ASPET), Atlanta, GA, USA, 1995

34. Stevens, C.W. and Paul, D.J. Opioid analgesia after spinal administration in amphibians: binding and behavioral studies, College on Problems of Drug Dependence (CPDD), Scottsdale, AZ, 1995.

35. Stevens, C.W. An amphibian model for the assessment of opioid analgesia: systemic and spinal studies. International Narcotics Research Committee (INRC) St. Andrews, Scotland, UK, July 8-13, 1995.

36. Rothe-Skinner, K.S. and Stevens, C.W., Distribution of opioid-expressing neurons in the frog: an *in situ* hybridization study International Narcotics Research Committee (INRC) St. Andrews, Scotland, UK, July 8-13, 1995.

37. Willenbring, B.S. and Stevens, C.W. Somatic hypersensitivity following peripheral nerve injury in frogs: a novel model for studying neuropathic pain, American Pain Society (APS) San Diego, California, Nov. 8-11, 1995.

38. Willenbring, B.S. and Stevens, C.W. Effects of morphine or nerve injury on mechanical and chemical response thresholds in frogs, Society for Neuroscience (SFN) San Diego, California, Nov. 11-16, 1995.

39. Stevens, C.W. and Brenner, G.M. Studies of opioid and alpha$_2$ analgesia after spinal administration in amphibians, Society for Neuroscience (SFN) San Diego, California, Nov. 11-16, 1995.

40. Rothe-Skinner, K.S. and Stevens, C.W., Analgesia produced by intracerebroventricular injection of morphine in amphibians, College on Problems of Drug Dependence (CPDD), San Juan, Puerto Rico, 1996.

CONFERENCE ABSTRACTS (CONT.)

41. Stevens, C.W., Deason, L., and Rothe-Skinner, K.S., Analgesia after icv injection of *mu*, *delta*, and *kappa* opioids in amphibians. International Narcotics Research Conference (INRC), Long Beach, CA, July, 1996.

42. Stevens, C.W., An alternative model for the testing of opioids and pain research using amphibians. 2nd World Congress on Animal Alternatives and Use in the Life Sciences, Utrecht, Netherlands, October, 1996.

43. Stevens, C.W., and Deason, L.L., Seasonal variation in analgesic thresholds to morphine and melatonin analgesia in amphibians, Society for Neuroscience (SFN) Washington, DC, Nov. 16-21, 1996.

44. Willenbring, S. and Stevens, C.W., Spinal opioid pharmacology in the frog: chemical, thermal and mechanical sensitivities, Society for Neuroscience (SFN) Washington, DC, Nov. 16-21, 1996.

45. Stevens, C.W. and Newman, L.C., Studies of selective *mu* opioid antagonism after spinal administration of β-FNA in amphibians, College on Problems of Drug Dependence (CPDD) Nashville, TN, June, 12-18, 1997.

46. Hamamoto, D.T., Willenbring, S., Stevens, C.W., and Kajander, K.C., Changes in tissue pH and responses of cutaneous receptors to acetic acid application in the frog. Society for Neuroscience (SFN) New Orleans, Louisiana, Oct. 25-30, 1997.

47. Willenbring, S. and Stevens, C.W., Glycinergic mechanisms in amphibian peripheral sensitivity. Society for Neuroscience (SFN) New Orleans, Louisiana, Oct. 25-30, 1997.

48. Stevens, C.W. and Newman, L.C., Selective opioid antagonists and spinal opioid analgesia in amphibians. Society for Neuroscience (SFN) New Orleans, LA, October 27-Nov. 1, 1997.

49. Stevens, C.W. and Newman, L.C., The unireceptor hypothesis of opioid antinociception in amphibians. American Society of Pharmacology and Experimental Therapeutics (ASPET) San Francisco, April, 1998.

50. Stevens, C.W., Newman, L.C., and D.R Wallace, The unireceptor hypothesis of opioid antinociception in amphibians: Implications for the functional evolution of opioid receptors. International Narcotics Research Conference (INRC) Garmisch-Partenkirchen, Germany, July 1998.

51. Stevens, C.W. and Newman, L.C., Evolution of opiate receptors: the unireceptor hypothesis of opioid antinociception in amphibians, International Union of Pharmacology (IUPHAR) Munich, Germany, July, 1998.

52. Stevens, C.W. and Newman, L.C., The unireceptor hypothesis of opioid antinociception in amphibians, Society for Neuroscience (SFN) Los Angeles, CA, November 7-12, 1998.

53. Stevens, C.W., Newman, L.C., and Wallace D.R., Binding and behavioral studies of the opioid unireceptor in amphibians, International Narcotics Research Conference (INRC) Saratoga Springs, NY, July 10-15, 1999.

54. Stevens, C.W. and Newman, L.C., The unireceptor hypothesis of opioid antinociception in amphibians: behavioral studies, Society for Neuroscience (SFN) Miami Beach, FL, October 23-28, 1999.

55. Newman, L.C., Wallace, D.R., and Stevens, C.W., The unireceptor hypothesis of opioid antinociception in amphibians: binding studies, Society for Neuroscience (SFN) Miami Beach, FL, October 23-28, 1999.

56. Stevens, C.W., Maciver D., and Newman, L.C., Testing and comparison of non-opioid analgesics in amphibians, American College of Laboratory Animal Medicine (ACLAM) Fort Myers, FL, May 21-24, 2000.

57. Stevens, C.W., Newman, L.C., Wallace, D.R., From pond to pain: From pond to pain: Amphibian opioid unireceptors and speculations on the divergence of mammalian mu, kappa, and delta opioid receptor types, Committee on Problems of Drug Dependence (CPDD) San Juan, Puerto Rico, June 17-22, 2000.

58. Stevens, C.W., Newman, L.C., and Wallace, D.R., Mu, kappa, and delta opioid radioligand binding in amphibian brain, International Narcotics Research Conference (INRC) Seattle, WA, July 15-20, 2000.

59. Stevens, C.W., Newman, L.C., and Wallace, D.R., Amphibian opioid receptors: characterization of mu, kappa, and delta opioid ligand binding, Society for Neuroscience (SFN) New Orleans, La, November 4-9, 2000.

60. Stevens, C.W., Newman, L.C., and Wallace, D.R., Opioid receptors in amphibian brain: radioligand binding studies, American Society of Pharmacology and Experimental Therapeutics (ASPET) Orlando, FL, March 30-April 4, 2001.

61. Sands, S.S., Wallace, D.R., and Stevens, C.W., Chronic opioid agonist regulation of a novel opioid receptor in amphibians, International Narcotics Research Conference (INRC) Helsinki, Finland, July 14-20, 2001.

62. Sands, S.S., Wallace, D.R., and Stevens, C.W., Chronic morphine regulation of opioid receptors in amphibian brain, Society for Neuroscience (SFN) San Diego, CA, November 10-15, 2001

63. Stevens, C.W. and C.M. Brasel, Cloning of an *mu* opioid-like receptor in an amphibian, *Rana pipiens*, Committee on Problems of Drug Dependence (CPDD) Quebec City, Canada, June 8-13, 2002.

64. Sands, S.S. and Stevens, C.W., Characterization of opioid receptor types in amphibian spinal cord, International Narcotics Research Conference (INRC) Pacific Grove, CA, July 9-14, 2002.

65. Stevens, C.W. and C.M. Brasel, Sequence and homology of a *mu* opioid-like receptor in an amphibian, International Narcotics Research Conference (INRC) Pacific Grove, CA, July 9-14, 2002.

66. Martin, K.K. and Stevens, C.W., Nociceptin analgesia after spinal administration in amphibians, Society for Neuroscience (SFN) Orlando, FL, November 2-7, 2002.

67. Stevens, C.W. and C.M. Brasel, Cloning and homology of a *mu* opioid-like receptor from amphibian brain tissue, Society for Neuroscience (SFN) Orlando, FL, November 2-7, 2002.

68. Stevens, C.W. and C.M. Brasel, Evolution of opioid receptors: insights from the cloning of opioid-like receptors in amphibians, American Society of Pharmacology and Experimental Therapeutics (ASPET), San Diego, CA, April 11-15, 2003.

69. C.M. Brasel and Stevens, C.W., Cloning and homology of an ORL1/nociceptin-like receptor from amphibian brain and spinal cord, International Narcotics Research Conference (INRC) Perpignan, France, July 6-11, 2003.

70. Stevens, C.W. and C.M. Brasel, Cloning of opioid-like receptors in amphibians: insights on the evolution of opioid receptors, International Narcotics Research Conference (INRC) Perpignan, France, July 6-11, 2003.

71. Martin, K.K. and Stevens, C.W., Nociceptin analgesia after spinal administration in amphibians, Society for Neuroscience (SFN) New Orleans, LA, November 8-12, 2003.

72. C.M. Brasel and Stevens, C.W., Cloning and homology of an ORL1/nociceptin-like receptor from amphibian brain and spinal cord, Society for Neuroscience (SFN) New Orleans, LA, November 8-12, 2003.

73. Stevens, C.W. and C.M. Brasel, Cloning of opioid-like receptors in amphibians: insights on the evolution of opioid receptors, Society for Neuroscience (SFN) New Orleans, LA, November 8-12, 2003.

74. Stevens, C.W., Opioid research in amphibians: an alternative pain model yielding insights on the evolution of opioid receptors, British Society for Experimental Biology (SEB) Edinburgh, Scotland, April 2-5, 2004.

75. Stevens, C.W., Opioid research in amphibians: behavioral and molecular studies on the evolution of opioid receptors, European Opioid Conference (EOC) Visegrad, Hungary, April 6-9, 2004.

76. C.M. Brasel, K.K. Martin, and Stevens, C.W., An amphibian *ORL1* receptor suggests pattern of vertebrate opioid receptor evolution, International Narcotics Research Conference (INRC) Kyoto, Japan, July 18-23, 2004.

77. Stevens, C.W. and C.M. Brasel, Molecular evolution of vertebrate opioid receptors: the amphibian contribution, International Narcotics Research Conference (INRC), Kyoto, Japan, July 18-23, 2004.

78. C.M. Brasel and Stevens, C.W., Phylogenetic analysis vertebrate opioid receptors, Society for Neuroscience (SFN) San Diego, CA, Oct. 23-27, 2004.

79. Stevens, C.W., Opioid receptors in vertebrates: evolution of ligand type-selectivity, American Society of Pharmacology and Experimental Therapeutics (ASPET) San Diego, CA, April 1-6, 2005.

80. Stevens, C.W. and T. B. Summers, From one to four: gene duplications and the evolution of *mu*, *delta*, and *kappa* type-selectivity of vertebrate opioid receptors, International Narcotics Research Conference (INRC) Annapolis, MD, July 10-15, 2005.

81. Mohan, S.K. and Stevens, C.W., Studies of remifentanil in amphibians. Society for Neuroscience (SFN) Washington DC, November 12–16, 2005.

82. Brasel, C.M. and Stevens, C.W., Opioid receptors in vertebrates: evolution of ligand type-selectivity. Society for Neuroscience (SFN) Washington DC, November 12–16, 2005.

83. Davis, R.L., Buck, D.J., Saffarian, N., and Stevens, C.W., The opioid antagonist, β-funaltrexamine, inhibits chemokine expression in human astroglial cells. International Narcotics Research Conference (INRC) St. Paul, MN, July 9-14, 2006.

84. Brasel, C.M. and Stevens, C.W., Comparison of MOR opioid receptors from amphibians and humans, Society for Neuroscience (SFN) Atlanta, GA, November 12–16, 2006.

85. Davis, R.L., Buck, D.J., Saffarian, N., and Stevens, C.W., Inhibition of chemokine expression in human astroglial cells by the opioid receptor antagonist β-FNA, Society for Neuroscience (SFN) Atlanta, GA, November 12–16, 2006.

86. Mohan, S.K., Davis, R.L. and Stevens, C.W., Human *mu* opioid receptor-1 expression in SK-N-SH cells after IL-1beta treatment, Society for Neuroimmune Pharmacology (SNIP), Salt Lake City, UT, April 11-14, 2007.

87. Sawyer, G.W., Stevens, C.W., and Brasel, C.M, Pharmacological comparison of human and frog *mu* opioid receptors. Committee on Problems of Drug Dependence (CPDD) Quebec City, Canada, June 16-21, 2007.

88. Sawyer, G.W., Stevens, C.W., and Brasel, C.M, Pharmacological comparison of human and frog MOR. International Narcotics Research Conference (INRC) Berlin, Germany, July 8-13, 2007.

89. Mohan, S.K. and Stevens, C.W., Opioid receptors in the chick, *Gallus gallus*. Society for Neuroscience (SFN) San Diego, CA, November 3-7, 2007.

90. Brasel, C.M., Sawyer, G.W., and Stevens, C.W., Pharmacological comparison of human and frog *mu* opioid receptors: differences in receptor internalization. Society for Neuroscience (SFN) San Diego, CA, November 3-7, 2007.

91. Stevens, C.W., Brasel, C.M., and G.W. Sawyer, Characterization of receptor internalization and inhibition of cAMP in cell lines expressing amphibian or human *mu* opioid receptors. American Society of Pharmacology and Experimental Therapeutics (ASPET) San Diego, CA, U.S.A., April 5-9, 2008.

92. Mohan, S.K., Fernando, S.C., DeSilva, U., Davis, R.L. and Stevens, C.W., Signaling pathways involved in IL-Iβ-induced regulation of hMOR expression in neurons, International Congress of Neuroimmunology, 2008

93. Stevens, C.W., C. M. Brasel, and G.W. Sawyer, Comparison of amphibian and human *mu* opioid receptors: differences in receptor internalization and inhibition of cAMP in stable cell lines. Committee on Problems of Drug Dependence (CPDD) San Juan, Puerto Rico June 14-19, 2008.

94. Stevens, C.W., Evolution of opioid receptors: why the *mu* opioid receptor would make Darwin proud. International Narcotics Research Conference (INRC) Charleston, SC, USA, July 13-18, 2008.

95. Mohan, S.K., Fernando, S.C., DeSilva, U., Davis, R.L. and Stevens, C.W., Molecular signals responsible for IL-1beta effects on hMOR expression in SK-N-SH cells: potential targets for opioid tolerance treatment? Society for Neuroscience (SFN) Washington DC, USA, November 15-19, 2008.

96. Stevens, C.W., Evolution of opioid receptors: why the *mu* opioid receptor would make Darwin proud. Society for Neuroscience (SFN) Washington DC, USA, November 15-19, 2008.

97. Davis, R.L., Buck, D.J., Armstrong, D.R., Saffarian, N., Mohan, S.K., Fernando, S.C., DeSilva, U. and CW. Stevens, β-Funaltrexamine inhibits inflammatory signaling in human astroglial cells. Society for Neuroscience, (SFN) Washington DC, USA, November 15-19, 2008.

98. Davis, R.L., Buck, D.J., Armstrong, D.R., Saffarian, N., Mohan, S.K., Fernando, S.C., DeSilva, U. and CW. Stevens, β-Funaltrexamine inhibits inflammatory signaling in human astroglial cells. Glial Biology in Medicine, 2008

99. Stevens, C.W., Evolution of opioid receptors. American Association for the Advancement of Science-Sothwestern AAAS Regional Meeting (AAAS-SWARM), Tulsa, OK, March 28-31, 2009.

100. Davis, R.L., Buck, D.J., Armstrong, D.R., Saffarian, N., and Stevens, C.W., Novel anti-inflammatory actions of the opioid receptor antagonist, beta-funaltrexamine. International Society for NeuroVirology, 2009.

101. Stevens, C.W., Evolution of vertebrate opioid receptors: evidence from cloning and bioinformatics. Experimental Biology-American Society for Pharmacology and Experimental Therapeutics (ASPET), New Orleans, LA, USA, April 18-22, 2009.

102. Stevens, C.W., The special case of the *mu* opioid receptor and the evolution of the opioid receptor family. Committee on Problems of Drug Dependence (CPDD), Reno, NV, USA. June 20-25, 2009.

103. Brasel, C.M., Sawyer, G.W., and Stevens, C.W., Pharmacological comparison of the cloned frog and human *mu* opioid receptors reveals differences in opioid affinity and function, International Narcotics Research Conference (INRC) Portland, OR, USA, July 12-17, 2009.

104. Davis, R.L., Buck, D.J., Armstrong, D.J., Saffarian, N., and Stevens, C.W., β-Funaltrexamine, an opioid receptor antagonist, inhibits CCL2 and CXCLIO expression in astroglial, Society for Neuroscience (SFN), Chicago, IL, October 16-21, 2009.

105. Davis, R.L., Buck, D.J., Aravind S., Saffarian N., and Stevens, C.W., Anti-inflammatory actions of the opioid receptor antagonist, β-funaltrexamine: implications in neuroinflammation. Society on Neuroimmune Pharmacology (SNIP), Manhattan Beach, CA, April 13-17, 2010.

106. Stevens, C.W., Aravind, S., and R.L. Davis, The selective *mu* opioid antagonist β-funaltrexamine (β-FNA) reduces toll-like receptor-4 signaling. Experimental Biology-American Society for Pharmacology and Experimental Therapeutics (ASPET) Anaheim, CA, USA, April 23-28, 2010.

107. Grewe, E., Buck, D.J., Aravind, S., Stevens, C.W. and R.L. Davis, Anti-inflammatory actions of the opioid receptor antagonist, β-funaltrexamine: role of TLR-4 and NF-κB?, International Symposium on NeuroVirology, Milan, Italy, October 10, 2010.

108. Davis, R.L., Buck, D.J., Aravind, S., and Stevens, C.W. The opioid receptor antagonist, β-funaltrexamine, inhibits inflammatory signaling. Society for Neuroscience (SFN), San Diego, CA, November 12-17, 2010.

109. Stevens, C.W., Aravind, S., and R.L. Davis, Opioid agonists and antagonists alter toll-like receptor-4 (TLR4) signaling. Society for Neuroscience (SFN), San Diego, CA, November 12-17, 2010.

110. Stevens, C.W., Novel opioid effects on toll-like receptors, Annual OCAST Health Research Conference, Oklahoma City, OK, April 6, 2011.

111. <u>Stevens, C.W.</u>, Novel opioid effects on toll-like receptors, Annual OCAST Health Research Conference, Oklahoma City, OK, April 4, 2012.

112. Dodson, S., Castoro, R., Das, S., Davis, R.L., and <u>Stevens, C.W.</u>, Characterization of non-classical opioid activity at toll-like Receptor 4, International Narcotics Research Conference (INRC), July 15-20, 2012, Kansas City, MO, USA.

113. Vardy, E., <u>Stevens, C.W.</u>, and Roth, B.L., Evolutionary differences of opioid receptors are reflected in their pharmacological profiles, International Narcotics Research Conference (INRC), July 15-20, 2012, Kansas City, MO, USA.

114. Figueroa-Hall, L.K., Das, S., Buck, D.J., <u>Stevens, C.W.</u>, Davis, R.L., β-Funaltrexamine inhibits IL-1R- and TLR4-signaling pathways in human glial cells. Society for Neuroscience, New Orleans, LA, USA, Oct 13-17, 2012.

115. <u>Stevens, C.W.</u>, Novel opioid effects on toll-like receptors, Annual OCAST Health Research Conference, Oklahoma City, OK, March 13, 2013.

116. Dodson, S., Das S., Davis, R.L., and <u>Stevens, C.W.</u>, The influence of methadone on toll-like receptor 4 and human *mu* opioid receptor expression. Experimental Biology-American Society for Pharmacology and Experimental Therapeutics (ASPET) Boston MA, USA, April 20-24, 2013.

117. <u>Stevens, C.W.</u>, Castoro, R.J., and Davis, R.L., Opioid-immune crosstalk: role of microRNA regulation following opioid and cytokine treatment in normal human astrocytes. Experimental Biology-American Society for Pharmacology and Experimental Therapeutics (ASPET) Boston MA, USA, April 20-24, 2013.

118. Figueroa-Hall, L.K., Das, S., Buck, D.J., <u>Stevens, C.W.</u>, Davis, R.L., Investigating TLR4-signaling mechanisms in CHME-5 human microglial cells and the effects of β-funaltrexamine treatment. American Association of Immunologists, Honolulu, HI, USA, May 3-7, 2013.

**Testimonial Cases – Last 4 years**                                    *Prepared on: October 31, 2019*
Craig W. Stevens, Ph.D., Professor of Pharmacology & Drug Expert          *(listed in reverse chronological order)*

1. Trail testimony given on **10/29/2019** in *Charles Russel Rhines vs. South Dakota DOC et al.,* SD Circuit Court, Second Judicial Circuit, Minnehaha County, Sioux Falls, SD, for the Plaintiff and Mr. Alex Kursman, FPD Office, Philadelphia, PA. *Issue: Pentobarbital classification as a short-acting barbiturate.*

2. Deposition given on **9/17/2019** in *Deela vs. Annett Holdings et al.,* US District Court, Eastern District of OK, Case No. 17-CV-483-KEW for the Plaintiff and Mr. Michael Carr in Tulsa, OK. *Issue: Interpretation of a preliminary drug test for methamphetamine in a motor vehicle accident.*

3. Trial testimony on 4/**30/2019** in *Abu-Ali-Abdur'Rahman v Tony Parker et al.,* The Chancery Court for the Tennessee, Davidson County, Pt. III, case no. 18-183-II(III) for the Plaintiffs and FPD office, Nashville, TN. *Issue: Use of midazolam in lethal injection protocol.*

4. Deposition given on **3/01/2019** in *Hawkins v. Lake,* District Court, Grady County, OK, Case No. CJ-2016-213 for the Plaintiffs and Mr. Paul Kolker of Pignato, Cooper, Kolker & Roberson, P.C. in Tulsa, OK. *Issue: Interpretation of a post-mortem femoral and vitreous humor ethanol concentrations.*

5. Deposition given on **1/28/2019** in *Ochoa v. Mercy Hospital* for the Plaintiffs and Mr. Travis Dunn of Maples, Nix & Diesselhorst in Oklahoma City, OK. *Issue: Interpretation of a presumptive positive and subsequent negative results for methamphetamine in a patient's urine and blood samples.*

6. Trial testimony on **12/13/2018** in *In Re: Ohio Execution Protocol Litigation,* The United States District Court for the Southern District of Ohio, Eastern Division, case No. 2:11-CV-1016, Dayton, OH for the Plaintiffs and FPD office. *Issue: Use of midazolam in lethal injection protocol.*

7. Trial testimony on **8/30/2018** in *The State of Oklahoma vs. Jerry Lee Newman, No. CF-2017-3086,* Tulsa District Court, for the Defendant and Boeheim/Freeman Law Firm, Tulsa, OK. *Issue: Methamphetamine-induced aggression, impulsivity, and memory deficits.*

8. Trial testimony on **8/28/2018** in *Joki v Causey: Tulsa County CJ-2014-03898,* Tulsa District Court, for the Plaintiffs and Rode Law Firm, Tulsa, OK. *Issue: Driving impairment with use of alcohol/psychotropic drugs.*

9. Trial testimony on **7/09/2018** in *Abu-Ali-Abdur'Rahman v Tony Parker et al.,* The Chancery Court for the Tennessee, Davidson County, Pt. III, case no. 18-183-II(III) for the Plaintiffs and FPD office, Nashville, TN. *Issue: Use of midazolam in lethal injection protocol.*

10. Deposition given on **6/11/2018** in *Abu-Ali-Abdur'Rahman v Tony Parker et al.,* The Chancery Court for the Tennessee, Davidson County, Pt. III, case no. 18-183-II(III) taken by the Asst. District Attorney, Attorney General's Office, Nashville, TN. *Issue: Use of midazolam in lethal injection protocol.*

11. Trial testimony on **12/12/2017** in *State v Bridges, Tulsa County Case No. CF-2017-1161,* for the defendant and Allen Smallwood Law Firm, Tulsa, OK. *Issue: Impulsive behavior, aggression, violence, and psychosis caused by methamphetamine abuse.*

12. Trial testimony on **10/24/2017** in *In Re: Ohio Execution Protocol Litigation,* The United States District Court for the Southern District of Ohio, Eastern Division, case No. 2:11-CV-1016, Dayton, OH for the Plaintiffs and FPD office. *Issue: Use of midazolam in lethal injection protocol.*

13. Trial testimony on **9/20/2017** in *Sanders v. Merciez: Okmulgee County CJ 2015-185*, Okmulgee, Oklahoma, for the Defendants and Andrea Medley, Middleton & Associates, Tulsa, OK. *Issue: Use of alcohol by pedestrians in a fatal motor vehicle accident.*

14. Deposition given on **6/28/2017** in *Ruth v Reagan/K & W Contractors,* Tulsa County, Case No. CJ-2016-1146 in the offices of Gene Robinson Law firm Tulsa, OK, on behalf of the defendants**.** *Issue: Interpretation of confirmed and detected-only drugs in a driver's blood sample after a fatal motor vehicle accident.*

15. Deposition given on **4/07/2017** in *Lewis v CTCA,* Tulsa County, Case No. CJ-2014-02748 in the offices of the Rode Law Firm in Tulsa, OK, for the plaintiff. *Issue: Fatal respiratory depression caused by improper administration of fentanyl.*

16. Trial testimony on **4/11/2017** in *Jason Mcghee, et al. v. Asa Hutchinson and Wendy Kelley*, case Number: 4:17-CV-00179-KGB, United States District Court for the Eastern District of Arkansas, Little Rock, AR for the Plaintiffs and FPD office. *Issue: Use of midazolam in lethal injection protocol.*

17. Trial testimony on **3/16/2017** in *Reed and Armstrong v Vegas Corporation*, Tulsa County, Case No. CJ-2011-6116 for plaintiff and Richard Shallcross Law Firm, Tulsa, OK. *Issue: Interpretation of ethanol and THC levels in blood samples obtained from the driver after a motor vehicle accident.*

18. Deposition given on **1/26/2017** in *Joki v Causey*, Tulsa County, case No. CJ-2014-03898, in the offices of the Rode Law Firm in Tulsa, OK, for the plaintiff. *Issue: Effects of low-dose ethanol and interaction of alcohol and the prescription medications Lipitor®, Lexapro® and Depakote® obtained from driver after a motor vehicle accident.*

19. Trial testimony on **1/4/2017** in *In Re: Ohio Execution Protocol Litigation,* The United States District Court for the Southern District of Ohio, Eastern Division, case No. 2:11-CV-1016, Dayton, OH for the Plaintiffs and FPD office. *Issue: Use of midazolam in lethal injection protocol.*

20. Pre-trial testimony on **6/1/2016** in *Sanders v Richardson Homes* CJ-2012-130, McClain County, Purcell, OK, for the defendant and Derrick Teague at James Jennings at Jennings & Teague PC, Oklahoma City, OK. *Issue: Impact of the prescription drugs, alprazolam (Xanax®), ropinirole (Requip®), sertraline (Zoloft®), and levocetirizine (Xyzal®), on a homeowner accident.*

21. Trial testimony on **3/23/2016** in *Haulcomb v. Earl-Le Dozer Service*, 2014-10950-H, in the Workers' Compensation Court of Existing Claims, State of Oklahoma, Tulsa, OK for claimant and Mike Jones Law Firm, Bristow, OK. *Issue: Interpretation of an initial hospital urine drug screen in an employment accident.*

22. Deposition given on **02/04/2016** in *Lasek v Keith Co.*, 14-CV-0687-CVE-PJC, in the offices of Norman & Edem, PLLC, Oklahoma City, OK for the plaintiff and Mark Bonner. *Issue: Impact of the use of the prescription drugs, paroxetine (Paxil®) and zolpidem (Ambien®), on the operation of a tractor-trailer motor vehicle.*

23. Trial testimony on **12/08/2015** in *State v Ashton*, Tulsa County, Tulsa, OK, Case No. CF-2014-4108, for the defendant and Stan Monroe at Stan Monroe & Associates, Tulsa, OK. *Issue: Interpretation of methamphetamine blood levels in the decedent.*

24. Trial testimony in *Figg v Toyota*, Oklahoma County, Case No. CJ-2009-890 for the defendant and James Jennings at Jennings & Teague PC, Oklahoma City, OK on **11/13/2015**. *Issue: Impact of the prescription medications, diazepam (Valium®) and hydromorphone (Dilaudid®), on the operation of a motor vehicle.*

## Supplemental Expert Declaration of Gail A. Van Norman M.D. Regarding Lisa Montgomery

**Introduction**

On November 1, 2019, I provided Plaintiffs' counsel with my opinions regarding the Federal Execution Protocol in a declaration that included detailed discussion and cited scientific evidence.  On June 29, 2020 I provided a Supplemental Expert Declaration addressing specific questions regarding flash pulmonary edema in prisoners executed by IV administration of 5 grams of pentobarbital.  I also provided a Secondary Supplemental Declaration to the Court dated August 7, 2020 for Plaintiff Keith Nelson, addressing findings of pulmonary edema following the execution of Wesley Purkey on July 16, 2020. On September 15, 2020, I wrote an Additional Supplemental Report to the Court, providing rebuttal to the declarations of Dr. Kendall Von Crowns (August 10, 2020) and Dr. Joseph Antognini (September 11, 2020).  In addition on September 24, 2020, after the execution of William LeCroy, I was provided with eyewitness accounts of the execution of William LeCroy on September 22, 2020, as well as autopsy reports of 307 prisoners executed by judicial lethal injection involving various drugs, most of which were cited by in a story published by NPR on September 21, 2020,[1] and submitted an opinion dated September 24, 2020 regarding breathing and eye movements witnessed during the execution and reexamining the incidence of flash pulmonary edema among prisoners executed using the Federal Lethal Injection Protocol.

Counsel for Lisa Montgomery have asked me to review her medical records and comment about 1) how her medications may affect the clinical response to pentobarbital during lethal judicial execution, and 2) how her medical conditions, specifically asthma, obstructive sleep apnea (OSA), Prinzmetal's angina, and post-traumatic stress disorder (PTSD) may affect awareness and sensations of drowning during the lethal injection process.

I have stated previously that when additional documents or materials are provided to me for specific review and analysis, or if I become aware of other scientific or clinical evidence that impacts my opinions, (or if in attendance at any hearings or trials in this case I learn of relevant evidence), I may choose to modify these opinions accordingly.

This supplemental declaration accordingly 1) provides **new data and emerging scientific information**,[2] 2)  updates information  in supplemental reports to the Court dated July 13, 2020 pages 3-6, regarding Daniel Lee, and report dated August 9, 2020 pages 3-7, regarding Norris Holder and addressing enzyme breakdown of pentobarbital, and  3) addresses issues unique to Lisa Montgomery and judicial lethal injection.

---

[1] Caldwell N., Chang A., Myers J.  Gasping for air: autopsies reveal troubling effects of lethal injection.  NPR.  Sept 21, 2020.  Available at:  https://www.npr.org/2020/09/21/793177589/gasping-for-air-autopsies-reveal-troubling-effects-of-lethal-injection. Accessed Sept 21, 2020

[2] This report supplies new information about CYP breakdown of barbiturates, including emerging scientific evidence that they are present in and have action in the brain, and that changes in the clinical effects in the brain of psychoactive drugs specifically, such as barbiturates, are altered in the presence of common medications that are used to treat seizures or mental illness such as depression, bipolar illness, PTSD and others.

In addition to the materials listed in my Expert Declaration dated November 1, 2019, and in my previous Supplemental Reports dated June 29, 2020; August 7, 2020; and September 15, 2020, and September 24, 2020, I have further reviewed and relied upon the following materials:

- Medical records for Lisa Montgomery as supplied by Counsel from the Bureau of Prisons to counsel for Mrs. Montgomery;
- Various authoritative medical texts and scientific publications as referenced and footnoted throughout this report.

**Opinions**

To aid Counsel and the Court, I will restate some of my previous conclusions that are relevant to this declaration, in addition to my new conclusions that address Counsel's questions. Each of the new opinions is discussed at length in this declaration.

1. Flash pulmonary edema occurs in essentially 100% of prisoners executed by judicial lethal injection using pentobarbital. (Please refer to my Expert Declaration, dated November 1, 2019, pages 32-33, for a discussion of pulmonary edema in barbiturate overdose and references).

2. Flash pulmonary edema occurs very rapidly (i.e. within seconds or minutes), and is associated by excruciating symptoms of drowning and suffocation, including shortness of breath, air hunger, anxiety, terror and panic. (Please refer to my Expert Declaration dated November 1, 2019, pages 33-34, detailing sensations of drowning and suffocation).

3. Clearance of pentobarbital from the brain is enhanced when specific cytochrome P450 enzymes, notably CYP2C9, CYP2C19 and CYP2E1 are "induced" or enhanced, often by the administration of drugs that specifically interact with these enzymes to induce them. Clearance of psychoactive drugs from the brain occurs locally, as has been demonstrated in numerous studies, and is now a well-accepted concept in brain neurochemistry. (Please refer to my reports dated July 13, 2020 regarding Daniel Lee, and August 9, 2020 regarding Norris Holder).

4. Enhanced clearance of pentobarbital by a CYP enzyme present in both the brain and liver (CYP2E1) will lower pentobarbital levels locally within the brain, within the timeframe of judicial lethal injection, enhancing the person's awareness of sensations of drowning, suffocation and terror. Mrs. Montgomery has been receiving chronic administration of mirtazapine, which has been shown to induce CYPE21, and will therefore have more rapid clearance of pentobarbital from the brain, and enhanced awareness of those sensations of suffocation and drowning during judicial lethal injection.

5. Those sensations will be worsened by Mrs. Montgomery's underlying medical conditions: 1) asthma and obstructive sleep apnea (OSA), puts her at risk of early airway obstruction and prolonged sensations of suffocation and drowning,  2) Prinzmetal's angina puts her at high risk to additionally chest pain, chest pressure and shortness of

2

breath and 3) PTSD predisposes her to  severe anxiety and terror, and to present difficulties with placement of intravenous catheters.


**DISCUSSION**

**Early Termination of Barbiturate Action in the Brain in Patients on Psychoactive Medications:  Enzymatic Breakdown of Pentobarbital by CYP Enzymes of the 2C Subset.** (Please refer also my Declaration dated November 1, 2019 pages 9-12 for further discussion of barbiturate action in the brain.)

Pentobarbital is a very short acting drug, which owes its termination of action to **redistribution** of the drug out of the brain, and to **enzymatic breakdown** of the drug in the liver and brain.  The breakdown of pentobarbital both removes drug from the body, and also hastens redistribution out of the brain.

**Redistribution of Pentobarbital:**

How quickly redistribution of pentobarbital out of the brain occurs and terminates its brain activity is dependent on several factors. One of the important factors is the difference in concentration of the drug between the brain and the blood.  From the bloodstream, the drug travels from areas of high concentration to lower concentration, and the greater the difference in concentrations between different tissues, the faster the drug will travel, so long as the blood flow to the area is also high.  In areas of the body where blood flow is low (e.g. fat), redistribution into the tissue is slower than in the brain, blood and liver, simply because there is less blood delivering the drug to the tissue.

When the pentobarbital is being injected, for example, brain levels are low, but the blood level is climbing rapidly as the injection proceeds.  There is significant blood flow to the brain (about 15% of all of the blood leaving the heart) and liver (about 25%), and therefore the blood carries a drug very rapidly to the liver and brain (a few seconds).  Other tissues such as fat receive much less blood (5% of the blood leaving the heart), and so the total amount of a drug they receive is also much less than one-fifth of what is delivered to the brain and liver during the same time.

As injection begins, not only does blood circulate it to the brain very quickly, but blood levels of pentobarbital are much higher than those in the brain tissue initially, and so the drug "willingly" leaves the blood to enter the brain and "fill it up".  As injection ends, blood levels of the drug have already fallen, because the drug has also been delivered to various tissues not limited to the brain.  The blood levels are lower than brain levels, and the drug transit in the brain changes direction and begins to leave the brain to rejoin the blood.  For barbiturates, the transition to drug flowing *out* of the brain happens within seconds to minutes and is in part responsible for the early termination of pentobarbital's effects in the brain.

This relatively simple explanation is not the whole story, however.  Another factor that lowers both brain and blood levels of pentobarbital is the activity of a set of enzymes responsible for the breakdown and then removal of pentobarbital from the body, the CYP system (also called cytochrome P450 system).  This system works in 2 ways:  1) CYP enzymes located in the brain—and preferentially concentrated in some areas of the brain that affect "consciousness"—break down the drug as it arrives in the brain, and 2) blood carries drug to the liver, where the same CYP enzymes concentrated in the liver break it down and eliminate it from the body.

**Enzymatic Breakdown of Pentobarbital**

(Please refer also to my discussion of the enzymatic breakdown of barbiturates in my reports dated November 1, 2019 pages 9-12 regarding Daniel Lee, and report dated August 9, 2020, pages 2-7 regarding Norris Holder)

The set of CYP enzymes responsible for the breakdown of pentobarbital are CYP2C9, CYP2C19, and CYP2E1.[3,4,5]

Generally, in normal, healthy volunteers who are not taking medications, the process of barbiturate breakdown and its complete elimination from the body is slow relative to the time for rapid redistribution of the drug to other tissues, and it will be several hours before significant portions of the drug are eliminated from the body entirely.  But it is important to recall that the "normal" distribution and elimination of drugs that is referred to in textbook pharmacology is tested in "normal, healthy volunteers" who are not taking any other medications that interfere with the drug being tested.  Drugs do not follow this "normal" behavior in people who have genetic abnormalities of these enzymes, or whose medical conditions or medications interfere with the "normal" ways in which these enzymes will work to eliminate drugs.

Some patients either a) have genetic predisposition for high levels of these enzymes or for abnormally active enzymes, or b) have chronically been exposed to medications that "induce" these enzymes—i.e. increase the amount and activity of these enzymes. In such patients, this slower step (of drug breakdown) occurs *significantly* more rapidly. In proven cases, drug elimination can occur 5 to 8 times more rapidly than is seen in normal volunteers.  This change in drug elimination can affect drug interactions, by eliminating pentobarbital more quickly and thereby decreasing efficacy, and wields a significant

---

[3] Patsalos PN, Froscher W, Pisani F, van Rijn CM.  The importance of drug interactions in epilepsy therapy. Epilepsia 2002; 43:365-8
[4] Johannessen SI, Johannessen-Landmark C.  Antiepileptic drug interactions—principles and clinical implications. Curr Neruopharmacol 2010; 8:254-67
[5] Perucca E.  Clinically relevant drug interactions with antiepileptic drugs.  Brit J clin Pharmacol. 2005; 61:246-255

influence on the variation of drug actions in individuals.[6,7,8]  For drugs whose elimination is done primarily by CYP-mediated mechanisms, CYP induction *will decrease* the therapeutic efficacy.[9]

The science of CYP effects on drug metabolism, particularly on drugs that have their primary actions in the brain, is young.  Traditionally, we have spoken of the major role of these enzymes in the liver, where they are most concentrated in the body.  Liver "clearance" of drugs is the most common way to look at how drugs are metabolized, and therefore most of drug action and clearance has been described by how the drug levels in the blood change during liver elimination from the body.  Very recent work, however shows that the local breakdown of drugs in the brain contribute more to drug efficacy and to termination of effects in the brain itself than drug processing in the liver.  It is becoming clear that the "textbook" method of predicting drug action by examining blood levels and "liver elimination from the body" is a poor way to determine how drugs will interact and have their effects in the brain, *which has its own processing system that uses the same enzymes*.[10]

Such "enhanced" CYP processing leads to a much more rapid decline of drug levels in the brain overall through two mechanisms.  First, CYP enzymes in the brain itself begin to immediately break down the drug even before redistribution occurs, and lower drug levels in the brain directly.  This has the effect of reducing the drug's effects immediately, and right at the site where it works.  Second, CYP enzymes in the liver begin immediately to eliminate the drug in the bloodstream much more rapidly than normal pharmacokinetics, and blood levels fall much more rapidly than under "normal" conditions, causing pentobarbital to leave the brain much more rapidly to re-enter the bloodstream.

The concentration of the CYP enzymes that metabolize barbiturates is much lower in the brain overall than in the liver, but these enzymes are highly concentrated in very specific areas of the brain, and have much higher specific activity in those areas. In recent years, attention has turned to understanding how these enzymes, which were only recently understood to work in the brain as well as the liver, affect local drug concentrations and the efficacy of the drugs themselves on brain activity.

Recent scientific evidence demonstrates that these enzymes are distributed unevenly in the brain, and can create "microenvironments" with differing drug levels in different

---

[6] Miksys S, Tyndale RF.  The unique regulation of brain cytochrome P450 2 (CYP2) family enzymes by drugs and genetics.  Drug Metab Rev.  2004; 36:313-33
[7] Lin JH.  CYP induction drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7
[8] Pelkonen O, Turpeinen M, Hakkola J, Honkakoski P, Hukkanen J, Raunion H.  Inhibition and induction of human cytochrome P450 enzymes:  current status.  Arch Toxicol 2008; 82:667-715
[9] Lin JH.  CYP induction-mediated drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7
[10] Miksys S, Tyndale RF.  Cytochrome P450-mediated drug metabolism in the brain.  J Psychiatry Neurosci 2013; 38:152-63

areas of the brain .[11]  Thus enzyme induction can selectively lower levels of drug specifically in those parts of the brain where the enzyme is more heavily concentrated. CYPE1, for example, is one enzyme associated with barbiturate metabolism,[12] and it is found in the prefrontal cortex of the brain in high concentration.  That area of the brain is important in "consciousness"[13].

There is scientific proof that CYP-mediated metabolism in the brain can meaningfully impact the response to a psychoactive drug.[14]  In a study in rats[15] the enzyme that metabolizes propofol (an anesthetic "sleep" drug) was "induced" or caused to increase in concentration and activity, and it lowered local brain levels of propofol.  This was accompanied by decreased clinical response—the rats didn't "sleep" by even half as long as they should.  The difference was not due to liver-clearance of propofol from the blood (blood levels actually remained unchanged in the rats), but rather due to the breakdown of propofol in the brain, lowering the local brain levels below those seen in the rats who did not undergo enzyme induction, even though *no changes in blood levels occurred*.[16] This alteration in drug function was brought about by much smaller amounts of CYP than those found in the liver, and therefore CYP enzyme induction in the liver appeared to have little if any effect on brain blood levels compared to local enzymes in the brain.  *To rephrase, enzyme induction led to increased local metabolism in the brain which decreased the drug's effect on sleep, but, it did not change blood levels that are used to measure liver clearance.* Scientific evidence furthermore shows that brain CYPs can impact both immediate and chronic responses to drugs.[17,18]

Studies have demonstrated that with so-called "low hepatic clearance drugs" such as barbiturates, the induction of enzymes has significant effects on the systemic clearance of the drugs that are *independent of the route of administration,[19]* meaning it makes an equally significant change to the clearance of drugs regardless of whether they are administered orally or given intravenously[20].  In other words, the metabolism and

[11] Miksys S, Tyndale RF.  The unique regulation of brain cytochrome P450 2 (CYP2) family enzymes by drugs and genetics.  Drug Metab Rev.  2004; 36:313-33

[12] Garcia-Suastegui WA, Ramos-Chavez LA, Rubio-Osornio M, et al.  The role of CYP2E1 in the drug metabolism or bioactivation in the brain.  Oxid Med Cell Longev 2017: Article ID 4680732

[13] Waking up is hard to do.  University of Michigan.  June 21, 2018.  Available at: https://www.sciencedaily.com/releases/2018/06/180621141040.htm  Accessed October 24, 2020

[14] Ferfuson CS, Tyndale RF.  Cytochromes P450 in the brain: emerging evidence for biological significance.  Trnsd Pharmacol Sci. 2011; Oct 3: DOI; 10/106/j.tips.2011.08.005

[15] While I try in general to rely on in-human studies for evidence to the Court due to its clear applications, in this case, in-human studies would be unethical, because such studies involve sacrificing the experimental subject and harvesting brain tissue to study drug levels in localized areas of the brain.  The only available studies relevant to this discussion at this time involve animal subjects.

[16] Khokhar JY, Tyndale RF.  Drug metabolism within the brain changes drug response:  selective manipulation of brain CYP2B alters propofol effects.  Neuropsychopharmaology 2011; 36:692-700

[17] McMillan DM, Tyndale RF.  CYP-mediated drug metabolism in the brain impacts drug respons.  Pharmacol Ther 2018; 184:189-200

[18] Garcia-Suastegui WA, Ramos-Chavez LA, Rubio-Osornio M, et al.  The role of CYP2E1 in the drug metabolism or bioactivation in the brain.  Oxid Med Cell Longev 2017: Article ID 4680732

[19] Lin JH.  CYP induction-mediated drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7

elimination of drugs like pentobarbital will change significantly in response to enzyme induction, and that in turn will significantly affect both blood and brain levels of the drug. All of which has been demonstrated in scientific studies.

While there is no data on the change in pentobarbital clearance after enzyme induction specifically, other low-hepatic clearance drugs that are cleared by the same enzymes have seen magnification of breakdown by up to *8-fold*.[21]  Drug clearance by the induction of CYP2C9 enzyme— another of 3 enzymes known to interact with barbiturates—by itself can be enhanced 5-fold, which leads to very significant changes in drug levels.  In the case of warfarin, a drug known to be eliminated by CYP2C9, and used as a "classic" example of what induction of this particular enzyme can do to the levels of a drug it clears, enzyme induction caused average AUC (area under the curve)[22] drug levels with normal doses to fall from a blood level of 220ng h/mL, to 59ng h/mL[23]— a decrease of 74%—and for the drug's therapeutic effects to essentially disappear.[24]

Scientific evidence, including reference to hundreds of studies in human beings of awareness using the IFT technique I cited in my main report dated November 1, 2019 demonstrates that awareness occurs very frequently overall in patients who are given anesthetic drugs, including pentothal, a barbiturate similar in all important ways to pentobarbital, and is much more common than even most anesthesiologists want to believe. Furthermore, awareness is not apparent in the vast majority of cases at the time because the *patient remains unresponsive even though they are awake* (Please refer to my Declaration dated November 1, 2019 pages 13-29 for a discussion regarding consciousness and responsiveness).

When the person who is being exposed to a barbiturate has elevated levels and/or enzyme activity of an enzyme that is specifically directed at eliminating barbiturates, barbiturate levels are lowered much more rapidly, and the risk of awareness *goes up even farther*. Recall that because these enzymes reside in the brain as well as the liver, the barbiturate need not be eliminated from the body, nor even entirely eliminated from the brain for this to happen.

Simply stopping the "inducing" drugs to allow the body to return to its "normal" state is problematic, for several reasons.  In the first place, the enzyme activity takes a significant amount of time to return to normal, usually measured in weeks or months rather than

---

[21] Lin JH.  CYP induction-mediated drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7
[22] AUC refers to a measure of total drug concentration over time after a dose.  It is not identical to drug levels at discreet points, but rather more indicative of a "total dose" the patient sees.  This comparison, rather than comparison of momentary "blood levels" allows a true comparison of different drugs with different absorption and onset characteristics.  For the reader, it can be used to interpret how drug levels will behave, but does not indicate that a specific drug level will actually occur.
[23] Lin JH.  CYP induction-mediated drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7
[24] Lin JH.  CYP induction-mediated drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7

hours or days.[25]  So simply "holding" an inducing drug the day before, or even the week before the injection of pentobarbital won't change the enhanced enzyme effects within weeks.  In the second place, the inducing drug is being given to control a medical problem or process that would then fall rapidly out of control without the medication.

For Lisa Montgomery, those conditions are depression and suicidal ideation, bipolar disease, psychosis, and terror related to PTSD.  She is receiving mirtazapine, an enzyme-inducing drug, to control these issues.  These conditions would then become uncontrolled as the drug levels fall if mirtazapine is held.  As her mental conditions fall out of control, for example, acute psychosis could result.  Note that the drug levels will continue to fall during the weeks before the higher-than-normal enzyme activity returns to a normal, lower level. These medical conditions will return rapidly—within hours or days, as the drug levels fall. As Lin points out[26]: "Addition of any potent inducer or withdrawal of a potent inducer from an existing drug regimen may cause pronounced changes of drug concentrations, leading to failure of drug therapy….."  Replacing her usual medications with alternative therapies does not  help, because the alternative therapies generally have the same inducing effect on the enzymes that the original drugs have had, and will take weeks to reach therapeutic levels.

**Lisa Montgomery Has Specific Risks for Pulmonary Edema, Awareness and Suffering During Judicial Lethal Injection**

According to her Bureau of Prisons medical records, Lisa Montgomery suffers from "significant mental illness".  She has chronically been on several antidepressants and antipsychotic medications to control suicidal ideation, depressive symptoms, hallucinations (primarily auditory), and anxiety related to post-traumatic stress disorder.  In addition, her records reflect diagnoses of poorly characterized bipolar illness, and possible schizophrenia.  Her medical conditions of significance to this declaration, apart from her mental illness, include Prinzmetal's angina, use of CPAP (presumed obstructive sleep apnea—OSA), gastroesophageal reflux, and asthma.

**Medications:  Mirtazapine Induces CYP2E1**

In treatment of her mental illness, Lisa Montgomery is receiving mirtazapine, also known by the trade name Remeron, a psychoactive drug for which few studies have been done with regard to its effects on CYP enzymes.  However, one study demonstrated that mirtazapine "upregulates" or induces CYP2E1, one of the three enzymes known to enhance the metabolism of barbiturates.[27]

---

[25] Lin JH.  CYP induction-mediated drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7
[26] Lin JH.  CYP induction-mediated drug interactions: *in vivo* assessment and clinical implications.  Pharm Res 2006; DOI: 10.1007/s11095-006-0277-7
[27] Kotsovolou O, Ingelman-Sundberg M, Lang MA, et al.  Hepatic drug metabolizing profile of Flinders Sensitive Line rat model of depression.  Prog Neuropsychopharm Biol Psych. 2010; 34:1075-84

With elevated activity of CYP2E1, Mrs. Montgomery is at enhanced risk for 1) immediate (at the time of initial injection) reduction in pentobarbital levels in the brain due to dramatically increased local enzymatic breakdown of pentobarbital in the brain itself, and 2) more rapid redistribution of pentobarbital out of the brain by induced CYP2E1 activity in the liver that dramatically increases clearance from the bloodstream. This decreases the blood levels of pentobarbital to lower-than-expected levels, which in turn lead to even more rapid redistribution out of the brain than usual. With enzyme induction sometimes leading to up to an 8-fold increase in drug clearance, both brain clearance and liver clearance of pentobarbital would be dramatically higher and more rapid than in "normal" persons. Together, these two actions are known to dramatically decreased efficacy of many drugs known to be metabolized by CYP2E1, such as the barbiturates.

In addition to the concerns that "awareness" is not actually blocked as effectively with anesthetic agents such as barbiturates as most people believe, Mrs. Montgomery's unique situation puts her especially at risk for awareness, and her medical conditions contribute to the significant likelihood that she will suffer pain and sensations of suffocation and drowning during judicial lethal injection.

**Medical Conditions**

Mrs. Montgomery suffers from several conditions that present particular risks during judicial lethal injection with pentobarbital; obstructive sleep apnea, asthma, and Prinzmetal's angina, all of which will contribute to flash pulmonary edema, pain and sensations of drowning.

I have already reviewed extensively the mechanisms of flash pulmonary in previous reports (please refer to my Declaration dated November 1, 2019, pages 31-33), as well as the virtual certainty of flash pulmonary edema in the setting of massive IV overdose of barbiturates; these are scientific facts: to date, essentially 100% of all prisoners executed with pentobarbital in whom the lungs were examined at autopsy have shown flash pulmonary edema (please refer to my Supplemental Report to the Court dated September 24, 2020, pages 5-6). I have also previously outlined the ways in which upper airway obstruction—a well-known consequence of barbiturate injection in humans during anesthetic induction—contributes to the occurrence of flash pulmonary edema through a mechanism called "negative pressure pulmonary edema". Negative pressure pulmonary edema is a well-known phenomenon in anesthesia and intensive care medicine. (Please see my Declaration dated November 1, 2019 pages 31-33).

Asthma and obstructive sleep apnea are both disorders of the respiratory system.  In patients with chronic asthma, the airways are reactive and constrict when exposed to a number of factors in the environment, including allergens, pollutants, and chronic inflammation due to low level infection (bronchitis).  Chronic asthma is treated usually with a class of drugs called "bronchodilators"—literally intended to dilate the airways, such as inhaled albuterol.  Mrs. Montgomery is, in fact, prescribed two separate bronchodilators: albuterol and fluticasone. Chronic inflammation in patients with asthma like Lisa Montgomery, leads to a chronic inflammatory state in the airways, with chronic swelling (edema) in the walls of the airways, and subsequent narrowing in the airways. [28]  In episodes of acute asthma, breathing becomes more

---

[28] Padem N, Saltoun C.  Classification of asthma.  Allergy Asthma Proc 2019; 40:385-8

difficult, wheezing and cough often develop, and the patient experiences shortness of breath and a sensation of being unable to get enough air.

Obstructive sleep apnea (OSA) is a condition in which, during periods of sleep, the muscles of the upper airway relax enough that the upper airway experiences partial or total obstruction.  OSA can occur due to obesity (because of excess tissue in the airway), due to drug interactions, or due to intrinsic abnormalities in the brain. A typical sleep pattern with OSA patients is early airway collapse, greater and greater respiratory efforts to keep the airway open, sometimes a pause in breathing, followed by partial awakening and return to normal breathing. During the periods of abnormal breathing oxygen levels in the blood fall—significantly but not usually to a degree that deprives the brain of oxygen—and those periods of lower oxygen level cause strain on the heart.

OSA patients are particularly prone to airway collapse and early upper airway obstruction after administration of sedatives or anesthetics, even while they continue to attempt to breathe. This tendency is attributed to several factors:  in obese patients, there may be extra fatty tissue in the upper airway (note: not all patients with OSA are obese), 2) there appears to be an association with decreased resting airway "tone", that may be neurological in nature, 3) some patients may have excessive growth of the tonsils and adenoids such that they "fill up" the upper airway, and 4) other structural abnormalities of the upper airway.  OSA patients are sometimes prescribed CPAP (continuous positive airway pressure)—in which oxygen is delivered while they sleep through a special mask that fits the face tightly and pushes air into the upper airway, holding it open while the patient breathes.  Mrs. Montgomery requires CPAP.

OSA is known to be associated with upper airway obstruction with administration of sedative medications, pain medications and anesthetic drugs, due to the tendency for the airway to collapse earlier in those patients.  The American Society of Anesthesiologists accordingly has guidelines for monitoring and sedating the patient with OSA[29], and points out that "even minimal sedation can cause upper airway obstruction…".[30]

The combination of asthma, with intrinsic airway obstruction due to bronchial constriction, edema and inflammation, plus OSA virtually guarantees that airway obstruction will occur even more rapidly than usual following intravenous administration of a massive overdose of barbiturates during lethal injection, meaning that flash pulmonary edema will occur earlier, while at the same time, her enhanced enzymes are clearing the pentobarbital from her brain more quickly.

---

[29] Practice guidelines for the perioperative management of patients with obstructive sleep apnea:  An updated report by the American Society of Anesthesiologists Task Force on Perioperative Management of Patients with Obstructive Sleep Apnea.  Anesthesiology 2014; 120:268-86

[30] Ogan OU, Plevak DJ.  Anesthesia safety always an issue with obstructive sleep apnea. APSF Newsletter. Summer 1997; vol 12(2).  Available at:  https://www.apsf.org/article/anesthesia-safety-always-an-issue-with-obstructive-sleep-apnea/ Accessed October 25, 2020.

**Prinzmetal's Angina**

Prinzmetal's angina refers to a type of chest pain due to myocardial ischemia (lack of oxygen to the heart), which occurs in atypical patterns, such as at rest.  In contrast with usual angina, Prinzmetal's angina is not often associated with obstruction or calcium in the coronary arteries, but occurs because the coronary blood vessels suddenly spasm ("vasospasm") and block blood flow to the heart.  Like regular angina, Prinzmetal's angina causes chest pain—but pain which is typically much more severe than regular angina—together with pressure in the chest, which patients typically describe as being "like an elephant is sitting on the chest", and shortness of breath, nausea, sweating and other symptoms. This is often accompanied by decrease in the ability of the heart to pump blood, another factor known to be a contributor to flash pulmonary edema.  Prinzmetal's angina is precipitated by mental and physical stress, among other factors,[31] which can be expected to occur in the minutes and hours prior to judicial execution.

**Post Traumatic Stress Disorder (PTSD)**

PTSD is a disorder that can develop when a person has been exposed to an extreme stressor or traumatic event that brought about feelings such as fear, helplessness, or horror.  The hallmark of PTSD is reexperiencing the event, avoidance of reminders of the event, and hyperarousal that lasts more than a month.  There is significant overlap of PTSD with anxiety disorders, including panic disorder.  It is a frequent consequence in woman following physical assault, including sexual assault. And the physiological responses of fear, stress, and horror are common during events that recall the original precipitator.

Patients with PTSD have increased levels of circulating catecholamines, which are the intrinsic chemicals the body produces in a state of stress, fear, or panic.  Long term PTSD leads to changes in brain structure.  Studies of patients with PTSD demonstrate that they have chronically higher level of activation of the sympathetic nervous system (the "fight or flight" aspects of the nervous system) with inability to respond normally to fear and stress.[32]  Patients suffering from PTSD also have much higher risk of angina, and asthma episodes.[33]  In anesthesiology we are well aware of the issues that PTSD poses, before, during and after anesthesia.  Patients in the preoperative holding area often have extreme anxiety, and develop fast heart rates, high blood pressure and shortness of breath.  They also often present difficulties in placement of IV catheters for administration of IV drugs, due to profound fear and anxiety and sympathetic nervous system responses. (Please see my Declaration dated November 1, 2019, pages 36-39 regarding complications of IV placement for judicial lethal injection.)

**Summary**

In summary, in persons in whom genetic differences in CYP enzymes occur, or who are chronically administered a medication or medications that "induce" the activity of CYP enzymes

---

[31] Picard F, Sayah N, Spanolli V, et al.  Vasospastic angina: a literature review of current evidence.  Arch Cardiovas Dis 2019; 112:44-55

[32] Yehuda R.  Post-traumatic stress disorder.  New Eng J Med 2002; 346:108-14

[33] Spitzer C, Barnow S, Volzke H, et al.  Trauma, posttraumatic stress disorder, and physical illness:  findings from the general population.  Psychosom Med 2009; 17:1012-7

responsible for the breakdown of barbiturates, there is rapid local clearance of pentobarbital from the brain, and enhanced clearance from the body by the liver. This will increase the probability of awareness during judicial lethal injection, and the prisoner will experience sensations of drowning, shortness of breath, suffocation and terror.

Lisa Montgomery has received chronic administration of mirtazapine, which has been shown to enhance the activity of CYP2E1, an enzyme responsible for the breakdown of barbiturates. She therefore has enhanced CYP2E1, and will experience more rapid clearance than normal of pentobarbital. The local clearance of the drug within the brain can be sufficient to further reduce the effects of pentobarbital in her brain, and this effect will be further enhanced by liver clearance of the drug. Enhancement of her CYP enzyme system by mirtazapine further increases the risk of awareness during judicial lethal injection—and the probability that she will experience excruciating feelings of drowning, suffocation, shortness of breath, and terror.

Mrs. Montgomery's asthma and OSA likely will lead her to experience sensations of shortness of breath earlier in the injection process than other prisoners without this condition, thus prolonging these experiences. Because of her Prinzmetal's angina, she is at risk of additional suffering through cardiac ischemia due to her anxiety and stress during the execution, that causes severe chest pain, shortness of breath, and terror. PTSD will amplify all of these conditions, as well as increase the probability that placement of intravenous catheters will be difficult.

I declare under penalty of perjury that the foregoing constitutes my expert opinion and is true to to a reasonable degree of medical certainty.

Signed: _Gail A. Van Norman MD_

Dated: _10/26/2020_