**\*\*\*EXECUTION SCHEDULED FOR JANUARY 15, 2021\*\*\***

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,** | ) ) ) | |
| | ) | |
| **Lead case:**  *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| *Roane et al. v. Barr et al.*, No. 05-cv-2337 | ) | |

<u>**MOTION FOR PRELIMINARY INJUNCTION BARRING THE EXECUTION
OF PLAINTIFF DUSTIN HIGGS**</u>

Plaintiff Dustin Higgs respectfully moves the Court to enter a preliminary injunction

pursuant to Fed. R. Civ. P. 65(a), enjoining Defendants from carrying out the scheduled

execution of Mr. Higgs on January 15, 2021, or at any other time until further order of this Court,

and granting an evidentiary hearing. For the reasons stated in the accompanying Memorandum of

Points and Authorities, the Court should enter a preliminary injunction barring Mr. Higgs's

scheduled execution pursuant to the 2019 Protocol because this execution would violate the Fifth

and Eighth Amendments, the *Ex Post Facto* Clause of Article I, Section 9 of the Constitution,

and the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* and 701 *et seq.* Pursuant to Local

Rule 7(m), undersigned counsel has conferred with Defendants concerning this motion, and

Defendants advise that they oppose a preliminary injunction.

Dated:  December 4, 2020

Respectfully submitted,

*/s/ Shawn Nolan*
Shawn Nolan, Chief, Capital Habeas Unit
Matthew Lawry, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Higgs*

**\*\*\*EXECUTION SCHEDULED FOR JANUARY 15, 2021\*\*\***

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,** | ) ) ) | |
| | ) | |
| **Lead case:**   *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| *Roane et al. v. Barr et al.*, No. 05-cv-2337 | ) | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION BARRING THE EXECUTION
OF PLAINTIFF DUSTIN HIGGS**</u>

Shawn Nolan, Chief, Capital Habeas Unit
Matthew Lawry, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Higgs*

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

BACKGROUND .............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.     Plaintiff Higgs Is Likely To Succeed On The Merits Of His Claims ................................. 3

     A.    Mr. Higgs is likely to succeed on the merits of his *ex post facto* claim.................... 3

     B.    Mr. Higgs is likely to succeed on his as-applied Eighth Amendment challenge....... 8

          1.    The 2019 Protocol creates a demonstrated risk of severe pain for Mr. Higgs. ................................................................................................................8

          2.    Mr. Higgs has identified feasible alternative methods of execution................18

     C.    Mr. Higgs is likely to succeed on the merits of his claim that Defendants' arbitrary selection of Plaintiff for execution violates the Fifth and Eighth Amendments and is arbitrary and capricious under the APA.................................. 20

II.    Mr. Higgs Will Suffer Irreparable Harm Absent Injunctive Relief ................................ 25

III.   The Balance of Equities Favors Injunctive Relief ........................................................ 27

IV.   Mr. Higgs Is Entitled To An Evidentiary Hearing........................................................ 28

CONCLUSION.............................................................................................................. 31

i

# TABLE OF AUTHORITIES

## Federal Cases

*Arthur v. Dunn*, 137 S. Ct. 725 (2017) .................................................................. 19

*Brown v. Beck*, No. 5:06-CT-3018-H, 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006) ................. 26

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) .............................................................. 19

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........... 3, 26, 28

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ................................................... 28, 30

*Cooey v. Taft*, 430 F. Supp. 2d 702 (S.D. Ohio 2006) ........................................... 26, 27

*Evans v. Bennett*, 440 U.S. 1301 (1979) ................................................................. 26

*Fla. EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7 (D.D.C. 2020) ...................... 27

*Fletcher v. District of Columbia*, 391 F.3d 250 (D.C. Cir. 2004) ................................. 4

*Furman v. Georgia*, 408 U.S. 238 (1972) ............................................................... 23

*Garner v. Jones*, 529 U.S. 244 (2000) ................................................................... 4

*Glossip v. Gross*, 135 S. Ct. 2726 (2015) ............................................................ *passim*

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ...................................................... 20-21, 22

*Harris v. Johnson*, 323 F. Supp. 2d 797 (S.D. Tex. 2004) ...................................... 27

*In re Medley¸* 134 U.S. 160 (1890) ....................................................................... 4

*In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044 (S.D. Ohio 2012) ......... 27

*Jones v. Chappell*, 31 F. Supp. 3d 1050 (C.D. Cal. 2014) .................................. 21, 24

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ........... 3, 26, 27

*Malloy v. South Carolina*, 237 U.S. 180 (1915) ..................................................... 4

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ........................................................................................... 21, 22

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009) ................. 27

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................ 26, 27

*In re Fed. Bureau of Prisons' Execution Protocol Cases*, — F.3d —, No. 20-5329, 2020 WL 6750375 (D.C. Cir. Nov. 18, 2020) ................................................. 18, 19

*Nooner v. Norris*, No. 5:06-cv-00110-SWW, 2006 WL 8445125 (E.D. Ark. June 26, 2006) ...................................................................................................... 26, 27

*Peugh v. United States*, 569 U.S. 530 (2013) ......................................................... 4

*Proctor v. D.C.*, 310 F. Supp. 3d 107 (D.D.C. 2018) ............................................ 28

*Rogers v. Tennessee*, 532 U.S. 451 (2001) .............................................................. 8

*United States v. Haynes*, 26 F. App'x 123 (4th Cir. 2001) ...................................... 22

*Wainwright v. Booker*, 473 U.S. 935 (1985) ......................................................... 26

*Weaver v. Graham*, 450 U.S. 24 (1981) ................................................. 3

*Williams v. Hobbs*, 658 F.3d 842 (8th Cir. 2011) ................................... 4

**Federal Statutes**

5 U.S.C. § 706 ...................................................................................... 8, 21

5 U.S.C. § 500 ............................................................................................ 3

18 U.S.C. §§ 3591-3597 ................................................................ 1, 4, 5, 6, 7

**State Cases**

*Evans v. State*, 914 A.2d 25 (Md. 2006) ...................................................... 5

*Montgomery v. Barr*, No. 20-3261, 2020 WL 6799140 (D.D.C. Nov. 19, 2020) ............... 27, 28

**State Statutes**

MD Code Ann., Corr. Servs. § 3-905 ............................................................ 5

MD Code, Art 27 § § 3-905 ......................................................................... 5

Miss. Code Ann. § 99-19-51 ....................................................................... 20

Okla. Stat. tit. 22 § 1014 ............................................................................ 20

Tex. Code Crim. Proc. Art. 43.141 ............................................................... 23

Utah Code Ann. § 77-18-5.5 ....................................................................... 20

Ga. St. § 17-10-40(a) ................................................................................ 23

**Other**

85 Fed. Reg. 75846, 75847-48 (Nov. 27, 2020) ............................................ 20

Fed. R. Civ. P. 24 ...................................................................................... 2

Mo. Sup. Ct. R. 30.30 ............................................................................... 23

Department of the Army, Army Reg. 190-55 (§ 1-4(a)(3)) ............................. 23

In accordance with Local Rule 7(a), Plaintiff Dustin Higgs submits this statement of points and authorities in support of his motion for a preliminary injunction.

## BACKGROUND

Mr. Higgs is a federal prisoner who was convicted and sentenced to death in the United States District Court for the District of Maryland. He was convicted in 2000 for the January 27, 1996 killings of Tanji Jackson, Tamika Black, and Mishann Chinn, and the district court conducted formal sentencing on January 3, 2001. The district court indicated that the death sentence was imposed "pursuant to Title 18 United States Code Sections 3591 through 3597, including particularly Sections 3594 and 3596." *United States of America v. Dustin Higgs*, 8:98-cr-00520, ECF No. 640-1 at 2, January 3, 2001 (Messitte, J.). At the time Mr. Higgs's crimes were committed and when the sentence was imposed, the State of Maryland provided for the implementation of a death sentence, and thus Section 3596 required that the sentence be implemented in the manner prescribed by Maryland law. In 2013, the State of Maryland abolished the death penalty. *See* S.B. 276, 2013 Leg. 433rd Sess. (Md. 2013).

On July 25, 2019, after considering the matter for eight years, the Bureau of Prisons (BOP) announced that it had adopted a new execution protocol for carrying out federal death sentences using a single, five-gram dose of the barbiturate pentobarbital (2019 Protocol). *See* "Notice of Adoption of Revised Protocol," *Roane et. al. v. Gonzales et al.,* No. 05-2337 (D.D.C.), ECF No. 385 (July 25, 2019).[1] This single-drug barbiturate protocol replaced the previous execution protocol, which mandated use of the ultrashort-acting barbiturate sodium thiopental as the first drug in a three-drug procedure. On June 1, 2020, in accordance with the

---

[1] Unless otherwise indicated, all ECF citations refer to the consolidated action, *In the Matter of Federal Bureau of Prisons Execution Protocol Cases*, No. 1:19-mc-00145-TSC.

briefing schedule ordered by this Court, Plaintiffs to these consolidated cases filed an amended complaint in this Court raising claims for relief under various constitutional and statutory provisions. ECF No. 92.

On September 1, 2020, Mr. Higgs filed a motion to intervene in *Roane et al. v. Gonzales et al.*, No. 05-2337, pursuant to Fed. R. Civ. P. 24(a) and (b), and attached a proposed complaint raising twelve claims for relief under the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution, the Administrative Procedure Act (APA), the Federal Death Penalty Act (FDPA), the Federal Food, Drug, and Cosmetic Act (FDCA), and the Controlled Substances Act (CSA). *See* ECF No. 229; 229-1. The Court granted Mr. Higgs's motion to intervene on September 4, 2020.

Concurrently with this motion, Mr. Higgs is filing an amended and supplemental complaint raising the following claims: (1) Defendants' planned execution of Mr. Higgs using pentobarbital is unconstitutional as an *ex post facto* law; and (2) Defendants' arbitrary selection of Mr. Higgs for execution violates the Fifth and Eighth Amendments and is arbitrary and capricious in violation of the APA. This motion seeks a preliminary injunction with respect to both claims in the amended and supplemental complaint, as well as the as-applied Eighth Amendment claim (Claim IV) raised in Mr. Higgs's complaint filed on September 1, 2020.  *See* ECF No. 229-1 at ¶¶ 166-172. Additional facts will be described below as they relate to those claims.

On November 20, 2020, Defendants scheduled Mr. Higgs's execution for January 15, 2021. Mr. Higgs now moves for a preliminary injunction to prevent Defendants from executing him pursuant to the 2019 Protocol in violation of the Fifth and Eighth Amendments, the *Ex Post*

*Facto* Clause of Article I, Section 9 of the Constitution, and the Administrative Procedure Act

(APA), 5 U.S.C. §§ 500 *et seq.* and 701 *et seq.*

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of

the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted). The moving party must

show (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm

in the absence of relief; (3) that the balance of the equities weigh in his favor; and (4) that an

injunction is in the public interest. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d

1, 6 (D.C. Cir. 2016). That standard is met here.

## I.     PLAINTIFF HIGGS IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

### A.     Mr. Higgs is likely to succeed on the merits of his *ex post facto* claim.

Defendants' planned execution of Mr. Higgs using pentobarbital pursuant to the 2019

Protocol is unconstitutional as an *ex post facto* law because it is an increased punishment as

compared to the punishment in effect when Mr. Higgs's crimes occurred. Article I, Section 9,

clause 3 of the United States Constitution prohibits the federal government from passing any *ex*

*post facto* law. The prohibition against *ex post facto* laws forbids the government from applying

any law against an individual that imposes additional punishment for a crime after its

commission. *Weaver v. Graham*, 450 U.S. 24, 28 (1981); *id*. at 29 ("[T]wo critical elements must

be present for a criminal or penal law to be *ex post facto*: it must be retrospective . . . and it must

disadvantage the offender affected by it." (citations and quotation omitted)).

*Ex post facto* protections apply here, where the challenged governmental conduct is not

derived from statute or regulation, and even though Defendants have discretion to modify their

conduct. *See Garner v. Jones*, 529 U.S. 244, 253 (2000). The controlling question is whether the 2019 Protocol has the "practical effect" of creating a significant risk of increasing the prisoner's punishment. *Fletcher v. District of Columbia*, 391 F.3d 250, 251 (D.C. Cir. 2004).

"The question when a change in law creates such a risk is 'a matter of degree'; the test cannot be reduced to a single formula." *Peugh v. United States*, 569 U.S. 530, 539 (2013). Changes to execution statutes have been held to violate the *ex post facto* clause when retroactively applied. *In re Medley*¸134 U.S. 160, 172 (1890). Where, as here, a prisoner is challenging an execution statute, he must show "more than a 'speculative and attenuated risk of increasing the measure of punishment attached the covered crimes.'" *Williams v. Hobbs*, 658 F.3d 842, 848 (8th Cir. 2011) (quoting *Cal. Dept. of Corr. v. Morales*, 514 U.S. 499, 514 (1995)); *see also Malloy v. South Carolina*, 237 U.S. 180, 185 (1915) (explaining the *ex post facto* clause was not violated where the method of execution was changed from hanging to electrocution because electrocution was the more humane method). That showing suffices for an *ex post facto* claim, regardless of whether the Government's execution method independently violates the Eighth Amendment. *See*, *e.g.*, *Williams*, 658 F.3d at 848.

When Mr. Higgs's crimes were committed, and when he was sentenced to death, 18 U.S.C. § 3596(a) required, and continues to require, that capital sentences be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." Section 3596 further requires that if the State does not provide for the implementation of a death sentence, the court shall designate another state, and the sentence shall be implemented in the latter state in the manner prescribed by that state's law. *Id.*

On January 3, 2001, Mr. Higgs was sentenced to death by the United States District Court for the District of Maryland for the January 27, 1996 killings of Tanji Jackson, Tamika Black,

and Mishann Chinn. At the time of the crimes and death sentence, Maryland provided for implementation of the death penalty. *See* MD Code, Art 27 § 71 (West) (repealed by Acts 1999); MD Code Ann., Corr. Servs. § 3-905 (West) (repealed by Acts 2013). Consistent with § 3596(a), the District Court's Judgment and Order imposed the death sentence to be implemented in the manner prescribed by Maryland law. *United States of America v. Dustin Higgs*, No. 8:98-cr-00520 (D. Md.), ECF No. 640-1 at 2 (Jan. 3, 2001) (Messitte, J.) (ordering sentence "pursuant to Title 18 United States Code, Section 3591 through 3597, including particularly Sections 3594 and 3596.").[2]

"[T]he law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), i.e., the Maryland death penalty statute in effect at the time of Mr. Higgs's sentencing, required that "[t]he manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an *ultrashort acting barbiturate* or other similar drug in combination with a chemical paralytic agent[.]" § 3-905(a) (emphasis added); *see also Evans v. State*, 914 A.2d 25, 76-77 (Md. 2006) (describing the 1994 lethal injection legislation). In 2013, Maryland abolished the death penalty. *See* S.B. 276, 2013 Leg. 433rd Sess. (Md. 2013). Until 2019, the BOP Execution Protocol required, consistent with the Maryland statute, the use of an ultrashort-acting barbiturate as the first drug in a lethal injection procedure. *Roane et. al. v. Gonzales et. al.*, No. 05-02337, ECF No. 215-1 at 2 (Addendum to BOP Execution Protocol,

---

[2] Currently pending before the District Court for the District of Maryland is a Motion, filed by the Government, to Amend Judgment and Order to designate the State of Indiana as the state to implement Petitioner's death sentence. *See United States of America v. Dustin Higgs*, 8:98-cr-00520, ECF No. 640 (filed August 4, 2020). Given that it is Defendants' preference and intent to execute Mr. Higgs in Indiana and using pentobarbital as specified in the 2019 Protocol, the present motion for a preliminary injunction targets the 2019 Protocol as an *ex post facto* law as applied to Mr. Higgs.

effective August 1, 2008). The 2019 Protocol replaced that procedure with instructions that all federal lethal injections be conducted via a uniform procedure utilizing intravenous injection of five grams of pentobarbital.[3]

Only two drugs are classified as ultrashort-acting barbiturates: sodium thiopental and methohexital. Declaration of Craig W. Stevens, Ph.D, at 1 (December 2, 2020), Exhibit A ("Stevens Decl. (Dec. 2, 2020)"). Pentobarbital is not an ultrashort-acting barbiturate. *Id*. at 1. Pentobarbital is instead classified as a short acting barbiturate. *Id*. The extreme fear, grief, and pain that prisoners suffer during their executions is minimized by the use of an ultrashort-acting barbiturate instead of pentobarbital, a short-acting barbiturate. As its name suggests, an ultrashort-acting barbiturate has a quicker onset of action when compared to slower acting barbiturates like pentobarbital, and therefore will produce anesthesia and death more rapidly than pentobarbital. When a person is injected with an ultrashort-acting barbiturate, anesthesia occurs within ten to thirty seconds. Stevens Decl. (Dec. 2, 2020) at 2. By comparison, a short-acting barbiturate typically takes 30 seconds to one minute for its intended onset of action. *Id.* at 1. "Its effects take significantly longer to begin than thiopental or methohexital." *Id*.

The difference in the onset of action exposes the prisoner to a significantly heightened risk of experiencing flash pulmonary edema, and for a longer period of time. The longer it takes for the anesthetic properties of the barbiturate to take effect and to kill the prisoner, the longer he will suffer pulmonary edema while sensate and thus experience excruciating pain prior to the onset of general anesthesia or death. As pathologist Dr. Mark Edgar has explained, the primary

---

[3] Defendants have informed this Court that, consistent with Section 3596, they will comply with the "top line methods" of execution for inmates sentenced to death in the states of South Carolina and Virginia, and allow those prisoners to choose execution by electrocution if so desired. ECF No. 261 at 26.

mechanism by which flash pulmonary edema occurs during an execution is the barbiturate's high pH. *See* Supplemental Declaration of Mark A. Edgar, M.D., at 2 (Sept. 28, 2020) (ECF No. 282-5) ("Edgar Supp. Decl."). This high pH has an immediately caustic effect on capillaries and lung tissues even before the drug reaches the brain, let alone before the drug has any anesthetic effect on the brain. *See id.* (stating that flash edema "results from the corrosive effect of the highly alkaline pentobarbital solution on the lung capillaries and tissues (which, if injected into a peripheral vein, the drug reaches before it reaches the brain)" and that "reports of respiratory distress before the loss of consciousness suggest that the onset begins soon after the drug is administered").

The use of pentobarbital, as compared to the use of an ultrashort-acting barbiturate as required in this case, increases the risk that Mr. Higgs will endure a longer and more painful execution. As described in the amended and supplemental complaint, the use of pentobarbital as the sole drug in the Defendants' lethal injection protocol creates a significant risk of severe pain—namely, the experience of flash pulmonary edema while sensate. Defendants do not contest that their lethal injection protocol utilizing pentobarbital will cause pulmonary edema. Instead, they argue that when the pulmonary edema occurs, the prisoner will no longer be sensate. Based on the parties' competing evidence, this Court explained that it "continues to be concerned at the possibility that inmates will suffer excruciating pain during their executions[.]" ECF No. 261 at 36. That concern is necessarily greater than it would be if the Defendants utilized an ultrashort-acting barbiturate.

The use of pentobarbital in place of an ultrashort-acting barbiturate enhances both the length and likelihood of the prisoner's suffering from flash pulmonary edema. Because the current protocol increases Mr. Higgs's punishment beyond the punishment that was in effect at

the time Mr. Higgs's crimes occurred, it is unconstitutional as an *ex post facto* law when applied to Mr. Higgs. The limitations of the *ex post facto* clause are also "inherent in the notion of due process." *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001). Because executing Mr. Higgs with pentobarbital under the 2019 Protocol would violate the *Ex Post Facto* Clause as well as due process, Defendants' planned execution is "not in accordance with law" and is "contrary to constitutional right" under the Administrative Procedure Act, 5 U.S.C. § 706(2).

**B.      Mr. Higgs is likely to succeed on his as-applied Eighth Amendment challenge.**

Mr. Higgs is likely to succeed on his as-applied Eighth Amendment claim. At the preliminary injunction stage, a movant must "establish a likelihood that [he] can establish both that [the 2019 Protocol] creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015). Mr. Higgs has made that showing. His underlying health problems create a demonstrated risk of severe pain if Defendants carry out the 2019 Protocol on Mr. Higgs as planned.

**1.      The 2019 Protocol creates a demonstrated risk of severe pain for Mr. Higgs.**

Mr. Higgs suffers from severe asthma and has longstanding heart problems. Both of these conditions make it more likely that Mr. Higgs will suffer from pulmonary edema immediately upon injection of a high dose of pentobarbital, prior to becoming insensate or dying. Flash pulmonary edema causes a rapid accumulation of fluid or froth in the lungs, which forces sensate prisoners to experience the sensation of drowning—"an excruciating complication." Decl. of Gail Van Norman, M.D., at 31 (Nov. 11, 2019) (ECF No. 24) ("Van Norman Decl.").

In addition, it is likely that Mr. Higgs has contracted COVID-19 or will contract the disease in the near future. COVID-19—which is a respiratory illness affecting the lungs—further heightens the risk that Mr. Higgs will suffer extreme pain from flash pulmonary edema.

### a.     Mr. Higgs's underlying health conditions

Asthma is a chronic respiratory condition characterized by reversible swelling of the airways. *See* Decl. of Joel B. Zivot, M.D., at 5 (Aug. 31, 2020) (ECF No. 303-4) ("Zivot Decl."). "Common symptoms of asthma include shortness of breath, coughing, and wheezing." Supplemental Decl. of Joel B. Zivot, M.D., at 1 (Dec. 3, 2020), Exhibit B ("Zivot Supp. Decl."). Mr. Higgs has suffered from severe asthma since childhood. *See* Decl. of Jessica Johnson, at 1 (Dec. 3, 2020), Exhibit C ("Johnson Decl."); Zivot Decl. at 5. His prison medical records document that he regularly experiences "wheezing, difficulty breathing, coughing, and shortness of breath" as a result of his asthma. Zivot Supp. Decl. at 2. He requires the use of inhaled albuterol to manage his asthma even under normal conditions. He uses his inhaler between two and six times per day, with an average of about three times per day. *See* Johnson Decl. at 1.

Mr. Higgs also has lifelong heart problems. Specifically, Mr. Higgs has a cardiac murmur and a condition called mitral valve regurgitation, also known as mitral valve insufficiency. Mitral valve regurgitation occurs when the mitral valve on the left side of the heart does not close properly, allowing blood to backflow or leak into the left atrium in the heart. Zivot Supp. Decl. at 2-3. Over time, this condition can cause a patient to develop pulmonary edema:

> When a patient has mitral regurgitation, each contraction of the heart forces some blood backwards into the left atrium and then further backwards into the lungs. The pressure in the lungs is lower than the pressure in the contracting left ventricle. In the normal functioning heart, when the left ventricle contracts, the mitral valve shuts, preventing blood from regurgitating backwards. At the same time, the aortic valve opens and permits the normal flow of blood forward. The pressure in the lungs is not high enough to block backwards flow without a functioning mitral valve. A competent and non-leaking mitral valve is the normal protection for the

lungs from this blood under pressure. Extra fluid in the lungs, when severe, produces significant shortness of breath and is called congestive heart failure or pulmonary edema.

*Id.* at 3. Those with mitral valve regurgitation also often feel tired or out of breath. *Id.*

### b.    Mr. Higgs's likely exposure to COVID-19

COVID-19 is "a highly contagious respiratory illness caused by a novel coronavirus (SARS-CoV-2)." Zivot Decl. at 3; *see* Compl. ¶¶ 92-98. COVID-19 "spreads via the respiratory route" and specifically "targets the lungs." Zivot Decl. at 4. Patients infected with COVID-19 frequently experience shortness of breath, and in more serious cases suffer from "segmental lung collapse and a buildup of fluid in the lungs. COVID-19 disease can also lead to long lasting lung damage and permanent lung scars that remain even after the patient has apparently recovered." *Id.* at 4-5. Many COVID-19 patients "suffer from chronic lung dysfunction. In the worst case scenario, some patients have ultimately undergone a lung transplant as the only possible treatment." Zivot Supp. Decl. at 4.

COVID-19 spreads especially rapidly in prisons, and USP Terre Haute continues to report new active cases of the virus. At the recent execution of Orlando Hall, Mr. Hall's spiritual advisor contracted COVID-19 as a result of attending the execution. Decl. of Yusuf Ahmed Nur Decl. at 7 (Nov. 30, 2020), Exhibit D ("Nur Decl."). In addition, Mr. Higgs has previously experienced symptoms consistent with COVID-19 infection. Taken together, these facts demonstrate a significant likelihood that Mr. Higgs has been or will be infected with the virus prior to his January 15, 2021 execution date.

### i.    Prevalence of COVID-19 in Indiana and at the Terre Haute prison complex

COVID-19 "reached pandemic status in March 2020." Decl. of Dr. Joe Goldenson, at 2 (Nov. 24, 2020), Exhibit E ("Goldenson Decl."). As of December 2, 2020, the number of

confirmed cases worldwide had reached 64,326,880, including 13,881,620 in the United States. Zivot Supp. Decl. at 3.

At the time of filing, FCC Terre Haute is in the midst of a major COVID-19 outbreak. The prison complex at Terre Haute ("FCC Terre Haute") includes three separate facilities: USP Terre Haute, a high-security facility where Mr. Higgs is housed; and FCI Terre Haute, which includes a medium-security facility and a minimum-security satellite camp. *See* Goldenson Decl. at 12-13. As of December 3, 2020, BOP has reported 19 active confirmed cases among inmates and an additional 3 active cases among staff at USP Terre Haute. At FCI Terre Haute, there are a staggering 175 active cases among inmates and an additional 21 active cases among staff. *See* https://www.bop.gov/coronavirus/ (last visited Dec. 3, 2020). Cumulatively, BOP has reported 441 cases in the FCC Terre Haute complex, including 113 cases at USP Terre Haute. *See* https://www.bop.gov/coronavirus/ (last visited Dec. 3, 2020). Notably, the total number of inmates who have tested positive for COVID-19 at USP Terre Haute since March has increased by 35% in the past *two weeks* alone. *See* ECF No. 329 at 5 (stating that 84 inmates in total had tested positive as of Nov. 20, 2020).

In Indiana, "there had been 344,373 confirmed cases of COVID-19 as of December 2, 2020. Vigo County, where USP Terre Haute is located, had 6,513 confirmed cases." Zivot Supp. Decl. at 3. In addition, recent randomized testing of Indiana residents has revealed that the number of confirmed cases vastly undercounts the true number of people who have been infected. Preliminary results from this randomized testing indicate that "as of November 19, 2020, approximately 10.6% of non-institutionalized Indiana residents (i.e., residents outside of settings such as nursing homes and prisons) had previously been infected with COVID-19. . . .

Of those Indiana residents who tested positive in the random sample, approximately 40% had been asymptomatic." [4] *Id.* at 4.

These numbers—which are already staggeringly high—almost certainly underestimate the extent of COVID-19 infection at USP Terre Haute. Many inmates at FCC Terre Haute, including Mr. Higgs, have never been tested for the virus. *See* Johnson Decl. at 2. In addition, "COVID-19 has a typical incubation period of 2 to 14 days." Goldenson Decl. at 9. During this incubation period, individuals who are screened for COVID-19 (e.g., through questions about symptoms or a temperature check) would not be included in the number of confirmed cases. Finally, false negative test results can lead to undercounting of true case numbers, particularly if inmates are tested during the incubation period.

COVID-19 spreads especially rapidly in correctional settings. As Dr. Goldenson has explained,

> [C]urrent CDC recommendations for social distancing, frequent hand washing, frequent cleansing of surfaces, symptom screening, temperature checks and isolation to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in carceral settings. As a result, the risk of COVID transmission is far greater than in non-custodial institutions. Given the rapid spread of COVID-19, it is likely impossible to achieve and sustain these measures sufficiently to mitigate the risk of transmission for medically vulnerable inmates, staff, or visitors.

Goldenson Decl. at 11-12. S*ee generally id.* at 8-12; *see also* Zivot Decl. at 5 ("Shared facilities such as bathrooms and cafeterias, densely packed indoor spaces, and the difficulty of maintaining social distancing facilitates rapid transmission of this airborne illness.").

---

[4] Even those who are asymptomatic, however, may experience lasting lung damage. A recent study revealed that "over half of asymptomatic people infected with COVID-19 showed abnormalities on a CT scan of the lungs." Zivot Decl. at 4.

These problems are exacerbated by the operations of USP Terre Haute. BOP staff members have daily contact with one another at all three facilities comprising FCC Terre Haute. This raises the possibility that staff may transmit the virus between facilities within the larger complex. In addition, all three facilities are overcrowded:

> [B]oth USP and FCI within the FCC Terre Haute complex exceed their rated capacity, making social distancing and adequate quarantining for symptomatic and positive inmates an impossibility. . . .
>
> In the May 2019 Audit of FCC Terre Haute, it was determined that USP has a rated capacity of 910, FCI has a rated capacity of 560, and the satellite camp has a rated capacity of 324. Current data shows that USP and FCI far exceed their rated capacity. Specifically, despite a rated capacity of 910, USP currently houses 1,269 male inmates. Similarly, FCI currently houses 875 inmates, which exceeds their rated capacity by 315.

Goldenson Decl. at 14-15 (citations omitted).

Against this backdrop, BOP plans to execute four more individuals before executing Mr. Higgs: Brandon Bernard, Alfred Bourgeois, Lisa Montgomery, and Corey Johnson. For previous executions, Rick Winter, speaking for BOP, has stated that "specialized BOP teams . . . will travel to FCC Terre Haute from other BOP institutions. These teams consists [*sic*] of approximately 50 individuals." ECF No. 139-1 at 3. Contractors also must travel to Terre Haute to assist with the executions. *Id.* at 2. In addition, victims' family members are invited to travel to Terre Haute to witness the executions. *Id.* at 3. Thus, prior to Mr. Higgs's execution date on January 15, dozens of individuals will be traveling from across the country, including at least some by air, and staying in local hotels. Those individuals will then be in the confined spaces of the FCC Terre Haute complex in order to assist with or attend the executions. *See* Nur Decl. at 2-6 (spiritual advisor of Orlando Hall describing hours leading up to the execution in small, windowless spaces within Terre Haute in close proximity to other people).

13

Indeed, several days after the recent execution of Orlando Hall, Mr. Hall's spiritual advisor, Yusuf Nur, tested positive for COVID-19. *Id.* at 7. Mr. Nur is unaware of any other contact that could have given him the virus. Moreover, previous executions carried out at Terre Haute have been associated with spikes in COVID-19 rates, even with lower population levels of COVID-19 at the times those executions were carried out. *See generally* Goldenson Decl. at 15-18. Given the dramatic recent rise in COVID-19 cases across the country, the additional executions are likely to further exacerbate the spread of COVID-19 in FCC Terre Haute.

### ii. Mr. Higgs has likely been or will be exposed to COVID-19 before his scheduled execution

Earlier in the year, Mr. Higgs experienced symptoms consistent with COVID-19. In February of 2020, Mr. Higgs became ill and developed a fever, sweating, body aches, and nausea. Johnson Decl. at 2. His illness persisted for approximately one month. He was not tested for COVID-19 at that time, and he has not been tested for either an active COVID-19 infection or for antibodies to the virus.

Taken together, the high rate of infection in Indiana; the comparatively higher rate of infection in prison settings; the high incidence of asymptomatic COVID-19 infection; and the fact that Mr. Higgs was in fact ill with symptoms consistent with COVID-19 earlier in the year strongly support the inference that Mr. Higgs contracted COVID-19. Moreover, even if Mr. Higgs has not yet contracted COVID-19, Indiana is in the midst of a spike in COVID-19 cases, which is projected to worsen over the winter months and as hundreds of people from across the country travel to USP Terre Haute to conduct the four executions scheduled prior to Mr. Higgs's execution date. In addition, the prison complex where Mr. Higgs is housed is currently experiencing a significant outbreak of the virus. Thus, it is likely that Mr. Higgs will be exposed

14

to COVID-19 prior to his execution date in mid-January, even if he has not previously contracted the virus.

iii.     **The combination of Mr. Higgs's medical issues makes him especially likely to suffer severe pain from execution by pentobarbital**

Mr. Higgs has alleged that the 2019 Protocol violates the Eighth Amendment because it is likely to cause flash pulmonary edema resulting in severe pain. Mr. Higgs is especially at risk of experiencing flash pulmonary edema while still sensate as a result of his underlying medical conditions and exposure to COVID-19.

Flash pulmonary edema is a rapid accumulation of fluid in the lungs, which produces a sensation of drowning. *See* Van Norman Decl. at 33-34; Decl. of Mark A. Edgar, M.D., at 19-21 (Oct. 24, 2019) (ECF. No. 303-3) ("Edgar Decl."); Zivot Decl. at 2-3. As Dr. Van Norman has explained, "[n]ot being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man." Van Norman Decl. at 34. People who are drowning typically "will reach such a level of agony that they will be compelled to take a 'breath' within about 1 minute," as "[p]anic and terror, and the attempt to fight take over." *Id.* at 34; *see* Zivot Dec. at 3 ("Severe pulmonary edema creates the sensation of drowning."); Edgar Decl. at 3 ("[Pulmonary edema] produces sensations similar to drowning or asphyxiation as fluid occupies a greater volume of the air spaces.").

Importantly, the administration of pentobarbital does not guarantee a lack of consciousness or awareness, such that Mr. Higgs is very likely to experience the excruciating pain of pulmonary edema while conscious. As Dr. Van Norman has explained, the effects of barbiturates like pentobarbital diminish *responsiveness* rather than *consciousness*. Although outdated "traditional textbooks and authors report that the inhibitory effects of barbiturates cause 'unconsciousness,'" "authoritative publications now describe barbiturates as producing

15

'unresponsiveness,' since how, and even whether, they affect consciousness is under serious question." Van Norman Decl. at 13; *see also id.* at 22-23, 28-29. The distinction between unresponsive and unconscious prisoners is crucial: "[E]ven when the patients appear to be unconscious by all clinical measures and are unresponsive … consciousness will permit extreme pain and suffering during the execution process." *Id.* at 7.

Mr. Higgs's underlying medical issues make it particularly likely that he will experience "flash" pulmonary edema—i.e., pulmonary edema that occurs virtually immediately, and before the execution drugs would have an opportunity to reach Mr. Higgs's brain to provide any anesthetic effects. Mr. Higgs suffers from severe asthma, a condition which restricts airflow to the lungs. His asthma regularly causes him to struggle for air, and he uses an inhaler several times each day in order to breathe. Johnson Decl. at 1. As Dr. Zivot has explained, "the sensation of suffocation or drowning" that execution by pentobarbital is likely to produce "would be further exacerbated by his asthma, which produces shortness of breath even without the presence of respiratory illness or barbiturates." Zivot Decl. at 5. For Mr. Higgs, the experience of

> pulmonary edema – which causes difficulty breathing due to a buildup of fluid in the lungs – [] would cause further strain on Mr. Higgs's already-impaired breathing. Compared to a person without asthma, Mr. Higgs would struggle for air more quickly and painfully after the onset of pulmonary edema because his asthma inflames and constricts his airways, making it more difficult for enough oxygen to reach his lungs even under normal circumstances. The suffering that Mr. Higgs would experience from pulmonary edema would be more severe because his asthma would have an additive effect, making his struggle for air more acute.

Zivot Supp. Decl. at 2.

In addition, Mr. Higgs's heart condition increases his risk for experiencing flash pulmonary edema. Dr. Kendall Von Crowns, a medical expert retained by Defendants, has acknowledged that heart conditions like Mr. Higgs's can cause flash pulmonary edema in a prisoner executed with pentobarbital:

I know there's a case report of an individual who developed flash pulmonary edema, but he had underlying heart issues, specifically mitral valve issues, as well as other heart problems. So his heart was already compromised when the flash pulmonary edema occurred.

So in his situation, his flash pulmonary edema was the result of the fact that he already had a compromised heart which then resulted in him developing edema more rapidly than normal. So you have an individual that was already kind of critical when this occurred.

Evid. Hr'g Tr. (Sept. 18, 2020) at 18; *see also* Zivot Supp. Decl. at 2-3, 5-6.

Mr. Higgs's exposure to COVID-19 also puts him at particular risk for flash pulmonary edema that would occur while he is still sensate. COVID-19 primarily affects the respiratory system and targets the lungs. Zivot Decl. at 4. Lung damage can occur even in patients who do not display outward symptoms of COVID-19. In fact, "[i]n a recent study, researchers found that over half of asymptomatic people infected with COVID-19 showed abnormalities on a CT scan of the lungs." *Id.* Such lung damage increases the risk and severity of flash pulmonary edema. "Because COVID-19 can cause lasting lung damage, a person injected with pentobarbital would experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19." Zivot Decl. at 5-6. With respect to Mr. Higgs specifically, "the sensation of suffocation or drowning would be further exacerbated by his asthma, which produces shortness of breath even without the presence of respiratory illness or barbiturates." *Id.* at 6.

In sum, Mr. Higgs's "preexisting lung dysfunction conditions make Mr. Higgs particularly likely to experience pulmonary edema that he will experience as choking and drowning prior to the sedative properties of pentobarbital taking effect." Zivot Supp. Decl. at 5-6.

### 2.     Mr. Higgs has identified feasible alternative methods of execution.

The risks presented by the 2019 Protocol are "substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737. As relevant here, Plaintiff has specifically alleged two such alternatives relevant to his as-applied challenge: (i) administration of a pre-dose of a pain-relieving anesthetic prior to the administration of pentobarbital; and (ii) the firing squad. Compl. ¶ 144. As the D.C. Circuit recently held in this case, these allegations sufficiently plead an alternative method of execution that would significantly reduce the risk of severe pain resulting from flash pulmonary edema. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, — F.3d —, No. 20-5329, 2020 WL 6750375 (D.C. Cir. Nov. 18, 2020), at *6-*7.

A pre-dose of an opioid would substantially reduce Mr. Higgs's suffering. As Doctor of Pharmacology Craig Stevens explains, opioids "inhibit the activity of the pain neurons," which "produces the analgesia, or relief of pain, that characterizes the therapeutic action of morphine and other opioid analgesics." Decl. of Craig W. Stevens, Ph.D. at 3 (Nov. 1, 2019) (ECF No. 25) ("Stevens Decl. (Nov. 1, 2019)"). "Barbiturates" like pentobarbital, on the other hand, "do not have 'analgesic,' (i.e. pain relieving), properties and in lower doses actually are 'antalgesic,' meaning they augment feelings of pain." Van Norman Decl. at 9. Administration of a clinical dose of a pretreatment opioid (after IVs are set but before the injection of pentobarbital commenced) would "exert a clinical effect of analgesia"—eliminating or significantly reducing a prisoner's ability to feel pain. Stevens Decl. (Nov. 1, 2019) at 2. Many analgesic opioids are relatively fast-acting as well—clinical studies have showed significant analgesic effects within five to six minutes of administration of a dose of morphine (or as quickly as one minute after an IV bolus injection of an 8mg dose). *Id.* at 5; *see also id.* at 5-6 (discussing clinical trials concluding that the onset of fentanyl's analgesic effect is from two to five minutes, depending on

18

dosage). Given the near certainty that the current execution protocol will result in Mr. Higgs experiencing pulmonary edema while sensate, pre-treatment with an opioid would significantly reduce the pain and suffering experienced by prisoners. Use of opioid pre-medications would also "reduce . . . anxiety." *Id.* at 4.

Providing Mr. Higgs with a pre-dose of an opioid is also "readily available." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). Because Defendants would be utilizing opioids in clinical doses, they "are commercially available and obtainable as these drugs would be used for medical purposes, like other medications ordered and used by the prison medical staff." *Id.* at 6. Moreover, BOP "has confirmed that it has located a lawfully licensed compounding pharmacy in the United States that is able and willing to 'lawfully provide [BOP] with commercially manufactured medications as they are available,' and to compound fentanyl as needed." Compl. ¶ 144a. The D.C. Circuit has held in this case that the consolidated Plaintiffs plausibly alleged that severe pain from flash pulmonary edema "could readily be avoided" if Defendants were to "administer[] a widely available analgesic first . . . ." *Execution Protocol Cases*, 2020 WL 6750375, at *7. Pre-treatment of prisoners with an opioid is therefore both "feasible and readily available." *Bucklew*, 139 S. Ct. at 1127.

Alternatively, Defendants could carry out Plaintiffs' executions by firing squad. *See* Compl. ¶ 144. Execution by firing squad causes a faster and less painful death than execution by lethal injection. *See Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative); *Arthur v. Dunn*, 137 S. Ct. 725, 733-734 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution).

Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad is statistically much less likely to result in "botched" executions than lethal injection. *See* Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* 120, App. A (2014). Execution by firing squad is currently authorized by the laws of three states: Utah Code Ann. § 77-18-5.5; Okla. Stat. tit. 22 § 1014(D); Miss. Code Ann. § 99-19-51(4). Since 1976, Utah has carried out three executions by firing squad, most recently on July 18, 2010. Protocols for execution by firing squad are known and available. Utah's technical manual, specifying the state's execution protocol in great detail, is publicly accessible.[5] The use of a firing squad is available, feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol. Indeed, the DOJ's final rule amending its regulations for implementing death sentences allows for alternative execution methods, including the firing squad. *See* 85 Fed. Reg. 75846, 75847-48 (Nov. 27, 2020) (concerning amendments to 28 C.F.R. Part 26, effective Dec. 24, 2020). That amendment will go into effect prior to Mr. Higgs's execution date, further ensuring availability of the firing squad as an alternative for Mr. Higgs.

C.     **Mr. Higgs is likely to succeed on the merits of his claim that Defendants' arbitrary selection of Plaintiff for execution violates the Fifth and Eighth Amendments and is arbitrary and capricious under the APA.**

The Eighth Amendment forbids the arbitrary imposition and implementation of capital punishment. *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) ("[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner

---

[5] Technical Manual of Utah Department of Corrections, https://www.documentcloud.org/documents/3522376-Responsive-Documents.html#document/p2 (last visited Dec. 4, 2020).

that avoids the arbitrary and capricious infliction of the death penalty."); *Jones v. Chappell*, 31 F. Supp. 3d 1050, 1061 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015) ("[N]o rational person can question that the execution of an individual carries with it the solemn obligation of the government to ensure that the punishment is not arbitrarily imposed and that it furthers the interests of society."). This proscription against arbitrariness applies to the selection of prisoners for execution. "The Eighth Amendment simply cannot be read to proscribe a state from randomly selecting which few members of its criminal population it will sentence to death, but to allow that same state to randomly select which trivial few of those condemned it will actually execute." *Jones*, 31 F. Supp. 3d at 1063.

Under the APA, a reviewing court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action that is not the product of reasoned decision-making is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy the requirement of reasoned decision-making, an agency must "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48.

Defendants, including the Attorney General, have provided no explanation whatsoever for choosing Mr. Higgs for immediate execution, let alone a "cogent" one. *See id.* The Death Penalty Information Center currently lists 54 prisoners as federally death-sentenced. *See* Death Penalty Information Center, List of Federal Death-Row Prisoners, https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/list-of-federal-death-row-prisoners. From among those 54 prisoners, the Attorney General chose five to execute in December 2020 and January 2021. Mr. Higgs is the last of those five; his execution is scheduled for January 15, 2021. Defendants have provided no basis whatsoever to justify this decision, and

more broadly have not codified or otherwise disclosed any specific set of standards or criteria by which the Government chooses which prisoners it will schedule for execution. The selection of Mr. Higgs therefore violates the Eighth Amendment's proscription against arbitrariness in the implementation of death sentences, *see Godfrey*, 446 U.S. at 428, as well as the APA's prohibition of agency action that is arbitrary and capricious, *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Although Defendants have previously invoked the interest of crime victims in "timely" enforcement of a death sentence, *see, e.g.*, ECF No. 16 ("Defendants' Opposition to Plaintiff Daniel Lewis Lee's Motion for a Preliminary Injunction"), at 45, Defendants have not actually followed a practice of scheduling executions according to the length of time that has passed since a sentence was imposed. Nor have they scheduled executions according to the length of time that has passed since a crime was committed, or even the length of time since the prisoner finished an initial round of post-conviction remedies. Of the 54 prisoners currently on death row, eight were sentenced to death earlier than Mr. Higgs.

The Attorney General stated that the purpose of resuming federal executions after a 17-year hiatus is to "bring[] justice to victims of the most horrific crimes." *Roane*, No. 05-02337, ECF No. 389-1, at 1 (press release). But it is undisputed that Mr. Higgs killed no one. *See, e.g.*, *United States v. Haynes*, 26 Fed. Appx. 123, 127 (4th Cir. 2001) (unpub.) (describing how "Haynes exited the vehicle and fired five shots, killing all three women"). His co-defendant, Willis Haynes, was found guilty of fatally shooting the three victims in the 1996 case and was sentenced by a federal jury to life in prison without the possibility of parole. It is undisputed that Mr. Higgs did not shoot any of the victims, and he has maintained consistently that he did not order their deaths.

In addition to lacking standards, the Attorney General's exercise of discretion is unilateral and lacks any judicial or executive oversight. At no point does a warrant issue from a federal court or the President, and at no point does the prisoner have the opportunity to argue against the issuance of a warrant in light of current legal proceedings, prospective litigation, or other circumstances that militate against scheduling an execution. Defendants claim to have modeled their execution method after those in Georgia, Missouri, and Texas. *See Roane*, No. 05-02337, ECF No. 389-1, at 1 (press release); AR 7-19, 70-71, 83-91. But all of those states provide for an execution warrant to be issued by a court, and even then, only on a showing by the prosecutor or attorney general that a death warrant is justified. *See* Mo. Sup. Ct. R. 30.30(d); Tex. Code Crim. Proc. Art. 43.141; Ga. St. § 17-10-40(a). Other than the federal government, there is not a single death penalty jurisdiction within the United States that gives law enforcement the unilateral discretion to select prisoners for execution and to schedule their deaths. Even federal military executions must be approved by the President. *See* Department of the Army, Army Reg. 190-55 (§ 1-4(a)(3)).

Granting the Attorney General unfettered discretion has, in practice, led to a completely arbitrary process for determining who lives and who dies. There are no limits to cabin executive discretion, there are no guidelines for the selection process, and the entire process is cloaked in secrecy. *Cf. Furman v. Georgia*, 408 U.S. 238, 309-10 (1972) (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders . . . many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed."). The absence of discernible criteria creates a legal vacuum for deciding which prisoners will suffer the ultimate punishment, leading to arbitrary decision-

making on the weightiest question a government can address. The mere fact that a prisoner has

been convicted and sentenced to death, and that the sentence has survived appellate and post-

conviction review, does not cure the arbitrariness with which the sentence is carried out.

"Arbitrariness in execution is still arbitrary, regardless of when in the process the arbitrariness

arises." *Jones*, 31 F. Supp. 3d at 1063.

  If all five currently scheduled executions go forward, Mr. Higgs will be the last of 13

federal civilian prisoners to be executed since July 2020—and the last of 13 federal civilian

prisoners to be executed since 2003. The 13 executions that will have taken place between July

2020 and January 2021 will be the most in a single year since 1896, when Grover Cleveland's

administration carried out 16 executions. *See* Death Penalty Information Center, Executions in

the U.S. 1608-2002: The Espy File, https://deathpenaltyinfo.org/executions/executions-

overview/executions-in-the-u-s-1608-2002-the-espy-file. The soaring number of federal

executions comes at the same time that states are on track to perform the fewest executions in 37

years. *Id.* Moreover, the outgoing presidential administration has rushed this unprecedented

number of federal executions after a 17-year hiatus, during a global pandemic, even as public

sentiment continues trending against the death penalty. *See* E. Tammy Kim, "Trump's Final

Cruelty: Executing Prisoners," The New Yorker (Nov. 25, 2020), *available at*

<<https://www.newyorker.com/news/daily-comment/trumps-final-cruelty-executing-prisoners>>

("When President Bill Clinton signed the 1994 crime bill, eighty per cent of the public supported

the death penalty in cases of murder; only fifty-five per cent do today.").

  On November 7, 2020, Joseph R. Biden, Jr., and Kamala Harris were named President-

Elect and Vice President-Elect of the United States, respectively. They will formally assume

their new offices on January 20, 2021. Biden stated during his campaign that he supports

stopping federal executions, and Democratic members of Congress have now called for the suspension of federal executions during the lame-duck period. The current lame-duck presidency furthers the arbitrariness of Mr. Higgs's selection for an execution between now and January 20, 2021. The last time the United States government carried out an execution between a presidential election and the inauguration of the new president was nearly 132 years ago, on January 25, 1889.

Current President-Elect Joe Biden's criminal justice reform plan includes the elimination of the federal death penalty. *See* "The Biden Plan for Strengthening America's Commitment to Justice," Biden/Harris Website, https://joebiden.com/justice/# ("Biden will work to pass legislation to eliminate the death penalty at the federal level, and incentivize states to follow the federal government's example."). Vice President-Elect Kamala Harris is an original cosponsor of legislation introduced in the U.S. Senate to eliminate the federal death penalty. *See* S.B. 2390, "A bill to prohibit the imposition of the death penalty for any violation of Federal law, and for other purposes" (116th Congress, introduced July 31, 2019). A record number of Americans voted for President-Elect Biden and Vice-President Elect Harris, and they deserve an opportunity to implement their policy agenda without the current Administration rushing to take preemptive and irreversible steps. Executing Mr. Higgs will arbitrarily deprive him of life a mere five days before President-Elect Biden and Vice President-Elect Harris are formally sworn into office and able to put a stop to this unprecedented rush of federal executions—a deprivation stemming from the happenstance that the current Attorney General selected Mr. Higgs for execution.

## II.   MR. HIGGS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

To constitute irreparable harm, "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent

irreparable harm," and it "must be beyond remediation." *Newby*, 838 F.3d at 7-8 (citing *Chaplaincy*, 454 F.3d at 297) (internal quotation marks and brackets omitted). Mr. Higgs will plainly suffer irreparable harm if he is executed pursuant to an unlawful protocol before he can fully litigate his claims under U.S. Constitution and the APA. The threatened harm is "beyond remediation" because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at 297. Mr. Higgs's claim is therefore "categorically irreparable." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Recognizing this basic reality, courts have found that the "requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases." *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring). Courts have repeatedly held that a prisoner will suffer irreparable harm if he is executed before his legal challenges to the method of execution are complete. *See, e.g.*, *Nooner v. Norris*, No. 5:06cv00110 SWW, 2006 WL 8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed threat of irreparable harm because if he suffered pain during his execution, as alleged, the injury would never be rectified); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No. 5:06CT3018 H, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).

There is no question that Mr. Higgs will suffer irreparable harm absent an injunction: The Government will be allowed to execute him in a manner that violates the law and causes him significant suffering. That harm is great, imminent, and irremediable. *See, e.g.*, *Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring in decision to vacate stay of execution) ("irreparable harm … is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty).

### III.     THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435; *see also Fla. EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020). Here, these two factors favor a preliminary injunction. This Court has already decided that the balance of the equities favors Plaintiffs under these circumstances because "the potential harm to the government caused by a delayed execution is not substantial" and "[t]he public interest is not served by executing individuals before they have had the opportunity to avail themselves of legitimate procedures to challenge the legality of their executions." ECF No. 50 at 14.

These conclusions are consistent with the principle that "[t]he public interest is . . . served when administrative agencies comply with their [legal] obligations." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). By contrast, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. In the capital-punishment context, "the public's interest in seeing justice done lies not only in carrying out the sentence imposed years ago but also in the lawful process leading to possible execution." *Montgomery v. Barr*, No. 20-3261, 2020 WL 6799140, at *11 (D.D.C. Nov. 19, 2020); *see also Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("[C]onfidence in the humane application of the governing laws of the State must be in the public's interest."). Accordingly, courts have recognized an "important public interest in the humane and constitutional application of [a] lethal injection statute." *Nooner*, 2006 WL 8445125 at *4; *see also In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012); *Cooey*, 430 F. Supp. 2d at 708. When the government decides to take a life, the public interest demands that it do so in a considered and deliberate manner. The seriousness of a person's offenses of conviction does not alter that analysis.

The government has no legitimate interest in carrying out an execution using illegal procedures or arbitrary selection methods. Indeed, by doing so the government would compromise the public interest, among other things by undermining public confidence in the "lawful process leading to possible execution." *See Montgomery*, 2020 WL 6799140, at *11. Curing the flaws in the government's execution procedures and selection process would further the public interest, which is served when agencies comply with their legal obligations. A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the government. *Chaplaincy*, 454 F.3d at 297. To the contrary, the requested injunction will advance the public interest.

## IV.    MR. HIGGS IS ENTITLED TO AN EVIDENTIARY HEARING

The Court may grant a preliminary injunction "on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Nevertheless, "an evidentiary hearing is required if the parties raise a genuine issue of material fact that must be resolved in deciding the motion." *Proctor v. D.C.*, 310 F. Supp. 3d 107, 113 (D.D.C. 2018) (quoting *Cobell*, 391 F.3d at 261). An evidentiary hearing is particularly important "when a court must make credibility determinations to resolve key factual disputes in favor of the moving party . . . ." *Cobell*, 391 F.3d at 261 (citing *Prakash v. Am. Univ.*, 727 F.2d 1174, 1181 (D.C. Cir. 1984)).

The Court should hold an evidentiary hearing in order to evaluate the facts underlying Mr. Higgs's claims, and to resolve disputes that are likely to arise from Defendants' inevitable disagreement. With respect to the *ex post facto* claim, Mr. Higgs has alleged that executing him with pentobarbital, which is a short-acting barbiturate, will materially increase his punishment in violation of the *Ex Post Facto* Clause. At the time of Mr. Higgs's crimes and sentencing, Maryland law provided for execution with an ultrashort-acting barbiturate. A hearing would

enable Mr. Higgs to develop the evidence to establish that the use of pentobarbital will increase the pain that Mr. Higgs experiences relative to what he would experience if an ultrashort-acting barbiturate were used.

With respect to his as-applied Eighth Amendment claim, Mr. Higgs's underlying heath conditions and probable exposure to the COVID-19 virus render it "virtually certain" not only that he will experience flash pulmonary edema while sensate, but also that his experience of flash pulmonary edema will be more painful and severe than someone who does not have similar health conditions. Zivot Decl. at 6. Although Defendants attempt to downplay this claim as mere "hypothetical speculation," *see* ECF No. 340 at 5 (quotation marks and citation omitted), they have not offered any expert testimony to refute it.

It is also very likely that Mr. Higgs has already had COVID-19, which further increases the likelihood that he will experience flash pulmonary edema while sensate during his execution, as well as the likelihood that the experience will be particularly severe. In February 2020, Mr. Higgs was ill for approximately one month and experienced fever, sweating, severe body aches, and nausea. Johnson Decl. at 2. These symptoms are consistent with COVID-19. Zivot Supp. Decl. at 4. At that time, no tests were available, and despite Defendants' assertion that "70 percent of the population of inmates at USP Terre Haute . . . have completed a COVID-19 test," ECF No. 340, Mr. Higgs has never received a COVID-19 test to date.[6] To the extent Defendants contest that Mr.

---

[6] Moreover, Defendants do not specify *when* inmates were tested for COVID-19. If most of those tests were completed in March or April, for instance, the fact that 70% of prisoners were tested would reveal very little about the prevalence of COVID-19 infection in December. Relatedly, if a prisoner is tested *after* a COVID-19 infection has already resolved, the test result would come back negative for the virus. Because Defendants do not allege that they have conducted antibody testing of prisoners, Defendants' allegation that 70% of the population has been tested at some point provides very little, if any, relevant information.

Higgs had COVID-19 last winter or that it will worsen his experience of suffering flash pulmonary edema while sensate during his execution, these are factual disputes appropriate for resolution following an evidentiary hearing. *See Cobell*, 391 F.3d at 261.

Furthermore, as of this writing, prisoners and staff at FCC Terre Haute, the prison complex where USP Terre Haute is located, are experiencing a significant COVID outbreak involving 196 total active cases at the FCI and 22 active cases at the USP.[7] If Mr. Higgs did not in fact have COVID-19 last winter, these current outbreaks render it highly likely that Mr. Higgs will contract COVID-19 between now and his January 15, 2021 execution date, or that he will contract the disease again. The outbreaks notwithstanding, the BOP plans to bring dozens of people into the complex for the four executions scheduled prior to Mr. Higgs's. Given the present surge of cases nationwide, it is almost certain that at least some of these individuals will be infected and contagious to others. This harm is far more than merely speculative. Former Plaintiff Orlando Hall's spiritual advisor tested positive for COVID-19 only a few days after witnessing Mr. Hall's execution, and does not know of any place he could have contracted the disease other than in the course of serving as a spiritual advisor during Mr. Hall's execution at USP Terre Haute. *See* Nur Decl. at 7; Nur. Decl. Ex. D-B (positive test result).

---

[7] In their motion to dismiss Mr. Higgs's as-applied challenge, Defendants argued there were only 3 active cases of COVID-19 at USP Terre Haute. They are silent on the issue in their reply to Plaintiff Higgs's response opposing their motion to dismiss. To the extent Defendants contest that the number of active cases at USP Terre Haute has grown from 3 to 22—plus the additional outbreak of nearly 200 active cases at the FCI, where staff members regularly have contact with USP Terre Haute staff—this is another key factual dispute to be resolved at a hearing. *See Cobell*, 391 F.3d at 261.

**CONCLUSION**

For the foregoing reasons, Mr. Higgs respectfully requests that the Court (a) preliminarily enjoin Defendants from proceeding with his execution on January 15, 2021, and from setting any other date or time for Mr. Higgs's execution until further order of this Court, and (b) conduct an evidentiary hearing on Mr. Higgs's *ex post facto* and as-applied Eighth Amendment claims.

Dated:  December 4, 2020                    Respectfully submitted,


                                            */s/ Shawn Nolan*
                                            Shawn Nolan, Chief, Capital Habeas Unit
                                            Matthew Lawry, Assistant Federal Defender
                                            Federal Community Defender Office, E.D. Pa.
                                            601 Walnut Street, Suite 545 West
                                            Philadelphia, PA 19106
                                            Telephone: 215-928-0520
                                            Email: shawn_nolan@fd.org

                                            *Counsel for Plaintiff Dustin Higgs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record.  The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN & MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

1

Email: gerald_king@fd.org

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

2

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Email: john.beck@hoganlovells.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

Dated:  December 4, 2020                    Respectfully submitted,

/s/ Shawn Nolan
Shawn Nolan, Chief, Capital Habeas Unit
Matthew Lawry, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West

4

Philadelphia, PA 19106
Telephone: 215-928-0520
Email: shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Higgs*

EXHIBIT A

**DECLARATION OF CRAIG W. STEVENS, Ph.D.**

I, Craig W. Stevens, Ph.D., do hereby affirm and attest under penalty of perjury:

1.     I am a full-time faculty member in the department of Pharmacology and Physiology at the College of Osteopathic Medicine, a unit of Oklahoma State University, Center for Health Sciences campus in Tulsa, Oklahoma.  After receiving my Ph.D. in Pharmacology from the Mayo Clinic, in Rochester, Minnesota, I completed a 2-year postdoctoral fellowship at the University of Minnesota Medical School in Minneapolis, Minnesota, and secured a position as an Assistant Professor of Pharmacology with my present employer in 1990.  I advanced through the academic ranks to Associate Professor of Pharmacology in 1993, and Professor of Pharmacology in 2000.

2.     Besides my regular duties of teaching medical students, pursuing research and scholarly activities, and serving on college committees, I work part-time as a litigation consultant/expert witness on cases involving pharmacological issues.  I have consulted in both civil and criminal cases, working with both the prosecution or plaintiff and the defendant.  With regard to the pharmacological issues of lethal injection, I have worked as a consultant with the state as well as with attorneys representing condemned inmates.

3.     I have been retained by counsel for Dustin Higgs.  Counsel have asked me to provide the Court with information regarding the classification and function of lethal injection drugs.

4.     I have reviewed the following case materials in preparing this Affidavit: the Maryland statute §3-905 "Method of Execution"; Federal Bureau of Prisons "BOP Execution Protocol" 2019 (redacted); "ADDENDUM TO BOP EXECUTION PROTOCOL FEDERAL DEATH SENTENCE IMPLEMENTATION PROCEDURES," effective JULY 25, 2019; the Declaration of Joseph F. Antognini, M.D., M.B.A, and his Supplemental Report; the Expert Declaration of Gail A. Van Norman, M.D. and her Supplemental Report, and Expert Declaration of Mark A. Edgar, M.D.

5.     Barbiturates are a drug group that derive from barbituric acid.  Barbiturates depress the central nervous system and have been used as sedatives and hypnotic drugs for over a century.

6.     Barbiturates are divided into the following classes: ultra-short-acting, short-acting, intermediate-acting, and long-acting.  The classifications refer to the time of onset and duration of the drug effects.  These classifications are widely accepted in the field of pharmacology.

7.     I am aware of two ultra-short-acting barbiturates: sodium thiopental and methohexital. Short-acting barbiturates include pentobarbital and secobarbital.    Intermediate-acting barbiturates include amobarbital and butabarbital.   Long-acting barbiturates include phenobarbital and mephobarbital.

8.     As indicated above, pentobarbital is not an ultra-short-acting barbiturate and has never been classified as such.  Pentobarbital has an onset of action time of 30 seconds to 1 minute. Its effects take significant longer to begin than thiopental or methohexital.

9.      Thiopental, the most frequently used ultra-short-acting barbiturate, was used for surgery of short duration.  The onset of anesthesia is within 10 to 30 seconds, because thiopental is so lipid soluble that it rapidly enters the brain.

10.     The ultra-short-acting barbiturate, thiopental, is no longer commercially available.

11.     The ultra-short-acting barbiturate, methohexital, is commercially available.

12.     In pharmacology, chemical paralytic agents are synonymous with neuromuscular blockers.   Paralytics by themselves do not lessen a patient's awareness of pain.  Rather, they inhibit muscle action and thus prevent movement.  They are typically used during surgical procedures in combination with analgesics and general anesthetics.  Common chemical paralytic agents include pancuronium, vecuronium, and rocuronium.

13.     Pentobarbital is not a chemical paralytic and has never been classified as such.

14.     Attached hereto is my curriculum vitae.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury.

_____            _____
Craig W. Stevens, Ph.D.                                     Date

*December 2, 2020*

# EXHIBIT B

## SUPPLEMENTAL DECLARATION OF DR. JOEL ZIVOT
## PURSUANT TO 28 U.S.C. § 1746

I, Joel Zivot, being of sound mind and lawful age, hereby state under penalty of perjury as follows:

1.     On August 31, 2020, I provided Mr. Higgs's counsel with my opinion regarding the likelihood that Mr. Higgs would experience flash pulmonary edema from pentobarbital injection as a result of his medical history.

2.     In formulating my original opinion, I reviewed a file containing medical records for Dustin Higgs; the Federal Bureau of Prisons Lethal Injection Protocol and the 2019 Addendum to the federal government's lethal injection protocol; preliminary autopsy findings for Wesley Purkey; and the declarations of Dr. Mark Edgar, Dr. Gail Van Norman, and Dr. Joseph Antognini. Subsequently, I reviewed a file containing additional medical records for Mr. Higgs, the Declaration of Jessica Johnson, the Declaration of Joe Goldenson, M.D., and the September 18, 2020 testimony of Drs. Antognini and Crowns in this matter.

### Mr. Higgs's Asthma

3.     Asthma is a chronic condition characterized by reversible swelling of the bronchial tubes. Individuals with asthma often also have an increased production of mucus inside the bronchial tubes. Common symptoms of asthma include shortness of breath, coughing, and wheezing.

4.     Mr. Higgs suffers from severe asthma. He has had asthma since childhood. He currently uses inhaled albuterol approximately three times daily to manage his asthma. His daily use of albuterol ranges from two to six times per day.

5.      Mr. Higgs has sought medical treatment for his asthma throughout his incarceration. His medical records indicate that he experiences wheezing, difficulty breathing, coughing, and shortness of breath.

6.      Based on my review of the records, it is clear that Mr. Higgs's asthma often makes it difficult for him to breathe. If Mr. Higgs were to experience pulmonary edema – which causes difficulty breathing due to a buildup of fluid in the lungs – this would cause further strain on Mr. Higgs's already-impaired breathing. Compared to a person without asthma, Mr. Higgs would struggle for air more quickly and painfully after the onset of pulmonary edema because his asthma inflames and constricts his airways, making it more difficult for enough oxygen to reach his lungs even under normal circumstances. The suffering that Mr. Higgs would experience from pulmonary edema would be more severe because his asthma would have an additive effect, making his struggle for air more acute.

<u>**Mr. Higgs's Heart Condition**</u>

7.      Mr. Higgs has had mitral valve regurgitation for many years. This has been confirmed by an echocardiogram of the heart. According to his Bureau of Prisons medical records, his EKG results from as early as 2008 showed possible left atrial enlargement. In 2010, his EKG results indicated possible left ventricular hypertrophy (LVH), which means that the left ventricle of his heart is abnormally enlarged. Such enlargement can be both the consequence and cause of high blood pressure, and the thickened left ventricular further worsens the degree of mitral valve regurgitation and the corresponding degree of lung congestion or pulmonary edema.

8.      Mitral valve regurgitation, also known as mitral valve insufficiency, is a condition in which the mitral valve on the left side of the heart does not close tightly. This allows blood to flow backward (leak) into the left atrium of the heart. If the regurgitation is significant, the

condition can decrease the efficiency of blood flow to the rest of the body, causing the heart to pump harder to move blood through the body. As a result, patients with mitral valve regurgitation often have high blood pressure. The condition often makes a patient feel tired or out of breath.

9.      When a patient has mitral regurgitation, each contraction of the heart forces some blood backwards into the left atrium and then further backwards into the lungs. The pressure in the lungs is lower than the pressure in the contracting left ventricle. In the normal functioning heart, when the left ventricle contracts, the mitral valve shuts, preventing blood from regurgitating backwards. At the same time, the aortic valve opens and permits the normal flow of blood forward. The pressure in the lungs is not high enough to block backwards flow without a functioning mitral valve. A competent and non-leaking mitral valve is the normal protection for the lungs from this blood under pressure. Extra fluid in the lungs, when severe, produces significant shortness of breath and is called congestive heart failure or pulmonary edema.

**Mr. Higgs's Exposure to COVID-19**

10.     In the time since I submitted my August 31, 2020 declaration, cases of COVID-19 have been spiking across the country. As of December 2, 2020, there were 64,326,880 confirmed cases of COVID-19 worldwide, including 13,881,620 in the United States. *See* Johns Hopkins University, Coronavirus Resource Center, https://coronavirus.jhu.edu/ (last visited Dec. 2, 2020).

11.     In Indiana, there had been 344,373 confirmed cases of COVID-19 as of December 2, 2020. Vigo County, where USP Terre Haute is located, had 6,513 confirmed cases. Even these high numbers are likely significant underestimates of the total cases, as some who are infected with COVID-19 are never tested for the virus. *See* Johns Hopkins University, COVID-19 Status Report, https://bao.arcgis.com/covid-19/jhu/county/18167.html (last visited Dec. 2, 2020).

12.     Indiana is the only state that has conducted widespread randomized population testing to determine the cumulative number of Indiana residents who have been infected with COVID-19. *See* Governor Holcomb Indiana COVID-19 Update (Nov. 25, 2020), https://www.youtube.com/watch?v=p01AaI_X0-s (last visited Dec. 2, 2020). This testing has indicated that as of November 19, 2020, approximately 10.6% of non-institutionalized Indiana residents (i.e., residents outside of settings such as nursing homes and prisons) had previously been infected with COVID-19. *Id.* The number is likely higher in prisons, where adequate ventilation and social distancing are often impossible. Of those Indiana residents who tested positive in the random sample, approximately 40% had been asymptomatic. *Id.*

13.     COVID-19 is a novel disease and the full scope of long term sequelae cannot be presently known. In my experience as an intensive care doctor caring for hundreds of patients with COVID-19, many suffer from chronic lung dysfunction. In the worst case scenario, some patients have ultimately undergone a lung transplant as the only possible treatment.

14.     Dustin Higgs was very ill in February of 2020. He reported symptoms of fever, sweating, severe body aches, and nausea, and was ill for approximately one month. These symptoms are consistent with COVID-19. However, Mr. Higgs has never been tested for COVID-19.

15.     Given these factors, it is likely that Dustin Higgs has been infected with COVID-19 at USP Terre Haute. Moreover, even if he has not yet been infected, there is a significant likelihood that he could be infected prior to January 15, 2020, given the current nationwide spike in COVID-19 cases.

**Using Pentobarbital to Execute Mr. Higgs Would Result in Severe Pain**

16.     Even in the absence of a prior COVID-19 infection, Mr. Higgs's asthma and his

mitral valve regurgitation put him especially at risk for flash pulmonary edema. With respect to

his asthma, the fact that his airways are narrowed and inflamed makes it difficult for Mr. Higgs

to breathe even under ordinary circumstances. If Mr. Higgs were to be injected with a large dose

of pentobarbital, his lungs would immediately begin to fill with fluid and it would be even more

difficult for Mr. Higgs to breathe. Likewise, Mr. Higgs's mitral valve insufficiency means that

Mr. Higgs's heart has to work harder to pump blood throughout his body as explained above.

Mr. Higgs is always at a greater risk for lung congestion than an otherwise healthy person as a

consequence of mitral regurgitation and asthma. Each of these circumstance when combined

with pentobarbital injection creates an even worse state of lung destruction.

17.     Pulmonary edema occurs when a beating heart pushes blood into the lungs. If the

heart stops, blood no longer enters the lungs. What is striking and important about execution

with pentobarbital execution is the near constant finding of pulmonary edema seen at post

mortem. If pentobarbital injection caused death by quickly stopping the heart, pulmonary edema

would not be seen. Pentobarbital is a caustic chemical and when injected, destroys the delicate

membrane that separates the breathed air from the circulating blood. In the case of Mr. Higgs,

blood would cross into the air-filled parts of the lung as a baseline tendency. If Mr. Higgs is put

to death by pentobarbital injection, his beating heart will now flood his lungs even more rapidly.

The beating heart also still delivers blood to the brain, and therefore the ensuing lung destruction

would be experienced by Mr. Higgs as he lay dying.  To be clear, the preexisting lung

dysfunction conditions make Mr. Higgs particularly likely to experience pulmonary edema that

he will experience as choking and drowning prior to the sedative properties of pentobarbital taking effect.

18.     In addition, COVID-19 infection is associated with an increased risk of lung damage. Because COVID-19 infection is associated with an increased risk of lung damage, Mr. Higgs's likely exposure to COVID-19 puts him at even greater risk for painful complications from pentobarbital injection. Specifically, the onset of pulmonary edema would likely be more rapid and more severe in a patient with damaged lungs.

19.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. § 1746.

Dated:

December 3, 2020

_____

Joel B. Zivot, M.D.

6

EXHIBIT C

## DECLARATION OF JESSICA JOHNSON
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is Jessica Johnson. I am employed as an investigator by the Federal

Community Defender Office for the Eastern District of Pennsylvania.

2.      I have known Dustin Higgs for approximately 9 years. I communicate with him

regularly by visiting, talking on the phone, emailing, and writing letters.

3.      Over the course of the time I have known him, Dustin has told me about various

health problems. He has told me about his asthma, his heart problems, and his high blood

pressure. He also told me about an illness he had in February of 2020.

4.      I most recently spoke with Dustin on Wednesday, December 2, 2020. During that

conversation, I spoke with him in detail about his medical conditions and confirmed all of the

facts contained in this Declaration.

5.      Dustin has suffered from severe asthma since early childhood. He has to use an

inhaler nearly every day in order to breathe properly. He uses an inhaler on average three times

each day.  He uses it as often as six times a day and as infrequently as two times a day.

6.      Dustin also has heart problems. Specifically, he has been diagnosed with mitral

valve regurgitation.  Dustin understands this problem as a heart murmur where his valves get

stuck and fluid backs up into lungs. He has had this defect all of his life, but he did not have

symptoms until 2012 or 2013, around when a doctor diagnosed him. Most recently, he had an

echocardiogram over a month ago, he saw a cardiologist about a month ago, and had an EKG

about two weeks ago. He continues to suffer from mitral valve regurgitation. He occasionally has

trouble breathing and chest pain.

7.       In February of 2020, Dustin became ill. He had a fever and experienced nausea, severe body aches, chills, and sweating. He went to the prison infirmary but was not diagnosed with a specific illness. Dustin was ill for approximately one month.

8.       Dustin has never been tested for COVID-19.

9.       Dustin told me that, currently, three correctional officers who work on his tier were exposed to COVID-19 and are in quarantine.

10.       Dustin is not aware of anyone housed in his building who has been tested for COVID-19, aside from one inmate who went to the hospital outside the prison for an unrelated medical condition. That inmate was tested for COVID-19 because he was traveling outside the prison.

11.       I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information and belief.

Dated: *12/03/20*

Jessica Johnson

# EXHIBIT D

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| PATRICK R. SMITH and BRANDON S. HOLM, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 2:20-cv-630- JMS-DLP |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T. J. WATSON, in his official capacity as Complex Warden for the Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF YUSUF AHMED NUR**

I, Yusuf Ahmed Nur, declare as follows:

1.      I am over the age of 18, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2.      I am a professor of business and management at Indiana University Kokomo. I am Muslim and was a spiritual advisor for Orlando Hall, who was executed by the federal government on November 19, 2020. I witnessed Mr. Hall's execution.

3.      On the morning of Orlando's execution, I met with him behind a glass window for three hours in USP Terre Haute. Before my visit with Orlando there, I had been processed through security where I came into close contact with multiple BOP staff members.  After the morning visit, I was then instructed to leave the prison and drive downtown to the Sheriff's office to be

1

picked up later by the prison officials and returned to the prison for the execution. When I left the prison at 2:00 p.m., I met with the prison Chaplain (Chaplain Roloff) in the lobby of the building where Mr. Hall was housed.  He was the person who told me where to go and what to do. I was told to arrive at the Sheriff's parking lot at 3:30 p.m.

4.      When I arrived at the Sheriff's office parking lot, I met with the mother of one of Orlando's children, a friend of Orlando's who came from Texas, and a close friend of Orlando from Indianapolis. The four of us were then met by two female prison officials, a different Chaplain, whose job was to help the family deal with the situation, and a driver. They had us fill out forms, and then we waited for 30 or 45 minutes to receive word that we could come to the prison.

5.      At that time, they put all of us into a white transit van with 11 seats. There were eight of us total in the van, including the driver. They had many other security vans and cars; I did not understand why they put us all in the same van. They did not open the windows, and I do not believe that we could open the windows in the back.  I estimate that we spent approximately 15 minutes in the van.

6.      They drove us to the USP building, where the death row is housed, and they processed us. First, they had us all sit down in the waiting area. Present were the seven of us (the driver remained in the van) and three officers who processed us. They then called each of us one at a time to be screened. Each of us went through a body scanner and the officers put our shoes, jackets, and belongings through the metal detectors. They then used a hand wand on each of us, wanding us first in the front and then in the back. All of these actions took place in very close proximity with the officers.  While each person went through the security measures, the others

waited together. They waited for clearance from another area of the prison before moving us, and there were no windows to the outside in the security screening room or the waiting area.

7.      They then took us back to the van and drove us to another building. We entered the front door into a hallway without windows. They took us to a room that appeared to be used as a classroom for the lower security inmates. It also had no windows. It was approximately twelve feet by twelve feet. There was a small table (roughly five feet by three feet) with plastic chairs, which is where we sat together. Our escorts left us there and went into another small room with another male official. I remained in that room with the other three witnesses for Mr. Hall for approximately five hours. Different BOP staff brought snacks and bottles of soda and juice into the room for us to share. They left the door open, but there were no windows in the room.

8.      Our escorts (the Chaplain and the two female prison officials) were joined by another male prison official. He was responsible for bringing us updates throughout the process. They all stayed in a small room down the hall from us.  The room looked to be a secretarial or administrative office.  This room was near the bathrooms and we could see them when we went to the bathroom. When they were in the room together, the two female employees did not wear masks.

9.      At around 10:30 p.m. Chaplain Roloff walked to the classroom we were in, took me outside and put me into a van which he drove to the execution chamber. There was an armed guard at every intersection that we had to pass, and the Chaplain would come to the intersection, wait for a clearance, and then move the van. One of the guards walked up to the van and briefly spoke to the Chaplain, acknowledging recognition. With these delays, the trip took approximately 15 minutes.

10.     Chaplain Roloff first took me to a temporary tent, and handed me off to an official-looking person, wearing a suit and tie. That person took me to a building which housed the

execution chamber. I was taken into a very small room (approximately six feet by four feet). The official and I were there with two other prison employees for approximately 15 minutes. There were no windows to the outside, only a window that looked into the execution chamber.

11.     I was then taken by the official through a metal door into the execution chamber. The two other employees, who I had just been with, stayed in the small room and were joined by Orlando's other three witnesses. These two employees wore masks, but they frequently wore them below their noses.

12.     The prison official told me that I would be permitted to administer last rites or speak before the execution, and that I would be permitted to touch Orlando after the execution and pray for him.

13.     When I arrived in the execution chamber, Orlando was already there. He was strapped into the gurney, though you could not see the straps because he was covered with a blanket. You could see the tubes going into him. He looked like he was being operated on.

14.     Around the chamber were three rooms that looked into the chamber. On my left side was the small room where I had been. I could see Orlando's witnesses with the two employees. The second room was the media room, which appeared to be the same size as the small room I waited in (with the same size window). There were at least three witnesses in the media room. The third room appeared larger and was dimmed so that we could not see into it very well.

15.     The execution chamber was approximately ten feet by twelve feet. In the chamber with me was the official who brought me, Orlando, and two executioners. They put tape on the floor about two feet from the gurney, and told me to stand on the outside of the tape. The two executioners were not wearing masks. Each was standing at the head of the gurney on one side of Orlando.  The one on Orlando's left side made pronouncements.  Each time he did so, he shouted

in a loud and booming voice, presumably for the benefit of people in the adjoining rooms. It was the job of the person on Orlando's right side to pick up the telephone and tell them when it was time to release the poison. The one on the left side asked Orlando what his last statement was. I then began to recite Ya Seen, Chapter 36, from the Quran. It is a tradition to recite this for people on their deathbed. Orlando and I went over it that morning, and talked about the Islamic ritualism. The passage takes about five minutes to recite. I spoke for approximately two or three minutes, and then the guard on the left interrupted. I was in the middle of the passage when he said – "that's enough."  I was prevented from reading the words of comfort at the end of the passage: "So glory be to Him in whose hand is the dominion of everything, and to Him you will be returned." The other executioner then called someone and the execution process began. Until he lost consciousness, Orlando recited the Quran and, in between passages, told his family, "I love you, everything will be ok". He was in the middle of that when he lost consciousness.

16.     After Orlando was pronounced dead, they closed the curtains. At that point, I went to the gurney and put both hands on Orlando and began praying, as I had been told I could do. The three officers remained in place. When I moved toward Orlando, I was extremely close to the unmasked executioners. I had been praying over Orlando's body for less than a minute when the unmasked executioner who made the announcements again interrupted me and told me to stop praying.

17.     I was in the execution chamber for about 15 minutes. While I was there, I was approximately four feet away from each of the unmasked executioners.

18.     There were signs throughout the prison that masks were mandatory and most of the staff members I interacted with indoors had masks on (though some wore them below their noses). But I did not see anyone enforcing this rule.

19.     I was escorted out of the execution room by the prison official who escorted me in. He brought me first to the room with Orlando's other three witnesses. Then they took us all out together to the van that had brought us from the Sheriff's department. The driver and the second Chaplain were with us. They drove us downtown to our cars.

20.     There were no windows that opened to the outside in any of the rooms that I was in throughout the process.

21.     There were white sedans and guards with assault rifles stationed all over the complex.  Indoors, there were additional employees stationed without assault rifles. There were other white sedans patrolling the area. They were all over the place. The guards stationed outdoors around the facility were not masked.

22.     The medical examiner turned over Orlando's body to a funeral home with which the BOP contracts. We were told we could prepare the body for burial.  Orlando's sons and I went there the next day to wash and dress the body. We were taken through a hallway by the funeral home director, down a flight of stairs, and into a basement room. They process the body in that basement room, and then there is an outside door for the hearse to back up to and load the casket. The room was approximately seven feet by fourteen feet and it was dirty.

23.     There were three other dead bodies in the room in addition to Orlando's. One was in a casket and two others had not been processed. One was in a body bag. The other one was covered in white blankets. I assumed it came straight from the hospital. The room was so small that the casket and one of the bodies was underneath the stairwell.

24.     I wanted them to put Orlando's body in a casket, so that we could do the Muslim prayer. But we could not do that, because the prison was not going to bring the casket until Monday. Instead, the funeral home put the body parallel to the door so that Orlando's family and

6

Islamic community members could do the funeral prayers on the other side of the door. Embalming is not allowed in Islam, but they insisted on embalming him. They were not delivering the body to Orlando's family until today, four days after his execution.

25.     On November 15, 2020, prior to the execution, I was tested for COVID-19.  The results were negative for the presence of the virus.

26.     On November 24, 2020, after the execution, I was again tested for COVID. I was administered the SARS-CoV-2, NAA test 5 days after the execution. This was the soonest that I was advised the test would be accurate.

27.     On November 26, 2020, I received the results from my official test. The test was inconclusive, indicating that one of the three COVID targets had a signal above threshold.  I have attached as Exhibit A to this declaration and true and correct copy of this test result.  I was advised to take a second test to confirm the results.

28.     The following day, November 27, 2020, I was administered a second test: the SARS-COV-2 RNA, QL, RT PCR (COVID-19).

29.     On November 29 I received the results from that test, which confirmed that I am positive for COVID-19.  I have attached as Exhibit B to this declaration a true and correct copy of the results from my second test.

30.     In between the execution and the COVID tests I took after the execution, I had no contact with anyone other than my three children.  I followed social distancing at all times, wore a mask in public, and did not come into close contact with any other persons.  I drove to and from my home for the execution by myself and did not stop at any point during the drives, so the activities relating to my involvement in the execution were the only places I believe I could have been exposed to the virus.  Those activities took place on the prison grounds, in the parking lot at

the Sheriff's office in Terre Haute, on the drive from that parking lot to the prison, and at the funeral home in Terre Haute where they took Mr. Hall after the execution.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    November 30, 2020          By:    _____
                                            Yusuf Ahmed Nur

# EXHIBIT D-A

| Component | Value | Standard Range & Units |
|---|---|---|
| **SARS-CoV-2, NAA** | Inconclusive | Negative |

Inconclusive SARS-CoV-2 result
When only one of the three COVID targets has a signal above threshold, the test is reported as inconclusive.
This is thought to represent a low amount of viral copies in the specimen. In practice, inconclusive results should be treated as presumptive positive COVID cases, and repeat testing may be warranted.
This test was developed for the detection of nucleic acids from the SARS-CoV-2 virus by RT-PCR in individuals who meet SARS-CoV-2 clinical and/or epidemiological criteria.
This test has not been FDA cleared or approved.
This test has been authorized by FDA under an EUA for use by the authorized laboratory.
This test is only authorized for the duration of time that the Secretary of the HHS declares circumstances exist justifying the authorization of the emergency use of in vitro diagnostic tests for detection of SARS-CoV-2 virus and/or diagnosis of COVID-19 infection under section 564(b)(1) of the Act, 21 U.S.C. 360bbb-3(b)(1), unless the authorization is terminated or revoked sooner.
To learn more about this test, go to https://www.helix.com/pages/covid19-efforts
Performed by: Helix, CAP 9382893, CLIA 05D2117342, 9875 Towne Centre Dr Suite 100 San Diego, CA 92121

# EXHIBIT D-B

**CVS**Health.

---

### Your COVID-19 test result

# POSITIVE

A positive result for this test means that SARS-CoV-2 RNA (the cause of
COVID-19) was detected in the collection sample.

---

 ## What does it mean to have a **positive** test result?

If you have a positive test result, it is likely you have COVID-19. Therefore, it is also likely that
you may be placed in isolation to avoid spreading the virus to others. There is a very small
chance that this test can give a positive result that is wrong (a false positive result). Most cases
can be cared for at home. Stay home and limit contact with other until:

You have been fever-free for at least 3 days without using medicine that reduces fever **AND** your
symptoms have improved **AND** at least 10 days have passed since your symptoms first
appeared.

- Do not go to the hospital to seek care unless you have a medical emergency
- Do not go to work, notify your employer of your positive test result
- Contact your primary care provider and inform them of your positive COVID-19 test result
- Continue to monitor your symptoms at home and seek medical attention if symptoms worsen

 ## Test information

**Patient's name**
Yusuf Nur

**Collection date**
November 27, 2020 at 2:40 PM ET

**Patient's date of birth**

**Collection location**
292 VAN BUREN STREET SOUTH, P O
BOX 451, NASHVILLE, IN 47448

**Test type**
SARS-COV-2 RNA, QL, RT PCR (COVID-19)

**Provider**
BOLTON TARYN

## MinuteClinic contact information

**Customer Service:** (886) 389-2727

**CVS**Health.

---

**Your COVID-19 test result**

# POSITIVE

A positive result for this test means that SARS-CoV-2 RNA (the cause of
COVID-19) was detected in the collection sample.

---

## Legal Disclaimer

Positive: SARS-CoV-2 detected Testing identified the presence of SARS-CoV-2 (the virus that causes COVID-19) in
the patient's sample. This test was developed for the detection of nucleic acids from the SARS-CoV-2 virus by RT-
PCR in individuals who meet SARS-CoV-2 clinical and/or epidemiological criteria. This test has not been FDA
cleared or approved. This test has been authorized by FDA under an EUA for use by the authorized laboratory. This
test is only authorized for the duration of time that the Secretary of the HHS declares circumstances exist justifying
the authorization of the emergency use of in vitro diagnostic tests for detection of SARS-CoV-2 virus and/or
diagnosis of COVID-19 infection under section 564(b)(1) of the Act, 21 U.S.C. 360bbb-3(b)(1), unless the
authorization is terminated or revoked sooner. To learn more about this test, go to https://www.helix.com/pages/
covid19-efforts Performed by: Helix, CAP 9382893, CLIA 05D2117342, 9875 Towne Centre Dr Suite 100 San Diego,
CA 92121 Laboratory Director: Philip D Cotter, PhD, FACMG, FFSC (RCPA)

<u>EXHIBIT E</u>

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

|  |  |  |
|---|---|---|
| PATRICK R. SMITH and BRANDON S. HOLM, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 2:20-cv-630- JMS-DLP |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T. J. WATSON, in his official capacity as Complex Warden for the Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF DR. JOE GOLDENSON

I, Dr. Joe Goldenson, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

### Background

1. I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director. In that role, I provided direct clinical services; managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility; planned and coordinated the jail's response to H1N1; and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3.      For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4.      I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years.  I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation.  I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in the states of Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5.      My CV is attached as **Exhibit 1**.

6.      I am not being compensated for my time reviewing materials and preparing this report.

7.      As a researcher of prisoner health care and infectious diseases, I have studied the scientific literature about COVID-19, including the literature regarding symptoms, testing, infection rates and transmission.  In addition, I have studied and am familiar with the public health guidance regarding prevention and containment of COVID-19, including U.S. Centers for Disease Control and Prevention's ("CDC") Guidance for Population in Jails and the CDC's Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings.

## COVID-19

8.      COVID-19 is a serious disease that reached pandemic status in March 2020.  As of November 19, 2020, there are at least 56,561,918 confirmed cases of COVID-19 worldwide, including 11,573,758 cases in the United States.[1]  At least 1,354,780 people have died, including 251,029 in the United States.[2]  As of November 19, 2020 there were 275,503 confirmed cases of COVID-19 in Indiana and 5,084 reported deaths.[3]  Vigo County, where Terre Haute is located, has had 5,087 confirmed cases and 69 deaths.[4]  Because these numbers include only laboratory confirmed cases, they likely understate the actual number of cases and deaths. Cases continue to rise in states across the United States.[5]  An average of 162,816 cases per day have been reported in

---

[1] Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/ (last visited November 19, 2020); Centers for Disease Control and Prevention, COVID Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases (last visited November 19, 2020).

[2] *Id.*

[3] *Id.*

[4] Johns Hopkins University Coronavirus Resource Center, COVID-19 United States Cases by County, https://coronavirus.jhu.edu/us-map (last visited November 19, 2020).

[5] New York Times, The Coronavirus Outbreak: Live Updates, https://www.nytimes.com/news-event/coronavirus (last visited November 19, 2020).

the last week, which represents an increase of 77 percent from the average two weeks ago.  As of November 19, cases were rising in almost every state in the country.  23 states hit single-day case records the first week of November.[6]

9.      COVID-19 is a highly contagious respiratory illness. It is transmitted between persons in close proximity (within about six feet) by airborne droplets released by infected individuals when they cough or sneeze.[7] The droplets can survive in the air for up to three hours. In October 2020, CDC revised its COVID-19 guidelines to include that the coronavirus can be spread through aerosols, which "can linger in the air for minutes to hours" and travel farther than six feet. CDC concluded, "There is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away. These transmissions occurred within enclosed spaces that had inadequate ventilation.[8] It may also be possible for an individual to become infected by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for variable lengths of time, ranging from up to four hours on copper, to 24 hours on cardboard, to two to three days on plastic or stainless steel.

10.      Signs and symptoms of COVID-19 may appear two to 14 days after exposure and may include fever, cough, shortness of breath or difficulty breathing, chills, fatigue, muscle pain, headache, sore throat, new loss of taste or smell, congestion or runny nose, nausea or vomiting, or diarrhea.[9] In severe cases, COVID-19 can require hospitalization and lead to respiratory failure or death. While more than 80% of the cases are mild, overall some 20% of cases will have severe disease requiring medical intervention and support.

11.      Patients who suffer from serious disease may progress to Acute Respiratory Distress Syndrome (ARDS), which is a type of respiratory failure. Many patients suffering from ARDS will require mechanical ventilation. ARDS has a 30 percent mortality rate overall, and a higher mortality rate in people with other medical conditions.

12.      Certain populations are particularly vulnerable to severe cases of COVID-19. The case fatality rate and need for advanced medical intervention and support increase significantly with advancing age in people aged over 50 and for people of any age with certain underlying medical conditions (the "medically vulnerable"). The CDC has identified people with the following medical conditions as high risk for severe illness (hospitalization, intensive care, ventilatory support or death) from COVID-19:

- Type 2 diabetes mellitus

---

[6] *Id.*

[7] Centers for Disease Control and Prevention, Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings (updated Nov. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/.

[8] Centers for Disease Control and Prevention, How COVID-19 Spreads, (updated October 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[9] Centers for Disease Control and Prevention, Symptoms of Coronavirus (updated May 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

- Chronic obstructive pulmonary disease
- Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies
- Sickle cell disease
- Chronic kidney disease
- Immunocompromised state (weakened immune system) from solid organ transplant
- Obesity (body mass index (BMI) of 30 or higher)

13.    The CDC notes that people with the following conditions might also be at risk for severe illness from COVID-19:

- Asthma (moderate to severe)
- Cerebrovascular disease (affects blood vessels and blood supply to the brain)
- Cystic fibrosis
- Hypertension or high blood pressure
- Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines
- Neurologic conditions, such as dementia
- Liver disease
- Pregnancy
- Pulmonary fibrosis (having damaged or scarred lung tissues)
- Smoking
- Thalassemia (a type of blood disorder)
- Type 1 diabetes mellitus[10]

14.    The CDC also notes the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.[11] For example, as depicted in Chart 1, a CDC graphic from June 2020, 84.6 patients per 100,000 patients age 40-49 years are hospitalized due to COVID-19. That rate increases to 136.1 patients per 100,000 for patients age 50-64 years; to 198.7 per 100,000 for patients age 65-74 years; and to 329.3 per 100,000 for patients age 75-84 years.[12]

---

[10] Centers for Disease Control and Prevention, People of Any Age with Underlying Medical Conditions (updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.

[11] Centers for Disease Control and Prevention, Older Adults (updated September 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[12] Id.

Chart 1



15.     The risk of death from COVID-19 also increases with age. As shown in Chart 2, another CDC graphic, patients age 40-49 account for 2.9% of all COVID-19 deaths. Beginning at age 50, the risk of death increases dramatically. Patients age 50-64 account for 15% of COVID-19 deaths; patients aged 65-74 account for 20.6% of deaths; patients aged 75-84 account for 26.1% of deaths.[13] The increasing death toll for older adults does not correlate with overall percentage of the population. Rather, the death rate from COVID-19 increases significantly with age, despite the fact that those age groups constitute an increasingly smaller percentage of the overall population. This trend is depicted in Chart 3, below, compiled from CDC data[14] and population estimates from the U.S. Census Bureau.[15]

---

[13] Centers for Disease Control and Prevention, Demographic Trends of COVID-19 cases and deaths in the US reported to CDC (updated November 20, 2020), https://www.cdc.gov/covid-data-tracker/index.html#demographics.

[14] Id.

[15] United States Census Bureau, 2019 Population Estimates by Age, Sex, Race and Hispanic Origin (June 25, 2020), https://www.census.gov/newsroom/press-kits/2020/population-estimates-detailed.html.

Chart 2



Deaths by Age Group:



Data from 183,808 deaths. Age group was available for 183,796 (99%) deaths.

Chart 3



16.     A significant number of infected individuals do not exhibit symptoms, however, and asymptomatic individuals—either before the onset of symptoms or because no symptoms will ever manifest—can nevertheless transmit the disease to others. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[16] Similarly, infected individuals may experience only mild symptoms. These asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. Because of the high risk of transmission by asymptomatic individuals, CDC recommends everyone wear a mask when they leave their homes.

17.     At this time there is no vaccine that has been authorized or approved to prevent COVID-19 and there is no known cure.[17]  While it appears a vaccine or multiple vaccines may be approved in the near future, they will not be widely available for many months, there will be challenges in their distribution, and their ultimate efficacy remains to be seen.

18.     Current preventive measures seek to slow the transmission of COVID-19 through a

---

[16] Apoorva Mandavilli, Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[17] Centers for Disease Control and Prevention, 8 Things to Know about Vaccine Planning (updated October 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html.

number of mechanisms.  The CDC has identified social distancing (keeping persons separated by at least six feet) as a cornerstone of reducing transmission of respiratory diseases such as COVID-19. In addition, frequent handwashing, respiratory hygiene (*e.g.*, covering mouth and nose when coughing or sneezing), and frequent cleansing of surfaces, while less effective than social distancing, are recommended.[18] While these are important and necessary actions to reduce the risk of infection and the spread of the virus, they are not fully preventive.

### COVID-19 in Detention Facilities Generally

19.     For multiple reasons, the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community, putting inmates, staff, and others who must enter the facility at high risk of becoming ill with COVID-19.

20.     Close living quarters and often overcrowded conditions in jails, prisons, and detention centers facilitate the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing or coughing, like COVID-19. In these congregate settings, large numbers of people are closely confined and forced to share bunkrooms, bathrooms, cafeterias, and other enclosed spaces. They are physically unable to practice social distancing. Within these facilities, space and resource limitations—and the resulting inability of inmates and employees to practice social distancing[19]—make it extremely difficult to effectively quell the explosive growth of a highly contagious virus. The CDC has recognized that correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[20]

21.     Frequent and thorough hand washing is one of the key recommendations to reduce transmission, but sufficient soap and/or hand sanitizer is often not available (for inmates and staff) to wash their hands frequently enough to prevent the risk of transmission in contravention of the CDC's *Interim Guidance.*[21]

22.     Correctional facilities are commonly poorly ventilated, which facilitates the transmission of airborne illnesses, such as COVID-19. The CDC recommends generally after an infection in buildings that building operators open windows to allow fresh air to circulate.[22] This recommendation is not possible in prisons

23.     Current CDC recommendations for reducing the transmission of COVID-19 in jails

---

[18] Centers for Disease Control and Prevention, How to Protect Yourself and Others 1–2 (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.

[19] *Id*. at 2, 11.

[20] *Id*. at 2.

[21] *Id.*

[22] Centers for Disease Control and Prevention, Cleaning and Disinfecting Your Facility (Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility-H.pdf.

include screening of all newly arriving arrestees, quarantining all newly arriving arrestees for 14 days and performing daily symptom screening and temperature checks while they are in quarantine, isolating any detainee with any symptoms consistent with COVID-19 or with fever who is currently housed in the facility, and providing masks to all inmates who are "confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19."[23] In addition, the CDC generally recommends providing and wearing masks in congregate settings. Individuals should not be added to an existing quarantine cohort after the 14-day quarantine clock has started. Doing so would complicate the calculation of the cohort's quarantine period, and potentially introduce new sources of infection.[24] Nor should individuals who have been exposed but tested negative be quarantined with those who have tested positive. The CDC recommends that prisoners in quarantined be celled in single cells with solid walls and solid doors, with an empty cell between prisoners. If quarantined together, the cells should have bars instead of solid walls and doors and allow for distancing of six feet.

24.     These recommendations are also difficult, if not impossible, to implement in prisons due to space constraints, lack of sufficient respiratory isolation rooms, and lack of necessary equipment and other resources.

25.     Testing has been limited in many jails and prisons. Even when available, it can take days to obtain results. Moreover, someone who is tested shortly after being infected may test negative. As a result of this limited testing, the data regarding the spread of COVID-19 in correctional facilities is extremely limited and likely significantly undercounts the true spread of the virus. CDC Director Robert Redfield estimates that the number of people infected with COVID-19 in the community is likely 10 times higher than the number of patients who have been confirmed positive through testing.[25] It is likely that the rate of undiagnosed patients is even higher in prisons and jails, where testing rates are often much lower than in the community.

26.     Non-test based verbal screens—i.e., asking a person for a subjective report of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the Centers for Disease Control and Prevention, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[26] Similarly, infected individuals may experience only mild symptoms. These newly infected, asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. As a result, such inadequate screening presents a critical problem. The possibility

---

[23] Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Updated October 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#QuarantineCloseContacts.

[24] Id.

[25] Lena H. Sun & Joel Achenbach, CDC chief says coronavirus cases may be 10 times higher than reported, Washington Post (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

[26] Apoorva Mandavilli, Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission. Because of the problems with screening procedures, the risk of false negative tests, the unavailability of test kits and the delays in obtaining test results, one necessary means to prevent the introduction of COVID-19 into the jails by someone who is arrested is to quarantine all arrestees for 14 days and monitor them daily for symptoms and fever before they are deemed safe to introduce into the general population of the jail.

27. In correctional facilities, groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria or visiting room.  Inmates often come from different housing units, congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, or telephones. These group movements, which often cluster large numbers of people together in small spaces, increase the risk of transmission between incarcerated persons and throughout the facility. It is common for individuals in a given housing unit to routinely be subjected to such group movements multiple times each day. Additionally, detention facilities often rely on incarcerated people to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility.

28. Correctional officers and other facility staff routinely have direct physical contact with incarcerated people, especially when handcuffing or removing handcuffs from prisoners who are entering or exiting the facility, or who are being escorted from one part of the facility to another. Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the facility and transmission to and from incarcerated people in different parts of the facility. Correctional officers must also come into close contact with visitors at facilities, in order to process them through security, conduct security searches, and escort them to their destination within the facility. This creates further opportunities for transmission between staff and visitors.

29. Correctional facilities largely lack the robust medical care infrastructure that would be necessary to deal with a COVID-19 outbreak. If a significant number of people become sick with COVID-19 the institution's health care facilities will be unable to respond appropriately to those people and those who need medical care for other reasons. And, when an incarcerated patient's needs are too acute for a correctional facility to provide adequate treatment, the patient must be transported to and treated at a community hospital. Once COVID-19 spreads throughout the correctional facility, the burden of caring for many of these sick individuals will shift to local community medical facilities.

30. When an outbreak strikes a correctional facility, correction and medical staff will become ill. They will not show up to work. These vacancies can result in facilities becoming dangerously understaffed, which compromises medical care. Healthcare staff who provide treatment are unavailable. Correctional staff also play a vital role in delivering medical services, by escorting prisoners, responding to and alerting medical of medical emergencies, and providing security to health care staff while they provide services. Their absence also compromises treatment.

31. If infected, inmates are at greater risk for harm from COVID-19 than those in the general community. This is due to a number of factors including the fact that people in prisons

have high rates of chronic illnesses, such as diabetes, heart disease, chronic lung disease, and immunosuppressive illnesses such as HIV disease that increase the risk from COVID-19, often have had poor or absent prior health care, and often have made unhealthy lifestyle choices, including alcohol and drug use. For these reasons, it is well accepted within the medical community that prison inmates are physiologically 10 years older than their chronological age.

32.     Because of the conditions typically found in jails and prisons, carceral settings often have particularly serious incidence of communicable disease. For example, during the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[27] Until recently the Cook County Jail in Chicago was believed to be the largest-known source of U.S. COVID virus infections.[28] As of April 13, more than 500 people had been infected at the facility, and the numbers continue to climb.[29] In one prison in Ohio, 78% of the approximately 2,500 prisoners tested positive.[30] The State of Ohio tested its prisoners en masse for COVID-19 so this number includes large numbers of inmates who were asymptomatic and would otherwise not have been tested. This underscores the risk of the spread of COVID-19 by asymptomatic individuals. In addition, 109 staff had tested positive for COVID-19.[31]

33.     During an infectious disease outbreak, a containment strategy requires people who have known or suspected illness be isolated and that caregivers have access to personal protective equipment to protect themselves and to prevent the further transmission of the disease. During an outbreak, jails and prisons are under-resourced in being able to provide medically appropriate housing for persons with known or suspected infectious illness and are often underequipped to provide sufficient personal protective equipment, increasing the risk of a widespread outbreak.

34.     In sum, current CDC recommendations for social distancing, frequent hand washing, frequent cleansing of surfaces, symptom screening, temperature checks and isolation to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in carceral settings. As a result, the risk of COVID transmission is far greater than in non-custodial institutions. Given the rapid spread of COVID-19, it is likely impossible to achieve and sustain these measures sufficiently to mitigate the risk of transmission for medically vulnerable inmates,

---

[27] David M. Reutter, Swine Flu Widespread in Prisons and Jails, but Deaths are Few, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu- widespread-in-prisons-and-jails-but-deathsare-few/.

[28] Timothy Williams and Danielle Ivory, Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[29] Cheryl Corley, The COVID-19 Struggle In Chicago's Cook County Jail, NPR (Apr. 13, 2020) https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail.

[30] Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing (updated Apr. 20, 2020), https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-20-2020%20%201304.pdf.

[31] Bill Chappell and Paige Pfleger, 73% Of Inmates At An Ohio Prison Test Positive For Coronavirus, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

staff, or visitors.

## Conditions in Prisons Pose Significant Risk of Transmission of COVID-19 To and From the Community Outside the Prisons

35.     The conditions in prisons pose very significant risk of transmission of communicable diseases like COVID-19 not only to inmates, employees and volunteers in the prisons, but also to the community as a whole. It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission, and that due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. In addition, staff may contract communicable diseases in the community and then introduce those diseases into the facility.  While prisons are often thought of as closed environments, this is not the case.  A large number of custody, medical, and other support staff and contractors who have direct contact with prisoners enter and leave the facility throughout the day. Prisons admit and release prisoners on a regular basis. Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to the inmate population.

36.     When there is an outbreak in a prison, staff can become infected and bring the virus home to their families and community.  For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home.

37.     COVID-19 has devastated correctional facilities and its surrounding communities. At Rikers Island in New York, between the mornings of Wednesday, April 1 and Thursday, April 2, the number of COVID-19 positive incarcerated individuals and staff members grew by 47 and 57 people, respectively, upping the jail's total numbers of confirmed cases to 231 among the incarcerated population and 223 among staff.[32] The first known case of COVID-19 at Rikers was confirmed on Wednesday, March 18,[33] illustrating just how quickly this disease can and will overwhelm detention facilities.  By November 17, 197,659 cases of coronavirus have been reported among prisoners. [34]  A rising number of individuals in prisons continue to test positive for COVID-19.

## Conditions at FCI and USP Terre Haute and Risks for Visitation

38.     The Bureau of Prisons (BOP) describes the Terre Haute Federal Correctional Complex (FCC) as comprised of two facilities, USP Terre Haute, a High Security Detention Facility with 1,306 male prisoners and FCI Terre Haute, a Medium Security Federal Correctional

---

[32] As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000, N.Y. Times (updated Mar. 19, 2020), https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html.

[33] The Marshall Project, A State-by-State Look at Coronavirus in Prisons (Updated November 20, 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.

[34] *Id.*

Institution (978 prisoners) with an adjacent Minimum Security Satellite Camp (256 prisoners).[35] Death row prisoners are housed in USP Terre Haute, in the Maximum Security Facility. According to the BOP, FCC Terre Haute is Care Level 3 medical complex with prisoners with significant medical and psychiatric issues. A weapons range, training center, execution complex and staff housing are all on located in the complex.[36]

39.      The BOP employees several hundreds of staff at FCC Terre Haute.[37]

40.      In April, Terre Haute FCC became the BOP's regional intake center, resulting in the transfer of inmates who were in the custody of the US Marshals from facilities around the region.[38]

41.      The first case of COVID-19 in Terre Haute was publicly reported on May 16, 2020.[39] Since then, at least three prisoners at Terre Haute have died from the virus.[40]

42.      The BOP reports that as of November 20, 62 inmates (3 housed in USP Terre Haute and 59 in FCI Terre Haute) and 13 staff have tested positive for, and currently have, COVID-19.[41] The results of 61 additional tests are pending.[42] As of November 20, the BOP reports that 311 inmates (84 housed in USP Terre Haute and 227 in FCI Terre Haute) is the total number that have ever tested positive for COVID-19.[43]

43.      According to BOP's Implementing Modified Operations, intended to mitigate the spread of COVID-19, health screening of staff, contractors, and other visitors is being performed at all BOP locations.[44] That screening includes "temperature checks and COVID-19 screening," but

---

[35] Federal Bureau of Prisons, FCI Terre Haute, https://www.bop.gov/locations/institutions/tha/.

[36] Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020), p.6.

[37] In 2019, the BOP employed 708 staff with potential direct contact with FCC prisoners. Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020); *Id.* at 3.

[38] WHTI-TV 10, New Inmates Arrived at Terre Haute's Federal Penitentiary As Part of Plan to Make it Intake Center for the Region (April 22, 2020), https://www.wthitv.com/content/news/New-inmates-arrived-at-Terre-Hautes-federal-penitentiary-as-part-of-plan-to-make-it-intake-center-for-the-region-569837071.html.

[39] Lisa Trigg, Case of COVID-19 Infection Reported at Federal Prison in Terre Haute, Tribune- Star (May 18, 2020), https://www.tribstar.com/news/case-of-covid-19-infection-reported-at-federal-prison-in-terre-haute/.

[40] Federal Bureau of Prisons, COVID-19 Cases, www.bop.gov/coronavirus/ (last visited November 20, 2020).

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] Federal Bureau of Prisons, BOP Implementing Modified Operations (updated October 8, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp.

does not elaborate on what "COVID-19 screening" entails.[45] The screening, at a minimum, should inquire about the broad range of COVID-19 symptoms that patients may experience. Further, temperature checks and non-test based verbal screens such as this cannot adequately screen for new, asymptomatic or pre-symptomatic infections. Infected staff are a key vector for introducing COVID-19 into a correctional facility. Such screening does not mitigate the risk of asymptomatic or pre-symptomatic staff introducing the virus to the facility.

44.     According to the BOP website for FCC Terre Haute, the facility has implemented modified visiting procedures as of October 20, 2020.[46] In addition, the BOP appears to be utilizing a screening form that has not been updated since March 13, 2020 and includes only three questions regarding international travel, contact with a COVID-19 positive individual, and a subjective report of symptoms.[47] As noted above, temperature checks and non-test based verbal screens such as this cannot adequately screen for new, asymptomatic or pre-symptomatic infections. In addition, this screening form appears to rely on outdated information. It only asks about three symptoms: fever or chills, cough, and shortness of breath. But as noted above, the CDC expanded its list of typical COVID-19 symptoms to include not only fever, cough, and shortness of breath, but also fatigue, muscle pain, headache, sore throat, new loss of taste or smell, congestion or runny nose, nausea or vomiting, or diarrhea.[48] The CDC updated this information in May; any screening forms in use should have been subsequently updated. Given our quickly evolving understanding of COVID-19, it is imperative to update safety measures according to updated knowledge about the virus. BOP does not appear to have done this.

45.     These intended measures alone are not adequate. As noted above, necessary precautions include ensuring the ability to social distance, frequent cleaning and disinfecting of objects and surfaces, requiring staff and inmates to wear masks if within six feet of others, and adequate ventilation.

46.     In addition to these inadequate measures, both USP and FCI within the FCC Terre Haute complex exceed their rated capacity, making social distancing and adequate quarantining for symptomatic and positive inmates an impossibility. Rated capacity is the number of beds or inmates assigned by a rating official to institutions within a jurisdiction.[49]

47.     In the May 2019 Audit of FCC Terre Haute, it was determined that USP has a rated capacity of 910, FCI has a rated capacity of 560, and the satellite camp has a rated capacity of 324

---

[45] *Id.*

[46] *Id.*

[47] Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited November 19, 2020) and Federal Bureau of Prisons, FCI Terre Haute, https://www.bop.gov/locations/institutions/tha/ https://www.bop.gov/locations/institutions/thp/ (last visited November 20, 2020).

[48] Centers for Disease Control and Prevention, Symptoms of Coronavirus (updated May 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

[49] Office of Justice Programs, Bureau of Justice Statistics, Terms & Definitions: Corrections, https://www.bjs.gov/index.cfm?ty=tdtp&tid=1 (last visited November 21, 2020).

inmates.[50] Current data shows that USP and FCI far exceed their rated capacity. Specifically, despite a rated capacity of 910, USP current houses 1,269 male inmates.[51] Similarly, FCI currently houses 875 inmates, which exceeds their rated capacity by 315.[52]

48.     Rated capacity statistics were not designed to account for a pandemic that requires social distancing. Thus, under normal conditions, an excess of the rated capacity is concerning due to general complications with overcrowding, such as lack of proper facilities to accommodate everyone. However, during the COVID-19 pandemic, such an excess can lead to the rapid spread of a deadly virus and excessive death among the inmate population.

49.     With the current population in USP and FCI, it is likely that individuals are forced to live in spaces without adequate social distancing (at least six feet apart). In addition, there is likely a lack of adequate space for individuals who are symptomatic or have contracted COVID-19 to quarantine in isolation or even with social distancing measures pursuant to the CDC's guidelines.[53] This lack of distancing compounded with the inadequate measures noted above, breed an environment for COVID-19 to thrive.

50.     The rated capacity number is a jail-wide statistic, which fails to reflect the crowded conditions in individual housing units. USP has six housing units constructed in a "bow-tie design", with two floors, and FCI has ten housing units.[54] The number of inmates compared to each rated capacity of FCI and USP only depicts a general overcrowding in the complexes. It does not reflect the crowded conditions in each housing unit, such as the possibility of two or three individuals sharing a single cell. With complexes exceeding the rated capacity, it is inevitable each individual housing unit suffers from crowded conditions that fail to abide by social distancing measures.

51.     Overall, the rated capacity of complexes is directed to guide correctional institutions during normal conditions and does not account for distancing measures required in a pandemic. Under the current conditions of COVID-19, the overcrowding of USP and FCI forces a lack of social distancing and inadequate space for quarantining symptomatic and positive inmates. An exceeded rated capacity is concerning during normal times; now, it is a deadly condition.

## Special Risks Posed by Executions and Rising Infection Levels

---

[50] Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020).

[51] Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited November 21, 2020).

[52] Federal Bureau of Prisons, FCI Terre Haute, https://www.bop.gov/locations/institutions/tha/ (last visited November 21, 2020).

[53] Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Updated October 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#QuarantineCloseContacts.

[54] Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020).

52.     The risk of COVID-19 spread for BOP prisoners detained at FCC Terre Haute is heightened by the BOP's decision to hold federal executions at the Terre Haute facility. I previously submitted declarations regarding the COVID-related risks created by these executions for witnesses attending the executions, in the following case: *Hartkemeyer v. Barr*, No. 2:20-cv-00336-JMS-DLP (S.D. Ind.).  My prior declarations described these significant factors, in addition to the general risks described above posed by COVID-19 in prisons:

   a.  **A large number of BOP FCC Terre Haute staff from across the prison complex are involved in carrying out the executions**. I relied upon information from BOP counsel Rick Winter reporting that 200 FCC Terre Haute staff would provide specialized security and support for the execution, pulled away from their regular duties.  *Hartkemeyer v. Barr*, ECF 6-25, ¶ 57.

   b.  **A large number of out of state witnesses and other BOP personnel will travel to Terre Haute for the executions**. I noted that the BOP regulations specify the attendance of a large number of witnesses for the execution, delineating 24 witnesses exclusive of the custodial staff, the Warden, Marsha, and Department of Justice Attorneys. *Hartkemeyer v. Barr*, ECF 6-25, ¶ 50. In addition to the 200 security and support staff from across FCC Terre Haute, Mr. Winter described approximately 40 BOP staff members who would participate on the execution team, along with 50-person specialized security teams who would travel to Terre Haute from unidentified parts of the country and other BOP facilities. *Id.*, ¶ 57. I described the increased risks associated with flying and other travel. *Id.* ¶ 56.

   c.  **Many of these out of state individuals and BOP staff will congregate together in the small execution facility with poor ventilation and no room for social distancing**. *Hartkemeyer v. Barr*, ECF 6-26, ¶¶ 52-53.

53.     I noted that the large-scale execution plans posed the risk of becoming a "super-spreader event," an indoor event with many people resulting in clusters of infection. *Hartkemeyer v. Barr*, ECF 6-26 ¶ 59.

54.     The federal government has executed eight men in 2020, all during the pendency of the COVID-19 pandemic. Shortly before the first of these executions, BOP attorney Rick Winter filed a declaration noting that one of the FCI Terre Haute staff members involved in the execution preparations subsequently tested positive for COVID-19, after attending multiple training meetings for the execution preparations and working in USP Terre Haute approximately one week before the execution was scheduled to be carried out. This staff member had worked without wearing a mask. I filed a supplemental declaration describing this as confirmation of "the worst case scenario: a known exposure from an infected staff person who had been in contact with other staff involved in carrying out the executions and who has been in the housing unit with the individuals scheduled for execution." *Hartkemeyer v. Barr*, ECF 80-1, ¶ 8.

55.     I described the kind of careful quarantine practices that would be required in order to reduce the risk of exposure from this outbreak: the Government needed to identify the individuals who were exposed in any of the indoor settings and place all of those individuals on a

14-day quarantine. *Hartkemeyer v. Barr*, ECF 80-1, ¶ 9. The Government would then need to track through testing the exposed individuals. If any of those exposed, quarantined individuals had a positive test, the Government would need trace in turn the contacts of those individuals. *Id.*, ¶ 10.

56.     I also noted that it was a significant issue of concern that the FCI Terre Haute individual who tested positive for COVID-19 did not always wear a mask while at the prison, increasing the likelihood of spread to others. *Hartkemeyer v. Barr*, ECF 80-1, ¶ 12. I observed that this was contrary to the BOP's sworn statement that all BOP staff are required to wear face masks and that the BOP needed to evaluate its enforcement policies to assess why this basic requirement was not followed. *Id.*

57.     The BOP has more recently disclosed documents describing staff infections, quarantine and isolation practices, and its COVID-19 testing at Terre Haute. These materials are additional cause for concern.[55]

58.     The records show that the July infected staff member "wore mask while speaking with inmate, but not with staff in SHU and SCU."[56]  The records further suggest that the failure of the COVID-positive staff member at Terre Haute to wear a mask was not an isolated event. Several BOP staff members likewise were either not wearing masks or not wearing masks properly around COVID-positive Terre Haute staff.[57] Multiple BOP staff described not wearing masks in the office, station and breakroom.[58]

59.     The BOP's Staff Positive Case Forms illustrate the potential for spread to prisoners through staff. For example, one staff member who later tested positive was in contact with "120 inmates approx."[59] Another Staff Positive Case Form shows that the daily routine of a staff member who later tested included passing out food trays to prisoners.[60] One staff member worked in both the USP and FCI facilities before testing positive.[61]

60.     The numbers of COVID-19 infections at FCC Terre Haute have increased dramatically in the wake of the executions. The Vigo County Health Department published a chart of the COVID-19 positive cases for Terre Haute FCI prisoners and Vigo County:[62]

---

[55] ACLU, BOP Data Show Federal Executions Likely Caused COVID-19 Spike (Sept. 21, 2020) https://www.aclu.org/press-releases/bop-data-show-federal-executions-likely-caused-covid-19-spike.

[56] Stubbs Decl., Ex. E-1 at 1.

[57] *Id.* at 1-9.

[58] *Id.* at 3-5, 9.

[59] *Id.* at 7.

[60] *Id.* at 8.

[61] *Id.* at 9.

[62] *See* Vigo County Health Dep't, Vigo County and Federal Correction Inmates COVID Positives, Facebook (Nov. 13, 2020), https://www.facebook.com/vigocountyhd/photos/pcb.4885966584776927/4885962581443994/?type=3&theater.



61.      Before the first execution on July 14, 2020, the publicly reported numbers by BOP showed a cumulative total of 11 or 12 prisoner infections since March. The federal government carried out executions on July 14, 2020, July 16, 2020, and July 17, 2020, bringing together different constellations of individuals for each of these executions.[63]  By August 17, 2020, one month later, the cumulative total had risen to 21 cases, with three active cases reported at USP Terre Haute and no active cases reported at FCI Terre Haute.[64]

62.      The federal government then carried out two additional executions at the end of August, one on August 26, 2020 and one two days later on August 28, 2020. This time there was a much larger and more immediate rise in COVID-19 cases following the executions. By August 31, 2020, 102 prisoners, 57 at USP Terre Haute and 45 at FCI Terre Haute, had confirmed COVID-19 infections.[65] The federal government then carried out additional executions on September 22 and 24, 2020. As of November 22, 311 inmates, 84 at USP Terre Haute and 227 at FCI Terre Haute, had ever tested positive or COVID-19. On November 23, 82 prisoners and 14 BOP staff had confirmed current COVID-19 infections.[66]

**<u>Conclusion</u>**

63.      For the reasons above, it is my professional opinion that inmates at FCC Terre Haute are at a heightened risk of contracting COVID-19 as a result of the nature of conducting

---

[63] The U.S. Department of Justice, Executions Scheduled for Four Federal Inmates Convicted of Murdering Children (July 15, 2020), https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children; BOP, Historical Information, Federal Executions, 2020s, https://www.bop.gov/about/history/federal_executions.jsp (last visited November 22, 2020).

[64] Stubbs Decl. ¶ 5.

[65] *Id.*

[66] BOP, COVID-19 Update (updated November 20, 2020), https://www.bop.gov/coronavirus/.

executions at the facility, which involves bringing people from outside the community onto the facility before and during executions; the sharing of staff members from the FCI and USP complexes to participate in the executions; and the failure to follow CDC-recommended guidelines at FCC Terre Haute for inhibiting the spread of COVID-19.  The same is true of staff members at FCC Terre Haute and their families and members of the broader Terre Haute community, all of which groups would likely have a higher risk of contracting COVID-19 than they would if the executions were postponed, with the attendant risk of serious illness and death for some number of the members of those groups.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 24, 2020 in Alameda County, California.

_____
Dr. Joe Goldenson

# EXHIBIT E-1

## CURRICULUM VITAE

**JOE GOLDENSON, MD**
**1406 CYPRESS STREET**
**BERKELEY, CA 94703**
**(510) 557-1086**
**jgoldenson@gmail.com**

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX |
| | Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco |
| | Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York |
| | M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor |
| | B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-2015 | Director/Medical Director |
| | Jail Health Services |
| | San Francisco Department of Public Health |
| 1991-1993 | Medical Director |
| | Jail Health Services |
| | San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice |
| | Jail Health Services |
| | San Francisco Department of Public Health |
| 1987-1990 | Staff Physician |
| | Jail Health Services |
| | San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician |
| | United Farm Workers Health Center, Salinas, CA |

**Consulting**

| | |
|---|---|
| 3/20-Preset | Federal Court appointed Medical Monitor, *Chavez, et al., v. County of Santa Clara,* Case No. 15-cv-05277-RMI, Consent Decree, United States District Court, Northern District of California, Eureka Division, re: Medical care in Santa Clara County Jail |
| 6/16-8/19 | Consultant to Los Angeles Department of Health Services re: provision of health care services in the LA County Jail |
| 4/02-Present | Federal Court Medical Expert, *Plata v. Newsome*, Class Action Lawsuit re: prisoner medical care in California State Prison System |
| 6/14-9/14 | Medical expert for the Illinois Department of Corrections and the ACLU of Illinois |
| 6/10-12/13 | Federal Court appointed Medical Monitor, U.S.A. v. Cook County, et al., United States District Court for the Northern District of Illinois, No. 10 C 2946, re: medical care in the Cook County Jail |
| 6/08-6/12 | Member, *Plata v. Schwarzenegger* Advisory Board to the Honorable Thelton E. Henderson, U.S. District Court Judge |
| 5/08-9/09 | Medical Expert for ACLU re Maricopa County Jail, Phoenix, AZ |
| 1/08 | Member of the National Commission on Correctional Health Care's Technical Assistance Review Team for the Miami Dade Department of Corrections |
| 9/07-1/10 | Federal Court appointed Medical Expert, *Herrera v. Pierce County, et al.,* re: medical care at the Pierce County Jail, Tacoma, WA |
| 8/06-8/12 | State Court Appointed Medical Expert, *Farrell v. Allen*, Superior Court of California Consent Decree re medical care in the California Department of Juvenile Justice |
| 6/05 | Member of Technical Assistance Review Team for the Dallas County Jail |
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-8/06 | Federal Court Medical Expert, *Austin, et. al vs Wilkinson, et al,* Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template),* |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-1/14 | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-6/08 | Medical Expert for the Office of the Special Master, *Madrid vs* |

|  | *Alameida*, Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility |
| --- | --- |
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |
| 2/98 | Medical Expert, Department of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, INS Detention Center, El Centro, CA |

## Work Related Committees

| | |
| --- | --- |
| 1/14 to present | Member, Editorial Advisory Board, *Correctional Health Care Report* |
| 10/11 to 5/19 | Member, Board of Directors of the National Commission on Correctional Health Care |
| 5/07-10/12 | Liaison to the CDC Advisory Council for the Elimination of Tuberculosis (ACET) from the National Commission on Correctional Health Care |
| 12/04-3/06 | Member of the CDC Advisory Council for the Elimination of Tuberculosis (ACET) Ad Hoc Working Group on the *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (MMWR 2006; 55(No. RR-9)) |
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-1/15 | Director's Cabinet San Francisco Department of Public Health |
| 3/01 | Consultant to Centers for Disease Control on the Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings (MMWR 2003; 52(No. RR-1)) |
| 9/97-6/02 | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-6/12 | Chairperson, Bay Area Corrections Committee (on tuberculosis) |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate Treatment Program, San Francisco Department of public Health |
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |

| 2/92-2/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |
| 1/93-7/93 | Medical Staff Bylaws Committee, San Francisco Department of Public Health |

## ACADEMIC APPOINTMENT

| 1980-2015 | Assistant Clinical Professor |
| | University of California, San Francisco |

## PROFESSIONAL AFFILIATIONS

Society of Correctional Physicians, Member of President's Council, Past-Treasurer and Secretary

American Correctional Health Services Association, Past-President of California Chapter

American Public Health Association, Jails and Prison's Subcommittee

Academy of Correctional Health Professionals

## PROFESSIONAL PRESENTATIONS

*Caring for the Inmate Health Population: A Public Health Imperative,* Correctional Health Care Leadership Institutes, July 2015

*Correctional Medicine and Community Health,* Society of Correctional Physicians Annual Meeting, October, 2014

*Identifying Pulmonary TB in Jails: A Roundtable Discussion*, National Commission on Correctional Health Care Annual Conference, October 31, 2006

*A Community Health Approach to Correctional Health Care,* Society of Correctional Physicians, October 29, 2006

*Prisoners the Unwanted and Underserved Population*, *Why Public Health Should Be in Jail*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04

*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities,* Francis J. Curry National Tuberculosis Center, 10/7/04

*Public Health and Correctional Medicine,* American Public Health Association Annual Conference, 11/19/2003

*Hepatitis in Corrections,* CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 1/17/02

*Correctional Medicine*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 12/16/02

*SuperMax Prisons*, American Public Health Association Annual Conference, 11/8/01

*Chronic Care Programs in Corrections,* CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 9/19/02

*Tuberculosis in Corrections - Continuity of Care*, California Tuberculosis Controllers Association Spring Conference, 5/12/98

*HIV Care Incarcerated in Incarcerated Populations*, UCSF Clinical Care of the AIDS Patient Conference, 12/5/97

*Tuberculosis in Correctional Facilities*, Pennsylvania AIDS Education and Training Center, 3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS

*Structure and Administration of a Jail Medical Program. Correctional Health Care: Practice, Administration, and Law.* Kingston, NJ: Civic Research Institute. 2017.

*Structure and Administration of a Jail Medical Program – Part II.* Correctional Health Care Report. Volume 16, No. 2, January-February 2015.

*Structure and Administration of a Jail Medical Program – Part I.* Correctional Health Care Report. Volume 16, No. 1, November-December 2014.

*Pain Behind Bars: The Epidemiology of Pain in Older Jail Inmates in a County Jail.* Journal of Palliative Medicine. 09/2014; DOI: 10.1089/jpm.2014.0160

*Older jail inmates and community acute care use.* Am J Public Health. 2014 Sep; 104(9):1728-33.

*Correctional Health Care Must be Recognized as an Integral Part of the Public Health Sector,* Sexually Transmitted Diseases, February Supplement 2009, Vol. 36, No. 2, p.S3–S4

*Use of sentinel surveillance and geographic information systems to monitor trends in HIV prevalence, incidence, and related risk behavior among women undergoing syphilis screening in a jail setting.* Journal of Urban Health 10/2008; 86(1):79-92.

*Discharge Planning and Continuity of Health Care: Findings From the San Francisco County Jail,* American Journal of Public Health, 98:2182–2184, 2008

*Public Health Behind Bars,* Deputy Editor, Springer, 2007

*Diabetes Care in the San Francisco County Jail,* American Journal of Public Health, 96:1571-73, 2006

*Clinical Practice in Correctional Medicine, 2nd Edition,* Associate Editor, Mosby, 2006.

*Tuberculosis in the Correctional Facility,* Mark Lobato, MD and Joe Goldenson, MD, *Clinical Practice in Correctional Medicine, 2nd Edition,* Mosby, 2006.

*Incidence of TB in inmates with latent TB infection: 5-year follow-up.* American Journal of Preventive Medicine. 11/2005; 29(4):295-301.

*Cancer Screening Among Jail Inmates: Frequency, Knowledge, and Willingness* Am J Public Health. 2005 October; 95(10): 1781–1787

*Improving tuberculosis therapy completion after jail: translation of research to practice.* Health Education Research. 05/2005; 20(2):163-74.

*Incidence of TB in Inmates with Latent TB Infection, 5-Year Follow-up,* American Journal of Preventive Medicine, 29(4), 2005

*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings,* Morbidity and Mortality Reports, (External Consultant to Centers for Disease Control),Vol. 52/No. RR-1 January 24, 2003

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 162:1044-1050, 2002

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis*, International Journal of STD & AIDS; 12: 380-385, 2001

*Tuberculosis Prevalence in an urban jail: 1994 and 1998*, International Journal of Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release*, American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail*, International Journal of Tuberculosis Lung Disease, 2(6):506-512,1998


## AWARDS

Armond Start Award of Excellence, Society of Correctional Physicians, 2014
Award of Honor, San Francisco Board of Supervisors, 2014
Award of Honor, San Francisco Health Commission, 2014
Certificate of Appreciation, San Francisco Public Defender's Office, 2014
Certificate for Excellence in Teaching, California Department of Health Services, 2002
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

## LICENSURE AND CERTIFICATION

Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)