Exhibit 2

| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
|---|---|---|
| | :SS | |
| COUNTY OF MINNEHAHA | ) | SECOND JUDICIAL CIRCUIT |

| | |
|---|---|
| **CHARLES RUSSELL RHINES,**<br><br>Plaintiff,<br><br>vs.<br><br>**SOUTH DAKOTA DEPARTMENT OF CORRECTIONS, MIKE LEIDHOLT, SECRETARY, SOUTH DAKOTA DEPARTMENT OF CORRECTIONS,** and **DARIN YOUNG IN HIS CAPACITY AS WARDEN OF THE SOUTH DAKOTA STATE PENITENTIARY,**<br><br>Defendants. | 49CIV19-002940<br><br><br>**MEMORANDUM OPINION AND ORDER DENYING APPLICATION FOR PRELIMINARY INJUNCTION AND STAY OF EXECUTION** |

Plaintiff Charles Rhines (Rhines) is scheduled to be executed by lethal injection sometime between November 3-9, 2019, for the murder of Donnivan Schaeffer.  Rhines seeks a preliminary injunction and stay of the execution for such duration as necessary to have a full trial on the merits of his complaint alleging that the proposed drug the State intends to use in the lethal injection process, pentobarbital, is not an "ultra-short-acting" barbiturate as required by South Dakota statutes.  The State opposes the request, asserting Rhines' claims are barred by res judicata and further that pentobarbital is an ultra-short acting barbiturate as that phrase is used in the statute.  The matter came before the Court for hearing on October 29, 2019.

1

After considering the parties' written submissions, testimony presented at the hearing, the applicable authorities, the record, and oral arguments, the Court denies Rhines' request for a preliminary injunction and stay of execution.

## FACTUAL BACKGROUND

On March 8, 1992, the body of Donnivan Schaeffer, an employee of Dig 'Em Donuts in Rapid City, South Dakota, was found in the storeroom of the donut shop. His hands were bound, and he had stab wounds to his abdomen, upper back, and the back of his neck. There was also money missing from the store.

After an investigation, Charles Rhines was charged with third-degree burglary of the store and first-degree murder of Mr. Schaeffer.

A jury trial was held, and on January 22, 1993, the jury found Rhines guilty of these crimes. The jury recommended a sentence of death for the first-degree murder conviction. The trial court entered a judgment and issued a warrant of execution.

Rhines appealed the conviction and sentence to the South Dakota Supreme Court. The South Dakota Supreme Court affirmed the conviction and sentence in an opinion that was issued May 15, 1996. *State v. Rhines, 1996* S.D. 55, 548 N.W.2d 415.

Since that time Rhines has pursued a multitude of suits and appeals, both in the South Dakota state court system, and in the federal court system, including a case in which a decision was issued October 25, 2019, by the South Dakota Supreme Court affirming the dismissal of Rhines' suit challenging a Department of Corrections administrative policy relating to the methods and procedures for carrying out capital

2

sentences. *Rhines v. South Dakota Department of Corrections,* 2019 S.D. 59, ___
N.W.2d ____.

Rhines is currently scheduled for execution sometime during the week of
November 3-9, 2019.

Rhines' request for relief in this case arises out of the South Dakota
Legislature's 2007 revisions to South Dakota's death penalty statutes contained in
South Dakota Codified Laws  Chapters 23A-27A.  Prior to the 2007 changes, SDCL
23A-27A-32 read in applicable part:

> The  punishment  of  death  shall  be  inflicted  by  the   intravenous
> administration of a lethal quantity of an **ultra-short-acting barbiturate** in
> combination  with  a  chemical  paralytic  agent  and  continuing  the
> application thereof until the convict is pronounced dead by a licensed
> physician according to accepted standards of medical practice. (*emphasis
> added*).

> The 2007 revisions changed the statute to read in applicable part:

> The punishment of  death shall be inflicted by the intravenous injection of
> a substance or substances in a lethal quantity.  The warden, subject to the
> approval of the secretary of corrections, shall determine the substances and
> the quantity of substances used for the punishment of death.

At the same time SDCL 23A-27A-32 was revised in 2007, the legislature added
a new section, 23A-27A-32.1, which states:

> Any person convicted of a capital offense or sentenced to death prior to
> July 1, 2007 may choose to be executed in a manner provided in § 23A-
> 27A-32 or in the manner provided by South Dakota law at the time of the
> person's conviction or sentence.  The person shall choose by indicating in
> writing to the warden not less than seven days prior to the scheduled week
> of execution the manner of execution chosen.  If the person fails or refuses
> to choose in the time provided under this section, then the person shall be
> executed  as provided in 23A-27A-32.

On October 1, 2019, pursuant to SDCL 23A-27A-32.1, Rhines submitted a "KITE-REQUEST SLIP" addressed to Warden Darin Young in which Rhines elected the method of execution that was in effect at the time that he was sentenced to death. On October 4, 2019, an amended "KITE-REQUEST SLIP" was submitted by Rhines, again addressed to Warden Young, in which Rhines elected the method of execution that was in effect at the time he was sentenced to death, clarifying that the chosen method was pursuant to the two-drug protocol of a lethal dose of an ultra-short-acting barbiturate and chemical paralytic.

On October 15, 2019, attorneys for Rhines sent a letter by e-mail to Warden Young and the Attorney General requesting confirmation that Rhines' requests to be executed by the intravenous administration of a lethal quantity of an ultra-short acting barbiturate would be honored. Rhines' attorneys also requested that the State identify which ultra-short- acting barbiturate would be used to execute Rhines.

Two days later, October 17, 2019, Assistant Attorney General Paul Swedlund, on behalf of the State, sent an e-mail to Rhines' attorneys, stating:

> I am in receipt of your letter regarding Mr. Rhines' request for execution pursuant to the combination of drugs provided by statute at the time of his execution. The DOC will follow the law. The ultra-short-acting barbiturate the State intends to use is pentobarbital.

Five days later, October 22, 2019, Rhines filed this suit against Defendants (hereinafter collectively referred to as the "State") challenging the State's use of pentobarbital. Rhines also filed his application for a preliminary injunction and stay of execution, his brief in support of his application, an affidavit by his attorney, Dan

4

Fritz, with documents attached being relied upon by Rhines, and an affidavit by Rhines' expert, Craig Stevens, Ph.D.  An amended complaint was filed the next day, October 23, 2019.

Because the execution is scheduled for next week, an expedited hearing was held October 29, 2019.  Prior to the hearing, the State submitted a brief opposing Rhines' requests.  The State also submitted documents in support of their argument, including a Declaration of Joseph Antognini, M.D.

At the hearing, the parties presented their respective arguments.  Rhines also called his expert, Craig Stevens, Ph.D as a witness.  Because of the expedited schedule, the State's expert, Joseph Antognini, M.D., was not available to testify, but his affidavit had previously been submitted.

## OVERVIEW

In this suit Rhines is not challenging whether he received a fair trial.  He is not challenging his conviction for first-degree murder.  He is not challenging his sentence of death by lethal injection.  He is not challenging whether death by lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment.  He is challenging whether pentobarbital is an ultra-short-acting barbiturate as that phrase was used in SDCL 23A-27A-32.

Barbiturates are a drug group derived from barbituric acid.  Barbiturates depress the central nervous system and have long been used as sedatives and hypnotics. Depending on the type of barbiturate and the size of the dosage, the drug can be used to

reduce anxiety, help a person fall asleep, or to render a person unconscious. Depending on the type and the dose, it can also be lethal.

In the two-drug protocol followed by South Dakota in executing a death sentence by lethal injection, a large dose of the barbiturate is administered intravenously. This is intended to cause unconsciousness in less than a minute. After the prisoner is unconscious the prisoner is no longer aware of pain or distress. As the drug continues to affect the body, the respiratory system is suppressed, the brain is deprived of oxygen, and cardiac activity ceases. The barbiturate by itself is sufficient to cause death. To ensure death, however, after the prisoner is unconscious, a paralytic agent is administered intravenously. This further inhibits muscle action, including ceasing cardiac activity.

Rhines agrees this case does not involve a challenge to the paralytic agent the State intends to use, but only a challenge to the use of pentobarbital as the barbiturate the State intends to administer. In support of his challenge, Rhines retained Dr. Craig Stevens. Dr. Stevens has a Ph.D. in Pharmacology and is currently a Professor of Pharmacology at Oklahoma State University. Dr. Stevens submitted an affidavit and testified at the October 29, 2019, hearing. In his opinion, barbiturates are divided into four distinct categories: ultra-short acting, short-acting, intermediate-acting, and long-acting. In his affidavit he states the classifications refer to the time of onset and duration of the drugs' effects. He testified that, the faster the onset (time required for the drug to take effect), the shorter the duration (time it takes for the drug to wear off). During his testimony at the hearing, he added that the classifications also relate to the drugs' lipid solubility.

6

In Dr. Stevens' opinion, there are two "ultra-short-acting" barbiturates, sodium thiopental and methohexital. Thiopental, the most frequently used ultra-short-acting barbiturate, is used in short-duration surgeries. The onset of anesthesia is usually within 10 to 30 seconds, because thiopental is so lipid soluble that it rapidly enters the brain.

Dr. Stevens also opines that pentobarbital is classified as a short-acting barbiturate, not an ultra-short-acting barbiturate. In support of his opinion, Dr. Stevens references various publications that place pentobarbital in the class of fast-acting barbiturates. He noted that even the package insert for Nembutal Sodium Solution (a brand-name pentobarbital sodium injection) states it is a short-acting barbiturate.

Rhines also relies heavily on a Montana state court decision, *Smith v. State of Montana, Dept. of Corr.*, 2015 WL 5827252 (Mont. Dist. 2015). The trial judge in *Smith*, in interpreting a statute similar to SDCL 23A-27A-32, ruled that pentobarbital is not an ultra-fast-acting barbiturate and enjoined the state from using it in the state's lethal injection protocol. *Id.* It does not appear the *Smith* decision was appealed to the Montana Supreme Court.

The State's expert on this issue is Joseph Antognini, M.D. Dr. Antognini is board certified in anesthesiology and his experience includes being Director of Peri-operative Services at the University of California Davis Health; and a Professor of Anesthesiology and Pain Medicine and Professor of Neurobiology, Physiology, and Behavior at University of California, Davis.

In his Declaration, Dr. Antognini explains that barbiturates can be classified as "ultra-short acting", "ultra-fast acting", "short acting," and "fast acting." These

7

classifications, however, are not absolute and change depending on the size of the dosage of the drug and whether it is administered orally (a pill) or intravenously.

Importantly, Dr. Antognini explains that the terms "ultra-short acting" and "short-acting" refer to the <u>duration</u> of action of the drug, that is, the length of time the drug has its intended effect (i.e., how long it takes to wear off). Dr. Antognini further explains that "ultra-fast acting" and "fast-acting" refers to the <u>onset</u> of action, in other words the length of time it takes for the effect of the drug to occur.

Exhibit C attached to Dr. Antognini's Declaration shows that a <u>clinical</u> intravenous dosage of thiopental takes effect in 10-40 seconds, while a <u>clinical</u> dosage of pentobarbital takes effect in one minute. In lethal <u>execution</u> dosages, however, while thiopental intravenously still takes effect in 10-40 seconds, pentobarbital takes effect in 20-30 seconds. Accordingly, in lethal execution dosages, pentobarbital's <u>onset</u> may take effect more quickly than thiopental.

In Dr. Antognini's opinion, pentobarbital administered intravenously in the lethal dose the State intends to use in Rhines' execution, will cause Rhines to be unconscious within 20-30 seconds after the initiation of the infusion. This is consistent with the time it would take for Rhines to be unconscious after initiation of an infusion of thiopental (10-40 seconds). Accordingly, pentobarbital is consistent with the classification of an ultra-fast acting/ultra-short acting barbiturate.

Further, in lethal doses, the duration of the drug, whether pentobarbital or thiopental, is meaningless as the inmate will die prior to the time the drug's effects cease. The State argues that it makes no sense and would lead to an absurd result to think that

8

the legislature was requiring use of a drug, the effects of which would wear off quickly (a drug with a short duration). The drug must be of such duration that its effects extend beyond the time of death. Instead, the State asserts it does make sense that the legislature was referring to a drug that induces a very quick transition from consciousness to unconsciousness. In a lethal intravenous dosage, the transition from consciousness to unconsciousness is virtually the same whether it is thiopental or pentobarbital, and, in fact, may be faster with pentobarbital.

## PRELIMINARY INJUNCTION STANDARDS

SDCL 15-6-65 and SDCL Chapter 21-8 confirm that courts have the authority to issue preliminary and permanent injunctions. Whether a preliminary injunction should be issued involves the consideration of four factors, namely: (1) the threat of irreparable harm to the movant; (2) the balance of equities between the parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc); *Hedlund v. River Bluff Estates, LLC*, 2018 S.D. 20, ¶ 15, 908 N.W.2d 766, 771; *Dacy v. Gors*, 471 N.W.2d 576, 579 (S.D. 1991). No single factor is determinative in deciding whether to issue a preliminary injunction. *Dataphase*, 640 F.2d at 113.

### Irreparable Harm to the Movant

Death, of course, cannot be undone. Rhines, however, is not asserting in this suit that he should not be put to death by lethal injection. Instead, he asserts that the irreparable harm he will suffer is being deprived of his right to be executed in the manner provided for by South Dakota law, more specifically by the administration of lethal doses

9

of an ultra-short-acting barbiturate in combination with a paralytic agent. Rhines asserts the only barbiturates that qualify as ultra-short-acting barbiturates are thiopental and methohexital.

The State counters that there is no irreparable harm to Rhines because in lethal doses pentobarbital is an ultra-short-acting barbiturate as that phrase is used in SDCL 23A-27A-32. Further, the effect of pentobarbital in lethal doses is not materially different from the effect of thiopental, and in some circumstances, pentobarbital induces unconsciousness faster than thiopental.

In considering this factor, I find it is neutral, not favoring Rhines or the State.

**Balance of Equities Between the Parties**

Rhines asserts the harm to the State is a minimal incremental delay and the administrative inconvenience of seeking another execution warrant. Rhines further cites to *Bucklew v. Precythe*,139 S.Ct. 1112, 1146 (2019), for the proposition that "the equities in a death penalty case will almost always favor the prisoner so long as he or she can show a reasonable probability of success on the merits."

The State counters with its own quote from *Bucklew*, that stays of execution "should be the extreme exception, not the norm." *Bucklew*, 139 S.Ct. at 1134. The State has a strong interest in enforcing its criminal judgments. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). In addition, victims of crime (in this case the family of Donnivan Schaeffer) "have an important interest in the timely enforcement of a sentence." *Id.*

As stated in *Nelson v. Campbell*, 541 U.S. 637, 650 (2004), "[g]iven the state's significant interest in enforcing its criminal judgments, there is a strong equitable

10

presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay."

In *Ledford v. Comm'r, Georgia Dep't of Corr.*, 856 F.3d 1312, 1319-20 (11th Cir. 2017), the court denied a stay even though the inmate's claims were not necessarily barred by the statute of limitations. The court reasoned that the inmate had not been timely in waiting until five days before his execution to raise his claim. *Id.*

In *Jones v. Allen*, 485 F.3d 635 (11th Cir. 2007) an inmate facing imminent execution filed a last-minute challenge to Alabama's execution protocol, which had been adopted four years earlier. The Allen court concluded that the inmate's delay "leaves little doubt that the real purpose behind his claim is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out." *Jones*, 485 F.3d at 640.

In considering the equities in this matter, it is highly doubtful that the real purpose of this suit is Rhines' desire to die by the use of thiopental instead of pentobarbital as the barbiturate used in the two-drug protocol. Instead, the real purpose behind his claim is likely to seek a delay of his execution.

I find that the balance of equities between the parties favors the State.

**Public Interest**

The public interests in this matter are similar to the balance of equities between the parties, with the additional factor of the public's interest in its citizens and public officials complying with the laws passed by our legislature. The public has a strong interest in making sure the State complies with laws passed by our legislature. This interest is

11

magnified when the State is carrying out the ultimate criminal penalty—death. Whether

this factor favors the State or Rhines, however, depends in large part on this court's

findings on the probability of Rhines being successful on the merits of his challenge.

**Probability that Movant Will Succeed on the Merits**

In this case, the most significant factor in determining whether to grant Rhines'

request for an injunction and stay of execution is the probability of Rhines succeeding on

the merits of his claim. As stated in Hill, this requires Rhines to show "a significant

possibility of success on the merits." *Hill*, 547 U.S. at 584. To determine this, the court

must first address the issue of whether Rhines' suit is barred by the doctrine of res

judicata.

**Res Judicata**

The State argues that Rhines' current claims are barred by res judicata. It argues

that Rhines could have and should have raised this challenge eight years ago rather than

waiting until less than two weeks before his execution is scheduled. The federal courts

have held

> "A court considering a stay must ... apply 'a strong equitable presumption
> against the grant of a stay where a claim could have been brought at such a
> time as to allow consideration of the merits without requiring entry of a
> stay.'" *Hill v. McDonough*, 547 U.S. 573, 584, 126 S.Ct. 2096, 165 L.Ed.2d
> 44 (2006) (quoting *Nelson v. Campbell*, 541 U.S. 637, 650, 124 S.Ct. 2117,
> 158 L.Ed.2d 924 (2004)).

*McGehee v. Hutchinson*, 854 F.3d 488, 491 (8th Cir.), *cert. denied*, 137 S. Ct. 1275, 197

(2017).

The 2007 additions to SDCL 23A-27A-32 allow the warden to determine the

substances and quantity of substances used for the punishment of death. In 2008, Rhines

amended his pending habeas petition in Pennington County (51 CIV 02-924) to also include a complaint for declaratory and injunctive relief. The declaratory and injunctive relief sought was in response to the statutory language in 23A-27A-32. Rhines' requested relief included: (1) a declaration that an execution carried out by means of the two drug cocktail provided in SDCL 23A-27A-32 in effect at the time of his conviction constitutes cruel and unusual punishment in violation of the South Dakota and United States Constitutions, as well as deprives him of his right to due process of law, and is therefore unconstitutional; and (2) a declaration that SDCL 23A-27A-32, as presently codified, and as applied to Rhines, constitutes an unconstitutional bill of attainder and an unconstitutional ex post facto law and deprives him of his right to due process of the law.

In August 2010, following the changes in 2007 to the statute and the United States Supreme Court decision in *Baze v. Rees,* 553 U.S. 35, the State revised its existing execution policy and protocol ("the protocol"). The protocol used the same three-drug protocol approved in *Baze.* In response to emerging judicial acceptance of pentobarbital as an execution anesthetic, the State again modified the protocol in October of 2011 to also provide for execution via a 1-drug, pentobarbital protocol for all prospective executions. After the adoption of the revised protocol, Rhines was served with notice of the protocol on October 21, 2011. Exhibit 1 attached to the State's brief in this matter is the notice and protocol.

The protocol included a policy on the substances and quantity of substances to be used for executions. The protocol identified the contents of the syringes for 3-Drug, 2-Drug, and 1-Drug executions. With regard to the barbiturates used for executions, the

13

protocol identified that either sodium thiopental *or* pentobarbital would be used.

Importantly, following the charts describing the drugs to be utilized in executions,

paragraph 4 on page 3 stated:

> Any person sentenced to death prior to July 1, 2007, may choose to be
> executed by the 3- or 1-Drug protocol set forth in this document, provided
> the SDDOC possess the necessary substance or substances for the method
> chosen at the time scheduled for the inmate's execution, or in the manner
> provided by South Dakota law at the time of the person's conviction *(2-
> Drug protocol set forth in this document).*[1]

After notice of the protocol in October of 2011, Petitioner made no further

amendments to his petition.  A court trial was held over a year later in December

of 2012.  During this period, discovery ensued and experts were deposed. Experts

were deposed largely on the subject of a 3-drug protocol and whether it violates

the Eighth Amendment; however, pentobarbital was a subject of frequent

questioning.  On February 27, 2013, Judge Trimble issued an Order denying

Petitioner's claims, which decision included discussions of the use of

pentobarbital.  Both the circuit court and the South Dakota Supreme Court denied

a Certificate of Probable Cause.

"Res judicata precludes relitigation of issues previously heard and resolved; it also

bars prosecution of claims that *could have been raised in the earlier proceeding*, even

though not actually raised." *Hobart v. Ferebee*, 2009 S.D. 101, ¶ 30, 776 N.W.2d 67, 76

(emphasis added).  The South Dakota Supreme Court has also advised that:

> Res judicata consists of two preclusion concepts: issue preclusion and claim
> preclusion." *Am. Family Ins. Grp. v. Robnik*, 2010 S.D. 69, ¶ 15, 787 N.W.2d

---

[1] Exhibit 1 attached to State's brief in this matter.

14

768, 774. "Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided," and "also is referred to as direct or collateral estoppel." *Id.* (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1, 104 S.Ct. 892, 894 n.1, 79 L.Ed.2d 56). "Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit...." Id (quoting *Migra*, 465 U.S. at 77 n.1, 104 S.Ct. at 894 n.1). "To invoke the doctrine of res judicata, four elements must be established: (1) a final judgment on the merits in an earlier action; (2) the question decided in the former action is the same as the one decided in the present action; (3) the parties are the same; and (4) there was a full and fair opportunity to litigate the issues in the prior proceeding. *People ex rel. L.S.*, 2006 S.D. 76, ¶ 22, 721 N.W.2d 83, 89–90.

*Estate of Johnson ex rel Johnson v. Weber*, 2017 S.D. 36, ¶ 41, 898 N.W.2d 718, 733, reh'g denied (July 28, 2017).

When examining a res judicata argument, a court is "not restricted to whether the specific question posed by the parties in both actions was the same or whether the legal question posed by the nature of the suit was the same." *Farmer v. S. Dakota Dep't of Revenue & Regulation*, 2010 S.D. 35, ¶ 10, 781 N.W.2d 655, 660. Instead, "[a] cause of action is comprised of the facts which give rise to, or establish, the right a party seeks to enforce." *Merchants State Bank v. Light*, 458 N.W.2d 792, 794 (citing *Bank of Hoven v. Rausch*, 449 N.W.2d 263, 266)). "Essentially, it is the underlying facts which give rise to the cause of action that must determine the propriety or necessity of presenting a specific issue within the prior proceedings." *Lewton v. McCauley*, 460 N.W.2d 728, 731 (S.D. 1990).

This Court considers the cases of *Lewton* and *Farmer* as instructive in understanding res judicata. In both cases, each claim arose out of factually similar

15

scenarios. In *Farmer*, both claims arose out of the same act: failure to pay taxes. Because both claims came from the same transaction and one already had a final judgment, the Court found that res judicata applied. Similarly, in *Lewton*, both claims arose out of the same scenario: Lewton's bankruptcy. However, the difference in *Lewton* focuses on whether the subsequent claim even existed at the time the first claim was brought. While the first claim concerned the cattle and the contract between the parties, the amount of rent owed is certainly related to both; however, the second claim could not have been brought at that time because the issue of the amount of rent owed derived from the first court's decision. *Lewton* demonstrates that while the two claims may arise out of the same factual scenario, the second claim must have existed at the time if a party is going to assert that the claim should have been brought pursuant to the doctrine of res judicata. *Farmer*, on the other hand, demonstrates two separate claims related to the same action. If the party had a fair opportunity to litigate the second claim during the proceedings of the first claim, res judicata precludes the subsequent action.

Rhines had a full and fair opportunity to challenge the protocol's compliance with the statutes in his 2011 Pennington County action. Rhines was put on notice of the State's intent to use pentobarbital when Rhines was served with a copy of the protocol on October 24, 2011. The protocol contained explicit notice of the State's intention to use pentobarbital in the 2-drug protocol that Rhines ultimately elected. Rhine's then-pending complaint for declaratory and injunctive relief contained general arguments that the protocol denied him due process that he felt he was entitled to under SDCL 23A-27A-32 and opposed the "two chemicals" that would be used. Experts in the case frequently

discussed the use of pentobarbital in the execution.  In a deposition taken December 1, 2012, one of Rhine's own experts, Dr. Mark Heath, testified at length about the use of pentobarbital.  A copy of Dr. Heath's deposition is attached as Exhibit 8 to the State's brief in this case.  Examples of Dr. Heath's discussion of pentobarbital includes testimony on page 21 of the deposition transcript that "pentobarbital is typically put into the short or medium-acting categories."  Further on page 22 he discusses the differences between thiopental and pentobarbital.  On page 22 he is asked whether he has "reviewed the protocol and have an understanding at least a paper level of how the State of South Dakota intends to use pentobarbital as a lethal injection drug", to which Dr. Heath replies "Yes."

Additionally, during the litigation of Rhine's method of execution claims, the State had an expert opine on whether a 2-drug protocol of pentobarbital and a paralytic agent would provide a painless and humane death for an inmate.  Therefore, not only was Rhines put on notice in October of 2011, but he was also put on notice, through the deposition of the experts, of the State's intent to use pentobarbital in carrying out the 2-drug protocol.

Because Rhines was aware of the State's intent to use pentobarbital in its 2-drug protocol, Rhines could have and should have brought a specific challenge to the use of pentobarbital as part of his then-pending complaint for declaratory and injunctive relief eight years ago.  While Rhines challenged many other aspects with regard to 23A-27A-32, Rhines failed to present any argument as to pentobarbital when the protocol explicitly listed pentobarbital as one of two drugs that could be administered in the 2-drug protocol.

17

Because the declaratory action sought in the prior litigation specifically talked about both drugs, the protocol, and the statute, Rhines was bound to bring the claims at that time, not eight years later and just days before his scheduled execution.

The State further asserts that this was a strategic attempt to stay his execution because he also could have asserted the claims in his APA challenge in August of 2018 but did not do so. *See Rhines v. South Dakota Dept. of Corrections*, 2019 S.D. 59, __ N.W.2d __.

At the hearing, Rhines asserted that the claims are not barred by res judicata because the claim was not ripe until the State's non-compliance with the statute. Rhines also argues that the claims asserted are not the same under a res judicata analysis. As to the ripeness, Rhines argues that SDCL 23A-27A-32.1 provides him with a right to elect which method of execution to administer up until 7 days prior to the scheduled week of execution. Thus, the choice to elect which method of execution gives him authority to wait to choose his manner of execution and no issue existed until the State notified him that the barbiturate to be used at his execution would be pentobarbital.

This court finds that argument unpersuasive. As discussed above, Rhines initially filed a habeas petition on unrelated grounds in Pennington County in 2002. Following the amendments to the statutes in 2007, Rhines amended his petition in 2008 seeking declaratory and injunctive relief based on the constitutionality of SDCL 23A-27A-32 before and after the amendments. Many of Rhines' claims related to the changes in the statutes and the lack of specificity of what kind of drugs would be utilized in an execution. The protocol was issued in 2010 and revised in 2011 and provided specific

explanations of the types of drugs the State would utilize, among others.  Further, the

protocol in paragraph 4 on page 3 made it clear that the 2-drug protocol was exclusively

applied to inmates sentenced prior to 2007, such as Rhines.  Rhines was put on notice of

the adoption and revision of the protocol.  The protocol specifically referenced

pentobarbital as one of two barbiturates to be used in a 3-, 2-, or 1- drug execution.

Rhines had this information and made no amendments to his current declaratory and

injunctive requests in his petition.  Unlike *Lewton*, Rhines' cause of action existed at the

time his Pennington County declaratory judgment action was pending.  Rhines had a "full

and fair opportunity to litigate" the validity of whether the protocol was in compliance

with the language under SDCL 23A-27A-32 at that time.

As to Rhines' ripeness argument, SDCL 21-24-1 permits the declaration of legal

rights or relations before an actual injury occurs.[2]  When seeking declaratory relief, there

are four jurisdictional requirements that must be established:

> (1) There must exist a justiciable controversy; that is to say, a controversy
> in which a claim of right is asserted against one who has an interest in
> contesting it; (2) the controversy must be between persons whose interests
> are adverse; (3) the party seeking declaratory relief must have a legal
> interest in the controversy, that is to say, a legally protectible interest; and
> (4) the issue involved in the controversy must be ripe for judicial
> determination.

*Boever v. South Dakota Bd. Of Accountancy*, 526 N.W.2d 747, 750 (quoting *Danforth v.

City of Yankton*, 25 N.W.2d 50, 53 (S.D. 1946).  "Ripeness involves the timing of judicial

---

[2] SDCL 21-24-1 provides: Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declaration shall have the force and effect of a final judgment or decree.

review and the principle that '[j]udicial machinery should be conserved for problems which are real and present or imminent, not squandered on problems which are abstract or hypothetical or remote.'" *Id.* (quoting *Gottschalk v. Hegg,* 228 N.W.2d 640, 643–44 (S.D.1975) (quoting Davis, *Administrative Law Treatise,* § 21.01)).

In *Boever v. South Dakota Bd. of Accountancy,* Boever was a certified public accountant licensed under SDCL ch 36-20A. 526 N.W.2d 747, 748 (S.D. 1995). In order to maintain his licensure, Boever, as well as all CPAs, were subjected to quality reviews every three years pursuant to statute. *Id.* After a statutorily mandated quality review was conducted, the South Dakota Department of Legislative Audit filed a complaint against Boever. *Id.* at 749. In an agreement to terminate disciplinary action against Boever, he agreed to undergo another quality review. *Id.* Shortly after his agreement, Boever filed a complaint in circuit court seeking a declaration at the review and disciplinary statutes were unconstitutional due to vagueness and lack of sufficient standards to constitute a lawful delegation of legislative powers. *Id.* The trial court found that the claims were not ripe because there was "no present controversy." *Id.*

On appeal, the South Dakota Supreme Court affirmed and reversed in part. *Id.* at 751. In the analysis, the Court affirmed the trial court's conclusion that there was no present controversy with regard to the disciplinary statutes. *Id.* at 750. With regard to the quality review statutes, though, the Court reversed and remanded the trial court's decision based on the statutory language that required quality reviews every three years. *Id.* The language there provides for future quality reviews that are "imminent and

inevitable" because a review was bound to happen in the future. *Id.* The court therefore found that the constitutional challenge to the statute was ripe for review. *Id.*

Rhines was lawfully sentenced to death. Like the quality reviews statutes in *Boever,* Rhines execution was "imminent and inevitable." The statutes and protocol undoubtedly applied to Rhines in 2011 as much as it does now in 2019. The issue was ripe in 2011 when the protocol was issued because the protocol explicitly referenced pentobarbital as one of two barbiturates to be used in executions. Further, in his previous litigation in 2011, Rhines specifically referenced both drugs listed in the protocol in his declaratory action. Furthermore, in 2011, when the protocol was issued, the issue now presented was not abstract, hypothetical, or remote at that time.

The State is correct in its assertion that Rhines challenged the exact protocol in 2011 as he is challenging now. The protocol clearly indicated that the State would administer a barbiturate of either sodium thiopental or pentobarbital. Rhines places emphasis on the word *or* and argues that because he did not know which drug the State would use at his execution, the issue was not ripe. However, Rhines argument fails because the issue of the constitutionality of the 3-drug protocol was ripe for judicial review as was demonstrated by the Rhines' declaratory and injunctive action in 2011. Applying Rhines' logic, because the State or Rhines could have elected alternate methods of execution, his original claims in 2011 would also not have been ripe for adjudication. Therefore, the question of whether pentobarbital, as listed in the protocol and discussed in the habeas petition, fits within the statutory definition of an ultra-short acting barbiturate would be ripe as well.

The Eighth Circuit's decision in *McGehee v. Hutchinson*, in another death penalty case challenging the drug cocktails, also supports this court's decision. "Whether or not the claim technically is barred by doctrine of res judicata or collateral estoppel, the prisoners' use of "piecemeal litigation" and dilatory tactics is sufficient reason by itself to deny a stay." *McGehee v. Hutchinson*, 854 F.3d 488, 492-92 (8th Cir.), *cert. denied*, 137 S. Ct. 1275, 197 L.Ed. 2d 746 (2017) (quoting *Hill v. McDonough*, 547 U.S. at 584-85, 126 S.Ct. 2096). "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill v. McDonough*, 547 U.S. 573, 584, 126 S. Ct. 2096, 2104, 165 L. Ed. 2d 44 (2006) (quoting *Calderon v. Thompson*, 523 U.S. 538, 556, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998)).

The Court finds there is a strong probability that Rhines' claims are barred by res judicata, and further finds there is not a significant possibility that Rhines will be successful on the merits of the res judicata issue. Because of the court's finding on the res judicata issue, it does not need to, and does not, make a finding regarding whether pentobarbital is an ultra-short acting barbiturate as that phrase is used in SDCL 23A-27A-32.

## ORDER

Based upon the foregoing, Rhines' request for a temporary restraining order and preliminary injunction is denied.  Rhines' request for a stay of execution is also denied.

Dated this 31st day of October, 2019.

BY THE COURT:

Jon C. Sogn
Circuit Court Judge

ATTEST:
Angelia M. Gries, Clerk of Court

By: _____
        Deputy Clerk