***EXECUTION SCHEDULED FOR JANUARY 15, 2021***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,<br><br>Lead case:    *Roane et al. v. Barr et al.*<br><br><br><br><br>THIS DOCUMENT RELATES TO:<br><br>*Roane et al. v. Barr et al.*, No. 05-cv-2337 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 19-mc-00145-TSC |

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF DUSTIN HIGGS'S MOTIONS FOR PRELIMINARY INJUNCTION AND FOR LEAVE TO FILE AN AMENDED AND SUPPLEMENTAL COMPLAINT

Dustin Higgs's claims entitle him to a preliminary injunction, or at the very least an evidentiary hearing to resolve the factual and scientific disputes that the Government tries to create. On his *ex post facto* claim, Mr. Higgs makes the simple point that the punishment he now faces – a pentobarbital execution – is likely to involve greater and longer-lasting pain than an execution with the ultrashort-acting barbiturate that Maryland law, and thus the Federal Death Penalty Act, required at the time of the crime and judgment. There is no merit to the Government's arguments that the change is somehow "procedural" or that the FDPA applies only at the time of execution.

There is also no merit to the Government's expert evidence. Already afforded little weight by the Court for his previous declarations, *see* ECF No. 261 at 39, Dr. Antognini offers yet a fourth supplemental declaration. This time, Dr. Antognini relies on studies on pentobarbital-induced horse euthanasia, in order to conclude that pentobarbital and the ultrashort-acting barbiturate thiopental – which was not even studied on horses – are comparable

1

drugs when used to execute human beings, with a comparable speed of onset. *See* Declaration of Craig Stevens, December 9, 2020 at ¶ 7 "Stevens Supp. Dec." (Attached hereto as Exhibit A). If the Court is not prepared to reject that proposition out of hand, it should at least hear testimony on it.

The Government fares no better on the remainder of issues. It offers only after-the-fact justifications for selecting Mr. Higgs as the final prisoner to be executed by the current Administration, but it *still* provides no established criteria by which it chooses which prisoners will be executed and when. It argues that Mr. Higgs cannot show irreparable harm on any claim, even though Defendants have no plans to use the ultrashort-acting drug to which Mr. Higgs is entitled, and will instead administer a drug that is likely to bring about greater and longer-lasting suffering. And it wrongly insists that the public interest demands an immediate execution instead of a legal one. Mr. Higgs is entitled to a preliminary injunction so that he can continue to litigate his meritorious claims.

## I.      Mr. Higgs Is Likely to Succeed on the Merits of His Claims

### A.      Execution of Mr. Higgs under the 2019 Protocol Would Violate *Ex Post Facto* Principles

Defendants argue that Mr. Higgs is unlikely to succeed on the merits of his *ex post facto* claim because: 1) he could have raised this claim earlier and therefore it is waived; 2) the applicable state law is that in effect at the time of execution; 3) *Dobbert v. Florida*, 432 U.S. 282 (1977), forecloses the claim; and 4) the use of pentobarbital does not change his punishment. All of these arguments are unavailing.

First, Defendants argue that the Court should dismiss this claim because Mr. Higgs "waived this claim, which he could have brought at any time after July, 2019[.]" Op. at 11. Yet, two pages later, Defendants take the polar opposite position and argue that this "claim is not yet

ripe, and should be dismissed for that reason alone." *Id*. at 13, n. 3. Defendants are wrong,

regardless of which position they intended to take. The claim is not waived, and it is ripe for

review. Mr. Higgs could not know that Defendants planned to execute him with pentobarbital

before August 4, 2020, when the Government filed a motion in the United States District Court

for the District of Maryland asking the Court to designate the state law of Indiana as the law for

implementing the sentence of death. *United States v. Higgs*, 8:98-cr-00520, Dkt. #640 (D. Md.

August 4, 2020). The Government's notice of its intention to execute Mr. Higgs with

pentobarbital, as opposed to the ultrashort-acting barbiturate required by Maryland law at the

time of Mr. Higgs's crime and judgment, as the FDPA requires, makes this claim ripe for review.

*See Federal/Postal/Retiree Coalition, American Federation of Government Employees v. Devine*,

751 F.2d 1424, 1426 (D.C. Cir. 1985) (government's "notice of . . . intent to take action" ripens

claim for review). A legal claim cannot be both too early and too late, but Mr. Higgs's claim is

neither.

     Second, Defendants argue that the FDPA does not implicate *ex post facto* concerns

because "the FDPA has always required the federal government to implement a death sentence in

the manner prescribed by the State in which the sentence is imposed *at the time of the

execution*[.]" Op. at 12 (emphasis added). Defendants are wrong. 18 U.S.C. § 3596(a) requires

that the "implementation of the sentence [be] in the manner prescribed by the law of the State in

which the sentence *is imposed*." *Id*. (emphasis added). "If the law of the State does not provide

for implementation of a sentence of death, the court shall designate another State[.]" *Id.* In all

cases, including this one, the sentencing court designates the manner of execution at the time of

sentencing, not at the time of execution. *United States v. Higgs*, 8:98-cr-00520, Dkt. #414 (D.

Md. Jan. 9, 2001). That is precisely why the Government asked the district court to amend its

judgment in this very case and designate Indiana. *Id*., Dkt. 640. To be sure, Sections 3596(b) & (c), unlike Section 3596(a), contain the phrase "carried out," specifically to prohibit the death penalty against a prisoner who is pregnant or incompetent *at the time of the execution*. Had Congress intended state law at the time of execution to control, it would have included that same phrase in § 3596(a), i.e. the manner prescribed by the law of the State in which the sentence is imposed when the sentence is carried out. *See Motion Picture Ass'n of America, Inc. v. F.C.C.*, 309 F.3d 796, 410 (D.C. Cir 2002) ("Statutory provisions *in pari materia* normally are construed together to discern their meaning." (citation omitted)).

Third, Defendants argue that Mr. Higgs's claim "is foreclosed by *Dobbert v. Florida*, 432 U.S. 282 (1977)," in which the Supreme Court held that "a 'procedural change' did not violate the 'ex post facto' rule." Opp. 13 (quoting *Dobbert*, 432 U.S. at 282). The "procedural changes" addressed in *Dobbert*, however, were not, as here, changes to the method of punishment. Rather, they involved trial procedures, including who may testify at trial, *id.* at 293 (discussing *Hopt v. Utah*, 110 U.S. 574 (1884); the admissibility of evidence, *id.* (discussing *Thompson v. Missouri*, 171 U.S. 380 (1898)); and, the respective roles of the judge and jury, *id.* at 293-94. In such circumstances, the procedural changes "simply altered the methods employed in determining *whether the death penalty was to be imposed*; there was no change in the quantum of punishment attached to the crime." *Id*. Moreover, the procedural changes were "ameliorative," in that they "afford[ed] significantly more safeguards to the defendant." *Id*. at 295.

The circumstances are entirely different here. The change from ultrashort-acting to short-acting barbiturate is harmful, not ameliorative. *See infra.* The change here is to the punishment that will be implemented, not to "the methods employed in determining whether the death penalty was to be imposed." No change to the punishment itself was at issue in *Dobbert* – nor in

4

*United States v. Chandler*, 996 F.2d 1073, 1096 (11th Cir. 1993) or *United States v. Tipton*, 90 F.3d 861, 903 (4th Cir. 1996), the other cases relied on by Defendants. Opp. 14-15. "[A]t the time [the] death sentences [in *Chandler* and *Tipton*] were imposed, no federal statute provided authorization for the specific means of executing such sentences." *Tipton*, 90 F.3d at 901-02; *see Chandler*, 996 F.2d at 1095. The issue was therefore whether it was an *ex post facto* violation merely to adopt one. *See Tipton*, 90 F.3d at 902; *Chandler*, 996 F.2d at 1096. But there is a stark difference between adopting a method of execution in a statutory vacuum and utilizing a method of execution that contravenes statutory law. *See Wilkerson v. Utah*, 99 U.S. 130, 137 (1879) (recognizing that only in the absence of a statute prescribing the means of execution do the other branches of government have authority to prescribe them)

The *Chandler* and *Tipton* courts recognized that "Congress clearly may, if it chooses, preemptively legislate the means of executing federal death sentences," but merely "conclude[d] that Congress ha[d] not" done so. *Tipton*, 90 F.3d at 903. By contrast, Congress has explicitly done so here, by incorporating state law in § 3596(a). In seeking to utilize its pentobarbital protocol against Mr. Higgs, the Government thus "makes more burdensome the punishment for a crime, after its commission," contrary to the *Ex Post Facto* Clause. *Dobbert*, 432 U.S. at 292.

Defendants' fourth argument—that the use of pentobarbital as the sole execution agent does not impose a greater punishment than the use of an ultrashort-acting barbiturate in combination with a chemical paralytic, as required by Maryland law, Opp. at 15—is factually incorrect. Defendants allege a purported conflict between the declarations of Mr. Higgs's experts Dr. Craig Stevens and Dr. Gail Van Norman. *Id*. at 15-16. The declarations of Dr. Van Norman and Dr. Stevens, however, are consistent. Dr. Van Norman opines that pentobarbital, like an ultrashort-acting barbiturate, will cause flash pulmonary edema and that the prisoner will feel the

5

physical effects from the pulmonary edema because the barbiturates will not render him

insensate. *See* Declaration of Dr. Gail Van Norman, M.D. at 7, 13-17, 22-23, 28-29 (ECF No.

29-1). In relation to *these* specific conclusions – i.e., these types of barbiturates can cause flash

pulmonary edema and do not render a person fully insensate before its onset – she states that

pentobarbital and ultrashort-acting barbiturates are "essentially the equivalent in all

pharmacological characteristics." *Id*. at 9. The Government repeatedly cites Dr. Van Norman's

statement out of context, *see* Opp. 1, 2, 16, 40, 43, but Dr. Van Norman never addressed the

question of how quickly pentobarbital affects the brain or produces death when compared to

ultrashort-acting barbiturates.

Dr. Stevens opines that the onset of action of an ultrashort-acting barbiturate will be

quicker than that of pentobarbital and will cause death at a more rapid rate. Declaration of Craig

W. Stevens, Ph.D. at ¶¶ 8-9, (ECF No. 343-2).[1] Taken together, Dr. Van Norman's and Dr.

Stevens's declarations show that Mr. Higgs would suffer the experience of pulmonary edema for

a shorter period when injected with an ultrashort-acting barbiturate. To the extent that this Court

accepts the opinions of Dr. Antognini or Dr. Crowns that pulmonary edema may not occur

immediately, it remains more likely to be experienced by a prisoner who receives a pentobarbital

injection, as compared to an ultra-short acting barbiturate. As explained by Dr. Van Norman and

Dr. Stevens, a prisoner will be alive and sensate for longer after the injection of pentobarbital.

Defendants cite to an additional declaration from Dr. Antognini confirming that the

typical onset of action for pentobarbital takes longer than for an ultrashort-acting barbiturate.

---

[1] Dr. Steven's CV was mistakenly omitted from Dr. Stevens's December 2, 2020 declaration filed with the Court as an attachment to Mr. Higgs's motion for preliminary injunction. ECF No. 344-1. It is available on the Court's docket at ECF No. 25 at 8-22.

Opp. at 16-17; *see also* ECF No. 352-1, p. 17 (December 8, 2020 declaration of Dr. Joseph Antognini (citing to publicly available data)). Inexplicably, however, Dr. Antognini reports that in an "execution dose," the onset of action for pentobarbital shortens from one minute to twenty to thirty seconds, while the onset of action for an ultrashort-acting barbiturate remains the same at ten to forty seconds. *Id*. Dr. Antognini does not explain how he came up with this data, but he apparently relies on studies of euthanasia in horses using pentobarbital, not an ultrashort-acting barbiturate. Stevens Supp. Dec. at ⁋ 7. Based on these studies, Dr. Antognini somehow extrapolates that while the onset time of pentobarbital will become quicker, an ultrashort acting barbiturate, which was never tested, will stay the same. *Id*. More problematic, however, is that a drug's onset of action in horses cannot be extrapolated to determine the onset of action in humans, and no studies have compared the two. *Id*. And for good reason: humans and horses have stark differences in circulatory parameters, and horses have ten times greater cardiac output. Thus, a study on horses does little, if anything, to predict a drug's onset of action in humans. *Id*.

Dr. Antognini cites to Dundee, JW, Abormal Responses to Barbiturates, Brit. J. Anesth 1957; 29:440-46 ("Dundee"), ECF No. 352-1, p. 17, for further support that pentobarbital's onset of action in an "execution dose," will be quicker. Dundee, however, says the opposite. Specifically, Dundee states: "[a]t any given temperature . . . a more rapid onset of anesthesia [will occur] with thiopentone [an ultrashort acting barbiturate], than with pentobarbitone [pentobarbital], which is significant." Stevens Supp. Dec. at ⁋ 8. When pentobarbital and an ultrashort-acting barbiturate are administered via the same route, the ultrashort-acting barbiturate *always* has a quicker onset of action because it is more lipid-soluble and therefore passes the blood brain barrier more quickly. *Id.* at ⁋ 4. Given that this Court previously found that Dr.

Antognini's opinions "did not carry much weight[,]" ECF No. 261 at 39, an evidentiary hearing is particularly appropriate.

Defendants' additional argument that *Rhines v. South Dakota Department of Corrections*, No. 49CIV19-002940 (S. Dak. Cir. Ct. Oct. 31, 2019), "*concluded* that the onset times for thiopental and pentobarbital were essentially indistinguishable in the lethal injection context," is misleading to say the least. *See* Opp. at 17 (emphasis added). In *Rhines*, the court determined that there was a strong probability that the prisoner's claim was barred by res judicata, and therefore, expressly "[did] not[] make a finding regarding whether pentobarbital is an ultra-short acting barbiturate as that phrase is used in [South Dakota Codified Law 23A-27A-32]." ECF No. 352-2 at 23 (Exhibit 2 at 22). The section of the opinion Defendants characterize as a "conclusion" is merely the court's introductory "Overview." *See* ECF No. 352-2 at 6-10 (Exhibit 2 at 5-9). It has no relevance here.

Defendants' final arguments are that Mr. Higgs did not allege Maryland's now-abolished lethal injection protocol as an alternative in his Eighth Amendment claims, and therefore his *ex post facto* claim should fail; and that he provides no expert opinion that an ultrashort-acting barbiturate in combination with a chemical paralytic agent would be less painful than pentobarbital. Opp. at 17. The standard of proof in an *ex post facto* claim (which does not require the prisoner to propose an alternative method) is lower than in an Eighth Amendment claim, so it is immaterial that Mr. Higgs did not allege the Maryland statute as an alternative method of execution in his Eighth Amendment claim. *Compare Williams v. Hobbs*, 658 F.3d 842, 848 (8th Cir. 2011) (to establish an *ex post facto* violation, a prisoner must show "more than a speculative and attenuated risk of increasing the measure of punishment attached to the covered crimes.") *with Glossip v. Gross*, 576 U.S. 863, 878 (2015) (to establish an Eighth Amendment violation, a

prisoner must "establish a likelihood that [he] can establish both that [the 2019 Protocol] creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives."). Moreover, Mr. Higgs has shown that the injection of an ultrashort-acting barbiturate will cause his death quickly, which would likely occur before the administration or effects of the chemical paralytic agent. Thus, the injection of the second drug is immaterial to the risk analysis.

For the reasons stated in the preliminary injunction motion, the injection of pentobarbital, as compared to an ultrashort-acting barbiturate in combination with a chemical paralytic agent, increases the risk that Mr. Higgs will endure a longer and more painful execution.

### B.     Defendants' selection of Plaintiff for execution violates the Fifth and Eighth Amendments and is arbitrary and capricious under the APA.

Defendants argue that their selection of Mr. Higgs for execution was constitutional and rational. Defendants' primary defense of their opaque selection process is that "the scheduling of executions is a matter committed to the Attorney General's discretion," Opp. 20, because "[a]n action is committed to agency discretion when 'no judicially manageable standards are available for judging how and when an agency should exercise its discretion,'" *id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). But an action committed to agency discretion is a 5 U.S.C. § 706(2)(A) *exemption*, and only a "very narrow" one at that. *Heckler*, 470 U.S. at 830 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)); *see also id.* at 826 ("[T]here is a general presumption that all agency decisions are reviewable under the APA, at least to assess whether the actions were 'arbitrary, capricious, or an abuse of discretion.'") (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 139–141 (1967)). Defendants provide no persuasive reason why their selection of prisoners for execution should fall into this narrow exemption contrary to the usual presumption favoring judicial review of agency action. Nor do

they attempt to distinguish it from other exercises of authority pursuant to the FDPA that are reviewable, such as the Defendants' development of an over-arching federal lethal injection protocol, as opposed to a policy of following the execution protocol of the state in which each prisoner was sentenced. *See* 18 U.S.C. § 3596(a); *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 108-13 (D.C. Cir. 2020) (rejecting FDPA claim on the merits). Although Defendants assert that "the FDPA provides 'no legal norms pursuant to which' this Court may 'evaluate the challenged action,'" Opp. 20-21 (citing *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)), they do not go so far as to contend that the FDPA "confers such broad discretion as to essentially rule out the possibility of abuse," *Drake*, 291 F.3d at 70. Nor could they: surely the Attorney General could not simply flip a coin or toss a set of papers down a flight of stairs to determine which prisoners will live and which will die.

Defendants contend that the selection of Mr. Higgs for execution was "rational based on the seriousness and aggravating factors surrounding his crimes." Opp. 22. They claim that "the Attorney General has directed the BOP Director to schedule the executions of those inmates who have committed particularly heinous crimes," *id.*, but they fail to explain what they mean by "particularly heinous," and they have not written, promulgated, codified, or otherwise memorialized this supposed standard anywhere other than in these pleadings. This complete lack of policy has allowed Defendants to provide shifting, *post hoc* explanations for their rationale as it suits them. Several months ago, for example, in urging this Court to vacate long-standing injunctions for the seven Plaintiffs in the consolidated action who had them for several years, Defendants argued that it would be "profoundly inequitable" to allow the injunctions to "bar the execution of federal death-row inmates with some of the oldest conviction dates (as early as 1993)." ECF No. 173 at 1-2. Notwithstanding that statement to the Court, Defendants have not

yet executed any of the prisoners who were convicted in 1993, and their concern about the

"profound inequity" in executing prisoners with relatively newer cases is now being borne by

Mr. Higgs, who is scheduled to be executed ahead of eight prisoners with older convictions and

sentences. This type of inconsistent, *post-hoc* rationale strongly suggests arbitrariness.[2] *See, e.g.*,

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)

("[T]he courts may not accept … counsel's post hoc rationalizations for agency action.");

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962) ("There are no findings

and no analysis here to justify the choice made, no indication of the basis on which the

Commission exercised its expert discretion. We are not prepared to and the Administrative

Procedure Act will not permit us to accept such adjudicatory practice.").

Defendants urge that Mr. Higgs was selected because "he was convicted of the murder of

three young women" and "the court imposed[] nine separate death sentences." Opp. 24. But Mr.

Higgs did not kill anyone, and his co-defendant who shot the victims received a life sentence.

*See United States v. Haynes*, 26 F. App'x 123, 127 (4th Cir. 2001) (unpub.). It makes little sense

for Defendants suggest that Mr. Higgs's execution will "bring justice to victims of the most

horrific crimes," Opp. 24 (quoting *Roane v. Barr*, No. 05-02337 (D.D.C.), ECF No. 389-1),

while the more culpable defendant will die a natural death.

Finally, Defendants' attempt to distinguish Mr. Higgs's authority as "no longer good

law," Opp. 19, is disingenuous. As even Defendants themselves acknowledge, *Jones* was

---

[2] Similarly, due process under the Fifth Amendment requires a "rational" means to accomplish a "legitimate" end. *See Dorn's Transp., Inc. v. I.A.M. Nat. Pension Fund, Ben. Plan A*, 578 F. Supp. 1222, 1227 (D.D.C. 1984), *aff'd sub nom. Dorn's Transp., Inc. v. IAM Nat. Pension Fund*, 753 F.2d 166 (D.C. Cir. 1985). Rather than creating and adhering to any rational and discernible criteria, however, Defendants appear to be justifying their selection of prisoners only after the fact.

reversed on grounds other than those Mr. Higgs relies on here, and the court of appeals declined

to decide whether the Eighth Amendment's proscription against arbitrariness applies to a State's

the selection of prisoners for execution. *Id.* at 18-19 ("[T]he Ninth Circuit did not ultimately pass

on the merits of the claim because it found the claim barred for a procedural reason … .") (citing

*Jones v. Chappell*, 31 F. Supp. 3d 1050, 1061 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis*,

806 F.3d 538 (9th Cir. 2015)). To the extent the Ninth Circuit weighed in on the issue, its

comments suggest that arbitrary imposition of the death penalty is unconstitutional: "*Furman* and

*Gregg* articulate a general Eighth Amendment standard that the death penalty is unconstitutional

if imposed arbitrarily," *Jones v. Davis*, 806 F.3d 538, 550 (9th Cir. 2015) (quotation marks and

citation omitted). And the court acknowledged that a different issue would be presented where

the arbitrariness was caused by "unfettered discretion" rather than long delays in post-conviction

review. *Id.* at 551 ("Petitioner does not contend that the State has granted unfettered discretion to

a fact-finder to decide on an execution date. Nor does he contend that the State intentionally

chooses an execution date through a truly random selection process, such as a lottery.").

## II.   THE REMAINING EQUITABLE CONSIDERATIONS JUSTIFY A PRELIMINARY INJUNCTION

Mr. Higgs will be irreparably harmed without an injunction from this Court, and the

balance of equities are in his favor. Leaving aside Mr. Higgs' interest in continuing to live for

additional months but for his arbitrary selection as the current Administration's last execution,

there can be no doubt that he demonstrates adequate harm on his *ex post facto* claim. The harm

of using a slower-acting drug to execute Mr. Higgs is "certain and great, actual and not

theoretical, and so imminent that there is a clear and present need for equitable relief." *League of*

*Women Voters of United States v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (internal quotation

marks and brackets omitted). As this Court has recognized, autopsy results and witness reports

from recent executions – along with the expert testimony and declarations offered in this case –

establish a significant likelihood that prisoners will experience flash pulmonary edema during a

single-drug pentobarbital execution. *See* ECF No. 322 at 6-7 (Memorandum Opinion). For the

reasons outlined above, the use of pentobarbital rather than an ultra-short acting barbiturate to

kill Mr. Higgs will prolong the amount of time during which he is alive and sensate, which will

both (1) increase the likelihood that Mr. Higgs will suffer flash pulmonary while still sensate;

and (2) prolong the severe pain that Mr. Higgs will experience from edema.

The balance of equities and public interest likewise tip in Mr. Higgs's favor. While there

is no "public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12,

"[t]he public interest is . . . served when administrative agencies comply with their [legal]

obligations." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). In this

case, ensuring that the government carries out Mr. Higgs's execution lawfully outweighs the

government's interest in carrying it out rapidly.

The recent COVID-19 outbreak at FCC Terre Haute further undermines the

Government's interest in carrying out Mr. Higgs's execution within these next weeks. In the last

three days alone, the number of confirmed active cases at USP Terre Haute has more than

doubled; compared to a week ago, there has been a six-fold increase in cases. *Compare* ECF No.

344 at 17 (22 active cases as of December 3, 2020) *with* D.C. Cir. No. 20-5361 at 25 n.4 (52

active cases as of December 7, 2020); https://www.bop.gov/coronavirus/ (134 active cases as of

December 10, 2020) (last visited Dec. 10, 2020). The outbreak at FCI Terre Haute, which is part

of the same complex, is even more dire at the moment, with 221 active cases. *See*

https://www.bop.gov/coronavirus/ (last visited Dec. 10, 2020). Given the large number of BOP

employees and others traveling to Terre Haute for the executions, the risk of additional COVID-19 spread further undermines the government's interest in prompt executions.

Moreover, the fact that more than a month remains before Mr. Higgs's execution belies any representations by the government that it would not be possible to reschedule the execution. Indeed, given the current outbreak at Terre Haute and across the country, it is implausible to assume that Defendants have no contingency plan in the event that critical members of the execution team are exposed to the virus, or that the situation at FCI Terre Haute further deteriorates such that it would not be safe to bring dozens of outside individuals through the prison complex.

## III.     THE COURT SHOULD CONDUCT AN EVIDENTIARY HEARING

The Government opposes a hearing but does little more than rehash its flawed arguments on the merits. Although Defendants wish to avoid the taking of "live testimony where possible," Opp. 43 (quoting Local Civil Rule 65.1(d)), it is *not* possible to avoid a hearing when the Court must resolve materially conflicting evidence and decide which testimony to find credible. *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004); *Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 113 (D.D.C. 2018).

On Mr. Higgs' *ex post facto* claim, Defendants misrepresent Dr. Van Norman's opinions, stating that she believes that "there is no material difference between a short-acting barbiturate and an ultrashort-acting one in this context." Opp. 43. Mr. Higgs has already explained that Dr. Van Norman was *not* addressing this context, which concerns the speed with which the relevant drugs affect the brain. *See supra* pp. 5-6. Dr. Stevens in fact describes that a short-acting barbiturate is more likely to bring about the conscious experience of flash edema and for a longer period of time than an ultrashort-acting barbiturate. *See* Stevens Decl. at 1-2; Supplemental

Declaration of Mark A. Edgar, M.D., at 2 (Sept. 28, 2020) (ECF No. 282-5) (describing the mechanism by which a large dose of pentobarbital brings about pulmonary edema before the drug reaches the brain). Dr. Antognini disputes those differences, Opp. 16-17, but provides no basis for many of his contrary opinions. *See, e.g.,* ECF No. 352-1 at 17 (asserting, without support, that the onset of action in an execution setting somehow shortens for pentobarbital but remains the same for an ultrashort acting barbiturate). Considering the Court has questioned Dr. Antognini's past opinions in this case, ECF No. 261 at 39, and has never heard live testimony from Drs. Edgar, Stevens, or Van Norman in this case, it is all the more reason for the Court to conduct a hearing.

WHEREFORE, for the foregoing reasons, Mr. Higgs respectfully requests that the Court grant his motion for leave to file an amended and supplemental complaint, and that it grant a preliminary injunction that prevents Defendants from executing him on January 15, 2021, or at any other time until further order of the Court.

Dated:  December 10, 2020          Respectfully submitted,

*/s/ Shawn Nolan*
Shawn Nolan, Chief, Capital Habeas Unit
Matthew Lawry, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Higgs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system. Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record. The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN & MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

(404) 688-7530
Email: gerald_king@fd.org

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221

Email: EMiller@velaw.com

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP

Email: mhulkower@steptoe.com

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

(212) 918-3000
Email: john.beck@hoganlovells.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

*/s/ Shawn Nolan* _____
Shawn Nolan, Chief, Capital Habeas Unit
Matthew Lawry, Assistant Federal Defender
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: shawn_nolan@fd.org

*Counsel for Plaintiff Dustin Higgs*

**SUPPLEMENTAL DECLARATION OF CRAIG W. STEVENS, Ph.D.**
*IN RESPONSE TO THE FOURTH DECLARATION OF JOSEPH F. ANTOGNINI*

I, Craig W. Stevens, Ph.D., do hereby affirm and attest under penalty of perjury:

1.      I am a full-time faculty member in the department of Pharmacology and Physiology at the College of Osteopathic Medicine, a unit of Oklahoma State University, Center for Health Sciences campus in Tulsa, Oklahoma. Other experiences and training that qualify me as a Pharmacology Expert were elaborated in my original Declaration.

2.      I have been retained by counsel for Dustin Higgs. Counsel have asked me to provide a response to the *Fourth Supplemental Declaration of Joseph F. Antognini*.

3.      On pp. 17 Dr. Antognini expounds on the classification of barbiturates "is not absolute, and depends in large part on the dose of the drug and the route of administration (oral versus intravenous)." He is correct that if two drugs are compared with two different routes then the classification doesn't make sense. He uses the example of an oral barbiturate and an IV barbiturate. But any drugs for lethal execution will be given by the IV route so his testimony on oral route of administration is not germane and rather distracting to the issue at hand.

4.      When thiopental and pentobarbital are given by the same route, thiopental will always have a faster onset time and shorter duration than pentobarbital because the lipid solubility of thiopental is greater than the lipid solubility of pentobarbital. The lipid solubility of a drug is correlated to the entry of the drug into the brain and the exit of the drug from the brain. So the same property of the drug (lipid solubility) determines both the onset of action and the duration of action. I made this clear in my original declaration stating "The classification[s] refer to the time of onset and duration of the drug effects" (pp. 6) The classification is based on the physicochemical nature of the barbiturate drugs, which has not changed and is found in a number of textbooks and scientific publications. It is not germane to the argument should a particular textbook include or not include a table showing the classification of barbiturates. Likewise content written by this author for a general introductory textbook in Pharmacology is not comparable to expert testimony in a lethal execution case.

5.      Lipid solubility is a measure of the ability of the drug to leave the bloodstream and enter the brain. It is measured by placing a known quantity of a drug in a vessel containing both oil and water and quantifying how much of the drug ends up in the oil and how much in the water. Highly lipid soluble drugs are therefore also highly hydrophobic drugs with low water solubility. For example, only 96 mg of thiopental can be dissolved in one liter of water whereas 679 mg of pentobarbital can be dissolved in one liter of water (from the PubChem database at *pubchem.ncbi.nlm.nih.gov*).

6.      Throughout Dr. Antognini's declaration he consistently misunderstands that the classification of ultra-short acting also means quicker onset time as well as duration of action. Dr. Antognini spends considerable efforts to argue that thiopental in some repeated administration studies can be a longer duration of action and therefore does not have an ultra-short duration of action. Duration of action considerations are not germane to the issue of lethal injection protocols; the only important pharmacology factor is how quickly the barbiturate acts so that the inmate is quickly brought into a state of general anesthesia.

**Exh. A**

7.      The only data that Dr. Antognini brings to bear on his arguments concerning the barbiturate's time of onset is with regards to two studies of euthanasia in horses using pentobarbital (Aleman et al. 2015, Buhl et al. 2013). While these studies show that pentobarbital acts rather quickly in horses, there is no comparison with thiopental to that it acts even quicker. Besides, onset of action in horses even if limited to one drug has little bearing to onset of action in humans given the differences in important circulatory parameters such as the 10 times greater cardiac output in horse compared to humans. There are no studies that show horses are a good model for the human condition with regards to pharmacokinetics and drug entry into the brain.

6.      Exhibit B in Dr. Antognini's Fourth Supplemental Declaration contains a Table entitled "Table showing typical onset times and durations of action for thiopental (intravenous) and pentobarbital (oral and intravenous)." As mentioned above, the information on oral pentobarbital is extraneous and irrelevant. Dr. Antognini manufactured this Table, and has added two unique columns with the headings "TYPICAL ONSET (Execution dose)" and "TYPICAL DURATION (Execution dose)." Dr. Antognini does not explain how he obtained the values entered in these two columns for thiopental and pentobarbital. For thiopental onset time he repeats the same 10-40 sec that he entered under ONSET TIME (Clinical dose). As the execution is many times greater than the clinical dose, this directly contradicts his own testimony that greater doses of barbiturates leads to faster onset time. For pentobarbital, he uses data from Dundee (1957) to posit that the onset time for an execution dose is 20-30 sec. This range is misleading as Dundee reports (table 1 in the paper) that at room temperature (72-74° F), pentobarbital had an average onset time of 33.3 sec and only at the hot temperature of 84-90° F did pentobarbital have an onset time of 21.3 sec. Most telling, as I note above, thiopental will always have a faster onset time than pentobarbital as Dundee shows in Table 1 and further states "At any given temperature it also reveals a more rapid onset of anesthesia with thiopentone [thiopental] than with pentobarbitone [pentobarbital], which is significantly significant." Dr. Antognini fails to mention this significant finding from the Dundee paper.

7.      In conclusion, Dr. Antognini avoids the basic pharmacology knowledge that leads to the standard classification of thiopental as ultra-fast acting and pentobarbital as fast-acting (i.e. differences in their lipid solubility). Dr. Antognini attempts to assert that at high execution doses these differences between thiopental and pentobarbital are irrelevant; this is incorrect as no matter what the dose, thiopental will act quicker than pentobarbital due to the differing chemical nature of the two drugs.


I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury.


_____                    _____
Craig W. Stevens, Ph.D.                                      December 9, 2020

                                                                        Date


**Exh. A**