**\*\*\*\* EXECUTION SCHEDULED FOR JANUARY 15, 2021\*\*\*\***

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL** | ) | |
| **BUREAU OF PRISONS' EXECUTION** | ) | |
| **PROTOCOL CASES,** | ) | |
| | ) | |
| **Lead case:**   *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| **ALL CASES** | ) | |
| | ) | |
| *Roane, et al. v. Barr, et al.*, No. 05-2337 | ) | |

<u>**MOTION FOR LEAVE OF COURT FOR DUSTIN HIGGS**</u>
<u>**TO FILE SECOND AMENDED AND SUPPLEMENTAL COMPLAINT AND**</u>
<u>**MOTION FOR PRELIMINARY INJECTION BARRING HIS EXECUTION**</u>

Plaintiff Dustin Higgs respectfully requests leave of Court to file a second amended and

supplemental complaint pursuant to Fed. R. Civ. P. 15(a) and (d), in order to assert one newly

arising claim that, in light of Mr. Higgs's recent positive COVID-19 test and his underlying

conditions of heart impairments and asthma, Defendants' planned use of pentobarbital pursuant

to the 2019 Protocol violates his rights under the Eighth Amendment to the United States

Constitution.

In compliance with the Court's Minute Order of September 14, 2020, Mr. Higgs also

respectfully moves for leave to file the accompanying motion for preliminary injunction barring

his execution on January 15, 2021. In support of these requests, Mr. Higgs states the following:

1.      Mr. Higgs is scheduled for execution on January 15, 2021. *See* ECF No. 330.

2.      In his original complaint, Mr. Higgs raised, among other things, an as-applied

Eighth Amendment challenge to Defendants' 2019 Protocol based on his underlying medical

conditions and his likely exposure to COVID-19 while incarcerated at USP Terre Haute. *See* ECF No. 229-1 at 43-44. Thereafter, Mr. Higgs filed an amended and supplemental complaint, which raised two additional claims, *see* ECF No. 343-1, and a motion for a preliminary injunction barring his execution based on the as-applied Eighth Amendment claim and the two claims raised in his amended and supplemental complaint. ECF No. 344.

3.      On December 9, 2020, the Court dismissed Mr. Higgs's as-applied Eighth Amendment claim, noting that his injury was "hypothetical" and that he had not alleged that he had "any reason to believe that he contracted [COVID-19] aside from the fact that he is incarcerated." ECF No. 354 at 4.

4.      Mr. Higgs developed a cough and chills on December 13, 2020, and he tested positive for COVID-19 on December 16, 2020. As of the date of this filing, he continues to experience symptoms of COVID-19.

5.      Mr. Higgs's original complaint alleges in detail how the injection of a large dose of pentobarbital as outlined in the 2019 Protocol causes a large and sudden influx of fluid in the lungs prior to the loss of consciousness, producing a sensation of drowning. *See* ECF No. 229-1 at 18-22.

6.      As explained in the accompanying second amended and supplemental complaint, COVID-19 causes lung damage in a majority of patients, including those who report experiencing only mild symptoms or no symptoms at all. Lung damage from a COVID-19 infection "sensitizes the lungs to more extensive and immediate further damage," and therefore pentobarbital "[will] caus[e] massive pulmonary edema at an earlier stage in the execution process before drug levels in the brain have peaked." Supp. Decl. of Gail Van Norman, M.D. (Dec. 22, 2020), at 3 ("Van Norman Supp. Decl. (Dec. 22, 2020)").

7.      Executing Mr. Higgs with pentobarbital in light of his COVID-19 infection is therefore "particularly likely to cause extreme suffering" because he will "experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19." Decl. of Joel Zivot, M.D. (Aug. 31, 2020) (ECF No. 303-4), at 5-6 ("Zivot Decl."); *see* Van Norman Supp. Decl. (Dec. 22, 2020) at 1 ("[T]hese prisoners will experience sensations of drowning and suffocation sooner than a person without COVID-related lung damage and, therefore, their conscious experience of the symptoms of pulmonary edema will be prolonged.").

8.      In addition to his COVID-19 infection, Mr. Higgs "is always at a greater risk for lung congestion than an otherwise healthy person" because of two preexisting medical conditions that increase his risk of experiencing painful pulmonary edema while sensate: mitral valve regurgitation and asthma. Supplemental Decl. of Joel Zivot, M.D. (Dec. 3, 2020) (ECF No. 344-2), at 5 ("Zivot Supp. Decl."). Mr. Higgs's COVID-19 infection also exacerbates the risk created by his mitral valve regurgitation. Decl. of Michael Stephen, M.D. (Dec. 22, 2020) at 3-4 ("Stephen Decl.").

9.      Rule 15(d) provides for a supplemental pleading "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." In this instance, Mr. Higgs filed an unopposed motion to intervene and complaint on September 1, 2020. ECF Nos. 229, 229-1. The complaint alleged an as-applied Eighth Amendment challenge to Defendants' 2019 Protocol based on his underlying medical conditions and his likely exposure to COVID-19 while incarcerated at USP Terre Haute. *See* ECF No. 229-1 at 43-44. On December 9, 2020, the Court dismissed Mr. Higgs's as-applied Eighth Amendment claim, noting that he had not alleged that he had "any reason to believe that he contracted [COVID-19] aside

from the fact that he is incarcerated." ECF No. 354 at 4. On December 16, 2020, Mr. Higgs

tested positive for COVID-19. Mr. Higgs and undersigned counsel were informed that he tested

positive for COVID-19 on December 17, 2020.[1]

10.     Leave to supplement a complaint is "liberally granted," especially when, as here,

the supplemental claim is factually and legally related to matters in the earlier complaint.[2]

*Chadler v. James*, 783 F. Supp. 2d 33, 39 (D.D.C. 2011); *see also Banks v. York*, 448 F. Supp. 2d

213, 214 (D.D.C. 2006) (leave should be "freely granted ... where such supplementation will

promote the economic and speedy disposition of the controversy between the parties, will not

cause undue delay of trial, inconvenience and will not prejudice the rights of any other party");

*Costa v. Bazron*, 2020 WL 1935524, at *1, 2 (D.D.C. Apr. 22, 2020) (granting plaintiffs' motion

to supplement six months after original complaint was filed where new allegations arose out of

defendants' response to the COVID-19 pandemic but were related to original claims and "time

[was] of the essence").

11.     Although a supplemental complaint generally supersedes an earlier complaint, the

Court in this case has directed the parties to file Plaintiff-specific claims in separate filings. *See*

ECF No. 81. Therefore, Mr. Higgs does not intend for his second amended and supplemental

---

[1] To the extent that Mr. Higgs must ask the Court to alter and amend its dismissal order, he does so here pursuant to Fed. R. Civ. P. 59(e), and within the 28 days provided for by the rule. A court may alter or amend a judgment when, as here, the movant demonstrates "the availability of new evidence." *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C. Cir. 1996). In this instance, Mr. Higgs offers his positive COVID-19 test and the consequences of that infection. The Court should alter and amend its dismissal because Mr. Higgs presents "new facts . . . which compel the court to change its prior position." *National Ctr. for Mfg. Sciences v. Department of Defense*, 199 F.3d 507, 511 (D.C. Cir. 2000).

[2] Motions to amend under Rule 15(a) and motions to supplement under Rule 15(d) are, for the most part, "subject to the same standard." *Wildearth Guardians v. Kempthorne*, 592 F. Supp. 2d 18, 23 (D.D.C. 2008); *see also University of Colorado Health v. Azar*, 2020 WL 1557134, at *13 (D.D.C. March 31, 2020) (declining to dismiss claims on "highly technical grounds" related to whether plaintiffs should have moved to amend or supplement).

complaint to supplant or otherwise waive any claims from his complaint, or from his amended and supplemental complaint. *See* ECF Nos. 229-1, 343-1.

12.     As explained in the accompanying motion for preliminary injunction, Mr. Higgs seeks a preliminary injunction barring his execution as scheduled on January 15, 2021, until such time as Defendants' method of administering Mr. Higgs's death sentence complies with the Eighth Amendment. Absent a preliminary injunction, Mr. Higgs will suffer irreparable harm.

13.     Undersigned counsel have consulted with opposing counsel, who states that the Government opposes the motion for leave to file a second amended and supplemental complaint and the motion for preliminary injunction. Opposing counsel takes no position on the motion for leave to file a motion for preliminary injunction.

14.     Opposing counsel has requested that Mr. Higgs include the following statement to the Court:

> "Should the Court grant leave, the government requests that it be granted leave to respond to Higgs's motion by December 31, 2020. This will allow the government time to monitor the progress of Higgs's disease, confer with its experts (whose availability may be limited by the upcoming holidays) about any changes in Higgs's condition, and address any such changes in its response brief. Further, the government understands that Plaintiff Cory Johnson intends to file a motion for preliminary injunction tomorrow, December 23, 2020 (Mr. Johnson's counsel has agreed to the government responding to that motion by December 31 also), and the government will need time to respond to that motion as well, should the Court grant Johnson leave to file it. The government intends to file a combined opposition to both motions for preliminary injunction."

Mr. Higgs does not object to this timeline.

WHEREFORE, Plaintiff Dustin Higgs respectfully requests that the Court grant him leave to file the accompanying second amended and supplemental complaint and the accompanying motion for preliminary injunction barring his execution.

Dated:   December 22, 2020    Respectfully submitted,

        /s/ *Alex Kursman*
        Alex Kursman
        Devon Porter
        Federal Community Defender Office, E.D. Pa.
        601 Walnut Street, Suite 545 West
        Philadelphia, PA 19106
        Telephone: 215-928-0520
        Email: alex_kursman@fd.org

        *Counsel for Plaintiff Dustin Higgs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, I caused a true and correct a copy of the foregoing motion to be served on all counsel of record via the Court's CM/ECF system. Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record. The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN & MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Margaret O'Donnell

FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Robert A. Ayers

(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

/s/ Alex Kursman
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: alex_kursman@fd.org

*Counsel for Plaintiff Dustin Higgs*

4

****EXECUTION SCHEDULED FOR JANUARY 15, 2021****

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,** | ) ) ) | |
| | ) | |
| **Lead case:** *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| *Roane et al. v. Barr* **et al, No. 05-2337** | ) | |

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT OF PLAINTIFF DUSTIN
HIGGS FOR INDIVIDUALIZED INJUNCTIVE AND DECLARATORY RELIEF**

**I.
Nature of Action and Procedural Background**

1.      Pursuant to the Court's Order of February 19, 2020 (ECF No. 81) and Fed. R.
Civ. P. 15 (a) and (d), and in addition to his previous Complaint (ECF No. 229-1) and Amended
and Supplemental Complaint (ECF No. 343-1), Mr. Higgs brings this Second Amended and
Supplemental Complaint seeking injunctive and declaratory relief for violations of his rights
under the Eighth Amendment.

2.      On November 20, 2020, Defendants set a date of January 15, 2021, for the
execution of Mr. Higgs. *See* ECF No. 330.

3.      Pursuant to the Court's February 19, 2020 Order (ECF No. 81), the circumstances
described herein "warrant . . . a separate filing" concerning "issues that are particular to" Mr.
Higgs. ECF No. 81. Because the Court has allowed individual plaintiffs to bring claims such as
these in a "separate filing," Mr. Higgs does not intend for this Amended and Supplemental

Complaint to supersede his earlier claims contained in his Complaint or in his Amended and Supplemental Complaint, including his claims for relief under the Eighth Amendment, the Ex Post Facto Clause, the Administrative Procedure Act ("APA"), and the Food, Drug and Cosmetic Act as made cognizable by the APA.

4.       Mr. Higgs realleges and incorporates herein by reference, as if set forth in full below, the paragraphs of his Complaint and Amended and Supplemental Complaint that relate to the present claim. *See* ECF No. 229-1; ECF No. 343-1; *In re Federal Bureau of Prisons Execution Protocol Cases*, 980 F.3d 123 (D.C. Cir. 2020) (reinstating consolidated Plaintiffs' Eighth Amendment claim).

## II.

### Factual Background

### *Mr. Higgs tested positive for COVID-19 on December 16, 2020*

5.       Mr. Higgs developed a cough and chills on December 13, 2020. His son, Da'Quan Darby, visited Mr. Higgs on December 13 and 14, and noticed that his father was coughing on both days. His father repeatedly asked whether the visiting room was cold when Mr. Darby did not perceive it as cold, and Mr. Darby had the impression that his father had chills. Decl. of Da'Quan Darby (Dec. 20, 2020) (Exhibit 1) at 1 ("Darby Decl."). Mr. Darby perceived his father's symptoms to be worse on the second day. *Id.* Mr. Higgs told Mr. Darby that he felt like he was coming down with something, and that he had taken some cough medicine.

6.       On December 17, 2020, the Bureau of Prisons ("BOP") informed counsel for Mr. Higgs that he had tested positive for COVID-19.

7.       As of the date of this filing, Mr. Higgs continues to experience symptoms of COVID-19.

*Background on the COVID-19 virus*

8.     COVID-19 is "a highly contagious respiratory illness caused by a novel coronavirus (SARS-CoV-2)." Decl. of Joel A. Zivot, M.D. (Aug. 31, 2020) at 3 ("Zivot Decl."). The illness originated in China but quickly spread across the globe, and the World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See* World Health Organization, *WHO Timeline – COVID-19*, https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (last visited Dec. 21, 2020).

9.     COVID-19 "spreads via the respiratory route and as such, targets the lungs." Zivot Decl. at 4.

10.     COVID-19 causes lung damage in a majority of patients, including those who report experiencing only mild symptoms or no symptoms at all. In fact, CT scans revealed that of the cases of COVID-19 from the Diamond Princess cruise ship, "54% of patients who experienced *asymptomatic* infections still suffered the same severe lung changes (lung opacifications) seen in many hospitalized patients." Supp. Decl. of Gail Van Norman, M.D. (Dec. 22, 2020) (Exhibit 2), at 4 ("Van Norman Suppl. Decl. (Dec. 22, 2020)") (emphasis added). For *symptomatic* patients, the percentage of patients with lung damage visible on a CT scan rose to 79%. *Id.* This finding has been corroborated by other emerging research on the effects of COVID-19 on the lungs. *See id.* In short, "[i]t is clear now that even in mild infection—i.e. infection that is either asymptomatic or symptomatic but does not require hospitalization—significant damage is occurring in the lungs . . . ." *Id.*

11.     In addition to lung damage, COVID-19 often causes or exacerbates heart conditions. *See* Decl. of Michael Stephen, M.D. (Dec. 22, 2020) (Exhibit 3) at 3-4 ("Stephen Decl."). Heart problems typically persist for some period of time after a person has apparently

recovered from the virus: according to one study, 78% of patients who had recently recovered from COVID-19 had abnormal imaging as seen on a cardiac MRI. *See id.* at 3.

12.     Doctors who treat COVID-19 patients routinely observe lingering effects from the virus, even after the patient has apparently recovered. Some patients present with an apparently-resolved COVID-19 infection, but "a complete workup on these patients often reveals decreased heart function, small clots in the lung that impede heart function, or pneumonia." *Id.* at 4.

13.     Lingering effects from COVID-19 typically last at least two to three months after the initial development of symptoms. *See* Stephen Decl. at 6 (observing that in Dr. Stephen's experience treating COVID-19 patients, it typically takes approximately 8 weeks for patients to regain normal functioning); Van Norman Supp. Decl. (Dec. 22, 2020) at 5-6 (summarizing research indicating that COVID-19 lung damage persists for at least 90-100 days).

### *COVID-19 and execution with pentobarbital*

14.     The 2019 Protocol was developed prior to the emergence of SARS-CoV-2 (the virus that causes COVID-19 illness).

15.     Preexisting lung damage from COVID-19 infection is likely to put Mr. Higgs at serious risk of severe pain and suffering from the pentobarbital injection called for by the 2019 Protocol.

16.     As explained in detail in Mr. Higgs's Complaint (ECF No. 229-1), injection with a large dose of pentobarbital as outlined in the 2019 Protocol causes a large and sudden influx  of fluid in the lungs prior to the loss of consciousness, producing a sensation of drowning. Decl. of Gail Van Norman, M.D., at 33-34 (Nov. 11, 2019) (ECF No. 24) ("Van Norman Decl."); Decl. of Mark A. Edgar, M.D., at 19-21 (Oct. 24, 2019) (ECF. No. 303-3) ("Edgar Decl."); Zivot Decl. at 2-3. This excruciating experience is comparable to waterboarding. Van Norman Decl. at 34.

17.     "Infection with the COVID-19 virus causes severe damage to many areas in the airways and the lungs, but most specifically to the alveolar-capillary membrane, which is also the site of damage of massive barbiturate overdose." Van Norman Supp. Decl. (Dec. 22, 2020) at 2.

18.     Lung damage from COVID-19 thereby "sensitizes the lungs to more extensive and immediate further damage . . . , causing massive pulmonary edema at an earlier stage in the execution process before drug levels in the brain have peaked." *Id.* at 3. Execution with pentobarbital is thus "particularly likely to cause extreme suffering. Because COVID-19 can cause lasting lung damage, a person injected with pentobarbital would experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19." Zivot Decl. at 5-6; *see* Van Norman Supp. Decl. (Dec. 22, 2020) at 1 ("[T]hese prisoners will experience sensations of drowning and suffocation sooner than a person without COVID-related lung damage and, therefore, their conscious experience of the symptoms of pulmonary edema will be prolonged.").

### *Mr. Higgs's preexisting medical conditions*

19.     Mr. Higgs has lifelong heart problems. Specifically, Mr. Higgs has a cardiac murmur and a condition called mitral valve regurgitation, also known as mitral valve insufficiency. *See* Stephen Decl. at 5 (noting that a recent electrocardiogram on November 12, 2020 and an ultrasound of his heart from May 26, 2020 show that Mr. Higgs has moderate mitral valve regurgitation, left atrial enlargement, and likely left ventricular hypertrophy).

20.     Mitral valve regurgitation occurs when the mitral valve on the left side of the heart does not close properly, allowing blood to backflow or leak into the left atrium in the heart. Zivot Supp. Decl. at 2-3. Over time, this condition can cause a patient to develop pulmonary edema:

5

> When a patient has mitral regurgitation, each contraction of the heart forces some blood backwards into the left atrium and then further backwards into the lungs. . . . In the normal functioning heart, when the left ventricle contracts, the mitral valve shuts, preventing blood from regurgitating backwards. At the same time, the aortic valve opens and permits the normal flow of blood forward. The pressure in the lungs is not high enough to block backwards flow without a functioning mitral valve. A competent and non-leaking mitral valve is the normal protection for the lungs from this blood under pressure. Extra fluid in the lungs, when severe, produces significant shortness of breath and is called congestive heart failure or pulmonary edema.

*Id.* at 3.

21.     Mitral valve regurgitation increases the risk of flash pulmonary edema. Dr. Kendall Von Crowns, a medical expert retained by Defendants, has acknowledged that heart conditions like Mr. Higgs's can cause flash pulmonary edema in a prisoner executed with pentobarbital:

> I know there's a case report of an individual who developed flash pulmonary edema, but he had underlying heart issues, specifically mitral valve issues, as well as other heart problems. So his heart was already compromised when the flash pulmonary edema occurred.
>
> So in his situation, his flash pulmonary edema was the result of the fact that he already had a compromised heart which then resulted in him developing edema more rapidly than normal. So you have an individual that was already kind of critical when this occurred.

Evid. Hr'g Tr. (Sept. 18, 2020) at 18; *see also* Zivot Supp. Decl. at 2-3, 5-6.

22.     Mr. Higgs's COVID-19 infection exacerbates the risk created by his underlying heart condition. Specifically, this condition "puts him at higher risk of COVID-19 related heart issues" and increases his risk of COVID-related pulmonary edema. Stephen Decl. at 5. Because Mr. Higgs has an enlarged left atrium, he is particularly at risk for COVID-related heart failure, "as an enlarged left atrium ineffectively pumps blood to the left ventricle, further putting him at risk for fluid to back up into his lungs (pulmonary edema)." *Id.* at 6.

23.     Mr. Higgs also suffers from lifelong asthma, which often makes it difficult for him to breathe. His asthma is serious and requires a "continuous high dose of inhaled steroids," *id.* at 5, and Mr. Higgs currently uses an inhaler about three times each day. In addition, Mr. Higgs "has had asthma exacerbations over the years, and has required the use of nebulizer treatments." *Id.* His medical records reflect that at times, Mr. Higgs experiences "wheezing, difficulty breathing, coughing, and shortness of breath" as a result of his asthma. Zivot Supp. Decl. at 2.

24.     For Mr. Higgs, the experience of pulmonary edema "would cause further strain on Mr. Higgs's already-impaired breathing." Zivot Supp. Decl. at 2. Because of Mr. Higgs's asthma, he is likely to "struggle for air more quickly and painfully after the onset of pulmonary edema because his asthma inflames and constricts his airways, making it more difficult for enough oxygen to reach his lungs even under normal circumstances." *Id.*

25.     In sum, the risk of painful pulmonary edema while sensate is especially acute for Mr. Higgs, who "is always at a greater risk for lung congestion than an otherwise healthy person as a consequence of mitral regurgitation and asthma." Zivot Supp. Decl. at 5.

**Supplemental Count III: Eighth Amendment Violation As Applied to Mr. Higgs**

26.     Mr. Higgs realleges and incorporates herein by reference all of the preceding paragraphs of this Second Amended and Supplemental Complaint as if set forth in full below.

27.     The Eighth Amendment provides prisoners with the right to be free from cruel and unusual punishments. In carrying out a sentence of death, the Government violates the Eighth Amendment if the planned manner of execution presents a "substantial risk of serious harm" to the prisoner. *Baze v. Rees*, 553 U.S. 35, 50 (2008).

28.     Executing Mr. Higgs under the 2019 Protocol poses a substantial risk of serious harm to Mr. Higgs. Mr. Higgs's recent infection with COVID-19, coupled with his preexisting health problems, creates a substantial and unjustifiable risk that Mr. Higgs will endure an excruciating experience akin to drowning to death.

29.     The Eighth Amendment also forbids "deliberate indifference" to "serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment when he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

30.     BOP knows of Mr. Higgs's current COVID-19 infection, underlying asthma, and mitral valve regurgitation.

31.     The BOP must provide Mr. Higgs with medical care until the moment of his death.

32.     Executing Mr. Higgs pursuant to the 2019 Protocol poses a substantial risk of severe pain due to his recent COVID-19 infection, his asthma, and his heart condition. Defendants are deliberately indifferent to this risk.

33.     There is substantial and unjustifiable risk that the Defendants will cause serious harm to Mr. Higgs by executing him pursuant to the 2019 Protocol.

34.     Mr. Higgs continues to plead the two alternative execution methods from his original complaint: a pre-execution dose of an opioid or other suitable analgesic, as well as the firing squad. *See* ECF No. 229-1 at 37-39. At a minimum, a third alternative method is to postpone Mr. Higgs's execution for a period of two to three months from the onset of his COVID-19 infection, at which time the functioning of Mr. Higgs's heart and lungs are likely to improve, so that the postponement of Mr. Higgs's execution would substantially reduce the

COVID-enhanced risk that he will experience flash pulmonary edema while sensate, as well as the duration of that experience.

### **Prayer for Relief**

WHEREFORE, in order to prevent the above-alleged violations of Mr. Higgs's rights under the Eighth Amendment, Plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that Defendants' planned use of pentobarbital pursuant the 2019 Protocol to execute Plaintiff violates the Constitution;

b.      enjoining Defendants from executing Mr. Higgs as scheduled on January 15, 2021, or on any other date until such time as Defendants' method of administering death sentences complies with the statutory and Constitutional provisions described herein; and

c.      granting such further relief as the Court deems just and proper.


Dated:   December 22, 2020                      Respectfully submitted,

                                                                /s/ Alex Kursman_____
                                                                Alex Kursman
                                                                Devon Porter
                                                                Federal Community Defender Office, E.D. Pa.
                                                                601 Walnut Street, Suite 545 West
                                                                Philadelphia, PA 19106
                                                                Telephone: 215-928-0520
                                                                Email: alex_kursman@fd.org

                                                                *Counsel for Plaintiff Dustin Higgs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, I caused a true and correct a copy of the foregoing amended and supplemental complaint and the exhibits thereto to be served on all counsel of record via the Court's CM/ECF system. Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record. The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN & MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Margaret O'Donnell

FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Robert A. Ayers

(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

Dated:   December 22, 2020

/s/ Alex Kursman
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: alex_kursman@fd.org

*Counsel for Plaintiff Dustin Higgs*

4

# EXHIBIT 1

**DECLARATION OF DA'QUAN DARBY**
**PURSUANT TO 28 U.S.C. SECTION 1746**

I, Da'Quan Darby, do hereby declare and verify as follows:

1.    My name is Da'Quan Darby.   Dustin Higgs is my dad.

2.    Last week, on December 13th and December 14th, I visited my dad at USP Terre Haute.

3.    During the visits, my dad was coughing.   He kept asking me if I was cold, but the room was not cold.   I had the impression that he had the chills.   He was like this both days, but it was worse the second day.   He said he had to take some cough medicine because he felt like he was coming down with something.

4.    When I found out he tested positive for Covid-19, I was not surprised because of the symptoms I saw my dad had.

5.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C.   § 1746.

Da'Quan Darby

Dated:   12/20/20

1

# EXHIBIT 2

### Supplemental Expert Declaration of Gail A. Van Norman M.D.
### Regarding Significance of Infection of Death Row Prisoners by the COVID-19 Virus and Implications for Lethal Injection Protocols Involving Pentobarbital

The COVID-19 virus leads to significant lung damage—even in the majority of patients who are asymptomatic—and has direct and serious implications for death row inmates subject to execution by use of pentobarbital sodium ("pentobarbital") pursuant to the Federal Bureau of Prisons' ("BOP") current lethal injection protocol (the "2019 Protocol"). For prisoners experiencing COVID-related lung damage at the time of their execution, flash pulmonary edema will occur even earlier in the execution process, and before brain levels of pentobarbital have peaked. To a reasonable degree of medical certainty, these prisoners will experience sensations of drowning and suffocation sooner than a person without COVID-related lung damage and, therefore, their conscious experience of the symptoms of pulmonary edema will be prolonged.

On November 1, 2019, I provided Plaintiffs' counsel with my opinions regarding the 2019 Protocol in a declaration that included detailed discussion and cited scientific evidence. On June 29, 2020, I provided a Supplemental Expert Declaration addressing specific questions regarding flash pulmonary edema in prisoners executed by intravenous (IV) administration of 5 grams of pentobarbital. I also provided a Secondary Supplemental Declaration to the Court dated August 7, 2020 for Plaintiff Keith Nelson, addressing findings of flash pulmonary edema following the execution of Wesley Purkey on July 16, 2020. On September 15, 2020, I wrote an Additional Supplemental Report to the Court, providing rebuttal to the declarations of Dr. Kendall Von Crowns (dated August 10, 2020) and Dr. Joseph Antognini (dated September 11, 2020). I was provided with eyewitness accounts of William LeCroy's execution on September 22, 2020, as well as autopsy reports of 307 prisoners executed by lethal injection involving various drugs, most of which were discussed in a story published by NPR on September 21, 2020.[1] On September 24, 2020, I submitted an opinion regarding breathing and eye movements witnessed during the execution and reexamining the incidence of flash pulmonary edema among prisoners executed using the 2019 Protocol. On October 28, 2020, I provided supplemental reports on behalf of Lisa Montgomery and Norris Holder, regarding effects of antiseizure and other psychoactive medications on the results of lethal injection utilizing pentobarbital.

It is my understanding that since submission of these reports, death row prisoners scheduled for execution by the BOP have tested positive for, and are symptomatic with, infection by the COVID-19 virus. Counsel has asked me to offer an opinion regarding how recent or concurrent COVID-19 infection may affect lethal injection with pentobarbital.

I have stated previously that when additional documents or materials are provided to me for specific review and analysis, or if I become aware of other scientific or clinical evidence that impacts my opinions, (or if in attendance at any hearings or trials in this case I learn of relevant evidence), I may choose to modify my opinions accordingly.

---

[1] Caldwell N., Chang A., Myers J. Gasping for air: autopsies reveal troubling effects of lethal injection. NPR. Sept 21, 2020. Available at: https://www.npr.org/2020/09/21/793177589/gasping-for-air-autopsies-reveal-troubling-effects-of-lethal-injection. Accessed Sept 21, 2020

This supplemental declaration accordingly provides emerging scientific information regarding the effects of COVID-19 viral infection in both symptomatic and asymptomatic patients on the alveolar-capillary membrane of the lungs, which is one site at which barbiturates act to produce flash pulmonary edema in barbiturate overdose.

In addition to the materials listed in my Expert Declaration dated November 1, 2019, and in my previous Supplemental Reports dated June 29, 2020, August 7, 2020, and September 15, 2020, September 24, 2020, and October 28, 2020, I have further reviewed and relied upon various scientific publications as referenced and footnoted throughout this declaration.

## OPINIONS

To aid Counsel and the Court, I will restate some of my previous conclusions that are relevant to this declaration, in addition to my new conclusions that address Counsel's questions. Each of the new opinions is discussed at length in this declaration.

**Opinion #1:** Flash pulmonary edema occurs in essentially 100% of prisoners executed by lethal injection using pentobarbital. (Please refer to my Expert Declaration, dated November 1, 2019, pages 32-33, for a discussion of pulmonary edema in barbiturate overdose and references). Flash pulmonary edema occurs very rapidly (i.e. within seconds or minutes), and is associated with excruciating symptoms of drowning and suffocation, including shortness of breath, air hunger, anxiety, terror and panic. (Please refer to my Expert Declaration dated November 1, 2019, pages 33-34, detailing sensations of drowning and suffocation.)

**Opinion #2:** Infection with the COVID-19 virus causes severe damage to many areas in the airways and the lungs, but most specifically to the alveolar-capillary membrane, which is also the site of damage of massive barbiturate overdose. The damage from COVID-19 infection can be seen by radiography in the majority (65%) of patients who have asymptomatic infection, and in at least 79% of patients who have symptomatic COVID-19 infection, even when such infections are mild.

**Opinion #3:** After infection with COVID-19, symptoms gradually resolve, but damage to the lung tissue persists for a much longer period of time, even after the patients no longer experience symptoms. The duration of the changes in lung tissue is unknown at this time, although several studies have demonstrated that severe pulmonary functional changes have been demonstrated for more than 90 days after infection. Clinical observation of divers who experienced mild COVID symptoms demonstrated severely abnormal oxygen levels in the blood with stress, and other lung function abnormalities that were severe enough to prevent them from being certified to return to work, even 6 weeks after symptoms had apparently resolved. Additional studies of COVID survivors demonstrate that radiographic lung changes persist for weeks to months following infection.

**Opinion #4:** The presence of this particular COVID-19 virally-induced lung injury sensitizes the lungs to more extensive and immediate further damage to the alveolar-capillary membrane and other sites. When the barbiturate reaches the alveolar-capillary membrane and other sites in the lung, the drug will cause more extensive damage—at even lower blood levels of barbiturate, i.e. earlier in the injection process and in a shorter period of time—causing massive pulmonary edema at an earlier stage in the execution process before drug levels in the brain have peaked. To a reasonable degree of medical certainty, prisoners will experience earlier and therefore more prolonged sensations of drowning and suffocation compared to health prisoners.

## DISCUSSION

This month marks one year since the first case of COVID-19 viral infection was seen in Wuhan, China. While the medical world has worked tirelessly to both learn all that can be determined about this new pathogen, and to treat COVID-19 patients, we are still in the infancy of understanding this extreme threat. We know that COVID-19 produces respiratory infection, and that it also causes a diffuse inflammatory response, produces widely disseminated blood clotting abnormalities, and causes severe damage to virtually every organ system, particularly the lungs and heart. We also are learning that significant damage occurs far earlier in infection than previously thought, even before the patient is symptomatic, and that it is both profound and long lasting. Until very recently, for example, large studies of damage in the lungs evidenced at autopsy were lacking, in part because of safety issues in performing such autopsies and studies, and in preventing widespread contamination.

In the last several months, a number of studies emerged, some of which reviewed and characterized more clearly than earlier studies the widespread effects of COVID-19 effects in lung tissue. At the same time, other studies were published that examined the pattern of damage in patients who did not die of the disease, and in asymptomatic patients who test positive for the disease—with startling results.

In patients who have died of COVID-19 infection, postmortem findings in the lungs include pulmonary edema and exudates,[2,3] infiltration of inflammatory cells in the lung tissues, swelling of lymph nodes and other tissue, inflammation and swelling of the trachea (tracheitis), and inflammation and breakdown of the pulmonary capillary walls ("diffuse pulmonary vasculitis") and diffuse damage to the alveoli (termed "DAD" or "diffuse alveolar damage"), among other effects.[4] It is known that this damage occurs very early, even before patients have

---

[2] The term "pulmonary edema" refers generally to fluid that has leaked from the pulmonary capillaries into lung tissues, and the air-containing spaces in the lungs called alveoli. "Exudates" refer also to fluids in these spaces, but these fluids are produced in response to inflammation and contain different types of cells and proteins. COVID-19 infection causes both inflammatory responses that produce exudates, and damage to capillary membranes that cause pulmonary edema. Both exudates and pulmonary edema prevent normal passage of oxygen into the bloodstream, and carbon-dioxide out of the bloodstream, but through different mechanisms.

[3] De Maat S, et al. Impaired breakdown of bradykinin and its metabolites as a possible cause for pulmonary edema in COVID-19 infection. Semin Thromb Hemost 2020: 46:835-7

[4] Calebrese F, et al. Pulmonary pathology and COVID-19: lessons from autopsy. The experience of European pulmonary pathologists. Virchow Arch 2020; 477:359-72

3

symptoms; specifically, many patients do not experience shortness of breath while the virus is causing diffuse pulmonary vasculitis and alveolar damage. The absence of symptoms is unreliable in indicating effects on the lungs; in the majority of cases, absence of symptoms is misleading. This is a *unique* characteristic of COVID-19 infection, and appears to be because early in COVID infection, the lungs retain enough elasticity or "compliance" that patients are able to compensate for falling oxygen levels by changing their breathing patterns ("tachypnea").[5]

Just recently, it has also become apparent that asymptomatic cases or mild cases that never progress to hospitalization nevertheless involve similar damage to the lungs. Computerized tomography (CT) scans of 104 cases from the cruise ship Diamond Princess demonstrated that 54% of patients who experienced asymptomatic infections still suffered the same severe lung changes (lung opacifications) seen in many hospitalized patients. When patients had symptoms of any kind, the percentage that had sufficiently advanced damage to be apparent on CT scan rose to 79%. Asymptomatic and symptomatic patients were not significantly different with regard to having previous lung disease.[6] This finding was very close to those from a different group of investigators, who found that 56% of cases with few or no symptoms also showed diffuse lung damage.[7] Varble, et al. also used CT scanning to show that 65% of patients who were COVID positive had severe lung changes almost four days before onset of symptoms.[8] Very early in the pandemic, Meng et al., found that in *all* of the patients with asymptomatic COVID-19 infections (N = 58), 94.8% had abnormal, ground glass opacifications (GGO) by CT scan.[9]

It is clear now that even in mild infection—i.e. infection that is either asymptomatic or symptomatic but does not require hospitalization—significant damage is occurring in the lungs, and particularly to the alveolar/capillary membrane. This is the same site that is eroded by high blood levels of barbiturate that occur in massive barbiturate overdose and cause the membranes to leak fluid into the air-exchanging chambers of the lungs, effectively drowning the prisoner. With the alveolar-capillary membrane already damaged by the virus, COVID-positive prisoners would be more susceptible to rapid and massive barbiturate damage, and this damage would occur long before the level of pentobarbital peaks in the brain. Thus, even if a 5-gram intravenous dose of pentobarbital would render a prisoner insensate under normal circumstances—which I dispute, as I have stated in my previous declarations—a COVID-positive prisoner or a prisoner who has recently recovered from COVID-19 would experience a much more rapid and devastating onset of flash pulmonary edema at an earlier stage of the injection when brain levels of barbiturate are much lower. This would prolong the period of time that a prisoner would experience sensations of drowning and suffocation.

[5] Bavriatopoulou M et al. Clin Exp Med. July 27, 2020
[6] Inui S et al. Chest CT findings in cases from the cruise ship Diamon Princess with coronavirus disease (COVID-19) Radiology: Cardiothoracic Imaging 2020: 2: e200110
[7] Castelli M et al. Prevalence and risk factors for lung involvement on low-dose chest CT (LDCT) in a paucisymptomatic population of 247 patients affected by COVID-19. Insights Imaging. 2020: 11:117
[8] Varble N et al. CT and clinical assessment in asymptomatic and pre-symptomatic patients with early SARS-CoV-2 in outbreak settings. Eur Radiol 2020. Nov 4th
[9] Meng H. CT imaging and clinical course of asymptomatic cases with COVID-19 pneumonia at admission in Wuhan, China. J.Infect. April 12, 2020.

We know that even asymptomatic patients have significant and severe enough lung changes that they are detectable by CT scan. What we do not know is exactly how long after COVID infection the lung damage is repaired, and the alveolar-capillary membrane returns to more normal function. At least two studies suggest that recovery does not occur within 90 to 100 days.

One group of workers particularly concerned about lung changes that can cause predisposition to pulmonary edema are professional and recreational divers. In order to be certified to dive, they require medical clearance after pulmonary infections, since the lungs may be sensitive to damage from changes in pressure during diving and breath holding. Damage to the pulmonary capillary member can predispose them to air embolism, for example, a deadly event.[10] Frank Hartig, a German physician who is also a diver, followed six divers for six weeks who tested positive for COVID-19. Although the patients had only mild symptoms, their lung CT scans showed dramatic changes typical of COVID. At 6 weeks after their infection,[11] and after all apparent symptoms had resolved, four patients still had dramatic lung changes on CT, and two had an abnormal exercise test (low blood oxygen with exercise). *None* could be recertified to return to diving.[12]

Sonnweber et al., followed COVID-19 patients and found that a significant number of patients who had symptomatic infections were still experiencing symptoms 100 days after their initial infection, and that CT abnormalities, while improving, still persisted.[13] Zhao et al., found persistent radiographic changes in the lungs three months after COVID infection in 71% of patients.[14]

## CONCLUSION

Infection with the COVID-19 virus leads to significant lung damage, including diffuse alveolar damage and damage to the pulmonary capillaries, both of which are sites at which high blood levels of barbiturates cause erosion and pulmonary edema. Significant damage is present and demonstrable on CT scans in the majority of *asymptomatic* patients, and in at least 79% of patients who have *any symptoms*. The presence of COVID-19 virus-mediated damage to the alveoli and pulmonary capillaries will predispose prisoners undergoing lethal injection with a barbiturate overdose to severe additional damage by the intravenous drug. Damage to their lungs will happen more quickly with less drug (i.e. lower blood levels) than prisoners who do not have such infections. Evidence of flash pulmonary edema has been demonstrated in 100% of

---

[10] Russell, MC. New advice cautions against rushed return to diving for coronavirus patients. DIVE. April 2020. Available at: http://divemagazine.co.uk/skills/8907-serious-problems-diving-after-covid19 Accessed Dec 20, 2020

[11] Six weeks is a common period of time for functional recovery following more typical types of pneumonia, and is the usual time for follow-up for pneumonia patients in clinical practice. Because not much was known about COVID this early in the pandemic, Dr. Hartig was timing his follow-up to correspond with usual practice. We now know that this is far too soon to assume recovery from COVID, as Dr. Hartig's own observations corroborated.

[12] Hartig F. Diving after COVID-19 disease? Wetnotes. April 15, 2020. Available at: https://www.wetnotes.eu/tauchen-nach-covid-19-erkrankung/ Accessed Dec 20, 2020

[13] Sonnweber T, et al. Cardiopulmonary recovery after COVID-19—an observational prospective multi-center trial. Eur Respir J. 2020: Dec 10; 2003481

[14] Zhao YM, et al. Follow-up study of the pulmonary function and related physiological characteristics of COVID-19 survivors three months after recovery. EClnicalMedicine 2020 Aug; 25:100463

autopsies in which a full examination of the lungs has been documented, and therefore is a virtual certainty following pentobarbital lethal injection. In prisoners who have COVID-19 lung damage, flash pulmonary edema will occur even earlier during the injection process, and before brain levels of drug have peaked.

**It is my expert opinion,** to a reasonable degree of medical certainty, that prisoners with recent or concurrent COVID infection will experience earlier onset of flash pulmonary edema, and more prolonged and severe symptoms of drowning and suffocation. It is further my opinion based on my professional experience and my review of the medical literature that the effects of COVID-19 infection on the lungs are present for at least three months (90-100 days) following COVID infection, and will result in the prisoner experiencing earlier and more prolonged sensations of suffocation and drowning associated with flash pulmonary edema.

Signed: _Paula A. Van Norm, MD_   Date: _12/22/2020_

6

# EXHIBIT 3

**DECLARATION OF DR. MICHAEL STEPHEN**
**PURSUANT TO 28 U.S.C. § 1746**

I, Michael Stephen, M.D., being of sound mind and lawful age hereby state under penalty of

perjury as follows:

1.        I am an Associate Professor of Medicine at Thomas Jefferson University in the

Department of Medicine and Division of Pulmonary and Critical Care.  I graduated from Boston

University School of Medicine in 2001.  Thereafter, I completed a residency at Beth Israel

Deaconess Medical Center, and a fellowship at the University of Pennsylvania.  I am board

certified by the American Board of Internal Medicine in Internal Medicine, Pulmonary Medicine,

and Critical Care Medicine.   I hold a medical license from the states of Pennsylvania and

California.   A copy of my curriculum vitae is attached as Exhibit 1.

2.        My regular practice includes treating patients in the intensive care unit for

pneumonia, acute liver failure, encephalopathy, septic shock, acute respiratory failure and

congestive heart failure. I regularly encounter complex cases of combined cardiac and

pulmonary physiology issues. Many patients are sent to our hospital for second opinions. I have

also been on the front line in treating COVID-19 patients, both in the intensive care unit as well

as on the general medical floors.  I have personally performed or supervised the care of hundreds

afflicted with the COVID-19 virus and I consider myself up to date on the manifestations and

care for these patients.

3.        At the request of the Federal Community Defender Office for the Eastern District

of Pennsylvania, I have reviewed medical records pertaining to Dustin Higgs, including a

December 16, 2020 positive result for COVID-19 RNA; the federal government's lethal

1

injection protocol; and several medical opinions related to the federal government's lethal injection protocol.

4.      The medical opinions I reviewed are as follows: a June 25, 2020 declaration of Joseph Antognini, M.D., M.B.A.; a supplemental declaration of Joseph Antognini dated June 30, 2020; a second supplemental declaration of Joseph Antognini dated September 11, 2020; a third supplemental declaration of Joseph Antognini dated October 9, 2020; a fourth supplemental declaration of Joseph Antognini dated December 8, 2020; a declaration of Kendall Von Crowns, M.D. dated August 10, 2020; a declaration of Kendall Von Crowns dated December 7, 2020; a declaration of Mark Edgar, M.D. dated October 24, 2019; a declaration of Gail Van Norman dated November 1, 2019; a supplemental declaration of Gail Van Norman dated July 1, 2020, a second supplemental declaration of Gail Van Norman dated August 9, 2020, a third supplemental declaration of Gail Van Norman dated September 29, 2020; an affidavit of Dr. Craig Stevens, Ph.D. dated October 22, 2019; a declaration of Dr. Joel Zivot, M.D., dated August 31, 2020; and a supplemental declaration from Joel Zivot dated December 3, 2020.

5.      I agree with the declarations and supplemental declarations of Dr. Gail Van Norman and Dr. Joel Zivot and Dr. Mark Edgar.

6.      I have been asked to address the following question: how, if at all, a December 16, 2020 positive COVID-19 diagnosis will affect the scheduled January 15, 2021 execution of Mr. Higgs under the federal government's lethal injection protocol.

7.      To form my opinion I have considered the effects of the COVID-19 virus, Mr. Higgs's underlying medical conditions, and the federal government's lethal injection protocol.

8.      COVID-19 generally infects the upper respiratory system first, and has the ability to travel to the lower respiratory system and cause pneumonia. The virus can also get into the

bloodstream, and it commonly attacks the heart, liver, and brain, along with the vasculature. Blood clots are very common in this disease.  Some clots remain in the legs, while some travel to the lungs and cause issues including stress on the heart. Heart failure from depressed heart function is also a common manifestation. Pneumonia, even in asymptomatic patients, is extremely common.

9.      The potential for overt disease is of course possible in COVID-19, but sub-clinical symptoms where an organ is affected but not enough for a patient to necessarily notice is also very well described in the medical literature. Patients with sub-clinical symptoms frequently manifest with either fatigue or mild shortness of breath. There is also clear potential for organ dysfunction with no symptoms whatsoever, as very well documented in the medical literature with pneumonia and kidney disease. The manifestations of COVID-19 can also be spread out over a lengthy period of time, with different organs presenting with disease in the same patient over a widely spread out time period. One large study on blood clots showed a range of presentation from initial diagnosis of COVID-19 to a diagnosis of blood clots to be from 4 to 22 days.[1] Evidence of blood clots in this same study is referenced as high as 30% in certain cases.[2] Heart disease from COVID-19 has also been shown to be quite common, with one study using cardiac MRI demonstrating 78% of patients had abnormal imaging in those who have recovered from COVID.[3] Another study showed that in 62% of cardiac specimens, COVID-19

---

[1] Sakr Y, Giovini M, Leone M et al. Pulmonary embolism in patients with coronavirus disease 2019 pneumonia: a narrative review. Annals of Intensive Care 2020;124.

[2] Sakr Y, Giovini M, Leone M et al. Pulmonary embolism in patients with coronavirus disease 2019 pneumonia: a narrative review. Annals of Intensive Care 2020;124.

[3] Puntmann  VO, Carerj  ML, Wieters  I,  et al.  Outcomes of cardiovascular magnetic resonance imaging in patients recently recovered from coronavirus disease 2019 (COVID-19).  *JAMA Cardiol*. Published online July 27, 2020.

was detectable.[4] The incidence of pneumonia, even in completely asymptomatic patients, is

extremely high. One study of 58 completely asymptomatic COVID-19 patients showed evidence

of pneumonia on CT scans in 55 out of 58 patients, or 94.8%.[5]As demonstrated in a recent

Nature Reviews Nephrology paper, asymptomatic patients can have ongoing kidney damage that

includes endothelial damage, coagulopathy, complement activation, and inflammation from the

direct viral effects of the virus.[6]

10.     We are currently seeing many COVID-19 patients come to the hospital with sub-

clinical heart failure as well as sub-clinical blood clots in their lung and/or pneumonia. Heart

failure in patients with COVID-19 is quite clearly a case of the virus attacking their heart,

causing depressed function. This depressed function may cause over heart failure requiring

oxygen or even mechanical ventilation. Others, however, may only have symptoms of mild

breathlessness or even fatigue, but a complete workup on these patients often reveals decreased

heart function, small clots in the lung that impede heart function, or pneumonia.

11.     I am not only seeing these patients in a hospital setting, but also commonly in my

office. They come to our practice with a distant COVID diagnosis from weeks or months prior,

and have fatigue or simply difficulty sleeping. A full workup again can yield newly depressed

heart function or blood clots in the lung. This is one of the frustrating things about COVID-19: in

---

[4]Lindner  D, Fitzek  A, Bräuninger  H,  et al.  Association of cardiac infection with SARS-CoV-2 in confirmed COVID-19 autopsy cases.  *JAMA Cardiol*. Published online July 27, 2020. doi:10.1001/jamacardio.2020.3551

[5]Meng H, Xiong R, He R et al. CT imaging and clinical course of asymptomatic cases with COVID-19 pneumonia at admission in Wuhan, China. J Infection 2020; 81: e33-e39.

[6] Nadim MK, Forni LG, Mehta RL et al. COVID-19 associated acute kidney injury: a consensus report of the 25[th]Acute Disease Quality Initiative Workgroup. Nature Reviews Nephrology 2020, October 15. See Figure 1.

some people it causes no symptoms, in some it leads to a rapid decline and death, and in others there are subtle but potentially deadly manifestations that crop up weeks and often months after an initial diagnosis. This is noted by the Centers for Disease Control (CDC), who states that the COVID-19 related syndrome of "multisystem inflammatory syndrome in adults" can occur "days to weeks," after contracting the virus.[7] The reason for this is likely that COVID-19 turns from an infectious disease into one of autoimmunity, which can then easily manifest as heart failure, blood clots, or strokes.

12.     Upon reviewing the medical records of Mr. Higgs, it is quite clear he has serious underlying asthma issues as he is maintained on a continuous high dose of inhaled steroids, in his case mometasone. He has had asthma exacerbations over the years, and has required the use of nebulizer treatments. He also has underlying structural heart disease, as documented by an electrocardiogram of 2010, which showed left atrial enlargement and likely left ventricular hypertrophy. These findings are again seen on his very recent electrocardiogram of November 12, 2020. The enlarged left atrium is confirmed on an ultrasound of his heart from May 26, 2020. Even more concerning, the ultrasound of his heart shows significant mitral valve disease with moderate mitral valve regurgitation and anterior leaflet dysfunction. This is likely from his longstanding hypertension, which in his case is clearly significant as he is maintained on three medications to control his blood pressure.

13.     Mr. Higgs's significant underlying structural heart disease certainly puts him at higher risk of COVID-19 related heart issues. This higher risk of COVID-19 heart issues in those with underlying heart disease is documented in a recent Journal of the American Medical

---

[7] https://www.cdc.gov/mis-c/mis-a.html

Association paper.[8] His left atrium is enlarged, and that quite clearly puts him at risk from any issues from heart failure, as an enlarged left atrium ineffectively pumps blood to the left ventricle, further putting him at risk for fluid to back up into his lungs (pulmonary edema).

14.     Given that he has received a recent positive COVID-19 diagnosis, it is my opinion that an injection of pentobarbital would create a substantial risk of extreme suffering in the case of Mr. Higgs. Pentobarbital is a known cardiac depressant, which will be given to a patient with known significant structural heart disease, who also has the very real potential for COVID-19 related dysfunction in his lungs, kidneys, vasculature, heart or all four.. Pneumonia itself, which as mentioned is seen in up to 94.8% of asymptomatic COVID-19 patients, is a known risk factor for triggering heart failure. Kidney disease and inflammation, as noted in the Nature Nephrology Reviews paper, occurs in asymptomatic patients, and is of course also a very well known trigger for heart failure. Given these facts, there is a substantial risk that an injection of pentobarbital will induce sudden onset congestive heart failure (flash pulmonary edema) in Mr. Higgs, which mimics a drowning with the sense of suffocation it induces.

15.     Based on my experience, the prudent action in this case would be to wait a full eight weeks from diagnosis and then reassess his cardiopulmonary status to ensure an injection of a cardio-depressant drug like pentobarbital would not put him at risk of a cruel death. The eight week period of observation is based on personal experience of the time period patients with COVID-19 are presenting to me with symptoms from diagnosis.

16.     I hold the above opinions to a reasonable degree of medical certainty.

---

[8]Freany PM, Shah SJ and SS Kahn. COVI-19 and Heart Failure with Preserved Ejection Fraction. JAMA 2020, September 30th.

Date:   12/22/2020

_____

Michael J. Stephen, M.D.

# EXHIBIT 1 TO EXHIBIT 3

Michael J. Stephen MD
Curriculum Vitae

Home Address:              409 E Summit Ave
                           Haddonfield, NJ  08033
                           (617) 645-8443
                           michael.stephen@jefferson.edu

Work Addresses:            Thomas Jefferson University
                           834 Walnut St, Suite 650
                           Philadelphia PA 19107
                           Phone 215-955-5161
                           Fax 215-955-8668

Education                  8/97-5/01     MD            Boston University
                           9/91-5/95     AB, History   Brown University

Postgraduate Training and Fellowship Appointments:

                6/01-6/02     Intern in Medicine, Beth Israel Deaconess Medical
                              Center, Boston MA
                7/02-7/04     Resident in Medicine, Beth Israel Deaconess Medical
                              Center, Boston MA
                7/05-12/08    Fellow in Pulmonary and Critical Care Medicine
                              University of Pennsylvania

Faculty Appointments:    6/01-7/04     Clinical Instructor in Medicine
                                        Harvard Medical School
                         7/04-6/05     Assistant Clinical Professor in Medicine
                                        Tufts University
                         1/09-8/09     Instructor of Medicine
                                        University of Pennsylvania
                         11/09-6/11    Instructor of Medicine
                                        Mt Sinai School of Medicine
                         7/11-11/19    Associate Professor of Medicine
                                        Drexel University College of Medicine
                         12/1-present  Associate Professor of Medicine
                                        Thomas Jefferson University

Work Experience:         7/04-6/05     Hospitalist Attending, Lemuel Shattuck Hospital
                                        Boston, MA 02130
                                        -Public Health Hospital of Massachusetts
                                        -Underserved Population
                                        -HIV and Tuberculosis Experience

                         8/09-10/09    Volunteer, Groote Schuur Hospital,
                                        Cape Town, South Africa
                                        -Pediatric and Adolescent HIV work
                                        -Tuberculosis management
                                        -Township Urgent Care Clinics

                         11/09-6/11    Instructor of Medicine, Mt Sinai Hospital
                                        New York, NY 10029
                                        -Attending on Inpatient Transplant Service
                                        -Member, ILD outpatient group
                                        -General Consult and MICU attending

                         7/11-present  Associate Professor of Medicine, Drexel University

|  |  | Philadelphia, PA 19102 |
|  |  | -Program Director, Adult Cystic Fibrosis Center |
|  |  | -Program Director, Pulmonary Fellowship Program |
|  |  | -General Consult and MICU Attending |

| Research Experience: | 7/03-11/03 | Molecular Biology Gene Promoter Isolation |
|  |  | -Isolation of Inflammatory Genes in Pneumonia |
|  |  | Cystic Fibrosis Lab |
|  |  | Harvard Medical School, Boston MA |
|  | 1/07-8/09 | MRI and Functional Lung Imaging |
|  |  | -Development of Helium MRI in two models of IPF |
|  |  | In animals.  NIH R21 funded. |
|  |  | Hospital of University of Pennsylvania, Phila PA |

| Special Certifications: | 2004 | ABIM- Internal Medicine #227647 |
|  | 2006 | Advanced Trauma Life Support |
|  | 2008 | ABIM- Pulmonary Disease |
|  | 2009 | ABIM- Critical Care Medicine |
|  | 2009 | Certificate in Clinical Epidemiology, University of Pennsylvania |
|  | 2013 | Neurocritical Care Board Certification, UCNS |
|  | 2014 | DEA License #FS2503298 |
|  | 2015 | ABIM- Recertification in Internal Medicine |
|  | 2019 | ABIM- Recertification in Pulmonary Medicine |
|  | 2019 | ABIM- Recertification in Critical Care Medicine |

| Licensure: | California #88030, Pennsylvania #MD432837 |

Memberships in Professional and Scientific Societies:

| | 5/07-present | American Thoracic Society |

| Outside Interests: | Running, Completed 2018 Lehigh Valley Marathon. |
|  | Writing: Published pieces in Philadelphia Inquirer, STAT news, Philly Voice |

| Committees | 2012-2015 | Education Committee, Cystic Fibrosis Foundation. |
|  | 2019 | Program for Adult Care Excellence Committee, Cystic Fibrosis Foundation |
|  | 2016-2019 | Utilization Review Committee, Hahnemann Hospital |

| Educational Activities | StreetSide Clinic Preceptor, January 2012-2017 |

## **Funding:**

Mental Health Coordinator Award, Cystic Fibrosis Foundation. Adult Cystic Fibrosis Center Drexel University.  2016-2019.  Principle Investigator.

Therapeutic Development Network, Cystic Fibrosis Foundation. Adult Cystic Fibrosis Center Drexel University, 2013-present.  Principle Investigator.

State of Pennsylvania Fund for Orphan Diseases, Cystic Fibrosis Adult Center Drexel University. 2012- present.  Principle Investigator.

Cystic Fibrosis Foundation Grant, Adult Cystic Fibrosis Center, Drexel University, 2014-present. Principle Investigator.

Program for Adult Care Excellence Grant, Cystic Fibrosis Foundation. 2009-2010, 2012-2014.

Principle Investigator.

**Papers:**

O'Hayer, CV, O'Loughlin CM, Nurse CN, Smith PJ, Stephen M. ACT with CF: A telehealth and in person feasibility study to address anxiety and depressive symptoms among people with cystic fibrosis. Journal of Cystic Fibrosis 2020; December.

Stephen M, Fiel S, Zanni R, Hadjiliadis D. Prevalence of Medical Marijuana Use in Cystic Fibrosis. BMC Complementary Medicine 2020;323.

Woytanowski JR, Ko W, Granche J, Stephen M. Outcomes of Septic Patients Requiring Renal Replacement Therapy. Journal of the Intensive Care Society, April 2020

Abramian O, Singhal S, Stephen M. A 49-year-Old Man with cough and hand, wrist and knee pain. Chest, February 2020.

Stephen M, Goss C. A Set Length of Antibiotics for an Acute Exacerbation of Cystic Fibrosis, A Pro/Con. Lancet Respiratory Medicine 2018; 6;573-5.

Weintraub Z, Hadjiliadis D, Jagpal S, Stephen M. Attitudes Towards Lung Transplant in Cystic Fibrosis. Preparing Manuscript for Submission.

Stephen M, Hadjiliadis D, Holsclaw D, Zanni R, Fiel S, Bonsall C. A Prospective Study of Daily Spirometry in Acute Exacerbations of Cystic Fibrosis Patients. Chronic Respiratory Disease, December 2017.

Stephen M, Weintraub Z. Evaluation of Adherence with Inhaled Antibiotic Regimens and Outcomes in Adults with Cystic Fibrosis. Drexel Medical Journal 2016.

Stephen M, Emami K, Woodburn JM, Chia E, Kadlecek S, Zhu J, Pickup S, Ishii M, Rizi R, Rossman M. Quantitative Assessment of Lung Ventilation and Microstructure in an Animal Model of Idiopathic Pulmonary Fibrosis. Academic Radiology. 2010; 17:1433-43.

Stephen M and Hadjiliadis D. The New Lung Allocation Score for Lung Transplantation: What Has Changed and Why? Clinical Pulmonary Medicine. 2009; 16:45-50.

Emami K, Stephen M, Kadlecek S, Cadman RV, Ishii M, Rizi RR. Quantitative assessment of lung using hyperpolarized magnetic resonance imaging. Proc Am Thorac Soc 2009; 6:431-8.

Yu J, Law M, Kadlecek S, Emami K, Ishii M, Stephen M, Woodburn JM, Vahdat V, Rizi RR. Simultaneous measurement of pulmonary partial pressure of oxygen and apparent diffusion coefficient by hyperpolarized 3He MRI. Magn Reson Med. 2009; 61:1015-21.

Ishii M, Emami K, Kadlecek S, Petersson JS, Golman K, Vahdat V, Yu J, Cadman RV, MacDuffie-Woodburn J, Stephen M, Lipson DA, Rizi RR. Hyperpolarized 13C MRI of the Pulmonary Vasculature and Parenchyma. Magn Reson Med 2007; 57:459-463.

**Book Chapters:**

Cystic Fibrosis and Non-CF Bronchiectasis. Scientific American Medicine, January 2014.

Pulmonary Complications of Pregnancy, in Complications of Pregnancy. Pmph USA, September 2012.

**Speaker:**

"Use of Alternative Medicines in Cystic Fibrosis." Symposium on Alternative Therapies for Cystic Fibrosis. North American Cystic Fibrosis Conference 2017, Indianapolis Indiana.

"Lung Transplant and Cystic Fibrosis: Implications of the Lung Allocation Score." Symposium on Issues in Lung Transplantation. North American Cystic Fibrosis Conference 2012, Orlando Florida.

"Hyperpolarized 3He in the Assessment of Two Rat Interstitial Lung Disease Models of IPF." Mini-Symposium, American Thoracic Society, 2009 San Diego California.

"Assessment of Pre- and Post-Lung Volume Reduction Surgery Changes in Lung Function and Structure - A Rat Emphysema Model." Mini-symposium, American Thoracic Society, 2008 Toronto Canada.

**Clinical Trial Studies, Principle Investigator:**

A Prospective Phase 2 Study of Lenabasum in Cystic Fibrosis Patients. Corbus Pharmaceuticals, JBT-101. Completed 11/19.

A Prospective Observational Study in Cystic Fibrosis Patients with Chronic Respiratory Pseudomonas Aeruginosa Infection Treated with Tobi® Podhaler™ (Tobramycin Inhalation Powder) Or Other Fda Approved Inhaled Antipseudomonal Antibacterial Drugs. Novartis, Ctbm100c2407. Completed 12/19.

A Prospective, 5-year Registry Study to Monitor the Susceptibility to Aztreonam of Pseudomonas aeruginosa Isolates from Patients with Cystic Fibrosis in the United States. Gilead Sciences, GX-US-205-0128. Completed 12/19.

A Long-Term Prospective Observational Safety Study of The Incidence of And Risk Factors for Fibrosing Colonopathy In Us Patients with Cystic Fibrosis Treated with Pancreatic Enzyme Replacement Therapy: A Harmonized Protocol Across Sponsors, Cffc-Ob-11. Completed 12/19.

A Prospective Phase 2 Study of PTI-428 in Cystic Fibrosis Patients Homozygous for delF508. Proteostasis. Completed.

A Prospective Phase 3 Study of Tezacaftor/Lumacaftor/659 in Cystic Fibrosis Patients Heterozygous for delF508. Vertex, VX-659. Completed 11/19.

A Phase 3 Efficacy and Safety Study of Ataluren (Ptc124®) In Patients with Nonsense Mutation Cystic Fibrosis. Ptc Therapeutics Ptc124-Gd-021-Cf. Completed.

The Use of Home Spirometry to follow Acute Exacerbations of Cystic Fibrosis. Completed.

A Prospective Study of Ivacaftor/Lumacaftor in Cystic Fibrosis Patients Heterozygous for delF508. Vertex, VX-102. Completed.

A Prospective Study of Ivacaftor/Lumacaftor in Cystic Fibrosis Patients Homozygous for delF508. Vertex, VX-105. Completed.

Alternating Inhaled Antibiotic Therapy in Cystic Fibrosis Patients Chronically Colonized with Pseudomonas Aeruginosa. Gilead Sciences. Completed.

**Abstracts:**

**CF Related Abstracts:**

Weintraub Z, Stephen M. Attitudes of Cystic Fibrosis Patients Towards Lung Transplant. American Thoracic Society 2019; Dallas, Texas.

Mills N, Stephen M. Challenges Facing Mothers with Cystic Fibrosis: A Survey. American Thoracic Society 2019; Dallas, Texas.

O'Hayer CV, Aikens RV, Stephen M. ACT with CF: Promising Conclusion of Telehealth. North American Cystic Fibrosis Conference 2018; Denver, Colorado.

Tahir S, Woytanowski J, Stephen M. Sleep Quality in Relation to Pulmonary Function in patients with Cystic Fibrosis. American Thoracic Society 2018; San Diego, California.

Randhawa E, Bhandari S, Stephen M. Mycobacterium Abscessus in Patient with Cystic Fibrosis. American Thoracic Society 2018; San Diego California.

Ahmad D, Zanni R, Marmolejos G, Stephen M. Side Effect Profile of Lumacaftor/Ivacaftor. North American Cystic Fibrosis Conference 2017; Indianapolis, Indiana.

O'Hayer CF, Edouard G, Stephen M. ACT Via Telehealth: Acceptance Based Behavioral Therapy for Anxiety and Depression Among Individuals with Cystic Fibrosis. North American Cystic Fibrosis Conference 2017; Indianapolis, Indiana.

Chowdhury J and Stephen M. Complementary and Alternative Medicine in Cystic Fibrosis Patients. North American Cystic Fibrosis Conference 2017; Indianapolis, Indiana

Ahmad D, Patel M, Mills N, Stephen M. Real World Experience of Lumacaftor-Ivacaftor. North American Cystic Fibrosis Conference 2016; Orlando, Florida.

Breeding Z, Stephen M. Use of Pancreatic Enzyme Management Smartphone App in Adult CF Patients. North American Cystic Fibrosis Conference 2016; Orlando, Florida.

Wolfe W, O'Hayer CV, Taylor D, Stephen M. Acceptance and Commitment Therapy with CF: A Telehealth Pilot Study. North American Cystic Fibrosis Conference 2016; Orlando, Florida.

Stephen M, Hoag J, Thakur, T. Evaluation of Tolerability of Tobramycin Inhalation Powder in An Adult Cystic Fibrosis Population. North American Cystic Fibrosis Conference 2015; Phoenix, Arizona.

Stephen M, Weintraub Z. Evaluation of Adherence with Inhaled Antibiotic Regimens and Outcomes in Adults with Cystic Fibrosis. North American Cystic Fibrosis Conference 2015; Phoenix, Arizona.

Hoag J, Stephen M, Hadjiliadis D, Cohen R. Clinical Effectiveness of Off-Label Ivacaftor Use in Patients with Cystic Fibrosis. North American Cystic Fibrosis Conference 2015; Phoenix, Arizona.

Stephen M, Bonsall C, Hadjiliadis D, Zanni R, Varlotta L, Fiel S, Holsclaw D. Update: A Prospective Study of Daily Home Spirometry in Adult Cystic Fibrosis Patients. North American Cystic Fibrosis Conference 2014; Atlanta, Georgia.

Stephen M, Bonsall C, Hadjiliadis D, Zanni R, Varlotta L, Fiel S, Holsclaw D. A Prospective Study of Daily Home Spirometry in Adult Cystic Fibrosis Patients. North American Cystic Fibrosis Conference 2013; Salt Lake City, Utah.

Hoag JB, Hendry M, Hillman J, Garces J, Rosse K, Smith B, Delany-Hudzik M, Hudzik E, Stephen MJ, Sherman M. Utilization of Quality Improvement Initiative to Increase Adherence with Routine Clinic Appointments for Patients with Cystic Fibrosis. North American Cystic Fibrosis Conference, 2012; Orlando, Florida.

Stephen M, Hendry M, Hoag J, Garces J, Smith B. Lung Transplant and Cystic Fibrosis: Implications of the Lung Allocation Score. North American Cystic Fibrosis Conference, 2012; Orlando, Florida.

Stephen M, Back S, Altes TA, Holsclaw D, Lingaraju R, Ferrin M. CT Scans as a Predictor of Pulmonary Function in Adult CF. North American Cystic Fibrosis Conference, 2007; Anaheim, CA.

Back S, Altes TA, Lipson D, Lingaraju R, Ferrin M, Stephen M, Hadjiliadis D.  Routine CT Scanning of Adult Patients with Cystic Fibrosis.  American Thoracic Society, 2007; San Francisco, CA.

**Other Abstracts:**

Marmolejos G, Stephen M, Tuttle E, van der Rijst N. Cutting Through the Submassive. Update on Pulmonary Embolism and CTEPH. American Thoracic Society 2019; Dallas Texas.

N. Hinds, JR Woytanowski, MJ Stephen. Outcomes of Hemoptysis in Sarcoid. Diffuse Parenchymal Lung Diseases: Basic And Clinical Studies. American Thoracic Society 2019; Dallas Texas.

Randhawa E, Stephen M. Evaluation of CT Angiograms from the Hahnemann Emergency Room of CT Angiograms from the Hahnemann Emergency Room. Here we Clot Again: Clinical Studies in PE and CTEPH. American Thoracic Society 2018; San Diego California.

Woytanowski JR, Rincon-Prieto C, Stephen M. Outcomes of Septic Patients Requring New Onset Renal Replacement Therapy – A Single Center Retrospective Analysis. Crtical Care: Beyond the Lungs. American Thoracic Society 2018; San Diego California.

Bakhsh K, Abramian O, Mills N, Stephen MJ. FIRST: Female Inequality Represented in Subspecialty Training-The Gender Divide in Pulmonary Critical Care Medicine. Emerging Strategies to train Medical Professionals. American Thoracic Society 2017; Washington, D.C.

Rincon-Prieto C, Stephen MJ, Woytanowski JR. Pulmonary Manifestation of IBD: A Case Report. Autoimmune Lung Disease: Case Reports. American Thoracic Society 2017; Washington, D.C.

Figueroa AM, Abramian O, Bakhsh K, Stephen MJ. Retrospective Study of Outcomes in the Medical Intensive Care Unit for Cirrhotic and Noncirrhotic Liver Failure Patients. Critical Care: More Non-Pulmonary Critical Care Problems. American Thoracic Society 2017; Washington, D.C.

Dago-oc JR, Stephen M, Kasarabada A. Diagnosing Tuberculosis at Hahnemann University Hospital: A Quality Improvement Project. Identifying Effective Treatment Options in Pulmonary and Critical Care. American Thoracic Society 2017; Washington, D.C.

Heckert G, and Stephen M. Steroid Use in Inpatient COPD Patients. American Thoracic Society 2016; San Francisco California.

Dago-oc J, Stephen M, Kasarabada A. Efficiency of Tuberculosis Evaluation in an Inpatient Setting. American Thoracic Society 2015; Denver, Colorado.

Salim A and Stephen M. A Chronic Asthmatic with HyperIgE Presenting at an Adult Cystic Fibrosis Center. Drexel Student Research Day, 2015.

Patel N, Dimaghi N, and Stephen M. Assessing Mortality in the Medical Intensive Care Unit of Interfacility Transferred MICU Patients. Chest Meeting 2014; Austin, Texas.

Stephen M and Khan I. Sarcoidosis and Lung Transplant before and after the LAS. American Thoracic Society 2012; San Francisco, California.

Stephen M, Emami K, Kadlecek S, Woodburn J, Vahdat V, Yu J, Ishii M, Cadman RV, Rizi RR, Rossman M.  Hyperpolarized 3He in the Assessment of Two Rat Interstitial Lung Disease Models of IPF.  American Thoracic Society 2009; San Diego, California.

Emami K, Kadlecek S, Woodburn J, Vahdat V, Yu J, Ishii M, Cadman RV, Stephen M, Rizi RR.  Regional Measurement of Lung Ventilation in Large Animals Using Hyperpolarized 3He MRI. American Thoracic Society, 2008; Toronto, Canada.

Emami K, Kadlecek S, Woodburn J, Pickup S, Cadman RV, Yu J, Ishii M, Stephen M, Rizi RR. Dependency of 3He Apparent Diffusion Coefficient Measurements on Positive End-Expiratory Pressure. American Thoracic Society, 2008; Toronto, Canada.

Emami K, Kadlecek S, Woodburn J, Guyer RA, Pickup S, Cadman RV, Vahdat V, Yu J, Ishii M, Stephen M, Rizi RR.  High Resolution Mapping of Mouse Lung Alveolar Structure Using Apparent Diffusion Coefficient of 3He. American Thoracic Society, 2008; Toronto, Canada.

**\*\*\*EXECUTION SCHEDULED FOR JANUARY 15, 2021\*\*\***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL** | ) | |
| **BUREAU OF PRISONS' EXECUTION** | ) | |
| **PROTOCOL CASES,** | ) | |
| | ) | |
| **Lead case:**   *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| *Roane et al. v. Barr et al.*, No. 05-cv-2337 | ) | |

<u>**MOTION FOR PRELIMINARY INJUNCTION BARRING THE EXECUTION**</u>
<u>**OF PLAINTIFF DUSTIN HIGGS**</u>

Plaintiff Dustin Higgs respectfully moves the Court to enter a preliminary injunction

pursuant to Fed. R. Civ. P. 65(a) enjoining Defendants from carrying out the scheduled execution

of Mr. Higgs on January 15, 2021, or at any other time until further order of this Court, and to

grant an evidentiary hearing. For the reasons stated in the accompanying Memorandum of Points

and Authorities, the Court should enter a preliminary injunction barring Mr. Higgs's scheduled

execution pursuant to the 2019 Protocol because this execution would violate the Eighth

Amendment. Pursuant to Local Rule 7(m), undersigned counsel has conferred with Defendants

concerning this motion, and Defendants advise that they oppose a preliminary injunction.

Dated:  December 22, 2020

Respectfully submitted,

*/s/ Alex Kursman*
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: alex_kursman@fd.org

*Counsel for Plaintiff Dustin Higgs*

***EXECUTION SCHEDULED FOR JANUARY 15, 2021***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,<br><br>Lead case:   *Roane et al. v. Barr et al.*<br><br><br>THIS DOCUMENT RELATES TO:<br><br>*Roane et al. v. Barr et al.*, No. 05-cv-2337 | )<br>)<br>)<br>)<br>)<br>)<br>)   **Case No. 19-mc-00145-TSC**<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION BARRING THE EXECUTION OF PLAINTIFF DUSTIN HIGGS

In accordance with Local Rule 7(a), Plaintiff Dustin Higgs submits this statement of points and authorities in support of his motion for a preliminary injunction.

## BACKGROUND

On September 1, 2020, Mr. Higgs, who is a federal prisoner sentenced to death, filed a motion to intervene in *Roane et al. v. Gonzales et al.*, No. 05-2337, pursuant to Fed. R. Civ. P. 24(a) and (b), and attached a proposed complaint raising twelve claims for relief under the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution, the Administrative Procedure Act (APA), the Federal Death Penalty Act (FDPA), the Federal Food, Drug, and Cosmetic Act (FDCA), and the Controlled Substances Act (CSA). *See* ECF No. 229; 229-1. Count IV of Mr. Higgs's complaint raised an as-applied Eighth Amendment challenge to Defendants' 2019 execution protocol ("2019 Protocol") based on Mr. Higgs's underlying medical conditions and his likely exposure to COVID-19 while incarcerated at USP Terre Haute. The Court granted Mr. Higgs's motion to intervene on September 4, 2020.

1

Defendants filed a motion to dismiss Mr. Higgs's as-applied Eighth Amendment challenge on November 3, 2020. ECF No. 306. On November 20, 2020, Defendants scheduled Mr. Higgs's execution for January 15, 2021. *See* ECF No. 330. On December 4, 2020, Mr. Higgs filed an amended and supplemental complaint raising two additional claims: (1) Defendants' planned execution of Mr. Higgs using pentobarbital is unconstitutional as an *ex post facto* law; and (2) Defendants' arbitrary selection of Mr. Higgs for execution violates the Fifth and Eighth Amendments and is arbitrary and capricious in violation of the APA. ECF No. 343-1. Concurrently, Mr. Higgs filed a motion for preliminary injunction barring his execution (ECF No. 344) based on these two claims and on his as-applied Eighth Amendment claim (Count IV of Mr. Higgs's complaint, ECF No. 229-1).

This Court dismissed Mr. Higgs's as-applied Eighth Amendment challenge on December 9, 2020. ECF No. 354. The Court noted that Mr. Higgs's injury was "hypothetical" because Mr. Higgs had not alleged that he had "any reason to believe that he contracted the virus aside from that fact that he is incarcerated. Thus, given the speculative nature of the allegations in the Complaint, the court is unable to find that Higgs has plausibly stated a claim that his execution is *sure or very likely* to cause serious illness and needless suffering." ECF No. 354 at 4 (internal quotation marks and citations omitted).

Mr. Higgs began experiencing symptoms of COVID-19 on December 13, 2020. He tested positive for the virus on December 16, and he was informed of the test result on December 17. Concurrently with this Motion, Mr. Higgs has filed an amended and supplemental complaint alleging that Defendants' use of the 2019 Protocol to execute Mr. Higgs would violate his right to be free from cruel and unusual punishment under Eighth Amendment due to his COVID-19 infection and underlying medical conditions. Mr. Higgs now seeks a preliminary injunction to

2

prevent Defendants from executing him pursuant to the 2019 Protocol in violation of the Eighth
Amendment.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of
the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v.
England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted). The moving party must
show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in
the absence of relief; (3) the balance of the equities weigh in his favor; and (4) an injunction is in
the public interest. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir.
2016). That standard is met here.

## I.     Plaintiff Higgs Is Likely To Succeed On The Merits Of His Claim

Mr. Higgs is likely to succeed on his as-applied Eighth Amendment claim. At the
preliminary injunction stage, a movant must "establish a likelihood that [he] can establish both
that [the 2019 Protocol] creates a demonstrated risk of severe pain and that the risk is substantial
when compared to the known and available alternatives." *Glossip v. Gross*, 135 S. Ct. 2726,
2737 (2015). Mr. Higgs has made that showing. His recent COVID-19 infection—particularly in
light of his underlying health problems—creates a demonstrated risk of severe pain if Defendants
carry out the 2019 Protocol on Mr. Higgs as planned on January 15, 2021.

### A.     The 2019 Protocol creates a demonstrated risk of severe pain for Mr. Higgs.

Mr. Higgs tested positive for COVID-19 late last week. Prior to his COVID-19 infection,
Mr. Higgs suffered from severe asthma and longstanding heart problems. Mr. Higgs's health
conditions create a substantial risk that Mr. Higgs will suffer from painful flash pulmonary
edema immediately upon injection of a high dose of pentobarbital, prior to becoming insensate

3

or dying.  The alternative methods of execution that Mr. Higgs proffers below will significantly reduce the substantial risk of severe pain associated with the planned execution of Mr. Higgs on January 15, 2020 under the 2019 Protocol.

### 1.   Mr. Higgs's COVID-19 infection

Mr. Higgs tested positive for COVID-19 on December 16, 2020. A few days prior to his positive test, he was experiencing chills and a cough. His son, Da'Quan Darby, visited Mr. Higgs on December 13 and 14, and observed his father coughing on both days. Mr. Higgs also repeatedly asked his son whether the visiting room was cold, and Mr. Darby had the impression that his father had chills. Decl. of Da'Quan Darby (Exhibit 1) at 1 ("Darby Decl."). Mr. Darby noticed that his father's symptoms were worse on the second day. *Id.* As of the date of this filing, Mr. Higgs continues to experience symptoms of COVID-19.

COVID-19 is "a highly contagious respiratory illness caused by a novel coronavirus (SARS-CoV-2)." Decl. of Joel A. Zivot, M.D. (Aug. 31, 2020) (ECF No. 303-4) at 3 ("Zivot Decl."). The illness originated in China but quickly spread across the globe, and the World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See* World Health Organization, *WHO Timeline – COVID-19*, https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (last visited Dec. 21, 2020).

COVID-19 causes lung damage in a majority of patients, including those who report experiencing only mild symptoms or no symptoms at all. In fact, in a study of COVID-positive passengers on the Diamond Princess cruise ship, CT scans revealed that "54% of patients who experienced *asymptomatic* infections still suffered the same severe lung changes (lung opacifications) seen in many hospitalized patients." Supp. Decl. of Gail Van Norman, M.D. (Dec. 22, 2020), at 4 ("Van Norman Supp. Decl. (Dec. 22, 2020)") (emphasis added). For

*symptomatic* patients, the percentage of patients with lung damage visible on a CT scan rose to 79%. *Id.* This finding has been corroborated by other emerging research on the effects of COVID-19 on the lungs. *Id.* "[i]t is clear now that even in mild infection—i.e. infection that is either asymptomatic or symptomatic but does not require hospitalization—significant damage is occurring in the lungs . . . ." *Id.*

The medical research that is currently available indicates that lung damage persists for months after initial infection with COVID-19, even when it appears superficially that a patient has recovered. One study followed a small group of professional divers who had developed mild symptoms of COVID-19. *Id.* at 5. When assessed six weeks after the development of symptoms, *none* of the divers could be certified to return to diving because all of them had impaired lung functioning. *Id.* Although research indicates that lung functioning in COVID patients does improve over time, *id.*, the available evidence indicates that it takes two months or more for patients to fully recover. *See* Decl. of Michael Stephen, M.D. (Dec. 22, 2020), at ⁋ 11 ("Stephen Decl.") (observing that in his clinical experience, it takes patients around eight weeks to fully recover from COVID-19).

### 2.  Mr. Higgs's underlying health conditions

Mr. Higgs has lifelong heart problems, including a cardiac murmur and a condition called mitral valve regurgitation, also known as mitral valve insufficiency. *See* Stephen Decl. at ⁋ 12 (noting that a recent electrocardiogram on November 12, 2020 and an ultrasound of his heart from May 26, 2020 show that Mr. Higgs has moderate mitral valve regurgitation, left atrial enlargement, and likely left ventricular hypertrophy).

Mitral valve regurgitation occurs when the mitral valve on the left side of the heart does not close properly, allowing blood to backflow or leak into the left atrium in the heart.

Supplemental Decl. of Joel B. Zivot, M.D. (Dec. 3, 2020) (ECF No. 344-2), at 2-3 ("Zivot Supp.

Decl.").  Over time, this condition can cause a patient to develop pulmonary edema:

> When a patient has mitral regurgitation, each contraction of the heart forces some blood backwards into the left atrium and then further backwards into the lungs. . . . In the normal functioning heart, when the left ventricle contracts, the mitral valve shuts, preventing blood from regurgitating backwards. At the same time, the aortic valve opens and permits the normal flow of blood forward. The pressure in the lungs is not high enough to block backwards flow without a functioning mitral valve. A competent and non-leaking mitral valve is the normal protection for the lungs from this blood under pressure. Extra fluid in the lungs, when severe, produces significant shortness of breath and is called congestive heart failure or pulmonary edema.

*Id.* at 3.

In addition, Mr. Higgs suffers from serious, lifelong asthma. Asthma is a chronic

respiratory condition characterized by reversible swelling of the airways. Zivot Decl. at 5.

"Common symptoms of asthma include shortness of breath, coughing, and wheezing." Zivot

Supp. Decl. at 5. Mr. Higgs's prison medical records document that he periodically experiences

"wheezing, difficulty breathing, coughing, and shortness of breath" as a result of his asthma.

Zivot Supp. Decl. at 2. He requires daily use of inhaled albuterol to manage his asthma even

under normal conditions, and "is maintained on a continuous high dose of inhaled steroids,"

indicating serious asthma. Stephen Decl. ¶ 12. In the past, he has experienced asthma

exacerbations and nebulizer treatments. *Id.*

### 3. The combination of Mr. Higgs's medical issues makes him especially likely to suffer severe pain from execution by pentobarbital

Mr. Higgs has alleged that the 2019 Protocol violates the Eighth Amendment because it

is likely to cause flash pulmonary edema resulting in severe pain. Mr. Higgs is especially at risk

of experiencing flash pulmonary edema while still sensate as a result of his underlying medical

conditions and exposure to COVID-19. Due to his current underlying health conditions, he also

6

faces the substantial risk of suffering a prolonged experience of flash pulmonary edema as compared to healthy individuals.

Flash pulmonary edema is a rapid accumulation of fluid in the lungs, which produces a sensation of drowning. *See* Decl. of Gail Van Norman, M.D., at 33-34 (Nov. 11, 2019) (ECF No. 24) ("Van Norman Decl."); Decl. of Mark A. Edgar, M.D., at 19-21 (Oct. 24, 2019) (ECF. No. 303-3) ("Edgar Decl."); Zivot Decl. at 2-3. As Dr. Van Norman has explained, "[n]ot being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man." Van Norman Decl. at 34. People who are drowning typically "will reach such a level of agony that they will be compelled to take a 'breath' within about 1 minute," as "[p]anic and terror, and the attempt to fight take over." *Id.* at 34; *see* Zivot Decl. at 3 ("Severe pulmonary edema creates the sensation of drowning."); Edgar Decl. at 3 ("[Pulmonary edema] produces sensations similar to drowning or asphyxiation as fluid occupies a greater volume of the air spaces.").

Importantly, the administration of pentobarbital does not induce a lack of consciousness or awareness, such that even a healthy individual is very likely to experience the excruciating pain of pulmonary edema while conscious. As Dr. Van Norman has explained, the effects of barbiturates like pentobarbital diminish *responsiveness* rather than *consciousness*. Although outdated "traditional textbooks and authors report that the inhibitory effects of barbiturates cause 'unconsciousness,'" "authoritative publications now describe barbiturates as producing 'unresponsiveness,' since how, and even whether, they affect consciousness is under serious question." Van Norman Decl. at 13; *see also id.* at 22-23, 28-29. The distinction between unresponsive and unconscious prisoners is crucial: "[E]ven when the patients appear to be

unconscious by all clinical measures and are unresponsive … consciousness will permit extreme pain and suffering during the execution process." *Id.* at 7.

Mr. Higgs's COVID-19 infection puts him at particular risk for flash pulmonary edema that would occur while he is still sensate. COVID-19 primarily affects the respiratory system and targets the lungs. Zivot Decl. at 4. "Infection with the COVID-19 virus causes severe damage to many areas in the airways and the lungs, but most specifically to the alveolar-capillary membrane, which is also the site of damage of massive barbiturate overdose." Van Norman Supp. Decl. (Dec. 22, 2020) at 2. Lung damage from COVID-19 thereby "sensitizes the lungs to more extensive and immediate further damage . . . , causing massive pulmonary edema at an earlier stage in the execution process before drug levels in the brain have peaked." *Id.* at 3. As Dr. Van Norman has explained:

> • COVID-positive prisoners, and those with recent COVID infections, are more susceptible to rapid and massive barbiturate damage, and this damage would occur long before the level of pentobarbital peaks in the brain;
>
> • Even if a 5-gram intravenous dose of pentobarbital would render a prisoner insensate under normal circumstance – which Dr. Van Norman disputes – a prisoner infected with COVID-19, or who has recently recovered from COVID-19, would experience a much more rapid and devastating onset of flash pulmonary edema at an earlier stage of the injection;
>
> • Thus, a prisoner who was COVID-positive, or who has recently recovered from COVID-19, would experience prolonged sensations of drowning and suffocation as compared to a healthy prisoner.

*Id.* at 4; *see also* Zivot Decl. at 5-6 ("Because COVID-19 can cause lasting lung damage, a person injected with pentobarbital would experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19.").

With respect to Mr. Higgs specifically, "the sensation of suffocation or drowning" that execution by pentobarbital is likely to produce "would be further exacerbated by his asthma, which produces shortness of breath even without the presence of respiratory illness or barbiturates." Zivot Decl. at 5. For Mr. Higgs, the experience of

> pulmonary edema – which causes difficulty breathing due to a buildup of fluid in the lungs – [] would cause further strain on Mr. Higgs's already-impaired breathing. Compared to a person without asthma, Mr. Higgs would struggle for air more quickly and painfully after the onset of pulmonary edema because his asthma inflames and constricts his airways, making it more difficult for enough oxygen to reach his lungs even under normal circumstances. The suffering that Mr. Higgs would experience from pulmonary edema would be more severe because his asthma would have an additive effect, making his struggle for air more acute.

Zivot Supp. Decl. at 2.

Mr. Higgs's mitral valve regurgitation also increases the risk of flash pulmonary edema while sensate. Dr. Kendall Von Crowns, a medical expert retained by Defendants, has acknowledged that heart conditions like Mr. Higgs's can cause flash pulmonary edema in a prisoner executed with pentobarbital:

> I know there's a case report of an individual who developed flash pulmonary edema, but he had underlying heart issues, specifically mitral valve issues, as well as other heart problems. So his heart was already compromised when the flash pulmonary edema occurred.
>
> So in his situation, his flash pulmonary edema was the result of the fact that he already had a compromised heart which then resulted in him developing edema more rapidly than normal. So you have an individual that was already kind of critical when this occurred.

Evid. Hr'g Tr. (Sept. 18, 2020) at 18; *see also* Zivot Supp. Decl. at 2-3, 5-6.

Mr. Higgs's COVID-19 infection further exacerbates the risk created by his underlying heart condition, which "puts him at higher risk of COVID-19 related heart issues" and increases his risk of COVID-related pulmonary edema. Stephen Decl. at ⊩ 13. Because Mr. Higgs has an enlarged left atrium, he is particularly at risk for COVID-related heart failure, "as an enlarged left atrium ineffectively pumps blood to the left ventricle, further putting him at risk for fluid to back up into his lungs (pulmonary edema)." *Id.*

In sum, his "preexisting lung dysfunction conditions make Mr. Higgs particularly likely to experience pulmonary edema that he will experience as choking and drowning prior to the sedative properties of pentobarbital taking effect." Zivot Supp. Decl. at 5-6. Mr. Higgs's recent COVID-19 infection makes him particularly likely to "experience earlier and therefore more prolonged sensations of drowning and suffocation" if he is executed under the 2019 Protocol before his heart and lungs are able to fully heal from his COVID-19 infection. *See* Van Norman Supp. Decl. (Dec. 22, 2020) at 6.

### B.     Mr. Higgs has identified feasible alternative methods of execution.

The risks presented by the 2019 Protocol are "substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737. As relevant here, Mr. Higgs alleges three such alternatives relevant to his as-applied challenge. First, Defendants could administer a pre-dose of a pain-relieving anesthetic prior to the administration of pentobarbital. Second, Defendants could execute Mr. Higgs by firing squad. Compl. ¶ 144. Third, in the alternative, Defendants should at minimum postpone Mr. Higgs's execution for a period of two to three months, so that he will likely recover from COVID-19-induced heart and lung damage that places him at an enhanced risk for an excruciatingly painful execution.

### Pre-dose of opioid

As the D.C. Circuit recently held in this case, the allegations of a pre-dose of an opioid sufficiently plead an alternative method of execution that would significantly reduce the risk of severe pain resulting from flash pulmonary edema. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 132-33 (D.C. Cir. 2020).

A pre-dose of an opioid would substantially reduce Mr. Higgs's suffering. As Doctor of Pharmacology Craig Stevens, Ph.D., explains, opioids "inhibit the activity of the pain neurons," which "produces the analgesia, or relief of pain, that characterizes the therapeutic action of morphine and other opioid analgesics." Decl. of Craig W. Stevens, Ph.D. at 3 (Nov. 1, 2019) (ECF No. 25) ("Stevens Decl. (Nov. 1, 2019)"). "Barbiturates" like pentobarbital, on the other hand, "do not have 'analgesic,' (i.e. pain relieving), properties and in lower doses actually are 'antalgesic,' meaning they augment feelings of pain." Van Norman Decl. at 9. Administration of a clinical dose of a pretreatment opioid (after IVs are set but before the injection of pentobarbital commenced) would "exert a clinical effect of analgesia"—eliminating or significantly reducing a prisoner's ability to feel pain. Stevens Decl. (Nov. 1, 2019) at 2. Many analgesic opioids are relatively fast-acting as well—clinical studies have showed significant analgesic effects within five to six minutes of administration of a dose of morphine (or as quickly as one minute after an IV bolus injection of an 8mg dose). *Id.* at 5; *see also id.* at 5-6 (discussing clinical trials concluding that the onset of fentanyl's analgesic effect is from two to five minutes, depending on dosage). Given the near certainty that utilizing the current execution protocol on January 15, 2021 will result in Mr. Higgs experiencing flash pulmonary edema while sensate, pre-treatment with an opioid would significantly reduce the pain and suffering experienced by prisoners. Use of opioid pre-medications would also "reduce . . . anxiety." *Id.* at 4.

Providing Mr. Higgs with a pre-dose of an opioid is also "readily available." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). Because Defendants would be utilizing opioids in clinical doses, they "are commercially available and obtainable as these drugs would be used for medical purposes, like other medications ordered and used by the prison medical staff." *Id.* at 6. Moreover, BOP "has confirmed that it has located a lawfully licensed compounding pharmacy in the United States that is able and willing to 'lawfully provide [BOP] with commercially manufactured medications as they are available,' and to compound fentanyl as needed." Compl. ¶ 144a. The D.C. Circuit has held in this case that the consolidated Plaintiffs plausibly alleged that severe pain from flash pulmonary edema "could readily be avoided" if Defendants were to "administer[] a widely available analgesic first . . . ." *Execution Protocol Cases*, 980 F.3d at 133. Pre-treatment of prisoners with an opioid is therefore both "feasible and readily available." *Bucklew*, 139 S. Ct. at 1127.

### *Firing squad*

Defendants could also carry out Mr. Higgs's execution by firing squad. *See* Compl. ¶ 144. Execution by firing squad causes a faster and less painful death than execution by lethal injection. *See Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative); *Arthur v. Dunn*, 137 S. Ct. 725, 733-734 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution). Indeed, the DOJ's final rule amending its regulations for implementing death sentences purports to allow for alternative execution methods, including the firing squad. *See* 85 Fed. Reg. 75846, 75847-48 (Nov. 27, 2020) (concerning amendments to 28 C.F.R. Part 26, effective Dec. 24, 2020). That amendment is scheduled to go into effect prior to Mr. Higgs's execution date.

12

Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad is statistically much less likely to result in "botched" executions than lethal injection. *See* Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* 120, App. A (2014). Execution by firing squad is currently authorized by the laws of three states: Utah Code Ann. § 77-18-5.5; Okla. Stat. tit. 22 § 1014(D); Miss. Code Ann. § 99-19-51(4). Since 1976, Utah has carried out three executions by firing squad, most recently on July 18, 2010. Protocols for execution by firing squad are known and available. Utah's technical manual, specifying the state's execution protocol in great detail, is publicly accessible.[1] The use of a firing squad is available, feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

### Execution pursuant to the 2019 Protocol after Mr. Higgs has recovered from COVID-19

While Mr. Higgs maintains that the 2019 Protocol causes significant pain and suffering such that it violates the Eighth Amendment even when carried out on a healthy person, it is clear that Mr. Higgs's current COVID-19 infection subjects him to an even greater risk of severe pain as compared to an execution pursuant to the 2019 Protocol on a healthy person. Allowing Mr. Higgs to recover from COVID-19 before executing him under the 2019 Protocol would significantly reduce the substantial risk of the prolonged suffering of flash pulmonary edema while sensate. Thus, at minimum, Defendants should wait to execute Mr. Higgs until his heart and lungs have recovered from his current COVID-19 infection. Specifically, current medical

---

[1] Technical Manual of Utah Department of Corrections, https://www.documentcloud.org/documents/3522376-Responsive-Documents.html#document/p2 (last visited Dec. 22, 2020).

research supports waiting a minimum of two to three months in order to allow Mr. Higgs's heart and lungs to recover from the infection. *See* Stephen Decl. at ¶ 15 (recommending an eight-week period of observation); Van Norman Supp. Decl. (Dec. 22, 2020) at 2 (describing research finding that six weeks is insufficient for lungs to regain normal functioning after COVID-19, and that many patients continue to have lung damage 90 days after infection). The proposed alternative of a two- to three-month postponement is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737 (quotation omitted).

## II.     **Mr. Higgs will Suffer Irreparable Harm Absent Injunctive Relief**

To constitute irreparable harm, "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and it "must be beyond remediation." *Newby*, 838 F.3d at 7-8 (citing *Chaplaincy*, 454 F.3d at 297) (internal quotation marks and brackets omitted). Mr. Higgs will plainly suffer irreparable harm if he is executed in violation of the Eighth Amendment's prohibition on cruel and unusual punishment before he can fully litigate his claim. The threatened harm is "beyond remediation" because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at 297. Mr. Higgs's claim is therefore "categorically irreparable." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Recognizing this basic reality, courts have found that the "requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases." *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring). Courts have repeatedly held that a prisoner will suffer irreparable harm if he is executed before his legal challenges to the method of execution are complete. *See, e.g., Nooner v. Norris*, No. 5:06cv00110 SWW, 2006 WL

14

8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed threat of irreparable harm because if he suffered pain during his execution, as alleged, the injury would never be rectified); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No. 5:06CT3018 H, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).

There is no question that Mr. Higgs will suffer irreparable harm absent an injunction: The Government will be allowed to execute him in a manner that violates the Constitution and causes him significant suffering. That harm is great, imminent, and irremediable. *See, e.g., Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring in decision to vacate stay of execution) ("[I]rreparable harm … is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty").

Moreover, because Mr. Higgs is suffering from COVID-19 just weeks before his scheduled execution, he will not be able to prepare for his death as a healthy person could. Mr. Higgs's ability to meet with his family and spiritual advisor, and to prepare himself and his affairs for death, is substantially limited due to his illness.

## III.   The Balance of Equities Favors Injunctive Relief

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435; *see also Fla. EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020). Here, these two factors favor a preliminary injunction. This Court has already decided that the balance of the equities favors Plaintiff under these circumstances because "the potential harm to the government caused by a delayed execution is not substantial" and "[t]he public interest is not served by executing individuals before they have had the opportunity to avail themselves of legitimate procedures to challenge the legality of their executions." ECF No. 50 at 14.

These conclusions are consistent with the principle that "[t]he public interest is . . . served when administrative agencies comply with their [legal] obligations." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). By contrast, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. In the capital-punishment context, "the public's interest in seeing justice done lies not only in carrying out the sentence imposed years ago but also in the lawful process leading to possible execution." *Montgomery v. Barr*, No. 20-3261, 2020 WL 6799140, at *11 (D.D.C. Nov. 19, 2020); *see also Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("[C]onfidence in the humane application of the governing laws of the State must be in the public's interest."). Accordingly, courts have recognized an "important public interest in the humane and constitutional application of [a] lethal injection statute." *Nooner*, 2006 WL 8445125 at *4; *see also In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012); *Cooey*, 430 F. Supp. 2d at 708. When the government decides to take a life, the public interest demands that it do so in a considered and deliberate manner. The seriousness of a person's offenses of conviction does not alter that analysis.

The government has no legitimate interest in carrying out an execution that will cause Mr. Higgs unnecessary suffering in violation of the Eighth Amendment. Indeed, by doing so the government would compromise the public interest, among other things by undermining public confidence in the "lawful process leading to possible execution." *See Montgomery*, 2020 WL 6799140, at *11. Furthermore, the government has no legitimate interest in carrying out an execution during a pandemic, particularly where the execution itself is likely to further the spread of the disease. *See Montgomery*, 2020 WL 6799140, at *11 (granting in part the plaintiff's motion for a preliminary injunction and temporary restraining order "[g]iven the gravity of the

16

circumstances and the extraordinary circumstances of the pandemic"); *D.A.M. v. Barr*, No. 20-CV-1321 (CRC), 2020 WL 4218003, at *14 (D.D.C. July 23, 2020) ("It is in the public interest to avoid or reduce that risk [of contracting the COVID-19 virus].").

Curing the flaws in the government's execution procedures would further the public interest, which is served both when agencies abide by their constitutional obligations and when they act to decrease health risks in the midst of a global pandemic. A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the government. *Chaplaincy*, 454 F.3d at 297. To the contrary, the requested injunction will advance the public interest.

## IV.   Mr. Higgs Is Entitled To An Evidentiary Hearing

The Court may grant a preliminary injunction "on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Nevertheless, "an evidentiary hearing is required if the parties raise a genuine issue of material fact that must be resolved in deciding the motion." *Proctor v. D.C.*, 310 F. Supp. 3d 107, 113 (D.D.C. 2018) (quoting *Cobell*, 391 F.3d at 261). An evidentiary hearing is particularly important "when a court must make credibility determinations to resolve key factual disputes in favor of the moving party . . . ." *Cobell*, 391 F.3d at 261 (citing *Prakash v. Am. Univ.*, 727 F.2d 1174, 1181 (D.C. Cir. 1984)).

The Court should hold an evidentiary hearing in order to evaluate the facts underlying Mr. Higgs's claims, and to resolve disputes that may arise from Defendants' disagreement. With respect to his as-applied Eighth Amendment claim, Mr. Higgs's underlying health conditions and his COVID-19 infection render it "virtually certain" not only that he will experience extreme suffering while sensate, but also that his suffering will be more pronounced than someone who

17

does not have similar health conditions. Zivot Decl. at 6. Dr. Antognini has previously expressed

disagreement with the conclusions that Mr. Higgs's asthma and mitral valve regurgitation are

likely to increase the suffering that he experiences from execution with pentobarbital. *See* ECF

No. 352-1 at 1-3. To the extent that Defendants may also contest that Mr. Higgs's COVID-19

infection and his underlying health conditions will worsen his experience of suffering flash

pulmonary edema while sensate during his execution, these are factual disputes appropriate for

resolution following an evidentiary hearing. *See Cobell*, 391 F.3d at 261.

## CONCLUSION

For the foregoing reasons, Mr. Higgs respectfully requests that the Court (a) preliminarily

enjoin Defendants from proceeding with his execution on January 15, 2021, and from setting any

other date or time for Mr. Higgs's execution until further order of this Court, and (b) conduct  an

evidentiary hearing on Mr. Higgs's as-applied Eighth Amendment claim.


Dated:  December 22, 2020                    Respectfully submitted,


                                             */s/ Alex Kursman*
                                             Alex Kursman
                                             Devon Porter
                                             Federal Community Defender Office, E.D. Pa.
                                             601 Walnut Street, Suite 545 West
                                             Philadelphia, PA 19106
                                             Telephone: 215-928-0520
                                             Email: alex_kursman@fd.org

                                             *Counsel for Plaintiff Dustin Higgs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record.  The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of
Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of
Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

1

Email: gerald_king@fd.org

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Donald P. Salzman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Margaret O'Donnell
(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR, LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER, EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

Robert A. Ayers
STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL LLP
(302) 351-9197
Email: Amoshos@mnat.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE & DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com

3

Amelia J. Schmidt
KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

Kathryn Louise Clune
CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

Dated:  December 22, 2020

Respectfully submitted,

*/s/ Alex Kursman*
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: alex_kursman@fd.org

*Counsel for Plaintiff Dustin Higgs*

4