***EXECUTION SCHEDULED FOR JANUARY 15, 2021***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES, | ) ) ) ) | |
| Lead case:    *Roane et al. v. Barr et al.* | ) ) ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| THIS DOCUMENT RELATES TO: | ) ) | |
| *Roane et al. v. Barr et al.*, No. 05-cv-2337 | ) ) | |

## MOTION FOR PRELIMINARY INJUNCTION BARRING THE EXECUTION OF PLAINTIFF DUSTIN HIGGS

Plaintiff Dustin Higgs respectfully moves the Court to enter a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) enjoining Defendants from carrying out the scheduled execution of Mr. Higgs on January 15, 2021, or at any other time until further order of this Court, and to grant an evidentiary hearing. For the reasons stated in the accompanying Memorandum of Points and Authorities, the Court should enter a preliminary injunction barring Mr. Higgs's scheduled execution pursuant to the 2019 Protocol because this execution would violate the Eighth Amendment. Pursuant to Local Rule 7(m), undersigned counsel has conferred with Defendants concerning this motion, and Defendants advise that they oppose a preliminary injunction.

Dated:  December 23, 2020

Respectfully submitted,

*/s/ Alex Kursman*
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: alex_kursman@fd.org

*Counsel for Plaintiff Dustin Higgs*

**\*\*\*EXECUTION SCHEDULED FOR JANUARY 15, 2021\*\*\***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,** | ) ) ) | |
| | ) | |
| **Lead case:**   *Roane et al. v. Barr et al.* | ) | |
| | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| ***Roane et al. v. Barr et al.*, No. 05-cv-2337** | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION BARRING THE EXECUTION**
**OF PLAINTIFF DUSTIN HIGGS**

In accordance with Local Rule 7(a), Plaintiff Dustin Higgs submits this statement of points and authorities in support of his motion for a preliminary injunction.

**BACKGROUND**

On September 1, 2020, Mr. Higgs, who is a federal prisoner sentenced to death, filed a motion to intervene in *Roane et al. v. Gonzales et al.*, No. 05-2337, pursuant to Fed. R. Civ. P. 24(a) and (b), and attached a proposed complaint raising twelve claims for relief under the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution, the Administrative Procedure Act (APA), the Federal Death Penalty Act (FDPA), the Federal Food, Drug, and Cosmetic Act (FDCA), and the Controlled Substances Act (CSA). *See* ECF No. 229; 229-1. Count IV of Mr. Higgs's complaint raised an as-applied Eighth Amendment challenge to Defendants' 2019 execution protocol ("2019 Protocol") based on Mr. Higgs's underlying medical conditions and his likely exposure to COVID-19 while incarcerated at USP Terre Haute. The Court granted Mr. Higgs's motion to intervene on September 4, 2020.

1

Defendants filed a motion to dismiss Mr. Higgs's as-applied Eighth Amendment challenge on November 3, 2020. ECF No. 306. On November 20, 2020, Defendants scheduled Mr. Higgs's execution for January 15, 2021. *See* ECF No. 330. On December 4, 2020, Mr. Higgs filed an amended and supplemental complaint raising two additional claims: (1) Defendants' planned execution of Mr. Higgs using pentobarbital is unconstitutional as an *ex post facto* law; and (2) Defendants' arbitrary selection of Mr. Higgs for execution violates the Fifth and Eighth Amendments and is arbitrary and capricious in violation of the APA. ECF No. 343-1. Concurrently, Mr. Higgs filed a motion for preliminary injunction barring his execution (ECF No. 344) based on these two claims and on his as-applied Eighth Amendment claim (Count IV of Mr. Higgs's complaint, ECF No. 229-1).

This Court dismissed Mr. Higgs's as-applied Eighth Amendment challenge on December 9, 2020. ECF No. 354. The Court noted that Mr. Higgs's injury was "hypothetical" because Mr. Higgs had not alleged that he had "any reason to believe that he contracted the virus aside from that fact that he is incarcerated. Thus, given the speculative nature of the allegations in the Complaint, the court is unable to find that Higgs has plausibly stated a claim that his execution is *sure or very likely* to cause serious illness and needless suffering." ECF No. 354 at 4 (internal quotation marks and citations omitted).

Mr. Higgs began experiencing symptoms of COVID-19 on December 13, 2020. He tested positive for the virus on December 16, and he was informed of the test result on December 17. Concurrently with this Motion, Mr. Higgs has filed an amended and supplemental complaint alleging that Defendants' use of the 2019 Protocol to execute Mr. Higgs would violate his right to be free from cruel and unusual punishment under Eighth Amendment due to his COVID-19 infection and underlying medical conditions. Mr. Higgs now seeks a preliminary injunction to

prevent Defendants from executing him pursuant to the 2019 Protocol in violation of the Eighth Amendment.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted). The moving party must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of relief; (3) the balance of the equities weigh in his favor; and (4) an injunction is in the public interest. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). That standard is met here.

## I.     Plaintiff Higgs Is Likely To Succeed On The Merits Of His Claim

Mr. Higgs is likely to succeed on his as-applied Eighth Amendment claim. At the preliminary injunction stage, a movant must "establish a likelihood that [he] can establish both that [the 2019 Protocol] creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015). Mr. Higgs has made that showing. His recent COVID-19 infection—particularly in light of his underlying health problems—creates a demonstrated risk of severe pain if Defendants carry out the 2019 Protocol on Mr. Higgs as planned on January 15, 2021.

### A.     The 2019 Protocol creates a demonstrated risk of severe pain for Mr. Higgs.

Mr. Higgs tested positive for COVID-19 late last week. Prior to his COVID-19 infection, Mr. Higgs suffered from severe asthma and longstanding heart problems. Mr. Higgs's health conditions create a substantial risk that Mr. Higgs will suffer from painful flash pulmonary edema immediately upon injection of a high dose of pentobarbital, prior to becoming insensate

3

or dying.  The alternative methods of execution that Mr. Higgs proffers below will significantly reduce the substantial risk of severe pain associated with the planned execution of Mr. Higgs on January 15, 2020 under the 2019 Protocol.

### 1.   Mr. Higgs's COVID-19 infection

Mr. Higgs tested positive for COVID-19 on December 16, 2020. A few days prior to his positive test, he was experiencing chills and a cough. His son, Da'Quan Darby, visited Mr. Higgs on December 13 and 14, and observed his father coughing on both days. Mr. Higgs also repeatedly asked his son whether the visiting room was cold, and Mr. Darby had the impression that his father had chills. Decl. of Da'Quan Darby (Dec. 20, 2020) (ECF No. 370-1) at 1 ("Darby Decl."). Mr. Darby noticed that his father's symptoms were worse on the second day. *Id.* As of the date of this filing, Mr. Higgs continues to experience symptoms of COVID-19.

COVID-19 is "a highly contagious respiratory illness caused by a novel coronavirus (SARS-CoV-2)." Decl. of Joel A. Zivot, M.D. (Aug. 31, 2020) (ECF No. 303-4) at 3 ("Zivot Decl."). The illness originated in China but quickly spread across the globe, and the World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See* World Health Organization, *WHO Timeline – COVID-19*, https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (last visited Dec. 21, 2020).

COVID-19 causes lung damage in a majority of patients, including those who report experiencing only mild symptoms or no symptoms at all. In fact, in a study of COVID-positive passengers on the Diamond Princess cruise ship, CT scans revealed that "54% of patients who experienced *asymptomatic* infections still suffered the same severe lung changes (lung opacifications) seen in many hospitalized patients." Supp. Decl. of Gail Van Norman, M.D. (Dec. 22, 2020) (ECF No. 370-2) at 4 ("Van Norman Supp. Decl. (Dec. 22, 2020)") (emphasis

added). For *symptomatic* patients, the percentage of patients with lung damage visible on a CT scan rose to 79%. *Id.* This finding has been corroborated by other emerging research on the effects of COVID-19 on the lungs. *Id.* "[i]t is clear now that even in mild infection—i.e. infection that is either asymptomatic or symptomatic but does not require hospitalization— significant damage is occurring in the lungs . . . ." *Id.*

The medical research that is currently available indicates that lung damage persists for months after initial infection with COVID-19, even when it appears superficially that a patient has recovered. One study followed a small group of professional divers who had developed mild symptoms of COVID-19. *Id.* at 5. When assessed six weeks after the development of symptoms, *none* of the divers could be certified to return to diving because all of them had impaired lung functioning. *Id.* Although research indicates that lung functioning in COVID patients does improve over time, *id.*, the available evidence indicates that it takes two months or more for patients to fully recover. *See* Decl. of Michael Stephen, M.D. (Dec. 22, 2020) (ECF No. 370-3) at ¶ 11 ("Stephen Decl.") (observing that in his clinical experience, it takes patients around eight weeks to fully recover from COVID-19).

### 2.    Mr. Higgs's underlying health conditions

Mr. Higgs has lifelong heart problems, including a cardiac murmur and a condition called mitral valve regurgitation, also known as mitral valve insufficiency. *See* Stephen Decl. at ¶ 12 (noting that a recent electrocardiogram on November 12, 2020 and an ultrasound of his heart from May 26, 2020 show that Mr. Higgs has moderate mitral valve regurgitation, left atrial enlargement, and likely left ventricular hypertrophy).

Mitral valve regurgitation occurs when the mitral valve on the left side of the heart does not close properly, allowing blood to backflow or leak into the left atrium in the heart.

Supplemental Decl. of Joel B. Zivot, M.D. (Dec. 3, 2020) (ECF No. 344-2), at 2-3 ("Zivot Supp. Decl."). Over time, this condition can cause a patient to develop pulmonary edema:

> When a patient has mitral regurgitation, each contraction of the heart forces some blood backwards into the left atrium and then further backwards into the lungs. . . . In the normal functioning heart, when the left ventricle contracts, the mitral valve shuts, preventing blood from regurgitating backwards. At the same time, the aortic valve opens and permits the normal flow of blood forward. The pressure in the lungs is not high enough to block backwards flow without a functioning mitral valve. A competent and non-leaking mitral valve is the normal protection for the lungs from this blood under pressure. Extra fluid in the lungs, when severe, produces significant shortness of breath and is called congestive heart failure or pulmonary edema.

*Id.* at 3.

In addition, Mr. Higgs suffers from serious, lifelong asthma. Asthma is a chronic respiratory condition characterized by reversible swelling of the airways. Zivot Decl. at 5. "Common symptoms of asthma include shortness of breath, coughing, and wheezing." Zivot Supp. Decl. at 5. Mr. Higgs's prison medical records document that he periodically experiences "wheezing, difficulty breathing, coughing, and shortness of breath" as a result of his asthma. Zivot Supp. Decl. at 2. He requires daily use of inhaled albuterol to manage his asthma even under normal conditions, and "is maintained on a continuous high dose of inhaled steroids," indicating serious asthma. Stephen Decl. ¶ 12. In the past, he has experienced asthma exacerbations and nebulizer treatments. *Id.*

### 3. The combination of Mr. Higgs's medical issues makes him especially likely to suffer severe pain from execution by pentobarbital

Mr. Higgs has alleged that the 2019 Protocol violates the Eighth Amendment because it is likely to cause flash pulmonary edema resulting in severe pain. Mr. Higgs is especially at risk of experiencing flash pulmonary edema while still sensate as a result of his underlying medical conditions and exposure to COVID-19. Due to his current underlying health conditions, he also

faces the substantial risk of suffering a prolonged experience of flash pulmonary edema as
compared to healthy individuals.

Flash pulmonary edema is a rapid accumulation of fluid in the lungs, which produces a
sensation of drowning. *See* Decl. of Gail Van Norman, M.D., at 33-34 (Nov. 11, 2019) (ECF No.
24) ("Van Norman Decl."); Decl. of Mark A. Edgar, M.D., at 19-21 (Oct. 24, 2019) (ECF. No.
303-3) ("Edgar Decl."); Zivot Decl. at 2-3. As Dr. Van Norman has explained, "[n]ot being able
to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings
known to man." Van Norman Decl. at 34. People who are drowning typically "will reach such a
level of agony that they will be compelled to take a 'breath' within about 1 minute," as "[p]anic
and terror, and the attempt to fight take over." *Id.* at 34; *see* Zivot Decl. at 3 ("Severe pulmonary
edema creates the sensation of drowning."); Edgar Decl. at 3 ("[Pulmonary edema] produces
sensations similar to drowning or asphyxiation as fluid occupies a greater volume of the air
spaces.").

Importantly, the administration of pentobarbital does not induce a lack of consciousness
or awareness, such that even a healthy individual is very likely to experience the excruciating
pain of pulmonary edema while conscious. As Dr. Van Norman has explained, the effects of
barbiturates like pentobarbital diminish *responsiveness* rather than *consciousness*. Although
outdated "traditional textbooks and authors report that the inhibitory effects of barbiturates cause
'unconsciousness,'" "authoritative publications now describe barbiturates as producing
'unresponsiveness,' since how, and even whether, they affect consciousness is under serious
question." Van Norman Decl. at 13; *see also id.* at 22-23, 28-29. The distinction between
unresponsive and unconscious prisoners is crucial: "[E]ven when the patients appear to be

unconscious by all clinical measures and are unresponsive … consciousness will permit extreme pain and suffering during the execution process." *Id.* at 7.

Mr. Higgs's COVID-19 infection puts him at particular risk for flash pulmonary edema that would occur while he is still sensate. COVID-19 primarily affects the respiratory system and targets the lungs. Zivot Decl. at 4. "Infection with the COVID-19 virus causes severe damage to many areas in the airways and the lungs, but most specifically to the alveolar-capillary membrane, which is also the site of damage of massive barbiturate overdose." Van Norman Supp. Decl. (Dec. 22, 2020) at 2. Lung damage from COVID-19 thereby "sensitizes the lungs to more extensive and immediate further damage . . . , causing massive pulmonary edema at an earlier stage in the execution process before drug levels in the brain have peaked." *Id.* at 3. As Dr. Van Norman has explained:

> • COVID-positive prisoners, and those with recent COVID infections, are more susceptible to rapid and massive barbiturate damage, and this damage would occur long before the level of pentobarbital peaks in the brain;
>
> • Even if a 5-gram intravenous dose of pentobarbital would render a prisoner insensate under normal circumstance – which Dr. Van Norman disputes – a prisoner infected with COVID-19, or who has recently recovered from COVID-19, would experience a much more rapid and devastating onset of flash pulmonary edema at an earlier stage of the injection;
>
> • Thus, a prisoner who was COVID-positive, or who has recently recovered from COVID-19, would experience prolonged sensations of drowning and suffocation as compared to a healthy prisoner.

*Id.* at 4; *see also* Zivot Decl. at 5-6 ("Because COVID-19 can cause lasting lung damage, a person injected with pentobarbital would experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19.").

With respect to Mr. Higgs specifically, "the sensation of suffocation or drowning" that execution by pentobarbital is likely to produce "would be further exacerbated by his asthma, which produces shortness of breath even without the presence of respiratory illness or barbiturates." Zivot Decl. at 5. For Mr. Higgs, the experience of

> pulmonary edema – which causes difficulty breathing due to a buildup of fluid in the lungs – [] would cause further strain on Mr. Higgs's already-impaired breathing. Compared to a person without asthma, Mr. Higgs would struggle for air more quickly and painfully after the onset of pulmonary edema because his asthma inflames and constricts his airways, making it more difficult for enough oxygen to reach his lungs even under normal circumstances. The suffering that Mr. Higgs would experience from pulmonary edema would be more severe because his asthma would have an additive effect, making his struggle for air more acute.

Zivot Supp. Decl. at 2.

Mr. Higgs's mitral valve regurgitation also increases the risk of flash pulmonary edema while sensate. Dr. Kendall Von Crowns, a medical expert retained by Defendants, has acknowledged that heart conditions like Mr. Higgs's can cause flash pulmonary edema in a prisoner executed with pentobarbital:

> I know there's a case report of an individual who developed flash pulmonary edema, but he had underlying heart issues, specifically mitral valve issues, as well as other heart problems. So his heart was already compromised when the flash pulmonary edema occurred.
>
> So in his situation, his flash pulmonary edema was the result of the fact that he already had a compromised heart which then resulted in him developing edema more rapidly than normal. So you have an individual that was already kind of critical when this occurred.

Evid. Hr'g Tr. (Sept. 18, 2020) at 18; *see also* Zivot Supp. Decl. at 2-3, 5-6.

Mr. Higgs's COVID-19 infection further exacerbates the risk created by his underlying heart condition, which "puts him at higher risk of COVID-19 related heart issues" and increases his risk of COVID-related pulmonary edema. Stephen Decl. at ⁋ 13. Because Mr. Higgs has an enlarged left atrium, he is particularly at risk for COVID-related heart failure, "as an enlarged left atrium ineffectively pumps blood to the left ventricle, further putting him at risk for fluid to back up into his lungs (pulmonary edema)." *Id.*

In sum, his "preexisting lung dysfunction conditions make Mr. Higgs particularly likely to experience pulmonary edema that he will experience as choking and drowning prior to the sedative properties of pentobarbital taking effect." Zivot Supp. Decl. at 5-6. Mr. Higgs's recent COVID-19 infection makes him particularly likely to "experience earlier and therefore more prolonged sensations of drowning and suffocation" if he is executed under the 2019 Protocol before his heart and lungs are able to fully heal from his COVID-19 infection. *See* Van Norman Supp. Decl. (Dec. 22, 2020) at 6.

### B.    Mr. Higgs has identified feasible alternative methods of execution.

The risks presented by the 2019 Protocol are "substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737. As relevant here, Mr. Higgs alleges three such alternatives relevant to his as-applied challenge. First, Defendants could administer a pre-dose of a pain-relieving anesthetic prior to the administration of pentobarbital. Second, Defendants could execute Mr. Higgs by firing squad. Compl. ¶ 144. Third, in the alternative, Defendants should at minimum postpone Mr. Higgs's execution for a period of two to three months, so that he will likely recover from COVID-19-induced heart and lung damage that places him at an enhanced risk for an excruciatingly painful execution.

### *Pre-dose of opioid*

As the D.C. Circuit recently held in this case, the allegations of a pre-dose of an opioid sufficiently plead an alternative method of execution that would significantly reduce the risk of severe pain resulting from flash pulmonary edema. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 132-33 (D.C. Cir. 2020).

A pre-dose of an opioid would substantially reduce Mr. Higgs's suffering. As Doctor of Pharmacology Craig Stevens, Ph.D., explains, opioids "inhibit the activity of the pain neurons," which "produces the analgesia, or relief of pain, that characterizes the therapeutic action of morphine and other opioid analgesics." Decl. of Craig W. Stevens, Ph.D. at 3 (Nov. 1, 2019) (ECF No. 25) ("Stevens Decl. (Nov. 1, 2019)"). "Barbiturates" like pentobarbital, on the other hand, "do not have 'analgesic,' (i.e. pain relieving), properties and in lower doses actually are 'antalgesic,' meaning they augment feelings of pain." Van Norman Decl. at 9. Administration of a clinical dose of a pretreatment opioid (after IVs are set but before the injection of pentobarbital commenced) would "exert a clinical effect of analgesia"—eliminating or significantly reducing a prisoner's ability to feel pain. Stevens Decl. (Nov. 1, 2019) at 2. Many analgesic opioids are relatively fast-acting as well—clinical studies have showed significant analgesic effects within five to six minutes of administration of a dose of morphine (or as quickly as one minute after an IV bolus injection of an 8mg dose). *Id.* at 5; *see also id.* at 5-6 (discussing clinical trials concluding that the onset of fentanyl's analgesic effect is from two to five minutes, depending on dosage). Given the near certainty that utilizing the current execution protocol on January 15, 2021 will result in Mr. Higgs experiencing flash pulmonary edema while sensate, pre-treatment with an opioid would significantly reduce the pain and suffering experienced by prisoners. Use of opioid pre-medications would also "reduce . . . anxiety." *Id.* at 4.

Providing Mr. Higgs with a pre-dose of an opioid is also "readily available." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). Because Defendants would be utilizing opioids in clinical doses, they "are commercially available and obtainable as these drugs would be used for medical purposes, like other medications ordered and used by the prison medical staff." *Id.* at 6. Moreover, BOP "has confirmed that it has located a lawfully licensed compounding pharmacy in the United States that is able and willing to 'lawfully provide [BOP] with commercially manufactured medications as they are available,' and to compound fentanyl as needed." Compl. ¶ 144a. The D.C. Circuit has held in this case that the consolidated Plaintiffs plausibly alleged that severe pain from flash pulmonary edema "could readily be avoided" if Defendants were to "administer[] a widely available analgesic first . . . ." *Execution Protocol Cases*, 980 F.3d at 133. Pre-treatment of prisoners with an opioid is therefore both "feasible and readily available." *Bucklew*, 139 S. Ct. at 1127.

### *Firing squad*

Defendants could also carry out Mr. Higgs's execution by firing squad. *See* Compl. ¶ 144. Execution by firing squad causes a faster and less painful death than execution by lethal injection. *See Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative); *Arthur v. Dunn*, 137 S. Ct. 725, 733-734 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution). Indeed, the DOJ's final rule amending its regulations for implementing death sentences purports to allow for alternative execution methods, including the firing squad. *See* 85 Fed. Reg. 75846, 75847-48 (Nov. 27, 2020) (concerning amendments to 28 C.F.R. Part 26, effective Dec. 24, 2020). That amendment is scheduled to go into effect prior to Mr. Higgs's execution date.

12

Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad is statistically much less likely to result in "botched" executions than lethal injection. *See* Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* 120, App. A (2014). Execution by firing squad is currently authorized by the laws of three states: Utah Code Ann. § 77-18-5.5; Okla. Stat. tit. 22 § 1014(D); Miss. Code Ann. § 99-19-51(4). Since 1976, Utah has carried out three executions by firing squad, most recently on July 18, 2010. Protocols for execution by firing squad are known and available. Utah's technical manual, specifying the state's execution protocol in great detail, is publicly accessible.[1] The use of a firing squad is available, feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

### Execution pursuant to the 2019 Protocol after Mr. Higgs has recovered from COVID-19

While Mr. Higgs maintains that the 2019 Protocol causes significant pain and suffering such that it violates the Eighth Amendment even when carried out on a healthy person, it is clear that Mr. Higgs's current COVID-19 infection subjects him to an even greater risk of severe pain as compared to an execution pursuant to the 2019 Protocol on a healthy person. Allowing Mr. Higgs to recover from COVID-19 before executing him under the 2019 Protocol would significantly reduce the substantial risk of the prolonged suffering of flash pulmonary edema while sensate. Thus, at minimum, Defendants should wait to execute Mr. Higgs until his heart and lungs have recovered from his current COVID-19 infection. Specifically, current medical

---

[1] Technical Manual of Utah Department of Corrections, https://www.documentcloud.org/documents/3522376-Responsive-Documents.html#document/p2 (last visited Dec. 22, 2020).

research supports waiting a minimum of two to three months in order to allow Mr. Higgs's heart and lungs to recover from the infection. *See* Stephen Decl. at ⁋ 15 (recommending an eight-week period of observation); Van Norman Supp. Decl. (Dec. 22, 2020) at 2 (describing research finding that six weeks is insufficient for lungs to regain normal functioning after COVID-19, and that many patients continue to have lung damage 90 days after infection). The proposed alternative of a two- to three-month postponement is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737 (quotation omitted).

## II.   Mr. Higgs will Suffer Irreparable Harm Absent Injunctive Relief

To constitute irreparable harm, "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and it "must be beyond remediation." *Newby*, 838 F.3d at 7-8 (citing *Chaplaincy*, 454 F.3d at 297) (internal quotation marks and brackets omitted). Mr. Higgs will plainly suffer irreparable harm if he is executed in violation of the Eighth Amendment's prohibition on cruel and unusual punishment before he can fully litigate his claim. The threatened harm is "beyond remediation" because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at 297. Mr. Higgs's claim is therefore "categorically irreparable." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Recognizing this basic reality, courts have found that the "requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases." *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring). Courts have repeatedly held that a prisoner will suffer irreparable harm if he is executed before his legal challenges to the method of execution are complete. *See, e.g., Nooner v. Norris*, No. 5:06cv00110 SWW, 2006 WL

14

8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed threat of irreparable harm because if he suffered pain during his execution, as alleged, the injury would never be rectified); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No. 5:06CT3018 H, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).

There is no question that Mr. Higgs will suffer irreparable harm absent an injunction: The Government will be allowed to execute him in a manner that violates the Constitution and causes him significant suffering. That harm is great, imminent, and irremediable. *See, e.g., Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring in decision to vacate stay of execution) ("[I]rreparable harm … is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty").

Moreover, because Mr. Higgs is suffering from COVID-19 just weeks before his scheduled execution, he will not be able to prepare for his death as a healthy person could. Mr. Higgs's ability to meet with his family and spiritual advisor, and to prepare himself and his affairs for death, is substantially limited due to his illness.

## III.   The Balance of Equities Favors Injunctive Relief

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435; *see also Fla. EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020). Here, these two factors favor a preliminary injunction. This Court has already decided that the balance of the equities favors Plaintiff under these circumstances because "the potential harm to the government caused by a delayed execution is not substantial" and "[t]he public interest is not served by executing individuals before they have had the opportunity to avail themselves of legitimate procedures to challenge the legality of their executions." ECF No. 50 at 14.

15

These conclusions are consistent with the principle that "[t]he public interest is . . . served when administrative agencies comply with their [legal] obligations." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). By contrast, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. In the capital-punishment context, "the public's interest in seeing justice done lies not only in carrying out the sentence imposed years ago but also in the lawful process leading to possible execution." *Montgomery v. Barr*, No. 20-3261, 2020 WL 6799140, at *11 (D.D.C. Nov. 19, 2020); *see also Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("[C]onfidence in the humane application of the governing laws of the State must be in the public's interest."). Accordingly, courts have recognized an "important public interest in the humane and constitutional application of [a] lethal injection statute." *Nooner*, 2006 WL 8445125 at *4; *see also In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012); *Cooey*, 430 F. Supp. 2d at 708. When the government decides to take a life, the public interest demands that it do so in a considered and deliberate manner. The seriousness of a person's offenses of conviction does not alter that analysis.

The government has no legitimate interest in carrying out an execution that will cause Mr. Higgs unnecessary suffering in violation of the Eighth Amendment. Indeed, by doing so the government would compromise the public interest, among other things by undermining public confidence in the "lawful process leading to possible execution." *See Montgomery*, 2020 WL 6799140, at *11. Furthermore, the government has no legitimate interest in carrying out an execution during a pandemic, particularly where the execution itself is likely to further the spread of the disease. *See Montgomery*, 2020 WL 6799140, at *11 (granting in part the plaintiff's motion for a preliminary injunction and temporary restraining order "[g]iven the gravity of the

16

circumstances and the extraordinary circumstances of the pandemic"); *D.A.M. v. Barr*, No. 20-CV-1321 (CRC), 2020 WL 4218003, at *14 (D.D.C. July 23, 2020) ("It is in the public interest to avoid or reduce that risk [of contracting the COVID-19 virus].").

Curing the flaws in the government's execution procedures would further the public interest, which is served both when agencies abide by their constitutional obligations and when they act to decrease health risks in the midst of a global pandemic. A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the government. *Chaplaincy*, 454 F.3d at 297. To the contrary, the requested injunction will advance the public interest.

## IV.   Mr. Higgs Is Entitled To An Evidentiary Hearing

The Court may grant a preliminary injunction "on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Nevertheless, "an evidentiary hearing is required if the parties raise a genuine issue of material fact that must be resolved in deciding the motion." *Proctor v. D.C.*, 310 F. Supp. 3d 107, 113 (D.D.C. 2018) (quoting *Cobell*, 391 F.3d at 261). An evidentiary hearing is particularly important "when a court must make credibility determinations to resolve key factual disputes in favor of the moving party . . . ." *Cobell*, 391 F.3d at 261 (citing *Prakash v. Am. Univ.*, 727 F.2d 1174, 1181 (D.C. Cir. 1984)).

The Court should hold an evidentiary hearing in order to evaluate the facts underlying Mr. Higgs's claims, and to resolve disputes that may arise from Defendants' disagreement. With respect to his as-applied Eighth Amendment claim, Mr. Higgs's underlying health conditions and his COVID-19 infection render it "virtually certain" not only that he will experience extreme suffering while sensate, but also that his suffering will be more pronounced than someone who

does not have similar health conditions. Zivot Decl. at 6. Dr. Antognini has previously expressed disagreement with the conclusions that Mr. Higgs's asthma and mitral valve regurgitation are likely to increase the suffering that he experiences from execution with pentobarbital. *See* ECF No. 352-1 at 1-3. To the extent that Defendants may also contest that Mr. Higgs's COVID-19 infection and his underlying health conditions will worsen his experience of suffering flash pulmonary edema while sensate during his execution, these are factual disputes appropriate for resolution following an evidentiary hearing. *See Cobell*, 391 F.3d at 261.

## CONCLUSION

For the foregoing reasons, Mr. Higgs respectfully requests that the Court (a) preliminarily enjoin Defendants from proceeding with his execution on January 15, 2021, and from setting any other date or time for Mr. Higgs's execution until further order of this Court, and (b) conduct an evidentiary hearing on Mr. Higgs's as-applied Eighth Amendment claim.

Dated:  December 23, 2020                    Respectfully submitted,

*/s/ Alex Kursman*
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: alex_kursman@fd.org

*Counsel for Plaintiff Dustin Higgs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2020, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.  Pursuant to this Court's August 20, 2019 Order, below is a list of all counsel of record.  The names marked with an asterisk (*) have no email provided on the docket and are no longer with the identified firms.

Alan Burch
U.S. Attorney's Office for the District of
Columbia
(202) 252-2550
Email: alan.burch@usdoj.gov

Peter S. Smith
United States Attorney's Office
Appellate Division
(202) 252-6769
Email: peter.smith@usdoj.gov

Ethan P. Davis
Civil Division, U.S. Department of Justice
(202) 616-4171
Email: Ethan.Davis@usdoj.gov

Robert J. Erickson
US Department of Justice
(202) 514-2841
Email: Robert.erickson@usdoj.gov

Joshua Christopher Toll
KING & SPALDING LLP
(202) 737-8616
Email: jtoll@kslaw.com

Charles Anthony Zdebski
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
(202) 659-6605
Email: czdebski@eckertseamans.com

Gerald Wesley King, Jr.
FEDERAL DEFENDER PROGRAM, INC.
(404) 688-7530
Email: gerald_king@fd.org

Paul R. Perkins
Civil Division, Department of Justice
(202) 514-5090
Email: Paul.R.Perkins@usdoj.gov

Jonathan Kossak
Civil Division, Department of Justice
(202) 305-0612
Email: Jonathan.kossak@usdoj.gov

Denise M. Clark
U.S. Attorney's Office for the District of
Columbia
(202) 252-6605
Email: Denise.Clark@usdoj.gov

Jean Lin
Civil Division, Department of Justice
(202) 514-3716
Jean.lin@usdoj.gov

Cristen Cori Handley
Civil Division, Department of Justice
(202) 305-2677
Cristen.Handley@usdoj.gov

Paul F. Enzinna
ELLERMAN ENZINNA PLLC
(202) 753-5553
Email: penzinna@ellermanenzinna.com

Brandon David Almond
TROUTMAN SANDERS LLP
(202) 274-2864
Email: brandon.almond@troutmansanders.com

Donald P. Salzman

1

Charles Fredrick Walker
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7000
Email: Charles.Walker@skadden.com

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(212) 735-2129
Email: Alexander.Drylewski@skadden.com
(*pro hac vice application forthcoming)

Celeste Bacchi
OFFICE OF THE PUBLIC DEFENDER
Capital Habeas Unit
(213) 894-1887
Email: celeste_bacchi@fd.org

Jonathan Charles Aminoff
FEDERAL PUBLIC DEFENDER,
CENTRAL DISTRICT OF CALIFORNIA
(213) 894-5374
Email: jonathan_aminoff@fd.org

Billy H. Nolas
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: Billy_Nolas@fd.org

*Jeanne Vosberg Sourgens
VINSON & ELKINS LLP
(202) 639-6633

William E. Lawler, III
VINSON & ELKINS LLP
(202) 639-6676
Email: wlawler@velaw.com

Evan D. Miller
VINSON & ELKINS LLP
(202) 639-6605
Email: EMiller@velaw.com

Margaret O'Donnell

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7983
Email: Donald.salzman@skadden.com

Steven M. Albertson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
(202) 371-7112
Email: Steven.Albertson@skadden.com

Craig Anthony Harbaugh
FEDERAL PUBLIC DEFENDER, CENTRAL
DISTRICT OF CALIFORNIA
(213) 894-7865
Email: craig_harbaugh@fd.org

Alexander Louis Kursman
OFFICE OF THE FEDERAL COMMUNITY
DEFENDER/EDPA
(215) 928-0520
Email: Alex_Kursman@fd.org

Kathryn B. Codd
VINSON & ELKINS LLP
(202) 639-6536
Email: kcodd@velaw.com

Robert E. Waters
KING & SPALDING LLP (202) 737-0500
Email: rwaters@velaw.com

Yousri H. Omar
VINSON & ELKINS LLP
(202) 639-6500
Email: yomar@velaw.com

*William E. Hoffman, Jr.
KING & SPALDING LLP
(404) 572-3383

Mark Joseph Hulkower
STEPTOE & JOHNSON LLP
(202) 429-6221
Email: mhulkower@steptoe.com

Robert A. Ayers

(502) 320-1837
Email: mod@dcr.net

Abigail Bortnick
KING & SPALDING LLP
(202) 626-5502
Email: abortnick@kslaw.com

Matthew John Herrington
STEPTOE & JOHNSON LLP
(202) 429-8164
Email: mherrington@steptoe.com

Amy J. Lentz
STEPTOE & JOHNSON LLP
(202) 429-1320
Email: Alentz@steptoe.com

Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR,
LLC
(410) 444-1500
Email: garyeproctor@gmail.com

Scott Wilson Braden
FEDERAL PUBLIC DEFENDER,
EASTERN DISTRICT OF ARKANSAS
(501) 324-6144
Email: Scott_Braden@fd.org

Amy Gershenfeld Donnella
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EDPA
(215) 928-0520
Email: amy_donnella@fd.org

David Victorson
(202) 637-5600
HOGAN LOVELLS US LLP
Email: David.Victorson@hoganlovells.com

John D. Beck
HOGAN LOVELLS US LLP
(212) 918-3000
Email: john.beck@hoganlovells.com

Amelia J. Schmidt

STEPTOE & JOHNSON LLP
(202) 429-6401
Email: rayers@steptoe.com

Robert L. McGlasson
MCGLASSON & ASSOCIATES, PC
(404) 314-7664
Email: rlmcglasson@comcast.net

Sean D. O'Brien
PUBLIC INTEREST LITIGATION CLINIC
(816) 363-2795
Email: dplc@dplclinic.com

Shawn Nolan
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: shawn_nolan@fd.org

Joseph William Luby
FEDERAL PUBLIC DEFENDER/EDPA
(215) 928-0520
Email: joseph_luby@fd.org

Pieter Van Tol
HOGAN LOVELLS US LLP
(212) 918-3000
Email: Pieter.Vantol@hoganlovells.com

Jonathan Jeffress
KAISER DILLON, PLLC
(202) 640-4430
Email: Jjeffress@kaiserdillon.com

Andrew Moshos
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 351-9197
Email: Amoshos@mnat.com

Alan E. Schoenfeld
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 937-7294
Email: Alan.Schoenfeld@wilmerhale.com
Kathryn Louise Clune

3

KAISER DILLON, PLLC
(202) 869-1301
Email: Aschmidt@kaiserdillon.com

Norman Anderson
KAISER DILLON PLLC
(202) 640-2850
nanderson@kaiserdillon.com

Jennifer Ying
MORRIS NICHOLS ARSHT & TUNNELL
LLP
(302) 658-9300
Email: Jying@mnat.com

Andres C. Salinas
WILMER CUTLER PICKERING HALE &
DORR LLP
(202) 663-6289
Email: Andres.Salinas@wilmerhale.com

*Ryan M. Chabot
WILMER CUTLER PICKERING HALE &
DORR LLP
(212) 295-6513

Dale Andrew Baich
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
(602) 382-2816
Dale_Baich@fd.org

CROWELL & MORING LLP
(202) 624-5116
kclune@crowell.com

Jennifer M. Moreno
OFFICE OF THE PUBLIC FEDERAL
DEFENDER, DISTRICT OF ARIZONA
(602) 382-2718
Jennifer_moreno@fd.org

Ginger Dawn Anders
MUNGER, TOLLES & OLSON LLP
(202) 220-1107
Ginger.anders@mto.com

*Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

*Brendan Gants
MUNGER, TOLLES & OLSON LLP
(202) 220-1100

Timothy Kane
FEDERAL COMMUNITY DEFENDER
OFFICE, EDPA
(215) 928-0520
Email: timothy_kane@fd.org

Dated:  December 23, 2020

Respectfully submitted,

*/s/ Alex Kursman*
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: 215-928-0520
Email: alex_kursman@fd.org

*Counsel for Plaintiff Dustin Higgs*