****EXECUTION SCHEDULED FOR JANUARY 14, 2021****

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**In the Matter of the**
**Federal Bureau of Prisons' Execution**          :
**Protocol Cases,**

                                                  :

**Lead Case: Roane et al. v. Barr**                     **Case No. 19-mc-00145 (TSC)**

                                                  :

**THIS DOCUMENT RELATES TO:**                     :

**James H. Roane, Jr. et al. v. William Barr,**   :
**Case No. 05-2337**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF COREY JOHNSON'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Dated: December 23, 2020

Donald P. Salzman
D.C. Bar Number #479775
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7983

Alexander C. Drylewski (admitted *pro hac vice*)
One Manhattan West
New York, NY 10001
(212) 735-3278

*Counsel for Plaintiff Corey Johnson*

# TABLE OF CONTENTS

Page

I.  BACKGROUND ...................................................................................................1

II.  LEGAL STANDARDS ........................................................................................3

III.  ARGUMENT .......................................................................................................4

    A.  Corey Johnson is Likely to Prevail On His Eighth Amendment Claim .................4

        1.  Defendants' Intended Execution of Mr. Johnson Creates a
            Demonstrated Risk of Severe and Unnecessary Pain and Suffering ..........4

            (a)  Mr. Johnson is Suffering From COVID-19 .....................................4

            (b)  COVID-19 Impacts Lung Functioning ............................................5

            (c)  Mr. Johnson's COVID-19 Diagnosis Makes Him
                 Especially Likely To Suffer Severe Pain From Execution
                 by Pentobarbital ..............................................................................6

        2.  Mr. Johnson Has Identified Alternative Methods of Execution .................7

            (a)  Pre-Dose of Anesthetic Drug ..........................................................7

            (b)  Firing Squad ....................................................................................9

            (c)  Execution Pursuant to 2019 Protocol After Mr. Johnson
                 Has Recovered from the Effects of COVID-19 ..............................10

    B.  Mr. Johnson Will Suffer Irreparable Injury if not Granted a Preliminary
        Injunction ...........................................................................................................10

    C.  The Balance of Equities and Public Interest Weigh in Favor of a
        Preliminary Injunction .......................................................................................13

    D.  Mr. Johnson is Entitled to An Evidentiary Hearing...........................................16

IV.  CONCLUSION...................................................................................................17

# TABLES OF AUTHORITIES

## CASES

*Alcresta Therapeutics, Inc. v. Azar*,
    755 F. App'x 1 (D.C. Cir. 2018) ....................................................................................13

*Arthur v. Dunn*,
    137 S. Ct. 725 (2017) .......................................................................................................9

*Banks v. Booth*,
    468 F. Supp. 3d 101 (D.D.C. 2020) ..............................................................................12

*Brown v. Beck*,
    No. 06CT3018, 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006)..........................................12

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) ..................................................................................................8, 9

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...................................................................................11, 15

*Cigar Association of America v. U.S. Food & Drug Administration*,
    317 F. Supp. 3d 555 (D.D.C. 2018) ..............................................................................3, 4

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) ...................................................................................16, 17

*Cooey v. Taft*,
    430 F. Supp. 2d 702 (S.D. Ohio 2006) ......................................................................12, 14

*D.A.M. v. Barr*,
    No. 20-CV-1321, 2020 WL 4218003 (D.D.C. July 23, 2020) ........................................16

*Dunkin' Donuts Franchising, LLC v. 14th Street Eatery, Inc.*,
    102 F. Supp. 3d 334 (D.D.C. 2015) .................................................................................3

*Evans v. Bennett*,
    440 U.S. 1301 (1979) .....................................................................................................11

*In re Federal Bureau of Prisons' Execution Protocol Cases*,
    980 F.3d 123 (D.C. Cir. 2020) .............................................................................1, 7, 8, 9

*Fishman v. Paolucci*,
    628 F. App'x 797 (2d Cir. 2015) ...................................................................................13

*Florida EB5 Investments, LLC v. Wolf*,
    443 F. Supp. 3d 7 (D.D.C. 2020) ...................................................................................13

*Glossip v. Gross,*
  576 U.S. 863 (2015)...............................................................................................4, 7, 9, 10

*Hall v. Florida,*
  572 U.S. 701, 708 (2014),.................................................................................................14

*Harris v. Johnson,*
  323 F. Supp. 2d 797 (S.D. Tex. 2004) ..............................................................................14

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ..............................................................................................11

*Matter of Federal Bureau of Prisons' Execution Protocol Cases,*
  No. 05-CV-2337, 2020 WL 6799129 (D.D.C. Nov. 19, 2020) ........................................12

*Michigan v. U.S. Army Corps of Engineers,*
  667 F.3d 765 (7th Cir. 2011) ............................................................................................13

*Minney v. U.S. Office of Personnel Management,*
  130 F. Supp. 3d 225 (D.D.C. 2015) ..................................................................................13

*Montgomery v. Barr,*
  No. 20-3261, 2020 WL 6799140 (D.D.C. Nov. 19, 2020) ...................................14, 15, 16

*National Association of Farmworkers Organizations v. Marshall,*
  628 F.2d 604 (D.C. Cir. 1980) ..........................................................................................13

*National Parks Conservation Association v. Semonite,*
  No. 17-CV-01361, 2018 WL 3838809 (D.D.C. July 3, 2018) ...........................................3

*Nken v. Holder,*
  556 U.S. 418 (2009)................................................................................................3, 11, 13

*Nooner v. Norris,*
  No. 06cv00110, 2006 WL 8445125 (E.D. Ark. June 26, 2006) ...........................11, 14, 15

*Northern Mariana Islands v. United States,*
  686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................................................13

*In re Ohio Execution Protocol Litigation,*
  840 F. Supp. 2d 1044 (S.D. Ohio 2012) ...........................................................................14

*Osorio-Martinez v. Attorney General United States,*
  893 F.3d 153 (3d Cir. 2018)..............................................................................................15

*Planned Parenthood Association of Cincinatti, Inc. v. City of Cincinatti,*
  822 F.2d 1390 (6th Cir. 1987) ..........................................................................................16

*Population Institute v. McPherson*,
    797 F.2d 1062 (D.C. Cir. 1986) ...........................................................................4

*Proctor v. District of Columbia*,
    310 F. Supp. 3d 107 (D.D.C. 2018) .....................................................................16

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) .............................................................................3

*Steele v. United States*,
    287 F. Supp. 3d 1 (D.D.C. 2017) .........................................................................3

*Trop v. Dulles*,
    356 U.S. 86 (1958) ..............................................................................................14

*Wainwright v. Booker*,
    473 U.S. 935 (1985) ............................................................................................11

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) .........................................................................3, 4

*Williams v. Zbaraz*,
    442 U.S. 1309 (1979) ..........................................................................................13

*Wilson v. Williams*,
    455 F. Supp. 3d 467 (N.D. Ohio 2020), *vacated on other grounds*, 961 F.3d 829,
    844 (6th Cir. 2020) .............................................................................................12

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................3

## RULES

Federal Rule of Civil Procedure 65 ...........................................................................1

Local Civil Rule 65.1 ................................................................................................1

## REGULATIONS

Manner of Federal Executions, 85 Fed. Reg. 75846, 75847-48 (Nov. 27, 2020) ..........................10

## OTHER AUTHORITIES

Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty*
    (2014) .................................................................................................................9

World Health Organization, *WHO Timeline – COVID-19*,
　　　　https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 ................. 5

This memorandum is respectfully submitted in support of Plaintiff Corey Johnson's motion pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1 for entry of a Preliminary Injunction enjoining Defendants from proceeding with his execution pursuant the Federal Bureau of Prisons' ("BOP") current lethal injection protocol (the "2019 Protocol"), currently scheduled for January 14, 2021, pending resolution of the claims raised in his supplemental complaint ("Supplemental Complaint") filed concurrently with this motion.

## I.  BACKGROUND

Mr. Johnson is one of several prisoners on death row who has filed an amended complaint challenging the Federal Bureau of Prisons' execution protocol ("2019 Protocol") and Defendants' implementation of it.  *See* ECF No. 92.  Plaintiffs allege, among other things, that the 2019 Protocol will subject them to cruel and unusual punishment in violation of their rights under the Eighth Amendment.  *See id.* ¶¶ 122-126.  Specifically, Defendants' use of pentobarbital will cause prisoners to suffer flash pulmonary edema, a condition that causes "sensations of drowning and asphyxia[tion]" before becoming unconscious and insensate and results in "extreme pain, terror, and panic."  *Id.* ¶ 78.  On August 15, 2020, this Court dismissed the Eighth Amendment claim "because [Plaintiffs'] evidence of pain would not satisfy *Lee*'s high bar for an objectively intolerable risk of pain."  ECF No. 193 at 5.  On November 18, 2020, the D.C. Circuit determined that Plaintiffs "plausibly allege[d] that the government's execution protocol will, without relevant penological justification, impose a substantial risk of severe pain and suffering that is needless given a readily available, administrable, and known alternative." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 135 (D.C. Cir. 2020). On November 20, 2020, Defendants set a date of January 14, 2021, for the execution of Mr. Johnson.  *See* ECF No. 330.

Following a sharp increase in COVID-19 positive cases in the state of Indiana, and specifically at the USP Terre Haute prison complex, Mr. Johnson began experiencing symptoms of COVID-19 and on December 18, 2020, Mr. Johnson was informed he tested positive for the virus.  As set forth in Mr. Johnson's accompanying Supplemental Complaint, Mr. Johnson's medical reports indicate that his infection has already resulted in "***significant lung damage***." (*Infra* 4-5.)  Indeed, Mr. Johnson has shown a decrease in blood oxygen saturation and cough—both of which are signs of damage to his respiratory system. (*Id.*)  Because COVID-19 can cause lasting lung damage, a person injected with pentobarbital will experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19.  Here, given Mr. Johnson's compromised respiratory health, Defendants' method of execution through injection of pentobarbital will cause flash pulmonary edema earlier in his execution process, and before brain levels of pentobarbital have peaked, causing Mr. Johnson to suffer needless and excruciating pain before the end of his life.

Mr. Johnson now seeks a preliminary injunction to prevent Defendants from executing him in violation of the Eighth Amendment to the U.S. Constitution.  Mr. Johnson's execution would violate his right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution due to the combined effects of his COVID-19 infection and Defendants' administration of pentobarbital, which will cause Mr. Johnson to suffer the excruciating pain and terror of flash pulmonary edema.  As explained below, Mr. Johnson is likely to succeed on the merits of his claims, and he will also suffer irreparable harm should injunctive relief be denied; the balance of the equities and the public interest, moreover, weigh in his favor.

## II.  LEGAL STANDARDS

Courts consider and weigh four factors before granting a preliminary injunction: 1) the threat of irreparable harm to the plaintiff if an injunction is not granted, 2) the likelihood of the plaintiff's success on the merits, 3) the balance of the equities, and 4) the interests of the public.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.*, 102 F. Supp. 3d 334, 336 (D.D.C. 2015) (Chutkan, J.). Irreparable harm and likelihood of success are "the most critical" factors in whether a preliminary injunction is warranted.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Courts in this Circuit traditionally analyze the four factors using a "sliding-scale" approach, whereby "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  That framework "allows a movant to remedy a lesser showing of likelihood of success on the merits with a strong showing as to the other three factors, provided that [there is] a 'serious legal question' on the merits." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).  Absent a contrary holding from the D.C. Circuit, courts in this District continue to apply the sliding-scale standard following the Supreme Court's decision in *Winter*. *See, e.g.*, *id*. at 560-61; *National Parks Conservation Ass'n v. Semonite*, No. 17-CV-01361, 2018 WL 3838809, at *1 (D.D.C. July 3, 2018); *Steele v. United States*, 287 F. Supp. 3d 1, 3 (D.D.C. 2017).  In any event, each of these factors independently weighs in favor of a preliminary injunction.

## III.     ARGUMENT

### A.     Corey Johnson is Likely to Prevail On His Eighth Amendment Claim

Mr. Johnson is likely to succeed on his Eighth Amendment claim.  To

demonstrate that success on the merits is sufficiently likely, a plaintiff "need not establish an

absolute certainty of success."  *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir.

1986); *see also Washington Metro. Area Transit Comm'n*, 559 F.2d at 843.  Instead, it is

ordinarily sufficient that "the plaintiff has raised questions going to the merits so serious,

substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more

deliberative investigation."  *Id.* at 844; *Cigar Ass'n of Am.*, 317 F. Supp. 3d at 560-61; *Nat'l*

*Parks Conservation Ass'n*, 2018 WL 3838809, at *1.

Mr. Johnson has met that standard.  Here, Mr. Johnson can "establish both that

[the 2019 Protocol] creates a demonstrated risk of severe pain and that the risk is substantial

when compared to the known and available alternatives."  *Glossip v. Gross*, 576 U.S. 863, 878

(2015).  His recent COVID-19 diagnosis creates a demonstrated risk of severe pain if Defendants

carry out the 2019 Protocol as planned on January 14, 2021.

#### 1.     Defendants' Intended Execution of Mr. Johnson Creates a Demonstrated Risk of Severe and Unnecessary Pain and Suffering

##### (a)     Mr. Johnson is Suffering From COVID-19

It is undisputed that Mr. Johnson tested positive for COVID-19 and is

experiencing symptoms.  (Supp. Compl. ¶ 11.)  Mr. Johnson's COVID-19 infection create a

substantial risk that Mr. Johnson will suffer from flash pulmonary edema immediately upon

injection of a high dose of pentobarbital, prior to becoming insensate or dying.  (*Id.* ¶ 26.)  And

alternative methods of execution that Mr. Johnson proffers below will significantly reduce this

substantial risk of severe pain associated with the planned execution on January 14, 2020, under the 2019 Protocol.

Mr. Johnson started to develop a cough, headache, runny nose, fatigue and body aches on December 14, 2020.  On December 18, 2020, the BOP informed counsel for Mr. Johnson that he had tested positive for COVID-19.  Mr. Johnson's medical records indicated that he is symptomatic and his symptoms have "progressed to include both a headache and dry cough."  (*Id.* ¶ 11.)  On December 20, 2020, Mr. Johnson's medical records indicate that his pulse oximetry result dropped from a 99% to a 97%, which "is clinically significant and indicates significant changes have occurred in gas exchange in the lungs, particularly in the setting of early COVID-19 infection."  (*Id.* ¶ 12.)  In other words, Mr. Johnson's COVID-19 infection "has already caused significant lung damage, which in turn is already leading to measurably abnormal oxygen exchange."  (*Id.*)

Given his positive test, his pulse oximetry rate, and his overt symptoms, Mr. Johnson has "already clinically entered a phase of infection that in virtually all patients results in pulmonary damage."  (*Id.* ¶ 13.)  "During the very early phase of his illness (in the first four days), he has shown decrease in blood oxygen saturation and cough—both of which are signs of damage to his respiratory system.  The cough demonstrates inflammation in the airway, while lower readings by pulse oximetry, an indirect method of measuring blood oxygen levels, demonstrate that oxygen exchange at the alveolar-capillary membrane is already abnormal."  *Id.*

### (b)   COVID-19 Impacts Lung Functioning

COVID-19 is "a highly contagious respiratory illness caused by a novel coronavirus (SARS-CoV-2)."  (*Id.* ¶ 15.)  On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.  *See* World Health Organization, *WHO Timeline – COVID-19*, https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (last visited Dec.

21, 2020).  COVID-19 "spreads via the respiratory route and as such, targets the lungs."  (*Id.*
¶ 19.)  COVID-19 causes lung damage in a majority of patients.  (*See id.* ¶ 20.) (citing Zivot
Suppl. Decl.) ("COVID-19 infection is associated with an increased risk of lung damage.").  This
is true even for patients who report experiencing only mild symptoms or no symptoms at all.
(*Id.*)  In one such test, 79% of *symptomatic* patients had lung damage visible on a CT scan.  (*Id.*)
This finding has been corroborated by other emerging research on the effects of COVID-19 on
the lungs.  (*Id.*)  In short, "[i]t is clear now that even in mild infection—i.e. infection that is either
asymptomatic or symptomatic but does not require hospitalization—significant damage occurs in
the lungs . . . ."  (*Id.*)

The medical research that is currently available indicates that lung damage
persists for at least two to three months after initial infection with COVID-19, even when it
appears that a patient has recovered.  (*Id.* ¶ 22.)  One study followed a small group of
professional divers who had developed mild symptoms of COVID-19.  (*Id.* ¶ 21.)  When
assessed six weeks after the development of symptoms, *none* of the divers could be certified to
return to diving because all of them had impaired lung functioning.  (*Id.*)

### (c)     Mr. Johnson's COVID-19 Diagnosis Makes Him Especially Likely To Suffer Severe Pain From Execution by Pentobarbital

Mr. Johnson has alleged that the 2019 Protocol violates the Eighth Amendment
because it is likely to cause flash pulmonary edema resulting in excruciating pain.  (*See id.* ¶¶ 24-
26.)  Mr. Johnson is especially at risk of experiencing flash pulmonary edema while still sensate
as a result of his COVID-19 infection. "Infection with the COVID-19 virus causes severe
damage to many areas in the airways and the lungs, but most specifically to the alveolar-capillary
membrane, which is also the site of damage of massive barbiturate overdose."  (*Id.* ¶ 25.)

Lung damage from COVID-19 thereby "sensitizes the lungs to more extensive and immediate further damage . . . , causing massive pulmonary edema at an earlier stage in the execution process before drug levels in the brain have peaked." (*Id.* ¶ 26.)  Execution with pentobarbital is thus "particularly likely to cause extreme suffering. Because COVID-19 can cause lasting lung damage, a person injected with pentobarbital would experience the feeling of suffocating or drowning even more quickly and acutely than a person who had not been infected with COVID-19." (*Id.*)

Mr. Johnson's recent COVID-19 infection and his current symptoms makes him particularly likely to "experience[] earlier and more prolonged sensations of suffocation and drowning" if he is executed under the 2019 Protocol before his lungs are able to fully heal from his COVID-19 infection.  (*Id.*)  As such, "the government's execution protocol will, without relevant penological justification, impose a substantial risk of severe pain and suffering that is needless." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 135.

## 2.   Mr. Johnson Has Identified Alternative Methods of Execution

The risks presented by the 2019 Protocol are "substantial when compared to the known and available alternatives."  *Glossip*, 576 U.S. at 863-64.  First, Mr. Johnson alleges as an alternative that Defendants could administer "a pre-dose of a pain-relieving, anesthetic drug in a sufficiently large clinical dose" prior to the administration of pentobarbital.  ECF No. 92 ¶ 114(a).  Second, Defendants could execute Mr. Johnson by firing squad.  *Id.* ¶ 114(c).  Third, in the alternative, Defendants should at minimum wait until Mr. Johnson recovers from COVID-19-induced lung damage before carrying out his execution.

### (a)   Pre-Dose of Anesthetic Drug

The D.C. Circuit recently held that the allegations of a pre-dose of an opioid sufficiently plead an alternative method of execution that would significantly reduce the risk of

pain resulting from flash pulmonary edema.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 132-33.  A pre-dose of an anesthetic drug would substantially reduce Mr. Johnson's pain.  For example, "the opioid fentanyl is one option of a drug that would substantially reduce the risk that the prisoner would remain sensate to experience pain, including the pain and suffering caused by pulmonary edema."  ECF No. 92 ¶ 114(a).  "Barbiturates" like pentobarbital, on the other hand, "do not have 'analgesic,' (i.e. pain relieving), properties and in lower doses actually are 'antalgesic,' meaning they augment feelings of pain."  Decl. of Dr. Gail A. Van Norman, M.D., ¶ 24 (Nov. 1, 2019) (ECF No. 24) (Nov. 1, 2019).  Administration of a clinical dose of a pretreatment opioid (after IVs are set but before the injection of pentobarbital commenced) would "exert a clinical effect of analgesia"—eliminating or significantly reducing a prisoner's ability to feel pain.  Decl. of Craig W. Stevens, Ph.D. ¶ 5 (Nov. 1, 2019) (ECF No. 25) (Nov. 1, 2019).  Given the near certainty that utilizing the current execution protocol on January 14, 2021, will result in Mr. Johnson experiencing flash pulmonary edema while sensate, pre-treatment with an opioid would significantly reduce his pain and suffering.

Anesthesia drugs are "feasible" and "readily available" to the BOP.  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019); *see also In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 133.  "There are a wide variety of well-known, accessible, and easily administered pain-relieving medications used in anesthetic procedures."  ECF No. 92. ¶ 114(a).  Moreover, as Mr. Johnson alleged on June 1, 2020:  the BOP "has confirmed that it has located a lawfully licensed compounding pharmacy in the United States that is able and willing to 'lawfully provide [BOP] with commercially manufactured medications as they are available,' and to compound fentanyl as needed."  ECF No. 92. ¶ 114(a).

The D.C. Circuit has found this alternative method of execution (i.e. including an anesthesia drug in the protocol) to be a viable alternative.  "By pleading that the federal government's execution protocol involves a 'virtual medical certainty' of severe and torturous pain that is unnecessary to the death process and could readily be avoided by administering a widely available analgesic first, the Plaintiffs' complaint properly and plausibly states an Eighth Amendment claim."  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 133 (citation omitted).

### (b)    Firing Squad

Defendants could execute Mr. Johnson by use of a firing squad.  *Id.* ¶ 114(c). Execution by firing squad is currently authorized in Utah, Oklahoma, and Mississippi. Defendants have the means and ability to administer this alternative execution method.

Execution by firing squad causes a faster and less painful death than execution by lethal injection. *See Arthur v. Dunn,* 137 S. Ct. 725, 733-34 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution); *see also Bucklew,* 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative).  Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip*, 576 U.S. at 976 (Sotomayor, J., dissenting).  Recent studies have confirmed that execution by firing squad statistically is much less likely to result in "botched" executions than lethal injection.  *See* Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* 120, App. A (2014) (analysis of contemporaneous news reports of all executions in the United States from 1900 to 2010 found that 7.12% of the 1,054 executions by lethal injection were "botched" and none, 0%, of the 34 executions by firing squad were "botched"). The Department of Justice's final rule amending its regulations for implementing death sentences

purports to allow for alternative execution methods, including the firing squad. *See* Manner of

Federal Executions, 85 Fed. Reg. 75846, 75847-48 (Nov. 27, 2020) (concerning amendments to

28 C.F.R. Part 26, effective Dec. 24, 2020).  That amendment is scheduled to go into effect prior

to Mr. Johnson's execution date.

> **(c)     Execution Pursuant to 2019 Protocol After Mr. Johnson Has Recovered from the Effects of COVID-19**

While Mr. Johnson maintains that the 2019 Protocol causes significant pain and

suffering such that it violates the Eighth Amendment even when carried out on a healthy person,

it is clear that Mr. Johnson's current COVID-19 infection subjects him to an even greater risk of

severe pain.  Thus, even if execution of a healthy prisoner using were constitutionally

permissible, at minimum, allowing Mr. Johnson to recover from the effects of COVID-19 before

executing him under the 2019 Protocol would reduce the substantial risk of the prolonged

suffering of flash pulmonary edema while sensate.  At minimum, Defendants should wait to

execute Mr. Johnson until his lungs have recovered from his current COVID-19 infection.

Specifically, current medical research supports waiting at least two to three

months in order to allow Mr. Johnson heart and lungs to recover from the infection.  (*See* Suppl.

Compl. ¶ 22.)  The proposed alternative of a two- to three-month postponement is "feasible,

readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain."

*Glossip*, 576 U.S. at 877 (alteration in original) (citation omitted).  Given the government's long

delays in carrying out Mr. Johnson's execution, Defendants can offer no cogent reason why this

further temporary delay is infeasible or unreasonable under the circumstances.

> **B.     Mr. Johnson Will Suffer Irreparable Injury if not Granted a Preliminary Injunction**

Mr. Johnson will undoubtedly suffer irreparable harm if the Court denies the

motion for a preliminary injunction.  To constitute irreparable harm, "the harm must be 'certain

and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for

equitable relief to prevent irreparable harm,'" and it "must be beyond remediation." *League of*

*Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (alterations omitted)).  Mr.

Johnson unquestionably faces grave injury—an unnecessarily excruciating death

　　　　　　　Facing an imminent execution, scheduled to take place in three weeks, Mr.

Johnson has alleged a harm that, if realized, cannot be corrected.  Without this Court's

intervention, Mr. Johnson will suffer unnecessary pain, well before he can fully litigate his

claims.  Moreover, because Mr. Johnson is suffering from COVID-19 just weeks before his

scheduled execution, he will not be able to prepare for his death as a healthy person could.  For

example, Mr. Johnson's ability to meet with his family, his counsel, and loved ones, and to

prepare himself and his affairs for death, is substantially limited due to his illness.  The

threatened harm is "beyond remediation," *Newby*, 838 F.3d at 8, because no "adequate

compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at

297 (citation omitted).  For Mr. Johnson, there is no later date.  His claims are therefore

"categorically irreparable." *Nken*, 556 U.S. at 435.  Recognizing this basic reality, courts have

found that the "requirement—that irreparable harm will result if a stay is not granted—is

necessarily present in capital cases." *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985)

(Powell, J., concurring); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of

execution in light of the "obviously irreversible nature of the death penalty").  In similar

circumstances, courts have repeatedly held that a plaintiff suffers irreparable harm if he is

executed before his legal challenges to the execution methods are complete.  *See Nooner v.*

*Norris*, No. 06cv00110, 2006 WL 8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed

threat of irreparable harm because if he suffered pain during his execution, as alleged, the injury would never be rectified); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No. 06CT3018, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).

Moreover, extensive evidence demonstrates that Mr. Johnson will suffer unnecessary, protracted, and extraordinary pain if he is executed pursuant to the 2019 Protocol; a likelihood that has only increased because of Mr. Johnson's infection from COVID-19.  It is a "virtual medical certainty" that the injection of pentobarbital will immediately cause Plaintiff to experience flash pulmonary edema.  Supplemental Decl. of Dr. Gail A. Van Norman, M.D., ¶ 19 (Sept. 30, 2020) (ECF No. 282-4).  COVID-19 is a viral infection that has already caused Mr. Johnson "significant lung damage" and will lead to flash pulmonary edema earlier in the injection process, and before a peak brain level of barbiturate is achieved.  (Suppl. Compl. ¶¶ 12-13, 26.)

If Defendants are allowed to proceed with Mr. Johnson's scheduled execution, he will experience unnecessary, excruciating physical pain and suffering that can never be undone. Courts have previously granted injunctive relief to prevent harm to health and bodily integrity that was far less definite, direct, or severe.  *See, e.g.*, *Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, No. 05-CV-2337, 2020 WL 6799129, at *4 (D.D.C. Nov. 19, 2020), ("without injunctive relief, Plaintiff will be executed with a drug administered in violation of a federal law that ensures its safety and efficacy for the intended purpose. . . . This harm is manifestly irreparable."), *vacated by Barr v. Hall*, No. 20A102, 2020 WL 6797719 (U.S. Nov. 19, 2020); *Wilson v. Williams*, 455 F. Supp. 3d 467, 479 (N.D. Ohio 2020), *vacated on other grounds*, 961 F.3d 829, 844 (6th Cir. 2020) ("The district court correctly noted that inmates at Elkton face a *risk* of irreparable injury *if* they are infected by COVID-19."); *Banks v. Booth*, 468

12

F. Supp. 3d 101, 123 (D.D.C. 2020) (inmate's "*risk* of contracting COVID-19 and the resulting complications . . . is the prototypical irreparable harm" (emphasis added)); *Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 5 (D.C. Cir. 2018) (per curiam) (loss of medical coverage); *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613-14 (D.C. Cir. 1980) (possible exposure to pesticides); *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015) ("A lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address."); *accord Williams v. Zbaraz*, 442 U.S. 1309, 1314 (1979) (Stevens, J., as a circuit justice) (denying stay of injunction based on exposure to "considerable risk of severe medical problems" (citation omitted)).

Finally, Mr. Johnson need not establish that he ***will*** experience an unconstitutional level of pain at his execution.  Whereas assessing success on the merits involves "an early measurement of the quality of the underlying lawsuit," the question whether Mr. Johnson has shown irreparable harm asks "how urgent the need for equitable relief really is," that is, "the ability to correct [the harm] if it is created."  *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).  It is "error to conflate these inquiries."  *Id*. at 787.  Here, there is no question that Mr. Johnson will face irreparable harm absent an injunction.

### C.    The Balance of Equities and Public Interest Weigh in Favor of a Preliminary Injunction

The balance of equities and public interest factors "merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435; *see also Fla. EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020).  Here, balance of the equities and public interest also favors a preliminary injunction.  *See Nken*, 556 U.S. at 434-35.  It is indisputable that "[a]pplying the law in a way that violates the Constitution is *never* in the public's interest . . . ."  *Minney v. U.S. Office of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015); *N. Mariana Islands v. United*

*States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is . . . served when administrative agencies comply with their [legal] obligations . . . .").

In the capital-punishment context, "the public's interest in seeing justice done lies not only in carrying out the sentence imposed years ago but also in the lawful process leading to possible execution." *Montgomery v. Barr*, No. 20-3261, 2020 WL 6799140, at *11 (D.D.C. Nov. 19, 2020); *see also Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("[C]onfidence in the humane application of the governing laws of the State must be in the public's interest."). Accordingly, courts have further recognized that the public has an "important public interest in the humane and constitutional application of [a] lethal injection statute." *Nooner*, 2006 WL 8445125, at *4; *see also In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006). The Eighth Amendment guarantees that even when the government decides to take a life, the public interest demands that it do so in a considered, safe and respectful manner. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). The seriousness of a person's offenses of conviction does not alter that analysis. *See Hall v. Florida*, 572 U.S. 701, 708 (2014) ("By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons.")

This Court has already decided that the balance of the equities favors Plaintiff under these circumstances because "the potential harm to the government caused by a delayed execution is not substantial" and "[t]he public interest is not served by executing individuals before they have had the opportunity to avail themselves of legitimate procedures to challenge the legality of their executions." ECF No. 50 at 14. While Defendants may cite a general

interest in ensuring the "finality" of capital proceedings, that interest in the conclusion of litigation cannot eclipse Plaintiff's rights by allowing Defendants to permanently extinguish potentially meritorious claims.  In fact, "finality" will be served even if Plaintiff does not ultimately succeed on the merits of his claims, as his death sentence would still be undisturbed by this Court's preliminary injunction.  Further, any interest in finality cannot outweigh the public's interest in a "humane and constitutional" application of the federal execution protocol. *Nooner*, 2006 WL 8445125 at *4.  This is especially true where, as here, there is substantial scientific evidence that if Defendants are allowed to proceed with their chosen method of execution, Mr. Johnson will experience excruciating pain and suffering in his final moment.

   For seventeen years, Defendants did not execute or seek to execute any inmates sentenced to death, including Mr. Johnson.  Defendants cannot now credibly allege that their interest in finality or in expeditious executions would be seriously hampered by allowing Mr. Johnson's claims to be fully litigated—nor can Defendants blame the lapse between the imposition of Mr. Johnson's sentences and the setting of execution dates on Plaintiff.  "[T]he fact that the government has not—until now—sought to" schedule Plaintiffs' executions "undermines any urgency surrounding" its need to do so.  *See Osorio-Martinez v. Att'y Gen. U.S.*, 893 F.3d 153, 179 (3d Cir. 2018).  Under these circumstances, a preliminary injunction that will allow Mr. Johnson to fully and fairly litigate his Eighth Amendment claims will "not substantially injure other interested parties," the public, or the government.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

   Further, the government has no legitimate interest in carrying out an execution during a pandemic, particularly where the execution itself is likely to further the spread of the disease. *See Montgomery*, 2020 WL 6799140, at *11 (granting in part the plaintiff's motion for

15

a preliminary injunction and temporary restraining order "[g]iven the gravity of the circumstances and the extraordinary circumstances of the pandemic . . . ."); *D.A.M. v. Barr*, No. 20-CV-1321, 2020 WL 4218003, at \*14 (D.D.C. July 23, 2020) ("It is in the public interest to avoid or reduce that risk [of contracting the COVID-19 virus].").

Finally, the U.S. criminal justice system is founded upon a system of constitutional guarantees, including the right protected under the Eighth Amendment to the U.S. Constitution to be free from cruel and unusual punishment.  Protection of these rights for one person is the protection for all.  *Cf. Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (public interest served by preliminary injunction because "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional").  Permitting the government to violate these constitutional rights in carrying out an execution that will cause Mr. Johnson foreseeable and unnecessary suffering undermines public confidence in the "lawful process leading to possible execution." *Montgomery*, 2020 WL 6799140, at \*11.  Absent an injunction, defendants will violate Mr. Johnson's Eighth Amendment rights, casting grave doubt upon the legitimacy and moral authority of the federal capital punishment system.  Because of the strong public interest in protecting the constitutional rights of all citizens and in preventing conduct that reduces the legitimacy and moral authority of the federal capital punishment system, public interest favors injunctive relief.

###### D.     Mr. Johnson is Entitled to An Evidentiary Hearing

The Court may grant a preliminary injunction "on less formal procedures and on less extensive evidence than in a trial on the merits."  *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).  Nevertheless, "an evidentiary hearing is required if the parties raise a genuine issue of material fact that must be resolved in deciding the motion."  *Proctor v. D.C.*, 310 F. Supp. 3d

16

107, 113 (D.D.C. 2018) (citing *Cobell*, 391 F.3d at 261).  An evidentiary hearing is particularly

important "when a court must make credibility determinations to resolve key factual disputes in

favor of the moving party . . . ."  *Cobell*, 391 F.3d at 261 (citing *Prakash v. Am. Univ.*, 727 F.2d

1174, 1181 (D.C. Cir. 1984)).

       The Court should hold an evidentiary hearing in order to evaluate the facts

underlying Mr. Johnson's claims, and to resolve any disputes that may arise.  With respect to his

as-applied Eighth Amendment claim, Mr. Johnson's COVID-19 infection renders it "virtual[ly]

certain" not only that he will experience extreme suffering while sensate, but also that his

suffering will be more pronounced than someone who does not have similar health conditions.

(Suppl. Compl. ¶¶ 24-26.)  To the extent that Defendants may contest that Mr. Johnson's

COVID-19 infection will worsen his experience of suffering flash pulmonary edema while

sensate during his execution, these are factual disputes appropriate for resolution following an

evidentiary hearing.  *See Cobell*, 391 F.3d at 261.

## IV.    CONCLUSION

       For all the foregoing reasons, the Court should (1) grant a preliminary injunction

in favor of Plaintiff Corey Johnson, so as to enjoin Defendants from carrying out the scheduled

execution of Mr. Johnson on January 14, 2021, or at any other time until further order of this

Court, and (2) conduct an evidentiary hearing on Mr. Johnson's as-applied Eighth Amendment

claim.

Dated: December 23, 2020

Respectfully submitted,

/s/ *Donald P. Salzman*

Donald P. Salzman
D.C. Bar Number #479775
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7983

Alexander C. Drylewski (admitted *pro hac vice*)
One Manhattan West
New York, NY 10001
(212) 735-3278

*Counsel for Plaintiff Corey Johnson*