Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


IN THE MATTER OF THE         .   MC No. 19-0145 (TSC)
FEDERAL BUREAU OF PRISONS'   .   Washington, D.C.
EXECUTION PROTOCOL CASES.    .   Thursday, December 17, 2020
. . . . . . . . . . . . . .  .   4:04 p.m.


TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff              DEVON E. PORTER, ESQ.
Dustin Higgs:              ALEXANDER L. KURSMAN, ESQ.
                           Federal Community Defender Office
                           601 Walnut Street
                           Suite 545 West
                           Philadelphia, PA 19106
                           (215) 928-0520


For Plaintiff              PAUL F. ENZINNA, ESQ.
James H. Roane Jr.:        Ellerman Enzinna PLLC
                           1050 30th Street NW
                           Washington, DC 20007
                           (202) 753-5553


For Plaintiff              JOSHUA C. TOLL, ESQ.
Anthony Battle:            King & Spalding, LLP
                           1700 Pennsylvania Avenue NW
                           Suite 200
                           Washington, DC 20002
                           (202) 737-8616


For Plaintiff              GERALD W. KING JR., ESQ.
Richard Tipton:            Federal Defender Program, INC.
                           101 Marietta Street NW
                           Suite 1500
                           Atlanta, GA 30303
                           (404) 688-7530


For Defendants:            Johnny H. Walker III, AUSA
                           U.S. Attorney's Office
                           555 4th Street NW
                           Washington, DC 20530
                           (202) 252-2575

```
Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```

**Proceedings reported by stenotype shorthand.**
**Transcript produced by computer-aided transcription.**

P R O C E E D I N G S

          THE DEPUTY CLERK:  Your Honor, we have Miscellaneous

Action 19-145, In the Matter of the Federal Bureau of Prisons'

Execution Protocol Cases.  I'll ask that counsel identify

yourselves one at a time, please.

          MS. PORTER:  This is Devon Porter, representing

Dustin Higgs, and I'm here with my co-counsel, Alex Kursman.

          THE COURT:  All right.  Good afternoon.

     Ms. Porter, will you be speaking for Mr. Higgs?

          MS. PORTER:  Yes.

          THE COURT:  Okay.

          MR. WALKER:  Good morning, Your Honor.  This is

Assistant United States Attorney Johnny Walker on behalf of

defendants.

          THE COURT:  All right.  Good afternoon.

     All right.  Anybody else present?

          MR. ENZINNA:  Your Honor, this is Paul Enzinna

representing James Roane.

          THE COURT:  Good afternoon, Mr. Enzinna.

          MR. TOLL:  And this is Joshua Toll representing

Plaintiff Anthony Battle.  Good afternoon, Your Honor.

          THE COURT:  Good afternoon.

          MR. KING:  Good afternoon, Your Honor.  Gerald King

on behalf of Richard Tipton.

          THE COURT:  Good afternoon.  Is that it?

1          Okay.  We are getting fewer.  All right.  Today's hearing

2     relates to motions that have been filed by Plaintiff

3     Dustin Higgs, who's represented by Ms. Porter today.

4     Are you also from the Federal Defender's, Ms. Porter?

5               MS. PORTER:  Yes, I am.

6               THE COURT:  Okay.

7               MS. PORTER:  And, Your Honor, I don't know if it

8     makes sense right now, but I did have a couple of preliminary

9     matters that I wanted to bring to your attention.

10              THE COURT:  Sure.  Go ahead.

11              MS. PORTER:  Thank you, Your Honor.  The first

12    one is that we just learned this afternoon from the Bureau

13    of Prisons that Mr. Higgs has tested positive for COVID-19.

14              THE COURT:  Oh, boy.  I'm sorry to hear that.

15              MS. PORTER:  Yeah.  Thanks, Your Honor.  I just

16    wanted to kind of put that on the record and let you know

17    about that.  We just learned that a couple of hours ago.

18              THE COURT:  Well, that certainly changes the --

19    well, we'll get into that in a minute.  Go ahead.

20              MS. PORTER:  Sure.  And the other thing was just

21    that, as you know, the execution of Alfred Bourgeois, who my

22    office also represents, occurred on Friday, and there were some

23    additional witness accounts of that execution that I wanted to

24    put on the record as well if that would be all right.

25              THE COURT:  Mr. Walker, do you have any objection?

1    MR. WALKER:  No, Your Honor.  We would certainly

2    want to respond to that.

3    THE COURT:  Okay.  You may put those on the record,

4    Ms. Porter.

5    MS. PORTER:  Thank you.  So the reporter George Hale

6    from NPR witnessed --

7    THE COURT:  Now, will you be filing anything, or you

8    were just putting these orally?  Are there any affidavits or

9    anything?

10    MS. PORTER:  At this point, there are no affidavits,

11    and all of this information is new as of yesterday.

12    THE COURT:  Okay.

13    MS. PORTER:  So at this point we don't have anything

14    to file.  And Mr. Hale reported --

15    THE COURT:  This is a reporter for NPR?

16    MS. PORTER:  The reporter for NPR, yes.  That's

17    correct.  Reported that the execution took about 28 minutes --

18    in his words, about 28 minutes.  He said that's about twice as

19    long as it took to kill Brandon Bernard one day earlier using

20    the same method, an overdose of pentobarbital, and he also said

21    -- he gave times, notes.  So he said -- I'm quoting from his

22    Twitter account at this point:

23    "At 7:56 p.m., for example, I wrote 'Not Natural Movement,'

24    referring to how Alfred Bourgeois's torso appeared to be

25    contracting uncontrollably not too long after the drug began

1    flowing.  This went on for several minutes.

2        "I made related notes each minute starting at 7:55 p.m.

3    ('stomach rising,' 'stomach heaving,') at 7:56 p.m. ('stomach

4    popping up,' 'heaving inside'), at 7:57 p.m. ('sucking inside

5    middle,' 'still heaving') and ending at 7:58 p.m.  All times

6    are eastern U.S."

7        So that was his reporting on the execution of Alfred

8    Bourgeois.

9            THE COURT:  All right.

10       Mr. Walker, do you have a response now?

11           MR. WALKER:  Yes, Your Honor.  My anticipation was to

12   file something in response to any statements.  We do have some

13   statements from BOP officials who witnessed the execution, and

14   we'll be happy to put those on the docket.

15           THE COURT:  All right.  Thank you.

16       Ms. Porter, anything else?

17           MS. PORTER:  No, Your Honor.

18           THE COURT:  All right.  So, again, today's hearing

19   relates to motions filed by Mr. Higgs, and we're here to discuss

20   the possibility and parameters of an evidentiary hearing should

21   one need to take place for Mr. Higgs, whose execution is

22   scheduled for Friday, January 15, 2021.

23       Right now I have in front of me Mr. Higgs' motion for

24   leave to file an amended and supplemental complaint, which is

25   ECF No. 343, and Mr. Higgs' motion for a preliminary injunction,

1    ECF No. 344, in which he requests an evidentiary hearing.

2        Now, assuming that I grant Mr. Higgs' leave to file

3    his amended pleading, and I want to emphasize that I haven't

4    decided whether I will or not, there are several issues that

5    Mr. Higgs raises in his preliminary injunction motion.

6        As of right now, I previously dismissed Mr. Higgs'

7    as-applied Eighth Amendment challenge as speculative.  At the

8    time Mr. Higgs raised the possibility of him getting COVID,

9    which he had not at the time gotten, and now that Ms. Porter

10   has informed me that he has tested positive, are you planning

11   on filing -- refiling that motion, Ms. Porter?

12       MS. PORTER:  We'll need to discuss it with our

13   client since it was just about two hours ago that we learned

14   about this.

15       THE COURT:  Right.  Well, obviously, since that now

16   has occurred, unfortunately, then your claim is no longer

17   speculative.  So, obviously, if you need to refile based on

18   that, you may.  You should obviously seek leave, but --

19       MS. PORTER:  Thank you, Your Honor.

20       THE COURT:  -- the circumstances have changed.

21       MR. WALKER:  Your Honor, this is Johnny Walker.

22   If I could add something at this point?

23       THE COURT:  Certainly.

24       MR. WALKER:  The government's position is that the

25   claim is still speculative.  I believe Your Honor noted in

your opinion that there were sort of two elements as to the
speculations related to that claim.

One was that Mr. Higgs either had been diagnosed with
COVID-19 or would be diagnosed with COVID-19.  The other element
of speculation is that any COVID-19 would result in a sort of
a lung damage that would make -- that could allegedly make the
experience of flash pulmonary edema more acute or hastened in
some way.  So we would argue that the speculation as to any
lung damage resulting from COVID-19 is still present.

THE COURT:  Well, Mr. Walker, all we have right now
is a positive test, and as I'm sure you're no doubt aware, this
virus is extremely unpredictable and presents in many different
ways and presents many different symptoms.  Some people are
asymptomatic; some people develop life-threatening respiratory
problems; some develop heart problems, gastro problems.

So we are -- Mr. Higgs' execution is set for January 15th,
and he has just tested positive.  We're in an early stage.
But I certainly wouldn't -- couldn't even begin to guess how it
will affect him, and neither could any of us sitting here today.
So, obviously, we are dealing with a situation that can change.

I assume his lawyers will file a motion if his health
situation deteriorates such that they believe they have a claim.
So, yes.  Obviously, we don't know very much right now other
than he has tested positive, which he had not at the time I
denied the motion.  There was simply a fear or concern that he

1    would test positive and, if he were to test positive, he would

2    be in danger of suffering extreme flash pulmonary edema.

3        One of those events has occurred in that he does have

4    the virus, and so therefore I will assume that his lawyers

5    will monitor his physical condition; and if it appears to them

6    and his physicians that his health has deteriorated to a point

7    where that is a possibility, then they'll file the appropriate

8    pleading.  So let's not -- we are where we are right now, and

9    obviously we're in a situation that could change.

10       All right.  Mr. Higgs also argues that the use of

11   pentobarbital in his execution violates the Ex Post Facto

12   Clause of the United States Constitution and that the Attorney

13   General's intent to carry out his execution is arbitrary and

14   capricious and therefore violates the Fifth and Eighth

15   Amendments.

16       I have to tell you I'm not entirely convinced a hearing

17   is necessary, but I want to drill down the arguments to make

18   sure I understand what's at issue.  Obviously, as I've said

19   before, these cases, you know, that -- obviously, execution is

20   irreversible and the claims must be taken seriously.  And I am

21   of the view that in cases such as -- any case involving the

22   death penalty, the plaintiffs obviously must be afforded the

23   full panoply of due process rights to which they're entitled.

24   So I wanted to have this hearing today.

25       Let's begin with the Ex Post Facto Clause argument.

1    Mr. Higgs argues that the use of pentobarbital in his execution

2    is unconstitutional as an ex post facto law.  He was sentenced

3    in Maryland federal court, but the State of Maryland has since

4    outlawed the death penalty.

5        At the time of his sentence, however, Maryland's death

6    penalty law, which was Maryland Code Annotated Correctional

7    Services § 3-905, required that, and I quote:

8        "The manner of inflicting the punishment of death shall be

9    the continuous intravenous administration of a lethal quantity

10   of an ultrashort-acting barbiturate or other similar drug in

11   combination with a chemical paralytic agent."

12       Mr. Higgs argues that pentobarbital is not an ultrashort-

13   acting barbiturate nor a similar drug, and thus its use in his

14   execution would increase his punishment.

15       I understand Mr. Higgs' point that the issue of whether

16   pentobarbital is similar to an ultrashort-acting barbiturate is

17   a factual question that may be served by live witness testimony,

18   but before we get there, I see two threshold issues that appear.

19       As everyone knows at this point, § 3596(a) of the Federal

20   Death Penalty Act states that an execution is to be implemented

21   in the manner prescribed by the law of the state in which the

22   sentence is imposed.  If, however, the law of the state does

23   not provide for implementation of a sentence of death -- as

24   in Maryland, for example -- the Court shall designate another

25   state, the law of which does provide for the implementation of

1    the sentence of death, and the sentence shall be implemented in

2    the latter state in the manner prescribed by such law.

3        Now, my understanding is that the government has filed

4    a motion in the District of Maryland asking that court to

5    designate Indiana as a sentencing state for purposes of carrying

6    out Mr. Higgs' execution.  The last I checked, the court had not

7    yet ruled on that motion, but there was a status conference last

8    week.  Could someone provide me an update regarding that case?

9        MS. PORTER:  This is Devon Porter.  I can, Your Honor.

10   If the government wants to add anything, obviously they can.

11       My understanding is that Judge Messitte at that status

12   conference indicated that he was working on an opinion and

13   wanted to issue something soon in order to give the losing party

14   time to appeal, but had not yet ruled.

15       THE COURT:  And so you have no idea when that's coming

16   down.  Did he give any indication?

17       MS. PORTER:  No.  He said that he was working on it

18   and wanted to give the parties ample time to appeal, but he

19   didn't give us a time frame.

20       THE COURT:  Okay.  Now, Ms. Porter, if Maryland

21   designates a different state, doesn't that moot your ex post

22   facto claim?

23       MS. PORTER:  I don't think so, Your Honor.  If the

24   judge were to designate a different state and the government

25   were to agree to carry out the lethal injection with an

1    ultrashort-acting barbiturate, then I suppose that would --

2              THE COURT:  Well, I'm not sure -- wait.

3              MS. PORTER:  Okay.

4              THE COURT:  Maryland doesn't have a death penalty

5    anymore, and so if the court in Maryland designates Indiana as

6    a sentencing state for purposes of carrying out the execution,

7    then doesn't the execution then have to be carried out in

8    accordance with the laws of Indiana?

9              MS. PORTER:  Yes, Your Honor.  Under the FDPA, the

10   sentence would have to be carried out in accordance with the

11   laws of Indiana.

12             THE COURT:  And, therefore, wouldn't the ex post

13   facto argument be mooted?

14             MS. PORTER:  Well, I don't think it would be mooted.

15   I think he would still have the claim that there is a

16   constitutional violation.  The problem would be that the gov --

17   I mean the government would be bound by statute to execute him

18   in a way that wouldn't violate the Ex Post Facto Clause.  So I

19   think our position would be that, you know, at that point

20   compliance with the statute under the -- you know, if the judge

21   rules the way that the government wants the judge to rule --

22             THE COURT:  But then they're not --

23             MS. PORTER:  -- there would be an --

24             THE COURT:  So your argument is that even if the

25   judge in Maryland designates Indiana as a sentencing state

1  for purposes of carrying out the execution, the Bureau of

2  Prisons is still obligated to follow the Maryland statute?

3       MS. PORTER:  Under the Ex Post Facto Clause, yes,

4  because the relevant time for the Ex Post Facto Clause would

5  be the time that he committed the crime and was sentenced

6  originally, and the idea is that can't be changed, you know,

7  ex post.  That can't be changed in the intervening time in order

8  to increase punishment.

9       THE COURT:  So let me just -- let me extrapolate

10  from that argument.  Suppose he had been executed in the state

11  of Utah, which provides for execution by a firing squad, Utah

12  outlawed its death penalty and designated Indiana as a

13  sentencing state for purposes of carrying out the execution.

14  Are you saying that execution by any means other than a firing

15  squad would violate the ex post facto law?

16       MS. PORTER:  Well, with the Utah example, I believe

17  Utah provides for lethal injection or firing squad, and so --

18  but is the hypothetical that you're positing is if Utah's law

19  was different and it was just firing squad only?

20       THE COURT:  Yes.

21       MS. PORTER:  In that case --

22       THE COURT:  Because it would seem to obviate

23  the provision in the Federal Death Penalty Act that says to

24  designate a state other than Maryland as a sentencing state.

25  In other words, where a state no longer has a death penalty,

1   a new state would be designated, and that state's procedures

2   would be followed.  Otherwise, what's the purpose of designating

3   a state?

4          MS. PORTER:  Right.  Well, I would argue that the

5   new state procedures can't increase punishment.  That's the key

6   to where there's an ex post facto problem.  So the government is

7   free to designate a new state if a state gets rid of its death

8   penalty, but the key would be that that new state can't have a

9   means of effectuating the death penalty that increases punishment

10  that is worse than the original state's procedure that the

11  person was sentenced under.

12         THE COURT:  And do you have any case law for that?

13         MS. PORTER:  These challenges are relatively rare

14  because, you know, these changes that increase punishment are

15  relatively rare.  But, you know, there is the *Medley* case that

16  we cite in our briefs which says that, you know, if a person

17  isn't told the exact time, that uncertainty qualifies as

18  increasing punishment.

19      And even restricting visitation and putting somebody

20  in solitary confinement due to a change in the law during the

21  last days before their execution has been found to increase

22  punishment in violation of the Ex Post Facto Clause.  So there

23  are -- you know, there are some kind of similar types of changes

24  to procedure around execution that has been found to violate the

25  Ex Post Facto Clause.

1          THE COURT:  Okay.  Mr. Walker?

2          MR. WALKER:  Yes.  I mean, Your Honor, the

3    government's position is that it would moot it.  I mean, what

4    we have shown in our brief is that the FDPA applies the statute

5    in which the execution -- the sentence is actually carried out.

6    And so there would be no retroactive change.

7          There was no -- Maryland was not the sentence [sic] in

8    which the execution was carried out at the time the sentence

9    was imposed.  The state which the execution is carried out and

10   the state of the execution will be whatever the District of

11   Maryland determines it to be.

12         And so there is no retroactive change as far as the FDPA

13   is concerned that would result in an ex post facto problem.  So

14   our position is that it would moot it.  And I'll just note that

15   we've made several legal arguments based on --

16         THE COURT:  Well, I was going to ask you about that.

17   You argue that Mr. Higgs' ex post facto claim fails because it

18   constitutes a procedural change under *Dobbert v. Florida*.  Now,

19   I understand that Mr. Higgs challenges the applicability of

20   *Dobbert* here.  And this is not intended to be a motions hearing.

21   Nevertheless, this seems like a purely legal question that

22   doesn't require a hearing to resolve.

23         Ms. Porter, do you maintain that we need to have a hearing

24   to resolve this issue, or do you agree it's a legal question?

25         MS. PORTER:  I do believe that we need a hearing,

1    Your Honor, mostly because Dr. Antognini has submitted a lengthy

2    additional expert declaration in support of the government's

3    opposition that includes new, you know, data points and studies

4    that he has relied on that were new to what we've previously

5    heard in this case.

6        And he includes -- at the last page of that declaration in

7    Exhibit B, includes two columns of, you know, what he referred

8    to as data for execution doses of thiopental and pentobarbital,

9    both for their onset and duration, and doesn't cite sources for

10   where he's getting that information.

11       So I think that, you know, some of the scientific

12   information that's been presented and is new would benefit

13   from a hearing, and we would like the opportunity to cross-

14   examine Dr. Antognini on the sources for his information.

15           THE COURT:  So just to clarify, assuming that I find

16   in Mr. Higgs' favor on these issues, that is, that Mr. Higgs'

17   ex post facto claim survives regardless of which state is

18   ultimately designated for the execution and that the use of

19   pentobarbital in his execution is not a procedural change.

20       So let's assume for the purposes of argument that I

21   find that.  It is only then that we reach the factual issue

22   of whether pentobarbital is considered an ultrashort-acting

23   barbiturate or similar drug.  Is that right?

24           MS. PORTER:  I believe so, Your Honor.  I mean,

25   I think that whether or not it's considered a procedural

1    change might be in some sense wrapped up with the substance

2    of, you know, what the differences are in the drugs.  But

3    I agree that these, you know, are threshold questions.

4            THE COURT:  And, Mr. Walker, given the additional

5    exhibit from Dr. Antognini, why wouldn't Mr. Higgs be entitled

6    to an evidentiary hearing for the Court to assess that report?

7            MR. WALKER:  Well, certainly Your Honor has

8    articulated a number of threshold legal issues.  We certainly

9    don't think that any evidentiary hearing is necessary because

10   of the threshold legal issues.

11      With respect to the actual testimony of the experts,

12   you know, they do have competing testimony.  We'd note that

13   plaintiffs' own experts sort of compete with each other.  Our

14   experts' testimony is sort of in line with Dr. Van Norman's

15   testimony that pentobarbital and thiopental are basically

16   equivalent for all intents and purposes in this area, and we

17   don't just -- you know, the holding of an evidentiary hearing

18   is not this district's preferred practice in connection with

19   motions for preliminary injunction, and so we do not think one

20   would be necessary.

21           THE COURT:  All right.  And I have held them.

22   I have heard from these experts before, and I have reviewed

23   these experts 'reports several times.  But there is an

24   additional -- since there is a new report and obviously a

25   different issue with regard to whether pentobarbital is

considered an ultrashort-acting barbiturate or similar drug

that's a new factual issue for me to consider, that may be

possible.  But I think I'd have to get through the legal

threshold questions first.

So I'm not sure -- well, a couple of things.  One, I'd ask

someone to let me know once the judge in Maryland has issued his

opinion; and two, I will decide -- not at this hearing, not on

the record here today -- whether I'm going to have a hearing.

But if I do, I want to hear from the parties about what a

hearing on this question would look like.  I mean which witnesses

would you call, how long would it take, in what form.  I mean,

previously, parties have submitted the affidavits and then done

simply cross-examination and redirect.

Ms. Porter, can you tell me what you envision a hearing on

this issue to look like?

MS. PORTER:  Yes, Your Honor.  I think that a similar

hearing to what you held before is what we were envisioning as

well.  From our perspective, I think Mr. Higgs would want to call

Dr. Antognini and do cross-examination with, you know, obviously

with the opportunity of redirect for the government, and if the

government wanted to cross-examine any of our witnesses, that

would be fine as well.  But I think that Dr. Antognini is really

the only witness that we would need to cross-examine.

THE COURT:  And -- well, now that Mr. Higgs has tested

positive, if you refile your as-applied challenge, that might

1    require a hearing also.  How do you envision that?  What's the

2    scope of that?  What would you want the scope of that to be?

3           MS. PORTER:  Yes.  I mean, I imagine if we were

4    going to provide direct examination, we would also need to

5    call Dr. Zivot, who provided a declaration and supplemental

6    declaration related to the as-applied challenge, and we would

7    certainly be happy to do a new supplemental declaration in

8    advance of the hearing if that would be preferred or however

9    you want to do it.

10           THE COURT:  Okay.  And if I decided to have a hearing,

11    I want to emphasize it would not be cumulative of any other

12    hearing that I've held in this case but simply supplement the

13    record with regard to Mr. Higgs' as-applied claim and Mr. Higgs'

14    ex post facto claim regarding whether pentobarbital is an

15    ultrashort-acting barbiturate or similar.

16       So given that, how long do you think we're talking about

17    here?  Do you expect it would just be cross-examination and

18    redirect?

19           MS. PORTER:  I think we could probably do it in

20    four hours or so.  I think just for the ex post facto claim,

21    we wouldn't need to do direct examination of our experts.  I

22    think cross-examination of Dr. Antognini would be sufficient

23    for plaintiff.  I think if we're also including an as-applied

24    challenge, then it might make sense to also have direct

25    examination for our expert given the new developments.

1          THE COURT:  I have to tell you, I don't think four

2    hours is necessary.  We had a pretty lengthy evidentiary hearing

3    before.  I have reviewed the reports.  We're talking about

4    supplemental declarations, basically, supplemental declarations

5    only and as they apply to Mr. Higgs' claim.  So I'm not sure

6    that I share your assessment that four hours would be necessary.

7          MS. PORTER:  We could certainly do a shorter hearing.

8    I think at most it would be half a day, depending on what

9    witnesses the government also wanted to call.

10          THE COURT:  Mr. Walker.

11          MR. WALKER:  Yes, Your Honor.  I mean, it's a bit up

12   in the air at this point given that we don't know whether or

13   what additional claim that Mr. Higgs would file and what sort

14   of supporting evidence would come along with that.

15          THE COURT:  Well, I guess that depends on the course

16   of the virus.

17          MR. WALKER:  Exactly.  And we just don't know at this

18   point.

19          THE COURT:  And I'll tell you, as you all know,

20   I'm trying my very best, although these circumstances are

21   unpredictable, to not be doing this all last minute.  But I

22   understand there's some things I can't control.

23          MS. PORTER:  And, Your Honor, we'll do our best to

24   file things promptly as well.

25          MR. WALKER:  I suspect, Your Honor, that if there is

an additional as-applied claim related to the COVID diagnosis

that the government would provide some additional testimony by

Dr. Antognini and possibly one other expert.

THE COURT:  Okay.  All right.  If a hearing is

necessary, we can schedule something for the first week of

January.  But again, that's a big "if."  And again, that also

depends on what's going on with Mr. Higgs.

Next, Mr. Higgs alleges that his execution constitutes

arbitrary and capricious action by the Attorney General in

violation of the Fifth and Eighth amendments.  And again,

this appears to be a purely legal claim to me.  Does anybody

dispute this characterization?

MS. PORTER:  No, Your Honor.  We don't believe

that a hearing is necessary on this claim.

THE COURT:  Mr. Walker, I assume you agree.

MR. WALKER:  Yes.  We very much agree there.

THE COURT:  Okay.  All right.  So I will take the

matter of the hearing under advisement as I consider the

threshold legal claims.  Ms. Porter, I assume you will update

us with regard to any change as to Mr. Higgs' condition.

MS. PORTER:  Yes, Your Honor.

THE COURT:  And also, if somebody would let me

know once the court in Maryland has issued a ruling on the

designation on the state issue and which state, that would

also be very helpful.

1        Is there anything else?  All right.  My clerk will be in

2   touch if we need to schedule any further hearings or statuses.

3   Thank you all for making yourselves available late in the

4   afternoon on such short notice.  All right?  Anything else?

5                MS. PORTER:  No, Your Honor.

6                MR. WALKER:  No, Your Honor.

7                THE COURT:  All right.  Thanks very much.

8   Appreciate it.  Bye-bye.

9        (Proceedings adjourned at 4:36 p.m.)

CERTIFICATE *

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Bryan A. Wayne
Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via telephone conference in compliance with U.S. District Court Standing Order 20-19 during the COVID-19 pandemic.  Transcript accuracy may be affected by limitations associated with use of electronic technology, including but not limited to any sound distortions and/or audio interferences.