**\*\*EXECUTIONS SCHEDULED FOR JANUARY 14, 2021 AND JANUARY 15, 2021\*\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**In the Matter of the**
**Federal Bureau of Prisons' Execution**           :
**Protocol Cases,**

                                                                               :

**Lead Case: Roane et al. v. Barr**                        **Case No. 19-mc-00145 (TSC)**

                                                                               :

**THIS DOCUMENT RELATES TO:**             :

**James H. Roane, Jr. et al. v. William Barr,**  :
**Case No. 05-2337**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT REPLY MEMORANDUM OF COREY JOHNSON AND DUSTIN HIGGS IN
## <u>FURTHER SUPPORT OF MOTIONS FOR PRELIMINARY INJUNCTION</u>

Donald P. Salzman
D.C. Bar Number #479775
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7983

Alexander C. Drylewski
  (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3278

*Counsel for Plaintiff Corey Johnson*

Alex Kursman
Devon Porter
Federal Community Defender
  Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Plaintiff Dustin Higgs*

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    ARGUMENT ......................................................................................................2

    A.    Mr. Higgs and Mr. Johnson Are Likely to Succeed on the Merits of Their As-Applied Eighth Amendment Claims .............................................................2

        1.    Defendants Do Not Dispute that Plaintiffs Have COVID-19 and Remain Symptomatic, or that Most Symptomatic COVID-19 Patients Sustain Lung Damage ...................................................................3

        2.    BOP Medical Records Cannot Support Defendants' Incorrect Assertion That Plaintiffs Have Not Suffered Lung Damage ......................6

        3.    Defendants Cannot Dispute That Mr. Higgs Also Has Underlying Medical Conditions that Increase the Likelihood of Unnecessary Suffering ..............................................................................................7

        4.    If Defendants Execute Plaintiffs Pursuant to the 2019 Protocol, They Are Virtually Certain to Experience Flash Pulmonary Edema .........10

        5.    Severe Pain from Flash Pulmonary Edema Violates the Eighth Amendment ........................................................................................13

        6.    Purported Witness Accounts of Recent Executions Do Not Undermine Plaintiffs' Eighth Amendment Claims ....................................15

        7.    Plaintiffs Have Proposed Feasible Alternatives .........................................16

    B.    Mr. Higgs and Mr. Johnson Have Established Irreparable Harm.........................20

    C.    The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction ..........................................................................................22

    D.    Defendants' Argument Against an Evidentiary Hearing Is Moot .........................23

III.    CONCLUSION.................................................................................................24

# **TABLE OF AUTHORITIES**

## **CASES**

*Banks v. Booth*,
 468 F. Supp. 3d 101 (D.D.C. 2020), *appeal filed*, No. 20-5216 (D.C. Cir. July 22,
 2020) ..................................................................................................................................20

*Barr v. Lee*,
 140 S. Ct. 2590 (2020) ...............................................................................13, 14, 21, 22

*Brown v. Beck*,
 No. 06CT3018, 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006)..........................................20

*Bucklew v. Precythe*,
 139 S. Ct. 1112 (2019) ..................................................................................................13

*Cobell v. Norton*,
 391 F.3d 251 (D.C. Cir. 2004) ...............................................................................15, 24

*Cooey v. Taft*,
 430 F. Supp. 2d 702 (S.D. Ohio 2006) ..........................................................................20

*Evans v. Bennett*,
 440 U.S. 1301 (1979).....................................................................................................20

*In re Federal Bureau of Prisons' Execution Protocol Cases*,
 980 F.3d 123 (D.C. Cir. 2020) ............................................................................. passim

*Gayle v. Meade*,
 No. 20-21553-Civ, 2020 WL 3041326 (S.D. Fla. June 6, 2020).....................................20

*Glossip v. Gross*,
 576 U.S. 863 (2015).................................................................................................17, 19

*League of Women Voters of United States v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) ...........................................................................................22

*Make the Road New York v. McAleenan*,
 405 F. Supp. 3d 1 (D.D.C. 2019), *reversed and remanded on other grounds sub
 nom. Make the Road N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020)...................................20

*McNeil v. Harvey*,
 No. 17-1720, 2019 WL 1003582 (D.D.C. Feb. 28, 2019) ................................................23

*Nooner v. Norris*,
 No. 06cv00110, 2006 WL 8445125 (E.D. Ark. June 26, 2006) .......................................20

*Northern Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ...................................................................................22

*In re Ohio Execution Protocol Litigation*,
    946 F.3d 287 (6th Cir. 2019) ........................................................................................14

*Proctor v. District of Columbia*,
    310 F. Supp. 3d 107 (D.D.C. 2018) ...............................................................................24

*Wilson v. Williams*,
    455 F. Supp. 3d 467 (N.D. Ohio 2020), *vacated on other grounds*, 961 F.3d 829,
    844 (6th Cir. 2020).........................................................................................................20

**RULES**

Local Civil Rule 65.1(d) ............................................................................................................24

**OTHER AUTHORITIES**

Danielle Cinone, *Struggling for Life*, The U.S. Sun (Nov. 20, 2020), https://www.the-
    sun.com/news/1829845/execution-murderer-kidnapped-raped-teen-1994-bury-
    alive/................................................................................................................................16

Plaintiffs Corey Johnson and Dustin Higgs ("Plaintiffs") respectfully submit this joint reply memorandum in further support of their Motions for Preliminary Injunction (ECF Nos. 371, 375) to enjoin Defendants from proceeding with their executions, currently scheduled for January 14 and 15, 2021, respectively.[1]

## I.    INTRODUCTION

The D.C. Circuit has already determined that Plaintiffs "plausibly allege[d] that the government's execution protocol will, without relevant penological justification, impose a substantial risk of severe pain and suffering that is needless given a readily available, administrable, and known alternative." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 135 (D.C. Cir. 2020).  Now that Plaintiffs have tested positive for COVID-19, that same execution protocol will cause Plaintiffs to "experience sensations of drowning and suffocation ***sooner*** than a person without COVID-related lung damage and, therefore, their conscious experience of the symptoms of pulmonary edema ***will be prolonged***."  ECF No. 370-2 at 2 (Van Norman Decl., 12/22/2020) (emphasis added).

Critically, Defendants fail to dispute that:  (i) COVID-19 causes lung damage in a majority of symptomatic patients; (ii) Plaintiffs have experienced symptoms relating to lung functioning and continue to do so weeks after their initial diagnoses; and (iii) COVID-induced lung damage persists for weeks after symptoms have subsided.  As Plaintiffs' extensive medical evidence reflects, such lung damage leads to flash pulmonary edema earlier in the lethal injection process, and certainly before a peak brain level of barbiturate is achieved.  Despite these uncontested facts and the clear medical evidence, Defendants continue their mad dash to execute

---

[1]    All capitalized terms shall have the same meanings ascribed to them in Plaintiffs' Motions.

Plaintiffs before they can recover from their COVID infections and in a manner that is virtually certain to impose unnecessary pain and suffering.

Defendants' rush to execute Plaintiffs should be rejected because Plaintiffs are likely to succeed on the merits of their Eighth Amendment claims and the balance of the equities and the public interest weigh heavily in favor of granting a stay.  The Court should therefore grant Plaintiffs' motions and enjoin Defendants while these substantial claims remain pending.

## II.    ARGUMENT

### A.    Mr. Higgs and Mr. Johnson Are Likely to Succeed on the Merits of Their As-Applied Eighth Amendment Claims

Plaintiffs are likely to succeed on their Eighth Amendment claims because they can "establish both that [the 2019 Protocol] creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives."  ECF No. 371 at 3 (Higgs Mem., 12/23/20); ECF No. 375-1 at 4 (Johnson Mem., 12/23/20).  Plaintiffs' recent COVID-19 diagnoses create a demonstrated risk of severe pain if Defendants carry out the executions as planned on January 14 and 15, 2021.  Indeed, because of these infections, the injection of pentobarbital will cause flash pulmonary edema even earlier in the execution process than is typical, and certainly before brain levels of pentobarbital have reached levels necessary to render Plaintiffs insensate, causing significant and unnecessary pain and suffering before the end of life – even if pentobarbital were capable of rendering the prisoner insensate in the first place, as opposed to merely unresponsive.  *See* ECF No. 24 at 12-29 (Van Norman Decl.,11/1/2019); ECF No. 135 at 12 (Mem. Op., 7/13/20) (Court observing that "Plaintiffs have the better of the scientific evidence on this question.").  In their Opposition, Defendants fail to raise any serious arguments to the contrary; rather, Defendants do not dispute the crucial facts entitling Plaintiffs to preliminarily enjoin their approaching executions.

2

1.      Defendants Do Not Dispute that Plaintiffs Have COVID-19 and Remain
Symptomatic, or that Most Symptomatic COVID-19 Patients Sustain
Lung Damage

Defendants admit that Mr. Higgs and Mr. Johnson tested positive for COVID-19 and now, ***more than two weeks later***, are both still experiencing symptoms.  Opp. at 6-7.  Indeed, none of Defendants' medical experts dispute Plaintiffs' diagnoses, symptoms, or credibly undermine the proposition that Mr. Higgs and Mr. Johnson are consequently at greater risk of experiencing painful flash pulmonary edema during execution.

Plaintiffs' medical records, on which Defendants rely, indicate they both have experienced COVID-19 symptoms related to lung functioning.  Mr. Higgs and Mr. Johnson tested positive for COVID-19 on December 16, 2020.  Opp. at 6.  A few days prior to Mr. Higgs' positive test, he was experiencing chills and a cough.  ECF No. 371 at 4 (Higgs Mem., 12/23/20). He continued to experience labored breathing and coughing for weeks thereafter.  Ex. 1 ¶¶ 7-16 (J. Johnson Decl., 1/3/2021). Similarly, on December 14, 2020, Mr. Johnson started to develop a cough, headache, runny nose, fatigue and body aches.  ECF No. 374 ¶ 7 (Johnson Suppl. Compl., 12/23/20).  On December 20, 2020, Mr. Johnson's medical records indicate that his pulse oximetry result dropped from a 99% to a 97%, which "is clinically significant and indicates significant changes have occurred in gas exchange in the lungs, particularly in the setting of early COVID-19 infection."  *Id.* ¶ 12.  Like Mr. Higgs, Mr. Johnson also continues to experience symptoms, including a cough.  Opp. at 7.

These undisputed symptoms are enough to show that Plaintiffs have very likely suffered lung damage.  ECF No. 374 ¶ 20 (Johnson Suppl. Compl., 12/23/20) (citing Zivot Suppl. Decl.) ("COVID-19 infection is associated with an increased risk of lung damage.").  As Dr. Van Norman has explained, a recent study found that 79% of COVID-19 patients who "had symptoms of any kind" showed "severe lung changes (lung opacifications)" on CT scans.  ECF

3

No. 374-1 at 4 (Van Norman Decl., 12/22/20).   In other words, COVID-positive patients—even those with mild symptoms—have about a 4 in 5 chance of having severe lung changes.   This hardly presents a "speculative" risk of lung damage.  *See* Opp. at 18.

Importantly, Defendants' expert Dr. Locher does not dispute the finding, nor does he cite *any* medical research to undermine it.   Indeed, the only purportedly contrary study that Dr. Locher cites concludes that 44.5% of *asymptomatic* COVID-19 patients had abnormal CT scans. ECF No. 380-1 ¶ 11 (Locher Decl., 12/31/20).[2]   But the research on *asymptomatic* patients is inapposite, as the government does not dispute that both Mr. Higgs and Mr. Johnson are symptomatic.

Thus, even Dr. Locher does not dispute that a large majority of symptomatic COVID-19 patients have lung damage.   Even relative to this baseline, he admits that "[p]atients who have more symptoms of cough, shortness of breath and objective findings of low oxygen level or elevated respiratory rate typically have *more extensive* shadows on CT scan of the chest."  *Id.* (emphasis added).   And after examining Mr. Johnson's medical records, Dr. Van Norman concluded that his infection "has *already* caused significant lung damage, which in turn is *already* leading to measurably abnormal oxygen exchange."   ECF No. 374-2 ¶ 12 (Van Norman Decl., 12/22/20) (emphasis added).

Although not necessary to establish that Plaintiffs have suffered lung damage, *id.* at 3-5, it bears emphasis that their COVID-19 symptoms are not necessarily improving, and in fact may be worsening.   For example, Mr. Higgs's medical records indicate, and the BOP does not

---

[2]   This research appears to be consistent with a study on asymptomatic patients that Dr. Van Norman cited, which found that even "54% of patients who experienced asymptomatic infections still suffered the same severe lung changes (lung opacifications) seen in many hospitalized patients." ECF No. 374-1 at 4 (Van Norman Decl., 12/22/20).

dispute, that as of December 30, 2020, he had difficulty catching his breath and was short of breath.  Opp. at 8.  Mr. Johnson reported having developed a cough and sore throat on December 27, 2020, that has persisted through at least December 31, 2020.[3]  *Id.* at 7.  This is particularly notable since Defendants' expert Dr. Locher states that his opinion only "holds true assuming Mr. Higgs's and Mr. Johnson's clinical conditions do not worsen."  ECF 380-1 ¶ 15.  (Locher Decl., 12/31/20).

Finally, Defendants do not dispute the evidence presented by Drs. Van Norman and Stephen that COVID-induced lung damage persists for at least six to eight weeks after symptoms have apparently resolved.  *See* ECF No. 370-2 at 2 (Van Norman Decl., 12/22/20) (describing research finding that six weeks is insufficient for lungs to regain normal functioning after COVID-19, and that many patients continue to have lung damage 90 days after infection); ECF No. 372-8 ¶ 11 (Stephen Decl., 12/22/2020) (observing that in his clinical experience, it takes patients around eight weeks to fully recover from COVID-19).  Defendants' own medical experts, then, have presented no evidence to suggest that the lung damage Mr. Johnson and Mr. Higgs have experienced from their COVID-19 infections will resolve prior to their execution dates of January 14 and 15, respectively.

In sum, Defendants' medical experts fail to credibly dispute that Plaintiffs' diagnoses and symptoms place them at an even greater risk of suffering during their executions—suffering that is made all the more unnecessary by Defendants' inexplicable rush to execute Plaintiffs in less than two weeks.

---

[3]   The fact that Mr. Johnson began reporting a cough on December 27 significantly undermines the BOP's hurried decision to "medically clear[]" Mr. Johnson "from isolation status" since his symptoms are not improving, as required by the Centers for Disease Control guidelines. *See* Opp. at 6.

2.     BOP Medical Records Cannot Support Defendants' Incorrect Assertion
       That Plaintiffs Have Not Suffered Lung Damage

To the extent that Defendants' experts rely on BOP medical records to conclude that Plaintiffs have not suffered lung damage, those records understate Plaintiffs' symptoms and reflect inadequate medical care.  For example, on December 30, 2020, the BOP provided Mr. Higgs with a chest x-ray, whereas the BOP has failed to administer a similar x-ray to Mr. Johnson.  ECF No. 380-4 ¶ 12 (Smiledge Decl., 12/31/20).  Furthermore, Plaintiffs only receive pulse oximetry tests on an intermittent basis.  Beginning the day after Mr. Johnson tested positive for COVID-19 on December 16, 2020, he received pulse oximetry readings at least once daily.  *See* ECF No. 380-4, Attachment 2 at 129 (Johnson Med. Records).  On December 20, 2020, Mr. Johnson's pulse oximetry test resulted in 97%—two points lower than the day before—and Defendants failed to test him again until nearly a week later, on December 26, 2020. ECF No. 374-3 ¶ 5 (Van Norman Decl., 12/22/20);  ECF No. 380-4 ¶ 14 (Smiledge Decl., 12/31/20).  Mr. Higgs' medical records reveal similar gaps.  *See* ECF No. 380-4, Attachment 1 at 50 (Higgs Med. Records) (showing a four-day gap in pulse oximetry readings from December 21-24).  The BOP's selective use of diagnostic assessments raises questions about the accuracy and efficacy of its purported medical evaluations of Plaintiffs.

Additionally, although Defendants originally claimed that Mr. Johnson refused a pulse oximetry text on December 27, 2020, ECF No. 376 ¶ 8 (Joint Status Report, 12/28/20), they since changed their story in their latest submission and now state that Mr. Johnson had simply refused to leave his cell and "deemed" him to have refused the exam.  Opp. at 7.  This makes no sense since medical records indicate that at the exact same time he "declined to leave his cell" the BOP checked his pulse rate, his respiratory rate, and his temperature.  ECF No. 380-4 ¶ 14 (Smiledge Decl., 12/31/30); ECF No. 380-4, Attachment 1 at 121 (Johnson Med. Records).

Additionally, the BOP noted that his affect was "pleasant and cooperative."  ECF No. 380-4, Attachment 1 at 122 (Johnson Med. Records).[4]

> 3.    <u>Defendants Cannot Dispute That Mr. Higgs Also Has Underlying Medical Conditions that Increase the Likelihood of Unnecessary Suffering</u>

Like Mr. Johnson, Mr. Higgs has been experiencing symptoms of COVID-19 for more than two weeks.  According to Defendants' expert Dr. Locher, Mr. Higgs has at minimum reported shortness of breath and difficulty catching his breath, headache, nasal congestion, sore throat, and labored breathing.  ECF No. 380-1 ¶ 12 (Locher Decl., 12/31/30).

As explained *supra*, 3, the fact that Mr. Higgs is symptomatic makes it extremely likely that he has serious lung damage that would be visible on a CT scan—a fact not seriously disputed by any of Defendants' experts.  Defendants claim that Mr. Higgs's presumptive lung damage has been "disproved by a chest x-ray showing that his lungs have no coronavirus-related issues."  Opp. at 2.  But even Dr. Locher acknowledges that an x-ray is insufficient to determine whether lung damage is present.  Indeed, none of the studies cited by Dr. Locher to determine whether lung damage is present in COVID-19 patients used chest x-rays.  *See* ECF No. 380-1 ¶ 11 (Locher Decl., 12/31/30).

---

[4]   Despite Defendants' changing story, Mr. Johnson did in fact have a pulse oximetry exam on December 27, 2020.  Ex. 3 ¶ 5 (Johnson Decl.).  Plaintiffs are aware of other discrepancies in the medical records as well.  For example, on January 2, 2021, Mr. Johnson visited with his spiritual advisor Mr. Breeden from approximately 8:00 a.m. to 3:00 p.m.  Ex. 4 ¶  5 (Breeden Decl.)  Despite Mr. Johnson's medical records indicating that he received a temperature check at 11:20 a.m. on January 2, 2021, Mr. Breeden confirms that no such test occurred and that Mr. Johnson received no tests or examinations while he was present.  *Id.* ¶ 5.  Mr. Breeden further confirms that Mr. Johnson's cough was more pronounced and more frequent than the cough Mr. Johnson had during Mr. Breeden's last visit, which also does not appear in the medical records.  *Id.* ¶ 7.  Finally, Mr. Johnson asserts that he was administered a pulse oximetry exam on January 2, 2021, the results of which do not appear anywhere in Mr. Johnson's medical records.  Ex. 3 ¶ 6 (Johnson Decl.).  Due to time and logistical constraints, Mr. Johnson was unable to sign his declaration by the filing deadline but has verified the contents.  He will submit a signed version of the declaration as soon as possible.

In addition to his symptomatic COVID-19 infection, Mr. Higgs also suffers from both asthma and mitral valve regurgitation—two serious, lifelong medical conditions that increase his risk of suffering during his execution.[5]  None of Defendants' expert witnesses dispute that Mr. Higgs has these underlying medical conditions, nor do they dispute that asthma and mitral valve regurgitation can increase the risk of flash pulmonary edema under certain circumstances.

None of Defendants' medical experts dispute that severe asthma would cause suffering during a pentobarbital execution, particularly when exacerbated by COVID related lung damage.  Instead, Dr. Locher discounts Mr. Higgs's asthma primarily because he characterizes the condition as "mild to moderate in severity," relying in part on the fact that "[t]he medical record reports no use of oral corticosteroids . . . ."  ECF No. 380-1 ¶ 4 (Locher Decl., 12/31/30).  But Dr. Locher ignores the fact that Mr. Higgs did require systemic corticosteroids in the past.  Ex. 2 at 2. (Glass Decl., 1/3/2020).  In fact, Mr. Higgs suffers from aspirin exacerbated respiratory disease (AERD), which is establishes that his asthma is severe.  *Id*.  Although Mr. Higgs's asthma is currently controlled with medication, this does not reduce the risk that Mr. Higgs's underlying severe asthma will place him at great risk of extreme suffering if he is executed pursuant to the 2019 Protocol.

Dr. Mitchell Glass, a pulmonologist who has developed drugs to control asthma, has opined that Mr. Higgs's underlying severe asthma makes it virtually certain that pentobarbital

---

[5]   Defendants argue that because Mr. Higgs did not, in his previous Reply brief, address the as-applied claim that had been included in his original Complaint, he has "effectively acknowledged that his asthma and heart condition are insufficient to warrant preliminary injunctive relief, either independently or collectively, without his contracting COVID-19." Opp. at 5.  Not so.  Mr. Higgs did not address the claim in his earlier Reply brief quite simply because the Court had dismissed it.  Since that time, however, the Court granted Mr. Higgs leave to amend his Complaint to allege a new as-applied claim in light of his new COVID-19 diagnosis.

will trigger a massive asthma attack in Mr. Higgs.  According to Dr. Glass, Mr. Higgs's severe asthma "will, to medical certainty, trigger an immediate asthma attack and closing of Mr. Higgs's airways, which will result in a terrifying period of breathlessness that can last minutes, or until either pulmonary edema or cardiac failure results in death."  Ex. 2 at 3. (Glass Decl., 1/3/2020).   This effect will occur "within approximately one second" because the "highly concentrated dose of pentobarbital is pumped directly into the pulmonary circulation, where it will trigger an immediate asthma attack of the larger airways, as well as serum leakage into the smallest ("peripheral") airways."  *Id.* at 4.  In addition to triggering an asthma attack upon injection of pentobarbital, Mr. Higgs's asthma will make the experience of pulmonary edema even more terrifying and painful;

> Compared to a person without asthma, Mr. Higgs would struggle for air more quickly and painfully after the onset of pulmonary edema because his asthma inflames and constricts his airways, making it more difficult for enough oxygen to reach his lungs even under normal circumstances. The suffering that Mr. Higgs would experience from pulmonary edema would be more severe because his asthma would have an additive effect, making his struggle for air more acute.

ECF No. 372-7 ¶ 6 (Zivot Decl.)

Mr. Higgs's underlying mitral valve regurgitation also increases his risk of developing pulmonary edema.   As Dr. Zivot explained, mitral valve regurgitation is the result of an abnormality in the way that a valve in the heart closes.  ECF No. 374-6 ¶ 9 (Zivot Suppl. Decl, 12/3/20).  "In the normal functioning heart, . . . the mitral valve shuts, preventing blood from regurgitating backwards."  *Id.*  But when a patient has mitral valve regurgitation—as Mr. Higgs indisputably does—"each contraction of the heart forces some blood backwards into the left atrium and then further backwards into the lungs."  *Id.*  Without a functioning mitral valve, "[t]he pressure in the lungs is not high enough to block backwards flow," putting the patient at higher risk for pulmonary edema.  *Id.*

9

During this Court's September 18 evidentiary hearing, Dr. Crowns testified that "there's a case report of an individual who developed flash pulmonary edema" during an execution with pentobarbital, "but he had underlying heart issues, *specifically mitral valve issues*, as well as other heart problems. So his heart was already compromised when the flash pulmonary edema occurred." ECF No. 271 at 18 (Evid. Hr'g Tr., 9/18/20) (emphasis added). Dr. Crowns went on to explain that in that individual's situation, "his flash pulmonary edema was the result of the fact that he already had a compromised heart which then resulted in him developing edema more rapidly than normal." *Id.* In the supplemental declaration, Dr. Crowns contends that this case study involved a patient experiencing heart failure, but that Mr. Higgs is not experiencing heart failure. *See generally* ECF No. 380-5 (Crowns Decl., 12/30/20). In any event, Dr. Crowns does not, claim that heart failure is a necessary precondition for the development of flash pulmonary edema in response to a massive dose of barbiturate, nor does he undermine Dr. Zivot's explanation of the mechanism that would place Mr. Higgs at increased risk of flash pulmonary edema.

In sum, Mr. Higgs's symptomatic COVID-19 infection, in combination with his underlying asthma and mitral valve regurgitation, place him at substantially greater risk of suffering severe pain during his execution.

4.     <u>If Defendants Execute Plaintiffs Pursuant to the 2019 Protocol, They Are Virtually Certain to Experience Flash Pulmonary Edema</u>

Extensive expert evidence establishes that Plaintiffs are virtually certain to experience the pain and suffering of flash pulmonary edema during their executions—a condition that is further exacerbated as a result of their COVID-19 infections. *See* ECF No. 371 at 8-10 (Higgs Mem., 12/23/20); ECF No. 375-1 at 6-7 (Johnson Mem., 12/23/20). Defendants' reliance on the declarations of Dr. Antognini and Dr. Crowns does nothing to undermine the credible evidence

that Plaintiffs have put forward on this front.[6]   To start, relying on Dr. Antognini, Defendants

again contend that pentobarbital will prevent the prisoner from "feel[ing] the sensation" of flash

pulmonary edema.  Opp. at 12.  But the Court has already discredited Dr. Antognini's testimony

in this regard, and it has instead accorded greater weight to Dr. Van Norman's explanation that

pentobarbital and other barbiturates merely inhibit the person's responsiveness to pain rather

than his or her conscious awareness of that pain.  *See* ECF No. 261 at 36, 39 (Mem. Op.,

9/20/20).  Defendants offer no reason why the fifth supplemental declaration of Dr. Antognini is

any more persuasive than his previous ones.

Defendants' reliance on declarations from Dr. Crowns also fails.  Opp. at 13-14.  For one

thing, Dr. Crowns' declarations do not dispute what he said during the evidentiary hearing:

impaired cardiac function from mitral valve damage enhances the likelihood of flash pulmonary

edema.  *See* ECF No. 271 at 18 (Evid. Hr'g Tr., 9/18/20).  For another, Dr. Crowns is a

pathologist rather than an epidemiologist.  He is not qualified to offer an opinion on the

pharmacological effects of pentobarbital on the brain, as Drs. Van Norman and Edgar have both

explained.  *See* ECF No. 282-4 ¶ 35 (Van Norman Decl., 9/29/20); ECF No. 282-5 ¶ 6 (Edgar

Decl., 9/28/20).  Moreover, Dr. Crowns does not address Mr. Johnson's COVID-19 diagnosis or

medical records.

Defendants fare no better arguing the perceived implications of Dr. Van Norman's

opinion—and indeed the prevailing view of modern anesthesia texts—that pentobarbital causes

flash pulmonary edema while inhibiting only the patient's responsiveness instead of his or her

consciousness.  Opp. at 14-15.  Defendants argue that if Dr. Van Norman were correct, then

---

[6]   To the extent the Court credits Defendants' argument that Plaintiffs' expert witnesses should
be discounted as none have "personally examined" Plaintiffs, Defendants' experts suffer
from the same purported shortcoming.  Opp. at 26.

millions of patients have been subjected to horrifying experiences while under general anesthesia, and clinicians would have long since abandoned the use of sodium thiopental as an anesthetic. *Id.* at 15.

This argument fails for numerous reasons. First, Dr. Van Norman does not claim that routine modern anesthesia is ineffective; rather, she claims that pentobarbital—administered alone, and in a massive dose—is not sufficient to induce unconsciousness. As Dr. Van Norman explains, surgical anesthesia involves the administration of ***multiple*** drugs, including drugs that otherwise impair the patient's brain functions and memory. *See* ECF No. 24 ¶¶ 16, 61-62 (Van Norman Decl., 11/1/19) ("During general anesthesia, both pain and awareness are reduced by the administration of multiple, different classes of potent anesthetic drugs."). Second, clinicians have indeed abandoned the use of barbiturates to induce surgical anesthesia. *See id.* ¶ 25. Third, the dosage involved in the 2019 Protocol is much larger than would be administered to induce surgical anesthesia, and a clinical dose—unlike the high dose outlined in the 2019 Protocol—is unlikely to trigger flash pulmonary edema. *See id.* ¶ 72 ("Experience in humans and animal models indicate that flash pulmonary edema occurs virtually immediately during and after ***high-dose*** barbiturate injection[.]") (emphasis added). Dr. Van Norman has also explained that the absence of visible distress does not necessarily indicate the absence of conscious suffering. *See* ECF No. 282-4 ¶ 7 (Van Norman Decl., 9/29/20).

Even if the Court were to agree with Dr. Antognini's opinion that a 5-gram dose of pentobarbital will make the prisoner insensate—a view as to which the Court has already decided that Dr. Van Norman provides "the better of the scientific evidence," *see* ECF No. 135 at 12 (Mem. Op., 7/13/20)—Dr. Antognini believes that the drug does not have its onset as to brain functions until 20-30 seconds after administration, in comparison to Dr. Stevens, who opines that

the drug's onset is 30 seconds to one minute, *see* ECF 344-1 ¶ 8 (Stevens Decl., 12/2/20).  There is no dispute that the prisoner will be conscious during that period.  And the primary mechanism of flash pulmonary edema involves the corrosion of lung tissue because of the caustic drug's high pH level – before the drug reaches the brain.  *See* ECF No. 282-5 ¶ 5 (Edgar Decl., 9/28/20).  At the very least, then, the prisoner will suffer the excruciating sense of drowning for up to one minute.  Defendants mistakenly cite *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), for the idea that the Eighth Amendment is indifferent to such suffering.  In fact, the Court in *Bucklew* ruled only that the prisoner's alternative (nitrogen hypoxia) did not appreciably reduce the duration of suffering, not that the suffering itself was constitutionally inconsequential. *See id.* at 1132.

5.   <u>Severe Pain from Flash Pulmonary Edema Violates the Eighth Amendment</u>

Plaintiffs have also established that the pain they are likely to suffer from pulmonary edema is beyond that required by the Eighth Amendment to justify injunctive relief.  *See* ECF No. 370 ¶ 28 (Higgs Suppl. Compl., 12/22/20); ECF No. 374 ¶ 28 (Johnson Suppl. Compl., 12/23/20).  Relying on the same misreading of *Barr v. Lee*, 140 S. Ct. 2590 (2020), that was recently rejected by the D.C. Circuit, Defendants argue that the pain caused by flash pulmonary edema falls short of what the Eighth Amendment requires, Opp. at 16-17, and that even if it did not, Plaintiffs have at most produced insufficient competing expert testimony, Opp. at 11-12, 27-29.  These arguments fail.

For one, "*Lee* did not hold that the Eighth Amendment turns its back on needless and extreme suffering as long as it is caused by flash pulmonary edema." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 134.  In fact, the D.C. Circuit wholesale rejected Defendants' arguments that *Lee* "forevermore categorically exempted the federal government's

13

execution protocol from Eighth Amendment scrutiny." *Id.* Instead, the D.C. Circuit described *Lee* as a limited ruling, addressing only those specific facts and under the conditions of a "last-minute" stay. *Id.* Thus Defendants' assertion that flash pulmonary edema "would not suffice to establish a violation of the Eighth Amendment" is without legal basis. Opp. at 16.

Similarly, Defendants' attempt to compare the conscious experience of flash pulmonary edema to hanging fails. *See* Opp. 16-17. Defendants rely on the Sixth Circuit's ruling in *In re Ohio Execution Protocol Litigation*, 946 F.3d 287, 289 (6th Cir. 2019). Leaving aside the fact that the Sixth Circuit did not "reach a conclusion as to whether pulmonary edema can result in pain that is so severe as to violate the Eighth Amendment," ECF No. 135 at 11 (Mem. Op., 7/13/20), the Court has already explained that the case is distinguishable:

> [T]his case is factually distinct from *Ohio Execution Protocol*. That case not only involved a different execution protocol using a different drug—a three-drug protocol employing midazolam as the first drug rather than a one-drug protocol relying exclusively on pentobarbital—but it held that the plaintiff had failed to provide "evidence showing that a person deeply sedated by a 500 milligram dose of midazolam is still 'sure or very likely' to experience an unconstitutionally high level of pain." *Id.* Here, Plaintiffs have amassed an extensive factual record, and their experts have concluded that there is a "virtual medical certainty" that the 2019 Protocol will result in "excruciating suffering." (Van Norman Decl. at 7.)

*Id.* Although the Supreme Court vacated the Court's ruling of July 13, it did not do so by endorsing the Sixth Circuit's reasoning. *See Barr v. Lee*, 140 S. Ct. 2590 (2020).

Nor is there any merit to Defendants' assertion that the so-called "competing expert testimony" they have produced is "sufficient to defeat [Plaintiffs'] motions for injunctive relief." Opp. at 29. First, Defendants incorrectly argue that if they can muster ***any*** expert declarations supporting their contentions, that is enough to defeat Plaintiffs' claims as a matter of law. Even if competing expert testimony exists, which there is not, the Court is entitled to resolve that controversy at a hearing.

14

There is no bona fide scientific "controversy" here because Defendants' expert opinions are all flawed for reasons discussed above. *See supra* 10-13. Moreover, if there is a controversy, Plaintiffs are entitled to have their evidence weighed by the trier of fact to determine its merits. *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("[I]f there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required. Particularly when a court must make credibility determinations to resolve key factual disputes in favor of the moving party, it is an abuse of discretion for the court to settle the question on the basis of documents alone, without an evidentiary hearing." (citations omitted)). By opposing an evidentiary hearing, Opp. at 37, and arguing that Plaintiffs' motions should be denied based solely on written declarations which are facially defective, Defendants seek to short circuit this crucial factfinding process. If indeed a "battle of experts" is sufficient to preclude injunctive relief, Opp. at 9, the Court should resolve that battle and decide which experts to credit after an evidentiary hearing.

      6.    <u>Purported Witness Accounts of Recent Executions Do Not Undermine Plaintiffs' Eighth Amendment Claims</u>

Defendants also invoke eyewitness accounts of BOP's own employees, which purport to describe pain-free executions. Opp. at 15-16. This contention, too, is fatally flawed. As Dr. Van Norman explains, the "lack of movement, or responsiveness, does not correlate with a lack of awareness." ECF No. 282-4 ¶ 37 (Van Norman Decl., 9/29/20). The person's responsiveness is not determinative because "clinical studies clearly prove that awareness is present even when there is no responsiveness." *Id.* Moreover, lay observers are not trained to recognize the signs of respiratory distress. Dr. Edgar explains it is "not surprising that a minority of eyewitness[] descriptions contain sufficient detail to infer the presence, let alone the time of onset of respiratory compromise." ECF No. 282-5 ¶ 3 (Edgar Decl., 9/28/20).

In any event, regarding the several recent executions, there are directly conflicting eyewitness accounts indicating that prisoners indeed suffered.  For example, Mr. Bourgeois' execution took 28 minutes—double the time of Mr. Bernard's execution—and a disinterested media witness reported that his torso was "contracting uncontrollably" for "several minutes." ECF No. 380-3 at 5-6 (Tel. Conf. Tr., 12/17/20).  This witness also reported that Mr. Bourgeois experienced "stomach rising," "stomach heaving," "stomach popping up," "heaving inside," and "sucking inside middle" for periods after receiving his dose of pentobarbital.  *Id.* at 6.  As another example, a disinterested media witness reported that, "almost immediately" after receiving the lethal injection drugs, Mr. LeCroy "began to jerk and contract uncontrollably" for "a minute or a bit longer."  ECF No. 282-1 at 1 (Hale Statements, 9/24/20).  Mr. LeCroy's eyes "shut during this time" and "[h]is mouth also fell halfway open."  *Id.*

This evidence undermines the purported "eyewitness accounts" of Defendants' own biased employees.  *See* ECF No. 282-5 ¶ 5 (Edgar Decl., 9/28/20); *id.* ¶ 2 (concerning William LeCroy) (concerning Wesley Purkey); ECF No. 282-4 ¶ 6-37 (Van Norman Decl., 9/29/20) (concerning Mr. Purkey); ECF No. 282-1, 282-2, 282-3 (media witness accounts concerning Mr. LeCroy); *see also* Danielle Cinone, *Struggling for Life*, The U.S. Sun (Nov. 20, 2020), https://www.the-sun.com/news/1829845/execution-murderer-kidnapped-raped-teen-1994-bury-alive/ (stating that Orlando Hall "winced, twitched and gasped for breath in his final moments after being given a lethal injection last night").

### 7.  Plaintiffs Have Proposed Feasible Alternatives

Defendants also attack Plaintiffs' proposed alternatives as insufficient to meet the second prong of *Glossip*.  Opp. at 29-34.  Indeed, all three options that Plaintiffs have identified—the addition of an analgesic, firing squad, or postponement—are "feasible, readily implemented, and

in fact significantly reduce[s] a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (alteration in original) (quoting *Baze v. Rees*, 553 U.S. 35, 52 (2008)).

As for the proposal of administering an opioid or other analgesic before the pentobarbital, Defendants recycle Dr. Antognini's view that no such opioid is necessary because pentobarbital will make the prisoner insensate. Opp. at 35. This merely begs the essential question, and fails to confront the reality that the addition of a pre-dose analgesic would be both simple and readily available. *See* ECF No. 135 at 15 (Mem. Op., 7/13/20) (finding pre-dose to be "a simple addition to the execution procedure that is likely to be as effective as it is easily and quickly administered"). And, again, the Court has already determined that Dr. Antognini's opinion does not "carry much weight" on these topics. ECF No. 261 at 39 (Mem. Op., 9/20/20). For that matter, Defendants' attack on the analgesic alternative does not acknowledge this Court's acceptance of that alternative—which was neither criticized nor overturned on appeal by the D.C. Circuit or Supreme Court. *See* ECF No. 135 at 13-15 (Mem. Op., 7/13/20). Indeed, the D.C. Circuit recently rejected Defendants' same novelty and feasibility objections to the two-drug alternative:

> The combination of drugs as part of lethal injection protocols has been used by both states and the federal government, and is still used in a number of jurisdictions. *See, e.g.*, J.A. 384–388; *Glossip,* 576 U.S. at 869. The two-drug protocol also fits squarely within the plain text of the federal execution protocol, which provides that the method of execution is the "intravenous injection of a lethal substance or substances[.]" 28 C.F.R. § 26.3(a)(4). To be sure, Plaintiffs propose using two drugs rather than the three drugs used in many capital-punishment jurisdictions. But that change *eases* the logistics of known protocols, and does so by adding a commonly used and available pain reliever.

*In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 133.[7]

---

[7]   Defendants argue that the BOP declined to adopt an opioid method because it has never been used before. But this Court observed that Nebraska has used fentanyl in a recent execution, much as the D.C. Circuit observed that an opioid or other analgesic is "commonly used and
*(cont'd)*

Defendants' attacks on the firing squad alternative are similarly misguided.  Defendants incorrectly claim that "[e]very court that has considered the issue agrees that a firing squad is not constitutionally superior to lethal injection."  Opp. at 30.  But Defendants fail to acknowledge this Court's acceptance of that alternative or explain why or how the Court erred.  *See* ECF No. 135 at 15-18 (Mem. Op., 7/13/20).  That is because the Court did not err—the Court's ruling is not undermined by Defendants' expert evidence, which consists of Dr. Antognini's opinions from watching two YouTube videos of firing squad executions, one of which took place in 1945. *See* ECF No. 352-1 ¶ 34 (Antognini Decl., 12/8/20).

Defendants' statistical arguments are similarly unhelpful.  They contend that states have carried out only two firing squad executions since 1980, so that there is insufficient data to compare the "botch" rate of such executions with those carried out by other methods.  Opp. at 31-32.  In fact, there have been 34 such firing squad executions since 1900, and none of them were "botched," according to the same study that Defendants describe and which the Court has already credited.  *See* ECF No. 135 at 16 (Mem. Op., 7/13/20).

Defendants' attempt to outline "legitimate reasons" for rejecting the firing squad also fail. *See* Opp. at 32-34.  Once again, Defendants' argument fails to acknowledge that this Court previously rejected these same arguments as "circular."  *See* ECF No. 135 at 17 (Mem. Op., 7/13/20).  Similarly, this Court also previously rejected "Defendants' final argument . . . that Plaintiffs' stated preference for execution by firing squad is insincere."  *Id.* at 18.  Nor does

_____

(*cont'd from previous page*)

available."  *Id.*; ECF No. 135 at 15 (Mem. Op., 7/13/20) ("[T]he parties agree that Nebraska recently used a pre-dose of fentanyl for the precise purpose of reducing the risk of serious pain during an execution.").  The D.C. Circuit, then, has already rejected the purportedly "legitimate reasons," Opp. at 30, that Defendants proffer as a basis for casting aside the two-drug method altogether.

Defendants' reference to Plaintiffs' attempts to avail themselves of Virginia law under the FDPA undermine the sincerity of Plaintiffs' pleading firing squad as an alternative. This Court squarely held that the FDPA does not apply, so Defendants' argument is entirely irrelevant. *See* ECF No. 378 at 6 (Mem. Op., 12/30/20). Even if it were relevant, asking Plaintiffs to seek access to or discovery on a method of execution to which they are not currently entitled defies all logic. In any event, *Glossip* only requires that Plaintiffs plead an alternative that is "feasible" and "readily implemented," *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 52)—it does not require Plaintiffs to propose an alternative method that is currently authorized by law in the jurisdiction in which they were sentenced to death.

Lastly, Defendants briefly argue that Plaintiffs' third proposed alternative of postponing their executions until they recover from the negative impacts of their COVID-19 infections "is a transparent attempt to postpone their execution in the hope that such a delay will permit them to avoid the implementation of their lawful capital sentences." Opp. at 34. But this argument is based on an incorrect premise; in no way do Plaintiffs concede that this alternative contradicts their underlying Eighth Amendment claim. *See id.* Indeed, the D.C. Circuit has held that Plaintiffs have already pled a valid Eighth Amendment claim separate from this as-applied challenge. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 135. To be clear, Plaintiffs maintain their position that lethal injection of pentobarbital will create significant risk of suffering flash pulmonary edema in otherwise healthy prisoners. Here, in the context of Plaintiffs' current motions, that conclusion is even stronger given their undisputed, symptomatic COVID-19 infections. Thus, putting aside the illegality of the 2019 Protocol itself, at the very least, Plaintiffs' postponement alternative is directed at the specific effects that COVID-19 has

had on their lungs and the reduction in those specific risks that postponement would effect.  *See* ECF No. 374 ¶ 35 (Johnson Suppl. Compl., 12/23/20).

## B.    Mr. Higgs and Mr. Johnson Have Established Irreparable Harm

Plaintiffs, as prisoners set to be executed before they have had a chance to fully litigate their meritorious claims, will be irreparably harmed without an injunction based on the tangible risk of severe suffering that they have demonstrated through expert evidence.  *See Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty"); *see also Nooner v. Norris*, No. 06cv00110, 2006 WL 8445125, at *3 (E.D. Ark. June 26, 2006) (plaintiff showed threat of irreparable harm because if he suffered pain during his execution, as alleged, the injury would never be rectified); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (same); *Brown v. Beck*, No. 06CT3018, 2006 WL 3914717, at *7 (E.D.N.C. Apr. 7, 2006) (same).

Numerous courts have held that the mere ***risk*** of contracting COVID-19 is sufficient to establish irreparable harm.  *See, e.g.*, *Wilson v. Williams*, 455 F. Supp. 3d 467, 479 (N.D. Ohio 2020), *vacated on other grounds*, 961 F.3d 829, 844 (6th Cir. 2020) ("The district court correctly noted that inmates at Elkton face a *risk* of irreparable injury *if* they are infected by COVID-19." (emphasis added)); *Banks v. Booth*, 468 F. Supp. 3d 101, 123 (D.D.C. 2020) (inmate's "*risk* of contracting COVID-19 and the resulting complications . . . is the prototypical irreparable harm" (emphasis added)), *appeal filed*, No. 20-5216 (D.C. Cir. July 22, 2020); *see also Gayle v. Meade*, No. 20-21553-Civ, 2020 WL 3041326, at *21 (S.D. Fla. June 6, 2020) ("Even in the early days of the pandemic, and with few exceptions, courts did not hesitate to find irreparable harm as a result of *potential* COVID-19 exposure in prison and detention, including in facilities where there had not been a confirmed case." (emphasis added)).  That conclusion applies with even greater force here, where Plaintiffs have already contracted COVID-19 and Defendants seek to

execute them before they have recovered and before their as-applied challenges can be fully and finally litigated.

Defendants cite to the Supreme Court's ruling in *Lee*, arguing that Plaintiffs are "essentially in the same position as the four moving plaintiffs in *Lee*." Opp. at 35. Unlike the four plaintiffs in *Lee*, however, Mr. Johnson and Mr. Higgs have each provided evidence that their medical conditions—and in particular, their recent COVID-19 infections—place them uniquely at risk of suffering excruciating pain during their executions. Plaintiffs submitted a series of new expert declarations from two anesthesiologists, Dr. Gail Van Norman and Dr. Joel Zivot, and a pulmonologist, Dr. Michael Stephen. *See* ECF Nos. 370 (Higgs Suppl. Compl., 12/22/20), 374 (Johnson Suppl. Compl., 12/23/20). This Court has ordered an evidentiary hearing to take place on January 4 and 5, 2021, during which several experts will provide live testimony. In contrast, this Court had not heard any live testimony by which to judge the competing expert opinions at issue in *Lee*. Plaintiffs' extensive new evidence, which is specific to their as-applied challenges, demonstrates that Plaintiffs are likely to suffer unnecessary, protracted, and extraordinary pain if they are executed pursuant to the 2019 Protocol due to their infection from COVID-19. *See* ECF No. 371 at 15 (Higgs Mem., 12/23/20); ECF No. 375-1 at 12 (Johnson Mem., 12/23/20).

Nor, as Defendants argue, do Plaintiffs' experts somehow make their case "less compelling" than the circumstances presented in *Lee*. Opp. at 35-36. As Dr. Van Norman explains, Plaintiffs "will experience sensations of drowning and suffocation sooner than a person without COVID-related lung damage and, therefore, their conscious experience of the symptoms of pulmonary edema will be prolonged." ECF No. 370-2 at 1 (Van Norman Decl., 12/22/20). And as explained more fully above, Defendants do not credibly dispute the key facts here: that

21

Mr. Johnson and Mr. Higgs both have symptomatic COVID-19 infections; that a large majority of symptomatic COVID patients have significant lung damage; and that COVID-induced lung damage persists for weeks after symptoms appear to have resolved.  Nor do Defendants dispute that lung damage may increase the risk of pulmonary edema.  Defendants hold the keys to that evidence and have declined to provide it.  *See Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 23 (D.D.C. 2019) (noting that "[e]vidence that goes beyond the unverified allegations of the pleadings and motion papers must be present to support *or oppose* a motion for a preliminary injunction" in granting preliminary injunction (alteration in original) (emphasis added) (citation omitted)), *reversed and remanded on other grounds sub nom. Make the Road N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020).  Accordingly, Plaintiffs' evidence here is even stronger than that presented in *Lee* and is sufficient to establish the irreparable harm Plaintiffs will suffer in the absence of an injunction.

**C.      The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction**

The balance of equities and public interest likewise tip in Plaintiffs' favor. While there is no "public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), "[t]he public interest is served when administrative agencies comply with their [legal] obligations," *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).  In this case, ensuring that Defendants carry out Plaintiffs' executions lawfully outweighs any interest in carrying them out rapidly.[8]

---

[8]      Indeed, Defendants' interest may actually conflict with the public's; Defendants have already been found in this litigation to have violated both the FDCA, *see In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 137, and the FDPA, *see* ECF No. 345 at 1 (Mem. Op., 12/6/20), and to have misled the Court, *see* ECF No. 378 at 5 (Mem. Op., 12/30/20).  In fact, just recently, a high ranking BOP officer publicly celebrated the
*(cont'd)*

As with previous motions for injunctive relief, Defendants do not attempt to address Plaintiffs' arguments on this point.  *See, e.g.*, ECF No. 22 at 30 (Lee Reply Mem., 11/1/19) (noting that Defendants failed to address the same arguments with respect to Plaintiff Lee's motion).  Instead, as before, Defendants cite to the "interests of [Plaintiffs'] victims, the victims' families, and the public."  Opp. at 36.  As this Court has already recognized, though, these arguments lack merit:

> While the government does have a legitimate interest in the finality of criminal proceedings, the eight years that it waited to establish a new protocol undermines its arguments regarding the urgency and weight of that interest. Other courts have found "little potential for injury" as a result of a delayed execution date. See, e.g., *Harris v. Johnson*, 323 F. Supp. 2d 797, 809 (S.D. Tex. 2004). This court agrees that the potential harm to the government caused by a delayed execution is not substantial.

ECF No. 50 at 14 (Mem. Op., 11/20/19).  Accordingly, the Court should once again determine that the balance of the equities and public interest both weigh in favor of Plaintiffs.

## D.      Defendants' Argument Against an Evidentiary Hearing Is Moot

Defendants' concede "that the Court has already granted [Plaintiffs'] request for an evidentiary hearing on the COVID-19 question."  Opp. at 37.  Indeed, upon agreement between the parties, the Court has already scheduled the date, time, and method of the hearing.  *See* Minute Order, 1/1/21.  Accordingly, Defendants' argument against a hearing is moot.  *See, e.g.*, *McNeil v. Harvey*, No. 17-1720, 2019 WL 1003582, at *4 (D.D.C. Feb. 28, 2019) (denying as moot an "argument that . . . has been decided on by the Court"); *see also* ECF No. 265 at 5 (Mem. Op., 9/20/20) (dismissing claims that "have been resolved").

---

*(cont'd from previous page)*
executions on social media, including that of Mr. Johnson.  *See* Ex. 5 (Vice News Article, 12/29/20).

Even if the Court had not already granted the request for an evidentiary hearing, Defendants' arguments against it also fail.  Opp. at 37.  Although Defendants argue that Local Civil Rule 65.1(d) provides the Court with authority to decline to hear live testimony, *see id.*, a hearing is appropriate when the Court must resolve materially conflicting evidence and decide which testimony to find credible.  *Cobell*, 391 F.3d at 261; *Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 113 (D.D.C. 2018).  Indeed, Defendants concede that "the parties have again presented competing expert testimony" on the issue.  Opp. at 37.  It is perverse, then, for Defendants to resist a hearing so that such disputes can be resolved by the trier of fact.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motions for preliminary injunctions.

Dated: January 3, 2020

Respectfully submitted,

/s/ Donald P. Salzman
Donald P. Salzman,  D.C. Bar Number #479775
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7983

Alexander C. Drylewski
  (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3278

*Counsel for Plaintiff Corey Johnson*

/s/ Alex Kursman
Alex Kursman
Devon Porter
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Plaintiff Dustin Higgs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd of January, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/ Donald P. Salzman
Donald P. Salzman,  D.C. Bar Number #479775
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7983

# EXHIBIT 1

## DECLARATION OF JESSICA JOHNSON
## PURSUANT TO 28 U.S.C. § 1746

1.     My name is Jessica Johnson. I am employed as an investigator by the Federal

Community Defender Office for the Eastern District of Pennsylvania.

2.     I have known Dustin Higgs for approximately 9 years. I communicate with him

regularly by visiting, talking on the phone, emailing and writing letters.

3.     On December 17, 2020, our office was notified by Alexis McGee of the Bureau of

Prisons that Dustin Higgs had tested positive for Covid-19.  Following this, I contacted Dustin

Higgs's son, Da'Quan Darby, who had visited with Mr. Higgs on December 13 and 14.  Mr.

Darby stated that he was not surprised to hear his father tested positive for the virus because his

father was coughing, had the chills, and was displaying symptoms consistent with the virus

during their visits. Mr. Darby said he recognized the symptoms right away.  He works as a Direct

Support Professional providing assistance to disabled clients recovering from serious illness.  In

his professional capacity, Mr. Darby worked with a client who had Covid-19.

4.     On December 18, 2020, our office spoke with Dustin Higgs.  He reported sinus

troubles, sniffles and a headache.  Dustin said he received a second Covid test on this date that

was sent to an outside lab.

5.     On December 19, 2020, our office spoke with Dustin Higgs.  He sounded

extremely ill, and was nearly impossible to understand for the first 45 minutes of the call.  After

that time, his voice got a little better but he was coughing, and said his throat was bothering him.

He reported that there is a woman on the prison medical staff (name unknown) who comes at

least once a day to see how he is feeling.

6.     On December 22, 2020, I spoke with Dustin Higgs.  He reported a headache,

stuffed nose, and persisting sinus trouble.  He also reported labored breathing, and that the prison

was checking his blood oxygen level.  As for his headaches, Dustin explained that they were severe – more severe than migraine headaches he gets. He described the pain as "a turn-the-lights out headache," and "like an elephant standing on my head."  He was also experiencing shivers and body aches similar to the flu.

7.      Mr. Higgs recounted that his symptoms first became bad on Sunday, Monday and Tuesday, December 13 to 15, when he had a slight fever. Then, from Wednesday to Friday, December 16 to 18, he felt a bit better. But on Saturday December 19, his headache was terrible, and he begged the nurse to give him something.  He took 6 Tylenol (two at a time, every half an hour) and he tried to lay down, but that didn't help.  (He is allergic to ibuprofen so could not take that.)  He could not even open his eyes, the pain was so bad.  By December 22, his headache pain had lessened somewhat but was like a migraine and still very painful.

8.      On December 23, 2020, our office spoke with Dustin Higgs.  He reported feeling roughly the same as the day before, with headaches being the worst part of his symptoms, and continued labored breathing.

9.      On December 24, 2020, our office spoke with Dustin and he had a bad headache, labored breathing and sinus congestion.

10.     On December 25, 2020, our office spoke with Dustin Higgs.  He reported labored breathing but that his pulse oximeter readings have been 100.  He reported that he is asked three times a day how he is feeling.  His headache was still present but less painful.  He continued to have a stuffy noise.  He generally reported feeling like the symptoms cycle.

11.     On December 26, 2020, our office spoke with Dustin Higgs and he reported that his breathing was still a little labored and he was stuffed up.  His headache was better than the day before.

12.     Da'Quan Darby and his sister visited Dustin Higgs on December 27 and December 28.   Mr. Darby reported that his dad seemed a little better during this visit (than his last visit) but was still showing symptoms of Covid-19 including a headache.  Mr. Darby observed his father sniffling and wiping his nose both days.  Moreover, Dustin told Mr. Darby that he woke up feeling like he had strep throat that morning.

13.     On December 28, 2020, our office received partial updated medical records on Dustin Higgs.  The records noted that on December 27, Dustin had a mild stuffy nose with nearly resolved headache and no other symptoms.  However, when our office spoke with Dustin on the 28, he explained that he had reported labored breathing and a headache on the 27.  On the 28, Dustin was still experiencing a little labored breathing and a mild headache.  He reported these symptoms on this date to prison medical staff as well.

14.     On December 29, 2020, our office spoke with Dustin Higgs.  He reported a mild headache and mild shortness of breath, and sounded congested.

15.     On December 30, 2020, a lawyer from our office visited Dustin at Terre Haute, where she observed Dustin blowing his nose and coughing during the visit.  He sounded congested and stuffed up.  Another team member spoke with him later in the day on the telephone, and Dustin sounded congested. Dustin reported that he still had labored breathing and had just gotten a chest x-ray.

16.     On December 31, our office spoke with Dustin and he made sniffling sounds frequently, and reported a headache that was not so bad. He described being intermittently unable to get comfortable breathing or clearing his sinuses and lungs.  He said he was taking more puffs on the rescue inhaler.

17.     I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information and belief.


Dated: 1/3/2021                                    *JJohnson |s|*
                                                   Jessica Johnson

# EXHIBIT 2

## DECLARATION OF DR. MITCHELL GLASS
## PURSUANT TO 28 U.S.C. § 1746

I, Mitchell Glass, M.D., being of sound mind and lawful age hereby state under penalty of

perjury as follows:

  1.  I am the CEO and Managing Director of Chronic Airway Therapeutics, Inc., a

company focused on novel treatments for lung diseases including the full spectrum of asthma

and chronic obstructive pulmonary disease (COPD).  I am Chief Medical Officer of Strados

Labs, Inc., a company focused on the development and commercialization of a novel wearable

stethoscope.  I am the Chairman and CEO of Accolade Pharma, LLC, a company focused on the

development of novel formulations and presentations of zafirlukast, which I developed for

Zeneca PLC (now Astra Zeneca) for the treatment of asthma.  I am the founder of Contagion

Preparedness Consortium, Inc, a company focused on discovery, development, and utilization of

a novel antibody test for SARS COV-2 infection.  I am frequently called upon by colleagues to

assist in the development of novel diagnostics and therapeutics.

  2.  I graduated from University of Chicago (Pritzker) School of Medicine in 1977.

Thereafter, I completed a residency in internal medicine at Presbyterian University of

Pennsylvania Medical Center and a fellowship at the University of Pennsylvania. I am board

certified by the American Board of Internal Medicine in Internal Medicine, Pulmonary Medicine,

and Critical Care Medicine.  A copy of my curriculum vitae is attached as Exhibit 1.

  3.  In forming my opinion, I reviewed the Bureau of Prisons' Execution protocol;

medical records for Dustin Higgs; and declarations from Drs. Antognini, Crowns, Edgar, Locher,

Stephen, Stevens, Van Norman, and Zivot.  In addition, I have reviewed the medical literature

with respect to barbiturates, SARS COV-2 infection (COVID-19), relevant aspects of asthma,

and recent advances in aspirin exacerbated respiratory disease (AERD).

**Opinion 1**. His severe asthma places him at heightened risk for a major asthma attack in response to any trigger that causes release of histamine.

4.      Mr. Higgs has aspirin exacerbated respiratory disease (AERD), which is one aspect of his severe asthma.  Mr. Higgs meets all of the criteria for a diagnosis of AERD, a form of asthma consisting of three complementary findings: asthma; intolerance to aspirin or NSAIDs; and nasal polyposis. The record from Mr. Higgs's extensive sinus surgery, including the removal of polyps (polypectomy 2010) clearly describes that he is ibuprofen (NSAID) intolerant and that he has an extremely high percentage of eosinophils (white blood cells increased in allergic asthma).  His bone marrow examination demonstrated no intrinsic hematological disease, and the opinion of (Dr. Jabbour, Hematologist) concludes that his eosinophilia is due to his allergic/ asthmatic condition.  The fact that Mr. Higgs has AERD establishes that his asthma is severe.

5.      Contrary to Dr. Locher's opinion (¶ 4), Mr. Higgs did require systemic corticosteroids during his confinement.  He also used a nebulizer in the past, which is associated with more severe symptoms.

6.      Although Dr. Locher relies on the fact that Mr. Higgs can exercise (¶ 4), exercise-induced asthma is a distinct form of asthma.  The fact that Mr. Higgs is able to exercise is not incompatible with a diagnosis of AERD or severe asthma.

7.      Mr. Higgs's asthma is currently fairly well controlled by medications, and so his symptoms on a day-to-day basis are not usually severe.  But importantly, the baseline respiratory functioning of Mr. Higgs is not helpful in ascertaining his risk for a life-threatening asthma "attack".  The course of AERD is often labile, with periods of few symptoms interrupted by significant exacerbation.  In particular, his AERD means that his asthma is severe by definition,

2

and that he is highly susceptible to experiencing a serious and life-threatening asthma attack in response to a pulmonary insult.

**Opinion 2**:  The massive dose of barbiturate will, to medical certainty, trigger an immediate asthma attack and closing of Mr. Higgs's airways, which will result in a terrifying period of breathlessness that can last minutes, or until either pulmonary edema or cardiac failure results in death.

8.      There are two effects of barbiturates in patients with asthma that are significant and relevant to Mr. Higgs.  The first is that the massive bolus of an alkaline substance (pH 11), will arrive in the blood vessels in less than one second and instantaneously cause his airways to shut down.  The pH of blood is about 7.4, and pH is measured on a logarithmic scale.  A pH of 11 is therefore extremely caustic.  If a person with AERD is injected with a large dose of a highly caustic substance, this event will trigger a massive asthma attack.

9.      The second effect is that a very high dose of pentobarbital will cause a primary metabolic alkalosis (increased base in his blood), which would normally be compensated by a decrease in breathing (ventilation). However, Mr Higgs's response to his asthma attack will be to try to increase his breathing rate, causing further pain within seconds of his injection. The hallmarks of severe acute asthma are smooth muscle contraction which narrows the airway, and the outpouring of mucus from glands that line the airway.  If the airway narrowing and mucus secretion lasts minutes, white blood cells including eosinophils (inflammatory cells) are drawn into the airway causing pain on breathing.  Mr. Higgs's long term asthma has caused thickening of the walls of his airways and increased the number of mucus glands and cells (goblet cells), each of which will heighten this response.  In addition, his COVID-19 infection will have already drawn inflammatory cells into his lungs, thereby worsening his immediate air hunger and pain as occurs with the inhalation of any noxious gas.

10.     The injection of pentobarbital will trigger a massive asthma attack in Mr. Higgs within approximately one second.  The intravenous injection of pentobarbital goes directly from the site of injection to the right side of the heart and then is delivered into the pulmonary circulation. This highly concentrated dose of pentobarbital is diluted only by blood that has also returned to the right side of the heart in the space of one heartbeat – which would take one second at a heart rate of 60 beats/ minute.  The pentobarbital is pumped directly into the pulmonary circulation, where it will trigger an immediate asthma attack of the larger airways, as well as serum leakage into the smallest ("peripheral") airways.  For Mr. Higgs, these peripheral airways have also been recently damaged by his COVID-19 infection.

**Opinion 3**:  Mr. Higgs's prior experience with asthma and reliance on an inhaler to relieve his symptoms will exacerbate the pain and suffering associated with this terminal asthma attack.

11.     Mr. Higgs has made regular use of a beta agonist bronchodilator to relieve symptoms of shortness of breath or difficulty breathing (dyspnea) associated with his asthma. Unlike the average  person who experiences acute shortness of breath, the patient with asthma is immediately aware of what is occurring and how to recover.  In my experience treating asthma patients and developing pharmaceuticals to treat asthma, the asthmatic patient will volunteer that an empty or malfunctioning inhaler is a source of immediate terror.  Therefore, the inability to access his inhaler places Mr. Higgs at heightened risk of a painful and terrifying experience during his execution.

12.     The medical chart notes that while Mr. Higgs regularly skipped use of his inhaled corticosteroid (ICS), he regularly used his inhaler to relieve his shortness of breath.

13.     The significance is that Mr. Higgs came to rely on his inhaler and to be reassured

that it was always "at hand".  When his airways close after he receives a high dose of

pentobarbital, he will not be able to access his inhaler, increasing his pain, terror, and suffering.

**Opinion 4**:  COVID-19 infection will accelerate and enhance the pain and suffering of Mr.
Higgs with or without flash pulmonary edema.

14.     COVID-19, even in mildly symptomatic or asymptomatic patients, is associated

with lung inflammation.

15.     Inflammatory mediators such as histamine and leukotrienes are increased in the

airways of asthmatic patients. These mediators are pre-formed in mast cells that are increased in

patients with asthma and released immediately upon stimulation.  The asthmatic airway is more

sensitive to triggers that cause release of these mediators.  Upon release from cells that line the

airways, these mediators cause  conscriction of the airways along with  mucus production and

secretion.

16.     COVID-19 further guarantees that the response to the bolus of pentobarbital will

trigger an immediate asthma attack, the duration of which could last minutes.  COVID-19

infection damages the smallest (peripheral) airways.  This peripheral damage would not be

visible on a chest x-ray, so Mr. Higgs's recent chest x-ray does not establish that Mr. Higgs has

not experienced lung damage.

17.     The effects above are medically certain.  While Mr. Higgs may ultimately

succumb to pulmonary edema, the bronchoconstriction, mucus plugging and inflammation

affecting his airways and triggered by the bolus of barbiturate will result in minutes of struggling

prior to his death.

18.     I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information and belief, subject to 28 U.S.C. § 1746.

Dated: 5 Jan.2021

Mitchell Glass, M.D.

6

# EXHIBIT A

# CURRICULUM VITAE

*Mitchell Glass, M.D.*

**HOME AND BUSINESS ADDRESS:**

902 N. Broom Street
Wilmington, DE 19806
302-652-3389
302 652-2279 FAX
mglassmd@aol.com (e-mail)

**EDUCATION:**

| | |
|---|---|
| 1973 | A.B. Special Honors in Biology, University of Chicago |
| 1977 | M.D. University of Chicago |

**POSTGRADUATE TRAINING, FELLOWSHIP AND FACULTY APPOINTMENTS:**

| | |
|---|---|
| 1977-1983 | Residency in Internal Medicine, Presbyterian University of Pennsylvania Medical Center |
| | Fellowship in Pulmonary Medicine, University of Pennsylvania |
| | Post-doctoral fellowship in Respiratory Physiology, University of Pennsylvania |
| 1985-1988 | Assistant Professor Medicine and Physiology, University of Pennsylvania |
| | Attending Physician, Pulmonary Section, Graduate Hospital (Philadelphia) |

**INDUSTRIAL EXPERIENCE**

| | |
|---|---|
| 2012 – Present: | Executive Vice President of Research & Development, Chief Medical Officer, and Executive Director, Invion LTD (Brisbane QLD, Australia) Consultant to start-up pharmaceutical and device companies |
| 2007 – Present: | CMO and Director, OrphageniX, Inc (targeted gene alteration, oligonucleotide therapy) |
| 2007 – 2013: | Founder and CEO, SleepTrials, Inc. |
| 2010 – 2012: | CEO and Director, Axeuron LLC (smoking cessation therapeutics) |
| July 2005 – 2010: | Chair, Scientific Advisory Board (Clinical), Topigen, Inc., (Montreal PQ, Canada) |
| May 2005 – June 2008: | CEO and Director, Aqumen NA, Inc. (Japanese ophthalmic biotech); Director, Aqumen KK |
| Oct. 2004 – June 2006: | Chief Scientific Officer, University City Science Center (Philadelphia, PA) |
| May 2003 – June 2004: | Board Director,  President and COO, geneRx+ |
| 2004: | Director of PERI Course DDMS-1; developed course curriculum for early drug development |

| | |
|---|---|
| <u>1997 – 2003</u>: | Chief Medical Officer, Senior Vice President of Strategic Drug Development, Clinical Development and Regulatory Affairs, AtheroGenics, Inc. (Alpharetta, GA) |

<u>Responsibilities included</u>:

- Managing annual budget that grew from $250,000 to > $20 million
- Filing 5 INDs and acting as senior representative to HPFB and FDA
- Initial and subsequent clinical plans for AGI-1067, AGIX 4207 and AGI-1096
- Corporate Officer, Member of IPO Team
- Establishing and managing a new development department that grew from n =1 to 29, including Development Chemistry, Toxicology, ADME and Biometrics/Data Management, Clinical Research and Safety; Regulatory Affairs and Quality Assurance
- Chairman of Pharmaceutical Review Board for integration of Research and Development
- Acting VP licensing and corporate development 3/01 to 6/02

<u>Activities/accomplishments included</u>:

- Out-licensing of diagnostic in-licensed in 1997; in-licensing second AGI platform (11patents around MEKK technology) from National Jewish MRC (Denver)
- Founding member of Executive Committee
- Presenter to potential investors and negotiator with all potential corporate partners
- Execution of 10 Phase 1 studies (3 NCEs)
- Successful completion and reporting of Phase 2 study (AHA plenary session)
- Advancement of second NCE into Phase 2 and 3rd NCE into licensing discussions
- Presentation of first and second strategic plan for AGI to Board of Directors
- Successful IPO of AtheroGenics, Inc (AGIX) August 2000
- AGI Chair of Joint Management Committee with Schering Ploug for co-development of AGI-1067: 10/99-10/01 (dissolution of collaboration)

| | |
|---|---|
| <u>1999</u>: | Faculty and course director PERI Course (DDMS-1) for doctors entering pharma |
| <u>1997</u>: | Consultant in clinical research and development to biotech and public companies |

1995 – 1996:      Vice President and Director, CardioPulmonary (Pulmonary/Diabetes) Therapeutic Unit Clinical Research, Development and Medical Affairs, SmithKline Beecham Pharmaceuticals

Responsibilities included:

- Managing budget > $150 million and team  of 55 FTEs (including 3 VPs)
- All aspects of phase 2 through 4 studies across a range of > 20 NCEs;
- Initial and subsequent clinical plans for NCEs (compound selection)
- Licensing diligence
- Providing strategic input as Senior Clinical Member of Cardiopulmonary TAT
- Filing NDA and MAA for TEVETEN, COREG (Heart Failure)
- Successful End of Phase 2 meeting and Phase 3 strategy for AVANDIA

1988 – 1995:      ICI Pharmaceutical Group and Zeneca PLC (Wilmington, DE)

Responsibilities included:

- Managing budget that grew from $165,000 to > $30 million
- Filing 7 INDs and all aspects of phase 1 studies across a range of NCEs;
- Initial and subsequent clinical plans for ICI 204,219 (ACCOLATE)
- Developing, executing and reporting phase 2 studies for 5 pulmonary products
- Establishing and managing a new therapeutic team that grew from n =1 to > 30
- Providing strategic input to all pulmonary and allergy projects
- International project Physician responsibility for ACCOLATE including Europe and Japan
- Preparation of NDA and MAA for ACCOLATE

**SPECIALTY CERTIFICATION:**

| | |
|---|---|
| 1980 | American Board of Internal Medicine |
| 1984 | Pulmonary Medicine (A.B.I.M.) |

**LICENSURE:**      PA MD 022820-E (inactive)

**AWARDS, HONORS, AND MEMBERSHIP IN HONORARY SOCIETIES:**

1980-1981      Pennsylvania Thoracic Society Fellow

| | |
|---|---|
| 1982-1983 | American Thoracic Society Fellow |
| 1984-1987 | E.L. Trudeau Fellow, American Thoracic Society |
| 1973 | Member, Sigma Xi |
| 1980 | Member, American Thoracic Society |
| 1991 | Member, American Academy Allergy & Immunology |
| 1991-1999 | Member, Board of Directors, American Lung Association (ALA) of  Delaware |
| 1991-1993 | Chairman, Medical Awareness Subcommittee, International Pharmaceutical Aerosol Coalition (PACC/IPAC) |
| 1993-1996 | Executive Board, American Lung Association (ALA) Delaware |
| 1996-1997 | President-Elect, Delaware Thoracic Society |
| 1997-1998 | President, Delaware Thoracic Society |
| 1997 | Volunteer Excellence Award in Organizational Effectiveness; American Lung Association (National Leadership Meeting) |
| 1997-1998 | American Lung Association (national), Research Coordinating Committee |
| 1998 | ALA Scientific Advisory Board; Volunteer Leader Task Force on Self Assessment and Strategic Planning |
| 1999-2001 | ALA: Member of Strategic Planning Committee (responsible for creation of nationwide strategic plan adopted in 2001) |
| 2002-2008 | Board of Governors, University of Chicago.  Oversight Committee for Alumni Affairs |
| 2002-2016 | Course Director, Drug Development for Medical Scientists (PERI) Lectures: Good Clinical, Manufacturing and Laboratory Practices         What Big Pharma and Small Pharma/ Biotech Value |
| 2009-Present | Board of Advisors, ALA Delaware |
| 2009-Present | Steering Committee University of Chicago Life Sciences (East Coast) |
| 2017-Present | Scientific Advisory Board, Cystic Fibrosis Development, UCSF |

## Employment History

| | |
|---|---|
| 1988 – 1995: | Senior/Executive Director, Zeneca Pharmaceuticals International Head of Pulmonary Drug Development |
| 1995 – 1996: | Vice President and Director of CardioPulmonary Therapeutics, SmithKline Beecham |
| 1997 – 2004: | Senior Vice President and Chief Medical Officer, AtheroGenics, Inc. (AGIX) |
| 2005 – 2006: | Chief Scientific Officer, University City Science Center |
| 2007 – 2011: | Chief Medical Officer and Director, Aqumen Pharmaceuticals (United States and Kyushu, Japan) |
| 2011 – 2019: | Executive Vice President, Chief Medical Officer, and Executive Director, Invion LTD |
| 2015 – Present: | Principal, Broom Street Associates LLC |

<u>2019 – Present</u>:      CEO and Director, Chronic Airway Therapeutics

CEO and Chairman, Accolade Pharma LLC

Chief Medical Officer, Strados Labs (wearable stethoscope)

<u>2020 – Present</u>:      Chief Business Officer and Director, Contagion Preparedness Consortium

**ORIGINAL PAPERS:**

1. Glass M, Kaplan JE, Macarak JE, Aukberg SA, Fisher AB, Serum fibronectin is elevated during normobaric and hyperbaric oxygen exposure in rats.  Am. Rev. Respir.  Dis 130:237-241, 1984.

2. Glass M, Sutherland MW, Forman HJ, Fisher AB, Selenium deficiency potentiates paraquat-induced lipid peroxidation in isolated perfused rat lung. J. Appl. Physiol. 59:619-622, 1985.

3. Sutherland MW, Glass M, Nelson J, Lyen Y, Forman HJ, Oxygen toxicity; loss of lung macrophage function without metabolite depletion.  Journal of Free Radicals in Biology and Medicine 1:209-214, 1985.

4. Glass M, Forman HJ, Rotman EI, Clark JM, Pietra GC, Fisher AB, Bronchoalveolar polymorphonuclear leukocytes in pulmonary oxygen toxicity.  J. Hyperbaric Medicine, 1:107-121, 1986.

5. Abrams WR, Kucich U, Kimbel P, Glass M, and Weinbaum G.  Acute cigarette smoke exposure in dogs: the inflammatory response.  Exper. Lung Res, 14:459-475, 1988.

6. Smith LJ, Geller S, Ebright L, Glass M, and Thyrum PT.  Inhibition of leukotriene $D_4$-induced bronchoconstriction in normal subjects by the oral $LTD_4$, receptor antagonist ICI 204, 219. Am Rev Respir Dis, 141:988-992, 1990.

7. Bernstein JA, Greenberger PA, Patterson R, Glass M, Krell RD, and Thyrum PT  The effect of the oral leukotriene antagonist, ICI 204, 219, on leukotriene $D_4$, and histamine-induced cutaneous vascular reactions in man.  JACI, 87: 93-97, 1991.

8. Glass M.  Early results with oral ICI 204,219.  Annals New York Academy of Sciences, 1991:629143-147.

9. Glass, M.  Feasibility of an outcome trial in the preventive therapy of emphysema.  Annals New York Academy of Sciences, 624:195-208, 1991.

10. Glass M, Fisher AB, Alveolar lavage fibronectin in pulmonary oxygen toxicity.  J. Hyperbaric Medicine.

11. Anthonisen N, Connnett J, Friedman, B, Glass M, Kilday DP, Mingo TS, Rudolphus A, Williams GW. Design of a clinical trial to test a treatment of the underlying cause of emphysema.  AA NY Acad Sci, 624 Suppl: 31-34, 1991

12. Akers S, Kucich U, Swartz M, Rosen G, Glass M, Rosenbloom J, Kimbel P, Weinbaum G. Sensitivity and specificity of plasma elastin-derived peptides in chronic obstructive pulmonary disease.  Amer. Rev. Respir. Dis, 145: 1077-1081, 1992.

13. Findlay SR, Barden JM, Easley CB, Glass M.  Effect of the oral leukotriene antagonist ICI 204, 219 in antigen-induced bronchoconstriction in subjects with  asthma.  J Allergy Clin. Immunol. 89:1040-1045,  1992.

14. Ahn CM, Sandler M, Glass M, Saldeen, T. Effect of a synthetic leukocyte elastase inhibitor on thrombin-induced pulmonary edema in the rat.  Exper. Lung Res., 19: 125-135, 1993.

15. Smith LJ, Glass M, Minkwitz MC.  Inhibition of leukotriene D4-induced bronchoconstriction in subjects with asthma: a concentration effect study of ICI 204,219. Clin Pharmacol Ther, 54: 430-436, 1993.

16. Nathan RA, Glass M, Minkwitz MC. Inhaled ICI 204,219 blocks antigen-induced bronchoconstriction in subjects with bronchial asthma.  Chest, 105: 483-488, 1994.

17. Spector SL, Smith LJ, Glass M. Effects of 6 weeks of therapy with oral doses of ICI 204,219, a leukotriene D4 receptor antagonist, in subjects with bronchial asthma.  (ACCOLATE Asthma Trialists Group).  Am J Respir Crit Care Med, 150: 618-623, 1994.

18. Donnelly AL, Glass M, Minkwitz MC, Casale TB.  The leukotriene receptor antagonist, ICI 204,219 relieves symptoms of acute seasonal allergic rhinitis.  Amer J  Respir Crit Care Med, 151: 1734-1739, 1995.

19. Fish JE et al. Zafirlukast as therapy for mild to moderate asthma: a 13-week multicenter study.  Clinical Therapeutics: 1997

20. Tardif JC et al. AGI-1067 and Probucol reduce post angioplasty restenosis after percutaneous coronary intervention. Circulation (accepted for publication).

**ABSTRACTS (selected):**

1. Blank J, Glass M, Glasgow J, Burdette LJ, Weinbaum G.  Acute alveolar damage induces by exposure to $NO_2$.  Amer. Rev. Respir. Dis.  133:85A, 1986.

2. Glass M, Akers S., Wederbrand KS, Fibronectin concentration in rats with altered sensitivity to hyperoxia.  Amer. Rev. Respir. Dis. 135:A143, 1987.

3. Silverman S, Weinbaum G, Glass M, Alveolar permeability changes induced by acute exposure of rats to $NO_2$.  Amer. Rev. Respir. Dis. 135:A143, 1987.

4. Silverman S, Oppenheim DM, Glass M, Weinbaum G.  Neutrophil chemotaxis during the first twenty-four hours of exposure of rats to 30 ppm $NO_2$.  Amer. Rev. Respir. Dis.  135:A94, 1987.

5. Nguyenpho HT, Haas K, Glass M.  Effect of Vitamin E on occlusion and reperfusion arrhythmias and infarct size in canine model.  Chest:  1990.

6. Glass M, Wade M, and Campbell EJ.   The establishment of a library of patient samples to validate assays of elastase:  antielastase balance.  Amer. Rev. Respir. Dis. 143: A327, 1991

7. Nathan RA, Storms WW, Bodman SF, Minkwitz MC, and Glass M.   Inhibition by aerosolized ICI 204,219, $LTD_4$ receptor antagonist, of allergen-induced bronchoconstriction.  J. All. Clin. Immunol.  87:  256, 1991.

8. Smith LJ, Glass M, Miller CJ.  Effect of oral ACCOLATE (zafirlukast) on leukotriene D4 (LTD4)- induced bronchoconstriction in patients with asthma. Amer J Respir Crit Care Med 151: A378, 1995.

9. Calhoun WJ, Lavins BJ, Glass M.  Effect of ACCOLATE ( zafirlukast) on bronchoalveolar lavage fluid (BAL) after segmental antigen bronchoprovocation.  Amer J Respir Crit Care Med 151: A42, 1995.

10. Glass M, Snader LA, Israel E.  Effect of the inhaled $LTD_4$ receptor antagonist ICI 204,219 on cold air-induced bronchoconstriction in patients with asthma. J Allergy Clin Immunol 93: 295. 1994.

11. Spector SL, Miller, CJ Glass M, et al.  13-week dose-response study with Accolate (zafirlukast) in patients with mild to moderate asthma. Amer J Respir Crit Care Med 151: A379, 1995.

12. Kemp JP, Glass M, Minkwitz, MC.  Onset of action of the leukotriene-receptor antagonist zafirlukast ( ACCOLATE) in patients with asthma. J Allergy Clin Immunol. 95: A844, 1995.

13. Nathan, RA Glass M, Snader LA, et al.  Effects of 13 weeks of treatment with ICI 204,219 (ACCOLATE) or sodium cromolyn  (INTAL) in patients with mild to moderate asthma.  J Allergy Clin Immunol. 95: A990, 1995.

14.  15 and 16 on AGI-1067 and CART-1 (Circulation 2001 and 2002)

**EDITORIALS:**

1.  Fisher AB, Forman HJ, and Glass M, Mechanisms of pulmonary oxygen toxicity Lung.162:255-259, 1984.

2.  Glass M, Karnovsky  M, and Fishman A.  Oxygen Free Radicals.    Proceedings of NIH symposium Dec 10-12, 1986 Summary of Frontiers in Basic Sciences that Relate to Heart, Lung and Blood Diseases Symposium.  (published by NIH).

**INVITED TALKS (selected)**

New York Academy of Science .Early results with ICI 204,219 (NYAS). London, UK. October, 91: NYAS . Testing novel therapy in preventing emphysema) Orlando, FL May, 91

Eighth Intl Conference on prostaglandins. ICI 204,219;  Montreal, Can. July, 92

American Thoracic Society Evening Symposium. Miami, FL May, 92

IBC conference New drugs for asthma (Chairman) Washington, D.C. October, 92

National Asthma Education Prog. Workshop Chair. CFC's. Washington, Dec 92

AAAI Clinical Research Coordinators' Course Chicago, IL March 93.

Eur Respir Soc. (ERS)  ICI 204,219 Florence, Italy          September, 93

Interasthma. Results with zafirlukast. Jerusalem Israel, October 1993

American Thoracic Society. Evening Symposium Boston MA May, 1994

Eur Respir Soc. Compliance with novel oral therapy. Nice, France October, 94

First global symposium on asthma: Plenary talk on new therapy for asthma. Chicago, IL    July, 95

ERS. Symposium Chairman. Role of pranlukast in pediatric asthma Stockholm. September, 1996

Marcel Dekker Publishers: Role of 5-lipoxygenase products in asthma (Puerto Rico March, 1997)

Conference organizer: "When zero percent is not enough; Atherosclerosis treatment in the era of coated stents" (Symposium associated with ACC Meeting; symposium proceedings : March, 2002

Regulatory framework for establishing a US subsidiary for Japanese Pharma co.: December 2005

Early Stage East: panelist on venture capital: the entrepreneur's perspective      May 2008

Booth School of Business University of Chicago: Future of Life Sciences          April 2010

Bioshares: 25 years of Working with the FDA: Lessons Learned: Queenstown, NZ August 2013
ALA National Expert Panel: Inhalation of cannabinoids: Chairman November 2019

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**In the Matter of the**
**Federal Bureau of Prisons' Execution**          :
**Protocol Cases,**

                                                                              :

**Lead Case: Roane et al. v. Barr**               **Case No. 19-mc-00145 (TSC)**

                                                                              :

**THIS DOCUMENT RELATES TO:**                     :

**James H. Roane, Jr. et al. v. William Barr,**   :
**Case No. 05-2337**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**DECLARATION OF PLAINTIFF COREY JOHNSON**</u>

I, Corey Johnson, declare and state as follows:

1.     I am a prisoner at USP Terre Haute in a unit they call the Special Confinement Unit.  I have been in this prison for over 20 years.

2.     In mid-December 2020, I began feeling like I had a cold or the flu.  A few days later, the nurse gave me a test, and a few days after that, a nurse told me that I had COVID.

3.     My lawyers have told me that the prison has sent them my medical records.  On Monday, December 28, 2020, my lawyers told me they had gotten records earlier that day that talked about what happened when a nurse came to see me the day before, on Sunday, December 27, 2020.

4.     My regular time to be taken by the officers to go to the recreation room where I can exercise and look at the computer is first thing in the morning at about 7 a.m.  On Sunday, December 27, 2020, in the morning, sometime around 7:30 a.m., a lieutenant and several correctional officers came to my cell to take me to rec, which is how they do it because a Lieutenant has to be there when they take us out of our cells.  On December 27, 2020, the

lieutenant and officers opened the outer metal door to my cell, and one officer came into the part between the outer door and the inner door, which has bars on it.  The officer put handcuffs on me through the tray slot of the barred inner door to my cell, with my hands behind my back like usual.  The officer then took me out of my cell, and they put leg irons on me like they do when they take us out of the cells.  They then patted me down and used a metal detector to check me, which is regular.  They then walked me down the A-range past the other cells into the pod area where there are tables and doors leading to the outside rec cages.

5.      The indoor recreation room where they were taking me that morning is upstairs.  Just when the officers were about to take me up the stairs to the upper rec room, a nurse came to check me while I was standing near the stairs with the Lieutenant and officers there.  She asked me some questions including how I was feeling, and I told her.  She took my temperature, and put a blood pressure cuff on my arm while my hands were cuffed behind my back.  She also put a clip on my finger, which my lawyers have told me is to see how much oxygen there is in my blood.  She listened to my chest with a stethoscope.  She never asked me to do any test that I did not let her do. Everything that happened with the nurse on Sunday, December 27, 2020 happened in the pod area near the stairs to the upper rec room, which is not anywhere close to my cell.

6.      On Saturday, January 2, 2020, my lawyers told me they got new medical records about me from the prison earlier that day that talked about tests the nurse gave me that morning.  A nurse came to see me sometime between 7 and 8 a.m. on Saturday, January 2, 2020.  They opened the outer metal door of my cell and the nurse came into the part outside of the inner door with bars.  She asked me how I was feeling and I told her that my cough was a little worse than it had been for the past few days.  She took my temperature and put the clip on my finger

2

to take the test about oxygen in my blood.  I did everything she asked me to do and answered her questions.  I never refused any test she asked me to do that morning.

7.      Not long after the nurse left, officers took me to a visiting room to meet with my spiritual advisor, Reverend Bill Breeden.  I got there first, sometime around 8 a.m. or so, and sat in a chair at the table.  Sometime after I got into the visiting room, Bill came into the other side of the visiting room, which has glass across a table between me and Bill.  Bill sat down and we met for about 7 hours.  I never left the visiting room during the whole time I was meeting with Bill on Saturday, January 2, 2021.

8.      Sometime a few hours after Bill and I started talking, a nurse came by to check on me.  The nurse asked me how I was doing by talking from the other side of the metal door to the visiting room.  I got up to answer the nurse's questions, because she was speaking through the solid glass window.  But the nurse never opened the door to the visiting room and she never took my temperature while I was in the visiting room.  She did not do any tests at all.  She just asked me how I was feeling, and I told her.  The nurse left after a minute or two and Bill and I kept talking until he left sometime around 3 p.m.

9.      When I first started feeling sick in mid-December, I thought I had a cold or the flu because every winter, once one of us gets a cold or flu, it gets passed around, and a lot of the guys on the row get sick.  At first, my nose was stuffy and my throat scratchy.  Within a day or so I started feeling really tired, got a headache, and then after maybe a day later, I started feeling aches all over my body, and they tested me for COVID.  A couple days after that, they told me I had COVID.  I also felt sick to my stomach but that did not last long.  And I started to have a little cough, especially when I breathed in or out deeply like the nurses told me I should.  My cough got a little worse on January 2, 2021 than it was before.  I still have more of a cough today

3

and cough more often than I did a few days ago.  I usually work out for several hours on an elliptical machine and a treadmill first thing in the morning, between about 7 and 9 a.m. and then ride a bicycle after checking the computer.  But one morning a day or two after I started feeling sick, I could only go for about 20 minutes on the elliptical and then gave up because I was so tired.  For the next few days, I slept almost the whole day and almost the whole night, only getting up when the officers opened the outer metal door, which is loud.  I took about a week or more before I tried to start exercising again and even then I have been taking it easy.

10.     Every time a nurse came during the couple of days I was sleeping a lot, I got out of my bed and went to the metal door with bars to speak to the nurse.  Every time the nurses have come to check on me including the days when I was sleeping a lot but also every other time, the nurses always ask me how I am feeling and what symptoms I have.  I always tell them how I am feeling and what symptoms I have that day.  Whatever test the nurses asked me to do, I agreed to do.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this ____ day of January 2021 at Terre Haute, Indiana.

_____
Corey Johnson

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**In the Matter of the**
**Federal Bureau of Prisons' Execution**              :
**Protocol Cases,**
                                                       :
**Lead Case: Roane et al. v. Barr**          **Case No. 19-mc-00145 (TSC)**
                                                       :

**THIS DOCUMENT RELATES TO:**               :

**James H. Roane, Jr. et al. v. William Barr,**   :
**Case No. 05-2337**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF THE REVEREND WILLIAM T BREEDEN

I, Rev. William T Breeden, declare and state as follows:

1.      I am a Minister Emeritus of the Unitarian Universalist Church of Bloomington,

Indiana, and am currently serving as the spiritual advisor to Plaintiff Corey Johnson, a prisoner

in the Special Confinement Unit ("SCU") of the Federal Correctional Complex, Terre Haute

("FCC Terre Haute"), which is operated by the United States Department of Justice, Federal

Bureau of Prisons ("BOP").  Mr. Johnson asked me to serve as his spiritual advisor to lend him

support, counseling, and guidance during the days leading up to his scheduled execution and, if

his scheduled execution goes forward on January 14, 2021, to attend his execution if he wishes

me to do so as his spiritual advisor witness.

2.      Counsel for Mr. Johnson has informed me that an issue has arisen concerning Mr.

Johnson's medical records, which purport to describe events on Saturday, January 2, 2021.  His

counsel asked me to describe from my personal knowledge the events that I observed on

Saturday, January 2, 2021.

3.      As Mr. Johnson's spiritual advisor, I was visiting him at FCC Terre Haute at 11:20 a.m. on Saturday, January 2, 2021, in SCU's visiting room.  I had arrived at the prison sometime around 8 a.m. on January 2, 2021.  As is the usual procedure, I signed in at the visiting desk and an officer took my photograph.  An officer escorted me into the secure part of the prison, and took me to an elevator to go up to the SCU visiting area.  When I got off the elevator, I signed another log book, which is the standard procedure.  My visit with Mr. Johnson started sometime after 8:00 a.m. and continued for approximately seven hours until after 3:00 p.m.  When our visit was over, I left the visiting room, signed out at the logbook near the elevator, and was then escorted by an officer out of the secure part of the prison.

4.      Mr. Johnson was already in the visiting room when I arrived on Saturday, January 2, 2021 sometime after 8 a.m.  Mr. Johnson remained in the visiting room for the duration of my visit.  I left the visiting room only once, at approximately 1:15 p.m., to use the restroom.  We were seated on opposite sides of tables in the middle of the room that were divided by a glass barrier.

5.      During my visit, a nurse came to check on Mr. Johnson sometime around 11:00 a.m.  The nurse remained outside the visiting room door and never opened the door.  She asked Mr. Johnson how he was doing at that time.  Mr. Johnson walked toward the visiting room door, so that, from my perspective, he could hear her better, since the nurse was talking to him through a little glass solid window.  The nurse did not conduct any tests or any sort of examination of Mr. Johnson at that time; she just asked him how he was doing, and he answered her questions.  Neither she nor anyone else took Mr. Johnson's temperature at any time during the approximately seven hours I visited with Mr. Johnson on Saturday, January 2, 2021.

6.      Accordingly, to the extent the medical records appear to reflect that Mr. Johnson's temperature was taken at 11:20 a.m. on January 2, 2021, or at any time during my visit with him that day, they are inaccurate.

7.      I had met with Mr. Johnson previously on Wednesday, December 30, 2020 for close to five hours.  During that earlier visit, I noticed that Mr. Johnson had a periodic cough throughout our visit.  When I visited with Mr. Johnson on Saturday, January 2, 2021, his cough was noticeably more pronounced and more frequent than on December 30, 2020, which I mentioned to his attorney later that day when we spoke.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 3rd day of January 2021 at Bloomington, Indiana.

The Reverend William T Breeden
Unitarian Universalist Minister Emeritus

# EXHIBIT 5

News

# Prison Counselor Created a Burner Twitter Account to Mock Death Row Inmates, Lawsuit Says

Attorney Ashley Kincaid Eve has filed a defamation suit.

By Trone Dowd

December 29, 2020, 10:18pm    ■ Share    ■ Tweet    ■ Snap

A TRUCK IS USED TO PATROL THE GROUNDS OF THE FEDERAL CORRECTIONAL COMPLEX TERRE HAUTE ON JULY 25, 2019 IN TERRE HAUTE, INDIANA. (PHOTO BY SCOTT OLSON/GETTY IMAGES)

A prison official at the Terre Haute Federal Correctional Institution has been accused of using a burner Twitter account to taunt a man who was recently executed by the federal government, and a lawyer who tried to help his appeal for clemency, according to a defamation lawsuit filed Monday.

Indianapolis attorney Ashley Kincaid Eve is suing Andrew Sutton, whom she names as a former counselor at the Special Confinement Unit of the Indiana prison, for what she says are tweets targeting her and former prisoner Christopher Vialva, who was executed Sept. 24. The suit further alleges that Sutton has been reassigned at the prison because of the social media posts.

Sutton is no longer listed as a counselor on the prison's website, according to Fox 59, a local news outlet that first reported on the filing. However, Sutton is still referred to as an SCU counselor under the prison's visiting regulations.

The Terre Haute prison did not return VICE News' request for comment.

VICE News was not able to reach Andrew Sutton for comment. When contacted by Fox 59, Sutton said, "I have no idea what you're talking about," and then hung up, according to the outlet.

1

In the lawsuit, Eve alleges that Sutton published several tweets speculating about her motive in assisting Vialva's legal team, and made light of the prisoner's final moments. The tweets were sent by a Twitter account that went by the name "fozzythebear," which no longer exists.

"Eve isn't on Vialva's legal team," reads one of the now-deleted tweets from the fozzythebear account, according to screenshots presented in the lawsuit. "She's a con-artist looking for 15 minutes of fame from the 'first black man' executed in 15 years. She's using Vialva for her own gain."

In another tweet nine days before Vialva's execution, the account wrote that Vialva was "getting exactly what he deserved."

Quoting a news story detailing Vialva's death by lethal injection, the fozzythebear account added the hashtag "#hahahaha."

The lawsuit also alleges that Sutton sent tweets about other inmates scheduled to be executed through the disguised Twitter account.

"Roane, Tipton, and Johnson better be ready," reads one tweet from the fozzythebear account sent on Aug. 20, referencing James Roane, Richard Tipton, and Cory Johnson. All three men were sentenced to death, and Johnson is scheduled to be executed on Jan. 14.

"Lining them up as they should have been years ago," the fozzythebear account wrote in a follow-up tweet.

One tweet posted by fozzythebear and included in the lawsuit claimed the account belonged to someone who worked within the prison.

"Having worked at Terre Haute, and spending 10 years in the Special Confinement Unit, I know more about the process and the inmates than any of you," the fozzythebear account tweeted, according to the lawsuit.

Eve did not immediately respond to VICE News' request for comment but did tweet about her decision to file the suit.

"Step into the light and make yourself right," she wrote on Twitter Monday.

Bringing back federal executions has become a defining and divisive aspect of Donald Trump's presidency. Under Trump, the Department of Justice has executed 10 people by lethal injection since July, more than any other president in 130 years, according to the Associated Press. And a few more people are scheduled to be executed in the next few weeks.

---

TAGGED:  TWITTER, DEATH ROW, PRISONS, LAWSUIT, DEATH PENALTY