# United States Court of Appeals
### For The District Of Columbia Circuit

_____

**No. 21-5004**                        **September Term, 2020**

1:19-mc-00145-TSC

**Filed On: January 13, 2021**

In re: In the Matter of the Federal Bureau of
Prisons' Execution Protocol Cases,

------------------------------

James H. Roane, Jr., et al.,

       Appellees

     v.

Jeffrey Rosen, Acting Attorney General, et al.,

       Appellants

       **BEFORE:**     Pillard\*\*, Katsas\*, and Walker\*, Circuit Judges

## O R D E R

     Upon consideration of the emergency motion to stay or to immediately vacate an injunction, the opposition thereto, and the reply, it is

     **ORDERED** that the motion be granted and that the preliminary injunction entered by the district court on January 12, 2021, be vacated. See Barr v. Lee, 140 S. Ct. 2590, 2591–92 (2020). It is

     **FURTHER ORDERED**, on the court's own motion, than any petition for rehearing or rehearing en banc be filed no later than 9:00 a.m. on January 14, 2021.

     Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until disposition of any timely petition for

---

\* A statement by Circuit Judge Katsas, joined by Circuit Judge Walker, concurring in this order, is attached.

\*\* A statement by Circuit Judge Pillard, dissenting from this order, is attached.

## United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 21-5004**  September Term, 2020

rehearing or rehearing en banc.  If no rehearing petition is filed by 9:00 a.m. on January 14, 2021, the Clerk is directed to issue the mandate forthwith.  <u>See</u> Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

**<u>Per Curiam</u>**

                      **FOR THE COURT:**
                      Mark J. Langer, Clerk

BY:   /s/
                      Scott H. Atchue
                      Deputy Clerk

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 21-5004**                                              **September Term, 2020**

Katsas, *Circuit Judge*, joined by Walker, *Circuit Judge*, concurring:

Cory Johnson and Dustin Higgs are scheduled to be executed by lethal injection of pentobarbital sodium. They contend that this method of execution violates the Eighth Amendment as applied to their specific medical circumstances. Johnson and Higgs recently tested positive for COVID-19. They argue that the virus has damaged their lungs to the point that the drug will cause them to experience flash pulmonary edema—"a form of respiratory distress that temporarily produces the sensation of drowning or asphyxiation," *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020)—before it renders them insensate. The district court agreed and so preliminarily enjoined the impending executions. The government has filed an emergency motion to stay or vacate the preliminary injunction. I write to explain my vote to grant the motion and vacate the injunction.

A prisoner claiming that a specific method of execution violates the Eighth Amendment "faces an exceedingly high bar." *Lee*, 140 S. Ct. at 2591. The Eighth Amendment "does not guarantee a prisoner a painless death—something that, of course, isn't guaranteed to many people." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019). Instead, it prohibits only methods of execution that "intensif[y] the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Id.* (cleaned up). To establish an Eighth Amendment violation, the prisoner must show that the disputed method presents "a substantial risk of severe pain," meaning that it is "*sure or very likely* to cause … needless suffering." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (cleaned up). The prisoner also must establish that a feasible alternative execution method would significantly decrease that suffering. *Bucklew*, 139 S. Ct. at 1125 (citing *Glossip*, 576 U.S. at 868–69). The Constitution affords a "measure of deference" to government choices in this area, and the Court has "yet to hold that a State's method of execution qualifies as cruel and unusual." *Id.* at 1124–25 (cleaned up).

In addition, to obtain a post-habeas stay of execution, the prisoner must show more than "competing expert testimony" on the question whether the government's chosen method is very likely to cause needless suffering. *Lee*, 140 S. Ct. at 2591 (2020); *see also Execution Protocol Cases*, 980 F.3d 123, 135 (D.C. Cir. 2020). This is partly because federal courts are not well suited to resolve "ongoing scientific controversies beyond their expertise." *Glossip*, 576 U.S. at 882 (quoting *Baze v. Rees*, 553 U.S. 35, 51 (2008) (plurality)). Moreover, "[l]ast-minute stays," issued years after the crime and days before the execution, "should be the extreme exception, not the norm." *Lee*, 140 S. Ct. at 2592 (quoting *Bucklew*, 139 S. Ct. at 1134) (cleaned up).

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 21-5004**                                             **September Term, 2020**

Applying these standards, the Supreme Court in *Lee* allowed several executions to proceed through lethal injections of pentobarbital. The Court noted that pentobarbital is used for executions by five States, has been "used to carry out over 100 executions, without incident," and is "repeatedly invoked by prisoners as a less painful and risky alternative to the lethal injection protocols of other jurisdictions." *Lee*, 140 S. Ct. at 2591 (cleaned up). In preliminarily enjoining the *Lee* execution, the district court had found that "scientific evidence overwhelmingly indicate[d]" a lethal injection of pentobarbital is "very likely" to cause "extreme pain and needless suffering" from flash pulmonary edema before the prisoner has been rendered insensate. *Execution Protocol Cases*, 471 F. Supp. 3d 209, 218 (D.D.C. 2020); *see also id.* at 219 (finding that the plaintiffs "ha[d] the better of the scientific evidence"). Yet because the government presented "competing expert testimony" on that question, the Court held that the plaintiffs had not "made the showing required to justify last-minute intervention." *Lee*, 140 S. Ct. at 2591–92. The Supreme Court therefore vacated the preliminary injunction, which we had declined to disturb. *See id.*

In this case, the district court sought to distinguish *Lee* on the ground that Higgs and Johnson's COVID-19 symptoms will exacerbate the effect of pentobarbital on their lungs. Specifically, it found that Higgs and Johnson will experience a flash pulmonary edema within "one or two seconds" of the injection, before becoming insensate. *Execution Protocol Cases*, No. 19-mc-145 (TSC), ECF 394, at 3. But the same legal standards govern facial and as-applied challenges to the use of pentobarbital for executions. *See Bucklew*, 139 S. Ct. at 1126–28. And the district court based its finding on the same kind of evidence that the Supreme Court had found insufficient in *Lee*: competing expert testimony on close questions of scientific fact.

The district court's reasoning reflects three subsidiary factual determinations: first, that COVID-19 has severely damaged the plaintiffs' lungs; second, that this damage would make them experience a flash pulmonary edema sooner; and third, that they will experience this before they become insensate. The record reflects genuinely disputed testimony on each of those points.

To begin, it is unclear whether Higgs has suffered significant lung damage from COVID-19. Shauna Smiledge, a health service administrator at the prison where Higgs is incarcerated, summarized his medical records. Smiledge Decl., ECF 380-4. According to the records, Higgs was "seen by five different providers" between December 23 and December 29, "all of whom assessed [his] pulmonary status." *Id.* at 4. During that period, his oxygen saturation level consistently measured between 99% and 100%. *Id.* at 3–4. Higgs once said that his breathing "felt funny," but "did not report any other problems." *Id.*

Page 4

Case 1:19-mc-00145-TSC   Document 403-1   Filed 01/14/21   Page 5 of 15
USCA Case #21-5004   Document #1879985   Filed: 01/13/2021   Page 5 of 15

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 21-5004**                                                                 **September Term, 2020**

On December 30, Higgs told his provider that he was "short of breath sometimes" but with the caveat, "Nothin's new. I'm fine." *Id.* at 4. Following an x-ray, Justin Yoon, the reviewing radiologist, read the scans to show only one abnormality: a "right apical reticular nodular density" that was "unchanged" since Higgs' last chest x-ray from two years ago. Locher Decl., ECF 380-1, at 4. Two government experts agreed with Yoon's assessment: pulmonologist Todd Locher, *id.*; H'rg Tr. at 59–60, and forensic pathologist Kendall Von Crowns, H'rg Tr. at 22. Locher thus concluded that Higgs' medical records reflect only "minimal symptoms" from COVID-19. Locher Decl., ECF 380-1, at 3.

Higgs contests that assessment. First, he has argued that his medical records understate his symptoms and reflect inadequate care. The district court declined to credit that argument, and for good reason: Higgs' medical records were updated daily; Smiledge saw no evidence that the records were inadequate, Smiledge Decl., ECF 380-4, at 3; and Higgs' own investigator reported that he "is asked three times a day how he is feeling," Johnson Decl., ECF 383-1, at 2. Second, through an expert, Higgs contests the government's interpretation of his x-rays. Michael Stephen, an intensive-care physician, testified that the x-rays show "significantly increased interstitial markings" on Higgs' lungs, which indicate "very acute COVID pneumonia." H'rg Tr. at 94, 96. The district court credited Stephen's testimony, based principally on its own independent interpretation of the x-rays. *See Execution Protocol Cases*, ECF 394, at 15 ("the right lung in the 2020 image has more prevalent cloudier streaks when compared to the same lung in 2018"). But that testimony, measured against the conflicting views of the two government experts and the attending radiologist, establishes at most "competing expert testimony" over whether Higgs has sustained appreciable lung damage. *See Lee*, 140 S. Ct. at 2591–92.

The same is true for Johnson. According to his medical records, Johnson reported a headache and dry cough on December 20. Locher Decl., ECF 380-1, at 4. On the six days following December 21, he reported an intermittent headache but no cough, at one point noting that his breathing had improved. *Id.* Between December 27–29, Johnson reported a "little cough," but on December 30 he told prison health officials, "I'm okay, I'm good." Smiledge Decl., ECF 380-4, at 5. Johnson recently submitted a declaration asserting that his cough had worsened since January 2, Johnson Decl., ECF 383-3, at 3–4, but updated medical records show that it was "improving" as of January 3, ECF 386-2 at 6.

The parties draw competing inferences from Johnson's mild symptoms. Plaintiffs' expert Gail Van Norman, an anesthesiologist, testified that Johnson had suffered "significant lung damage" that would persist for at least 90 days. Van Norman Decl., ECF

Case 1:19-mc-00145-TSC   Document 403-1   Filed 01/14/21   Page 6 of 15
USCA Case #21-5004   Document #1879985   Filed: 01/13/2021   Page 6 of 15

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 21-5004**                                     **September Term, 2020**

374-3, at 4–5.[1]  She cited studies that COVID-19 patients with mild or no symptoms experience lung damage in anywhere between 56–94% of cases.  Van Norman Decl., ECF 374-1, at 4.  Locher responded that the literature varied on the extent to which individuals with mild cases of COVID-19 develop temporary lung damage, but one recent study found damage in as low as 44.5% of patients.  Locher Decl., ECF 380-1, at 3.  In any event, Locher testified that given Johnson's mild symptoms, any damage to his lungs would be minor.  *Id.* at 4.

The record also contains substantial conflicting testimony on whether asymptomatic or mildly symptomatic COVID-19 patients would be more likely to experience flash pulmonary edema.  Van Norman testified that a person with "COVID-related lung damage" would experience pulmonary edema "even earlier in the execution process" than would a person without it.  Van Norman Decl., ECF No. 374-1, at 1.  She reasoned that COVID-19 damages the lungs' "alveolar-capillary membrane, which is also the site of damage of massive barbiturate overdose," and that this damage would render COVID-positive patients particularly "susceptible to rapid and massive barbiturate damage."  *Id.* at 2, 4.  But her declaration cites no evidence for that second inference.  Moreover, Joseph Antognini, who testified for the government and upon whom the Supreme Court relied in *Bucklew*, *see* 139 S. Ct. at 1131–32, described Van Norman's assertion as "entirely speculative," Antognini Decl., ECF 380-2, at 1, and based on "no published evidence," *id.* at 2.  The district court credited Van Norman's testimony on these points because she has treated patients with COVID-19.  Execution Protocol Cases, ECF 394, at 12.  But that provides little basis for an opinion on the specific question of the relationship between pentobarbital and pulmonary edema.  The district court further reasoned that, although Van Norman did not "provid[e] support for her conclusions," Antognini's opinions were "conclusory" as well.  *Id.* at 12.  But if both sides' evidence on this point was shaky, *Lee* requires denying a stay.

Finally, the record contains only conjecture on whether a lethal injection of pentobarbital would cause any edema before rendering the prisoner insensate.  Antognini opined in his written declaration that Higgs and Johnson "are not at increased risk of developing pulmonary edema from pentobarbital prior to the onset of unconsciousness."  Antognini Decl., 380-2, at 4.  In contrast, Van Norman stated in her oral testimony, but not

---

[1] Van Norman also based her assessment on what she described as a "clinically significant" drop recorded in Johnson's pulse oximetry reading from 99% to 97%.  Van Norman Decl., ECF 374-3, at 3–4.  But the district court accorded that opinion "minimal weight" because pulse oximetry readings are subject to minor variation and Johnson's readings were still within a normal range.  *Execution Protocol Cases*, ECF 394, at 18.

Case 1:19-mc-00145-TSC   Document 403-1   Filed 01/14/21   Page 7 of 15
USCA Case #21-5004   Document #1879985   Filed: 01/13/2021   Page 7 of 15

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 21-5004**                                **September Term, 2020**

her written declaration, that Higgs and Johnson would experience edema "within a second or two" of the injection, and thus at least thirty seconds before becoming insensate. H'rg Tr. at 192. Van Norman's testimony on this point is akin to evidence held insufficient to warrant a stay in *Lee*. There, Van Norman testified that the onset of pulmonary edema could be "virtually instantaneous" in even healthy persons injected with pentobarbital. Van Norman Decl., ECF 26-14, at 33. The Supreme Court declined to credit that thinly supported assertion in *Lee*. And we see no ground for distinguishing it from the near-identical claim that Van Norman has raised here.

Because the plaintiffs have failed to show more than "competing expert testimony" on the factual issues that undergird their method-of-execution challenge, they have not "made the showing required to justify last-minute intervention." *Lee*, 140 S. Ct. at 2591–92.

Apart from the merits, the balance of the equities also favors vacatur. Higgs and Johnson each committed multiple murders. *United States v. Higgs*, 353 F.3d 281, 289–91 (4th Cir. 2003); *United States v. Tipton*, 90 F.3d 861, 868–70 (4th Cir. 1996). Both men have exhausted all available direct and collateral challenges to their convictions and sentences. *Higgs v. United States*, 138 S. Ct. 2572 (2018); *Johnson v. United States*, 546 U.S. 810 (2005). They have had ample opportunity to file clemency petitions. And the Supreme Court repeatedly has stressed that the public has a "powerful and legitimate interest in punishing the guilty," *Calderon v. Thompson*, 523 U.S. 538, 556 (1998), which includes "an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (2019).

For these reasons, I vote to vacate the preliminary injunction, as the Supreme Court did in *Lee*.

# United States Court of Appeals
### For The District of Columbia Circuit

_____

**No. 21-5004**                                      **September Term, 2020**

Pillard, *Circuit Judge*, dissenting:

      Cory Johnson and Dustin Higgs are housed at the Federal Correctional Institution in Terre Haute, Indiana, the site of a COVID-19 outbreak. On December 16, both men tested positive for the virus. In the days that followed, Johnson and Higgs quickly moved to enjoin executions that the government less than two months ago scheduled for January 14 and 15. Their supplemented and amended complaints alleged that the lung damage they suffer as a result of their COVID-19 infections substantially increases the risk that they will unnecessarily experience agonizing pain if they are executed pursuant to the government's lethal injection protocol this week. The government declined to postpone the executions, so the district court scheduled a two-day evidentiary hearing on this newly arising claim in the limited time that remained. Based on evidence developed at the hearing and in light of the existing record in these cases about the operation on the human body of the government's chosen lethal injection drug, the court found that executing the plaintiffs under the protocol at issue so soon after their COVID-19 diagnoses was indeed likely to cause them severe pain in violation of the Eighth Amendment. It thus granted "a *limited* injunction to allow [the plaintiffs] the opportunity to adequately recover from COVID-19." Mem. Op. 3, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 05-cv-2337 (D.D.C. Jan. 12, 2021) [hereinafter Mem. Op.].

      The government now moves to stay that injunction. I would deny the government's motion because the traditional factors for equitable relief pending appeal weigh strongly in favor of the plaintiffs. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

      There is no dispute in this case that Higgs and Johnson were diagnosed with COVID-19 and have demonstrated symptoms since those diagnoses consistent with COVID-19 infections. The issue here is what effect if any their infections will have on their executions. Since last summer, the plaintiffs have been litigating a claim that their executions pursuant to the government's single-drug lethal injection protocol would violate the Eighth Amendment. The basis for this claim is evidence that the drug the government uses under the protocol—a barbiturate called pentobarbital—"causes inmates to experience 'flash pulmonary edema,' a medical condition in which fluid rapidly accumulates in the lungs, causing respiratory distress and sensations of drowning and asphyxiation." *See In re Fed. Bureau of Prisons' Execution Protocol Cases* (*Protocol Cases*), 980 F.3d 123, 131 (D.C. Cir. 2020) (citation and internal quotation marks omitted). The caustic nature of pentobarbital is responsible for that effect; after the drug is injected into the veins, it burns membranes in the lungs that separate blood carrying oxygen from the air sacs that collect that oxygen, thereby causing the accumulation of fluid in the lungs. In November, we

United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 21-5004**                                **September Term, 2020**

reversed the district court's dismissal of this claim, holding that the plaintiffs had plausibly pleaded an Eighth Amendment claim. *Id*. at 131-35. We noted then that "[t]he government has not contested that most individuals who are executed through the lethal injection of pentobarbital experience flash pulmonary edema," but identified a key remaining factual dispute as whether "the condition occurs only after the inmate has been rendered insensate." *Id*. at 131.

      The challenge before us is related to that one, but both factually and legally distinct. The plaintiffs allege with expert support that COVID-19 causes its own damage to the lungs, including to the membranes susceptible to burning by pentobarbital. Because of this damage, the district court credited the plaintiffs' evidence that they will experience flash pulmonary edema more quickly than they might absent their infections, "caus[ing] them to experience the sensation of drowning caused by flash pulmonary edema almost immediately after injection but before they are rendered unconscious." Mem. Op. 2.

      The government's motion requires that we engage in two nested inquiries, considering the plaintiffs' Eighth Amendment claim through the lens of the burden the government bears in seeking the "exceptional remedy of [a stay] pending appeal." *John Doe Co. v. CFPB*, 849 F.3d 1129, 1131 (D.C. Cir. 2017). To make out their Eighth Amendment method-of-execution claim, the plaintiffs have to (1) show their method of execution presents "a 'substantial risk of serious harm'" and (2) identify an alternative method that reduces the risk and is "feasible" and "readily implemented." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 50, 52 (2008)). In granting the preliminary injunction, the district court found that the plaintiffs were likely to succeed in establishing both of those elements. Our task is to determine whether to step in and stay the district court's order. Before we may do so, we must determine: "(1) whether the [government] has made a strong showing that [it] is likely to succeed on the merits; (2) whether [the government] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

      In my view, each of these four factors individually supports denying the government's requested stay; together, they require as much.

      The government focuses on the first factor, arguing that it is likely to succeed in defeating the plaintiffs' method-of-execution claim. The government lacks the "strong showing" required to establish a likelihood of success on the merits. *Id.* It argues that the district court "*could not* have found" the plaintiffs established their Eighth Amendment

# United States Court of Appeals
## For The District of Columbia Circuit

_____

**No. 21-5004**                                                September Term, 2020

claim, asserting that their as-applied COVID-19 challenge does not rise above a battle of the experts. Mot. to Stay 13 (emphasis added). But the government's persistence in highlighting its experts' disagreements with the plaintiffs' experts, *see id.* at 12-13, sidesteps the district court's factfinding after a hearing with live testimony and fails to acknowledge the deference we owe to that factfinding. The court considered the competing evidence and expert testimony offered by the government but repeatedly found that the plaintiffs' evidence and experts were more persuasive and credible. *See, e.g.*, Mem. Op. 10-11 (plaintiffs' witness was "highly credible" and "provided credible and persuasive responses to criticism of her opinions"); *id.* at 13 (plaintiffs' witness "was particularly persuasive and helpful"); *id.* at 14 (government's witness's declaration was unpersuasive and his "live testimony cast further doubt on his credibility"). And for good reason. For instance, one of the government's two witnesses to testify at the evidentiary hearing demonstrated basic misunderstandings of the two plaintiffs' medical records and asserted that x-rays of Higgs's lungs before and after his diagnosis were "unchanged" despite what the district court pointed out were differences on the x-rays visible to even a lay person. *Id.* at 15. In seeking a stay of the district court's order, the government offers no basis for disturbing the district court's carefully considered evidentiary and credibility factual findings.

As the Supreme Court has reminded us—including specifically in the death penalty context— "we review the District Court's factual findings under the deferential 'clear error' standard. This standard does not entitle us to overturn a finding 'simply because [we are] convinced that [we] would have decided the case differently.'" *Glossip*, 576 U.S. at 881 (alterations in original) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). Here, the district court weighed expert declarations, live expert testimony, and the two plaintiffs' medical records, including Higgs's x-rays showing injury to his lungs. Based on that evidence, it found as a matter of fact "that as a result of their COVID-19 infection, [the plaintiffs] have suffered significant lung damage such that they will experience the effects of flash pulmonary edema one to two seconds after injection and before the pentobarbital has the opportunity to reach the brain." Mem. Op. 3. It also found based on detailed expert testimony that the rapid accumulation of fluid in the lungs during flash pulmonary edema would "subject Plaintiffs to a sensation of drowning akin to waterboarding." *Id.* The government has not shown that any of those findings were clearly erroneous, so we cannot overturn them. *See Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009).

The government contends that, even accepting the district court's factual findings, the facts do not support the plaintiffs' claim. It first suggests that the district court applied the wrong legal standard, "fail[ing] to determine whether inmates have carried their burden of providing evidence that the challenge method 'is *sure or very likely* to result in needless

United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 21-5004**                                             September Term, 2020

suffering.'"  Mot. to Stay 11 (quoting *Glossip*, 576 U.S. at 881).  But the district court expressly recited exactly that burden, Mem. Op. 8 (quoting *Baze*, 553 U.S. at 49-50), and then went on to find that the plaintiffs "*will suffer* the effects of flash pulmonary edema anywhere from thirty seconds to two-and-a-half minutes after injection," *id.* at 11 (emphasis added).  The government argues that the district court was wrong to apply a preponderance of the evidence standard, relying on the Supreme Court's guidance that "federal courts should not 'embroil [themselves] in ongoing scientific controversies beyond their expertise.'"  Mot. to Stay 12 (alteration in original) (quoting *Glossip*, 576 U.S. at 882); *see also id.* at 11-14.  But what the *Glossip* Court drew from that consideration of judicial competence was not a heightened procedural standard of proof, as the government suggests, but rather a demanding substantive standard.  As the Court's next statement made clear, "an inmate challenging a protocol bears the burden to show, based on evidence presented to the court, that there is a substantial risk of severe pain."  *Glossip*, 576 U.S. at 882.  That is precisely what the district court found the plaintiffs did here.

The government alternatively suggests that the Supreme Court's decision turning away an as-applied Eighth Amendment challenge to a single-drug pentobarbital protocol in *Bucklew v. Precythe*, 139 S. Ct. 1112, 1130 (2019), forecloses plaintiffs' claim here.  "Here, as in *Bucklew*," the government argues, the plaintiffs' claim "rests . . . on a brief period of alleged pain before pentobarbital renders them unconscious."  Mot. to Stay 15.  But "[a]t no point did *Bucklew* hold that any particular period of excruciating suffering is a non-event for Eighth Amendment purposes."  Opp. to Mot. 10.  Nor did it address the execution protocol or allegations of flash pulmonary edema at issue here.  It could not have done so given that, as we have previously noted, neither that protocol nor those allegations were before the *Bucklew* Court.  *See Protocol Cases*, 980 F.3d at 130-31, 134-35.

Closer to the claim at hand, the government argues that *Barr v. Lee*, 140 S. Ct. 2590 (2020)—in which the Supreme Court on July 14, 2020, vacated an order preliminary enjoining all of the then-scheduled executions in this case—requires that we also vacate the narrow, time-limited relief before us today.  But neither these plaintiffs' current, as-applied claims nor the factual findings the district court made on the evidentiary record after last week's hearing were before the court in *Lee*.  The Eighth Amendment claim the Supreme Court in *Lee* held unlikely to succeed was that execution by lethal injection of pentobarbital alone likely caused flash pulmonary edema and associated suffering in all persons subject to that method.  The plaintiffs' evidence at that stage was limited to expert declarations.

In vacating that preliminary injunction, the Court in *Lee* underscored that the government had "produced competing expert testimony of its own," and that the paper

Case 1:19-mc-00145-TSC   Document 403-1   Filed 01/14/21   Page 12 of 15
USCA Case #21-5004   Document #1879985   Filed: 01/13/2021   Page 12 of 15

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**No. 21-5004**                                                   **September Term, 2020**

record failed to make "the showing required to justify last-minute intervention by a Federal Court." *Id.* at 2591. Here, by contrast, the plaintiffs' focused, as-applied challenges arise from the extraordinary circumstance of facing execution while infected with COVID-19. The district court found that Higgs and Johnson's pulmonary impairment from the disease exposes them to an elevated, substantial, and unnecessary risk of severe pain. Plaintiffs had no basis to raise such claims before their diagnoses,[2] so can hardly be disparaged as requesting "last-minute" court intervention. The government has again produced expert evidence seeking to rebut the plaintiffs' new claims, as it did in *Lee*. But the record now, unlike then, includes factual findings the district court made based on an evidentiary hearing at which it observed live witness testimony and weighed the individual experts' competencies and credibility. *Cf. id.* at 2594 (Sotomayor, J., dissenting) (noting "no factfinder ha[d] adjudicated" those claims). And at this hearing, one of the plaintiffs' experts who the district court found credible testified that, even assuming the government was right about the factual dispute in *Lee*—that is, that a healthy individual executed with pentobarbital would be unconscious when flash pulmonary edema occurred (a claim with which the expert disagreed)—it was nonetheless "certain" that an individual diagnosed with COVID-19 would be sensate at the onset of flash pulmonary edema and thus experience the accompanying "sensation of drowning and suffocation." Tr. of 1/5/21 Mot. Hearing at 115, *Protocol Cases*, No. 19-mc-145 (D.D.C. Jan. 7, 2021), ECF No. 389.

The government has also failed to make a strong showing that the plaintiffs are likely to fail on the second element of their method-of-execution claim. The plaintiffs identified two alternative methods of execution, each of which the district court found is feasible and would significantly reduce the risk of severe pain. The first is a two-drug protocol that would add a pre-dose of an opioid pain medication, such as morphine or fentanyl—a method of execution we have previously observed "has been used by both states and the federal government, and is still used in a number of jurisdictions." *Protocol Cases*, 980 F.3d at 133. The government emphasizes that we have not before reached the issue of

---

[2] Indeed, just a week before those diagnoses, the district court dismissed as speculative Higgs' challenge to his scheduled execution based on the risk that he would contract COVID-19. *See* Mem. Op. 1, *In re FBOP Protocol Cases*, No. 19-mc-145 (D.D.C. Dec. 9, 2020), ECF No. 354. Higgs had filed a complaint in September raising concerns that he was particularly vulnerable to COVID-19 because of his asthma. *See* Complaint at 26-27, *In re FBOP Protocol Cases*, No. 19-mc-145 (D.D.C. Sept. 1, 2020), ECF No. 229-1. The government dismissed Higgs' allegations about COVID-19 at Terre Haute as "dated" two months later. *See* Mem. in Support of Mot. to Dismiss Higgs' Complaint at 10 n.3, *In re FBOP Protocol Cases*, No. 19-mc-145 (D.D.C. Nov. 3, 2020), ECF. No. 306-1.

Case 1:19-mc-00145-TSC   Document 403-1   Filed 01/14/21   Page 13 of 15
USCA Case #21-5004   Document #1879985   Filed: 01/13/2021   Page 13 of 15

United States Court of Appeals
For The District of Columbia Circuit

**No. 21-5004**                                             September Term, 2020

whether the plaintiffs can actually succeed in establishing that such a method is an adequate alternative, and that the plaintiffs here have failed to offer evidence sufficient to do so.  *See* Mot. to Stay 18.  But the district court itself found based on expert testimony that the proposed two-drug protocol "is likely to be as effective as it is easily and quickly administered."  Mem. Op. 23; *see also id.* at 21 (citing expert declaration).  The second is execution by firing squad—a method that two Justices have suggested could be a constitutionally permissible alternative.  *See Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring); *Arthur v. Dunn*, 137 S. Ct. 725, 733-34 (2017) (Sotomayor, J., dissenting from the denial of certiorari).  The government argues here that the difference in pain between execution by firing squad and the government's existing lethal injunction protocol is not sufficient to support an Eighth Amendment claim.  But again, the district court found otherwise, citing evidence that suggests "execution by firing squad would significantly reduce the risk of severe pain."  Mem. Op. 24.  On neither of these proposed alternatives does the government even seek to establish that the district court's factual findings are clearly erroneous.

More importantly, under the unique circumstances of this case, holding off on the plaintiffs' executions until they can recover from COVID-19 itself constitutes a clearly adequate alternative "method" of execution.  The plaintiffs' as-applied COVID-19 claim is unlike other method-of-execution challenges insofar as they do not seek to avoid entirely the method of execution the government has chosen.  All they ask is that they not be executed in that manner while suffering from COVID-19.  Holding off on their executions until they recover is an alternative course that is both feasible and readily implemented, as the government's repeated scheduling and rescheduling of various execution dates since 2019 makes clear.  As the district court found, the gratuitous pain to the plaintiffs' COVID-19-infected lungs "would not occur were [their] execution[s] to be delayed."  Mem. Op. 16.  Proceeding with the executions as scheduled would thus "cruelly superadd[] pain to the death sentence," *Bucklew*, 139 S. Ct. at 1125, imposing on the plaintiffs "needless suffering" in violation of the Eighth Amendment.  *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 50).

The government's briefing on the other three stay factors only underscores that each weighs even more heavily in the plaintiffs' favor than the first.  As for irreparable injury—a "critical" factor in the traditional stay standard, *Nken*, 556 U.S. at 434—the government will suffer none in the absence of a stay.  All that the district court's order requires is that the government delay executing the plaintiffs until March.  "After suspending federal executions for over seventeen years," the district court observed, "the government announced a new Execution Protocol and a resumption of executions in July 2019, and since July [2020] has

Case 1:19-mc-00145-TSC   Document 403-1   Filed 01/14/21   Page 14 of 15
USCA Case #21-5004   Document #1879985   Filed: 01/13/2021   Page 14 of 15

# United States Court of Appeals
### For The District of Columbia Circuit

_____

**No. 21-5004**                                             September Term, 2020

executed eleven inmates. Any potential harm to the government caused by a brief stay is not substantial." Mem. Op. 29.

Issuance of the stay, on the other hand, would clearly cause the other parties in this case substantial, irremediable harm: Plaintiffs would be executed via a method that the district court has determined is likely under the current circumstances to cause them agonizing, readily avoidable pain. And the public interest most evidently weighs in favor of denying the stay. The Court has made clear that "the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). But in the capital punishment context, "the public's interest in seeing justice done lies not only in carrying out the sentence imposed years ago but also in the lawful process leading to possible execution." *Montgomery v. Barr*, No. 20-3261, 2020 WL 6799140, at *11 (D.D.C. Nov. 19, 2020). Proceeding with the executions of inmates infected with COVID-19 poses serious health risks not only to inmates but also the prison officials responsible for administering the death penalty and those choosing to or charged with witnessing it. Given that the district court has delayed the executions only long enough to ensure the plaintiffs no longer suffer from COVID-19, its order appropriately balances an interest in timely enforcement against the likelihood of unconstitutional harm to the plaintiffs and health risks to the public.

\* \* \*

Following a series of eleven executions carried out by the federal government since July 2020—including nine executions of plaintiffs in this case—Johnson and Higgs are the only federal inmates left on death row who face a scheduled execution. The government insists that these final scheduled executions must proceed as planned. It fails to explain why they must take place this week. To be sure, the Supreme Court has emphasized that "[l]ast-minute stays should be the extreme exception, not the norm," in death penalty cases, and that "'the last-minute nature of an application' that 'could have been brought' earlier . . . 'may be grounds for denial of a stay.'" *Bucklew*, 139 S. Ct. at 1134 (quoting *Hill*, 547 U.S. at 584). But Johnson's and Higgs' claims could not have been brought earlier. As soon as they knew of their COVID-19 diagnoses, they notified the district court; within days, they supplemented their complaints. The district court then held an evidentiary hearing in the limited time it had available, and, based on the evidence presented at that hearing, granted a limited preliminary injunction, delaying the plaintiffs' executions only long enough for them to recover from COVID-19. Contrary to the government's assertion, nothing about the issuance of this injunction was "untimely." Mot. to Stay 1. The district court ably responded to evolving circumstances and carefully assessed the plaintiffs' unique method-

Case 1:19-mc-00145-TSC   Document 403-1   Filed 01/14/21   Page 15 of 15
USCA Case #21-5004   Document #1879985   Filed: 01/13/2021   Page 15 of 15

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 21-5004**　　　　　　　　　　　　　　　　　　**September Term, 2020**

of-execution challenge—a category of Eighth Amendment claim that the Supreme Court, even in establishing a high substantive bar, has nonetheless continued to leave available to death row inmates like the plaintiffs here.

　　Our task is to determine whether the government is entitled to a stay of the district court's injunction pending appeal.  For the above reasons, I believe the government has failed to meet the high burden required to second-guess the district court's factfinding and stay its order.  Any desire on the part of the government to check two more executions off its list does not justify concluding otherwise.  I would thus deny the stay.