UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


IN THE MATTER OF THE        .  MC No. 19-0145 (TSC)
FEDERAL BUREAU OF PRISONS'  .  Washington, D.C.
EXECUTION PROTOCOL CASES.   .  Monday, January 4, 2021
. . . . . . . . . . . . . . .  11:38 a.m.


DAY 1
TELEPHONIC MOTION HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff           ALEXANDER L. KURSMAN, ESQ.
Dustin Higgs:           Federal Community Defender/EDPA
                        601 Walnut Street
                        Suite 545 West
                        Philadelphia, PA 19106
                        (215) 928-0520


For Plaintiff           ALEXANDER C. DRYLEWSKI, ESQ.
Corey Johnson:          Skadden Arps Slate Meagher & Flom
                        One Manhattan West
                        New York, NY 10001
                        (212) 335-3278


For Plaintiff           GERALD W. KING JR., ESQ.
Richard Tipton:         Federal Defender Program, Inc.
                        101 Marietta Street NW
                        Suite 1500
                        Atlanta, GA 30303
                        (404) 688-7530


For the Defendant:      JEAN LIN, ESQ.
                        U.S. Department of Justice
                        Federal Programs Branch
                        1100 L Street NW
                        Room 11532
                        Washington, DC 20005
                        (202) 514-3716


Court Reporter:         BRYAN A. WAYNE, RPR, CRR
                        U.S. Courthouse, Room 4704-A
                        333 Constitution Avenue NW
                        Washington, DC 20001
                        (202) 354-3186

C  O  N  T  E  N  T  S

WITNESS TESTIMONY

KENDALL VON CROWNS:    Direct Examination................... 13
                       Cross-Examination................... 25

1                        P R O C E E D I N G S

2              THE DEPUTY CLERK:  Your Honor, we have Miscellaneous

3    Action 19-145, In the Matter of the Federal Bureau of Prisons'

4    Execution Protocol Cases.  I'll ask that government counsel

5    identify herself; and those who will be speaking on behalf

6    of the plaintiffs, identify yourselves as well.  Thank you.

7              MS. LIN:  This is Jean Lin on behalf of the

8    government.  Good morning, Your Honor.

9              THE COURT:  Good morning, Ms. Lin.

10             MR. KURSMAN:  Good morning, Your Honor.

11         This is Alex Kursman on behalf of Dustin Higgs.

12             THE COURT:  Mr. Kursman, will you be handling this?

13             MR. KURSMAN:  I will be handling this.

14             THE COURT:  Okay.  Anybody else?

15         Has everyone checked in with Mr. Bradley?

16             UNIDENTIFIED:  Yes, Your Honor.

17             THE COURT:  Okay.  So Ms. Lin and Mr. Kursman will

18    be speaking for the parties?

19             MR. KURSMAN:  That's right, Your Honor.

20             MS. LIN:  Yes, Your Honor.

21             THE COURT:  All right.  Let's begin.

22         You want to call Dr. Crowns.  I'm sorry, does he go by

23    Crowns or Von Crowns?

24             MS. LIN:  Dr. Crowns.

25         Your Honor, before we begin, I have two preliminary points,

1    if I may.

2              THE COURT:  Yes.

3              MS. LIN:  The first is just to let the Court know that

4    our witness tomorrow, Dr. Locher, he's on call, and there's a

5    possibility that if there's an emergency he'll need to drop off

6    immediately.  Unfortunately, he's on call all week.  So.

7              THE COURT:  That's fine.

8              MS. LIN:  The second point is we're moving to strike

9    the declaration of Dr. Mitchell Glass.  The declaration was

10   filed last night in support of the plaintiffs' reply brief.

11   Dr. Glass was not on the parties' list of witnesses filed last

12   Thursday.  And the reason -- the primary reason also is that

13   not only were we surprised by the new witness being -- new

14   declaration being submitted, but also that Dr. Glass's

15   declaration is seeking to insert new medical theories for the

16   fourth time in this case on reply.

17        The new theories do not have to do with Mr. Higgs'

18   recent COVID-19 diagnosis, so they could have been raised

19   at the very latest by December 4, 2020, the deadline the Court

20   imposed.  And so just a very quick point about the new theories,

21   which is why it's very difficult even before to do a cross-

22   examination.

23        You know, for example, Dr. Glass states that Mr. Higgs

24   suffers from aspirin-exacerbated respiratory disease, which

25   then establishes the severity of Mr. Higgs' asthma?  None of

the experts so far for the plaintiffs have said anything about
this prior to late yesterday.

And, you know, even a preliminary look at the recent
medical records doesn't indicate such a diagnosis.  It's also
very odd to us that, from medical records, we could see at least
that Mr. Higgs has been taking aspirin for the last two years,
which would seem to be inconsistent with being allergic to
aspirin.

And there's another new theory about the pentobarbital
would trigger a massive asthma attack in one second.  Again,
none of his other experts have said anything about this, and
so this is new.

So to the extent that Dr. Glass's declaration talks about
COVID-19 and Mr. Higgs' asthma in connection with that, it is
cumulative with the plaintiffs' other experts, Dr. Zivot and
Dr. Stephen.  Both are licensed medical doctors.  And I just
want to note that based on our very quick search in the state
of Pennsylvania licensing verification system, Dr. Glass has not
held an active medical license since December 1990.  So he has
not treated any patients for 30 years.  So for all these reasons,
we move to strike the declaration of Dr. Mitchell Glass.

THE COURT:  Okay.  So I haven't even looked at
Dr. Glass's declaration, which is maybe a good thing since
you've moved to strike it, and I'm concerned by what I'm hearing
from Ms. Lin.  You know, I know this is death-penalty litigation

1   and, by necessity, there are a lot of last-minute filings.  But

2   the Supreme Court has cautioned against this sort of last-minute

3   litigation.

4        And I have repeatedly stressed to the parties that I'm

5   trying as hard as I can with the rest of my docket to consider,

6   to deal with issues, to deal with motions well in advance of

7   the execution date so that the parties can appeal if necessary,

8   can properly brief the issue, so then I'm not having to make

9   decisions with very little time.  And so the declarations that

10  were filed, I've been reviewing them all weekend, and I'm

11  frankly concerned to hear that you all filed something last

12  night.  Mr. Kursman?

13              MR. KURSMAN:  Yes.  Thank you, Your Honor.

14       So to begin with, I just want to note for the Court that

15  we filed an as-applied claim raising a COVID challenge even

16  before Mr. Higgs was diagnosed with COVID.

17              THE COURT:  I remember that.

18              MR. KURSMAN:  So that was dismissed as speculative.

19  The government responded with a declaration saying they were

20  taking all these protections that the inmates would not get

21  COVID.  Then on December 16th Mr. Higgs is diagnosed with COVID.

22  They notified plaintiff's counsel on December 17th.  Within

23  five days, we filed a new complaint with all of our expert

24  declarations --

25              THE COURT:  But let me stop you, Mr. Kursman.

That complaint did not include the declaration of Dr. Glass, did it?

MR. KURSMAN:  No.  Sure.  And that's what I want to get to, Your Honor.  So the responsive pleading filed by the government was filed late at night on New Year's Eve.  To get opinions from our doctors from, I believe it was --

THE COURT:  Hold on one minute, Mr. Kursman. Can I ask you to hold on one minute?

MR. KURSMAN:  Sure.

(Pause)

THE COURT:  All right.  Sorry.  Go on.

MR. KURSMAN:  So the government's responsive pleading was filed on New Year's Eve, late on New Year's Eve.  Our reply was due three days later, that Sunday night.  So from Thursday night to Sunday night, we were scrambling at that point to get some sort of reply; and a lot of these doctors that we're dealing with have, obviously, private lives but also have practices going on, and they were unavailable.

THE COURT:  Not Dr. Glass, apparently.

MR. KURSMAN:  That's right.  So Dr. Glass we were able to reach out to, and we got a declaration that was responsive to the declaration submitted in the government's responsive brief related to his asthma and COVID.

Now, Ms. Lin brings up some points that they searched and he's no longer licensed.  All of those points are free to be

1    brought up on cross-examination.

2          THE COURT:  I'm less concerned about that.  Please, can

3    you address Ms. Lin's contention that Dr. Glass's declaration

4    brings up new theories that the government is prejudiced from

5    being able to address because of when the declaration was filed?

6          MR. KURSMAN:  Sure.  So on New Year's Eve, the

7    government submitted a new declaration from Dr. Locher, a

8    doctor that we had never seen before in this litigation, and

9    Dr. Locher went on to say that Mr. Higgs' asthma is actually

10   mild or moderate.  Dr. Glass is responding to that with his

11   aspirin-induced asthma, said no it's not and here's why,

12   it's because he has this aspirin-induced asthma.

13       All of what's contained in Dr. Glass's declaration is

14   responsive to Dr. Locher, and the reason we had to go to

15   Dr. Glass is because, at that point, it was New Year's Eve.

16   Our reply -- and we agreed with the government that we would

17   file our reply by Sunday at 5 p.m., even though Your Honor

18   allowed us to file by midnight, to give them more time to

19   prepare.  We were scrambling to get a doctor to respond to

20   this new declaration from a new doctor that we had seen for

21   the very first time.

22       And remember, Your Honor, that we filed our initial

23   as-applied complaint five days after they informed us that

24   our clients were diagnosed with COVID, and the government is

25   actually the ones who waited one day, from December 16th to

December 17th, to tell us about that diagnosis.  And they're also the ones that moved to dismiss our earlier COVID complaint, saying it was unlikely that Mr. Higgs would ever be diagnosed with COVID.

THE COURT:  Well, I ruled that the initial as-applied challenge was speculative because he did not have COVID, so how the government responded to that motion is neither here nor there. But once the diagnosis was made, I agreed that the complaint was appropriate, or at least it was ripe for resolution.

I have not seen the declaration.  Are you planning on calling him tomorrow?  I mean -- and let me caution the parties. This is my third evidentiary hearing, I believe, in this case. I've lost track.  But I've heard from most of these witnesses before.  I've reviewed their declarations; I've reviewed supplemental declarations.  I know the parties have asked for two and a half hours on each side tomorrow.  I'm hoping we will not take five hours, but are you planning on calling Dr. Glass, Mr. Kursman, tomorrow?

MR. KURSMAN:  Your Honor, we actually hadn't made a definitive decision --

THE COURT:  Well, if you don't call him, how is the government able to cross-examine him on his professional qualifications?

MR. KURSMAN:  Well, my understanding -- and correct me if I'm wrong, Your Honor.  My understanding of the contours

1    of the hearing were that parties could decide who they wanted

2    to call on direct, but each party had the opportunity to

3    cross-examine, sort of like what we did in September.  But my

4    understanding was for -- like including today, my understanding

5    coming in was just that Dr. Crowns would be -- his testimony

6    would only be me cross-examining him and no direct examination.

7              THE COURT:  That's correct.  You're not wrong.

8    But my point -- hold on.  My point is Ms. Lin asserts that

9    Dr. Glass basically may not be qualified to testify as an

10   expert.  That has not been the issue -- or if it has, it's been

11   resolved -- with the other witnesses.  How is Ms. Lin going to

12   challenge Dr. Glass, his qualifications as a witness, if he

13   doesn't testify?

14             MR. KURSMAN:  I apologize, Your Honor.

15             MS. LIN:  Can I respond?

16             THE COURT:  Is he available to testify and be

17   cross-examined by Ms. Lin?

18             MR. KURSMAN:  Yes.

19             THE COURT:  Okay.  All right.  Not that you would

20   call him, but that he would be available for cross-examination.

21        Ms. Lin.

22             MS. LIN:  Yes, Your Honor.  A couple of points.

23   Given the parties' agreement, for some witnesses we may do

24   limited direct testimony, and that's what I plan to do with

25   Dr. Crowns today.  But as to Dr. Glass, though, the problem

1    we have is not whether we get an opportunity to cross-examine.

2    This is a declaration that raises new theories.  The idea of

3    what's called the aspirin-exacerbated respiratory disease is

4    nowhere mentioned prior to yesterday.

5        So to the extent that Mr. Kursman referenced Dr. Locher's

6    declaration and talking about the severity of Mr. Higgs' asthma

7    condition, that was in response directly to the plaintiff's

8    complaint and to the PI motion indicating that Mr. Higgs has

9    a condition that's more severe, so we're talking new medical

10   theories.  And there's another, which is that the pentobarbital

11   would trigger a massive asthma attack in one second.

12       Again, his expert hadn't said anything about that, and

13   we are prejudiced in a significant way in the sense of, other

14   than being able to talk about his lack of medical license, this

15   is the kind of medical theory that we need doctors we need to

16   be able to rebut.

17       And these, more importantly, are conditions about his

18   asthma that could have been raised not only at the time of the

19   amended complaint when they filed for PI motion, or even giving

20   us some sense as of last Thursday when the parties talked about

21   what witnesses they're planning to proffer.

22       And for the government, even though our brief was filed on

23   New Year's Eve, we shared our proposed new witness, Dr. Locher,

24   as well as the health service administrator's name, prior to

25   that so that the party can prepare.  But I think we're at a

1    disadvantage because of the new medical theories proffered

2    in this new declaration.  And, again, to the extent it's been

3    COVID, it's already cumulative of the licensed doctors that --

4            THE COURT:  Okay.  This hearing is supposed to be a

5    short hearing to accommodate Dr. Crowns' schedule.  What I'm

6    going to do is I'll look at the declaration of Dr. Glass.  And

7    I've heard the parties' objections, and I will give you

8    tomorrow -- if I don't rule by minute order before the hearing

9    tomorrow, which may not happen, I'll rule on this issue tomorrow.

10       But I need to think about it.  I'm not going to rule on it

11   right now, obviously, because I'm just hearing this motion to

12   strike.  So let's proceed with Dr. Crowns' testimony.

13           MR. KURSMAN:  Your Honor, before we begin, can I bring

14   up one housekeeping matter?

15           THE COURT:  Yes.

16           MR. KURSMAN:  Which is, in the September hearing, it

17   got a bit confusing when plaintiffs' counsel was cross-examining

18   with references relied on by the experts.  I was planning on

19   sending the prosecution [sic] and the Court those references so

20   that the experts could be provided with those references so it

21   would be easier to understand as the cross is going.  I just

22   don't want to clog up the entire inbox of all plaintiffs'

23   counsel.  So the question is what would the Court prefer in

24   terms of how I should send those documents before tomorrow?

25           THE COURT:  I guess it makes sense to send them to

1   the plaintiffs' counsel that are still in the case, of which

2   there are two, two plaintiffs left.  That's all I can suggest.

3                   MR. KURSMAN:  Okay.  Thank you, Your Honor.

4                   THE COURT:  And, obviously, to the Court.  And they'll

5   need to be filed on the docket.  All right?  Or I suppose, Mr.

6   Kursman, you could inquire to the other plaintiffs' counsel if

7   they want those documents.  But many -- there have been many

8   motions to dismiss, so I think that makes sense.

9        All right.  Let's begin with Dr. Crowns.  And, Mr. Kursman,

10  you're going to cross-examine him; is that correct?

11                  MR. KURSMAN:  That's correct, Your Honor.

12                  THE COURT:  Okay.  Go ahead.

13                  THE DEPUTY CLERK:  Okay.  Is it Dr. Crowns?

14       Please raise your right hand.

15            KENDALL VON CROWNS, WITNESS FOR DEFENDANT, SWORN

16                          DIRECT EXAMINATION

17  BY MS. LIN:

18  Q.   Dr. Crowns, do you recall that you provided oral testimony

19  in this case on September 18, 2020?

20  A.   Yes.

21  Q.   Okay.  And do you recall that you were asked about your

22  opinions from your declaration that says that there's no way to

23  determine, based on autopsy findings, how quickly the pulmonary

24  edema occurred; but even if the edema was a flash situation, it

25  would take minutes to occur?  Do you recall then -- do you

1    remember that question?

2    A.    Yes.  Yes, I do.

3    Q.    And do you recall the following question and answer --

4    and for the Court's reference, that's page 18, line 1, of

5    the September 18th transcript.

6         "Question:  Now, are you aware that there are case

7    studies showing that flash pulmonary edema can happen in

8    seconds or even instantaneously?

9         "Answer:  I don't know the one with instantaneously.

10   I know there's a case report of an individual who developed

11   flash pulmonary edema, but he had underlying heart issues,

12   specifically mitral valve issues as well as other heart

13   problems.  So his heart was already compromised when the

14   flash pulmonary edema occurred.

15        "So in his situation, his flash pulmonary edema was the

16   result of the fact that he already had a compromised heart which

17   then resulted in him developing edema more rapidly than normal.

18   So you have an individual that was already kind of critical when

19   this occurred.  But beyond that, I don't know of any other

20   statements with flash pulmonary edema where it doesn't always

21   say that it occurs.  The time frame seems to be minutes."

22        Do you recall this testimony?

23   A.    Yes, I do.

24   Q.    And what was the case report that you were referring to

25   in that testimony?

1    A.   The case report is from an article in the *British Journal*
2    *of Anesthesiology* that comes from 1967, and it's entitled
3    "Pleural Effusion Complicating Thiopentone Administration."
4    The case report is by M.W. Potts and P.W.R. Smethurst.
5    Q.   And how many patients were involved in that Potts study?
6    A.   It is a single patient.
7    Q.   And what was -- can you describe the Potts study for us?
8    A.   So they are reporting on an individual who, during a
9    cardiac surgery, had acute pulmonary edema as well as kind
10   of heart failure during it and the exact symptomatology that
11   occurred, and then how they brought the patient out of it and
12   then his subsequent recovery.
13   Q.   And what's the scientific significance of having only
14   one patient in the study?
15   A.   The scientific significance is it's basically a single
16   report.  So it could be an anomaly that doesn't occur very
17   often, and you'd have to look at more people to get a better
18   idea if this was something that occurs regularly or if this
19   is just a one-time thing.
20   Q.   Do you recall what the dosage was in the study?
21   A.   In the study, the dosage of the thiopentone administered
22   was 325 milligrams.
23   Q.   And what, if any, significance do you attach to the fact
24   that the dosage is 325 milligrams?
25   A.   The significance of that is it's a standard IV dose that

1    they were giving for the purpose of anesthetizing the patient.

2    Q.    And are you aware of the dosage that was being used in

3    the federal government's Bureau of Prisons' execution protocol

4    as to pentobarbital?

5    A.    I was aware.  Let's see.  Right off the top of my head,

6    I can't tell you.  I thought it was five -- I can't give you

7    the exact number right off the top of my head.  I apologize.

8    Q.    Can I refresh your memory about that, that what's not

9    disputed is that it's 5 grams of pentobarbital --

10   A.    Yes.  Five grams.  That's right.  It is 5 grams.

11   Q.    So what significance do you attach to the distinction

12   between the 325 milligrams and the 5,000 milligrams that was

13   being used in the federal execution protocol?

14   A.    The distinction is that the federal execution protocol

15   amount is significantly, almost over five times, higher than

16   what was used in this particular case.

17   Q.    And does the study say specifically when the onset of

18   the pulmonary edema in that one patient was?

19   A.    So it's a little vague, but it appears that the pulmonary

20   edema they really notice, or take note of, it is about after

21   eight minutes had elapsed after induction, and they were noticing

22   the blueness of the skin was persisting.  So they really feel

23   that at around the eight-minute mark there's something going on.

24   Q.    Now, do you see anything in the Potts study for the

25   proposition that pulmonary edema developed within seconds or

1   instantaneously?

2   A.   No.  I don't.

3   Q.   And can you describe for us the underlying heart issues

4   of the patient described in the Potts study?

5   A.   Certainly.  So he had -- as a child, he had had rheumatic

6   fever.  So he probably had subsequent damage to his heart

7   because of that, and what he had was mitral stenosis and mixed

8   aortic valve disease.  So two of the valves of the heart are

9   damaged.

10   Then he was also noted to have evidence of chronic

11   venous congestion as well as hemosiderosis.  These are signs

12   of congestive heart failure.  The hemosiderosis in particular

13   is like blood being shown in the lungs from long-term congestive

14   heart failure.

15   And then he's also noted to have poor circulation in

16   his lower limbs.  So, again, that goes back to heart failure.

17   Basically, the heart's not able to get the circulation back from

18   the legs to the heart, and so you start seeing changes in the

19   lower limbs that we call venous stasis.

20   You'll see edema, and then they'll also get pain, which is

21   called "claudication," which he was also experiencing.  So he

22   had several symptoms of heart failure already present before his

23   heart surgery.

24   Q.   During -- and I want to refer you to the brief that I sent

25   you yesterday that was the plaintiffs' reply brief that was filed

yesterday.  And in it, on page 14, ECF No. 383 -- you don't need
to read it if you don't want to.  I'm going to read it to you.
So it stated, and I quote:

"During the course of the September 18th evidentiary
hearing, Dr. Crowns testified that 'there's a case report of
an individual who developed flash pulmonary edema' during an
execution with pentobarbital, 'but he had underlying heart
issues, specifically mitral valve issues, as well as other
heart problems.'"

Does that accurately describe your testimony?
A.   So, I mean, it wasn't during an execution; it's during
cardiac surgery, with specifically mitral valve issues and
aortic valve issues as well.  So he did have an already
compromised heart when his edema occurred.

That's characterized correctly.  But it wasn't during an
execution, obviously.  It was during cardiac surgery, and his
heart issues were mitral valve and aortic valve.
Q.   Have you reviewed Mr. Higgs' medical records from 2020?
A.   Yes.

MS. LIN:  For the Court's reference, the medical
records are attached to the declaration of Shauna Smiledge,
and that is Exhibit 4 to the government's opposition to the
preliminary injunction motion, which is ECF No. 380-4.
BY MS. LIN:
Q.   Dr. Crowns, based on the medical records and focusing

1   just on the period before Mr. Higgs' COVID diagnosis, which was

2   December 16, 2020, what is your opinion about whether Mr. Higgs'

3   heart condition -- I'm sorry.  What is your condition [sic]

4   of Mr. Higgs' heart condition?

5   A.   So Mr. Higgs has a mitral valve prolapse with some mitral

6   valve regurgitation, meaning he gets kind of -- when his heart

7   pumps, his blood comes back into his heart slightly.  But from

8   the information in the medical records, he does not have any

9   symptoms of heart failure.  And from his echocardiogram that

10  was performed, it appears that his heart's functioning normally.

11  I would refer you to his medical records, if I could, on --

12  it's labeled Higgs 101.  It's the Federal Penitentiary

13  Cardiology Clinic consult.

14  Q.   I'm sorry.  Doctor, can you just pause?  What's the number?

15  101, did you say?

16  A.   101.

17  Q.   101.  Okay.  Please proceed.

18  A.   This is the Federal Penitentiary Cardiology Clinic consult

19  that appears to have been by Dr. Mercho on November 5, 2020.

20  In this he states in his impression that there's moderate mitral

21  valve prolapse with moderate mitral regurgitation, which has not

22  been progressing.  And in his plan he states that, from a

23  cardiac standpoint, the gentleman appears to be stable.

24       Also, he notes that the lungs are clear to auscultation,

25  which means when he puts a stethoscope up to the chest, that he

1      doesn't hear any symptoms such as rales or crackles or anything

2      like that.  So he has no evidence of pulmonary edema at that

3      time.  He also notices in the extremities that there is no

4      edema.  So that means his legs don't show any edema.  So he's

5      not getting peripheral vascular disease.  So from this, he's

6      cardiac stable.

7           Then if you go to Higgs page 0020, which is a physical

8      exam which is also on November 5, 2020, it's a lot more

9      detailed.  In the physical exam, it states that he denies any

10     chest pain, palpitations, or shortness of breath.  So again he

11     does not have any of these symptoms of congestive heart failure.

12          And then if we -- I'll refer you to Higgs page 26,

13     which is another detailed physical exam that was performed on

14     September 11.  Again, if you go to Higgs page 28, the chest is

15     equal expansion, clear to auscultation.  So, again, they're not

16     hearing anything with the stethoscope in his lungs.  His heart

17     appears to have the systolic murmur that he always had.  And

18     then his assessment is basically the same: unspecified asthma,

19     cardiac murmurs.

20          And finally, if you go to Higgs 106, it is his echo-

21     cardiogram that was performed on May 26, 2020.  Within the

22     results it shows the left ventricle is normal in size.  He has

23     an ejection fraction of 60 to 65 percent, which anything over

24     55 percent or higher is considered normal.

25          He does have a borderline dilation of his left atrium,

1    but there's no significance placed on that.  He does not have

2    any suggestions of pulmonary hypertension, so his lungs are

3    functioning normally.  And they basically say that his --

4    their conclusion is the left ventricle is normal size.  His

5    left ventricular function is normal.

6         And then from all of those, I would say that he was --

7    prior to his diagnosis, his heart was functioning normally.

8    I did have a mitral valve prolapse and regurgitation, but it

9    really hadn't affected his heart to the point that he was in

10   congestive heart failure and that he continued to be exercise-

11   tolerant and not showing any fatigue or any other symptoms of

12   congestive heart failure.

13   Q.   Thank you.  So then is your opinion -- what is your

14   opinion, then, given the heart condition that you see from

15   his medical record, whether the heart condition would cause

16   him to experience acute pulmonary edema while he's sensate?

17   A.   My opinion is it would not cause him to have any

18   significant pulmonary edema prior to going unconscious with

19   the pentobarbital, that his heart condition would not have

20   any effect on him.

21   Q.   So if I can focus you then on the period after his

22   COVID-19 diagnosis -- again, that was December 16, 2020.

23   What do Mr. Higgs' records indicate about his heart condition?

24   A.   So I would refer you to Higgs page 6, which is dated

25   December 30, 2020, at 9:40 a.m.  He has a physical exam here.

He does complain of difficulty catching his breath but
denies any cough, painful breathing, or bloody breathing.
He also denied shortness of breath upon examination.

In his general examination under pulmonary, the inspection
is within normal limits, and it's again clear to auscultation.
So when they put the stethoscope on his chest, they don't hear
any crackles, rhonchi, wheezing, or pleural rub, meaning he
doesn't have pneumonia or pulmonary edema, among other things.

Also, he has vitals taken.  His respiratory rate at that
time, which is on page 5, was 18, which is -- normal is between
12 and 20.  And his blood pulse is 66.  So that's again another
normal finding.

They also performed an x-ray, which the results are
listed on Higgs page 99, which showed that he has a stable chest
examination without acute cardiopulmonary process, clear lungs
except for an unchanged right apical reticular nodular density,
which is basically kind of a calcified area or a nodule on his
lungs.  It could be from a number of things, but it wouldn't
affect his lung function.

Also in the x-ray it states that he has normal
cardiomediastinal contours for his age, his age being 48,
and so that means his heart's not enlarged and they aren't
seeing any other signs that there could be a problem.

So, again, there's no evidence of a pulmonary edema,
there's no evidence of congestive heart failure, even after

1   the COVID diagnosis.

2   Q.   And how would you compare Mr. Higgs' heart condition to

3   the patient in the Potts study?

4   A.   The patient in the Potts study had gotten to the point

5   where he was in congestive heart failure and was needing to have

6   the cardiac surgery to correct it, or he was going to probably

7   expire.

8        So comparing the two, Mr. Higgs is stable.  His heart's

9   not enlarged, he's not showing any signs of congestive heart

10  failure, whereas the patient had significant chances of

11  congestive heart failure.  So I think the two of them --

12  the patient in the Potts report is in far worse shape than

13  Mr. Higgs.

14  Q.   And, Dr. Crowns, what qualifies you to offer an opinion

15  about Mr. Higgs' heart condition?

16  A.   I am a forensic pathologist.  I've been practicing forensic

17  pathology for 20 years.  Part of my practice is we evaluate

18  medical records and go through what the symptoms and signs

19  people were having prior to death, and then we compare that back

20  to what we find at autopsy and then determine cause and manner

21  of death.  I have done thousands of autopsies on individuals

22  with heart disease similar to Mr. Higgs and similar to the

23  people -- the person in the Potts study.

24  Q.   Thank you.  And so I just want to refer, then, to the reply

25  brief.  You don't have to look at it.  I'll just read it to you

1  for the Court's reference, the reply brief page 15.  That's

2  the third full paragraph in the middle of that page.

3      And I quote:  "Dr. Crowns is a pathologist rather than

4  an epidemiologist.  He is not qualified to offer an opinion

5  on the pharmacological effect of pentobarbital on the brain,

6  as Drs. Van Norman and Edgar have explained."

7      Do you agree with that statement?

8  A.   I don't agree with that statement.  First off, epidemiologists

9  aren't necessarily even medical doctors.  They can often be

10  people with master's degrees in public health.  They don't often

11  see patients.  They don't deal with the actual -- they don't

12  necessarily touch patients.  They usually just analyze data.

13      I, on the other hand, do autopsies on a daily basis, review

14  medical records, and have done also thousands of cases on people

15  dying from the various drugs, drug overdoses, including -- I have

16  had a few cases of people that have overdosed with pentobarbital.

17  So I do feel that I am qualified to review the information at

18  hand and give an opinion on what the effects may be.

19  Q.   And one final question that's just a clarification about

20  -- we talked earlier about the term "flash pulmonary edema."

21  Does it mean -- what does it mean to -- sorry.  It sounds like

22  it happens immediately.  What is your understanding of the term

23  "flash pulmonary edema"?

24  A.   So, again, my understanding of "flash pulmonary edema" is

25  that it occurs in a period of time, usually within minutes if

1    not instantaneous.  I really feel nothing really is instantaneous

2    except for a few conditions in the body, like pulmonary emboli

3    that block the vasculature and causes sudden heart stoppage, or

4    a stroke in the brainstem that kills you instantly.

5          But there are very few things that happen instantaneously.

6    And I feel that from everything that I've been able to find that

7    acute pulmonary edema, also known as flash pulmonary edema,

8    takes several minutes to set in.

9    Q.    Thank you, Dr. Crowns.  I don't have any further questions.

10              THE COURT:  Okay.  Mr. Kursman?

11                        CROSS-EXAMINATION

12   BY MR. KURSMAN:

13   Q.    Good morning, Dr. Crowns.

14   A.    Good morning.

15   Q.    You're a medical examiner.  Right?

16   A.    That's correct.

17   Q.    And that has been your job since you graduated medical

18   school?

19   A.    That's correct.

20   Q.    So that's been your job for the past 20 years or so?

21   A.    Yes.

22   Q.    And have you also worked as a forensic pathologist for

23   a bit, too?

24   A.    So a medical examiner and a forensic pathologist are

25   basically the same thing, and you're just saying it differently.

1  Forensic pathologists are medical examiners, but also forensic
2  pathologists are coroners' pathologists that work for coroners'
3  offices and then answer to a coroner, which I've also done that
4  as well.
5  Q.   So for the past 20 years or so, you haven't practiced
6  medicine on living patients.  Right?
7  A.   I have practiced medicine on decedents, that is correct,
8  but I still review their medical records prior to their death.
9  Q.   But to my question, you don't practice medicine on living
10  patients.  Am I right?
11  A.   That's correct.
12  Q.   And you're not a pulmonologist.  Correct?
13  A.   No.
14  Q.   And you're certainly not an anesthesiologist.  Correct?
15  A.   I am not.
16  Q.   And you don't have any specialized training in
17  anesthesiology.  Right?
18  A.   I do not.
19  Q.   And you don't have any special training in pharmacology
20  either, do you?
21  A.   Beyond my background in chemistry that I had several
22  classes in medicinal chemistry, no, I'm not a pharmacologist.
23  Q.   And are you aware of the four main categories of anesthesia?
24  A.   No.
25  Q.   You're not.  Okay.  Well, are you aware that pentobarbital

1    is not used clinically as a sole induction agent for general

2    anesthesia?

3    A.    I am not.

4    Q.    Okay.  And in an operating procedure, you wouldn't

5    be the doctor that is used to determine anesthetic depth.

6    Isn't that right?

7    A.    We have done cases in which individuals died under

8    anesthesia.  I have reviewed those, yes.

9    Q.    No, no.

10            THE COURT:  Mr. Kursman, I want to interrupt you

11   for a minute.  We've heard from Dr. Crowns before on cross-

12   examination, and I'm really going to ask you to focus your

13   questioning on Mr. Higgs' as-applied challenge.

14            MR. KURSMAN:  I apologize, Your Honor.  Ms. Lin

15   just had Dr. Crowns go in depth into his medical record, so

16   I'm just attempting to establish what his qualifications for

17   this are.

18            THE COURT:  Okay.  All right.  But we don't have all

19   day.  Thank you.  Go ahead.

20   BY MR. KURSMAN:

21   Q.    So let me repeat my question:  In an operating procedure,

22   in a procedure where they're operating on a patient, you

23   wouldn't be the doctor that's used to determine anesthetic

24   depth.  Isn't that right?

25   A.    I'm not sure what you mean by anesthetic death, because

1    I will be the individual who reviews the case if an individual

2    dies while on the operating table while getting anesthesia.

3    We've seen that in dental patients as well as operations.  It's

4    considered medical misadventure, and they will be brought into

5    the office for evaluation.  I'm not sure what you're saying.

6    Q.   Maybe my question's confusing.  I apologize.  If a patient

7    goes in for surgery and they go under anesthesia, you're not the

8    doctor that determines how deep under anesthesia they are, are

9    you?

10   A.   I'm not in an operating room helping with the -- how

11   far they are under anesthesia.  But if they die from their

12   anesthesia, I am the doctor that evaluates that death.

13   Q.   Right.  But at that point, they're dead.  Right?

14   A.   Yes.

15   Q.   Right.  And the reason you're not the doctor who determines

16   the level of anesthetic depth that they're under is because you

17   don't have special training in anesthesiology.

18            MS. LIN:  Objection, Your Honor.  This is

19   mischaracterizing the witness's testimony.  Also, we didn't

20   say anything about Dr. Crowns' expertise in anesthesia.

21   He's not an anesthesiologist.

22            THE COURT:  I think it's fair cross-examination.

23   But I'm aware that Dr. Crowns is not an anesthesiologist,

24   Mr. Kursman.  But as I said, Dr. Crowns was previously

25   cross-examined as to his qualifications, and I really -- and

I understand that Ms. Lin went into it, but that's -- you know.
That's not the purpose of this hearing today, and you didn't
object when she was going into his qualifications.  So focus
your questioning on Mr. Higgs' as-applied challenge and as to
Dr. Crowns' declaration and testimony regarding Mr. Higgs.

MR. KURSMAN:  Your Honor, if I could just respond,
the reason that this is relevant is that Dr. Crowns just
testified on direct examination that Mr. Higgs and Mr. Johnson
would be unconscious at the time that they would have suffered
from pulmonary edema.  So I need to establish that he doesn't
have that specialty.  He just told the Court that he doesn't
even know the different levels of anesthetic depth.

THE COURT:  I understand.  But that issue as to
whether pulmonary edema occurs when a plaintiff is unconscious
or not has been litigated.  I've heard testimony from experts,
including Dr. Crowns, on that particular issue, and it doesn't
go to Mr. Higgs' as-applied challenge.

I've heard testimony with regard to Dr. Crowns' expertise,
and I can certainly draw conclusions as to whether he is
qualified -- or whether he has sufficient experience to make
those statements but -- and again, you didn't object when
Ms. Lin was directing him on those qualifications.

But I'm not going to spend all day challenging Dr. Crowns'
professional qualifications.  We've been through this, especially
on the substance of the onset of flash pulmonary edema.  I spent

1   many hours on this before.

2           MR. KURSMAN:  And I apologize, Your Honor.  I'll

3   be done quickly.  I'm just trying to rebut Ms. Lin's direct

4   examination.  So I apologize.

5   BY MR. KURSMAN:

6   Q.   And you know -- I apologize.  Let me get back to where

7   I was.  And do you know how anesthesiologists determine what

8   category of anesthesia a patient is under?

9           MS. LIN:  Objection.

10          THE WITNESS:  No.

11          THE COURT:  Overruled.

12  BY MR. KURSMAN:

13  Q.   And you know that it's not just simply looking at the

14  patient and determining that they are sleeping; correct?

15  A.   I know they have criteria that they go through, but

16  I couldn't go through all the criteria that they use.

17  Q.   Okay.  Well, let me ask you this:  Do you know the pH

18  level of pentobarbital?

19  A.   I know it's alkaline, but I don't know the exact pH.

20  Q.   And when you say it's alkaline, that means it's considered

21  caustic.  Right?

22  A.   Alkaline can be caustic at certain levels, yes.

23  Q.   Well, do you know that pentobarbital has such a high

24  pH level that it's considered caustic?

25          MS. LIN:  Objection, Your Honor.  This is not within

1    the scope of --

2         THE COURT:  Mr. Kursman, there's no jury here.

3    This is not a trial.  There is no jury here.  I have heard

4    evidence on this subject for hours.  You have an as-applied

5    challenge for your client.  I suggest you get to your client.

6         MR. KURSMAN:  Your Honor --

7         THE COURT:  I've given you some leeway here, but

8    again, there's no jury present.  I have heard testimony on

9    this issue from other experts as well as Dr. Crowns.  You have

10   a particular client with particular health conditions, and I am

11   considering those conditions on this motion.

12        MR. KURSMAN:  Your Honor --

13        THE COURT:  What I'm saying is please get to the

14   meat of the matter.

15        MR. KURSMAN:  Your Honor, the reason that the pH level

16   being caustic is relevant is that is what -- that is what the

17   conditions exacerbate.  The pentobarbital is caustic, so it --

18        THE COURT:  He said it was.  He agreed with you.

19   He agreed with you.

20        MR. KURSMAN:  Okay.

21        MS. LIN:  And, Your Honor, I would just note that he

22   didn't testify, even in his declarations, anything about the pH

23   level or --

24        THE COURT:  I understand, Ms. Lin.

25        MS. LIN:  -- topic.

1          THE COURT:  I understand.  I allowed the question.

2     The point has been made.  We can move on.

3          MR. KURSMAN:  Sure.

4     BY MR. KURSMAN:

5     Q.   Are you aware that an overdose with pentobarbital can

6     cause pulmonary edema?

7     A.   Yes.

8          MR. KURSMAN:  I have nothing further, Your Honor.

9          THE COURT:  Okay.

10        Any redirect?

11         MS. LIN:  No, Your Honor.

12         THE COURT:  All right.  If there are no further

13    questions, then Dr. Crowns, you're excused.  Thank you for

14    your time.

15         THE WITNESS:  Thank you, Your Honor.  And I'd just

16    like to say Happy New Year.

17         THE COURT:  Happy New Year to you, too.

18        Okay, everyone.  We will reconvene tomorrow morning with

19    the remaining witnesses.  I will take Ms. Lin's motion to strike

20    under advisement, and I will rule on it as soon as I'm able to

21    thoroughly consider it.  Any other housekeeping matters before

22    we begin tomorrow?

23         MR. KURSMAN:  Just one, Your Honor.

24         THE COURT:  Yes, Mr. Kursman.

25         MR. KURSMAN:  I think you advised me to file the

1    exhibits on the record as well.  I don't intend to enter the

2    exhibits into evidence.  I'm just going to be using them --

3              THE COURT:  Okay.  All right.

4              MR. KURSMAN:  So if I could just email that, that

5    would be fine if that's okay with the Court.

6              THE COURT:  Well, here's the thing.  How you make your

7    record is your decision.  But if they're not filed, they're not

8    in the record.  And for appellate purposes, I mean -- it's up to

9    you.  I'm not going to require that you file them.

10             MR. KURSMAN:  Okay.

11             THE COURT:  Okay?  All right.

12             MR. KURSMAN:  Okay.  Thank you, Your Honor.

13             THE COURT:  Sure.  All right.  So we'll reconvene

14   tomorrow.  Thank you, everyone.

15             THE DEPUTY CLERK:  Judge, what time tomorrow?

16   I'm sorry.

17             THE COURT:  Yes.  Let's just double-check, because

18   we do have...

19             MS. LIN:  9 a.m.

20             THE COURT:  9 a.m.  Okay.

21             THE DEPUTY CLERK:  Thank you.

22             THE COURT:  Thank you all.

23        (Proceedings adjourned at 12:40 p.m.)

24

25

1

2                          CERTIFICATE *

3          I, BRYAN A. WAYNE, Official Court Reporter, certify

4   that the foregoing pages are a correct transcript from the

5   record of proceedings in the above-entitled matter.

6

7

8                     */s/ Bryan A. Wayne*
                      Bryan A. Wayne

9

10

11

12

13

14

15

16

17

18

19

20

21

22   * PLEASE NOTE:

23   This hearing was taken via telephone conference in compliance
     with U.S. District Court Standing Order 20-19 during the
24   COVID-19 pandemic.  Transcript accuracy may be affected by
     limitations associated with use of electronic technology,
25   including but not limited to any sound distortions and/or
     audio interferences.